03-80612



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CIV-ZLOCH

MAGISTRATE JUDGE
SNOW

**Case No.**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) |
| v. | ) |
| MICHAEL LAUER, | ) |
| LANCER MANAGEMENT GROUP, LLC, and | ) |
| LANCER MANAGEMENT GROUP II, LLC, | ) |
| Defendants, | ) |
| and | ) |
| LANCER OFFSHORE, INC., | ) |
| LANCER PARTNERS, LP, | ) |
| OMNIFUND, LTD., | ) |
| LSPV, INC., and | ) |
| LSPV, LLC, | ) |
| Relief Defendants. | ) |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges that:

### INTRODUCTION

1.     The Commission brings this action to restrain and enjoin Defendants Michael Lauer ("Lauer"), Lancer Management Group, LLC ("Lancer") and Lancer Management Group II, LLC ("Lancer II") (collectively "Defendants") from continuing to violate the federal securities laws in connection with their deliberate manipulation of the closing prices of various Over-the-Counter Bulletin Board ("OTCBB") and pink sheet quoted stocks owned by three hedge funds named Lancer Offshore, Inc. ("Offshore"), Lancer Partners LP ("Partners") and the



OmniFund, Ltd. ("OmniFund") (collectively the "Funds"). From at least March 2000 to the present, Defendants have used their portfolio pumping techniques to overstate the value of certain of the Funds' holdings in virtually worthless companies and overinflate performances and net asset values ("NAVs"). In furtherance of their devious plot, Defendants provided unfounded and unrealistic valuation opinions to Offshore's auditor to obtain audited financials for that fund. Defendants also made numerous materially false and misleading statements and omissions in the Funds' offering and marketing materials.

2.      Defendants' fraudulent manipulative trading practices and outlandish valuations were designed to attract new investors to invest and induce actual investors to forgo redemptions and continue investing in the Funds, and ultimately result in increased management fees paid to Defendants. Through Defendants' fraudulent scheme the Funds amassed hundreds of millions of dollars from investors and Defendants earned at least tens of millions of dollars in fees.

## DEFENDANTS

3.      Lauer is the founder, sole manager and principal owner of Lancer and Lancer II and the founder and investment manager for the Funds.

4.      Lancer is a Connecticut limited liability company established in December 1997 and is the investment manager for Offshore and OmniFund. Lauer is the sole manager and principal owner of Lancer.

5.      Lancer II is a Connecticut limited liability company established in November 1997. (Lancer and Lancer II collectively "Lancer Management"). Lancer II serves as the investment manager for Partners and Lauer is its sole manager and principal owner.

## **RELIEF DEFENDANTS**

6.      Offshore is a British Virgin Islands ("BVI") international business corporation ("IBC") incorporated in September 1995. Lancer is Offshore's investment manager. Offshore's most current audited financial statement represented that it had $854 million in assets as of December 31, 2001.  As of April 30, 2003, Defendants Lauer and Lancer represented that Offshore had $657 million in assets.

7.      Partners is a Connecticut limited partnership that commenced operations in November 1997.  Lancer II manages Partners and is its general partner.  Partners most current audited financial statement represented that it had $227 million in assets as of December 31, 2000.  Partners is currently in bankruptcy.

8.      OmniFund is a BVI IBC originally incorporated in January 1999 as The Orbiter Fund, Ltd. ("Orbiter").  OmniFund is the successor fund to the March 2002 merger of the Orbiter fund and The Viator Fund, Ltd. ("Viator"), another BVI IBC incorporated in September 1999. Lancer is OmniFund's investment manager.  Defendants Lauer and Lancer represented that OmniFund had $44 million in assets as of April 30, 2003.

9.      LSPV, Inc. ("Offshore LSPV") is a BVI IBC incorporated in December 2002. Offshore LSPV is a special purpose company created by Lauer to handle the redemption requests of investors in Offshore.  Each Offshore investor who requested redemption by December 31, 2002 was purportedly given a pro rata interest in Offshore LSPV having an estimated net asset value equal to their interest in Offshore as of January 2, 2003.

10.      LSPV, LLC ("Partners LSPV") is a Delaware limited liability company established in December 2002 with its principal place of business in Connecticut.  Lauer created Partners LSPV to handle the redemption requests of investors in Partners.  Each Partners investor

who requested redemption by December 31, 2002 was purportedly given a limited liability company interest in Partners LSPV having an estimated net asset value equal to their interest in Partners as of January 2, 2003.

## JURISDICTION AND VENUE

11.   This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e) and 78aa; and Section 214 of the Investment Advisers Act of 1940, 15 U.S.C. § 78u(d)(3).

12.   This Court has personal jurisdiction over Defendants and venue is proper in the Southern District of Florida because many of Defendants' acts and transactions constituting violations of the Securities Act and the Exchange Act occurred in the Southern District of Florida.

13.   Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

## FACTUAL ALLEGATIONS

14.   Lauer is the founder of three hedge funds, Partners, Offshore and Omnifund. (Hedge funds are private investment pools not deemed investment companies under the federal securities laws and not required to register with the SEC). The Funds are operated as typical hedge funds in that they are not required to register with the SEC, are open only to accredited

investors with certain net worths, have limited redemption windows and provide limited information about their holdings.

15.     The investment strategy, at least for the two largest funds – Offshore and Partners, has purportedly been "concentrated" on investments in small and mid cap companies that are "investment community pariahs." In a 1997 *Business Week* article, Lauer is quoted as stating that the Funds' "secret" is seeking out "fallen angels" - companies in which Wall Street firms have little or no interest.

16.     Lancer Management manages the Funds in exchange for a hedge fund incentive fee calculated on the basis of the Funds' performance.   Specifically, Lancer Management receives a 1% annualized advisory fee, paid quarterly, and 1% expense fee, paid annually, on the Funds' assets and an annual incentive fee calculated as of the last business day of the Funds' fiscal year equal to 20% of the net profits.

17.     Over the last three years, the Funds have relied on a few purportedly highly valued small cap issuers to comprise a substantial portion of their portfolios.   A majority of the stocks in which the Funds have been heavily invested were and/or are thinly traded on the OTCBB and pink sheets.   Despite the fact that most of the issuers in which the Funds were heavily invested had virtually no operations or earnings, Defendants assigned values to them in the hundreds of millions of dollars.  For example,

- As of December 31, 2000, 2001, 2002 and April 30, 2003, the Funds collectively held shares and warrants in Fidelity First Financial Corporation ("Fidelity First") and valued those securities in their portfolios at approximately $71 million, $163 million, $244 million and $340 million, respectively.  In 2000, Fidelity First exited the mortgage business and since that time has essentially been a non-operating, shell corporation. Fidelity First has traded on the pink sheets since November 1999.  Fidelity First had no revenues for 2001 and 2002, lost millions of dollars since 2000 and had total assets of a mere $25,101 as of December 31, 2002.

- As of December 31, 2001 and 2002, and April 30, 2003, the Funds collectively held shares in Biometrics Security Technology, Inc. (f/k/a Aug Corp.) ("Biometrics"), and valued those shares in their portfolios at approximately $115 million, $247 million and $107 million, respectively. Biometrics' common stock had been quoted on the OTCBB from December 2001 through May 23, 2003. On May 23, 2003, Biometrics was delisted from the OTCBB and it currently trades on the Pink Sheets. In 2001, Biometrics had no revenues, negative cash flow from operations of $385,593, and an accumulated deficit of $22,371,214. Biometrics' current results for all of 2002 are unknown because Biometrics' last public filing containing financial information was a Form 10-QSB for the period ended September 30, 2002, at which time Biometrics reported total revenues for the nine months of just $68,936.

- As of December 31, 2000 and 2001, the Funds collectively held shares and warrants in SMX Corp. ("SMX") and valued those securities at approximately $228 million and $173 million, respectively. SMX has traded on the pink sheets since December 2000. In fiscal 2000, SMX had no revenues and a net loss of $415,356. By December 31, 2001, SMX had revenues of $99,441, assets of a mere $1.28 million and its losses had increased to $4.31 million.

- As of December 31, 2000, 2001, 2002 and April 30, 2003, the Funds collectively held shares and warrants in XtraCard Corp. (f/k/a Nu-D-Zine, Inc.) ("XtraCard") and valued those shares in their portfolios at approximately $71 million, $204 million, $235 million and $123 million, respectively. XtraCard has traded on the pink sheets since February 2000. XtraCard earned no revenue in 2000 and 2001; in 2002 it showed revenues of only $152,407. On December 31, 2002, XtraCard had assets of less than $2 million.

- As of December 31, 2001, 2002 and April 30, 2003, the Funds collectively held shares in Total Film Group, Inc. ("Total Film") and valued those shares in their portfolios at approximately $74 million, $53 million and $59 million, respectively. Total Film traded on the OTCBB from May 2001 until April 2002 at which point it began trading exclusively on the pink sheets. In 2000-2001 Total Film had revenues of $1.8 million and a loss of $8.95 million in the nine months (ending March 31, 2001) before it stopped filing with the SEC.

18.     The values assigned to the Funds were directly tied to the closing prices of the securities in which the Funds were invested. The Partners' private placement memorandum ("PPM") provided that its net worth would be calculated as follows:

> [listed or quoted securities are to] be valued at their last sales price . . . or . . . at the mean between "bid" and "asked" prices. [If securities are not listed, their value is based on the] last closing "bid" prices if held "long" and at their last closing "asked" prices if sold "short."

19.     The Offshore and Omnifund PPMs include the same valuation methodology with the further caveat that in the event the Board of Directors determined that the above valuation of a security did not represent its market value, the Board of Directors would value the securities as it reasonably determined.

20.     As described in detail below, Defendants pumped up the values of the Funds by manipulating the month end closing prices of certain securities in which the Funds were heavily invested.   In furtherance of the fraudulent scheme, Defendants also obtained audited financials for Offshore for at least 2001 based on bogus valuation opinions they provided to that fund's auditor.

## I.     Defendants' Manipulative Trading

21.     From at least March 2000 through the present, Defendants manipulated the price of certain securities in which the Funds were and/or are heavily invested.

22.     Defendants' manipulative trading practices consisted of purchasing blocks of certain thinly traded stocks, generally at increasing prices, at or near the close of the last trading days of the month (commonly known in the securities industry as "Marking the Close"). Defendants made these purchases through brokerage accounts they controlled and with the Funds' assets.  These purchases were made with the intent to raise the closing market price of certain stocks in the Funds' portfolios.   The ultimate objective of the scheme was to overinflate the Funds' performances and NAVs to attract additional prospective investors and/or induce investors to invest additional funds, and thereby result in increased management fees.

### A.     "Marking the Close" of Fidelity First Financial Corp.

23.     On December 31, 2002 and in April 2003, Lancer Management purposefully raised the closing price of the stock of one of Partners' largest holdings, Fidelity First

(representing 21.22% of the portfolio as of December 31, 2002 and 42.82% as of April 30, 2003).

24.     On December 31, 2002, at the end of the last trading day of the year, Lancer Management placed two orders for Fidelity First stock which comprised 100% of retail purchases on that date.   These orders artificially raised the price of Fidelity First stock to $5.00 a share.  Defendants then valued all of the Funds' Fidelity First stock holdings, as of December 31, 2002, at $5.00 per share.

25.     In April 2003, Lancer Management once again "Marked the Close" by purchasing Fidelity First on April 28, 2003 through April 30, 2003, on each day as follows:

| T/Date | Lancer Order | Latest Execution | Execution Price | Closing Price | Total Volume |
|--------|--------------|------------------|-----------------|---------------|--------------|
| 4/28   | 2,000 shs.   | 4:00 PM          | $8.50           | $8.50         | 2,900 shs.   |
| 4/29   | 1,000 shs.   | 2:29 PM          | $6.50           | $6.50         | 2,500 shs.   |
| 4/30   | 500 shs.     | 2:37 PM          | $7.00           | $7.00         | 1,800 shs.   |

26.     Lancer Management dominated and controlled the market for Fidelity First common stock on the above-mentioned days because their purchases accounted for 100% of the retail purchase volume.

27.     After manipulating Fidelity First's closing price, Defendants calculated the value of the Funds' Fidelity First holdings based on the share closing price, which was a rigged price achieved through "Marking the Close."   Defendants used this overinflated value in calculating the Funds' performances and NAVs which were or are going to be disseminated to investors.

**B.      Manipulation of Biometrics Security Technology, Inc.**

28.     On December 31, 2002, the Funds collectively owned over 44,915,445 shares of Biometrics, which represented over 20% of each Funds' NAVs.  Lancer Management purchased Biometrics on December 27, 2002 through December 31, 2002, intentionally "Marking the Close" on each day as follows:

| T/Date | Lancer Order | Latest Execution | Execution Price | Closing Price | Total Reported Volume |
|--------|--------------|------------------|-----------------|---------------|------------------------|
| 12/27  | 3,609 shs.   | 3:15 PM          | $4.50           | $4.50         | 5,600 shs.             |
| 12/30  | 2,500 shs.   | 3:54 PM          | $5.10           | $5.10         | 5,300 shs.             |
| 12/31  | 12,000 shs.  | 3:57 PM          | $5.50           | $5.50         | 24,000 shs.            |

29.     Lancer Management dominated and controlled the market for Biometrics common stock on each of the above dates because Lancer Management's orders comprised 100% of the total retail purchases.

30.     After "Marking the Close," Defendants valued the Funds' Biometrics shares at the $5.50 closing price and gave the Funds' Biometrics total holdings a value of over $247 million as of December 31, 2002.  Defendants used this grossly inflated value in calculating the Funds' performances and NAVs which were disseminated to investors.

### C.     Manipulation of Lighthouse Fast Ferry, Inc.

31.     Lancer manipulated the closing price of Lighthouse Fast Ferry, Inc. ("Lighthouse") on multiple occasions.  For example, on October 31, 2001, Lancer Management purchased 40,000 shares of Lighthouse at the end of the trading day representing the largest single day volume in the month of October.   Lancer Management thereby controlled and dominated the market for Lighthouse's common stock because its purchases represented 100% of all retail purchases on that day.   Lancer Management's manipulative trading caused Lighthouse's stock price to rise dramatically on October 31, 2001 to $2.15 per share from the previous day's closing price of $1.60 per share (a 34% increase over the previous day). Defendants then valued the Funds' holdings in Lighthouse at the materially overstated value of $2.15 per share.  This greatly exaggerated value was used in calculating the Funds' performances and NAVs which were disseminated to investors.

32.     Utilizing the above-mentioned trading technique of "Marking the Close," Lancer Management successfully manipulated the closing price of Lighthouse's stock on April 30, 2001,

June 29, 2001, July 31, 2001, August 31, 2001, September 28, 2001, November 30, 2001, December 26, 2001, December 28, 2001 and December 31, 2001.  Defendants then used the rigged closing prices to value the Funds' holdings and then calculate the Funds' performances and NAVs which were publicly disseminated.

### D.     Manipulation of Other Securities in Which the Funds Were Invested

33.     From at least March 2000, Lancer Management, utilizing the trading techniques discussed above, intentionally "Marked the Close" of other securities held in its portfolio including, among others, SMX, XtraCard, Continental Southern Resources, Inc. and Total Film. Defendants then used the rigged closing prices in valuing those securities and in calculating the Funds' performances and NAVs which were disseminated to investors.

## II.     Bogus Valuations

34.     In order to obtain at least year end 2001 audited financials for Offshore, Lancer Management provided Offshore's auditor with appraisals valuing certain of that fund's holdings. These appraisals mirrored or closely approximated the values assigned to Offshore's holdings by Defendants based on the manipulated closing prices at month end.  These valuation reports were, however, fatally flawed and did not reflect the true values of Offshore's holdings under the generally accepted Uniform Standards of Professional Appraisal Practice or American Society of Appraisers Business Valuation Standards.  For example, the valuations were improperly based on unreliable market prices of thinly traded securities; unjustified prices of private transactions in thinly traded securities; unfounded, baseless and unrealistic projections; hypotheticals; and/or an averaging of various factors.  Indeed, under accepted standards of valuing businesses, certain of the Funds' holdings were and/or are essentially worthless.

III.     **Material Misrepresentations and Omissions**
         **in Offering and Marketing Materials**

35.      Defendants made materially false and misleading statements in offering materials and newsletters about, among other things, the Funds' holdings, performances, values and management backgrounds.

A.       **Misrepresentations in the Private Placement Memoranda**

36.      The Partners' May 8, 2001 PPM and Offshore's February 15, 2002 PPM, promulgated by Defendants, misrepresented the type of investments those funds would make and the availability of audited financial statements.  Specifically, both PPMs represented that most investments made by Partners and Offshore would trade on "listed exchanges." In truth, a majority of those funds' investments were and are on unlisted exchanges such as the OTCBB or pink sheets.  Furthermore, the Partners' PPM stated that investors would receive yearly audited financials upon request.  Partners has not obtained audited financials since the year ended 2000 and repeatedly refused at least one investor's requests for audited financials for the year ended 2001.

37.      Offshore's PPM, dated February 15, 2002, promulgated by Defendants, also stated, under a section titled "Investment Restrictions," that Offshore may "not take or seek to take legal or management control of the issuer of any underlying investments."  In direct contravention of this restriction, Offshore repeatedly acquired majority ownership over several small issuers.  For example, Offshore owned over 72% of SMX as of December 31, 2001, over 87% of Fidelity First as of December 31, 2002, over 96% and 78% of Biometrics as of December 31, 2001 and 2002, respectively, and over 94% of XtraCard as of December 26, 2000.

## B.     False and Misleading Marketing Materials

38.     Monthly newsletters and other marketing materials sent to investors by Defendants through the Funds, generally under Lauer's name, were replete with falsehoods.

39.     A July 2000 Partners newsletter stated that U.S. Industries, which is listed on the New York Stock Exchange ("NYSE"), is "one of our significant positions." However, U.S. Industries made up a mere 1.36% of Partners' portfolio value as of June 30, 2000.

40.     A September 2001 newsletter stated that the Funds held shares of DRS Technologies Inc., a NYSE listed firm; in reality, they did not own a single share of that company.

41.     In a May 2002 newsletter, Defendants claimed that the Funds' year to date growth came from taking profits in 2002 on their equity holdings in Hyperion Solutions, Perkin Elmer, Plantronics, TRW, Teledyne Tech., Terex, Tyco International and U.S. Industries. Partners did not hold any Platronics, Terex, Teledyne or TRW securities during that time period. Offshore did not hold any Terex or TRW securities at that time.

42.     Defendants also disseminated a personnel list, at a date unknown, and a newsletter on September 11, 2002, to investors relating to the background of Bruce Cowen ("Cowen"). The personnel list placed Cowen directly below Lauer and described, among other things, Cowen's stint as chief financial officer and later president of TRC Companies, Inc. The newsletter stated that Cowen was a consultant for Lancer Management and praised his professional background by stating "his personal achievements speak for themselves." Neither Defendants' personnel list nor their September 11, 2002 newsletter disclosed that Cowen was enjoined, fined and also barred from serving as an officer or director of a public company for five years for his fraudulent

conduct involving, among other things, misallocating to himself securities while serving as CFO and later president of TRC Companies, Inc.

43.     Defendants also misled investors in the September 2002 newsletter in stating that "Methods Products Corporation was a *small position*.... If it is successful, the pay off could be substantial. If not, it will turn into a *minor write-off*" (emphasis added). Offshore's holdings in Methods Product Corporation would not by any stretch of the imagination result in a "minor write-off" if unsuccessful. As of August 31, 2002, Methods Production Corporation made up 3.33% or $33.45 million of Offshore's portfolio.

44.     A January 13, 2003 newsletter stated that the Funds owned the Credit Store, Inc. "a number of years ago" and that the stock had "no influence on valuations for a number of years." In fact, the Funds held over 10 million shares as recently as May 2002 and the shares ranged in value from approximately 2.22% to 5.97% of Partners and approximately 1.52% to 4.63% of Offshore during the time period of August 2000 to August 2001.

45.     The January 13, 2003 newsletter also announced that Lancer Management "upgraded" its board of directors to include "John Bendall" ("Bendall"). The newsletter claimed that Bendall "runs a successful New York based institutional investment banking/brokerage boutique and with over 30 years in the business, possesses a very extensive knowledge base..." This statement was misleading because from 1968 to 1977 Bendall was barred from associating with any broker or dealer.

**IV.     Lauer's Role in the Scheme**

46.     Lauer is the founder of the Funds and Lancer Management and directly or indirectly controlled and controls the Funds' trading strategies. Partners' May 8, 2001 PPM states that Lauer is solely responsible for the operations and activities of that Fund. Offshore's

February 5, 2002 PPM states that Lauer is the sole manager of Lancer Management and as such he determines the allocation of capital to investment strategies. Lauer reviewed the Funds' trades almost daily.

47.     The Funds' newsletters are often sent to investors under Lauer's name and he is featured prominently in all of the Funds' PPMs and marketing materials. In addition, Lauer executed the documents necessary to acquire the majority ownership of the shell companies used to overvalue the portfolios and made on-going funding decisions to keep these shell companies from shutting  or scaling down. Further, externally generated valuation reports for the Funds' holdings were addressed to Lauer. Finally, Lauer had and has the ultimate decision-making authority and participates in the day-to-day management of Lancer Management.

48.     Lauer directly benefited from the manipulative and fraudulent conduct. Lancer Management's fees were directly related to the Funds' performances. As a result of the overstated values and performances, the Funds attracted new investors, lured existing investors to forgo redemptions and continue investing in the Funds and thereby resulted in exorbitant management fees which would not have otherwise been realized.

49.     As a result of the foregoing, Defendants knew or were severely reckless in not knowing that they were "Marking the Close" to overvalue the Funds' holdings and then grossly overinflating the Funds' performances and NAVs. Defendants likewise knew or were severely reckless in not knowing that the appraisals they provided to Offshore's auditor were completely unrealistic and not in accordance with accepted appraisal standards. Finally, Defendants also knew or were severely reckless in not knowing that the Funds' newsletters and PPMs were blatantly false and misleading.

14

## COUNT I

### FRAUD IN VIOLATION OF
### SECTION 17(a)(1) OF THE SECURITIES ACT

50.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint.

51.     Since a date unknown, but since at least from March 2000 through the present, Defendants Lauer, Lancer and Lancer II, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this Complaint, have been, knowingly, willfully or recklessly employing devices, schemes or artifices to defraud.

52.     By reason of the foregoing, Defendants Lauer, Lancer and Lancer II, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT II

### FRAUD IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER

53.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint.

54.     Since a date unknown, but since at least from March 2000 through the present, Defendants Lauer, Lancer and Lancer II, directly and indirectly, by use of the means and instrumentality of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this Complaint, have been, knowingly, willfully or recklessly: (a) employing devices, schemes or artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaging in

acts, practices and courses of business which have operated, are now operating and will operate as a fraud upon the purchasers of such securities.

55.     By reason of the foregoing, Defendants Lauer, Lancer and Lancer II, directly or indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240. 10b-5, thereunder.

## COUNT III

### FRAUD IN VIOLATION OF
### SECTIONS 17(a)(2) AND 17(a)(3) OF THE SECURITIES ACT

56.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint.

57.     Since a date unknown, but since at least from March 2000 through the present, Defendants Lauer, Lancer and Lancer II, directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities, as described in this Complaint, have been: (a) obtaining money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (b) engaging in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

58.     By reason of the foregoing, Defendants Lauer, Lancer and Lancer II, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

## COUNT IV

### SECTION 20(a) – CONTROL PERSON – LIABILITY FOR LANCER AND LANCER II'S VIOLATIONS OF SECTION 17(a) OF THE SECURITIES ACT AND SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5, THEREUNDER

#### (Solely as to Defendant Lauer)

59.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint.

60.     Since a date unknown, but since at least from March 2000 through the present, Defendant Lauer has been, directly or indirectly, a control person of Defendants Lancer and Lancer II for purposes of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

61.     Since a date unknown, but since at least March 2000 through the present, Defendants Lancer and Lancer II violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, and Sections 206(1) and (2) of the Advisers Act.

62.     As a control person of Lancer and Lancer II, Defendant Lauer is jointly and severally liable with and to the same extent as Lancer and Lancer II for their violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, thereunder and Sections 206(1) and (2) of the Advisers Act during this time period.

## COUNT V

### FRAUD IN VIOLATION OF SECTIONS 206(1) AND 206(2) OF THE ADVISERS ACT

63.     The Commission repeats and realleges paragraphs 1 through 49 of this Complaint.

64.     Since a date unknown but since at least from March 2000 through the present, Defendants Lauer, Lancer and Lancer II, by use of the mails or means or instrumentalities of interstate commerce, directly or indirectly, has been, knowingly, willfully or recklessly:  (i) employing devices, schemes or artifices to defraud their clients or prospective clients; and (ii)

engaging in transactions, practices and courses of business which are now operating and will operate as a fraud or deceit upon their clients or prospective clients.

65.    By reason of the foregoing, Defendants Lauer, Lancer and Lancer II have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I. Declaratory Relief

Declare, determine and find that Defendants Lauer, Lancer and Lancer II committed the violations of the federal securities laws alleged in this Complaint.

### II. Temporary Restraining Order, Preliminary and Permanent Injunctive Relief

Issue a Temporary Restraining Order, a Preliminary Injunction and a Permanent Injunction, restraining and enjoining:

(a)    Defendants Lauer, Lancer and Lancer II, their officers, representatives, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a); Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; and Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3); and Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and (2).

### III. Disgorgement

Issue an Order requiring Defendants Lauer, Lancer and Lancer II and Relief Defendants Offshore, Partners, OmniFund, Offshore LSPV and Partners LSPV to disgorge all ill-gotten

profits or proceeds that they have received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest.

### IV. Penalties

Issue an Order directing Defendants Lauer, Lancer and Lancer II to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78(d)(3) and Section 217 of the Advisers Act, 15 U.S.C. § 80b-17.

### V. Asset Freeze and Accounting

Issue an Order temporarily freezing the assets of Defendants Lauer, Lancer and Lancer II and Relief Defendants Offshore, OmniFund, Offshore LSPV and Partners LSPV until further Order of the Court, and requiring accountings by Defendants Lauer, Lancer and Lancer II and Relief Defendants Offshore, Partners, OmniFund, Offshore LSPV and Partners LSPV.

### VI. Records Preservation and Expedited Discovery

Issue an Order requiring Defendants Lauer, Lancer and Lancer II and Relief Defendants Offshore, Partners, OmniFund, Offshore LSPV and Partners LSPV to preserve any records related to the subject matter of this lawsuit that are in their custody, possession or subject to their control, and to respond to discovery on an expedited basis.

### VII. Repatriation of Investor Proceeds

Issue an Order requiring Defendants Lauer, Lancer and Lancer II and Relief Defendants Offshore, Omnifund, Offshore LSPV and Partners LSPV to take such steps as are necessary to repatriate to the territory of the United States all funds and assets of investors described in the Commission's Complaint in this action which are held by them or are under their direct or indirect control, jointly or singly, and deposit such funds into the registry of the United States

District Court for the Southern District of Florida, and provide the Commission and the Court a written description of the funds and assets so repatriated.

## VIII.  Appointment of Receiver

Issue an Order appointing a Receiver over the assets of Defendants Lancer and Lancer II and Relief Defendants Offshore, Omnifund, Offshore LSPV and Partners LSPV to marshal and safeguard all of said assets, and any other duties the Court deems appropriate, and to prepare a report to the Court and the Commission detailing the activities of Defendants Lancer and Lancer II and Relief Defendants Offshore, Partners, OmniFund, Offshore LSPV and Partners LSPV  and the whereabouts of investor funds.

## IX.  Further Relief

Grant such other and further relief as may be necessary and appropriate.

## X.  Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

July 8, 2003                    By: _____
                                    Kerry A. Zinn
                                    Senior Trial Counsel
                                    Florida Bar No. 0118559
                                    Direct Dial: (305) 982-6379

                                    Christopher E. Martin
                                    Senior Trial Counsel
                                    SD Fla. Bar. No. A5500747
                                    Direct Dial: (305) 982-6386
                                    Attorneys for Plaintiff
                                    **SECURITIES AND EXCHANGE COMMISSION**
                                    801 Brickell Avenue, Suite 1800
                                    Miami, Florida 33131
                                    Telephone: (305) 982-6300
                                    Facsimile: (305) 536-4154

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

SECURITIES AND EXCHANGE COMMISSION

CIV-ZLOCH

**DEFENDANTS** MICHAEL LAUER, LANCER MANAGEMENT GROUP, LLC, and LANCER MANAGEMENT GROUP II, LLC, Defendants, and LANCER OFFSHORE, INC., LANCER PARTNERS, LP, OMNIFUND, LTD., LSPV, INC., and LSPV, LLC, Relief Defendants.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF

(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Fairfield

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

MAGISTRATE JUDGE

UPB 03CV80612 2/0x4

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

SEC, Kerry Zinn, Esq. (305) 982-6379
801 Brickell Ave., Suite 1800, Miami, FL 33131

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE   HIGHLANDS

| II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY) | III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only) | | |
|---|---|---|---|

|  |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|
| ☒ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
|  |  | Citizen or Subject of a ☐ 3 Foreign Country | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. § 77q(a)(1); 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; 15 U.S.C. §§ 77q(a)(2) and

LENGTH OF TRIAL   77q(a)(3); 15 U.S.C. §§ 80b-6(1) and (2).  Violations of the federal securities laws.

via __7 days estimated for (both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $   Prel. and Perm. Inj. Disgorgement/Penalties

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

**VIII. RELATED CASE(S)** (See instructions)
**IF ANY**   JUDGE _____   DOCKET NUMBER _____

DATE   07/08/03

SIGNATURE OF ATTORNEY OF RECORD   Kerry A. Zinn, Esq.

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____