03 - 80612

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.

_____

SECURITIES AND EXCHANGE COMMISSION, )
 )
   Plaintiff, )
 )
   v. )
 )
MICHAEL LAUER, )
LANCER MANAGEMENT GROUP, LLC, and )
LANCER MANAGEMENT GROUP II, LLC, )
 )
   Defendants, )
and )
 )
LANCER OFFSHORE, INC., )
LANCER PARTNERS, LP, )
OMNIFUND, LTD., )
LSPV, INC., and )
LSPV, LLC, )
 )
   Relief Defendants. )
_____)

### EXHIBITS IN SUPPORT OF THE MOTION AND MEMORANDUM OF LAW FOR EX PARTE TEMPORARY RESTRAINING ORDER AND OTHER RELIEF AND THEREAFTER PRELIMINARY INJUNCTION

### VOLUME 1

<u>EX. #</u>    <u>DESCRIPTION</u>

1.   Lancer Management Group, LLC ("Lancer") Incorp. Papers
2.   Lancer Management Group II, LLC Incorp. Papers
3.   Lancer Offshore, Inc.'s ("Offshore") PPM
4.   Lancer Partners, LP ("Partners") PPM
5.   Omnifund, Ltd.'s ("Omnifund") PPM
6.   Offshore Incorp. Papers
7.   Offshore Audited Financial Statements, 12/31/01 and 2000
8.   Offshore's Portfolio as of 4/30/03
9.   Partners Incorp. Papers
10.   Partners Audited Financial Statements, 12/31/00
11.   Omnifund Incorp. Papers



| EX. # | DESCRIPTION |
|---|---|
| 12. | Omnifund's Portfolio as of 4/30/03 |
| 13. | LSPV, Inc. ("Offshore LSPV") Incorp. Papers |
| 14. | Offshore Newsletter dated 1/2/03 |
| 15. | LSPV, LLC ("Partners LSPV") Incorp. Papers |
| 16. | Partners Letter dated 2/3/03 |
| 17. | Lancer Group Objectives |
| 18. | 1997 Business Week Article |
| 19. | Funds Portfolio as of 12/31/00 |
| 20. | Funds Portfolio as of 12/31/01 |
| 21. | Funds Portfolio as of 12/31/02 |
| 22. | Declaration of Harold Schimkat |

# EXHIBIT 1

FILING #0001783145 PG  01 OF  01 VOL B-00160
FILED 12/11/1997 01:35 PM PAGE   03428
SECRETARY OF THE STATE
CONNECTICUT SECRETARY OF THE STATE

# ARTICLES OF ORGANIZATION
## OF
## LANCER MANAGEMENT GROUP, LLC

**State of Connecticut**
**Secretary of State**

The undersigned, organizer of a limited liability company under the Connecticut Limited Liability Company Act, does hereby certify that:

1.   The name of the limited liability company is Lancer Management Group, LLC.

2.   The nature of business to be transacted or the purpose to be promoted or carried out by the limited liability company is to act as general partner of one or more investment limited partnerships or other entities and provide advisory services in connection therewith.

3.   The principal office address is 980 Post Road East, Westport, CT 06880.

4.   The statutory agent for service of process is Michael Lauer whose business address is 980 Post Road East, Westport, CT 06880 and whose residence address is 51 Keelers Ridge, Wilton, CT  06897.

5.   The management of the limited liability company shall be vested in a manager.

## EXECUTION

Dated this ___9th___ day of December, 1997.

Robert G. Leonard
Name of Organizer

Signature

Acceptance of appointed statutory agent.

Michael Lauer
Name

Signature

Rec
cc

CSC

THE UNITED STATES
CORPORATION
C O M P A N Y
30 High Street
Hartford, CT  06103

# EXHIBIT 2

FILING #0001778556 PG  01 OF  01 VOL B-00158
FILED 11/24/1997 02:15 PM PAGE  01267
SECRETARY OF THE STATE
CONNECTICUT SECRETARY OF THE STATE

# ARTICLES OF ORGANIZATION
## OF
### LANCER MANAGEMENT GROUP II, LLC.

State of Connecticut
Secretary of State

The undersigned, organizer of a limited liability company under the Connecticut Limited Liability Company Act, does hereby certify that: 

1.   The name of the limited liability company is Lancer Management Group II, LLC.

2.   The nature of business to be transacted or the purpose to be promoted or carried out by the limited liability company is to act as general partner of one or more investment limited partnerships or other entities and provide advisory services in connection therewith.

3.   The principal office address is 980 Post Road East, Westport, CT 06880.

4.   The statutory agent for service of process is Michael Lauer whose business address is 980 Post Road East, Westport, CT 06880 and whose residence address is 51 Keelers Ridge, Wilton, CT 06897.

5.   The management of the limited liability company shall be vested in a manager.

## EXECUTION

Dated this 19th day of November, 1997.

Robert G. Leonard

Name of Organizer

Signature

Acceptance of appointed statutory agent.

Michael Lauer
Name

Signature

CSC
THE UNITED STATES
CORPORATION
COMPANY
30 High Street
Hartford, CT 06103

79829.1

# EXHIBIT 3

A00474

NAME OF OFFEREE _____   MEMORANDUM NO. _____

**PLACEMENT MEMORANDUM**

Relating to Shares of Capital Stock

of Par Value U.S. $1.00 Per Share

of

# LANCER OFFSHORE, INC.
(A British Virgin Islands Corporation)

Investment Manager:

**LANCER MANAGEMENT GROUP, LLC**

Administrator:

**CITCO FUND SERVICES (CURACAO) N.V.**

February 15, 2002

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SHARES
DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON OR ENTITY TO WHOM IT IS
UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

# LANCER OFFSHORE, INC.

A00475

Lancer Offshore, Inc. (the "Fund") is a corporation incorporated under the laws of the British Virgin Islands on September 27, 1995. The Fund was formed to pool investment funds of non-U.S. Persons and Permitted U.S. Persons (as such terms are defined below) for the purpose of investing, trading and dealing in securities, traded in the United States and elsewhere, of all kinds and descriptions, including but not limited to, equity, debt, convertible securities, preferred stock, options, warrants, trade claims and monetary instruments, all as determined by the Fund's Investment Manager (as defined below). The Investment Manager believes that in the small to middle capitalized financial markets, its contrarian bias and emphasis on anticipatory timing of future corporate developments will enable the Fund to achieve significantly above average capital returns while exposing the Fund to what the Investment Manager believes will be reasonable risks as compared to potential rewards. See "*INVESTMENT PROGRAM*". There is no assurance that the Fund's objective will be achieved, and investment results may vary substantially on a quarterly and annual basis.

The Fund's assets are managed by Lancer Management Group, LLC (the "Investment Manager"), a limited liability company formed under the laws of the State of Connecticut, United States of America. Michael Lauer is the sole manager and principal owner of the Investment Manager and, as such, he controls the operations and activities of the Investment Manager. The Investment Manager also serves as the sole investment manager of the Viator Fund, Ltd. ("VFL") and the Orbiter Fund, Ltd. ("OFL"), both of which are British Virgin Islands companies. Mr. Lauer is also the sole manager and principal owner of Lancer Management Group II, LLC ("LMG II"), a Connecticut limited liability company, which is the sole general partner of Lancer Partners, Limited Partnership, a Connecticut investment limited partnership formed in November 1997 to succeed by merger to, and carry on the business of, Lancer Partners, L.P. which was formed in December 1994 (collectively, "LPLP"). The Fund's investment program is similar to that of LPLP.

The Fund is offering (the "Offering") shares of par value $1.00 per share (the "Shares"; all "$" references herein are to U.S. dollars), to persons and entities (collectively, "Offerees") outside the United States who are not U.S. Persons and inside the United States to a limited number of Offerees that are Permitted U.S. Persons, and who meet other suitability requirements. The minimum initial subscription for Shares is $1,000,000, subject to the Fund's board of directors (the "Board of Directors"), in its sole and absolute discretion, right to accept lesser amounts, but in no event shall the initial subscription be for less than $100,000. The minimum subscription for additional Shares is $100,000. Generally, Shares may be purchased on a monthly basis and redeemed on a quarterly basis, subject to the Redemption Charge (as defined below) for redemptions occurring during a shareholder's (individually, "Shareholder" and collectively, "Shareholders") first year as a Shareholder of the Fund.

CITCO Fund Services (Curaçao) N.V. (the "Administrator") will make available to each Offeree or its authorized representative, prior to subscribing for Shares in this Offering, the opportunity to ask questions of, and receive answers from, the Administrator or a person acting on its behalf, concerning the terms and conditions of this Offering, and to obtain any additional information, to the extent that the Administrator possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information set forth herein. Please direct inquiries to the Administrator at Tel. No. (599-9) 732-2222.

The Shares are admitted to the Official List of the Irish Stock Exchange. This document comprises listing particulars in respect of such application. The Directors do not anticipate that an active secondary market will develop in the Shares. No application has been made to list the Shares on any other stock exchange.

The Directors of the Company, whose names appear on Page (v) herein, accept responsibility for the information contained in this document. To the best of the knowledge and belief of the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in this Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information. The Directors accept responsibility accordingly.

(i)

THE SHARES BEING OFFERED HEREBY HAVE NOT BEEN APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC") OR BY ANY OTHER GOVERNMENTAL AUTHORITY AND NEITHER THE SEC NOR ANY SUCH OTHER AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  IT IS ANTICIPATED THAT THE OFFERING AND SALE WILL BE EXEMPT FROM REGISTRATION UNDER THE UNITED STATES FEDERAL SECURITIES ACT OF 1933, AS AMENDED ("1933 ACT") AND THAT THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("ICA").

PURCHASE OF THE SHARES INVOLVES A HIGH DEGREE OF RISK.  SEE "CERTAIN RISK FACTORS".  CONFLICTS OF INTEREST BETWEEN THE INVESTMENT MANAGER AND THE FUND MAY ARISE IN VARIOUS CIRCUMSTANCES.  SEE "CONFLICTS OF INTEREST".

OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT OR OTHER ADVICE.  OFFEREES SHOULD REVIEW THIS MEMORANDUM AND ALL OTHER DOCUMENTS RECEIVED IN CONNECTION WITH THE OFFERING WITH THEIR LEGAL COUNSEL, ACCOUNTANT, BUSINESS AND TAX ADVISOR ON WHOSE OPINIONS THEY SHOULD RELY AS TO ALL LEGAL, TAX, REGULATORY, FINANCIAL AND RELATED MATTERS CONCERNING AN INVESTMENT IN SHARES.  OFFEREES SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING AND DISPOSAL OF SHARES, AND ANY FOREIGN EXCHANGE OR OTHER RESTRICTIONS THAT MAY BE RELEVANT THERETO.  A REPRESENTATION TO THAT EFFECT IS REQUIRED TO BE MADE BY EACH OFFEREE ACQUIRING SHARES.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE SHARES IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW.  NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT AN OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE.  ACCORDINGLY, SHARES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED, IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION.  SHARES THAT ARE ACQUIRED BY OFFEREES NOT ENTITLED TO HOLD THEM WILL BE COMPULSORILY REDEEMED.  THE BOARD OF DIRECTORS RESERVES THE RIGHT TO REFUSE ANY SUBSCRIPTION ON THE BASIS OF ANY OFFEREE'S FAILURE TO MEET THE SUITABILITY CRITERIA DESCRIBED HEREIN OR FOR ANY OTHER REASON.

THIS IS A PRIVATE OFFERING, MADE ONLY BY DELIVERY OF A COPY OF THIS MEMORANDUM TO THE OFFEREE WHOSE NAME APPEARS HEREON AND THIS MEMORANDUM MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE.  ANY DISTRIBUTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.  THE OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM TO THE ADMINISTRATOR IF THE OFFEREE DOES NOT PURCHASE SHARES.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE OFFERING OF SHARES EXCEPT FOR THIS MEMORANDUM AND THE SUBSCRIPTION DOCUMENT BOOKLET WHICH WILL BE DELIVERED TO OFFEREES THAT ARE INTERESTED IN ACQUIRING SHARES.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS, OR FURNISH ANY INFORMATION, WITH RESPECT TO THE FUND OR SHARES, OTHER THAN THE REPRESENTATIONS AND INFORMATION SET FORTH IN THIS

(ii)

MEMORANDUM, THE SUBSCRIPTION DOCUMENT BOOKLET AND THE DOCUMENTS AND INFORMATION FURNISHED BY THE FUND UPON REQUEST, AS DESCRIBED BELOW AND ANY REPRESENTATION OR INFORMATION NOT CONTAINED IN ANY OF THE FOREGOING DOCUMENTS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND OR INVESTMENT MANAGER.

THE DELIVERY OF THIS MEMORANDUM DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE ON THE COVER HEREOF. EACH OFFEREE IS INVITED TO ASK QUESTIONS AND OBTAIN ADDITIONAL INFORMATION FROM THE FUND, OUTSIDE OF THE UNITED STATES, CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND ANY OTHER RELEVANT MATTERS (INCLUDING BUT NOT LIMITED TO, ADDITIONAL INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN) TO THE EXTENT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

THIS MEMORANDUM DOES NOT CONTAIN ANY UNTRUE STATEMENT OF MATERIAL FACT OR OMIT TO STATE A MATERIAL FACT NECESSARY TO MAKE THE STATEMENTS MADE, IN LIGHT OF THE CIRCUMSTANCES IN WHICH THEY WERE MADE, NOT MISLEADING. THIS MEMORANDUM CONTAINS SUMMARIES, BELIEVED BY THE DIRECTORS AND INVESTMENT MANAGER TO BE ACCURATE, OF CERTAIN TERMS OF CERTAIN DOCUMENTS, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS (COPIES OF WHICH ARE AVAILABLE FROM THE FUND) FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE.

THE SHARES ARE SUITABLE ONLY FOR SOPHISTICATED OFFEREES WHO ARE EITHER NOT U.S. PERSONS OR PERMITTED U.S. PERSONS, WHO DO NOT REQUIRE IMMEDIATE LIQUIDITY OF THEIR INVESTMENT, FOR WHOM AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE FUND'S INVESTMENT PROGRAM. OFFEREES THAT SUBSCRIBE FOR SHARES MUST REPRESENT THAT THEY ARE ACQUIRING THE SHARES FOR INVESTMENT PURPOSES ONLY. THE TRANSFER OF SHARES IS SUBJECT TO LIMITATIONS IMPOSED BY THE FUND'S MEMORANDUM AND ARTICLES OF ASSOCIATION.

IMPORTANT INFORMATION REQUIRED BY UNITED STATES FEDERAL AND STATE LAWS AND THE LAWS OF OTHER JURISDICTIONS IS ATTACHED TO THIS MEMORANDUM AS <u>APPENDIX A</u>.   YOU ARE URGED TO READ THIS INFORMATION CAREFULLY.

NEITHER THE ADMISSION OF THE SHARES TO THE OFFICIAL LIST NOR THE APPROVAL OF THESE LISTING PARTICULARS PURSUANT TO THE LISTING REQUIREMENTS OF THE IRISH STOCK EXCHANGE SHALL CONSTITUTE A WARRANTY OR REPRESENTATION BY THE IRISH STOCK EXCHANGE AS TO THE COMPETENCE OF SERVICE PROVIDERS TO OR ANY OTHER PARTY CONNECTED WITH THE FUND, THE ADEQUACY OF INFORMATION CONTAINED IN THESE LISTING PARTICULARS OR THE SUITABILITY OF THE FUND FOR INVESTMENT PURPOSES

## TABLE OF CONTENTS

| Caption | Page |
|---|---|
| DIRECTORY | v |
| SUMMARY | vi |
| THE INVESTMENT MANAGER | 1 |
| INVESTMENT PROGRAM | 2 |
| INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES | 6 |
| CERTAIN RISK FACTORS | 8 |
| CONFLICTS OF INTEREST | 13 |
| THE FUND | 14 |
| THE OFFERING | 16 |
| DETERMINATION OF OFFERING PRICE | 19 |
| DETERMINATION OF NET ASSET VALUE | 24 |
| TRANSFER AND REDEMPTION | 26 |
| CERTAIN TAX CONSIDERATIONS | 28 |
| INVESTMENT BY U.S. TAX EXEMPT ENTITIES – ERISA CONSIDERATIONS | 32 |
| ADMINISTRATION | 34 |
| SUBSCRIPTION PROCEDURES | 37 |
| MISCELLANEOUS | 38 |
| APPENDIX A – REQUIRED DISCLOSURES | 40 |

## DIRECTORY

**Registered Office**

CITCO Building
Wickams Cay
Road Town, Tortola
British Virgin Islands

**Directors of the Fund**

John W. Bendall, Jr.
Dr. Richard Geist

**Administrator, Registrar and Transfer Agent:**

CITCO Fund Services (Curaçao) N.V.
Kaya Flamboyan 9
P.O. Box 812
Curaçao, Netherlands Antilles
Telephone:      (599-9) 732-2222
Telecopier:      (599-9) 732-2225

**Fund U.S. Legal Counsel**

Robinson Silverman Pearce Aronsohn
& Berman LLP
1290 Avenue of the Americas
New York, NY 10104
United States of America

**Sponsoring Broker to the Irish Stock Exchange
and Paying Agent**

J & E Davy
Davy House
49 Dawson Street
Dublin 2
Republic of Ireland

**Investment Manager**

Lancer Management Group, LLC
350 Bedford Street
Stamford, CT 06901
Telephone:  (203) 977-7700
Telecopier:  (203) 977-8360

**Prime Broker**

Banc of America Securities, LLC
9 West 57th Street
New York, NY 10019

**Auditor for the Fund**

PricewaterhouseCoopers
Chartered Accountants
Julianaplein 38
P.O. Box 360
Curaçao, Netherlands Antilles

**Fund British Virgin Islands Special Counsel**

Conyers Dill & Pearman
Romasco Place
Wickham's Cay I
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

(v)

## SUMMARY

The following is a summary of certain information set forth more fully elsewhere in this Memorandum and is qualified by other information contained in this Memorandum and by the Fund's Memorandum of Association and Articles of Association (collectively, "Articles"), copies of which are available from the Fund. Copies may also be inspected at the offices of the Sponsoring Broker to the Irish Stock Exchange.

**Offerees should read the entire Memorandum and the Articles carefully before making any investment decision regarding the Fund and should pay particular attention to the information in this Memorandum under the heading "*CERTAIN RISK FACTORS*". In addition, Offerees should consult their own advisers in order to understand fully the consequences of an investment in the Fund.**

| | |
|---|---|
| **The Fund** | Lancer Offshore, Inc. (the "Fund") is a British Virgin Islands corporation. The Fund has been established to give investors an opportunity to participate in an investment program similar to that of Lancer Partners, Limited Partnership ("LPLP"), a limited partnership organized in November 1997 in the State of Connecticut, United States of America. LPLP is the successor by merger to Lancer Partners, L.P., a limited partnership organized in December 1994. See "*THE FUND*". |
| **Investment Objective** | The Fund's objective is to seek high economic return primarily through capital appreciation while attempting to control risk. The Investment Manager does not intend to adhere to any one particular investment strategy. Rather, the Investment Manager intends to follow a flexible approach so as to attempt to be in the best position to capitalize on opportunities in the financial markets. |
| | The Investment Manager believes that in the small to middle capitalized financial markets, its bottom-up value approach combined with its contrarian bias and emphasis on anticipatory timing of future corporate developments will enable the Fund to achieve significantly above average capital returns while exposing the Fund to what the Investment Manager believes will be reasonable risks as compared to potential rewards. |
| **Investment Manager** | The Investment Manager is Lancer Management Group, LLC, a limited liability company formed in 1997 under the laws of the State of Connecticut, United States of America (the "Investment Manager"). The Investment Manager is the successor by merger to Lancer Management Group, LLC, a New York limited liability company, which had been the investment manager for the Fund since its inception. The Investment Manager has entered into an investment management agreement (the "Investment Management Agreement") with the Fund and is responsible for the investment of the Fund's assets, subject to the policies and control of the Board of Directors. Michael Lauer is the sole manager and principal owner of the Investment Manager and, as such, he controls the operations and activities of the Investment Manager. The Investment Management Agreement is effective through December 31, 2005, and is automatically extended for additional five (5) year terms thereafter, except that it may be terminated upon ninety (90) days' written notice by either of the parties at the end of the initial term or at the end of any renewal term. See |

*"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES".*

**Listing**

The Shares are admitted to the Official List of the Irish Stock Exchange. There can be no assurance, however, that such listing will be maintained. The Directors do not anticipate that an active secondary market will develop in the Shares. No application has been made to list the Shares on any other stock exchange. See *"TRANSFER AND REDEMPTION".*

**Eligibility Requirements**

Shares will be sold outside the United States solely to Offerees that are not U.S. Persons and inside the United States solely to a limited number of Offerees that are Permitted U.S. Persons. At no time will: (i) Benefit Plan Investors (as defined below) be allowed to own twenty-five (25%) percent or more of the outstanding Shares; or (ii) Permitted U.S. Persons be allowed to own fifty (50%) percent or more of the outstanding Shares. All Permitted U.S. Persons must be either Accredited Investors (as defined below) or Sophisticated Investors (as defined below). The Board of Directors, in its sole and absolute discretion, may decline to accept the subscription of any prospective Shareholder. See *"THE OFFERING-Suitability".*

**Minimum Subscription**

The minimum initial subscription is $1,000,000; however, the Board of Directors, in its sole and absolute discretion, may accept subscriptions of lesser amounts, but in no event less than $100,000. Thereafter, the minimum subscription for additional Shares is $100,000. See *"THE OFFERING".*

**The Shares**

The Shares have a par value of $1.00 per share (the "Shares") and have equal dividend, distribution, liquidation and voting rights. See *"THE FUND".*

**Offering of Shares**

The Fund may offer Shares on the first Business Day (for purposes hereof, the term "Business Day" shall mean any day on which securities are traded on the New York Stock Exchange) of each month or at such other times as the Board of Directors, in its sole and absolute discretion, may allow, at a purchase price per Share equal to the Offering Price (as defined below) per Share as of the close of business on the preceding Business Day. As at January 31, 2002 the Offering Price was $927.15 per Share. The Investment Manager, in its sole and absolute discretion, may pay referral fees to unaffiliated eligible persons who introduce prospective Shareholders to the Fund and be reimbursed by the Fund for such referral fees to the extent that the aggregate amount of such referral fees for which reimbursement is sought, together with the Administrative Expenses (as defined below), do not exceed the Expense Cap (as defined below). See *"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES", "THE OFFERING"* and *"ADMINISTRATION-Brokerage Commissions".*

**Use of Proceeds and Distributions**

Proceeds received by the Fund from the sale of Shares (after payment of Offering expenses) will be used by the Fund in its investment

(vii)

program. See "*INVESTMENT PROGRAM*". The Fund does not expect to make distributions or pay dividends on the Shares.

|                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                           |
|--------------------------|--|
| **Transfer Restrictions** | The Articles provide that without the prior written consent of the Board of Directors, any sale, assignment, transfer, conveyance or other disposition or any attempt to do any of the foregoing (collectively, "Transfer") shall be invalid. The Board of Directors shall not withhold its consent to a proposed Transfer unless it determines that the proposed Transfer would lead to legal, fiscal, regulatory, pecuniary or material administrative disadvantage for the Fund or the Shareholders as a whole or to maintain the minimum shareholding per Shareholder. Notwithstanding the foregoing, the Board of Directors will not consent to the Transfer of Shares to a U.S. Person. Any attempt to Transfer Shares without the prior approval of the Board of Directors may subject such Shares to compulsory redemption. There is no independent market for the purchase or Transfer of Shares and none is expected to develop, except as set forth above under "Listing". Offerees must represent that they are purchasing Shares for investment purposes only. |
| **Redemption** | Generally, Shares may be redeemed by a Shareholder on at least six (6) months' prior written notice (subject to the Board of Directors, in its sole and absolute discretion, waiving or reducing such notice requirement), on the last Business Day of each fiscal quarter of the Fund, and at such other times with the consent of, and upon such terms of payment as may be approved by, the Board of Directors, in its sole and absolute discretion (each date being referred to as a "Redemption Date"). Shares will be redeemed at the Redemption Price (as defined below). Payment of ninety-five (95%) percent of the aggregate Redemption Price for redeemed Shares (calculated on the basis of unaudited data) normally will be made within thirty (30) days following the Redemption Date. Payment of the balance of the aggregate Redemption Price will be made within thirty (30) days after completion of (i) unaudited quarterly financial statements for redemptions on the last Business Day of the first three (3) fiscal quarters of the Fund; or (ii) audited financial statements for redemptions on the last Business Day of a fiscal year. Redemption proceeds generally will be paid in $. Any redemption of Shares within one (1) year after a Shareholder's initial investment in the Fund (whether Shares are acquired directly from the Fund or by way of Transfer in the secondary market) will be subject to a redemption charge of five (5%) percent of the amount withdrawn (the "Redemption Charge"). Other than the Redemption Charge, there are no redemption charges. See "*TRANSFER AND REDEMPTION-Redemption*". |

If a redemption would cause the value of Shares held by a Shareholder to fall below $1,000,000, or such lesser amount as determined by the Board of Directors in its sole and absolute discretion, then the Board of Directors will have the right to compel redemption of all Shares held by such Shareholder. The Board of Directors, upon not less than ten (10) days' prior written notice to a Shareholder, may compel redemption of all of such Shareholder's Shares at any time if the Board of Directors determines that the continued ownership of Shares by such Shareholder would result in a legal, pecuniary, regulatory, taxation or material

(viii)

administrative disadvantage for the Fund or the Shareholders as a whole or to maintain the minimum shareholding per Shareholder. See *"TRANSFER AND REDEMPTION-Redemption"*. In addition, the Board of Directors, by written notice to the Shareholders, may suspend redemption rights for all Shareholders when, in the opinion of the Board of Directors, disposal of part or all of the Fund's assets, or the determination of Net Asset Value (as defined below), would not be reasonable or practicable or would be prejudicial to the Shareholders.

**Management and Incentive Fees**

As set forth in the Investment Management Agreement, the Investment Manager receives (i) a fixed quarterly advisory fee (the "Management Fee") equal to 0.25% of the Net Asset Value of the Fund as of the beginning of each fiscal quarter (approximately 1.0% on an annualized basis), and (ii) an annual incentive fee (the "Incentive Fee"), determined as of the last Business Day of the Fund's fiscal year, equal to twenty (20%) percent of the net profits (including net unrealized gain) (hereinafter "Net Profits"), if any, during a fiscal year allocable to each Share; provided, however, that if a Share is redeemed at any time other than the end of a fiscal year, such payment will be made to the Investment Manager with respect to such redeemed Share as though the Redemption Date were the last day of the fiscal year. For a description of the manner in which the Incentive Fee is borne by each Share and the time of payment, see *"DETERMINATION OF OFFERING PRICE"*. If a Share has a loss chargeable to it during any fiscal year or years ("Unrecouped Loss") and during any succeeding fiscal year there are Net Profits allocable to the Share, there will be no Incentive Fee payable with respect to such Share until the amount of the Unrecouped Loss allocated to such Share has been recouped. Generally, the Incentive Fee will be determined as of the last Business Day of the Fund's fiscal year based on net realized and unrealized appreciation for the fiscal year then ended. The Management Fee will be prorated for any fiscal quarter in which the Investment Manager does not act as Investment Manager for the entire quarter. See *"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES"*.

The Investment Manager and the Fund may enter into a deferred incentive fee agreement pursuant to which the Investment Manager may elect to defer payment of all or a portion of its Incentive Fee. See *"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES"*.

**Expenses**

The Fund will pay all of its accounting, legal, administrative and other operating expenses, including the expenses of the offer and sale of Shares to Shareholders (collectively, "Administrative Expenses") for each fiscal year, and reimburse the Investment Manager for referral fees paid to unaffiliated eligible persons, up to a maximum of one (1%) percent of the Fund's Net Asset Value at the end of each fiscal year ("Expense Cap"). To the extent that the Administrative Expenses and referral fee reimbursements exceed the Expense Cap in any fiscal year, the Investment Manager shall pay such excess Administrative Expenses and/or the Fund shall not reimburse the Investment Manager for such excess referral fees. The Expense Cap, however, does not apply to investment expenses (e.g., expenses related to the investment of the

{IX}

Fund's assets, such as brokerage commissions and other trading and investment charges and fees, corporate licensing expenses, interest, custodial fees, prime broker charges and taxes. All organizational expenses are being amortized over sixty (60) months.

**Administrator, Registrar And Transfer Agent**

Citco Fund Services (Curaçao) N.V. (the "Administrator") has been retained by the Fund to perform administrative services. The Fund pays the Administrator an annual fee of 15 basis points on the first $100 million of Net Asset Value of the Fund and 10 basis points on the remainder. See "*THE ADMINISTRATOR*".

**Risk Factors**

An investment in the Fund involves significant risks. See "*CERTAIN RISK FACTORS*".

**Brokerage Commissions**

Portfolio transactions for the Fund will be allocated to brokers as selected by the Investment Manager on the basis of best execution and in consideration of such broker's provision or payment of the costs of research and other services and/or property which are of benefit to the Fund and related funds and accounts. The Investment Manager may also direct commissions to brokers who refer clients to the Fund and certain broker/dealers which may furnish other services to the Fund and/or the Investment Manager. See "*ADMINISTRATION-Brokerage Commissions*".

**Shareholder Meetings and Reports**

Meetings of Shareholders will be held annually. Each Shareholder will receive performance reports at least quarterly and an annual audited financial report of the Fund. The fiscal year end of the Fund is December 31.

**Taxes**

Based upon the Fund's organizational structure and methods of operation as described herein, it is anticipated that the Fund generally will not be subject to U.S. Federal income tax on gains from trading in securities and instruments. In addition, interest from U.S. sources earned on bank deposits, "portfolio interest" as defined under the United States Internal Revenue Code, as amended (the "IRC") and interest from certain short term obligations generally would not be subject to withholding for U.S. Federal income tax. However, dividend income and certain other interest from U.S. sources would be subject to thirty (30%) percent withholding. Permitted U.S. Persons should not be subject to U.S. Federal income tax on any dividends received from the Fund, or on any gain recognized on the sale or other disposition of Shares, provided that such Permitted U.S. Person does not utilize leverage in acquiring or holding Shares in the Fund.

At the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Ordinance of the British Virgin Islands with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the British Virgin Islands and is also exempt from any capital gains realized with respect to any Share, debt obligations or other securities of the Fund by persons who are not persons resident in the British Virgin Islands. No estate, inheritance, succession or gift tax,

(x)

A 0 0 4 8 5

rate, duty, levy or other charge is payable by persons who are not persons resident in the British Virgin Islands with respect to any Shares, debt obligations or other securities of the Fund.

There can be no assurance that the U.S. or British Virgin Islands tax laws will not be changed adversely with respect to the Fund and its Shareholders or that the Fund's income tax status will not be successfully challenged by such authorities.

Potential Shareholders should consult their own advisors regarding tax treatment by the local and other jurisdictions applicable to them. Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them.

**Subscription Procedures**

Offerees interested in subscribing for Shares will be furnished a Subscription Document Booklet, which contains Instructions For Subscribers and a Subscription Agreement and Revocable Proxy. The Subscription Agreement and Revocable Proxy must be completed for a specified dollar amount. The original completed and executed copy of the Subscription Agreement and Revocable Proxy should be sent by overnight courier to: Lancer Offshore, Inc., c/o CITCO Fund Services (Curaçao) N.V., Kaya Flamboyan 9, P.O. Box 812, Curaçao, Netherlands Antilles.

All payments are to be made in United States dollars. If payment is to be made by wire transfer, it is to be made in immediately available funds to HSBC Bank USA, International Banking, 452 Fifth Avenue, New York, NY 10018, ABA#021001088, for Account of CITCO Banking Corporation N.V., Account No. 000-301 795, for further credit to the account Lancer Offshore, Inc., Account No. 0012-443222-200. If payment is to be made by check, the check should be made payable to "Lancer Offshore, Inc." and it should be sent at least one (1) week prior to the Closing Date by overnight courier to Lancer Offshore, Inc., c/o CITCO Fund Services (Curaçao) N.V., Kaya Flamboyan 9, P.O. Box 812, Curaçao, Netherlands Antilles.  See *"SUBSCRIPTION PROCEDURES"*.

A00486

## THE INVESTMENT MANAGER

The Fund's Investment Manager is Lancer Management Group, LLC ("Investment Manager"), a limited liability company formed in 1997 under the laws of the State of Connecticut. The Investment Manager is the successor by merger to Lancer Management Group, LLC, a New York limited liability company formed in 1995. Michael Lauer is the sole manager and principal owner of the Investment Manager and, as such, he controls the operations and activities of the Investment Manager. The Investment Manager is responsible for the management of the Fund. The Investment Manager is solely responsible for researching, selecting and monitoring investments by the Fund and determining when and how much to invest with or withdraw from a particular investment.

Michael Lauer began his investment career with Oppenheimer & Co. in 1980 as a technology analyst. His other professional affiliations include: Cyrus J. Lawrence and Kidder Peabody (both as senior diversified technology and defense electronics analyst). Mr. Lauer became a portfolio manager in 1993. On numerous occasions, the annual Greenwich Associates survey of sell-side analysts distinguished Mr. Lauer as the premier source for stock purchase recommendations in his discipline of industry coverage. Likewise, Mr. Lauer was selected to the Institutional Investor's All Star analyst team for seven consecutive years. The Wall Street Journal's first ever survey also rated Mr. Lauer among the tope three analysts in his group. Mr. Lauer holds a BA degree in International Relations and an MBA in Finance.

From December 1994 to December 1997, Mr. Lauer served as the general partner of LPLP. Mr. Lauer serves as the sole manager and principal owner of LMG II which became the sole general partner of LPLP on January 1, 1998. The Investment Manager also serves as the sole investment manager of VFL and OFL. It is possible that in certain circumstances, the Fund, on the one hand, and LPLP, VFL, and/or OFL on the other hand, could own securities of the same company and/or take opposite positions in the market.

Mr. Lauer, as sole manager of the Investment Manager and, as the sole manager of LMG II, the general partner of LPLP, devotes a substantial amount of his time to the business of running the Fund, OFL, VFL and LPLP although, Mr. Lauer may devote such time to the Investment Manager and Fund as he determines in his sole and absolute discretion. The Investment Manager, LMG II and/or Mr. Lauer may also manage accounts for certain parties and/or provide consulting and/or advisory services to others.

There have never been any administrative, civil or criminal actions, whether pending, on appeal or concluded, against the Fund, Investment Manager or Mr. Lauer.

-1-

A00487

INVESTMENT PROGRAM

### Purpose

The Fund was organized for the purpose of investing, trading and dealing in securities, traded in the United States of America and elsewhere, of all kinds and descriptions, including but not limited to, equity, debt, convertible securities, preferred stock, options, warrants, trade claims and monetary instruments. The Fund may invest in arbitrage and special situations, both long and short securities positions, option arbitrage, international arbitrage and other financial instruments. The Fund may also engage in transactions to hedge long and short securities positions. The descriptions contained in this Memorandum of the specific activities in which the Fund may engage should not be understood to limit in any way the types of investment activities or the allocation of Fund capital among such investments which the Fund may make. The Fund may engage in any investment activities not described herein which the Investment Manager considers appropriate and consistent with the Fund's objective.

### Investment Objective

The Investment Manager does not follow a market timing philosophy and accordingly, it is anticipated that the Fund's assets will be fully invested at all times. The Investment Manager's philosophy of investing could be described as an analytical discipline concentrating on underlying corporate value with an added emphasis on anticipatory timing of future corporate developments, primarily in small and middle capitalized companies. The Fund's objective is to achieve high economic return primarily through capital appreciation while exposing the Fund to what the Investment Manager believes will be reasonable risks as compared to potential rewards. One way of controlling risk is through the diversification of Fund assets by investing and trading in a range of securities, although the Investment Manager anticipates that, at any given time, it is possible that a significant percentage of the Fund's assets may be invested in one or more securities of a single entity. The Fund seeks to maximize its return by purchasing securities which the Investment Manager believes are below intrinsic value, based on the Investment Manager's evaluation of such factors as fundamental analysis of a company and the underlying value of its assets, or by seeking price appreciation due to a "catalyst" such as an earnings turnaround, a corporate restructuring or an accumulation of shares by outsiders. Potential investments will be reviewed using fundamental, technical, financial, industry and trading analyses.

In selecting investments, the Investment Manager considers various criteria. The Investment Manager focuses nearly exclusively on corporations in the secondary and tertiary financial markets. The Investment Manager's approach is highly anticipatory of a corporate event that will facilitate favorable evaluation of the corporation. Similarly, the Investment Manager may sell or sell short securities which the Investment Manager believes are overvalued.

### Investment Program

The following is a description of the principal types of securities in which the Investment Manager has and intends to cause the Fund to invest in, certain trading techniques that it has and intends to employ, the investment criteria that it has and intends to apply, and the guidelines that it has established with respect to the composition of the Fund's investment portfolio. The following description, however, is merely a summary and the Investment Manager has broad discretion to cause the Fund to invest in other types of securities and to follow other investment criteria and guidelines.

1.     **Equity Securities**.   The Investment Manager has and intends to generally select equity investments primarily on the basis of their potential for capital appreciation. Normally, any current income, such as dividends and interest, received from such investments will be only incidental to the objective of capital appreciation.

The majority of the common stocks in which the Fund has and intends to invest in are traded on the New York Stock Exchange, the American Stock Exchange or in the over-the-counter market in the United States of America. The principal focus of the Investment Manager has and will be on the common stock of small and

-2-

A00488

middle capitalized companies. The Fund also has and may invest in options and warrants to purchase common stock and other securities convertible into common stock.

The Fund has and may purchase non-U.S. equity securities which may be represented by American Depository Receipts listed on a United States of America securities exchange or traded in the over-the-counter market in the United States of America. The Fund may also purchase non-U.S. securities denominated in non-U.S. currencies and/or traded outside of the United States of America.

The Fund may invest in newly-issued equity securities of both developing and fully developed public companies which the Investment Manager believes, based on the Investment Manager's analysis of offering materials and other information, offer the opportunity for capital appreciation.

In addition to investing in equity securities which may appreciate in the medium or long term, the Fund attempts to trade securities in a fashion intended to take advantage of what the Investment Manager believes are short-term market inefficiencies, particularly during periods of high market volatility.

2.    **Diversity and Hedging Strategies.**  The Investment Manager has and may seek to minimize the losses which may be incurred in severe market declines or in the decline of individual securities prices by generally utilizing internal stop limits and various hedging techniques, including short sales, stock index options and stock options. There is no assurance that these stock selection or trading techniques will eliminate or reduce in any material manner the inherent risks of equity investing.

3.    **Short Sales.**  The Investment Manager has and may make "short sales" of securities when it believes that particular securities are overvalued and the Investment Manager anticipates a significant decline in their market price, including arbitrage situations in which the Investment Manager believes that the proposed transaction is not likely to be consummated.

Short selling of securities involves the sale of securities which the Fund does not own. To effect a short sale, the Fund borrows securities from a third party in order to make delivery to its purchaser. The Fund returns the borrowed securities to the lender by purchasing the securities in the open market. A short seller must generally pledge other securities or cash as collateral for the short position. This collateral may be increased or decreased in response to changes in the market price of the borrowed securities.

4.    **Leveraged Purchases of Securities.**  The Fund may leverage its securities positions by borrowing funds up to the maximum extent permitted by law. In general, for most equity securities the maximum initial amount that can presently be loaned by brokers and banks is fifty (50%) percent of the value of most securities positions. There are no borrowing or leverage limits in the Fund's Articles.

Leverage increases the potential risk of loss on any securities position so leveraged. In addition, increases in interest rates adversely affect earnings. Furthermore, in the event of a decline in the value of the leveraged securities or a change in the percentage of the value of securities for which a margin loan may be made, the Fund may be forced to sell securities at a substantial loss in order to generate cash to reduce the Fund's margin loan.

5.    **Equity and Stock Index Options.**  The Investment Manager has and may purchase or sell put and call options that are traded on options exchanges at such times as it deems appropriate and consistent with the Fund's investment objectives.

The Investment Manager has and may utilize stock index options, primarily as a means of hedging the Fund's portfolio or specific securities therein (for example, to lock in gain or minimize the risk of loss), but also has and may engage in such trading as a portfolio investment or as a method of rapid implementation of an investment strategy where it is impractical to quickly purchase or sell equity securities. The Investment Manager has and may also purchase or sell options on a specific underlying security.

6.    **Risk Arbitrage Activities.**  The investment activities of the Fund include taking positions in companies which are, or in the opinion of the Investment Manager may be, subject to a corporate takeover, restructuring, acquisition of securities or assets, merger, reorganization, leveraged buyout or other form of similar corporate event.  Generally, when a contemplated acquisition of a company's securities or assets is announced, the market price of that company's outstanding securities may not immediately rise to the stated acquisition price due to uncertainties that may exist in the marketplace, including questions relating to the possibility that the transaction will not be consummated and, if a tender offer is involved, whether all of the securities tendered will be purchased.  Risk arbitrage often involves the purchase of securities which are the subject of an acquisition attempt in the expectation that by purchasing or holding the security, the Fund will recognize a gain on the ultimate disposition, whether the contemplated transaction or another transaction is consummated.  Risk arbitrage may also involve the short sale of securities if the Investment Manager believes it more likely that the transaction will not be consummated.  In either case, if the Investment Manager's judgment is not correct, the Fund could sustain losses on the transaction.

7.    **High-Yield Securities; Participation in Buy-Outs; Liquidations; Bankruptcy Situations.**  The Investment Manager may purchase high-yield speculative securities, including so-called "junk bonds."  In addition, companies may propose from time to time a plan of liquidation pursuant to which all or substantially all of their assets are to be sold and the proceeds of such sales are to be distributed to their shareholders.  A particular plan of liquidation may involve several liquidating distributions.  The Fund may invest in the securities of the entity to be liquidated if the Investment Manager believes that the assets of the entity are worth more than the market price of the entity's publicly-traded securities and that there is a substantial likelihood that the liquidation proposal will be effected.  However, the Fund would incur a loss if the sale of the entity's assets does not produce the anticipated revenues and the liquidating distributions are less than the Fund's cost of purchasing the securities.

The Fund may also invest in securities of companies involved in various stages of bankruptcy or reorganization.  These situations may be particularly complicated and may involve substantial uncertainty.

Because of the highly complex nature of many liquidations, bankruptcies and reorganizations, the securities involved in such transactions may have to be held for long periods of time during which time they may have limited marketability.

## Portfolio Turnover

As a result of the investment policies described in this Memorandum, the Fund expects to engage in a substantial number of portfolio transactions.  It is anticipated that the Fund's investment portfolio may be frequently traded, and, accordingly, the Fund may incur substantial brokerage commissions, expenses and other transaction costs.  The Investment Manager is not, however, required to execute transactions at the lowest available commission rates.  See "*ADMINISTRATION-Brokerage Commissions*".

## General

The Investment Manager does not presently intend to cause the Fund to purchase or sell real estate (although it may purchase securities of companies whose businesses involve the purchase and sale of real estate), make loans (although it may acquire publicly distributed or privately held bonds, debentures, notes and other debt securities, it may buy securities with an agreement by the vendor to repurchase them and it may lend portfolio securities), purchase participations or other direct interests in oil, gas or other minerals (except as an investor in companies in this field) or participate in the marketing of the securities of any companies.

The Fund may not amend its investment objectives and policies for a period of three years from the date of commencement of operations of the Fund except in exceptional circumstances and then only with the consent of the majority of shareholders.

## Investment Restrictions

The following restrictions shall apply only so long as the Shares are listed on the Irish Stock Exchange:

-4-

(i)  No more than 20% of the gross asset value of the Fund may be lent to or invested in the securities of any one issuer or may be exposed to the creditworthiness or solvency of any one counterparty, provided that this limit per issuer shall not apply to securities issued or guaranteed by any government or any government agency or instrumentality of any EU member state or OECD Member States or by any supranational institution, organization or authority of which one or more EU or OECD Member States are members.

(ii)  The Fund may not take or seek to take legal or management control of the issuer of any of its underlying investments.

(iii)  The Fund will not invest more than ten (10%) of its Net Asset Value in real property.

(iv)  The Fund may not invest more than 10% of its gross assets directly in physical commodities.

(v)  The Fund will adhere to the general principle of risk spreading in respecting of its investment in derivative instruments.

THE FUND'S INVESTMENT PROGRAM ENTAILS SUBSTANTIAL RISKS AND THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES OF THE FUND WILL BE ACHIEVED. THE PRACTICES OF SHORT SELLING, LEVERAGE AND OTHER INVESTMENT TECHNIQUES WHICH THE FUND MAY EMPLOY FROM TIME TO TIME CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH THE FUND'S INVESTMENT PORTFOLIO MAY BE SUBJECT.

A 0 0 4 9 1

## INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES

Investment Management Agreement

The Fund has entered into an investment management agreement (the "Investment Management Agreement") with the Investment Manager to manage the Fund's portfolio investments. The Investment Management Agreement provides that the Investment Manager is responsible for investment of the Fund's assets, subject to the policies and control of the Board of Directors. The Investment Manager initiates all orders for the purchase and sale of securities on behalf of the Fund. The Investment Management Agreement will remain in effect through December 31, 2005, and is automatically extended for additional five year terms thereafter, except that it may be terminated by the Investment Manager or by the Fund upon ninety (90) days' written notice prior to the end of the initial term or the end of any renewal term.

The Investment Management Agreement provides that the Fund will indemnify and hold harmless the Investment Manager and its members, and their respective affiliates from and against any loss or expense suffered or sustained by the Investment Manager or its members or their respective affiliates resulting from the performance or non-performance of the Investment Manager's duties under the Investment Management Agreement, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding; provided, however, that such person acted honestly and in good faith and reasonably believed that its conduct was in the best interest of the Fund and, in the case of criminal proceedings, such person had no reasonable cause to believe its action was unlawful.

Management Fee

Under the Investment Management Agreement, the Fund is obligated to pay the Investment Manager: (i) a fixed quarterly advisory fee (the "Management Fee") equal to 0.25% of the Net Asset Value of the Fund as of the beginning of each fiscal quarter (approximately 1.0% on an annualized basis); and (ii) an annual incentive fee (the "Incentive Fee") determined as of the last day of the Fund's fiscal year equal to twenty (20%) percent of the net profits (including net unrealized gains) (hereinafter "Net Profits"), if any, during a fiscal year allocable to each Share; provided, however, that if a Share is redeemed at any time other than the end of a fiscal year, such payment will be made to the Investment Manager with respect to such redeemed Share as though the Redemption Date were the last day of the fiscal year. If a Share has a loss chargeable to it during any fiscal year or years ("Unrecouped Loss") and during any succeeding fiscal year there are Net Profits allocable to the Share, there will be no Incentive Fee payable with respect to the Share until the amount of the Unrecouped Loss allocated to the Share has been recouped. Generally, the Incentive Fee will be determined as of the last Business Day of the Fund's fiscal year based on the net realized and unrealized appreciation for the fiscal year then ended. The Management Fee will be prorated for any fiscal quarter in which the Investment Manager does not act as Investment Manager for the entire quarter.

The Investment Manager may elect to defer payment of its Incentive Fee to the last day of any fiscal year following the fiscal year such fee was earned. If the Investment Manager elects to defer payment of all or part of the Incentive Fee, any such deferred amounts payable to the Investment Manager shall be treated, and the amounts eventually payable at the end of such deferred periods shall be determined, as if such deferred amounts had been invested in the Fund on the first day of the fiscal year following the fiscal year the deferred fee was earned (or, in the case of an Incentive Fee attributable to Shares redeemed during a fiscal year, on the day following the period the deferred fee was earned) and withdrawn as of the last day of the deferred period. Thus, the deferred Incentive Fee participates in both profits and losses of the Fund. The deferred Incentive Fee and amounts of net profits (without any charge for management or incentive fees), if any, allocated to such deferred Incentive Fee shall be paid promptly after the end of the deferred period.

Expenses

     The Fund will pay all of its accounting, legal, administrative and other operating expenses, including the expenses of the offer and sale of Shares to Shareholders (collectively, "Administrative Expenses") for each fiscal year and reimburse the Investment Manager for referral fees paid to unaffiliated eligible persons, up to a maximum of one (1%) percent of the Fund's Net Asset Value at the end of each fiscal year ("Expense Cap"). To the extent that the Administrative Expenses and referral fee reimbursements exceed the Expense Cap in any fiscal year, the Investment Manager shall pay such excess Administrative Expenses and/or the Fund shall not reimburse the Investment Manager for such excess referral fees.  The Expense Cap, however, does not apply to investment expenses (e.g., expenses related to the investment of the Fund's assets, such as brokerage commissions and other trading and investment charges and fees), corporate licensing expenses, interest, custodial fees, prime broker charges and taxes.  The Fund's organizational expenses of $40,000 are being amortized over sixty (60) months.

-7-

CERTAIN RISK FACTORS

THE PURCHASE OF SHARES OFFERED HEREBY INVOLVES CERTAIN RISKS AND IS SUITABLE ONLY FOR OFFEREES OF ADEQUATE FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.  OFFEREES SHOULD BEAR IN MIND THE FOLLOWING RISK FACTORS:

**Offerees should give careful consideration to the following risk factors in evaluating the merits and suitability of an investment in the Fund as they relate specifically to the Shares or to the Fund, in general, as the context requires.  The following does not purport to be a comprehensive summary of all the risks associated with an investment in the Fund.  Rather, the following are only certain particular risks to which the Fund is subject.  The Investment Manager urges Offerees to discuss such risks and other potential risks, in detail with their professional advisors prior to making an investment decision.**

Market Risks

1.   Nature of Certain Investments.  There is no limitation on the size or operating experience of the companies in which the Fund may invest.  Some of these companies in which the Fund may invest may lack management depth or the ability to generate internally or obtain externally the funds necessary for growth. Companies with new products or services could sustain significant losses if projected markets do not materialize.  Further, such companies may have, or may develop, only a regional market for products or services and may be adversely affected by purely local events.  Such companies may be small factors in their industries and may face intense competition from larger companies and entail a greater risk than investment in larger companies.

2.   Competition.  The securities industry, and the varied strategies engaged in by the Investment Manager are extremely competitive and each involves a degree of risk.  The Fund competes with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs.

3.   Market Volatility.  The Fund's profitability substantially depends upon the Investment Manager correctly assessing the future price movements of stocks, bonds and options on stocks and other securities and the movements of interest rates.  There can be no assurance that the Investment Manager will be successful in accurately predicting price and interest rate movements.

4.   The Fund's Investment Activities.  The Fund's investment activities involve a high degree of risk.  The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager.  Such factors include a wide range of economic, political, competitive and other conditions which may affect investments in general or specific industries or companies.  In recent years the securities markets have become increasingly volatile, which may adversely affect the ability of the Fund to realize profits.  As a result of the nature of the Fund's investing activities, it is possible that the Fund's financial performance may fluctuate substantially from period to period.

5.   Transaction Execution and Costs.  The Fund expects to utilize a portion of its assets in a trading strategy that is extremely short-term and will involve heavy trading, high volume and in many cases relatively narrow spreads between the prices at which the Fund will purchase and sell particular positions.  The successful application of such a strategy depends significantly upon the quality of execution of transactions, such as the ability of broker-dealers to execute orders on a timely and efficient basis.  Although the Investment Manager will seek to utilize brokerage firms which will afford superior execution capability to the Fund, there is no assurance that all of the Fund's transactions will be executed with optimal quality.  On account of the degree of heavy trading, total commission charges and other transaction costs are expected to be very high.  The level of commission charges as a cost to the Fund, may be expected to be a significant factor in determining future profitability of the Fund.

-8-

6.     Leverage. The Investment Manager may cause the Fund to employ leverage. This includes the use of borrowed funds and investments in options, such as puts and calls, and warrants. Also, the Investment Manager may cause the Fund to engage in short selling. While such techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Fund.

7.     Liquidity. Some of the investments that are made by the Fund may lack liquidity. Though it is intended that substantially all investments made by the Fund will be in publicly traded investments and most on listed exchanges, some may be thinly traded. As set forth in "INVESTMENT PROGRAM", the Investment Manager intends to cause the Fund to invest a substantial portion of its assets in securities of small and middle capitalized entities. This could present a problem in realizing the prices quoted and in effectively trading the position(s). In certain situations, the Fund may invest in illiquid investments which could result in significant losses.

8.     Short Sales. The Investment Manager may cause the Fund to sell securities short. Selling securities short risks losing an amount greater than the proceeds received. Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. The Fund may be subject to losses if a security lender demands return of the borrowed securities and an alternative lending source cannot be found.

9.     Options. The Fund may utilize options contracts in furtherance of its investment strategy. Options positions may include both long positions, where the Fund is the holder of put or call options, as well as short positions, where the Fund is the seller (writer) of an option. Although option techniques can increase investment return, they can also involve a relatively higher level of risk. The expiration of unexercised long options effectively results in loss of the entire cost, or premium paid for the option. Conversely, the writing of an uncovered put or call option can involve, similar to short-selling, a theoretically unlimited risk of an increase in the Fund's cost of selling or purchasing the underlying securities in the event of exercise of the option. The use of options thereon involve the contractual commitment to purchase or sell the underlying instrument at a future date. The eventual price of such security may be influenced by a broad variety of market, economic and issuer-specific events and risks, many of which may be difficult to predict or assess.

10.     Risk Arbitrage. The Fund may engage in risk arbitrage transactions. Risk arbitrage involves purchasing securities which are the subject of an acquisition attempt, cash tender offer, exchange offer, corporate reorganization (such as a merger), liquidation, or an offer by an issuer to repurchase or exchange some of its own securities. Risk arbitrage investments are subject to such additional risks as the failure of the transaction to close, the failure to obtain shareholders' approval and other factors. Risk arbitrage also involves selling securities, possibly by a short sale or put option, in anticipation of the failure of a transaction to close, with the risk that the proposed transaction or another transaction will close.

11.     Counterparty Creditworthiness. The Fund may engage in transactions in securities and other instruments that involve counterparties. Under certain conditions, a counterparty to a transaction could default or the market for certain securities and/or other instruments may become illiquid.

12.     Systemic Risk. World events and/or the activities of one or more large participants in the financial markets and/or other events or activities of others could result in a temporary systemic breakdown in the normal operation of financial markets. Such events could result in the Fund losing substantial value caused predominantly by liquidity and counterparty issues (as noted above) which could result in the Fund incurring substantial losses.

Regulatory Risks

1.     Changes in Applicable Law. The Fund must comply with various legal requirements, including requirements imposed by the securities laws, tax laws and pension laws in various jurisdictions. Should

-9-

any of those laws change, the legal requirements to which the Fund and the Shareholders may be subject could differ materially from current requirements.

2.    Strategy Restrictions. Certain Offerees may be restricted from directly utilizing investment strategies of the type the Fund may engage in. These include sales of "naked" options (those in which there is no position in the underlying security) or purchases of put and call options on stocks. Such Offerees should consult their own advisors, counsel, and accountants.

3.    Trading Limitations. For all securities, including options, listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Fund to loss.

4.    No Regulatory Oversight in the United States. The Fund will not be registered as an "investment company" under the ICA, and it is not currently intended that the Investment Manager will register as an investment advisor under the United States Investment Advisors Act of 1940, as amended, nor will the Investment Manager register as a "commodity pool operator" under the United States Commodity Exchange Act. Consequently, the Shareholders of the Fund will not benefit from certain of the protections afforded by such statutes.

Fund Risks

1.    Limited Liquidity. An investment in the Fund provides limited liquidity. In connection with this Offering, an Offeree must represent that the Offeree is acquiring the Shares for investment purposes only and not with a view to or for resale, distribution or fractionalization of the Shares. The Shares will not be registered under the securities or "blue sky" laws of any state in the United States or under the laws of any other jurisdiction and, therefore, are subject to restriction.

2.    Concentration of Investments. Except as specifically set forth in the section entitled "INVESTMENT PROGRAM - Investment Restrictions", the Investment Manager is not limited in the amount of capital which it may commit to any one investment. Although the Investment Manager will follow a general policy of seeking to spread capital among a number of investments, the Investment Manager may depart from such policy from time to time and may hold a few, relatively large securities positions in relation to the Fund's capital.

3.    Dependence on the Investment Manager. All decisions with respect to the Fund's assets and the general management of the Fund will be made by the Investment Manager which relies on the services of several key employees. Shareholders will have no right or power to take part in the management of the Fund. As a result, the success of the Fund for the foreseeable future will depend largely upon the ability of the Investment Manager. Should any of its employees leave or become incapacitated for any period of time, profitability of the Fund's investments may suffer.

4.    Custodial Risks of Brokers. Various brokers will trade with the relevant exchange as a principal on behalf of the Fund, in a "debtor-creditor" relationship, unlike other clearing broker relationships where the broker is merely a facilitator of the transaction. Such broker could, therefore, have title to all of the assets of the Fund (for example, the transactions which the broker has entered into on behalf of the Fund as principal as well as the margin payments which the Fund provides). In the event of such broker's insolvency, the transactions which the broker has entered into as principal could therefore default and the Fund's assets could become part of the insolvent broker's estate, to the detriment of the Fund.

5.    Redemption. Shareholders may redeem part or all of their Shares as of the last Business Day of each fiscal quarter of the Fund, in each case upon at least six (6) months' prior written notice, and at such other times as the Board of Directors determines. All redemptions during the first year that a Shareholder is a Shareholder of the Fund (whether Shares are acquired directly from the Fund or by way of Transfer in the secondary market) are subject to the Administrative Charge. The Board of Directors also has the right to compel redemption of all of such Shareholder's Shares at any time if the Board of Directors determines

-10-

A00496

that the continued ownership of Shares by such Shareholder would result in a legal, pecuniary, regulatory, taxation or material administrative disadvantage for the Fund or the Shareholders as a whole or to maintain the minimum shareholding per shareholder.

6.    Frequency of Trading.   Some of the strategies employed by the Investment Manager require frequent trades to take place and, as a consequence, portfolio turnover and brokerage commissions may be greater than for other investment entities of similar size.

7.    Fees and Expenses.   The operating expenses of the Fund, including, but not limited to, the Management Fee, Incentive Fee, the referral fee payment reimbursement, and fees paid to the Administrator, accountants and attorneys, and the Administrative Expenses, may, in the aggregate, constitute a high percentage relative to other investment entities.

8.    No Participation in Management.   The management of the Fund's operations is and will be vested solely in the Board of Directors, and the Shareholders will have no right to take part in the conduct or control of the business of the Fund.  The Board of Directors has irrevocably delegated to the Investment Manager the sole and exclusive authority to manage the assets of the Fund through December 31, 2005.

General Risks

1.    Reserve for Contingent Liabilities.   Under certain circumstances, the Board may find it necessary to establish a reserve for contingent liabilities or withhold a portion of the Shareholder's Redemption Price at the time of redemption, in which case, the reserved portion would remain at the risk of the Fund's activities.

2.    Risk of Litigation.   The Investment Manager to whom the Fund has allocated capital may accumulate substantial positions in the securities of a specific company.  In some instances, the Investment Manager may engage in a proxy fight or become involved in litigation.  Under such circumstances, the Fund may be named as a defendant in a lawsuit or regulatory action and be subject to the costs involved.

3.    Limited Operating History of Fund and Investment Manager.   The Fund was formed in September 1995 and has a limited operating history.  The success of the Fund depends on the experience and skill of the Investment Manager, which was also formed in September 1995, and therefore has only a limited operating history as well.  There can be no assurance that the Investment Manager will generate any gains or profits for the Fund.

4.    Lack of Separate Representation.   Neither the Fund, the Articles, the Investment Management Agreement nor any of the agreements, contracts and arrangements between the Fund, on the one hand, and the Investment Manager, Mr. Lauer or their affiliates, on the other hand, were or will be the result of arm's-length negotiations.  The Administrator, attorneys, accountants and others who have performed services for the Fund in connection with this Offering, and who will perform services for the Fund in the future, have been and will be selected by the Board of Directors based upon the advice of the Investment Manager.

5.    Limited Diversification.   Except as specifically set forth in the section entitled "INVESTMENT PROGRAM - Investment Restrictions", the Fund is not restricted in the amount of its capital that it may commit to any single investment.  At times the Fund may hold a relatively large concentration in a particular security or type of investment.  Losses incurred in such investments could have a materially adverse effect on the Fund's overall financial condition.

6.    Non-U.S. Investments.   The Fund may invest in both U.S. and non-U.S. securities and interests denominated in non-U.S. currencies and/or traded outside of the United States of America.  Such investments require consideration of certain risks not typically associated with investing in securities traded in the United States of America or other assets.  Such risks include unfavorable currency exchange rate developments, restrictions on repatriation of investment income and capital, imposition of exchange control regulation, confiscatory taxation, and economic or political instability in foreign nations.  In addition, there may be less publicly available information about certain non-U.S. companies than would be the case for

comparable companies in the United States of America, and certain non-U.S. companies may not be subject to accounting, auditing and financial reporting standards and requirements comparable to or as uniform as those of U.S. companies.

7.      Incentive Fee.  The payment of the Incentive Fee to the Investment Manager may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case if this special payment was not made. In addition, since the Incentive Fee is calculated on a basis that includes unrealized appreciation of the Fund's assets, it may be greater than if such fee was based solely on realized gains.

8.      Valuation of the Fund's Assets.  The Board of Directors of the Fund, in consultation with the Investment Manager, will value the securities held by the Fund in accordance with the Fund's Articles of Association. When no market exists for an investment or when the Board of Directors, in consultation with the Investment Manager, determines that the market price does not fairly represent the value of the investment, the Board of Directors of the Fund, in consultation with the Investment Manager, will value such investment as it reasonably determines.

        **The foregoing list of certain risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  In addition, as the Fund's investment program develops and changes over time, an investment in the Fund may be subject to additional and different risk factors. Offerees should read the entire Memorandum and consult with their own advisors before deciding to subscribe for Shares.**

-12-

## CONFLICTS OF INTEREST

In the conduct of the Fund's business, conflicts may arise between the interests of the Investment Manager and its affiliates, on the one hand, and those of the Fund and its Shareholders, on the other hand. Among the conflicts which each Offeree should consider are the following:

(a)     Neither the Investment Manager nor Mr. Lauer is under any obligation to devote their full time to the business of the Fund; the Investment Manager is only required to devote such time and attention to the affairs of the Fund as the Investment Manager may deem appropriate. As previously noted, Mr. Lauer is also the sole manager and principal owner of LMG II which is the sole general partner of LPLP, an investment entity engaged in a business similar to that of the Fund and the Investment Manager is also the investment manager for OFL and for VFL , which also are engaged in a business similar to that of the Fund. Mr. Lauer will devote such time and attention to the Investment Manager, LMG II, the Fund, LPLP, OFL and VFL as he deems appropriate. In addition, the Investment Manager, Mr. Lauer and their affiliates, either individually or collectively, may manage other accounts for which they may be compensated and may provide consulting and/or advisory services to others.

(b)     Mr. Lauer, as the sole manager of the Investment Manager and as the sole manager of LMG II, will determine the allocation of the Fund's capital, LPLP's capital, OFL's capital, VFL's capital and such other accounts to investment strategies and techniques on whatever basis he considers appropriate or desirable in his sole and absolute discretion.

(c)     The Investment Manager, Mr. Lauer and/or their affiliates, may manage other accounts and provide investment advice to other parties, and they may decide to invest the assets of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's assets, in a particular security or strategy.

(d)     The payment of the Incentive Fee to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such an arrangement.

(e)     Mr. Lauer is the sole manager and principal owner of LMG II which is the sole general partner of LPLP, an investment partnership engaged in a similar investment program to that of the Fund. The Investment Manager also serves as the investment manager for OFL and VFL. It is possible that LPLP, OFL and/or VFL may take positions either similar or opposite to positions taken by the Fund and that the Fund, LPLP, OFL and/or VFL may from time to time be competing for either similar or opposite positions in the markets.

(f)     The Investment Management Agreement authorizes the Investment Manager to combine purchase and sale orders on behalf of the Fund together with orders for other accounts managed by the Investment Manager or its affiliates and allocate the securities or other assets so purchased or sold on an average price basis among such accounts.

(g)     To the extent the Fund's brokerage business is allocated to brokers or dealers in recognition of past or future referrals, the Investment Manager may have an incentive to cause the Fund to effect more transactions than it might otherwise in order to stimulate brokers or dealers to refer more Shareholders to the Fund.

In the event that a conflict of interest arises, the Investment Manager will endeavor to ensure that it is resolved fairly. The Investment Manager, under the Investment Management Agreement, is required to exercise its duties with care, skill, prudence and diligence. In the event of a conflict of interest between the Fund and LPLP, OFL or VFL, the Investment Manager will resolve such conflict by taking into account the investment objective of each entity, any investment restrictions applicable to each entity and the other available investment options for each entity and will resolve such conflict in a fair and equitable manner.

A 0 0 4 9 9

THE FUND

### Capital Structure of the Fund

The Fund (Reg. No. 161934) was incorporated as an international business company pursuant to the International Business Companies Act of the British Virgin Islands (the "Companies Act") on September 27, 1995 and has authorized capital of 10,000,000 Shares, par value $1.00 per Share. Each Share has equal dividend, distribution, liquidation and voting rights. The Fund does not anticipate paying any dividends on the Shares; however, in the event that a dividend is declared, such dividend will be paid in accordance with any applicable regulation of the Irish Stock Exchange and any applicable British Virgin Islands law or regulation. From time to time, the Fund, by a resolution of the Board of Directors, may increase the authorized capital in order to have a substantial number of Shares available at all times for issuance. There are no preemptive rights associated with the Shares.

The Board of Directors may refuse to register or permit the Transfer of Shares if it reasonably determines that such registration or transfer would lead to legal, fiscal, regulatory, pecuniary or material administrative disadvantage for the Fund or the Shareholders as a whole. No Shares may be transferred to any U.S. Person. See "*SUITABILITY REQUIREMENTS*".

Shares generally may be purchased on the first Business Day of each month. The proper documentation necessary to purchase Shares must be received by the Fund at least three (3) Business Days prior to the purchase date unless waived by the Fund. The Board of Directors may permit Shares to be purchased on dates other than the first Business Day of each month.

The Fund sold its initial Shares on October 31, 1995 at $100 per Share. As of January 31, 2002, the Offering Price was $927.15 per Share.

The Shares are admitted to the Official List of the Irish Stock Exchange. There can be no assurance, however, that such listing will be maintained. The Directors do not anticipate that an active secondary market will develop in the shares. No application has been made to list the Shares on any other stock exchange.

The Fund's object as set out in clause 4 of the Memorandum of Association provides for engaging in any act or activity that is not prohibited by British Virgin Islands law, which includes the carrying on of the business of an investment company.

### Voting by Shareholders of the Fund

Subject to the exceptions set forth below and except as otherwise provided in the International Business Companies Ordinance, 1984, all decisions of the Shareholders will be made by the holders of a majority of outstanding Shares represented at a meeting, provided that a quorum of the holders of one-third of the outstanding Shares is present. Each Share is entitled to one vote. Notwithstanding the foregoing, the (i) dismissal of a member of the Board of Directors must be adopted by an affirmative vote of two-thirds of the votes cast at a general meeting of Shareholders at which more than one-half of the total number of Shares then issued and outstanding are represented; (ii) any investment advisory or management contract entered into by the Fund may not be terminated by the Fund unless such termination is approved by a unanimous vote cast at a meeting at which all the issued and outstanding Shares are represented; (iii) amendments to the Memorandum and Articles of Association which have a material adverse effect on the rights of Shareholders of the Fund must be approved by three-quarters of the votes cast at a meeting at which not less than one-half of the issued and outstanding Shares are represented, except that any amendment to decrease the vote required to terminate an investment advisory or investment management contract requires approval by a unanimous vote cast at a meeting at which all of the issued and outstanding Shares are represented; and (iv) the merger or consolidation of the Fund with another corporation or the dissolution of the Fund requires the affirmative vote of the holders of three-quarters of the Shares outstanding. Any matters referred to herein may also be adopted by resolution in writing of all the Shareholders. There are no conversion or preemptive rights in connection with any Shares. All Shares, when duly issued, will be fully paid and non-assessable.

-14-

A 0 0 5 0 0

The Fund's Shares have equal voting rights, which means that the holders of more than fifty (50%) percent of the Shares voting for the election of Directors can elect all of the Directors if they chose to do so, and in such event the holders of the remaining Shares representing less than fifty (50%) percent of the Shares voting for such election of Directors will not be able to elect any person or persons as Directors.

The Fund may from time to time either by a resolution of the Shareholders or by a resolution of the Directors increase the authorized capital of the Fund by such sum divided into shares of such amount, or may increase the number of its shares to such number, as the resolution shall prescribe.

-15-

<u>THE OFFERING</u>

<u>General</u>

Shares will be offered for sale to non-U.S. Persons and Permitted U.S. Persons generally on the first Business Day of each month and at such other times as the Board of Directors, in its sole and absolute discretion, may determine (each such date being referred to as a "Closing Date"). The proper documentation necessary to purchase Shares must be received by the Fund at least three (3) Business Days prior to the applicable Closing Date, unless waived by the Board of Directors. The minimum initial subscription for Shares is $1,000,000; however, the Board of Directors, in its sole and absolute discretion, may accept subscriptions of lesser amounts, but in no event less than $100,000. Therefore, the minimum subscription for additional Shares is $100,000. Subscriptions received will be segregated until such date as the sale of the subject Shares is to be effected. An Offeree acceptable to the Board of Directors will be sold that number of Shares (including fractional Shares) which the Offeree's subscription will purchase (to the extent accepted) at the Offering Price then in effect. The Offeree will be notified within thirty (30) days of the number of Shares allotted to it.

The Investment Manager may pay referral fees to unaffiliated eligible persons who introduce investors to the Fund and be reimbursed by the Fund for such payments to the extent that the aggregate amount of such referral fees, together with the Administrative Expenses, do not exceed the Expense Cap.

The Shares generally will be issued in book-entry, registered form and no share certificates representing the Shares subscribed for will be forwarded to a Shareholder unless specifically requested in writing.

The Board of Directors has the right to accept or reject any subscription, in whole or in part, for any reason or no reason.

<u>Suitability</u>

Prospective Shareholders in the Fund must be non-U.S. Persons or Permitted U.S. Persons and must meet other suitability requirements described below and in the Subscription Agreement and Revocable Proxy. All Permitted U.S. Persons must be either Accredited Investors or Sophisticated Investors. The Fund will not accept subscriptions from more than thirty-five (35) Sophisticated Investors. The Fund, in its sole and absolute discretion, may decline to accept the subscription for Shares of any prospective Shareholder.

The Fund's Articles of Association provide that: (i) Shares may not be owned by any U.S. Person other than a Permitted U.S. Person, (ii) Shares may not be owned by any corporation which is not a Permitted U.S. Person in which U.S. Persons hold ten (10%) percent or more of either voting power or value, (iii) Shares may not be owned by any partnership which is not a Permitted U.S. Person in which a U.S. Person is a partner, (iv) Shares may not be owned by a trust which is not a Permitted U.S. Person whose grantor or any of its beneficiaries is a U.S. Person, (v) Benefit Plan Investors may not own twenty-five (25%) percent or more of the outstanding Shares and (vi) Permitted U.S. Persons may not own fifty (50%) percent or more of the outstanding Shares. See *INVESTMENT BY U.S. TAX EXEMPT ENTITIES - ERISA CONSIDERATIONS*.

The term "U.S. Person" means, with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service, or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least thirty-one (31) days during such year, and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 1/3 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days. With respect to persons other than individuals, the term "U.S. Person" means (i) a corporation or partnership created or organized in the United States or under the laws of the United States or any state or (ii) a trust or estate which is subject to U.S. tax on its worldwide income from all sources.

-16-

The term "Permitted U.S. Persons" means any entity organized under the laws of the United States that is generally exempt from Federal income taxation.

Each Offeree desiring to purchase the Shares will be required to certify to the Fund, among other things: (i) the identity and nationality of the person or persons on whose behalf the Shares are being acquired; and (ii) the Shares are not being acquired by and will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person other than Permitted U.S. Persons. Shareholders will be required to notify the Fund immediately of any change in such information. **IT IS THE RESPONSIBILITY OF EACH SHAREHOLDER TO VERIFY THAT SUCH SHAREHOLDER SATISFIES THE SUITABILITY REQUIREMENTS SET FORTH HEREIN.**

Prior to acceptance of any subscription for Shares, each prospective Shareholder must represent in writing, by completing and signing the Subscription Agreement and Revocable Proxy, that, among other things:

1.      Neither the proposed record owner nor beneficial owner of the Shares is a U.S. Person other than a Permitted U.S. Person;

2.      The prospective Shareholder has such knowledge and experience in financial and business matters that the prospective Shareholder is capable of evaluating the merits and risks of the proposed investment, that the prospective Shareholder understands the method of compensation under the Investment Management Agreement and its risks and that the prospective Shareholder can bear the economic risk of the investment (i.e., at the time of the investment the prospective Shareholder can afford a complete loss of the investment and can afford to hold the investment for an indefinite period of time);

3.      The prospective Shareholder is acquiring Shares for investment purposes only and solely for the prospective Shareholder's own account and not with a view to or present intention of reselling them, except for the prospective Shareholder's right to redeem Shares;

4.      The Fund has, during the course of the Offering and prior to the sale of Shares, afforded the prospective Shareholder the opportunity to ask questions and receive answers concerning the terms and conditions of this Offering and to obtain any additional information, to the extent the Fund possesses such information or could acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in this Memorandum;

5.      The prospective Shareholder possesses certain other qualifications and makes certain other warranties and representations, as more fully set forth in the Subscription Agreement and Revocable Proxy;

6.      The prospective Shareholder will indemnify the Fund against any liability, costs or expenses resulting from any misrepresentation or breach of warranty in connection with the offer or sale of Shares;

7.      If the beneficial owner of the Shares is a publicly-held investment corporation, to the best of the knowledge of the owner, none of the beneficial interests in the shares of such corporation are owned, directly or indirectly through foreign entities, by any U.S. Person other than Permitted U.S. Persons;

8.      If the beneficial owner of the Shares is a closely-held corporation, none of the beneficial interests in the shares of such corporation are owned, directly or indirectly through foreign entities, by any U.S. Person other than Permitted U.S. Persons;

9.      The prospective Shareholder will not Transfer, directly or indirectly, any of the Shares or any interest therein (including without limitation any right to receive dividends or other distributions), unless the proposed transferee has made warranties similar to those contained in the "Subscription Agreement and Revocable Proxy", such warranties by such person have been approved by the Fund, such transferee is not to a U.S. Person and the consent of the Board of Directors has been obtained;

-17-

10.     The prospective Shareholder has consulted with such prospective Shareholder's own legal, tax and/or investment advisors to determine the suitability of an investment in the Shares, and the relationship of such an investment to the prospective Shareholder's overall investment program and financial and tax position;

11.     The prospective Shareholder has not dealt with a broker in connection with the purchase of the Shares, other than as is specifically disclosed in the Subscription Agreement and Revocable Proxy; and

12.     The prospective Shareholder is willing and able to bear the economic risks of an investment in the Fund for an indefinite period of time.

The suitability standards referred to above represent minimum suitability requirements for prospective Shareholders and the satisfaction of such standards by a prospective Shareholder does not necessarily mean that the Shares are a suitable investment for such prospective Shareholder or that the prospective Shareholder's subscription will be accepted.  The Board of Directors may, in circumstances it deems appropriate, modify such requirements.  In addition, the Board of Directors will have the right to reject a subscription for any reason deemed by the Board of Directors, in its sole discretion, to be sufficient.

-18-

## DETERMINATION OF OFFERING PRICE

When Shares are subscribed for at the beginning of the fiscal year ("Year Beginning") or at any time other than Year Beginning ("Interim Purchases") when there is a Loss Carryover (as defined below), certain adjustments to the amount of money paid for the purchase of Shares are necessary. This is done so that (i) the Incentive Fee paid to the Investment Manager is charged only to those Shares which have appreciated in value since their acquisition, (ii) all Shareholders will have the same amount per Share at risk and (iii) all Shares will have the same Net Asset Value. "Loss Carryover" shall mean, at anytime, the largest aggregate Unrecouped Loss attributable to an outstanding Share.

The number of Shares to be purchased will be based on the offering price per Share (the "Offering Price") as defined below. The Offering Price for each Share is calculated in the following manner:

(1)     For Shares purchased at the Year Beginning, the Offering Price is the Year Beginning Net Asset Value ("Beginning Value") plus a depreciation deposit ("Depreciation Deposit") equal to 20% of the Loss Carryover, if any, at Year Beginning. The Depreciation Deposit is invested and paid out as described in Section 2(a) below.

(2)     For Interim Purchases:

(a)     When the Net Asset Value per Share is less than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Offering Price is the sum of the Net Asset Value per Share and the "Depreciation Deposit". The Depreciation Deposit is 20% of the amount by which (i) and (ii) above exceed the Net Asset Value per Share at the date of purchase. The Depreciation Deposit is segregated and separately invested in U.S. Treasury Bills or other high quality short term debt securities or certificates of deposit and is not at risk with the Fund. It may, in certain circumstances, be returned to the Shareholder at the time of redemption of the Shares. It is included in the Offering Price to permit the Shares purchased on the date of purchase to be charged the 20% Incentive Fee with respect to any increase in Net Asset Value up to Beginning Value and with respect to any benefit received by reason of the existence of a Loss Carryover. If at the end of any fiscal year (or at any time during the fiscal year when the Shares of a Shareholder are redeemed), the losses which gave rise to the Depreciation Deposit are recouped, then, to the extent that the losses which gave rise to all or a portion of the Depreciation Deposit are recouped, the Depreciation Deposit will be paid to the Investment Manager as a part of the Incentive Fee. Any portion of the Depreciation Deposit not paid to the Investment Manager will be paid to the Shareholder upon redemption. Promptly after the end of each fiscal year in which a Depreciation Deposit is held, the interest (net of the income taxes payable thereon, if any) earned thereon will be paid to the Shareholder who made such Depreciation Deposit.

(b)     When the Net Asset Value per Share is more than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Offering Price is the sum of the Net Asset Value per Share and the "Equalization Factor" as defined below. The term "Equalization Factor" means an amount which the Shares outstanding since Year Beginning should be charged (i.e. 20% of the increase in Net Asset Value since Year Beginning in excess of the Loss Carryover at Year Beginning), and which the Shares subscribed for at the date of the Interim Purchase ("Interim Purchase Date") should not be charged. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is not lost in the current fiscal year, the Equalization Factor attributable to such increase becomes payable to the Shareholder at the end of the current fiscal year. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is lost in the fiscal year the Shares are purchased but is recovered in a subsequent fiscal year, the Equalization Factor attributable to such recovery will become payable to the Shareholder at the end of the fiscal year in which the recovery occurs. Upon redemption by a Shareholder of his Shares, the same amount of the Equalization Factor will be paid to him as if the date of redemption were the last day of the fiscal

-19-

A 0 0 5 0 5

year in which the Shares are redeemed.  Any Equalization Factor, or portion thereof, which is due to a Shareholder not redeeming his Shares will be used to purchase additional full Shares on behalf of such Shareholder as of the first day of the next succeeding fiscal year.

The following tables have been provided to illustrate the manner in which the adjustments set forth above operate.  Table I illustrates the manner in which the adjustments described above operate with respect to Shares subscribed for at the beginning and during a hypothetical fiscal year where there is no Loss Carryover at the beginning of the fiscal year.  Table II illustrates the manner in which the adjustments described above operate with respect to Shares subscribed for, prior to, at the beginning and during a hypothetical fiscal year where there is a Loss Carryover of $20 per Share at the end of the first year.

-20-

A 0 0 5 0 6

TABLE 1

| Shareholder | Shareholder Subscribes for Shares at | NAV on Date of Purchase | Equalization Factor Paid | Depreciation Deposit Amount Paid | Offering Price | NAV at Year End (before 20% Incentive Fee) | 20% Incentive Fee Accrued at Year End | Depreciation Deposit Paid to Investment Manager | Equalization Factor Returned to Shareholder | NAV at Year End (after 20% Incentive Fee) |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Year Beginning July 1 NAV = $100 | $100 | $0 | $0 | $100 | $130 | $6 | $0 | $0 | $124 |
| B | Interim Purchase Date Jan 1 NAV = $90 | 90 | 0 | 2 | 92* | 130 | 6 | 2 | 0 | 124 |
| C | Interim Purchase Date April 1 NAV = $110 (before 20% Incentive Fee) | 108 | 2 | 0 | 110** | 130** | 4 | 0 | 2 | 124 |

* Includes Depreciation Deposit

** Includes Equalization Factor

-21-

A00507

TABLE II

| Shareholder | Shareholder Subscribes for Shares at | NAV on Date of Purchase | Equalization Factor Paid | Depreciation Deposit Paid | Offering Price | NAV at Year End (before 20% Incentive Fee) | 20% Incentive Fee Accrued at End at Year 2 | Depreciation Deposit Paid to Investment Manager | Equalization Factor Returned to Shareholder | NAV at Year End (after 20% Incentive Fee) |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Beginning of Year 1 NAV = 100 | $100 | $0 | $0 | $100 | $115 | $3 | $0 | $0 | $112 |
| B | Beginning of Year 2 NAV = 80 | 80 | 0 | 4 | 84* | 115 | 3 | 4 | 0 | 112 |
| C | Interim Purchase Date Oct. 1 Year 2 NAV = 110 (before Incentive Fee) | 108 | 2 | 0 | 110** | 115** | 1 | 0 | 2 | 112 |

* Includes Depreciation Deposit

** Includes Equalization Factor

-22-

Shareholder B in Table 1, purchasing Shares on an Interim Purchase Date when the Net Asset Value has decreased since Year Beginning, pays an Offering Price of $92 per Share (which includes a Depreciation Deposit of $2) since the Incentive Fee which would accrue to his Shares would be $2 more than the Incentive Fee which would accrue for Shares purchased by Shareholder A at Year Beginning.

Shareholder C in Table I, purchasing Shares on an Interim Purchase Date when the Net Asset Value has increased since Year Beginning, pays an Offering Price of $110 per Share (which includes an Equalization Factor of $2). The Equalization Factor is returned to him at Year End and applied to the purchase of additional Shares since the Incentive Fee which would accrue to his Shares would be $2 less than the Incentive Fee which would accrue to the Shares purchased by Shareholder A.

Shareholder B in Table II, purchasing Shares at the beginning of Year 2 when the Net Asset Value has decreased since the beginning of Year 1, pays an Offering Price of $84 per Share (which includes a Depreciation Deposit of $4) since the Incentive Fee which would accrue to his Shares would be $4 more than the Incentive Fee which would accrue for Shares purchased by Shareholder A at Year 1. The Depreciation Deposit is paid to the Investment Manager at the end of Year 2 when the Net Asset Value for Shareholder B's Shares has increased by more than the loss carryover.

Shareholder C in Table II, purchasing Shares on an Interim Purchase Date during Year 2 when the Net Asset Value has increased since the beginning of Year 1, pays an Offering Price of $110 per Share (which includes an Equalization Factor of $2) since the amount of funds he would otherwise have at risk would be $2 less than the amount of funds at risk of Shareholder A. The Equalization Factor is returned to him and applied to the purchase of additional Shares at the end of Year 2 since the Incentive Fee which would accrue to his Shares would be $2 less than the Incentive Fee which accrues to Shareholder A.

-23-

## DETERMINATION OF NET ASSET VALUE

The Net Asset Value of the Fund is equivalent to its gross assets less its gross liabilities as of any Valuation Date (as defined below) or Redemption Date. Net Asset Value per Share is determined by dividing Net Asset Value of the Fund by the number of outstanding Shares. The Net Asset Value of a Share at any date shall be the total net assets of the Fund divided by the number of Shares then outstanding. The total net assets of the Fund at any date shall be determined on an accrual basis of accounting in accordance with generally accepted accounting principles in the United States of America and in accordance with the following:

(a)     no value will be assigned to goodwill;

(b)     organizational expenses will be written off over a five year period beginning on the date the Fund commences operations;

(c)     accrued investment management fees and other fees will be treated as liabilities;

(d)     securities and instruments which are listed or quoted on a securities or other exchange market (including the National Association of Securities Dealers National Market System), other than securities and instruments which are in the form of put or call options, shall be valued at their last sales prices on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Board of Directors;

(e)     securities and instruments which are in the form of put and call options and are listed or quoted on a securities or other exchange or market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Board of Directors;

(f)     securities and instruments which are not listed or quoted on a securities or other market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Board of Directors;

(g)     securities and instruments which are in the form of put and call options and are not listed or quoted on a securities, commodities or futures exchange or market shall be valued at their parity value, except when the Board of Directors has reasonably assigned some other value to such securities and instruments;

(h)     the value of any shares of stock held by the Fund in an investment company which is, or which is similar to those companies which are, registered as investment companies under the United States Investment Company Act of 1940, as amended, shall be valued in accordance with the manner in which such shares are valued by such investment company; provided, however, that the Board of Directors may make such adjustments in such valuation as the Fund may from time to time consider appropriate; and

(i)     all other assets of the Fund shall be valued in the manner determined by the Board of Directors of the Fund to reflect their market value.

-24-

All such valuations shall be made as of the last Business Day of a month and at such other times as the Board of Directors shall determine (each, a "Valuation Date"). If the Board of Directors determines, in its sole discretion, that the valuation of any security or instrument pursuant to the foregoing does not fairly represent its market value, the Board of Directors shall value such security or instrument as it reasonably determines and shall set forth the basis of such valuation in writing in the Fund's records. The value of any investment, security or instrument as aforesaid or other property for which no price quotations are available as above provided shall be determined in such manner as the Board of Directors, in its sole discretion, reasonably determines and the basis of such valuation shall be set forth in writing in the Fund's records. Notwithstanding the foregoing, where on any Valuation Date or Redemption Date, any cash or other asset of the Fund has been realized or contracted to be realized, there shall be included in the assets of the Fund, in place of such cash or other asset, the assets receivable by the Fund in respect thereof, provided that if the value of such assets is not then known exactly, then the value shall be as estimated by the Board of Directors, and provided that if the net amount receivable is not payable until some future time after the Valuation Date or Redemption Date, the Board of Directors may make such allowance (discounting of claims) as is considered appropriate to reflect the true current value thereof.

In connection with the determination of the Net Asset Value of Shares, the Board of Directors may consult with and is entitled to rely upon the advice of the Fund's Investment Manager and Prime Broker. In no event and under no circumstances shall the Board of Directors, the Investment Manager or Prime Broker incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

-25-

## TRANSFER AND REDEMPTION

### Transfer

A00511

The Fund's Memorandum and Articles of Association provide that, without the prior written consent of the Board of Directors, any sale, assignment, transfer, conveyance or other disposition of Shares or any attempt to do any of the foregoing (collectively, "Transfer") will not be recognized by the Fund. The Fund may only withhold its consent to a Transfer of Shares if the Transfer of Shares would lead to legal, regulatory, pecuniary or material administrative disadvantage for the Fund or Shareholders. Any attempt to Transfer Shares as whole or to maintain the minimum shareholding per Shareholder. There is no independent market for the purchase or Transfer of Shares, and none is expected to develop. Offerees desiring to purchase Shares without such consent may subject such Shares to a compulsory redemption. There is no independent market for the purchase or Transfer of Shares, and none is expected to develop. only, solely for their own account and not with a view to or present intention to Transfer the Shares. The Shares are not being, and will not be, offered in the United States or its territories or possessions or to U.S. Persons other than Permitted U.S. Persons, and no Transfer of the Shares may be made to or held for the benefit of U.S. Persons.

THE TRANSFER OF SHARES TO U.S. PERSONS IS PROHIBITED. THE FUND SHALL HAVE THE RIGHT COMPULSORILY AND IMMEDIATELY TO REDEEM ANY SHARES TRANSFERRED TO A U.S. PERSON. MEMORANDUM AND ARTICLES OF ASSOCIATION ANY SHARES TRANSFERRED TO A U.S. PERSON.

### Redemption

Shareholders may, in accordance with and subject to the applicable provisions of the Memorandum and Articles of Association and the laws of the British Virgin Islands, redeem their Shares as of the last Business Day of each fiscal quarter, in each case upon at least six (6) months' prior written notice (subject to the Board of Directors, in its sole and absolute discretion, waiving or reducing such notice requirement), and at such other times, with the consent of, and upon such terms of payment as may be approved by, the Board of Directors, in its sole and absolute discretion (such dates being referred to as "Redemption Dates"). If a redemption would cause the value of a Shareholder's Shares to fall below $1,000,000, or such lesser amount as determined by the Board of Directors in its sole and absolute discretion, then the Board of Directors will have the right to compel redemption of all Shares held by such Shareholder. Shares will be redeemed at the Redemption Price as of the close of business on such Redemption Date. The "Redemption Price" shall equal (1) the Net Asset Value of the Shares on the Redemption Date, (2) all or a portion of the Depreciation Deposit to the extent it is not paid to the Investment Manager as an Incentive Fee and (3) all or a portion of the Equalization Factor to the extent that the increase in value of the Shares that caused the payment of the Equalization Factor has not been lost or has not been paid previously to the redeeming Shareholder, less the accrued Management Fee and Incentive Fee payable to the Investment Manager attributable to the Shares redeemed. Payment of the Redemption Price is subject to a Redemption Charge, if applicable. See "DETERMINATION OF OFFERING PRICE".

Redemption requests must be on the Fund's Form of Request for Redemption of Shares ("Redemption Form") and may be made by mail or facsimile; however, the Redemption Price will not be paid until an original executed copy of the Redemption Form is received by the Fund. If the Shareholder has elected to have share certificates sent to him rather than held for him by CITCO, the Redemption Form must be accompanied by delivery to the Fund of the certificates for the Shares to be redeemed, duly endorsed for transfer or accompanied by a proper instrument of transfer. The original executed copy of the Redemption Form should be sent to Lancer Offshore, Inc., c o CITCO Fund Services (Curacao) N.V., Kaya Flamboyan 9, P.O. Box 812, Curacao, Netherlands Antilles.

Payment of ninety-five (95%) percent of the aggregate Redemption Price for redeemed Shares normally will be made within thirty (30) days after an authorized Redemption Date. Payment of the balance of the aggregate Redemption Price will be made thirty (30) days after completion of (i) unaudited quarterly financial statements for redemptions on the last Business Day of the first three (3) fiscal quarters of the Fund; or (ii) audited financial statements for redemptions on the last Business Day of a fiscal year.

-26-

**A 0 0 5 1 2**

Redemption proceeds generally will be paid in U.S. $. In accordance with the Fund's Articles of Association, any redemption of Shares within one (1) year of a Shareholder's initial investment in the Fund (whether Shares are acquired directly from the Fund or by way of Transfer in the secondary market) will be subject to a Redemption Charge. Other than the Redemption Charge, there are no redemption charges.

The Board of Directors, upon not less than ten (10) days' prior written notice to a Shareholder, may compel redemption of all of such Shareholder's Shares at any time if the Board of Directors determines that the continued ownership of Shares by such Shareholder may result in a legal, pecuniary, regulatory, taxation or material administrative disadvantage for the Fund or the Shareholders as a whole or to maintain the minimum shareholding per Shareholder. Under such circumstances, the Board of Directors will have the irrevocable power to act in the name of such Shareholder to redeem his Shares. In the event of any compulsory redemption, the Redemption Price will be (i) the Net Asset Value of the Fund as at the close of business on such Redemption Date (which includes an accrual for the Incentive Fee) multiplied by (ii) a fraction the numerator of which is the number of Shares being redeemed and the denominator of which is the number of Shares outstanding as of such date. See "*DETERMINATION OF NET ASSET VALUE*". Such Shareholder will have no Shareholder rights with respect to the Shares to be redeemed after the close of business on the date as of which the Redemption Price was calculated, except the right to receive the Redemption Price therefor, without interest.

The Board of Directors may suspend Share redemptions and subscriptions (a) during any period when any stock exchange or over-the-counter market on which a substantial position of the Fund's investments are quoted, traded, listed or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (b) when circumstances exist as a result of which in the opinion of the Board of Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to Shareholders; (c) when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets cannot reasonably or fairly be ascertained; or (d) during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Board of Directors be effected at normal rates of exchange. During the suspension period, requests for redemption of Shares may be withdrawn. To the extent that a request for redemption of Shares is not withdrawn, the redemption shall be effected as of the first Redemption Date following the recommencement of redemptions. Any such suspension shall be notified immediately to the Irish Stock Exchange. Where possible, all reasonable efforts will be taken to bring any period of suspension to an end as soon as possible.

CERTAIN TAX CONSIDERATIONS

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE SHAREHOLDERS. EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT HIS PROFESSIONAL TAX ADVISER WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING ON THE STATUS OF A PARTICULAR SHAREHOLDER. THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE TO PROSPECTIVE SHAREHOLDERS.

The Fund has not sought a ruling from the U.S. Internal Revenue Service or any other U.S., Federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has it obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain material U.S. Federal tax issues which may be relevant to prospective Shareholders. The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practice, all of which are subject to change, retroactively as well as prospectively. A decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND PROPOSED OPERATIONS OF THE FUND, THE FUND GENERALLY SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

Non-U.S. Shareholders

A "Non-U.S. Shareholder" is any Shareholder other than (i) a citizen or resident of the United States; (ii) a corporation, partnership, or other entity created or organized in the United States, under the laws of the United States or of any state or political subdivision thereof, (iii) an estate whose income is includible in gross income for United States Federal income tax purposes, regardless of its source, or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and (b) one or more U.S. persons have the authority to control all substantial decisions of the trust.

U.S. Trade or Business

In general, a foreign corporation is subject to U.S. income tax on its income from United States sources under two separate sets of rules. Under the first set of rules, if a foreign corporation is deemed to be engaged in a United States trade or business, such foreign corporation will be subject to U.S. income taxation at the graduated rates generally applicable to U.S. corporations and may also be subject to a 30% branch profits tax. Section 864(b)(2) of the United States Internal Revenue Code of 1986, as amended (the "IRC"), sets forth a safe harbor (the "Safe Harbor") which provides that a foreign corporation that trades securities for its own account (other than a dealer in securities) or a foreign corporation that trades commodities for its own account (other than a dealer in commodities) is not deemed to be engaged in a U.S. trade or business by reason of such activity. A proposed regulation (the "Proposed Regulation") creates a similar safe harbor provision applicable to foreign corporations trading certain derivative instruments such as options, forward contracts, short positions and similar financial instruments in commodities, currencies, stocks, partnership or beneficial interests in publicly traded partnerships or trusts, notes, bonds, debentures and other evidences of indebtedness, and notional principal contracts. Furthermore, the Proposed Regulation applies only to foreign persons other than (i) dealers in stocks and securities, (ii) dealers in commodities, and (iii) persons who regularly offer to enter into, assume, offset or otherwise terminate positions in derivatives with customers in the ordinary course of a trade or business (including regularly holding oneself out, in the ordinary course of a trade or business, as being willing and able to enter into either side of a derivative transaction). The Preamble to the Proposed Regulation provides that until the final regulations are issued, taxpayers

-28-

may take any reasonable position, including that set forth in the Proposed Regulation. The Fund intends to conduct its business operations in a manner so as to meet the requirements of the Safe Harbor and the Proposed Regulation. Accordingly, the Fund's trading activities should not constitute a trade or business and, except in the limited circumstances discussed below, the Fund should not be subject to the regular U.S. income tax on any of its profits

Even if the Fund's trading activity does not constitute a U.S. trade or business, gains realized from the sale or disposition of (i) stock or securities (other than debt instruments with no equity component) of U.S. Real Property Holding Corporations (as defined in Section 897 of the IRC) ("USRPHCs") or (ii) stock or securities (other than debt instruments with no equity component) of Real Estate Investment Trusts ("REITs"), will be generally subject to U.S. income tax on a net basis. However, certain principal exceptions to these rules of taxation would apply (i) in the case of an interest in a USRPHC, if such interest is a class of stock which is regularly traded on an established securities market and the Fund generally did not hold more than five (5%) percent of such regularly traded class of stock at any time during the five (5) year period ending on the date of disposition, or (ii) in the case of an interest in a REIT, if during the five (5) year period ending on the date of disposition (or during the life of the REIT, if shorter) less than fifty (50%) percent in value of the stock of the REIT was held directly or indirectly by foreign persons. Moreover, if the Fund were deemed to be engaged in a U.S. trade or business as a result of owning a limited partnership interest in a U.S. business partnership or a similar ownership interest, income and gain realized from that investment would be subject to U.S. income and branch profits taxes.

U.S. Withholding Tax

Under the second set of rules, certain types of United States source income that is not effectively connected with a United States trade or business is subject to a withholding tax of 30% (unless reduced by an applicable income tax treaty). The types of income subject to the 30% withholding tax include dividends, rents, certain interest, certain other gains (but not capital gains from the sale of securities) and original issue discount. There is presently no tax treaty between the U.S. and the British Virgin Islands.

Generally, dividends are considered to be from United States sources (and are subject to 30% withholding) where the payor is incorporated under the laws of one of the fifty states or the District of Columbia. Furthermore, where a foreign corporation is engaged in the United States trade or business, and 25% or more of such corporation's worldwide income over a specified testing period is effectively connected with such trade or business, a portion of the dividends received from such corporation (which bears the same ratio as such corporation's income which is effectively connected with the U.S. trade or business bears to the worldwide income) is treated as from U.S. sources.

Certain types of income are specifically exempted from the thirty (30%) percent tax and thus withholding is not required on payments of such income to a foreign corporation. The thirty (30%) percent tax generally does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a foreign corporation on its deposits with U.S. banks. The thirty (30%) percent tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which is issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the thirty (30%) percent tax receives the required statement that the beneficial owner of the obligation is not a U.S. person and certain other requirements are met. Under certain circumstances, interest on bearer obligations may also be considered portfolio interest. Also exempt from the thirty (30%) percent tax is income from original issue discount obligations which are payable no more than 183 days from the date of issue.

Redemption of Shares

In general, any gain realized by a Non-U.S. Shareholder on the sale, exchange, redemption or disposition of Shares will not be subject to U.S. Federal income tax, unless (i) such gain is effectively connected with a U.S. trade or business, (ii) the Non-U.S. Shareholder is an individual who is present in the United States for 183 days or more during the taxable year of the disposition and certain other conditions are met, (iii) the Non-U.S. Shareholder is subject to tax under U.S. Federal income tax law provisions applicable to certain expatriates, including certain former citizens and residents of the United States, or (iv) the Shares are treated as a United States real property

-29-

interest. Based solely on the Fund's anticipated activities, it is not expected that the conditions set forth in (i) or (iv) above will be met.

Permitted U.S. Persons

Permitted U.S. Persons are U.S. entities that generally are exempt from Federal income tax on their passive income (e.g., qualified pension plans and certain charitable organizations). Shares in the Fund will constitute equity in a passive foreign investment company ("PFIC") for U.S. tax purposes. Although not entirely clear, under current U.S. income tax law, a Permitted U.S. Person that holds shares as capital assets should not be subject to the unrelated business income tax ("UBIT") with respect to any dividends received in respect of its holding Shares and any gain from the disposition of Shares, provided that (i) such Permitted U.S. Person does not incur acquisition indebtedness in connection with an investment in the Fund, (ii) the Fund is not a "controlled foreign corporation," or "CFC," for U.S. Federal income tax purposes and (iii) such Permitted U.S. Person does not make a "mark-to-market" election (pursuant to Section 1296) with respect to its Shares in the Fund. The Fund could be a CFC if fifty (50%) percent or more of the Shareholders in the Fund (measured by voting power or value) were owned by U.S. Shareholders, each owning ten (10%) percent or more of the total combined voting power of such foreign corporation. To avoid being treated as a CFC (or, in addition, a foreign personal holding company, or foreign investment company) the Investment Manager will limit the Shares held by Permitted U.S. Persons to less than fifty (50%) percent of the outstanding Shares. Permitted U.S. Persons may be subject to certain United States information reporting requirements based on their ownership of the Shares. **PERMITTED U.S. PERSONS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISERS REGARDING THE TAX CONSEQUENCES AND INFORMATION REPORTING REQUIREMENTS OF AN INVESTMENT IN THE FUND.**

U.S. tax legislation has been proposed in the past that would significantly alter certain of the UBIT, CFC and PFIC rules described above. It is not possible to predict whether any similar legislation will be proposed or enacted in the future; accordingly, a Permitted U.S. Person should consult its tax adviser with respect to any proposed U.S. tax legislation that could affect the U.S. Federal income tax treatment of an investment in the Fund.

Estate and Gift Taxes

Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Shares

Other Jurisdictions

Income realized by the Fund from non-U.S. sources may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

British Virgin Islands

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Ordinance of the British Virgin Islands with respect to all dividends, interests, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the British Virgin Islands and is also exempt from any capital gains realized with respect to any shares, debt obligations or other securities of the Fund by persons who are not persons resident in the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the British Virgin Islands with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange controls in the British Virgin Islands and, accordingly, the Fund is free to acquire, hold and sell any securities without restriction under the laws of the British Virgin Islands.

-30-

The foregoing discussion represents a general summary of tax law and is based on current law and interpretations thereof on the date of this Memorandum. No assurance can be given that applicable tax law and interpretations thereof will not be changed in the future. Additionally, in view of the number of different jurisdictions where local laws may apply to a Shareholder of the Fund, this Memorandum does not discuss the local tax consequences to a potential Shareholder arising from the subscription, purchase, holding and redemption of Shares. Accordingly, prospective Shareholders are urged to consult their own professional advisers and inform themselves of, and where appropriate take advice on, the laws and regulations (such as taxation and exchange controls) applicable to the subscription, purchase, holding and redemption of Shares in the place of their citizenship, residence, domicile or incorporation and the places in which they conduct business.

Other Taxes

Offerees should consult their own counsel regarding tax laws and regulations of any other jurisdiction which may be applicable to them.

Future Changes in Applicable law

The foregoing description of U.S. and the British Virgin Islands tax consequences of an investment in and the operations of the Fund is based on laws and regulations which are subject to change through legislative, judicial or administrative action. Other legislation could be proposed that, if enacted, would subject the Fund to income taxes or subject Shareholders to increased income taxes.

THE FOREGOING DISCUSSION REPRESENTS A GENERAL SUMMARY OF TAX LAW AND IS BASED ON CURRENT LAW AND INTERPRETATIONS THEREOF ON THE DATE OF THIS MEMORANDUM. NO ASSURANCE CAN BE GIVEN THAT APPLICABLE TAX LAW AND INTERPRETATIONS THEREOF WILL NOT BE CHANGED IN THE FUTURE. ADDITIONALLY, IN VIEW OF THE NUMBER OF DIFFERENT JURISDICTIONS WHERE LOCAL LAWS MAY APPLY TO A PROSPECTIVE SHAREHOLDER, THIS MEMORANDUM DOES NOT DISCUSS THE LOCAL TAX CONSEQUENCES TO A POTENTIAL SHAREHOLDER ARISING FROM THE SUBSCRIPTION, PURCHASE, HOLDING AND REDEMPTION OF SHARES. ACCORDINGLY, PROSPECTIVE SHAREHOLDERS ARE URGED TO CONSULT THEIR OWN PROFESSIONAL ADVISERS AND INFORM THEMSELVES OF, AND WHERE APPROPRIATE TAKE ADVICE ON, THE LAWS AND REGULATIONS (SUCH AS TAXATION AND EXCHANGE CONTROLS) APPLICABLE TO THE SUBSCRIPTION, PURCHASE, HOLDING AND REDEMPTION OF SHARES IN THE PLACE OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE OR INCORPORATION AND THE PLACES IN WHICH THEY CONDUCT BUSINESS.

INVESTMENT BY U.S. TAX EXEMPT ENTITIES – ERISA CONSIDERATIONS

General

In considering an investment in the Fund of a portion of the assets of employee benefit plans subject to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), including IRAs and Keogh plans (hereinafter referred to individually as "Plan" and collectively as "Plans"), fiduciaries and their legal counsel should consider, in light of all of the matters disclosed in this Memorandum, and the Plan's funding objectives and requirements, whether: (i) the investment in the Fund is prudent and in accordance with the documents and instruments governing such Plan; (ii) the investment is consistent with the fiduciary responsibility to diversify the Plan's investments under Section 404(a)(1)(C) of ERISA, if applicable; (iii) the investment will result in unrelated business taxable income ("UBTI") to the Plan; and (iv) the investment is consistent with the Plan's cash flow needs in view of the illiquidity of an investment in the Fund as described elsewhere in this Memorandum. Plan fiduciaries must make their own determination regarding whether an investment in the Fund is prudent under ERISA, taking into consideration all of the specific facts and circumstances of the Plan and an investment in the Fund.

ERISA generally requires that the assets of employee benefit plans be held in trust and that the trustee, or a duly authorized investment manager (within the meaning of Section 3(38) of ERISA), have exclusive authority and discretion to manage and control the assets of the Plan. ERISA also imposes certain duties on persons who are fiduciaries of employee benefit plans subject to ERISA and prohibits certain transactions between an employee benefit plan and the fiduciaries of such plan. Under the IRC, similar prohibitions apply to all Plans which are not subject to ERISA. Under ERISA and the IRC, any person who exercises any discretionary authority or discretionary control respecting the management or disposition of the assets of a Plan or who renders investment advice for a fee to a Plan is considered to be a fiduciary of such Plan (subject to certain exceptions not here relevant). Each Plan Investor who so requests will be issued a certificate evidencing its Shares in the Fund. The possession of such indicia of ownership should satisfy the holding in trust requirements of ERISA.

Furthermore, ERISA and the IRC prohibit fiduciaries of a Plan from engaging in various acts of self-dealing. In order to avoid such self dealings with respect to any Plan which invests in the Fund, the Investment Adviser will not permit an investment in the Fund with assets of any Plan (including a Keogh plan or IRA) if the Investment Adviser (i) has investment discretion with respect to such assets or (ii) regularly gives individualized investment advice which serves as the primary basis for the investment decisions made with respect to such assets.

Plan Asset Rules

If, by virtue of a Plan's purchase of a Share in the Fund, the assets of the Fund are deemed to be "plan assets" under ERISA, then: (i) the Investment Adviser may be required to adhere to the standards of a "fiduciary" under ERISA; and (ii) certain other transactions in which the Fund may engage may constitute prohibited transactions under Section 406 of ERISA and Section 4975(a) of the IRC.

ERISA and the IRC do not explicitly define what assets are "plan assets". Regulations issued by the Department of Labor (the "Regulations") generally provide that, unless certain exemptions apply, when a Plan acquires an equity interest in a corporation, partnership or other entity, which interest is neither a "publicly offered" readily transferable security nor a security issued by an investment company registered under the ICA, the assets of such Plan will include not only the investment, but also the underlying assets of the entity in which the equity investment is made.

The Regulations provide, however, that the assets of a corporation or partnership in which an employee benefit plan invests would not be deemed to be assets of such plan if less than twenty-five (25%) percent of each class of equity interests in the corporation or partnership are held in the aggregate by "benefit plan investors" (including, for this purpose, benefit plans such as foreign plans, Keogh Plans for owner-employees and IRAs which are not subject to the general requirements of ERISA). For purposes of this "25 percent" rule, the interests of any person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the

corporation or partnership, or who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such person, shall be disregarded. Thus, any investment in the Fund by the Investment Adviser or its affiliates will be disregarded in determining whether this exemption is satisfied.

The Investment Adviser will not permit investments in the Fund by "benefit plan investors" to equal or exceed at any time twenty-five (25%) percent of the equity interests of the Fund. Accordingly, the above exemption will be applicable and the assets of the Fund should not be deemed to be plan assets under ERISA. In order to comply with the foregoing, the Investment Adviser has the right, in its sole discretion, to reject any proposed investment by a Shareholder or by an existing Shareholder and/or to require a mandatory redemption of all or part of the Shares of a Shareholder. Accordingly, Plan fiduciaries considering an investment in the Fund should consider the fact that neither the Investment Adviser nor its affiliates nor any of their respective officers, directors, agents, employees, affiliates, advisers or consultants will be acting as a fiduciary under ERISA or the IRC in managing the assets of the Fund.

Unrelated Business Taxable Income

Unless removed from the purview of IRC Section 501(a) by a relevant exception, organizations described in that provision are exempt from Federal income tax. Notwithstanding this, such organizations are subject to income taxes at the rate applicable to business corporations on their UBTI under Section 511(a) of the IRC. Generally, UBTI means the gross income (with certain exceptions) derived by an IRC Section 501(a) exempt organization from any trade or business carried on by such entity which is unrelated to the entity's exempt purposes, less certain deductions related to such trade or business. UBTI includes the income recognized by a tax exempt entity from any unrelated trade or business regularly carried on by a partnership of which such tax exempt entity is a partner. Also included in UBTI is "unrelated debt financed income". This is generally the net income from assets not related to the entity's exempt purpose, acquired with debt, to the extent of the ratio of debt on such assets to such assets' adjusted basis.

Under Section 512(b) of the IRC, certain forms of income are excluded from the definition of UBTI. These items include dividends, interest, annuities, royalties, capital gains, rents from real property and, in limited circumstances, personal property leased with real property. To the extent, however, that the Fund employs debt in its strategy, or if the Fund acquires securities of an entity that generates UBTI that flows through to the Fund (e.g., a corporation) or if Fund activities are determined to be a trade or business within the meaning of IRC Section 513, it is possible that otherwise tax-exempt investors subject to these rules would be liable for tax on part of their allocable share of Fund income.

Each tax-exempt investor is urged to consult with its own professional tax advisers concerning the suitability of this investment, taking into account the likelihood that such investment will generate UBTI, as well as whether, under the particular circumstances of its investment, its interest would constitute debt-financed property.

ADMINISTRATION

Board of Directors

The Fund has a Board of Directors which is elected annually by the Shareholders. The Board of Directors meets at least once a year to review and assess the investment policy and performance of the Fund and generally to supervise the conduct of its affairs. The Board of Directors is required to hold at least one Board meeting per annum in the British Virgin Islands. The Board of Directors has adopted resolutions approving the sale of the Shares in accordance with the terms set forth in this Memorandum. The Directors will not receive any remuneration from the Fund for serving as such. No person may serve as a Director once they are 70 years old.

The Board of Directors has the right to terminate the Fund at any time and for any reason. In the case of such termination, the Fund's assets will be distributed to the Shareholders within thirty (30) days after completion of a final audit of the Fund's books. The Directors will use their best endeavors to procure the final audit within ninety (90) days.

The directors of the Fund are as follows:

**John W. Bendall, Jr.** founded Hermitage Capital Corporation in 1986; he is presently its Chairman and Chief Executive Officer. Mr. Bendall was Senior Vice-President and Head of Institutional Sales of Bateman, Eichler, Hill and Richards from 1977 to 1986. He was a Specialist in Mergers and Acquisitions at William E. Hill and Co. (a Division of Dunn and Bradstreet). Mr. Bendall also serves as a Director of JBC Holdings.

**Dr. Richard Geist** is President of The Institute of Psychology and Investing, Inc. Dr. Geist received his undergraduate degree and his doctorate in Psychology from Harvard University and is an Instructor in the Department of Psychiatry at Harvard Medical School. Dr. Geist has written and lectured extensively on the psychology of investing. His recommendations have been featured in various financial publications and he has appeared on numerous national television and radio programs.

The Articles provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Fund through the insufficiency or deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his officer or in relation thereto, to the extent permitted by law.

The Articles further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors out of the funds of the Fund to pay all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if any such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

The Administrator

CITCO Fund Services (Curaçao) N.V. (the "Administrator") has been retained by the Fund to perform administrative services for the Fund. Pursuant to an Administration Agreement entered into between the Fund and the Administrator (the "Administration Agreement"), the Administrator is responsible for, among other things: (i)

-34-

maintaining the register of Shareholders of the Fund and generally performing all actions related to the issuance and transfer of Shares of the Fund and the safe-keeping of certificates therefor, if any, (ii) reviewing subscriptions for Shares and accepting payment therefor, (iii) publishing and furnishing the Net Asset Value of the Fund's Shares in accordance with its Articles of Association, (iv) performing all acts related to redemption of Shares, (v) keeping the accounts of the Fund and such financial books and records as are required by law or otherwise for the proper conduct of the financial affairs of the Fund and making available annual financial statements for inspection, as well as furnishing quarterly reports regarding the Fund's performance and Net Asset Value per Share, to Shareholders and (vi) performing all other matters necessary in connection with the administration of the Fund. The Administration Agreement provides for exculpation of liability of the Administrator and that the Fund will indemnify the Administrator as to certain liabilities and costs, except for those liabilities and costs caused by the Administrator's own gross negligence, willful misconduct or reckless disregard of its duties. The Administrator receives customary fees paid out of Fund assets based upon the nature and extent of the services performed by the Administrator for the Fund. The Administration Agreement may be terminated at any time without penalty by either of the parties upon not less than ninety (90) days' notice.

Brokerage Commissions

The Investment Manager has the sole power and authority to determine the broker to be used for each securities transaction for the Fund. In selecting brokers or dealers to execute transactions, the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost. In selecting brokers, the Investment Manager may or may not negotiate "execution only" commission rates; thus, the Fund may be deemed to be paying for other services provided by the broker to the Fund or the Investment Manager or their affiliates which are included in the commission rate. In negotiating commission rates, the Investment Manager will take into account the financial stability and reputation of brokerage firms and the brokerage, research and other services provided by such brokers, although the Fund may not, in any particular instance, be the direct or indirect beneficiary of the services provided. The Investment Manager may also direct commissions to brokers who refer clients to the Fund. In addition, the Investment Manager is authorized to direct commissions to certain broker/dealers which may furnish other services to the Fund or the Investment Manager or their affiliates, such as telephone lines, news and quotation equipment, electronic office equipment, account record keeping and clerical services, financial publications, economic consulting services, office space and facilities and travel and entertainment expenses.

Accordingly, the Fund may be deemed to be paying for research and other services with "soft" or commission dollars. Although the Investment Manager believes the Fund will benefit from many of the services obtained with soft dollars generated by Fund trades, the Fund will not benefit exclusively. The Investment Manager may also derive direct or indirect benefits from some or all of these services, particularly to the extent that the Investment Manager uses "soft" or commission dollars to pay for expenses it would otherwise be required to pay itself.

Section 28(e) of the United States Federal Securities Exchange Act of 1934, as amended, provides a "safe harbor" to investment managers who use commission dollars generated by their advised accounts to obtain investment research and brokerage services that provide lawful and appropriate assistance to the manager in the performance of investment decision-making responsibilities. Conduct outside of the safe harbor afforded by Section 28(e) is subject to the traditional standards of fiduciary duty under state and Federal law. Notwithstanding a good faith determination that the amount of commissions paid is reasonable in relation to the value of brokerage research services provided, to the extent that the Investment Manager determines to use commission dollars to pay for products and services that provide administrative or other nonresearch assistance to the Investment Manager, such payments may not fall within the safe harbor of Section 28(e).

The Fund's investment program will emphasize active management of the Fund's portfolio. Consequently, the Fund's portfolio turnover and brokerage commission expenses may be greater than for other types of investment vehicles.

-35-

Conflicts of Interest

The Fund's Directors, the Administrator and the Prime Broker perform similar services for other pooled investment vehicles, many of which are larger and have greater resources than the Fund. The Fund believes that there are no conflicts of interest that exist between the Fund, on the one hand, and the Fund's Directors, the Administrator or the Prime Broker, on the other hand. For a discussion of the conflicts of interest between the Fund and the Investment Manager, see "CONFLICTS OF INTEREST".

Prime Broker

The Fund has appointed Banc of America Securities, LLC ("BAS"), as prime broker and custodian. As such, BAS will settle and clear all transactions executed by the Fund. Such transactions may be executed through BAS or other brokers.

The custodial functions of BAS include, among other matters, arranging for: (i) the receipt and delivery of securities purchased, sold, borrowed and loaned; (ii) the making and receiving payments therefor; (iii) custody of securities fully paid or not fully paid for and, therefore, compliance with margin and maintenance requirements; (iv) custody of all cash, dividends and exchanges, distributions and rights accruing to an account, or delivery of cash to the Fund's banks; and (v) tendering securities in connection with cash tender offers, exchange offers, mergers or other corporate reorganizations. BAS has no decision-making discretion relating to the Fund's investments.

BAS is entrusted with the safe custody of all the assets of the Fund and maintains segregated accounts in the name of and for the sole benefit of the Fund. The assets of the Fund will be separately designated in the books of BAS. These fully paid assets will be segregated from BAS' own proprietary positions in order to ensure adequate protection in the event of the bankruptcy or insolvency of BAS. Fully paid for assets refers to all assets not deposited as margin. Non-fully paid for securities held in the margin accounts with BAS need not be segregated and may be available to the creditors of BAS. The assets of the Fund may also be deposited as margin with other brokers dealers and may not be held in segregated accounts.

The Fund is not required to pay any custody fee to BAS to act as Prime Broker and custodian. The Fund is not committed to continue its "prime brokerage" relationship or its clearing relationship with BAS for any minimum period. If the Fund uses another prime broker, it may be required to pay separate fees in cash. To the extent that securities are purchased in non-U.S. markets, BAS will transfer funds to its sub-brokers located in the country in which the securities are purchased. Such sub-brokers (sub-custodians) will maintain custody of the securities until such time as they are sold, at which point uninvested proceeds will be transferred back to the Fund's account at BAS. BAS shall exercise reasonable skill, care and diligence in the selection of sub-custodians. BAS will be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of any sub-custodian to provide custodian services to the Fund. BAS shall maintain an appropriate level of supervision over the sub-custodians and make appropriate enquiries, periodically to confirm that the obligations of the sub-custodians continue to be competently discharged. BAS remains responsible for losses arising from the acts or omissions or insolvency of such sub-custodians. A sub-custodian who holds assets of the Fund other than margin will segregate those assets in segregated accounts to ensure that they are unavailable to creditors of the sub-custodian or any other entity. The fees of any such sub-custodians shall be at normal commercial rates. The Investment Manager also expects to allocate portions of the Fund's brokerage business to BAS.

Accounting Matters

The Fund's accountants are PricewaterhouseCoopers, which have audited the Fund's accounts for the Fiscal Year ended December 31, 1999 and 2000 and they are expected to audit the Fund's accounts for the Fiscal Year ended December 31, 2001 and the current Fiscal Year. The annual accounts of the Fund have been audited since inception of the Fund.

-36-

SUBSCRIPTION PROCEDURES

Offerees interested in subscribing for Shares will be furnished a Subscription Document Booklet which contains Instructions For Subscribers and a Subscription Agreement and Revocable Proxy to be completed by them for a specified dollar amount of Shares. The Fund is domiciled in the British Virgin Islands and as such the Irish Stock Exchange requires that there is a minimum subscription amount of US$100,000 at all times. The Fund currently has a minimum initial subscription amount of $1,000,000 but may permit subscriptions for a lesser amount. The Fund shall not be permitted to reduce such lesser amount to less than $100,000. Please contact the Administrator if you desire to subscribe for Shares so that a Subscription Document Booklet can be forwarded to you. The proper documentation necessary to purchase Shares must be received by the Fund at least three (3) days prior to the applicable Closing Date, unless waived by the Board of Directors.

The completed and original executed copy of the Subscription Agreement and Revocable Proxy should be sent by overnight courier to: Lancer Offshore, Inc., c/o CITCO Fund Services (Curaçao) N.V., P.O. Box 812, Curaçao, Netherlands Antilles.

All payments are to be made in U.S. dollars. If payment is to be made by wire transfer, it is to be made in immediately available funds to HSBC Bank USA, International Banking, 452 Fifth Avenue, New York, NY 10018, ABA# 021001088, for Account of CITCO Banking Corporation N.V., Account No. 000-301 795, for further credit to the account Lancer Offshore, Inc., Account No. 0012-443222-200. If payment is to be made by check, the check should be made payable to "Lancer Offshore, Inc." and it should be sent at least one (1) week prior to the Closing Date by overnight courier to Lancer Offshore, Inc., c/o CITCO Fund Services (Curaçao) N.V., Kaya Flamboyan 9, P.O. Box 812, Curaçao, Netherlands Antilles.

The Subscription Agreement and Revocable Proxy to be executed and delivered by prospective Shareholders contains their agreement to indemnify and hold harmless the Fund, its Directors and officers and the Investment Manager, against any loss, liability, cost or expense (including attorneys' fees, taxes and penalties) which may result, directly or indirectly, from any misrepresentation or breach of any warranty, condition, covenant or agreement set forth therein or in any other document delivered by the prospective Shareholders to the Fund.

The acceptance or non-acceptance of any subscription is solely at the discretion of the Board of Directors and no reasons need be given for the non-acceptance of any subscription.

The Shares generally will be issued in book-entry, registered form and no share certificates representing the Shares subscribed for will be forwarded to a Shareholder unless specifically requested.

The form of "Subscription Agreement and Revocable Proxy" grants a proxy to the Administrator, authorizing it or its designee to vote the Shares subscribed for on behalf of the subscriber at any annual or special meeting of Shareholders. Such proxy may be revoked by the Shareholder giving the proxy by written notice to the Administrator at the business office of the Fund. Any such revocation shall be effective upon its receipt by the Administrator.

MISCELLANEOUS

A00523

(1)    A Permitted U.S. Person is an "Accredited Investor" if the U.S. Person is:

    (A)    An employee benefit plan within the meaning of Title 1 of ERISA:

        (i)    whose investment decisions are made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, insurance company or registered investment advisor;

        (ii)    having total assets in excess of $5,000,000; or

        (iii)    if self-directed, the investment decisions are made solely by natural persons, each of whom either:

            (1)    currently has a net worth in excess of $1 million, and/or

            (2)    has individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; OR

    (B)    A trust, which is a tax-exempt entity with assets in excess of $5 million, not formed for the specific purpose of acquiring Shares, whose investment decisions are made by a person or persons who have such knowledge and experience in financial and business matters that such person or persons is or are capable of evaluating the merits and risks of the prospective investment; OR

    (C)    A tax-exempt entity in which all of the equity owners are natural persons each of whom either (i) currently has a net worth in excess of $1 million, and/or (ii) had individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; OR

    (D)    A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefits of its employees if such plan has total assets in excess of $5,000,000; OR

    (E)    A tax-exempt organization under Section 501(c)(3) of the IRC having total assets in excess of $5,000,000, which was not formed for the specific purpose of acquiring Shares.

(2)    A Permitted U.S. Person is a "Sophisticated Investor" if it either alone or with a purchaser representative has knowledge and experience in financial and business matters so as to be capable of evaluating the relative merits and risks of the purchase of Shares and recognizes and understands the nature of such an investment.

(3)    The term "U.S. Person" means, with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service, or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least thirty-one (31) days during such year, and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 1/3 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days.

A 0 0 5 2 4

With respect to persons other than individuals, the term "U.S. Person" means (i) a corporation or partnership created or organized in the United States or under the laws of the United States or any state or (ii) a trust or estate which is subject to U.S. tax on its worldwide income from all sources.

(4)     The term "Permitted U.S. Persons" means any entity organized under the laws of the United States that is generally exempt from Federal income taxation.

(5)     A "Professional Investor" is defined as a person whose ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund or a person (in the case of a natural person, either individually or jointly with spouse) who has signed a declaration that they have a net worth in excess of $1 million (or its equivalent in any other currency) and they consent to being treated as a Professional Investor.

APPENDIX A

REQUIRED DISCLOSURES

**FOR ALL OFFEREES:**

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

EACH INVESTOR MUST REPRESENT AND WARRANT THAT THE INVESTOR HAS READ THIS MEMORANDUM AND IS AWARE OF AND CAN AFFORD THE RISKS OF AN INVESTMENT IN THE FUND FOR AN INDEFINITE PERIOD OF TIME. THIS INVESTMENT IS SUITABLE ONLY FOR INVESTORS WHO HAVE ADEQUATE MEANS OF PROVIDING FOR THEIR CURRENT AND FUTURE NEEDS AND CONTINGENCIES, AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

**FOR PERMITTED U.S. PERSONS:**

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE SHAREHOLDERS MAY ONLY REDEEM THEIR SHARES AT CERTAIN LIMITED TIMES AND UPON CERTAIN REQUIRED ADVANCE NOTICE.

THE SHARES ARE BEING OFFERED IN THE UNITED STATES UNDER SECTION 4(2) OF THE 1933 ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER ONLY TO PERMITTED U.S. PERSONS WHO QUALIFY AS ACCREDITED INVESTORS UNDER THE 1933 ACT. EACH PERMITTED U.S. PERSON WILL BE REQUIRED TO REPRESENT THAT THEY ARE AN ACCREDITED INVESTOR THAT SATISFIES ALL OTHER SUITABILITY CRITERIA SET FORTH IN THIS MEMORANDUM, ARE ACQUIRING THE SHARES FOR THEIR OWN ACCOUNT, AS PRINCIPAL, FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION TO RESELL, TRANSFER, DISTRIBUTE OR OTHERWISE DISPOSE OF OR FRACTIONALIZE THE SHARES, EITHER IN WHOLE OR IN PART, AND NO RESALE, TRANSFER OR OTHER DISPOSITION OF THE SHARES WILL BE PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE 1933 ACT, THE RULES AND REGULATIONS THEREUNDER, ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND THE TERMS AND CONDITIONS OF THE ARTICLES.

**Special Notice to U.S. Investors Subject to ERISA**

THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, IMPOSES CERTAIN LIMITATIONS ON THE INVESTMENT BY CERTAIN PENSION AND OTHER EMPLOYEE BENEFIT PLANS IN INVESTMENTS SUCH AS THE FUND. THEREFORE, ANY PENSION OR OTHER EMPLOYEE BENEFIT PLAN CONSIDERING AN INVESTMENT IN SHARES OF THE FUND SHOULD CONSULT ITS OWN COUNSEL AS TO THE LEGAL EFFECTS OF SUCH INVESTMENT.

**FOR BRITISH VIRGIN ISLANDS RESIDENTS:**

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE BRITISH VIRGIN ISLANDS TO SUBSCRIBE FOR SHARES.

**FOR UNITED KINGDOM INVESTORS:**

THE FUND IS A COLLECTIVE INVESTMENT SCHEME WHICH WILL NOT BE AUTHORISED OR OTHERWISE APPROVED FOR PROMOTION IN THE UNITED KINGDOM AND IS NOT REGULATED BY THE FINANCIAL SERVICES AUTHORITY OF THE UNITED KINGDOM. NOR HAS THIS OFFERING MEMORANDUM BEEN ISSUED OR APPROVED BY ANY PERSON AUTHORISED UNDER THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSM ACT"). CONSEQUENTLY, INVESTORS WILL NOT HAVE THE BENEFIT OF THE INVESTORS' COMPENSATION SCHEME AND OTHER PROTECTIONS AFFORDED BY THE FSM ACT OR THE RULES AND REGULATIONS MADE THEREUNDER AND THE FUND MAY ONLY BE PROMOTED IN THE UNITED KINGDOM: (A) BY PERSONS NOT AUTHORISED UNDER THE ACT TO CERTAIN CATEGORIES OF PERSONS SPECIFIED IN THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2001; AND (B) BY PERSONS WHO ARE NOT AUTHORISED UNDER THE FSM ACT TO PERSONS WHO ARE OF A KIND DESCRIBED IN THE FINANCIAL SERVICES AND MARKETS ACT 2000 (PROMOTION OF COLLECTIVE INVESTMENT SCHEMES) (EXEMPTIONS) ORDER 2001 OR WHO ARE PERSONS TO WHOM THIS DOCUMENT MAY OTHERWISE LAWFULLY BE DISTRIBUTED OR TO WHOM THE FUND MAY OTHERWISE LAWFULLY BE PROMOTED.

RSDOCS1 889428v4

# EXHIBIT 4

A 0 0 3 8 5

NAME OF OFFEREE _____          NO. _____

_____

_____

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

# LANCER PARTNERS, LIMITED PARTNERSHIP
### (A Connecticut Limited Partnership)

**May 8, 2001**

_____

_____

**THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY THE INTERESTS DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.**

11556-00002/887553.2

A 0 0 3 8 6

## LANCER PARTNERS, LIMITED PARTNERSHIP
### A CONNECTICUT LIMITED PARTNERSHIP
### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
### FOR THE SALE OF LIMITED PARTNERSHIP INTERESTS ("INTERESTS")
### FOR A MINIMUM INVESTMENT OF $1,000,000

The Interests offered herein of Lancer Partners, Limited Partnership, a Connecticut limited partnership (the "Partnership"), represent Interests in the Partnership which was formed to pool investment funds of its investors (each a "Limited Partner" and collectively, "Limited Partners"), for the purpose of investing, trading and dealing in securities, domestic and foreign, of all kinds and descriptions, including but not limited to equity, debt, convertible securities, preferred stock, options, warrants, trade claims and monetary instruments, all as determined by Lancer Management Group II, LLC, a Connecticut limited liability company, the sole general partner of the Partnership ("General Partner"; which together with Limited Partners shall be referred to as "Partners"). Michael Lauer is the sole manager and principal owner of the General Partner and he is solely responsible for its operations and activities. The General Partner believes that in the small to middle capitalized financial markets, its bottom-up value approach combined with its contrarian bias and emphasis on anticipatory timing of future corporate developments will enable the Partnership to achieve significantly above average capital returns while exposing the Partnership to what the General Partner believes will be reasonable risks as compared to potential rewards. See *"BUSINESS OF THE PARTNERSHIP"*.

PURCHASE OF THESE SECURITIES INVOLVES CERTAIN RISKS. SEE *"RISK FACTORS"*.

THERE IS NO PUBLIC MARKET FOR THE INTERESTS OFFERED PURSUANT TO THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM ("MEMORANDUM"). A LIMITED PARTNER MAY, HOWEVER, WITHDRAW FROM THE PARTNERSHIP AND RECEIVE PAYMENT FOR THE LIMITED PARTNER'S INTERESTS AS SPECIFIED IN THE LIMITED PARTNERSHIP AGREEMENT OF THE PARTNERSHIP ("PARTNERSHIP AGREEMENT"), A COPY OF WHICH IS ANNEXED HERETO AS <u>EXHIBIT B</u>, SEE *"SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT-Withdrawals"*.

The business address, telephone and facsimile numbers of the Partnership and the General Partner are:

350 Bedford Street
Stamford, CT 06901
Telephone:  (203) 977-7700
Facsimile:   (203) 977-8360

-i-

CONFLICTS OF INTEREST BETWEEN THE GENERAL PARTNER AND THE PARTNERSHIP MAY ARISE IN VARIOUS CIRCUMSTANCES.  SEE *"CONFLICTS OF INTEREST"*.

THE SECURITIES AND EXCHANGE COMMISSION ("SEC") HAS NOT PASSED UPON THE MERITS OF PARTICIPATING IN THE PARTNERSHIP NOR HAS THE SEC PASSED UPON THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.   IT IS ANTICIPATED THAT THE OFFERING AND SALE WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("1933 ACT") AND THE VARIOUS STATE SECURITIES LAWS AND THAT THE PARTNERSHIP WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") PURSUANT TO AN EXEMPTION PROVIDED BY SECTION 3(c)(1) THEREUNDER.

NO RULINGS HAVE BEEN SOUGHT FROM THE INTERNAL REVENUE SERVICE ("SERVICE") WITH RESPECT TO ANY TAX MATTERS DISCUSSED IN THIS MEMORANDUM.  PERSONS AND ENTITIES TO WHICH THIS MEMORANDUM IS DELIVERED ("OFFEREES") ARE CAUTIONED THAT THE VIEWS CONTAINED HEREIN ARE SUBJECT TO MATERIAL QUALIFICATIONS AND SUBJECT TO POSSIBLE CHANGES IN REGULATIONS BY THE SERVICE OR BY CONGRESS IN EXISTING TAX STATUTES OR IN THE INTERPRETATION OF EXISTING STATUTES AND REGULATIONS.

OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE.  OFFEREES SHOULD REVIEW THE PROPOSED TRANSACTIONS WITH THEIR OWN COUNSEL, ACCOUNTANT, BUSINESS AND TAX ADVISOR ON WHOSE OPINIONS THEY SHOULD RELY. A REPRESENTATION TO THAT EFFECT IS REQUIRED TO BE MADE BY EACH OFFEREE ACQUIRING AN INTEREST.

THIS IS A PRIVATE PLACEMENT MADE ONLY BY DELIVERY OF A COPY OF THIS MEMORANDUM TO THE OFFEREE WHOSE NAME APPEARS HEREON. THE OFFERING IS MADE ONLY TO OFFEREES THAT ARE GENERALLY SUBJECT TO FEDERAL INCOME TAXATION AND THAT ARE ACCREDITED INVESTORS (AS SUCH TERM IS DEFINED IN RULE 501 OF REGULATION D PROMULGATED BY THE SEC UNDER THE 1933 ACT).

THE GENERAL PARTNER RESERVES THE RIGHT TO REFUSE ANY SUBSCRIPTION ON THE BASIS OF ANY OFFEREE'S FAILURE TO MEET THE SUITABILITY CRITERIA DESCRIBED HEREIN OR FOR ANY OTHER REASON. EACH OFFEREE WILL BE REQUIRED TO REPRESENT THAT THE OFFEREE IS ACQUIRING

-ii-

A00388

THE INTEREST FOR THE OFFEREE'S OWN ACCOUNT, FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION OF DISTRIBUTION, RESALE OR TRANSFER OF THE INTEREST, EITHER IN WHOLE OR IN PART, AND NO DISTRIBUTION, RESALE OR TRANSFER OF THE INTEREST WILL BE PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE 1933 ACT, THE RULES AND REGULATIONS THEREUNDER, ANY APPLICABLE STATE SECURITIES LAWS AND THE TERMS AND CONDITIONS OF THE PARTNERSHIP AGREEMENT.  FURTHER, EACH OFFEREE MUST REPRESENT AND WARRANT THAT THE OFFEREE HAS READ THIS MEMORANDUM AND IS AWARE OF AND CAN AFFORD THE RISKS OF AN INVESTMENT IN THE PARTNERSHIP FOR AN INDEFINITE PERIOD OF TIME.  THIS INVESTMENT IS SUITABLE ONLY FOR OFFEREES WHO HAVE ADEQUATE MEANS OF PROVIDING FOR THEIR CURRENT AND FUTURE NEEDS AND CONTINGENCIES, AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.  SEE *"SUITABILITY REQUIREMENTS"*.

THIS MEMORANDUM IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT OF INTERESTS AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE.  ANY DISTRIBUTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED.  THE OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM AND ALL ENCLOSED DOCUMENTS TO THE GENERAL PARTNER IF THE OFFEREE DOES NOT PURCHASE ANY INTERESTS.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE OFFERING OF INTERESTS EXCEPT FOR THIS MEMORANDUM.

EACH OFFEREE AND REPRESENTATIVES OF EACH OFFEREE, IF ANY, ARE INVITED TO ASK QUESTIONS AND OBTAIN ADDITIONAL INFORMATION FROM THE GENERAL PARTNER CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, THE PARTNERSHIP, AND ANY OTHER RELEVANT MATTERS (INCLUDING BUT NOT LIMITED TO, ADDITIONAL INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN) TO THE EXTENT THE GENERAL PARTNER POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.   OFFEREES OR THEIR REPRESENTATIVES   HAVING   QUESTIONS   OR   DESIRING   ADDITIONAL INFORMATION SHOULD CONTACT THE GENERAL PARTNER.

THIS MEMORANDUM CONTAINS SUMMARIES, BELIEVED BY THE GENERAL PARTNER TO BE ACCURATE, OF CERTAIN TERMS OF CERTAIN DOCUMENTS, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS (COPIES OF WHICH ARE ATTACHED HERETO OR ARE AVAILABLE FROM THE GENERAL PARTNER) FOR COMPLETE INFORMATION CONCERNING THE RIGHTS

11556-00002/887553.2

A00389

AND OBLIGATIONS OF THE PARTIES THERETO, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE.   ALL DOCUMENTS RELATING TO THIS PRIVATE PLACEMENT WILL BE MADE AVAILABLE TO THE OFFEREE AND THE OFFEREE'S REPRESENTATIVES UPON REQUEST.  NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR FURNISH ANY INFORMATION WITH RESPECT TO THE PARTNERSHIP OR THE INTERESTS, OTHER THAN THE REPRESENTATIONS AND INFORMATION SET FORTH IN THIS MEMORANDUM OR OTHER DOCUMENTS OR INFORMATION FURNISHED BY THE GENERAL PARTNER UPON REQUEST, AS DESCRIBED ABOVE.

THE INFORMATION CONTAINED HEREIN IS GIVEN AS OF THE DATE HEREOF AND THIS MEMORANDUM DOES NOT PURPORT TO GIVE INFORMATION AS OF ANY OTHER DATE. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF.

**FOR RESIDENTS OF ALL STATES:**

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.  THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.   FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE    SECURITIES    ARE    SUBJECT    TO    RESTRICTIONS    ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

-iv-

A00390

## TABLE OF CONTENTS

| CAPTION | PAGE |
|---|---|
| SUMMARY OF THE OFFERING | (A) |
| INTRODUCTION | -1- |
| BUSINESS OF THE PARTNERSHIP | -3- |
| MANAGEMENT OF THE PARTNERSHIP | -7- |
| CERTAIN RISK FACTORS | -8- |
| FINANCIAL SUMMARY OF THE OFFERING | -12- |
| CONFLICTS OF INTEREST | -16- |
| FIDUCIARY RESPONSIBILITIES OF THE GENERAL PARTNER | -17- |
| CERTAIN FEDERAL INCOME TAX CONSIDERATIONS | -18- |
| BROKERAGE COMMISSIONS | -25- |
| INVESTMENT RESTRICTIONS | -27- |
| SUITABILITY REQUIREMENTS | -28- |
| SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT | -29- |

### EXHIBITS

"A"   Subscription Documents Booklet

"B"   Limited Partnership Agreement

11556-00002/887553.2

A00391

## SUMMARY OF THE OFFERING

The following is only a summary of the information contained in this Memorandum and is qualified in its entirety by other information contained in this Memorandum and by the Partnership Agreement. Offerees should read the entire Memorandum and the Partnership Agreement carefully before making any investment decision regarding the Partnership and should pay particular attention to the information under the headings *"RISK FACTORS"* and *"CONFLICTS OF INTEREST"*. In addition, Offerees should consult their own advisors in order to understand fully the consequences of an investment in the Partnership.

| | |
|---|---|
| **The Partnership** | Lancer Partners, Limited Partnership is a Connecticut limited partnership formed in November 1997 to succeed by merger to, and carry on the business of, Lancer Partners, L.P., a New York limited partnership formed in December 1994. |
| **Investment Objective** | The Partnership's objective is to seek high economic return primarily through capital appreciation while attempting to control risk. The General Partner believes that in the small to middle capitalized financial markets, its bottom-up value approach combined with its contrarian bias and emphasis on anticipatory timing of future corporate developments will enable the Partnership to achieve its objective. There is no assurance that the objective of the Partnership will be achieved. See *"BUSINESS OF THE PARTNERSHIP"*. |
| **General Partner** | The General Partner is Lancer Management Group II, LLC, a Connecticut limited liability company. Michael Lauer is the sole manager and principal owner of the General Partner. The General Partner has sole and complete authority to manage the Partnership's activities. See *"MANAGEMENT OF THE PARTNERSHIP"*. |
| **Eligible Investors** | Interests will be sold solely to Accredited Investors that are generally subject to Federal income taxation. See *"SUITABILITY REQUIREMENTS"*. |
| **Minimum Investment and Admission of Limited Partners** | The required minimum initial capital contribution to purchase an Interest is $1,000,000 (although the General Partner, in its sole and absolute discretion, may accept lesser amounts) and additional capital contributions from existing Limited Partners must be of $100,000 or more (although the General Partner, in its sole and absolute discretion, may accept lesser amounts). |

-A-

A 0 0 3 9 2

The General Partner expects that additional Limited Partners will be admitted, and additional capital contributions from existing Limited Partners will be accepted, throughout the term of the Partnership.   Capital contributions generally will be accepted as of the first day of any Fiscal Period (as defined in this Memorandum), although the General Partner can accept capital contributions at any time in its sole and absolute discretion.   There is no minimum or maximum aggregate amount of funds which may be invested in the Partnership. Generally, on a monthly basis, changes in the Partnership's net worth ("Net Worth") (e.g., realized and unrealized gain or loss as to Partnership assets) will be credited to existing Partners and the respective percentage interests of existing and any new Limited Partners will be adjusted accordingly.   As a result, new Limited Partners will not share in items of income, gain, loss (whether or not realized), or deductions arising (or otherwise allocable to periods) before the date of their admission.   See "*SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT - Profits, Losses and Interest in Partnership's Net Worth*".

**Withdrawals of Capital**

A Limited Partner may withdraw part or all of the value of the Limited Partner's capital account after one (1) year from the date of the Limited Partner's original capital contribution as of January 1 and July 1 of each calendar year (each a "Withdrawal Date"), upon at least ninety (90) days' prior written notice. Withdrawals may be made at such other times as determined by the General Partner in its sole discretion.   The Partnership currently expects to pay to a withdrawing Limited Partner an amount equal to approximately ninety-five (95%) percent of the value in such Limited Partner's capital account within fifteen (15) days after the applicable Withdrawal Date.   The Partnership currently expects to pay the balance of the amount remaining in a withdrawing Limited Partner's capital account, without interest, as soon as practicable after completion of the unaudited interim financial statements for the six (6) month period ending June 30 for July 1 withdrawals or December 31 audited financial statements for January 1 withdrawals.   The Partnership currently expects to pay a Limited Partner who makes a partial withdrawal within fifteen (15) days after the applicable Withdrawal Date.   There are no withdrawal fees associated with a Limited Partner's withdrawal of capital from the Partnership.   The General Partner, in its sole and absolute

-B-

A 0 0 3 9 3

discretion, may waive or reduce any notice period. The General Partner may require any Limited Partner to withdraw all or any part of the value in their capital account for any reason upon not less than three (3) days prior written notice. See *"SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT - Withdrawals"*.

**Management Fee**

The General Partner will receive a quarter-annual management fee ("Management Fee") of one-quarter (0.25%) percent of each Limited Partner's share of the Partnership's Net Worth (as defined in this Memorandum) at March 31, June 30, September 30 and December 31 of each year (the period from January 1 to March 31, the period from April 1 to June 30, the period from July 1 to September 30 and the period from October 1 to December 31 of each calendar year, and such other period or periods as the General Partner shall determine, shall each be referred to herein as "Fiscal Period"). A pro rata Management Fee will be charged to Limited Partners on any amounts permitted to be invested and withdrawn during any quarter-annual Fiscal Period.

**General Partner's Allocation**

The General Partner shall have reallocated by credit to its capital account and debit to each Limited Partner's capital account net income of the Partnership attributable to each Limited Partner (net increase in Net Worth) equal in the aggregate to twenty (20%) percent of such net increase in Net Worth allocated to each Limited Partner during any Fiscal Year (as defined in this Memorandum) (on the accrual basis of accounting) on an annual basis ("General Partner Allocation"). The General Partner Allocation shall be in addition to the allocations of the balance of income and profits, or losses, to the General Partner based upon its capital account proportionate to the aggregate amount of the capital account of all Partners.

In any Fiscal Year in which a Limited Partner has a decrease in Net Worth, the General Partner Allocation in the succeeding Fiscal Year(s) shall be calculated on the net increase in Net Worth for such Limited Partner for each such succeeding Fiscal Year(s) reduced by an amount equal to the decrease in Net Worth in the preceding Fiscal Year(s) for such Limited Partner ("Loss Carryover") until the aggregate reductions equal the Loss Carryover. In the event, however, that a Limited Partner withdraws funds at a time in which such Limited Partner has a

-C-

11556-00002/887553.2

A00394

Loss Carryover, the amount of such Loss Carryover at such withdrawal date applicable to such Limited Partner shall be reduced by a percentage equal to 100% multiplied by a fraction, the numerator of which is the amount to be withdrawn from the capital account, and the denominator of which is the amount in such capital account immediately prior to the withdrawal.

**Allocation of Economic Profit and Loss**

To determine how the economic gains and losses of the Partnership will be shared, the Partnership Agreement provides detailed procedures for allocating net income or loss (increases and decreases in Net Worth) to each Partner's capital account. Net income of the Partnership includes all portfolio gains and losses, whether realized or unrealized, plus all other Partnership items of income (such as interest) and less all Partnership expenses. Generally, net income (subject to the General Partner Allocation) and net loss for each month will be allocated to the Partners in proportion to their capital account balances as of the start of each month. Capital account balances will reflect capital contributions, previous allocations of increases and decreases in Net Worth and withdrawals.

**Allocation of Taxable Income and Loss**

For income tax purposes, all items of taxable income, gain, loss, deduction and credit will be allocated among the Partners annually in a manner consistent with their economic interests therein. In light of the fact that the Partnership does not intend to make distributions, to the extent the Partnership's investment activities are successful, Limited Partners should expect to incur tax liabilities from an investment in the Partnership without receiving cash distributions with which to pay those liabilities. To obtain cash from the Partnership to pay taxes, if any, Limited Partners will be required to make withdrawals. See "*SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT - Withdrawals*".

**Expenses**

The Partnership will pay all of its accounting, legal and other operating expenses, including expenses incurred in connection with the offer and sale of Interests and the admission of Limited Partners (collectively, the "Administrative Expenses") up to a maximum of one (1%) percent (or a prorated amount for the Partnership's first and last Fiscal Years and on any amounts permitted to be invested and withdrawn during any Fiscal Period) of the Partnership's Net Worth at the end of its Fiscal

-D-

Year (the "Administrative Cap").   To the extent that the Administrative Expenses exceed the Administrative Cap in any Fiscal Year, the General Partner shall pay such excess Administrative Expenses either by charging its capital account or by making a direct payment, as determined by the General Partner in its sole discretion. The Administrative Cap, however, does not apply to brokerage commissions, custodial fees and other trading, research and investment charges, fees and expenses which shall be paid by the Partnership. The Partnership will also pay all of its organizational expenses which will be amortized over sixty (60) months.   See "*FINANCIAL SUMMARY OF THE OFFERING*".

**Risks**

An investment in the Partnership involves significant risks.  See "*RISK FACTORS*".

**Reports to Limited Partners**

Each Limited Partner will receive: (i) an unaudited quarterly statement of the Limited Partner's capital account and a letter from the General Partner discussing the results of the Partnership for the quarter just ended, and (ii) copies of such Limited Partner's Schedule K-1 to the Partnership's tax returns. The annual audited financial statements of the Partnership will be made available to the Limited Partners upon request.  See "*CERTAIN   PROVISIONS   OF   THE   PARTNERSHIP AGREEMENT - Reports to Limited Partners*".

**Term**

The Partnership will terminate on December 31, 2044 unless earlier terminated as provided in the Partnership Agreement.

**Transferability of Interests**

Interests are not assignable or transferable (except by operation of law) without the prior written consent of the General Partner, which consent may be given or withheld in its sole and absolute discretion.

**Partnership's Attorneys**

Robinson Silverman Pearce Aronsohn & Berman LLP, New York, NY.

**Partnership's Accountants**

Goldstein Golub Kessler & Company, P.C.

-E-

11556-00002/887553.2

A 0 0 3 9 6

**How to Subscribe**

Offerees interested in acquiring Interests are required to complete the applicable documents in the Subscription Documents Booklet and return it to the Partnership. Under the terms of the Subscription Agreement and the Partnership Agreement, an Offeree must pay 100% of the Offeree's investment at the time of subscription by wire transfer of immediately available funds, or by check, subject to collection, payable to the Partnership, in accordance with the instructions set forth in the Section of the Subscription Documents Booklet entitled "*Instructions to Subscribers*".

-F-

11556-00002/887553.2

A00397

## INTRODUCTION

Lancer Partners, Limited Partnership, a Connecticut limited partnership (the "Partnership") formed in November 1997 pursuant to the Connecticut Uniform Limited Partnership Act ("CULPA"), is an investment partnership that pools its Limited Partners' capital contributions for the purpose of investing, trading in and dealing in securities of all kinds and descriptions as determined by the General Partner. The General Partner believes that in the small to middle capitalized financial markets, its bottom-up value approach combined with its contrarian bias and emphasis on anticipatory timing of future corporate developments will enable the Partnership to achieve significantly above average capital returns while exposing the Partnership to what the General Partner believes will be reasonable risks as compared to potential rewards.

The Partnership's objective is to seek high economic return primarily through capital appreciation while attempting to control risk. The General Partner intends to follow a flexible approach so as to attempt to be in the best position to capitalize on opportunities in the financial markets. No assurance can be given, however, that the Partnership will achieve its objective.

The Limited Partners, by pooling their assets in the Partnership, will be able to invest their funds in a diversified portfolio of securities managed by the General Partner that is seeking to maximize return while controlling risk. Ordinarily, an Offeree acting alone would not be able to diversify the Offeree's assets as the Partnership will be able to do nor would an Offeree have the resources to monitor, evaluate and implement the investing and trading strategies to be engaged in by the Partnership.

The Partnership is the successor by merger to, and is carrying on the business of, Lancer Partners, L.P., a limited partnership formed in New York in December 1994. The General Partner is Lancer Management Group II, LLC, a Connecticut limited liability company. Michael Lauer ("Lauer") is the sole manager and principal owner of the General Partner. As the manager of the General Partner, Lauer controls all of its operations and activities. The principal office and telephone and facsimile numbers of the Partnership and General Partner are 350 Bedford Street, Stamford, CT 06901, Telephone No. (203) 977-7700 and Facsimile No. (203) 977-8360. The Partnership will terminate on December 31, 2044 unless sooner terminated as provided for in the Partnership Agreement. See "*SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT*".

The Partnership is offering the Interests in a private placement pursuant to Section 4(2) of the 1933 Act and Rule 506 of Regulation D promulgated thereunder by the SEC. The Interests will be sold by the General Partner and will be continuously offered in the sole and absolute discretion of the General Partner. No selling commission will be charged. The minimum initial capital contribution by an Offeree is $1,000,000; however, the General Partner may, in its sole and absolute discretion, waive the foregoing minimum purchase requirement. There are no minimum or maximum amounts that may be invested by all of the Limited Partners in the Partnership, in the aggregate. Existing Limited Partners may subscribe for additional Interests of any amount; however, the acceptance of any additional or new subscription is at the sole and absolute discretion of the General Partner. Interests may only be purchased by Offerees that are Accredited Investors. The General Partner expects that additional Limited Partners will be admitted and additional capital contributions from existing Limited Partners will be accepted throughout the term of the Partnership.

The Partnership's fiscal year ends December 31 (the "Fiscal Year"). As soon as practicable after the end of each Fiscal Year, audited financial statements for the year will be prepared by the Partnership, audited by the Partnership's independent certified public accountants, and made available to the Limited Partners upon request. Information as to the Limited Partner's distributive share of the Partnership's income, gains, losses and deductions for the year, for Federal income tax purposes shall be distributed to each Limited Partner as soon as it becomes available. The Limited Partners will also receive from the Partnership after the end of each calendar quarter, an unaudited statement of the Limited Partner's capital account, including such Limited Partner's opening balance, capital contributions and withdrawals, if any, net income or loss and ending balance, and a letter from the General Partner discussing the results of the Partnership for the quarter just ended.

The Partnership is not registered as an investment company and is not subject to the provisions of the Investment Company Act, in reliance upon an exemption for an entity which does not have more than one hundred (100) beneficial owners of its securities. Accordingly, the Partnership will limit the number of beneficial owners of Interests and the percentage Interests of the Partnership acquired by certain Limited Partners. The Partnership will comply with the applicable provisions of the Internal Revenue Code of 1986, as amended (the "Code") and the regulations promulgated thereunder to insure that the Partnership is not taxed as a publically traded partnership pursuant to Treasury Regulations ' 1.7704 of the Code. The General Partner is not registered as an investment advisor under the Investment Advisers Act of 1940, as amended ("Advisers Act") based upon an exemption for private activities. The General Partner is also not registered as a commodity pool operator under the Commodity Exchange Act based on its intention not to trade commodities on behalf of the Partnership. In the event that the General Partner determines to cause the Partnership to trade in commodities, the General Partner will first either register as a commodity pool operator or seek an exemption from registration.

A 0 0 3 9 9

## BUSINESS OF THE PARTNERSHIP

### Purpose

The Partnership was organized for the purpose of investing, trading in and dealing in securities, domestic and foreign, of all kinds and descriptions, including but not limited to, equity, debt, convertible securities, preferred stock, options, warrants, trade claims and monetary instruments. The Partnership may invest in arbitrage and special situations, both long and short securities positions, option arbitrage, international arbitrage and other financial instruments. The Partnership may also engage in transactions to hedge long and short securities positions. The descriptions contained in this Memorandum of the specific activities in which the Partnership may engage should not be construed to limit in any way the types of investment activities or the allocation of Partnership capital among such investments which the Partnership may make. The Partnership may engage in any investment activities not described herein which the General Partner considers appropriate and consistent with the Partnership's objectives.

### Investment Objectives

The General Partner does not follow a market timing philosophy and accordingly, it is anticipated that the Partnership's assets will be fully invested at all times. The General Partner's philosophy of investing could be described as an analytical discipline concentrating on underlying corporate value with an added emphasis on anticipatory timing of future corporate developments, primarily in small and middle capitalized companies. The Partnership's goal is to achieve high economic return primarily through capital appreciation while exposing the Partnership to what the General Partner believes will be reasonable risks as compared to potential rewards. One way of controlling risk is through the diversification of Partnership assets by investing and trading in a range of securities, although the General Partner anticipates that, at any given time, it is possible that a significant percentage of the Partnership's assets may be invested in one or more securities of a single entity. The Partnership seeks to maximize its return by purchasing securities which the General Partner believes are below intrinsic value, based on the General Partner's evaluation of such factors as fundamental analysis of a company and the underlying value of its assets, or by seeking price appreciation due to a "catalyst" such as an earnings turnaround, a corporate restructuring or an accumulation of shares by outsiders. Potential investments are reviewed using fundamental, technical, financial, industry and trading analyses.

In selecting investments, the General Partner considers various criteria, and the General Partner anticipates that the securities which the Partnership has and may purchase will, in his opinion, meet one or more of the following criteria:

> ! Due to the near exclusive focus on corporations in the secondary and tertiary financial markets, the General Partner believes that the Partnership will enjoy a competitive advantage as to such entities versus its competitors.

> ! The approach will be highly anticipatory of a corporate event that will facilitate favorable evaluation of the corporation.

Similarly, the General Partner may sell or sell short securities which the General Partner believes are overvalued.

A 0 0 4 0 0

**Investment Program**

  The following is a description of the principal types of securities in which the Partnership invests in and intends to invest in, certain trading techniques that it has and intends to employ, the investment criteria that it has and intends to apply, and the guidelines that it has established with respect to the composition of its investment portfolio.   The following description, however, is merely a summary and the General Partner has broad discretion to cause the Partnership to invest in other types of securities and to follow other investment criteria and guidelines.

  1. **Equity Securities.**   The General Partner has and intends generally to select equity investments primarily on the basis of their potential for capital appreciation.   Normally, any current income, such as dividends and interest, received from such investments will be only incidental to the objective of capital appreciation.

  The majority of the common stocks in which the Partnership has and intends to invest in are traded on the New York Stock Exchange, the American Stock Exchange or in the over-the-counter market.   The principal focus of the General Partner is on the common stocks of small and middle capitalized companies.   The Partnership also invests in options and warrants to purchase common stock and other securities convertible into common stock.

  The Partnership, from time to time, invests in privately placed common stock, preferred stock and convertible debt of public companies.   These securities are not generally immediately liquid although there is frequently a registration right with respect to the common stock purchased or the common stock receivable upon conversion of the preferred stock or convertible debt.

  The Partnership may purchase foreign equity securities which may be represented by American Depository Receipts listed on a United States securities exchange or traded in the over-the-counter market.

  The Partnership also invests in newly-issued equity securities of both developing and fully developed public companies which the General Partner believes, based on the General Partner's analysis of offering materials and other information, offer the opportunity for capital appreciation.

  The Partnership also invests in "late stage private equity", that is to say the equity securities of private companies that are expected to be public within 3 to 6 months following the Partnership's investment.   The General Partner believes that from time to time there will be opportunities in this market for significant capital appreciation.   As there are significant risks included in this strategy, including liquidity risks, not more than ten (10%) percent of the Partnership's assets will be committed to this strategy.

  In addition to investing in equity securities which may appreciate in the medium or long term, the Partnership attempts to trade securities in a fashion intended to take advantage of what the General Partner believes are short-term market inefficiencies, particularly during periods of high market volatility.

  2. **Diversity and Hedging Strategies.**   The General Partner may seek to minimize the losses which may be incurred in severe market declines or in the decline of individual

securities prices by generally utilizing internal stop limits and various hedging techniques, including short sales, stock index options and stock options. There is no assurance that these stock selection or trading techniques will eliminate or reduce in any material manner the inherent risks of equity investing.

3. **Short Sales.** The General Partner may make "short sales" of securities when he believes that particular securities are overvalued and the General Partner anticipates a significant decline in their market price, including arbitrage situations in which the General Partner believes that the proposed transaction is not likely to be consummated.

Short selling of securities involves the sale of securities which the Partnership does not own. To effect a short sale, the Partnership borrows securities from a third party in order to make delivery to its purchaser. The Partnership returns the borrowed securities to the lender by purchasing the securities in the open market. A short seller must generally pledge other securities or cash with the lender in an amount equal to the market price of the borrowed securities. This deposit may be increased or decreased in response to changes in the market price of the borrowed securities.

4. **Leveraged Purchases of Securities.** The Partnership may leverage its securities positions by borrowing funds up to the maximum extent permitted by law. In general, for most equity securities the maximum initial amount that can presently be loaned by brokers and banks is 50% of the value of most securities positions.

Leverage increases the potential risk of loss on any securities position so leveraged. In addition, increases in interest rates adversely affect earnings. Furthermore, in the event of a decline in the value of the leveraged securities or a change in the percentage of the value of securities for which a margin loan may be made, the Partnership may be forced to sell securities at a substantial loss in order to generate cash to reduce the Partnership's margin loan.

5. **Equity and Stock Index Options.** The General Partner has and may purchase or sell put and call options that are traded on options exchanges at such times as he deems appropriate and consistent with the Partnership's investment objectives.

The General Partner has and may utilize stock index options, primarily as a means of hedging the Partnership's portfolio or specific securities therein (for example, to lock in gain or minimize the risk of loss), but also has and may engage in such trading as a portfolio investment or as a method of rapid implementation of an investment strategy where it is impractical to quickly purchase or sell equity securities. The General Partner has and may also purchase or sell options on a specific underlying security.

6. **Risk Arbitrage Activities.** The investment activities of the Partnership include taking positions in companies which are, or in the opinion of the General Partner, may be subject to a corporate takeover, restructuring, acquisition of securities or assets, merger, reorganization, leveraged buy out or other form of similar corporate event.

7. **High-Yield Securities; Participation in Buy-Outs; Liquidations; Bankruptcy Situations.** The General Partner may purchase high-yield speculative securities, including so-called "junk bonds." In addition, companies may propose from time to time a plan of liquidation pursuant to which all or substantially all of their assets are to be sold and the proceeds of such sales are to be distributed to their stockholders. A particular plan of liquidation

A00402

may involve several liquidating distributions.  The Partnership may invest in the securities of the entity to be liquidated if the General Partner believes that the assets of the entity are worth more than the market price of the entity's publicly-traded securities and that there is a substantial likelihood that the liquidation proposal will be effected.  However, the Partnership would incur a loss if the sale of the entity's assets does not produce the anticipated revenues and the liquidating distributions are less than the Partnership's cost of purchasing the securities.

The Partnership may also invest in securities of companies involved in various stages of bankruptcy or reorganization.  These situations may be particularly complicated and may involve substantial uncertainty.

Because of the highly complex nature of many liquidations, bankruptcies and reorganizations, the securities involved in such transactions may have to be held for long periods of time during which time they may have limited marketability.

## Portfolio Turnover

As a result of the investment policies described in this Memorandum, the Partnership has and expects to continue to engage in a substantial number of portfolio transactions.  The Partnership's investment portfolio has been frequently traded and it is anticipated that the Partnership's investment portfolio will continue to be frequently traded.  Accordingly, the Partnership will continue to incur substantial brokerage commissions, expenses and other transaction costs.  See *"BROKERAGE COMMISSIONS"*.

## General

The General Partner does not presently intend to cause the Partnership to purchase or sell real estate (although it may purchase securities of companies whose businesses involve the purchase and sale of real estate), make loans (although it may acquire publicly distributed or privately held bonds, debentures, notes and other debt securities, it may buy securities with an agreement by the vendor to repurchase them and it may lend portfolio securities), purchase participations or other direct interests in oil, gas or other minerals (except as an investor in companies in this field) or participate in the marketing of the securities of any companies.

**THE PARTNERSHIP'S INVESTMENT PROGRAM ENTAILS SUBSTANTIAL RISKS AND THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVES OF THE PARTNERSHIP WILL BE ACHIEVED. THE PRACTICES OF SHORT SELLING, LEVERAGE AND OTHER INVESTMENT TECHNIQUES WHICH THE PARTNERSHIP MAY EMPLOY FROM TIME TO TIME CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH THE PARTNERSHIP'S INVESTMENT PORTFOLIO MAY BE SUBJECT.**

## MANAGEMENT OF THE PARTNERSHIP

The General Partner is responsible for the management of the Partnership. The General Partner is solely responsible for researching, selecting and monitoring investments by the Partnership and making decisions on when and how much to invest with or withdraw from a particular investment. The General Partner is Lancer Management Group II, LLC, a Connecticut limited liability company formed in November 1997. Lancer Management Group II, LLC has no current business other than serving as General Partner of the Partnership. Lauer is the sole manager and principal owner of the General Partner. Two (2) individuals who work with Lauer are the other members of the General Partner.

Michael Lauer began his investment career with Oppenheimer & Co. in 1980 as a technology analyst. His other professional affiliations include: Cyrus J. Lawrence and Kidder Peabody (both as senior diversified technology and defense electronics analyst). Mr. Lauer became a portfolio manager in 1993. On numerous occasions, the annual Greenwich Associates survey of sell-side analysts distinguished Mr. Lauer as the premier source for stock purchase recommendations in his discipline of industry coverage. Likewise, Mr. Lauer was selected to the Institutional Investor's All Star analyst team for seven consecutive years. The Wall Street Journal's first ever survey also rated Mr. Lauer among the tope three analysts in his group. Mr. Lauer holds a BA degree in International Relations and an MBA in Finance. From December 1994 to December 1997, Lauer served as the general partner of Lancer Partners, L.P., a New York limited partnership ("NYLP"). On December 31, 1997, NYLP merged with and into the Partnership with the Partnership being the surviving entity and the General Partner being the surviving general partner. Prior to the merger, the Partnership did not engage in any business. From December 1995 to December 1997, Lauer served as the sole manager and principal owner of Lauer Management Group, LLC, a New York limited liability company ("LMG-NY"). LMG-NY served as the sole investment manager for Lancer Offshore, Inc., a British Virgin Islands investment company ("LOI"). On December 31, 1997, LMG-NY merged with and into Lancer Management Group, LLC, a Connecticut limited liability company ("LMG-CT") with LMG-CT being the surviving entity and LMG-CT is carrying on the business of LMG-NY. Lauer is the sole manager and principal owner of LMG-CT and LMG-CT now serves as the sole investment manager for LOI. LMG-CT also serves as the sole investment manager of The Orbiter Fund, Ltd. ("TOF") and The Viator Fund, Ltd. ("TVF"), each a British Virgin Islands investment company formed in 1999.

Lauer, as sole manager of the General Partner and, as the sole manager of LMG-CT, the investment manager of LOI, TOF and TVF, devotes a substantial amount of his time to the business of running the Partnership, LOI, TOF and TVF although, Lauer may devote such time to the General Partner and the Partnership as he determines in his sole discretion. The General Partner, LMG-CT and/or Lauer may also manage accounts for certain parties and/or provide consulting and/or advisory services to others.

There have never been any administrative, civil or criminal actions, whether pending, on appeal or concluded, against the Partnership, General Partner, Lauer or their affiliates.

A 0 0 4 0 4

## CERTAIN RISK FACTORS

THE PURCHASE OF INTERESTS OFFERED HEREBY INVOLVES CERTAIN RISKS AND IS SUITABLE ONLY FOR OFFEREES OF ADEQUATE FINANCIAL MEANS WHICH HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. OFFEREES SHOULD BEAR IN MIND THE FOLLOWING RISK FACTORS:

Market Risks

1.   Competition. The securities industry, and the varied strategies and techniques engaged in by the General Partner are extremely competitive and each involves a degree of risk. The Partnership competes with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs.

2.   Market Volatility. The profitability of the Partnership substantially depends upon the General Partner correctly assessing the future price movements of stocks, bonds, options on stocks and other securities and the movements of interest rates. There can be no assurance that the General Partner will be successful in accurately predicting price and interest rate movements.

3.   Partnership's Investment Activities. The Partnership's investment activities involve a high degree of risk. The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the General Partner. Such factors include a wide range of economic, political, competitive and other conditions which may affect investments in general or specific industries or companies. In recent years the securities markets have become increasingly volatile, which may adversely affect the ability of the Partnership to realize profits. As a result of the nature of the Partnership's investing activities, it is possible that the Partnership's financial performance may fluctuate substantially from period to period.

4.   Leverage. The General Partner may cause the Partnership to employ leverage. This includes the use of borrowed funds and investments in options, such as puts, calls and warrants. Also, the General Partner may cause the Partnership to engage in short sales. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Partnership.

5.   Liquidity. Some of the investments made by the Partnership may lack liquidity. Though it is intended that substantially all of the investments made by the Partnership will be in publicly traded investments and most on listed exchanges, some may be thinly traded. This could present a problem in realizing the prices quoted and in effectively trading the position(s). In certain situations, the Partnership may invest in illiquid investments which could result in significant loss in value should the Partnership be forced to sell the illiquid investments as a result of rapidly changing market conditions or as a result of other factors.

6.   Counterparty Creditworthiness. The Partnership may engage in transactions in securities and other instruments that involve counterparties. Under certain conditions,

o

a counterparty to a transaction could default or the market for certain securities and/or other instruments may become illiquid.

7.    Options.  The Partnership may utilize options contracts in furtherance of its investment strategy.  Options positions may include both long positions, where the Partnership is the holder of put or call options, as well as short positions, where the Partnership is the seller (writer) of an option.  Although option techniques can increase investment return, they can also involve a relatively higher level of risk.  The expiration of unexercised long options effectively results in loss of the entire cost, or premium paid for the option. Conversely, the writing of an uncovered put or call option can involve, similar to short-selling, a theoretically unlimited risk of an increase in the Partnership's cost of selling or purchasing the underlying securities in the event of exercise of the option.  The use of options thereon involve the contractual commitment to purchase or sell the underlying instrument at a future date.  The eventual price of such security may be influenced by a broad variety of market, economic and issuer-specific events and risks, many of which may be difficult to predict or assess.

8.    Risk Arbitrage.  The Partnership may engage in risk arbitrage transactions.  Risk arbitrage involves purchasing securities which are the subject of an acquisition attempt, cash tender offer, exchange offer, corporate reorganization (such as a merger), liquidation, or an offer by an issuer to repurchase or exchange some of its own securities.  Risk arbitrage investments are subject to such additional risks as the failure of the transaction to close, the failure to obtain stockholders' approval and other factors.  Risk arbitrage also involves selling securities, possibly by a short sale or put option, in anticipation of the failure of a transaction to close, with the risk that the proposed transaction or another transaction will close.

9.    Short Sales.  The Partnership may sell securities short.  Selling securities short risks losing an amount greater than the proceeds received.  Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed.  In addition, the supply of securities that can be borrowed fluctuates from time to time.  The Partnership may be subject to losses if a security lender demands return of the lent securities and an alternative lending source cannot be found.

10.   Systemic Risk.  World events and/or the activities of one or more large participants in the financial markets and/or other events or activities of others could result in a temporary systemic breakdown in the normal operation of financial markets.  Such events could result in the Partnership losing substantial value caused predominantly by liquidity and counterparty issues (as noted above) which could result in the Partnership incurring substantial losses.

Regulatory Risks

1.    Strategy Restrictions.  Certain Offerees may be restricted from directly utilizing investment strategies of the type the Partnership may engage in.  These may include sales of "naked" options (those in which there is no position in the underlying security) or purchases of put and call options on stocks.  Such Offerees should consult their own advisors, counsel, and accountants.

2.      Trading Limitations.  For all securities, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances.  Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss.

3.      No Regulatory Oversight.  The Partnership is not registered as an "investment company" under the Investment Company Act and the General Partner is not registered as an investment adviser under the Advisers Act.  Consequently, the Limited Partners will not benefit from certain of the protections afforded by such statutes.

4.      Tax Risk.  Reference is made to *"CERTAIN FEDERAL INCOME TAX CONSIDERATIONS"* for a discussion of certain tax risks inherent in the acquisition of Interests in the Partnership.

Partnership Risks

1.      Limited Liquidity.  An investment in the Partnership provides limited liquidity.  The Interests are not freely transferable. In connection with the purchase of an Interest, each Limited Partner must represent that the Limited Partner has acquired the Interest for investment purposes only and not with a view to or for resale, distribution or fractionalization of the Interest.  The Interests have neither been registered under the 1933 Act nor under the securities or "blue sky" laws of any state and, therefore, are subject to transfer restrictions.

2.      Withdrawal of Capital.  A Limited Partner may not withdraw any value of the Limited Partner's capital account for one (1) year from the date of such Limited Partner's initial capital contribution.  Thereafter, a Limited Partner may withdraw all or any amount of value of the Limited Partner's capital account as of January 1 and July 1 of each calendar year.  All withdrawals must be upon at least ninety (90) days' prior written notice.

3.      Frequency of Trading.  Some of the strategies and techniques to be employed by the General Partner requires frequent trades to take place and, as a consequence, portfolio turnover and brokerage commissions may be greater than for other investment entities of similar size.

4.      Concentration of Investments.  While the General Partner intends to allocate the Partnership's equity among a number of different securities of a number of different companies, it is possible that a significant amount of the Partnership's equity could be invested in the securities of only a few companies.

5.      Fees, Expenses and General Partner Allocation.  The operating expenses of the Partnership, including, but not limited to, fees paid to accountants, attorneys, the Management Fee and the General Partner Allocation may, in the aggregate, constitute a high percentage relative to other investment entities.

6.      No Participation in Management.  The management of the Partnership's operations is vested solely in the General Partner, and the Limited Partners will have no right to take part in the conduct or control of the business of the Partnership. In connection with the management of the Partnership's business, the General Partner will contribute services

to the Partnership and devote thereto such time in its discretion as it deems appropriate. See *"CONFLICTS OF INTEREST"*.

7.  Limitation of General Partner's Liability and Indemnification of the General Partner. Under the CULPA, a general partner is accountable to the limited partners as a fiduciary and, consequently, is required to exercise good faith and integrity in handling partnership affairs. The Partnership Agreement provides that the General Partner shall be indemnified against and shall not be liable for, any loss or liability incurred in connection with the affairs of the Partnership, so long as such loss or liability arose from acts performed in good faith and not involving any fraud, malfeasance or gross negligence.   Therefore, a Limited Partner may have a more limited right of action against the General Partner than a Limited Partner would have had absent these provisions in the Partnership Agreement. See *"FIDUCIARY RESPONSIBILITIES OF THE GENERAL PARTNER"*.

8.  Liability of a Limited Partner for the Return of Capital Distributions. Limited Partners will not be liable under Connecticut law for the Partnership's debts, except that a Limited Partner which has received a distribution from the Partnership representing, in whole or in part, a return of such Limited Partner's capital contribution may be liable to the Partnership for an amount equal to such returned contribution, without interest, if such distribution was made in violation of the Partnership Agreement or the CULPA, or, under certain circumstances, to the extent necessary to discharge the Partnership's liabilities to creditors who extended credit to the Partnership prior to such distribution.

9.  Delayed Schedule K-1s.   The General Partner will endeavor to provide a final Schedule K-1 to each Limited Partner for any given calendar year prior to April 15 of the following year.  In the event that the final Schedule K-1 is not available by such date, a Limited Partner will either have to file for an extension or pay taxes based on an estimated amount and file an amended return once the final Schedule K-1 is received.

General Risks

1.  Limited Operating History; Experience of General Partner.  The Partnership was formed in 1997 and is the successor to NYLP which was formed in December 1994 and has a limited operating history.  The success of the Partnership depends on the ability and experience of the General Partner, which was also formed in 1997 and has a limited operating history.  There can be no assurance that the General Partner will generate any gains for the Partnership.

2.  Lack of Separate Representation.  Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner, or their respective affiliates, on the other hand, were or will be the result of arm's-length negotiations.  The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner.

A00408

## FINANCIAL SUMMARY OF THE OFFERING

This summary is qualified in its entirety by the detailed information (including *"RISK FACTORS"* and *"CERTAIN FEDERAL INCOME TAX CONSIDERATIONS"*), appearing in this Memorandum, and the Exhibits hereto and the documents referred to herein. All documents referred to herein and not attached hereto are available for inspection during normal business hours at the office of the General Partner, 475 Steamboat Road, Greenwich, CT 06930, upon request by an Offeree.

### The Partnership

The Interests in the Partnership offered herein each represent a percentage interest in the Partnership proportionate to the amount invested by each Partner as related to the aggregate amount invested by all Partners. See *"SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT - Profits, Losses and Interest in Partnership's Net Worth"*.

### General Partner

The General Partner of the Partnership is Lancer Management Group II, LLC, a Connecticut limited liability company. Lauer is the sole manager and principal owner of the General Partner and he is solely responsible for its operations and activities. See *"MANAGEMENT OF THE PARTNERSHIP"*.

### Terms Of Offering

Each Limited Partner must invest a minimum of $1,000,000 (however, the General Partner reserves the right, in its sole and absolute discretion, to admit Limited Partners with less than such minimum investment). There is no minimum or maximum aggregate amount of funds which may be contributed to the Partnership. The General Partner, in its sole and absolute discretion, can accept or reject any capital contributions from existing Limited Partners or Offerees.

The General Partner reserves the right to sell Interests through banks and registered broker-dealers and to pay a fee or commission thereon. Any such fee or commission will be paid solely by the General Partner, and no portion thereof will be paid by the Partnership.

Offerees and existing Limited Partners may invest funds in the Partnership as of the beginning of each Fiscal Period, although the General Partner in its sole and absolute discretion has the right to admit new Limited Partners and to accept additional funds from existing Limited Partners at any time. All funds invested in the Partnership by Limited Partners will be held in the Partnership's name and the Partnership will not commingle its funds with any other party.

A copy of the subscription documents and instructions for subscribing are attached as Exhibit "A". Each Offeree desiring to acquire an Interest will be required to execute a subscription agreement and other subscription documents to be accompanied by a check made payable to the Partnership representing the Offeree's capital contribution for their Interest. Offerees may alternatively wire transfer to a bank account in the name of the Partnership their capital contribution for their respective Interests in accordance with the Instructions to Subscribers in Exhibit "A" hereto. Existing Limited Partners making additional capital

A00409

contributions will be required to execute a one page form confirming certain information previously provided to the Partnership.

Withdrawals

A Limited Partner may withdraw part or all of the value of the Limited Partner's capital account after one (1) year from the date of the Limited Partner's original capital contribution as of January 1 and July 1 of each calendar year (each a "Withdrawal Date") upon at least ninety (90) days' prior written notice. Withdrawals may be made at such other times as determined by the General Partner in its sole and absolute discretion. The Partnership currently expects to pay to a withdrawing Limited Partner an amount equal to approximately ninety-five (95%) percent of the value in such Limited Partner's capital account within fifteen (15) days after the applicable Withdrawal Date. The Partnership currently expects to pay the balance of the amount remaining in a withdrawing Limited Partner's capital account, without interest, as soon as practicable after completion of the unaudited interim financial statements for the six (6) month period ending June 30 for July 1 withdrawals or December 31 audited financial statements for January 1 withdrawals. The Partnership currently expects to pay a Limited Partner who makes a partial withdrawal within fifteen (15) days after the applicable Withdrawal Date. There are no withdrawal fees associated with a Limited Partner's withdrawal of capital from the Partnership. The General Partner, in its sole and absolute discretion, may waive any notice period. The General Partner may require any Limited Partner to withdraw all or any part of the value in their capital account for any reason upon not less than three (3) days prior written notice. The Partnership has the right to pay cash or marketable securities, or both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

Distributions From Profits or Capital

The Partnership does not expect to make any distributions from profits or capital, except pursuant to requests for withdrawals and upon termination of the Partnership. See "*SUMMARY OF CERTAIN TERMS OF THE PARTNERSHIP AGREEMENT-Distributions When Partnership Terminated*" and "*Withdrawals*".

Management Fee

The General Partner will receive a quarter-annual management fee ("Management Fee") of one-quarter (0.25%) percent of each Limited Partner's share of the Partnership's Net Worth (as defined in this Memorandum) at March 31, June 30, September 30 and December 31 of each year. A pro rata Management Fee will be charged to Limited Partners on any amounts permitted to be invested and withdrawn during any quarter-annual Fiscal Period.

A 0 0 4 1 0

General Partner Allocation

The General Partner shall have reallocated by credit to its capital account and debit to each Limited Partner's capital account net income of the Partnership attributable to each Limited Partner (net increase in Net Worth) equal in the aggregate to twenty (20%) of the net increase in Net Worth allocated to each Limited Partner during any Fiscal Year (on the accrual basis of accounting) on an annual basis ("General Partner Allocation"). The General Partner Allocation shall be in addition to the allocations of the balance of income and profits, or losses, to the General Partner based upon its capital account proportionate to the aggregate amount of the capital accounts of all Partners.

In any Fiscal Year(s) in which a Limited Partner has an existing Loss Carryover, the General Partner Allocation for such succeeding Fiscal Year(s) shall be calculated on the net increase in Net Worth for such Limited Partner reduced by the Loss Carryover for such Limited Partner until the aggregate reductions equal the Loss Carryover for such Limited Partner. In the event, however, that a Limited Partner withdraws funds at a time in which such Limited Partner has a Loss Carryover, the amount of such Loss Carryover at such withdrawal date applicable to such Limited Partner shall be reduced by a percentage equal to 100% multiplied by a fraction, the numerator of which is the amount to be withdrawn from the capital account, and the denominator of which is the amount in such capital account immediately prior to the withdrawal.

Determination of Partnership's Net Worth

As set forth in Section 9.05 of the Partnership Agreement, the Net Worth of the Partnership is determined in accordance with the following:

"The net worth of the Partnership ("Net Worth") shall be determined on the accrual basis of accounting in accordance with generally accepted accounting principles consistently applied and, further, in accordance with the following:

(a)    A determination shall be made on the last day of each Fiscal Year (or Fiscal Period, if required) as to the value of all Partnership assets and as to the amount of liabilities of the Partnership. In making such determination, securities which are listed on a national securities exchange or over-the-counter securities listed on the NASDAQ National Market System, shall be valued at their last sales price on such date, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices. Securities which are not so listed shall be valued at their last closing "bid" prices if held "long" and at their last closing "asked" prices if sold "short". Securities which have no public market shall be considered at such value as the General Partner may reasonably determine. Investment in partnerships, if any, shall be valued at their last reported value, updated by any interim valuations provided by such partnerships or by any other applicable valuation deemed reasonable by the General Partner. All such valuations shall be made as of the last trading day of the Fiscal Year (or Fiscal Period, as the case may be), and all values assigned to securities by the General Partner pursuant to this Section shall be final and conclusive as to all of the Partners.

14

A00411

(b)     There shall be deducted the Basic Fee and properly accruable estimates of expenses for accounting, legal and other administrative services, subject to the Administrative Cap (whether performed therein or to be performed thereafter) and such reserves for contingent liabilities of the Partnership, including estimated expenses, if any, in connection therewith, as the General Partner shall determine; and

(c)     The organizational expenses of the Partnership shall be amortized over a period of sixty (60) months or such shorter period as the General Partner shall select and, in computing the Net Worth of the Partnership, organizational expenses, shall be treated as an asset with a value equal to the unamortized amount thereof.

After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Worth of the Partnership during the Fiscal Year (or Fiscal Period, as the case may be) just ended. The term "increase in Net Worth" shall be the excess of Net Worth at the end of any Fiscal Year (or Fiscal Period, as the case may be) over that of the preceding Fiscal Year (or Fiscal Period, as the case may be), after adjusting for interim capital contributions and withdrawals. The term "decrease in Net Worth" shall be the amount by which the Net Worth at the end of the Fiscal Year (or Fiscal Period, as the case may be) is less than the Net Worth of the Partnership as of the end of the preceding Fiscal Year (or Fiscal Period, as the case may be) after adjusting for interim capital contributions and withdrawals."

Expenses

The Partnership will pay all of its accounting, legal and other operating expenses, including all expenses incurred in connection with the offer and sale of Interests and the admission of Limited Partners (collectively, the Administrative Expenses") up to a maximum of one (1%) percent (or a prorated amount for the Partnership's first and last Fiscal Year and on amounts permitted to be invested and withdrawn during any Fiscal Period) of the Partnership's Net Worth at the end of its Fiscal Year (the "Administrative Cap"). To the extent that the Administrative Expenses exceed the Administrative Cap in any Fiscal Year, the General Partner shall pay such excess Administrative Expenses either by charging its capital account or by making a direct payment, as determined by the General Partner in its sole discretion. The Administrative Cap, however, does not apply to brokerage commissions, custodial fees and other trading, research and investment charges, fees and expenses which shall be paid by the Partnership. The Partnership will also pay all of its organizational expenses which will be amortized over sixty (60) months.

## CONFLICTS OF INTEREST

There may be inherent and potential conflicts of interest between the General Partner (and Lauer) and the Partnership.  Among the conflicts which Offerees should consider are the following:

(a)      Neither the General Partner nor Lauer has any obligation to devote their full time to the business of the Partnership, but the General Partner is required to devote only such time and attention to the affairs of the Partnership as it may deem appropriate in its sole and absolute discretion.  In addition, the General Partner and Lauer may manage other accounts for which they may be compensated and may provide consulting and/or advisory services to others.  Lauer currently is the sole manager and principal owner of LMG-CT, which is the sole investment manager of LOI, TOF and TVF.

(b)      The General Partner will determine the allocation of funds from the Partnership and such other accounts to investment strategies and techniques on whatever basis it considers appropriate or desirable in its sole and absolute discretion.

(c)      The General Partner and/or Lauer may manage other accounts and provide investment advice to other parties, and the General Partner and/or Lauer may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Partnership's funds, in a particular security or strategy.

(d)      The General Partner Allocation may create an incentive for the General Partner to make investments that are riskier or more speculative than would be the case in the absence of such an arrangement.

(e)      To the extent the Partnership's brokerage business is allocated to brokers or dealers in recognition of past or future referrals, the General Partner may have an incentive to cause the Partnership to effect more transactions than it might otherwise in order to stimulate brokers or dealers to refer more Offerees to the Partnership.

## FIDUCIARY RESPONSIBILITIES OF THE GENERAL PARTNER

The General Partner is accountable to the Limited Partners as a fiduciary and consequently must exercise the utmost good faith and integrity in handling Partnership affairs. The General Partner must provide the Limited Partners (or their representatives) with timely and full information concerning matters affecting the activities of the Partnership, including its formation and liquidation, and each Limited Partner may, subject to the terms of the Partnership Agreement, inspect the Partnership's books and records at any time during normal business hours upon prior written notice to the General Partner.

Cases have been decided under the common and statutory laws of certain jurisdictions to the effect that a limited partner may institute legal action on behalf of such limited partner and all other similarly situated limited partners (a class action) to recover damages from a general partner for violations of the general partner's fiduciary duties, or on behalf of the partnership (a partnership derivative action) to recover damages from a third party where the general partner has failed or refused to enforce an obligation.  Comparable relief may be available under Connecticut law, depending upon the facts.

On the basis of Federal statutes and rules and decisions by Federal courts, it appears that the limited partners of limited partnerships have the right, subject to the provisions of the Federal Rules of Civil Procedure, to bring partnership class actions in the Federal courts (to enforce the Federal rights of all similarly situated limited partners) and partnership derivative actions in the Federal courts (to enforce Federal rights of a partnership) including in each case, rights under certain rules of the SEC.

Notwithstanding the foregoing, it should be noted that the cost of litigating against the General Partner for enforcement of its contractual or fiduciary obligations may be prohibitively high and that any judgment obtained may not be collectible since the General Partner is not bonded and may lack sufficient funds to satisfy the judgment.

The foregoing summary is based on statutes, rules and decisions as of the date hereof and involves a rapidly developing and changing area of law.  Therefore, if a Limited Partner believes that a breach of a fiduciary duty by the General Partner has occurred, or if a Limited Partner has any other questions concerning the duties of the General Partner, the Limited Partner should consult the Limited Partner's own counsel as to such counsel's evaluation of the status of the law and available remedies at such time.

Under the terms of the Partnership Agreement, the General Partner (provided it acts in good faith within the scope of the Partnership Agreement) not only is not liable to the Partnership or the Limited Partners for errors in judgment or other acts or omissions not amounting to gross negligence, malfeasance or fraud, but is indemnified in such circumstances by the Partnership. Therefore, purchasers of the Interests may have more limited rights of action than they would have absent the limitations in the Partnership Agreement.  It should be noted, however, that it is the position of the SEC and certain states that any attempt to limit the liability of a general partner or to indemnify a general partner under the Federal securities laws or applicable state law is contrary to public policy and, therefore, unenforceable.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

General

There are risks associated with the Federal income tax aspects of an investment in the Partnership. This summary is not intended as a substitute for careful tax planning, particularly since the tax aspects of an investment in the Partnership are complex and will vary depending on the overall tax posture of each Limited Partner.

OFFEREES ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISERS WITH SPECIFIC REFERENCE TO THEIR TAX SITUATION PRIOR TO PURCHASING AN INTEREST.

**EACH OFFEREE WILL BE REQUIRED TO REPRESENT THAT THE OFFEREE HAS RELIED UPON THE ADVICE OF THE OFFEREE'S ADVISERS AND REPRESENTATIVES, INCLUDING THE OFFEREE'S TAX AND LEGAL ADVISERS, BEFORE PURCHASING AN INTEREST. OFFEREES MUST RELY SOLELY ON THEIR ADVISERS WITH RESPECT TO THE FINANCIAL AND TAX CONSEQUENCES OF THIS INVESTMENT. NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE BY THE GENERAL PARTNER, THE PARTNERSHIP OR ANY COUNSEL OR ACCOUNTANTS TO THE PARTNERSHIP WITH RESPECT TO ANY FINANCIAL OR FOREIGN, FEDERAL, STATE OR LOCAL INCOME TAX CONSEQUENCES RELATING TO THE PARTNERSHIP OR OF AN INVESTMENT IN THE PARTNERSHIP. THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE, AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE.**

The following is a summary of certain material Federal income tax aspects of acquiring Interests. It is based upon the Code, rules and regulations promulgated thereunder, published rulings and court decisions, all as in effect on the date of this Memorandum. This summary does not discuss all of the tax aspects that may be relevant to a particular Offeree. No advance rulings have been or will be sought from the Service regarding any matter discussed in this Memorandum. Counsel to the Partnership has not rendered any legal opinions with respect to any Federal income tax consequences relating to the Partnership or an investment therein. Accordingly, Offerees are urged to consult their tax advisers to determine the Federal, state, local and foreign income and other tax consequences to them of acquiring Interests.

For individual taxpayers, the maximum Federal income tax rate generally is thirty-nine and six-tenths (39.6%) percent, including short-term capital gains. Long-term capital gains are taxed for individual taxpayers at maximum rates of twenty (20%) percent (for gains from the sale of capital assets held more than one (1) year). In addition, Limited Partners will be taxed on gains on certain open positions (i.e., unrealized gains) in "Section 1256 contracts" (e.g., foreign currency contracts and non-equity options, all as defined in Section 1256 of the Code) that are "marked to market" at the end of each year for Federal income tax purposes held by any investment limited partnership, limited liability company or managed accounts in which the Partnership invests. Under this mark-to-market procedure, Limited Partners will be subject to tax on certain gains that may never be realized.

Partnership Status. Effective January 1, 1997, the Service finalized regulations that generally permit domestic unincorporated entities to be taxed as partnerships or corporations.

18

A00415

Under these regulations, a newly formed non-corporate domestic entity is automatically classified as a partnership if it has at least two members, unless it affirmatively elects to be classified as an association taxable as a corporation. Eligible domestic business entities that were in existence before January 1, 1997 do not have to file elections to retain their current classifications. They retain the classification claimed under preexisting regulations. The Service will not challenge the classification of an existing eligible entity for periods prior to January 1, 1997, if the entity had a reasonable basis for its claimed classification and neither the entity nor any Partner was notified in writing by May 8, 1996 that the entity's classification was under examination. The Partnership has filed its tax returns as a partnership for tax purposes since its inception and neither the Partnership nor any Partner was notified in writing that the Partnership's classification was under examination. Accordingly, the Partnership will continue to be taxed as a partnership under these regulations.

Certain entities otherwise taxable as partnerships, however, are taxed as corporations if they are "publicly traded" or deemed to be readily tradeable on a secondary market or the substantial equivalent thereof (such entities "Publicly Traded Partnerships"). Under the Treasury Regulations, certain types of transfers of interests in a partnership are disregarded in determining whether such interests are readily tradeable in a secondary market. In addition, interests in a partnership are not readily tradeable on a secondary market if (i) all interests in the partnership were issued in a transaction (or transactions) that was not required to be registered under the 1993 Act; and (ii) the partnership does not have more than one hundred (100) partners at any time. Notwithstanding the foregoing, an entity otherwise qualifying as a Publicly Traded Partnership will not be taxed as a corporation if, for all years, ninety (90%) percent or more of the entity's gross income consists of "qualifying income." Recently promulgated Treasury Regulations clarify that qualifying income includes interest, dividends, capital gain from the sale of stock and other capital assets held for the production of income (including gain on positions that are marked to market), gain characterized as ordinary income from certain foreign currency transactions, income from certain notional principal contracts and other substantially similar income to the extent determined by the IRS, provided the entity receiving such qualifying income is not acting as a broker, market maker or dealer. Special rules apply for losses and for straddles and similar transactions.

Based on the Partnership's investment objective and its strategy and expected investments, it appears that the Partnership will satisfy the 90% qualifying income test described above. If that test is satisfied, then the Partnership will not be taxed as a corporation even if it has more than one hundred (100) Partners (the Partnership, however, does not expect to have more than one hundred (100) Partners). Moreover, if the Partnership fails to meet the qualifying income test but the IRS determines that such failure was inadvertent and the Partnership makes certain adjustments and takes corrective steps to meet such test, then notwithstanding the failure, the Partnership will not be taxed as a corporation under these rules.

Taxation of Limited Partners on Partnership Profits and Losses. The Partnership, if treated as a partnership for Federal income tax purposes as discussed above, will not itself generally be subject to Federal income tax. Rather, each Limited Partner in computing its Federal income tax liability for a taxable year will be required to take into account its allocable share of all items of Partnership income, gain, loss, deduction and credit for the taxable year of the Partnership ending within or with such taxable year of such Limited Partner, regardless of whether such Limited Partner has received any distributions from the Partnership. The

characterization of an item of profit or loss usually will be determined at the Partnership (rather than at the Partner) level.

Tax Allocations of Partnership Profits and Losses. For Federal income tax purposes, a Limited Partner's allocable share of items of Partnership income, gain, loss, deduction and credit will be determined by the Partnership Agreement if such allocations either have "substantial economic effect" or are determined to be in accordance with the Limited Partner's Interest in the Partnership. If the allocations provided by the Partnership Agreement were successfully challenged by the Service, the redetermination of the allocations to a particular Limited Partner for Federal income tax purposes could be less favorable than the allocations set forth in the Partnership Agreement.

Tax allocations generally will be made proportionately to book accounting allocations. However, the amount of such tax allocations may differ significantly from book accounting allocations because book accounting allocations are made with respect to unrealized gains and losses (i.e., reflecting interim changes in the value of investments) and tax allocations are generally made with respect to recognized gains and losses (i.e., generally when they are sold).

Book Accounting Allocations. At the end of the calendar year and any other interim periods during which the General Partner, in its sole and absolute discretion, allows entry of new Partners, withdrawal (total or partial) of Partners or additional capital contributions from existing Partners, changes in the Net Worth of the Partnership's assets and investments will be allocated to each Partner. This includes an allocation based upon unrealized gains and losses (on all positions not yet sold that have appreciated or depreciated), including long and short positions, outstanding options, and the like. Since unrealized gains and losses are not taxable, except for regulated futures contracts held at the end of the Fiscal Year, the allocation for accounting purposes will differ from that for tax purposes in each year.

Adjusted Tax Basis for Interests. A Limited Partner's adjusted tax basis for its Interest generally will be equal to the amount of such Limited Partner's initial capital contribution and will be increased by (a) any additional capital contributions made by such Limited Partner and (b) such Limited Partner's allocable share of items of Partnership taxable income and gain. Such adjusted tax basis generally will be decreased, but not below zero, by such Limited Partner's allocable share of (i) items of Partnership taxable deduction and loss and (ii) withdrawals by such Limited Partner.

In general, if the recognition of a Limited Partner's distributive share of Partnership losses would reduce its adjusted tax basis for such Limited Partner's Interest below zero, the recognition of such losses by the Limited Partner would be deferred until such time as the recognition of such losses would not reduce the Limited Partner's basis below zero.

Sale of Interests. A sale of all or part of a Limited Partner's Interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds and the Limited Partner's allocable adjusted tax basis for its Interest. Such Limited Partner's adjusted tax basis will be adjusted for this purpose by its allocable share of the Partnership's income or loss for the year of such sale or withdrawal. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss.

Treatment of Cash Distributions; Withdrawals; Liquidation. Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's adjusted tax basis in such

A00417

Limited Partner's Interest, will not result in taxable income to such Limited Partner but will reduce such Limited Partner's adjusted tax basis in such Limited Partner's Interest. Distributions in excess of a Limited Partner's adjusted tax basis in such Limited Partner's Interest immediately prior thereto ("Excess Distributions") will result in the recognition of gain to the extent of such excess.

In general, any gain recognized upon an Excess Distribution in connection with a redemption or liquidation of the Partnership will be treated as capital gain or loss, except for the portion of any gain which is attributable to such Limited Partner's share of income of the Partnership up to the date of exchange, redemption or liquidation, which income will be taxed as otherwise described above. Such gain or loss will be treated as long-term capital gain or loss taxable at a maximum rate of 20% if the Interest so disposed was held for more than one (1) year, or as short-term capital gain or loss if the Interest so disposed of was held for one (1) year or less.

Limitation on Deductibility of Capital Losses. Capital losses generally are deductible by individuals only to the extent of capital gains for the taxable year plus up to $3,000 of ordinary income ($1,500 in the case of a husband and wife filing separate returns). Excess capital losses may be carried forward but not back. Capital losses generally are deductible by corporations only to the extent of capital gains for the taxable year. Corporations may carry capital losses back three years and forward five years. Prospective corporate Offerees should consult their tax advisers regarding the deductibility of capital losses.

Limitation on Deductibility of Passive Losses. In addition to the limitations on the deductibility of losses described above, the Code restricts individuals, certain personal service corporations and certain non-corporate taxpayers from using trade or business losses sustained by limited partnerships and other businesses in which the taxpayer does not materially participate to offset income from other sources. Therefore, such losses cannot be used to offset salary or other earned income, active business income or "portfolio income" (i.e., dividends, interest, royalties and nonbusiness capital gains) of the taxpayer; however, in the case of certain closely-held corporations, passive activity losses can offset other active business income. Losses and credits suspended under the limitation may be carried forward indefinitely and may be used in later years against income from passive activities. Moreover, a taxable disposition by a taxpayer of the entire interest in a passive activity will cause the recognition of any suspended losses attributable to that activity.

This so-called "passive activity loss" limitation generally will not apply, however, to limit losses sustained by the Partnership because the Partnership's investment activities are not expected to produce losses which would be characterized as "passive activity losses" under current regulations. Furthermore, a Limited Partner will not be able to use losses from its interests in passive activities to offset its share of income and capital gain from the Partnership that is not "passive activity income".

Limited Deduction for Certain Expenses. The Partnership's activities in any taxable year may vary sufficiently with regard to its status as either a trader or investor to preclude a determination at this time. If the Partnership is a trader engaged in the business of trading securities, each Limited Partner who is an individual will be entitled to deduct such Limited Partner's share of expenses of the Partnership under Section 162 of the Code as business expenses. If the Partnership is an investor engaged in an activity for its own account, each Limited Partner who is an individual will only be able to deduct such Limited Partner's share of

A00418

expenses of the Partnership to the extent that such investment expenses (excluding interest) when combined with other expenses deductible under Section 212 of the Code exceed two (2%) percent of such Limited Partner's adjusted gross income. In addition, the amount in excess of such two (2%) percent limitation will not be deductible in computing the alternative minimum tax. The deductible portion, if any, of such expenses becomes part of the Limited Partner's total itemized deductions, which total is subject to further reduction generally in amount equal to the lesser of three (3%) percent of an individual's adjusted gross income in excess of $100,000 (indexed for inflation) or eighty (80%) percent of the individual's otherwise allowable total itemized deductions. To the extent that the Partnership incurs such itemized deductions subject to the two (2%) percent floor, depending on each Limited Partner's particular circumstances, the taxable income of certain Limited Partners could exceed their true economic gain to the extent of their share of such expenses that are less than such two (2%) percent floor. The General Partner will review the Partnership's activities for each taxable year and take the position that the Partnership is either a trader or an investor based upon the facts and circumstances existing at such time.

Limitation on Deductibility of Investment Interest. Interest paid or accrued on indebtedness properly allocable to property held for investment, other than a passive activity ("investment interest"), generally is deductible by individuals and other non-corporate taxpayers only to the extent it does not exceed net investment income. Investment interest disallowed under this limitation is carried forward and treated as investment interest in succeeding taxable years. Investment income includes gross income from "property held for investment" and generally includes short-term capital gains attributable to the disposition of such property and any (long-term) capital gains attributable to the disposition of such property so long as the taxpayer has elected to have such net (long-term) capital gains taxed at ordinary income rates. For purposes of these rules, property held for investment includes property that produces "portfolio income" (see *"Limitation on Deductibility of Passive Losses"* above) and any interest in a trade or business activity which is not a passive activity and in which the holder does not materially participate. Any items of income or expense taken into account under the passive activity loss limitation is excluded from investment income and expense for purposes of computing net investment income.

Tax Elections. The Code provides for optional adjustments to the basis of Partnership property upon distributions of Partnership property to a Limited Partner and transfers of Interests, including transfers by reason of death, provided that a Partnership election has been made pursuant to Section 754 of the Code. As a result of the complexities and added expense of the tax accounting required to implement such an election, and because such election, once made, may be revoked only with the consent of the Service, it is highly unlikely that the General Partner will make such an election. Accordingly, any benefits that might be available to the Limited Partners by reason of such an election would not be available.

Taxes Withheld. The Partnership may withhold taxes attributable to any Limited Partner to the extent required under the Code of Treasury Regulations, or under any state, local or other tax law. Any taxes so withheld by the Partnership shall be deemed to be a distribution or payment to such Limited Partner and shall reduce the amount otherwise distributable to each Limited Partner pursuant to the Partnership Agreement.

Tax Audits. Under the Code, adjustments in tax liability with respect to Partnership items generally will be made at the Partnership level in a single partnership proceeding rather

A 0 0 4 1 9

than in separate proceedings with each Limited Partner. The General Partner will represent the Partnership as the "tax matters partner" during any audit and in any dispute with the Service. Each Limited Partner will be informed by the General Partner of the commencement of an audit of the Partnership. In general, the General Partner may enter into a settlement agreement with the Service on behalf of, and binding upon, the Limited Partners. Prior to settlement, however, a Limited Partner may file a statement with the Service providing that the General Partner does not have authority to settle on behalf of such Limited Partner.

The period for assessing a deficiency against a partner in a partnership, such as the Partnership, with respect to a partnership item is the later of three (3) years after the partnership files its returns or, under certain circumstances, if the name, address, and taxpayer identification number of the partner do not appear on the partnership return, one (1) year after the Service is furnished with such information. The General Partner may consent on behalf of the Partnership to an extension of the period for assessing a deficiency with respect to a Partnership item. As a result, a Limited Partner's Federal income tax return may be subject to examination and adjustment by the Service for a Partnership item more than three (3) years after such return has been filed.

If adjustments are made to items of Partnership income, gain, loss, deduction or credit as the result of an audit of the Partnership, the tax returns of the Limited Partners may be reviewed by the Service, which could result in adjustments of non-Partnership items as well as Partnership items.

Offerees should note that the Treasury Department has examined and continues to study among other things, the administrative and compliance issues related to the tax treatment of large partnerships, including the issues of imposing collection and/or withholding of tax at the partnership level and procedures for audits and assessments of partnerships and partners.

Possible Tax Law Changes. The foregoing discussion is only a summary and is based upon existing Federal income tax law. Offerees should recognize that the Federal income tax treatment of an investment in Interests may be modified at any time by legislative, judicial or administrative action. Any such changes may have retroactive effect with respect to existing transactions and investments and may modify the statement made above.

State and Local Taxes; Foreign Taxes. In addition to the Federal income tax aspects described above, various state and local tax aspects should be considered. State and local taxation resulting from the Partnership's activities may differ from the treatment for Federal income tax purposes. Offerees are urged to consult their tax advisers with respect to the state and local tax aspects of acquiring Interests. To the extent that the Partnership invests in foreign securities, the Partnership and the Limited Partners might become subject to tax in jurisdictions outside the United States on the Partnership's foreign-source income, if any. Such taxes may be creditable, in whole or in part, against the Limited Partners' respective U.S. income tax liabilities, if any. In addition, special U.S. tax rules may apply to investments in foreign entities.

* * * * *

A00420

The foregoing summary is not intended as a substitute for professional tax advice, nor does it purport to be a complete discussion of all tax consequences that could apply to this investment. For example, the foregoing does not discuss tax consequences that may be relevant to particular Limited Partners in light of their personal circumstances and tax consequences of particular investments such as "wash sales," hedging transactions, straddle or other risk reduction transactions. In addition, the foregoing does not discuss estate tax, gift tax or other estate planning aspects of this investment, nor does it specifically discuss Federal income tax rates or the alternative minimum tax or special rules that may apply to investments in foreign entities. Accordingly, prospective Limited Partners must consult their own tax advisers with respect to the tax effects of this investment, including the effects on their own tax situation.

A00421

## BROKERAGE COMMISSIONS

The General Partner has the sole power and authority to determine the broker or brokers to be used for each securities transaction for the Partnership. In selecting brokers or dealers to execute transactions, the General Partner need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost. In selecting brokers, the General Partner may or may not negotiate commission rates based solely on the execution of orders; thus, the Partnership may be deemed to be paying for other services provided by the broker to the Partnership or the General Partner which is included in the commission rate. In negotiating commission rates, the General Partner will take into account the financial stability and reputation of brokerage firms and the brokerage, research and other services provided by such brokers, although the Partnership may not, in any particular instance, be the direct or indirect beneficiary of the services provided. The General Partner may also direct commissions to brokers who refer clients to the Partnership. In addition, the General Partner has the sole power and authority to direct commissions to certain broker/dealers which may furnish other services to the Partnership or the General Partner, such as telephone lines, news and quotation equipment, electronic office equipment, account record keeping and clerical services, financial publications, economic consulting services, office space and facilities and travel and entertainment expenses.

Accordingly, the Partnership may be deemed to be paying for research and other services with "soft" or commission dollars. Although the General Partner believes the Partnership will benefit from many of the services obtained with soft dollars generated by Partnership trades, the Partnership will not benefit exclusively. The General Partner may also derive direct or indirect benefits from some or all of these services, particularly to the extent that the General Partner uses "soft" or commission dollars to pay for expenses it would otherwise be required to pay itself.

Section 28(e) of the 1934 Act provides a "safe harbor" to investment managers who use commission dollars generated by their advised accounts to obtain investment research and brokerage services that provide lawful and appropriate assistance to the manager in the performance of investment decision-making responsibilities. Conduct outside of the safe harbor afforded by Section 28(e) is subject to the traditional standards of fiduciary duty under state and Federal law. Notwithstanding a good faith determination that the amount of commissions paid is reasonable in relation to the value of brokerage research services provided, to the extent that the General Partner determines to use commission dollars to pay for products and services that provide administrative or other nonresearch assistance to the General Partner, such payments may not fall within the safe harbor of Section 28(e).

The Partnership will have a "prime brokerage" arrangement with Banc of America Securities LLC ("BAS"), which will clear (on the basis of payment against delivery) the Partnership's securities transactions which are effected through other brokerage firms. Through these arrangements, BAS will provide certain record keeping services and will perform the following functions, among others: (i) arranging for the receipt and delivery of securities purchased, sold, borrowed and loaned; (ii) making and receiving payments for securities; (iii) custody of securities; (iv) custody of all cash, dividends and exchanges, distributions and rights accruing to an account, or delivery of cash to the Partnership's banks; and (v) tendering securities in connection with cash tender offers, exchange offers, mergers or other corporate reorganizations. The General Partner also expects to allocate portions of the Partnership's brokerage business to BAS.

The Partnership is not required to pay any fee to BAS to act as Prime Broker. The Partnership is not committed to continue its "prime brokerage" relationship or its clearing relationship with BAS for any minimum period. If the Partnership uses another prime broker, it may be required to pay separate fees. To the extent that securities are purchased in non-U.S. markets, BAS will transfer funds to its sub-brokers located in the country in which the securities are purchased. Such sub-brokers will maintain custody of the securities until such time as they are sold, at which point uninvested proceeds will be transferred back to the Partnership's account at BAS.

The General Partner's investment program will emphasize active management of the Partnership's portfolio. Consequently, the Partnership's portfolio turnover and brokerage commission expenses may be greater than for other types of investment vehicles.

## INVESTMENT RESTRICTIONS

A purchaser of Interests will be required to represent that the purchaser is acquiring the Interest for the purchaser's own account for investment purposes only (and is assuming the economic risk of the investment) and not with a view to the distribution thereof (that is to say, that such purchaser is not acting as an underwriter or conduit for the sale to the public or to others of unregistered securities, directly or indirectly, on behalf of the Partnership).

The Interests offered hereby have not been registered under the 1933 Act or under any state securities or "blue sky" laws ("State Securities Laws") and they may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of or encumbered, except in compliance with the requirements of the 1933 Act, applicable State Securities Laws and the Partnership Agreement. Accordingly, Limited Partners will not be able to transfer the Interests without satisfactory evidence to the effect that the Interests were originally acquired for investment purposes and not for distribution. Offerees, therefore, should not acquire any Interests in anticipation of selling them on a short-term basis upon some increase in price or to purchase some other security or for any other purpose which could reasonably be foreseen at the time of making the purchase. All instruments evidencing Interests in the Partnership will bear a legend to the foregoing effect. Registration under the 1933 Act is not anticipated nor is the Partnership required to effect any such registration. Prior to any resale of Interests to the public, other than by an effective registration statement filed with the SEC, or other applicable exemption, such securities must have been beneficially owned and fully paid for at least one year and other requirements of Rule 144 must be present.

If a Limited Partner wishes to dispose of the Limited Partner's Interest in a transaction not requiring registration under the 1933 Act, such disposition is governed by, among other things, the terms of the Partnership Agreement. See "*SUMMARY OF CERTAIN PROVISIONS OF THE PARTNERSHIP AGREEMENT - Transfer and Assignment*". The General Partner's consent shall be required for any transfers of an Interest, and consent to such transfer shall be at the absolute discretion of the General Partner. In general, an assignee must satisfy the suitability standards applicable to the transferor or assignor. In no event may a transfer of all or any part of an Interest be made, if the General Partner is informed in an opinion of counsel that such transfer (i) violates the provisions of the 1933 Act and the rules and regulations thereunder or (ii) violates any State Securities Laws, or (iii) violates the CULPA. Additionally, an Interest may not be transferred if such transfer would result in a change of ownership, by reason of sales or exchanges, of fifty (50%) percent or more of the total Interests of the Partnership (or such other percentage of interest as will result in a termination of the Partnership under Section 708(b)(1) or successor Section of the Code) during the twelve (12) month period ending on the date of such transfer.

Any violation of the foregoing limitations by the Limited Partners could have serious legal and financial consequences to the Partnership and the Limited Partners. DUE TO THESE LIMITATIONS ON TRANSFERABILITY, LIMITED PARTNERS MAY BE REQUIRED TO HOLD THEIR INTERESTS INDEFINITELY UNLESS THEY WITHDRAW FROM THE PARTNERSHIP IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PARTNERSHIP AGREEMENT.

A00424

## SUITABILITY REQUIREMENTS

An investment in the Partnership involves a substantial degree of risk. See "*RISK FACTORS*" and "*CERTAIN FEDERAL INCOME TAX CONSIDERATIONS*". Further, transfer of the Interests is restricted by the terms of the Partnership Agreement and applicable Federal and State Securities Laws. The suitability standards referred to herein represent minimum suitability requirements for Offerees and the satisfaction of such standards by an Offeree does not necessarily mean that the Interests are a suitable investment for such Offeree.

This offering is made for purchase of Interests by Accredited Investors that are generally subject to Federal income taxation. The minimum investment amount is $1,000,000 (which may be waived by the General Partner in its sole discretion).

Annexed to this Memorandum as Exhibit A are the Subscription Documents (the "Subscription Documents") which must be completed by each Offeree. The Subscription Documents set forth in detail the definition of Accredited Investors Each Offeree must check the appropriate places in the Subscription Documents to represent to the Partnership that they are an Accredited Investor in order to be able to purchase Interests. The General Partner may reject any Offeree's subscription for any reason or for no reason.

**THE DELIVERY OF THIS MEMORANDUM TO AN OFFEREE DOES NOT CONSTITUTE AN OFFER, BUT RATHER THE SOLICITATION OF AN OFFER TO BE MADE BY THE OFFEREE, SUBJECT TO ACCEPTANCE BY THE GENERAL PARTNER.**

## SUMMARY OF CERTAIN PROVISIONS
## OF THE PARTNERSHIP AGREEMENT

The rights and obligations of the Partners and the various terms and provisions governing the operation and business of the Partnership are set forth in the Partnership Agreement.

THE PARTNERSHIP AGREEMENT (ATTACHED HERETO AS EXHIBIT "B") AFFECTS THE SUBSTANTIVE RIGHTS OF PARTNERS.  OFFEREES ARE URGED TO READ THE PARTNERSHIP AGREEMENT IN ITS ENTIRETY.  EACH NEW LIMITED PARTNER WILL BE REQUIRED TO REPRESENT, IN WRITING, AS A CONDITION OF ACQUIRING THE INTERESTS, THAT THE NEW LIMITED PARTNER HAS READ AND UNDERSTOOD THE PROVISIONS OF THE PARTNERSHIP AGREEMENT.

THE PARTNERSHIP AGREEMENT CONTAINS PROVISIONS SEVERELY RESTRICTING THE ABILITY OF THE LIMITED PARTNERS TO TRANSFER THEIR INTERESTS.  WITH LIMITED EXCEPTIONS, A TRANSFER MAY NOT BE MADE WITHOUT PRIOR WRITTEN CONSENT OF THE GENERAL PARTNER, WHICH CONSENT MAY BE GIVEN OR WITHHELD IN THE SOLE AND ABSOLUTE DISCRETION OF THE GENERAL PARTNER.  THE GENERAL PARTNER WILL NOT GIVE SUCH CONSENT FOR A TRANSFER UNLESS IT RECEIVES SATISFACTORY LEGAL OPINIONS AS TO COMPLIANCE WITH ALL APPLICABLE LAWS INCLUDING THE 1933 ACT, REGULATIONS THEREUNDER, AND APPLICABLE STATE SECURITIES LAWS. TRANSFERS WHICH WOULD RESULT IN A TERMINATION OF THE PARTNERSHIP FOR FEDERAL INCOME TAX PURPOSES ARE PROHIBITED.

The following is a summary of certain of the provisions of the Partnership Agreement and is qualified in its entirety by reference to the Partnership Agreement.

Term

The term of the Partnership shall continue until December 31, 2044, provided, however, that the Partnership may be terminated prior thereto as provided in the Partnership Agreement.

Control of Operations

The General Partner has exclusive authority to control the management of the day to day business operations and all other aspects of the Partnership, other than the termination or dissolution of the Partnership upon the withdrawal of the General Partner and certain other events, which are subject to the Limited Partners' right to vote to continue the Partnership as provided in Article IV of the Partnership Agreement. In addition, the Limited Partners have the right to vote upon the appointment of an additional or substitute General Partner and substantive amendment to the Partnership's Certificate of Limited Partnership or the Partnership Agreement.

The General Partner has the right to employ investment advisors, attorneys, accountants, consultants, and other personnel on behalf of the Partnership.

The General Partner may own, operate and invest in other interests and business ventures which may result in conflicts of interest.  The General Partner is required to devote only such time to the business of the Partnership as it may deem necessary in its sole and absolute discretion.

A00426

Liability of General Partner

The General Partner will be generally liable to third parties for all obligations of the Partnership to the extent such obligations are not paid by the Partnership or are not by their terms limited to recourse against specific assets. The doing of any act or the failure to do any act by the General Partner, the effect of which may cause or result in loss, liability, damage or expense to the Partnership or the Limited Partners, shall not subject the General Partner to any liability to the Partnership or to the Limited Partners, except that the General Partner may be so liable if it is grossly negligent or guilty of willful misconduct. The Partnership (but not the Limited Partners individually), shall indemnify and save harmless the General Partner from any loss, liability, damage or expense incurred by it by reason of any act or acts taken or omitted by it for and on behalf of the Partnership and in furtherance of the Partnership's best interest, if such act was taken or omitted other than in bad faith and did not constitute gross negligence or willful misconduct.

Withdrawal of General Partner

The Partnership shall terminate upon the dissolution, resignation or bankruptcy of the General Partner, provided, however, that the Partnership may be continued in accordance with the provisions of Article XIII of the Partnership Agreement. Upon the withdrawal or resignation of the General Partner, the Limited Partners shall have the right to appoint a Substitute General Partner.

Liability of Limited Partners

A Limited Partner will have no obligation at any time to make contributions to the capital of the Partnership except for the capital contributions to be made upon such Limited Partner's admission. No Limited Partner shall be personally liable for any debts and obligations of the Partnership; provided, however, that each Limited Partner, if the Limited Partner receives a return of all or any part of such Limited Partner's capital, may be liable to the Partnership for any sum, not in excess of such return of capital (without interest), if such distribution was made in violation of the Partnership Agreement or the CULPA, or, under certain circumstances, to the extent necessary to discharge the Partnership's liabilities to creditors who extended credit to the Partnership prior to such distribution.

Profits, Losses and Interest in Partnership's Net Worth

The interest of the Partners in profit, loss and increases and decreases in Net Worth after allocation to the General Partner of the General Partner Allocation, shall be allocated to each Partner in proportion to all Partners' capital accounts for such Fiscal Period.

Representations of General Partner

The General Partner has represented to the Partnership that: (i) there are no commitments or obligations binding upon the Partnership except as described in the Memorandum; (ii) to the best of its knowledge, no material default on the part of the General Partner and/or the Partnership exists with respect to any agreement affecting the Partnership; (iii) it has no actual knowledge of any claim, litigation, investigation, legal action or other proceeding with regard to liens affecting the Partnership; and (iv) that no such claim, litigation, etc., is threatened.

A 0 0 4 2 7

## Distributions When Partnership Terminated

Upon the termination of the Partnership (upon the expiration of its term or the occurrence of any of the other events specified in Article XIII of the Partnership Agreement), the Partnership will be liquidated and the proceeds of liquidation will be applied and distributed in proportion to the respective capital accounts of the Partners. The Partnership Agreement does not provide for distribution to be made other than upon termination of the Partnership.

## Distributions in Kind

If the Partnership is dissolved, then to the extent that the Partnership's assets have not been sold or otherwise disposed of, the Partnership's non-cash assets may be distributed in kind and each Partner shall receive an undivided interest in such assets equal to the portion of the proceeds to which the Partner would have been entitled if the assets were sold.

## Accounting Period and Method

The Partnership has adopted a December 31 Fiscal Year, and shall keep its books and records based on the accrual method of accounting.

## Power of Attorney

The Partnership Agreement provides for the granting by each Limited Partner of an irrevocable Special Power of Attorney in favor of the General Partner and any successor General Partner. The Special Power of Attorney, which is coupled with an interest (and accordingly cannot be revoked), will particularly cover various administrative functions, including those relating to execution of the Partnership Agreement and certificates relating thereto along with authorized amendments to the Partnership Agreement and certificates.

## Reports to Limited Partners

The General Partner shall be required to keep, in accordance with generally accepted accounting principles, adequate books of account for the Partnership. Such books of account shall be kept on an accrual basis at the principal office of the Partnership and will be subject to inspection by any Limited Partner or authorized representative of a Limited Partner during reasonable business hours on advance written notice.

## Transfer and Assignment

Except in the event of a transfer occurring as a result of a death of a Limited Partner or occurring by operation of law, or those transfers specifically provided for in Section 10.01 of the Partnership Agreement, sale, assignment or exchange of Interests will be permitted only with consent of the General Partner. Sale, assignment or exchange of an Interest will not be permitted if it would result in termination of the Partnership for Federal income tax purposes and transfers of Interests are subject to other restrictions as are indicated in the Partnership Agreement.

A00428

### Admission of Additional Partners

The General Partner may admit additional Limited Partners as of the beginning of any Fiscal Period and, upon such admission, the Interests of the Partners will be readjusted in accordance with their capital accounts.

### Additional Capital Contributions

Any Partner may make additional contributions to the capital of the Partnership with the consent of the General Partner as of the first day of any Fiscal Period of the Partnership and, upon the receipt of such additional capital contributions, the Interests of the Partners will be readjusted in accordance with their capital accounts.

### Withdrawals

A Limited Partner may withdraw part or all of the value of the Limited Partner's capital account after one (1) year from the date of the Limited Partner's original capital contribution as of January 1 and July 1 of each calendar year (each a "Withdrawal Date") upon at least ninety (90) days' prior written notice. Withdrawals may be made at such other times as determined by the General Partner in its sole and absolute discretion. The Partnership currently expects to pay to a withdrawing Limited Partner an amount equal to approximately ninety-five (95%) percent of the value in such Limited Partner's capital account within fifteen (15) days after the applicable Withdrawal Date. The Partnership currently expects to pay the balance of the amount remaining in a withdrawing Limited Partner's capital account, without interest, as soon as practicable after completion of the unaudited interim financial statements for the six (6) month period ending June 30 for July 1 withdrawals or December 31 audited financial statements for January 1 withdrawals. The Partnership currently expects to pay a Limited Partner who makes a partial withdrawal within fifteen (15) days after the applicable Withdrawal Date. There are no withdrawal fees associated with a Limited Partner's withdrawal of capital from the Partnership. The General Partner, in its sole and absolute discretion, may waive any notice period. The General Partner may require any Limited Partner to withdraw all of any part of the value in their capital account for any reason upon not less than three (3) days prior written notice.

In the event a Limited Partner withdraws all of its capital account from the Partnership, the General Partner, in its sole and absolute discretion, may make a special allocation to the Limited Partner for Federal income tax purposes of the net capital gains recognized by the Partnership. in the last Fiscal Year in which the Limited Partner participates in the performance of the Partnership, in such manner as will reduce the amount, if any, by which such Limited Partner's capital account exceeds its Federal income tax basis in its interest in the Partnership before such allocation.

The Partnership has the right to pay cash or marketable securities, or both, to a Limited Partner that makes a withdrawal from such Limited Partner's capital account.

### Management Fee

The General Partner will receive a quarter-annual management fee ("Management Fee") of one-quarter (0.25%) percent of each Limited Partner's share of the Partnership's Net Worth (as defined in this Memorandum) at March 31, June 30, September 30 and December 31 of each

A 0 0 4 2 9

year. A pro rata Management Fee will be charged to Limited Partners on any amounts permitted to be invested and withdrawn during any quarter-annual Fiscal Period.

General Partner Allocation

The General Partner shall have reallocated by credit to its Capital Account and debit to each Limited Partner's Capital Account net income of the Partnership attributable to each Limited Partner (net increase in Net Worth) equal in the aggregate to twenty (20%) of the net increase in Net Worth allocated to each Limited Partner during any Fiscal Year (on the accrual basis of accounting) on an annual basis ("General Partner Allocation"). The General Partner Allocation shall be in addition to the allocations of the balance of income and profits, or losses, to the General Partner based upon its capital accounts proportionate to the aggregate amount of the capital accounts of all Partners.

In any Fiscal Year(s) in which a Limited Partner has an existing Loss Carryover, the General Partner Allocation for such succeeding Fiscal Year(s) shall be calculated on the net increase in Net Worth for such Limited Partner reduced by the Loss Carryover for such Limited Partner until the aggregate reductions equal the Loss Carryover for such Limited Partner. In the event, however, that a Limited Partner withdraws funds at a time in which such Limited Partner has a Loss Carryover, the amount of such Loss Carryover at such withdrawal date applicable to such Limited Partner shall be reduced by a percentage equal to 100% multiplied by a fraction, the numerator of which is the amount to be withdrawn from the capital account, and the denominator of which is the amount in such capital account immediately prior to the withdrawal.

Expenses

The Partnership will pay all of its accounting, legal and other operating expenses, including all expenses incurred in connection with the offer and sale of Interests and the admission of Limited Partners (collectively, the Administrative Expenses") up to a maximum of one (1%) percent (or a prorated amount for the Partnership's First and last Fiscal Year and on amounts permitted to be invested and withdrawn during any Fiscal Period) of the Partnership's Net Worth at the end of its Fiscal Year (the "Administrative Cap"). To the extent that the Administrative Expenses exceed the Administrative Cap in any Fiscal Year, the General Partner shall pay such excess Administrative Expenses either by charging its capital account or by making a direct payment, as determined by the General Partner in its sole discretion. The Administrative Cap, however, does not apply to brokerage commissions, custodial fees and other trading, research and investment charges, fees and expenses which shall be paid by the Partnership. The Partnership will also pay all of its organizational expenses which will be amortized over sixty (60) months.

Hot Issues

While the Partnership has not participated in "hot issues" in the past, it may invest in "hot issues". Hot issues result when the price in the secondary market of a new offering of securities rises to a premium over the initial offering price immediately or very soon after the securities are first distributed to the public. Under rules adopted by the National Association of Securities Dealers, Inc. ("NASD"), certain persons engaged in the securities, banking or financial services industries (and members of their family) are restricted from acquiring hot issues. If any Partner falls into the category of a restricted person, then the Partnership would have to create a separate memorandum account in order to participate in hot issues, because such account would allow for

the segregation of such profits in a manner which would exclude restricted persons. In such event, a Limited Partner that is a restricted person would be prejudiced in that assets of the Partnership would be used for an investment that such Limited Partner does not benefit from. Because it is not possible to predict the amount or profitability of any "hot issue" trades that the Partnership may engage in the future, no representations can be made as to the effect of possible future hot issue trades on the Partnership's trading results allocable to restricted and non-restricted Partners, respectively.

Amendment

The Partnership Agreement is subject to amendment with consent of the General Partner and Limited Partners owning more than fifty (50%) percent in Interest, except with respect to the appointment of an additional or substitute General Partner, which requires the unanimous vote of the Limited Partners.

RSDOCS1 887553v2

A 0 0 4 3 1

# LANCER PARTNERS, LIMITED PARTNERSHIP

## SUBSCRIPTION DOCUMENTS BOOKLET

### INSTRUCTIONS
### and
### SUBSCRIPTION AGREEMENT

A00432

# LANCER PARTNERS, LIMITED PARTNERSHIP

## INSTRUCTIONS TO SUBSCRIBERS

A 0 0 4 3 3

## INSTRUCTIONS TO SUBSCRIBERS

Persons and entities ("Subscribers") wishing to subscribe to Interests in LANCER PARTNERS, LIMITED PARTNERSHIP should complete and sign the Subscription Agreement and Form W-9.

Normally, Subscribers may subscribe by completing the following steps:

CAREFULLY REVIEW THE MEMORANDUM AND THE EXHIBITS THERETO.

1.      SUBSCRIPTION AGREEMENT:

Complete applicable Sections in Article IV, complete and sign **two** signature pages (9A and 9B) and have your signature notarized **twice** on the applicable pages (either 10A and 10B or 11A and 11B).

2.      FORM W-9:

Complete and sign the attached Form W-9.

Completed Subscription Agreements and Forms W-9 should be returned to:

> Lancer Management Group II, LLC
> 350 Bedford Street
> Stamford, CT
> Attention: Mr. Michael Lauer

INSTRUCTIONS FOR TRANSMITTAL OF FUNDS:

Your subscription may be made by wire transfer in accordance with the following wire instructions:

| | |
|---|---|
| Bank: | Bank of America NA |
| ABA#: | 121-000-358 |
| A/C: | Banc of America Securities LLC |
| A/C#: | 12339-32118 |
| Sub A/C: | Lancer Partners, Limited Partnership |
| Sub A/C #: | 118-11897 |

Please inform Mr. Michael Lauer, at (203) 977-7700 of the date, the amount, the bank and branch from which the funds originate. This will allow us to confirm the receipt of your funds. If you prefer to make your subscription by check, please make your check payable to "Lancer Partners, Limited Partnership" and deliver it to Lancer Management Group II, LLC with your completed documents.

We will transfer your capital contribution into Lancer Partners, Limited Partnership's account upon accepting your completed subscription agreement. You will at that time begin participating as a limited partner in Lancer Partners, Limited Partnership.

# EXHIBIT 5

A00542

Name of Offeree _____     Memorandum No. _____

## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

Relating to Class A Shares

of Par Value U.S. $0.01 Per Share

of

# THE OMNIFUND, LTD.

(A British Virgin Islands International Business Company)

Investment Manager:

## LANCER MANAGEMENT GROUP, LLC

Administrator:

## CITCO FUND SERVICES (CURAÇAO) N.V.

To be effective April 1, 2002

THIS IS NOT AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE SHARES DESCRIBED HEREIN IN ANY JURISDICTION TO ANY PERSON OR ENTITY TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER OR SALE.

# THE OMNIFUND, LTD.

The OmniFund, Ltd. (the "Fund") is an international business company incorporated under the laws of the British Virgin Islands in January 1999 as The Orbiter Fund, Ltd. The Fund is the successor fund to the merger with The Viator Fund, Ltd., an international business company incorporated under the laws of the British Virgin Islands. The Fund was formed to pool investment funds of non-U.S. Persons and Permitted U.S. Persons (as such terms are defined below) for the purpose of investing, trading and dealing in securities of public and non-public companies, traded in the United States of America and elsewhere, of all kinds and descriptions, including but not limited to, equity, debt, convertible securities, preferred stock, options, warrants, trade claims, monetary and other instruments, all as determined by the Fund's Investment Manager (as defined below) in its sole and absolute discretion. The Fund's objective is to maximize capital growth while attempting to control risk. The Investment Manager pursues the Fund's objective by engaging in an aggressive investment program that will include, but not be limited to, (i) investing, trading and dealing in securities of micro and small capitalized companies and other companies that "fly beneath the radar screens" of the large institutional oriented research entities, (ii) participating in initial public offerings, (iii) engaging in late stage private equity transactions, and (iv) providing bridge financing to public and non-public companies. It is intended that the Fund will be all-encompassing in its approach and that it will be opportunistic by nature with the potential for high-volatility and reduced liquidity. It is expected that substantially all of the companies that the Fund invests in, whether public or private, will have small to micro market capitalizations and that the Fund's investments will be concentrated. The Fund may employ leverage as part of its strategy although, historically, both the Fund's and the Investment Manager's use of leverage has been minimal. See *"INVESTMENT PROGRAM"*. **There is no assurance that the Fund's objective will be achieved, and investment results may vary substantially on a monthly, quarterly and annual basis.**

The Fund's assets are managed by Lancer Management Group, LLC (the "Investment Manager"), a limited liability company formed under the laws of the State of Connecticut, United States of America. Michael Lauer is the sole manager and principal owner of the Investment Manager and, as such, he controls the operations and activities of the Investment Manager. The Investment Manager also serves as the sole investment manager of Lancer Offshore, Inc., ("LOI"), a British Virgin Islands company. Mr. Lauer is also the sole manager and principal owner of Lancer Management Group II, LLC ("LMG II"), a Connecticut limited liability company, which is the sole general partner of Lancer Partners, Limited Partnership, a Connecticut investment limited partnership ("LPLP").

The Fund is offering (the "Offering") Class A shares, par value $0.01 per share (the "Shares"; all "S" references herein are to U.S. dollars), to non-U.S. Persons and to a limited number of Permitted U.S. Persons, each of which must meet certain suitability requirements, including being a Professional Investor (as defined below) under the laws of the British Virgin Islands (collectively, the "Offerees"). The minimum initial subscription for Shares is $1,000,000, subject to the right of the Fund's board of directors (the "Board"), in its sole and absolute discretion, to accept lesser amounts (but not less than $100,000). The minimum subscription for additional Shares is $100,000. Generally, Shares may be purchased on a monthly basis and shareholders (individually, "Shareholder" and collectively, "Shareholders") may redeem Shares upon at least six (6) months' prior written notice to the Fund on a quarterly basis, subject to the Redemption Charge (as defined below) for redemptions of Shares that have been outstanding for less than three (3) years.

Citco Fund Services (Curaçao) N.V. (the "Administrator") will make available to each Offeree or an Offeree's authorized representative, prior to subscribing for Shares in this Offering, the opportunity to ask questions of, and receive answers from, the Administrator or a person acting on its behalf, concerning the terms and conditions of this Offering, and to obtain any additional information, to the extent that the Administrator possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information set forth herein. Please direct inquiries to the Administrator at Tel. No. **(599-9) 732-2222.**

There is no public market for the Shares and none is expected to develop.

The Board of Directors of the Company (the "Board"), whose details appear on Page (v) herein, accepts responsibility for the information contained in this document. To the best of the knowledge and belief of the Board (who has taken all reasonable care to ensure that such is the case), the information contained in this

Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information. The Board accepts responsibility accordingly.

THE SHARES BEING OFFERED HEREBY HAVE NOT BEEN APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC") OR BY ANY OTHER GOVERNMENTAL AUTHORITY AND NEITHER THE SEC NOR ANY SUCH OTHER AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. IT IS ANTICIPATED THAT THE OFFERING AND SALE WILL BE EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT") AND THAT THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("ICA"), IN RELIANCE UPON SECTION 3(c)(1) THEREUNDER.

PURCHASE OF THE SHARES INVOLVES A HIGH DEGREE OF RISK. SEE "*CERTAIN RISK FACTORS*". CONFLICTS OF INTEREST BETWEEN THE INVESTMENT MANAGER AND THE FUND MAY ARISE IN VARIOUS CIRCUMSTANCES. SEE "*CONFLICTS OF INTEREST*".

OFFEREES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX, INVESTMENT OR OTHER ADVICE. OFFEREES SHOULD REVIEW THIS MEMORANDUM AND ALL OTHER DOCUMENTS RECEIVED IN CONNECTION WITH THE OFFERING WITH THEIR LEGAL COUNSEL, ACCOUNTANT, BUSINESS AND TAX ADVISOR ON WHOSE OPINIONS THEY SHOULD RELY AS TO ALL LEGAL, TAX, REGULATORY, FINANCIAL AND RELATED MATTERS CONCERNING AN INVESTMENT IN SHARES. OFFEREES MUST INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING AND DISPOSAL OF SHARES, AND ANY FOREIGN EXCHANGE OR OTHER RESTRICTIONS THAT MAY BE RELEVANT THERETO. A REPRESENTATION TO THAT EFFECT IS REQUIRED TO BE MADE BY EACH OFFEREE ACQUIRING SHARES.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE SHARES IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW. NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT AN OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE. ACCORDINGLY, SHARES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED, IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION. SHARES THAT ARE ACQUIRED BY OFFEREES NOT ENTITLED TO HOLD THEM WILL BE COMPULSORILY REDEEMED. THE BOARD RESERVES THE RIGHT TO REFUSE ANY SUBSCRIPTION ON THE BASIS OF ANY OFFEREE'S FAILURE TO MEET THE SUITABILITY CRITERIA DESCRIBED HEREIN OR FOR ANY OTHER REASON.

THIS IS A PRIVATE OFFERING, MADE ONLY BY DELIVERY OF A COPY OF THIS MEMORANDUM TO THE OFFEREE WHOSE NAME APPEARS HEREON AND THIS MEMORANDUM MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY DISTRIBUTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS UNAUTHORIZED. THE OFFEREE, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN THIS MEMORANDUM TO THE ADMINISTRATOR IF THE OFFEREE DOES NOT PURCHASE SHARES.

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM SHALL BE EMPLOYED IN THE OFFERING OF SHARES EXCEPT FOR THIS MEMORANDUM AND THE SUBSCRIPTION DOCUMENTS BOOKLET WHICH WILL BE DELIVERED TO OFFEREES THAT ARE INTERESTED IN ACQUIRING SHARES. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS, OR FURNISH ANY INFORMATION, WITH RESPECT TO THE FUND OR SHARES, OTHER THAN THE REPRESENTATIONS AND INFORMATION SET FORTH IN THIS

A00545

MEMORANDUM, THE SUBSCRIPTION DOCUMENTS BOOKLET AND THE DOCUMENTS AND INFORMATION FURNISHED BY THE FUND UPON REQUEST, AS DESCRIBED BELOW AND ANY REPRESENTATION OR INFORMATION NOT CONTAINED IN ANY OF THE FOREGOING DOCUMENTS MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND OR INVESTMENT MANAGER.

THE DELIVERY OF THIS MEMORANDUM DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE ON THE COVER HEREOF. EACH OFFEREE IS INVITED TO ASK QUESTIONS AND OBTAIN ADDITIONAL INFORMATION FROM THE FUND, OUTSIDE OF THE UNITED STATES, CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND ANY OTHER RELEVANT MATTERS (INCLUDING BUT NOT LIMITED TO, ADDITIONAL INFORMATION TO VERIFY THE ACCURACY OF THE INFORMATION SET FORTH HEREIN) TO THE EXTENT THE FUND POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

THIS MEMORANDUM CONTAINS SUMMARIES, BELIEVED BY THE BOARD AND INVESTMENT MANAGER TO BE ACCURATE, OF CERTAIN TERMS OF CERTAIN DOCUMENTS, BUT REFERENCE IS HEREBY MADE TO THE ACTUAL DOCUMENTS (COPIES OF WHICH ARE AVAILABLE FROM THE FUND) FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO, AND ALL SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE.

THE SHARES ARE SUITABLE ONLY FOR OFFEREES WHO ARE EITHER NOT U.S. PERSONS OR PERMITTED U.S. PERSONS, WHO DO NOT REQUIRE IMMEDIATE LIQUIDITY OF THEIR INVESTMENT, FOR WHOM AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE FUND'S INVESTMENT PROGRAM. OFFEREES THAT SUBSCRIBE FOR SHARES MUST REPRESENT THAT THEY ARE ACQUIRING THE SHARES FOR INVESTMENT PURPOSES ONLY. THE TRANSFER OF SHARES IS SUBJECT TO LIMITATIONS IMPOSED BY THE FUND'S MEMORANDUM OF ASSOCIATION AND ARTICLES OF ASSOCIATION (COLLECTIVELY, THE "ARTICLES").

This Memorandum has been prepared for investments denominated in United States dollars. The Board may accept, in its sole and absolute discretion, investments in other currencies under the following conditions: (i) each currency will be converted to S, at the sole cost and expense of the Offeree making the investment (and the cost will be deducted from the Offeree's gross subscription amount); (ii) each Shareholder will bear all currency fluctuation risks between S and their base currency; and (iii) all distributions will be made in S, unless the Shareholder requests in writing in advance that distributions to such Shareholder be made in a different currency, in which event the shareholder will bear the cost of converting the distribution to their base currency and such cost shall be deducted from such Shareholder's distribution.

IMPORTANT INFORMATION REQUIRED BY UNITED STATES FEDERAL AND STATE LAWS AND THE LAWS OF OTHER JURISDICTIONS IS ATTACHED TO THIS MEMORANDUM AS APPENDIX A. YOU ARE URGED TO READ THIS INFORMATION CAREFULLY.

# TABLE OF CONTENTS

| **Caption** | **Page** |
|---|---|
| DIRECTORY | v |
| SUMMARY | A |
| THE INVESTMENT MANAGER | 1 |
| INVESTMENT PROGRAM | 2 |
| INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES | 5 |
| CERTAIN RISK FACTORS | 7 |
| CONFLICTS OF INTEREST | 12 |
| THE FUND | 13 |
| THE OFFERING | 15 |
| DETERMINATION OF OFFERING PRICE | 18 |
| DETERMINATION OF NET ASSET VALUE | 23 |
| TRANSFER AND REDEMPTION | 25 |
| CERTAIN TAX CONSIDERATIONS | 27 |
| INVESTMENT BY U.S. TAX EXEMPT ENTITIES – ERISA CONSIDERATIONS | 31 |
| ADMINISTRATION | 33 |
| SUBSCRIPTION PROCEDURES | 36 |
| MISCELLANEOUS | 37 |
| APPENDIX A  REQUIRED DISCLOSURES | 39 |

## DIRECTORY

Registered Office

    Citco Building
    Wickams Cay
    Road Town, Tortola
    British Virgin Islands

Investment Manager

    Lancer Management Group, LLC
    475 Steamboat Road
    Greenwich, CT 06930
    Telephone: (203) 629-0300
    Telecopier: (203) 629-5325

Director of the Fund

    John W. Bendall, Jr.
    Dr. Richard Geist

Prime Broker

    Banc of America Securities, LLC
    9 West 57th Street - 17th Floor
    New York, NY 10019

Administrator, Registrar and Transfer Agent

    Citco Fund Services (Curaçao) N.V.
    Kaya Flamboyan 9
    P.O. Box 812
    Curaçao, Netherlands Antilles
    Telephone:   (599-9) 732-2222
    Telecopier:   (599-9) 732-2225

Auditor for the Fund

    PricewaterhouseCoopers
    Julianaplein 38
    P.O. Box 360
    Curaçao, Netherlands Antilles

Fund U.S. Legal Counsel

    Robinson Silverman Pearce Aronsohn
      & Berman LLP
    1290 Avenue of the Americas
    New York, NY 10104
    United States of America

Fund British Virgin Islands Special Counsel

    Conyers Dill & Pearman
    Romasco Place
    Wickhams Cay I
    P.O. Box 3140
    Road Town, Tortola
    British Virgin Islands

A00547

## SUMMARY

The following is a summary of certain information set forth more fully elsewhere in this Memorandum and is qualified by other information contained in this Memorandum and by the Fund's Articles, copies of which are available from the Administrator.

**Offerees should read the entire Memorandum and the Articles carefully before making any investment decision regarding the Fund and should pay particular attention to the information in this Memorandum under the heading "*CERTAIN RISK FACTORS*". In addition, Offerees should consult their own advisers in order to understand fully the consequences of an investment in the Fund.**

| | |
|---|---|
| **The Fund** | The OmniFund, Ltd. (the "Fund") is a British Virgin Islands international business company formed in January 1999 as The Orbiter Fund, Ltd. The Fund is the successor fund to the merger with The Viator Fund, Ltd., a British Virgin Islands international business company. |
| **Investment Objective** | The Fund's objective is to maximize capital growth while attempting to control risk. The Investment Manager pursues the Fund's objective by engaging in an aggressive investment program that will include, but not be limited to, (i) investing, trading and dealing in securities of micro and small capitalized companies and other companies that "fly beneath the radar screens" of the large institutional oriented research entities, (ii) participating in initial public offerings, (iii) engaging in late stage private equity transactions, and (iv) providing bridge financing to public and non-public companies. It is intended that the Fund will be all-encompassing in its approach and that it will be opportunistic by nature with the potential for high-volatility and reduced liquidity. It is expected that substantially all of the companies that the Fund invests in, whether public or private, will have small to micro market capitalizations and that the Fund's investments will be concentrated. The Fund may employ leverage as part of its strategy although, historically, both the Fund's and the Investment Manager's use of leverage has been minimal. See "*INVESTMENT PROGRAM*". |
| **Investment Manager** | The Investment Manager is Lancer Management Group, LLC, a limited liability company formed in 1997 under the laws of the State of Connecticut, United States of America (the "Investment Manager"). The Investment Manager is the successor by merger to Lancer Management Group, LLC, a New York limited liability company. The Investment Manager also serves as the sole investment manager of LOI. The Investment Manager has entered into an amended and restated investment management agreement to be effective April 1, 2002 (the "Investment Management Agreement") with the Fund and is responsible for the investment of the Fund's assets, subject to the policies and control of the Board. Michael Lauer is the sole manager and principal owner of the Investment Manager and, as such, he controls the operations and activities of the Investment Manager. The Investment Management Agreement is effective through December 31, 2020, and is automatically extended for additional five (5) year terms thereafter, except that it may be terminated upon ninety (90) days' written notice by either of the parties at any time. See "*INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES*". |

A

**Eligibility Requirements**

Shares will be sold to non-U.S. Persons and to a limited number of Permitted U.S. Persons, each of which must meet certain suitability requirements, including being a Professional Investor. At no time will: (i) Benefit Plan Investors (as defined below) be allowed to own twenty-five (25%) percent or more of the outstanding Shares; or (ii) Permitted U.S. Persons be allowed to own fifty (50%) percent or more of the outstanding Shares. All Permitted U.S. Persons must be Accredited Investors (as defined below). In addition, no Offeree that is described in IM-2110-1 (the "Hot Issue Rule") of the rules adopted by the National Association of Securities Dealers, Inc. ("NASD") or any successor rules may purchase or own Shares. The Board, in its sole and absolute discretion, may decline to accept the subscription of any prospective Shareholder for any reason or no reason. See *"THE OFFERING-Suitability"*.

**Minimum Subscription**

The minimum initial subscription is $1,000,000; however, the Board, in its sole and absolute discretion, may accept subscriptions of lesser amounts (but not less than $100,000). Thereafter, the minimum subscription for additional Shares is $100,000. See *"THE OFFERING"*.

**The Shares**

The Class A Shares have a par value of $0.01 per share (the "Shares") and have equal voting, dividend, distribution and liquidation rights as to the separate account maintained by the Fund for the Shares. See *"THE FUND"*.

**Offering of Shares**

The Fund may offer Shares on the first Business Day (for purposes hereof, the term "Business Day" shall mean any day on which securities are traded on the New York Stock Exchange) of each month or at such other times as the Board, in its sole and absolute discretion, may allow, at a purchase price per Share equal to the Offering Price (as defined below) per Share as of the close of business on the preceding Business Day. As at January 31, 2002 the Offering Price was $207.04 per Share. To the extent that it determines to do so, the Investment Manager, in its sole and absolute discretion, may pay referral fees to unaffiliated eligible persons who introduce prospective Shareholders to the Fund. No referral fees will be paid by the Fund. See *"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES"*, *"THE OFFERING"* and *"ADMINISTRATION-Brokerage Commissions"*.

**Use of Proceeds and Distributions**

Proceeds received by the Fund from the sale of Shares will be used by the Fund in its investment program and for the payment of fees and expenses described elsewhere in this Memorandum. See *"INVESTMENT PROGRAM"*. The Fund does not expect to make distributions or pay dividends on the Shares.

**Transfer Restrictions**

Without the prior written consent of the Board, which consent may be given or withheld in its sole and absolute discretion, any sale, assignment, transfer, conveyance, pledge, hypothecation or other disposition or encumbrance or any attempt to do any of the foregoing (collectively, "Transfer") shall not be recognized by the Fund. Further, the transferee must complete a subscription document in a form that is acceptable to the Fund before such transfer will be accepted. The Board will not consent to the Transfer of Shares to a U.S. Person. Any attempt to Transfer Shares without the prior written consent of the

B

Board may subject such Shares to compulsory redemption at the sole and absolute discretion of the Board. There is no independent market for the purchase or Transfer of Shares and none is expected to develop. Offerees must represent that they are purchasing Shares for investment purposes only.

**Redemption**

Generally, Shares may be redeemed by a Shareholder on at least six (6) months' prior written notice to the Fund, on the last Business Day of each fiscal quarter of the Fund, and at such other times with the consent of, and upon such terms of payment as may be approved by, the Board, in its sole and absolute discretion (each date being referred to as a "Redemption Date"). Shares will be redeemed at the Redemption Price (as defined below). Payment of ninety-five (95%) percent of the aggregate Redemption Price for redeemed Shares (calculated on the basis of unaudited data) normally will be made within thirty (30) days following the Redemption Date. Payment of the balance of the aggregate Redemption Price will be made within thirty (30) days after completion of (i) unaudited quarterly financial statements for redemptions on the last Business Day of the first three (3) fiscal quarters of the Fund, or (ii) audited financial statements for redemptions on the last Business Day of the Fund's fiscal year. Redemption proceeds generally will be paid in U.S. $. Any redemption of a Share within one (1) year, two (2) years or three (3) years after a Shareholder's purchase of such Share (whether the Share is acquired directly from the Fund or by way of Transfer) will be subject to a redemption charge of fifteen (15%) percent, ten (10%) percent or five (5%) percent, respectively, of the value of such Share on the date redeemed (each, as applicable, the "Redemption Charge"). There are no Redemption Charges for Shares redeemed after three (3) years from the date of issuance. All Redemption Charges assessed against a redeeming Shareholder will become assets of the Fund. Other than the Redemption Charge, there are no redemption charges. The Board, in its sole and absolute discretion, may shorten or waive any notice requirement and/or reduce or waive the Redemption Charge. See *"TRANSFER AND REDEMPTION-Redemption"*.

If a redemption would cause the value of Shares held by a Shareholder to fall below $1,000,000, or such lesser amount as determined by the Board, in its sole and absolute discretion, then the Board shall have the right, in its sole and absolute discretion, to compel redemption of all Shares held by such Shareholder. The Board, in its sole and absolute discretion, upon not less than five (5) days' prior written notice to a Shareholder, may compel redemption of all or part of such Shareholder's Shares at any time for any reason or no reason. In certain limited circumstances, the Board may suspend redemption rights for all Shareholders. See *"TRANSFER AND REDEMPTION-Redemption"*.

**Management and Incentive Fees**

As set forth in the Investment Management Agreement, the Fund is obligated to pay the Investment Manager (i) a fixed advisory fee (the "Management Fee") payable at the beginning of each fiscal quarter equal to 0.50% of the Net Asset Value of the Shares as of the beginning of such fiscal quarter (approximately 2.0% on an annualized basis), and (ii) an annual incentive fee (the "Incentive Fee"), determined as of the last Business Day of the Fund's fiscal year, equal to twenty-five (25%) percent of the net profits (including net realized and unrealized gain,

C

A00550

other income and net of Management Fees and any other Fund expenses) (hereinafter, "Net Profits"), if any, during a fiscal year allocable to each Share; provided, however, that if a Share is redeemed at any time other than at the end of a fiscal year, the Incentive Fee with respect to such redeemed Share shall be calculated through the Redemption Date; and further provided, however, that if a Share is purchased by a Shareholder during a fiscal year, the Incentive Fee with respect to such purchased Share for such fiscal year shall be calculated commencing on the date of purchase. See *"DETERMINATION OF OFFERING PRICE"*. The Management Fee will be prorated for any fiscal quarter in which the Investment Manager does not act as Investment Manager for the entire quarter; however, no Management Fees will be repaid if a Share is redeemed during a fiscal quarter. See *"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES"*.

The Investment Manager and the Fund have entered into a deferred incentive fee agreement pursuant to which the Investment Manager may elect to defer payment of all or a portion of its Incentive Fee. See *"INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES"*.

**Loss Carry-Forward**

The Incentive Fee is subject to a loss carry-forward limitation, which means that if a Share has a loss chargeable to it during any fiscal year (collectively, the "Unrecouped Loss") and during any succeeding fiscal year or years there are Net Profits allocable to the Share, there will be no Incentive Fee payable with respect to such Net Profits until the amount of the aggregate Unrecouped Loss allocated to such Share has been recouped by allocations of Net Profits.

**Expenses**

The Fund pays all of its accounting, legal, administrative and other operating expenses, including the expenses of the offering and sale of Shares to Shareholders (collectively, "Administrative Expenses") for each fiscal year. The Fund also pays all investment expenses (e.g., expenses related to the investment of the Fund's assets, such as brokerage commissions and other trading and investment charges and fees), corporate licensing expenses, interest, custodial fees, prime broker charges and taxes. All organizational expenses have been paid by the Investment Manager.

**Hot Issues**

The Fund may invest in "hot issues". Hot issues result when the price in the secondary market of a new offering of securities rises to a premium over the initial offering price immediately or very soon after the securities are first distributed to the public.

**Administrator, Registrar and Transfer Agent**

Citco Fund Services (Curaçao) N.V. (the "Administrator") has been retained by the Fund to perform administrative services.

**Risk Factors**

An investment in the Fund involves significant risks. See *"CERTAIN RISK FACTORS"*.

**Conflicts of Interest**

Certain inherent conflicts of interest arise from the fact that the Investment Manager, Mr. Lauer and their affiliates carry on substantial investment activities for other clients, including LPLP and LOI, in which the Fund will have no interest. While the investment objectives

D

A 0 0 5 5 1

and strategies of certain of such clients are different from those of the Fund, such clients may invest in certain securities in which the Fund has invested or may invest and/or take opposite positions from the Fund in the market. Investments in which more than one client account participates will be allocated among the accounts in a manner that the Investment Manager believes in good faith to be equitable. The Investment Manager will devote to the Fund so much of its time as it deems necessary in its sole and absolute discretion. See *"CONFLICTS OF INTEREST"*.

**Brokerage Commissions**

Portfolio transactions for the Fund will be allocated to brokers as selected by the Investment Manager on the basis of best execution and in consideration of such broker's provision or payment of the costs of research and other services and/or property which are of benefit to the Fund, the Investment Manager and/or its affiliates. The Investment Manager may also direct commissions to brokers who refer clients to the Fund and certain broker/dealers which may furnish other services to the Fund and/or the Investment Manager. See *"ADMINISTRATION-Brokerage Commissions"*.

**Shareholder Reports**

An annual audited financial report will be made available to Shareholders within six (6) months after the Fund's fiscal year end. Unaudited performance reports will be made available to Shareholders periodically.

**Fiscal Year**

The fiscal year end of the Fund is September 30 of each calendar year.

**Taxes**

Based upon the Fund's organizational structure and methods of operation as described herein, it is anticipated that the Fund generally will not be subject to U.S. Federal income tax on gains from trading in securities and instruments. In addition, interest from U.S. sources earned on bank deposits, "portfolio interest" as defined under the Code and interest from certain short term obligations generally would not be subject to withholding for U.S. Federal income tax. However, dividend income and certain other interest from U.S. sources would be subject to thirty (30%) percent withholding. Permitted U.S. Persons should not be subject to U.S. Federal income tax on any dividends received from the Fund, or on any gain recognized on the sale or other disposition of Shares, provided that such Permitted U.S. Person does not utilize leverage in acquiring or holding Shares in the Fund.

At the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the British Virgin Islands with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the British Virgin Islands and is also exempt from any capital gains realized with respect to any Share debt obligations or other securities of the Fund by persons who are not persons resident in the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the British Virgin Islands with respect to any Shares, debt obligations or other securities of the Fund.

There can be no assurance that the U.S. or British Virgin Islands tax laws will not be changed adversely with respect to the Fund and its

E

Shareholders or that the Fund's income tax status will not be successfully challenged by such authorities.

Potential Shareholders should consult their own advisors regarding tax treatment by the local and other jurisdictions applicable to them. Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them.

**Subscription Procedures**

Offerees interested in subscribing for Shares will be furnished a Subscription Documents Booklet, which contains Instructions For Subscribers and a Subscription Agreement.   The Subscription Agreement must be completed for a specified dollar amount.   The original completed and executed copy of the Subscription Agreement should be sent by fax and courier delivery service to: The OmniFund, Ltd., c/o Citco Fund Services (Curaçao) N.V., Kaya Flamboyan 9, P.O. Box 812, Curaçao, Netherlands Antilles.  Fax no. (5-999) 732-2225. The original executed and completed Subscription Agreement must be received by the Fund at least three (3) Business Days prior to the applicable Closing Date (as defined in this Memorandum), unless waived by the Board.

All payments are to be made in United States dollars, via wire transfer, in immediately available funds to JP Morgan Chase Bank, One New York Plaza, New York, NY 10081, ABA # 021-000021, for Account of Citco Banking Corporation N.V., Account # 001-1-627502, for further credit to The OmniFund, Ltd., Account # 0012.519915.200.   See *"SUBSCRIPTION PROCEDURES"*.

**Other Classes**

The Board of Directors, in its sole and absolute discretion, may amend the Memorandum of Association of the Fund to create one or more additional classes of shares with different rights and privileges.  The owners of such other classes may or may not be required to invest different minimum amounts, pay different fees to the Investment Manager, be charged for different expenses and have certain other items applicable to them that are different than those that are applicable to the shareholders of the Shares described in this Memorandum, all as determined by the Board of Directors in its sole and absolute discretion.

F

A 0 0 5 5 3

## THE INVESTMENT MANAGER

The Fund's Investment Manager is Lancer Management Group, LLC ("Investment Manager"), a limited liability company formed in 1997 under the laws of the State of Connecticut. The Investment Manager is the successor by merger to Lancer Management Group, LLC, a New York limited liability company formed in 1995. Michael Lauer is the sole manager and principal owner of the Investment Manager and, as such, he controls the operations and activities of the Investment Manager. The Investment Manager is responsible for the management of the Fund. The Investment Manager is solely responsible for researching, selecting and monitoring investments by the Fund and determining when and how much to invest with or withdraw from a particular investment.

Michael Lauer began his investment career with Oppenheimer & Co. in 1980 as a technology analyst. His other professional affiliations include: Cyrus J. Lawrence and Kidder Peabody (both as senior diversified technology and defense electronics analyst). Mr. Lauer became a portfolio manager in 1993. On numerous occasions, the annual Greenwich Associates survey of sell-side analysts distinguished Mr. Lauer as the premier source for stock purchase recommendations in his discipline of industry coverage. Likewise, Mr. Lauer was selected to the Institutional Investor's All Star analyst team for seven consecutive years. The Wall Street Journal's first ever survey also rated Mr. Lauer among the top three analysts in his group. Mr. Lauer holds a BA degree in International Relations and an MBA in Finance.

From December 1994 to December 1997, Mr. Lauer served as the general partner of LPLP. Mr. Lauer serves as the sole manager and principal owner of LMG II which became the sole general partner of LPLP on January 1, 1998. The Investment Manager also serves as the sole investment manager of LOI and had served as the sole investment manager of The Viator Fund, Ltd. until the time that such fund merged with and into the Fund. It is possible that in certain circumstances, the Fund, on the one hand, and LPLP and/or LOI on the other hand, could own securities of the same company and/or take opposite positions in the market.

Mr. Lauer, as sole manager of the Investment Manager and, as the sole manager of LMG II, the general partner of LPLP, devotes a substantial amount of his time to the business of running the Fund, LOI and LPLP although, Mr. Lauer may devote such time to the Investment Manager and Fund as he determines in his sole and absolute discretion. The Investment Manager, LMG II and/or Mr. Lauer may also manage accounts for certain parties and/or provide consulting and/or advisory services to others.

There have never been any administrative, civil or criminal actions, whether pending, on appeal or concluded, against the Fund, the Investment Manager or Mr. Lauer.

A00554

## INVESTMENT PROGRAM

### Purpose

The Fund was organized for the purpose of investing, trading and dealing in securities of public and non-public companies, traded in the United States of America and elsewhere, of all kinds and descriptions, including but not limited to, equity, debt, convertible securities, preferred stock, options, warrants, trade claims and monetary instruments. The Fund may invest in arbitrage and special situations, both long and short securities positions, option arbitrage, international arbitrage and other financial instruments. The descriptions contained in this Memorandum of the specific activities in which the Fund may engage should not be understood to limit in any way the types of investment activities or the allocation of Fund capital among such investments which the Fund may make. The Fund may engage in any investment activities not described herein which the Investment Manager considers appropriate and consistent with the Fund's objective.

### Investment Objective

The Fund's objective is to maximize capital growth while attempting to control risk. The Investment Manager pursues the Fund's objective by engaging in an aggressive investment program that will include, but not be limited to, (i) investing, trading and dealing in securities of micro and small capitalized companies and other companies that "fly beneath the radar screens" of the large institutional oriented research entities, (ii) participating in initial public offerings, (iii) engaging in late stage private equity transactions, and (iv) providing bridge financing to public and non-public companies. It is intended that the Fund will be all-encompassing in its approach and that it will be opportunistic by nature with the potential for high-volatility and reduced liquidity. No assurance can be given that the Fund will achieve its objective. It is expected that substantially all of the companies that the Fund invests in, whether public or private, will have small to micro market capitalizations and that the Fund's investments will be concentrated. The Fund may employ leverage as part of its strategy although, historically, both the Fund's and the Investment Manager's use of leverage has been minimal. The Investment Manager does not follow a market timing philosophy and accordingly, it is anticipated that substantially all of the Fund's assets will be fully invested at all times.

### Investment Program

The following is a description of the principal types of securities in which the Investment Manager intends to cause the Fund to invest in, certain trading techniques that it intends to employ, the investment criteria that it intends to apply, and the guidelines that it has established with respect to the composition of the Fund's investment portfolio. The following description, however, is merely a summary and the Investment Manager has broad discretion to cause the Fund to invest in other types of securities and to follow other investment criteria and guidelines.

1. **Securities of Undervalued Companies.** In addition to focusing on neglected securities in which the institutional ownership is typically significantly underrepresented, the Fund will target "fallen angels" whose severe valuation decreases are caused by what the Investment Manager believes to be a transitional problem which often present timely accumulation opportunities. The Fund will buy undervalued securities at what the Investment Manager believes to be opportune prices if the Investment Manager believes that the strong underlying economics of the company remain intact. The Investment Manager's valuation disciplines focus on the net current asset values, franchise and private markets, and liquidation value analysis. The Investment Manager also applies more conventional valuation gauges, including ratios of price to cash flows, book value, working capital, forecast sales, and earnings. The Investment Manager generally expects that, when it identifies the securities of the company that are undervalued and warrant accumulation, such securities will generally be trading at half (or less) of the previous 52-week peak price. The Investment Manager also intends to identify companies that have a strong market position, a competitive cost structure, higher-than-average profitability and public valuations that are significantly lower than their estimated private market value.

A00555

2.  **Concentration of Investments.** The Investment Manager intends to concentrate holdings. When the Investment Manager discovers what it believes to be great value and potential for capital growth in a particular company, the securities of such company may become over-represented in the portfolio. The Investment Manager believes that excess diversification tends to detract from superior performance as it becomes a proxy for the overall market. Conversely, concentration can magnify a gain or a loss based on the change in value of the securities of one company.

3.  **Bridge Financing.** The Investment Manager intends to cause the Fund to engage in bridge financing transactions with public companies and with non-public companies that plan to register their securities pursuant to the 1933 Act, thereby becoming public companies, within approximately eighteen (18) months after the date of the Fund's investment. In engaging in bridge financing transactions, the Investment Manager will attempt to identify companies (both public and private) that have short term cash requirements and that have one or more of the following characteristics: strong management, cash flow, increasing margins, niche markets, expect a catalyst and/or other factors that the Investment Manager determines. Bridge financing generally takes the form of a secured or unsecured loan to the company for a specified period of time. The company, in addition to issuing a promissory note to the Fund for the loan, will generally also issue some form of equity. The equity component can consist of warrants, options, preferred stock, common stock, the right to convert all or part of the loan to equity and other variations. The ability to realize upon the equity component issued by a non-public company is generally tied to the company becoming a public company, if it is not so already.

4.  **Catalyst.** The Investment Manager believes that value is often concealed in a recent corporate event (restructuring, acquisition, divestiture), accelerating earnings (beyond consensus forecast), large contract awards, a successful company's market transformation (e.g., from defense to telecommunications). Moreover, the Investment Manager believes that a thorough balance sheet and cash flow analysis often yields telltale markers of an impending earnings resurgence. The Investment Manager also looks for competent and shareholder-value focused management.

5.  **Cash Generating Companies.** The Investment Manager believes that convalescing balance sheets can be the precursor to a rebound in earnings. As a result, the Investment Manager expects to cause the Fund to invest in companies where the Investment Manager believes that an upswing in cash flow may serve as a precursor to an upswing in earnings.

6.  **Solid Business in Attractive (Often Niche) Markets.** The Investment Manager focuses on companies with "franchise" positions, and avoids commodity market exposure. It prefers not to label its holdings as either predominantly value- or growth-oriented, even though both often apply. The Investment Manager does, however, look for strong positions in industries that offer attractive growth potential.

7.  **Comprehension of Holdings.** The Investment Manager will invest only within industries where it believes it has a firm understanding of the underlying dynamics. The Investment Manager believes that greater understanding of the industries in which the Fund invests is a hedge against risk.

8.  **Short Sales.** The Investment Manager will make "short sales" of securities when it believes that particular securities are vulnerable as the result of the occurrence of specific events, causing the Investment Manager to anticipate a significant decline in their market price. Such events may include arbitrage situations in which the Investment Manager believes that the proposed transaction is not likely to be consummated. The Investment Manager does not expect to make "short sales" solely because a stock is expensive.

9.  **Leveraged Purchases of Securities.** The Fund may leverage its securities positions by borrowing funds up to the maximum extent permitted by law. In general, for most equity securities, the maximum initial amount that can presently be loaned by brokers and banks is fifty (50%) percent of the value of most securities positions. There are no borrowing or leverage limits in the Articles. Leverage increases the potential risk of loss on any securities position so leveraged. In addition, increases in interest rates adversely affect earnings. Furthermore, in the event of a decline in the value of the leveraged securities or a change in the percentage of the value of securities for which a margin loan may be made, the Fund may be forced to sell securities at a substantial loss in order to generate cash to reduce the Fund's margin loan.

10.     **Avoidance of "Concept" Stocks.** The Investment Manager does not intend to invest in securities in which there is a flurry of investment caused by attraction to a "concept", thereby driving up the price of such security to an overvalued position, especially where the Investment Manager believes there is a likelihood that the value of such security will plummet once flaws in the "concept" are exposed.

11.     **Lack of Reliance on Market Timing.** The Investment Manager believes that stock market forecasts are unreliable. The Investment Manager will focus its energies and research resources on specific investment ideas which it believes possess enough of an internal propellant so as to increase in value even in an otherwise uncooperative stock market environment. Consequently, the Investment Manager intends to be fully invested in reliance upon its ideas at most times.

12.     **"Initial Public Offerings".** The Fund may participate in initial public offerings ("IPOs"). Many IPOs are considered "hot issues". Hot issues result when the price in the secondary market of a new offering of securities rises to a premium over the initial offering price immediately or very soon after the securities are first distributed to the public.

## Portfolio Turnover

        As a result of the investment policies described in this Memorandum, the Fund expects to engage in a substantial number of portfolio transactions. It is anticipated that the Fund's investment portfolio may be frequently traded, and, accordingly, the Fund may incur substantial brokerage commissions, expenses and other transaction costs. The Investment Manager is not, however, required to execute transactions at the lowest available commission rates. See *"ADMINISTRATION-Brokerage Commissions"*.

## General

        The Investment Manager does not presently intend to cause the Fund to purchase or sell real estate (although it may purchase securities of companies whose businesses involve the purchase and sale of real estate), purchase participations or other direct interests in oil, gas or other minerals (except as an investor in companies in this field) or participate in the marketing of the securities of any companies.

        The Investment Manager may invest Fund assets that are not currently used in the investment program in short-term U.S. Government securities, money market accounts and/or other short-term interest bearing instruments located at major financial institutions in the United States. Any income earned from such investments will be reinvested by the Fund in accordance with the Fund's investment strategies.

        THE FUND'S INVESTMENT PROGRAM ENTAILS SUBSTANTIAL RISKS AND THERE CAN BE NO ASSURANCE THAT THE OBJECTIVE OF THE FUND WILL BE ACHIEVED. THE PRACTICES OF SHORT SELLING, LEVERAGE AND OTHER INVESTMENT TECHNIQUES WHICH THE FUND MAY EMPLOY FROM TIME TO TIME CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH THE FUND'S INVESTMENT PORTFOLIO MAY BE SUBJECT.

A 0 0 5 5 7

## INVESTMENT MANAGEMENT AGREEMENT, FEES AND EXPENSES

Investment Management Agreement

The Fund has entered into an amended and restated investment management agreement (the "Investment Management Agreement") with the Investment Manager to manage the Fund's portfolio investments. The Investment Management Agreement provides that the Investment Manager is responsible for investment of the Fund's assets, subject to the policies and control of the Board. The Investment Manager initiates all orders for the purchase and sale of securities on behalf of the Fund. The Investment Management Agreement will remain in effect through December 31, 2020, and is automatically extended for additional five year terms thereafter, except that it may be terminated by the Investment Manager or by the Fund upon ninety (90) days' written notice by either party at any time.

The Investment Management Agreement provides that the Fund will indemnify and hold harmless the Investment Manager and its members, and their respective affiliates from and against any loss or expense suffered or sustained by the Investment Manager or its members or their respective affiliates resulting from the performance or non-performance of the Investment Manager's duties under the Investment Management Agreement, including without limitation any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding; provided, however, that the Fund will not indemnify and hold harmless such person against any loss or expense arising from the gross negligence, fraud or willful misconduct of such person in connection with such performance or non-performance of duties under the Investment Management Agreement.

Management and Incentive Fees

Under the Investment Management Agreement, the Fund is obligated to pay the Investment Manager: (i) a fixed advisory fee (the "Management Fee") payable at the beginning of each fiscal quarter equal to 0.50% of the Net Asset Value of the Shares as of the beginning of such fiscal quarter (approximately 2.0% on an annualized basis); and (ii) an annual incentive fee (the "Incentive Fee") determined as of the last Business Day of the Fund's fiscal year, equal to twenty-five (25%) percent of the net profits (including net realized and unrealized gain, other income and net of Management Fees and any other Fund expenses) (hereinafter, "Net Profits"), if any, during a fiscal year allocable to each Share; provided, however, that if a Share is redeemed at any time other than at the end of a fiscal year, the Incentive Fee with respect to such redeemed Share shall be calculated through the Redemption Date; and further provided, however, that if a Share is purchased by a Shareholder during a fiscal year, the Incentive Fee with respect to such purchased Share for such fiscal year shall be calculated commencing on the date of purchase. If a Share has a loss chargeable to it during any fiscal year or years ("Unrecouped Loss") and during any succeeding fiscal year there are Net Profits allocable to the Share, there will be no Incentive Fee payable with respect to the Share until the amount of the Unrecouped Loss allocated to the Share has been recouped. The Management Fee will be prorated for any fiscal quarter in which the Investment Manager does not act as Investment Manager for the entire quarter; however, no Management Fees will be repaid if a Share is redeemed during a fiscal quarter.

Deferral

Pursuant to the Investment Management Agreement, the Investment Manager has the right to defer all or part of the Incentive Fee. During the deferral period, deferred fee amounts will be recorded by the Fund as a liability in an unfunded book entry account that is indexed to the overall performance (whether positive or negative) of the Fund (determined without accrual of Management Fees or Incentive Fees), so that the amount ultimately payable will reflect the return that would have been earned if the Incentive Fee had been paid to the Investment Manager and simultaneously invested by the Investment Manager in a special class of Shares of the Fund at the Offering Price Per Share immediately following the close of the fiscal year in which the Incentive Fee was earned (the "Deferred Fee Liability"). Any Incentive Fee not deferred shall be paid to the Investment Manager in cash on a current basis after the close of the fiscal year. As of April 1, 2002, the Deferred Fee Liability constituted a material portion of the overall value of the Fund.

A00558

Expenses

  The Fund pays all of its accounting, legal, administrative and other operating expenses, including the expenses of the offering and sale of Shares to Shareholders (collectively, "Administrative Expenses") for each fiscal year. The Fund also pays all investment expenses (e.g., expenses related to the investment of the Fund's assets, such as brokerage commissions and other trading and investment charges and fees), corporate licensing expenses, interest, custodial fees, prime broker charges and taxes. All organizational expenses have been paid by the Investment Manager.

A00559

## CERTAIN RISK FACTORS

THE PURCHASE OF SHARES OFFERED HEREBY INVOLVES SUBSTANTIAL RISKS AND IS SUITABLE ONLY FOR OFFEREES OF ADEQUATE FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. OFFEREES SHOULD BEAR IN MIND THE RISK FACTORS SET FORTH BELOW.

**Offerees should give careful consideration to the following risk factors in evaluating the merits and suitability of an investment in the Fund as they relate specifically to the Shares or to the Fund, in general, as the context requires. The following does not purport to be a comprehensive summary of all the risks associated with an investment in the Fund. Rather, the following are only certain particular risks to which the Fund is subject. The Investment Manager urges Offerees to discuss such risks and other potential risks, in detail with their professional advisors prior to making an investment decision.**

Market Risks

1.    Competition. The securities industry, and the varied strategies engaged in by the Investment Manager are extremely competitive and each involves a degree of risk. The Fund competes with firms, including many of the larger securities and investment banking firms, which have substantially greater financial resources and research staffs.

2.    Market Volatility. The Fund's profitability substantially depends upon the Investment Manager correctly assessing the future price movements of stocks, bonds and options on stocks and other securities and the movements of interest rates. There can be no assurance that the Investment Manager will be successful in accurately predicting price and interest rate movements.

3.    The Fund's Investment Activities. The Fund's investment activities involve a high degree of risk. The performance of any investment is subject to numerous factors which are neither within the control of nor predictable by the Investment Manager. Such factors include a wide range of economic, political, competitive and other conditions which may affect investments in general or specific industries or companies. In recent years the securities markets have become increasingly volatile, which may adversely affect the ability of the Fund to realize profits. As a result of the nature of the Fund's investing activities, it is possible that the Fund's financial performance may fluctuate substantially from period to period.

4.    Systemic Risk. World events and/or the activities of one or more large participants in the financial markets and or other events or activities of others could result in a temporary systemic breakdown in the normal operation of financial markets. Such events could result in the Fund losing substantial value caused predominantly by liquidity and counterparty issues (as noted above) which could result in the Fund incurring substantial losses.

5.    Transaction Execution and Costs. The Fund expects to utilize a portion of its assets in a trading strategy that is extremely short-term and will involve heavy trading, high volume and in many cases relatively narrow spreads between the prices at which the Fund will purchase and sell particular positions. The successful application of such a strategy depends significantly upon the quality of execution of transactions, such as the ability of broker-dealers to execute orders on a timely and efficient basis. Although the Investment Manager will seek to utilize brokerage firms which will afford superior execution capability to the Fund, there is no assurance that all of the Fund's transactions will be executed with optimal quality. On account of the degree of heavy trading, total commission charges and other transaction costs are expected to be very high. The level of commission charges as a cost to the Fund, may be expected to be a significant factor in determining future profitability of the Fund.

6.    Nature of Certain Investments. There is no limitation on the size or operating experience of the companies in which the Fund may invest. Some small companies in which the Fund may invest may lack management depth or the ability to generate internally or obtain externally the funds necessary for growth. Companies

with new products or services could sustain significant losses if projected markets do not materialize. Further, such companies may have, or may develop, only a regional market for products or services and may be adversely affected by purely local events. Such companies may be small factors in their industries and may face intense competition from larger companies and entail a greater risk than investment in larger companies.

7.  Liquidity of Fund Investments. Some of the investments that are made by the Fund may lack liquidity. As set forth in "*INVESTMENT PROGRAM*", the Investment Manager intends to cause the Fund to invest a substantial portion of its assets in securities of small and micro capitalized entities. This could present a problem in realizing the prices quoted in and in effectively trading the position(s). In certain situations, the Fund may invest in illiquid investments which could result in significant losses.

8.  Short Sales. The Investment Manager may cause the Fund to sell securities short. Selling securities short risks losing an amount greater than the proceeds received. Theoretically, securities sold short are subject to unlimited risk of loss because there is no limit on the price that a security may appreciate before the short position is closed. The Fund may be subject to losses if a security lender demands return of the borrowed securities and an alternative lending source cannot be found.

9.  Counterparty Creditworthiness. The Fund may engage in transactions in securities and financial instruments that involve counterparties. Under certain conditions, a counterparty to a transaction could default or the market for certain securities and/or financial instruments may become illiquid.

10. Risk Arbitrage. The Fund may engage in risk arbitrage transactions. Risk arbitrage involves purchasing securities which are the subject of an acquisition attempt, cash tender offer, exchange offer, corporate reorganization (such as a merger), liquidation, or an offer by an issuer to repurchase or exchange some of its own securities. Risk arbitrage investments are subject to such additional risks as the failure of the transaction to close, the failure to obtain shareholders' approval and other factors. Risk arbitrage also involves selling securities, possibly by a short sale or put option, in anticipation of the failure of a transaction to close, with the risk that the proposed transaction or another transaction will close.

11. Bridge Loan Transactions. The Fund's bridge loan financing activities involves significant risks, including the risk of loss of the Fund's entire investment. The Investment Manager expects that most bridge loan transactions will not be secured by collateral. As a result, if such company defaults on its obligations to the Fund and/or files for bankruptcy, the Fund will be an unsecured creditor. The promissory notes and the equity components issued by companies to the Fund generally are not freely transferable. In the event that a non-public company to which the Fund makes a bridge loan is not successful in engaging in a public offering, the equity component may become worthless and the ability of the Fund to collect on the loan may be impaired.

12. Late Stage Private Equity Transactions. The Fund's late state private equity financing activities involves significant risks, including the failure of the company from completing an initial public offering of securities. As a result, such company may not have enough working capital to meet its needs and may require additional rounds of private financing from investors such as the Fund. In addition, as an equity investor in a private company that may have insufficient working capital, the Fund may be required to make additional contributions to the company in order to retain its level of ownership in such company.

13. Leverage. The Investment Manager may cause the Fund to employ leverage. This includes the use of borrowed funds and investments in options, such as puts and calls, and warrants. Also, the Investment Manager will cause the Fund to engage in short selling. While such techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Fund.

Regulatory Risks

1.   Changes in Applicable Law. The Fund must comply with various legal requirements, including requirements imposed by the securities laws, tax laws and pension laws in various jurisdictions. Should any of those laws change, the legal requirements to which the Fund and the Shareholders may be subject could differ materially from current requirements.

2.   Strategy Restrictions. Certain Offerees may be restricted from directly utilizing investment strategies of the type the Fund may engage in. These include sales of "naked" options (those in which there is no position in the underlying security) or purchases of put and call options on stocks. Such Offerees should consult their own advisors, counsel, and accountants.

3.   Trading Limitations. For all securities, including options, listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Fund to loss.

4.   No Regulatory Oversight in the United States. The Fund will not be registered as an "investment company" under the ICA, and it is not currently intended that the Investment Manager will register as an investment advisor under the United States Investment Advisors Act of 1940, as amended, nor will the Investment Manager register as a "commodity pool operator" under the United States Commodity Exchange Act. Consequently, the Shareholders of the Fund will not benefit from certain of the protections afforded by such statutes.

5.   Participation Limited to Professional Investors. The Fund has been recognized as a professional fund for the purposes of the Mutual Funds Act, 1996 (British Virgin Islands). As a professional fund, investment in the Fund is restricted to Professional Investors.

Fund Risks

1.   Limited Liquidity of Investment in the Fund. An investment in the Fund provides limited liquidity. In connection with this Offering, an Offeree must represent that the Offeree is acquiring the Shares for investment purposes only and not with a view to or for resale, distribution or fractionalization of the Shares. The Shares will not be registered under the securities or "blue sky" laws of any state in the United States or under the laws of any other jurisdiction and, therefore, are subject to restriction.

2.   Concentration of Investments. The Investment Manager is not limited in the amount of capital which it may commit to any one investment. It is likely that the Investment Manager will hold a few, relatively large securities positions in relation to the Fund's capital.

3.   No Current Income. The Fund's investment policies should be considered speculative, as there can be no assurance that the Investment Manager's assessments of the short-term or long-term prospects of investments will generate a profit. In view of the fact that the Fund will likely not pay dividends, an investment in the Fund is not suitable for investors seeking current income for financial or tax planning purposes.

4.   Dependence on the Investment Manager. All decisions with respect to the Fund's assets and the general management of the Fund will be made by the Investment Manager which relies on the services of several key employees. Shareholders will have no right or power to take part in the management of the Fund. As a result, the success of the Fund for the foreseeable future will depend largely upon the ability of the Investment Manager. Should any of its employees leave or become incapacitated for any period of time, profitability of the Fund's investments may suffer.

5.   Custodial Risks of Brokers. Various brokers will trade with the relevant exchange as a principal on behalf of the Fund, in a "debtor-creditor" relationship, unlike other clearing broker relationships where the broker is merely a facilitator of the transaction. Such broker could, therefore, have title to all of the assets of the

Fund (for example, the transactions which the broker has entered into on behalf of the Fund as principal as well as the margin payments which the Fund provides). In the event of such broker's insolvency, the transactions which the broker has entered into as principal could therefore default and the Fund's assets could become part of the insolvent broker's estate, to the detriment of the Fund.

6.  Redemption. Shareholders may redeem part or all of their Shares as of the last Business Day of each fiscal quarter of the Fund, in each case upon at least six (6) months' prior written notice, and at such other times as the Board determines in its sole and absolute discretion. A Share redeemed within the first three (3) years of the date that such Share was purchased (whether the Share is acquired directly from the Fund or by way of Transfer) is subject to the Redemption Charge. The Board also has the right to compel redemption of all or part of such Shareholder's Shares at any time for any reason or no reason. In order to fund redemption requests, the Fund, in all likelihood, will be required to liquidate positions it has in publicly traded companies. As a result, the Fund's portfolio could be more heavily weighted toward bridge loan financing activities with non-public companies and such activities are generally very illiquid. The Board also has the power to suspend the payment of redemptions under certain circumstances.

7.  Frequency of Trading. Some of the strategies employed by the Investment Manager require frequent trades to take place and, as a consequence, portfolio turnover and brokerage commissions may be greater than for other investment entities of similar size.

8.  Fees and Expenses. The operating expenses of the Fund, including, but not limited to, the Management Fee, the Incentive Fee, and fees paid to the Administrator, accountants and attorneys, the investment expenses and the Administrative Expenses, may, in the aggregate, constitute a high percentage relative to other investment entities.

9.  Conflicts of Interest. Neither the Investment Manager, Mr. Lauer, nor any of their affiliates are restricted by an agreement not to compete with the Fund, and the Investment Manager, Mr. Lauer and their affiliates may engage in other business ventures which may result in various conflicts of interest between them and the Fund. See "CONFLICTS OF INTEREST".

General Risks

1.  Early Termination. In the event of the early termination of the Fund, the Fund would have to distribute to the Shareholders their pro rata interest in the assets of the Fund. Certain assets held by the Fund may be highly illiquid and might have little or no marketable value. It is possible that at the time of such sale or distribution, certain securities held by the Fund would be worth less than the initial cost of such securities, resulting in a loss to Shareholders.

2.  Effect of Substantial Withdrawals. Substantial withdrawals by Shareholders within a short period of time could require the Investment Manager to liquidate positions more rapidly than would otherwise be desirable, which could adversely affect the value of the Fund's assets. The resulting reduction in the Fund's assets could make it more difficult to generate a positive rate of return or to recoup losses due to a reduced equity base.

3.  Reserve for Contingent Liabilities. Under certain circumstances, the Board may find it necessary to establish a reserve for contingent liabilities or withhold a portion of the Shareholder's Redemption Price at the time of redemption, in which case, the reserved portion would remain at the risk of the Fund's activities.

4.  Risk of Litigation. The Investment Manager to whom the Fund has allocated capital may accumulate substantial positions in the securities of a specific company. In some instances, the Investment Manager may engage in a proxy fight or become involved in litigation. Under such circumstances, the Fund may be named as a defendant in a lawsuit or regulatory action and be subject to the costs involved.

A 0 0 5 6 3

5.   Limited Operating History.  The Fund was formed in January 1999 and has a limited operating history. The success of the Fund depends on the ability and experience of the Investment Manager, which has a limited operating history as well. There can be no assurance that the Investment Manager will generate any gains or profits for the Fund.

6.   Lack of Separate Representation.  Neither the Fund, the Articles of the Fund, the Investment Management Agreement nor any of the agreements, contracts and arrangements between the Fund, on the one hand, and the Investment Manager, Mr. Lauer or their affiliates, on the other hand, were or will be the result of arm's-length negotiations. The Administrator, attorneys, accountants and others who have performed services for the Fund in connection with this Offering, and who will perform services for the Fund in the future, have been and will be selected by the Board based upon the advice of the Investment Manager.

7.   Non-U.S. Investments.  The Fund may invest in both U.S. and non-U.S. securities and interests denominated in non-U.S. currencies and/or traded outside of the United States of America.  Such investments require consideration of certain risks not typically associated with investing in securities traded in the United States of America or other assets.  Such risks include unfavorable currency exchange rate developments, restrictions on repatriation of investment income and capital, imposition of exchange control regulation, confiscatory taxation, and economic or political instability in foreign nations.  In addition, there may be less publicly available information about certain non-U.S. companies than would be the case for comparable companies in the United States of America, and certain non-U.S. companies may not be subject to accounting, auditing and financial reporting standards and requirements comparable to or as uniform as those of U.S. companies.

8.   Incentive Fee.  The payment of the Incentive Fee to the Investment Manager may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case if this special payment was not made.  In addition, since the Incentive Fee is calculated on a basis that includes unrealized appreciation of the Fund's assets, it may be greater than if such fee was based solely on realized gains.

9.   Valuation of the Fund's Assets.  The Board, as advised by the Investment Manager, will value the securities held by the Fund in accordance with the Articles.  When no market exists for an investment or when the Board, as advised by the Investment Manager, determines that the market price does not fairly represent the value of the investment, the Board, as advised by the Investment Manager, will value such investment as it reasonably determines.

The foregoing list of certain risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  In addition, as the Fund's investment program develops and changes over time, an investment in the Fund may be subject to additional and different risk factors.  Offerees should read the entire Memorandum and consult with their own advisors before deciding to subscribe for Shares.

## CONFLICTS OF INTEREST

In the conduct of the Fund's business, conflicts may arise between the interests of the Investment Manager and its affiliates, on the one hand, and those of the Fund and its Shareholders, on the other hand.  Among the conflicts which each Offeree should consider are the following:

(a)     Neither the Investment Manager nor Mr. Lauer is under any obligation to devote their full time to the business of the Fund; the Investment Manager is only required to devote such time and attention to the affairs of the Fund as the Investment Manager may deem appropriate in its sole and absolute discretion.  The Investment Manager is also the investment manager for LOI.  Mr. Lauer is also the sole manager and principal owner of LMG II which is the sole general partner of LPLP.  While the investment objectives and strategies of each of LPLP and LOI are different from that of the Fund, it is possible, that under certain circumstances, the Fund, on the one hand, and LPLP and/or LOI, on the other hand, may invest in the securities of the same company and/or take opposite positions in the market.  It is also possible that one or more entities could engage in transactions with the Fund.  Any such transactions would be on arm's-length terms.  Mr. Lauer will devote such time and attention to the Investment Manager, LMG II, the Fund, LPLP and LOI as he deems appropriate in his sole and absolute discretion.  In addition, the Investment Manager, Mr. Lauer and their affiliates, either individually or collectively, may manage other accounts for which they may be compensated and may provide consulting and/or advisory services to others.

(b)     Mr. Lauer, as the sole manager of the Investment Manager and as the sole manager of LMG II, will determine the allocation of the Fund's capital, LPLP's capital, LOI's capital and such other accounts to investment strategies and techniques on whatever basis he considers appropriate or desirable in his sole and absolute discretion.

(c)     The Investment Manager, Mr. Lauer and/or their affiliates, may manage other accounts and provide investment advice to other parties, and they may decide to invest the assets of one or more other accounts or recommend the investment of funds by other parties, rather than the Fund's assets, in a particular security or strategy.

(d)     The payment of the Incentive Fee to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such an arrangement.

(e)     The Investment Management Agreement authorizes the Investment Manager to combine purchase and sale orders on behalf of the Fund together with orders for other accounts managed by the Investment Manager or its affiliates and allocate the securities or other assets so purchased or sold on an average price basis among such accounts.

(f)     To the extent the Fund's brokerage business is allocated to brokers or dealers in recognition of past or future referrals, the Investment Manager may have an incentive to cause the Fund to effect more transactions than it might otherwise in order to stimulate brokers or dealers to refer more Shareholders to the Fund.

In the event that a conflict of interest arises, the Investment Manager will endeavor to ensure that it is resolved fairly.  The Investment Manager, under the Investment Management Agreement, is required to exercise its duties with care, skill, prudence and diligence.  In the event of a conflict of interest between the Fund and LPLP or LOI, the Investment Manager will resolve such conflict by taking into account the investment objective of each entity, any investment restrictions applicable to each entity and the other available investment options for each entity and will resolve such conflict in a fair and equitable manner.

A 0 0 5 6 5

## THE FUND

Capital Structure of the Fund

The Fund was incorporated as an international business company pursuant to the International Business Companies Act of the British Virgin Islands (the "IBC Act") in January 1999 as The Orbiter Fund, Ltd. The Fund's current name was adopted effective March 26, 2002. The authorized capital of the Fund is $50,000, consisting of 5,000,000 shares, $0.01 par value per share (the "Common Shares"). There is currently one (1) class of Common Shares, the Class A Shares (the "Shares"). Each Common Share has equal voting, dividend, distribution and liquidation rights as to the separate account maintained by the Fund for each class of Common Shares. The Fund does not anticipate paying any dividends on the Shares; however, in the event that a dividend is declared, such dividend will be paid in accordance with the Articles and applicable British Virgin Islands law and/or regulation. There are no preemptive rights associated with the Shares. Subject to the provisions of the Articles and applicable law and the rights of the Shareholders, the Fund may increase its share capital, consolidate its shares or subdivide any of them into shares of a smaller amount and may reduce its share capital or any capital redemption reserve. The Board reserves the right, without the approval of the Shareholders, to issue additional classes of shares in the future which may differ in terms of investment program, suitability requirements, fees charged, redemption and subscription rights and other aspects. There are no conversion or preemptive rights associated with the Shares. All Shares, when duly issued, will be fully paid and non-assessable.

Shares generally may be purchased on the first Business Day of each month. The proper documentation necessary to purchase Shares must be received by the Fund at least three (3) Business Days prior to the purchase date unless waived by the Fund. The Board may permit Shares to be purchased on dates other than the first Business Day of each month.

The initial Offering Price for Shares in the Fund was $100 per Share. As at January 31, 2002, the Offering Price was $207.04 per Share.

Voting by Shareholders of the Fund

Subject to the exceptions set forth below and except as otherwise provided in the IBC Act, all decisions of the Shareholders will be made by the holders of a majority of outstanding Common Shares represented at a meeting, provided that a quorum of the holders of one-third of the outstanding Common Shares is present. Each Common Share is entitled to one vote. Notwithstanding the foregoing, the (i) dismissal of a member of the Board must be adopted by an affirmative vote of two-thirds of the votes cast at a general meeting of Shareholders at which more than one-half of the total number of Common Shares then issued and outstanding are represented; (ii) any investment advisory or management contract entered into by the Fund may not be terminated by the Fund unless such termination is approved by a unanimous vote cast at a meeting at which all the issued and outstanding Common Shares are represented; (iii) amendments to the Articles which have a material adverse effect on the rights of Shareholders of the Fund as a whole or a particular class, as applicable, must be approved by three-quarters of the votes cast at a meeting at which not less than one-half of the issued and outstanding Common Shares of the Fund or of the relevant class, as applicable, are represented, except that any amendment to decrease the vote required to terminate an investment advisory or investment management contract requires approval by a unanimous vote cast at a meeting at which all of the issued and outstanding Common Shares are represented; and (iv) the merger or consolidation of the Fund with another corporation or the dissolution of the Fund requires the affirmative vote of the holders of three-quarters of the Common Shares outstanding. Any matters referred to herein may also be adopted by resolution in writing of all the Shareholders of the Fund or if only affecting a particular class, the relevant class, as applicable. The Fund is not required to hold an annual meeting of Shareholders.

The Fund's Common Shares have equal voting rights, which means that the holders of more than fifty (50%) percent of the Common Shares voting for the election of Directors can elect all of the Directors if they chose to do so, and in such event the holders of the remaining Common Shares representing less than fifty (50%) percent of the Common Shares voting for such election of Directors will not be able to elect any person or persons as Directors.

British Virgin Islands Mutual Funds Act 1996

The Fund has received recognition as a professional fund under the Mutual Funds Act, 1996 (British Virgin Islands). As such, the minimum investment in the Company is $1,000,000 (subject to acceptance of a lesser amount in the discretion of the Board, but in no event less than $100,000) and each investor will have to represent that it is a "Professional Investor". A Professional Investor is a person (i) whose ordinary business involves, whether for its own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Company, or (ii) has a net worth in excess of $1,000,000 or its equivalent in any other currency (individuals may include the worth of his or her spouse in determining his or her own worth) and consents to being treated as a professional investor.

As a professional fund, the Fund is required to pay an annual government fee and is subject to the supervision of the Registrar of Mutual Funds (British Virgin Islands) (the "Registrar"). The Registrar may direct the Fund to furnish information or provide access to any records, books or other documents relating to the business of the Fund which, in the opinion of the Registrar, are necessary to enable him to ascertain compliance with the Mutual Funds Act, 1996 and its regulations. However, recognition as a professional fund does not involve an examination of the merits of an investment in the Fund, or supervision of the investment performance or investment restrictions of the Fund by the Registrar. A certificate of recognition may be cancelled if, inter alia, the Fund is carrying on business in a manner detrimental to the interests of investors or to the public interest.

A 0 0 5 6 7

## THE OFFERING

General

Shares will be offered for sale to non-U.S. Persons and Permitted U.S. Persons generally on the first Business Day of each month and at such other times as the Board, in its sole and absolute discretion, may determine (each such date being referred to as a "Closing Date"). The original executed and completed Subscription Agreement must be received by the Fund at least three (3) Business Days prior to the applicable Closing Date, unless waived by the Board. The minimum initial subscription for Shares is $1,000,000; however, the Board, in its sole and absolute discretion, may accept subscriptions of lesser amounts (but not less than $100,000). Thereafter, the minimum subscription for additional Shares is $100,000. Subscriptions received will be segregated until such date as the sale of the subject Shares is to be effected. An Offeree acceptable to the Board will be sold that number of Shares (including fractional Shares) which the Offeree's subscription will purchase (to the extent accepted) at the Offering Price then in effect. As at January 31, 2002 the Offering Price was $207.04 per Share. The Offeree will be notified as soon as practical of the number of Shares allotted to it.

To the extent it determines to do so, the Investment Manager may pay referral fees to unaffiliated eligible persons who introduce investors to the Fund. No referral fees will be paid by the Fund.

The Shares generally will be issued in book-entry, registered form and no share certificates representing the Shares subscribed for will be forwarded to a Shareholder unless specifically requested in writing.

The Board has the right to accept or reject any subscription, in whole or in part, for any reason or no reason.

Suitability

Prospective Shareholders in the Fund must be non-U.S. Persons or Permitted U.S. Persons, each of which must meet certain suitability requirements described below and in the Subscription Agreement, including being a Professional Investor. All Permitted U.S. Persons must be Accredited Investors. The Fund, in its sole and absolute discretion, may decline to accept the subscription for Shares of any prospective Shareholder.

The Fund's Articles provide that: (i) Shares may not be owned by any U.S. Person other than a Permitted U.S. Person, (ii) Shares may not be owned by any corporation which is not a Permitted U.S. Person in which U.S. Persons hold ten (10%) percent or more of either voting power or value, (iii) Shares may not be owned by any partnership which is not a Permitted U.S. Person in which a U.S. Person is a partner, (iv) Shares may not be owned by a trust which is not a Permitted U.S. Person whose grantor or any of its beneficiaries is a U.S. Person, (v) Benefit Plan Investor Shareholders may not own twenty-five (25%) percent or more of the outstanding Shares and (vi) Permitted U.S. Persons may not own fifty (50%) percent or more of the outstanding Shares in the aggregate. See "INVESTMENT BY U.S. TAX EXEMPT ENTITIES - ERISA CONSIDERATIONS".

The Hot Issue Rule prohibits certain individuals and entities from benefitting from "hot issues". As the Investment Manager may cause the Fund to participate in "hot issues", no person or entity prohibited by the Hot Issue Rule from benefitting from "hot issues" may purchase or own Shares.

Each Offeree desiring to purchase Shares will be required to certify to the Fund, among other things: (i) the identity and nationality of the person or persons on whose behalf the Shares are being acquired; and (ii) the Shares are not being acquired by and will not at any time be held for the account or benefit, directly or indirectly, of any U.S. Person other than Permitted U.S. Persons. Shareholders will be required to notify the Fund immediately of any change in such information. **IT IS THE RESPONSIBILITY OF EACH SHAREHOLDER TO VERIFY THAT SUCH SHAREHOLDER SATISFIES THE SUITABILITY REQUIREMENTS SET FORTH HEREIN.**

Prior to acceptance of any subscription for Shares, each prospective Shareholder must represent in writing, by completing and signing the Subscription Agreement, that, among other things:

A 0 0 5 6 8

1.   Neither the proposed record owner nor beneficial owner of the Shares is a U.S. Person other than a Permitted U.S. Person;

2.   The prospective Shareholder has such knowledge and experience in financial and business matters that the prospective Shareholder is capable of evaluating the merits and risks of the proposed investment, that the prospective Shareholder understands the method of compensation under the Investment Management Agreement and its risks and that the prospective Shareholder can bear the economic risk of the investment (i.e., at the time of the investment the prospective Shareholder can afford a complete loss of the investment and can afford to hold the investment for an indefinite period of time);

3.   The prospective Shareholder is acquiring Shares for investment purposes only and solely for the prospective Shareholder's own account and not with a view to or present intention to Transfer them, except for the prospective Shareholder's right to redeem Shares;

4.   The Fund has, during the course of the Offering and prior to the sale of Shares, afforded the prospective Shareholder the opportunity to ask questions and receive answers concerning the terms and conditions of this Offering and to obtain any additional information, to the extent the Fund possesses such information or could acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information contained in this Memorandum;

5.   The prospective Shareholder possesses certain other qualifications and makes certain other warranties and representations, as more fully set forth in the Subscription Agreement;

6.   The prospective Shareholder will indemnify the Fund, the Investment Manager, the Administrator, the Board and each of their respective subsidiaries, affiliates, directors and other officers, shareholders, employees, agents and permitted delegates, against any liability, costs or expenses resulting from any misrepresentation or breach of warranty in connection with the offer or sale of Shares;

7.   If the beneficial owner of the Shares is a publicly-held investment corporation, to the best of the knowledge of the owner, none of the beneficial interests in the shares of such corporation are owned, directly or indirectly through foreign entities, by any U.S. Person other than Permitted U.S. Persons;

8.   If the beneficial owner of the Shares is a closely-held corporation, none of the beneficial interests in the shares of such corporation are owned, directly or indirectly through foreign entities, by any U.S. Person other than Permitted U.S. Persons;

9.   The prospective Shareholder will not Transfer, directly or indirectly, any of the Shares or any interest therein (including without limitation any right to receive dividends or other distributions), unless the proposed transferee has made warranties similar to those contained in the Subscription Agreement, such warranties by such person have been approved by the Fund, such transfer is not to a U.S. Person and the prior written consent of the Board has been obtained. Further, the prospective Shareholder will complete a subscription document in a form acceptable to the Fund before such transfer will be accepted;

10.  The prospective Shareholder has consulted with such prospective Shareholder's own legal, tax and/or investment advisors to determine the suitability of an investment in the Shares, and the relationship of such an investment to the prospective Shareholder's overall investment program and financial and tax position;

11.  The prospective Shareholder has not dealt with a broker in connection with the purchase of the Shares, other than as is specifically disclosed in the Subscription Agreement;

12.  The prospective Shareholder is willing and able to bear the economic risks of an investment in the Fund for an indefinite period of time; and

13.  The prospective Shareholder is a Professional Investor (as hereinafter defined).

14. The prospective Shareholder is not prohibited by the Hot Issue Rule from benefiting from "hot issues" (the Subscription Agreement contains a detailed description of who is a "restricted person" under the Hot Issue Rule).

The suitability standards referred to above represent minimum suitability requirements for prospective Shareholders and the satisfaction of such standards by a prospective Shareholder does not necessarily mean that the Shares are a suitable investment for such prospective Shareholder or that the prospective Shareholder's subscription will be accepted. The Board may, in circumstances it deems appropriate, modify such requirements. In addition, the Board has the right to accept or reject a subscription, in whole or in part, for any reason or no reason whatsoever.

<u>Anti-Money Laundering Protection</u>

To ensure compliance with statutory and other generally accepted principles relating to anti-money laundering, the Administrator may require verification of identity from any person lodging a completed subscription agreement. Depending on the circumstances of each application, a detailed verification may not be required if:

(a)     the investor is a recognized financial institution; or

(b)     the investor makes the payment from an account held in the investor's name at a recognized financial institution.

These exceptions will only apply if the financial institution or intermediary referred to above is within a country recognized as having sufficient anti-money laundering regulations such as a member state of the European Union which is subject to the EC Money Laundering Directive or one of the countries which make up the Financial Action Task Force ("FATF") and which is subject to the FATF Recommendations.

An individual may be required to produce a copy of a passport or identification card certified by a notary public. In the case of corporate applicants, they may be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or equivalent), the names, occupations, dates of birth and residential and business addresses of all directors.

The Administrator reserves the right to request such information as is necessary to verify the identity of an applicant. To ensure compliance with statutory and other requirements relating to money laundering, the Administrator may require verification of identity from any person lodging a completed subscription agreement. Pending the provisions of evidence satisfactory to the Administrator as to identity, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

-17-

A00570

## DETERMINATION OF OFFERING PRICE

When Shares are subscribed for at the beginning of the fiscal year ("Year Beginning") or at any time other than Year Beginning ("Interim Purchases") when there is a Loss Carryover (as defined below), certain adjustments to the amount of money paid for the purchase of Shares are necessary. This is done so that (i) the Incentive Fee paid to the Investment Manager is charged only to those Shares which have appreciated in value since their acquisition, (ii) all Shareholders will have the same amount per Share at risk and (iii) all Shares will have the same Net Asset Value. "Loss Carryover" shall mean, at anytime, the largest aggregate Unrecouped Loss attributable to an outstanding Share.

The number of Shares to be purchased will be based on the offering price per Share (the "Offering Price") as defined below. The Offering Price for each Share is calculated in the following manner:

(1)     For Shares purchased at the Year Beginning, the Offering Price is the Year Beginning Net Asset Value ("Beginning Value") plus a depreciation deposit ("Depreciation Deposit") equal to 25% of the Loss Carryover, if any, at Year Beginning. The Depreciation Deposit is invested and paid out as described in Section 2(a) below.

(2)     For Interim Purchases:

(a)     When the Net Asset Value per Share is less than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Offering Price is the sum of the Net Asset Value per Share and the "Depreciation Deposit". The Depreciation Deposit is 25% of the amount by which (i) and (ii) above exceed the Net Asset Value per Share at the date of purchase. The Depreciation Deposit is segregated and separately invested in U.S. Treasury Bills or other high quality short term debt securities or certificates of deposit and is not at risk with the Fund. It may, in certain circumstances, be returned to the Shareholder at the time of redemption of the Shares. It is included in the Offering Price to permit the Shares purchased on the date of purchase to be charged the 25% Incentive Fee with respect to any increase in Net Asset Value up to Beginning Value and with respect to any benefit received by reason of the existence of a Loss Carryover. If at the end of any fiscal year (or at any time during the fiscal year when the Shares of a Shareholder are redeemed), the losses which gave rise to the Depreciation Deposit are recouped, then, to the extent that the losses which gave rise to all or a portion of the Depreciation Deposit are recouped, the Depreciation Deposit will be paid to the Investment Manager as a part of the Incentive Fee. Any portion of the Depreciation Deposit not paid to the Investment Manager will be paid to the Shareholder upon redemption. Promptly after the end of each fiscal year in which a Depreciation Deposit is held, the interest (net of the income taxes payable thereon, if any) earned thereon will be paid to the Shareholder who made such Depreciation Deposit.

(b)     When the Net Asset Value per Share is more than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Offering Price is the sum of the Net Asset Value per Share and the "Equalization Factor" as defined below. The term "Equalization Factor" means an amount which the Shares outstanding since Year Beginning should be charged (i.e. 25% of the increase in Net Asset Value since Year Beginning in excess of the Loss Carryover at Year Beginning), and which the Shares subscribed for at the date of the Interim Purchase ("Interim Purchase Date") should not be charged. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is not lost in the current fiscal year, the Equalization Factor attributable to such increase becomes payable to the Shareholder at the end of the current fiscal year. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is lost in the fiscal year the Shares are purchased but is recovered in a subsequent fiscal year, the Equalization Factor attributable to such recovery will become payable to the Shareholder at the end of the fiscal year in which the recovery occurs. Upon redemption by a Shareholder of his Shares, the same amount of the Equalization Factor will be paid to him as if the date of redemption were the last day of the fiscal year in which the Shares are redeemed. Any Equalization Factor, or portion thereof, which is due to a Shareholder not

-18-

A 0 0 5 7 1

redeeming his Shares will be used to purchase additional full Shares on behalf of such Shareholder as of the first day of the next succeeding fiscal year.

The following tables have been provided to illustrate the manner in which the adjustments set forth above operate. Table I illustrates the manner in which the adjustments described above operate with respect to Shares subscribed for at the beginning and during a hypothetical fiscal year where there is no Loss Carryover at the beginning of the fiscal year. Table II illustrates the manner in which the adjustments described above operate with respect to Shares subscribed for, prior to, at the beginning and during a hypothetical fiscal year where there is a Loss Carryover of $20 per Share at the end of the first year.

TABLE 1

| Shareholder | Shareholder Subscribes for Shares at | NAV on Date of Purchase | Equalization Factor Paid | Depreciation Deposit Amount Paid | Offering Price | NAV at Year End (before 25% Incentive Fee) | 25% Incentive Fee Accrued at Year End | Depreciation Deposit Paid to Investment Manager | Equalization Factor Returned to Shareholder | NAV at Year End (after 25% Incentive Fee) |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Year Beginning July 1 NAV = $100 | $100 | $0 | $0 | $100 | $132 | $8 | $0 | $0 | $124 |
| B | Interim Purchase Date Jan. 1 NAV = $92 | 92 | 0 | 2 | 94* | 132 | 8 | 2 | 0 | 124 |
| C | Interim Purchase Date April 1 NAV = $108 (before 25% Incentive Fee) | 106 | 2 | 0 | 108** | 132** | 6 | 0 | 2 | 124 |

* Includes Depreciation Deposit
** Includes Equalization Factor

-20-

A00572

TABLE II

| Share-holder | Shareholder Subscribes for Shares at | NAV on Date of Purchase | Equalization Factor Paid | Depreciation Deposit Paid | Offering Price | NAV at Year End (before 25% Incentive Fee) | 25% Incentive Fee Accrued at End at Year 2 | Depreciation Deposit Paid to Investment Manager | Equalization Factor Returned to Shareholder | NAV at Year End (after 25% Incentive Fee) |
|---|---|---|---|---|---|---|---|---|---|---|
| A | Beginning of Year 1 NAV = 100 | $100 | $0 | $0 | $100 | $116 | $4 | $0 | $0 | $112 |
| B | Beginning of Year 2 NAV = 80 | 80 | 0 | 5 | 85* | 116 | 4 | 5 | 0 | 112 |
| C | Interim Purchase Date Oct. 1 Year 2 NAV = 108 (before 25% Incentive Fee) | 106 | 2 | 0 | 108** | 116** | 2 | 0 | 2 | 112 |

\*    Includes Depreciation Deposit
\*\*   Includes Equalization Factor

-21-

Shareholder B in Table I, purchasing Shares on an Interim Purchase Date when the Net Asset Value has decreased since Year Beginning, pays an Offering Price of $94 per Share (which includes a Depreciation Deposit of $2) since the Incentive Fee which would accrue to his Shares would be $2 more than the Incentive Fee which would accrue for Shares purchased by Shareholder A at Year Beginning.

Shareholder C in Table I, purchasing Shares on an Interim Purchase Date when the Net Asset Value has increased since Year Beginning, pays an Offering Price of $108 per Share (which includes an Equalization Factor of $2). The Equalization Factor is returned to him at Year End and applied to the purchase of additional Shares since the Incentive Fee which would accrue to his Shares would be $2 less than the Incentive Fee which would accrue to the Shares purchased by Shareholder A.

Shareholder B in Table II, purchasing Shares at the beginning of Year 2 when the Net Asset Value has decreased since the beginning of Year 1, pays an Offering Price of $85 per Share (which includes a Depreciation Deposit of $5) since the Incentive Fee which would accrue to his Shares would be $5 more than the Incentive Fee which would accrue for Shares purchased by Shareholder A at Year 1. The Depreciation Deposit is paid to the Investment Manager at the end of Year 2 when the Net Asset Value for Shareholder B's Shares has increased by more than the loss carryover.

Shareholder C in Table II, purchasing Shares on an Interim Purchase Date during Year 2 when the Net Asset Value has increased since the beginning of Year 1, pays an Offering Price of $108 per Share (which includes an Equalization Factor of $2) since the amount of funds he would otherwise have at risk would be $2 less than the amount of funds at risk of Shareholder A. The Equalization Factor is returned to him and applied to the purchase of additional Shares at the end of Year 2 since the Incentive Fee which would accrue to his Shares would be $2 less than the Incentive Fee which accrues to Shareholder A.

A00575

## DETERMINATION OF NET ASSET VALUE

The net asset value of the Fund ("Net Asset Value") is equivalent to its gross assets less its gross liabilities as of any Valuation Date (as defined below) or Redemption Date.

The initial Net Asset Value of a class shall equal the aggregate subscription price of the Common Share of such class issued at the initial offering price of such class. Thereafter, on each Valuation Date, the Net Asset Value of each class shall be calculated by crediting or debiting, as the case may be, to each class (apportioned between each class by reference to the percentage that the Net Asset Value of each class as at the previous Valuation Date, bore to the aggregate Net Asset Value of all classes as at that Valuation Date) the profits and gains or losses (realized and unrealized) of the Fund and debited the expenses and liabilities (other than the management and incentive fees then accruing) of the Fund (apportioned in the manner aforesaid). The Net Asset Value per share of a class shall be determined by dividing the Net Asset Value of such class by the number of outstanding shares of such class.

The total net assets of the Fund at any date shall be determined on an accrual basis of accounting in accordance with generally accepted accounting principles and in accordance with the following:

(a)     no value will be assigned to goodwill;

(b)     the Deferred Fee Liability and the accrued Incentive Fee and Management Fee payable to the Investment Manager, estimated Administrative Expenses and investment expenses of the Fund and such reserves for contingent liabilities of the Fund, if any, as the Board, as advised by the Investment Manager, shall determine, will be treated as liabilities;

(c)     securities and instruments which are listed or quoted on a securities or other exchange market (including the National Association of Securities Dealers National Market System), other than securities and instruments which are in the form of put or call options, shall be valued at their last sales prices on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value assigned to such securities and instruments by the Board, as advised by the Investment Manager;

(d)     securities and instruments which are in the form of put and call options and are listed or quoted on a securities or other exchange or market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value assigned to such securities and instruments by the Board, as advised by the Investment Manager;

(e)     securities and instruments which are not listed or quoted on a securities or other market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 Business Days prior to the date of such determination, at the value assigned to such securities and instruments by the Board, as advised by the Investment Manager;

(f)     securities and instruments which are in the form of put and call options and are not listed or quoted on a securities, commodities or futures exchange or market shall be valued at their parity value, except when the Board, as advised by the Investment Manager, has assigned some other value to such securities and instruments;

(g)     the value of any shares of stock held by the Fund in an investment company which is, or which is similar to those companies which are, registered as investment companies under the ICA, shall be valued in accordance with the manner in which such shares are valued by such investment company;

-23-

provided, however, that the Board, as advised by the Investment Manager, may make such adjustments in such valuation as the it may from time to time consider appropriate;

(h)      securities and instruments of a non-public company will be valued at cost until the non-public company becomes a public company or some other material event involving the company occurs (e.g., it raises additional capital, enters into a joint venture, etc.), all as determined by the Board, as advised by the Investment Manager; and

(i)      all other assets of the Fund shall be valued in the manner determined by the Board, as advised by the Investment Manager, to reflect their market value.

All such valuations shall be made as of the last Business Day of a month and at such other times as the Board shall determine in its sole and absolute discretion (each, a "Valuation Date"). If the Board determines, in its sole and absolute discretion, that the valuation of any security or instrument pursuant to the foregoing does not fairly represent its market value, the Board shall value such security or instrument, after consultation with and as advised by the Investment Manager, and shall set forth the basis of such valuation in writing in the Fund's records. The value of any investment, security or instrument as aforesaid or other property for which no price quotations are available as above provided shall be determined by the Board, after consultation with and as advised by the Investment Manager, and the basis of such valuation shall be set forth in writing in the Fund's records. Notwithstanding the foregoing, where on any Valuation Date or Redemption Date, any cash or other asset of the Fund has been realized or contracted to be realized, there shall be included in the assets of the Fund, in place of such cash or other asset, the assets receivable by the Fund in respect thereof, provided that if the value of such assets is not then known exactly, then the value shall be determined by the Board, after consultation with and as advised by the Investment Manager, and provided that if the net amount receivable is not payable until some future time after the Valuation Date or Redemption Date, the Board may make such allowance (discounting of claims) as it considers appropriate, after consultation with and as advised by the Investment Manager, to reflect the true current value thereof.

In connection with the determination of the Net Asset Value of Shares, the Board will consult with and is entitled to rely upon the advice of the Investment Manager, Prime Broker and/or any other reputable brokerage firm or pricing service. In no event and under no circumstances shall the Board, the Investment Manager or Prime Broker incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

To the extent that Citco relies on information supplied by the Board, the Investment Manager, or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

## TRANSFER AND REDEMPTION

Transfer

The Articles provide that, without the prior written consent of the Board, which consent may be given or withheld in its sole and absolute discretion, any sale, assignment, transfer, conveyance or other disposition of Shares or any attempt to do any of the foregoing (collectively, "Transfer") will not be recognized by the Fund. Any attempt to Transfer Shares without such consent may subject such Shares to a compulsory redemption. In addition, the transferee must complete a subscription document in a form that is acceptable to the Fund before such transfer will be accepted. There is no independent market for the Transfer of Shares, and none is expected to develop. Offerees desiring to purchase Shares must represent that they are purchasing the Shares for investment purposes only, solely for their own account and not with a view to or present intention to Transfer the Shares. The Shares are not being, and will not be, offered in the United States or its territories or possessions or to U.S. Persons other than Permitted U.S. Persons, and no Transfer of the Shares may be made to or held for the benefit of U.S. Persons.

THE TRANSFER OF SHARES TO U.S. PERSONS IS PROHIBITED. THE FUND SHALL HAVE THE RIGHT TO COMPULSORILY REDEEM IN ACCORDANCE WITH THE ARTICLES ANY SHARES TRANSFERRED TO A U.S. PERSON.

Redemption

Shareholders may, in accordance with and subject to the applicable provisions of the Articles and the laws of the British Virgin Islands, redeem their Shares as of the last Business Day of each fiscal quarter, in each case upon at least six (6) months' prior written notice, and at such other times, with the consent of, and upon such terms of payment as may be approved by, the Board, in its sole and absolute discretion (each such date being referred to as a "Redemption Date"). If a redemption would cause the value of a Shareholder's Shares to fall below $1,000,000, or such lesser amount as determined by the Board, in its sole and absolute discretion, then the Board will have the right to compel redemption of all Shares held by such Shareholder. The Board, in its sole and absolute discretion, may shorten or waive any notice requirement. Shares will be redeemed at the Redemption Price as of the close of business on such Redemption Date. The "Redemption Price" shall equal (1) the Net Asset Value of the Shares being redeemed on the Redemption Date, plus (2) all or a portion of the Depreciation Deposit to the extent it is not paid to the Investment Manager as an Incentive Fee, plus (3) all or a portion of the Equalization Factor to the extent that the increase in value of the Shares that caused the payment of the Equalization Factor has not been lost or has not been paid previously to the redeeming Shareholder, less (4) the Incentive Fee, if any, and less (5) the Redemption Charge, if applicable. Redemption proceeds generally will be paid in U.S. $. See "DETERMINATION OF OFFERING PRICE".

Redemption requests must be on the Fund's Form of Request for Redemption of Shares ("Redemption Form") and must be sent by fax initially with two original copies to follow by courier delivery service. The Redemption Price will not be paid until an original executed copy of the Redemption Form is received by the Fund. If the Shareholder has elected to have share certificates issued and sent to such Shareholder, the Redemption Form must be accompanied by delivery to the Fund of the original certificates, if any, for the Shares to be redeemed. The original executed copy of the Redemption Form should be sent to The OmniFund, Ltd., c/o Citco Fund Services (Curaçao) N.V., Kaya Flamboyan 9, P.O. Box 812, Curaçao, Netherlands Antilles. Fax no.: (5-999) 732-2225.

Payment of ninety-five (95%) percent of the aggregate Redemption Price for redeemed Shares normally will be made within thirty (30) days after an authorized Redemption Date. Payment of the balance of the aggregate Redemption Price will be made within thirty (30) days after completion of (i) unaudited quarterly financial statements for redemptions on the last Business Day of the first three (3) fiscal quarters of the Fund, or (ii) audited financial statements for redemptions on the last Business Day of a fiscal year.

In accordance with the Articles, any redemption of a Share within one (1) year, two (2) years or three (3) years after a Shareholder's purchase of such Share (whether the Share is acquired directly from the Fund or by way of Transfer) will be subject to a redemption charge of fifteen (15%) percent, ten (10%) percent or five (5%) percent,

-25-

respectively, of the value of such Share on the date redeemed (each, as applicable, the "Redemption Charge"). There are no Redemption Charges for Shares redeemed after three (3) years from the date of issuance. All Redemption Charges assessed against a redeeming Shareholder will become assets of the Fund. Other than the Redemption Charge, there are no redemption charges.

The Board, in its sole and absolute discretion, upon not less than five (5) days' prior written notice to a Shareholder, may compel redemption of all of such Shareholder's Shares at any time for any reason or for no reason whatsoever. Under such circumstances, the Board will have the irrevocable power to act in the name of such Shareholder to redeem such Shareholder's Shares. In the event of any compulsory redemption, the Redemption Price will be determined as set forth above. Such Shareholder will have no Shareholder rights with respect to the Shares to be redeemed after the close of business on the date as of which the Redemption Price was calculated, except the right to receive the Redemption Price therefor, without interest.

The Board may suspend calculation of the Net Asset Value, Share redemptions, subscriptions and payment of redemption proceeds (a) in the event that Shareholders, in the aggregate, request redemption of twenty-five (25%) percent or more of the Fund's outstanding Shares of any class as of a Redemption Date; (b) during any period when any stock exchange or over-the-counter market on which a substantial position of the Fund's investments are quoted, traded, listed or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (c) when circumstances exist as a result of which in the opinion of the Board it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to Shareholders; (d) when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets cannot reasonably or fairly be ascertained; or (e) during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Board be effected at normal rates of exchange. During the suspension period, requests for redemption of Shares may be withdrawn. To the extent that a request for redemption of Shares is not withdrawn, the redemption shall be effected as of the first Redemption Date following the recommencement of redemptions. Where possible, all reasonable efforts will be taken to bring any period of suspension to an end as soon as possible. The Fund will notify Shareholders of suspensions and recommencements of calculations and redemptions by e-mail, fax and/or regular mail.

## CERTAIN TAX CONSIDERATIONS

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE SHAREHOLDERS. EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT HIS PROFESSIONAL TAX ADVISER WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING ON THE STATUS OF A PARTICULAR SHAREHOLDER. THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE TO PROSPECTIVE SHAREHOLDERS.

The Fund has not sought a ruling from the U.S. Internal Revenue Service or any other U.S., Federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has it obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain material U.S. Federal tax issues which may be relevant to prospective Shareholders. The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practice, all of which are subject to change, retroactively as well as prospectively. A decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND PROPOSED OPERATIONS OF THE FUND, THE FUND GENERALLY SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

### Non-U.S. Shareholders

A "Non-U.S. Shareholder" is any Shareholder other than (i) a citizen or resident of the United States; (ii) a corporation, partnership, or other entity created or organized in the United States, under the laws of the United States or of any state or political subdivision thereof, (iii) an estate whose income is includible in gross income for United States Federal income tax purposes, regardless of its source, or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and (b) one or more U.S. persons have the authority to control all substantial decisions of the trust.

### U.S. Trade or Business

In general, a foreign corporation is subject to U.S. income tax on its income from United States sources under two separate sets of rules. Under the first set of rules, if a foreign corporation is deemed to be engaged in a United States trade or business, such foreign corporation will be subject to U.S. income taxation at the graduated rates generally applicable to U.S. corporations and may also be subject to a 30% branch profits tax. Section 864(b)(2) of the United States Internal Revenue Code of 1986, as amended (the "IRC"), sets forth a safe harbor (the "Safe Harbor") which provides that a foreign corporation that trades securities for its own account (other than a dealer in securities) or a foreign corporation that trades commodities for its own account (other than a dealer in commodities) is not deemed to be engaged in a U.S. trade or business by reason of such activity. A proposed regulation (the "Proposed Regulation") creates a similar safe harbor provision applicable to foreign corporations trading certain derivative instruments such as options, forward contracts, short positions and similar financial instruments in commodities, currencies, stocks, partnership or beneficial interests in publicly traded partnerships or trusts, notes, bonds, debentures and other evidences of indebtedness, and notional principal contracts. Furthermore, the Proposed Regulation applies only to foreign persons other than (i) dealers in stocks and securities, (ii) dealers in commodities, and (iii) persons who regularly offer to enter into, assume, offset or otherwise terminate positions in derivatives with customers in the ordinary course of a trade or business (including regularly holding oneself out, in the ordinary course of a trade or business, as being willing and able to enter into either side of a derivative transaction). The Preamble to the Proposed Regulation provides that until the final regulations are issued, taxpayers may take any reasonable position, including that set forth in the Proposed Regulation. The Fund intends to conduct its business operations in a manner so as to meet the requirements of the Safe Harbor and the Proposed Regulation.

Accordingly, the Fund's trading activities should not constitute a trade or business and, except in the limited circumstances discussed below, the Fund should not be subject to the regular U.S. income tax on any of its profits

A00580

Even if the Fund's trading activity does not constitute a U.S. trade or business, gains realized from the sale or disposition of (i) stock or securities (other than debt instruments with no equity component) of U.S. Real Property Holding Corporations (as defined in Section 897 of the IRC) ("USRPHCs") or (ii) stock or securities (other than debt instruments with no equity component) of Real Estate Investment Trusts ("REITs"), will be generally subject to U.S. income tax on a net basis. However, certain principal exceptions to these rules of taxation would apply (i) in the case of an interest in a USRPHC, if such interest is a class of stock which is regularly traded on an established securities market and the Fund generally did not hold more than five (5%) percent of such regularly traded class of stock at any time during the five (5) year period ending on the date of disposition, or (ii) in the case of an interest in a REIT, if during the five (5) year period ending on the date of disposition (or during the life of the REIT, if shorter) less than fifty (50%) percent in value of the stock of the REIT was held directly or indirectly by foreign persons. Moreover, if the Fund were deemed to be engaged in a U.S. trade or business as a result of owning a limited partnership interest in a U.S. business partnership or a similar ownership interest, income and gain realized from that investment would be subject to U.S. income and branch profits taxes.

## U.S. Withholding Tax

Under the second set of rules, certain types of United States source income that is not effectively connected with a United States trade or business is subject to a withholding tax of 30% (unless reduced by an applicable income tax treaty). The types of income subject to the 30% withholding tax include dividends, rents, certain interest, certain other gains (but not capital gains from the sale of securities) and original issue discount. There is presently no tax treaty between the U.S. and the British Virgin Islands.

Generally, dividends are considered to be from United States sources (and are subject to 30% withholding) where the payor is incorporated under the laws of one of the fifty states or the District of Columbia. Furthermore, where a foreign corporation is engaged in the United States trade or business, and 25% or more of such corporation's worldwide income over a specified testing period is effectively connected with such trade or business, a portion of the dividends received from such corporation (which bears the same ratio as such corporation's income which is effectively connected with the U.S. trade or business bears to the worldwide income) is treated as from U.S. sources.

Certain types of income are specifically exempted from the thirty (30%) percent tax and thus withholding is not required on payments of such income to a foreign corporation. The thirty (30%) percent tax generally does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a foreign corporation on its deposits with U.S. banks. The thirty (30%) percent tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which is issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the thirty (30%) percent tax receives the required statement that the beneficial owner of the obligation is not a U.S. person and certain other requirements are met. Under certain circumstances, interest on bearer obligations may also be considered portfolio interest. Also exempt from the thirty (30%) percent tax is income from original issue discount obligations which are payable no more than 183 days from the date of issue.

## Redemption of Shares

In general, any gain realized by a Non-U.S. Shareholder on the sale, exchange, redemption or disposition of Shares will not be subject to U.S. Federal income tax, unless (i) such gain is effectively connected with a U.S. trade or business, (ii) the Non-U.S. Shareholder is an individual who is present in the United States for 183 days or more during the taxable year of the disposition and certain other conditions are met, (iii) the Non-U.S. Shareholder is subject to tax under U.S. Federal income tax law provisions applicable to certain expatriates, including certain former citizens and residents of the United States, or (iv) the Shares are treated as a United States real property interest. Based solely on the Fund's anticipated activities, it is not expected that the conditions set forth in (i) or (iv) above will be met.

-28-

Permitted U.S. Persons

Permitted U.S. Persons are U.S. entities that generally are exempt from Federal income tax on their passive income (e.g., qualified pension plans and certain charitable organizations). Shares in the Fund will constitute equity in a passive foreign investment company ("PFIC") for U.S. tax purposes. Although not entirely clear, under current U.S. income tax law, a Permitted U.S. Person that holds shares as capital assets should not be subject to the unrelated business income tax ("UBIT") with respect to any dividends received in respect of its holding Shares and any gain from the disposition of Shares, provided that (i) such Permitted U.S. Person does not incur acquisition indebtedness in connection with an investment in the Fund, (ii) the Fund is not a "controlled foreign corporation," or "CFC," for U.S. Federal income tax purposes and (iii) such Permitted Person does not make a "mark-to-market" election (pursuant to Section 1296) with respect to its Shares in the Fund. The Fund could be a CFC if fifty (50%) percent or more of the Shareholders in the Fund (measured by voting power or value) were owned by U.S. Shareholders, each owning ten (10%) percent or more of the total combined voting power of such foreign corporation. To avoid being treated as a CFC (or, in addition, a foreign personal holding company, or foreign investment company) the Investment Manager will limit the Shares held by Permitted U.S. Persons to less than fifty (50%) percent of the outstanding Shares. Permitted U.S. Persons may be subject to certain United States information reporting requirements based on their ownership of the Shares. **PERMITTED U.S. PERSONS MUST CONSULT THEIR OWN TAX ADVISERS REGARDING THE TAX CONSEQUENCES AND INFORMATION REPORTING REQUIREMENTS OF AN INVESTMENT IN THE FUND.**

U.S. tax legislation has been proposed in the past that would significantly alter certain of the UBIT, CFC and PFIC rules described above. It is not possible to predict whether any similar legislation will be proposed or enacted in the future; accordingly, a Permitted U.S. Person should consult its tax adviser with respect to any proposed U.S. tax legislation that could affect the U.S. Federal income tax treatment of an investment in the Fund.

Estate and Gift Taxes

Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Shares.

Other Jurisdictions

Income realized by the Fund from non-U.S. sources may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

British Virgin Islands

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the British Virgin Islands with respect to all dividends, interests, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the British Virgin Islands and is also exempt from any capital gains realized with respect to any shares, debt obligations or other securities of the Fund by persons who are not persons resident in the British Virgin Islands. No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the British Virgin Islands with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange controls in the British Virgin Islands and, accordingly, the Fund is free to acquire, hold and sell any securities without restriction under the laws of the British Virgin Islands.

Other Taxes

Offerees should consult their own counsel regarding tax laws and regulations of any other jurisdiction which may be applicable to them.

A 0 0 5 8 2

Future Changes in Applicable law

The foregoing description of U.S. and the British Virgin Islands tax consequences of an investment in and the operations of the Fund is based on laws and regulations which are subject to change through legislative, judicial or administrative action. Other legislation could be proposed that, if enacted, would subject the Fund to income taxes or subject Shareholders to increased income taxes.

THE FOREGOING DISCUSSION REPRESENTS A GENERAL SUMMARY OF TAX LAW AND IS BASED ON CURRENT LAW AND INTERPRETATIONS THEREOF ON THE DATE OF THIS MEMORANDUM. NO ASSURANCE CAN BE GIVEN THAT APPLICABLE TAX LAW AND INTERPRETATIONS THEREOF WILL NOT BE CHANGED IN THE FUTURE. ADDITIONALLY, IN VIEW OF THE NUMBER OF DIFFERENT JURISDICTIONS WHERE LOCAL LAWS MAY APPLY TO A PROSPECTIVE SHAREHOLDER, THIS MEMORANDUM DOES NOT DISCUSS THE LOCAL TAX CONSEQUENCES TO A POTENTIAL SHAREHOLDER ARISING FROM THE SUBSCRIPTION, PURCHASE, HOLDING AND REDEMPTION OF SHARES. ACCORDINGLY, PROSPECTIVE SHAREHOLDERS MUST CONSULT THEIR OWN PROFESSIONAL ADVISERS AND INFORM THEMSELVES OF, AND WHERE APPROPRIATE TAKE ADVICE ON, THE LAWS AND REGULATIONS (SUCH AS TAXATION AND EXCHANGE CONTROLS) APPLICABLE TO THE SUBSCRIPTION, PURCHASE, HOLDING AND REDEMPTION OF SHARES IN THE PLACE OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE OR INCORPORATION AND THE PLACES IN WHICH THEY CONDUCT BUSINESS.

## INVESTMENT BY U.S. TAX EXEMPT ENTITIES – ERISA CONSIDERATIONS

General

In considering an investment in the Fund of a portion of the assets of employee benefit plans subject to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), including IRAs and Keogh plans (hereinafter referred to individually as "Plan" and collectively as "Plans"), fiduciaries and their legal counsel should consider, in light of all of the matters disclosed in this Memorandum, and the Plan's funding objectives and requirements, whether: (i) the investment in the Fund is prudent and in accordance with the documents and instruments governing such Plan; (ii) the investment is consistent with the fiduciary responsibility to diversify the Plan's investments under Section 404(a)(1)(C) of ERISA, if applicable; (iii) the investment will result in unrelated business taxable income ("UBTI") to the Plan; and (iv) the investment is consistent with the Plan's cash flow needs in view of the illiquidity of an investment in the Fund as described elsewhere in this Memorandum. Plan fiduciaries must make their own determination regarding whether an investment in the Fund is prudent under ERISA, taking into consideration all of the specific facts and circumstances of the Plan and an investment in the Fund.

ERISA generally requires that the assets of employee benefit plans be held in trust and that the trustee, or a duly authorized investment manager (within the meaning of Section 3(38) of ERISA), have exclusive authority and discretion to manage and control the assets of the Plan. ERISA also imposes certain duties on persons who are fiduciaries of employee benefit plans subject to ERISA and prohibits certain transactions between an employee benefit plan and the fiduciaries of such plan. Under the IRC, similar prohibitions apply to all Plans which are not subject to ERISA. Under ERISA and the IRC, any person who exercises any discretionary authority or discretionary control respecting the management or disposition of the assets of a Plan or who renders investment advice for a fee to a Plan is considered to be a fiduciary of such Plan (subject to certain exceptions not here relevant). Each Plan Investor who so requests will be issued a certificate evidencing its Shares in the Fund. The possession of such indicia of ownership should satisfy the holding in trust requirements of ERISA.

Furthermore, ERISA and the IRC prohibit fiduciaries of a Plan from engaging in various acts of self-dealing. In order to avoid such self dealings with respect to any Plan which invests in the Fund, the Investment Adviser will not permit an investment in the Fund with assets of any Plan (including a Keogh plan or IRA) if the Investment Adviser (i) has investment discretion with respect to such assets or (ii) regularly gives individualized investment advice which serves as the primary basis for the investment decisions made with respect to such assets.

Plan Asset Rules

If, by virtue of a Plan's purchase of a Share in the Fund, the assets of the Fund are deemed to be "plan assets" under ERISA, then: (i) the Investment Adviser may be required to adhere to the standards of a "fiduciary" under ERISA; and (ii) certain other transactions in which the Fund may engage may constitute prohibited transactions under Section 406 of ERISA and Section 4975(a) of the IRC.

ERISA and the IRC do not explicitly define what assets are "plan assets". Regulations issued by the Department of Labor (the "Regulations") generally provide that, unless certain exemptions apply, when a Plan acquires an equity interest in a corporation, partnership or other entity, which interest is neither a "publicly offered" readily transferable security nor a security issued by an investment company registered under the ICA, the assets of such Plan will include not only the investment, but also the underlying assets of the entity in which the equity investment is made.

The Regulations provide, however, that the assets of a corporation or partnership in which an employee benefit plan invests would not be deemed to be assets of such plan if less than twenty-five (25%) percent of each class of equity interests in the corporation or partnership are held in the aggregate by "benefit plan investors" (including, for this purpose, benefit plans such as foreign plans, Keogh Plans for owner-employees and IRAs which are not subject to the general requirements of ERISA). For purposes of this "25 percent" rule, the interests of any person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the corporation or partnership, or who provides investment advice for a fee (direct or indirect) with respect to such

A00584

assets, or any affiliate of such person, shall be disregarded. Thus, any investment in the Fund by the Investment Adviser or its affiliates will be disregarded in determining whether this exemption is satisfied.

The Investment Adviser will not permit investments in the Fund by "benefit plan investors" to equal or exceed at any time twenty-five (25%) percent of the equity interests of the Fund. Accordingly, the above exemption will be applicable and the assets of the Fund should not be deemed to be plan assets under ERISA. In order to comply with the foregoing, the Investment Adviser has the right, in its sole discretion, to reject any proposed investment by a Shareholder or by an existing Shareholder and/or to require a mandatory redemption of all or part of the Shares of a Shareholder. Accordingly, Plan fiduciaries considering an investment in the Fund should consider the fact that neither the Investment Adviser nor its affiliates nor any of their respective officers, directors, agents, employees, affiliates, advisers or consultants will be acting as a fiduciary under ERISA or the IRC in managing the assets of the Fund.

Unrelated Business Taxable Income

Unless removed from the purview of IRC Section 501(a) by a relevant exception, organizations described in that provision are exempt from Federal income tax. Notwithstanding this, such organizations are subject to income taxes at the rate applicable to business corporations on their UBTI under Section 511(a) of the IRC. Generally, UBTI means the gross income (with certain exceptions) derived by an IRC Section 501(a) exempt organization from any trade or business carried on by such entity which is unrelated to the entity's exempt purposes, less certain deductions related to such trade or business. UBTI includes the income recognized by a tax exempt entity from any unrelated trade or business regularly carried on by a partnership of which such tax exempt entity is a partner. Also included in UBTI is "unrelated debt financed income". This is generally the net income from assets not related to the entity's exempt purpose, acquired with debt, to the extent of the ratio of debt on such assets to such assets' adjusted basis.

Under Section 512(b) of the IRC, certain forms of income are excluded from the definition of UBTI. These items include dividends, interest, annuities, royalties, capital gains, rents from real property and, in limited circumstances, personal property leased with real property. To the extent, however, that the Fund employs debt in its strategy, or if the Fund acquires securities of an entity that generates UBTI that flows through to the Fund (e.g., a corporation) or if Fund activities are determined to be a trade or business within the meaning of IRC Section 513, it is possible that otherwise tax-exempt investors subject to these rules would be liable for tax on part of their allocable share of Fund income.

Each tax-exempt investor is urged to consult with its own professional tax advisers concerning the suitability of this investment, taking into account the likelihood that such investment will generate UBTI, as well as whether, under the particular circumstances of its investment, its interest would constitute debt-financed property.

A00585

## ADMINISTRATION

Board of Directors

The Fund is managed by its Board. The Board is elected by the holders of the Shares.

The directors of the Fund are as follows:

**John W. Bendall, Jr.** founded Hermitage Capital Corporation in 1986; he is presently its Chairman and Chief Executive Officer. Mr. Bendall was Senior Vice-President and Head of Institutional Sales of Bateman, Eichler, Hill and Richards from 1977 to 1986. He was a Specialist in Mergers and Acquisitions at William E. Hill and Co. (a Division of Dunn and Bradstreet). Mr. Bendall also serves as a Director of JBC Holdings.

**Dr. Richard Geist** is President of The Institute of Psychology and Investing, Inc. Dr. Geist received his undergraduate degree and his doctorate in Psychology from Harvard University and is an Instructor in the Department of Psychiatry at Harvard Medical School. Dr. Geist has written and lectured extensively on the psychology of investing. His recommendations have been featured in various financial publications and he has appeared on numerous national television and radio programs.

Under the laws of the British Virgin Islands and the Fund's Articles, each Director and officer of the Fund is entitled to be indemnified out of the assets of the Fund against all expenses (including legal fees and disbursements), losses, liabilities, judgments or fines which such Director or officer may sustain or incur in or about the execution of the duties of such office or otherwise in relation thereto. No Director or officer is liable for any loss, damage or misfortune which may happen to, or be incurred by, the Fund in the execution of the duties of such office, or in relation thereto, except for such Director's or officer's own gross negligence, willful default, fraud or dishonesty, if in the determination of the Board, such Director or officer acted honestly and in good faith with a view to the best interests of the Fund and had no reasonable cause to believe that his conduct was unlawful and that the determination of the Board is, in the absence of fraud, conclusive for purposes of indemnification.

The Administrator

Citco Fund Services (Curacao) N.V., Curacao, Netherlands Antilles has been delegated the responsibility as administrator (the "Administrator") under the terms of an Administration Agreement to be effective April 1, 2002 between the Fund and the Administrator and registrar and transfer agent for Shares of the Fund. The Administrator is responsible for the maintenance of the Fund's corporate records and books of accounts. Net Asset Value calculation, and communication with Shareholders and the general public.

The Administration Agreement may be terminated by either party thereto upon not less than ninety (90) days' notice.

The Fund has agreed to indemnify the Administrator and its subsidiaries, affiliates, directors and other officers. shareholders, employees, agents and permitted delegates against, and hold it harmless from, any expense or liability arising out of any asserted or threatened claim in connection with the obligations of the Administrator to the Fund, except for any expense or liability caused by its gross negligence or willful misconduct or by its reckless disregard of its duties.

Brokerage Commissions

The Investment Manager has the sole power and authority to determine the broker to be used for each securities transaction for the Fund. In selecting brokers or dealers to execute transactions, the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost. In selecting brokers, the Investment Manager may or may not negotiate "execution only" commission rates; thus, the Fund may be deemed to be paying for other services provided by the broker to the Fund or the Investment Manager or their affiliates which are included in the commission rate. In negotiating commission rates, the Investment

A 0 0 5 8 6

Manager will take into account the financial stability and reputation of brokerage firms and the brokerage, research and other services provided by such brokers, although the Fund may not, in any particular instance, be the direct or indirect beneficiary of the services provided. The Investment Manager may also direct commissions to brokers who refer clients to the Fund. In addition, the Investment Manager is authorized to direct commissions to certain broker/dealers which may furnish other services to the Fund or the Investment Manager or their affiliates, such as telephone lines, news and quotation equipment, electronic office equipment, furniture, account record keeping and clerical services, financial publications, economic consulting services, office space and facilities and travel, entertainment expenses and administrative expenses.

Accordingly, the Fund may be deemed to be paying for research and other services with "soft" or commission dollars. Although the Investment Manager believes the Fund will benefit from many of the services obtained with soft dollars generated by Fund trades, the Fund will not benefit exclusively. The Investment Manager may also derive direct or indirect benefits from some or all of these services, particularly to the extent that the Investment Manager uses "soft" or commission dollars to pay for expenses it would otherwise be required to pay itself.

Section 28(e) of the United States Federal Securities Exchange Act of 1934, as amended, provides a "safe harbor" to investment managers who use commission dollars generated by their advised accounts to obtain investment research and brokerage services that provide lawful and appropriate assistance to the manager in the performance of investment decision-making responsibilities. Conduct outside of the safe harbor afforded by Section 28(e) is subject to the traditional standards of fiduciary duty under state and Federal law. Notwithstanding a good faith determination that the amount of commissions paid is reasonable in relation to the value of brokerage research services provided, to the extent that the Investment Manager determines to use commission dollars to pay for products and services that provide administrative or other nonresearch assistance to the Investment Manager, such payments may not fall within the safe harbor of Section 28(e).

The Fund's investment program will emphasize active management of the Fund's portfolio. Consequently, the Fund's portfolio turnover and brokerage commission expenses may be greater than for other types of investment vehicles.

Prime Broker

The Fund has appointed Banc of America Securities, LLC ("BAS"), as prime broker and custodian. As such, BAS will settle and clear all transactions executed by the Fund. Such transactions may be executed through BAS or other brokers.

The custodial functions of BAS include, among other matters, arranging for: (i) the receipt and delivery of securities purchased, sold, borrowed and loaned; (ii) the making and receiving payments therefor; (iii) custody of securities fully paid or not fully paid for and, therefore, compliance with margin and maintenance requirements; (iv) custody of all cash, dividends and exchanges, distributions and rights accruing to an account, or delivery of cash to the Fund's banks; and (v) tendering securities in connection with cash tender offers, exchange offers, mergers or other corporate reorganizations. BAS has no decision-making discretion relating to the Fund's investments.

BAS is entrusted with the safe custody of all the assets of the Fund and maintains segregated accounts in the name of and for the sole benefit of the Fund. The assets of the Fund will be separately designated in the books of BAS. These fully paid assets will be segregated from BAS' own proprietary positions in order to ensure adequate protection in the event of the bankruptcy or insolvency of BAS. Fully paid for assets refers to all assets not deposited as margin. Non-fully paid for securities held in the margin accounts with BAS need not be segregated and may be available to the creditors of BAS. The assets of the Fund may also be deposited as margin with other brokers/dealers and may not be held in segregated accounts.

The Fund is not required to pay any custody fee to BAS to act as Prime Broker and custodian. The Fund is not committed to continue its "prime brokerage" relationship or its clearing relationship with BAS for any minimum period. If the Fund uses another prime broker, it may be required to pay separate fees in cash. To the extent that securities are purchased in non-U.S. markets, BAS will transfer funds to its sub-brokers located in the country in which the securities are purchased. Such sub-brokers (sub-custodians) will maintain custody of the securities until

A 0 0 5 8 7

such time as they are sold, at which point uninvested proceeds will be transferred back to the Fund's account at BAS.  BAS shall exercise reasonable skill, care and diligence in the selection of sub-custodians.  BAS will be responsible to the Fund for the duration of the sub-custody agreement for satisfying itself as to the ongoing suitability of any sub-custodian to provide custodian services to the Fund.  BAS shall maintain an appropriate level of supervision over the sub-custodians and make appropriate enquiries, periodically to confirm that the obligations of the sub-custodians continue to be competently discharged.  BAS remains responsible for losses arising from the acts or omissions or insolvency of such sub-custodians.  A sub-custodian who holds assets of the Fund other than margin will segregate those assets in segregated accounts to ensure that they are unavailable to creditors of the sub-custodian or any other entity.  The fees of any such sub-custodians shall be at normal commercial rates.  The Investment Manager also expects to allocate portions of the Fund's brokerage business to BAS.

Accounting Matters

The Fund's independent accountants are PricewaterhouseCoopers which have audited the Fund's accounts for the fiscal years ended December 31, 1999 and 2000 and they are expected to audit the Fund's accounts for the fiscal year ended December 31, 2001 and the current fiscal year ending September 30, 2002.  The annual accounts of the Fund have been audited since inception of the Fund.

A 0 0 5 8 8

## SUBSCRIPTION PROCEDURES

Offerees interested in subscribing for Shares will be furnished a Subscription Documents Booklet which contains Instructions For Subscribers and a Subscription Agreement to be completed by them for a specified dollar amount of Shares. The Fund currently has a minimum initial subscription amount of $1,000,000 but may permit subscriptions for a lesser amount (but not less than $100,000). Please contact the Administrator if you desire to subscribe for Shares so that a Subscription Documents Booklet can be forwarded to you. The proper documentation necessary to purchase Shares must be received by the Fund at least three (3) Business Days prior to the applicable Closing Date, unless waived by the Board.

The original executed and completed Subscription Agreement should be sent by fax initially with two original copies to follow by courier delivery service to: The OmniFund, Ltd., c/o Citco Fund Services (Curaçao) N.V., P.O. Box 812, Curaçao, Netherlands Antilles. Fax no.: (5-999) 732-2225.

All payments are to be made in U.S. dollars, via wire transfer, in immediately available funds to JP Morgan Chase Bank. One New York Plaza, New York, NY 10081, ABA # 021-000021, for Account of Citco Banking Corporation N.V., Account # 001-1-627502, for further credit to The OmniFund, Ltd., Account # 0012.519915.200.

The Subscription Agreement to be executed and delivered by prospective Shareholders contains their agreement to indemnify and hold harmless the Fund, the Investment Manager, the Administrator, Directors and each of their respective subsidiaries, affiliates, directors and other officers, shareholders, employees, agents and permitted delegates, against any loss, liability, cost or expense (including attorneys' fees, taxes and penalties) which may result, directly or indirectly, from any misrepresentation or breach of any warranty, condition, covenant or agreement set forth therein or in any other document delivered by the prospective Shareholders of the Fund.

The acceptance or non-acceptance of any subscription is solely at the discretion of the Board and no reasons need be given for the non-acceptance of any subscription.

The Shares generally will be issued in book-entry, registered form and no share certificates representing the Shares subscribed for will be forwarded to a Shareholder unless specifically requested.

A 0 0 5 8 9

## MISCELLANEOUS

(1)     A Permitted U.S. Person is an "Accredited Investor" if the U.S. Person is:

    (A)     An employee benefit plan within the meaning of Title 1 of ERISA:

        (i)     whose investment decisions are made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, insurance company or registered investment advisor;

        (ii)     having total assets in excess of $5,000,000; or

        (iii)     if self-directed, the investment decisions are made solely by natural persons, each of whom either:

            (1)     currently has a net worth in excess of $1 million, and/or

            (2)     has individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; OR

    (B)     A trust, which is a tax-exempt entity with assets in excess of $5 million, not formed for the specific purpose of acquiring Shares, whose investment decisions are made by a person or persons who have such knowledge and experience in financial and business matters that such person or persons is or are capable of evaluating the merits and risks of the prospective investment; OR

    (C)     A tax-exempt entity in which all of the equity owners are natural persons each of whom either (i) currently has a net worth in excess of $1 million, and/or (ii) had individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; OR

    (D)     A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefits of its employees if such plan has total assets in excess of $5,000,000; OR

    (E)     A tax-exempt organization under Section 501(c)(3) of the IRC having total assets in excess of $5,000,000, which was not formed for the specific purpose of acquiring Shares.

(2)     The term "U.S. Person" means, with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service, or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least thirty-one (31) days during such year, and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 1/3 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days. With respect to persons other than individuals, the term "U.S. Person" means (i) a corporation or partnership created or organized in the United States or under the laws of the United States or any state or (ii) a trust or estate which is subject to U.S. tax on its worldwide income from all sources.

(3)     The term "Permitted U.S. Persons" means any entity organized under the laws of the United States that is generally exempt from Federal income taxation.

A00590

(4)    A "Professional Investor" is defined as a person whose ordinary business involves, whether for his own account or the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund or a person who has signed a declaration that it (in the case of a natural person, either individually or jointly with spouse) has a net worth in excess of $1 million (or its equivalent in any other currency) and it consents to being treated as a Professional Investor.

A 0 0 5 9 1

## APPENDIX A

### REQUIRED DISCLOSURES

**FOR ALL OFFEREES:**

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.   FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

EACH INVESTOR MUST REPRESENT AND WARRANT THAT THE INVESTOR HAS READ THIS MEMORANDUM AND IS AWARE OF AND CAN AFFORD THE RISKS OF AN INVESTMENT IN THE FUND FOR AN INDEFINITE PERIOD OF TIME.   THIS INVESTMENT IS SUITABLE ONLY FOR INVESTORS WHO HAVE ADEQUATE MEANS OF PROVIDING FOR THEIR CURRENT AND FUTURE NEEDS AND CONTINGENCIES, AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.

**FOR PERMITTED U.S. PERSONS:**

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. THE SHAREHOLDERS MAY ONLY REDEEM THEIR SHARES AT CERTAIN LIMITED TIMES AND UPON CERTAIN REQUIRED ADVANCE NOTICE.

THE SHARES ARE BEING OFFERED IN THE UNITED STATES UNDER SECTION 4(2) OF THE 1933 ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER ONLY TO PERMITTED U.S. PERSONS WHO QUALIFY AS ACCREDITED INVESTORS UNDER THE 1933 ACT.   EACH PERMITTED U.S. PERSON WILL BE REQUIRED TO REPRESENT THAT THEY ARE AN ACCREDITED INVESTOR THAT SATISFIES ALL OTHER SUITABILITY CRITERIA SET FORTH IN THIS MEMORANDUM, ARE ACQUIRING THE SHARES FOR THEIR OWN ACCOUNT, AS PRINCIPAL, FOR INVESTMENT PURPOSES ONLY, AND NOT WITH ANY INTENTION TO RESELL, TRANSFER, DISTRIBUTE OR OTHERWISE DISPOSE OF OR FRACTIONALIZE THE SHARES, EITHER IN WHOLE OR IN PART, AND NO RESALE, TRANSFER OR OTHER DISPOSITION OF THE SHARES WILL BE PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE 1933 ACT, THE RULES AND REGULATIONS THEREUNDER, ANY APPLICABLE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND THE TERMS AND CONDITIONS OF THE ARTICLES.

#### Special Notice to U.S. Investors Subject to ERISA

THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, IMPOSES CERTAIN LIMITATIONS ON THE INVESTMENT BY CERTAIN PENSION AND OTHER EMPLOYEE BENEFIT PLANS IN INVESTMENTS SUCH AS THE FUND.  THEREFORE, ANY PENSION OR OTHER EMPLOYEE BENEFIT PLAN CONSIDERING AN INVESTMENT IN SHARES OF THE FUND SHOULD CONSULT ITS OWN COUNSEL AS TO THE LEGAL EFFECTS OF SUCH INVESTMENT.

A 0 0 5 9 2

**FOR BRITISH VIRGIN ISLANDS RESIDENTS:**

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE BRITISH VIRGIN ISLANDS TO SUBSCRIBE FOR SHARES.

**FOR UNITED KINGDOM INVESTORS:**

THE FUND IS A COLLECTIVE INVESTMENT SCHEME WHICH WILL NOT BE AUTHORIZED OR OTHERWISE APPROVED FOR PROMOTION IN THE UNITED KINGDOM AND IS NOT REGULATED BY THE FINANCIAL SERVICES AUTHORITY OF THE UNITED KINGDOM. NOR HAS THIS OFFERING MEMORANDUM BEEN ISSUED OR APPROVED BY ANY PERSON AUTHORIZED UNDER THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSM ACT"). CONSEQUENTLY, INVESTORS WILL NOT HAVE THE BENEFIT OF THE INVESTORS' COMPENSATION SCHEME AND OTHER PROTECTIONS AFFORDED BY THE FSM ACT OR THE RULES AND REGULATIONS MADE THEREUNDER AND THE FUND MAY ONLY BE PROMOTED IN THE UNITED KINGDOM: (A) BY PERSONS NOT AUTHORIZED UNDER THE ACT TO CERTAIN CATEGORIES OF PERSONS SPECIFIED IN THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2001; AND (B) BY PERSONS WHO ARE NOT AUTHORIZED UNDER THE FSM ACT TO PERSONS WHO ARE OF A KIND DESCRIBED IN THE FINANCIAL SERVICES AND MARKETS ACT 2000 (PROMOTION OF COLLECTIVE INVESTMENT SCHEMES) (EXEMPTIONS) ORDER 2001 OR WHO ARE PERSONS TO WHOM THIS DOCUMENT MAY OTHERWISE LAWFULLY BE DISTRIBUTED OR TO WHOM THE FUND MAY OTHERWISE LAWFULLY BE PROMOTED.

# EXHIBIT 6



# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP.291)

### CERTIFICATE OF INCORPORATION    (SECTIONS 14 AND 15)

No. 161934

The Registrar of Companies of the British Virgin Islands HEREBY CERTIFIES

pursuant to the International Business Companies Act, Cap. 291 that all

the requirements of the Act in respect of incorporation having been satisfied,

**LANCER OFFSHORE, INC.**

is incorporated in the British Virgin Islands as an International Business

Company this 27th day of September, 1995.

Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



for REGISTRAR OF COMPANIES



2I001



No: *161934*

# BRITISH VIRGIN ISLANDS
## The International Business Companies Ordinance, 1984

MEMORANDUM OF ASSOCIATION
ARTICLES OF ASSOCIATION

of

LANCER OFFSHORE, INC.

CERTIFIED A TRUE COPY

REGISTRAR BRITISH VIRGIN ISLANDS
Date: *May 7 2003*

An International Business Company

Incorporated the    27th    day of  September,   19 95

**CITCO B.V.I. LIMITED**
CITCO Building, Wickhams Cay
Road Town
Tortola
British Virgin Islands



**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE, 1984**
**(As amended)**

**MEMORANDUM OF ASSOCIATION**

**of**

**LANCER OFFSHORE, INC.**

1.   NAME

The name of the Company is LANCER OFFSHORE, INC.

2.   REGISTERED OFFICE

The Registered Office of the Company will be CITCO Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

3.   REGISTERED AGENT

The Registered Agent of the Company will be CITCO B.V.I. Limited of CITCO Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

4.   GENERAL OBJECTS AND POWERS

(1)   The object of the company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

(2)   The Company may not

(a)   carry on business with persons resident in the British Virgin Islands;

(b)   own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subclause (3);

(c)   carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990;

(d)   carry on business as an insurance or reinsurance company,

- 2 -

        insurance agent or insurance broker, unless it is licensed under an enactment authorizing it to carry on that business;

    (e)    carry on the business of the company management unless it is licensed under the Company Management Act, 1990;

    (f)    carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

(3)    For purposes of paragraph (a) of subclause (2), the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if

    (a)    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

    (b)    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

    (c)    it prepares or maintains books and records within the British Virgin Islands;

    (d)    it holds, within the British Virgin Islands, meetings of its Directors or members;

    (e)    it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

    (f)    it holds shares, debt obligations or other securities in a company incorporated under The International Business Companies Ordinance or under The Companies Act; or

    (g)    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under The International Business Companies Ordinance or under the Companies Act.

(4)    The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the

- 3 -

Company.

5.    CURRENCY

Shares in the Company shall be issued in the currency of the United States of America.

6.    AUTHORISED CAPITAL

The authorised capital of the Company is US$10,000,000.00.

7.    CLASSES, NUMBER AND PAR VALUE OF SHARES

The authorised capital is made up of one class of shares divided into 10,000,000 shares of US$1.00 par value with one vote for each share.

8.    DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES

The designations, powers, preferences, rights, qualifications, limitations and restrictions of each share that the Company is authorised to issue shall be fixed by resolution of Directors, but the Directors shall not allocate different rights as to voting, dividends, redemption or distributions on liquidation unless the Memorandum of Association shall have been amended to create separate classes of shares and all the aforesaid rights as to voting, dividends, redemption and distributions shall be identical in each separate class.

9.    VARIATION OF CLASS RIGHTS

If at any time the authorised capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class or series and of the holders of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

10.    RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU

Rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

11.    SHARE ISSUANCE

Shares in the Company will be issued as registered shares.

LST/dmp/248768/15.9.95

- 4 -

12. TRANSFER OF REGISTERED SHARES

Registered shares in the Company may be transferred subject to the prior approval of the Directors of the Company as evidenced by a resolution of Directors.

13. AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

The Company may amend its Memorandum of Association and Articles of Association by a resolution of the members if the proposed amendments would materially affect the rights of member, if not then any proposed amendments may be approved by a resolution of the Directors.

14. DEFINITIONS

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.

We, Citco B.V.I. Limited, of Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 27th day of September , 1995 in the presence of:

Witness                          Subscriber

...........................      ...........................
Road Town, Tortola               Authorized Signatory
                                 Citco B.V.I. Limited



LST/dmp/248768/15.9.95

## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE (THE ACT)
### (NO. 8 of 1984)

# ARTICLES OF ASSOCIATION

# OF

# LANCER OFFSHORE, INC.

## INDEX

| | |
|---|---|
| Interpretation | 1-4 |
| Business | 4-5 |
| Capital | 5-6 |
| Issue of Shares | 6-8 |
| Redemption of Shares | 8-11 |
| Determination of Net Asset Value | 12-16 |
| Investment and Borrowing Powers | 16 |
| The Manager | 16 |
| Custodian | 16-17 |
| Share Certificates | 17 |
| Register of Members | 17-18 |
| Transfer of Shares | 18 |
| Transmission of Shares | 18-19 |
| Reduction or Increase in Authorised Capital or Capital | 19-20 |
| Meetings and Consents of Members | 20-23 |
| Directors | 23-24 |
| Powers of Directors | 24 |
| Proceedings of Directors | 24-26 |
| Officers | 26 |
| Conflict of Interests | 26-27 |
| Indemnification | 27 |
| The Seal | 27 |
| Dividends | 27-28 |
| Accounts | 29 |
| Audit | 30 |
| Notices | 30-31 |
| Arbitration | 31 |
| Voluntary Winding Up and Dissolution | 31-32 |
| Continuance | 32 |
| The Schedule | |

LST/248826

- 1 -

Form "A":  Transfer of Shares
Form "B":  Transfer by Personal Representatives
Form "C":  Proxy Limited to One Meeting

# ARTICLES OF ASSOCIATION

## OF

## LANCER OFFSHORE, INC.

### INTERPRETATION

1.        In these Articles unless there is something in the subject or context inconsistent therewith:-

"Act" means The International Business Companies Ordinance, 1984 of the British Virgin Islands as amended from time to time;

"Administrator" means the person or entity for the time being appointed by the Board of Directors to provide administrative services to the Company;

"Articles" means these Articles of Association as herein contained or as the same may from time to time be altered or amended;

"Auditor" means the person or firm for the time being appointed as independent Auditor of the Company;

"business day" means any day on which securities are traded on the New York Stock Exchange;

"Company" means **Lancer Offshore, Inc.**;

"connected person" of any manager or any investment adviser appointed by the Company means:

(a)    any person beneficially owning, directly or indirectly, 20% or more of the ordinary share capital of that company or able to exercise, directly or indirectly, 20% or more of the total votes in that company;

(b)    any person controlled by a person who meets one or both of the requirements set out in (a) above;

LST/248826

- 2 -

(c)   any company 20% or more of whose ordinary share capital is beneficially owned, directly or indirectly, but any such manager and any such investment adviser taken together; and any company 20% or more of the total votes in which can be exercised, directly or indirectly, by any such manager and any such investment adviser taken together; and

(d)   any director or officer of any such manger or any such investment adviser or of any connected person of that company, as defined in (a), (b) or (c) above.

"Custodian" means the person or persons for the time being appointed as custodian or joint custodians pursuant to the Articles;

"Director" means Directors of the Company;

"duties and charges" includes all stamp and other duties, taxes, Governmental charges, brokerage, bank charges, transfer fees and registration fees;

"Fiscal Year" means the fiscal year of the Company from July 1 to June 30 of each calendar year;

"Investment" means any right or interest in any share, stock, bond, debenture, debenture stock, unit, sub-unit, trade claims or other security or any loan of money or any currency or interest in any currency and includes any financial stock market index, interest rate or currency futures or similar financial or other instruments and any rights in or options over any of the aforesaid, issued by or under the guarantee of anybody, whether incorporated or unincorporated, or of any governmental body and whether paying interest or dividends or not and whether fully paid, partly paid or nil paid and includes any participation as a limited partner or participant in any partnership or unincorporated association;

"in writing" and "written" includes printing, lithography, photography, and other modes of representing or reproducing words in visible form;

"Loss Carryover" means at anytime, the largest aggregate unrecouped loss attributable to an outstanding Share;

"Member" has the same meaning as member given in the Act and means the person or body corporate registered in the Register as the holder of shares in the Company, and, when two or more persons are so registered as joint holders of shares, means the person whose name stands first in the Register as one of such joint holders;

"Memorandum" means the Memorandum of Association of the Company;

"month" means calendar month;

LST/248826

"Net Asset Value" means the gross assets less the gross liabilities of the Company, as determined in accordance with Article 10;

"notice" means written notice unless otherwise specifically stated;

"Offering Date" means the first business day of each fiscal quarter and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally;

"Office" means the Registered Office of the Company for the time being;

"Paid up" means paid up and/or credited as paid up;

"Principal Market" with reference to any Investment, means such securities market which in the opinion of the Directors is the sole or securities market upon which such Investment is listed, quoted or traded or in respect of which permission to deal is effective and the expression "market" shall include any over-the-counter market or recognised exchange;

"Record Date" in respect of any dividend means the date as of which the persons entitled to participate therein fall to be determined;

"Redemption Date" means the last business day of every each fiscal quarter or such other day or days in addition thereto or in substitution therefor as may be determined by the Directors from time to time, either in any particular case or generally;

"Redemption Price" means the price at which Shares may be redeemed, determined in accordance with these Articles;

"Register" means the Register of Members maintained by the Company in British Virgin Islands;

"Seal" means the Common Seal of the Company;

"Secretary" means (subject to the provisions of the Act) the person for the time being appointed to perform the duties of the Secretary of the Company and includes an Assistant, Acting or Deputy Secretary;

"Share" means a share of any class in the capital of the Company of a par value of US$1.00 having the rights and being subject to the restrictions specified in the bye-laws with respect to such shares and shall, where the context so permits, include a fraction of a Share and "Shares" shall be construed accordingly;

"Subscription Price" means the price at which Shares may be subscribed, determined in accordance with the Articles;

"United Kingdom" means Great Britain and Northern Ireland;

"United States" or "U.S." means the United States of America;

"Unrecouped Loss" as to a Share, means a loss chargeable to such Share during any Fiscal Year or Years which is not recouped in any succeeding Fiscal Year by profit allocable to such Share;

"US Dollars" and "US$" mean dollars in the currency of the United States of America.

"U.S. Person" means:

    (a)    with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service, or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least 31 days during such year, and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 113 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days; and

    (b)    with respect to persons other than individuals, the term "U.S. Person" includes (i) a corporation or partnership created or organized in the United States or under the laws of the United States or any state or (ii) a trust or estate which is subject to U.S. tax on its worldwide income from all sources; and (iii) any corporation which is not a U.S. Person in which U.S. Persons hold 10% or more of either voting power or value; (iv) any partnership which is not a U.S. Person in which a U.S. Person is a partner; or (v) a trust which is not a U.S. person whose grantor or any of its beneficiaries is a U.S. Person.

"Valuation Day" means the business day immediately preceding an Offering Date and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally but so that there shall be at least one Valuation Day in each month.

The word "may" shall be construed as permissive and the word "shall" shall be construed as imperative.

Words importing the singular number only include the plural number and vice versa.

Words importing the masculine gender only include the feminine gender.

Words importing persons include companies or associations or bodies of persons, whether corporate or unincorporated.

Reference herein to any Act are to an Act of the British Virgin Islands legislature.

Save as aforesaid any words or expressions defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## BUSINESS

2.      (1)  The meetings of the Members and of the Directors and of any committee appointed by the Directors shall be held in British Virgin Islands or such other place as the Directors may from time to time determine.

(2)  Notwithstanding the provisions of Article 2, no meeting of the Members or of the Directors or of any committee of or established by the Directors of the Company shall at any time be held or take place in the United Kingdom or the United States.  Any meeting so held or so taking place and all business purporting to be transacted thereat shall be null and void. If the provisions of this Article shall be inconsistent with the provisions of any other of these Articles, the provisions of this Article shall prevail.

3.      Any branch or kind of business which the Company is either expressly or by implication authorised to undertake may be undertaken by the Directors at such time or times as they may think fit, and further may be suffered by them to be in abeyance, whether such branch or kind of business may have been actually commenced or not, so long as the Directors may deem it expedient not to commence or proceed with the same.

## CAPITAL

4.      (1)  The capital of the Company shall be divided into such number of Shares as the Directors may from time to time determine.  Every Share carries the right to one vote per Share.

(2)  Subject to the provisions of these Articles, the unissued Shares of the Company shall be available for issue as Shares of any class and shall be at the disposal of the Directors who may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as they may determine.

(3)  Notwithstanding anything herein contained, fully paid shares of the Company shall be free and clear of all and any liens and charges in favour of the Company.

5.      Without prejudice to any special rights for the time being conferred on the holders of any shares or class of shares (which special rights shall not be varied or abrogated except with such consent or sanction as is provided by the next following Article) any share in the

LST/248826

- 6 -

Company may be issued with such preferred, deferred or other special rights, or such restrictions, whether in regard to dividend, return of capital, redemption, voting or otherwise as the Company may from time to time in general meeting determine.

6.　　　　Whenever the capital of the Company is divided into different classes of shares all or any of the special rights for the time being attached to any class of share for the time being issued may (unless otherwise provided by the terms of issue of the shares of that class) be altered or abrogated, either whilst the Company is a going concern or during or in contemplation of a winding up, with the consent in writing of the holders of not less than three-fourths of the issued shares of the class, or with the sanction of a resolution passed at a separate meeting of the holders of the shares of the class by a majority of three-fourths of such holders voting in person or by proxy, but not otherwise.  To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, mutatis mutandis, apply, except that the necessary quorum shall be two persons at least holding or representing by proxy not less than one-third in nominal amount of the issued shares of the class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those holders of shares of that class who are present shall be a quorum), and that the holders of shares of the class shall, on a poll, have one vote in respect of every share of the class held by them respectively and that any holder of shares of that class present in person or by proxy may demand a poll.  For such purposes the Directors may treat all the classes of shares as forming one class if they consider that all such classes would be affected in the same way by the proposals under consideration but in any other case shall treat them as separate classes.

7.　　　　The special rights conferred upon the holders of any shares or class of shares issued with preferred or other special rights shall not (unless otherwise expressly provided by the conditions of issue of such shares) be deemed to be varied by the creation, allotment or issue of further shares ranking pari passu therewith or subsequent thereto.

## ISSUE OF SHARES

8.　　　　(1) Subject as hereinafter provided, the Company may on receipt by it or its authorised agent of an application in such form as the Directors may from time to time determine issue and allot Shares.  Issues of Shares shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article.  The Directors may satisfy any such application for Shares by procuring the transfer to the applicant of fully paid Shares at the appropriate Subscription Price.

PROVIDED THAT:

(a)　　　all Shares shall be allotted on an Offering Date provided the application has been received by the Company or its agent, at least 7 days preceding the relevant Offering Date;

(b)　　　no Share shall be allotted or issued (except those for which applications have been previously received and accepted by the Company or its agent) during

LST/248826

any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 10;

(c)    no Share shall be allotted or issued at a price less than its par value;

(d)    if in lieu of issuing Shares the Company shall procure a transfer of Shares to the person making such application any duties and charges payable in connection with such transfer shall be discharged by or on account of the transferor out of the price payable for such Shares;

(e)    payment shall be made in US Dollars at such time and place and in such manner as the Directors may from time to time determine failing which any allotment of Shares for which payment is due may be cancelled by the Directors;

(f)    the Company shall not issue any of its Shares or securities (i) for services, or (ii) for property other than cash or securities (including securities of which the Company is the issuer) except that it may issue fully paid Shares as a distribution to its Members or in connection with a reorganisation;

(g)    Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; and

(h)    fractions of a Share, of not less than one-thousandth of a Share, may be issued.

(2)    In respect of an initial offer to the public the Directors shall, at their discretion, fix a Subscription Price which shall apply for the purposes of such initial offer. Thereafter the Subscription Price for each Share shall be determined as at the close of business in British Virgin Islands on the Valuation Day immediately preceding the Offering Date on which such issue is made in each case rounded down to the nearest whole US$0.01 as follows:

(1) For Shares purchased at the beginning of a Fiscal Year ("Year Beginning"), the Subscription Price shall be the Year Beginning Net Asset Value ("Beginning Value") plus a depreciation deposit ("Depreciation Deposit") equal to 20% of the Loss Carryover, if any, at Year Beginning.

(2) For Interim Purchases:

(a)    When the Net Asset Value per Share is less than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Subscription Price shall be the sum of the Net Asset Value per Share and the Depreciation Deposit. The Depreciation Deposit is 20% of the amount by which (i) and (ii) above exceed the Net Asset Value per Share at the date of purchase.    If at the end of any Fiscal Year (or at any time

- 8 -

during the Fiscal Year when the Shares of a Member are redeemed) the losses which gave rise to the Depreciation Deposit are recouped, then, to the extent that the losses which gave rise to all or a portion of the Depreciation Deposit are recouped, the Depreciation Deposit shall be paid to the investment manager as part of the incentive fee. Any portion of the Depreciation Deposit not paid to the investment manager will be paid to the Member upon redemption. Promptly after the end of each Fiscal Year in which a Depreciation Deposit is held, the interest (net of the income taxes payable thereon, if any) earned thereon shall be paid to the Member who made such Depreciation Deposit.

(b) When the Net Asset Value per Share is more than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Subscription Price shall be the sum of the Net Asset Value per Share and the "Equalization Factor" as defined hereinafter. "Equalization Factor" means an amount which the Shares outstanding since Year Beginning should be charged (i.e. 20% of the increase in Net Asset Value since Year Beginning in excess of the Loss Carryover at Year Beginning), and which the Shares subscribed for at the date of the Interim Purchase ("Interim Purchase Date") should not be charged. To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is not lost in the Fiscal Year, the Equalization Factor attributable to such increase shall become payable to the Member at the end of the Fiscal Year. To the extent that the increase in value of the Shares that causes the payment of the Equalization Factor is lost in the Fiscal Year the Shares are purchased but is recovered in the subsequent Fiscal Year, the Equalization Factor attributable to such recovery shall become payable to the Member at the end of the Fiscal Year in which the recovery occurs. Upon redemption by a Shareholder of his Shares, the same amount of the Equalization Factor will be paid to him as if the date of redemption were the last day of the Fiscal Year in which the Shares are redeemed. Any Equalization Factor, or portion thereof, which is due to a Member not redeeming his Shares will be used to purchase additional full Shares on behalf of such Member as of the first day of the next succeeding Fiscal Year.

(3) Share certificates (if specifically requested) in respect of Shares allotted as aforesaid shall not be issued or delivered unless and until the subscription moneys representing the full Subscription Price have been paid over to the Administrator.

(4) The Company shall not pay any brokerage or commission on any issue of Shares.

- 9 -

(5)     The Directors may decline to issue Shares to satisfy an application unless the amounts subscribed for the Shares (inclusive of any initial charge) equals or exceeds such sum as the Directors may from time to time determine.

## REDEMPTION OF SHARES

9.      (1)     Subject to the provisions of the Memorandum and the Act and to these Articles, subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member (the "Applicant") specifying the number of Shares to be redeemed, redeem all or any portion of the Shares registered in the Applicant's name at the Redemption Price determined in accordance with paragraph (3) of this Article or procure the purchase thereof at not less than such Redemption Price and at the same time and under the same conditions as apply to redemption under the provisions of these Articles PROVIDED THAT:

(a)     subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Redemption Date falling at least forty-five (45) days (or such other notice period as the Directors may in their discretion determine) after the receipt of such written request;

(b)     on any such redemption the Directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price and any other sums payable on redemption as is herein provided;

(c)     where a certificate has been issued in respect of the Shares to be redeemed or purchased, the Applicant shall lodge with the Company or its authorised agent such certificate and subject to the next proviso below no payment shall be made under this Article until such certificate shall have been received;

(d)     the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed upon compliance by the Applicant with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(e)     no redemption or purchase of part only of the holding of any Member may be made if as a result thereof such Member would hold less than the minimum number of Shares as specified from time to time by the Directors and as set out in these Articles;

(f)     on redemption or purchase of part only of the Shares registered in the Applicant's name the Applicant shall be entitled without payment to a balance certificate for the balance of such Shares held by him;

LST/248826

(g)        subject as is hereinafter in this Article provided, the Applicant shall not be entitled to withdraw a request duly made in accordance with this Article without the consent of the Directors;

(h)        no Shares shall be redeemed during any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 10 hereof, the right of the Applicant to have his Shares redeemed or purchased pursuant to this Article shall be similarly suspended and during the period of suspension he may withdraw his request for redemption and his certificate.  Any withdrawal of a request for redemption under the provisions of this Article shall be made in writing and shall only be effective if actually received by the Company or its duly authorised agent before termination of the said period of suspension.  If the request is not so withdrawn the redemption or purchase of the said Shares shall be made on the Redemption Date next following the end of the said suspension; and

(i)        no request for redemption under this paragraph (1) of this Article may be made by a Member until after one year from the date of such Member's initial subscription for Shares.

(2)        Subject as hereinafter provided, payment shall be made to the Applicant in US Dollars in respect of the redemption or purchase of Shares.  Payment for Shares redeemed or purchased hereunder shall be made to the Applicant by a cheque, draft or other means of payment posted (at the risk of the Applicant) or otherwise paid to the Applicant in the manner determined by the Directors from time to time.

PROVIDED THAT if an Applicant shall require payment in a currency other than US Dollars, the Directors may, subject to receipt of any necessary exchange control or other governmental consent and at the risk of the Applicant and on his paying any costs thereby involved, arrange for the conversion of the US Dollars to which the Applicant is entitled into such currency as the Applicant may require at such exchange rate as the Directors shall consider appropriate.

(3)        The Redemption Price for each Share shall be the (1) Net Asset Value per Share (as determined in accordance with Article 10) as at the relevant Redemption Date; and (2) all or a portion of the Depreciation Deposit (as defined in these Articles) to the extent that the same is not paid as an incentive fee to any investment manager; and (3) all or a portion of the Equalization Factor (as defined in these Articles) to the extent that the increase in value of the Shares that caused the payment of the Equalization Factor has not been lost or previously repaid to the Member so redeeming.

(4)        Upon the redemption or purchase of a Share being effected pursuant to this Article, the Members shall cease to be entitled to any rights in respect of that Share (excepting always the right to receive a dividend which has been declared in respect thereof prior to such redemption or repurchase being effected) and accordingly his name shall be removed from the Register with respect thereto.

LST/248826

(5)     The Directors shall have power to impose such restrictions, other than a restriction on transfer, as they may think necessary for the purpose of ensuring that no Shares in the Company are acquired or held by -

(a) any U.S. Person;

(b) any person in breach of the law or requirements of any country or governmental authority; or

(c) any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any other persons, connected or not, or any other circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

(6)     (i) If it shall come to the notice of the Directors that any Shares are owned directly or beneficially by any person in contravention of any such restrictions as are referred to in paragraph (5) of this Article, the Directors may give notice to such person requiring him to transfer such Shares to a person who would not thereby be in contravention of any such restrictions as aforesaid or may give a request in writing for the redemption of such Shares in accordance with paragraph (1) of this Article. If any person upon whom such a notice is served pursuant to this subparagraph does not within thirty days after such notice transfer such Shares as aforesaid or establish to the satisfaction of the Directors (whose judgment shall be final and binding) that such Shares are not held in contravention of any such restrictions he shall be deemed upon the expiration of thirty days to have given a request in writing for the redemption of all such Shares pursuant to paragraph (1) of this Article whereupon he shall be bound forthwith to deliver to the Company or its duly authorised agents the certificate or certificates (if issued) for such Shares.

(ii) A person who becomes aware that he is holding or owning Shares in contravention of any such restrictions as are referred to in paragraph (5) of this Article shall forthwith unless he has already received notice pursuant to subparagraph (6)(i) of this Article either transfer all such Shares to a person who would not thereby be in contravention of any such restrictions as aforesaid or give a request in writing for the redemption of all such Shares pursuant to paragraph (1) of this Article. Every such request shall be accompanied by the certificate or certificates (if issued) for the Shares to which it refers.

(iii) Payment of the redemption moneys payable under this paragraph (6) on redemption will (subject to any requisite exchange control or other governmental consents first having been obtained by the Company and subject to the provisions of paragraph (2) of this Article) be made in US Dollars and will be deposited by the Company with or to the order of the Administrator in the name of the Company for payment to any such person against surrender of the certificate or certificate

representing such Shares previously held by such person.  Upon the deposit of such redemption moneys as aforesaid such person shall have no further interest in such Shares or any of them or any claim against the Company in respect thereof except the right to receive the moneys so deposited (without interest) from the Company upon surrender of the said certificate or certificates (if issued).

(7)      The Directors reserve the right, upon not less than 10 days' prior written notice, to compulsorily redeem all of a Member's Shares at any time for any reason or no reason.  Under such circumstances, the Directors shall have the irrevocable power to act in the name of such Member to redeem his Shares.  In the event of any such compulsory redemption, the Redemption Price shall be (i) the Net Asset Value of the Company as at the close of business on such Redemption Date (which includes an accrual for the Incentive Fee) multiplied by (ii) a fraction the numerator of which is the number of Shares being redeemed and the denominator of which is the number of Shares outstanding as of such date.  Such Member shall have no Members' rights with respect to the Shares to be redeemed after the close of business on the date as of the relevant Redemption Date, except the right to receive the Redemption Price therefor.

## DETERMINATION OF NET ASSET VALUE

10.      (1)      The Net Asset Value per Share shall be determined by the Directors as at the close of business in the British Virgin Islands on each Valuation Day and Redemption Date (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the Net Asset Value of the Company by the number of Shares then in issue or deemed to be in issue, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.

(2)      The Net Asset Value of the Company shall be determined on an accrual basis in accordance with generally accepted accounting principles in the United States and shall comprise the aggregate of:-

(a)  Investments owned or contracted to be acquired by the Company;

(b)  cash on hand or on deposit including accrued interest;

(c)  cash payments outstanding on any Shares allotted;

LST/248826

- 13 -

(d)  bills and demand notes and amounts receivable including net amounts receivable in respect of investments contracted to be realised;

(e)  interest accrued on interest bearing investments except that accrued on securities which is included in the quoted price; and

(f)  other property and assets of any kind and nature including prepaid expenses and unamortised preliminary expenses as valued and defined from time to time by the Directors;

from which shall be deducted:-

(i)  Investments contracted to be sold;

(ii)  bills and accounts payable;

(iii) management and administrative expenses payable and/or accrued (the latter on a day-to-day basis);

(iv) the gross acquisition consideration of Investments or other property contracted to be purchased;

(v)  reserves authorised or approved by the Directors for duties and charges or taxes or contingencies (accrued where appropriate on a day-to-day basis);

(vi) the aggregate amount of all borrowings and interest, commitment fee, and other charges arising in connection therewith (accrued where appropriate on a day-to-day basis); and

(vii) other liabilities of the Company of whatsoever nature (which shall, where appropriate, be deemed to accrue from day-to-day) including outstanding payments on any Shares previously redeemed and, as from the Record Date in respect thereof, any dividends declared and not paid (contingent liabilities (if any) being valued in such manner as the Directors may determine from time to time or in any particular case).

For the purpose of calculating the number of Shares in issue or deemed to be in issue, Shares for which applications have been duly made shall be deemed to be not in issue on the relevant Valuation Day and Shares to be redeemed or purchased in accordance with Article 9 hereof shall be deemed to be in issue on the relevant Redemption Date.

(3)      For the purpose of calculating the value of the net assets:

(a)   no value shall be assigned to goodwill;

(b)   the value of any cash on hand or on deposit, bills, demand notes, accounts receivable, prepaid expenses, cash dividends and interest declared or accrued and not yet received shall be deemed to be the full amount thereof unless the Directors shall have determined that any such deposit, bill, demand note or account receivable is not worth the full amount thereof in which event the value thereof shall be deemed to be such value as the Directors shall deem to be the reasonable value thereof;

(c)   securities and instruments which are listed or quoted on a securities or other exchange market (including the National Association of Securities Dealers National Market System), other than securities and instruments which are in the form of put or call options, shall be valued at their last sales prices on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value reasonably assigned to such securities and instrument by the Directors;

(d)   securities and instruments which are in the form of put and call options and are listed or quoted on a securities or other exchange or market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Directors;

(e)   securities and instruments which are not listed or quoted on a securities or other market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value reasonably assigned to such securities and instruments by the Directors;

(f)   securities and instruments which are in the form of put and call options and are not listed or quoted on a securities, commodities or futures exchange or market shall be valued at their parity value, except when the have reasonably assigned some other value to such securities and instruments;

(g)   the value of any shares of stock held by the Company in an investment company which is, or which is similar to those companies which are registered as investment companies under the United States Investment Company Act of 1940,

as amended, shall be valued in accordance with the manner in which such shares are valued by such investment company; provided, however, that the Directors may make such adjustments in such valuation as the Company may from time to time consider appropriate;

(h) the value of any investment, security or instrument as aforesaid or other property for which not price quotations are available as above provided shall be determined in such manner as the Directors, in their sole discretion, reasonably determine and the basis of such valuation shall be set forth in writing; and

PROVIDED ALWAYS that:-

(i) if the Directors in their discretion consider that the prices ruling on a market other than the Principal Market provide in all the circumstances a fairer criterion of value in relation to any such investment, they may adopt such prices;

(ii)   the Directors may, at their absolute discretion, permit some other method of valuation to be used if they consider that such valuation better reflects the fair value; and

(iii) in either event as outlined in sub-paragraph (i) and (ii) above, the Directors shall set forth the basis of such valuation in writing;

(i)   preliminary expenses (including the expenses incurred in connection with the initial issue of shares) will be amortised over a period of five years or such shorter period as the Directors may determine from time to time and will be included as an asset at cost less amounts written off; and

(j)   any value (whether of a security or cash) otherwise than in US Dollars shall be converted into US Dollars at the rate (whether official or otherwise) which the Directors shall in their absolute discretion deem appropriate to the circumstances having regard inter alia to any premium or discount which they consider may be relevant and to costs of exchange.

(4)    The Directors may suspend the determination of the Net Asset Value per Share of any class for the whole or any part of a period:-

(a) during any period when any stock exchange or over-the-counter markets on which any of the investments of the Company are listed, quoted, traded or dealt in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted or suspended; or

(b) when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Company to dispose of Investments or as a result of which any such disposal would be materially prejudicial to shareholders; or

(c) when a breakdown occurs in any of the means normally employed in ascertaining the value of Investments or when for any other reason the value of any of the Investments or other assets cannot reasonably or fairly be ascertained; or

(d) during which the Company is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemptions of shares of the relevant class cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorised under this paragraph shall exist. Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Company and as shall be in effect at the time. To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive. Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall use their best endeavours to cause a notice to be placed in a leading daily newspaper stating that such declaration has been made. At the end of any period of suspension as aforementioned the Directors shall cause another notice to be placed in a leading daily newspaper stating that the period of suspension has ended.

## INVESTMENT AND BORROWING POWERS

11.      (1)      The Directors shall be entitled to apply any part of the assets of the Company in the acquisition of any Investments as they shall in their absolute discretion determine; and

(2)      The Directors shall further be entitled to enter in into such borrowing arrangement on behalf of the Company, whether with or without security, as they shall in their absolute discretion determine.

## THE MANAGER



12.    (1)    The Directors may appoint any person or persons as manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit and whether collaterally with or to the exclusion of their own powers.  The Directors shall procure that, if the manager is dismissed or resigns, another person or persons are appointed as soon as possible as manager in its place.  The Directors shall procure that in any agreement appointing any person as manager provisions shall be contained restricting the manager and any investment adviser appointed by the manager dealing with the Company as beneficial owner on the sale or purchase of investments to or from the Company except on a basis approved by the Directors from time to time or without the consent of the Directors otherwise dealing with the Company as principal.

(2)    The manager shall be entitled to receive for its services such fees, including a fee on the issue of Shares, as may from time to time be agreed between the manager and the Company.

## CUSTODIAN

13.    The Directors shall appoint a Custodian who or whose nominee shall hold the assets of the Company and in whose name or in the name of whose nominee the same shall be registered in the case of registered securities and who shall perform such other duties upon such terms as the Directors may from time to time (with the agreement of the Custodian) determine.  All moneys, bills and notes belonging to the Company shall be paid to or to the order of or deposited with or to the order of the Custodian to an account to be opened in the name of the Company.  In the event of the Custodian desiring to retire the Directors shall use their best endeavours to find a corporation having the said qualifications to act as Custodian and upon doing so the Directors shall appoint such corporation to be Custodian in place of the retiring Custodian.   The Directors shall not remove the Custodian unless and until a successor corporation shall have been appointed in accordance with this Article to act in the place thereof.  The powers of the Directors under this Article shall include a power to appoint joint custodians and/or sub-Custodians.

## SHARE CERTIFICATES

14.    No person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or recognise any equitable, contingent or future interest in any share or any fractional part of a share, or (except only as by these presents otherwise provided or as by law required) any other right in respect of any share or any fractional part of a share, except an absolute right to such share or fractional part in the registered holder.

15.    (1)    Unless a Member by notice in writing to the Company requests it to issue a certificate or certificates for his shares, the Company will maintain a bookstock account of the shares for which such Member is entered in the Register.

LST/248826

(2)      Subject to the foregoing, every person whose name is entered as a Member in the Register shall be entitled if such Member so requests in writing without payment to one certificate for all his shares, or upon payment of such reasonable out-of-pocket expenses as the Directors shall from time to time determine, to several certificates, each for one or more of his shares.  Where a Member transfers part only of his holding of shares he shall be entitled without payment to a balance certificate, if applicable, for the shares retained by him.  Every certificate shall be issued within two months after allotment or the lodgment with the Company of the transfer of the shares, unless the conditions of issue of such shares otherwise provide, and shall be under the Seal or a facsimile thereof or a securities seal of the Company adopted by the Directors for that purpose and shall specify the number and class and distinguishing numbers (if any) of the shares to which it relates, and the amount paid up thereon.  The Company shall not be bound to register more than four persons as the joint holders of any share or shares (except in the case of executors or trustees of a deceased Member) and in the case of a share held jointly by two or more persons, the Company shall not be bound to issue more than one certificate therefor, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all.  If a share certificate be defaced, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity as the Directors think fit.

## REGISTER OF MEMBERS

16.      The Secretary shall enter or procure the entry in the Register of the particulars required by the Act, and the Register shall be kept in such manner as to show at all times the Members of the Company for the time being and the shares respectively held by them.  The Register shall be open for inspection at the office of the Company in accordance with the provisions of the Act.

## TRANSFER OF SHARES

17.      (1)      Subject to any limitations in the Memorandum or these Articles, NO registered Shares in the Company may be transferred without the prior written consent of the Directors which may be given or withheld at the sole discretion of the Directors.  Any attempt by a Member to transfer all or any of his Shares in contravention of this Article may subject such a Member to compulsory redemption of all his Shares in accordance with these Articles.

(2)      Any transfer approved by the Directors shall be by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the Directors may accept such evidence of a transfer of shares as they consider appropriate.

(3)      No transfer of Shares may be made if as a result of such transfer either the transferor or the transferee of such Shares would hold less than the minimum number of Shares as the Directors may from time to time specify.

LST/248826

18.     The Company shall not be required to treat a transferee of a registered share in the Company as a Member until the transferee's name has been entered in the share register.

19.     Subject to any limitations in the Memorandum or these Articles, the Company must on the application of the transferor or transferee of a registered share in the Company enter in the share register the name and address of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of Directors determine provided always that such registration shall not be suspended and the share register closed for more than sixty days in any period of twelve months.

## TRANSMISSION OF SHARES

20.     The executor or administrator of a deceased Member, the guardian of an incompetent Member or the trustee of a bankrupt Member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a Member of the Company until they have proceeded as set forth in the next following two Articles.

21.     Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any Member may be registered as a Member upon such evidence being produced as may reasonably be required by the Directors. An application by any such person to be registered as a Member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt Member and the Directors shall treat it as such.

22.     Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any Member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

23.     What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

## REDUCTION OR INCREASE IN AUTHORISED CAPITAL OR CAPITAL

24.     The Company may by a resolution of Directors amend the Memorandum to increase or reduce its authorised capital and in connection therewith the Company may in respect of any unissued shares increase or reduce the number of such shares, increase or reduce the par value of any such shares or effect any combination of the foregoing.

25.     The Company may amend the Memorandum to

LST/248826



(a) divide the shares, including issued shares, of a class into a larger number of shares of the same class; or

(b) combine the shares, including issued shares, of a class into a small number of shares of the same class,

provided, however, that where shares are divided or combined under (a) or (b) of this Article, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares.

26.     The capital of the Company may by a resolution of Directors be increased by transferring an amount of the surplus of the Company to capital, and, subject to the provisions of Articles 27 and 28, the capital of the Company may, by resolution of Directors, be reduced by transferring an amount of the capital of the Company to surplus.

27.     No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

28.     No reduction of capital shall be effected unless the Directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realizable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the Directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

29.     Where the Company reduces its capital the Company may:-

(a) return to its Members any amount received by the Company upon the issue of any of its shares;

(b) purchase, redeem or otherwise acquire its shares out of capital, or

(c) cancel any capital that is lost or not represented by assets having a realizable value.

## MEETINGS AND CONSENTS OF MEMBERS

30.     Subject to Article 2, the Directors of the Company may convene meetings of the Members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the Directors consider necessary or desirable.

31.        Upon the written request of Members holding fifty percent or more of the outstanding voting shares in the Company the Directors shall convene a meeting of Members.

32.        The Directors shall give not less than three days notice of meetings of Members to those persons whose names on the date the notice is given appear as Members in the share register of the Company.

33.        A meeting of Members held in contravention of the requirement in Article 32 is valid:-

        (a)  if Members holding not less than ninety percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or ninety percent of the votes of each class of shares where Members are entitled to vote thereon as a class together with not less than a ninety percent majority of the remaining votes, have agreed to shorter notice of the meeting or

        (b)  if all Members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

34.        The inadvertent failure of the Directors to give notice of a meeting to a Member, or the fact that a Member has not received notice, does not invalidate the meeting.

35.        A Member may be represented at a meeting of Members by a proxy (who need not be a Member) who may speak and vote on behalf of the Member.

36.        The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting as which the person named in such instrument proposes to vote.

37.        An instrument appoint a proxy shall be in substantially in the form of Exhibit C or such other form as the chairman of the meeting shall accept as properly evidencing the wishes of the Member appointing the proxy.

38.        The following shall apply in respect of joint ownership of shares:

        (a)  if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a Member;

        (b)  if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and

        (c)  if two or more of the joint owners are present in person or by proxy they shall vote as one.

LST/248826

39.     A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means and all Members participating in the meeting are able to hear each other.

40.     A meeting of Members is duly constituted if, at the commencement of the meeting, there are present two persons representing in person or by proxy one third (1/3) of the outstanding Shares which shall be a quorum for all purposes.

41.     If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the Directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

42.     (1)   Subject to paragraph (2) below, any act or thing which in accordance with these Articles is required to be transacted, made, done, approved, determined, decided or passed by the Company in general meeting shall not be effective except by virtue of a resolution passed by a simple majority of the persons voting thereat upon a show of hands, or, if a poll is duly demanded, by a simple majority of the votes given at such poll.

        (2)   Notwithstanding the foregoing, the (i) dismissal of a Director must be adopted by an affirmative vote of two-thirds of the votes cast at a general meeting of Members at which more than one-half of the total number of Shares then issued and outstanding are represented; (ii) any investment advisory or management contract entered into by the Company may not be terminated by the Company unless such termination is approved by a unanimous vote cast at a meeting at which all the issued and outstanding Shares are represented; (iii) amendments to the Memorandum of Association and the Articles of Association which have a material, adverse effect on the rights of Members must be approved by three-quarters of the votes cast at a meeting at which not less than one-half of the issued and outstanding Shares are represented, except that any amendment to decrease the vote required to terminate an investment advisory or investment management contract requires approval by a unanimous vote cast at a meeting at which all of the issued and outstanding Shares are represented; and (iv) the merger or consolidation of the Company with another corporation or the dissolution of the Company requires the affirmative vote of the holders of three-quarters of the Shares outstanding.

        (3)   In the case of an equality of votes at a general meeting, whether on a show of hands or on a poll, the chairman of such meeting shall be entitled to a second or casting vote.

43.     At every meeting of Members, the President or Vice President of the Board of Directors shall preside as chairman of the meeting. If there is no President or Vice President of the board of Directors or if the President or Vice President of the board of Directors is

LST/248826

present at the meeting, the Members present shall choose some one of their number to be the chairman. If the Members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual Member or representative of a Member present shall take the chair.

44.      The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

45.      At any meeting of the Members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof. If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any Member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

46.      Any person other than an individual shall be regarded as one Member and subject to these Articles the right of any individual to speak for or represent such Member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the Directors may rely and act upon such advice without incurring any liability to any Member.

47.      Any person other than an individual which is a Member of the Company may by resolution in writing (certified or signed by a duly authorized person) of its Directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members of the Company, and the person so authorised shall be entitled to exercise the same powers of behalf of the person which he represents as that person could exercise if it were an individual Member of the Company.

48.      The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

49.      Directors of the Company may attend and speak at any meeting of Members of the Company and at any separate meeting of the holders of any class of shares in the Company

LST/248826

## DIRECTORS

50.        The first Directors of the Company shall be elected by the subscriber to the Memorandum; and thereafter, the Directors shall be elected by the Members for such term as the Members determine.

51.        The minimum number of Directors shall be two and the maximum number shall be seven.

52.        Each Director shall hold office for the term, if any, fixed by resolution of Members or until his earlier death, resignation or removal.

53.        A Director may be removed from office, with or without cause, by a resolution of Members.

54.        A Director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

55.        A vacancy in the board of Directors may be filled by a resolution of the remaining Directors.

56.        With the prior or subsequent approval by a resolution of Shareholders, the Directors may, by a resolution of Directors, fix the emoluments of Directors with respect to services to be rendered in any capacity to the Company.

57.        A Director shall not require a share qualification, and may be an individual or a company.

## POWERS OF DIRECTORS

58.        The business and affairs of the Company shall be managed by the Directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the Members of the Company, subject to any delegation of such powers as may be authorised by these Articles and to such requirements as may be prescribed by a resolution of Members; but no requirement made by a resolution of Members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the Directors which would have been valid if such requirement had not been made.

59.        The Directors may, by a resolution of Directors, appoint any person, including a person who is a Director, to be an officer or agent of the Company.

LST/248826

- 23 -

60.       Every officer or agent of the Company has such powers and authority of the Directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of Directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to fixing the emoluments of Directors.

61.       Any Director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the board of Directors or with respect to unanimous written consents.

62.       The continuing Directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of the Directors, the continuing Directors or Director may act only for the purpose of appointing Directors to fill any vacancy that has arisen or summoning a meeting of Members.

63.       All cheques, promissory notes, draft, bills or exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of Directors.

## PROCEEDINGS OF DIRECTORS

64.       Subject to Article 2, the Directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the Directors may determine to be necessary or desirable. Notwithstanding the foregoing a resolution in writing signed by all the Directors which may be in counterparts, shall be as valid as if it had been passed at a meeting of the Directors duly called and constituted, such resolution to be effective on the date on which the last Director signs the resolution.

65.       A Director shall be deemed to be present at a meeting of Directors if he participates by telephone or other electronic means and all Directors participating in the meeting are able to hear each other.

66.       A Director shall be given not less than three days notice of meetings of Directors, but a meeting of Directors held without seven days notice having been given to all Directors shall be valid if all the Directors entitled to vote at the meeting who do not attend, waive notice of the meeting. The inadvertent failure to give notice of a meeting to a Director, or the fact that a Director has not received the notice, does not invalidate the meeting.

67.       A Director may by a written instrument appoint an alternate who need not be a Director and an alternate is entitled to attend meetings in the absence of the Director who appointed him and to vote or consent in place of the Director.

68.       The Directors may determine by resolution the quorum necessary for the transaction of business and unless otherwise determined, two Directors shall be a quorum.

LST/248826

69.      At every meeting of the Directors the chairman of the board of Directors shall preside as chairman of the meeting. If there is no chairman of the board of Directors or if the chairman of the board of Directors is not present at the meeting the vice chairman of the board of Directors shall preside. If there is no vice chairman of the board of Directors or if the vice chairman of the board of Directors is not present at the meeting the Directors present shall choose some one of their number to be chairman of the meeting.

70.      The Directors shall cause the following corporate records to be kept:

      (a) minutes of all meetings of Directors, Members, committees of Directors, committees of officers and committees of Members;

      (b) copies of all resolutions consented to by Directors, Members, committees of Directors, committees of offices and committees of Members;

      (c) such accounts and records as the Directors by resolution of Directors consider necessary or desirable in order to reflect the financial position of the Company; and

      (d) a share register in which there shall be recorded the name and address of each Member, the number of shares held by each Member and the par value thereof, the date upon which the holder became a Member and the date upon which the holder ceased to be a Member and otherwise as required by the Act.

71.      The books, records, minutes and share register shall be kept at the registered office of the Company or at such other place as the Directors determine.

72.      The Directors may, by a resolution of Directors, designate one or more committees, each consisting of one or more Directors.

73.      Each committee of Directors has such powers and authorities of the Directors, including the power and authority to affix the Seal, as are set forth in the resolution of Directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles or with respect to the matters requiring a resolution of Directors under these Articles.

74.      The meetings and proceedings of each committee of Directors consisting of two or more Directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of Directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

## OFFICERS

75.      The Company may by resolution of Directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers m...

LST/248826

- 27 -

president and one or more vice presidents, secretaries and treasurers and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

76.     The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of Directors or resolution of Members, but in the absence of any specific allocation of duties it shall be the responsibility of the chairman of the board of Directors to preside at meetings of Directors and Members, the vice chairman to act in the absence of the chairman, the president to manage the day to day affairs of the Company, the vice presidents to act in order of seniority in the absence of the president but otherwise to perform such duties as may be delegated to them by the president, the secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law and the treasurer to be responsible for the financial affairs of the Company.

77.     The emoluments of all officers shall be fixed by resolution of Directors.

78.     The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the Directors may be removed at any time, with or without cause, by resolution of Directors. Any vacancy occurring in any office of the Company may be filled by resolution of Directors.

## CONFLICT OF INTERESTS

79.     No agreement or transaction between the Company and one or more of its Directors or any person in which any Director has a financial interest or to whom any Director is related, including as a Director of that other person, is void or voidable for this reason only or by reason only that the Director is present at the meeting of Directors or at the meeting of the committee of Directors that approves the agreement or transaction or that the vote or consent of the Director is counted for that purpose if the material facts of the interest of each Director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other Directors.

80.     A Director who has an interest in any particular business to be considered at a meeting of Directors or Members may be counted for purposes of determining whether the meeting is duly constituted.

## INDEMNIFICATION

81.     Subject to the provisions of the Act, every Director, Secretary, and other Officer or servant of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay, all costs, losses, and expenses which any such Officer or servant may incur or become liable for by reason of the contract entered into, or act or thing done by him as such Officer, Director, Secretary or servant or in any way

LST/248826

- 28 -

in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the Members over all other claims, unless the same happened through his own willful negligence, willful default, fraud or dishonesty.

82.      No Director, Secretary or other Officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other Director or Officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for say loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, unless the same happened through his own wilful neglect, wilful default, fraud or dishonesty.

## SEAL

83.      The Directors shall provide for the safe custody of the Seal.  An imprint thereof shall be kept at the registered office.  The Seal when affixed to any written instrument shall be witnessed by a Director or any other person so authorised from time to time by resolution of Directors.  The Directors may provide for a facsimile of the Seal and of the signature of any Director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## DIVIDENDS

84.      The Company may by a resolution of Directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus.  In the event that dividends are paid in specie the Directors shall have responsibility for establishing and recording in the resolution of Directors authorising the dividends, a fair and proper value for the assets to be so distributed.

85.      The Directors may from time to time pay to the Members such interim dividends as appear to the Directors to be justified by the profits of the Company.

86.      The Directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

87.      No dividend shall be declared and paid unless the Directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets

LST/248826

of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the Directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

88.  Notice of any dividend that may have been declared shall be given to each Member in the manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by resolution of Directors for the benefit of the Company.

89.  No dividend shall bear interest as against the Company.

90.  A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred from surplus to capital at the time of the distribution.

91.  In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

92.  In the case of a dividend of authorized but unissued shares with par value, the amount designated by the Directors shall be transferred from surplus to capital at the time of the distribution, except that the Directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

93.  A division of the issued and outstanding shares of a class of shares into a larger number of shares of the same class having a proportionately smaller par value does not constitute a dividend of shares.

## ACCOUNTS

94.  The Directors shall cause to be kept proper accounts with respect to:-

     (a)  all sums of money received and expended by the Company and the matters in respect of which such receipt and expenditure take place;

     (b)  all sales and purchases of assets by the Company; and

     (c)  the assets and liabilities of the Company.

95.  The books of account shall be kept at the office of the Company, or (subject to the provisions of the Act) at such other place as the Directors think fit and shall always be open to inspection by the Directors.

LST/248826

96.      No Member (other than a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by the Act or authorised by the Directors or by the Company in General Meeting.

97.      At the annual General Meeting in each year the Directors shall lay before the Members a Profit and Loss Statement of the Company made up to a date not earlier than the date of the meeting by more than six months.

98.      The Directors shall cause to be made out in every Fiscal Year and to be laid before the Company in General Meeting a Balance Sheet of the Company as at the date to which the Profit and Loss Statement referred to in the preceding Article is made up to.

99.      Every Balance Sheet laid before the Company in General Meeting shall be signed on behalf of the Board by two of the Directors.  The Directors' and Auditor's Reports shall be attached to such Balance Sheets and such Reports shall be read to the meeting and shall be open to inspection by any Member.

100.      Printed Copies of the Directors' and auditor's Reports accompanied by printed copies of the Balance Sheets including every document required by law to be annexed thereto and Profit and Loss Statements shall, not less than seven days prior to the annual General Meeting, be delivered or sent by post to the registered address of every Member and to the Auditor, and the required number of copies of each of these documents shall at the same time be forwarded to any stock exchange on which all or any of the Shares of the Company are for the time being listed.

101.      Every account of the Directors when audited and approved by an annual General Meeting shall be conclusive except as regards any error discovered therein within three months next after the approval thereof.  Whenever such an error is discovered within that period, the accounts shall forthwith be corrected and thereupon shall be conclusive.

## AUDIT

102.      At any annual General Meeting or at a subsequent General Meeting in each year an independent representative of the Members (who shall not be a Member) shall be appointed by them as Auditor of the accounts of the Company and such Auditor shall hold office until the Members shall appoint another Auditor.

103.      The remuneration of the Auditor shall be determined by the Members or by the Directors if so authorised by the Members.

104.      If the Auditor's office becomes vacant by the resignation or death of the Auditor or by his becoming incapable of acting by reason of illness or otherwise at a time when his services are required, the Directors shall, as early as practicable, convene a General Meeting to appoint an Auditor to fill the vacancy or an Acting Auditor to act during the incapacity of the Auditor.

LST/248826

105. (1) The Auditor shall examine such books, accounts and vouchers as may be necessary for the performance of his duties.

(2) The Auditor shall make a report to the Members in a report to be laid before the Company at any annual General Meeting during his term of office, and shall state in his report whether in his opinion the financial statement presents fairly the financial position of the Company and the results of its operations for the period under review.

106. The Auditor shall be furnished with a list of all books kept by the Company and shall at all times have the right of access to the books and accounts and vouchers of the Company, and shall be entitled to require from the Directors and Officers of the Company such information and explanations as may be necessary for the performance of his duties.

107. The Auditor shall be entitled to attend any General Meeting of the Company at which any accounts which have been examined or reported on by him are to be laid before the Company and to make any statement or explanations he may desire with respect to the accounts, and notice of every such meeting shall be given to the Auditor in the manner prescribed for Members.

## NOTICES

108. Any notice, information or written statement to be given by the Company to Members must be served by mail addressed to each Member at the address shown in the share register.

109. Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

110. Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was mailed in such time as to admit to its being delivered in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## ARBITRATION

111. Whenever any difference arises between the Company on the one hand and any of the Members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to two Arbitrators

- 32 -

one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

112.      If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for ten days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

## VOLUNTARY WINDING UP AND DISSOLUTION

113.      (1)      The Company may voluntarily commence to wind up and dissolve by a resolution of Members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of Directors.

(2)      If the Company shall be wound up the Liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as he thinks fit.

(3)      The assets available for distribution among the Members shall then be applied first, in the payment to the holders shares of a sum equal to the par value of the shares provided that there are sufficient assets available to enable such payment to be made and second, in the payment of any balance then remaining, such payment being made in proportion to the number of Shares in the Company held.

(4)      If the Company shall be wound up (whether the liquidation is altogether voluntary or by or under the supervision of the Supreme Court) the Liquidator may, with the authority of a resolution passed in general meeting divide among the members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds, and may for such purposes set such value as he deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members. The Liquidator may with the like authority, vest any part of the assets in trustees upon such trust for the benefit of Members as the Liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

## CONTINUANCE

114.      The Company may by resolution of Members or by a resolution passed unanimously by all Directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

- 33 -

We, Citco B.V.I. Limited, of Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 27th day of September  , 1995 in the presence of:


Witness                                    Subscriber


.....................                      ......................
Road Town, Tortola                         Authorized Signatory
                                           Citco B.V.I. Limited


LST/248826



## THE SCHEDULE

### FORM "A"

### TRANSFER OF SHARES

I / W e

.......................................................................................................

.............[the

transferor] in consideration of......................[amount]

D O   H E R E B Y   T R A N S F E R

TO...............................,................................................[the

t   r   a   n   s   f   e   r   e   e   ]
of...........................[address].....................................................
.......

.......................................................[number and class of shares] in
the company,

Lander Offshore, Inc., represented by the attached/within certificate.

AS WITNESS my/our hand(s) the        day of            19

SIGNED by the above-named transferor(s)
in the presence of:

.............................................
(Signature of Transferor(s))

.............................................
(Witness)

.............................................

LST/248826



- 35 -

(Signature of Transferee(s))


……………………………………
(Witness)

LST/248826

- 36 -

## FORM "B"

### TRANSFER BY PERSONAL REPRESENTATIVES

I/We having become entitled in consequence of the death of (name of deceased shareholder) ……………………………… to (number) …………………… share(s) comprised in certificate(s) numbered ……………… standing in the Register of Members of Lancer Offshore, Inc. in the name of the said deceased shareholder, instead of being registered myself/ourselves in consideration of the sum of (state total consideration) ………………… paid to me/us by name(s) of transferee(s) ……………………………………………………………………………………………… ………………………………………… o f ( a d d r e s s ( e s ) ……………………………………………………………………………………………… …………… (hereinafter called "the transferee(s)") do hereby transfer to the transferee(s) (number and class of shares transferred) ………………… share(s) in the said Company subject to the several conditions on which the same were held immediately before the execution hereof; and I/We the transferee(s) do hereby agree to take the said share(s) hereby transferred subject to the conditions aforesaid.

AS WITNESS my/our hand(s) the          day of               19

SIGNED by the above-named person(s)
entitled in the presence of:


…………………………………………
(Signatures of person(s) entitled)



…………………………………………


SIGNED by the above-named Transferee(s)
in the presence of:



…………………………………………
(Signature(s) of Transferee(s))


LST/248826



...........................................

## FORM "C"

## PROXY LIMITED TO ONE MEETING

I / W e
.................................................................................................................
...............[name]

t  h  e  h  o  l  d  e  r  o  f
...............................................................................................[number]
shares

h e r e b y  a p p o i n t  . . . . . . . . . . . . . . . . . . . . . . [ p r o x y ]
of.........................................................................................

.................................................................................................................
...........................[address]
o r  f a i l i n g  w h o m . . . . . . . . . . . . . . . . . . . . . . [ p r o x y ]
of.........................................................................................

.................................................................................................................
...........................[address]

to be my/our proxy to vote on me/our behalf at the annual/special general meeting of the shareholders of the company to be held on the ........ day of ............ 19 .., and at any adjournment thereof.

This form is to be used in favour of the following resolution(s):

Unless otherwise instructed with respect to any particular resolution(s) the proxy will vote or abstain as he thinks fit.

AS WITNESS my/our hand(s) this        day of           19

SIGNED by

LST/248826



- 39 -

....................................
(Signature(s) of shareholder(s))


....................................
(Witness)

LST/248826

# EXHIBIT 7

A00748

**Lancer Offshore, Inc.**

**Financial statements**
**December 31, 2001 and 2000**

A00749

# Contents

| | | |
|---|---|---|
| **1** | **Board of Directors and Service Providers** | **3** |
| 1.1 | Board of Directors and Service Providers | 4 |
| **2** | **Report** | **5** |
| 2.1 | Report from the investment manager | 6 |
| 2.2 | Independent auditor's report | 0 |
| **3** | **Financial Statements** | **9** |
| 3.1 | Statements of assets and liabilities as of December 31, 2001 and 2000 (expressed in U.S. Dollars) | 10 |
| 3.2 | Statements of operations for the years ended December 31, 2001 and 2000 (expressed in U.S. Dollars) | 12 |
| 3.3 | Statements of changes in shareholders' equity for the years ended December 31, 2001 and 2000 (expressed in U.S. Dollars) | 13 |
| 3.4 | Statements of cash flows for the years ended December 31, 2001 and 2000 (expressed in U.S. Dollars) | 14 |
| 3.5 | Notes to the financial statements for the years ended December 31, 2001 and 2000 | 15 |

A00750

# 1   Board of Directors and Service Providers

A00751

## 1.1    Board of Directors and Service Providers

**Registered Office:**

Lancer Offshore, Inc.
c/o Citco B.V.I. Limited
Citco Building
Wickams Cay
Road Town, Tortola
British Virgin Islands

**Legal Counsel:**

Robinson Silverman Pearce
Aronsohn & Berman LLP.
1290 Avenue of the Americas
New York, NY 10104
U.S.A.

**Board of Directors:**

Anthony Stocks* (until July 17, 2001)
Kieran Conroy*
Declan Quilligan* (with effect from July 17, 2001)

**British Virgin Islands
Special Counsel:**

Conyers Dill & Pearman
Romasco Place
Wickham's Cay I
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

**Investment manager:**

Lancer Management Group, LLC.
350 Bedford Street
Stamford, CT 06901
U.S.A.

**Auditors:**

PricewaterhouseCoopers
Julianaplein 38
P.O. Box 360
Curaçao, Netherlands Antilles

**Administrator, Registrar and Transfer Agent:**

Citco Fund Services (Curaçao) N.V.
Kaya Flamboyan 9
P.O. Box 812
Curaçao, Netherlands Antilles

**Custodian:**

Banc of America Securities, LLC.
9 West 57th Street – 17th Floor
New York, NY 10019
U.S.A.

* Independent non – executive directors

*Lancer Offshore, Inc.*                                                                4

A 0 0 7 5 2

## 2   Report

A00753

## 2.1      Report from the investment manager

Dear Shareholder:

2001 represented the second consecutive money-losing year for the U.S. equity markets (a first since 1973/74), with all senior indexes losing ground. Pounded by the economic recession (which pundits tell us commenced in March), vanishing corporate profitability, a horrific terrorist assault (with likely enduring consequences) and further hampered by still lofty valuations among the index driving stocks, the S&P 500 posted another double-digit annual decline (13% and 10% for 2001 and 2000), while the NASDAQ Composite plunged 21%, adding to its 39% calamity in 2000.

The cumulative market losses since the start of 2000 (through year-end) have been appalling, with the NASDAQ Composite plunging nearly 52%, and the S&P 500 shedding nearly 22% of its value. Worth noting is the disintegration amongst the would be "high quality" growth large caps, so over-represented amid the mutual fund and the pension management community. Favored as "one decision" stocks to be held in perpetuity, in reality they represented a highly speculative momentum play, pursued principally by the performance benchmarking imperatives of large institutional investors. The indexes, representative of the secondary equity universe, did conspicuously less badly, as the Russell 2000 was essentially unchanged last year (up 1%). We have discussed the rationale for the divergence and the bifurcated nature of the markets on numerous occasions, but in a nutshell, it resides in the fact that with the exception of the top quartile of the S&P 500 universe (leaving the technology bubble aside), most of the stocks were not nearly as extended, thus less vulnerable to a market decline (see comments dated March 1999).

Conventional mutual funds' performance mirrored the damage in the global equity markets (the U.S. actually outperformed nearly all developed countries exchanges, as MSCI EAFE tumbled 22.6%), with the Lipper international mutual fund index dropping 20% in 2001, after losing 15% in 2000. According to the CSFB/Tremont Hedge fund index, the absolute return strategies held up last year, delivering a 4.4% net return, after a 4.85% advance in 2000. Alas, the long/short equity funds did less well, posting a 3.65% loss, according to the same source.

Lancer Offshore's own performance for the past year was decidedly sub par relative to our history, but given the damage sustained in the broader equity markets and the ongoing violent cross currents whipsawing the indexes, the preservation of capital continued to be our primary objective for 2001, as was the case in 2000. Lancer Offshore's final NAV for 2001 was 915.43, representing an approximately 10% year-over-year increase, while the S&P 500 posted a loss of 13%.

*Lancer Offshore, Inc.*                                                                                      6

A00754

On balance, we felt that 2001 was an educational year (with many humbling moments), but still highly supportive of our strategy (that was severely stress tested), which emphasizes bottom up stock picking, with a value focus, in catalyst/event driven ideas. A reasonable concentration of the portfolio is also a must if the Fund's performance is to decouple from the general indexes and deliver absolute profitability in less than accommodating markets.

As I begin my 23rd year in the investment community and tenth year of managing a hedge fund portfolio, I must concede that the past two years were particularly instructive and consequently should serve us well as we forge ahead.

The investment public's unbridled euphoria through early 2000, which subsequently turned into pervasive pessimism, has created large market segments of pricing inefficiencies and thus the profit prospects for opportunistic investors. The economic recession, vanishing profitability of corporate America, geopolitical uncertainty and more recently a bout with Enron-itis, have all cast a pall over the sentiment, and justifiably so. But it is precisely at times of collective glumness that bear market bottoms are established, and from which significant capital gains are spawned. Although significant risk in the indexes continue to exist, particularly among some of the bellwether stocks, the overall risk-reward profile for the "market of stocks" favors the upside.

Sincerely,




Michael Lauer, investment manager
June 2002

# PRICEWATERHOUSE COOPERS 

A00755

PricewaterhouseCoopers
P.O. Box 360
Julianaplein 38
Willemstad - Curaçao
Netherlands Antilles
Telephone +599 (9) 430 0000
Facsimile +599 (9) 461 1118

To the Directors and Shareholders of:
Lancer Offshore, Inc.

Reference number:
67.5406.0/220273

## 2.2    Independent auditor's report

We have audited the accompanying statement of assets and liabilities of Lancer Offshore, Inc. (the "Fund") as of December 31, 2001 and the related statement of operations, changes in shareholders' equity and cash flows for the year ended December 31, 2001. These financial statements are the responsibility of the Fund's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with international standards on auditing. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion the financial statements referred to above present fairly, in all material respects, the financial positions of Lancer Offshore, Inc. as of December 31, 2001 and the results of its operations, changes in shareholders' equity and cash flows for the year ended December 31, 2001, in conformity with international accounting standards.

Curaçao, May 29, 2002

*Pricewaterhouse Coopers*

PricewaterhouseCoopers

PricewaterhouseCoopers (Netherlands Antilles) is a Netherlands Antilles civil partnership formed by limited liability companies incorporated under Netherlands Antilles law. PricewaterhouseCoopers (Netherlands Antilles) is a member of PricewaterhouseCoopers International Limited, a company limited by guarantee registered in England and Wales.

A 0 0 7 5 6

# 3   Financial Statements

A00757

**3.1     Statements of assets and liabilities as of December 31, 2001 and 2000 (expressed in U.S. Dollars)**

|  | 2001 | | 2000 |
|---|---:|---:|---:|
|  | USD | USD | USD | USD |

| | 2001 USD | 2001 USD | 2000 USD | 2000 USD |
|---|---:|---:|---:|---:|
| **Assets** | | | | |
| Investment securities, at market value (cost at USD 244,915,425 and USD 289,329,944, respectively) | 827,020,243 | | 709,774,347 | |
| Due from brokers | 10,448,602 | | - | |
| Cash at banks | 9,034,168 | | 131,931 | |
| Receivable for securities sold | 7,032,928 | | 2,479,476 | |
| Interest and dividend receivable | 125,403 | | 1,993,958 | |
| Other receivables | 2,399 | | - | |
| **Total assets** | | 853,663,743 | | 714,379,712 |
| | | | | |
| **Liabilities** | | | | |
| Incentive fee payable | 13,548,193 | | 15,915,593 | |
| Deferred incentive fee payable | 48,264,309 | | 44,006,726 | |
| Due to brokers | - | | 13,422,244 | |
| Subscriptions received in advance | 6,763,048 | | 72,758 | |
| Payable for securities purchased | 5,846,037 | | 7,232,328 | |
| Equalization payable | 2,344,670 | | 3,351,864 | |
| Management fee payable | 1,607,928 | | 1,524,406 | |
| Consulting services payable | 1,279,082 | | 1,005,000 | |
| Other payables and accrued expenses | 207,451 | | 156,768 | |
| **Total liabilities** | | 79,860,718 | | 86,687,687 |
| Net assets, applicable to 845,286.21 shares issued and outstanding at December 31, 2001 (2000: 747,056.77 shares issued and outstanding) | | 773,803,025 | | 627,692,025 |

The accompanying notes are an integral part of these financial statements.

*Lancer Offshore, Inc.*                                                                                    10

A00758

### 3.1 Statements of assets and liabilities as of December 31, 2001 and 2000 (expressed in U.S. Dollars) continued

|  | 2001 | | 2000 | |
|  | USD | USD | USD | USD |
|---|---|---|---|---|
| **Net assets are comprised of:** |  |  |  |  |
| Capital shares | 377,624,652 |  | 295,405,036 |  |
| Accumulated net investment loss | (144,762,474) |  | (111,932,612) |  |
| Accumulated net realized gain on investments | 25,676,793 |  | 34,301,291 |  |
| Net unrealized appreciation in value of investments | 530,047,730 |  | 420,444,403 |  |
|  |  | 788,586,701 |  | 638,218,118 |
| Accumulated net appreciation on deferred incentive fees |  | (14,783,676) |  | (10,526,093) |
| **Net assets** |  | 773,803,025 |  | 627,692,025 |
| **Net asset value per share** |  | 915.43 |  | 840.22 |

The accompanying notes are an integral part of these financial statements.

*Lancer Offshore, Inc.*

A00759

**3.2** **Statements of operations for the years ended December 31, 2001 and 2000 (expressed in U.S. Dollars)**

|  | 2001 USD | 2001 USD | 2000 USD | 2000 USD |
|---|---|---|---|---|
| **Investment income** | | | | |
| Interest on interest bearing financial statements | - | | 1,678,650 | |
| Interest from banks and brokers | 260,918 | | 283,489 | |
| Dividends (net of withholding taxes) | 41,848 | | 551,977 | |
|  | | 302,766 | | 2,514,116 |
| **Expenses** | | | | |
| Incentive fees | 13,548,193 | | 17,048,568 | |
| Consulting services | 9,086,178 | | 7,634,702 | |
| Management fees | 6,634,182 | | 6,327,545 | |
| Accrued interest written off | 1,860,330 | | - | |
| Custodian, broker and bank expenses | 1,015,142 | | 756,186 | |
| Administration fees | 748,465 | | 646,156 | |
| Insurance expenses | 111,615 | | 111,615 | |
| Other operating expenses | 128,523 | | 92,725 | |
|  | | 33,132,628 | | 32,617,497 |
| **Net investment loss** | | (32,829,862) | | (30,103,381) |
| Net realized (loss)/gain on investments | (8,624,498) | | 20,092,862 | |
| Net change in unrealized appreciation in value of investments | 109,603,327 | | 80,688,173 | |
|  | | 100,978,829 | | 100,781,035 |
| **Net realized and unrealized gain on investments** | | 68,148,967 | | 70,677,654 |
| Less: Appreciation on deferred incentive fees | | 4,257,583 | | 3,458,403 |
| **Net increase in shareholders' equity resulting from operations** | | 63,891,384 | | 67,219,251 |

The accompanying notes are an integral part of these financial statements.

*Lancer Offshore, Inc.*                                                                 12

A00760

### 3.3    Statements of changes in shareholders' equity for the years ended December 31, 2001 and 2000 (expressed in U.S. Dollars)

| | Share capital | Share premium | Retained earnings | Total |
|---|---|---|---|---|
| | USD | USD | USD | USD |
| **Balance at January 1, 2000** | 706,653 | 251,796,672 | 265,067,738 | 517,571,063 |
| Shares subscribed | 190,479 | 166,738,040 | - | 166,928,519 |
| Equalization capital contributed to subscription | - | (3,351,864) | - | (3,351,864) |
| Shares redeemed | (150,075) | (120,524,869) | - | (120,674,944) |
| Net investment loss | - | - | (30,103,381) | (30,103,381) |
| Net realized gain on investments | - | - | 20,092,862 | 20,092,862 |
| Net change in unrealized appreciation in value of investments | - | - | 80,688,173 | 80,688,173 |
| Appreciation on deferred incentive fees | - | - | (3,458,403) | (3,458,403) |
| **Balance at December 31, 2000** | 747,057 | 294,657,979 | 332,286,989 | 627,692,025 |
| | | | | |
| **Balance at January 1, 2001** | 747,057 | 294,657,979 | 332,286,989 | 627,692,025 |
| Shares subscribed | 186,279 | 161,091,318 | - | 161,277,597 |
| Equalization capital contributed to subscription | - | (2,344,670) | - | (2,344,670) |
| Shares redeemed | (88,050) | (76,625,261) | - | (76,713,311) |
| Net investment loss | - | - | (32,829,862) | (32,829,862) |
| Net realized loss on investments | - | - | (8,624,498) | (8,624,498) |
| Net change in unrealized appreciation in value of investments | - | - | 109,603,327 | 109,603,327 |
| Appreciation on deferred incentive fees | - | - | (4,257,583) | (4,257,583) |
| **Balance at December 31, 2001** | 845,286 | 376,779,366 | 396,178,373 | 773,803,025 |

The accompanying notes are an integral part of these financial statements.

*Lancer Offshore, Inc.*                                                                 13

A00761

**3.4    Statements of cash flows for the years ended December 31, 2001 and 2000
(expressed in U.S. Dollars)**

|  | 2001 | 2000 |
|---|---|---|
|  | USD | USD |
| **Cash flows used in operating activities** | | |
| Purchases of investment securities | (401,295,957) | (1,004,360,967) |
| Proceeds from sale of investment securities | 379,089,147 | 994,383,567 |
| Net investment loss | (32,829,862) | (30,103,381) |
| | | |
| Adjustments to reconcile net investment loss to net cash used in operating activities: | | |
| (Increases)/decreases in operating assets: | | |
| Due from brokers | (23,870,846) | - |
| Interest and dividend receivable | 1,868,555 | (1,427,623) |
| Other receivables | - | 76,815 |
| Increases/(decreases) in operating liabilities: | | |
| Due to brokers | - | 8,199,748 |
| Management and incentive fees payable | 1,973,705 | (6,753,446) |
| Consulting services payable | 274,082 | 540,000 |
| Equalization payable | (1,007,194) | 212,553 |
| Other payables and accrued expenses | 50,683 | (17,736) |
| Appreciation on deferred incentive fees | (4,257,583) | (3,458,403) |
| Net cash used in operating activities | (80,005,270) | (42,708,873) |
| | | |
| **Cash flows provided by financing activities** | | |
| Proceeds from the issuance of shares | 161,275,198 | 166,940,856 |
| Equalization capital contribution to subscription | (2,344,670) | (3,351,864) |
| Disbursements for shares redeemed | (70,023,021) | (121,750,307) |
| Net cash provided by financing activities | 88,907,507 | 41,838,685 |
| | | |
| Net increase/(decrease) in cash at banks | 8,902,237 | (870,188) |
| | | |
| Cash at banks at beginning of the year | 131,931 | 1,002,119 |
| Cash at banks at end of the year | 9,034,168 | 131,931 |

The accompanying notes are an integral part of these financial statements.

*Lancer Offshore, Inc.*                                                                     14

A00762

**3.5     Notes to the financial statements for the years ended December 31, 2001 and 2000**

*3.5.1     Organization*

Lancer Offshore, Inc. (the "Fund") has been incorporated as an International Business Company on September 27, 1995 under the laws of the British Virgin Islands and commenced operations on October 1, 1995. Effective December 24, 1998, the Fund has been listed on the Irish Stock Exchange.

The Fund is organized for the purpose of investing, trading, and dealing in securities of public and non-public companies, traded in the United States of America and elsewhere, of all kinds and descriptions, including but not limited to, equity, debt, convertible securities, preferred stock, options, warrants, trade claims and monetary instruments. The Fund may invest in arbitrage and special situations, both long and short securities positions, option arbitrage, and other financial instruments. The Fund may also engage in transactions to hedge long and short positions.

The Fund's primary objective is to seek high economic return primarily through capital appreciation while attempting to control risk. The investment manager pursues the Fund's objective by engaging in an aggressive investment program that primarily, but not exclusively, targets companies which the investment manager believes are valued below their intrinsic value, based on the investment manager's evaluation of such factors as fundamental analysis of a company and the underlying value of its assets, or by seeking price appreciation due to a "catalyst" such as an earnings turnaround, a corporate restructuring or an accumulation of shares by outsiders. The Fund invests primarily in small and mid size capitalized companies.

Some of the investments that are made by the Fund may lack liquidity. The Fund invests in privately and publicly placed common stock, preferred stock, convertible debt securities and engages in bridge financing. It has been the investment manager's experience that on occasions the most practicable tactic in accumulating large positions in small and mid capitalization stock is through a direct placement with the respective company. Generally, these securities may not be immediately liquid although there is a registration right with respect to the common stock purchased or the common stock receivable upon conversion of the preferred stock or convertible debt.

A 0 0 7 6 3

### 3.5.2    Summary of significant accounting policies

The accompanying financial statements have been prepared in accordance with international accounting standards. Certain of the significant accounting policies followed in the preparation of the financial statements are as follows:

#### Securities and contractual transactions

The Fund adopted IAS 39 and classified its investment securities into available-for-sale. Investments intended to be held for an indefinite period of time, which may be sold in response to needs for liquidity or changes in interest rates, exchange rates or equity prices are classified as available-for-sale.

#### Valuation of investments

Due to the nature and trading patterns of certain investments of the Fund, which result in the unavailability of bid and ask quotes at year-end, the Fund uses the most recent available last sales prices of the security for valuation purposes. However, in accordance and in conformity with the Fund's Placement Memorandum, the Board of Directors in conjunction with the investment manager determine at what value the investment securities are reported for the determination of the net asset value of the Fund.

To the extent that the Fund invests in public, private securities or restricted securities, the valuation of such securities will be determined by the Fund's Board of Directors in conjunction with the investment manager. Due to the characteristics of certain investment securities of the Fund combined with limited trading volumes of such securities, the Board of Directors in conjunction with the investment manager estimated the fair values of such securities based on a methodology developed by the investment manager. The total value of investment securities of the Fund which were subjected to such valuation procedures at year-end amounted to USD 827,020,243 which represents 100% of investment securities of the Fund.

The values produced by the valuation methodologies applied may be materially different from values that would have been used by the Fund if the respective investment securities were trading in an active secondary market with transaction volumes that could allow the Fund to realize the reported values within a reasonable period of time. The size of certain of the Fund's investment positions relative to their trading volumes could limit the Fund's ability to realize the respected values of the securities in a reasonable period. The values assigned to these investment securities are estimates based upon information available to the investment manager and Board of Directors and do not necessarily represent amounts which might ultimately be realized, since such amounts depend on future circumstances and their occurrence is not certain.

A00764

The Fund has control whether direct or indirect, as defined by IAS 27 and IAS 28, over underlying companies in which it has investments with a total approximate value of USD 505,717,858 as of year-end. The investment manager considers it would be misleading to prepare financial statements that consolidate any such controlled entity, since all these investments are held for capital appreciation and has the intention to hold them temporarily.

The Fund also invests in certain privately issued securities, including warrants, which based on the judgment of the investment manager are illiquid or are otherwise subject to contractual restrictions on disposition but which the investment manager anticipates will become liquid (whether pursuant to a registration right or otherwise).

The investment manager with the consent of the Board of Directors has applied the following valuation methodologies for the unlisted and non-market trading securities at year end:

I.    Warrants at their natural premium (fair value of stock less exercise price).
II.   Bridge financing notes at nominal value subject to provision for permanent diminution in value.
III.  Preferred stocks at cost.

The Fund participates in bridge financing transactions with public and private companies. Bridge financing generally takes the form of an unsecured loan to a company for a specified period of time. The company, in addition to issuing a promissory note to the Fund for the loan, will generally also issue some form of equity. The equity component can consist of warrants, options, preferred stock, common stock, the right to convert all or part of the loan to equity and other variations.

*Lancer Offshore, Inc.*                                                            17

A00765

All restricted securities which either have a "demand registration right" or where a registration is in progress are priced at the same price as that which the publicly traded security is priced at. Management believes that this valuation methodology utilized in valuing these investments is reasonable and prudent. However, liquidity constraints could have a material valuation impact. At December 31, 2001 there were six restricted securities with "demand registration rights" which had a cost of USD 4,778,480 and a value of USD 12,663,380 representing 1.6% of total investments in securities.

### Accounting for investments

Security transactions are recorded on the trade date. Dividend income and expense are recognized on the ex-dividend date and interest income is recognized on an accrual basis. Realized gains and losses on security transactions are accounted for on a first-in first-out basis.

### Use of estimates

The preparation of financial statements in conformity with international accounting standards requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### 3.5.3   Portfolio analysis

The Fund has elected not to disclose the name, number of shares, value and type of securities. It is believed that such disclosure would be a breach of confidentiality and that this disclosure could undermine the Fund's ability to buy or sell those securities, thereby impairing their value.

*Lancer Offshore, Inc.*                                                                      18

A00766

A breakdown of the portfolio by sector is as follows (all of which are United States of America investments). Listed securities, for purposes of these financial statements, are those which trade on national stock exchanges such as the New York Stock Exchange, NASD or American Stock Exchange or in the over-the-counter (e.g. OTC Bulletin Board) markets in the United States of America.

|  | Value | | Percentage of net assets |
|---|---:|---:|---:|
|  | USD | USD |  |
| **Common stocks (Listed)** |  |  |  |
| Consumer | 4,415,286 |  |  |
| Entertainment/Media | 36,468,865 |  |  |
| Environmental/Waste Management | 757,893 |  |  |
| Financial/Insurance | 127,840,055 |  |  |
| Government Electronics/Aerospace | 105,181,522 |  |  |
| Health/Medical Instrumentation | 3,917,929 |  |  |
| Industrial | 243,083,072 |  |  |
| Technology/Packaging | 5,432,228 |  |  |
| Technology | 90,776,146 |  |  |
| Telecommunications | 89,513,056 |  |  |
| Transportation | 6,885,691 |  |  |
|  |  | 714,271,743 | 92.3% |
| **Warrants (Unlisted)** |  |  |  |
| Government Electronics/Aerospace | 5,280,000 |  |  |
| Industrial | 95,520,500 |  |  |
| Transportation | 195,000 |  |  |
|  |  | 100,995,500 | 13.1% |
| **Bridge financing (Unlisted)** |  |  |  |
| Entertainment/Media | 600,000 |  |  |
| Health/Medical Instrumentation | 1,005,000 |  |  |
| Technology/Packaging | 3,500,000 |  |  |
| Telecommunications | 600,000 |  |  |
| Transportation | 2,700,000 |  |  |
|  |  | 8,405,000 | 1.1% |
| **Preferred stocks (Unlisted)** |  |  |  |
| Financial/Insurance | 22,491 |  |  |
| Health/Medical Instrumentation | 400,000 |  |  |
| Technology | 2,925,509 |  |  |
|  |  | 3,348,000 | 0.4% |
|  |  | 827,020,243 | 106.9% |

*Lancer Offshore, Inc.*

A00767

The percentage of the total market value of the securities per industry sector are as follows:

|  | Value | Percentage |
|---|---|---|
|  | USD |  |
| Industrial | 338,603,572 | 40.9% |
| Financial/Insurance | 127,862,546 | 15.5% |
| Government Electronics/Aerospace | 110,461,522 | 13.4% |
| Technology | 93,701,655 | 11.3% |
| Telecommunications | 90,113,056 | 10.9% |
| Entertainment/Media | 37,068,865 | 4.5% |
| Transportation | 9,780,691 | 1.2% |
| Technology/Packaging | 8,932,228 | 1.1% |
| Health/Medical Instrumentation | 5,322,929 | 0.6% |
| Consumer | 4,415,286 | 0.5% |
| Environmental/Waste Management | 757,893 | 0.1% |
| Total investments securities | 827,020,243 | 100.0% |

### 3.5.4   Financial instruments

In the normal course of business, the Fund may trade in various financial instruments and enter into various investment activities with off-balance sheet risk. These instruments include warrants, options and short sales. Each of the described trades and activities contain varying degrees of off-balance sheet risk.

Generally, these financial instruments could represent future commitments to purchase or sell other financial instruments at specified terms at specified future dates. Additionally, these financial instruments expose the Fund to credit risk arising from potential inability of counterparties to perform under the terms of the contracts.

The Fund engages in the sale of securities, not yet purchased. Securities sold, not yet purchased, represent obligations of the Fund to deliver the specified security and thereby creates a liability to repurchase the security in the market at prevailing prices.

The Fund's investment in securities and amounts receivable for investments sold are partially restricted until the Fund satisfies the obligation to deliver the securities sold, but not yet purchased. As of December 31, 2001 and 2000, the Fund did not have any securities which were sold but not yet purchased.

A00768

Apart from the above mentioned off-balance sheet risks, the Fund is exposed to a number of risks arising from the various financial instruments it holds. The main risks to which the Fund is exposed are credit risk, market price risk, and liquidity risk. During the year, the Fund was not exposed to any currency risk because substantially all its assets and liabilities are denominated in US Dollars. The risk management policies employed by the Fund to manage these risks are discussed below:

### Credit risk

Credit risk is the risk that an issuer or counterparty will be unable or unwilling to meet commitments it has entered into with the Fund.

The majority of the common stocks in which the Fund invests are traded on the major stock exchanges or in the over-the-counter markets in the United States of America. Since a significant number of the counter parties in the over-the-counter markets may not be major financial institutions, the fund can be exposed to credit risk.

The Fund will invest no more than 20% of its gross asset value in any one issuer. At December 31, 2001, the Fund has no investment in any one issuer that is 20% of gross asset value. Furthermore, the Fund's investment manager will do constant research on the counterparties.

### Market price risk

Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

The Board of Directors of the Fund, in consultation with the investment manager, will value the securities held by the Fund in accordance with the Fund's Articles of Association. When no market exists for an investment or when the Board of Directors in consultation with the investment manager, determines that the market price does not fairly represent the value of the investment, the Board of Directors of the Fund, in consultation with the investment manager, will value such investment as it reasonably determines.

### Liquidity risk

Liquidity risk is the risk that an enterprise will encounter difficulty in raising funds to meet commitments associated with financial instruments. Liquidity risk may result from an inability to sell a financial asset quickly at close to its fair value.

Some of the investments that are made by the Fund may lack liquidity. Though it is intended that substantially all investments made by the Fund will be in publicly traded investments and most on listed exchanges, some may be thinly traded. The investment manager intends to cause the Fund to invest a substantial portion of its assets in securities of small and middle capitalized entities. This could present a problem in realizing the prices quoted and in effectively trading the position(s). In certain situations, the Fund may

*Lancer Offshore, Inc.*                                                                 21

A00769

invest in illiquid investments which could result in significant losses. The investment manager assesses the future price movements of stocks, bonds and options on stocks and other securities and the movements of interest rates, which is essential to the Fund's profitability but no assurance is given.

### 3.5.5    Management and incentive fees

Lancer Management Group, LLC serves as the investment manager for the Fund. Under the terms of the management agreement, Lancer Management Group, LLC receives a quarterly fee of 0.25% of the beginning net asset value of the Fund as of each fiscal quarter. In addition, the management agreement provides for an annual incentive fee to Lancer Management Group, LLC of 20% of net profits (including net unrealized gains), if any, during the fiscal year. If a share has a loss chargeable to it during any fiscal year or years ("unrecouped loss") and during any succeeding fiscal year there is a profit allocable to the share, there will be no incentive fee payable with respect to the share until the amount of the unrecouped loss allocated to the share has been recouped. For the year ended December 31, 2001 the management and incentive fees totaled USD 6,634,182 and USD 13,548,193, respectively (2000: USD 6,327,545 and USD 17,048,568, respectively).

The investment manager may elect to defer payment of its incentive fee (all or part) to the last day of any fiscal year following the fiscal year such fee was earned. If the investment manager elects to defer payment of all or part of the incentive fee, any such deferred amounts payable to the investment manager shall be treated, and the amounts eventually payable at the end of such deferred periods shall be determined, as if such deferred amounts had been invested in the Fund on the first day of the fiscal year following the fiscal year the deferred fee was earned and withdrawn as of the last day of the deferred period. The amount earned in 2001 and 2000 on the deferred incentive fee amounted to USD 4,257,583 and USD 3,458,403, respectively. The accumulated amount earned on deferred incentive fees up to December 31, 2001 amounts to USD 14,783,676 and is reflected in the deferred incentive fee payable account.

In addition to all deferred incentive fees since inception of the Fund, the principal of the investment manager, Mr. Michael Lauer, also held through an individual retirement account 399.45 shares in the Fund at year-end.

Based on a resolution of the investment manager on December 31, 2001, the investment manager elected to defer 70% of the 2001 incentive fees for a total period of 5 years.

A00770

### 3.5.6    Administration fees

Citco Fund Services (Curaçao) N.V. (the "Administrator") acts as the administrator, registrar and transfer agent of the Fund. The administration fees including directors' fees amounted to USD 575,209 and USD 539,901 for 2001 and 2000 respectively. In addition, the Fund reimbursed the administrator for out-of-pocket expenses in the amounts of USD 173,256 and USD 106,255 for 2001 and 2000 respectively. Each Board of Director member provided by the Administrator receives an annual fee of USD 4,000.

### 3.5.7    Consulting services

The investment manager makes payments to entities that perform consulting services and introduce prospective shareholders to the Fund and is reimbursed by the Fund for such payments to the extent that the aggregate amount of such payments, together with its accounting, legal, administrative and other operating expenses, do not exceed up to a maximum of one percent of the Fund's net asset value at the end of each fiscal year. The total amount of consulting services fees paid were USD 9,086,178 and USD 7,634,702 for the year ended December 31, 2001 and 2000, respectively.

### 3.5.8    Prime broker and custodian

The Fund has appointed Banc of America Securities, LLC ("BAS"), as prime broker and custodian. As such, BAS will settle and clear all transactions executed by the Fund. Such transactions may be executed through BAS or other brokers. The Fund is not required to pay any custody fees to BAS.

The Fund has investments directly in some companies through private placements and also has rights to investment securities which are based on contractual agreements. Due to the nature of the financial instruments the underlying companies and the investment manager might have actual custody and/or possession of certain of the ownership documents. As of year-end, the following were the entities having investment securities either in their custody/possession for the Fund:

| Entity: | Value |
| --- | --- |
| | USD |
| Banc of America Securities, LLC | 361,206,161 |
| Banc of America Securities, LLC (in transfer) * | 154,381,172 |
| Underlying Companies | 206,083,660 |
| Lancer Management Group, LLC | 105,349,250 |
| Total investment securities | 827,020,243 |

* Refer to note 3.5.12 subsequent events.

*Lancer Offshore, Inc.*                                                                              23

A00771

### 3.5.9   Insurance expenses

During 2000, the Fund has entered into two term insurance contracts on the life of Mr. M. Lauer the principal of the investment manager for the amounts of USD 25,000,000 with Lincoln Life & Annuity Company of New York and USD 57,500,000 with Berkshire Life Insurance Company. The total premium paid by the Fund on these insurance contracts amounted to USD 111,615 for the year ended December 31, 2001 and 2000. The Fund is the first beneficiary on the contracts.

### 3.5.10   Taxation

The Fund is exempt under the laws of the British Virgin Islands from any income or corporation taxes as it qualifies as an International Business Company under the International Business Companies Ordinance, 1984 of the British Virgin Islands.

The Fund will bear no liability for taxes in the Netherlands Antilles, the jurisdiction in which the administration is performed.

The Fund is subject to withholding taxes applicable to dividends and certain interest income considered to be from sources within the Unites States of America.

### 3.5.11   Share capital

The Fund has an authorized share capital of USD 10,000,000 comprising one class of shares divided into 10,000,000 shares of USD 1.00 par value.

Pursuant to the provisions of the articles of incorporation, the net asset value per share of the Fund is computed by dividing the total net assets of the Fund by the number of participating outstanding shares. Each share has equal dividend, distribution, liquidation and voting rights. Shares may be purchased or redeemed at the net asset value computed on the last business day of each month. The fund applies the concept of equalization with regards to its share capital transactions.

A00772

Transactions in the shares of capital stock, for the year ended December 31, 2001 and 2000 were as follows:

|  | 2001 | 2000 |
|---|---|---|
| Shares outstanding at the beginning of the year | 747,056.77 | 706,652.54 |
| Subscriptions during the year | 186,279.27 | 190,478.89 |
| Redemptions during the year | (88,049.83) | (150,074.66) |
| Shares outstanding at the end of the year | 845,286.21 | 747,056.77 |

The net asset value per share of subscriptions made during the year may include incentive fees accrued as of the date of subscription relating to the performance of the Fund prior to subscription. This amount of accrued incentive fee is referred to as the equalization payable.

### 3.5.12   Related party transactions

Mr. D. Quilligan and Mr. K. Conroy held office as non-executive directors throughout the year. The Directors receive an annual fee of USD 4,000. The Board members are employed by Citco Fund Services (Curaçao) N.V.

The Fund was not engaged in any material contract or any contract for the provision of services during the year in which the Board of Directors had a material interest.

### 3.5.13   Subsequent events

During 2002, the total of the securities in transfer to BAS were received by BAS and confirmed to the Fund.

The equalization payable recorded on the statement of assets and liabilities as of December 31, 2001 was converted into 2,561.28 shares of additional stock on January 1, 2002.

On January 1, 2002, issuance of shares were USD 22,763,046 and redemption of shares were USD 9,417,385.

A00773

There were investments valued at USD 3,017,460 in the financial statements of which the underlying companies have either ceased operations or are in bankruptcy proceedings. The Fund has written off these investments in 2002, with the effects reflected in the 2002 net asset value of the Fund.

The Fund has issued a new Placement Memorandum dated February 15, 2002.

During February 2002, Mr. R. Geist and Mr. J. Bendall have replaced Mr. D. Quilligan and Mr. K. Conroy as non-executive Directors.

# EXHIBIT 8

A01240

5/19/03

Banc of America Securities - Prime Brokerage - Client Position Summary

333-11895 Lancer Offshore Inc
PosSum-ICBA

Banc of America Securities LLC
Client Position Summary by Asset Class

Page 1
As of: 05/30/03
Printed: 05/14/03

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (1,294,022) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (1,294,021.93) | (1,294,021.93) | 0.00 | (0.50) |
| 3,879,807 USD | | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,879,806.60 | 3,879,806.60 | 0.00 | 0.58 |
| (166,931) USD | | TYPE 6 | 1.0000 | 1.0000 | 0.00 | (166,930.59) | (166,930.59) | 0.00 | (0.03) |
| **TOTAL CASH AND EQUIVALENTS** | | | | | | 368,854.08 | 368,854.08 | 0.00 | 0.06 |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 3,500,000 | 9386567 | EPS TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.53 |
| 3,500,000 | 9386637 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.53 |
| 500,000 | 9386655 | LIGHTHOUSE LANDINGS, INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.08 |
| 450,000 | AADCLOAN | AADC CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 450,000.00 | 450,000.00 | 0.00 | 0.07 |
| 625,000 | AURALOAN | AURA SYSTEMS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 625,000.00 | 625,000.00 | 0.00 | 0.10 |
| 2,815,000 | BLACK | BLACK SKY ENTERTAINMENT LOAN | 100.0000 | 100.0000 | 0.00 | 2,815,000.00 | 2,815,000.00 | 0.00 | 0.43 |
| 605,000 | CPHGLOAN | CORPUS HOLDINGS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 605,000.00 | 605,000.00 | 0.00 | 0.09 |
| 2,500,000 | CSOKLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 2,500,000.00 | 2,500,000.00 | 0.00 | 0.38 |
| 110 | CTNLLOAN | CONTINENTAL CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 110,000.10 | 110,000.10 | 0.00 | 0.02 |
| 7,000,000 | EQUILOAN | EQUITEC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 1.06 |
| 365,000 | EPSHLOAN | CONTINENTAL SOUTHERN BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 365,000.00 | 365,000.00 | 0.00 | 0.06 |
| 3,250,000 | FFIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 3,250,000.00 | 3,250,000.00 | 0.00 | 0.49 |
| 3,805,000 | INHSLOAN | 1STHEALTH INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 3,805,000.00 | 3,805,000.00 | 0.00 | 0.58 |
| 2,600,000 | KNGTLOAN | KNIGHTSCOVE ENTERTAINMENT BRIDGE | 100.0000 | 100.0000 | 0.00 | 2,600,000.00 | 2,600,000.00 | 0.00 | 0.40 |
| 400,000 | LIFELOAN | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.06 |
| 1,500,000 | LITFLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.23 |
| 50,000 | LHSHLOAN | LIONSHARE GROUP INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.01 |
| 600,000 | NEPHLOAN | NEPHROS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.09 |
| 100,000 | SKYLOAN | SKY LOAN | 100.0000 | 100.0000 | 0.00 | 100,000.00 | 100,000.00 | 0.00 | 0.02 |
| 3,000,000 | USPLELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 3,000,000.00 | 3,000,000.00 | 0.00 | 0.46 |
| 750,000 | XMMLOAN | CROSS MEDIA MARKETING LOAN | 100.0000 | 100.0000 | 0.00 | 750,000.00 | 750,000.00 | 0.00 | 0.11 |
| 1,060,000 | XWCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 1,060,000.00 | 1,060,000.00 | 0.00 | 0.16 |
| **Total Long Fixed Income** | | | | | | 33,985,000.10 | 33,985,000.10 | 0.00 | 5.17 |
| **Equities** | | | | | | | | | |
| 35,240,878 | AURA | AURA SYSTEMS INC | 0.2811 | 0.0700 | (75.10) | 9,905,380.95 | 2,465,861.46 | (7,438,519.49) | 0.38 |
| 40,953,910 | BMTSE | BIOMETRICS SECURITY TECHNOLOGY | 0.1426 | 1.8500 | 1196.96 | 5,841,716.36 | 75,764,733.50 | 69,923,007.14 | 11.52 |
| 14,364,060 | CHRK | CONTINENTAL CHIEF HOLDINGS INC | 0.0192 | 3.0003 | 2074.51 | 1,981,771.38 | 43,091,000.62 | 41,112,000.82 | 6.55 |
| 10,005,384 | CSOK | CONTINENTAL SOUTHERN RESOURCES | 0.1380 | 0.1380 | (76.61) | 1,181,891.41 | 1,140,881.41 | (140,883.41) | 0.01 |
| 5,285,319 | DIGR | COMPAS HOLDINGS INC | 478.8839 | 112.0000 | (81.13) | 43,991.18 | 199,190.00 | 1,191.00 | 0.03 |
| 30,916,158 | XMM | CROSS MEDIA MARKETING CORP | 3.5575 | 0.2000 | (94.38) | 18,731,615.70 | 1,053,063.80 | (17,678,551.90) | 0.16 |
| 6,850 | EPTG | EPL TECHNOLOGIES INC NEW | 15.1039 | 0.0500 | (91.18) | 346,996.67 | 342,996.67 | (917,006.67) | 0.42 |
| 9,273,350 | EDLG | EDUCATION LENDING GROUP INC NEW | 0.0603 | 0.0000 | (100.00) | 2,789,542.67 | 49,388.22 | (917,006.67) | 0.01 |
| | FFFRD | FIDELITY FIRST FINANCIAL CORP | 3.1000 | 2.7100 | 132.58 | 21,235.00 | 49,153.50 | 28,153.59 | 0.07 |
| | | | 1.1067 | 7.0000 | 132.51 | 10,262,801.46 | 64,913,730.00 | 54,650,928.54 | 9.87 |

Banc of America Securities – Prime Brokerage - Client Position Summary

A01241

5/19/03

313-11895 Lancer offshore Inc
PosSum-TCBA

Banc of America Securities LLC
Client Position Summary by Asset Class

As of: 04/30/03
Printed: 05/14/03
Page: 2

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 2,735,500 | ILCO | INTERNATIONAL TRAVEL CDS INC | 1.3015 | 1.5000 | 595.98 | 3,561.05 | 4,103,250.00 | 3,513,688.95 | 0.62 |
| 6,299,493 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.5700 | 1.0700 | (87.72) | 3,590,635.51 | 440,964.51 | (3,149,671.00) | 0.07 |
| | LHSG | LIONSHARE GROUP INC | 1.3000 | 1.2500 | (3.85) | | | (49.75) | 0.00 |
| 25,115,695 | CML | MAGIC LANTERN GROUP INC | 1.0021 | 1.0000 | (0.21) | 504,293.50 | 1,243.75 | (49.75) | 0.00 |
| 31,655,000 | MATTOE | MANHATTAN SCIENTIFIES INC | 0.2822 | 0.0280 | 461.36 | 8,911,460.84 | 886,340.00 | 23,855,820.00 | 3.63 |
| 4,936,909 | MHFTO | METHOD PRODUCTS CORP | 0.1975 | 0.0175 | (91.14) | 8,037,175.51 | 86,395.91 | 23,355,120.84 | 0.13 |
| 269,233 | PCFC | PIONEER COMMERCIAL FUNDING | 0.9978 | 0.0000 | (3.23) | 268,632.08 | 285,398.85 | (2,936,981.00) | 0.04 |
| 500,000 | RELM | RELM WIRELESS CORP WARRANTS | 0.0000 | 0.1000 | | | 50,000.00 | 50,000.00 | 0.01 |
| 11,501,562 | SKM | SKM CORP | 0.6686 | 0.6666 | 102.09 | 2,456,227.09 | 16,211,986.90 | 8,337,781.81 | 2.47 |
| 3,360,057 | SMKT | SIMEX CORP | 0.1703 | 0.1800 | (84.62) | 1,932,121.14 | 604,810.26 | (3,337,361.28) | 0.09 |
| | STG | STONE PATH GROUP INC | 0.5500 | 2.7500 | 230.91 | | 9,900.00 | 6,900.00 | 0.00 |
| 362,718 | SOI2799 | STONEPATH GROUP INC SER C PFD | 11.4138 | 14.4139 | 23.01 | 4,140,000.00 | 5,092,619.98 | 140,612.83 | 0.83 |
| 386,847 | SUR | SUREBEAM CORP | 2.4767 | 2.4600 | 15.48 | 908,569.59 | 1,049,182.42 | 140,612.83 | 0.16 |
| 14,599 | SUR7007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 0.0000 | 0.00 | 22,493.00 | 0.00 | | 0.00 |
| 125,884,919 | TFGP | TOTAL FILM GROUP INC | 0.1549 | 0.3500 | 125.90 | 19,504,175.87 | 44,059,721.65 | 24,555,545.98 | 6.70 |
| | VGSF | TOUCHSTONE RESOURCES LTD | 0.0000 | 0.8987 | (86.09) | 1,516,462.16 | 69,885.07 | (1,309,881.42) | 0.01 |
| 1,687,400 | VGSI | UNDERGROUND SOLUTIONS INC | 0.8987 | 0.1268 | (85.93) | 602,633.16 | 88,433.15 | (514,200.01) | 0.01 |
| 1,526,667 | U311992 | UNIVERSAL HEIGHTS INC OLD | 2.2385 | 0.0350 | (85.33) | 2,389,709.40 | 88,433.15 | (514,200.01) | 0.03 |
| 3,591,333 | | UNIVERSAL IN5 HLDGS INC | 0.5737 | 0.5000 | (50.00) | 131,250.00 | 165,625.00 | (2,185,051.03) | 0.03 |
| 331,250 | SI87252 | ICONNECT,COM | 1.0000 | 0.5000 | (50.00) | 21,455,810.04 | 37,880,327.86 | (185,625.00) | 0.03 |
| 124,088,287 | IMC | WORLD WIRELESS COMMUNICATIONS | 0.1768 | 0.3050 | 3894.38 | 1,455,830.01 | 9,317,992.96 | 37,880,542.08 | 1.51 |
| 42,042,152 | XTRD | XTRACARD CORP | 0.0350 | 1.9995 | 3894.38 | 71,045,493.15 | 30,434,500.00 | (40,610,938.15) | 1.53 |
| 15,220,975 | ZICA | ZI CORPORATION | 4.6676 | 0.0000 | (57.16) | 400,000.00 | 0.00 | | 4.63 |
| 2,000,000 | CRNKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.0000 | 0.00 | 266,647.69 | 202,697,357.00 | 202,420,709.81 | 0.06 |
| 45,041,635 | FFIR | FIRST FIDELITY STOCK | 0.0053 | 4.5000 | 75915.17 | | | | 30.88 |
| 16,000,000 | MHTDW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 0.0000 | | | 0.00 | | 0.00 |
| 16,000,000 | MHTDW7 | MANHATTAN SCIENTIFICS WARRANTS | 0.0000 | 0.0000 | | | 0.00 | | 2.51 |
| 10,500,000 | MXDTW | NU-D-ZINE WARRANT | 0.0000 | 0.0000 | | | 0.00 | | 0.00 |
| | LUMP-PFD | US PLASTIC LUMBER CORP SERIES D | 0.0000 | 1.5700 | | 1,400,000.00 | 16,485,000.00 | 14,915,000.00 | 2.53 |
| 9,500,000 | XTROWT | XTRACARD CORP WARRANT | 0.0000 | 1.5700 | | | 14,915,000.00 | 14,915,000.00 | 2.27 |

| | | | | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| Total Long Equities | | | | 206.42 | 203,348,222.65 | 623,105,407.53 | 419,757,184.88 | 94.77 |
| TOTAL LONG POSITIONS | | | | 176.86 | 237,333,222.75 | 657,090,407.63 | 419,757,184.88 | 99.94 |
| TOTAL EXPOSURE VALUE | | | | | 237,333,222.75 | 657,090,407.63 | 419,757,184.88 | 99.94 |
| NET EXPOSURE VALUE | | | | | 237,333,222.75 | 657,090,407.63 | 419,757,184.88 | 99.94 |
| TOTAL LONG POSITIONS | | | | | 237,333,222.75 | 657,090,407.63 | 419,757,184.88 | 99.94 |
| TOTAL SHORT POSITIONS | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | | 368,854.08 | 368,854.08 | | 0.06 |
| TOTAL | | | | | 237,702,076.83 | 657,459,261.71 | 419,757,184.88 | 100.00 |

https://www.primebroker.com/R/C/3131118955/M/200304/CPosAsTx.rpt.htm

# EXHIBIT 9

FILING #0001778072 PG  01 OF  01 VOL B-00158
FILED 11/24/1997 01:50 PM PAGE  00323
SECRETARY OF THE STATE
CONNECTICUT SECRETARY OF THE STATE

## CERTIFICATE OF LIMITED PARTNERSHIP

### OF

### LANCER PARTNERS, LIMITED PARTNERSHIP

To the Secretary of State
State of Connecticut

The undersigned, constituting the sole general partner of Lancer Partners, Limited Partnership, a limited partnership to be formed under the laws of the State of Connecticut (hereinafter called the "Limited Partnership"), does hereby certify that:

1. The name of the Limited Partnership is Lancer Partners, Limited Partnership.

2. The address of the office of the Limited Partnership in the State of Connecticut required to be maintained under Section 34-13b of the Connecticut Uniform Limited Partnership Act (the "Act") is:

> 980 Post Road East
> Westport, CT 06880

3. The name and address of the statutory agent for service of process required under Section 34-13b of the Act is Michael Lauer:

> Business Address:          Residence Address:
> 980 Post Road East         51 Keelers Ridge
> Westport, CT 06880         Wilton, CT 06897

4. The name and the business address of the sole general partner of the Limited Partnership is as follows:

> Lancer Management Group II, LLC
> 980 Post Road East
> Westport, CT 06880

5. The latest date upon which the Limited Partnership is to dissolve is December 31, 2044.

Signed on November 19, 1997.

Acceptance of Appointment
by Statutory Agent:

Michael Lauer

Lancer Management Group II, LLC, as sole general partner of the Limited Partnership to be formed by this certificate

Michael Lauer, Manager

79832.1

# EXHIBIT 10



**LANCER PARTNERS, L.P.**
**(a limited partnership)**

**FINANCIAL STATEMENTS**

**DECEMBER 31, 2000**

# GOLDSTEIN GOLUB KESSLER LLP

Certified Public Accountants and Consultants



**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0000278

**LANCER PARTNERS, L.P.**
(a limited partnership)

CONTENTS
December 31, 2000

Independent Auditor's Report                                                     1

Financial Statements:

    Statement of Financial Condition
    Statement of Income                                                          2
    Statement of Changes in Partners' Capital                                    3
    Statement of Cash Flows                                                      4
    Notes to Financial Statements                                                5
                                                                               6 - 7

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated



# GOLDSTEIN GOLUB KESSLER LLP

Certified Public Accountants and Consultants

**NEXIA**
**INTERNATIONAL**

## INDEPENDENT AUDITOR'S REPORT

To the Partners of
Lancer Partners. L.P.

We have audited the accompanying statement of financial condition of Lancer Partners. L.P. (a limited partnership) as of December 31, 2000, and the related statements of income, changes in Partners' capital, and cash flows for the year then ended. These financial statements are the responsibility of the General Partner. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management. as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

The Partnership declined to present a condensed schedule of investments as of December 31, 2000. Presentation of such statement summarizing the Partnership's investments is required by accounting principles generally accepted in the United States of America.

In our opinion, except that the omission of a condensed schedule of investments results in an incomplete presentation as explained in the preceding paragraph, the financial statements referred to above present fairly, in all material respects, the financial position of Lancer Partners, L.P. as of December 31, 2000, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

*Goldstein Golub Kessler LLP*

**GOLDSTEIN GOLUB KESSLER LLP**

April 24, 2001

---

1185 Avenue of the Americas   Suite 500   New York, NY 10036-2602
TEL 212 372 1800   FAX 212 372 1801   www.ggk.com

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0000280

# LANCER PARTNERS, L.P.
## (a limited partnership)

### STATEMENT OF FINANCIAL CONDITION

**December 31, 2000**

**ASSETS**

| | |
|---|---|
| Investments in Securities, at fair value (cost $58,057,546) (Notes 1 and 2) | $227,776,987 |
| **Total Assets** | **$227,776,987** |

**LIABILITIES AND PARTNERS' CAPITAL**

| | |
|---|---|
| Liabilities: | |
| Due to broker (Note 2) | $ 8,500,599 |
| Due to Partners | 10,703,614 |
| Accrued expenses | 482,472 |
| **Total liabilities** | **19,686,685** |
| Partners' Capital | 208,090,302 |
| **Total Liabilities and Partners' Capital** | **$227,776,987** |

The accompanying notes and independent auditor's report
should be read in conjunction with the financial statements

2.

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0000281

# LANCER PARTNERS, L.P.
## (a limited partnership)

### STATEMENT OF INCOME

**Year ended December 31, 2000**

| | | |
|---|---|---:|
| Investment loss: | | |
| Income: | | |
| Interest | $ | 169,741 |
| Dividends | | 46,055 |
| Other | | 30,217 |
| Total income | | 246,013 |
| | | |
| Expenses: | | |
| Management fees (Note 3) | | 1,850,360 |
| Professional fees | | 79,141 |
| Margin interest | | 111,601 |
| Other | | 177,842 |
| Total expenses | | 2,218,944 |
| Net investment loss | | (1,972,931) |
| | | |
| Realized and unrealized gain on investments: | | |
| Net realized gain on investments | | 6,599,698 |
| Change in unrealized appreciation of investments for the year | | 19,362,890 |
| Net realized and unrealized gain on investments | | 25,962,588 |
| Net income | | $23,989,657 |

The accompanying notes and independent auditor's report
should be read in conjunction with the financial statements

3

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

# LANCER PARTNERS, L.P.
## (a limited partnership)

### STATEMENT OF CHANGES IN PARTNERS' CAPITAL

**Year ended December 31, 2000**

| | |
|---|---:|
| Partners' capital at December 31, 1999 | $191,262,644 |
| Contributions | 25,449,611 |
| Withdrawals | (32,611,610) |
| Allocation of net income (Note 3): | |
| Special allocation to General Partner | 3,710,557 |
| Allocation to all Partners | 20,279,100 |
| Partners' capital at December 31, 2000 | $208,090,302 |

The accompanying notes and independent auditor's report
should be read in conjunction with the financial statements

4.

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

**LANCER PARTNERS, L.P.**
**(a limited partnership)**

## STATEMENT OF CASH FLOWS

**Year ended December 31, 2000**

| | |
|---|---:|
| Cash flows from operating activities: | |
| Net income | $ 23,989,657 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Gains on restricted securities | (27,159,711) |
| Changes in operating assets and liabilities: | |
| Increase in investments in securities, at fair value | (3,383,462) |
| Increase in due to broker | 7,200,152 |
| Increase in accrued expenses | 219,832 |
| **Net cash provided by operating activities** | 866,468 |
| Cash flows used in investing activity - purchases of restricted securities | (3,227,708) |
| Cash flows from financing activities: | |
| Partners' capital contributions | 23,049,611 |
| Partners' capital withdrawals | (23,088,371) |
| **Net cash used in financing activities** | (38,760) |
| Net decrease in cash | (2,400,000) |
| Cash at beginning of year | 2,400,000 |
| Cash at end of year | $    - 0 - |

**Supplemental disclosure of cash flow information:**

Cash paid during the year for interest was substantially the same as interest expense.

The accompanying notes and independent auditor's report
should be read in conjunction with the financial statements

5

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

**LANCER PARTNERS, L.P.**
**(a limited partnership)**

**NOTES TO FINANCIAL STATEMENTS**
**December 31, 2000**

| | |
|---|---|
| 1. **ORGANIZATION AND SIGNIFICANT ACCOUNTING POLICIES:** | Lancer Partners, L.P. (the "Partnership") is a limited partnership organized on December 14, 1994 under the laws of the State of New York to invest and trade in securities. |

Investments in securities traded on a national securities exchange or over-the-counter securities listed on the Nasdaq National Market System are valued at the last sales price or, if no sales occurred on such date, at the mean between the bid and ask prices. Securities which are not listed are valued at their last closing bid price if held long and their last closing ask price if sold short.

In addition, the Partnership invests in certain privately issued securities of public companies which, based on the judgment of the General Partner, are illiquid or are otherwise subject to contractual restrictions on disposition, but which the General Partner anticipates will become liquid (whether pursuant to registration rights or otherwise) ("restricted securities").

Generally, investments in restricted securities, which either have a "demand registration right" or where a registration is in progress, will be priced at the same price as that which the publicly traded security of the respective company is priced. Generally, warrants to purchase securities that are "in the money" will be priced at their natural premium. Management believes that valuing these investments in such manner is reasonable and prudent. However, liquidity constraints could have a material impact on realization. In certain instances, where appropriate, management has used a discounted price to value these securities. The value of these securities, which comprise a significant portion of the portfolio, may differ significantly from the values that would have been used had a ready market for the securities existed. At December 31, 2000, restricted securities, including warrants, with demand registration rights had a cost of $3,227,708 and a fair value of $42,564,013 representing 18.69% of total investments in securities, resulting in unrealized appreciation of $39,336,305.

Investments in securities include the securities of six issuers whose aggregate fair value represents a significant portion of the total of the investments in securities, at fair value, in the accompanying statement of financial condition.

Purchases and sales of securities are recorded on a trade-date basis. Realized gains and losses are recognized based on the first-in, first-out or specific-identification method.

No provision is made in the accompanying financial statements for liabilities for federal, state and local income taxes since such liabilities are the responsibility of the individual Partners.

These financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America which require the use of estimates by the General Partner.

6

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

**LANCER PARTNERS, L.P.**
(a limited partnership)

**NOTES TO FINANCIAL STATEMENTS**
**December 31, 2000**

| | | |
|---|---|---|
| 2. | **DUE TO BROKER:** | The clearing and depository operations for the Partnership's security transactions are provided for primarily by one broker. At December 31, 2000, substantially all of the securities owned and the amount due to broker reflected in the statement of financial condition are positions with and amounts due to this clearing broker. The securities serve as collateral for the amount due to the broker. The broker's right to sell or repledge this collateral is limited to 140% of the amount due to the broker. |
| 3. | **RELATED PARTY TRANSACTIONS:** | The Partnership pays the General Partner a management fee for management services provided to the Partnership equal to .25% of the net asset value at the end of each quarter (1% per annum). |
| | | The Partnership agreement provides for the reallocation to the General Partner of 20% of net income that is allocable to the capital accounts of the Limited Partners ("Incentive Fee"). The Incentive Fee amounted to $3,710,557 for the year ended December 31, 2000. |
| 4. | **SUBSEQUENT EVENT:** | As of January 1, 2001, Partners' capital contributions aggregated approximately $6,557,000. |

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

# EXHIBIT 11

# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP.291)

### CERTIFICATE OF MERGER                (SECTION 76)

No. of surviving company 310202

The Registrar of Companies of the British Virgin Islands (BVI) HEREBY CERTIFIES,
pursuant to the International Business Companies Act, Cap.291, that Articles
of Merger between THE OMNIFUND, LTD. OF THE BRITISH VIRGIN ISLANDS and
THE VIATOR FUND, LTD. OF THE BRITISH VIRGIN ISLANDS
have this 27th day of March, 2002 been registered and that upon this
27th day of March, 2002 THE OMNIFUND, LTD.
shall be the surviving company of the merger.

Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands



REGISTRAR OF COMPANIES

CRT/0058M



No:

CERTIFIED A TRUE COPY

REGISTRAR BRITISH VIRGIN ISLANDS

Date:

## BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE
## (NO. 8 OF 1984)

ARTICLES OF MERGER

between

The Viator Fund, Ltd.

and

The OmniFund Ltd.

with the surviving company of the Merger being

**The OmniFund Ltd.**

Submitted for registration on the 27th day of March 2002.

**Citco B.V.I. Limited**
**Citco Building, Wickhams Cay**
**Road Town**
**Tortola**
**British Virgin Islands**



## ARTICLES OF MERGER

**THESE ARTICLES OF MERGER** entered into this 27th day of March, 2002 by and between The OmniFund, Ltd. (whose name has been changed from The Orbiter Fund, Ltd.) (the "Surviving Company") and The Viator Fund, Ltd. (the "Subsumed Company") **WITNESSETH** as follows:

1.  The Surviving Company and the Subsumed Company HEREBY ADOPT the Plan of Merger, a copy of which is annexed hereto.

2.  The Surviving Company was incorporated under the laws of the British Virgin Islands on January 29, 1999.

3.  The Subsumed Company was incorporated under the laws of the British Virgin Islands on September 30, 1999.

4.  The Memorandum of Association and Articles of Association of The OmniFund, Ltd. shall be the Memorandum of Association and Articles of Association of the Surviving Company as in effect on the date hereof.

5.  The Plan of Merger was approved by a written resolution of the sole director of the Surviving Company dated March 11, 2002. A copy of the Plan of Merger was given to the members of the Surviving Company and the Plan of Merger was authorised by a resolution of members of the Surviving Company approved on March 26, 2002.

6.  The Plan of Merger was approved by a written resolution of the sole director of the Subsumed Company dated March 11, 2002. A copy of the Plan of Merger was given to the members of the Subsumed Company. The Plan of Merger was authorised by a written resolution of the sole holder of the Management Shares dated March [26], 2002, and the Plan of Merger was authorised by a resolution of the holders of the Shares of the Subsumed Company approved on March 26, 2002.

7.  This merger is to be effective at the close of business on April 2, 2002.

IN WITNESS WHEREOF, the parties hereto have caused these Articles of Merger to be executed on the 27th day of March, 2002.

The OmniFund, Ltd.                          The Viator Fund, Ltd.

Per: _____                      Per: _____
Director                                    Director: InterCaribbean Services Ltd.

25446

## PLAN OF MERGER

This plan of merger is made the 27th day of March, 2002 between The OmniFund, Ltd. (whose name has been changed from The Orbiter Fund, Ltd.) ("OmniFund") and The Viator Fund, Ltd. ("Viator").

WHEREAS the Parties are international business companies organised and existing under the International Business Companies Act (the "Act") and are entering into this plan of merger pursuant to the provisions of Sections 76 to 79 of the Act.

NOW THEREFORE this plan of merger witnesses as follows:

1.      The constituent companies to this plan of merger are OmniFund and Viator.

2.      The surviving company is OmniFund (the "Surviving Company").

3.      The authorised capital of OmniFund is US$50,000 divided into 5,000,000 shares of US$0.01 par value each.  The authorised capital of Viator is US$50,000 divided into 100 management shares of US$0.01 par value each and 4,999,900 shares (the "Shares") of US$0.01 par value each.  All of the shares of Omni Fund are entitled to vote on the merger as one class.  All of the management shares of Viator and all of the Shares of Viator are entitled to vote on the merger as two separate classes.

4.      Upon the merger, the separate corporate existence of Viator shall cease and the Surviving Company shall become the owner, without other transfer, of all the rights and property of the constituent companies, and the Surviving Company shall become subject to all liabilities, obligations and penalties of the constituent companies.

5.      The manner and basis of converting the shares of the constituent companies into shares of the Surviving Company or other property shall be as follows:

   (a)      each issued and outstanding share of OmniFund shall continue as a share of the Surviving Company;

   (b)      each issued and outstanding Share of Viator shall be converted into such number of shares of OmniFund as determined by the following formula:

$$A = \frac{RP}{SP}$$

where:

A is the number of shares of OmniFund to be allotted and issued;

RP is the Redemption Price of the shares of Viator, as such term is defined in the articles of association of Viator, as at March 28, 2002; and

SP is the Subscription Price of the shares of OmniFund, as such term is defined in the articles of association of OmniFund, as at March 28, 2002; and

The OmniFund, Ltd.                                                        Page 2

---

(f)    carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

(3)    For purposes of paragraph (a) of subclause (2), the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if:

    (a)    it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

    (b)    it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

    (c)    it prepares or maintains books and records within the British Virgin Islands;

    (d)    it holds, within the British Virgin Islands, meetings of its Directors or members;

    (e)    it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

    (f)    it holds shares, debt obligations or other securities in a company incorporated under The International Business Companies Ordinance or under The Companies Act; or

    (g)    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under The International Business Companies Ordinance or under the Companies Act.

(4)    The Company shall have all such powers as are permitted by law for the time being in force in the British Virgin Islands which are necessary or conducive to the conduct, promotion or attainment of the object of the Company.

5.    CURRENCY

Shares in the Company shall be issued in the currency of the United States of America.

6.    AUTHORISED CAPITAL

The authorised capital of the Company is US$50,000.00.



- 2 -

(c)     the holders of each issued and outstanding management share of Viator shall receive the par value of the management share in cash.

6.      The Memorandum of Association and Articles of Association of OmniFund as in effect on the effective date of the merger shall be the Memorandum of Association and Articles of Association of the Surviving Company until the same shall be altered or amended or until a new Memorandum of Association or Articles of Association are adopted as provided therein.

7.      This plan of merger shall be submitted to the members of each of the constituent companies for their authorisation.

8.      The merger shall be effective as of the close of business on April 2, 2002.


In witness whereof the parties hereto have caused this plan of merger to be executed on the 27th day of March, 2002.


The OmniFund, Ltd

Per: _____
Name:
Director


The Viator Fund, Ltd

Per: _____
Name: InterCaribbean Services Ltd.
Director

<div align="center">

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ACT**

**AMENDED AND RESTATED MEMORANDUM OF ASSOCIATION**

**of**

**THE OMNIFUND, LTD**

</div>

1.      NAME

     The name of the Company is The OmniFund, Ltd.

2.      REGISTERED OFFICE

     The Registered Office of the Company will be Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

3.      REGISTERED AGENT

     The Registered Agent of the Company will be Citco B.V.I. Limited of Citco Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

4.      GENERAL OBJECTS AND POWERS

     (1)      The object of the company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

     (2)      The Company may not:

         (a)      carry on business with persons resident in the British Virgin Islands;

         (b)      own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph (e) of subclause (3);

         (c)      carry on banking or trust business, unless it is licensed under the Banks and Trust Companies Act, 1990;

         (d)      carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

         (e)      carry on the business of company management unless it is licensed under the Company Management Act, 1990; and

The OmniFund, Ltd.                                                                Page 3

7.     CLASSES, NUMBER AND PAR VALUE OF SHARES

The authorised capital shall be divided into 5,000,000 Class A Shares (the "Shares") of US$0.01 par value each.

8.     DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES

The shares of the Company shall have the following rights and restrictions:

the holders of Shares shall, subject to the provisions of the Articles:

> (a)     be entitled to one vote per Share;
>
> (b)     be entitled to such dividends as the Directors may from time to time declare;
>
> (c)     in the event of a winding-up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, be entitled, subject to the provisions of the Articles, to share pro rata in the surplus assets of the Fund;
>
> (d)     be entitled, and subject, to redemption or repurchase of such Shares as provided in the Articles.

Except as provided in this Memorandum of Association and the Articles of Association, the designations, powers, preferences, rights, qualifications, limitations and restrictions of each share that the Company is authorised to issue shall be fixed by resolution of Directors, but the Directors shall not allocate different rights as to voting, dividends, distributions on liquidation or redemption unless the Memorandum of Association shall have been amended.

9.     SHARE ISSUANCE

Shares in the Company shall be issued as registered shares.

10.    AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

Subject to Article 26(3), the Company may amend its Memorandum of Association and Articles of Association by a resolution of the Members entitled to vote at general meetings or by a resolution of the Directors.

The OmniFund, Ltd.                                                    Page 4

---

11.   DEFINITIONS

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.

We, CITCO B.V.I. LIMITED, of Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an international business company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association the 29th day of January, 1999 in the presence of:

Witness                                   Subscriber


(Sgd. C. Questelles)                      (Sgd. W. Reich /D. Wattley)
Road Town, Tortola                        Authorized Signatory
                                          Citco B.V.I. Limited



## TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT

## AMENDED AND RESTATED ARTICLES OF ASSOCIATION

## of

## THE OMNIFUND, LTD.

## INTERPRETATION

1.　　　　In these Articles unless there is something in the subject or context inconsistent therewith:-

"Accounting Date" means, subject to the provisions of these Articles, the 30th day of September;

"Act" means the International Business Companies Act as amended from time to time;

"Articles" means these Articles of Association as herein contained or as the same may from time to time be altered or amended;

"Auditor" means the person or firm for the time being appointed as Auditor of the Company;

"Base Currency" means dollars in the currency of the United States of America;

"Benefit Plan Investor Members" means Permitted U.S. Persons subject to the Employee Retirement Income Security Act of 1974 of the United States of America ("ERISA"), including all employee benefit plans and individual retirement accounts whether or not subject to ERISA or the United States of America Internal Revenue Code of 1986, as amended, and any supplement or replacement thereof, and pension plans maintained by non-United States corporations as well as any entity of which twenty-five (25%) percent or more of the value of any class or equity interest is held by any of the aforementioned entities;

"business day" means any day on which securities are traded on the New York Stock Exchange;

"Company" means The OmniFund, Ltd.;

"Custodian" means the person or persons for the time being appointed as custodian, joint custodians or prime broker pursuant to the Articles;

"Dealing Day" means, with respect to subscriptions, the first business day following a Valuation Day, with respect to redemptions, the last business day of each fiscal quarter of the Company and/or in either case such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally;

"Dealing Time" means the time by which an application for subscription or a request for redemption must be received, which in relation to subscriptions is 5:00 pm (Netherlands Antilles time) on the day three business days before a Dealing Day for subscriptions and in relation to redemptions is 5:00 pm (Netherlands Antilles time) on the day six months before a Dealing Day for redemptions, or the next business day if such a day is not a business day, or, in either case, such other time or day as the Directors may from time to time determine either in any particular case or generally;

"Director" means a person who is a director of the Company;

"duties and charges" includes all stamp and other duties, taxes, Governmental charges, brokerage, bank charges, transfer fees and registration fees;

"Fund" means a fund established and maintained by the Company in connection with each class, if any, of Shares created for issue and within which all assets and liabilities attributable to the relevant class of Shares shall be held and may be invested in a common portfolio of the Company along with the assets of the other classes, if any, of Shares;

"Investment" means any right or interest in any share, stock, bond, debenture, debenture stock, unit, sub-unit, or other security or any loan of money or any currency or interest in any currency and includes any financial stock market index, interest rate or currency futures or similar financial or other instruments and any rights in or options over any of the aforesaid, issued by or under the guarantee of anybody, whether incorporated or unincorporated, or of any governmental body and whether paying interest or dividends or not and whether fully paid, partly paid or nil paid and includes any participation as a limited partner or participant in any partnership or unincorporated association;

"in writing" and "written" includes printing, lithography, photography, and other modes of representing or reproducing words in visible form;

"Managed Class" means a class of shares attributable to a Managed Fund;

"Managed Fund" means a Fund established in accordance with Article 4 as a Managed Fund and, except where the context otherwise requires, references to Fund include references to a Managed Fund;

"Manager" means the person for the time being appointed and acting as manager of the Company;

"Member" has the same meaning as member given in the Act and means the person or body corporate registered in the Register as the holder of shares in the Company, and, when two or more persons are so registered as joint holders of shares, means the person whose name stands first in the Register as one of such joint holders;

"Memorandum" means the Memorandum of Association of the Company;

"month" means calendar month;

"Net Asset Value" means the net asset value per Share determined in accordance with Article 11;

"notice" means written notice unless otherwise specifically stated;

"notional Shares" means a unit of reckoning for the purposes of determining the assets of a Managed Fund and the Net Asset Value per Share of a Fund which includes assets attributable to a Managed Fund in accordance with these Articles, and for certainty no votes or voting rights shall be attributable to notional Shares;

"Office" means the registered office of the Company for the time being;

"Paid up" means paid up and/or credited as paid up;

"Permitted U.S. Person" means any entity organised under the laws of the United States of America that is generally exempt from federal income taxation;

"Principal Market" with reference to any Investment, means such market which in the opinion of the Directors is the sole or principal securities market upon which such Investment is listed, quoted or traded or in respect of which permission to deal is effective and the expression "market" shall include any over-the-counter market or recognised exchange;

"Record Date" in respect of any dividend means the date as of which the persons entitled to participate therein fall to be determined and in respect of any general meeting of the Company means the date as of which the persons entitled to receive notice of and vote thereat fall to be determined;

"Redemption Charge" means an amount as determined by the Directors but not exceeding fifteen (15%) percent of the Redemption Price;

25514

"Redemption Price" means the price at which Shares may be redeemed, determined in accordance with these Articles;

"Register" means the Register of Members maintained by the Company at the office of the registrar and transfer agent of the Company, or such other place as the Directors may determine, with a copy kept at the registered office of the Company in the British Virgin Islands;

"Seal" means the Common Seal of the Company and includes any duplicate common seal which the Directors may by resolution approve or adopt;

"Secretary" means (subject to the provisions of the Act) the person for the time being appointed to perform the duties of the Secretary of the Company and includes an Assistant, Acting or Deputy Secretary;

"Share" means a share of any class in the capital of the Company of a par value of US$0.01 having the rights and being subject to the restrictions specified in the Memorandum and  these Articles with respect to such shares and shall where the context so permits include a fraction of a Share and "Shares" shall be construed accordingly;

"Subscription Price" means the price at which Shares may be subscribed, determined in accordance with the Articles;

"U.S." means the United States of America and its territories and possessions;

"U.S. Person" means, with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time and with respect to persons other than individuals, the term "U.S. Person" means (i) a corporation or partnership created or organised in the United States of America or under the laws of the United States of America or any state or (ii) a trust or estate which is subject to U.S. tax on its worldwide income from all sources; and

"Valuation Day" means the last business day of each month and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally but so that there shall be at least one Valuation Day in each month.

The word "may" shall be construed as permissive and the word "shall" shall be construed as imperative.

Words importing the singular number only include the plural number and vice versa.

The OmniFund, Ltd                                                          Page 5

Words importing the masculine gender only include the feminine gender.
Words importing persons include companies or associations or bodies of persons, whether corporate or unincorporate.

Reference herein to any act is to an act of the British Virgin Islands legislature.

Save as aforesaid any words or expressions defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## BUSINESS

2.         The meetings of the Members and of the Directors and of any committee appointed by the Directors shall be held in the British Virgin Islands or such other place as the Directors may from time to time determine.

3.         Subject to Article 26(3), any branch or kind of business which the Company is either expressly or by implication authorised to undertake may be undertaken by the Directors at such time or times as they may think fit, and further may be suffered by them to be in abeyance, whether such branch or kind of business may have been actually commenced or not, so long as the Directors may deem it expedient not to commence or proceed with the same.

## SHARE CAPITAL

4.    (1)    Subject to the provisions of these Articles, the unissued Shares of the Company shall be available for issue by the Directors who may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as they may determine.

(2)    The Directors shall establish and thereafter maintain Funds for each class of Shares that may exist from time to time.  The assets in a Fund may be commingled with the assets of any other Fund in a common portfolio provided that the investment objective and policy of each Fund is similar and further provided that the Net Asset Value of each Fund shall be calculated by crediting or debiting, as the case may be, to each Fund (apportioned between each Fund by reference to the percentage that the Net Asset Value of each Fund as at the previous Valuation Day, bore to the aggregate Net Asset Value of all Funds as at that Valuation Day) the profits and gains or losses (realized and unrealized) of the common portfolio and debited the expenses and liabilities (other than the management and incentive fees then accruing) of the common portfolio (apportioned in the manner aforesaid). In addition, the Directors shall be entitled from time to time at their own discretion to designate any Fund to be a Managed Fund.

25514

(3)      Except where the context otherwise requires, the provisions of these Articles shall apply, mutatis mutandis, separately and independently to each class of Shares and to each Fund as if any such class of Shares and Fund were the sole class of Shares and Fund created and established pursuant to these Articles.

(4)      Save as otherwise in these Articles provided, the assets so held in each Fund shall be applied solely in respect of the Shares of the class to which such Fund appertains and the following provisions shall apply to Funds established and maintained pursuant to this Article:

> (a)    the proceeds from the allotment and issue of each class of Shares shall be applied in the books of the Company to the Fund established for that class of Shares, and the assets and liabilities and income and expenditure attributable thereto shall be applied to such Fund subject to the provisions of this Article 4. In the case of a Managed Fund, the Directors may further apply in the books of the Company all or a portion of the assets thereof to the credit of another Fund (the "subject Fund"), and any assets so applied shall be held in such subject Fund as if received directly thereby. Where assets are so applied, the subject Fund shall record the issue of notional Shares to the relevant Managed Fund in a number equal to the value of the assets credited to the subject Fund divided by the Subscription Price for Shares of the subject Fund, and (i) the number of Shares of the subject Fund in issue shall be deemed to be increased by the number of such notional Shares recorded in respect of the subject Fund and (ii) the assets of the relevant Managed Fund shall, instead of the value of the assets applied to the subject Fund, be deemed to include an asset valued at the number of notional Shares recorded by the subject Fund in favour of the relevant Managed Fund multiplied by the Net Asset Value for Shares of the subject Fund;

> (b)    where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Fund as the asset from which it was derived and on each revaluation of an investment the increase or diminution in value shall be applied to the relevant Fund;

> (c)    subject to the Act and these Articles, any dividends as and when declared by the Directors shall be paid to the holders of Shares out of the relevant Fund. Where a Fund (the "subject Fund") shall have recorded notional Shares as in issue, on the payment of any dividend to the holders of Shares of the subject Fund, an amount equal to (i) the number of such notional Shares multiplied by (ii) the dividend per Share, shall be debited to the subject Fund and credited to the relevant Managed Fund;

(d) on a redemption of Shares of a class, the redemption proceeds shall be paid to the holder redeeming such Shares out of the relevant Fund. In the case of a Managed Fund recorded as entitled to notional Shares of another Fund (the "subject Fund), the Directors may on a Dealing Day require that an amount (not exceeding the number of such notional Shares multiplied by the Redemption Price) be debited to the subject Fund and credited to the relevant Managed Fund, and the number of such notional Shares recorded to be in issue in favour of the relevant Managed Fund shall be reduced by (i) the amount so debited to the subject Fund divided by (ii) the Redemption Price of Shares of the subject Fund;

(e) in the case of any asset of the Company (or amount treated as a notional asset) which the Directors do not consider is attributable to a particular Fund or Funds, the Directors shall have discretion to determine the basis upon which any such asset shall be allocated between Funds and the Directors shall have power at any time and from time to time to vary such basis;

(f) the Directors shall have power to (i) determine the basis upon which any liability shall be allocated between Funds (including conditions as to subsequent re-allocation thereof if circumstances so permit) and shall have power at any time and from time to time to vary such basis and (ii) transfer any assets (or amounts treated as notional assets) to and from Funds if, as a result of a creditor proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne under clause (i) aforesaid, or in any similar circumstances. Where a Fund (the "subject Fund") shall have notional Shares recorded as in issue, on a winding-up the Directors shall debit to the subject Fund and credit to the relevant Managed Fund an amount equal to (i) the number of such notional Shares recorded in issue in favour of the relevant Managed Fund multiplied by (ii) the Redemption Price of Shares of the subject Fund.

5.    (1)    Notwithstanding anything herein contained, fully paid shares of the Company shall be free and clear of all and any liens and charges in favour of the Company.

(2)    Subject to the provisions of these Articles and to the extent the Company has more than one class of Shares, the Company shall on receipt by it or its authorised agent of a conversion request in writing (or in such other form as the Directors may determine) by a Member (the "Converter") specifying the number and class of Shares to be converted (the "Existing Shares") and the class of Shares into which they are to be converted (the "New Shares"), convert all or a portion of the Existing Shares comprised in a share certificate into New Shares and the following provisions of this Article shall apply:

(a)   the rate at which all or any part of the holding of Existing Shares shall be converted into New Shares, shall be determined in accordance with the following formula:

$$A = \frac{[(B \times RP) - C]}{SP}$$

where:

A is the number of New Shares to be allotted

B is the number of Existing Shares to be converted

C is the conversion charge to be charged by the Manager

RP is the redemption price of the Existing Shares determined on the Valuation Day which precedes the day on which the conversion is to be effected

SP is the subscription price of the New Shares determined on the Valuation Day which precedes the day on which the conversion is to be effected.

PROVIDED THAT:

(b)   the conversion of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time;

(c)   no conversion of part only of the holding of any Member shall be made if as a result thereof such Member would hold less than the minimum number of Existing Shares and/or New Shares as specified from time to time by the Directors;

(d)   subject as hereinafter in this Article provided, the Converter shall not be entitled to withdraw a conversion request duly made in accordance with this Article;

(e)   no Shares shall be converted during any period when the determination of Net Asset Value is suspended pursuant to paragraph (4) of Article 11 hereof, the right of the Converter to have his Shares converted pursuant to this

Article shall be similarly suspended and during the period of suspension he may withdraw his request for conversion and his certificate. Any withdrawal of a request for conversion under the provisions of this Article shall be made in writing and shall only be effective if actually received by the Company or its duly authorised agent before termination of the said period of suspension. If the conversion request is not so withdrawn, the conversion of the said Shares shall be made on the Dealing Day next following the end of the said suspension.

(3)   Where a certificate has been issued in respect of any Shares to be converted:

(a)   the Converter shall lodge with the Company or its authorised agent such certificate and subject as hereinafter mentioned no New Shares shall be issued under this Article until such certificate shall have been received;

(b)   the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed on compliance by the Converter with the like requirements for those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(c)   on a conversion of part only of the Existing Shares registered in the Converter's name, the Converter shall be entitled without payment to a balance certificate for the balance of Existing Shares held by him.

6.       Without prejudice to any special rights for the time being conferred on the holders of any shares or class of shares (which special rights shall not be varied or abrogated, except with such consent or sanction as is provided by the next following Article) any share in the Company may be issued with such preferred deferred or other special rights, or such restrictions, whether in regard to dividend, return of capital, redemption, voting or otherwise as the Company may from time to time in general meeting determine.

7.       The special rights conferred upon the holders of any shares or class of shares issued with preferred or other special rights shall not (unless otherwise expressly provided by the conditions of issue of such shares) be deemed to be varied by the creation, allotment or issue of further shares ranking pari passu therewith or subsequent thereto.

8.       The Company shall be entitled to treat the registered holder of any share as the absolute owner thereof and accordingly shall not be bound to recognise any equitable or other claim to, or interest in, such share on the part of any other person.

25514

## ISSUE OF SHARES

9.    (1)    Subject as hereinafter provided, the Company may on receipt by it or its authorised agent of an application in such form as the Directors may from time to time determine issue and allot Shares PROVIDED THAT:

(a)    the issue of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the application is received provided that the application is received on or before the Dealing Time;

(b)    the issue of Shares pursuant to this Article shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article but in no event shall a Share be allotted or issued at a price less than its par value;

(c)    payment shall be made in the Base Currency at such time and place and in such manner as the Directors may from time to time determine failing which any allotment of Shares for which payment is due may be canceled by the Directors;

(d)    the Company shall not issue any of its Shares or securities (i) for services, or (ii) for property other than cash or securities (including securities of which the Company is the issuer) except that it may issue fully paid Shares as a distribution to its Members or in connection with a reorganisation;

(e)    no Share shall be allotted or issued (except those for which applications have been previously received and accepted by the Company or its agent) during any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 11;

(f)    the Directors may satisfy any such application for Shares by procuring the transfer to the applicant of fully paid Shares at the appropriate Subscription Price.  If in lieu of issuing Shares the Company shall procure a transfer of Shares to the person making such application, any duties and charges payable in connection with such transfer shall be discharged by or on account of the transferor out of the price payable for such Shares;

(g)    Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case;

(h)   fractions of a Share, of not less than one-thousandth of a Share, may be issued.

(2)   The Subscription Price for each Share shall be the Net Asset Value of each Share (as determined in accordance with Article 11) as at the close of business in New York City on the Valuation Day immediately preceding the Dealing Day on which such issue is made in each case rounded to the nearest minimum integral unit of the Base Currency plus or minus such amount as the Directors may determine is necessary to adjust the Subscription Price to ensure that (i) any incentive fee paid to the Manager is charged only to those Shares which have appreciated in value since their acquisition, (ii) all Members have the same amount per Share of a class at risk and (iii) all Shares of a class have the same Net Asset Value per Share, PROVIDED THAT in the case of an initial issue of Shares (that is, an issue of Shares at a time when there are no Shares of the relevant class in issue), the Directors shall, at their discretion, fix a Subscription Price which shall apply for the purposes of such initial issue of Shares.

(3)   Share certificates in respect of Shares allotted, if requested, as aforesaid shall not be issued or delivered unless and until the subscription moneys have been paid over to the Custodian.

(4)   The Company may on any issue of Shares pay such brokerage or commission as may be lawful.

(5)   Notwithstanding any other provision of the Memorandum and these Articles, (i) Shares may not be owned by any U.S. Person other than a Permitted U.S. Person, (ii) Shares may not be owned by any corporation which is not a Permitted U.S. Person in which U.S. Persons hold ten (10%) percent or more of either voting power or value, (iii) Shares may not be owned by any partnership which is not a Permitted U.S. Person in which a U.S. Person is a partner, (iv) Shares may not be owned by a trust which is not a Permitted U.S. Person whose grantor or any of its beneficiaries is a U.S. Person, (v) Benefit Plan Investor Members may not own twenty-five (25%) percent or more of the outstanding Shares and (vi) Permitted U.S. Persons may not own fifty (50%) percent or more of the outstanding Shares in the aggregate.

## REDEMPTION OF SHARES

10.   (1)   Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member (the "Applicant") specifying the number and class of Shares to be redeemed redeem or purchase all or any portion of the Shares registered in the Applicant's name PROVIDED THAT:

(a)  subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day on which, or immediately following the day on which, the written request is received provided that the said request is received on or before the Dealing Time;

(b)  the redemption or purchase of Shares pursuant to this Article shall be effected at the Redemption Price determined in accordance with paragraph (2) of this Article less the Redemption Charge, if any;

(c)  subject as hereinafter provided, payment shall be made to the Applicant in the Base Currency in respect of the redemption or purchase of Shares. Any amount payable as aforesaid to the Applicant shall be payable as up to 95% of the amount payable as soon as practicable after the relevant Dealing Day (normally within thirty (30) days) plus (i) any period after the receipt of the request for redemption and before such payment during which the determination of the Net Asset Value has been suspended by declaration of the Directors pursuant to Article 11 and (ii) any period during which the relevant share certificate, if any, has not been lodged as provided in this Article 10, and as to the balance of the amount payable within thirty (30) days after completion of (i) unaudited quarterly financial statements for redemptions on the last business day of the first three (3) fiscal quarters of the Company, or (ii) audited financial statements for redemptions on the last business day of the Company's fiscal year. Payment for Shares redeemed or purchased hereunder shall be made to the Applicant by a cheque, draft, wire transfer or other means of payment posted (at the risk of the Applicant) or otherwise paid to the Applicant in the manner determined by the Directors from time to time. If an Applicant shall require payment in a currency other than the Base Currency, the Directors may, subject to receipt of any necessary exchange control or other governmental consent and at the risk of the Applicant and on his paying any costs thereby involved, arrange for the conversion of the sum to which the Applicant is entitled into such currency as the Applicant may require at such exchange rate as the Directors shall consider appropriate;

(d)  on any redemption or purchase the Directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price and any other sums payable on redemption as is herein provided;

(e)  no Shares shall be redeemed or purchased during any period when the determination of the Net Asset Value is suspended pursuant to Article 11, the right of the Applicant to have his Shares redeemed or purchased

pursuant to this Article shall be similarly suspended and during the period of suspension he may withdraw his request for redemption and his certificate. Any withdrawal of a request for redemption under the provisions of this Article shall be made in writing and shall only be effective if actually received by the Company or its duly authorised agent before termination of the said period of suspension. If the request is not so withdrawn the redemption or purchase of the said Shares shall be made on the Dealing Day next following the end of the said suspension;

(f)    instead of redeeming or purchasing the Applicant's Shares, the Directors may procure the purchase thereof at not less than such Redemption Price and at the same time and under the same conditions as apply to redemption under the provisions of these Articles;

(g)    subject as hereinafter in this Article provided, the Applicant shall not be entitled to withdraw a request duly made in accordance with this Article without the consent of the Directors; and

(h)    no redemption or purchase of part only of the holding of any Member may be made if as a result thereof such Member would hold less than the minimum number of Shares as specified from time to time by the Directors.

(2)    The Redemption Price for each Share shall be the Net Asset Value per Share (as determined in accordance with Article 11) as at the close of business in New York City on the Valuation Day immediately preceding the Dealing Day on which such redemption is effected less such sum (if any) as the Directors may consider represents the appropriate provision for fiscal and sale charges which would be incurred on the sale of assets of the Company, in each case rounded to the nearest minimum integral unit of the Base Currency, plus or minus such amount as the Directors may determine is necessary to adjust the Redemption Price to ensure that (i) any incentive fee paid to the Manager is charged only to those Shares which have appreciated in value since their acquisition, (ii) all Members have the same amount per Share of a class at risk and (iii) all Shares of a class have the same Net Asset Value per Share.

(3)    Where a certificate has been issued in respect of any Shares to be redeemed or purchased:

(a)    the Applicant shall lodge with the Company or its authorised agent such certificate and subject as hereinafter mentioned no payment shall be made under this Article until such certificate shall have been received;

(b)    the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed upon compliance by

the Applicant with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(c)   on redemption or purchase of part only of the Shares registered in the Applicant's name the Applicant shall be entitled by written request without payment to a balance certificate for the balance of such Shares.

(4)   Upon the redemption or purchase of a Share being effected pursuant to this Article, the Member shall cease to be entitled to any rights in respect of that Share (excepting always the right to receive a dividend which has been declared in respect thereof prior to such redemption or repurchase being effected) and accordingly his name shall be removed from the Register with respect thereto.

(5)   Subject to the provisions of the Memorandum, these Articles and the Act and subject as hereinafter provided, the Directors shall have the power exercisable by resolution to redeem or purchase all or any portion of the Shares registered in the name of any Member (the "Relevant Member") and the provisions of this Article 10 shall apply to any such redemption or purchase EXCEPT THAT:

(a)   the Company shall give not less than five (5) days' prior written notice to the Relevant Member of its intention to redeem or purchase such Relevant Member's Shares specifying the class, if applicable, and the number of such Shares.  PROVIDED THAT the Company shall not be required to give any notice if (i) the Member holds less than the minimum number of Shares as the Directors may from time to time specify, (ii) the Member is a U.S. Person or (iii) the Shares being redeemed have been acquired or held by:

(1)   any person in breach of the law or requirements of any country or governmental authority; or

(2)   any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any persons, connected or not, or any circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

(b)   subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Dealing Day immediately

following the day on which such notice is received or deemed received by virtue of the provisions of these Articles;

(c)     if a certificate in respect of any Shares the subject of redemption or purchase under this paragraph of this Article is outstanding then, upon receipt of the notice as aforesaid, the Relevant Member shall be bound forthwith to deliver to the Company or its duly authorised agents the certificate for such Shares. Payment of the redemption or purchase proceeds shall be deposited by the Company with or to the order of the Custodian in the name of the Company for payment to the Relevant Member against surrender of the certificate representing such Shares previously held by such Relevant Member. Upon the deposit of such redemption or purchase monies as aforesaid, the Relevant Member shall have no further interest in such Shares or any of them or any claim against the Company in respect thereof except the right to receive the money so deposited (without interest) from the Company upon surrender of the said certificate;

(d)     no Shares shall be redeemed or purchased under this Article during any period when the determination of the Net Asset Value is suspended pursuant to Article 11.

## DETERMINATION OF NET ASSET VALUE

11.     (1)     The Net Asset Value per Share of each class shall be determined by the Directors as at the close of business on each Valuation Day (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the value of the net assets of the Fund by the number of Shares of the relevant class then in issue or deemed to be in issue, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.

(2)     The net assets of the Fund shall comprise the aggregate of:-

(a)     investments owned or contracted to be acquired by the Company for the account of the Fund;

(b)   cash on hand or on deposit including accrued interest relating to the Fund;

(c)   cash payments outstanding on any Shares of the class allotted;

(d)   bills and demand notes and amounts receivable including net amounts receivable in respect of investments of the Fund contracted to be realised;

(e)   interest accrued on interest bearing investments of the Fund except that accrued on securities which is included in the quoted price; and

(f)   other property and assets of the Fund of any kind and nature including prepaid expenses and unamortised preliminary expenses as valued and defined from time to time by the Directors;

from which shall be deducted:-

(i)   Investments of the Fund contracted to be sold;

(ii)   bills and accounts payable for the account of the Fund;

(iii)   management and administrative expenses payable and/or accrued (the latter on a day-to-day basis);

(iv)   the gross acquisition consideration of Investments or other property contracted to be purchased for the Fund;

(v)   reserves authorised or approved by the Directors for duties and charges or taxes or contingencies (accrued where appropriate on a day-to-day basis);

(vi)   the aggregate amount of all borrowings and interest, commitment fee, and other charges arising in connection therewith (accrued where appropriate on a day-to-day basis); and

(vii)   other liabilities of the Company relating to the Fund of whatsoever nature (which shall, where appropriate, be deemed to accrue from day-to-day) including outstanding payments on any Shares of the relevant class previously redeemed and, as from the Record Date in respect thereof, any dividends declared and not paid (contingent liabilities (if any) being valued in such manner as the Directors may determine from time to time or in any particular case).

25514

For the purpose of calculating the number of Shares in issue or deemed to be in issue, Shares for which applications have been duly made shall be deemed to be not in issue on the relevant Valuation Day and Shares to be redeemed or purchased in accordance with Article 10 hereof shall be deemed to be in issue on the relevant Valuation Day.

(3)     For the purpose of calculating the value of the net assets of the Fund:

(a)     no value will be assigned to goodwill;

(b)     any deferred fee liability and any accrued incentive fee and management fee payable to the Manager, estimated administrative expenses and investment expenses of the Company and such reserves for contingent liabilities of the Company, if any, as the Directors, as advised by the Manager, shall determine, will be treated as liabilities;

(c)     securities and instruments which are listed or quoted on a securities or other exchange market (including the National Association of Securities Dealers National Market System), other than securities and instruments which are in the form of put or call options, shall be valued at their last sales prices on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value assigned to such securities and instruments by the Directors, as advised by the Manager;

(d)     securities and instruments which are in the form of put and call options and are listed or quoted on a securities or other exchange or market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, at the mean between the "bid" and "asked" prices on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of such determination, at the value assigned to such securities and instruments by the Directors, as advised by the Manager;

(e)     securities and instruments which are not listed or quoted on a securities or other market shall be valued at the mean between the "bid" and "asked" prices on the date of determination, or if no such prices were quoted on such date, on the most immediate prior date on which such prices were quoted, or if no such prices were quoted during the 15 business days prior to the date of

25514

such determination, at the value assigned to such securities and instruments by the Directors, as advised by the Manager;

(f)     securities and instruments which are in the form of put and call options and are not listed or quoted on a securities, commodities or futures exchange or market shall be valued at their parity value, except when the Directors, as advised by the Manager, has assigned some other value to such securities and instruments;

(g)     the value of any shares of stock held by the Company in an investment company which is, or which is similar to those companies which are, registered as investment companies under the [ICA], shall be valued in accordance with the manner in which such shares are valued by such investment company; provided, however, that the Directors, as advised by the Manager, may make such adjustments in such valuation as it may from time to time consider appropriate;

(h)     securities and instruments of a non-public company will be valued at cost until the non-public company becomes a public company or some other material event involving the company occurs, all as determined by the Directors, as advised by the Manager; and

(i)     all other assets of the Company shall be valued in the manner determined by the Directors, as advised by the Manager, to reflect their market value.

(4)     Notwithstanding paragraph (3) of this Article 11, if the Directors determine, in their sole and absolute discretion, that the valuation of any security or instrument pursuant to the foregoing does not fairly represent its market value, the Directors shall value such security or instrument, after consultation with and as advised by the Manager, and shall set forth the basis of such valuation in writing in the Company's records. The value of any investment, security or instrument as aforesaid or other property for which no price quotations are available as above provided shall be determined by the Directors, after consultation with and as advised by the Manager, and the basis of such valuation shall be set forth in writing in the Company's records. Notwithstanding the foregoing, where on any Valuation Day, any cash or other assets of the Company has been realised or contracted to be realised, there shall be included in the assets of the Company, in place of such cash or other asset, the assets receivable by the Company in respect thereof, provided that if the value of such assets is not then known exactly, then the value shall be determined by the Director, after consultation with and as advised by the Manager, and provided that if the net amount receivable is not payable until some future time after the Valuation Day, the Director may make such allowance (discounting of claims) as it considers appropriate, after consultation with and as advised by the Manager, to reflect the true current value thereof.

25514

(5)    The Directors may suspend the determination of the Net Asset Value per Share of any class for the whole or any part of a period:-

(a)    in the event that Members, in the aggregate, request redemption of twenty-five (25%) percent or more of the Company's outstanding Shares of any class as of a Dealing Day;

(b)    during any period when any stock exchange or over-the-counter market on which a substantial position of the Company's investments are quoted, traded, listed or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

(c)    when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Company to dispose of investments or as a result of which any such disposal would be materially prejudicial to Members;

(d)    when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets cannot reasonably or fairly be ascertained; or

(e)    during which the Company is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorised under this paragraph shall exist.  Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Company and as shall be in effect at the time.    To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive.   Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all Members stating that

such declaration has been made.  At the end of any period of suspension as aforementioned the Directors shall give notice to all Members stating that the period of suspension has ended.

## INVESTMENT AND BORROWING POWERS

12.    (1)    In carrying on the business of the Company, the Directors shall be entitled to acquire, hold, deal in and dispose of any Investment in such manner at such times and in such amounts as the Directors shall think fit.

(2)    The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital, or any part thereof, and may issue debentures, debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or any third party.

## CUSTODIAN

13.          The Directors shall appoint a Custodian who or whose nominee shall hold the assets of the Company and in whose name or in the name of whose nominee the same shall be registered in the case of registered securities and who shall perform such other duties upon such terms as the Directors may from time to time (with the agreement of the Custodian) determine. All moneys, bills and notes belonging to the Company shall be paid to or to the order of or deposited with or to the order of the Custodian to an account to be opened in the name of the Company.  The Custodian shall be a corporation having a capital (in stock or shares) for the time being issued of not less than US$1,000,000 (or equivalent in other currency).  In the event of the Custodian desiring to retire the Directors shall use their best endeavours to find a corporation having the said qualifications to act as Custodian and upon doing so the Directors shall appoint such corporation to be Custodian in place of the retiring Custodian.  The Directors shall not remove the Custodian unless and until a successor corporation shall have been appointed in accordance with this Article to act in the place thereof.  The powers of the Directors under this Article shall include a power to appoint joint custodians and/or sub-Custodians.

## SHARE CERTIFICATES

14.     (1)     Every person whose name is entered as a Member in the Register shall, by request in writing, be entitled without payment to one certificate for all his shares, or upon payment of such reasonable out-of-pocket expenses as the Directors shall from time to time determine, to several certificates, each for one or more of his shares.  Where a Member transfers part only of his holding of shares he shall be entitled without payment to a balance certificate for the shares retained by him.  Every certificate shall be under the Seal or a facsimile thereof or a securities seal of the Company adopted by the Directors for that purpose and shall specify the number and class and distinguishing numbers (if any) of the shares to which it relates, and the amount paid up thereon.  The Company shall not be bound to register more than four persons as the joint holders of any share or shares (except in the case of executors or trustees of a deceased Member) and in the case of a share held jointly by two or more persons, the Company shall not be bound to issue more than one certificate therefor, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all.  If a share certificate be defaced, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity as the Directors think fit.

(2)     Notwithstanding the foregoing, unless and until the Company receives a request in writing from the Member requesting a certificate for his shares pursuant to paragraph (1) of this Article, the Company need not issue the certificate to which the Member is otherwise entitled, in which case such Member's holding shall be recorded in the Register alone.

## REGISTER OF MEMBERS

15.     (1)     The Secretary shall enter or procure the entry in the Register of the particulars required by the Act, and the Register shall be kept in such manner as to show at all times the Members of the Company for the time being and the shares respectively held by them.

(2)     Notwithstanding any other provision of these Articles, the Directors may fix any date as the Record Date for:-

(a)     determining the Members entitled to receive any dividend; and

(b)     determining the Members entitled to receive notice of and to vote at any general meeting of the Company.

## TRANSFER OF SHARES

16.          Without the prior written consent of the Directors, which consent may be given or withheld in their sole and absolute discretion, any sale, assignment, transfer, conveyance, pledge, hypothecation or other disposition or encumbrance of shares or any attempt to do any of the foregoing shall not be recognized by the Company.  Further, the transferee must complete a subscription document in a form that is acceptable to the Directors before such transfer will be accepted.  Subject to the foregoing and such other restrictions of these Articles as may be applicable, any Member may transfer all or any of his shares by instrument in writing in a usual common form or in any other form which the Directors may approve.  Such instrument may be on the back of the share certificate (if issued) and need not be under seal.  The transferor shall be deemed to remain the holder of such shares until the name of the transferee is entered in the Register in respect thereof.  An instrument of transfer need not be signed by or on behalf of the transferee.

17.     (1)     No transfer of Shares may be made if (i) as a result of such transfer either the transferor or the transferee of such Shares would hold less than the minimum number of Shares as the Directors may from time to time specify, (ii) the transferee is a U.S. Person, or (iii) such transfer would in the opinion of the Directors result in Shares being acquired or held by:-

     (a)     any person in breach of the law or requirements of any country or governmental authority; or

     (b)     any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any persons, connected or not, or any circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

     (2)     The Directors may decline to recognise any instrument of transfer, unless the instrument of transfer is deposited at the office of the Company or such other place as the Directors may appoint, accompanied by the certificate, if any, for the shares to which it relates, and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.

     (3)     The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine provided always that such registration shall not be suspended for more than thirty days in any year.

The OmniFund, Ltd                                                               Page 23

18.           All instruments of transfer which shall be registered shall be retained by the Company, but any instrument of transfer which the Directors may decline to register shall (except in the case of fraud) be returned to the person depositing the same.

## TRANSMISSION OF SHARES

19.     (1)      In the case of the death of a Member the survivors or survivor where the deceased was a joint holder, and the legal personal representatives of the deceased where he was a sole or only surviving holder, shall be the only persons recognised by the Company as having any title to his interest in the shares, but nothing in this Article shall release the estate of a deceased joint holder from any liability in respect of any share jointly held by him.

        (2)      Any person becoming entitled to shares in consequence of the death, incompetence or bankruptcy of a Member or otherwise by operation of law upon producing such evidence as the Directors may deem sufficient, may be registered as a Member in respect of such shares, or may, subject to Article 18, transfer such shares to some other person by executing an instrument of transfer in a usual common form or any other form which the Directors may approve.

        (3)      If the person so becoming entitled shall elect to be registered himself, he shall deliver or send to the Company a notice in writing signed by him stating that he so elects. If he shall elect to have another person registered, he shall testify his election by executing to such person a transfer of such share. All the limitations, restrictions and provisions of these presents relating to the right to transfer and the registration of transfers of shares shall be applicable to any such transfer as aforesaid as if the death, incompetence or bankruptcy of the Member had not occurred and the transfer were a transfer executed by such Member.

        (4)      A person becoming entitled to a share in consequence of the death, incompetence or bankruptcy or otherwise by operation of law of a Member shall be entitled to receive and may give a discharge for all dividends and other moneys payable on or in respect of the share, but he shall not be entitled to receive notice of or to attend or vote at meetings of the Company, or, save as aforesaid, to any of the rights or privileges of a Member until he shall have become a Member in respect of the share.

        (5)      For the purposes of this Article, what amounts to incompetence on the part of a person is a matter to be determined by the Supreme Court of the British Virgin Islands or a judge thereof after having regard to all the relevant evidence and the circumstances of the case.

## CONVENING OF MEETINGS OF MEMBERS

20.    (1)    The Directors of the Company may convene meetings of the Members at such times and in such manner and places within or outside the British Virgin Islands as the Directors consider necessary or desirable.

(2)    Upon the written request of Members holding more than fifty percent of the votes of the outstanding voting shares in the Company the Directors shall convene a meeting of Members.

21.    A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means, and all Members participating in the meeting are able to hear each other.

22.    The Directors shall give not less than seven days notice of meetings of Members to those persons whose names on the date the notice is given appear as Members in the share register of the Company and are entitled to vote at the meeting.

23.    A meeting of Members held in contravention of the requirement to give notice pursuant to this Article is valid if a 90% majority of:

(a)    the total number of shares entitled to vote on all matters to be considered at the meeting;

(b)    the votes of each class of shares where Members are entitled to vote thereon as a class together with an absolute majority of the remaining votes;

have waived notice of the meeting and, for this purpose, the presence of a Member at the meeting shall be deemed to constitute waiver on his part.

24.    The inadvertent failure of the Directors to give notice of a meeting to a Member, or the fact that a Member has not received notice, does not invalidate the meeting.

## QUORUM AT GENERAL MEETINGS

25.    No business shall be transacted at any general meeting unless a quorum is present. At a general meeting, subject as in these Articles otherwise provided, two persons present representing in person or by proxy not less than one-third of shares of the Company entitled to vote at general meetings for the time being in issue shall be a quorum for all purposes provided that where there is only one Member, one person representing in person or by proxy such Member shall be a quorum for all purposes. If within thirty minutes from the time appointed for

the meeting (including such a general meeting at which a resolution as aforesaid is to be proposed) a quorum is not present, the meeting, if convened on the requisition of or by Members, shall be dissolved.  In any other case, it shall stand adjourned for not less than fifteen days at the same place and if at such adjourned meeting a quorum is not present within thirty minutes from the time appointed for holding the meeting, the Members entitled to vote present in person or by proxy, not being less than two, shall be a quorum.

## MAJORITY TO APPROVE RESOLUTIONS

26.    (1)    Subject to paragraph (3) and any other provisions of these Articles, any act or thing which in accordance with these Articles is required to be transacted, made, done, approved, determined, decided or passed by the Company in general meeting shall not be effective except by virtue of a resolution passed by a simple majority of the persons voting thereat upon a show of hands, or, if a poll is duly demanded, by a simple majority of the votes given at such poll.

(2)    In the case of an equality of votes at a general meeting, whether on a show of hands or on a poll, the chairman of such meeting shall be entitled to a second or casting vote.

(3)    Notwithstanding paragraph (1), (i) a resolution to remove a director must be approved by a resolution passed by a two-thirds majority of the votes cast at a meeting of Members at which more than one-half of the issued and outstanding shares are represented; (ii) any investment advisory or management contract entered into by the Company may not be terminated by the Company unless its termination is approved by a resolution passed by all of the votes cast at a meeting of Members at which all of the issued and outstanding shares are represented; (iii) amendments to the Memorandum or these Articles which have material adverse effect on the rights of Members as a whole or a particular class, as applicable,  must be approved by a resolution passed by a three quarters majority of the votes cast at a meeting of Members at which not less than one-half of the issued and outstanding shares of the Company or the relevant class, as applicable, are represented, except that any amendment to decrease the vote required to terminate the investment advisory or investment management contract requires approval by a unanimous vote cast at a meeting at which all of the issued and outstanding shares of the Company are represented, and (iv) the merger or consolidation of the Company with another company or the winding up of the Company must be approved by a resolution passed by the vote of three quarters of the shares issued and outstanding.

27.    Subject to the Act, anything which may be done by resolution of the Company in general meeting or by resolution of a meeting of any class of the Members of the Company, may, without a meeting and without any previous notice being required, be done by resolution in writing signed by, or, in the case of a Member that is a corporation whether or not a company within the meaning of the Act, on behalf of, all the Members who at the date of the resolution would be entitled to attend the meeting and vote on the resolution.  A resolution in writing may be signed by, or, in the case of a Member that is a corporation whether or not a company within

the meaning of the Act, on behalf of, all the Members, or any class thereof, in as many counterparts as may be necessary.

## PROCEEDINGS AT GENERAL MEETINGS

28.      The Chairman or in his absence the Deputy Chairman of the Company, or in the absence of both of them some other Director nominated by the Directors, shall preside as chairman at every general meeting of the Company, but if at any meeting none of the foregoing persons is present within fifteen minutes after the time appointed for holding the meeting, or if none of them be willing to act as chairman, the Directors present shall choose some Director present to be chairman, or if no Director is present, or if all the Directors present decline to take the chair, the Members present shall choose some person present to be chairman.

29.      The Chairman may with the consent of any meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, provided that (a) no business shall be transacted at any adjourned meeting except business which might lawfully have been transacted at the meeting from which the adjournment took place and (b) notice of the adjourned meeting shall, if necessary, be given in accordance with the provisions of these Articles.

30.      At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands unless (before or on the declaration of the result of the show of hands) a poll be demanded by the chairman or by at least three Members present in person or by proxy and entitled to vote or by any Member or Members present in person or by proxy and representing in the aggregate not less than one-tenth of the total voting rights of all Members having the right to vote at the meeting or holding shares conferring a right to vote at the meeting on which there have been paid up sums in the aggregate equal to not less than one-tenth of the total sum paid on all shares conferring that right. Unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried or carried unanimously or by a particular majority or not carried by a particular majority or lost, and an entry to that effect in the book of the proceedings of the Company shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such a resolution. If a poll is duly demanded the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

31.      A poll demanded on the election of a chairman, or on a question of adjournment, shall be taken forthwith. A poll demanded on any other question shall be taken at such time and place and in such manner as the chairman directs.

32.       ˙ If any votes shall be counted which ought not to have been counted, or might have been rejected, the error shall not vitiate the result of the voting unless it is pointed out at the same

meeting, or at any adjournment thereof, and not in that case unless it shall in the opinion of the chairman of the meeting be of sufficient magnitude to vitiate the result of the voting.

33.         Each Director of the Company shall be entitled to attend and speak at any general meeting of the Company.

34.         Subject to any special terms as to voting upon which any shares may be issued or may for the time being be held, at any general meeting on a show of hands every Member who (being an individual) is present in person or (being a corporation) is present by a duly authorised representative and every person holding a valid proxy at such meeting shall have one vote, and on a poll every Member who is present as aforesaid or by proxy shall have one vote for every share of which he is the holder.

35.         On a poll a Member entitled to more than one vote need not, if he votes, use all his votes, or cast all the votes he uses in the same way.

36.         The following apply in respect of joint ownership of shares:

    (a)   if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a member;

    (b)   if only one of them is present in person or by proxy, he may vote on behalf of all of them; and

    (c)   if two or more are present in person or by proxy, they must vote as one.

37.         A Member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, receiver, curator bonis, or other person in the nature of a committee, receiver or curator bonis appointed by such court, and such committee, receiver, curator bonis or other person may on a poll vote by proxy, provided that such evidence as the Directors may require of the authority of the person claiming to vote shall have been deposited at the office of the Company not less than thirty-six hours before the time for holding the meeting or adjourned meeting at which such person claims to vote.

38.         No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered, and every vote not disallowed at such meeting shall be valid for all purposes. Any such objection made in due time shall be referred to the chairman of the meeting, whose decision shall be final and conclusive.

## PROXIES AND REPRESENTATIVES

39.        A Member may be represented at a general meeting by a proxy who may speak and vote on behalf of the Member.  The instrument appointing a proxy shall be in writing, under the hand of the appointor or of his attorney, or, if such appointor is a corporation, under its common seal or the hand of a duly authorised officer.  The instrument appointing a proxy shall be in such form as the Directors may approve either generally or for a particular instance.  A Member may appoint more than one proxy to attend on the same occasion.  A proxy need not, unless required by law, himself be a Member.

40.        The instrument appointing a proxy and the power of attorney or other authority (if any) under which it is signed, or a notarially certified or office copy of such power of attorney, shall be deposited at the office of the Company or at such other place as is specified in the notice of meeting or in the instrument of proxy issued by the Company before the time appointed for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote and in default the instrument of proxy shall not be treated as valid.  No instrument appointing a proxy shall be valid after the expiration of twelve months from the date named in it as the date of its execution, except at an adjourned meeting or on a poll demanded at a meeting or an adjourned meeting in cases where the meeting was originally held within twelve months from such date.

41.        The Directors may at the expense of the Company send, by post or otherwise, to the Members instruments of proxy (with or without stamped envelopes for their return) for use at any general meeting or at any meeting of any class of Members of the Company either in blank or nominating in the alternative any one or more of the Directors or any other persons.  If, for the purpose of any meeting invitations to appoint as a proxy a person or one of a number of persons specified in the invitations are issued at the expense of the Company, such invitations shall be issued to all (and not to some only) of the Members entitled to be sent a notice of the meeting and vote thereat by proxy.

42.        A vote given in accordance with the terms of an instrument of proxy shall be valid, notwithstanding the death or insanity of the principal or the revocation of the instrument of proxy, or of the authority under which the instrument of proxy was executed, or the transfer of the share in respect of which the instrument of proxy is given, provided that no intimation in writing of such death, insanity, revocation or transfer shall have been received by the Company at the office of the Company before the commencement of the meeting or adjourned meeting at which the instrument of proxy is used.

43.        Any corporation which is a Member of the Company may authorise such person as it thinks fit to act as its representative at any meeting of the Company, or at any meeting of any class of Members of the Company, and the person so authorised shall be entitled to exercise

the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Member of the Company.

### DIRECTORS

44.        The first Director or Directors of the Company shall be elected by the subscriber to the Memorandum and the first Director or Directors may elect any number of additional Directors as it or they may determine up to the maximum number set by Article 45.  Thereafter, the Directors shall be elected by the Members for such term as the Members determine

45.        The minimum number of Directors shall be one and the maximum number shall be seven.

46.    (1)    Each Director shall hold office for the term, if any, fixed by resolution of Members or until his earlier death, resignation or removal.

        (2)    Subject to Article 26(3), a Director may be removed from office, with or without cause, by a resolution of Members but not by resolution of Directors.

        (3)    A Director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

47.        A vacancy in the board of Directors resulting from the death, resignation or removal of a Director may be filled by a resolution of the remaining Directors.

48.    (1)    With the prior or subsequent approval by a resolution of Shareholders, the Directors may, by a resolution of Directors, fix the emoluments of Directors with respect to services to be rendered in any capacity to the Company.

        (2)    A Director shall not require a share qualification, and may be an individual or a company.

        (3)    Any Director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the board of Directors or with respect to unanimous written consents.

49.    (1)    A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director, or may act in a professional capacity to the Company, on such terms as to tenure of office, remuneration and otherwise as the Directors may determine.

(2)     No Director or intending Director shall be disqualified by his office from contracting with the Company either as vendor, purchaser or otherwise, nor shall any such contract or any contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office, or of the fiduciary relation thereby established, but the nature of his interest must be declared by him at the meeting of the Directors at which the question of entering into the contract or arrangement is first taken into consideration, or if the Director was not at the date of that meeting interested in the proposed contract or arrangement, then at the next meeting of the Directors held after he becomes so interested, and in a case where the Director becomes interested in a contract or arrangement after it is made then at the first meeting of the Directors held after he becomes so interested.

(3)     Save as provided in this Article, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest (otherwise than by virtue of his interests in shares or debentures or other securities of or otherwise in or through the Company) unless the nature of his interest is declared at the first opportunity at a meeting of the Directors or by writing to the Directors and no other Director objects to the interested Director voting on such arrangement.  A Director shall not be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

(4)     If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to such Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

(5)     The Company in general meeting may suspend or relax the provisions of this Article to any extent or ratify any transaction not duly authorised by reason of a contravention of this Article.

50.          Any Director may continue to be or become a president, vice president, director, managing director, manager or other officer or member of any other company in which this Company may be interested, and no such Director shall be accountable for any remuneration or other benefits received by him as a president, vice president, director, managing director, manager or other officer or member of any such other company.  The Directors may exercise the voting powers conferred by the shares in any other company held or owned by the Company, or exercisable by them as directors of such other company, in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them presidents, vice presidents, directors, managing directors, managers or other officers of

such company, or voting or providing for the payment of remuneration to the presidents, vice presidents, directors, managing directors, managers or other officers of such company), and subject to the provisions of the preceding Article any Director may vote in favour of the exercise of such voting rights in the manner aforesaid, notwithstanding that he may be, or be about to be, appointed a president, vice president, director, managing director, manager or other officer of such other company and as such is or may become interested in the exercise of such voting rights in manner aforesaid.

51.        No person other than a Director retiring at the meeting shall, unless recommended by the Directors for election, be eligible for the office of a Director at any general meeting unless, not less than six or more than forty-eight days before the day elected for the meeting, there shall have been given to the Company notice in writing by some Member duly qualified to be present and vote at the meeting for which such notice is given of his intention to propose such person for election, and also notice in writing signed by the person to be proposed of his willingness to be elected.

### POWERS OF DIRECTORS

52.        The business of the Company shall be managed by the Directors, who may exercise all such powers of the Company as are not by the Memorandum, these Articles or the Act reserved to the Members, subject nevertheless to any regulations of these Articles, to the provisions of the Memorandum and of the Act, and to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed by the Company in general meeting, but no regulation made by the Company in general meeting shall invalidate any prior act of the Directors which would have been valid if such regulation had not been made.  The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Directors by any other Article.

53.   (1)   The Directors may, subject to these Articles, establish any committees (not being committees consisting solely of Directors to which paragraph (2) of this Article applies), local boards or agencies for managing any of the affairs of the Company, either in the British Virgin Islands or elsewhere and may appoint any persons to be members of such committees, local boards or agencies, and may fix their remuneration and may delegate to any such committee, local board or agency any of the powers, authorities and discretions vested in the Directors, with power to sub-delegate, and may authorise the members of any local board, or any of them, to fill any vacancies therein, and to act notwithstanding vacancies, and any such appointment or delegation may be made upon such terms and subject to such conditions as the Directors may think fit, and the Directors may remove any persons so appointed, and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

(2)     The Directors may, by a resolution of the Directors, designate one or more committees, each consisting of one or more Directors.  Each committee of Directors has such powers and authorities of the Directors, including the power and authority to affix the Seal, as are set forth in the resolution of Directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles or with respect to the matters requiring a resolution of Directors under these Articles.   The meetings and proceedings of any such committee consisting of two or more members shall be governed by the provisions of these Articles regulating the meetings and proceedings of the Directors.

(3)     The Directors may from time to time, and at any time, by power of attorney under the Seal, appoint any company, firm or person, or any fluctuating body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to sub-delegate all or any of the powers, authorities and discretions vested in him.

54.        The Directors may from time to time appoint any one or more of their body to the office of managing Director, for such period and on such terms as they think fit.  A Director appointed to the office of managing Director shall receive such remuneration (whether by way of salary commission or participation in profits or otherwise) as the Directors may determine.

55.        The Directors may entrust to and confer upon any Director appointed to the office of managing Director any of the powers exercisable by them as Directors upon such terms and conditions and with such restrictions as they think fit, and either collaterally with or to the exclusion of their own powers, and may from time to time revoke, withdraw or vary all or any of such powers.

56.        All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments, and all receipts for moneys paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the Directors shall from time to time by resolution determine.

## REGISTER OF DIRECTORS

57.    (1)     The Company may keep a register to be known as a register of Directors containing:

(a)    the names and addresses of the persons who are Directors;

  (b) the date on which each person whose name is entered on in the register was appointed as a Director; and

  (c) the date on which each person named as a Director ceased to be a Director.

  (2) The register of Directors may be in such form as the Directors approve, but if it is in magnetic, electronic or other data storage form, the Company must be able to produce legible evidence of its contents.

  (3) A copy of the register of Directors, commencing from the date of the registration of the Company, shall be kept at the registered office of the Company.

  (4) The register of Directors is prima facie evidence of any matters directed or authorised by the Act to be contained therein.

## THE MANAGER

58. (1) The Directors may appoint any person or persons as Manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit and whether collaterally with or to the exclusion of their own powers.  The Directors shall procure that in any agreement appointing any person as Manager provisions shall be contained restricting the Manager and any investment adviser appointed by the Manager dealing with the Company as beneficial owner on the sale or purchase of investments to or from the Company except on a basis approved by the Directors from time to time or without the consent of the Directors otherwise dealing with the Company as principal.

  (2) The Manager shall be entitled to receive for its services such fees, including a fee on the issue of Shares, as may from time to time be agreed between the Manager and the Company.

## PROCEEDINGS OF DIRECTORS

59. (1) The Directors may meet at such times and in such manner and places within or outside the British Virgin Islands as the Directors may determine to be necessary or desirable. Questions arising at any meeting shall be determined by a majority of votes.  In case of an equality of votes the chairman shall have a second or casting vote.

(2)      A Director shall be deemed to be present at a meeting of Directors if he participates by telephone or other electronic means and all Directors participating in the meeting are able to hear each other.

(3)      An action that may be taken by the Directors or a committee of Directors at a meeting may also be taken by a resolution of Directors or a committee of Directors consented to in writing or by telex, telegram, cable or other written electronic communication, without the need for any notice.

(4)      A Director may by a written instrument appoint an alternate who need not be a Director and an alternate is entitled to attend meetings in the absence of the Director who appointed him and to vote or consent in place of the Director.

60.    (1)      A Director may, and the Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.  Notice of every meeting of Directors shall be given to all Directors.

(2)      A Director shall be given not less than three days notice of meetings of Directors. A meeting of Directors held without three days notice having been given to all Directors is valid if a majority of Directors entitled to vote at the meeting waive notice of the meeting and, for this purpose, the presence of a director at a meeting shall be deemed to constitute waiver on his part. The inadvertent failure to give notice of a meeting to a Director, or the fact that a Director has not received the notice, does not invalidate the meeting.

61.        The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed at any other number shall be two, unless there is only one Director, in which case a quorum shall be one.  For the purposes of this Article an alternate shall be counted in a quorum, but for the purpose of deciding whether or not there is a quorum for a meeting, an alternate shall only count as one person.

62.        The continuing Directors or a sole continuing Director may act notwithstanding any vacancies in their body, but if and so long as the number of Directors is reduced below the minimum number fixed by or in accordance with these Articles, the continuing Directors or Director may act for the purpose of appointing Directors to fill any vacancy, summoning general meetings of the Company and for preserving the assets of the Company, but not for any other purpose.  If there are no Directors or Director able or willing to act, then any Member may summon a general meeting for the purpose of appointing a Director or Directors.

63.        The Directors may appoint officers of the Company at such times as they may determine.  Such officers may consist of a Chairman, a Deputy Chairman, a President and one or more Vice Presidents and such other officers as they may from time to time determine.  Any number of offices may be held by the same person.

64.        Unless otherwise agreed by a majority of those attending and entitled to attend and vote thereat, the President or Chairman, as the case may be, or in his absence a Vice President or Deputy Chairman, as the case may be, shall preside at all meetings of the Directors, but if at any meeting none of the foregoing be present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

65.        A resolution in writing signed by all the Directors or by all the members of a committee of the Directors for the time being shall be as effective as a resolution passed at a meeting of the Directors or of such committee, duly convened and held, and any such resolution may consist of several documents in the like form each signed by one or more of the Directors.

66.        A meeting of the Directors for the time being at which a quorum is present shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

67.        All acts done by any meeting of Directors, or of a committee of Directors, or by any person acting as Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director, or person acting as aforesaid, or that they or any of them were disqualified, or had vacated office, or were not entitled to vote, be as valid as if every such person had been duly appointed, and was qualified and had continued to be a Director and had been entitled to vote

## <u>MINUTES</u>

68.        The Directors shall cause minutes to be made:-

    (a)    of all appointments of officers made by the Directors;

    (b)    of the names of the Directors present at each meeting of Directors and of any committee of Directors; and

    (c)    of all resolutions and proceedings at all meetings of the Company and of the Directors and of committees of Directors.

## THE SECRETARY

69.        A Secretary may be appointed by the Directors and shall hold office during the pleasure of the Directors.  Anything by the Act required or authorised to be done by or to the Secretary may, if the office is vacant or there is for any other reason no Secretary capable of acting, be done by or to any Assistant or Deputy Secretary or if there is no Assistant or Deputy Secretary capable of acting, by or to any officer of the Company authorised generally or specially in that behalf by the Directors.

70.        The Secretary shall attend all meetings of the Company and of the Directors or committee of Directors held in the British Virgin Islands to keep correct minutes of such meetings and enter the same in proper books provided for the purpose.  He shall perform such other duties as are prescribed by the Act or these Articles, or as shall be prescribed by the Directors.  The Secretary shall receive such salary or other remuneration as the Directors shall from time to time determine.

71.        Any provisions of the Act or of these Articles requiring or authorising a thing to be done by or to a Director and the Secretary shall not be satisfied by its being done by or to the same person acting both as a Director and as, or in the place of, the Secretary.

## THE SEAL

72.        The Directors shall provide for the safe custody of the Seal which shall only be used by the authority of the Directors or of a committee of Directors authorised by the Directors in that behalf.  Every instrument to which the Seal shall be affixed shall be signed by any two Directors or by a Director and the Secretary or by the Director if there is only one Director or the Seal shall be affixed under the signature of some other person appointed by the Directors for that purpose.  Notwithstanding the foregoing, the Secretary may affix the Seal of the Company over his signature only to any authenticated copies of the Memorandum or these Articles, the minutes of any meetings or any other documents required to be authenticated by him, and further when the instrument shall be a share certificate it shall be sufficient for the share certificate to bear a facsimile of the Seal or a securities seal (in such form as the Directors shall approve) and the facsimile signature of two Directors or of one Director and the Secretary or of the Director if there is only one Director and be signed by an authorised representative for the time being of the Company or its share registrar.

## DIVIDENDS AND DISTRIBUTIONS

73.        The Company may by a resolution of Directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. Dividends shall be paid to the Members in accordance with their respective rights and priorities. The Directors shall have power to declare and pay dividends accordingly and other distributions

at such times and at such intervals as they may think fit.  Dividends may be paid in cash or in specie.

74.    (1)    Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends or other distributions declared or paid to the holders of any class of share shall be declared and paid to such holders in proportion to the shares held by them.

(2)    All unclaimed dividends or distributions may be invested or otherwise made use of by the Directors for the benefit of the Company until claimed.  No dividend or distribution shall bear interest as against the Company.

(3)    The Directors may deduct from any dividend or other moneys payable to any Member on or in respect of a share all sums of money (if any) presently payable by him to the Company in relation to the shares of the Company.

75.    Any dividends or other moneys payable on or in respect of a share may be paid by cheque or warrant sent through the post to the registered address of the Member or person entitled thereto, and in the case of joint holders to any one of such joint holders, or to such person and such address as the holder or joint holders may direct.  Every such cheque or warrant shall be sent at the risk of the person entitled to the money represented thereby and where being sent to an address outside the British Virgin Islands shall as far as may be practicable be forwarded by airmail.

76.    If several persons are registered as joint holders of any share, any one of them may give effectual receipts for any moneys payable on or in respect of the share.

77.    The Directors may carry to reserve out of the profits or gains of the Company (including, if allowed by law, any surplus of the Company) such sums as they think proper as a reserve or reserves which shall at the discretion of the Directors be applicable for any purpose to which the profits or gains of the Company may be properly applied and pending such application may be employed in the business of the Company as the Directors may from time to time think fit.

78.    In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

79.    In the case of a dividend of authorized but unissued shares without par value, the amount designated by the Directors shall be transferred from surplus to capital at the time of the distribution, except that the Directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

## CAPITALISATION OF PROFITS

80.    (1)    The Directors may resolve that it is desirable to capitalise any undivided profits or surplus of the Company (including profits carried and standing to any capital or other reserve or reserves) relating to the Fund, and accordingly appropriate the profits or sum resolved to be capitalised to the Members holding shares of relevant class in the proportion in which such profits or sum would have been divisible amongst them had the same been applied or been applicable in making the payment of dividends  and to apply such profits or sum on their behalf, either in or towards paying up the amounts, if any, for the time being unpaid on any shares of the relevant class or debentures held by such Members respectively, or in paying up in full unissued shares of the relevant class or debentures of the Company of a nominal amount equal to such profits or sum, such shares or debentures to be allotted and distributed, credited as fully paid up, to and amongst such Members in the proportion aforesaid, or partly in one way and partly in the other provided that a surplus account relating to that class may, for purposes of this Article, only be applied in the paying up of unissued shares of the same class to be issued to Members of the Company holding shares of the relevant class as fully paid shares.

(2)    Whenever such a resolution as aforesaid shall have been passed the Directors shall make all appropriations and applications of the profits or sum resolved to be capitalised thereby, and all allotments and issues of fully paid shares, if any, and generally shall do all acts and things required to give effect thereto, with full power to the Directors to make such provision by the issue of fractional shares or by payment in cash or otherwise as they think fit for the case of shares becoming distributable in fractions and also to authorise any person to enter on behalf of all the Members entitled to the benefit of such appropriations and applications into an agreement with the Company providing for the allotment to them respectively, credited as fully paid up, of any further shares to which they may be entitled upon such capitalisation, and any agreement made under such authority shall be effective and binding on all such Members.

## ACCOUNTS AND FINANCIAL STATEMENTS

81.          The Directors shall cause to be kept proper accounts with respect to:-

(a)    all sums of money received and expended by the Company and the matters in respect of which such receipt and expenditure take place;

(b)    all sales and purchases of assets by the Company; and

(c)    the assets and liabilities of the Company.

25514

82.        The books of account shall be kept at the office of the Company, or (subject to the provisions of the Act) at such other place as the Directors think fit, and shall always be open to inspection by the Directors.

83.        No Member (other than a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by the Act or authorised by the Directors or by the Company in general meeting.

84.        The financial year end of the Company may be determined by resolution of the Directors and failing such resolution shall be the Accounting Date in each year.

85.        At least once every financial year, the Company shall send to each Member printed copies of the financial statements of the Company made up as of the date of the last financial year end.

86.        Every balance sheet contained in the financial statements sent to each Member shall be signed on behalf of the Board of Directors by two of the Directors.

87.        The Directors' report, if any, and Auditor's report, if any, shall be attached to the financial statements.

88.        Every account of the Directors when audited shall be conclusive except as regards any error discovered therein within three months next after the audit.  Whenever such an error is discovered within that period, the financial statements shall forthwith be corrected and thereupon shall be conclusive.

## AUDIT

89.    (1)    The Directors or Members may appoint an independent representative of the Members as Auditor of the accounts of the Company and such Auditor shall hold office until the Directors or Members shall appoint another Auditor or remove the Auditor, provided that if the Auditor was appointed by the Members only the Members may appoint another Auditor or remove the Auditor.

(2)    The Auditor may be a Member but no Director or officer of the Company shall, during his continuance in office, be eligible for appointment as Auditor.

(3)    The remuneration of the Auditor shall be determined by the Members or by the Directors if so authorised by the Members.

90.        If the Auditor's office becomes vacant by the resignation or death of the Auditor or by his becoming incapable of acting by reason of illness or absence from the British Virgin

25514

Islands at a time when his services are required, the Directors shall, as early as practicable, appoint an Auditor to fill the vacancy or an acting Auditor to act during the incapacity of the Auditor, or if the Auditor was appointed by the Members the Directors shall, as early as practicable, convene a  general meeting to appoint an Auditor to fill the vacancy or an acting Auditor to act during the incapacity of the Auditor.

91.    (1)    The Auditor shall examine such books, accounts and vouchers as may be necessary for the performance of his duties in accordance with generally accepted auditing standards in the British Virgin Islands or in such other country or jurisdiction as the Directors may determine.

        (2)    The Auditor shall be furnished with a list of all books kept by the Company and shall at all times have the right of access to the books and accounts and vouchers of the Company, and shall be entitled to require from the Directors and officers of the Company such information and explanations as may be necessary for the performance of his duties.

        (3)    The Auditor shall make a report to the Members on the financial statements examined by him during his tenure of office, and the report shall state whether or not in his opinion the financial statements present fairly, in all material aspects, the financial position of the Company and the results of its operations and the changes in its net assets in accordance with generally accepted accounting principles in the British Virgin Islands or in such other country or jurisdiction as the Directors may determine.

92.        The Auditor shall be entitled to attend any general meeting of the Company at which any financial statements which have been examined or reported on by him are to be laid before the Company and to make any statement or explanations he may desire with respect to the financial statements.

## NOTICES

93.        Any notice or document may be served by the Company on any Member either personally or by sending it through the post in a prepaid letter addressed to such Member at his address as appearing in the Register.  In the case of joint holders of a share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all joint holders.

94.        Any Member present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting, and, where requisite, of the purposes for which such meeting was convened.

95.    (1)    Any notice or other document, if served by post, shall be deemed to have been served at the time when the letter containing the same is posted, and in proving such service it

shall be sufficient to prove that the letter containing the notice or document was properly addressed and duly posted.

(2)     All notices or other documents being posted to addresses outside the British Virgin Islands shall so far as may be practicable be forwarded by airmail.

96.          Any notice or document delivered or sent by post to or left at the registered address of any Member in pursuance of these Articles shall, notwithstanding that such Member be then dead or bankrupt, and whether or not the Company had notice of his death or bankruptcy, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder, unless his name shall, at the time of the service of the notice or document, have been removed from the Register as the holder of the share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in that share.

## WINDING UP

97.     (1)     No resolution to wind up the Company shall be deemed passed unless it is passed by the majority of the votes cast at a general meeting as is specified in Article 26(3) and otherwise in accordance with the provisions of these Articles.

(2)     If the Company shall be wound up, the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner as he thinks fit.

(3)     The surplus assets available for distribution among the Members shall then be applied in the payment to the holders of each class of shares in accordance with the rights and restrictions of each such class and otherwise equally, such payment being made in proportion to the number of shares of the class held.

(4)     If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution passed in general meeting, divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds, and may for such purposes set such value as he deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trust for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

## FORMS

98.        The forms in the Schedule may be used, subject to such variations or alterations to meet the special circumstances or particular cases as may be necessary and as the Directors may approve.

## INDEMNITY

99.    (1)    Except for such person's own gross negligence, willful default, fraud or dishonesty, each Director, Secretary or other officer of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay all costs, losses, and expenses which any such Director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such Director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the Members over all other claims but only if any such Director or officer acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

        (2)    No Director, Secretary or other officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other Director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

        (3)    The decision of the Directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is in the absence of fraud, sufficient for the purposes of this Article, unless a question of law is involved.

The OmniFund, Ltd                                                    Page 43

---

## FUNDAMENTAL CHANGES

100.        The Company may by resolution of Members continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

101.        Notwithstanding section 80 of the Act, the Directors may sell, transfer, lease, exchange or otherwise dispose of the assets of the Company without the sale, transfer, lease, exchange or other disposition being authorised by a resolution of Members.

102.        Pursuant to Article 26(3), the merger or consolidation of the Company with another company shall require to be approved by a resolution of Members approved by the affirmative vote of the holders of three-quarters of the shares issued and outstanding.


We, CITCO B.V.I. LIMITED, of Wickhams Cay, P.O. Box 662, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an international business company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association the 29th day of January, 1999 in the presence of:


Witness                                          Subscriber


(Sgd. C. Questelles)                             (Sgd. W. Reich D. Wattley)
Road Town, Tortola                               Authorized Signatory
                                                 Citco B.V.I. Limited

25514

The OmniFund, Ltd                                                   Page 44

---

## THE SCHEDULE

### FORM "A"

### TRANSFER OF SHARES

I/We  ....................................................................................................[the transferor]

in consideration of.........................................................................................[amount]

DO HEREBY TRANSFER TO...........................................................[the transferee]

of...........................................................................................................[address]

...........................…......................................…...................[number and class of shares]
in the Company represented by the attached/within certificate.


AS WITNESS my/our hand(s) the        day of           20    .


SIGNED by the above-named transferor(s)
in the presence of:

                                                    ...........................................................
                                                    (Signature of Transferor(s))


.........................................
(Witness)

                                                    ...........................................................
                                                    (Signature of Transferee(s))


.........................................
(Witness)

25514

The OmniFund, Ltd                                                           Page 45

---

## FORM "B"

### TRANSFER BY PERSONAL REPRESENTATIVES

I/We having become entitled in consequence of the death of (name of deceased shareholder) .......................................... to (number) ........................ share(s) comprised in certificate(s) numbered ................... standing in the Register of Members of ................................. in the name of the said deceased shareholder, instead of being registered myself/ourselves in consideration of the sum of (state total consideration) ...................... paid to me/us by name(s) of transferee(s)....…...................................................................................................................... of (address(es) ...............................................................................…............................ (hereinafter called "the transferee(s)") do hereby transfer to the transferee(s) (number and class of shares transferred) .................... share(s) in the said Company subject to the several conditions on which the same were held immediately before the execution hereof; and I/We the transferee(s) do hereby agree to take the said share(s) hereby transferred subject to the conditions aforesaid.

AS WITNESS my/our hand(s) the        day of             20   .

SIGNED by the above-named person(s)
entitled in the presence of:

.....................................................................

.................................................................
(Signatures of person(s) entitled)

SIGNED by the above-named Transferee(s)
in the presence of:

.....................................................................

.................................................................
(Signature(s) of Transferee(s))

25514

The OmniFund, Ltd                                                                 Page 46

---

## FORM "C"

### PROXY LIMITED TO ONE MEETING

I/We ................................…………………………………………............................[name]

the holder of ..................................................................……...............[number] shares

hereby appoint ...........................................................................................[proxy]

of.......................................................................................................[address]

 or failing whom.......................................................................................[proxy]

of.......................................................................................................[address]

to be my/our proxy to vote on me/our behalf at the general meeting of the

Members of the company to be held on the ........ day of ............ 20 .., and at any adjournment

thereof.


Unless otherwise instructed with respect to any particular resolution(s) the proxy will vote or abstain as he thinks fit.


AS WITNESS my/our hand(s) this        day of         20   .

SIGNED by



..............................................
(Signature(s) of shareholder(s))



..............................................
(Witness)

25514

# EXHIBIT 12

A 0 1 2 4 5

5/19/03

Banc of America Securities - Prime Brokerage - Client Position Summary

Banc of America Securities LLC
Client Position Summary by Asset Class

333-12796 The Omnifund Ltd.
PosSum-TCBA

As of: 05/19/03
Printed: 05/14/03
Page: 1

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (1,065,382.01) USD | TYPE 2 | | 1.0000 | 1.0000 | 0.00 | (1,065,382.01) | (1,065,382.01) | 0.00 | (6.97) |
| 3,071,735.71 USD | TYPE 3 | | 1.0000 | 1.0000 | 0.00 | 3,071,735.71 | 3,071,735.71 | 0.00 | 6.99 |
| 0 USD | TYPE 6 | | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | 6,353.70 | 6,353.70 | 0.00 | 0.01 |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 300,000 | EXPGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.68 |
| **Equities** | | | | | | | | | |
| 200,000 | ADST | ADSTAR COM INC | 0.5000 | 0.7900 | 58.00 | 100,000.00 | 158,000.00 | 58,000.00 | 0.36 |
| 269,750 | AURA | AURA SYSTEMS INC | 0.3356 | 0.0700 | (79.14) | 90,502.50 | 18,882.50 | (217,273.00) | 0.04 |
| 2,874,935 | BWISE | BIOMETRICS SECURITY TECHNOLOGY | 0.0250 | 1.8500 | 7300.00 | 71,873.37 | 5,318,629.75 | 5,246,756.38 | 12.10 |
| 429,171 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 0.0319 | 3.0000 | 9391.05 | 13,710.00 | 1,287,513.00 | 1,273,803.00 | 2.93 |
| 25,000 | CMM | CROSS MEDIA MARKETING CORP | 2.2400 | 0.2000 | (91.07) | 56,000.00 | 5,000.00 | (51,000.00) | 0.01 |
| 8,567,968 | EPTG | EPL TECHNOLOGIES INC NEW | 0.0113 | 0.0900 | 696.04 | 96,869.62 | 771,117.12 | 674,247.50 | 1.75 |
| 417,025 | FFIFD | FIDELITY FIRST FINANCIAL CORP | 2.5979 | 7.0000 | 169.45 | 1,083,372.61 | 2,919,175.00 | 1,835,802.39 | 6.64 |
| 2,500 | ILCO | INTERNATIONAL TRAVEL CDS INC | 3.0590 | 3.0000 | (80.77) | 7,627.61 | 7,500.00 | (877.00) | 0.01 |
| 2,649,350 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.3640 | 0.0700 | (80.77) | 964,373.30 | 185,454.50 | (778,918.80) | 0.42 |
| 40,000 | GML | MAGIC LANTERN GROUP INC | 1.6276 | 0.9500 | (41.63) | 65,106.48 | 38,760.00 | (27,646.00) | 0.09 |
| 21,000 | MHTD | METHOD PRODUCTS CORP | 0.6300 | 0.6900 | (92.21) | 14,490.00 | 14,490.00 | 0.00 | 0.09 |
| 1,045,670 | SMKP | SMK CORP | 0.5846 | 0.0175 | (97.02) | 402.50 | 14,087.50 | (14,087.50) | 0.00 |
| 16,684,635 | TFGP | TOTAL FILM GROUP INC | 0.0641 | 0.0600 | 439.57 | 1,071,631.68 | 1,521,441.50 | 449,809.82 | 3.46 |
| 2,750,000 | ULSP | ULTIMATE SPORTS ENTERTAINMENT | 0.0045 | 0.0600 | 1270.00 | 12,500.00 | 165,000.00 | 152,500.00 | 0.38 |
| 12,500,000 | XMC | WORLD WIRELESS COMMUNICATIONS | 0.0011 | 0.0800 | 7076.63 | 14,980.00 | 1,032,000.00 | 1,032,000.00 | 2.35 |
| 1,500,000 | XTRD | XTRACARD CORP | 0.2333 | 1.4000 | 500.00 | 350,000.00 | 2,100,000.00 | 1,750,000.00 | 4.78 |
| 756,700 | ZICA | Z1 CORPORATION | 15.1347 | 1.3995 | (86.79) | 11,452,411.10 | 16,213,800.00 | 16,203,388.43 | 5.44 |
| 3,604,400 | FFIR | FIRST FIDELITY STOCK | 0.0016 | 4.5996 | 98614.20 | 16,419.80 | 1,570,600.00 | 1,570,600.00 | 36.51 |
| 2,000,000 | MHTHW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 |
| 2,000,000 | MHD2W | MHD-ZIKE WARRANT | 0.0000 | 1.5700 | 0.00 | 0.00 | 2,904,500.00 | 2,904,500.00 | 6.61 |
| 1,850,000 | XTRDWT | XTRACARD CORP WARRANT | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **Total Long Equities** | | | | | 166.04 | 15,404,390.54 | 43,642,084.80 | 27,237,694.26 | 99.30 |
| **TOTAL LONG POSITIONS** | | | | | 163.06 | 16,704,390.54 | 43,942,084.80 | 27,237,694.26 | 99.99 |
| | | | | TOTAL EXPOSURE VALUE | | 16,704,390.54 | 43,942,084.80 | | 99.99 |
| | | | | NET EXPOSURE VALUE | | 16,704,390.54 | 43,942,084.80 | | 99.99 |
| | | | | TOTAL LONG POSITIONS | | 16,704,390.54 | 43,942,084.80 | 27,237,694.26 | 99.99 |
| | | | | TOTAL SHORT POSITIONS | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | TOTAL CASH EQ | | 6,353.70 | 6,353.70 | 0.00 | 0.01 |
| | | | | **TOTAL** | | 16,710,744.24 | 41,948,438.50 | 27,237,694.26 | 100.00 |

# EXHIBIT 13



# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

### CERTIFICATE OF INCORPORATION    (SECTIONS 14 AND 15)

No. 525525

The Registrar of Companies of the British Virgin Islands HEREBY CERTIFIES

pursuant to the International Business Companies Act, Cap. 291 that all

the requirements of the Act in respect of incorporation having been satisfied,

**LSPV Inc.**

is incorporated in the British Virgin Islands as an International Business

Company this 30th day of December, 2002.

Given under my hand and seal at

Road Town, in the Territory of the

British Virgin Islands





REGISTRAR OF COMPANIES

CBT10013X

**No: 525525**



# British Virgin Islands

# The International Business Companies Act

# (CAP. 291)

Amended and Restated
Memorandum and Articles of Association
dated 11 February 2003
of

## LSPV INC.

INCORPORATED THE 30TH DAY OF DECEMBER 2002

CERTIFIED A TRUE COPY

REGISTRAR BRITISH VIRGIN ISLANDS

Date: _May 19, 2003_

**WALKERS (BVI) LIMITED**
PO Box 92
The Mill Mall
Road Town, Tortola
British Virgin Islands
Telephone: (284) 494 2204
Fax: (284) 494 5535

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**The International Business Companies Act**
**AMENDED AND RESTATED**
**MEMORANDUM OF ASSOCIATION**
**OF**
**LSPV INC.**

**AMENDED AND RESTATED BY RESOLUTION OF THE DIRECTORS DATED 10 FEBRUARY 2003**

**NAME**

1.      The name of the Company is LSPV Inc.

**REGISTERED OFFICE**

2.      The registered office of the Company will be situate at the offices of LWB Company Limited, Road Town, Tortola, British Virgin Islands or at such place in the British Virgin Islands as the directors may from time to time determine.

**REGISTERED AGENT**

3.      The registered agent of the Company will be LWB Company Limited of P O Box 92, Road Town, Tortola, British Virgin Islands or such other person or company being a person or company entitled to act as a registered agent as the directors may from time to time determine.

**GENERAL OBJECTS AND POWERS**

4.      The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands.

**EXCLUSIONS**

5.1     The Company may not:

5.1.1   carry on business with persons resident in the British Virgin Islands;

5.1.2   own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph 5.2.5

5.1.3   carry on banking or trust business, unless it is licensed to do so under the Banks and Trust Companies Act, 1990;

5.1.4   carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

5.1.5   carry on the business of company management, unless it is licensed under the Company Management Act, 1990; or

5.1.6   carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands:

5.2     For the purposes of paragraph 5.1.1, the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if:

5.2.1   it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

5.2.2   it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

5.2.3   it prepares or maintains books and records within the British Virgin Islands;

5.2.4   it holds, within the British Virgin Islands, meetings of its directors or members;

5.2.5   it holds a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

5.2.6   it holds shares, debt obligations or other securities in a company incorporated under the International Business Companies Ordinance or under the Companies Act;

5.2.7    shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Ordinance or under the Companies Act.

## LIMITATION OF LIABILITY
6.    The liability of members of the Company is limited.

## CURRENCY
7.    Shares in the Company shall be issued in the currency of US$.

## AUTHORISED CAPITAL
8.    The authorised capital of the Company is US$50,000.00.

## CLASSES, NUMBER AND PAR VALUE OF SHARES
9.    The authorised capital is made up of one class and one series of shares divided into 5,000,000 shares of US$0.01 each.

## DESIGNATIONS, POWERS, PREFERENCES, ETC. OF SHARES
10.    All shares shall
    10.1    have one vote each;
    10.2    be subject to redemption, purchase or acquisition by the Company for fair value; and
    10.3    have the same rights with regard to dividends and distributions upon liquidation of the Company.

## VARIATION OF CLASS RIGHTS
11.    If at any time the authorised capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class or series and of the holders of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

## RIGHTS NOT VARIED BY THE ISSUE OF SHARES *PARI PASSU*
12.    The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking *pari passu* therewith.

## REGISTERED SHARES AND BEARER SHARES
13.    Shares may be issued as registered shares or to bearer as may be determined by a resolution of directors.

## EXCHANGE OF REGISTERED SHARES AND BEARER SHARES
14.    Registered shares may be exchanged for bearer shares and bearer shares may be exchanged for registered shares.

## TRANSFER OF REGISTERED SHARES
15.    Subject to the provisions of the Articles of Association annexed hereto ("the Articles of Association"), registered shares in the Company may be transferred subject to prior or subsequent approval of the Company as evidenced by a resolution of directors or by a resolution of members.

## SERVICE OF NOTICE ON HOLDERS OF BEARER SHARES
16.    Where shares are issued to bearer, the bearer, identified for this purpose by the number of the share certificate, shall be requested to provide the Company with the name and address of

agent for service of any notice, information or written statement required to be given to members, and service upon such agent shall constitute service upon the bearer of such shares until such time as a new name and address for service is provided to the Company. In the absence of such name and address being provided it shall be sufficient for the purposes of service for the Company to publish the notice, information or written statement or a summary thereof in one or more newspapers published or circulated in the British Virgin Islands and in such other place, if any, as the Company shall from time to time by a resolution of directors or a resolution of members determine. The directors of the Company must give sufficient notice of meetings to members holding shares issued to bearer to allow a reasonable opportunity for them to secure or exercise the right or privilege, that is the subject of the notice other than the right or privilege to vote, as to which the period of notice shall be governed by the Articles of Association. What amounts to sufficient notice is a matter of fact to be determined after having regard to all the circumstances.

### AMENDMENT OF MEMORANDUM AND ARTICLES OF ASSOCIATION

17.   The Company may amend its Memorandum of Association or its Articles of Association by a resolution of members or by a resolution of directors.

### DEFINITIONS

18.   The meanings of words in this Memorandum of Association are as defined in the Memorandum of Association.

LWB Company Limited hereby subscribes to this Memorandum of Association this 30th day of December 2002 _____

NAME AND ADDRESS AND DESCRIPTION OF SUBSCRIBER

[Signed]

_____
Simon Pascoe
LWB COMPANY LIMITED
P O Box 92
Road Town
Tortola
BRITISH VIRGIN ISLANDS

WITNESS TO THE ABOVE SIGNATURE

[Signed]

_____
Rebecca Buss
P O Box 92
Road Town
Tortola
BRITISH VIRGIN ISLANDS



**TERRITORY OF THE BRITISH VIRGIN ISLANDS**

**THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**LSPV, INC.**

**AMENDED AND RESTATED BY RESOLUTION OF THE DIRECTORS DATED 10 FEBRUARY 2003**

**INTERPRETATION**

1.     In these Articles unless there is something in the subject or context inconsistent therewith:-

"**Act**" means The International Business Companies Ordinance, 1984 of the British Virgin Islands as amended from time to time;

"**Administrator**" means the person or entity for the time being appointed by the Board of Directors to provide administrative services to the Company;

"**Articles**" means these Articles of Association as herein contained or as the same may from time to time be altered or amended;

"**business day**" means any day on which securities are traded on the New York Stock Exchange;

"**Company**" means **LSPV Inc.**;

"**connected person**" of any manager or any investment adviser appointed by the Company means:

(a)     any person beneficially owning, directly or indirectly, 20% or more of the ordinary share capital of that company or able to exercise, directly or indirectly, 20% or more of the total votes in that company;

(b)     any person controlled by a person  who  meets one or both of the requirements set out in (a) above;

(c)     any company 20% or more of whose ordinary share capital is beneficially owned, directly or indirectly, but any such  manager and any such investment adviser taken together; and any company 20% or more of the total votes in which can be exercised, directly or indirectly, by any such manager and any such investment adviser taken together; and

(d)     any director or officer of any such manger or any such investment adviser or of any connected person of that company, as defined in (a), (b) or (c) above.

"**Custodian**" means the person or persons for the time being appointed as custodian or joint custodians pursuant to the Articles;

"**Director**" means Directors of the Company;

"**duties and charges**" includes all stamp and other duties, taxes, Governmental charges, brokerage, bank charges, transfer fees and registration fees;

"**Fiscal Year**" means the fiscal year of the Company from July 1 to June 30 of each calendar year;

"**Investment**" means any right or interest in any share, stock, bond, debenture, debenture stock, unit, sub-unit, trade claims or other security or any loan of money or any currency or interest in any currency and includes any financial stock market index, interest rate or currency futures or similar financial or other instruments and any rights in or options over any of the aforesaid, issued by or under the guarantee of anybody, whether incorporated or unincorporated, or of any governmental body and whether paying interest or dividends or not and whether fully paid, partly paid or nil paid and includes any participation as a limited partner or participant in any partnership or unincorporated association;

"**in writing**" and "**written**" includes printing, lithography, photography, and other modes of representing or reproducing words in visible form;

"**Loss Carryover**" means at anytime, the largest aggregate unrecouped loss attributable to an outstanding Share;

"**Member**" has the same meaning as member given in the Act and means the person or body corporate registered in the Register as the holder of shares in the Company, and, when two or more persons are so registered as joint holders of shares, means the person whose name stands first in the Register as one of such joint holders;

"**Memorandum**" means the Memorandum of Association of the Company;

"**month**" means calendar month;

"**Net Asset Value**" means the gross assets less the gross liabilities of the Company, as determined in accordance with Article 10;

"**notice**" means written notice unless otherwise specifically stated;

"**Offering Date**" means the first business day of each fiscal quarter and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally;

"**Office**" means the Registered Office of the Company for the time being;

"**Paid up**" means paid up and/or credited as paid up;

"**Principal Market**" with reference to any Investment, means such securities market which in the opinion of the Directors is the sole or securities market upon which such Investment is listed, quoted or traded or in respect of which permission to deal is effective and the expression "market" shall include any over-the-counter market or recognised exchange;

"**Record Date**" in respect of any dividend means the date as of which the persons entitled to participate therein fall to be determined;

"**Redemption Date**" means the last business day of every each fiscal quarter or such other day or days in addition thereto or in substitution therefor as may be determined by the Directors from time to time, either in any particular case or generally;

"**Redemption Price**" means the price at which Shares may be redeemed, determined in accordance with these Articles;

"**Register**" means the Register of Members maintained by the Company in British Virgin Islands;

"**Seal**" means the Common Seal of the Company;

"**Secretary**" means (subject to the provisions of the Act) the person for the time being appointed to perform the duties of the Secretary of the Company and includes an Assistant, Acting or Deputy Secretary;

"**Share**" means a share of any class in the capital of the Company of a par value of US$0.01 having the rights and being subject to the restrictions specified in the bye-laws with respect to such shares and shall, where the context so permits, include a fraction of a Share and "Shares" shall be construed accordingly;

"**Subscription Price**" means the price at which Shares may be subscribed, determined in accordance with the Articles;

"**United Kingdom**" means Great Britain and Northern Ireland;

"**United States**" or "**U.S.**" means the United States of America;

"**Unrecouped Loss**" as to a Share, means a loss chargeable to such Share during any Fiscal Year or Years which is not recouped in any succeeding Fiscal Year by profit allocable to such Share;

"**US Dollars**" and "**US$**" mean dollars in the currency of the United States of America.

"**U.S. Person**" means:

    (a)   with respect to individuals, any U.S. citizen (and certain former U.S. citizens) or "resident alien" within the meaning of U.S. income tax laws as in effect from time to time. Currently, the term "resident alien" is defined under U.S. income tax laws to generally include any individual who (i) holds an Alien Registration Card (a "green card") issued by the U.S. Immigration and Naturalization Service, or (ii) meets a "substantial presence" test. The "substantial presence" test is generally met with respect to any current calendar year if (i) the individual was present in the U.S. on at least 31 days during such year, and (ii) the sum of the number of days on which such individual was present in the U.S. during the current year, 113 of the number of such days during the first preceding year, and 1/6 of the number of such days during the second preceding year, equals or exceeds 183 days; and

    (b)   with respect to persons other than individuals, the term "U.S. Person" includes (i) a corporation or partnership created or organized in the United States or under the laws of the United States or any state or (ii) a trust or estate which is subject to U.S. tax on its worldwide income from all sources; and (iii) any corporation which is not a U.S. Person in which U.S. Persons hold 10% or more of either voting power or value; (iv) any partnership which is not a U.S. Person in which a U.S. Person is a partner; or (v) a trust which is not a U.S. person whose grantor or any of its beneficiaries is a U.S. Person.

"Valuation Day" means the business day immediately preceding an Offering Date and/or such other day or days in addition thereto or in substitution therefor as may from time to time be determined by the Directors either in any particular case or generally but so that there shall be at least one Valuation Day in each month.

The word "may" shall be construed as permissive and the word "shall" shall be construed as imperative.

Words importing the singular number only include the plural number and vice versa.

Words importing the masculine gender only include the feminine gender.

Words importing persons include companies or associations or bodies of persons, whether corporate or unincorporated.

Reference herein to any Act are to an Act of the British Virgin Islands legislature.

Save as aforesaid any words or expressions defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## BUSINESS

2.         (1)   The meetings of the Members and of the Directors and of any committee appointed by the Directors shall be held in British Virgin Islands or such other place as the Directors may from time to time determine.

          (2)      Notwithstanding the provisions of Article 2, no meeting of the Members or of the Directors or of any committee of or established by the Directors of the Company shall at any time be held or take place in the United Kingdom or the United States.  Any meeting so held or so taking place and all business purporting to be transacted thereat shall be null and void.  If the provisions of this Article shall be inconsistent with the provisions of any other of these Articles, the provisions of this Article shall prevail.

3.         Any branch or kind of business which the Company is either expressly or by implication authorised to undertake may be undertaken by the Directors at such time or times as they may think fit, and further may be suffered by them to be in abeyance, whether such branch or kind of business may have been actually commenced or not, so long as the Directors may deem it expedient not to commence or proceed with the same.

## CAPITAL

4.         (1)   The capital of the Company shall be divided into such number of Shares as the Directors may from time to time determine.  Every Share carries the right to one vote per Share.

          (2)      Subject to the provisions of these Articles, the unissued Shares of the Company shall be available for issue as Shares of any class and shall be at the disposal of the Directors who may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as they may determine.

          (3)      Notwithstanding anything herein contained, fully paid shares of the Company shall be free and clear of all and any liens and charges in favour of the Company.

5.         Without prejudice to any special rights for the time being conferred on the holders of any shares or class of shares (which special rights shall not be varied or abrogated, except with such consent or sanction as is provided by the next following Article) any share in the Company may be issued with such preferred, deferred or other special rights, or such restrictions, whether in regard to dividend, return of capital, redemption, voting or otherwise as the Company may from time to time in general meeting determine.

6.         Whenever the capital of the Company is divided into different classes of shares all or any of the special rights for the time being attached to any class of share for the time being issued may (unless

otherwise provided by the terms of issue of the shares of that class) be altered or abrogated, either whilst the Company is a going concern or during or in contemplation of a winding up, with the consent in writing of the holders of not less than three-fourths of the issued shares of the class, or with the sanction of a resolution passed at a separate meeting of the holders of the shares of the class by a majority of three-fourths of such holders voting in person or by proxy, but not otherwise.  To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, mutatis mutandis, apply, except that the necessary quorum shall be two persons at least holding or representing by proxy not less than one-third in nominal amount of the issued shares of the class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those holders of shares of that class who are present shall be a quorum), and that the holders of shares of the class shall, on a poll, have one vote in respect of every share of the class held by them respectively and that any holder of shares of that class present in person or by proxy may demand a poll.  For such purposes the Directors may treat all the classes of shares as forming one class if they consider that all such classes would be affected in the same way by the proposals under consideration but in any other case shall treat them as separate classes.

7.          The special rights conferred upon the holders of any shares or class of shares issued with preferred or other special rights shall not (unless otherwise expressly provided by the conditions of issue of such shares) be deemed to be varied by the creation, allotment or issue of further shares ranking pari passu therewith or subsequent thereto.

## ISSUE OF SHARES

8.          (1)   Subject as hereinafter provided, the Company may on receipt by it or its authorised agent of an application in such form as the Directors may from time to time determine issue and allot Shares.  Issues of Shares shall be effected at not less than the Subscription Price determined in accordance with paragraph (2) of this Article.  The Directors may satisfy any such application for Shares by procuring the transfer to the applicant of fully paid Shares at the appropriate Subscription Price.

PROVIDED THAT:

(a)          all Shares shall be allotted on an Offering Date provided the application has been received by the Company or its agent, at least 7 days preceding the relevant Offering Date;

(b)          no Share shall be allotted or issued (except those for which applications have been previously received and accepted by the Company or its agent) during any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 10;

(c)          no Share shall be allotted or issued at a price less than its par value;

(d)          if in lieu of issuing Shares the Company shall procure a transfer of Shares to the person making such application any duties and charges payable in connection with such transfer shall be discharged by or on account of the transferor out of the price payable for such Shares;

(e)          payment shall be made in US Dollars at such time and place and in such manner as the Directors may from time to time determine failing which any allotment of Shares for which payment is due may be cancelled by the Directors;

(f)          the Company shall not issue any of its Shares or securities (i) for services, or (ii) for property other than cash or securities (including securities of which the Company is the issuer) except that it may issue fully paid Shares as a distribution to its Members or in connection with a reorganisation;

(g)          Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case;

(h)      fractions of a Share, of not less than one-thousandth of a Share, may be issued; and

(2)      In respect of an initial offer to the public the Directors shall, at their discretion, fix a Subscription Price which shall apply for the purposes of such initial offer. Thereafter the Subscription Price for each Share shall be determined as at the close of business in British Virgin Islands on the Valuation Day immediately preceding the Offering Date on which such issue is made in each case rounded down to the nearest whole US$0.01 as follows:

(1) For Shares purchased at the beginning of a Fiscal Year ("Year Beginning"), the Subscription Price shall be the Year Beginning Net Asset Value ("Beginning Value") plus a depreciation deposit ("Depreciation Deposit") equal to 20% of the Loss Carryover, if any, at Year Beginning.

(2) For Interim Purchases:

(a)      When the Net Asset Value per Share is less than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Subscription Price shall be the sum of the Net Asset Value per Share and the Depreciation Deposit.  The Depreciation Deposit is 20% of the amount by which (i) and (ii) above exceed the Net Asset Value per Share at the date of purchase. If at the end of any Fiscal Year (or at any time during the Fiscal Year when the Shares of a Member are redeemed) the losses which gave rise to the Depreciation Deposit are recouped, then, to the extent that the losses which gave rise to all or a portion of the Depreciation Deposit are recouped, the Depreciation Deposit shall be paid to the investment manager as part of the incentive fee.  Any portion of the Depreciation Deposit not paid to the investment manager will be paid to the Member upon redemption.  Promptly after the end of each Fiscal Year in which a Depreciation Deposit is held, the interest (net of the income taxes payable thereon, if any) earned thereon shall be paid to the Member who made such Depreciation Deposit.

(b)      When the Net Asset Value per Share is more than the sum of (i) Beginning Value and (ii) the Loss Carryover at Year Beginning, the Subscription Price shall be the sum of the Net Asset Value per Share and the "Equalization Factor" as defined hereinafter.  "Equalization Factor" means an amount which the Shares outstanding since Year Beginning should be charged (i.e. 20% of the increase in Net Asset Value since Year Beginning in excess of the Loss Carryover at Year Beginning), and which the Shares subscribed for at the date of the Interim Purchase ("Interim Purchase Date") should not be charged.  To the extent that the increase in value of the Shares that cause the payment of the Equalization Factor is not lost in the Fiscal Year, the Equalization Factor attributable to such increase shall become payable to the Member at the end of the Fiscal Year.  To the extent that the increase in value of the Shares that causes the payment of the Equalization Factor is lost in the Fiscal Year the Shares are purchased but is recovered in the subsequent Fiscal Year, the Equalization Factor attributable to such recovery shall become payable to the Member at the end of the Fiscal Year in which the recovery occurs.  Upon redemption by a Shareholder of his Shares, the same amount of the Equalization Factor will be paid to him as if the date of redemption were the last day of the Fiscal Year in which the Shares are redeemed.  Any Equalization Factor, or portion thereof, which is due to a Member not redeeming his Shares will be used to purchase additional full Shares  on behalf of such Member as of the first day of the next succeeding Fiscal Year.

(3)        Share certificates (if specifically requested) in respect of Shares allotted as aforesaid shall not be issued or delivered unless and until the subscription moneys representing the full Subscription Price have been paid over to the Administrator.

(4)        The Company shall not pay any brokerage or commission on any issue of Shares.

(5)        The Directors may decline to issue  Shares to satisfy an application unless the amounts subscribed for the Shares (inclusive of any initial charge) equals or exceeds such sum as the Directors may from time to time determine.

## REDEMPTION OF SHARES

9.        (1)        Subject to the provisions of the Memorandum and the Act and to these Articles, subject as hereinafter provided, the Company shall on receipt by it or its authorised agent of a request in writing (or in such other form as the Directors may determine) by a Member (the "Applicant") specifying the number of Shares to be redeemed, redeem all or any portion of the Shares registered in the Applicant's name at the Redemption Price determined in accordance with paragraph (3) of this Article or procure the purchase thereof at not less than such Redemption Price and at the same time and under the same conditions as apply to redemption under the provisions of these Articles PROVIDED THAT:

(a)        subject as hereinafter provided, the redemption or purchase of Shares pursuant to this Article shall be made on the Redemption Date falling at least forty-five (45) days (or such other notice period as the Directors may in their discretion determine) after the receipt of such written request;

(b)        on any such redemption the Directors shall have the power to divide in specie the whole or any part of the assets of the Company and appropriate such assets in satisfaction or part satisfaction of the Redemption Price and any other sums payable on redemption as is herein provided;

(c)        where a certificate has been issued in respect of the Shares to be redeemed or purchased, the Applicant shall lodge with the Company or its authorised agent such certificate and subject to the next proviso below no payment shall be made under this Article until such certificate shall have been received;

(d)        the Directors may at their option dispense with the production of any certificate which shall have become lost or destroyed upon compliance by the Applicant with the like requirements to those applying in the case of an application by him for replacement of a lost or destroyed certificate under these Articles;

(e)        no redemption or purchase of part only of the holding of any Member may be made if as a result thereof such Member would hold less than the minimum number of Shares as specified from time to time by the Directors and as set out in these Articles;

(f)        on redemption or purchase of part only of the Shares registered in the Applicant's name the Applicant shall be entitled without payment to a balance certificate for the balance of such Shares held by him;

(g)        subject as is hereinafter in this Article provided, the Applicant shall not be entitled to withdraw a request duly made in accordance with this Article without the consent of the Directors;

(h)        no Shares shall be redeemed during any period when the determination of the Net Asset Value is suspended pursuant to paragraph (4) of Article 10 hereof, the right of the Applicant to have his Shares redeemed or purchased pursuant to this Article shall be similarly

suspended and during the period of suspension he may withdraw his request for redemption and his certificate. Any withdrawal of a request for redemption under the provisions of this Article shall be made in writing and shall only be effective if actually received by the Company or its duly authorised agent before termination of the said period of suspension. If the request is not so withdrawn the redemption or purchase of the said Shares shall be made on the Redemption Date next following the end of the said suspension.

(2)     Subject as hereinafter provided, payment shall be made to the Applicant in US Dollars in respect of the redemption or purchase of Shares. Payment for Shares redeemed or purchased hereunder shall be made to the Applicant by a cheque, draft or other means of payment posted (at the risk of the Applicant) or otherwise paid to the Applicant in the manner determined by the Directors from time to time.

PROVIDED THAT if an Applicant shall require payment in a currency other than US Dollars, the Directors may, subject to receipt of any necessary exchange control or other governmental consent and at the risk of the Applicant and on his paying any costs thereby involved, arrange for the conversion of the US Dollars to which the Applicant is entitled into such currency as the Applicant may require at such exchange rate as the Directors shall consider appropriate.

(3)     The Redemption Price for each Share shall be the (1) Net Asset Value per Share (as determined in accordance with Article 10) as at the relevant Redemption Date; and (2) all or a portion of the Depreciation Deposit (as defined in these Articles) to the extent that the same is not paid as an incentive fee to any investment manager; and (3) all or a portion of the Equalization Factor (as defined in these Articles) to the extent that the increase in value of the Shares that caused the payment of the Equalization Factor has not been lost or previously repaid to the Member so redeeming.

(4)     Upon the redemption or purchase of a Share being effected pursuant to this Article, the Members shall cease to be entitled to any rights in respect of that Share (excepting always the right to receive a dividend which has been declared in respect thereof prior to such redemption or repurchase being effected) and accordingly his name shall be removed from the Register with respect thereto.

(5)     The Directors shall have power to impose such restrictions, other than a restriction on transfer, as they may think necessary for the purpose of ensuring that no Shares in the Company are acquired or held by -

(a)     any U.S. Person;

(b)     any person in breach of the law or requirements of any country or governmental authority; or

(c)     any person or persons in circumstances (whether directly or indirectly affecting such person or persons and whether taken alone or in conjunction with any other persons, connected or not, or any other circumstances appearing to the Directors to be relevant) which in the opinion of the Directors might result in the Company incurring any liability to taxation or suffering any other pecuniary disadvantage which the Company might not otherwise have incurred or suffered.

(6)     (i)     If it shall come to the notice of the Directors that any Shares are owned directly or beneficially by any person in contravention of any such restrictions as are referred to in paragraph (5) of this Article, the Directors may give notice to such person requiring him to transfer such Shares to a person who would not thereby be in contravention of any such restrictions as aforesaid or may give a request in writing for the redemption of such Shares in accordance with paragraph (1) of this Article. If any person upon whom such a notice is served pursuant to this subparagraph does not within thirty days after such notice transfer such Shares as aforesaid or establish to the satisfaction of the Directors (whose judgment shall be final and binding) that such Shares are not held in contravention of

any such restrictions he shall be deemed upon the expiration of thirty days to have given a request in writing for the redemption of all such Shares pursuant to paragraph (1) of this Article whereupon he shall be bound forthwith to deliver to the Company or its duly authorised agents the certificate or certificates (if issued) for such Shares.

(ii)      A person who becomes aware that he is holding or owning Shares in contravention of any such restrictions as are referred to in paragraph (5) of this Article shall forthwith unless he has already received notice pursuant to subparagraph (6)(i) of this Article either transfer all such Shares to a person who would not thereby be in contravention of any such restrictions as aforesaid or give a request in writing for the redemption of all such Shares pursuant to paragraph (1) of this Article. Every such request shall be accompanied by the certificate or certificates (if issued) for the Shares to which it refers.

(iii) Payment of the redemption moneys payable under this paragraph (6) on redemption will (subject to any requisite exchange control or other governmental consents first having been obtained by the Company and subject to the proviso to paragraph (2) of this Article) be made in US Dollars and will be deposited by the Company with or to the order of the Administrator in the name of the Company for payment to any such person against surrender of the certificate or certificates representing such Shares previously held by such person. Upon the deposit of such redemption moneys as aforesaid such person shall have no further interest in such Shares or any of them or any claim against the Company in respect thereof except the right to receive the moneys so deposited (without interest) from the Company upon surrender of the said certificate or certificates (if issued).

(7)      The Directors reserve the right, upon not less than 10 days' prior written notice, to compulsorily redeem all of a Member's Shares at any time for any reason or no reason. Under such circumstances, the Directors shall have the irrevocable power to act in the name of such Member to redeem his Shares. In the event of any such compulsory redemption, the Redemption Price shall be (i) the Net Asset Value of the Company as at the close of business on such Redemption Date (which includes an accrual for the Incentive Fee) multiplied by (ii) a fraction the numerator of which is the number of Shares being redeemed and the denominator of which is the number of Shares outstanding as of such date. Such Member shall have no Members' rights with respect to the Shares to be redeemed after the close of business on the date as of the relevant Redemption Date, except the right to receive the Redemption Price therefor.

## DETERMINATION OF NET ASSET VALUE

10.      (1)      The Net Asset Value per Share shall be determined by the Directors as at the close of business in the British Virgin Islands on each Valuation Day and Redemption Date (except when determination of the Net Asset Value per Share has been suspended under the provisions of paragraph (4) of this Article), on such other occasions as may be required by these Articles and on such other occasions as the Directors may from time to time determine.

The Net Asset Value per Share shall be calculated at the time of each determination by dividing the Net Asset Value of the Company by the number of Shares then in issue or deemed to be in issue, all determined and calculated as hereinafter provided.

Any certificate as to the Net Asset Value per Share or as to the Subscription Price or Redemption Price therefor given in good faith by or on behalf of the Directors shall be binding on all parties.

(2)      The Net Asset Value of the Company shall be determined on an accrual basis in accordance with generally accepted accounting principles in the United States and shall comprise the aggregate of:-

(a)    Investments owned or contracted to be acquired by the Company;

(b)    cash on hand or on deposit including accrued interest;

(c)    cash payments outstanding on any Shares allotted;

(d)    bills and demand notes and amounts receivable including net amounts receivable in respect of investments contracted to be realised;

(e)    interest accrued on interest bearing investments except that accrued on securities which is included in the quoted price; and

(f)    other property and assets of any kind and nature including prepaid expenses and unamortised preliminary expenses as valued and defined from time to time by the Directors;

from which shall be deducted:-

(i)    Investments contracted to be sold;

(ii)    bills and accounts payable;

(iii)    management and administrative expenses payable and/or accrued (the latter on a day-to-day basis);

(iv)    the gross acquisition consideration of Investments or other property contracted to be purchased;

(v)    reserves authorised or approved by the Directors for duties and charges or taxes or contingencies (accrued where appropriate on a day-to-day basis);

(vi)    the aggregate amount of all borrowings and interest, commitment fee, and other charges arising in connection therewith (accrued where appropriate on a day-to-day basis); and

(vii) other liabilities of the Company of whatsoever nature (which shall, where appropriate, be deemed to accrue from day-to-day) including outstanding payments on any Shares previously redeemed and, as from the Record Date in respect thereof, any dividends declared and not paid (contingent liabilities (if any) being valued in such manner as the Directors may determine from time to time or in any particular case).

For the purpose of calculating the number of Shares in issue or deemed to be in issue, Shares for which applications have been duly made shall be deemed to be not in issue on the relevant Valuation Day and Shares to be redeemed or purchased in accordance with Article 9 hereof shall be deemed to be in issue on the relevant Redemption Date.

(3)    For the purpose of calculating the value of the net assets:

(a)    no value shall be assigned to goodwill;

(b)    the value of any cash on hand or on deposit, bills, demand notes, accounts receivable, prepaid expenses, cash dividends and interest declared or accrued and not yet received shall be deemed to be the full amount thereof unless the Directors shall have determined that any such deposit, bill, demand note or account receivable is not

12.   (1)      The Directors may appoint any person or persons as manager of the Company to exercise all or any of the duties, powers and discretions exercisable by the Directors upon such terms and conditions and for such period and with such restrictions as the Directors think fit and whether collaterally with or to the exclusion of their own powers.  The Directors shall procure that, if the manager is dismissed or resigns, another person or persons are appointed as soon as possible as manager in its place.  The Directors shall procure that in any agreement appointing any person as manager provisions shall be contained restricting the manager and any investment adviser appointed by the manager dealing with the Company as beneficial owner on the sale or purchase of investments to or from the Company except on a basis approved by the Directors from time to time or without the consent of the Directors otherwise dealing with the Company as principal.

(2)      The manager shall be entitled to receive for its services such fees, including a fee on the issue of Shares, as may from time to time be agreed between the manager and the Company.

## CUSTODIAN

13.     The Directors shall appoint a Custodian who or whose nominee shall hold the assets of the Company and in whose name or in the name of whose nominee the same shall be registered in the case of registered securities and who shall perform such other duties upon such terms as the Directors may from time to time (with the agreement of the Custodian) determine.  All moneys, bills and notes belonging to the Company shall be paid to or to the order of or deposited with or to the order of the Custodian to an account to be opened in the name of the Company.  In the event of the Custodian desiring to retire the Directors shall use their best endeavours to find a corporation having the said qualifications to act as Custodian and upon doing so the Directors shall appoint such corporation to be Custodian in place of the retiring Custodian.   The Directors shall not remove the Custodian unless and until a successor corporation shall have been appointed in accordance with this Article to act in the place thereof.  The powers of the Directors under this Article shall include a power to appoint joint custodians and/or sub-Custodians.

## SHARE CERTIFICATES

14.     No person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or recognise any equitable, contingent or future interest in any share or any fractional part of a share, or (except only as by these presents otherwise provided or as by law required) any other right in respect of any share or any fractional part of a share, except an absolute right to such share or fractional part in the registered holder.

15.     Every person whose name is entered as a Member in the Register shall be entitled if such Member so requests in writing without payment to one certificate for all his shares, or upon payment of such reasonable out-of-pocket expenses as the Directors shall from time to time determine, to several certificates, each for one or more of his shares.  Where a Member transfers part only of his holding of shares he shall be entitled without payment to a balance certificate, if applicable, for the shares retained by him.  Every certificate shall be issued within two months after allotment or the lodgment with the Company of the transfer of the shares, unless the conditions of issue of such shares otherwise provide, and shall be under the Seal or a facsimile thereof or a securities seal of the Company adopted by the Directors for that purpose and shall specify the number and class and distinguishing numbers (if any) of the shares to which it relates, and the amount paid up thereon.  The Company shall not be bound to register more than four persons as the joint holders of any share or shares (except in the case of executors or trustees of a deceased Member) and in the case of a share held jointly by two or more persons, the Company shall not be bound to issue more than one certificate therefor, and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all.  If a share certificate be defaced, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity as the Directors think fit.

## REGISTER OF MEMBERS

16.     The Secretary shall enter or procure the entry in the Register of the particulars required by the Act, and the Register shall be kept in such manner as to show at all times the Members of the Company for the time being and the shares respectively held by them. The Register shall be open for inspection at the office of the Company in accordance with the provisions of the Act.

## TRANSFER OF SHARES

17.     (1)        Subject to any limitations in the Memorandum or these Articles, NO registered Shares in the Company may be transferred without the prior written consent of the Directors which may be given or withheld at the sole discretion of the Directors.  Any attempt by a Member to transfer all or any of his Shares in contravention of this Article may subject such a Member to compulsory redemption of all his Shares in accordance with these Articles.

           (2)        Any transfer approved by the Directors shall be by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the Directors may accept such evidence of a transfer of shares as they consider appropriate.

           (3)        No transfer of Shares may be made if as a result of such transfer either the transferor or the transferee of such Shares would hold less than the minimum number of Shares as the Directors may from time to time specify.

18.     The Company shall not be required to treat a transferee of a registered share in the Company as a Member until the transferee's name has been entered in the share register.

19.     Subject to any limitations in the Memorandum or these Articles, the Company must on the application of the transferor or transferee of a registered share in the Company enter in the share register the name and address of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of Directors determine provided always that such registration shall not be suspended and the share register closed for more than sixty days in any period of twelve months.

## TRANSMISSION OF SHARES

20.     The executor or administrator of a deceased Member, the guardian of an incompetent Member or the trustee of a bankrupt Member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a Member of the Company until they have proceeded as set forth in the next following two Articles.

21.     Any  person  becoming  entitled  by  operation  of  law  or  otherwise  to  a  share  or  shares  in consequence of the death, incompetence or bankruptcy of any Member may be registered as a Member upon such evidence being produced as may reasonably be required by the Directors.  An application by any such person to be registered as a Member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt Member and the Directors shall treat it as such.

22.     Any  person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any Member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

23.     What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.

## REDUCTION OR INCREASE IN AUTHORISED CAPITAL OR CAPITAL

F:\walkers\simon\LSPV/Amended AoA 11Feb03

24.      The Company may by a resolution of Directors amend the Memorandum to increase or reduce its authorised capital and in connection therewith the Company may in respect of any unissued shares increase or reduce the number of such shares, increase or reduce the par value of any such shares or effect any combination of the foregoing.

25.      The Company may amend the Memorandum to

     (a)   divide the shares, including issued shares, of a class into a larger number of shares of the same class; or

     (b)   combine the shares, including issued shares, of a class into a small number of shares of the same class,

provided, however, that where shares are divided or combined under (a) or (b) of this Article, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares.

26.      The capital of the Company may by a resolution of Directors be increased by transferring an amount of the surplus of the Company to capital, and, subject to the provisions of Articles 27 and 28, the capital of the Company may, by resolution of Directors, be reduced by transferring an amount of the capital of the Company to surplus.

27.      No reduction of capital shall be effected that reduces the capital of the Company to an amount that immediately after the reduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

28.      No reduction of capital shall be effected unless the Directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realizable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the Directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

29.      Where the Company reduces its capital the Company may:-

     (a)   return to its Members any amount received by the Company upon the issue of any of its shares;

     (b)   purchase, redeem or otherwise acquire its shares out of capital, or

     (c)   cancel any capital that is lost or not represented by assets having a realizable value.

## MEETINGS AND CONSENTS OF MEMBERS

30.      Subject to Article 2, the Directors of the Company may convene meetings of the Members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the Directors consider necessary or desirable.

31.      Upon the written request of Members holding fifty percent or more of the outstanding voting shares in the Company the Directors shall convene a meeting of Members.

32.     The Directors shall give not less than three days notice of meetings of Members to those persons whose names on the date the notice is given appear as Members in the share register of the Company.

33.     A meeting of Members held in contravention of the requirement in Article 32 is valid:-

(a)  if Members holding not less than ninety percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or ninety percent of the votes of each class of shares where Members are entitled to vote thereon as a class together with not less than a ninety percent majority of the remaining votes, have agreed to shorter notice of the meeting or

(b)  if all Members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

34.     The inadvertent failure of the Directors to give notice of a meeting to a Member, or the fact that a Member has not received notice, does not invalidate the meeting.

35.     A Member may be represented at a meeting of Members by a proxy (who need not be a Member) who may speak and vote on behalf of the Member.

36.     The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting as which the person named in such instrument proposes to vote.

37.     An instrument appoint a proxy shall be in substantially in the form of Exhibit C or such other form as the chairman of the meeting shall accept as properly evidencing the wishes of the Member appointing the proxy.

38.     The following shall apply in respect of joint ownership of shares:

(a) if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of Members and may speak as a Member;

(b) if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and

(c) if two or more of the joint owners are present in person or by proxy they must vote as one.

39.     A Member shall be deemed to be present at a meeting of Members if he participates by telephone or other electronic means and all Members participating in the meeting are able to hear each other.

40.     A meeting of Members is duly constituted if, at the commencement of the meeting, there are present two persons representing in person or by proxy one third (1/3) of the outstanding Shares which shall be a quorum for all purposes.

41.     If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the Directors may determine, and if at the adjourned meeting there are present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

42.     (1)  Subject to paragraph (2) below, any act or thing which in accordance with these Articles is required to be transacted, made, done, approved, determined, decided or passed by the Company in

F:walkers\simon\LSPV/Amended AoA 11Feb03

general meeting shall not be effective except by virtue of a resolution passed by a simple majority of the persons voting thereat upon a show of hands, or, if a poll is duly demanded, by a simple majority of the votes given at such poll.

(2)    Notwithstanding the foregoing, the (i) dismissal of a Director must be adopted by an affirmative vote of two-thirds of the votes cast at a general meeting of Members at which more than one-half of the total number of Shares then issued and outstanding are represented; (ii) any investment advisory or management contract entered into by the Company may not be terminated by the Company unless such termination is approved by a unanimous vote cast at a meeting at which all the issued and outstanding Shares are represented; (iii) amendments to the Memorandum of Association and the Articles of Association which have a material, adverse effect on the rights of Members must be approved by three-quarters of the votes cast at a meeting at which not less than one-half of the issued and outstanding Shares are represented, except that any amendment to decrease the vote required to terminate an investment advisory or investment management contract requires approval by a unanimous vote cast at a meeting at which all of the issued and outstanding Shares are represented; and (iv) the merger or consolidation of the Company with another corporation or the dissolution of the Company requires the affirmative vote of the holders of three-quarters of the Shares outstanding.

(3)  In the case of an equality of votes at a general meeting, whether on a show of hands or on a poll, the chairman of such meeting shall be entitled to a second or casting vote.

43.    At every meeting of Members, the President or Vice President of the board of Directors shall preside as chairman of the meeting.  If there is no President or Vice President of the board of Directors or if the President or Vice President of the board of Directors is not present at the meeting, the Members present shall choose some one of their number to be the chairman.  If the Members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual Member or representative of a Member present shall take the chair.

44.    The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

45.    At any meeting of the Members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes thereof.  If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any Member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken.  If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

46.    Any person other than an individual shall be regarded as one Member and subject to these Articles the right of any individual to speak for or represent such Member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence.  In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the Directors may rely and act upon such advice without incurring any liability to any Member.

47.    Any person other than an individual which is a Member of the Company may by resolution in writing (certified or signed by a duly authorized person) of its Directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members of the Company, and the person so authorised shall be entitled to exercise the same powers of behalf of the person which he represents as that person could exercise if it were an individual Member of the Company.

48.     The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within seven days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

49.     Directors of the Company may attend and speak at any meeting of Members of the Company and at any separate meeting of the holders of any class of shares in the Company.

## DIRECTORS

50.     The first Directors of the Company shall be elected by the subscriber to the Memorandum; and thereafter, the Directors shall be elected by the Members for such term as the Members determine.

51.     The minimum number of Directors shall be one and the maximum number shall be seven.

52.     Each Director shall hold office for the term, if any, fixed by resolution of Members or until his earlier death, resignation or removal.

53.     A Director may be removed from office, with or without cause, by a resolution of Members.

54.     A Director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

55.     A vacancy in the board of Directors may be filled by a resolution of the remaining Directors.

56.     With the prior or subsequent approval by a resolution of Shareholders, the Directors may, by a resolution of Directors, fix the emoluments of Directors with respect to services to be rendered in any capacity to the Company.

57.     A Director shall not require a share qualification, and may be an individual or a company.

## POWERS OF DIRECTORS

58.     The business and affairs of the Company shall be managed by the Directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the Members of the Company, subject to any delegation of such powers as may be authorised by these Articles and to such requirements as may be prescribed by a resolution of Members; but no requirement made by a resolution of Members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the Directors which would have been valid if such requirement had not been made.

59.     The Directors may, by a resolution of Directors, appoint any person, including a person who is a Director, to be an officer or agent of the Company.

60.     Every officer or agent of the Company has such powers and authority of the Directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of Directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to fixing the emoluments of Directors.

61.     Any Director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the board of Directors or with respect to unanimous written consents.

62.     The continuing Directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of the Directors, the continuing Directors or Director may act only for the purpose of appointing Directors to fill any vacancy that has arisen or summoning a meeting of Members.

63.     All cheques, promissory notes, draft, bills or exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as shall from time to time be determined by resolution of Directors.

## PROCEEDINGS OF DIRECTORS

64.     Subject to Article 2, the Directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the Directors may determine to be necessary or desirable.  Notwithstanding the foregoing a  resolution in writing signed by all the Directors which may be in counterparts, shall be as valid as if it had been passed at a meeting of the Directors duly called and constituted, such resolution to be effective on the date on which the last Director signs the resolution.

65.     A Director shall be deemed to be present at a meeting of Directors if he participates by telephone or other electronic means and all Directors participating in the meeting are able to hear each other.

66.     A Director shall be given not less than three days notice of meetings of Directors, but a meeting of Directors held without seven days notice having been given to all Directors shall be valid if all the Directors entitled to vote at the meeting who do not attend, waive notice of the meeting.  The inadvertent failure to give notice of a meeting to a Director, or the fact that a Director has not received the notice, does not invalidate the meeting.

67.     A Director may by a written instrument appoint an alternate who need not be a Director and an alternate is entitled to attend meetings in the absence of the Director who appointed him and to vote or consent in place of the Director.

68.     The Directors may determine by resolution the quorum necessary for the transaction of business and unless otherwise determined, two Directors shall be a quorum.

69.     At every meeting of the Directors the chairman of the board of Directors shall preside as chairman of the meeting.  If there is no chairman of the board of Directors or if the chairman of the board of Directors is not present at the meeting the vice chairman of the board of Directors shall preside.  If there is no vice chairman of the board of Directors or if the vice chairman of the board of Directors is not present at the meeting the Directors present shall choose some one of their number to be chairman of the meeting.

70.     The Directors shall cause the following corporate records to be kept:

        (a)  minutes of all meetings of Directors, Members, committees of Directors, committees of officers and committees of Members;

        (b)  copies of all resolutions consented to by Directors, Members, committees of Directors, committees of offices and committees of Members;

        (c)  such accounts and records as the Directors by resolution of Directors consider necessary or desirable in order to reflect the financial position of the Company; and

(d)   a share register in which there shall be recorded the name and address of each Member, the number of shares held by each Member and the par value thereof, the date upon which the holder became a Member and the date upon which the holder ceased to be a Member and otherwise as required by the Act.

71.    The books, records, minutes and share register shall be kept at the registered office of the Company or at such other place as the Directors determine.

72.    The Directors may, by a resolution of Directors, designate one or more committees, each consisting of one or more Directors.

73.    Each committee of Directors has such powers and authorities of the Directors, including the power and authority to affix the Seal, as are set forth in the resolution of Directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles or with respect to the matters requiring a resolution of Directors under these Articles.

74.    The meetings and proceedings of each committee of Directors consisting of two or more Directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of Directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

## OFFICERS

75.    The Company  may by resolution of Directors appoint officers of the Company at such times as shall be considered necessary or expedient.  Such officers may consist of a president and one or more vice presidents, secretaries and treasurers and such other officers as may from time to time be deemed desirable.  Any number of offices may be held by the same person.

76.    The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of Directors or resolution of Members, but in the absence of any specific allocation of duties it shall be the responsibility of the chairman of the board of Directors to preside at meetings of Directors and Members, the vice chairman to act in the absence of the chairman, the president to manage the day to day affairs of the Company, the vice presidents to act in order of seniority in the absence of the president but otherwise to perform such duties as may be delegated to them by the president, the secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law and the treasurer to be responsible for the financial affairs of the Company.

77.    The emoluments of all officers shall be fixed by resolution of Directors.

78.    The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the Directors may be removed at any time, with or without cause, by resolution of Directors.  Any vacancy occurring in any office of the Company may be filled by resolution of Directors.

## CONFLICT OF INTERESTS

79.    No agreement or transaction between the Company and one or more of its Directors or any person in which any Director has a financial interest or to whom any Director is related, including as a Director of that other person, is void or voidable for this reason only or by reason only that the Director is present at the meeting of Directors or at the meeting of the committee of Directors that approves the agreement or transaction or that the vote or consent of the Director is counted for that purpose if the material facts of the interest of each Director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other Directors.

F:\walkers\simon\LSPV/Amended AoA 11Feb03

80.     A Director who has an interest in any particular business to be considered at a meeting of Directors or Members may be counted for purposes of determining whether the meeting is duly constituted.

## INDEMNIFICATION

81.     Subject to the provisions of the Act, every Director, Secretary, and other Officer or servant of the Company shall be indemnified by the Company against, and it shall be the duty of the Directors out of the funds of the Company to pay, all costs, losses, and expenses which any such Officer or servant may incur or become liable for by reason of any contract entered into, or act or thing done by him as such Officer, Director, Secretary or servant, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Company, and have priority as between the Members over all other claims, unless the same happened through his own willful negligence, willful default, fraud or dishonesty.

82.     No Director, Secretary or other Officer of the Company shall be liable for the acts, receipts, neglects or defaults of any other Director or Officer, or for joining in any receipt or other act for conformity, or for any loss or expense happening to the Company through the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Company, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Company shall be invested, or for say loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, unless the same happened through his own wilful neglect, wilful default, fraud or dishonesty.

## SEAL

83.     The Directors shall provide for the safe custody of the Seal.  An imprint thereof shall be kept at the registered office.  The Seal when affixed to any written instrument shall be witnessed by a Director or any other person so authorised from time to time by resolution of Directors.  The Directors may provide for a facsimile of the Seal and of the signature of any Director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## DIVIDENDS

84.     The Company may by a resolution of Directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus.  In the event that dividends are paid in specie the Directors shall have responsibility for establishing and recording in the resolution of Directors authorising the dividends, a fair and proper value for the assets to be so distributed.

85.     The Directors may from time to time pay to the Members such interim dividends as appear to the Directors to be justified by the profits of the Company.

86.     The Directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

87.     No dividend shall be declared and paid unless the Directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the Directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

88.     Notice of any dividend that may have been declared shall be given to each Member in the manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by resolution of Directors for the benefit of the Company.

89.     No dividend shall bear interest as against the Company.

90.     A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred from surplus to capital at the time of the distribution.

91.     In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

92.     In the case of a dividend of authorized but unissued shares with par value, the amount designated by the Directors shall be transferred from surplus to capital at the time of the distribution, except that the Directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

93.     A division of the issued and outstanding shares of a class of shares into a larger number of shares of the same class having a proportionately smaller par value does not constitute a dividend of shares.

## ACCOUNTS

94.     The Directors shall cause to be kept proper accounts with respect to:-

       (a)   all sums of money received and expended by the Company and the matters in respect of which such receipt and expenditure take place;

       (b)   all sales and purchases of assets by the Company; and

       (c)   the assets and liabilities of the Company.

95.     The books of account shall be kept at the office of the Company, or (subject to the provisions of the Act) at such other place as the Directors think fit and shall always be open to inspection by the Directors.

96.     No Member (other than a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by the Act or authorised by the Directors or by the Company in General Meeting.

## NOTICES

97.     Any notice, information or written statement to be given by the Company to Members must be served by mail addressed to each Member at the address shown in the share register.

98.     Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to, the registered agent of the Company.

99.     Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was mailed in such time as to admit to its being delivered in the normal

course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## ARBITRATION

100.    Whenever any difference arises between the Company on the one hand and any of the Members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act, touching anything done or executed, omitted or suffered in pursuance of the Act or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to two arbitrators, one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

101.    If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for ten days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

## VOLUNTARY WINDING UP AND DISSOLUTION

102. (1)    The Company may voluntarily commence to wind up and dissolve by a resolution of Members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of Directors.

(2) If the Company shall be wound up the Liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as he thinks fit.

(3) The assets available for distribution among the Members shall then be applied first, in the payment to the holders shares of a sum equal to the par value of the shares provided that there are sufficient assets available to enable such payment to be made and second, in the payment of any balance then remaining, such payment being made in proportion to the number of Shares in the Company held.

(4) If the Company shall be wound up (whether the liquidation is altogether voluntary or by or under the supervision of the Supreme Court) the Liquidator may, with the authority of a resolution passed in general meeting divide among the members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds, and may for such purposes set such value as he deems fair upon any one or more class or classes of property, and may determine how such division shall be carried out as between the Members or different classes of Members.  The Liquidator may with the like authority, vest any part of the assets in trustees upon such trust for the benefit of Members as the Liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares in respect of which there is a liability.

## CONTINUANCE

103.    The Company may by resolution of Members or by a resolution passed unanimously by all Directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

We, the undersigned, of the address stated below, for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to the Articles of Association this day in the presence of the undersigned witness

LWB Company Limited hereby subscribes to this Articles of Association this 30th day of December 2002

_____

NAME AND ADDRESS AND DESCRIPTION OF SUBSCRIBER

[Signed]
_____
Simon Pascoe
LWB COMPANY LIMITED
P O Box 92
Road Town
Tortola
BRITISH VIRGIN ISLANDS

WITNESS TO THE ABOVE SIGNATURE

[Signed]
_____
Rebecca Buss
P O Box 92
Road Town
Tortola
BRITISH VIRGIN ISLANDS

F:walkers\simon\LSPV/Amended AoA 11Feb03

**THE SCHEDULE**

FORM "A"

**TRANSFER OF SHARES**

I/We  ............................................................................................................[the

transferor] in consideration of.......................[amount]

DO HEREBY TRANSFER TO................................................................................[the

transferee]
of......................................[address]..........................................................................................
.....................................[number and class of shares] in the company,

LSPV Inc., represented by the attached/within certificate.

AS WITNESS my/our hand(s) the        day of            20

SIGNED by the above-named transferor(s)
in the presence of:

.........................................
(Signature of Transferor(s))


.........................................
(Witness)


.........................................
(Signature of Transferee(s))


.........................................
(Witness)

**FORM "B"**

**TRANSFER BY PERSONAL REPRESENTATIVES**

I/W e having become entitled in consequence of the death of (name of deceased shareholder) ........................................ to (number) ........................ share(s) comprised in certificate(s) numbered .................. standing in the Register of Members of LSPV Inc. in the name of the said deceased shareholder, instead of being registered myself/ourselves in consideration of the sum of (state total consideration) .................... paid to me/us by name(s) of transferee(s) ............................................................................................................................................................................... of (address(es) ............................................................................................................................................... (hereinafter called "the transferee(s)") do hereby transfer to the transferee(s) (number and class of shares transferred) .................... share(s) in the said Company subject to the several conditions on which the same were held immediately before the execution hereof; and I/We the transferee(s) do hereby agree to take the said share(s) hereby transferred subject to the conditions aforesaid.

AS WITNESS my/our hand(s) the     day of     20

SIGNED by the above-named person(s)
entitled in the presence of:

.........................................
(Signatures of person(s) entitled)


.........................................


SIGNED by the above-named Transferee(s)
in the presence of:

.........................................
(Signature(s) of Transferee(s))


.........................................

FORM "C"

## PROXY LIMITED TO ONE MEETING

I/We ...............................................................................................[name]

the holder of ...............................................................................[number] shares

hereby appoint ......................[proxy] of.................................................................................

...............................................................................................................[address]
or failing whom.....................[proxy] of...............................................................................

...............................................................................................................[address]

to be my/our proxy to vote on me/our behalf at the annual/special general meeting of the shareholders of the company to be held on the ........ day of ............ 20 .., and at any adjournment thereof.

This form is to be used in favour of the following resolution(s):

Unless otherwise instructed with respect to any particular resolution(s) the proxy will vote or abstain as he thinks fit.

AS WITNESS my/our hand(s) this        day of              20

SIGNED by


............................................
(Signature(s) of shareholder(s))


............................................
(Witness)

# EXHIBIT 14

# Lancer Offshore, Inc.

Dear Investor: January 2, 2003

The past 3 years have been difficult times for equity investors, as historic stock market losses, a surge in volatility and the consequent drying up of trading liquidity inflicted considerable hardship on the investing public. The stock market's staggering decline notwithstanding, the Fund still managed to significantly outdistance all relevant benchmarks and deliver absolute profitability for its shareholders. However, as communicated in our October conference call, the Fund in the latter part of the year received an unprecedented level of withdrawal requests, adding significantly to the liquidity crunch. The level of redemption requests is tantamount to a "run on the bank," and how we manage this process will be critical to maximal realization of the underling values for both ongoing shareholders and redeeming investors. As most of you know, the Fund historically has been highly accommodating on the payment of withdrawal proceeds, often making payouts prior to the required dates. I am writing to inform you that given the current situation, Lancer Management Group, LLC (the "Investment Manager") and the board of directors of the Fund (the "Board") are determined to continue to act to preserve and maximize value for the portfolios, and the Fund is taking certain steps that we believe are in the best interest of all investors.

As disclosed in the Fund's materials, in correspondence with shareholders and in quarterly conference calls, the Fund's investment strategy since inception has been to concentrate portfolio holdings in relatively few, often small companies, where the market's pricing inefficiencies are most significant. Although over the years this approach has been instrumental in delivering well above-average returns, it is not a liquid strategy. In fact, each investment's exit strategy often is linked to a specific "trigger event" that both enhances value and provides a liquidity window. The Fund's current portfolio is consistent with this historical investment strategy, where the Fund now holds a significant percentage of its assets in investments that are awaiting a "trigger event" and, until then, are illiquid.

The Board and the Investment Manager believe that the course of action that is best designed to maximize the value of the Fund as a whole is for each investor who elects or has elected to redeem his shares, in whole or in part, at December 31, 2002 (each, a "2002 Redeeming Investor") or certain quarterly dates thereafter (together with 2002 Redeeming Investors, "Redeeming Investors") to receive the value of his investment, valued as of the date of the redemption, through a distribution by the Fund of a pro rata interest in a special purpose company incorporated in the British Virgin Islands (LSPV, Inc. ("LSPV")) organized to receive a contribution of the Fund's assets equal to the Redeeming Investors' pro rata share of all assets of the Fund. In this way, each Redeeming Investor will receive an interest in LSPV reflecting his pro rata investment in the Fund, and LSPV thereafter will liquidate its assets in a manner designed to maximize value. The sole director and manager of LSPV is the Investment Manager of the Fund, which will manage the orderly liquidation of the assets of LSPV in the best interests of all investors, both those in LSPV and those in the Fund. The Investment Manager will not be compensated for its management of LSPV.

412512750l

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

The Board and the Investment Manager believe that it would be contrary to the best interests of the investors generally, including the Redeeming Investors, were the Fund to attempt to sell or distribute "in kind" securities currently held by the Fund ("Securities") to satisfy individual redemption requests. The quantity of Securities that would need to be sold, or that would or could be sold subsequent to an in-kind distribution, would likely create a gross imbalance of supply and demand of such Securities, which would likely be further exacerbated by short-selling pressure. As a result, such action would disproportionately reduce the value of Redeeming Investors' holdings, and would also be a significant detriment to ongoing shareholders. Similarly, selling a disproportionate portion of the Fund's marketable Securities in order to satisfy near-term redemptions would result in an inappropriate concentration of Fund investments in illiquid Securities. Such actions would be detrimental to both redeeming and remaining investors. In addition, unrestrained selling or distributing the Securities in this manner would unfairly place pressure on the businesses underlying the Securities.

Accordingly, as of January 2, 2003, the Fund contributed to LSPV a pro rata portion of the Fund's Securities attributable to the 2002 Redeeming Investors' shares in the Fund, and has received shares of LSPV ("SPV Interests") in consideration for such Securities. The Fund is distributing to each 2002 Redeeming Investor his pro rata portion of the SPV Interests, and will make similar pro rata contributions and pro rata distributions to future Redeeming Investors (each, a "Distribution"). LSPV will seek to maximize the realized value of the Securities held by it as promptly as practicable, given market conditions, its goals of maximizing value for the Redeeming Investors and the ongoing shareholders and other relevant factors. As the value of Securities is realized, LSPV will make periodic distributions of proceeds on a pro rata basis to all Redeeming Investors until all withdrawals have been fully satisfied. The Fund's investment objectives and strategies will be unchanged.

The Board and the Investment Manager believe that segregating a pro rata cross section of Securities into LSPV and satisfying near-term-redemptions through the Distribution provides all investors with the ability to redeem their investments held in the Fund in the most practicable and efficient means available and, at the same time, preserves the value of Securities for all investors.

While there are no guarantees, as events unfold, markets normalize and company milestones are achieved, LSPV should be able to liquidate its positions and distribute cash to Redeeming Investors. By maintaining the Fund's positions and providing the necessary time for events to unfold and market equilibrium to return, the possibility exists of a cash return substantially exceeding the current value of the Securities.

In the next several days, I will be telephoning you to answer any questions you may have. In the interim, please feel free to telephone me. I am grateful for your cooperation.


Sincerely,                                                           Michael Lauer, Manager


412512750

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

# EXHIBIT 15

# Delaware

PAGE 1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "LSPV, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE THIRTIETH DAY OF DECEMBER, A.D. 2002, AT 2 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "LANCER PARTNERS LIQUIDATING FUND, LLC" TO "LSPV, LLC", FILED THE THIRTY-FIRST DAY OF DECEMBER, A.D. 2002, AT 12:30 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY.

Harriet Smith Windsor
Harriet Smith Windsor, Secretary of State

3608677   8100H

030324601

AUTHENTICATION: 2431391

DATE: 05-22-03

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 02:00 PM 12/30/2002*
*020806348 — 3608677*

# CERTIFICATE OF FORMATION

## OF

## LANCER PARTNERS LIQUIDATING FUND, LLC

---

Pursuant to Chapter 18, Section 18-201 of the Delaware Limited Liability Company Act, the undersigned, being authorized to execute and file this Certificate of Formation, hereby testifies as follows:

**FIRST:**  The name of the limited liability company is Lancer Partners Liquidating Fund, LLC (the "Fund").

**SECOND:**  The address of its registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, City of Wilmington, County of New Castle. The name of its registered agent at such address is The Corporation Trust Company.

**THIRD:**  The Fund is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Fund is, engaging in any lawful act or activity for which limited liability companies may be formed under the Act and engaging in any and all activities necessary or incidental to the foregoing.

**FOURTH:**  The Fund may establish from time to time any number of series of members, managers or limited liability company interests having separate rights, powers or duties with respect to specified property or obligations of the Fund or profits and losses associated with specified property or obligations, and such series may have a separate business purpose and investment objective. The debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular series shall be enforceable against the assets of such series only, and not against the assets of the Fund generally or any other series thereof, and, unless otherwise provided in the limited liability company agreement, none of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to the Fund generally or any other series thereof shall be enforceable against the assets of such series.

**IN WITNESS WHEREOF**, the undersigned shall have caused this Certificate of Formation to be executed this 30th day of December 2002.

/s/ William Natbony
By:  William Natbony
     Authorized Person

11151134.01

# CERTIFICATE OF AMENDMENT

## OF

# CERTIFICATE OF FORMATION

## OF

## LANCER PARTNERS LIQUIDATING FUND, LLC

---

**Pursuant to Section 18-202 of the Delaware Limited Liability Company Act**

---

The undersigned, being authorized to execute and file this Certificate of Amendment, hereby certifies as follows:

1. The name of the limited liability company is Lancer Partners Liquidating Fund, LLC.

2. The Certificate of Formation of the limited liability company is hereby amended as follows:
FIRST:  The name of the limited liability company is LSPV, LLC.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment this 31st day of December 2002.

/s/ William Natbony
By:  William Natbony
Authorized Person

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 12:30 PM 12/31/2002
020811559 - 3608677

11151252.01

# EXHIBIT 16

# 𝕷𝖆𝖓𝖈𝖊𝖗 𝕻𝖆𝖗𝖙𝖓𝖊𝖗𝖘, 𝕷𝕻

February 3, 2003

Mr. Jerome B. Baesel
Morgan Stanley Institutional Fund of Hedge Funds, LP
One Tower Bridge
100 Front Street
Suite 1100
West Conshohocken, PA 19428-2881

Re: Redemption and Withdrawal from Lancer Partners, LP (the "Fund")

Dear Mr. Baesel:

As of December 31, 2002 (the "Redemption Date"), you redeemed your entire interest in the Fund having an estimated net asset value on the Redemption Date of $9,753,826.79 (subject to review and revision by the Fund's auditor). As described in the letter to Limited Partners dated January 2, 2003, your redemption payment consists of the transfer to you of a limited liability company interest (the "LLC Interest") in LSPV, LLC ("LSPV") having an estimated net asset value on January 2, 2003 of $9,753,826.79, which estimated net asset value may be revised based on the ongoing review by the Fund's auditor. The transfer of the LLC Interest was effective as of January 2, 2003. We have enclosed a copy of the Limited Liability Company Agreement for LSPV for your records.

As always, should you have any questions, please do not hesitate to telephone me.

Sincerely yours,

Lancer Management Group II, LLC
General Partner of Lancer Partners, Limited Partnership

By: _____
       Michael Lauer

41252879.03

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

# LIMITED LIABILITY COMPANY AGREEMENT

## of

## LSPV, LLC

**LIMITED LIABILITY COMPANY AGREEMENT** of LSPV, LLC, a Delaware limited liability company (the "Company") dated as of January 2, 2003, by and among LANCER PARTNERS, LIMITED PARTNERSHIP (the "Initial Member" or the "Partnership") and LANCER MANAGEMENT GROUP II, LLC (the "Managing Member").

## ARTICLE I

### General Provisions

Section 1.01   **Formation.**   The Initial Member and Managing Member have formed LSPV, LLC as a Delaware limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "Act").

Section 1.02   **Company Name.**   The name of the Company is and shall be LSPV, LLC.

Section 1.03   **Purpose.**   The Company is formed for the purpose of (i) serving as a liquidating vehicle to render payment to the limited partners of the Partnership who have elected to redeem, in whole or in part, their investment in the Partnership at December 31, 2002 or thereafter (each, a "Redeeming Investor" and collectively, the "Redeeming Investors"), and (ii) engaging in any and all activities necessary or incidental to the foregoing other than making new investments in equity securities.

Section 1.04   **Place of Business.**   The principal place of business of the Company shall be at 980 Post Road East, Westport, Connecticut 06880 or elsewhere within or outside the State of Delaware as the Managing Member may from time to time determine.

Section 1.05   **Fiscal Year and Fiscal Period.**   The fiscal year of the Company shall end on December 31 of each year, which fiscal year may be changed by the Managing Member (the "Fiscal Year"). The term Fiscal Period shall mean any one or more of the following: (a) the period from the first day of the Fiscal Year to the last day of the third month of the Fiscal Year; (b) the period from the first day of the fourth month of the Fiscal Year to the last day of the sixth month of the Fiscal Year; (c) the period from the first day of the seventh month of the Fiscal Year to the last day of the ninth month of the Fiscal Year; (d) the period from the first day of the tenth month of the Fiscal Year to the last day of the Fiscal Year; and (e) such

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

other periods as may be designated from time to time as a Fiscal Period by the Managing Member.

Section 1.06     **Term of Company.** The Company shall continue until December 31, 2044, unless dissolved on the last day of a particular Fiscal Year as hereinafter provided or otherwise terminated as provided in Section 13.01 below.

## ARTICLE II

### Admission of Members

Section 2.01     **Admission of Initial Member and Managing Member.** The Initial Member and Managing Member are admitted as members of the Company as of the date hereof. Effective January 2, 2003, the Initial Member made a capital contribution (the "Initial Capital Contribution") to the Company of a designated group of securities described on Annex I hereto (together with any additional securities contributed by the Initial Member to the Company from time to time, the "Partnership Securities") and was issued in consideration therefor all of the limited liability company interests in the Company (the "LLC Interests").

Section 2.02     **Admission of Redeeming Investors as Members.** Effective January 2, 2003, each Redeeming Investor listed on Exhibit A attached hereto became a member (each, an "Additional Member" and collectively, the "Additional Members" and together with the Initial Member and the Managing Member, the "Members") of the Company upon the distribution by the Initial Member to such Redeeming Investor of a ratable portion of the Initial Member's LLC Interests (pro rata in accordance with the relative amounts being withdrawn from the Partnership by all such Redeeming Investors) in satisfaction of the Redeeming Investor's withdrawal from the Partnership (the "Redemption Distribution").

## ARTICLE III

### Management

Section 3.01     **Management of Company.** The Managing Member shall serve as the manager of the Company and shall have the sole and exclusive power, discretion and authority regarding the management of the Company, including exercising the powers set forth in Section 3.02. The Initial Member and the Additional Members shall take no part in the management or control of the Company business and shall have no authority to act for or bind the Company. The Managing Member shall devote so much of its time and efforts to the affairs of the Company as may in its judgment be necessary to accomplish the purposes of the Company. Nothing herein contained shall prevent the Members from conducting any other business including any business with respect to securities not otherwise prohibited or restricted by this Agreement. The Members are not prohibited from buying or selling securities for their own accounts, including the same securities as are acquired, sold or held by the Company.

In accordance with ARTICLE VII below, the Managing Member shall operate the Company as a liquidating vehicle for the benefit of the Additional Members. The

-2-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

02/06/2003 14:15 FAX 610 260 7171    MORGAN STANLEY DEAN    @005/02.

Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 353 of 510

Managing Member shall effect the liquidation of the Partnership Securities from time to time as the Managing Member deems appropriate in the Managing Member's sole but reasonable discretion. The proceeds from the liquidation of the Partnership Securities (the "Liquidation Proceeds") shall be distributed as soon as practicable by the Managing Member pro rata to the Additional Members in portion to each Additional Member's Capital Account (as defined below). Each distribution of the Liquidation Proceeds is hereinafter referred to as a "Liquidation Distribution." Simultaneously with each Liquidation Distribution, the Managing Member shall correspondingly reduce the Capital Account (as defined below) of each Additional Member receiving a Liquidation Distribution. Upon the withdrawal of all of an Additional Member's Capital Account (pursuant to the terms herein), such Additional Member shall not be entitled to any further Liquidation Distribution.

Section 3.02    **Powers of the Managing Member.**  Without in any way intending to limit the powers of the Managing Member, the Managing Member shall have the following powers on behalf of the Company:

(a)    As provided in Section 3.01, to manage all of the assets held by the Company, including but not limited to the right to:

(i)    Buy and sell non-equity securities on behalf of the Company;

(ii)    Liquidate the Partnership Securities held by the Company;

(iii)    Maintain margin accounts with brokers;

(iv)    Pledge Company assets for loans and, in connection with any such pledge, to effect borrowings from brokers or banks in such amounts as may be determined from time to time; and

(v)    Effectuate the Liquidation Distribution.

(b)    Do any act or execute any agreement of any nature necessary to pursue the business of the Company in accordance with the provisions of this Agreement and all applicable Federal, state and local laws and regulations.

(c)    Acquire and enter into any contract of insurance that the Managing Member deems necessary or appropriate for the protection of the Company and the Managing Member or for any purpose convenient or beneficial to the Company.

(d)    Employ persons, whether full–time or part time, in the operation and management of the business of the Company, on such terms and for such compensation as the Managing Member shall determine.

(e)    Open investment and trading accounts, bank accounts, deposit and maintain funds in the name of the Company in banks or savings and loan

-3-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001318

associations and to temporarily invest such funds in United States government bonds or other short–term interest bearing instruments, and to draw checks or other orders for the payment of money; provided, however, that the Company funds shall not be commingled with the funds of any other person or entity.

(f)     Cause the Company to make or revoke any of the elections referred to in Section 754 of the Internal Revenue Code of 1986, as amended (the "Code"), or any similar provision enacted in lieu thereof.

(g)     Select as its accounting year the period ending December 31 or other Fiscal Year as is permitted by the Internal Revenue Service ("IRS").

(h)     Engage accountants, attorneys, investment managers and advisers, and other consultants and advisors.

(i)     Establish and maintain, for the conduct of Company affairs, at least one office, and in connection therewith, rent or acquire office space and do such other acts as may be deemed necessary or advisable in connection with maintenance or administration of such office.

(j)     Amend this Agreement to reflect the addition or substitution of Members, in accordance with the terms hereof, or the reduction of Capital Accounts (as hereinafter defined) upon the return of capital to Members.

(k)     Require a provision in all Company contracts that the Managing Member shall not have any personal liability therefor, but that the person or entity contracting with the Company is to look solely to the Company and its assets for satisfaction.

(l)     Purchase and sell Company assets, including the Partnership Securities, at such price or amount for cash, securities or other property and upon such terms as are deemed in the Managing Member's absolute discretion to be in the best interests of the Company; provided, however, that the Managing Member shall not cause the Company to purchase nor otherwise acquire an ownership interest in equity securities other than the Partnership Securities contributed by the Initial Member.

(m)     Prepare, or cause to be prepared, and to execute, acknowledge and deliver any and all instruments to effectuate the business of the Company, including, but not limited to, annual and/or interim reports, a copy of which shall be delivered to each Member, as provided in Sections 3.08 and 12.04 hereof.

(n)     Establish such reserves as the Managing Member shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Company.

-4-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001319

(o)    The Managing Member may establish any number of designated series of Interests ("Series") having separate rights, powers or duties with respect to specified property or obligations of the Company or profits and losses associated with specified property or obligations, and any such Series may have a separate business purpose or investment objective. The Company shall maintain separate and distinct records for any such Series and the assets associated with any such Series shall be held (directly or indirectly, including through a nominee or otherwise) and accounted for separately from the assets of any other Series. The debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of the Company generally or any other Series and none of the debts, liabilities, obligations and expenses incurred, contracted for or otherwise existing with respect to the Company generally or any other Series shall be enforceable against the assets of such Series.

Section 3.03    **Actions of Managing Member.**    The Managing Member is authorized to act individually on behalf of the Company and to execute all documents and instruments on behalf of the Company without requirement of the execution thereof by any other Member and without any special power of attorney designating the Managing Member an attorney-in-fact. Third parties may rely on execution of any documents on behalf of the Company by the Managing Member.

Section 3.04    **Liability and Indemnification.**

3.04.01  Neither the Managing Member, nor its officers, directors, members, employees, shareholders, affiliates, or other applicable representatives, as the case may be, shall be liable, responsible or accountable in damages or otherwise to the Company or any of the Members, their respective successors, assignees, transferees, or to third parties for any act or omission performed or omitted by them on behalf of the Company and in a manner reasonably believed by them to be within the scope of the authority granted to them by this Agreement except when such action or failure to act constitutes bad faith, fraud, gross negligence or willful misconduct. Moreover, neither the Managing Member nor its respective officers, directors, employees, shareholders, affiliates, or other applicable representatives, as the case may be, shall have any liability to the Company for any losses suffered due to the action or inaction of any employee or person retained by the Company whether through negligence, dishonesty or otherwise, provided that the person was selected by the Managing Member with reasonable care. The Managing Member may consult with counsel and accountants in respect of the Company's affairs and be fully protected and justified in any action or inaction which is taken in good faith and in accordance with the information, reports, statements, advice or opinion provided by such persons, provided that they were selected with reasonable care and the matter consulted is reasonably believed by the Managing Member to be within such persons' professional or expert competence. Notwithstanding the foregoing, nothing in this Agreement shall in any way constitute a waiver or limitation of any rights which the Members may have under Federal or State securities laws.

-5-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001320

3.04.02   The Company shall indemnify and hold harmless the Managing Member and its respective officers, directors, members, employees, shareholders, agents, affiliates and other representatives, as the case may be, from and against any and all claims, losses, damages or expenses, suffered or sustained by them as a result of or in connection with any act performed by them under this Agreement or otherwise on behalf of the Company, including, without limitation, any judgment, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding; provided, however, that such indemnity shall be payable only if the indemnified party or parties in good faith, acted or failed to act in a manner it reasonably believed to be in, or not opposed to, the best interests of the Company (as determined by the Managing Member), and such indemnification would be in the best interest of the Company (as determined by the Managing Member).  The Managing Member may, in its sole discretion, advance to any person or entity entitled to indemnification hereunder reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arise out of such conduct, provided that all such advances will be promptly repaid if it is subsequently determined that the person or entity reserving such advance was not entitled to indemnification hereunder. No indemnification may be made and each indemnified party shall reimburse the Company to the extent of any indemnification previously made in respect of any claim, issue or matter as to which the indemnified party shall have been adjudged to be liable for bad faith, fraud, gross negligence or willful misconduct in the performance of its duties to the Company or would not otherwise be entitled to be held harmless under Section 3.04.01 hereof unless, and only to the extent that, the court in which such action or suit was brought determines that in view of all the circumstances of the case, despite the adjudication of liability the indemnified party is fairly and reasonably entitled to indemnity for those expenses which the court deems proper.  Any indemnity under this Section 3.04.02 shall be paid from, and only to the extent of, Company assets, and no Member shall have any personal liability on account thereof.

3.04.03   All rights to indemnification permitted in this Agreement and payment of associated expenses shall not be affected by the termination and dissolution of the Company or the removal, withdrawal, insolvency, bankruptcy, termination, or dissolution of the Managing Member.

Section 3.05   **Conflicts Derived by Dual Status of the Managing Member**.  In the event of any inconsistency or conflict between the rights and obligations of the Managing Member as a managing member and as a Member under this Agreement, the rights and obligations of the Managing Member shall control.

Section 3.06   **Absolute Restrictions**.   The Managing Member shall not authorize the transfer of any Member's LLC Interests if the result of said transfer will be a sale or exchange of more than fifty (50%) percent of the LLC Interests within a twelve (12) month period or if it would otherwise materially affect the income benefits anticipated by the Additional Members; provided, however, that nothing in this Section 3.06 shall limit the Initial Member's ability to make Redemption Distributions or the Managing Member's ability to distribute the Liquidation Proceeds to Additional Members.

-6-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

The Managing Member shall not do any act, whether of omission or commission, that would make it impossible to carry on the normal business of the Company. The Managing Member may act to consummate a sale at arm's length of all or any portion of the Company's assets, to which the Members hereby consent.

The Managing Member shall not confess judgment against the Company or authorize anyone to confess judgment against the Company.

The Managing Member shall not enter into any agreement on behalf of the Company that exposes any Member to any personal liability unless such Member consents in writing thereto.

Section 3.07    **No Prohibition Against Other Business Ventures**.    The Managing Member may engage and hold interests in other business ventures of every kind and description for its own account including, without limitation, other investment entities similar to the Company, whether such business ventures are in direct or indirect competition with the Company and whether the Company or any of the Members also has an interest therein.

Section 3.08    **Duty to Keep Books, Financial and Tax Reports**.    At all times during the existence of the Company, the Managing Member shall keep full and true books of account on the accrual basis, in which shall be entered fully and accurately each transaction of the Company.  The Managing Member has the power, in its sole discretion, to delegate the administrative bookkeeping functions relating to the Company to an agent, which may be the Company's accountants.   Such books, together with a certified copy of the Company's Certificate of Formation filed with the Secretary of State of the State of Delaware and any amendments thereto (the "Certificate"), shall at all times be maintained at the principal office of the Company.   Such books and Certificate shall be open to reasonable inspection and examination by the Members during normal business hours upon prior written notice; provided, however, that: (i) any such inspection is requested and conducted in good faith without any intent to damage the Company or any of its Members in any manner; (ii) is for a purpose reasonably related to the Company's business and the Member's LLC Interest in the Company (as determined by the Managing Member), is not for any commercial purpose, is not detrimental to the best interest of the Company, and the Company is not required by law or by agreement with third parties to keep such books and records confidential (as reasonably determined by the Managing Member is good faith); and (iii) the Member agrees (in form and substance satisfactory to the Managing Member) to use such information only for Company purposes and to maintain such information in strict confidence.

The Managing Member shall cause to be prepared and distributed to each Member as soon as practicable following the end of each Fiscal Year an audited annual financial statement prepared in accordance with generally accepted accounting principles, consistently applied.  The Managing Member shall also cause to be prepared by an independent certified public accountant on an accrual basis and shall file all Federal, state and local income, franchise, gross receipts, payroll and other tax returns that the Company is obligated to file.  Copies of all Company tax returns, information returns or reports shall be available to all Members as soon as practicable after the close of the Fiscal Year at the principal office of the Company.  Copies of

-7-

4125173606

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

Schedule K–1 of the Company's Tax Return (Form 1065) shall be distributed to all Members as soon as practicable after the end of the Fiscal Year.

Section 3.09    **Section 754 Change in Basis.**  In the event of a transfer or withdrawal (in accordance with the provisions of this Agreement) of all or part of the LLC Interest of any Member, the Managing Member may, in the case of a transfer, adjust that Member's basis in the Company and, in the case of a withdrawal, the basis in the Company of all remaining Members for Federal income tax purposes, pursuant to Section 754 of the Code.

## ARTICLE IV

### Resignation; Prohibition Against Transfer;
### Continuation of Company;
### and Substitution of Managing Member

Section 4.01    **Managing Member Resignation and Involuntary Withdrawal; Prohibition Against Transfer by Managing Member.**  The Managing Member shall not be permitted to voluntarily withdraw or resign as a Managing Member except upon no less than thirty (30) days prior written notice to all Members.  In the event of death, insanity, permanent disability or other permanent physical or mental incompetency of the Managing Member or if a voluntary or involuntary petition for bankruptcy shall be filed by or against the Managing Member or the Managing Member shall make any general assignment for the benefit of creditors (collectively, "Involuntary Withdrawal"), the Managing Member or the Managing Member's trustee, receiver or assignee shall thereafter become inactive in the affairs of the Company, shall have none of the rights and powers of the Managing Member hereunder, shall have no authority to act on behalf of the Company or have any voice in the management and operation of the Company.

Section 4.02    **Continuation of Company; Appointment of Substitute Managing Member by Members.**  If an event as set forth in Section 12.01(b) below occurs, the Members shall have the right, within ninety (90) days after such event by: (i) affirmative vote of each of the Members, to continue the Company and appoint a substitute Managing Member; or (ii) affirmative vote of Members owning more than fifty (50%) percent of the LLC Interests of the Members, to continue the Company with any remaining Managing Member; in either event the Company shall not dissolve and shall continue its existence.  If the Members elect to continue the Company, a favorable opinion of counsel is required to the effect that the Company will continue to be treated as a partnership for Federal income tax purposes.

Section 4.03    **Substitute Managing Member Requirements.**  Any substitute Managing Member shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a substitute Managing Member, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by applicable law, an amendment of the Certificate.  Any successor to such office of Managing Member shall have all of the rights (except as expressly provided to the contrary herein) powers and obligations that the Managing Member possessed prior to its withdrawal from the Company.

-8-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

## ARTICLE V

### Status, Rights, Powers and
### Voting Rights of Members

Section 5.01     **Limited Liability.**  Members, including any substitute Member, shall not be personally liable or bound for the expenses, liabilities or obligations of the Company beyond the amount of such Member's Capital Contributions (as defined below).

Section 5.02     **Capital Contributions.**  No Member shall be entitled to a return of such Member's Capital Contribution or any portion thereof except as set forth in ARTICLE VII below and no time has been agreed upon for the return of any Member's Capital Contribution except as herein provided.

5.02.01   Each Member, if such Member receives a return of all or any part of such Member's Capital Contribution, may to the extent provided for in the Act be liable to the Company for an amount equal to such returned contribution, without interest.

5.02.02   The Managing Member shall not be personally liable for the return or repayment of all or any portion of the capital (or appreciation thereof) of any Member, it being expressly agreed that any such return of capital or appreciation made pursuant to this Agreement shall be made solely from the assets of the Company without any right of contribution from the Managing Member.

5.02.03   No Member shall be paid interest on any Capital Contribution, except as specifically provided in Section 8.01 and 9.04 below.

Section 5.03     **Liability of Member.**  No Member shall be obligated to provide any contributions to the capital of the Company in addition to those specified in Section 9.02 of this Agreement.

No Member shall be obligated to make any loan to the Company.

Section 5.04     **Rights of Members to Inspect Books, Records, and Company Documents.**  Except to the extent limited by Section 3.08, each Member shall have the same right as the Managing Member to inspect and copy the Company's books and records upon prior written notice at any reasonable time and at such Member's sole cost and expense, and to receive on demand true and full information regarding all transactions and circumstances affecting the Company, and a formal account of the Company's affairs whenever circumstances render it just and reasonable.

Section 5.05     **No Restriction on Other Activities.**  A Member may engage and hold interests in business ventures of every kind and description for such Member's own account including, without limitation, business ventures which are, directly or indirectly, in competition with the Company and whether the Company or any of the Members also has an interest therein.

-9-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

Neither the Company nor any of the Members shall have any rights in such independent business ventures by virtue of this Agreement.

Section 5.06    **Voting Rights.**  No Member, other than the Managing Member, shall have the right to vote on matters pertaining to the business, operations or management of the Company; however, as provided under ARTICLE IV herein, the Members shall have the right to vote upon:  (i) the appointment of an additional or substitute Managing Member in the case of a voluntary withdrawal, resignation or Involuntary Withdrawal of the Managing Member; and (ii) to continue the Company if an event as set forth in Section 13.01(b) below occurs.  No other voting rights are conferred upon the Members, other than the Managing Member.

Section 5.07    **Limitations on Members.**  No Member shall: (i) be permitted to take part in the management or control of the business or affairs of the Company, unless expressly permitted in other provisions of this Agreement, and then only to the limited extent provided, (ii) have any voice in the management or operation of any property, (iii) have the power to remove the Managing Member (other than as specifically provided above), or (iv) except as otherwise provided in this Agreement, have the authority or power in his/its capacity as a Member to act as agent for or on behalf of the Company, or any other Member, to do any act which would be binding on the Company, or any other Member, or to incur any expenditures on behalf of or with respect to the Company.

Section 5.08    **Constructive Consent by Members.**  Except with respect to the appointment of an additional or substitute Managing Member pursuant to Section 5.06 above and the election to continue the Company pursuant to Section 4.02 above, in the event the Managing Member requires the consent of the Members in order to take action, and written notice of such action is mailed to such Members (certified mail, return receipt requested) those Members not affirmatively objecting in writing within thirty (30) days after such notice is mailed, shall be deemed to have consented to the proposed action set forth in the Managing Member's notice.

Section 5.09    **Rights as to Dissolution.**  Except as otherwise required by the Act, the Members (other than the Managing Member) shall have no right or power to cause the dissolution and winding up of the Company by court decree or otherwise or to withdraw or reduce their Capital Contributions, except as set forth in the Certificate and this Agreement. No Member shall have the right to bring an action for partition against the Company.

-10-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

## ARTICLE VI

### Managing Member's Fees and Company Expenses

Section 6.01    **Managing Member's Fee.**  The Managing Member shall manage the assets and affairs of the Company in accordance with the terms herein, select and deal with natural persons, business entities and others with whom the Company has business or other relationships or with whom having those relationships might be necessary or desirable; provide office space and office equipment, executive, clerical and secretarial personnel and services, and the use of accounting equipment; and prepare from time to time for submission to the Members certain reports concerning the business of the Company.

The Managing Member will perform the management functions on behalf of the Company without the right to receive any type of management or performance-based fee from the Company.

Section 6.02    **Company Expenses.**  The Company will pay all of its accounting, legal and other operating expenses, including the expenses of the admission of the Additional Members to the Company (collectively, "Administrative Expenses") for each calendar year up to a maximum of one (1%) percent of the Company's Net Worth at the end of each calendar year ("Expense Cap").  To the extent that the Administrative Expenses exceed the Expense Cap in any calendar year, the Managing Member shall pay such excess Administrative Expenses either by reimbursing the Company or by making a direct payment in satisfaction of such Administrative Expenses, and the manner of any such payment shall be determined by the Managing Member in its sole discretion.  The Expense Cap, however, does not apply to brokerage commissions and other trading and investment charges and fees related to the acquisition and disposition of Company assets, including the liquidation of the Partnership Securities, which shall be paid solely by the Company.

## ARTICLE VII

### Withdrawals from Capital Account

Section 7.01    **Mandatory Withdrawals.**  The Managing Member shall upon each Liquidation Distribution effect a mandatory withdrawal of each Additional Member's Capital Account (as defined below) in proportion to the amount received by the Additional Member in such Liquidation Distribution.  Upon the withdrawal of the entire amount of an Additional Member's Capital Account, the Managing Member may remove such Additional Member as a member of the Company.

Section 7.02    **Permissible Withdrawals Not Permitted.**  An Additional Member may not voluntarily withdraw all or any part of such Additional Member's Capital Account (as defined below) and such Capital Account shall only be withdrawn in the manner provided under Section 7.01.

-11-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001326

Section 7.03     **Form of Payments**. All payments under this ARTICLE VII shall be made in cash or in-kind, as the Managing Member may in its discretion determine.

## ARTICLE VIII

### Admission of New Members and Additional Members

Section 8.01     **Future Issuance of LLC Interests**. The Managing Member shall not admit any person as a new Member of the Company other than those persons who are Redeeming Investors and who are admitted as Additional Members. The Managing Member shall admit as of the first day of any Fiscal Period, or at any other time that the Managing Member determines, a Redeeming Investor as a Member upon (i) the contribution by the Initial Member of additional Partnership Securities or other assets (valued at their full market value as determined by the Managing Member) in exchange for LLC Interests, and (ii) the contemporaneous distribution of such LLC Interests, or a portion thereof, to such Redeeming Investor pursuant to a Redemption Distribution. Such Partnership Securities or other assets contributed to the Company by the Initial Member, together with the Initial Capital Contribution, are hereinafter referred to as "Capital Contributions." Any Capital Contribution received within the first five (5) business days of any Fiscal Period will be deemed made as of the beginning of such Fiscal Period. As to any Capital Contribution received more than five (5) business days after the beginning of any Fiscal Period, the Managing Member, in its sole discretion, shall have the option to (a) deem such Capital Contribution to have been made as of the beginning of such Fiscal Period, or (b) place such Capital Contribution in an interest bearing account until the next Fiscal Period. If option (b) is selected by the Managing Member, any interest earned thereon shall be credited to the Additional Member's Capital Account (defined below). In the event that Additional Members are admitted pursuant to this Section, the Managing Member shall end the prior Fiscal Period on the last day of the prior month and commence a new Fiscal Period on the date of the admission of the Additional Member and upon such admission, the LLC Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Members.

## ARTICLE IX

### Capital Accounts, Capital Contributions
### Net Worth Adjustments and Taxable Income and Loss

Section 9.01     **Capital Accounts**. A Member's "Capital Account" as of a particular date shall consist of the following:

(a)     An amount equal to the Member's Original Capital Contribution (as defined under Section 9.02 below);

(b)     The increase, if any, to such account by reason of Additional Capital Contributions contributed by the Initial Member or the Managing Member;

-12-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

(c)     The decrease, if any, to such account by reason of withdrawals from such Capital Account (including withdrawals of the Initial Member's Capital Account resulting from a Redemption Distribution); and

(d)     The increase or decrease, if any, to such account in accordance with the provisions of Section 9.07 below allocated and credited or charged to the Capital Accounts of all Members.

Section 9.02     **Original Capital Contributions**.  A Member's "Original Capital Contribution" shall mean and shall be:

(a)     With respect to the Initial Member, the aggregate of (i) the amount of Partnership Securities contributed by the Initial Member to the Company and (ii) cash or other assets contributed by the Initial Member and not distributed to the Redeeming Investors as part of the Redemption Distribution.

(b)     With respect to the Managing Member, the aggregate amount, if any, of cash, securities other than Partnership Securities or other assets contributed by the Managing Member.

(c)     With respect to an Additional Member, the balance of the Capital Account of the Initial Member attributable to the LLC Interest, or portion thereof, distributed to the Additional Member as part of a Redemption Distribution, determined immediately prior to such Redemption Distribution.

Section 9.03   **Classes of LLC Interests**.  The Company shall initially issue two separate classes of LLC Interests.   In consideration of the Managing Member's Original Capital Contribution and any Additional Capital Contribution, the Managing Member shall receive common class LLC Interests ("Common Class LLC Interests").   In consideration of the Initial Member's Original Capital Contribution and any Additional Capital Contribution, the Initial Member shall receive preferred class LLC Interests ("Preferred Class LLC Interests").   Each Redeeming Investor shall receive Preferred Class LLC Interests in a Redemption Distribution effected by the Initial Member.

9.03.01     For subsequent Redemption Distributions made as of July 1, 2003 or thereafter, if any, the Initial Member shall receive Preferred Class LLC Interests in a separate Series established by the Company. Each such Series will have separate rights, powers or duties with respect to specified property or obligations of the Company in connection with a Redemption Distribution made as of a particular date.

9.03.02     Except to the extent otherwise specifically provided for under this Agreement, Common Class LLC Interests shall have all of the voting rights in the Company. Common Class LLC Interests shall have no rights with respect to any Liquidation Distribution.

-13-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001328

9.03.03       To the extent permitted under the Act, Preferred Class LLC Interests shall have a preference over Common Class LLC Interests as to any distributions by the Company. Except to the extent otherwise specifically provided for under this Agreement, Preferred Class LLC Interests shall have no voting rights in the Company or any rights to amend this Agreement.

Section 9.04       **Additional Capital Contributions.** Additional Members are not permitted to make any additional capital contributions. The Initial Member and the Managing Member are permitted to make additional capital contributions ("Additional Capital Contributions") to the capital of the Company as of the first day of any Fiscal Period or at any other time that the Managing Member determines. Any Additional Capital Contributions received within the first five (5) business days after the beginning of a Fiscal Period shall be deemed made as of the beginning of such Fiscal Period. As to any Additional Capital Contribution received more than five (5) business days after the beginning of any Fiscal Period, the Managing Member, in its sole discretion, shall have the option to (a) deem such Additional Capital Contribution to have been made as of the beginning of such Fiscal Period, or (b) place such Additional Capital Contribution in an interest bearing account until the next Fiscal Period. If option (b) is selected by the Managing Member, any interest earned thereon shall be credited to the Member's Capital Account.

Section 9.05       **Adjustment to Capital Accounts for Withdrawals.** The Capital Account of a Member shall be reduced by the amount of each mandatory withdrawal made from such Member's Capital Account as of the date of such withdrawal. Notwithstanding anything to the contrary contained in the Agreement, in the event all of a Member's Capital Account is withdrawn from the Company, the Managing Member, in its sole discretion, may make a special allocation to such Member for Federal income tax purposes of the net capital gains recognized by the Company, in the last Fiscal Year in which the Member participates in the performance of the Company, in such manner as will reduce the amount, if any, by which such Member's Capital Account exceeds the Federal income tax basis of such Member's LLC Interest before such allocation.

9.05.01   The Managing Member may withhold from any amount payable to any Member, any taxes required to be paid or withheld by the Company on behalf of or for the account of each Member. Any such taxes shall be deemed to be a distribution or payment to such Member reducing the amount otherwise distributable to such Member pursuant to this Agreement and reducing the Capital Account of such Member.

Section 9.06       **Determination of Net Worth.** The net worth of the Company ("Net Worth") shall be determined on the accrual basis of accounting in accordance with generally accepted accounting principles consistently applied and, further, in accordance with the following:

(a)       A determination shall be made on the last day of each Fiscal Year (or Fiscal Period, if required) as to the value of all Company assets and as to the amount of liabilities of the Company. In making such determination, securities which are listed on a national securities

-14-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

exchange or over-the-counter securities listed on the NASDAQ National Market System, shall be valued at their last sales price on such date, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices. Securities which are not so listed shall be valued at their last closing "bid" prices if held "long" and at their last closing "asked" prices if sold "short". Securities which have no public market shall be considered at such value as the Managing Member may reasonably determine. Investment in companies, if any, shall be valued at their last reported value, updated by any interim valuations provided by such company or by any other applicable valuation deemed reasonable by the Managing Member. All such valuations shall be made as of the last trading day of the Fiscal Year (or Fiscal Period, as the case may be), and all values assigned to securities by the Managing Member pursuant to this Section shall be final and conclusive as to all of the Members.

(b) There shall be deducted properly accruable estimates of expenses for accounting, legal and other administrative services, subject to the Administrative Cap (whether performed therein or to be performed thereafter) and such reserves for contingent liabilities of the Company, including estimated expenses, if any, in connection therewith, as the Managing Member shall determine; and

(c) The organizational expenses of the Company shall be amortized over a period of sixty (60) months or such shorter period as the Managing Member shall select and, in computing the Net Worth of the Company, organizational expenses, shall be treated as an asset with a value equal to the unamortized amount thereof.

After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Worth of the Company during the Fiscal Year (or Fiscal Period, as the case may be) just ended. The term "increase in Net Worth" shall be the excess of Net Worth at the end of any Fiscal Year (or Fiscal Period, as the case may be) over that of the preceding Fiscal Year (or Fiscal Period, as the case may be), after adjusting for interim capital contributions and withdrawals. The term "decrease in Net Worth" shall be the amount by which the Net Worth at the end of the Fiscal Year (or Fiscal Period, as the case may be) is less than the Net Worth of the Company as of the end of the preceding Fiscal Year (or Fiscal Period, as the case may be) after adjusting for interim capital contributions and withdrawals.

Section 9.07    **Allocation of Increase or Decrease in Net Worth (Net Income/Loss).**

9.07.01    Neither the Managing Member nor the Initial Member shall be entitled to receive any allocation to its Capital Account based on the net income (net increase in Net Worth) of the Company.

-15-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001330

9.07.02    Any net increase or decrease in Net Worth during any Fiscal Year (or Fiscal Period, as the case may be) shall be allocated as of the end of such Fiscal Year (or Fiscal Period, as the case may be) to the Capital Accounts of the Additional Members in the proportions that each Additional Member's Capital Account bore to the sum of the Capital Accounts of all Additional Members as of the beginning of such Fiscal Year (or Fiscal Period, as the case may be).

Section 9.08    **Allocation for Tax Purposes.**

9.08.01    Taxable income, losses and deductions of the Company for each year shall accrue to, and be borne by, the Members in proportion to their sharing of net increases or decreases in Net Worth, the allocations of various types of taxable income and losses likewise being as nearly as possible proportionate. The accountants will review for the Company the allocations and apportionments as may be appropriate with respect to Members who are admitted to, or who withdraw from, the Company. With respect to transactions the tax consequences of which are reportable in a different taxable year than for financial accounting purposes in the determination of increase or decrease in Net Worth, the tax consequences of such transactions shall be allocated and apportioned to the parties in the same proportion as originally credited or charged to the parties for financial accounting purposes. Such transactions shall include, but not be limited to, unrealized capital gains or losses at the end of a Fiscal Year not reflected for tax purposes until received, paid or realized.

9.08.02    All allocations under this paragraph shall be made pursuant to the principles of Section 704 of the Code and in conformity with Treasury Regulations promulgated thereunder, or the successor provisions to such Section and Regulations.

9.08.03    All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the Managing Member in consultation with the accountants for the Company, whose determination shall be final and conclusive as to all of the parties.

## ARTICLE X

### Transfers of, and Restrictions on Transfers of, LLC Interests of Members

Section 10.01    **Restrictions on Transfer of LLC Interests of Members.**

10.01.01    Except for transfers by will or intestate succession, no Member may offer, sell, transfer, assign, exchange, hypothecate or pledge, or otherwise dispose of or encumber (hereinafter collectively, "Transfer" or "Transferred"), in whole or in part, such Member's LLC Interest without the consent of the Managing Member, which may be given or withheld in the Managing Member's sole discretion, it being understood and agreed that a Redemption Distribution by the Initial Member of its LLC Interest, in whole or in part, shall not be deemed a "Transfer" for purposes of this Agreement.

-16-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

10.01.02     No Member may Transfer, in whole or in part, such Member's LLC Interest if such Transfer, would cause the Company not to be treated as a partnership for Federal income tax purposes, and any purported Transfer, that would cause such a termination shall be void ab initio. Counsel for the Company shall give its written opinion to the Managing Member as to whether any contemplated Transfer would cause such a termination and the Managing Member shall be entitled to rely conclusively upon such opinion in determining whether such Transfer would cause such termination and whether consent to such disposition should be given.

10.01.03     No Transfer of any LLC Interest of a Member may be made unless the Managing Member shall have received a written opinion of counsel satisfactory to the Managing Member that such proposed Transfer: (i) may be effected without registration of the LLC Interest being made under the Securities Act of 1933, as amended; and (ii) may be effected without violating any applicable state securities or "Blue Sky" law (including investment suitability standards).

10.01.04     In no event shall the LLC Interest of a Member or any portion thereof be Transferred to a minor or incompetent, unless by will or intestate succession.

Section 10.02     **Admission of Substitute Member.**

10.02.01     Subject to the provisions of this ARTICLE X, an assignee of the LLC Interest of a Member (which shall be understood, for purposes under this Agreement, to include any purchaser, transferee, donee or other recipient of any disposition of such LLC Interest, other than pursuant to a Redemption Distribution) shall be deemed admitted to the Company as a substitute Member ("Substitute Member") only upon the satisfactory completion of the following:

(i)     consent of the Managing Member shall have been given, which consent may be evidenced by a written consent executed by the Managing Member or by the execution by the Managing Member of an amendment, if required, to the Certificate evidencing the admission of such person as a Member;

(ii)     the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement (as it may be amended from time to time) by executing a counterpart hereof and shall have expressly assumed all of the obligations of the assignor hereunder, and shall have executed such other documents or instruments as the Managing Member may require in order to effect the admission of such person as a Member;

-17-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

(iii)   an amendment to the Certificate, if required by Delaware law, evidencing the admission of such person as a Member shall have been filed;

(iv)   the assignee shall have delivered a letter containing a representation that the assignee's acquisition of the LLC Interest is made as a principal for the assignee's own account, for investment purposes only and not with a view to the resale or distribution of such LLC Interest, and that the assignee will not Transfer such LLC Interest or any fraction thereof to anyone who does not similarly so represent and warrant;

(v)   if the assignee is a corporation or other entity, the assignee shall have provided to the Managing Member evidence satisfactory to counsel for the Company of its authority to become a Member under the terms and provisions of this Agreement;

(vi)   the assignee shall have complied with all applicable governmental rules and regulations, if any; and

(vii)   the assignee is an Accredited Investor (as such term is defined in Rule 501 promulgated under the Securities Act of 1933, as amended) and completes a questionnaire provided by the Managing Member certifying that the assignee is an Accredited Investor.

10.02.02    The Managing Member shall cooperate with the person or entity seeking to become a Substitute Member by preparing the documentation required by this Section 10.02 and making all official filings and publications as promptly as possible after the satisfaction by such person or entity of the conditions in this ARTICLE X to the admission of such person or entity as a Member of the Company. All expenses in connection herewith shall be paid by the person or entity seeking to become a Substitute Member.

Section 10.03      **Rights of Assignee of LLC Interest.**

10.03.01    Subject to the provisions of Section 10.01, and except as required by operation of law, the Company shall not be obligated for any purposes whatsoever to recognize the assignment by any Member of such Member's LLC Interest until the Company has received notice thereof.

10.03.02    Any person or entity who is the assignee of all or any portion of the LLC Interest of a Member, but who has not become a Substitute Member, and desires to make a further disposition of such LLC Interest, shall be subject to all the provisions of this

-18-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

ARTICLE X to the same extent and in the same manner as any Member desiring to make a disposition of his LLC Interest.

10.03.03    If a Member Transfers all or a portion of such Member's LLC Interest, involuntarily, by operation of law or voluntarily, without the consent required by this ARTICLE X, the transferee or assignee shall be entitled only to receive that proportion of the Company's profit and loss, and any distribution of Company assets, attributable to the LLC Interest acquired by reason of such disposition from and after the effective date of such disposition, and only upon notification of same to the Managing Member.

Section 10.04    **Effect of Bankruptcy, Death or Incompetence of a Member.**  If a Member (other than the Managing Member) becomes bankrupt, the trustee or receiver of such Member's estate or, if a Member dies, such Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Member's committee, guardian or conservator, shall have the rights of such Member for the purposes of settling or managing such Member's estate or property and such power as the bankrupt, deceased or incompetent Member possessed to dispose of all or any part of such Member's LLC Interest and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a Substitute Member.  Upon the death of a Member, the rights and obligations in respect to such Member's interest are set forth at Section 7.02.

Section 10.05    **Attachment by Creditors.**  If a LLC Interest is subjected to attachment by a creditor, or is assigned for the benefit of any creditor, the LLC Interest obtained by such creditor shall be only that of an assignee, and in no event shall such creditor have the rights of a Member.

Section 10.06    **Transfer of Interests by Managing Member.**  Nothing in this Agreement shall be deemed to prevent the merger of the Managing Member with another corporation or entity, the reorganization of the Managing Member into or with any other corporation, limited liability company or other similar entity, or the transfer of all membership interests of the Managing Member or the assumption of the rights, duties and liabilities of the Managing Member by, in the case of a merger, reorganization or consolidation, the surviving entity by operation of law.

### ARTICLE XI

### Representations and Warranties

Section 11.01    **Members.**  Each Member represents and warrants to and covenants with the Company and every other Member as follows:

11.01.01    That such Member will promptly, upon request by the Managing Member, provide all financial data, personal information, documents, reports, certifications or other information necessary or appropriate to enable the Company to apply for and obtain an

-19-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Company.

11.01.02     With respect to each Additional Members, there is no misrepresentation contained in the subscriber questionnaire that was originally completed by such Additional Member pursuant to such Additional Member's admission to the Partnership.

11.01.03     With respect to each Substitute Member, there is no misrepresentation contained in the subscriber questionnaire that was completed by such Substitute Member pursuant to such Substitute Member's admission as a member of the Company.

11.01.04     If such Member is a corporation, trust, partnership or other entity, that the officer, trustee, Member or other party, as applicable, signing on its behalf has been duly authorized to execute and deliver this Agreement and, if required, the Certificate.

Section 11.02     **Managing Member.**     The Managing Member hereby represents and warrants to the Company and to the Members as follows:

11.02.01     That no commitments or obligations that would bind the Company have been entered into other than those commitments or obligations that the Managing Member, in its sole discretion, has determined are necessary, beneficial or advisable for the benefit of the Company and its Members.

11.02.02     That to the best of the Managing Member's knowledge, no material default by the Managing Member or the Company (or event which, with the giving of notice or the passage of time or both, would constitute a default) has occurred under any agreement affecting the Company or its assets.

11.02.03     That the Managing Member has no actual knowledge of any claim, litigation, investigation, legal action or other proceeding in regard to liens affecting the Company or its assets; and that to the best of the Managing Member's knowledge, no such claim, litigation, investigation, legal action or other proceeding is threatened before any court, commission, administrative body or other authority.

## ARTICLE XII

### Dissolution and Liquidation

Section 12.01     **Dissolution.**     The Company shall be dissolved upon the earliest to occur of:

(a)     The expiration of its term on December 31, 2044;

(b)     The retirement, withdrawal or Involuntary Withdrawal of the Managing Member or any other event that results in such entity or person

-20-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

ceasing to be a Managing Member unless the remaining Members agree in writing, within ninety (90) days after such event, to continue the Company with an existing or substitute qualified Managing Member pursuant to and in accordance with the terms and conditions set forth in ARTICLE IV hereof; or

(c)     The distribution, pursuant to this Agreement, of the proceeds of the sale, exchange or other disposition of all or substantially all of the assets of the Company; provided, however, that the Managing Member does not reasonably anticipate any future Redemption Distributions to any Redeeming Investors.

Section 12.02     **Liquidation.**     Upon the dissolution of the Company, the Liquidators, namely (1) the Managing Member or, if there is no remaining Managing Member, (2) (a) the person or persons previously designated by the Managing Member in a duly acknowledged written instrument or (b) if the Managing Member has not made such a designation, the person or persons designated by Members owning a majority in interest of the Capital Accounts of all the Members, shall cause the cancellation of the Certificate, liquidate the assets of the Company, establish reserves for contingent liabilities and expenses of liquidation, apply and distribute the proceeds of such liquidation in the order of priority set forth herein and in the then existing the Act, and shall take all other steps necessary to wind up the affairs of the Company as promptly as practicable.  To the extent reasonable, the business of the Company may continue to be conducted until liquidation is complete.  For purposes hereof, the term "Liquidators" shall also include the trustees, receivers or other persons required by law to wind up the affairs of the Company.  The Liquidators shall be entitled to the same indemnity and limitation of liability protection that is provided by the Company and Members to the Managing Member and to others performing services on behalf of the Company.

Section 12.03     **Distribution in Kind.**     Notwithstanding the provisions of Section 12.02 hereof, if on dissolution of the Company the Liquidators shall determine that an immediate sale of part or all of the Company's assets would be impractical or would cause undue loss to the Members, the Liquidators may, in their absolute discretion, either defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Company (other than those to Members) or distribute to the Members, in lieu of cash, as tenants in common and in proportion to their respective interests in the Company, undivided interests in such Company assets as the Liquidators deem not suitable for liquidation.

Section 12.04     **Final Statement.**     As soon as practicable after the dissolution of the Company, a final statement of its assets and liabilities shall be prepared by the accountants for the Company and furnished to the Members.

-21-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001336

## ARTICLE XIII

### General Provisions

Section 13.01    **Address and Notices**. The address of each Member for all purposes shall be the address set forth on the signature page of this Agreement or such other address of which the Managing Member has received written notice, and with respect to each Additional Member, the most recent address for such Additional Member annotated in the books and records maintained on behalf of the Partnership. Any notice, demand or request required or permitted to be given or made hereunder shall be in writing and shall be deemed given or made when delivered in person or when sent to such Member at such address by registered or certified mail, return receipt requested.

Section 14.02    **Titles and Captions.** All Article and Section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

Section 14.03    **Pronouns and Plurals.** Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 14.04    **Further Action.** The parties shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate to achieve the purposes set forth in this Agreement.

Section 14.05    **Applicable Law.** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware.

Section 14.06    **Forum.** Any action or proceeding hereunder must be commenced and prosecuted in the Superior Court of the State of Connecticut, Fairfield County.

Section 14.07    **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and assigns.

Section 14.08    **Integration.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof, and supersedes all prior agreements and understandings pertaining thereto. No covenant, representation or condition not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the express provisions hereof.

Section 14.09    **Amendment.** The Managing Member, in its sole discretion, shall have the right to amend this Agreement (other than with respect to this Section 14.09), provided that no amendment may: (i) modify the limited liability of a Member without the consent of each such affected Member; (ii) reduce the Capital Account of any existing Member without that Member's consent; or (iii) adversely affect the pecuniary interest of any Member.

-22-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

Section 14.10    **Creditors.** None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

Section 14.11    **Waiver by Member.**

14.11.01    Any Member by notice to the Managing Member may, but shall be under no obligation to, waive any of his or its rights or any conditions to his or its obligations hereunder, or any duty, obligation or covenant of any other Member.

14.11.02    No such waiver shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other than existing or subsequent breach.

Section 14.12    **Rights and Remedies.**

14.12.01    The rights and remedies of any of the Members hereunder shall not be mutually exclusive, and the implementation of one or more of the provisions of this Agreement shall not preclude the implementation of any other provision.

14.12.02    Each of the Members confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any Member aggrieved as against the other Members for a breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise.

Section 14.13    **Counterparts.** This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart.

Section 14.14    **Waiver of Partition.** Each Member hereby waives any right to partition of the Company property.

-23-

41251736.06

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

**INITIAL MEMBER:**

LANCER PARTNERS, LIMITED PARTNERSHIP

By: /s/ Michael Lauer _____

Name: MICHAEL LAUER

Title:  Authorized Person

**MANAGING MEMBER:**

LANCER MANAGEMENT GROUP II, LLC

By: /s/ Michael Lauer _____

Name: MICHAEL LAUER

Title:    Managing Member

-24-

41251736.06

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001339

# EXHIBIT 17

# The Lancer Group

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated



Through a fusion of strong qualitative and quantitative analytical disciplines we endeavor to generate significantly above average capital returns while exposing the portfolio to a manageable risk profile.

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

# The Lancer Group

## THE FUNDS' OBJECTIVE:

The Lancer Group seeks to attract qualified individuals and institutions, whose investment philosophy is compatible with that of the investment manager. In a nutshell, Lancer adds value by targeting investment opportunities which fly below the radar screens of the larger institutionally-oriented research entities. We focus nearly exclusively on the market pricing vs. the intrinsic value divergence resident in the secondary equity markets. Through a fusion of strong qualitative and quantitative analytical disciplines, we endeavor to generate significantly above average capital returns, while exposing the portfolio to a manageable risk profile. Our emphasis is on capital gains rather than income, thus striving for a more favorable tax treatment for our U.S. investors.

In addition to the domestic partnership (Lancer Partners L.P.), the organization manages two offshore investment vehicles (Lancer Offshore Inc. and the Lancer Voyager Fund), for non-U.S. entities.

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001447

### INVESTMENT PHILOSOPHY:

The Lancer funds are the quintessential bottom-up value seekers among the secondary equity universe. Our style is characterized by a strong contrarian bias and a cardinal emphasis on anticipatory timing. Before any stock is added to the portfolios. Lancer's original research would have judged the target investment to be misappraised by the market, with the intrinsic value of the enterprise significantly above the prevailing market price. Accumulating securities well below intrinsic value, coupled with an identified and timed upside revaluation catalyst, also serves as a most reliable downside safety net for our portfolios.

The investment manager believes that he customarily holds a competitive research advantage vis-à-vis the investment community on the securities of interest. Consequently, Lancer's reliance on Wall Street research sources is minimal.

In addition to focusing on neglected securities in which the institutional ownership is always significantly under represented, we also frequently target "fallen angels".

Severe valuation dips caused by what is determined to be a transitional problem, often present timely accumulation opportunities. Thus, we will buy into bad news (at an opportune price), if we believe that the strong underlying dynamics of the target company remain intact. It is our experience that for the Street's "orphans" and "fallen angels" any positive surprise, and or greater visibility among the investment community does wonders to the supply/demand equation for the common stock.

### LANCER'S INVESTMENT PRECEPTS:

*Gain competitive information advantage vis-à-vis the Street.* This is made possible primarily by focusing on the universe of smaller companies, which hold little interest to the institutionally-oriented research houses. However, the "fallen angels" and other (temporary) investment community pariahs also represent a potential harvest of misappraised values.

*Thorough comprehension of holdings.* We invest only within the industries where we have a firm understanding of the underlying dynamics. Moreover, the investment manager must retain an unencumbered access to the senior executives of the companies in which we have, or contemplate investments. We believe that the best intelligence also represents the supreme hedge against risk.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

*Select solid businesses in stable markets.* The funds focus on companies with franchise, niche market positions and avoid commodity product exposure. We prefer not to label our holdings as either predominantly value or growth oriented, inasmuch often both apply. We do however look for strong positions in industries that offer growth potential.

*Buying well below intrinsic value.* This not only provides a solid upward revaluation launching platform, but also furnishes a safety net against significant portfolio risk. Our valuation disciplines focus on: the net current asset values, franchise and private market values, as well as liquidation analysis. We also apply more conventional valuation gauges including: ratios of price-to-cash flow, book value, working capital, forecast sales, earnings etc. It should be noted that when targeted for accumulation, the securities of interest are frequently at half (or less) the previous 52 week peak price.

*Focus on cash generating (not consuming) companies.* Although we may compromise on a less than pristine balance sheet, the cash flow prognosis is usually on the upswing. A convalescing balance sheet often presages a rebound in earnings.

*A stock catalyst emphasis is cardinal to our approach.* The equity revaluation facilitator could be concealed in a recent corporate event (restructuring, acquisition, divestiture), a deficit to earnings transition, large contract awards, a company's successful market transformation (from defense to telecommunications for example), etc. Moreover, we find that a thorough balance sheet and cash flow analysis often yield telltale markers of an impending earnings resurgence. Our holdings usually constitute an attractive investment for their own industry's peers, hence they frequently become acquisition targets.

Our preference is for competent and shareholder value motivated management. However, when appropriate, Lancer may exercise influence with management in the interest of its holdings.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

*The funds will overweigh in high conviction situations.* Concentration (rather than diversification) of holdings is critical to superior performance. When the investment manager has a high conviction level in any particular idea, that holding will be over-represented in the portfolio. Excessive diversification tends to detract from superior performance as it becomes a proxy for the overall market.

*The Lancer funds avoid "concept" stocks*, which often thrive on "greater fool" dynamics, and plunge into a near bottom-less valuation pit once the "concept" is dented. We also eschew exotic investment vehicles and derivatives.

*The funds engage in short-selling*, but only of thoroughly researched "event" driven situations, and not just random "expensive" stocks.

*We are not market timers.* The empirical evidence strongly supports the general futility of forecasting the stock market's manic-depressive vicissitudes. We focus our energies and research resources on specific investment ideas which we believe possess enough of an internal propellant so as to gain (or re-gain) in value even in an otherwise uncooperative stock market environment. Consequently, we tend to be fully invested in our portfolios at all times.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

THE FOLLOWING Q&A FORMAT COMMENTARY IS DESIGNED TO FURTHER ELUCIDATE *OF* THE FUNDS' INVESTMENT OBJECTIVES AND STRATEGY:

*1*

---

**In a brief outline, what are the essential elements of Lancer's investment approach?**
In a nutshell, to deliver on our mandate of *optimizing market non-correlated returns, while maintaining a manageable risk profile,* we try to maximize the probabilities of success by searching for meaningful *pricing inefficiencies.* The elements that are instrumental include: all *original bottom-up* research, within the idea-prodigious *small-cap* universe, risk-diminishing and return-enhancing *value* orientation, as well as *event-driven* and high *concentration* positioning.

The original research and bottom-up approach focuses on fundamentally driven ideas. This increases probabilities of discovering pricing inefficiencies, as few of our target holding are likely to be followed by the investment community. Our typical position has a less than 20% institutional ownership. Dwelling within the small cap universe allows us access to a nearly infinite source of investment ideas, even if the selections are restricted to American companies only. Recent sub-par performance notwithstanding, small-caps have generated higher returns over longer-term periods. Our value focus not only maximizes profit potential, but also constitutes the single most effective hedge against a significant decline in the stock. We endeavor to accumulate our positions below intrinsic/private market values with the *M&A/LBO* valuation models most frequently deployed in the decision making process. Very importantly, our holdings are deemed to be event-driven. Thus if successful, returns generated are not only above-average but also more immediate and market *non-correlated.* Anticipatory (pre-event) positioning is essential as we often look for restructuring candidates, earnings turnarounds, industry consolidations, transitions from development to dynamic growth stages, divestitures, significant new contracts, etc. A high level of concentration in the portfolio is a must for meeting our objectives. Usually 12 to 15 positions represent 75% plus of the portfolio's value. Concentration allows each position to make a significant impact on the portfolio. Also, it is certainly easier to find truly worthy stocks and we are more likely to be the "best informed" outsider (competitive edge needed to invest with a high degree of conviction) on the position. The inherently higher portfolio volatility suggests superior long-term performance. It should be noted that our industry exposure is quite diverse. This reduces macro-economic risk and enlarges the pool of potential investments.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

2

**What are the investment manager's annual portfolio performance expectations?**

Other than striving for *optimal* and market *non-correlated* performance, we hold no preconceived or specifically quantified portfolio targets. In our opinion, a conscious aiming at what might be viewed as a reasonable performance target (say 20% annual gain) would tend detract from the optimal portfolio potential that opportunities allowing, in any given year could be significantly higher. Our definition of optimal is rather qualitative in nature and secondarily reflective of the prevailing market realities. Therefore, perhaps a 15% portfolio appreciation amidst a bruising market decline of more than 20% would be judged as quite satisfying and optimal. However, we would deem a 50% portfolio advance in a concurrently and comparably robust market environment as that of offering minimal value-added and thus a disappointment. *It is important that our investment decisions remain bottom-up researched and specific stock-even driven.* In specific stock selection strategy, the manager must "aim high to reach high". *He will not assume a significant long-position unless we believe the upside potential is at least 100% within 12 months.* This we have found historically to be the best recipe for optimal, market non-correlated performance.

In our judgment, it is a safe generalization to suggest that the self-preservation instincts that power the professional investment community's eagerness to appease the third-party gate keepers (consulting community) and conform to the business media's reinforced standards of excellence, in-fact promote performance mediocrity that is significantly less than optimal. This often means that over-diversification in an attempt to minimize downside risk and lessen the portfolio's volatility is *de rigueur*, even if it significantly dilutes portfolios appreciation potential. Burdened by the portfolio transparency requirements, general stock selection strategies also tends to focus on blue-chip high quality companies, rather than *inefficiently priced stocks*. Although this certainly minimizes distracting justifications of potentially controversial positions, it also significantly degrades the portfolios' risk-reward profile. In a nutshell, the professional investment community is structured so it is more willing to fail (in portfolio performance terms) in a conventional fashion, rather than to succeed unconventionally.

3

**What accounts for the Lancer portfolios' historical market *non-correlated* performance?**

In our opinion, one of the most significant value-added characteristics of money management is the ability to deliver over longer-term *above average*, market *non-correlated absolute* returns. To that end we find that focus on

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

event-driven stocks in the context of a highly *concentrated portfolio* are the key elements to success. By definition, an event-driven position must possess a sufficient *internal dynamic* that could significantly re-value the underlying equity, regardless of the markets' general direction.



**Given the prominence of a revaluation *catalyst* to the investment strategy, what are some examples of these agents of change?**

A preferred catalyst is one that can *not* be extrapolated from prior events, and consequently acts as a potent *investor perception modifier* once it is known. Therefore we look for a surprise-event that will significantly alter the perceptions of the company's prospects and thus skew the supply demand equation for the stock in favor of our position.

A common catalyst used by momentum strategists (from which we abstain) is accelerating earnings growth. We find that a significantly more vigorous revaluation driver is a *deficit to profitability* swing of the underlying company. Likewise, a company redefining major contract, corporate restructuring (that optimize earnings potential or/and enhance PE's), product breakthroughs, business alliances, significant corporate developments, etc. would also be of interest. In our "fallen angel" strategy, frequently the more severe the recent problems, the less it takes to convert the investment community. For example, a banishment of a potentially threatening event (such as bankruptcy) that weighted heavily on the stock, would likely present a compelling opportunity as the stock recoils from the preceding declines.



**Is not Lancer's strategy of high concentration particularly prone to portfolio volatility?**

Absolutely! *Deliberate volatility minimization strategies dramatically diminish the possibilities of significant out-performance.* In our view, it is a fair trade to suffer through an occasional month of consolidation, particularly if it follows and/or precedes months of significant advances. Consider that in 1996 Lancer funds posted gains of over 130%, while registering three down months during the year (suggesting a reasonable consolidation after several months of strong gains). It is indeed a pity that the industry's consulting community, in trying to justify its existence, has effectively "terrified" often talented managers into performance *conformity*. The myth of diversity as a risk abating strategy is nonsense in our opinion.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

*Diversification is just a hedge against ignorance of one's holdings and not a safety-net for risk,* and thus the emphasis on diversification automatically condemns the portfolio to a life of mediocrity.



---

### Does the fund maintain any particular *industry bias*?

Unlike our portfolio individual stock concentration which is highly focused, our industry exposure tends toward eclectic and diversified. It is however always a function of the bottom-up stock selection exercise that eventually settles the portfolio in various industry groups, rather than a top-down sector allocation decision. Although at times, as a by product of bottom up approach there may appear a bias towards certain groups, it should be viewed only as a secondary indication of investment merits for the given sector.



---

### How important is *financial leverage* to Lancer's strategy?

The application of financial leverage is *minimal,* and when used, it is done only on a highly opportunistic and time-abridged basis (as in anticipation of an event). In our opinion, a significant margin exposure in small-cap stocks, given their inherent volatility and less than optimal liquidity, is potentially very dangerous. Our investors should assume that even in anticipation of a value enhancing event, the portfolio would not exceed a *gross* long exposure of approximately 115% which, adjusting for shorts, would likely still translate to a less than 100% *net-long* market portfolio exposure.



---

### What is the strategy's most significant *risk* factor?

Given the high level of concentration in mostly small-cap stocks, *liquidity* has to be viewed as the most imposing risk factor. It is for this reason that the *exit strategy* from each position has to be clearly identified before the investment is committed. Historically, the single most effective exit strategy has been the ability to acquire a large block (often controlling) of a target company's stock, at prices well *below the private market value* of the enterprise and divest when it gravitates to its "fair" value. Hopefully, the latter being closer to double the former. It is worth noting that at approximately the fair value, the trading liquidity tends to improve significantly.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

Buying below intrinsic value also reduces the potential of a severe decline from our point of entry, while enhancing the probabilities of an extraordinary transaction (acquisition, merger, restructuring, etc.) that would act as a catalyst to upside revaluation. Many of our holdings at approximately cost basis are (were) in companies engaged in share repurchases and which also represent attractive takeover targets for third parties in their respective industries.

## 9

### Why the focus on *small caps*, given their persistent under-performance?

An essential ingredient to long-term significant market out-performance is a *near-limitless universe of potential investment ideas*, which is also likely to be subjected to the *highest probabilities of pricing inefficiencies*. We consistently find both of these elements in the small-caps. Consider that in the U.S. alone there are more than 7000 publicly traded companies with capitalization of less than $300 million, which at the same time have little or no Wall Street coverage. Moreover, the institutionalization of the marketplace results in an ever greater emphasis on large-cap investing, creating an even more compelling value divergence between the small and large companies. Thus when it comes to achieving our stated goal of significant market out-performance with minimal correlation, *"the smaller the better."*

Although it is certainly true that over the past 3 years the small-caps lagged the senior market averages, if viewed over the longer horizon of the past two decades, as evidenced by the Merrill Lynch Small-Cap index, our preferred universe would have outperformed the large caps by nearly 50%. Given that valuation "catch-up" phases customarily are compressed and dynamic, timing the market's resurrection of affection for the small-caps is futile.

Thus far in the 1990's, the small-caps outperformed from December '90 through March '94. However, the subsequent under-performance from March '94 through mid-'97 created a compelling divergence in value. Currently, the price-to-book of many large-cap companies is more than twice that of the small/micro-caps, creating attractive valuations not seen since the late 1970's. The price-to-sales ratio, which we employ when searching for value is also about half that of the big caps, its lowest point in 20+ years.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

## 10

**Given that Lancer is both a long and short fund, what is the *short-selling* strategy?**

It is important to understand that although the fund positions are both long and short, it is *not* hedged as the term "hedge" fund implies. We perceive our mandate as optimizing the portfolio's absolute returns, thus we short-sell only when we believe profit can be generated. Given that the short-selling loss potential is theoretically infinite, the importance of a revaluation *catalyst*, as well as the position's *timing* is even more critical than on the long side.

A typical short-selling target is a *high expectation*, heavily institutionally owned stock, with abundant trading liquidity (mistakes must to be covered swiftly with minimum damage), *perception* of which is about to undergo a significant *deterioration*. We essentially *make a bet against the Street's judgment*, consensus opinion of which, sets the prevailing valuation of the stock. When we espy a *mis*perception, coupled with an identified and timed catalyst, we pull the trigger. It is essentially a *trading strategy* with a likely maximum time horizon of *less* than one month.

## 11

**Do the funds participate in *private equity* opportunities?**

Both, the Lancer Offshore and the domestic partnership are at the present exclusively *public* equity funds with all positions valued daily on the domestic exchanges. Lancer Voyager, however, in addition to our regular strategies also participates in "late stage private equity" opportunities. To date these placements have proven lucrative, but clearly should be viewed as riskier near-term.

## 12

**What has been Lancer's *severest monthly decline*?**

As our investment strategies seek positions with an average 12 to 18 month investment horizon, we are not particularly concerned with the monthly performance. Indeed, after posting significant advances, it is not only likely, but highly desirable for a concentrated portfolio to consolidate. Over the past 58 months (through October 1997), the domestic fund has averaged about one deficit or break-even month per quarter, with the steepest decline of approximately 6%. However, the largest monthly gain was in excess of 40% (January of 1994).

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

*13*

---

**Is *technical analysis* used in stock selection?**

Philosophically we are "fundamentalists", inclined towards value investing. However, some position establishing *timing* benefits could be very real with the technical approach, particularly in the short-selling strategies. Although we would never assume a position solely because of a favorable stock chart pattern, if the technical analysis supports the fundamental merits, than we would view it as reassuring.

*14*

---

**Why is the investment manager reluctant to *disclose portfolio's active holdings*?**

Experience has taught us that disclosing our "active" positions did absolutely nothing to deliver on our mandate, and in fact on several occasions clearly detracted from it, as outsiders tried to "coat-tail" our ideas. Our *original research* is the only value-added we possess. Thus when third parties compete as buyers for our target investments, it directly inflates Lancer's cost of entry, reducing the capital gains potential. We are embarrassed to admit that our initial (read as years ago) compliant subordination to the issue of "transparency" *cost* us money.

Those who believe that time is money (count us in), will also empathize that revealing our positions often led to *"qualitative" scrutiny* of our holdings. The no doubt well-intentioned interrogators on occasion suggested that some of our investments were *not* necessarily in great companies, an observation with which we agree. However, *the investment world reality is that the truly significant and market non-correlated capital gains come from investments in inefficiently priced stocks and not great companies*, whose merits are usually already efficiently reflected in the market. Thus a company whose equity valuation is hinting at a potential bankruptcy (with the stock often down by three-quarters from its high), but which in reality is just a mediocre entity with intrinsic/private value significantly above our entry point, when coupled with an identified and timed re-valuation catalyst, is much more likely to be a component of Lancer's long portfolio than Microsoft, Coca-Cola or Intel.

Our concern is not for the investment judgment behind each holding but rather for the *wasted time* in balancing the patient rationalizing of our positions against the risk of appearing discourteous or defensive for choosing not to entertain the query. It should be noted that once the fund dis-invests or covers (on the short-side) a position, in many cases we do list the stocks by name in our subsequent correspondences. It goes without saying that our prime-broker and auditors have complete and continuous access to our holdings.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

**About the Investment Manager:**

Michael Lauer, the President and largest single investor in The Lancer Group, began his investment career with Oppenheimer & Co. in 1980 as a technology analyst. His other professional affiliations include: Cyrus J. Lawrence and Kidder Peabody (both as senior diversified technology and defense electronics analyst). Mr. Lauer became a portfolio manager in 1993. On numerous occasions, the annual Greenwich Associates survey of sell-side analysts distinguished Mr. Lauer as the premier source for stock purchase recommendations in his discipline of industry coverage. Likewise, Mr. Lauer was selected to the Institutional Investor's All Star analyst team for seven consecutive years. The Wall Street Journal's first ever survey also rated Mr. Lauer among the top three analysts in his group.

Mr. Lauer holds a BA degree in International Relations and a MBA in Finance.

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

# EXHIBIT 18

Source: News & Business > News > Magazine Stories, Combined ;¡,
Terms: "a wallflower about to bloom?"  (Edit Search)

*Business Week, June 2, 1997*

Copyright 1997 The McGraw-Hill Companies, Inc.
Business Week

June 2, 1997

**SECTION:** INSIDE WALL STREET; Number 3529; Pg. 130

**LENGTH:** 371 words

**HEADLINE: A WALLFLOWER ABOUT TO BLOOM?**

**BYLINE:** BY GENE G. MARCIAL

**BODY:**
Who's afraid of micro-cap stocks? Not Mike Lauer, managing partner of Lancer Partners, a high-flying New York hedge fund. Despite most small-cap stocks' pathetic performance, Lauer concentrates on outfits with capitalization under $ 300 million -- with impressive results: Lancer's stock portfolio has had triple-digit annual average gains for the past four years. This year through Apr. 30, the fund has gained 21%, while the Russell 5000 small-stock index lost more than 5%. Lancer's secret? "We seek out fallen angels that we think have a good chance of being revalued and take a 5% to 10% stake in them," says Lauer. One pick: Tech-Sym (TSY), a diversified electronics-engineering company that makes products for communications, oil service, and defense customers. The stock has been a wallflower, trading at 28 -- where it was seven months ago.

Lauer acquired a big slice of Tech-Sym in 1996 when the stock slumped after Fidelity's Magellan Fund dumped its 12% stake -- a few months after Fidelity's Jeff Vinik abruptly resigned as Magellan's chief stock picker. Lauer grabbed part of Magellan's block in the open market and has since accumulated a 7% stake.

What's Tech-Sym's appeal? "The company is unlocking the intrinsic worth of its assets," says Lauer. He expects it will soon take its TRAK Communications subsidiary public as part of a restructuring. Tech-Sym CEO Wendell Gamel told BUSINESS WEEK he would spin off 25% of the unit by yearend. TRAK makes microwave components for wireless and satellite voice and data communications. It produced $ 131 million of Tech-Sym's total 1996 sales of $ 321 million.

Lauer figures TRAK is worth $ 170 million, or 29 a share in Tech-Sym stock. The spin-off, he believes, will be similar to what Tech-Sym did last year when it took its GeoScience unit public, spinning off 24.7%. GeoScience, which makes seismic data systems and software for oil-service companies, is worth $ 100 million, or 13 a share. Lauer figures Tech-Sym will also spin off a part of its defense unit, which he estimates is worth $ 110 million, or 17.

Lauer says Tech-Sym is worth 59 a share based on its assets. Even if it sells at a 20% discount, the stock is worth 47 a share.
URL: http://www.businessweek.com/index.html

**GRAPHIC:** Illustration: Chart: A SAGGING TECH-SYM ERIC HOFFMANN/BW

**LOAD-DATE:** May 29, 1997

# EXHIBIT 19

A00922

Banc Of America Securities LLC
Client Position Summary by Asset Class

118-11892 Lancer Partners LP

PosSum-CTA

Page: 1
As Of: 12/31/00
Printed: 01/08/01

| SHR/FACE | | Security | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH BALANCES** | | | | | | | | | |
| (9,030,632) USD | EQUILLOAN | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (9,030,631.60) | (9,030,631.60) | 0.00 | (4.12) |
| 576,515 USD | LLFLOAN | TYPE 3 | 1.5000 | 1.5000 | 0.00 | 576,515.01 | 576,515.01 | 0.00 | 0.26 |
| | | **TOTAL CASH BALANCES** | | | 0.00 | | (8,454,116.59) | 0.00 | (3.85) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 900,000 | EQUILLOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 900,000.00 | 900,000.00 | 0.00 | 0.41 |
| 300,000 | LLFLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.14 |
| 500,000 | OSGELOAN | OSAGE SYSTEMS GROUP (OSH) | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.23 |
| 500,000 | TFGPLOAN4 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.23 |
| | | **Total Long Fixed Income** | | | 0.00 | 2,200,000.00 | 2,200,000.00 | 0.00 | 1.00 |
| | | **Equities** | | | | | | | |
| 51,500 | CNFT | CNF TECHNOLOGIES INC | 2.0910 | 0.4063 | (80.57) | 107,689.00 | 20,921.88 | (86,767.13) | 0.01 |
| 250,000 | CBBD | CHINA BROADBAND CORP | 7.5000 | 7.0000 | (6.67) | 1,875,000.00 | 1,750,000.00 | (125,000.00) | 0.80 |
| 2,521,248 | CDS | CREDIT STORE INC | 1.0819 | 3.4375 | 217.73 | 2,727,754.73 | 8,666,790.00 | 5,939,035.27 | 3.95 |
| 1,362,100 | XMM | CROSS MEDIA MARKETING CORP | 1.3200 | 2.6250 | 98.86 | 1,797,972.63 | 3,575,512.50 | 1,777,539.87 | 1.63 |
| 150,000 | CYDX | CYTOMEDIX INC | 2.8000 | 2.5625 | (8.48) | 420,000.00 | 384,375.00 | (35,625.00) | 0.18 |
| 153,000 | DRS | DIAGNOSTIC RETRIEVAL SYS INC | 39.5749 | 48.5478 | 22.67 | 6,054,963.80 | 7,427,806.25 | 1,372,842.45 | 3.39 |
| 173,000 | DRCT | DIRECT III MARKETING INC | 3.3517 | 5.8750 | 75.28 | 579,844.17 | 1,016,375.00 | 436,530.83 | 0.46 |
| 41,000 | EDEL | EDELBROCK CORP | 11.5009 | 10.2500 | (10.88) | 471,536.07 | 420,250.00 | (51,286.07) | 0.19 |
| 603,188 | FTGX | FIBERNET TELECOM GROUP INC | 3.3084 | 5.5000 | 66.24 | 1,995,570.87 | 3,317,534.00 | 1,321,963.13 | 1.51 |
| 742,059 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 4.4698 | 22.0000 | 392.19 | 3,316,890.97 | 16,325,298.00 | 13,008,407.03 | 7.44 |
| 1,532,300 | GETT | GLOBAL E TUTOR INC | 0.2956 | 0.0500 | (83.08) | 452,909.99 | 76,615.00 | (376,294.99) | 0.03 |
| 110,900 | GFF | GRIFFON CORP. | 7.6519 | 7.8750 | 2.92 | 848,598.71 | 873,337.50 | 24,738.79 | 0.40 |
| 355,800 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.6848 | 2.2031 | 221.74 | 243,635.40 | 783,871.88 | 540,236.47 | 0.36 |
| 125,000 | MNGX | MANGOSOFT INC | 4.0977 | 1.1880 | (71.01) | 512,208.75 | 148,500.00 | (363,708.75) | 0.07 |
| 12,390,000 | MHTX | MANHATTAN SCIENTIFIES INC | 0.1216 | 2.5000 | 1956.22 | 1,506,407.25 | 30,975,000.00 | 29,468,592.75 | 14.12 |
| 10,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS | 1.0000 | 3.4500 | 245.00 | 10,000,000.00 | 34,500,000.00 | 24,500,000.00 | 15.73 |
| 5,091,235 | NURC | NEUROCHEM LTD) | 0.3545 | 4.3350 | 1122.76 | 1,804,791.25 | 22,068,273.75 | 20,263,482.50 | 10.06 |
| 19,087,500 | NUDZ | NU-D-ZINE INC. | 0.0170 | 1.0156 | 5864.84 | 325,000.00 | 19,385,142.19 | 19,060,142.19 | 8.84 |
| 200,000 | NXNM | NXGEN NETWORKS INC | 0.0000 | 0.7500 | | 0.00 | 150,000.00 | 150,000.00 | 0.07 |
| 25,000 | OPTK | OPTIKA IMAGING SYSTEMS INC | 1.2686 | 0.7813 | (38.42) | 31,715.00 | 19,531.25 | (12,183.75) | 0.01 |
| 16,600 | ORB | ORBITAL SCIENCES CORP | 8.1924 | 4.1250 | (49.65) | 135,994.40 | 68,475.00 | (67,519.40) | 0.03 |
| 1,696,666 | OSE | OSAGE SYSTEMS GROUP INC | 0.3318 | 0.3750 | 13.02 | 562,954.80 | 636,249.75 | 73,294.95 | 0.29 |
| 25,000 | P001682 | WTS PIONEER COMMERCIAL FUNDING | 0.0000 | 0.2500 | | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 395,934 | PCFC | PIONEER COMMERCIAL FUNDING | 2.2652 | 6.0000 | 164.88 | 896,866.00 | 2,375,604.00 | 1,478,738.00 | 1.08 |
| 511,500 | RXTX | RX TECHNOLOGY HLDGS INC | 0.1016 | 1.0000 | 884.14 | 51,974.40 | 511,500.00 | 459,525.60 | 0.23 |
| 789,600 | SM85815 | SM CORP | 1.7940 | 25.2783 | 1309.08 | 1,416,562.50 | 19,959,750.00 | 18,543,187.50 | 9.10 |
| 350,000 | SMXT | SINEX TECHNOLOGIES INC | 1.9000 | 1.0000 | (47.37) | 665,000.00 | 350,000.00 | (315,000.00) | 0.16 |
| 602,500 | SMXT | SINEX CORP | 0.9844 | 1.0000 | 1.59 | 593,099.25 | 602,500.00 | 9,400.75 | 0.27 |
| 259,650 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 21.7500 | | 0.00 | 5,647,387.50 | 5,647,387.50 | 2.57 |
| 550,900 | TTN | TITAN CORP | 10.5044 | 16.2500 | 54.70 | 5,786,854.24 | 8,952,125.00 | 3,165,270.76 | 4.08 |
| 2,125,897 | TFGP | TOTAL FILM GROUP INC | 1.3945 | 3.2500 | 133.06 | 2,964,601.20 | 6,909,165.25 | 3,944,564.05 | 3.15 |
| 2,076,667 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.6000 | 0.6250 | 4.17 | 1,246,000.00 | 1,297,916.88 | 51,916.88 | 0.59 |

A00923

118-11892 Lancer Partners LP

Position-CTA

Banc Of America Securities LLC

Client Position Summary by Asset Class

Page: 2
As Of: 12/31/00
Printed: 01/08/01

| SHR/FACE | SYMBOL | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 668,500 | UHTS | UNIVERSAL HEIGHTS INC | 0.6914 | 0.6250 | (10.38) | 466,180.70 | 417,812.50 | (48,368.20) | 0.19 |
| 131,419 | 9388042 | NETVALUE HOLDINGS INC | 11.4139 | 11.4139 | (10.00) | 1,500,000.00 | 1,499,999.38 | (10.62) | 0.68 |
| 2,000,000 | 9388464 | WTS SYMPOSIUM CORP | 0.0000 | 2.1250 | | 0.00 | 4,250,000.00 | 4,250,000.00 | 1.94 |
| 2,000,000 | 9388465 | WTS SYMPOSIUM CORP | 0.0000 | 2.1250 | | 0.00 | 4,250,000.00 | 4,250,000.00 | 1.94 |
| 2,369,024 | XWC | WORLD WIRELESS COMMUNICATIONS | 1.4105 | 2.0000 | 41.79 | 3,341,623.76 | 4,738,048.00 | 1,396,424.24 | 2.16 |
| 2,516,610 | ZICA | ***21 CORPORATION | 4.0163 | 7.9688 | 98.41 | 10,107,391.92 | 20,054,235.94 | 9,946,844.02 | 9.14 |
| 2,500,000 | OSEWTS | OSAGE SYSTEMS WARRANTS CONVERT @ | 0.0000 | 0.0750 | | 0.00 | 187,500.00 | 187,500.00 | 0.09 |
| 300,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,050,000.00 | 1,050,000.00 | 0.00 | 0.48 |
| Total Long Equities | | | | | 303.97 | 55,857,545.76 | 225,650,253.38 | 169,792,707.62 | 102.85 |
| TOTAL LONG POSITIONS: | | | | | 292.46 | 58,057,545.76 | 227,850,253.38 | 169,792,707.62 | 103.85 |
| TOTAL EXPOSURE VALUE | | | | | | 58,057,545.76 | 227,850,253.38 | 169,792,707.62 | 103.85 |
| NET EXPOSURE VALUE | | | | | | 58,057,545.76 | 227,850,253.38 | 169,792,707.62 | 103.85 |
| TOTAL LONG POSITIONS | | | | | | 58,057,545.76 | 227,850,253.38 | 169,792,707.62 | 103.85 |
| TOTAL SHORT POSITIONS | | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH | | | | | | (8,454,116.59) | (8,454,116.59) | | (3.85) |
| TOTAL | | | | | | 49,603,429.17 | 219,396,136.79 | 169,792,707.62 | 100.00 |

313-11895 Lancer Offshore Inc

PosSum-CTA

Client Position Summary by Asset Class

Page: 1
As Of: 12/31/00
Printed: 01/08/01

| SHR/FACE | CODE/SYM | DESCRIPTION | UNIT COST | CURRENT PRICE | MKT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH BALANCES** | | | | | | | | | |
| (22,328,582) USD | TYPE 2 | | 1.0000 | 1.0000 | 0.00 | (22,328,581.51) | (22,328,581.51) | 0.00 | (3.22) |
| 4,153,486 USD | TYPE 3 | | 1.0000 | 1.0000 | 0.00 | 4,153,485.79 | 4,153,485.79 | 0.00 | 0.60 |
| | | TOTAL CASH BALANCES | | | 0.00 | (18,175,095.72) | (18,175,095.72) | 0.00 | (2.62) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 1,400,000 | 8855705 | TELEDATA WORLD SERVICES 12% NT | 100.0000 | 100.0000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.20 |
| 3,000,000 | 9386567 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,000,000.00 | 3,000,000.00 | 0.00 | 0.43 |
| 500,000 | 9386637 | LIGHTHOUSE LANDING BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.07 |
| 1,600,000 | EQUILOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,600,000.00 | 1,600,000.00 | 0.00 | 0.23 |
| 200,000 | LLFLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 200,000.00 | 200,000.00 | 0.00 | 0.03 |
| 1,600,000 | OSGELOAN | OSAGE SYSTEMS GROUP (OSE) | 100.0000 | 100.0000 | 0.00 | 1,600,000.00 | 1,600,000.00 | 0.00 | 0.23 |
| 7,000,000 | SKYLOAN | SKYNET BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 1.01 |
| 1,500,000 | SKYLOAN2 | SKYNET BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.22 |
| 1,900,000 | TELWIRLES | TELEDATA WIRELESS COMMUNICATION | 100.0000 | 100.0000 | 0.00 | 1,900,000.00 | 1,900,000.00 | 0.00 | 0.27 |
| 400,000 | TFGPLOANS | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.06 |
| | | Total Long Fixed Income | | | 0.00 | 19,100,000.00 | 19,100,000.00 | 0.00 | 2.75 |
| | | **Equities** | | | | | | | |
| 198,300 | ASPQ | ASPI EUROPE INC | 0.7500 | 1.1560 | 54.13 | 148,725.00 | 229,234.80 | 80,509.80 | 0.03 |
| 1,772,000 | AVKX | AT VENTUREWORKS INC | 0.8675 | 0.1250 | (85.59) | 1,537,220.16 | 221,500.00 | (1,315,720.16) | 0.03 |
| 3,800,000 | AURA | AURA SYSTEMS INC | 0.2700 | 0.3130 | 15.93 | 1,026,000.00 | 1,189,400.00 | 163,400.00 | 0.17 |
| 1,058,091 | RACG | AUTOMOTIVE PERFORMANCE GROUP | 1.0489 | 0.5400 | (48.52) | 1,109,830.19 | 571,369.14 | (538,461.05) | 0.08 |
| 1,700,000 | 8350388 | AUTOMOTIVE PERFORMANCE GROUP | 1.6618 | 0.5400 | (67.50) | 2,825,000.00 | 918,000.00 | (1,907,000.00) | 0.13 |
| 8,000 | BTGI | BTG INC | 8.0669 | 5.9375 | (26.40) | 64,535.00 | 47,500.00 | (17,035.00) | 0.01 |
| 21,250 | CNFT | CNT TECHNOLOGIES INC | 1.8149 | 0.4063 | (77.62) | 38,566.57 | 8,633.81 | (29,932.76) | 0.00 |
| 576,250 | CBBD | CHINA BROADBAND CORP | 7.5060 | 7.0000 | (6.67) | 4,325,166.50 | 4,036,669.00 | (288,333.50) | 0.58 |
| 68,100 | DIGH | CONTROL CHIEF HOLDINGS INC | 4.5113 | 4.1875 | (7.18) | 307,216.93 | 285,168.75 | (22,048.18) | 0.04 |
| 6,700,835 | CDS | CREDIT STORE INC | 2.7557 | 3.4375 | 24.74 | 18,465,745.26 | 23,034,120.31 | 4,568,375.05 | 3.32 |
| 16,180,220 | XMH | CROSS MEDIA MARKETING CORP | 0.5530 | 2.6250 | 374.71 | 8,947,248.82 | 42,473,077.50 | 33,525,828.68 | 6.13 |
| 275,000 | CYDX | CYTOMEDIX INC | 2.8906 | 2.5625 | (11.35) | 794,905.50 | 704,687.50 | (90,218.00) | 0.10 |
| 1,590,150 | DRS | DIAGNOSTIC RETRIEVAL SYS INC | 10.9666 | 13.3750 | 21.96 | 17,438,612.88 | 21,266,256.25 | 3,829,643.37 | 3.07 |
| 2,213,425 | DECO | DECORA INDS INC | 4.5977 | 0.0110 | (99.76) | 10,176,763.87 | 24,347.67 | (10,152,416.20) | 0.00 |
| 1,736,100 | DRCT | DIRECT III MARKETING INC | 1.7462 | 5.8750 | 236.44 | 3,031,586.05 | 10,199,587.50 | 7,168,001.45 | 1.47 |
| 7,318,553 | EPTG | EPL TECHNOLOGIES INC NEW | 1.8050 | 0.5000 | (72.30) | 13,209,780.99 | 3,659,276.50 | (9,550,504.49) | 0.53 |
| 490,000 | ECSL | ECORE SOLUTIONS INC | 0.6605 | 0.3500 | (41.71) | 240,182.50 | 140,000.00 | (100,182.50) | 0.02 |
| 198,000 | EDSL | EDELBROCK CORP | 12.5833 | 10.2500 | (19.66) | 2,536,352.50 | 2,037,700.00 | (498,652.50) | 0.29 |
| 803,600 | EDVC | ENVISION DEV CORP | 11.4912 | 0.0156 | (99.86) | 9,234,332.88 | 12,556.25 | (9,221,776.63) | 0.00 |
| 2,290,074 | FTGX | FIBERNET TELECOM GROUP INC | 2.3869 | 5.5000 | 130.42 | 5,446,239.95 | 12,595,407.00 | 7,129,167.05 | 1.82 |
| 1,024,821 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 7.9798 | 22.0000 | 175.70 | 8,177,864.90 | 22,546,062.00 | 14,368,197.10 | 3.25 |
| 97,500 | FMHT | FINDWHAT.COM INC | 0.5000 | 0.7500 | 50.00 | 48,750.00 | 73,125.00 | 24,375.00 | 0.01 |
| 997,316 | GVEC | GENETIC VECTORS INC | 4.2721 | 8.0000 | 87.26 | 4,260,634.22 | 7,978,528.00 | 3,717,893.78 | 1.15 |
| 8,286,633 | GETT | GLOBAL E TUTOR INC | 0.8811 | 0.0500 | (94.33) | 7,301,030.49 | 414,331.65 | (6,886,698.84) | 0.06 |
| 307,900 | GBNE | GLOBALNET INC | 0.6427 | 0.9375 | 45.87 | 197,887.23 | 288,656.25 | 90,769.02 | 0.04 |
| 273,500 | GFF | GRIFFON CORP. | 7.5600 | 7.8750 | 4.17 | 2,067,646.83 | 2,153,812.50 | 86,165.67 | 0.31 |

A00925

```
313-11895 Lancer Offshore Inc                          Banc of America Securities LLC                              Page:  2
PosSum-CTA                                        Client Position Summary by Asset Class                      As Of: 12/31/00
                                                                                                             Printed: 01/08/01
```

| SHR/FACE | SYM/PACK | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 1,000,720 | LHFF | LIGHTHOUSE FAST FERRY INF | 0.3101 | 2.2011 | 206.79 | 718,646.27 | 2,204,711.25 | 1,486,064.98 | 0.32 |
| 275,000 | MNGX | MANGOSOFT INC | 4.1044 | 1.1000 | (70.63) | 1,112,208.75 | 326,700.00 | (785,508.75) | 0.05 |
| 31,240,500 | MHTX | MANHATTAN SCIENTIFICS INC | 0.2400 | 2.5000 | 400.71 | 7,804,494.28 | 78,101,250.00 | 70,296,856.72 | 11.26 |
| 16,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 2.4500 | 0.00 | 0.00 | 39,200,000.00 | 39,200,000.00 | 5.65 |
| 1,262,200 | MLRE | MILLIONARE.COM | 2.6996 | 0.1400 | (94.81) | 3,407,484.50 | 176,708.00 | (3,230,776.50) | 0.03 |
| 9,265,308 | NURC | NEUROCORP LTD | 1.6627 | 4.2500 | 155.61 | 15,405,410.64 | 39,377,559.00 | 23,972,148.36 | 5.68 |
| 21,820,500 | NUO2 | NU-D-ZINE INC. | 0.0198 | 1.0156 | 5028.63 | 432,112.10 | 22,161,445.31 | 21,729,333.21 | 3.20 |
| 914,082 | NYER | NYER MEDICAL GROUP INC | 4.9397 | 4.0000 | (19.02) | 4,515,253.37 | 3,656,328.00 | (858,925.37) | 0.53 |
| 27,500 | ORB | ORBITAL SCIENCES CORP | 8.3612 | 4.1250 | (50.66) | 229,932.37 | 113,437.50 | (116,494.87) | 0.02 |
| 9,029,401 | OSE | OSAGE SYSTEMS GROUP INC | 0.8396 | 0.3750 | (55.34) | 7,581,199.86 | 3,386,025.38 | (4,195,174.49) | 0.49 |
| 265,737 | PCFC | PIONEER COMMERCIAL FUNDING | 0.9800 | 6.0000 | 512.23 | 260,427.08 | 1,594,422.00 | 1,333,994.92 | 0.23 |
| 515,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 1.0000 | (42.86) | 901,250.00 | 515,000.00 | (386,250.00) | 0.07 |
| 5,666,100 | SMKP | SMK CORP | 0.4156 | 27.0000 | 6396.69 | 2,354,810.25 | 152,984,700.00 | 150,629,889.75 | 22.07 |
| 745,000 | 8856815 | SIMEX/NK TECHNOLOGIES INC | 1.9544 | 1.0000 | (48.83) | 1,456,000.00 | 745,000.00 | (711,000.00) | 0.11 |
| 1,508,357 | SMXT | SIMEX CORP | 1.4945 | 1.0000 | (33.09) | 2,254,254.54 | 1,508,357.00 | (745,897.54) | 0.22 |
| 236,000 | SKYN | SKYNET | 4.2838 | 0.3438 | (91.98) | 1,010,972.25 | 81,125.00 | (929,847.25) | 0.01 |
| 290,250 | STG | STONE PATH GROUP INC | 2.2744 | 0.5000 | (78.06) | 661,597.50 | 145,125.00 | (516,472.50) | 0.02 |
| 30,545,500 | TWOS | TELEDATA WORLD SERVICES INC | 0.0682 | 0.0110 | (83.88) | 2,084,271.96 | 335,995.00 | (1,748,276.96) | 0.05 |
| 21,000,000 | TWOSWTS | TELEDATA WORLD SERVICES WTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.21 | 0.21 | 0.00 |
| 1,253,500 | TNTU | TENGTU INTERNATIONAL CORP | 0.3592 | 0.2810 | (21.77) | 450,227.17 | 352,233.50 | (97,993.67) | 0.05 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 778,950 | 8856437 | WTS FFTR FUNDING CORPORATION | 0.0000 | 21.7500 | 0.00 | 0.00 | 16,942,162.50 | 16,942,162.50 | 2.44 |
| 1,199,500 | TTN | TITAN CORP | 14.1014 | 16.2500 | 16.89 | 16,674,772.56 | 19,491,875.00 | 2,817,102.44 | 2.81 |
| 5,144,757 | TFGP | TOTAL FILM GROUP INC | 1.8508 | 3.2500 | 75.60 | 9,522,044.55 | 16,720,460.25 | 7,198,411.70 | 2.41 |
| 1,084,250 | USPL | U S PLASTIC LUMBER CORP | 4.4141 | 1.2500 | (81.61) | 4,781,451.81 | 1,427,521.44 | (6,771,910.41) | 0.19 |
| 435,000 | U331992 | UNIVERSAL HEIGHTS INC OLD | 1.0000 | 0.6250 | (37.50) | 435,000.00 | 271,875.00 | (163,125.00) | 0.04 |
| 2,899,637 | UHTS | UNIVERSAL HEIGHTS INC | 0.7471 | 0.6250 | (16.34) | 2,166,216.85 | 1,812,273.13 | (353,943.72) | 0.26 |
| 1,025,200 | VHC | ***VHC CORP LTD | 3.3471 | 0.0156 | (99.53) | 3,431,472.19 | 16,018.75 | (3,415,453.44) | 0.00 |
| 750,000 | 9387800 | LIGHTHOUSE LANDINGS INC | 0.0000 | 1.9063 | 0.00 | 0.00 | 1,429,725.00 | 1,429,725.00 | 0.21 |
| 212,373 | 9388042 | NEPTUNE HOLDINGS INC | 11.4139 | 11.4139 | (0.00) | 2,424,000.00 | 2,423,997.81 | (2.19) | 0.35 |
| 5,594,628 | XWC | WORLD WIRELESS COMMUNICATIONS | 2.3215 | 2.7000 | (13.85) | 13,916,429.68 | 11,989,256.00 | (1,927,173.69) | 1.73 |
| 6,317,775 | ZICA | ***ZI CORPORATION | 3.7265 | 7.9400 | 113.84 | 23,543,181.68 | 50,344,769.51 | 26,801,587.83 | 7.26 |
| 10,000,000 | NUDZW | NU-D-ZINE WARRANT | 0.0000 | 0.9856 | | 0.00 | 9,856,000.00 | 9,856,000.00 | 1.42 |
| 20,000,000 | NUDZW2 | NU-D-ZINE WARRANTS | 0.0000 | 0.9656 | | 0.00 | 19,312,000.00 | 19,312,000.00 | 2.79 |
| 6,666,667 | OSEWTS | OSAGE SYSTEMS WARRANTS CONVERT @ | 0.0000 | 0.0750 | | 0.00 | 500,000.03 | 500,000.03 | 0.07 |
| 13,750,000 | SMKWT | SMK CORP WTS | 0.0000 | 2.6000 | | 0.00 | 35,750,000.00 | 35,750,000.00 | 5.16 |
| 250,000 | ENEWF | ***E-NEW MEDIA HKHU.50 | 0.0500 | 0.4000 | | 12,500.00 | 100,000.00 | 87,500.00 | 0.01 |
| | | **Total Long Equities** | | | 170.60 | 255,867,677.98 | 692,387,555.97 | 436,519,877.99 | 99.07 |
| | | | 158.75 | | 274,967,677.98 | 711,487,555.97 | 436,519,877.99 | 102.62 |
| | | **TOTAL LONG POSITIONS** | | | | | | | |

A00926

Bank of America Securities LLC

313-11895 Lancer Offshore Inc

PosSum-CTA

Client Position Summary by Asset Class

Page: 3
As Of: 12/31/00
Printed : 01/08/01

| SHR/FACE | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL EXPOSURE VALUE | | | | 274,967,677.98 | 711,487,555.97 | 436,519,877.99 | 102.62 |
| NET EXPOSURE VALUE | | | | 274,967,677.98 | 711,487,555.97 | 436,519,877.99 | 102.62 |
| | | | | | | | |
| TOTAL LONG POSITIONS | | | | 274,967,677.98 | 711,487,555.97 | 436,519,877.99 | 102.62 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH | | | | (18,175,095.72) | (18,175,095.72) | | (2.62) |
| | | | | | | | |
| TOTAL | | | | 256,792,582.26 | 693,312,460.25 | 436,519,877.99 | 100.00 |

Banc of America Securities LLC
Client Position Summary by Asset Class

113-12/96 The Oribler Fund Ltd

| SHR/FACE | | Description | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH BALANCES** | | | | | | | | | |
| (4,698,540) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (4,698,540.31) | (4,698,540.31) | 0.00 | (9.87) |
| 3,064,666 USD | | TYPE 1 | 1.0000 | 1.0000 | 0.00 | 3,064,666.77 | 3,064,666.77 | 0.00 | 6.44 |
| | | **TOTAL CASH BALANCES** | | | 0.00 | (1,633,873.54) | (1,633,873.54) | 0.00 | (3.43) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 250,000 | 9386653 | BUSINESS AND TRADE NETWORKS OF | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.53 |
| 500,000 | 9386655 | LIGHTHOUS LANDINGS INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 1.05 |
| 650,000 | 9387415 | GENETIC VECTORS 12% NOTE | 100.0000 | 100.0000 | 0.00 | 650,000.00 | 650,000.00 | 0.00 | 1.37 |
| 149,500 | GREYHAWK | GREYHAWK NET LEASE INVESTORS 11 | 93.7768 | 125.3656 | 33.69 | 140,196.39 | 187,421.57 | 47,225.18 | 0.40 |
| 300,000 | GVECLOAN | GENETIC VECTORS BRIDGELOAN | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.63 |
| 1,600,000 | SKYLOAN3 | SKYNET BRIDGELOAN | 100.0000 | 100.0000 | 0.00 | 1,600,000.00 | 1,600,000.00 | 0.00 | 3.36 |
| 600,000 | USPIELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 1.26 |
| | | **Total Long Fixed Income** | | | 1.17 | 4,040,196.39 | 4,087,421.57 | 47,225.18 | 8.59 |
| | | **Equities** | | | | | | | |
| 160,400 | AVMX | AT VENTUREWORKS INC | 1.9431 | 0.1250 | (93.57) | 311,680.00 | 20,050.00 | (291,630.00) | 0.04 |
| 1,008,500 | RACG | AUTOMOTIVE PERFORMANCE GROUP | 1.0360 | 0.5400 | (47.87) | 1,044,766.25 | 544,590.00 | (500,176.25) | 1.14 |
| 400,000 | 835038B | AUTOMOTIVE PERFORMANCE GROUP | 1.1875 | 0.5400 | (54.53) | 475,000.00 | 216,000.00 | (259,000.00) | 0.45 |
| 5,000 | BTGI | BTG INC | 7.5060 | 5.9375 | (20.90) | 37,530.00 | 29,687.50 | (7,842.50) | 0.06 |
| 754,000 | CNIT | CNF TECHNOLOGIES INC | 1.0098 | 0.4063 | (59.76) | 761,389.20 | 306,515.63 | (454,873.57) | 0.64 |
| 502,200 | CDS | CREDIT STORE INC | 2.7982 | 3.4375 | 22.84 | 1,405,277.50 | 1,726,312.50 | 321,035.00 | 3.63 |
| 78,300 | XMM | CROSS MEDIA MARKETING CORP | 3.0627 | 2.6250 | (14.29) | 239,811.49 | 205,537.50 | (34,273.99) | 0.43 |
| 100,000 | CYDX | CYTOMEDIX INC | 2.8000 | 2.5625 | (8.48) | 280,000.00 | 256,250.00 | (23,750.00) | 0.54 |
| 98,000 | DRS | DIAGNOSTIC RETRIEVAL SYS INC | 8.3266 | 13.3750 | 60.63 | 816,005.56 | 1,310,750.00 | 494,744.44 | 2.75 |
| 336,960 | DECO | DECORA INDS INC | 3.6726 | 0.0110 | (99.70) | 1,237,512.29 | 3,706.56 | (1,233,805.73) | 0.01 |
| 200,500 | DRCT | DIRECT III MARKETING INC | 0.0375 | 5.8750 | 15574.48 | 7,515.00 | 1,177,937.50 | 1,170,422.50 | 2.47 |
| 5,000 | EDBL | EDELBROCK CORP | 11.7530 | 11.2500 | (4.28) | 58,764.90 | 56,250.00 | (2,514.90) | 0.12 |
| 12,000 | ENHI | ENHI HOLDINGS INC | 12.5000 | 0.7500 | (94.00) | 150,000.00 | 9,000.00 | (141,000.00) | 0.02 |
| 152,500 | EDVC | ENVISION DEV CORP | 11.0836 | 0.0156 | (99.86) | 1,690,241.50 | 2,382.81 | (1,687,858.69) | 0.01 |
| 456,566 | FTGX | FIBERNET TELECOM GROUP INC | 0.7042 | 0.8031 | 14.05 | 321,504.08 | 366,663.00 | 45,158.92 | 0.77 |
| 354,968 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 2.7506 | 22.0000 | 699.83 | 976,370.61 | 7,889,286.32 | 6,832,915.71 | 16.40 |
| 7,500 | FTRL | FUTERLINK DISTRIBUTION CORP | 7.0012 | 0.6563 | (90.63) | 52,509.00 | 4,921.88 | (47,587.13) | 0.01 |
| 502,500 | GETT | GLOBAL E TUTOR INC | 0.2596 | 0.0500 | (80.74) | 130,427.50 | 25,125.00 | (105,302.50) | 0.05 |
| 25,000 | GFF | GRIFFON CORP. | 7.8311 | 7.8750 | 0.56 | 195,777.50 | 196,875.00 | 1,097.50 | 0.41 |
| 21,700 | LSATA | LIBERTY SATELLITE & TECHNOLOGY | 2.2879 | 3.1560 | 37.95 | 49,646.44 | 68,485.20 | 18,838.76 | 0.14 |
| 387,500 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.0937 | 2.2031 | 2252.06 | 36,296.25 | 853,710.94 | 817,414.69 | 1.79 |
| 629,200 | MHTX | MANHATTAN SCIENTIFICS INC | 1.7864 | 2.5000 | 40.02 | 1,123,394.31 | 1,573,000.00 | 449,605.69 | 3.30 |
| 1,001,097 | NHRC | NEUROCORP LTD | 0.3296 | 4.2500 | 1189.44 | 329,960.85 | 4,254,662.25 | 3,924,701.40 | 8.94 |
| 100,000 | NKGN | NKGEN NETWORKS INC | 0.0000 | 0.7500 | | 0.00 | 75,000.00 | 75,000.00 | 0.16 |
| 115,900 | ONTRM | WFS ONTRO INC | 0.3939 | 0.1250 | (68.27) | 45,654.30 | 14,487.50 | (31,166.80) | 0.03 |
| 1,028,333 | OSE | OSAGE SYSTEMS GROUP INC | 0.5082 | 0.3750 | (26.21) | 522,577.40 | 385,624.88 | (136,952.52) | 0.81 |
| 11,000 | PCFC | PIONEER COMMERCIAL FUNDING | 1.8707 | 6.0000 | 220.74 | 20,577.50 | 66,000.00 | 45,422.50 | 0.14 |
| 275,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 1.0000 | (42.86) | 481,250.00 | 275,000.00 | (206,250.00) | 0.58 |
| 155,520 | SMKP | SMK CORP | 1.0265 | 27.0000 | 2530.42 | 159,634.00 | 4,199,040.00 | 4,039,406.00 | 8.82 |

Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 398 of 510

A00927

A00928

413-12796 The Orbiter Fund ltd

PosSum-CTA

Banc Of America Securities LLC

Page: 2
As Of: 12/31/00
Printed: 01/08/01

Client Position Summary by Asset Class

| SHR/FACE | | | UNIT COST | CURRENT UNIT | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 18,500 | SMXT | SIMEX CORP | 5.7237 | 1.0000 | (82.53) | 105,8H7.70 | 18,500.00 | (87,387.70) | 0.04 |
| 46,500 | SKYN | SKYNET | 6.4505 | 0.4190 | (14.67) | 290,944.45 | 19,984.18 | (201,465.04) | 0.03 |
| 11,400 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 21.7500 | 0.00 | 0.00 | 247,950.00 | 247,950.00 | 0.52 |
| 37,500 | TTN | TITAN CORP | 28.4678 | 16.2500 | (42.92) | 1,067,543.25 | 609,375.00 | (458,168.25) | 1.28 |
| 353,488 | TFGP | TOTAL FILM GROUP INC | 0.7694 | 3.2500 | 322.71 | 272,101.43 | 1,148,816.00 | 876,714.57 | 2.41 |
| 250,000 | ULSF | ULTIMATE SPORTS ENTERTAINMENT | 0.0000 | 0.5600 | 0.00 | 0.00 | 140,000.00 | 140,000.00 | 0.29 |
| 208,000 | UHTS | UNIVERSAL HEIGHTS INC | 0.9898 | 0.6250 | (36.27) | 203,917.35 | 130,000.00 | (73,917.35) | 0.27 |
| 250,000 | 9389149 | WTS TOTAL FILM GROUP @ $2.00 | 0.0000 | 1.2500 | 0.00 | 0 | 312,500.00 | 312,500.00 | 0.66 |
| 177,541 | XWC | XWC | 0.8634 | 2.0000 | 131.64 | 153,291.05 | 355,082.00 | 201,790.95 | 0.75 |
| 513,845 | ZICA | ***ZI CORPORATION | 9.8641 | 7.9688 | (19.22) | 5,068,642.44 | 4,094,702.34 | (973,940.10) | 8.60 |
| 380,000 | GVECWTS | GENETIC VECTOR WARRANTS | 0.0000 | 7.9000 | | 0.00 | 3,002,000.00 | 3,002,000.00 | 6.31 |
| 833,333 | OSEWTS | OSAGE SYSTEMS WARRANTS CONVERT @ | 0.0000 | 0.0750 | | 0.00 | 62,499.97 | 62,499.97 | 0.13 |
| 2,500,000 | SMXWT | SMX CORP WTS | 0.0000 | 2.6000 | | 0.00 | 6,500,000.00 | 6,500,000.00 | 13.65 |
| 400,000 | 9082684 | ZI CORP WTS @ $1.75 EXP 1/11/02 | 0.0000 | 6.2188 | | 0.00 | 2,487,500.00 | 2,487,500.00 | 5.23 |
| | | Total Long Equities | | | 133.01 | 19,378,456.90 | 45,152,781.65 | 25,774,324.75 | 94.05 |
| | | TOTAL LONG POSITIONS: | | | 110.26 | 23,418,653.29 | 49,240,203.22 | 25,821,549.93 | 103.43 |
| | | TOTAL EXPOSURE VALUE | | | | 23,418,653.29 | 49,240,203.22 | 25,821,549.93 | 103.43 |
| | | NET EXPOSURE VALUE | | | | 23,418,653.29 | 49,240,203.22 | 25,821,549.93 | 103.43 |
| | | TOTAL LONG POSITIONS | | | | 23,418,653.29 | 49,240,203.22 | 25,821,549.93 | 103.43 |
| | | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH | | | | (1,633,873.54) | (1,633,873.54) | | (3.43) |
| | | TOTAL | | | | 21,784,779.75 | 47,606,329.68 | 25,821,549.93 | 100.00 |

Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 400 of 510

A00929

313-13377 Viator Fund Ltd
PosSum-CTA

Banc of America Securities LLC
Client Position Summary by Asset Class

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **LONG POSITIONS** | | | | | | | | | |
| **CASH BALANCES** | | | | | | | | | |
| (1,755,446) USD | 9386567 | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (1,755,446.42) | (1,755,446.42) | 0.00 | (6.44) |
| 885,746 USD | 9386655 | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 885,746.26 | 885,746.26 | 0.00 | 1.42 |
| TOTAL CASH BALANCES | | | | | 0.00 | (1,469,700.16) | (1,469,700.16) | 0.00 | (5.03) |
| **Fixed Income** | | | | | | | | | |
| 500,000 | SKYLOAN3 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 1.83 |
| 500,000 | SKYLOAN3 | LIGHTHOUS LANDINGS INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 1.83 |
| 900,000 | TFGPLOAN | SKYNET BRIDGELOAN | 100.0000 | 100.0000 | 0.00 | 900,000.00 | 900,000.00 | 0.00 | 3.30 |
| 250,000 | TFGPLOAN4 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.92 |
| 125,000 | TFGPLOAN5 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 125,000.00 | 125,000.00 | 0.00 | 0.46 |
| Total Long Fixed Income | | | | | 0.00 | 2,275,000.00 | 2,275,000.00 | 0.00 | 8.35 |
| **Equities** | | | | | | | | | |
| 5,000 | BTGI | BTG INC | 7.5060 | 5.9375 | (20.90) | 37,530.00 | 29,687.50 | (7,842.50) | 0.11 |
| 15,000 | CNFT | CNF TECHNOLOGIES INC | 1.7350 | 0.4063 | (76.58) | 26,024.70 | 6,093.75 | (19,930.95) | 0.02 |
| 40,000 | CBBD | CHINA BROADHAND CORP | 7.5000 | 7.0000 | (6.67) | 300,000.00 | 280,000.00 | (20,000.00) | 1.03 |
| 51,100 | LIB | COMMTRAC INC | 0.3750 | 0.1875 | (50.00) | 19,162.50 | 9,581.25 | (9,581.25) | 0.04 |
| 224,000 | CHS | CREDIT STORE INC | 4.1755 | 3.4375 | (17.68) | 935,306.51 | 770,000.00 | (165,306.51) | 2.83 |
| 141,400 | XMM | CROSS MEDIA MARKETING CORP | 2.1528 | 2.2005 | 2.22 | 304,416.00 | 311,175.00 | 6,759.00 | 1.36 |
| 100,000 | CYDX | CYTOMEDIX INC | 2.8000 | 2.5625 | (8.48) | 280,000.00 | 256,250.00 | (23,750.00) | 0.94 |
| 31,500 | DRS | DIAGNOSTIC RETRIEVAL SYS INC | 10.7134 | 13.3750 | 24.84 | 337,472.82 | 421,312.50 | 83,839.68 | 1.55 |
| 648,650 | DECO | DECORA INDS INC | 0.4334 | 0.0110 | (97.46) | 281,136.30 | 7,135.15 | (274,001.15) | 0.03 |
| 106,600 | DRCT | DIRECT 111 MARKETING INC | 0.8677 | 5.8750 | 577.09 | 92,494.86 | 626,275.00 | 533,780.14 | 2.30 |
| 560,732 | EPTG | EPL TECHNOLOGIES INC NEW | 0.0572 | 0.5000 | 744.05 | 33,106.62 | 280,366.00 | 247,259.38 | 1.03 |
| 4,000 | BNXI | BNEX HOLDINGS INC | 0.5000 | 0.7500 | 50.00 | 2,000.00 | 3,000.00 | 1,000.00 | 0.01 |
| 50,500 | EDVC | ENVISION DEV CORP | 10.9848 | 0.0164 | (99.86) | 554,732.40 | 830.31 | (553,902.09) | 0.00 |
| 121,300 | FTGX | FIBERNET TELECOM GROUP INC | 4.6152 | 5.5000 | 19.17 | 559,823.17 | 667,150.00 | 107,326.83 | 2.45 |
| 66,457 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 1.9396 | 22.0000 | 1034.24 | 128,902.00 | 1,462,054.00 | 1,333,152.00 | 5.37 |
| 7,500 | FTRL | FUTERLINK DISTRIBUTION CORP | 7.0012 | 0.6563 | (90.63) | 52,509.00 | 4,921.88 | (47,587.13) | 0.02 |
| 907,000 | GETT | GLOBAL E TUTOR INC | 0.1661 | 0.0500 | (69.90) | 150,652.50 | 45,350.00 | (105,302.50) | 0.17 |
| 100,000 | GBNE | GLOBALNET INC | 0.0000 | 0.9375 | | 0.00 | 93,750.00 | 93,750.00 | 0.34 |
| 6,800 | GORX | GO2PHARMACY INC | 7.8750 | 2.7500 | (65.08) | 53,550.00 | 18,700.00 | (34,850.00) | 0.07 |
| 25,000 | GFF | GRIFFON CORP. | 7.8340 | 7.8750 | 0.52 | 195,850.00 | 196,875.00 | 1,025.00 | 0.72 |
| 65,000 | HEB | HEMISPHERX BIOPHARMA INC | 0.9441 | 2.5625 | 171.43 | 61,365.00 | 166,250.00 | 105,901.00 | 0.61 |
| 66,000 | LSATA | LIBERTY SATELLITE & TECHNOLOGY | 3.7687 | 2.8691 | (23.87) | 248,735.65 | 189,360.00 | (59,375.65) | 0.69 |
| 913,500 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.6342 | 2.2031 | 247.37 | 579,375.05 | 2,012,554.69 | 1,433,179.64 | 7.39 |
| 905,000 | MHTX | MANHATTAN SCIENTIFIES INC | 1.7330 | 2.5000 | 44.26 | 1,568,397.20 | 2,262,500.00 | 694,102.80 | 8.30 |
| 166,800 | MLRE | MILLIONARE.COM | 0.2500 | 0.1400 | (44.00) | 41,700.00 | 23,352.00 | (18,348.00) | 0.09 |
| 90,833 | NURC | NEUROCORP LTD | 1.6211 | 4.2500 | 162.17 | 147,246.17 | 386,040.25 | 238,794.08 | 1.42 |
| 200,000 | NXNM | NXGEN NETWORKS INC | 0.0000 | 0.7500 | | 0.00 | 150,000.00 | 150,000.00 | 0.55 |
| 125,000 | ONTRM | WTS ONTRO INC | 0.2823 | 0.1250 | (55.72) | 35,290.00 | 15,625.00 | (19,665.00) | 0.06 |
| 179,000 | OSE | OSAGE SYSTEMS GROUP INC | 2.7302 | 0.3750 | (86.26) | 488,707.71 | 67,125.00 | (421,582.71) | 0.25 |
| 200,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 1.0000 | (42.86) | 350,000.00 | 200,000.00 | (150,000.00) | 0.73 |
| 160,050 | SMXP | SMX CORP | 1.6763 | 27.0000 | 1510.72 | 268,287.50 | 4,321,350.00 | 4,053,062.50 | 15.86 |

AC0930

Q3-1427/ Viator Fund Ltd

Banc Of America Securities LLC

Client Position Summary by Asset Class

PosSum-CTA

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 50,400 | SMXT | SIMEX CORP | 2.1203 | 1.0000 | (52.84) | 106,861.20 | 50,400.00 | (56,461.20) | 0.18 |
| 2,500 | SKYN | SKYNET | 4.5185 | 0.3438 | (92.39) | 11,296.25 | 859.38 | (10,436.88) | 0.00 |
| 492,500 | STG | STONE PATH GROUP INC | 1.0155 | 0.5000 | (50.76) | 500,136.75 | 246,250.00 | (253,886.75) | 0.90 |
| 57,500 | TIN | TITAN CORP | 29.8561 | 16.2500 | (45.57) | 1,716,726.50 | 934,375.00 | (782,351.50) | 3.43 |
| 164,750 | TFGP | TOTAL FILM GROUP INC | 4.1466 | 3.2500 | (21.62) | 683,156.68 | 535,437.50 | (147,719.18) | 1.96 |
| 86,500 | USHG | U S HOME & GARDEN INC | 2.3790 | 1.0000 | (57.97) | 205,784.95 | 86,500.00 | (119,284.95) | 0.32 |
| 111,650 | USPL | U S PLASTIC LMBR CORP | 2.5602 | 1.2188 | (52.40) | 285,848.81 | 136,073.44 | (149,775.37) | 0.50 |
| 250,000 | 9387252 | ICONNECT.COM | 1.0000 | 4.0000 | 300.00 | 250,000.00 | 1,000,000.00 | 750,000.00 | 3.67 |
| 150,000 | XWC | WORLD WIRELESS COMMUNICATIONS | 3.3665 | 2.0000 | (40.59) | 504,978.44 | 300,000.00 | (204,978.44) | 1.10 |
| 352,700 | ZICA | **21 CORPORATION | 17.7854 | 7.9688 | (55.19) | 6,272,409.99 | 2,810,578.13 | (3,462,531.87) | 10.31 |
| 1,750,000 | SMXWT | SMX CORP WTS | 0.0000 | 2.6000 | - | 0.00 - | 4,550,000.00 | 4,550,000.00 | 16.70 |
| 100,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 1.28 |
| | | Total Long Equities | | | 30.05 | 19,084,226.19 | 26,345,127.71 | 7,260,901.52 | 96.68 |
| | | TOTAL LONG POSITIONS: | | | 31.94 | 21,479,226.19 | 28,620,127.71 | 7,260,901.52 | 105.03 |

SHORT POSITIONS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Equities | 0.0000 | 0.0000 | (0.01) | (99.99) | (100.00) | (0.01) | (0.00) |
| (10,000) | LAZYT | LASERTEC INTERNATIONAL INC | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | TOTAL EXPOSURE VALUE | | | | 21,359,326.18 | 28,620,227.71 | 7,260,901.53 | 105.03 |
| | | NET EXPOSURE VALUE | | | | 21,359,126.20 | 28,620,021.71 | 7,260,901.51 | 105.03 |
| | | | | | | | | | |
| | | TOTAL LONG POSITIONS | | | | 21,359,226.19 | 28,620,127.71 | 7,260,901.52 | 105.03 |
| | | TOTAL SHORT POSITIONS | | | | (99.99) | (100.00) | (0.01) | (0.00) |
| | | TOTAL CASH | | | | (1,369,700.16) | (1,369,700.16) | | (5.03) |
| | | | | | | | | | |
| | | TOTAL: | | | | 19,989,426.04 | 27,250,327.55 | | 100.00 |

# EXHIBIT 20

11A-11B92 Lancer Partners LP

PosSum-TCUA

**Bank of America Securities LLC**
**Client Position Summary by Asset Class**

Page: 1
As Of: 12/31/01
Printed: 11/08/02

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (19,903,293) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (19,903,292.70) | (19,903,292.70) | 0.00 | (7.49) |
| 256,899 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 256,898.59 | 256,898.59 | 0.00 | 0.10 |
| 0 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH AND EQUIVALENTS | | | 0.00 | (19,646,394.11) | (19,646,394.11) | 0.00 | (7.39) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 250,000 | 9386655 | LIGHTHOUSE LANDINGS, INC | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.09 |
| 150,000 | EQUILOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 150,000.00 | 150,000.00 | 0.00 | 0.06 |
| 75,000 | FFIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 75,000.00 | 75,000.00 | 0.00 | 0.03 |
| 300,000 | LLFILOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.11 |
| | | Total Long Fixed Income | | | 0.00 | 775,000.00 | 775,000.00 | 0.00 | 0.29 |
| | | **Equities** | | | | | | | |
| 12,500,000 | AUGC | AUG CORP | 0.0400 | 3.4000 | 8400.00 | 500,000.00 | 42,500,000.00 | 42,000,000.00 | 15.99 |
| 4,409,367 | AURA | AURA SYSTEMS INC | 0.3706 | 0.4400 | 18.74 | 1,633,990.30 | 1,940,121.48 | 306,131.18 | 0.73 |
| 60,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0158 | 0.0090 | (43.16) | 950.00 | 540.00 | (410.00) | 0.00 |
| 2,839,048 | CDSEQ | CREDIT STORE INC | 1.1399 | 0.8200 | (28.06) | 3,236,140.65 | 2,328,019.36 | (908,121.29) | 0.88 |
| 929,740 | XMM | CROSS MEDIA MARKETING CORP | 6.2056 | 9.0000 | 45.03 | 5,769,635.13 | 8,367,660.00 | 2,598,024.87 | 3.15 |
| 188,500 | EPTG | EPL TECHNOLOGIES INC NEW | 0.4814 | 0.3100 | (35.61) | 90,752.75 | 58,435.00 | (32,317.75) | 0.02 |
| 127,800 | EDIG | EDUCATION LENDING GROUP INC | 3.6529 | 2.2000 | (39.77) | 466,444.17 | 281,160.00 | (185,684.17) | 0.11 |
| 4,453,730 | EQUA | EQUITEL INC | 0.7027 | 1.7900 | 154.71 | 3,129,630.50 | 7,972,394.84 | 4,842,764.34 | 3.00 |
| 10,488,281 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 0.3390 | 3.0000 | 784.87 | 3,555,880.47 | 31,464,843.00 | 27,908,962.53 | 11.84 |
| 5,000 | GVEC | GENETIC VECTORS INC | 3.0200 | 1.8500 | (38.74) | 15,100.00 | 9,250.00 | (5,850.00) | 0.00 |
| 1,169,100 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.3810 | 1.9000 | 398.65 | 445,472.70 | 2,221,290.00 | 1,775,817.30 | 0.84 |
| 12,615,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.1290 | 0.3850 | 198.40 | 1,627,607.25 | 4,856,775.00 | 3,229,167.75 | 1.83 |
| 10,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 0.3300 | | 0.00 | 3,300,000.00 | 3,300,000.00 | 1.24 |
| 77,000 | MHTD | METHOD PRODUCTS CORP | 0.8797 | 1.0500 | 19.35 | 67,740.00 | 80,850.00 | 13,110.00 | 0.03 |
| 19,226,450 | NUDZ | NU-D-ZINE INC. | 0.0265 | 3.1000 | 11616.97 | 508,681.00 | 59,601,995.00 | 59,093,314.00 | 22.43 |
| 25,000 | P001682 | WTS PIONEER COMMERCIAL FUNDING | 0.0000 | 0.2500 | | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 400,234 | PCFC | PIONEER COMMERCIAL FUNDING | 2.3018 | 2.0750 | (9.85) | 921,250.44 | 830,485.55 | (90,764.89) | 0.31 |
| 511,500 | RKTX | RX TECHNOLOGY HLDGS INC | 0.1016 | 0.2900 | 185.40 | 51,974.40 | 148,335.00 | 96,360.60 | 0.06 |
| 2,078,000 | SKXR | SHK CORP | 2.0505 | 2.2900 | 11.66 | 4,261,818.66 | 4,758,620.00 | 496,801.34 | 1.79 |
| 975,000 | SMXT | SIMEX CORP | 1.2994 | 12.5000 | 861.92 | 1,266,949.25 | 12,187,500.00 | 10,920,550.75 | 4.58 |
| 131,419 | SO12759 | STONEPATH GROUP INC SER C PFD | 11.4139 | 0.1000 | (99.12) | 1,500,000.00 | 13,141.90 | (1,486,858.10) | 0.00 |
| 41,870,097 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 0.0710 | | 0.00 | 2,972,776.89 | 2,972,776.89 | 1.12 |
| 1,012,000 | TTN | TITAN CORP | 16.7866 | 24.9500 | 48.63 | 16,988,071.56 | 25,249,400.00 | 8,261,328.44 | 9.50 |
| 111,650 | TFGP | TOTAL FILM GROUP INC | 1.0250 | 0.3797 | (62.96) | 114,441.25 | 42,393.50 | (72,047.75) | 0.02 |
| 2,076,061 | USPL | U S PLASTIC LMHR CORP | 0.6000 | 0.2500 | (58.33) | 1,246,000.00 | 519,166.75 | (726,833.25) | 0.20 |
| 688,500 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.6043 | 0.2500 | (58.63) | 416,060.55 | 172,125.00 | (243,935.55) | 0.06 |
| | UVIH | UNIVERSAL INS HLDGS INC | 0.6000 | 0.0843 | (85.95) | | | (229,005.10) | |
| 15,448,710 | WVIH | WORLD WIRELESS COMMUNICATIONS | 2.2746 | 0.8052 | (64.60) | 35,139,636.00 | 12,437,861.68 | (22,701,774.32) | 4.68 |
| 3,448,710 | ZICA | ZI CORPORATION | 4.5536 | 6.9995 | 53.69 | 15,703,999.18 | 24,135,774.86 | 8,431,775.68 | 9.08 |
| 250,000 | CENKPFD | CENTRAX INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.02 |
| 1,050,000 | FIRSTWT | FIRST FIDELITY WARRANTS | 0.0000 | 2.8600 | | 0.00 | 3,003,000.00 | 3,003,000.00 | 1.13 |

A01071

11H-11892 Lancer Partners LP

Bank of America Securities LLC

Client Position Summary by Asset Class

PosSum-TCBA

Page: 2
As of: 12/31/01
Printed: 11/08/02

| SHR/FACE | | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|---|
| 1,250,000 | SMX1 | SMX CORP WARRANTS | | 0.0000 | 7.2500 | | 0.00 | 9,062,500.00 | 9,062,500.00 | 3.41 |
| 1,250,000 | SMX2 | SMX CORP WARRANTS | | 0.0000 | 2.2500 | | 0.00 | 2,812,500.00 | 2,812,500.00 | 1.06 |
| 300,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | | 3.5000 | 3.5000 | 0.00 | 1,050,000.00 | 1,050,000.00 | 0.00 | 0.40 |
| | | Total Long Equities | | | | 289.32 | 73,103,418.89 | 284,606,369.60 | 211,502,950.71 | 107.10 |
| | | **Options** | | | | | | | | |
| 250 | QSOVO2AV | CALL SOVEREIGN BANCOR JAN 12.50 | | 1.0328 | 0.1500 | (85.48) | 25,820.00 | 3,750.00 | (22,070.00) | 0.00 |
| 125 | QTTNO2AF | CALL TITAN CORP JAN 30.00 | | 1.7300 | 0.1000 | (94.22) | 21,625.00 | 1,250.00 | (20,375.00) | 0.00 |
| | | Total Long Options | | | | (89.46) | 47,445.00 | 5,000.00 | (42,445.00) | 0.00 |
| | | TOTAL LONG POSITIONS | | | | 286.04 | 73,925,863.89 | 285,386,369.60 | 211,460,505.71 | 107.39 |
| | | TOTAL EXPOSURE VALUE | | | | | 73,925,863.89 | 285,386,369.60 | 211,460,505.71 | 107.39 |
| | | NET EXPOSURE VALUE | | | | | 73,925,863.89 | 285,386,369.60 | 211,460,505.71 | 107.39 |
| | | TOTAL LONG POSITIONS | | | | | 73,925,863.89 | 285,386,369.60 | 211,460,505.71 | 107.39 |
| | | TOTAL SHORT POSITIONS | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH EQ | | | | | (119,646,394.11) | (119,646,394.11) | | (7.39) |
| | | TOTAL | | | | | 54,279,469.78 | 265,739,975.49 | 211,460,505.71 | 100.00 |

313-11895 Lancer Offshore Inc

PosSum-TCHA

Banc Of America Securities LLC

Client Position Summary by Asset Class

Page: 1
As Of: 12/31/01
Printed: 11/08/02

## CASH AND EQUIVALENTS

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 1,529,331 | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | 1,529,331.35 | 1,529,331.35 | 0.00 | 0.18 |
| 4,103,716 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 4,103,718.36 | 4,103,718.36 | 0.00 | 0.49 |
| 6,002,443 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 6,002,443.37 | 6,002,443.37 | 0.00 | 0.71 |
| | | **TOTAL CASH AND EQUIVALENTS** | | | 0.00 | 11,635,493.08 | 11,635,493.08 | 0.00 | 1.38 |

## LONG POSITIONS

### Fixed Income

| SHR/FACE | CUSIP/SYM | Description | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 3,500,000 | 9386567 | EPL TECHNOLOGIES LOAN TECH/R&L | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.42 |
| 500,000 | 9386637 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.06 |
| 250,000 | 9386655 | LIGHTHOUSE LANDINGS INC | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.03 |
| 650,000 | 9387415 | GENETIC VECTORS 12% NOTE H/M | 100.0000 | 100.0000 | 0.00 | 650,000.00 | 650,000.00 | 0.00 | 0.08 |
| 600,000 | EQUI1LOAN | EQUITEL BRIDGE LOAN TEL | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.07 |
| 355,000 | GVECLOAN | GENETIC VECTORS BRIDGELOAN H/M | 100.0000 | 100.0000 | 0.00 | 355,000.00 | 355,000.00 | 0.00 | 0.04 |
| 500,000 | LFFLOAN1 | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.06 |
| 1,450,000 | LLFLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 1,450,000.00 | 1,450,000.00 | 0.00 | 0.17 |
| 600,000 | USPLELOAN | ULTIMATE SPORTS ENTERTAINMENT E/M | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.07 |
| | | **Total Long Fixed Income** | | | 0.00 | 8,405,000.00 | 8,405,000.00 | 0.00 | 1.00 |

### Equities

| SHR/FACE | SYM | Description | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 125,000 | ASPQ | ASPI EUROPE INC | 0.7500 | 0.9500 | 26.67 | 93,750.00 | 118,750.00 | 25,000.00 | 0.01 |
| 18,000,000 | AUGC | AUG CORP | 0.0278 | 3.4000 | 12140.00 | 500,000.00 | 61,200,000.00 | 60,700,000.00 | 7.27 |
| 16,340,536 | AURA | AURA SYSTEMS INC | 0.3224 | 0.4400 | 36.50 | 5,267,400.00 | 7,189,835.84 | 1,922,435.84 | 0.85 |
| 1,366,667 | CBBD | CHINA BROADBAND CORP | 3.3959 | 0.5000 | (85.28) | 4,641,002.50 | 683,333.50 | (3,957,669.00) | 0.08 |
| 57,800 | DIGMD | CONTROL CHIEF HOLDINGS INC | 4.6645 | 2.3500 | (49.62) | 269,609.17 | 135,830.00 | (133,779.57) | 0.02 |
| 7,597,335 | DOSEQ | CREDIT STORE INC | 2.5345 | 0.8200 | (67.65) | 19,255,724.46 | 6,229,814.70 | (13,025,909.76) | 0.74 |
| 3,371,344 | XM | CROSS MEDIA MARKETING CORP | 8.1131 | 5.8470 | (27.93) | 27,341,496.00 | 19,706,855.50 | (7,634,640.50) | 2.34 |
| 720,000 | CYME | CYTOMEDIX INC | 1.1597 | 1.0097 | (12.93) | 834,955.50 | 726,955.50 | (108,000.00) | 0.09 |
| 3,199,035 | DECO | DECORA INDS INC | 3.2113 | 0.0400 | (98.75) | 10,272,966.15 | 127,961.40 | (10,145,004.75) | 0.02 |
| 17,523,317 | EPTG | EPL TECHNOLOGIES INC NEW TECH/R&L | 0.7581 | 0.3100 | (59.11) | 13,284,564.74 | 5,432,226.27 | (7,852,338.47) | 0.65 |
| 400,000 | ECSL | ECARE SOLUTIONS INC | 0.6005 | 0.1050 | (82.51) | 240,182.50 | 42,000.00 | (198,182.50) | 0.00 |
| 1,849,750 | EDLG | EDUCATION LENDING GROUP INC | 1.8574 | 2.2000 | 18.45 | 3,435,711.05 | 4,069,450.00 | 633,738.95 | 0.48 |
| 4,913,872 | EQUA | EQUITEL INC TEL | 1.6504 | 5.4326 | 229.19 | 8,109,499.90 | 26,695,830.88 | 18,586,330.98 | 3.17 |
| 1,406,327 | FTGX | FIBERNET TELECOM GROUP INC | 2.2010 | 0.3700 | (83.19) | 3,095,270.72 | 520,340.99 | (2,574,929.73) | 0.06 |
| 2,295,571 | FTIRD | FIDELITY FIRST FINANCIAL CORP | 4.0147 | 3.0000 | (25.27) | 9,216,014.90 | 6,886,713.00 | (2,329,301.90) | 0.82 |
| 1,003,516 | GVEC | GENETIC VECTORS INC H/M | 4.2821 | 1.8500 | (56.80) | 4,297,184.22 | 1,856,504.60 | (2,440,679.62) | 0.22 |
| 3,824,048 | LMFF | LIGHTHOUSE FAST FERRY INC TLR | 0.4163 | 1.4034 | 237.06 | 1,592,090.17 | 5,293,601.03 | 3,774,272.54 | 0.63 |
| 12,564,940 | MHTX | MANHATTAN SCIENTIFICS INC E/I/A | 0.9643 | 0.2900 | (69.95) | 12,116,741.46 | 3,643,832.60 | (8,472,908.86) | 0.43 |
| 23,910,800 | MHTD | METHOD PRODUCTS CORP | 0.0370 | 1.0500 | 2736.73 | 885,045.00 | 25,106,340.00 | 24,221,295.00 | 2.99 |
| 15,595,490 | NURC | NEUROCORP LTD | 1.0315 | 0.3100 | (69.95) | 16,086,387.02 | 4,834,601.90 | (11,251,785.12) | 0.57 |
| 27,135,780 | NUDZ | NU-D-ZINE INC. | 0.0472 | 3.1000 | 6463.18 | 1,281,709.85 | 84,120,918.00 | 82,839,208.15 | 9.99 |
| 200,000 | NXNW | NXGEN NETWORKS INC | 0.0100 | 0.1000 | 900.00 | 2,000.00 | 20,000.00 | 18,000.00 | 0.21 |
| 955,492 | NYER | NYER MEDICAL GROUP INC | 4.8618 | 2.0700 | (57.42) | 4,159,213.00 | 1,770,868.44 | (2,388,344.64) | 0.07 |
| 276,737 | PCFC | PIONEER COMMERCIAL FUNDING | 1.0345 | 2.0750 | 100.59 | 286,277.08 | 574,229.28 | 287,952.20 | 0.02 |
| 625,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.4508 | 0.2900 | (80.01) | 906,750.00 | 181,250.00 | (725,500.00) | 0.07 |
| 10,891,179 | SMXP | SMX CORP | 0.3896 | 12.2500 | 3044.11 | 4,243,308.25 | 133,416,942.75 | 129,173,554.50 | 15.85 |

Bank of America Securities LLC
Client Position Summary by Asset Class

BA-11895 Lancer Offshore Inc

PosSum-TCBA

Page: 2
As Of: 12/31/01
Printed: 11/08/02

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 2,270,857 | SIMEX CORP | SMX | 1.6398 | 0.1000 | (93.90) | 3,723,654.54 | 227,085.70 | (3,496,568.84) | 0.03 |
| 271,084 | STONE PATH GROUP INC | STG | 0.5500 | 1.8600 | 236.36 | 149,096.20 | 501,505.40 | 352,409.20 | 0.06 |
| 212,373 | STONEPATH GROUP INC SER C IPD | S012759 | 11.4139 | 11.4149 | (0.00) | 2,424,000.00 | 2,423,997.81 | (2.19) | 0.29 |
| 50,000 | TERAYON COMMUNICATION SYS | TERN | 9.7409 | 8.2710 | (15.09) | 487,044.00 | 413,550.00 | (73,494.00) | 0.05 |
| *14,994 | FIDELITY FIRST FINANCIAL CORP F/Z | 8047007 | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 1,508,100 | TITAN CORP | TTN | 22.1971 | 24.9800 | 11.40 | 33,477,095.00 | 37,627,095.00 | 3,850,006.18 | 4.47 |
| 60,766,859 | TOTAL FILM GROUP INC | TFGP | 0.2070 | 0.3910 | 189.41 | 12,580,194.47 | 23,819,570.41 | 23,819,570.41 | 4.31 |
| 1,074,250 | U S PLASTIC LMHR CORP ℰⁱⁱ/ⁱ/ⁿ⁴⁴ | USPL | 7.4658 | 0.1797 | (94.91) | 8,020,108.81 | 407,892.72 | (7,612,276.09) | 0.05 |
| 1,687,400 | UNDERGROUND SOLUTIONS INC | UGSI | 0.8984 | 0.2550 | (71.61) | 1,516,462.16 | 430,287.00 | (1,086,175.16) | 0.05 |
| 15,300 | U S INDUSTRIES INC NEW | USI | 2.0115 | 2.5600 | 27.27 | 30,775.95 | 39,168.00 | 8,392.05 | 0.00 |
| 435,000 | UNIVERSAL HEIGHTS INC OLD | U331992 | 1.0000 | 0.2500 | (75.00) | 435,000.00 | 108,750.00 | (326,250.00) | 0.01 |
| 3,029,137 | UNIVERSAL INS HLDGS INC | UVIH | 0.7294 | 0.2500 | (65.73) | 2,209,583.40 | 757,284.25 | (1,452,299.15) | 0.09 |
| 250,000 | ICONNECT.COM | 9387252 | 1.0000 | 1.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.03 |
| 300,000 | WTS LIGHTHOUSE LANDINGS INC | 9390720 | 0.0000 | 0.6500 | | 0.00 | 195,000.00 | 195,000.00 | 0.02 |
| 58,089,328 | WORLD WIRELESS COMMUNICATIONS | XNC | 0.2898 | 0.8200 | 183.95 | 16,775,516.29 | 47,633,248.96 | 30,857,732.67 | 5.66 |
| 9,026,275 | ZI CORPORATION | ZICA | 4.5721 | 6.9906 | 53.06 | 41,270,573.95 | 63,170,327.80 | 21,899,753.85 | 7.50 |
| *2,000,000 | CENTRAX INTL PREFERRED STOCK H/H | CENKPFD | 0.2000 | 0.2000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.05 |
| 56,641,635 | FIRST FIDELITY STOCK | FFIR | 0.0059 | 2.0000 | 33683.63 | 335,320.00 | 113,283,270.00 | 112,947,950.00 | 13.46 |
| *16,000,000 | MANHATTAN SCIENTIFICS WARRANTS 66/A | MHTXWT | 0.0000 | 0.3300 | | 0.00 | 5,280,000.00 | 5,280,000.00 | 0.63 |
| 10,000,000 | METHOD PRODUCTS CORP WARRANTS | MTDPW1 | 0.0000 | 0.9500 | | 0.00 | 9,500,000.00 | 9,500,000.00 | 1.13 |
| 10,000,000 | METHOD PRODUCTS CORP WARRANTS | MTDPW2 | 0.0000 | 0.9000 | | 0.00 | 9,000,000.00 | 9,000,000.00 | 1.07 |
| 20,000,000 | METHOD PRODUCTS CORP WARRANTS | MTDPW3 | 0.0000 | 1.0400 | | 0.00 | 20,800,000.00 | 20,800,000.00 | 2.47 |
| 18,150,000 | NU-D-ZINE WARRANT | NUDZW | 0.0000 | 3.0000 | | 0.00 | 54,450,000.00 | 54,450,000.00 | 6.47 |
| *100,000 | US PLASTIC LUMBER CORP SERIES ℰᴄⁱⁱ/ⁱ⁴⁴ | USPLPFD | 3.5000 | 3.5000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.04 |
| 250,000 | E-NEW MEDIA COMPANY LTD ℰᵘⁱ | ENEWF | 0.0500 | 0.0474 | (5.10) | 12,500.00 | 11,862.09 | (637.91) | 0.00 |
| | **Total Long Equities** | | | | 224.24 | 253,481,484.85 | 821,886,751.88 | 568,405,267.03 | 97.62 |

Options

| 125 | CALL TITAN CORP JAN 30.00 | QTTN02AF | 1.7300 | 0.1000 | (94.22) | 21,625.00 | 1,250.00 | (20,375.00) | 0.00 |

| | **TOTAL LONG POSITIONS** | | 1.7300 | | 217.02 | 261,908,109.85 | 830,293,001.88 | 568,384,892.03 | 98.62 |

| | TOTAL EXPOSURE VALUE | | | | | 261,908,109.85 | 830,293,001.88 | 568,384,892.03 | 98.62 |
| | NET EXPOSURE VALUE | | | | | 261,908,109.85 | 830,293,001.88 | 568,384,892.03 | 98.62 |

| | TOTAL LONG POSITIONS | | | | | 261,908,109.85 | 830,293,001.88 | 568,384,892.03 | 98.62 |
| | TOTAL SHORT POSITIONS | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | TOTAL CASH EQ | | | | | 11,635,493.08 | 11,635,493.08 | | 1.38 |

| | **TOTAL** | | | | | 273,543,602.93 | 841,928,494.96 | 568,384,892.03 | 100.00 |

A 0 1 0 7 4

Bank of America Securities LLC

Client Position Summary by Asset Class

314 12/96 The OmniFund Ltd.

PosSum-TCBA

| SHR/FACE | | | UNIT COST | CURRENT PRICE | M/T G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (4,010,396) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (4,010,395.62) | (4,010,395.62) | 0.00 | (9.30) |
| 3,057,758 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,057,758.48 | 3,057,758.48 | 0.00 | 7.09 |
| 0 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | (952,637.14) | (952,637.14) | 0.00 | (2.21) |

**LONG POSITIONS**

**Fixed Income**

| SHR/FACE | | | UNIT COST | CURRENT PRICE | M/T G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 100,000 | LFFLOAN1 | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 100,000.00 | 100,000.00 | 0.00 | 0.23 |

**Equities**

| SHR/FACE | | | UNIT COST | CURRENT PRICE | M/T G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 2,000,000 | AUGC | AUG CORP | 0.0250 | 3.4000 | 13500.00 | 50,000.00 | 6,800,000.00 | 6,750,000.00 | 15.78 |
| 687,750 | AURA | AURA SYSTEMS INC | 0.3387 | 0.4400 | 29.91 | 232,941.50 | 302,610.00 | 69,668.50 | 0.70 |
| 100,000 | XHM | CROSS MEDIA MARKETING CORP | 2.5000 | 9.0000 | 260.00 | 250,000.00 | 900,000.00 | 650,000.00 | 2.09 |
| 3,185,000 | EPTG | EPL TECHNOLOGIES INC NEW | 0.0177 | 0.3100 | 1649.97 | 56,421.00 | 987,350.00 | 930,929.00 | 2.29 |
| 106,766 | FTGX | FIBERNET TELECOM GROUP INC | 0.3490 | 0.3700 | 6.03 | 37,256.16 | 39,503.42 | 2,247.26 | 0.09 |
| 359,968 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 2.6777 | 3.0000 | 12.04 | 963,870.61 | 1,079,904.00 | 116,033.39 | 2.51 |
| 975,000 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.3846 | 1.9000 | 394.00 | 375,000.00 | 1,852,500.00 | 1,477,500.00 | 4.30 |
| 25,000 | MNGX | MANGOSOFT INC | 0.8342 | 0.6500 | (22.08) | 20,856.00 | 16,250.00 | (4,606.00) | 0.04 |
| 755,000 | NUDZ | NU-D-ZINE INC. | 0.2397 | 3.1000 | 1193.09 | 181,000.00 | 2,340,500.00 | 2,159,500.00 | 5.43 |
| 100,000 | NXNW | NXGEN NETWORKS INC | 0.0000 | 0.1000 | 0.00 | 0.00 | 10,000.00 | 10,000.00 | 0.02 |
| 275,900 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.2900 | (81.41) | 481,750.00 | 80,250.00 | (401,500.00) | 0.19 |
| 837,770 | SMXP | SMX CORP | 0.2061 | 12.2500 | 5844.16 | 172,634.00 | 10,262,682.50 | 10,090,048.50 | 23.81 |
| 18,500 | SMKT | SIMEX CORP | 5.7237 | 0.1000 | (98.25) | 105,887.70 | 1,850.00 | (104,037.70) | 0.00 |
| 10,290,000 | TFGP | TOTAL FILM GROUP INC | 0.0097 | 0.6000 | 6074.00 | 100,000.00 | 6,174,000.00 | 6,074,000.00 | 14.32 |
| 2,750,000 | ULSP | ULTIMATE SPORTS ENTERTAINMENT | 0.0045 | 0.0800 | 1660.00 | 12,500.00 | 220,000.00 | 207,500.00 | 0.51 |
| 10,000 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.5450 | 0.8200 | 50.46 | 5,450.00 | 8,200.00 | 2,750.00 | 0.02 |
| 413,600 | ZICA | ZI CORPORATION | 13.1360 | 6.9985 | (46.72) | 5,433,047.49 | 2,894,674.95 | (2,538,470.54) | 6.72 |
| 2,745,000 | FFIR | FIRST FIDELITY STOCK | 0.0046 | 2.0000 | 43820.00 | 12,500.00 | 5,490,000.00 | 5,477,500.00 | 12.74 |
| 380,000 | GVECMTS | GENETIC VECTOR WARRANTS | 0.0000 | 1.8400 | 0.00 | 0.00 | 699,200.00 | 699,200.00 | 1.62 |
| 300,000 | NUDZW | NU-D-ZINE WARRANT | 0.0000 | 3.0000 | 0.00 | 0.00 | 900,000.00 | 900,000.00 | 2.09 |
| 1,605,000 | XWCWT | WORLD WIRELESS COMM WARRANTS | 0.0000 | 0.5000 | 0.00 | 0.00 | 802,500.00 | 802,500.00 | 1.86 |
| 400,000 | 9082684 | ZI CORP WTS | 0.0000 | 5.2300 | 0.00 | 0.00 | 2,092,000.00 | 2,092,000.00 | 4.85 |
| **Total Long Equities** | | | | | 417.67 | 8,490,614.46 | 43,953,376.87 | 35,462,762.41 | 101.98 |
| **TOTAL LONG POSITIONS** | | | | | 412.81 | 8,590,614.46 | 44,053,376.87 | 35,462,762.41 | 102.21 |

| | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|
| **TOTAL EXPOSURE VALUE** | 8,590,614.46 | 44,053,376.87 | 35,462,762.41 | 102.21 |
| **NET EXPOSURE VALUE** | 8,590,614.46 | 44,053,376.87 | 35,462,762.41 | 102.21 |
| **TOTAL LONG POSITIONS** | 8,590,614.46 | 44,053,376.87 | 35,462,762.41 | 102.21 |
| **TOTAL SHORT POSITIONS** | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL CASH EQ** | (952,637.14) | (952,637.14) | 0.00 | (2.21) |
| **TOTAL:** | 7,637,977.32 | 43,100,739.73 | 35,462,762.41 | 100.00 |

A01075

Banc Of America Securities LLC

Client Position Summary by Asset Class

313-13377 Viator Fund Ltd

PosSum-TCBA

Page: 1
As Of: 12/31/01
Printed: 11/08/02

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (2,175,054) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (2,175,054.43) | (2,175,054.43) | 0.00 | (7.97) |
| 346,095 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 346,094.89 | 346,094.89 | 0.00 | 1.27 |
| 0 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH AND EQUIVALENTS | | | 0.00 | (1,828,959.54) | (1,828,959.54) | 0.00 | (6.71) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Equities** | | | | | | | |
| 1,400,000 | AUGC | AUG CORP | 0.0740 | 3.4000 | 13500.00 | 35,000.00 | 4,760,000.00 | 4,725,000.00 | 17.45 |
| 783,500 | AURA | AURA SYSTEMS INC | 0.4447 | 0.4400 | 20.81 | 348,084.50 | 195,940.00 | 34,855.50 | 1.23 |
| 151,100 | CUBB | COMPUTHAC INC | 0.1750 | 0.4400 | 11.53 | 19,162.50 | 22,484.00 | 3,321.50 | 0.08 |
| 112,000 | CDSEQ | CREDIT STORE INC | 2.7094 | 0.8700 | (69.73) | 303,452.70 | 91,840.00 | (211,612.70) | 0.34 |
| 2,382,968 | EPTG | EPL TECHNOLOGIES INC NEW | 0.0170 | 0.3100 | 1726.32 | 40,444.82 | 738,720.08 | 698,271.46 | 2.71 |
| 100,000 | EULG | EDUCATION LENDING GROUP INC | 0.9249 | 2.2000 | 137.85 | 92,494.86 | 220,000.00 | 127,505.14 | 0.81 |
| 607,938 | FTGX | FIBERNET TELECOM GROUP INC | 1.0723 | 0.3700 | (65.50) | 651,905.72 | 224,937.06 | (426,968.66) | 0.82 |
| 57,057 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 2.0944 | 3.0000 | 43.24 | 119,502.00 | 171,171.00 | 51,669.00 | 0.63 |
| 19,800 | LSTTA | LIBERTY SATELLITE & TECHNOLOGY | 0.8266 | 0.9400 | 13.72 | 16,366.68 | 18,612.00 | 2,245.32 | 0.07 |
| 1,419,350 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.4146 | 1.9000 | 358.30 | 588,423.30 | 2,696,765.00 | 2,108,341.70 | 9.89 |
| 45,000 | MNGX | MANGOSOFT INC | 0.8012 | 0.6500 | (18.87) | 36,053.75 | 29,250.00 | (6,803.75) | 0.11 |
| 200,000 | MHTX | MANHATTAN SCIENTIFIES INC | 0.3711 | 0.3850 | 3.74 | 74,225.00 | 77,000.00 | 2,775.00 | 0.28 |
| 20,000 | NFRO | NFRO BIOTHERAPEUTICS INC | 11.4260 | 11.4000 | (4.41) | 228,520.00 | 228,000.00 | (520.00) | 0.84 |
| 91,333 | NRRC | NEDICORP LTD | 1.6272 | 0.3100 | (80.95) | 148,621.17 | 28,313.23 | (120,307.94) | 0.10 |
| 754,203 | NUBC | NU-D-ZINE INC. | 0.2385 | 3.1100 | 1200.00 | 179,800.00 | 2,337,400.00 | 2,157,600.00 | 8.57 |
| 200,000 | NXNW | NXGEN NETWORKS INC | 0.0000 | 0.1000 | 0.00 | 20,000.00 | 20,000.00 | 20,000.00 | 0.07 |
| 200,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.2900 | (83.43) | 350,000.00 | 58,000.00 | (292,000.00) | 0.21 |
| 395,800 | SMKP | SMK CORP | 0.9444 | 12.2500 | 1197.14 | 373,787.50 | 4,848,550.00 | 4,474,762.50 | 17.78 |
| 50,400 | SMXT | SIMEX CORP | 2.1203 | 0.6000 | (95.28) | 106,861.20 | 5,040.00 | (101,821.20) | 0.02 |
| 50,000 | TTN | TITAN CORP | 25.1250 | 24.9500 | (0.70) | 1,256,250.00 | 1,247,500.00 | (8,750.00) | 4.57 |
| 10,037,155 | TFGP | TOTAL FILM GROUP INC | 0.1198 | 0.6000 | 400.87 | 1,202,356.68 | 6,022,293.00 | 4,819,936.32 | 22.08 |
| 233,700 | UVLH | UNIVERSAL INS HLDGS INC | 0.0091 | 0.2500 | (38.90) | 95,617.39 | 58,425.00 | (37,192.39) | 0.21 |
| 300,000 | 9390720 | WFS LIGHTHOUSE LANDINGS INC | 0.0000 | 0.6500 | 0.00 | 0.00 | 195,000.00 | 195,000.00 | 0.71 |
| 200,000 | XMC | WORLD WIRELESS COMMUNICATIONS | 2.7632 | 0.8200 | (70.32) | 552,649.94 | 164,000.00 | (388,649.94) | 0.60 |
| 398,200 | ZICA | ZI CORPORATION | 16.6222 | 6.9985 | (57.90) | 6,618,942.99 | 2,786,800.15 | (3,832,142.84) | 10.22 |
| 859,400 | EFIR | FIRST FIDELITY STOCK | 0.0109 | 2.0000 | 9.400.00 | 9,400.00 | 1,718,800.00 | 1,709,400.00 | 6.30 |
| | | Total Long Equities | | | 117.40 | 13,387,926.50 | 29,104,840.52 | 15,716,914.02 | 106.71 |
| | | TOTAL LONG POSITIONS | | | 117.40 | 13,387,926.50 | 29,104,840.52 | 15,716,914.02 | 106.71 |

A01076

313-13377 Viator Fund Ltd

Banc Of America Securities LLC
Client Position Summary by Asset Class

Page: 2
As Of: 12/31/01
Printed: 11/08/02

PosSum-TCBA

| SHR/FACE | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL EXPOSURE VALUE | | | | 13,387,926.50 | 29,104,840.52 | 15,716,914.02 | 106.71 |
| NET EXPOSURE VALUE | | | | 13,387,926.50 | 29,104,840.52 | 15,716,914.02 | 106.71 |
| TOTAL LONG POSITIONS | | | | 13,387,926.50 | 29,104,840.52 | 15,716,914.02 | 106.71 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | (1,828,959.54) | (1,828,959.54) | | (6.71) |
| TOTAL | | | | 11,558,966.96 | 27,275,880.98 | 15,716,914.02 | 100.00 |

# EXHIBIT 21

A01206

118-11892 Lancer Partners LP
PosSum-TCBA

Banc Of America Securities LLC
Client Position Summary by Asset Class

Page: 1
As Of: 12/31/02
Printed: 01/16/03

| SHR/FACE | SYM | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (4,572,091) USD | TYPE 2 | | 1.0000 | 1.0000 | 0.00 | (4,572,091.11) | (4,572,091.11) | 0.00 | (1.89) |
| 241,760 USD | TYPE 3 | | 1.0000 | 1.0000 | 0.00 | 241,760.20 | 241,760.20 | 0.00 | 0.10 |
| 0 USD | TYPE 6 | | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH AND EQUIVALENTS | | | 0.00 | (4,330,330.91) | (4,330,330.91) | 0.00 | (1.79) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 65,000 | BLACK | BLACK SKY ENTERTAINMENT LOAN | 100.0000 | 100.0000 | 0.00 | 65,000.00 | 65,000.00 | 0.00 | 0.03 |
| | | **Equities** | | | | | | | |
| 5,544,167 | AURA | AURA SYSTEMS INC | 0.3307 | 0.0490 | (82.16) | 1,833,303.66 | 327,105.85 | (1,506,197.81) | 0.13 |
| 12,512,900 | BMTS | BIOMETRICS SECURITY TECHNOLOGY | 0.0450 | 5.5000 | 12129.67 | 562,737.40 | 68,820,950.00 | 68,258,212.60 | 28.37 |
| 60,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0158 | 0.0035 | (77.89) | 950.00 | 210.00 | (740.00) | 0.00 |
| 519,300 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 1.1577 | 5.1000 | 340.53 | 601,185.00 | 2,648,430.00 | 2,047,245.00 | 1.09 |
| 73,600 | XMM | CROSS MEDIA MARKETING CORP | 1.2003 | 0.5518 | (54.05) | 88,342.90 | 40,480.00 | (47,862.90) | 0.02 |
| 46,650 | EDLG | EDUCATION LENDING GROUP INC | 3.8200 | 4.1100 | 8.38 | 178,203.00 | 191,131.00 | 14,928.00 | 0.08 |
| 10,292,481 | FFTFD | FIDELITY FIRST FINANCIAL CORP | 0.0388 | 5.0000 | 1375.73 | 3,487,247.22 | 51,462,405.00 | 47,975,157.78 | 21.22 |
| 1,867,859 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.6806 | 0.1000 | (85.31) | 1,271,318.99 | 186,785.90 | (1,084,533.09) | 0.08 |
| 1,000 | LNSG | LIONSHARE GROUP INC | 1.3500 | 1.2500 | (7.41) | 1,350.00 | 1,250.00 | (100.00) | 0.00 |
| 5,010,000 | GML | MAGIC LANTERN GROUP INC | 0.0218 | 1.7000 | 7698.95 | 109,207.00 | 8,517,000.00 | 8,407,793.00 | 3.51 |
| 12,000,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.1333 | 0.0650 | (51.22) | 1,599,115.59 | 780,000.00 | (819,115.59) | 0.32 |
| 10,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 0.0150 | 0.00 | 0.00 | 150,000.00 | 150,000.00 | 0.06 |
| 37,650 | MHTD | METHOD PRODUCTS CORP | 6.0834 | 0.6000 | (90.14) | 229,038.50 | 22,590.00 | (206,448.50) | 0.01 |
| 25,000 | P001682 | WTS PIONEER COMMERCIAL FUNDING | 0.0000 | 0.2500 | 0.00 | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 400,234 | PCFC | PIONEER COMMERCIAL FUNDING | 2.3018 | 1.6050 | (30.27) | 921,250.44 | 642,375.57 | (278,874.87) | 0.26 |
| 827,948 | SMKP | SMX CORP | 2.8797 | 3.0000 | 4.18 | 2,384,272.86 | 2,483,844.00 | 99,571.14 | 1.02 |
| 383,353 | SURE | SUREBEAM CORP | 4.5090 | 4.0400 | (10.40) | 1,728,523.13 | 1,548,746.12 | (179,777.01) | 0.64 |
| 259,650 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 874,750 | TTN | TITAN CORP | 11.8000 | 10.4000 | (11.86) | 10,322,050.00 | 9,097,400.00 | (1,224,650.00) | 3.75 |
| 34,530,897 | TFGP | TOTAL FILM GROUP INC | 0.1674 | 0.3000 | 79.22 | 5,780,328.20 | 10,359,269.10 | 4,578,940.90 | 4.27 |
| 13,856,524 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.3145 | 0.1400 | (55.49) | 4,358,662.19 | 1,940,193.36 | (2,416,468.83) | 0.80 |
| 19,238,550 | XTRD | XTRACARD CORP | 0.0280 | 4.0000 | 14194.34 | 538,354.26 | 76,954,200.00 | 76,415,845.74 | 31.73 |
| 3,122,900 | ZICA | ZI CORPORATION | 5.4361 | 2.2900 | (57.94) | 16,989,377.94 | 10,580,938.50 | (6,408,439.44) | 4.36 |
| 250,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.02 |
| 1,050,000 | FIRSTWT | FIRST FIDELITY WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 |
| | | **Total Long Equities** | | | 365.38 | 53,034,818.28 | 246,813,554.42 | 193,778,736.14 | 101.76 |
| | | **TOTAL LONG POSITIONS** | | | 364.93 | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |

A01207

Banc Of America Securities LLC

118-11892 Lancer Partners LP

Client Position Summary by Asset Class

Position TCHA

Page: 2
As Of: 12/31/02
Printed: 01/16/03

| SHR/FACE | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL EXPOSURE VALUE | | | | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |
| NET EXPOSURE VALUE | | | | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |
| | | | | | | | |
| TOTAL LONG POSITIONS | | | | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | (4,330,330.91) | (4,330,330.91) | | (1.79) |
| | | | | | | | |
| TOTAL | | | | 48,769,487.37 | 242,548,223.51 | 193,778,736.14 | 100.00 |

A01208

Banc Of America Securities LLC
Client Position Summary by Asset Class

913-1895 Lancer Offshore Inc
PosSum-TCHA

| SHR/FACE | SYMBOL | DESCRIPTION | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (6,113,722) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (6,113,722.47) | (6,113,722.47) | 0.00 | (0.74) |
| 3,829,807 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,829,806.60 | 3,829,806.60 | 0.00 | 0.47 |
| 162,413 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 162,413.28 | 162,413.28 | 0.00 | 0.02 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | (2,121,502.59) | (2,121,502.59) | 0.00 | (0.26) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 3,500,000 | 9386567 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.43 |
| 500,000 | 9386637 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.06 |
| 500,000 | 9386655 | LIGHTHOUSE LANDINGS, INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.06 |
| 300,000 | AUGCLOAN | AUG CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.04 |
| 625,000 | AURACLOAN | AURA SYSTEMS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 625,000.00 | 625,000.00 | 0.00 | 0.08 |
| 2,635,000 | BLACK | BLACK SKY ENTERTAINMENT LOAN | 100.0000 | 100.0000 | 0.00 | 2,635,000.00 | 2,635,000.00 | 0.00 | 0.32 |
| 505,000 | CPHGLOAN | CORPUS HOLDINGS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 505,000.00 | 505,000.00 | 0.00 | 0.06 |
| 2,500,000 | CSORLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 2,500,000.00 | 2,500,000.00 | 0.00 | 0.30 |
| 75,000 | CTKLOAN | CENTRAK CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 75,000.00 | 75,000.00 | 0.00 | 0.01 |
| 500,017 | EQUILOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 500,017.10 | 500,017.10 | 0.00 | 0.06 |
| 7,000,000 | EXPGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 0.85 |
| 290,000 | FFIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 290,000.00 | 290,000.00 | 0.00 | 0.04 |
| 1,250,000 | INHEALTH | ISTINHEALTH INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,250,000.00 | 1,250,000.00 | 0.00 | 0.15 |
| 3,605,000 | KMGTLOAN | KNIGHTSCOVE ENTERTAINMENT BRIDGE | 100.0000 | 100.0000 | 0.00 | 3,605,000.00 | 3,605,000.00 | 0.00 | 0.44 |
| 600,000 | LFFLOAN1 | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.07 |
| 2,400,000 | LLFILOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 2,400,000.00 | 2,400,000.00 | 0.00 | 0.29 |
| 400,000 | LNSHLOAN | LIONSHARE GROUP INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.05 |
| 1,500,000 | NEPHLOAN | NEPHROS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.18 |
| 600,000 | USPIELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.07 |
| 3,000,000 | XMMLOAN | CROSS MEDIA MARKETING LOAN | 100.0000 | 100.0000 | 0.00 | 3,000,000.00 | 3,000,000.00 | 0.00 | 0.36 |
| 850,000 | XWCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 850,000.00 | 850,000.00 | 0.00 | 0.10 |
| | | **Total Long Fixed Income** | | | 0.00 | 33,335,017.10 | 33,335,017.10 | 0.00 | 4.05 |
| | | **Equities** | | | | | | | |
| 41,225,578 | AURA | AURA SYSTEMS INC | 0.2897 | 0.0590 | (79.64) | 11,944,338.36 | 2,432,309.10 | (9,512,029.26) | 0.30 |
| 29,554,610 | BMTS | BIOMETRICS SECURITY TECHNOLOGY | 0.1862 | 5.5000 | 2853.47 | 5,503,715.30 | 162,550,355.00 | 157,046,639.70 | 19.77 |
| 2,500,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0200 | 0.0035 | (82.50) | 50,000.00 | 8,750.00 | (41,250.00) | 0.00 |
| 14,313,600 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 0.1213 | 5.1000 | 4105.36 | 1,735,863.20 | 72,999,360.00 | 71,263,496.80 | 8.88 |
| 384 | DIGH | CONTROL CHIEF HOLDINGS INC | 478.8839 | 110.0000 | (77.03) | 183,891.41 | 42,240.00 | (141,651.41) | 0.01 |
| 10,000,000 | CPHG | CORPAS HOLDINGS INC | 0.0100 | 0.0500 | 400.00 | 100,000.00 | 500,000.00 | 400,000.00 | 0.06 |
| 5,250,319 | XMM | CROSS MEDIA MARKETING CORP | 3.5657 | 0.5500 | (84.58) | 18,721,007.70 | 2,887,675.45 | (15,833,332.25) | 0.35 |
| 53,797 | CYME | CYMEDIX CORP | 14.4630 | 0.7750 | (94.64) | 778,066.30 | 41,692.68 | (736,373.63) | 0.01 |
| 31,916,158 | EPTG | EFT BIOTECH HOLDINGS INC NEM | 0.4202 | 0.0110 | (97.38) | 13,412,729.74 | 351,077.74 | (13,061,652.00) | 0.04 |
| 53,190 | EFTG | FIBERNET TELECOM GROUP INC | 0.8859 | 1.9030 | 114.80 | 47,122.46 | 101,222.46 | 54,100.00 | 0.01 |
| 9,268,390 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 1.1051 | 5.0000 | 352.44 | 10,242,692.04 | 46,341,950.00 | 36,099,257.96 | 5.64 |
| 2,720,000 | ILCD | INTERNATIONAL TRAVEL CDS INC | 0.2035 | 3.0000 | 1374.28 | 553,491.05 | 8,160,000.00 | 7,606,508.95 | 0.99 |
| 17,510 | LSTTA | LIBERTY SATELLITE & TECHNOLOGY | 3.3854 | 2.6500 | (21.72) | 59,278.85 | 46,401.50 | (12,877.35) | 0.01 |
| 6,299,493 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.5700 | 0.1000 | (82.46) | 3,590,639.51 | 629,949.30 | (2,960,690.21) | 0.08 |

A01209

Banc of America Securities LLC
Client Position Summary by Asset Class

Page: 2
As Of: 12/31/02
Printed: 01/16/03

B3-11895 Lancer Offshore Inc
PosSum-TCBA

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 995 | LNRG | LITHOGRAND GROUP INC | 1.0000 | 1.0000 | (1.00) | 1,994.00 | 1,941.75 | (49.25) | 0.00 |
| 25,044,600 | GML | MAGIC LANTERN GROUP INC | 0.0161 | 1.0000 | 10477.18 | 402,525.14 | 42,975,820.00 | 42,175,294.66 | 5.18 |
| 31,366,300 | MHTX | MANHATTAN SCIENTIFIES INC | 0.2842 | 0.0650 | (77.13) | 8,913,052.34 | 2,038,809.50 | (6,874,242.84) | 0.25 |
| 4,931,909 | MHTD | METHOD PRODUCTS CORP | 0.6129 | 0.6000 | (2.10) | 3,022,754.51 | 2,959,145.40 | (63,609.11) | 0.36 |
| 690,692 | NYER | NYER MEDICAL GROUP INC | 4.4672 | 1.2500 | (72.02) | 3,085,446.93 | 863,365.00 | (2,222,121.93) | 0.10 |
| 269,237 | PCFC | PIONEER COMMERCIAL FUNDING | 0.9978 | 1.6050 | 60.85 | 268,652.08 | 432,125.39 | 163,473.30 | 0.05 |
| 500,000 | RELM | RELM WIRELESS CORP | 0.9000 | 0.4900 | (45.56) | 450,000.00 | 245,000.00 | (205,000.00) | 0.03 |
| 500,000 | RELMW | RELM WIRELESS CORP WARRANTS | 0.0000 | 0.1140 | | 0.00 | 67,500.00 | 67,500.00 | 0.01 |
| 11,043,962 | SMXY | SMX CORP | 0.6692 | 3.0000 | 348.30 | 7,390,517.09 | 33,131,886.00 | 25,741,368.91 | 4.03 |
| 3,360,057 | SMXT | SIMEX CORP | 1.1703 | 0.1000 | (91.45) | 3,932,171.54 | 336,005.70 | (3,596,165.84) | 0.04 |
| 5,000 | STG | STONE PATH GROUP INC | 0.5500 | 1.4500 | 163.64 | 2,750.00 | 7,250.00 | 4,500.00 | 0.00 |
| 362,718 | SO12759 | STONEPATH GROUP INC SER C PFD | 11.4138 | 11.4119 | 0.00 | 4,140,026.98 | 4,140,026.98 | 26.98 | 0.50 |
| 409,447 | SBRE | SUREBEAM CORP | 2.4207 | 4.0400 | 66.89 | 991,153.73 | 1,654,165.88 | 663,012.15 | 0.20 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 537,950 | TTN | TITAN CORP | 9.8697 | 10.4000 | 5.38 | 5,703,630.68 | 6,010,680.00 | 307,049.32 | 0.73 |
| 125,853,919 | TFGP | TOTAL FILM GROUP INC | 0.1549 | 0.3000 | 93.69 | 19,493,175.67 | 37,756,175.70 | 18,263,000.03 | 4.59 |
| 100,000 | TCHSV | TOUCHSTONE RESOURCES LTD | 0.0000 | 0.6900 | | 0.00 | 69,883.42 | 69,883.42 | 0.01 |
| 1,687,400 | UGSI | UNDERGROUND SOLUTIONS INC | 0.8997 | 0.1050 | (88.32) | 1,516,462.16 | 177,177.00 | (1,339,285.16) | 0.02 |
| 2,526,667 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.2385 | 0.0600 | (74.84) | 602,631.36 | 151,600.02 | (451,033.34) | 0.02 |
| 3,991,337 | UVIH | UNIVERSAL INS HLDGS INC | 0.5737 | 0.0600 | (89.54) | 2,289,709.40 | 239,480.22 | (2,050,229.18) | 0.03 |
| 331,250 | 9387252 | ICONNECT.COM | 1.0000 | 0.5000 | (50.00) | 331,250.00 | 165,625.00 | (165,625.00) | 0.02 |
| 124,197,828 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.1182 | 0.1400 | 21.46 | 22,138,181.54 | 17,387,695.92 | (4,750,485.62) | 2.11 |
| 25,744,680 | XTRD | 21 CORPORATION | 0.0510 | 4.0000 | 7747.07 | 1,312,320.03 | 102,978,720.00 | 101,666,399.97 | 12.52 |
| 15,211,575 | ZICA | 21 CORPORATION | 4.6655 | 2.8500 | (38.91) | 70,968,945.61 | 43,352,988.75 | (27,615,956.86) | 5.27 |
| 2,000,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.05 |
| 45,041,635 | FFIR | FIRST FIDELITY STOCK | 3.0000 | 3.0000 | 0.00 | 135,124,905.00 | 135,124,905.00 | 0.00 | 16.43 |
| 8,000,000 | MHTDW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 0.1700 | | 0.00 | 1,560,000.00 | 1,560,000.00 | 0.55 |
| 16,000,000 | MHTXWT | MANHATTAN SCIENTIFICS WARRANTS | 0.0000 | 0.0150 | | 0.00 | 240,000.00 | 240,000.00 | 0.03 |
| 10,500,000 | NUD2W | NU-D-ZINE WARRANT | 0.0000 | 3.9700 | | 0.00 | 41,685,000.00 | 41,685,000.00 | 5.07 |
| 400,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.17 |
| 3,500,000 | XTRDWT | XTRACARD CORP WARRANT | 0.0000 | 3.9700 | | 0.00 | 13,895,000.00 | 13,895,000.00 | 1.69 |
| | | **Total Long Equities** | | | 250.11 | 225,975,107.08 | 791,162,750.85 | 565,187,643.77 | 96.20 |
| | | **TOTAL LONG POSITIONS** | | | 117.96 | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |
| | | | | | | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |
| | | **TOTAL EXPOSURE VALUE** | | | | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |
| | | **NET EXPOSURE VALUE** | | | | | | | |
| | | **TOTAL LONG POSITIONS** | | | | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |
| | | **TOTAL SHORT POSITIONS** | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | **TOTAL CASH EQ** | | | | (2,121,502.59) | (2,121,502.59) | | (0.26) |
| | | **TOTAL** | | | | 257,188,621.59 | 822,376,265.36 | 565,187,643.77 | 100.00 |

A01210

Banc Of America Securities LLC
Client Position Summary by Asset Class

313-12796 The OmniFund Ltd.
PosSum-TCBA

Page: 1
As Of: 12/31/02
Printed: 01/16/03

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (2,418,392) USD | TYPE 2 | | 1.0000 | 1.0000 | 0.00 | (2,418,392.24) | (2,418,392.24) | 0.00 | (4.31) |
| 3,071,736 USD | TYPE 3 | | 1.0000 | 1.0000 | 0.00 | 3,071,735.71 | 3,071,735.71 | 0.00 | 5.48 |
| 0 USD | TYPE 6 | | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH AND EQUIVALENTS | 100.0000 | 100.0000 | 0.00 | 653,343.47 | 653,343.47 | 0.00 | 1.17 |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 300,000 | EXFGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.54 |
| | | **Equities** | | | | | | | |
| 200,000 | AUST | ADSTAR COM INC | 0.5000 | 0.9100 | 82.00 | 100,000.00 | 182,000.00 | 82,000.00 | 0.32 |
| 1,269,750 | AURA | AURA SYSTEMS INC | 0.3356 | 0.0590 | (82.42) | 426,159.50 | 74,915.25 | (351,244.25) | 0.13 |
| 2,874,935 | BMTS | BIOMETRICS SECURITY TECHNOLOGY | 0.0250 | 5.5000 | 21900.00 | 71,873.37 | 15,812,142.50 | 15,740,269.13 | 28.20 |
| 429,171 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 0.0319 | 5.1000 | 15864.79 | 13,710.00 | 2,188,772.10 | 2,175,062.10 | 3.90 |
| 25,000 | XRM | XRM | 2.2400 | 0.5500 | (75.45) | 56,000.00 | 13,750.00 | (42,250.00) | 0.02 |
| 8,567,968 | EITG | EPL TECHNOLOGIES INC NEW | 0.0113 | 0.0110 | (2.71) | 96,869.62 | 94,247.65 | (2,621.97) | 0.17 |
| 417,025 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 2.5979 | 5.0000 | 92.47 | 1,083,397.61 | 2,085,125.00 | 1,001,727.39 | 3.72 |
| 2,500 | IICU | INTERNATIONAL TRAVEL CUS INC | 3.0500 | 3.0000 | (1.64) | 7,625.00 | 7,500.00 | (125.00) | 0.01 |
| 2,649,350 | LHFY | LIGHTHOUSE FAST FERRY INC | 0.3640 | 0.1000 | (72.53) | 964,373.30 | 264,935.00 | (699,438.30) | 0.47 |
| 40,800 | GML | MAGIC LANTERN GROUP INC | 1.6276 | 1.7000 | 4.45 | 66,406.08 | 69,360.00 | 2,953.92 | 0.12 |
| 23,000 | MHTD | METHOD PRODUCTS CORP | 0.6300 | 0.6000 | (4.76) | 14,490.00 | 13,800.00 | (690.00) | 0.02 |
| 1,049,270 | SMXP | SMX CORP | 0.5586 | 3.0000 | 437.03 | 586,147.21 | 3,147,810.00 | 2,561,662.79 | 5.61 |
| 16,684,655 | TFGP | TOTAL FILM GROUP INC | 0.0642 | 0.3000 | 367.08 | 1,071,631.68 | 5,005,396.50 | 3,933,764.82 | 8.93 |
| 2,750,000 | ULSP | ULTIMATE SPORTS ENTERTAINMENT | 0.0045 | 0.2650 | 5730.00 | 12,500.00 | 728,750.00 | 716,250.00 | 1.30 |
| 100,000 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.1438 | 0.1400 | (2.64) | 14,380.00 | 14,000.00 | (380.00) | 0.02 |
| 1,500,000 | XTRD | XTRACARD CORP | 0.2333 | 4.0000 | 1614.29 | 350,000.00 | 6,000,000.00 | 5,650,000.00 | 10.10 |
| 756,700 | ZICA | ZI CORPORATION | 15.1347 | 2.8500 | (81.17) | 11,452,421.10 | 2,156,595.00 | (9,295,826.10) | 3.85 |
| 3,104,400 | FFIR | FIRST FIDELITY STOCK | 0.0053 | 3.0000 | 56580.42 | 16,431.07 | 9,313,200.00 | 9,296,768.93 | 16.61 |
| 1,000,000 | NUDZW | NU-D-ZINE WARRANT | 0.0000 | 3.9700 | 0.00 | | 3,970,000.00 | 3,970,000.00 | 7.08 |
| 1,000,000 | XTRDWT | XTRACARD CORP WARRANT | 0.0000 | 3.9700 | 0.00 | | 3,970,000.00 | 3,970,000.00 | 7.08 |
| | | Total Long Equities | | | 235.96 | 16,404,390.54 | 55,112,299.00 | 38,707,908.46 | 98.30 |
| | | TOTAL LONG POSITIONS | | | 231.72 | 16,704,390.54 | 55,412,299.00 | 38,707,908.46 | 98.83 |
| | | TOTAL EXPOSURE VALUE | | | | 16,704,390.54 | 55,412,299.00 | | |
| | | NET EXPOSURE VALUE | | | | 16,704,390.54 | 55,412,299.00 | | |
| | | TOTAL LONG POSITIONS | | | | 16,704,390.54 | 55,412,299.00 | 38,707,908.46 | 98.83 |
| | | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH EQ | | | | 653,343.47 | 653,343.47 | | 1.17 |
| | | TOTAL | | | | 17,357,734.01 | 56,065,642.47 | 38,707,908.46 | 100.00 |

A01211

Bank of America Securities LLC

Client Position Summary by Asset Class

Page:  1
As Of: 12/31/02
Printed: 01/16/03

413-11497 Viator Fund Ltd

PosSum-TCBA

| SHR/FACE | UNIT COST | CURRENT UNIT | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| CASH AND EQUIVALENTS | | | | | | | |
| TYPE 2    0 USD | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 97.79 |
| TYPE 3    0 USD | 1.0000 | 1.0000 | 0.00 | (0.00) | (0.00) | 0.00 | (9.87) |
| TYPE 6    0 USD | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 12.08 |
| TOTAL CASH AND EQUIVALENTS | | | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| | | | | | | | |
| TOTAL EXPOSURE VALUE | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| NET EXPOSURE VALUE | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | |
| TOTAL LONG POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | 0.00 | 0.00 | 0.00 | 100.00 |
| | | | | | | | |
| TOTAL | | | | 0.00 | 0.00 | 0.00 | 100.00 |

# EXHIBIT 22

## <u>DECLARATION OF HAROLD E. SCHIMKAT</u>

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is Harold E. Schimkat.  I am over the age of twenty-one (21) and I have personal knowledge of the matters set forth herein.  I am senior counsel in the Enforcement Division of the United States Securities and Exchange Commission ("SEC").

2.      I have conducted a review of the equity securities held in the portfolios of the Lancer Partners LP and the Lancer Offshore, Inc. hedge funds on December 31, 2002.  My review was based on a copy of the Client Position Summary by Asset Class prepared by Banc of America Securities LLC, which the staff of the SEC obtained during the course of its investigation in this matter.  A copy of the Client Position Summary by Asset Class is attached as Exhibit A.

3.      I also reviewed information on the website of Pink Sheets LLC relating to the equity securities held in the Lancer Partners LP and Lancer Offshore, Inc. portfolios on December 31, 2002.  A copy of this information is attached as Exhibit B.

4.      I also reviewed Bloomberg information relating to the corporate activity, including listing changes, for the companies whose equity securities were held in the Lancer Partners LP and Lancer Offshore, Inc. portfolios on December 31, 2002.  A copy of this information is attached as Exhibit C.

5.      On December 31, 2002, Lancer Partners LP owned equity securities (including common stock, preferred stock and warrants) issued by approximately 20 different companies.  Of these companies, roughly 13 were companies whose common stock was quoted on the Pink Sheets or the Over-The-Counter Bulletin Board ("OTCBB") markets on December 31, 2002.  In addition, as of June 23, 2003, the common stock of roughly 13 of these companies was quoted on the Pink Sheets or OTCBB.

6.      On December 31, 2002, Lancer Offshore, Inc. owned equity securities (including common stock, preferred stock and warrants) issued by approximately 35 different companies.  Of these companies, roughly 22 were companies whose common stock was quoted on the Pink Sheets or OTCBB markets as of December 31, 2002.  In addition, as of June 23, 2003, the common stock of roughly 23 of these companies was quoted on the Pink Sheets or OTCBB.

7.      Attached as Exhibit D is a copy of a publication prepared by the SEC, entitled "Microcap Stock:  A Guide for Investors," which describes the Pink Sheet and OTCBB markets.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 30 day of June, 2003, in Miami, Florida.

_____
Harold E. Schimkat

A01206

Banc of America Securities LLC
Client Position Summary by Asset Class

In 1189/ Lancer Partners LP
Account in MA

| Shares | Symbol | Security | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (4,572,091) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (4,572,091.11) | (4,572,091.11) | 0.00 | (1.89) |
| 241,760 USD | | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 241,760.20 | 241,760.20 | 0.00 | 0.10 |
| 0 USD | | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | **TOTAL CASH AND EQUIVALENTS** | 100.0000 | 100.0000 | 0.00 | (4,330,330.91) | (4,330,330.91) | 0.00 | (1.79) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 65,000 | BLACK | BLACK SKY ENTERTAINMENT LOAN | 100.0000 | 100.0000 | 0.00 | 65,000.00 | 65,000.00 | 0.00 | 0.03 |
| | | **Equities** | | | | | | | |
| 5,544,167 | AURA | AURA SYSTEMS INC | 0.3307 | 0.0590 | (82.16) | 1,833,303.66 | 327,105.85 | (1,506,197.81) | 0.13 |
| 12,512,900 | BMTS | BIOMETRICS SECURITY TECHNOLOGY | 0.0450 | 5.5000 | 12129.67 | 562,737.40 | 68,820,950.00 | 68,258,212.60 | 28.37 |
| 60,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0158 | 0.0035 | (77.89) | 950.00 | 210.00 | (740.00) | 0.00 |
| 519,300 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 1.1577 | 5.1000 | 340.53 | 601,185.00 | 2,648,430.00 | 2,047,245.00 | 1.09 |
| 73,600 | XMM | CROSS MEDIA MARKETING CORP | 1.2003 | 0.5500 | (54.18) | 88,342.90 | 40,480.00 | (47,862.90) | 0.02 |
| 46,650 | EDLG | EDUCATION LENDING GROUP INC | 3.8200 | 4.1400 | 8.38 | 178,203.00 | 193,131.00 | 14,928.00 | 0.08 |
| 10,292,481 | FFTRD | FIDELITY FIRST FINANCIAL CORP | 0.3388 | 5.0000 | 1375.73 | 3,487,247.22 | 51,462,405.00 | 47,975,157.78 | 21.22 |
| 1,867,859 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.6806 | 0.1000 | (85.31) | 1,271,318.99 | 186,785.90 | (1,084,533.09) | 0.08 |
| 1,000 | LHSG | LIONSHARE GROUP INC | 1.3500 | 1.2500 | (7.41) | 1,350.00 | 1,250.00 | (100.00) | 0.00 |
| 5,010,000 | GML | MAGIC LANTERN GROUP INC | 0.0218 | 1.7000 | 7698.95 | 109,207.00 | 8,517,000.00 | 8,407,793.00 | 3.51 |
| 12,000,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.1333 | 0.0650 | (51.22) | 1,599,115.59 | 780,000.00 | (819,115.59) | 0.32 |
| 10,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 0.0150 | 0.00 | 0.00 | 150,000.00 | 150,000.00 | 0.06 |
| 37,650 | MHTD | METHOD PRODUCTS CORP | 6.0834 | 0.6000 | (90.14) | 229,038.50 | 22,590.00 | (206,448.50) | 0.01 |
| 25,000 | P001602 | WTS PIONEER COMMERCIAL FUNDING | 0.0000 | 0.2500 | 0.00 | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 400,234 | PCFC | PIONEER COMMERCIAL FUNDING | 2.3018 | 1.6050 | (30.27) | 921,250.44 | 642,375.57 | (278,874.87) | 0.26 |
| 827,940 | SMXP | SMX CORP | 2.8797 | 3.0000 | 4.18 | 2,384,272.86 | 2,483,844.00 | 99,571.14 | 1.02 |
| 383,353 | SURE | SUREBEAM CORP | 4.5090 | 4.0400 | (10.40) | 1,728,523.13 | 1,548,746.12 | (179,777.01) | 0.64 |
| 259,650 | B855437 | WTS FFTR FUNDING CORPORATION | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 674,891 | TTM | TITAN CORP | 15.2938 | 13.4800 | (11.86) | 10,322,680.00 | 9,097,400.10 | (1,225,279.90) | 3.75 |
| 34,518,897 | TGIP | TOTAL FILM GROUP INC | 0.1674 | 0.3000 | 79.22 | 5,780,328.20 | 10,359,269.10 | 4,576,940.90 | 4.27 |
| 13,856,524 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.3145 | 0.1400 | (55.49) | 4,358,662.19 | 1,940,193.36 | (2,418,468.83) | 0.80 |
| 19,238,550 | XTRD | XTRACARD CORP | 0.0280 | 4.0000 | 14194.34 | 538,354.26 | 76,954,200.00 | 76,415,845.74 | 31.73 |
| 3,712,610 | ZICA | ZI CORPORATION | 4.5761 | 2.8500 | (37.72) | 16,989,377.94 | 10,580,936.50 | (6,408,439.44) | 4.36 |
| 250,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.02 |
| 1,050,000 | FIRSTWT | FIRST FIDELITY WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 |
| | | **Total Long Equities** | | | 365.38 | 53,034,818.28 | 246,813,554.42 | 193,778,736.14 | 101.76 |
| | | **TOTAL LONG POSITIONS** | | | 364.93 | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |



EXHIBIT
A

A01207

Banc of America Securities LLC

Client Position Summary by Asset Class

Page: 2
As Of: 12/31/02
Printed: 01/16/03

US FUNDZ Lancer Partners LP

Version: 1.0A

| | UNIT FIELD | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL EXPOSURE VALUE | | | | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |
| NET EXPOSURE VALUE | | | | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |
| TOTAL LONG POSITIONS | | | | 53,099,818.28 | 246,878,554.42 | 193,778,736.14 | 101.79 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | (4,330,330.91) | (4,330,330.91) | | (1.79) |
| TOTAL | | | | 48,769,487.37 | 242,548,223.51 | 193,778,736.14 | 100.00 |

A01208

Bank Of America Securities LLC

Client Position Summary by Asset Class

Page: 1
As Of: 12/31/02
Printed: 01/16/03

| BALANCE | SYMBOL | | UNIT COST | CURRENT UNIT | PCT L/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **ACCT TOTAL** | | | | | | | | | |
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| 6,113,722 | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | 6,113,722.47 | 6,113,722.47 | 0.00 | (0.74) |
| 3,829,807 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,829,806.60 | 3,829,806.60 | 0.00 | 0.47 |
| 162,413 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 162,413.28 | 162,413.28 | 0.00 | 0.02 |
| | | **Total Cash And Equivalents** | | | 0.00 | (2,121,502.59) | (2,121,502.59) | 0.00 | (0.26) |

**LONG POSITIONS**

| BALANCE | SYMBOL | Fixed Income | UNIT COST | CURRENT UNIT | PCT L/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 3,500,000 | 93863G7 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.43 |
| 500,000 | 9386631 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.06 |
| 500,000 | 9386655 | LIGHTHOUSE LANDINGS, INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.06 |
| 300,000 | AUGCLOAN | AUG CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.04 |
| 625,000 | AURALOAN | AURA SYSTEMS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 625,000.00 | 625,000.00 | 0.00 | 0.08 |
| 2,635,000 | BLACK | BLACK SKY ENTERTAINMENT LOAN | 100.0000 | 100.0000 | 0.00 | 2,635,000.00 | 2,635,000.00 | 0.00 | 0.32 |
| 505,000 | CHNGLOAN | CORPUS HOLDINGS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 505,000.00 | 505,000.00 | 0.00 | 0.06 |
| 2,500,000 | CSOHLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 2,500,000.00 | 2,500,000.00 | 0.00 | 0.30 |
| 75,000 | CTKLOAN | CENTRAK CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 75,000.00 | 75,000.00 | 0.00 | 0.01 |
| 500,017 | EQUITI | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 500,017.10 | 500,017.10 | 0.00 | 0.06 |
| 7,000,000 | EXKGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 0.85 |
| 290,000 | FTHLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 290,000.00 | 290,000.00 | 0.00 | 0.04 |
| 1,250,000 | INHBALTH | INHEALTH INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,250,000.00 | 1,250,000.00 | 0.00 | 0.15 |
| 3,805,000 | KNGTLOAN | KNIGHTSCOVE ENTERTAINMENT BRIDGE | 100.0000 | 100.0000 | 0.00 | 3,805,000.00 | 3,805,000.00 | 0.00 | 0.46 |
| 600,000 | LFFLOAN | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.07 |
| 2,400,000 | LLFLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 2,400,000.00 | 2,400,000.00 | 0.00 | 0.29 |
| 400,000 | LNSHLOAN | LIONSHARE GROUP INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.05 |
| 1,500,000 | NEPHLOAN | NEPHROS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.18 |
| 600,000 | USPUELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.07 |
| 3,000,000 | XMMLOAN | CROSS MEDIA MARKETING LOAN | 100.0000 | 100.0000 | 0.00 | 3,000,000.00 | 3,000,000.00 | 0.00 | 0.36 |
| 850,000 | XWCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 850,000.00 | 850,000.00 | 0.00 | 0.10 |
| | | **Total Long Fixed Income** | | | 0.00 | 33,335,017.10 | 33,335,017.10 | 0.00 | 4.05 |

| BALANCE | SYMBOL | Equities | UNIT COST | CURRENT UNIT | PCT L/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 41,225,578 | AURA | AURA SYSTEMS INC | 0.2897 | 0.0500 | (79.64) | 11,944,538.36 | 2,412,309.10 | (9,512,029.26) | 0.30 |
| 29,554,610 | BMTS | BIOMETRICS SECURITY TECHNOLOGY | 0.1862 | 5.5000 | 2853.47 | 5,503,715.30 | 162,550,355.00 | 157,046,639.70 | 19.77 |
| 2,500,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0200 | 0.0035 | (82.50) | 50,000.00 | 8,750.00 | (41,250.00) | 0.00 |
| 14,313,600 | CSUR | CONTINENTAL SOUTHERN RESOURCES | 0.1213 | 5.1000 | 4105.36 | 1,735,863.77 | 72,999,360.00 | 71,263,496.40 | 8.88 |
| 384 | DLCH | CONTROL CHIEF HOLDINGS INC | 478.8939 | 110.0000 | (77.03) | 183,891.41 | 42,240.00 | (141,651.41) | 0.01 |
| 10,000,000 | CPHG | CORPUS HOLDINGS INC | 0.0100 | 0.0500 | 400.00 | 100,000.00 | 500,000.00 | 400,000.00 | 0.06 |
| 5,250,319 | XMM | CROSS MEDIA MARKETING CORP | 3.5657 | 0.5500 | (84.58) | 18,721,007.70 | 2,887,675.45 | (15,833,332.25) | 0.35 |
| 5,117,500 | CYMX | CYTOMEDIX INC | 0.1430 | 0.1750 | 22.38 | 732,066.00 | 895,612.50 | (736,373.63) | 0.11 |
| 31,916,158 | EPTG | EPL TECHNOLOGIES INC NEW | 0.4202 | 0.0110 | (97.38) | 13,412,739.74 | 351,077.74 | (13,061,662.00) | 0.04 |
| 595,438 | FTGX | FIBERNET TELECOM GROUP INC | 0.0900 | 0.1700 | 88.89 | 53,589.42 | 101,224.46 | 47,635.04 | 0.01 |
| 9,268,390 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 1.1051 | 5.0000 | 352.44 | 10,242,692.04 | 46,341,950.00 | 36,099,257.96 | 5.64 |
| 2,720,000 | ILCD | INTERNATIONAL TRAVEL CDS INC | 0.2035 | 3.0000 | 1374.28 | 553,491.05 | 8,160,000.00 | 7,606,508.95 | 0.99 |
| 17,510 | LSTTA | LIBERTY SATELLITE & TECHNOLOGY | 3.3854 | 2.6500 | (21.72) | 59,278.85 | 46,401.50 | (12,877.35) | 0.01 |
| 6,299,493 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.5700 | 0.1000 | (82.46) | 3,590,639.51 | 629,949.30 | (2,960,690.21) | 0.08 |

A01209

Banc of America Securities LLC

Detail Position Summary by Asset Class

Page: 2
As Of: 12/31/02
Printed: 01/16/03

| SHARES | TICKER | Name | UNIT COST | CURRENT PRICE | UNIT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| ??,044,600 | IHDG | LIABAL CASH INC | 1.0000 | 1.0000 | (49.71) | 1,294.50 | 1,244.79 | (49.71) | 0.00 |
| | MHI | MHAL LEADING CASH INC | 0.0313 | 1.0000 | 1047.18 | 402,525.18 | 42,797,819.00 | 42,171,294.66 | 5.18 |
| 31,366,300 | MHIX | MANHATTAN SCIENTIFICS INC | 0.2842 | 0.0850 | (77.13) | 8,913,052.14 | 2,038,809.50 | 16,874,242.84 | 0.25 |
| 4,931,909 | MHTD | METHOD PRODUCTS CORP | 0.6179 | 0.6000 | (2.10) | 3,022,754.51 | 2,959,145.40 | 2,959,145.00 | 0.36 |
| 690,692 | NYEK | NYER MEDICAL GROUP INC | 4.4672 | 1.2500 | (72.02) | 3,085,486.93 | 863,365.00 | (2,222,121.93) | 0.10 |
| 269,237 | PCFC | PIONEER COMMERCIAL FUNDING | 0.9998 | 1.6050 | 60.85 | 268,652.08 | 432,125.39 | 163,473.30 | 0.05 |
| 500,000 | REIM | REIM WIRELESS CORP | 0.9000 | 0.4900 | (45.56) | 450,000.00 | 245,000.00 | (205,000.00) | 0.03 |
| 500,000 | REIMW | REIM WIRELESS CORP WARRANTS | 0.0000 | 0.1150 | | 0.00 | 67,500.00 | 67,500.00 | 0.01 |
| 11,043,962 | SMX | SMX CORP | 0.4692 | 3.0000 | 48.40 | 7,390,311.99 | 33,131,886.00 | 25,741,308.41 | 4.03 |
| 3,360,657 | SMXT | SIMEX CORP | 1.1703 | 4.0000 | (91.45) | 3,932,171.54 | 336,065.70 | 13,546,165.84 | 0.04 |
| 35,000 | STG | STONE PATH GROUP INC | 0.5000 | 1.4140 | 163.64 | 2,750.00 | 7,250.00 | 4,500.00 | 0.00 |
| 362,718 | SD12/259 | STONEPATH GROUP INC SER C LTD | 11.4119 | 11.4119 | 0.00 | 4,140,000.00 | 4,140,026.98 | 26.98 | 0.50 |
| 409,447 | SURE | SUREBEAM CORP | 2.4207 | 4.0400 | 66.89 | 991,153.73 | 1,654,165.88 | 663,012.15 | 0.20 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 577,950 | TTN | TITAN CORP | 9.8687 | 10.4000 | 5.38 | 5,703,630.68 | 6,010,680.00 | 307,049.32 | 0.73 |
| 125,853,919 | TFGP | TOTAL FILM GROUP INC | 0.1549 | 0.3000 | 93.69 | 19,493,175.67 | 37,756,175.70 | 18,263,000.03 | 4.59 |
| 100,000 | TCHER | TOUCHSTONE RESOURCES LTD | 0.0000 | 0.6400 | | 0.00 | 64,863.42 | 69,863.42 | 0.01 |
| 1,887,400 | UGSI | UNDERGROUND SOLUTIONS INC | 0.0907 | 0.1050 | (88.15) | 1,516,462.16 | 177,177.00 | (1,339,245.16) | 0.02 |
| 2,526,667 | U3413992 | UNIVERSAL HEIGHTS INC ORD | 0.7785 | 0.0400 | (14.84) | 602,611.36 | 151,600.02 | (451,011.34) | 0.02 |
| 3,991,337 | UVHI | UNIVERSAL INS BLDGS INC | 0.5777 | 0.0600 | (89.54) | 2,309,160.98 | 239,480.22 | (2,069,680.18) | 0.03 |
| 331,250 | 9387252 | ICONNECT.COM | 1.0000 | 0.5000 | (50.00) | 331,250.00 | 165,625.00 | (165,625.00) | 0.02 |
| 124,197,828 | XMC | WORLD WIRELESS COMMUNICATIONS | 0.1782 | 0.1400 | (21.46) | 22,138,181.54 | 17,387,695.92 | (4,750,485.62) | 2.11 |
| 25,744,680 | XTRD | XTRACARD CORP | 0.0510 | 4.0000 | 7847.07 | 1,312,320.03 | 102,978,720.00 | 101,666,399.97 | 12.52 |
| 15,211,575 | ZICA | ZI CORPORATION | 4.6655 | 2.8500 | (38.91) | 70,960,945.61 | 43,352,988.75 | (27,615,956.86) | 5.27 |
| 2,000,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.05 |
| 45,041,635 | FFIR | FIRST FIDELITY STOCK | 0.0059 | 3.0000 | 50575.45 | 266,647.69 | 135,124,905.00 | 134,858,257.31 | 16.43 |
| 8,000,000 | MHTDW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 0.5700 | | 0.00 | 4,560,000.00 | 4,560,000.00 | 0.55 |
| 16,000,000 | MHTXWT | MANHATTAN SCIENTIFICS WARRANTS | 0.0000 | 0.0150 | | 0.00 | 240,000.00 | 240,000.00 | 0.03 |
| 10,500,000 | NUD2W | NU-D-ZINE WARRANT | 0.0000 | 3.9700 | | 0.00 | 41,685,000.00 | 41,685,000.00 | 5.07 |
| 400,000 | USPLHFH | US PLASTIC LUMBER CORP SERIES B | 3.5000 | 3.5000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.17 |
| 3,500,000 | XTRDWT | XTRACARD CORP WARRANT | 0.0000 | 3.9000 | | 0.00 | 13,895,000.00 | 13,895,000.00 | 1.69 |

Total Long Equities

| | | | | | 250.11 | 225,975,107.08 | 791,167,750.85 | 565,187,641.77 | 96.20 |

TOTAL LONG POSITIONS

| | | | | | 217.96 | 259,310,124.18 | 824,497,767.95 | 565,187,641.77 | 100.24 |

| | | | | | | | | | |
| TOTAL EXPOSURE VALUE | | | | | | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |
| NET EXPOSURE VALUE | | | | | | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |

| | | | | | | | | | |
| TOTAL LONG POSITIONS | | | | | | 259,310,124.18 | 824,497,767.95 | 565,187,643.77 | 100.26 |
| TOTAL SHORT POSITIONS | | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | | | (2,121,502.59) | (2,121,502.59) | | (0.26) |

| | | | | | | | | | |
| TOTAL | | | | | | 257,188,621.59 | 822,376,265.36 | 565,187,643.77 | 100.00 |

![sheets — where markets are made]
QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[ Quote ] Go

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   AURAE



### AURAE -- Aura Systems, Inc.
Com ($0.005)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                          **Best Ask: Unpriced**

**TRADE DATA**

| | |
|---|---|
| Best Bid: 0.0580 | Best Ask: 0.0600 |
| Last Sale: 0.0580 | Change: -- |
| Percent Change: +0.00 | Tick: Up |
| Daily High: 0.0600 | Daily Low: 0.0550 |
| Opening Price: 0.0570 | Volume: 728,300 |
| Annual High: 0.1690 | Annual Low: 0.0550 |
| Dividend: 0.000 | Earnings/Share: -0.05 |
| Previous Close: 0.0580 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.54 |

Last Trade Date/Time: 13:23

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



EXHIBIT
B



## sheets
### where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

| Quote | Go |

**Symbol Lookup**

### Make Your Company's Inside and Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   BMTS



OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Day Changers
Value Changers
Trading Gainers
Quote Request Leaders
Stock List
Bond List

OTC ISSUES WITH
Real-Time Level II

**BMTS -- Biometrics Security Technology, Inc.**
Com ($0.0001)
Primary Venue: Pink Sheets

| | |
|---|---|
| **Best Bid: 1.55** (500 shares) | **Best Ask: 1.80** (500 shares) * |
| Date/Time of Last Inside Change: 12:18 | * Quoted on the Pink Sheets |

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 1.55 | Change: +0.29 |
| Percent Change: +23.02 | Tick: Down |
| Daily High: 1.55 | Daily Low: 1.55 |
| Opening Price: 1.55 | Volume: 1,500 |
| Annual High: 8.50 | Annual Low: 1.10 |
| Dividend: 0.000 | Earnings/Share: -1.64 |
| Previous Close: 1.26 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.76 |

Last Trade Date/Time: 11:03

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

**sheets**
where markets are made
QUOTES & DATA   INVESTORS   ISSUERS   TRADERS   PRODUCTS & SERVICES   ABOUT

**Enter Symbol:**

[ Quote ]   **Go**

**Symbol Lookup**





SCAN   CHART   TRADE                    30-Day, Risk-Free Trial

**Introducing eSignal 7.3!**
**eSignal Offers What Real**      Quoteboard Window        eSignal
**Traders Need!**                 Market Depth

ADVERTISEMENT

.: QUOTE   .: CHART   |: COMPANY INFORMATION   .: NEWS   .: SEC
FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   CENK

## CENK -- Centrack International, Inc.
Com
Primary Venue: Pink Sheets

| | |
|---|---|
| **Best Bid: 0.001 (5000 shares)** | **Best Ask: 0.01 (5000 shares)** * |
| Date/Time of Last Inside Change: 08:28 | * Quoted on the Pink Sheets |

 Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.0010 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 0.0100 | Annual Low: 0.0001 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 0.0010 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.79 |

Last Trade Date/Time: 06/17/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

# sheets
### where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[          ] **Go**

[ Quote ▾ ]

**Symbol Lookup**



## Make Your Company's Inside and
## Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC
FILINGS   .: FINANCIAL REPORTS

Home >>    Quotes & Data >>    Quote >>    CSOR

## CSOR -- Continental Southern Resources, Inc.
Com ($0.001)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                          **Best Ask: Unpriced**
**TRADE DATA**
Best Bid: 3.15                                  Best Ask: 3.25
Last Sale: 3.20                                 Change: -0.10
Percent Change: -3.03                           Tick: Down
Daily High: 3.35                                Daily Low: 3.20
Opening Price: 3.35                             Volume: 6,600
Annual High: 6.40                               Annual Low: 2.57
Dividend: 0.000                                 Earnings/Share: -0.65
Previous Close: 3.30                            P/E ratio: N/A
Yield: 0.00

                                                Beta Coefficient: 0.00

Last Trade Date/Time: 13:22
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between
8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-
time level two quotes so you can view free real-time inside and level two quotes in
their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

# sheets
**where markets are made**

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[          ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Daily Changes
Volume Changes
Trading Activities
Closing Prices of Bonds
Stock List
Bond List

OTC ISSUES WITH
Real-Time Level II

## Make Your Company's Inside and Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   DIGM

## DIGM -- Control Chief Holdings, Inc.
Com (50 Cents)
Primary Venue: Pink Sheets

**Best Bid: 110.00 (6 shares)**      **Best Ask: Unpriced**
Date/Time of Last Inside Change: 09:02      * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 111.50 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 111.50 | Annual Low: 110.00 |
| Dividend: 0.000 | Earnings/Share: -0.01 |
| Previous Close: 111.50 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.40 |

Last Trade Date/Time: 06/13/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

Stock Quote for CPHG - Pink Sheets

# sheets
**where markets are made**

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT



**Enter Symbol:**

[ ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Daily Change
Value Change
Trading Statistics
Chart Percent Leaders
Stock List
Bond List

OTC ISSUES WITH
Real-Time Level II

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE  .: CHART  .: COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   CPHG

### CPHG -- Corpas Holdings, Inc.
Com ($0.001)(New)
Primary Venue: Pink Sheets

**Best Bid: 0.06 (5000 shares)**          **Best Ask: 0.51 (2500 shares) ***
Date/Time of Last Inside Change: 07:37    * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.0600 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 0.2500 | Annual Low: 0.0500 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 0.0600 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.83 |

Last Trade Date/Time: 05/13/2003
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

## sheets
### where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[ ] Go

[ Quote ▾ ]

**Symbol Lookup**

OTC ELITE LISTS
SEC Reporting
AllReg
Banks & Trusts

OTC MARKET DATA

OTC ISSUED WITH
Real-Time Level II

### Make Your Company's Inside and Level II Quote Montage Available Free to Investors
ADVERTISEMENT

.: QUOTE   .: CHART   : COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   XMM

## XMM -- Cross Media Marketing Corp.
Com ($0.001)(New)
Primary Venue: Amex

### TRADE DATA

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 0.24 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 10.20 | Annual Low: 0.15 |
| Dividend: 0.000 | Earnings/Share: -2.38 |
| Previous Close: 0.24 | P/E ratio: N/A |
| Yield: 0.00 | Halted |
| News | Beta Coefficient: 0.40 |

Last Trade Date/Time: 05/23/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



![sheets where markets are made]

**QUOTES & DATA   INVESTORS   ISSUERS   TRADERS   PRODUCTS & SERVICES   ABOUT**

**Enter Symbol:**

[ ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   : COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>    Quotes & Data >>    Quote >>    CYME

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Gainers (20)
Volume (20)
Trade Summary
Short List
Bond List

OTC ISSUES WITH
Real-Time Level II

### CYME -- Cytomedix, Inc.
Com ($0.0001)(New)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                   **Best Ask: Unpriced**
**TRADE DATA**
Best Bid: 1.75                            Best Ask: 1.87
Last Sale: 1.80                           Change: --
Percent Change: +0.00                     Tick: Down
Daily High: 1.87                          Daily Low: 1.80
Opening Price: 1.87                       Volume: 3,000
Annual High: 2.75                         Annual Low: 0.51
Dividend: 0.000                           Earnings/Share: -1.15
Previous Close: 1.80                      P/E ratio: N/A
Yield: 0.00

                                          Beta Coefficient: 0.93

Last Trade Date/Time: 10:48
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?





**Enter Symbol:**

| Go |

| Quote ▾ |

**Symbol Lookup**



FROM THE No.1 WEB HOSTING COMPANY    HOSTWAY
ADVERTISEMENT

QUOTES & DATA  INVESTORS  ISSUERS  TRADERS  PRODUCTS & SERVICES  ABOUT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>    Quotes & Data >>    Quote >>    EDLG

**EDLG -- Education Lending Group, Inc.**
Com ($0.001)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                                    **Best Ask: Unpriced**
**TRADE DATA**

| | |
|---|---|
| Best Bid: 12.000 | Best Ask: 12.150 |
| Last Sale: 12.000 | Change: -0.400 |
| Percent Change: -3.23 | Tick: Down |
| Daily High: 12.200 | Daily Low: 11.950 |
| Opening Price: 12.050 | Volume: 52,300 |
| Annual High: 12.400 | Annual Low: 1.800 |
| Dividend: 0.000 | Earnings/Share: -2.37 |
| Previous Close: 12.400 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 1.21 |

Last Trade Date/Time: 13:37

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

 **sheets**
where markets are made



QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

 **Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

**Enter Symbol:**

[Quote] [Go]

**Symbol Lookup**





.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   EPTG

**EPTG -- EPL Technologies, Inc.**
Com ($0.001)
Primary Venue: Pink Sheets

**Best Bid: 0.04 (5000 shares)**              **Best Ask: 0.05 (5000 shares) ***
Date/Time of Last Inside Change: 08:07         * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**
Last Sale: 0.0400                          Change: pc
Percent Change: N/A                        Tick: Down
Daily High: 0                              Daily Low: 0
Opening Price: 0                           Volume: 0
Annual High: 0.1400                        Annual Low: 0.0030
Dividend: 0.000                            Earnings/Share: -0.62
Previous Close: 0.0400                     P/E ratio: N/A
Yield: 0.00

                                           Beta Coefficient: 1.08

Last Trade Date/Time: 06/19/2003
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

## sheets
### where markets are made



QUOTES & DATA    INVESTORS    ISSUERS    TRADERS    PRODUCTS & SERVICES    ABOUT

**Enter Symbol:**

[          ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

### Make Your Company's Inside and Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: **COMPANY INFORMATION**   .: NEWS   .: SEC **FILINGS**   .: **FINANCIAL REPORTS**

Home >>   Quotes & Data >>   Quote >>   FTGX

OTC ELITE LISTS
SEC Info Firms
ADRs
Bonds & Trusts

OTC MARKET DATA

OTC ISSUES WITH

## FTGX -- FiberNet Telecom Group, Inc.
Com ($0.001)(New)
Primary Venue: Nasdaq Small-Cap

### TRADE DATA

| | |
|---|---|
| Best Bid: 1.17 | Best Ask: 1.18 |
| Last Sale: 1.17 | Change: -0.02 |
| Percent Change: -1.68 | Tick: Unch |
| Daily High: 1.24 | Daily Low: 1.16 |
| Opening Price: 1.23 | Volume: 69,100 |
| Annual High: 6.54 | Annual Low: 0.89 |
| Dividend: 0.000 | Earnings/Share: -4.15 |
| Previous Close: 1.19 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.78 |

Last Trade Date/Time: 13:41

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?




**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

Quote [Go]

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   FFIRD

### FFIRD -- Fidelity First Financial Corp.
Com ($0.0015) (New)
Primary Venue: Pink Sheets

**Best Bid: Unpriced**                          **Best Ask: Unpriced**
**TRADE DATA**
Last Sale: 6.500                                 Change: pc
Percent Change: N/A                              Tick: Down
Daily High: 0                                    Daily Low: 0
Opening Price: 0                                 Volume: 0
Annual High: 8.500                               Annual Low: 0.510
Dividend: 0.000                                  Earnings/Share: 0.00
Previous Close: 6.500                            P/E ratio: N/A
Yield: 0.00

                                                 Beta Coefficient: 1.04

Last Trade Date/Time: 06/06/2003
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[        ] Go

[Quote ▼]

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE  .: CHART  .: COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   ILCD

## ILCD -- International Travel CD's, Inc.

Com ($0.001)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**

**Best Ask: Unpriced**

**TRADE DATA**

| | |
|---|---|
| Best Bid: 1.25 | Best Ask: 1.60 |
| Last Sale: 1.50 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 4.50 | Annual Low: 1.01 |
| Dividend: 0.000 | Earnings/Share: -0.02 |
| Previous Close: 1.50 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.00 |

Last Trade Date/Time: 06/20/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



## sheets
### where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

Go

Quote

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   LSTTA

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Day's Greatest
Volatility Indexes
Trader's Rankings
Short List
Bond List

OTC ISSUES WITH
Real Time Level II

### LSTTA -- Liberty Satellite & Technology, Inc.
Series A Com ($1)(New)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**

**Best Ask: Unpriced**

**TRADE DATA**

| | |
|---|---|
| Best Bid: 2.250 | Best Ask: 2.350 |
| Last Sale: 2.250 | Change: +0.050 |
| Percent Change: +2.27 | Tick: Up |
| Daily High: 2.300 | Daily Low: 2.250 |
| Opening Price: 2.250 | Volume: 1,300 |
| Annual High: 3.100 | Annual Low: 1.000 |
| Dividend: 0.000 | Earnings/Share: -6.38 |
| Previous Close: 2.200 | P/E ratio: N/A |
| Yield: 0.00 | |

News

Last Trade Date/Time: 13:36

Beta Coefficient: 1.06

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

**sheets**
where markets are made

QUOTES & DATA     INVESTORS     ISSUERS     TRADERS     PRODUCTS & SERVICES     ABOUT

**Enter Symbol:**

[ Quote ]     Go

**Symbol Lookup**

Make Your Company's Inside and
Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   LHFF

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Day Change
Volume Change
Trade Count Leaders
Closing Inside Leaders
Share List
Bond List

OTC ISSUES WITH
Real-Time Level II

**LHFF -- Lighthouse Fast Ferry, Inc.**
Com (1 Cent)
Primary Venue: Pink Sheets

**Best Bid: 0.05 (5000 shares)**          **Best Ask: 0.14 (5000 shares) ***
Date/Time of Last Inside Change: 07:37     * Quoted on the Pink Sheets

Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.05 | Change: -- |
| Percent Change: +0.00 | Tick: Down |
| Daily High: 0.05 | Daily Low: 0.05 |
| Opening Price: 0.05 | Volume: 10,000 |
| Annual High: 1.09 | Annual Low: 0.03 |
| Dividend: 0.000 | Earnings/Share: -0.97 |
| Previous Close: 0.05 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.69 |

Last Trade Date/Time: 10:24

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information | Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT



**Enter Symbol:**

[ ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

Make Your Company's Inside and Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE  .: CHART  : COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>  Quotes & Data >>  Quote >>  LNSG

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trust

OTC MARKET DATA
Daily Change
Value Change
Trading Volume
Cum. Volume Leaders
Stock List
Bond List

OTC ISSUES WITH
Real-Time Level II

## LNSG -- Lionshare Group, Inc. (The)
Com ($0.0001)(New)
Primary Venue: Other OTC

**TRADE DATA**

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 0.0001 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 1.3000 | Annual Low: 0.0001 |
| Dividend: 0.000 | Earnings/Share: -0.06 |
| Previous Close: 0.0001 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 1.67 |

Last Trade Date/Time: 06/12/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

## sheets
### where markets are made

QUOTES & DATA   INVESTORS   ISSUERS   TRADERS   PRODUCTS & SERVICES   ABOUT

**Enter Symbol:**

[          ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   GML

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Daily Gainers
Value Gainers
Trading Markets
Quote Summary Updates
Stock List
Bond List

OTC ISSUES WITH
Real-Time Level II

### GML -- Magic Lantern Group, Inc.
Com (1 Cent)
Primary Venue: Amex

**TRADE DATA**

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 0.92 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 1.75 | Annual Low: 0.25 |
| Dividend: 0.000 | Earnings/Share: -0.09 |
| Previous Close: 0.92 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.47 |

Last Trade Date/Time: 06/20/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information | Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

# sheets
### where markets are made

QUOTES & DATA    INVESTORS    ISSUERS    TRADERS    PRODUCTS & SERVICES    ABOUT

**Enter Symbol:**

[          ] **Go**

[ Quote ▾ ]

**Symbol Lookup**

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>    Quotes & Data >>    Quote >>    MHTX

## MHTX -- Manhattan Scientifics, Inc.
Com ($0.001)
Primary Venue: Pink Sheets

**Best Bid: 0.065 (5000 shares)**          **Best Ask: 0.068 (5000 shares) ***

Date/Time of Last Inside Change: 12:32          * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.0680 | Change: +0.0030 |
| Percent Change: +4.62 | Tick: Down |
| Daily High: 0.0700 | Daily Low: 0.0650 |
| Opening Price: 0.0680 | Volume: 155,800 |
| Annual High: 0.2500 | Annual Low: 0.0200 |
| Dividend: 0.000 | Earnings/Share: -0.03 |
| Previous Close: 0.0650 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.49 |

Last Trade Date/Time: 13:12

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[_____] **Go**

[Quote ▼]

**Symbol Lookup**




**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE  .: CHART  : COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   MHTD

**MHTD -- Method Products Corp.**
Com ($0.0001)(New)
Primary Venue: Pink Sheets

**Best Bid: 0.015 (5000 shares)**          **Best Ask: 0.025 (5000 shares) ***
Date/Time of Last Inside Change: 07:39          * Quoted on the Pink Sheets

 Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.011 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 6.000 | Annual Low: 0.010 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 0.011 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.00 |

Last Trade Date/Time: 05/21/2003
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

# sheets
### where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[　　　　] **Go**

[ Quote ▼ ]

**Symbol Lookup**



## Make Your Company's Inside and Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE  .: CHART  .: COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   NYER

## NYER -- Nyer Medical Group, Inc.
Com ($0.0001)
Primary Venue: Nasdaq Small-Cap

### TRADE DATA

| | |
|---|---|
| Best Bid: 1.32 | Best Ask: 1.43 |
| Last Sale: 1.44 | Change: +0.04 |
| Percent Change: +2.86 | Tick: Unch |
| Daily High: 1.44 | Daily Low: 1.31 |
| Opening Price: 1.31 | Volume: 5,500 |
| Annual High: 2.40 | Annual Low: 0.40 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 1.40 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.40 |

Last Trade Date/Time: 13:02

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information | Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[          ] Go

Quote

**Symbol Lookup**



Make Your Company's Inside and
Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC
FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   PCFC







### PCFC -- Pioneer Commercial Funding Corp.
Com (1 Cent)
Primary Venue: Pink Sheets

**Best Bid: 1.30 (500 shares)**          **Best Ask: 4.00 (500 shares) ***
Date/Time of Last Inside Change: 07:31     * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 1.050 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 2.500 | Annual Low: 0.900 |
| Dividend: 0.000 | Earnings/Share: -0.26 |
| Previous Close: 1.050 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.86 |

Last Trade Date/Time: 04/03/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between
8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-
time level two quotes so you can view free real-time inside and level two quotes in
their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  │  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?



**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE  .: CHART  .: COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   RELM





### RELM -- RELM Wireless Corp.
Com (60 Cents)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                    **Best Ask: Unpriced**

**TRADE DATA**

| | |
|---|---|
| Best Bid: 0.67 | Best Ask: 0.69 |
| Last Sale: 0.67 | Change: -0.03 |
| Percent Change: -4.29 | Tick: Down |
| Daily High: 0.67 | Daily Low: 0.67 |
| Opening Price: 0.67 | Volume: 6,100 |
| Annual High: 0.86 | Annual Low: 0.15 |
| Dividend: 0.000 | Earnings/Share: -0.35 |
| Previous Close: 0.70 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.67 |

Last Trade Date/Time: 13:07

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[        ] **Go**

[ Quote ▼ ]

**Symbol Lookup**

Make Your Company's Inside and Level II Quote Montage Available Free to Investors
ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>      Quotes & Data >>      Quote >>      SMXP

### SMXP -- SMX Corp.
Com
Primary Venue: Pink Sheets

**Best Bid: 0.65 (2500 shares)**                **Best Ask: 1.10 (500 shares) ***
Date/Time of Last Inside Change: 09:27         * Quoted on the Pink Sheets

  Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.650 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 7.000 | Annual Low: 0.650 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 0.650 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 1.05 |

Last Trade Date/Time: 06/04/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA   INVESTORS   ISSUERS   TRADERS   PRODUCTS & SERVICES   ABOUT

**Enter Symbol:**

Go

Quote

**Symbol Lookup**



**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   SMXT

### SMXT -- SIMEX Technologies, Inc.
Com ($0.001)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                    **Best Ask: Unpriced**

**TRADE DATA**

| | |
|---|---|
| Best Bid: 0.51 | Best Ask: 0.68 |
| Last Sale: 0.65 | Change: +0.14 |
| Percent Change: +27.45 | Tick: Up |
| Daily High: 0.85 | Daily Low: 0.65 |
| Opening Price: 0.77 | Volume: 33,000 |
| Annual High: 0.75 | Annual Low: 0.05 |
| Dividend: 0.000 | Earnings/Share: -0.25 |
| Previous Close: 0.51 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.52 |

Last Trade Date/Time: 13:20
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  │  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information | Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[        ] Go

[ Quote ]

**Symbol Lookup**





## Make Your Company's Inside and Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   STG

### STG -- Stonepath Group, Inc.
Com ($0.001)
Primary Venue: Amex

**TRADE DATA**

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 2.65 | Change: -0.05 |
| Percent Change: -1.85 | Tick: Up |
| Daily High: 2.70 | Daily Low: 2.58 |
| Opening Price: 2.70 | Volume: 72,600 |
| Annual High: 2.85 | Annual Low: 0.95 |
| Dividend: 0.000 | Earnings/Share: 0.22 |
| Previous Close: 2.70 | P/E ratio: 12.05 |
| Yield: 0.00 | |
| News | Beta Coefficient: 0.95 |

Last Trade Date/Time: 13:36

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

**Go**

[ Quote ▼ ]

**Symbol Lookup**



**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   | COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>     Quotes & Data >>     Quote >>     SURE

## SURE -- SureBeam Corp.
Class A Com ($0.001)
Primary Venue: Nasdaq National Market

### TRADE DATA

| | |
|---|---|
| Best Bid: 2.56 | Best Ask: 2.57 |
| Last Sale: 2.56 | Change: -0.11 |
| Percent Change: -4.12 | Tick: Down |
| Daily High: 2.67 | Daily Low: 2.54 |
| Opening Price: 2.65 | Volume: 400,400 |
| Annual High: 6.65 | Annual Low: 1.46 |
| Dividend: 0.000 | Earnings/Share: -0.47 |
| Previous Close: 2.67 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.93 |

Last Trade Date/Time: 13:46

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?





**Enter Symbol:**

Go

Quote ▾

**Symbol Lookup**



ADVERTISEMENT

.: QUOTE  .: CHART  : COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   TTN

### TTN -- Titan Corp. (The)
Com ($1)
Primary Venue: NYSE

**TRADE DATA**

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 10.10 | Change: -0.35 |
| Percent Change: -3.35 | Tick: Up |
| Daily High: 10.38 | Daily Low: 10.02 |
| Opening Price: 10.25 | Volume: 374,100 |
| Annual High: 16.29 | Annual Low: 6.80 |
| Dividend: 0.000 | Earnings/Share: -2.97 |
| Previous Close: 10.45 | P/E ratio: N/A |
| Yield: 0.00 | |
| News | Beta Coefficient: 1.06 |

Last Trade Date/Time: 13:41

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?

**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT



**Enter Symbol:**

[ ] **Go**

Quote ▾

**Symbol Lookup**

OTC ELITE LISTS
SEC Reporting
ADRs
Banks & Trusts

OTC MARKET DATA
Daily Changes
Most Active
Total Overall Volume
Stock of the Month
Bond List

OTC ISSUED WITH
...a Pink Level...

**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE    .: CHART    .: COMPANY INFORMATION    .: NEWS    .: SEC FILINGS    .: FINANCIAL REPORTS

Home >>    Quotes & Data >>    Quote >>    TFGP

### TFGP -- Total Film Group Inc.
Com ($0.001)
Primary Venue: Pink Sheets

**Best Bid: 0.11 (5000 shares)**           **Best Ask: 0.61 (2500 shares) ***
Date/Time of Last Inside Change: 10:03      * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 0.200 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 1.010 | Annual Low: 0.050 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 0.200 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.51 |

Last Trade Date/Time: 06/02/2003
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



# sheets
### where markets are made

**QUOTES & DATA** | **INVESTORS** | **ISSUERS** | **TRADERS** | **PRODUCTS & SERVICES** | **ABOUT**

**Enter Symbol:**

[_____] **Go**

[Quote ▼]

**Symbol Lookup**





**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   TCHSF

## TCHSF -- Touchstone Resources Ltd.
Com (No Par)(New)
Primary Venue: Other OTC

### TRADE DATA

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 0.3000 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 1.8200 | Annual Low: 0.0950 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 0.3000 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.98 |

Last Trade Date/Time: 06/18/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[ Go ]

| Quote ▾ |

**Symbol Lookup**





Make Your Company's Inside and
Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE  .: CHART  .: COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   UGSI

## UGSI -- Underground Solutions, Inc.

Com ($0.001)
Primary Venue: Pink Sheets

**Best Bid: 0.30 (5000 shares)**          **Best Ask: 0.39 (5000 shares) ***
Date/Time of Last Inside Change: 07:32    * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

Last Sale: 0.3000                         Change: pc
Percent Change: N/A                       Tick: Down
Daily High: 0                             Daily Low: 0
Opening Price: 0                          Volume: 0
Annual High: 0.5100                       Annual Low: 0.0600
Dividend: 0.000                           Earnings/Share: 0.00
Previous Close: 0.3000                    P/E ratio: N/A
Yield: 0.00

                                          Beta Coefficient: 0.47

Last Trade Date/Time: 06/20/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?



**sheets**
where markets are made

QUOTES & DATA   INVESTORS   ISSUERS   TRADERS   PRODUCTS & SERVICES   ABOUT

**Enter Symbol:**

[        ] **Go**

[ Quote ▼ ]

**Symbol Lookup**



**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   UVIH

## UVIH -- Universal Insurance Holdings, Inc.

Com (1 Cent)
Primary Venue: Dually Quoted on Pink Sheets and OTC Bulletin Board

**Best Bid: Unpriced**                          **Best Ask: Unpriced**
**TRADE DATA**
Best Bid: 0.0200                                 Best Ask: 0.0500
Last Sale: 0.0200                                Change: pc
Percent Change: N/A                              Tick: Up
Daily High: 0                                    Daily Low: 0
Opening Price: 0                                 Volume: 0
Annual High: 0.1500                              Annual Low: 0.0030
Dividend: 0.000                                  Earnings/Share: -0.01
Previous Close: 0.0200                           P/E ratio: N/A
Yield: 0.00

                                                 Beta Coefficient: 0.59

Last Trade Date/Time: 06/18/2003
*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?



## sheets
### where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[          ] **Go**

[ Quote ▾ ]

**Symbol Lookup**







Make Your Company's Inside and
Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   XWC

## XWC -- World Wireless Communications Inc.
Com ($0.001)
Primary Venue: Amex

### TRADE DATA

| | |
|---|---|
| Best Bid: N/A | Best Ask: N/A |
| Last Sale: 0.18 | Change: +0.01 |
| Percent Change: +5.88 | Tick: Up |
| Daily High: 0.18 | Daily Low: 0.16 |
| Opening Price: 0.17 | Volume: 248,300 |
| Annual High: 0.33 | Annual Low: 0.06 |
| Dividend: 0.000 | Earnings/Share: -0.31 |
| Previous Close: 0.17 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.67 |

Last Trade Date/Time: 13:42

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and
Privacy Statement.

Comments or Suggestions?



## sheets
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[          ] Go

[Quote ▼]

**Symbol Lookup**



**Make Your Company's Inside and Level II Quote Montage Available Free to Investors**

ADVERTISEMENT

.: QUOTE  .: CHART  .: COMPANY INFORMATION  .: NEWS  .: SEC FILINGS  .: FINANCIAL REPORTS

Home >>  Quotes & Data >>  Quote >>  XTRD

### XTRD -- XtraCard Corp.
Com ($0.001)
Primary Venue: Pink Sheets

**Best Bid: 1.05 (500 shares)**          **Best Ask: 1.50 (500 shares) ***

Date/Time of Last Inside Change: 07:45          * Quoted on the Pink Sheets

■ Want real-time level two quotes in this security?

**TRADE DATA**

| | |
|---|---|
| Last Sale: 1.450 | Change: pc |
| Percent Change: N/A | Tick: Down |
| Daily High: 0 | Daily Low: 0 |
| Opening Price: 0 | Volume: 0 |
| Annual High: 8.000 | Annual Low: 1.010 |
| Dividend: 0.000 | Earnings/Share: 0.00 |
| Previous Close: 1.450 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.49 |

Last Trade Date/Time: 06/18/2003

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information |
Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?





**Enter Symbol:**

Go

Quote

**Symbol Lookup**



Make Your Company's Inside and
Level II Quote Montage Available Free to Investors

ADVERTISEMENT

.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   ZICA

## ZICA -- Zi Corp.
Com (No Par)
Primary Venue: Nasdaq National Market





**TRADE DATA**

| | |
|---|---|
| Best Bid: 3.63 | Best Ask: 3.65 |
| Last Sale: 3.63 | Change: -- |
| Percent Change: +0.00 | Tick: Down |
| Daily High: 3.83 | Daily Low: 3.60 |
| Opening Price: 3.63 | Volume: 63,000 |
| Annual High: 5.15 | Annual Low: 1.42 |
| Dividend: 0.000 | Earnings/Share: -0.95 |
| Previous Close: 3.63 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.97 |

Last Trade Date/Time: 13:38

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*

Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map
Quotes & Data | Investor Information | Issuer Information | Trader Information | Products & Services

© Copyright 2003, Pink Sheets LLC. All Rights Reserved.
Please read our Terms of Service, Linking & Framing Terms, Trademarks, and Privacy Statement.

Comments or Suggestions?

Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 458 of 510



**sheets**
where markets are made

QUOTES & DATA | INVESTORS | ISSUERS | TRADERS | PRODUCTS & SERVICES | ABOUT

**Enter Symbol:**

[ Quote ]  Go

**Symbol Lookup**



ADVERTISEMENT





.: QUOTE   .: CHART   .: COMPANY INFORMATION   .: NEWS   .: SEC FILINGS   .: FINANCIAL REPORTS

Home >>   Quotes & Data >>   Quote >>   USPL

### USPL -- U.S. Plastic Lumber Corp.
Com (0.0001)
Primary Venue: OTC Bulletin Board

**TRADE DATA**

| | |
|---|---|
| Best Bid: 0.18 | Best Ask: 0.21 |
| Last Sale: 0.18 | Change: -- |
| Percent Change: +0.00 | Tick: Down |
| Daily High: 0.21 | Daily Low: 0.18 |
| Opening Price: 0.18 | Volume: 42,400 |
| Annual High: 0.42 | Annual Low: 0.08 |
| Dividend: 0.000 | Earnings/Share: -0.28 |
| Previous Close: 0.18 | P/E ratio: N/A |
| Yield: 0.00 | |
| | Beta Coefficient: 0.99 |

**Last Trade Date/Time:** 14:59

*Trade data is delayed at least 15 minutes. Best Bid and Ask reflect prices between 8:00am and 4:00pm EST, after these hours the best Bid and Ask at 4pm is shown.*

*If you are an investor in a Pink Sheets quoted company, tell them to sign up for real-time level two quotes so you can view free real-time inside and level two quotes in their stock. Otherwise you can always subscribe to our www.OTCQuote.com product.*



Risk Warning  |  Contact Regulators

Home | About Us | Contact Us | Help | Glossary | Site Map

`<HELP> for explanation.`                              P060 **Equity CACS**

| Output Results To ▾ | | | CORPORATE ACTION CALENDAR | |
|---|---|---|---|---|

**Aura Systems Inc**                              Page    1/1
**AURA US**                   Action Type ▉

Date Type: **E** Effective Date          Date Range **1/ 1/00** -- **6/23/03**

| Date | * | Type of Action | Summary |
|---|---|---|---|
| 1) 6/19/03 |   | Ticker Symbol Change | AURA US   => AURAE US |
| 2) 10/ 2/01 | * | Corporate Meeting | Annual Shareholder |
| 3) 2/ 1/01 |   | Change in Listing | OTC US ==> OTC BB |
| 4) 1/ 9/01 |   | Corporate Meeting | Annual Shareholder |
| 5) 1/ 9/01 |   | Corporate Meeting | Annual Shareholder |
| 6) 3/ 6/00 |   | Corporate Meeting | Annual Shareholder |
| 7) 2/25/00 |   | Corporate Meeting | Annual Shareholder |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:11:38

**Bloomberg**
PROFESSIONAL


EXHIBIT
C

<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
|---|---|

**Biometrics Security Technology**          Page    1/2
**AUGC US**                          Action Type ▮

Date Type: ▮ Effective Date        Date Range ▮1/ 1/00▮ -- ▮6/23/03▮

| | Date | ✱ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 5/23/03 | | Equity Delisting | Equity Delisting |
| 2) | 5/23/03 | | Change in Listing | OTC BB ==> OTC US |
| 3) | 5/23/03 | | Ticker Symbol Change | BMTSE US  => BMTS US |
| 4) | 4/23/03 | | Ticker Symbol Change | BMTS US   => BMTSE US |
| 5) | 12/27/02 | | ID Number Change | WPK:907044=>164665 |
| 6) | 12/20/02 | | ID Number Change | CUSIP:05103B10=>09062310 |
| 7) | 12/20/02 | | Ticker Symbol Change | AUGC US   => BMTS US |
| 8) | 12/20/02 | | Name Change | AUG Corp ==>Biometrics Security Tec |
| 9) | 5/13/02 | | Equity Delisting | Equity Delisting |
| 10) | 12/28/01 | ✱ | Acquisition | Target: SyntheSys Secure Tech |
| 11) | 10/31/01 | | Ticker Symbol Change | AUGNW US  => AUGCW US |
| 12) | 10/30/01 | | ID Number Change | CUSIP:05105B11=>05103B115 |
| 13) | 10/29/01 | | ID Number Change | SEDOL:2724148=>2813303 |
| 14) | 10/29/01 | | Warrant Terms Change | Security:Biometrics Security,Reason |
| 15) | 10/29/01 | | Stock Split    :Split | Security: BMTS US |

✱ - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:10:16



&lt;HELP&gt; for explanation.                                    P060 **Equity** CACS

| Output Results To | ▾ | CORPORATE ACTION CALENDAR |
|---|---|---|

## Biometrics Security Technology                    Page    2/2
## AUGC US                                Action Type  ■

Date Type: **E** Effective Date        Date Range  **1/ 1/00** -- **6/23/03**

| | Date | ＊ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 10/29/01 | | Name Change | Augment Systems Inc ==>AUG Corp |
| 2) | 10/29/01 | | ID Number Change | CUSIP:05105B20=>051038107 |
| 3) | 10/29/01 | | Ticker Symbol Change | AUGN US    => AUGC US |
| 4) | 2/ 8/01 | | Stock Split      :Split | Security: BMTS US |
| 5) | 2/ 8/01 | | ID Number Change | CUSIP:05105B10=>05105B20 |
| 6) | 2/ 8/01 | | Ticker Symbol Change | AUGS US    => AUGN US |
| 7) | 2/ 8/01 | | Ticker Symbol Change | AUGWE US   => AUGNW US |
| 8) | 7/25/00 | | Change in Listing | OTC  US ==> OTC BB |
| 9) | 6/ 5/00 | | Ticker Symbol Change | AUGSE US   => AUGS US |
| 10) | 6/ 1/00 | | Change in Listing | OTC BB ==> OTC  US |
| 11) | 6/ 1/00 | | Equity Delisting | Equity Delisting |
| 12) | 6/ 1/00 | | Equity Delisting | Equity Delisting |
| 13) | 4/27/00 | | Ticker Symbol Change | AUGS US    => AUGSE US |
| 14) | 4/27/00 | | Ticker Symbol Change | AUGSW US   => AUGWE US |
| 15) | 3/21/00 | | Ticker Symbol Change | AUGSE US   => AUGS US |

＊ - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:10:31



<HELP> for explanation.                                          N170 **Equity CACS**
NO FIELDS ENTERED. USE #<GO> FOR DETAILS.

| Output Results To | ▼ | CORPORATE ACTION CALENDAR |
|---|---|---|

**Centrack International Inc**                    Page    1/1
**CENK US**                          Action Type ▮

Date Type: ▣ Effective Date        Date Range  1/ 0/00 -- 6/25/04

| Date | * | Type of Action | Summary |
|---|---|---|---|
|  |  |  |  |

             * - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500      Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                                        G778-658-0 25-Jun-03 10:55:41



&lt;HELP&gt; for explanation.                                    P060 Equity **CACS**

| Output Results To | ▾ | | CORPORATE ACTION CALENDAR |

# Continental Southern Resources
## CSOR US
Page  1/1

Action Type ▮

Date Type: ▮ Effective Date        Date Range ▮1/ 1/00▮ -- ▮6/23/04▮

| | Date | ✳ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 4/24/03 | | Ticker Symbol Change | CSORE US  => CSOR US |
| 2) | 4/23/03 | | Ticker Symbol Change | CSOR US  => CSORE US |
| 3) | 6/ 3/02 | | ID Number Change | SEDOL:2826572=>2955409 |
| 4) | 6/ 3/02 | | Stock Split      :Split | Security: CSOR US |
| 5) | 6/ 3/02 | | ID Number Change | CUSIP:30218T10=>21206610 |
| 6) | 6/ 3/02 | | Ticker Symbol Change | EXPGE US  => CSOR US |
| 7) | 6/ 3/02 | | Name Change | Expressions Graphics Inc ==>Contine |
| 8) | 5/28/02 | | Ticker Symbol Change | EXPG US  => EXPGE US |
| 9) | 1/ 4/02 | | Stock Split      :Split | Security: CSOR US |
| 10) | 12/10/01 | | Change in Listing | OTC  US ==> OTC BB |
| 11) | 10/16/01 | | Equity Listing | Equity listing |

✳ - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:33:18



\<HELP\> for explanation.                                          P060 **Equity CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |

## Control Chief Holdings Inc                    Page    1/2
## DIGM US                          Action Type ▮

Date Type: **E** Effective Date          Date Range **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 12/ 2/02 | | Ticker Symbol Change | DIGMD US  => DIGM US |
| 2) | 11/ 5/02 | | Equity Delisting | Equity Delisting |
| 3) | 11/ 4/02 | | Change in Listing | NASDAQ Sm-Cp ==> OTC  US |
| 4) | 11/ 4/02 | | Equity Delisting | Equity Delisting |
| 5) | 11/ 1/02 | | ID Number Change | WPK:925029=>765941 |
| 6) | 11/ 1/02 | | ID Number Change | WPK:925029=>765941 |
| 7) | 11/ 1/02 | | ID Number Change | SEDOL:2224325=>2061674 |
| 8) | 11/ 1/02 | | ID Number Change | CUSIP:21234310=>21234320 |
| 9) | 11/ 1/02 | | Stock Split    :Split | Security: CNF GR |
| 10) | 11/ 1/02 | | Stock Split    :Split | Security: DIGM US |
| 11) | 11/ 1/02 | | ID Number Change | CUSIP:21234310=>21234320 |
| 12) | 11/ 1/02 | | Ticker Symbol Change | DIGM US  => DIGMD US |
| 13) | 10/29/02 | | Corporate Meeting | Annual Shareholder |
| 14) | 5/25/01 | | Corporate Meeting | Annual Shareholder |
| 15) | 3/ 1/01 | | Cash Dividend   :Reg. Cash | Security: DIGM US |

* - Amended (See Details)

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:25:51



<HELP> for explanation.                                      P060 **Equity CACS**

| Output Results To | ▼ | CORPORATE ACTION CALENDAR |

# Control Chief Holdings Inc        Page    2/2
# DIGM US                           Action Type ■

Date Type: ▣ Effective Date        Date Range  1/ 1/00 -- 6/23/04

| Date | ✱ | Type of Action | Summary |
|------|---|----------------|---------|
| 1) 9/ 6/00 | | Cash Dividend   :Reg. Cash | Security: DIGM US |
| 2) 6/29/00 | | Fiscal Year End Change | See Details. |

            ✱ - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                        G646-658-0 23-Jun-03 12:26:06



<HELP> for explanation.                                    P060 Equity **CACS**

| | Output Results To | | CORPORATE ACTION CALENDAR |
|---|---|---|---|

## Corpas Holdings Inc
## CPHG US

Action Type ▮                        Page    1/1

Date Type: **E** Effective Date       Date Range **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 3/26/02 | | ID Number Change | CUSIP:21986N20=>21986T10 |
| 2) | 3/26/02 | | Ticker Symbol Change | CPAS US    => CPHG US |
| 3) | 3/26/02 | | Name Change | Corpas Investments Inc ==>Corpas Ho |
| 4) | 3/26/02 | | Stock Split      :Split | Security: CPHG US |
| 5) | 1/23/02 | * | Ticker Symbol Change | CPIM US    => CPAS US |
| 6) | 1/22/02 | * | Stock Split      :Split | Security: CPHG US |
| 7) | 1/22/02 | | ID Number Change | CUSIP:21986N10=>21986N20 |
| 8) | 5/24/01 | | Ticker Symbol Change | CPIME US   => CPIM US |
| 9) | 5/23/01 | | Change in Listing | OTC BB ==> OTC  US |
| 10) | 5/23/01 | | Equity Delisting | Equity Delisting |
| 11) | 4/23/01 | | Ticker Symbol Change | CPIM US    => CPIME US |
| 12) | 4/21/00 | | Corporate Meeting | Extraordinary Shareholder |
| 13) | 3/ 6/00 | * | Acquisition | Target: Planet Extreme Ltd In |

* - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:35:17



`<HELP> for explanation.`                                    P060 **Equity CACS**

| | Output Results To | | CORPORATE ACTION CALENDAR | |
|---|---|---|---|---|

# Cross Media Marketing Corp                    Page   1/2
# XMM US                                Action Type ▮

Date Type: ▮ Effective Date          Date Range  1/ 1/00  --  6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 6/17/03 | | Bankruptcy Filing | Chapter 11 |
| 2) | 7/25/02 | * | Class Action | Securities Class Action |
| 3) | 5/29/02 | * | Acquisition | Target: JWE Enterprises |
| 4) | 1/15/02 | * | Acquisition | Target: National Syndications |
| 5) | 10/26/01 | | ID Number Change | WPK:924051=>763998 |
| 6) | 10/25/01 | | Stock Split    :Split | Security: SY6 GR |
| 7) | 10/25/01 | | ID Number Change | SEDOL:2492898=>2813024 |
| 8) | 10/25/01 | | ID Number Change | CUSIP:22754R10=>22754R201 |
| 9) | 10/25/01 | * | Stock Buyback :Open Market | Buyback: 3.000MLN |
| 10) | 10/25/01 | | ID Number Change | CUSIP:22754R10=>22754R201 |
| 11) | 10/25/01 | | Stock Split    :Split | Security: XMM US |
| 12) | 10/25/01 | * | Acquisition | Target: LifeMinders Inc |
| 13) | 6/ 6/01 | | Corporate Meeting | Annual Shareholder |
| 14) | 2/ 1/01 | * | Acquisition | Target: National Syndications |
| 15) | 1/ 4/01 | | ID Number Change | CUSIP:87155Q20=>22754R10 |

* - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500        Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:15:43



<HELP> for explanation.                                    P060 **Equity** CACS

| Output Results To | ▼ | CORPORATE ACTION CALENDAR |

## Cross Media Marketing Corp                    Page    2/2
## XMM US                                  Action Type ▊

Date Type: ▊ Effective Date          Date Range 1/ 1/00 -- 6/23/04

| | Date | ✱ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 12/29/00 | | ID Number Change | SEDOL:2713793=>2492898 |
| 2) | 12/29/00 | | ID Number Change | CUSIP:87155Q20=>22754R10 |
| 3) | 12/29/00 | | Ticker Symbol Change | SSM US    => XMM US |
| 4) | 12/29/00 | | Name Change | Symposium Corp ==>Cross Media Marke |
| 5) | 12/28/00 | | Corporate Meeting | Extraordinary Shareholder |
| 6) | 12/28/00 | | Corporate Meeting | Extraordinary Shareholder |
| 7) | 12/11/00 | | Equity Listing | Equity listing |
| 8) | 12/ 4/00 | ✱ | Acquisition | Target: WeFusion.com Inc |
| 9) | 9/15/00 | | Corporate Meeting | Annual Shareholder |
| 10) | 8/ 1/00 | | Ticker Symbol Change | SYPM US    => SSM US |
| 11) | 8/ 1/00 | | Change in Listing | OTC BB ==> American |
| 12) | 3/28/00 | | Corporate Meeting | Annual Shareholder |

✱ - Amended (See Details)



<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To | CORPORATE ACTION CALENDAR |
|---|---|

# Cytomedix Inc/Old
**CYME US**                          Action Type ▮        Page    1/1

Date Type: ▣ Effective Date        Date Range  1/ 1/00 -- 6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 1/24/03 | | Change in Listing | OTC  US ==> OTC BB |
| 2) | 7/26/02 | | ID Number Change | SEDOL:2794776=>2971632 |
| 3) | 7/26/02 | | Stock Split      :Split | Security: CYME US |
| 4) | 7/26/02 | | ID Number Change | CUSIP:23283B10=>23283B20 |
| 5) | 7/26/02 | | Ticker Symbol Change | CYDX US   => CYME US |
| 6) | 10/17/01 | | Ticker Symbol Change | CYDXE US  => CYDX US |
| 7) | 10/16/01 | | Change in Listing | OTC BB ==> OTC  US |
| 8) | 10/16/01 | | Equity Delisting | Equity Delisting |
| 9) | 8/27/01 | | Ticker Symbol Change | CYDX US   => CYDXE US |
| 10) | 8/ 7/01 | | Bankruptcy Filing | Chapter 11 |
| 11) | 1/ 2/01 | * | Acquisition | Target: Procuren(R) |
| 12) | 5/ 9/00 | | Change in Listing | OTC  US ==> OTC BB |
| 13) | 4/ 7/00 | | ID Number Change | CUSIP:05280410=>23283B10 |
| 14) | 4/ 7/00 | | Ticker Symbol Change | AWTX US   => CYDX US |
| 15) | 4/ 7/00 | | Name Change | Autologous Wound Therapy Inc ==>Cyt |

* - Amended (See Details)

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                 G646-658-0 23-Jun-03 12:26:27



<HELP> for explanation.                                          P060 **Equity CACS**

| Output Results To | ▾ | CORPORATE ACTION CALENDAR |
|---|---|---|

# Education Lending Group Inc
Page   1/1
# EDLG US
Action Type ▮

Date Type: ▮ Effective Date        Date Range ▮1/ 1/00▮ -- ▮6/23/04▮

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 5/24/02 | | ID Number Change | CUSIP:25456710=>28140A10 |
| 2) | 5/24/02 | | Ticker Symbol Change | DRCT US    => EDLG US |
| 3) | 5/24/02 | | Name Change | Direct III Marketing Inc. ==>Educat |
| 4) | 6/19/01 | * | Acquisition | Target: American Select Insur |
| 5) | 5/16/01 | | Corporate Meeting | Annual Shareholder |
| 6) | 5/ 4/00 | | Ticker Symbol Change | DRCTE US   => DRCT US |
| 7) | 4/24/00 | | Ticker Symbol Change | DRCT US    => DRCTE US |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500      Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:16:44



&lt;HELP&gt; for explanation.                                P060 **Equity CACS**

| Output Results To | ▾ | CORPORATE ACTION CALENDAR |
|---|---|---|

## EPL Technologies Inc                        Page    1/1
## EPTG US                          Action Type ▇

Date Type: **E** Effective Date        Date Range **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 10/ 4/01 | | Ticker Symbol Change | EPTGE US   => EPTG US |
| 2) | 10/ 3/01 | | Change in Listing | OTC BB ==> OTC  US |
| 3) | 10/ 3/01 | | Equity Delisting | Equity Delisting |
| 4) | 8/27/01 | | Ticker Symbol Change | EPTG US    => EPTGE US |
| 5) | 6/28/01 | | Corporate Meeting | Annual Shareholder |
| 6) | 5/14/01 | | Equity Delisting | Equity Delisting |
| 7) | 4/19/01 | | Change in Listing | NASDAQ Sm-Cp ==> OTC BB |
| 8) | 4/19/01 | | Equity Delisting | Equity Delisting |
| 9) | 7/ 6/00 | | Corporate Meeting | Annual Shareholder |
| 10) | 2/14/00 | | Ticker Symbol Change | EPTGC US   => EPTG US |
| 11) | 1/ 4/00 | | Ticker Symbol Change | EPTG US    => EPTGC US |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500       Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:16:20



<HELP> for explanation.                                          P060 **Equity CACS**

| | Output Results To ▼ | | CORPORATE ACTION CALENDAR |
|---|---|---|---|

**Fibernet Telecom Group Inc**       Page   1/2
**FTGX US**      Action Type ▓

Date Type: **E** Effective Date      Date Range **1/ 1/00** -- **6/23/04**

| | Date | ✳ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 6/17/03 | | Stock Buyback :Open Market | Buyback: 3.000MLN |
| 2) | 6/10/03 | | Ticker Symbol Change | FTGXD US  => FTGX US |
| 3) | 5/13/03 | | ID Number Change | CUSIP:31565310=>31565330 |
| 4) | 5/13/03 | | Stock Split  :Split | Security: FTG1 GR |
| 5) | 5/13/03 | | ID Number Change | SEDOL:5972665=>7591035 |
| 6) | 5/13/03 | | ID Number Change | Common:011770088=>016872784 |
| 7) | 5/13/03 | | ID Number Change | Common:011770088=>016872784 |
| 8) | 5/12/03 | | Ticker Symbol Change | FTGX US  => FTGXD US |
| 9) | 5/12/03 | | ID Number Change | CUSIP:31565310=>31565330 |
| 10) | 5/12/03 | | Stock Split  :Split | Security: FTGX US |
| 11) | 5/12/03 | | Ticker Symbol Change | FTG GR  => FTG1 GR |
| 12) | 5/12/03 | | ID Number Change | WPK:912616=>718350 |
| 13) | 5/12/03 | | ID Number Change | SEDOL:2259866=>2660662 |
| 14) | 5/24/02 | | Change in Listing | NASDAQ N-Mkt ==> NASDAQ Sm-Cp |
| 15) | 6/ 5/01 | | Corporate Meeting | Annual Shareholder |

✳ - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:27:57



<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
|---|---|

# Fibernet Telecom Group Inc                    Page   2/2
# FTGX US                         Action Type ▮

Date Type: **E** Effective Date        Date Range **1/ 1/00** -- **6/23/04**

| Date | * | Type of Action | Summary |
|---|---|---|---|
| 1) 8/15/00 | * | Equity Offering | US Equity Offering :ADDL |
| 2) 8/ 3/00 | * | Acquisition | Target: FiberNet Real Estate |
| 3) 7/27/00 | | Corporate Meeting | Annual Shareholder |
| 4) 4/27/00 | | Change in Listing | OTC BB ==> NASDAQ N-Mkt |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:28:06



<HELP> for explanation.                                    N170 **Equity** **CACS**



Output Results To                         CORPORATE ACTION CALENDAR

**Fidelity First Financial**                    Page    1/1
**FFIRD US**                          Action Type ▮

Date Type: ▮ Effective Date        Date Range  1/ 1/00 -- 6/25/04

| Date | * | Type of Action | Summary |
|------|---|----------------|---------|
|      |   |                |         |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                        G778-658-0 25-Jun-03 10:55:07



<HELP> for explanation.                              P060 Equity **CACS**

| Output Results To | CORPORATE ACTION CALENDAR |
| --- | --- |

# International Travel CD's Inc   Page   1/1
# ILCD US                        Action Type ▮

Date Type: ▮ Effective Date       Date Range  1/ 1/00  --  6/23/04

| | Date | * | Type of Action | Summary |
| --- | --- | --- | --- | --- |
| 1) | 3/25/03 | | Ticker Symbol Change | ILCDE US => ILCD US |
| 2) | 2/21/03 | | Ticker Symbol Change | ILCD US => ILCDE US |
| 3) | 11/19/02 | | Ticker Symbol Change | ILCDE US => ILCD US |
| 4) | 10/21/02 | | Ticker Symbol Change | ILCD US => ILCDE US |
| 5) | 10/ 2/02 | * | Acquisition | Target: Metropolitan Recordin |
| 6) | 5/ 2/02 | * | Stock Split    :Split | Security: ILCD US |
| 7) | 9/19/01 | | Equity Listing | Equity listing |

* - Amended (See Details)

Australia 61 2 9977 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                                    G646-658-0 23-Jun-03 12:35:44



&lt;HELP&gt; for explanation.

P060 **Equity CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
|---|---|

# Liberty Satellite & Technology
## LSTTA US

Page 1/2

Action Type ▮

Date Type: ▮ Effective Date    Date Range 1/ 1/00 -- 6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 10/31/03 | * | Acquisition | Target: Astrolink Internation |
| 2) | 4/ 2/03 | | Acquisition | Acquirer: Liberty Media Corp |
| 3) | 11/ 6/02 | | Corporate Meeting | Annual Shareholder |
| 4) | 8/23/02 | | Stock Buyback :Open Market | Buyback: 3,000,000 shares |
| 5) | 4/ 4/02 | | ID Number Change | CUSIP:53118210=>53118230 |
| 6) | 4/ 4/02 | * | ID Number Change | WPK:903956=>570693 |
| 7) | 4/ 4/02 | * | ID Number Change | WPK:903956=>570693 |
| 8) | 4/ 2/02 | | Stock Split      :Split | Security: TS1A GR |
| 9) | 4/ 2/02 | | ID Number Change | SEDOL:2890384=>2866716 |
| 10) | 4/ 2/02 | | ID Number Change | SEDOL:2890395=>2866705 |
| 11) | 4/ 2/02 | | Stock Split      :Split | Security: LSTTB US |
| 12) | 4/ 2/02 | | ID Number Change | CUSIP:53118220=>53118240 |
| 13) | 4/ 2/02 | | Ticker Symbol Change | LSATB US   => LSTTB US |
| 14) | 4/ 2/02 | | ID Number Change | CUSIP:53118210=>53118230 |
| 15) | 4/ 2/02 | | Ticker Symbol Change | LSATA US   => LSTTA US |

* - Amended (See Details)

Australia 61 2 9977 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:36:06



<HELP> for explanation.                                P060 **Equity CACS**

| Output Results To | ▾ | CORPORATE ACTION CALENDAR |

# Liberty Satellite & Technology    Page   2/2
# LSTTA US                          Action Type ▮

Date Type: **E** Effective Date    Date Range **1/ 1/00** -- **6/23/04**

| | Date | ✳ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 4/ 2/02 | | Stock Split     :Split | Security: LSTTA US |
| 2) | 4/ 1/02 | ✳ | Acquisition | Target: Ascent Entertainment |
| 3) | 3/26/02 | | Corporate Meeting | Annual Shareholder |
| 4) | 12/ 3/01 | ✳ | Acquisition | Acquirer: Liberty Media Corp |
| 5) | 8/23/00 | | Equity Listing | Equity listing |
| 6) | 8/21/00 | | ID Number Change | CUSIP:87229820=>53118220 |
| 7) | 8/21/00 | | Ticker Symbol Change | TSATB US   => LSATB US |
| 8) | 8/21/00 | | ID Number Change | CUSIP:87229810=>53118210 |
| 9) | 8/21/00 | | Ticker Symbol Change | TSATA US   => LSATA US |
| 10) | 8/21/00 | | Name Change | TCI SATELLITE ENTMNT GROUP ==>Liber |
| 11) | 8/15/00 | | Corporate Meeting | Annual Shareholder |

✳ - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                              G646-658-0 23-Jun-03 12:36:16



<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
|---|---|

## Lighthouse Fast Ferry Inc                    Page    1/1
## LHFF US                                Action Type ▮

Date Type: ▮ Effective Date        Date Range  1/ 1/00  --  6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 12/30/02 | | Change in Listing | OTC BB ==> OTC  US |
| 2) | 12/30/02 | | Equity Delisting | Equity Delisting |
| 3) | 12/30/02 | | Ticker Symbol Change | LHFFE US  => LHFF US |
| 4) | 11/27/02 | | Ticker Symbol Change | LHFF US   => LHFFE US |
| 5) | 10/ 3/01 | | Corporate Meeting | Annual Shareholder |
| 6) | 3/21/01 | | Change in Listing | OTC  US ==> OTC BB |
| 7) | 10/11/00 | | ID Number Change | CUSIP:53223310=>53223110 |
| 8) | 10/11/00 | | Ticker Symbol Change | LGHT US   => LHFF US |
| 9) | 10/11/00 | | Name Change | LightHouse Landings Inc. ==>Lightho |
| 10) | 1/20/00 | | Equity Delisting | Equity Delisting |
| 11) | 1/20/00 | | Ticker Symbol Change | LGHTE US  => LGHT US |

\* - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:18:36



<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To ▼ | CORPORATE ACTION CALENDAR |

## Lionshare Group Inc/The                    Page    1/1
## LNSG US                           Action Type ▮

Date Type: ▮ Effective Date       Date Range  1/ 1/00  --  6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 8/ 1/02 | | Stock Split      :Split | Security: LNSG US |
| 2) | 8/ 1/02 | | ID Number Change | CUSIP:53626920=>53626930 |
| 3) | 8/ 1/02 | | Ticker Symbol Change | LNSH US    => LNSG US |
| 4) | 6/30/00 | | Ticker Symbol Change | LNSHE US   => LNSH US |
| 5) | 6/28/00 | | Change in Listing | OTC BB ==> OTC  US |
| 6) | 6/28/00 | | Equity Delisting | Equity Delisting |
| 7) | 5/25/00 | | Ticker Symbol Change | LNSH US    => LNSHE US |

            * - Amended (See Details)

Australia 61 2 9777 8600          Brazil 5511 3048 4500      Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                             G646-658-0 23-Jun-03 12:33:45



&lt;HELP&gt; for explanation.                                    P060 **Equity** **CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |

**Magic Lantern Group Inc**                              Page    1/1
**GML  US**                         Action Type ▮

Date Type: ▮ Effective Date      Date Range  1/ 1/00  --  6/23/04

| Date | ✱ | Type of Action | Summary |
|------|---|----------------|---------|
| 1) 11/ 8/02 | | ID Number Change | WPK:883026=>157042 |
| 2) 11/ 8/02 | | ID Number Change | CUSIP:46618R10=>55914110 |
| 3) 11/ 8/02 | | Ticker Symbol Change | JKC US    => GML US |
| 4) 11/ 8/02 | | Name Change | JKC Group Inc ==>Magic Lantern Grou |
| 5) 11/ 7/02 | ✱ | Acquisition | Target: Magic Lantern Communi |
| 6) 11/ 7/02 | | Corporate Meeting | Extraordinary Shareholder |
| 7) 4/18/02 | | ID Number Change | CUSIP:85254210=>46618R10 |
| 8) 4/18/02 | | Ticker Symbol Change | SA US    => JKC US |
| 9) 4/18/02 | | Name Change | Stage II Apparel Corp ==>JKC Group |
| 10) 12/27/01 | | Corporate Meeting | Extraordinary Shareholder |
| 11) 6/16/00 | | Corporate Meeting | Annual Shareholder |

✱ - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:34:05



&lt;HELP&gt; for explanation.                                                P060 **Equity CACS**

```
 Output Results To          ▾        CORPORATE ACTION CALENDAR
Manhattan  Scientifics  Inc                        Page    1/1
MHTX US                        Action Type ▮
   Date Type: ▮ Effective Date      Date Range  1/ 1/00  --  6/23/04
      Date     ✱        Type of Action              Summary
 1)  5/27/03     Equity Delisting         Equity Delisting
 2)  5/27/03     Change in Listing        OTC BB ==> OTC  US
 3)  5/27/03     Ticker Symbol Change     MHTXE US  => MHTX US
 4)  4/24/03     Ticker Symbol Change     MHTX US   => MHTXE US
 5) 12/ 2/02     Divestiture              Unit: Holographic storage pat
 6) 12/ 2/02     Equity Delisting         Equity Delisting
 7)  5/17/01  ✱  Acquisition              Target: Teneo Computing Inc
 8) 12/19/00     Equity Listing           Equity listing
 9) 11/ 8/00     Acquisition              Target: e-Touch(TM) technolog
10) 11/ 8/00     Acquisition              Target: Novint Technologies I
11)  5/24/00     Change in Listing        OTC  US ==> OTC BB
12)  2/10/00     Change in Listing        OTC BB ==> OTC  US
13)  2/10/00     Equity Delisting         Equity Delisting
14)  2/10/00     Ticker Symbol Change     MHTXE US  => MHTX US
15)  1/14/00     Ticker Symbol Change     MHTX US   => MHTXE US
              ✱ - Amended (See Details)
```

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                          G646-658-0 23-Jun-03 12:19:01



<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To | CORPORATE ACTION CALENDAR |
|---|---|

# Method Products Corp
## MHTD US
Action Type ▮                                          Page    1/1

Date Type: **E** Effective Date          Date Range **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 3/29/02 | | Acquisition | Target: DataQuest Technologie |
| 2) | 2/ 4/02 | | ID Number Change | SEDOL:2725635=>2044477 |
| 3) | 2/ 4/02 | | Stock Split       :Split | Security: MHTD US |
| 4) | 2/ 4/02 | | ID Number Change | CUSIP:59151Q10=>59151Q20 |
| 5) | 2/ 4/02 | | Ticker Symbol Change | MTDP US   => MHTD US |
| 6) | 11/21/01 | | Ticker Symbol Change | MTDPE US   => MTDP US |
| 7) | 11/20/01 | | Change in Listing | OTC BB ==> OTC  US |
| 8) | 11/20/01 | | Equity Delisting | Equity Delisting |
| 9) | 10/19/01 | | Ticker Symbol Change | MTDP US   => MTDPE US |
| 10) | 9/ 4/01 | * | Acquisition | Target: Ameritrend Corp |
| 11) | 6/22/01 | | Ticker Symbol Change | MTDPE US   => MTDP US |
| 12) | 5/30/01 | | Ticker Symbol Change | MTDP US   => MTDPE US |
| 13) | 2/ 9/01 | | Change in Listing | OTC  US ==> OTC BB |
| 14) | 2/ 9/01 | * | Equity Listing | Equity listing |

\* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500         Europe 44 20 7330 7500         Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:19:36



&lt;HELP&gt; for explanation.                                    P060 Equity **CACS**

| Output Results To | CORPORATE ACTION CALENDAR |

**Nyer Medical Group Inc**                          Page    1/1
**NYER US**                              Action Type ▇

Date Type: ▇ Effective Date        Date Range  1/ 1/00  --  6/23/04

| | Date | ✱ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 5/12/03 | | Stock Buyback :Open Market | Buyback: 150,000 shares |
| 2) | 12/ 6/02 | | Corporate Meeting | Annual Shareholder |
| 3) | 11/26/01 | | Corporate Meeting | Annual Shareholder |
| 4) | 4/ 3/01 | ✱ | Acquisition | Target: worldhealth.net |
| 5) | 1/12/90 | | Stock Dividend  :Stock Div. | Security: NYR GR |
| 6) | 1/12/00 | ✱ | Stock Dividend  :Stock Div. | Security: NYER US |

✱ - Amended (See Details)

Australia 61 2 9777 8600          Brazil 5511 3048 4500          Europe 44 20 7330 7500          Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                                G646-658-0 23-Jun-03 12:29:33



&lt;HELP&gt; for explanation.                                    P060 **Equity** CACS

| Output Results To ▾ | CORPORATE ACTION CALENDAR |

# Pioneer Commercial Funding
# PCFC US

Page    1/1

Action Type ▉

Date Type: **E** Effective Date         Date Range **1/ 1/00** -- **6/23/04**

| | Date | ✳ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 3/25/03 | | Change in Listing | OTC BB ==> OTC US |
| 2) | 3/25/03 | | Equity Delisting | Equity Delisting |
| 3) | 10/ 9/01 | | Rights Offerings:Rights | Security: PCFC US |
| 4) | 5/21/01 | | Corporate Meeting | Annual Shareholder |
| 5) | 10/31/00 | | Equity Delisting | Equity Delisting |
| 6) | 5/23/00 | | Corporate Meeting | Annual Shareholder |

✳ - Amended (See Details)

Australia 61 2 9777 8600          Brazil 5511 3048 4500     Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:20:31



<HELP> for explanation.                                    P060 Equity **CACS**

```
 Output Results To                    CORPORATE ACTION CALENDAR
Relm Wireless Corp                               Page    1/1
RELM US                          Action Type  ▮
   Date Type: █ Effective Date    Date Range  1/ 1/00 -- 6/23/04

    Date    │ ✱ │     Type of Action     │        Summary
 1)  5/ 9/03│   │ Equity Delisting       │ Equity Delisting
 2)  5/ 8/03│   │ Equity Delisting       │ Equity Delisting
 3)  5/ 8/03│ ✱ │ Change in Listing      │ NASDAQ Sm-Cp ==> OTC BB
 4)  3/25/02│   │ Change in Listing      │ OTC  US ==> OTC BB
 5)  7/ 5/01│   │ Change in Listing      │ NASDAQ N-Mkt ==> NASDAQ Sm-Cp
 6)  6/14/01│   │ Corporate Meeting      │ Annual Shareholder
 7) 10/30/00│   │ Corporate Meeting      │ Annual Shareholder
 8)  3/17/00│   │ Acquisition            │ Target: Radio Product Lines
```

         ✱ - Amended (See Details)
Australia 61 2 9777 8600      Brazil 5511 3048 4500        Europe 44 20 7330 7500          Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                            G646-658-0 23-Jun-03 12:36:36



`<HELP>` for explanation.                                    P060 **Equity** **CACS**

```
Output Results To                  CORPORATE ACTION CALENDAR
SMX Corp                                          Page    1/1
SMXP US                              Action Type ▮

   Date Type: ▣ Effective Date      Date Range  1/ 1/00  --  6/23/04
```

| Date | * | Type of Action | Summary |
|------|---|----------------|---------|
| 1) 12/12/00 | | ID Number Change | CUSIP:78459P10=>78459P20 |
| 2) 12/12/00 | | Ticker Symbol Change | SMXX US   => SMXP US |
| 3) 12/12/00 | | Stock Split    :Split | Security: SMXP US |
| 4)  6/15/00 | | Ticker Symbol Change | SMXA US   => SMXX US |
| 5)  6/15/00 | | Name Change | Service Max of America Inc ==>SMX C |
| 6)  6/15/00 | | ID Number Change | CUSIP:81762310=>78459P10 |

```
             * - Amended (See Details)
```

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                      G646-658-0 23-Jun-03 12:21:22



`<HELP> for explanation.`                                    P060 **Equity CACS**

| | | | |
|---|---|---|---|
| Output Results To | | CORPORATE ACTION CALENDAR | |

## Simex Technologies Inc                              Page   1/1
## SMXT US                          Action Type ▮

Date Type: ▮ Effective Date        Date Range  1/ 1/00 -- 6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 5/21/03 | | Acquisition | Target: Probity Investigation |
| 2) | 11/19/02 | | Acquisition | Target: Fantasy Golf SA |
| 3) | 8/28/02 | | Ticker Symbol Change | SMXTE US  => SMXT US |
| 4) | 8/27/02 | | Ticker Symbol Change | SMXT US   => SMXTE US |
| 5) | 5/30/02 | | Ticker Symbol Change | SMXTE US  => SMXT US |
| 6) | 5/29/02 | | Ticker Symbol Change | SMXT US   => SMXTE US |
| 7) | 8/23/01 | * | Acquisition | Target: Helleviks VVS Plumbin |
| 8) | 8/23/01 | * | Acquisition | Target: Vendor Leasing Financ |
| 9) | 7/ 2/01 | * | Acquisition | Target: Bryne Elektrikel AS |
| 10) | 1/19/01 | * | Divestiture | Unit: Gjenvinning Midt Norge |
| 11) | 1/ 8/01 | * | Divestiture | Unit: Telefrost A/S |
| 12) | 3/13/00 | | Ticker Symbol Change | SMXTE US  => SMXT US |
| 13) | 3/10/00 | | Ticker Symbol Change | SMXT US   => SMXTE US |

* - Amended (See Details)



<HELP> for explanation.                                    P060 **Equity** CACS

| Output Results To ▾ | CORPORATE ACTION CALENDAR |

**Stonepath Group Inc**                          Page    1/2
**STG US**                          Action Type ■

Date Type: ▣ Effective Date      Date Range  1/ 1/00  --  6/23/04

| | Date | ✱ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 6/23/03 | | Acquisition | Target: Regroup Express LLC |
| 2) | 10/23/02 | | Acquisition | Target: Transport Specialists |
| 3) | 5/31/02 | ✱ | Acquisition | Target: United American Freig |
| 4) | 4/ 5/02 | ✱ | Acquisition | Target: Global Transportation |
| 5) | 10/ 9/01 | | Corporate Meeting | Annual Shareholder |
| 6) | 10/ 8/01 | ✱ | Acquisition | Target: Air Plus Ltd |
| 7) | 3/14/01 | | Equity Listing | Equity listing |
| 8) | 3/ 2/01 | ✱ | Divestiture | Unit: Webmodal Inc |
| 9) | 9/28/00 | | ID Number Change | CUSIP:64120C10=>86183710 |
| 10) | 9/28/00 | | Name Change | NetValue Holdings Inc. ==>Stonepath |
| 11) | 9/25/00 | | Corporate Meeting | Annual Shareholder |
| 12) | 9/11/00 | | Change in Listing | OTC BB ==> American |
| 13) | 9/11/00 | | Ticker Symbol Change | NETV US    => STG US |
| 14) | 2/18/00 | | Ticker Symbol Change | NETVE US   => NETV US |
| 15) | 2/ 2/00 | | Acquisition | Target: IndustrialVortex |

✱ - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                G646-658-0 23-Jun-03 12:30:18



<HELP> for explanation.                                    P060 **Equity CACS**

| Output Results To | CORPORATE ACTION CALENDAR |
|---|---|

# Stonepath Group Inc
## STG US

Action Type ▮                                    Page    2/2

Date Type: **E** Effective Date        Date Range  **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | | Summary |
|---|---|---|---|---|---|
| 1) | 1/28/00 | | Ticker Symbol Change | NETV US | => NETVE US |

* - Amended (See Details)

Australia 61 2 9777 8600          Brazil 5511 3048 4500      Europe 44 20 7330 7500          Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                    G646-658-0 23-Jun-03 12:30:28



<HELP> for explanation.                                    P060 **Equity CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
|---|---|

**Surebeam Corp**                                        Page    1/1
**SURE US**                          Action Type ▮

   Date Type: ▮ Effective Date      Date Range  1/ 1/00  --  6/23/04

| Date | * | Type of Action | Summary |
|---|---|---|---|
| 1) 3/20/01 |   | Equity Listing | Equity listing |
| 2) 3/16/01 |   | Equity Listing | Equity listing |
| 3) 3/15/01 | * | Equity Offering | US Equity Offering :IPO |

* - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
G646-658-0 23-Jun-03 12:34:33



<HELP> for explanation.                                    P060 **Equity CACS**

| | Output Results To ▾ | CORPORATE ACTION CALENDAR | |
|---|---|---|---|

**Titan Corp**                                           Page    1/3
**TTN US**                          Action Type ▮

Date Type: ▮ Effective Date        Date Range  1/ 1/00  --  6/23/04

| | Date | ∗ | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 7/30/03 | | Cash Dividend    :Reg. Cash | US8882662021  1 12/31/49 |
| 2) | 5/ 9/03 | | Debt Offering-New Issue | USD  888266AD5    8 05/15/11 |
| 3) | 5/ 9/03 | | Debt Offering-New Issue | USD  USU8884WAAB1  8 05/15/11 |
| 4) | 4/30/03 | | Cash Dividend    :Reg. Cash | US8882662021  1 12/31/49 |
| 5) | 2/ 4/03 | | Cash Dividend    :Reg. Cash | US8882662021  1 12/31/49 |
| 6) | 1/17/03 | ∗ | Acquisition | Target: Science & Engineering |
| 7) | 11/ 6/02 | | Cash Dividend    :Reg. Cash | US8882662021  1 12/31/49 |
| 8) | 10/23/02 | | Acquisition | Target: Wave Science Inc |
| 9) | 10/21/02 | | Divestiture | Unit: Avercom ops |
| 10) | 8/ 6/02 | | Conversion Terms Refix | US8882662021  1 12/31/49 |
| 11) | 8/ 6/02 | ∗ | Spin-off | Security: TTJ GR |
| 12) | 8/ 6/02 | ∗ | Spin-off | Security: TTN US |
| 13) | 7/31/02 | | Cash Dividend    :Reg. Cash | US8882662021  1 12/31/49 |
| 14) | 5/ 1/02 | | Cash Dividend    :Reg. Cash | US8882662021  1 12/31/49 |
| 15) | 3/22/02 | ∗ | Acquisition | Target: Jaycor Inc |

∗ - Amended (See Details)



&lt;HELP&gt; for explanation.                          P060 **Equity CACS**

| Output Results To | ▼ | CORPORATE ACTION CALENDAR |
|---|---|---|

**Titan Corp**                                    Page    2/3
**TTN US**                          Action Type ■

Date Type: ▉ Effective Date        Date Range  1/ 1/00 -- 6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 3/22/02 | * | Acquisition | Target: GlobalNet Inc |
| 2) | 1/31/02 | | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 3) | 11/28/01 | * | Acquisition | Target: BTG Inc |
| 4) | 11/ 7/01 | | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 5) | 10/ 1/01 | | Acquisition | Target: Datron Systems Inc-Ca |
| 6) | 8/ 1/01 | | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 7) | 7/25/01 | * | Equity Offering | US Equity Offering :ADDL |
| 8) | 5/ 2/01 | | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 9) | 1/31/01 | * | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 10) | 11/ 8/00 | | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 11) | 8/ 2/00 | | Cash Dividend :Reg. Cash | US0002662021  1 12/31/49 |
| 12) | 6/27/00 | * | Acquisition | Target: Averstar Inc |
| 13) | 6/ 1/00 | | Acquisition | Target: SenCom Corp |
| 14) | 5/30/00 | | Corporate Meeting | Annual Shareholder |
| 15) | 5/11/00 | | Acquisition | Target: Business assets |

* - Amended (See Details)



&lt;HELP&gt; for explanation.                                    P060 Equity **CACS**

| Output Results To | | CORPORATE ACTION CALENDAR |
|---|---|---|

**Titan Corp**                                           Page    3/3
**TTN US**                          Action Type ▮

   Date Type: **E** Effective Date        Date Range  1/ 1/00 -- 6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 5/ 3/00 | | Cash Dividend :Reg. Cash | US8882662021 1 12/31/49 |
| 2) | 3/24/00 | * | Acquisition | Target: Pulse Engineering |
| 3) | 2/28/00 | * | Acquisition | Target: Advanced Communicatio |
| 4) | 2/ 2/00 | | Cash Dividend :Reg. Cash | US8882662021 1 12/31/49 |

                      * - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                         G646-658-0 23-Jun-03 12:22:17



<HELP> for explanation.                                      P060 Equity **CACS**

| Output Results To | CORPORATE ACTION CALENDAR |

# Total Film Group Inc
## TFGP US
Action Type ▮                        Page    1/1

Date Type: **E** Effective Date          Date Range  **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 4/ 2/02 | | Ticker Symbol Change | TFGPE US  => TFGP US |
| 2) | 4/ 1/02 | | Change in Listing | OTC BB ==> OTC  US |
| 3) | 4/ 1/02 | | Equity Delisting | Equity Delisting |
| 4) | 2/27/02 | | Ticker Symbol Change | TFGP US   => TFGPE US |
| 5) | 5/30/01 | | Change in Listing | OTC  US ==> OTC BB |
| 6) | 4/20/00 | | Equity Delisting | Equity Delisting |
| 7) | 4/20/00 | | Ticker Symbol Change | TFGPE US  => TFGP US |
| 8) | 3/27/00 | | Ticker Symbol Change | TFGP US   => TFGPE US |
| 9) | 1/27/00 | | Acquisition | Target: MeetChina.com |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500       Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                                    G646-658-0 23-Jun-03 12:22:36



<HELP> for explanation.                                    P060 Equity **CACS**

| Output Results To ▼ | CORPORATE ACTION CALENDAR |
|---|---|

**Touchstone Resources Ltd**                    Page    1/1
**TCHSF US**                        Action Type ▉

Date Type: █ Effective Date        Date Range  1/ 1/00  --  6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 4/16/03 | | Equity Delisting | Equity Delisting |
| 2) | 8/26/02 | | Corporate Meeting | Extraordinary Shareholder |
| 3) | 5/ 2/02 | | Ticker Symbol Change | TCH CN   => TCH/U CN |
| 4) | 5/ 2/02 | | Currency Quotation Change | Security: TCH/U CN |
| 5) | 4/ 5/02 | * | ID Number Change | CUSIP:89191710=>89191720 |
| 6) | 4/ 5/02 | | Ticker Symbol Change | TOUCF US   => TCHSF US |
| 7) | 4/ 4/02 | | ID Number Change | CUSIP:89191710=>89191720 |
| 8) | 4/ 4/02 | | ID Number Change | SEDOL:2885658=>2871271 |
| 9) | 4/ 4/02 | | Stock Split    :Split | Security: TCH/U CN |
| 10) | 4/ 4/02 | | ID Number Change | CUSIP:89191710=>89191720 |
| 11) | 4/ 4/02 | | Ticker Symbol Change | TUT CN   => TCH CN |
| 12) | 3/27/02 | | Corporate Meeting | Annual Shareholder |
| 13) | 10/31/01 | | Equity Listing | Equity listing |
| 14) | 3/30/01 | | Corporate Meeting | Annual Shareholder |
| 15) | 3/30/00 | | Corporate Meeting | Annual Shareholder |

* - Amended (See Details)

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                 G646-658-0 23-Jun-03 12:37:12



<HELP> for explanation.                              P060 **Equity CACS**

| Output Results To ▼ | CORPORATE ACTION CALENDAR |
|---|---|

# Underground Solutions Inc
## UGSI US
Page   1/1

Action Type ■

Date Type: **E** Effective Date        Date Range **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 4/ 8/02 | | Acquisition | Target: Charjon Utility Servi |
| 2) | 4/19/01 | | ID Number Change | CUSIP:04648910=>90432310 |
| 3) | 4/19/01 | | Ticker Symbol Change | AVWX US    => UGSI US |
| 4) | 4/19/01 | | Name Change | @VentureWorks Inc. ==>Underground S |
| 5) | 7/10/00 | | Acquisition | Target: Ignition Sequence Inc |
| 6) | 7/ 6/00 | | Acquisition | Target: BigEquip.com Inc |
| 7) | 4/ 5/00 | | Acquisition | Target: @VentureWorks Inc/Old |
| 8) | 4/ 3/00 | | Ticker Symbol Change | ITXX US    => AVWX US |
| 9) | 4/ 3/00 | | Name Change | Infrastructure Technologies ==>@Ven |
| 10) | 1/13/00 | | Equity Delisting | Equity Delisting |
| 11) | 1/13/00 | | Ticker Symbol Change | ITXXE US   => ITXX US |

* - Amended (See Details)



&lt;HELP&gt; for explanation.                                    P060 **Equity CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
| --- | --- |

**Universal Insurance Holdings I**   Page   1/1
**UVIH US**                          Action Type ▮

Date Type: **E** Effective Date        Date Range **1/ 1/00** -- **6/23/04**

| Date | * | Type of Action | Summary |
| --- | --- | --- | --- |
| 1) 11/19/01 | * | Corporate Meeting | Annual Shareholder |
| 2) 6/21/01 | | Cash Dividend    :Spec. Cash | Security: UVIH US |
| 3) 2/27/01 | | Ticker Symbol Change | UHTS US    => UVIH US |
| 4) 2/27/01 | | Name Change | UNIVERSAL HEIGHTS INC ==>Universal |
| 5) 2/27/01 | | ID Number Change | CUSIP:91359C30=>91359V10 |
| 6) 11/16/00 | | Acquisition | Target: Quoters.com |
| 7) 11/ 3/00 | | Corporate Meeting | Annual Shareholder |

* - Amended (See Details)

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                 G646-658-0 23-Jun-03 12:32:01



<HELP> for explanation.                                          P060 **Equity CACS**

| Output Results To ▾ | CORPORATE ACTION CALENDAR |
|---|---|

**World Wireless Communications**                Page    1/1
**XWC US**                        Action Type ▮

Date Type: ▮ Effective Date          Date Range 1/ 1/00 -- 6/23/04

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 3/15/02 | | Corporate Meeting | Extraordinary Shareholder |
| 2) | 3/14/01 | | Equity Listing | Equity listing |
| 3) | 5/ 5/00 | | Change in Listing | OTC BB ==> American |
| 4) | 5/ 5/00 | | Ticker Symbol Change | WWWC US   => XWC US |

* - Amended (See Details)

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                 G646-658-0 23-Jun-03 12:23:23



`<HELP>` for explanation.                                    P060 **Equity CACS**

| Output Results To | ▾ | CORPORATE ACTION CALENDAR |
|---|---|---|

## XtraCard Corp                                    Page    1/1
## XTRD US                        Action Type ▮

Date Type: **E** Effective Date        Date Range **1/ 1/00** -- **6/23/04**

| | Date | * | Type of Action | Summary |
|---|---|---|---|---|
| 1) | 1/ 7/03 | | ID Number Change | CUSIP:66996010=>98415C10 |
| 2) | 1/ 7/03 | | Ticker Symbol Change | NUDZ US    => XTRD US |
| 3) | 1/ 7/03 | | Name Change | Nu-D-Zine Inc ==>XtraCard Corp |
| 4) | 2/13/01 | | Name Change | Nu-D-Zine Bedding & Bath Inc ==>Nu- |
| 5) | 2/25/00 | | Ticker Symbol Change | NUDZE US   => NUDZ US |
| 6) | 2/25/00 | | Equity Delisting | Equity Delisting |
| 7) | 1/28/00 | | Ticker Symbol Change | NUDZ US    => NUDZE US |

                    **\* - Amended (See Details)**

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                              G646-658-0 23-Jun-03 12:20:08



<HELP> for explanation.                                    P060 **Equity CACS**

| Output Results To | ▾ | CORPORATE ACTION CALENDAR |
|---|---|---|

## Zi Corp
## ZICA US

Action Type ▮                                    Page    1/1

Date Type: **E** Effective Date          Date Range **1/ 1/00** -- **6/23/04**

| Date | * | Type of Action | Summary |
|---|---|---|---|
| 1) 11/ 7/02 | * | Divestiture | Unit: Magic Lantern Communica |
| 2) 10/31/02 | * | Divestiture | Unit: Zi Services |
| 3) 6/ 5/02 | | Corporate Meeting | Annual & Extraordinary Shrhldr |
| 4) 6/ 7/01 | * | Corporate Meeting | Annual Shareholder |
| 5) 7/24/00 | | Acquisition | Target: Telecom Technology Ce |
| 6) 6/20/00 | | Acquisition | Target: EnglishPractice.com I |
| 7) 6/ 1/00 | | Corporate Meeting | Annual Shareholder |
| 8) 4/11/00 | | Change in Listing | NASDAQ Sm-Cp ==> NASDAQ N-Mkt |

**✱ - Amended (See Details)**

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                                            G646-658-0 23-Jun-03 12:23:47



<HELP> for explanation.                                      P060 Equity **CACS**

```
 Output Results To  ▾              CORPORATE ACTION CALENDAR
US Plastic Lumber Corp                          Page    1/1
USPL  US                          Action Type  ▮
   Date Type: E Effective Date    Date Range  1/ 1/00 -- 6/23/04

    Date     *      Type of Action              Summary
 1) 5/29/03     Equity Delisting         Equity Delisting
 2) 5/29/03     Change in Listing        NASDAQ Sm-Cp ==> OTC BB
 3) 5/15/03     Divestiture              Unit: Cornerboard business
 4) 6/25/02     Change in Listing        NASDAQ N-Mkt ==> NASDAQ Sm-Cp
 5) 3/19/02     Corporate Meeting        Extraordinary Shareholder
 6) 1/ 2/02  *  Divestiture              Unit: Clean Earth Inc
 7) 5/31/01     Corporate Meeting        Annual Shareholder
 8) 5/31/00     Corporate Meeting        Annual Shareholder
 9) 2/22/00     Acquisition              Target: Baron Enterprises Inc




              * - Amended (See Details)
Australia 61 2 9777 8600       Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2003 Bloomberg L.P.
                                                          G646-658-0 23-Jun-03 12:22:58
```



Microcap Stock: A Guide for Investors                                    Page 1 of 9
Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 502 of
510

Home | Previous Page

## U.S. Securities and Exchange Commission

## Microcap Stock: A Guide for Investors



**January 2003**

### Introduction

Information is the investor's best tool when it comes to investing wisely. But accurate information about "microcap stocks" — low-priced stocks issued by the smallest of companies — may be difficult to find. Many microcap companies do not file financial reports with the SEC, so it's hard for investors to get the facts about the company's management, products, services, and finances. When reliable information is scarce, fraudsters can easily spread false information about microcap companies, making profits while creating losses for unsuspecting investors.

In the battle against microcap fraud, the SEC has toughened its rules and taken actions against wrongdoers, but we can't stop every microcap fraud. We need your help in winning the battle. Before you consider investing in a microcap company, arm yourself first with information. This alert tells you about microcap stocks, how to find information, what "red flags" to consider, and where to turn if you run into trouble.

### What Is a Microcap Stock?

The term "microcap stock" applies to companies with low or "micro" capitalizations, meaning the total value of the company's stock. Microcap companies typically have limited assets. For example, in cases where the SEC suspended trading in microcap stocks, the average company had only $6 million in net tangible assets — and nearly half had less than $1.25 million. Microcap stocks tend to be low priced and trade in low volumes.

### Where Do Microcap Stocks Trade?

Many microcap stocks trade in the "over-the-counter" (OTC) market and are quoted on OTC systems, such as the OTC Bulletin Board (OTCBB) or the "Pink Sheets."

- **OTC Bulletin Board**   The OTCBB is an electronic quotation system that displays real-time quotes, last-sale prices, and volume information for many OTC securities that are not listed on the Nasdaq Stock Market or a national securities exchange. Brokers who subscribe to the system can use the OTCBB to look up prices or enter quotes for OTC securities. Although the NASD oversees the OTCBB, the OTCBB is *not* part of the Nasdaq Stock Market. Fraudsters often claim that an OTCBB company is a Nasdaq company to mislead investors into thinking that the company is bigger than it is.

- **The "Pink Sheets"**   The Pink Sheets — named for the color of paper

on which they've historically been printed — are listings of price quotes for companies that trade in the over-the-counter market (OTC market). "Market makers" — the brokers who commit to buying and selling the securities of OTC issuers-can use the pink sheets to publish bid and ask prices. A company named Pink Sheets LLC, formerly known as the National Quotation Bureau, publishes the pink sheets in both hard copy and electronic format. Pink Sheets LLC is not registered with the SEC as a stock exchange, nor does the SEC regulate its activities.

## How Are Microcap Stocks Different From Other Stocks?

**Lack of Public Information**   The biggest difference between a microcap stock and other stocks is the amount of reliable, publicly available information about the company. Larger public companies file reports with the SEC that any investor can get for free from the SEC's website. Professional stock analysts regularly research and write about larger public companies, and it's easy to find their stock prices in the newspaper. In contrast, information about microcap companies can be extremely difficult to find, making them more vulnerable to investment fraud schemes.

**No Minimum Listing Standards**   Companies that trade their stocks on major exchanges and in the Nasdaq Stock Market must meet minimum listing standards. For example, they must have minimum amounts of net assets and minimum numbers of shareholders. In contrast, companies on the OTCBB or the Pink Sheets do not have to meet any minimum standards.

**Risk**   While all investments involve risk, microcap stocks are among the most risky. Many microcap companies tend to be new and have no proven track record. Some of these companies have no assets or operations. Others have products and services that are still in development or have yet to be tested in the market. Another risk that pertains to microcap stocks involves the low volumes of trades. Because microcap stocks trade in low volumes, any size of trade can have a large percentage impact on the price of the stock.

## Which Companies File Reports With the SEC?

In general, the federal securities laws require all but the smallest of public companies to file reports with the SEC. A company can become "public" in one of two ways — by issuing securities in an offering or transaction that's registered with the SEC or by registering the company and its outstanding securities with the SEC. Both types of registration trigger ongoing reporting obligations, meaning the company must file periodic reports that disclose important information to investors about its business, financial condition, and management.

This information is a treasure trove for investors: it tells you whether a company is making money or losing money and why. You'll find this information in the company's quarterly reports on Form 10-Q, annual reports (with audited financial statements) on Form 10-K, and periodic reports of significant events on Form 8-K.

A company *must* file reports with the SEC if:

Microcap Stocks: A Guide for Investors                    Page 3 of 9
Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 504 of
510

- it has 500 or more investors *and* $10 million or more in assets; or

- it lists its securities on the following stock markets:

  - American Stock Exchange

  - Boston Stock Exchange

  - Cincinnati Stock Exchange

  - Chicago Stock Exchange

  - Nasdaq Stock Market

  - New York Stock Exchange

  - Pacific Exchange

  - Philadelphia Stock Exchange

If you'd like to learn more about the SEC's registration and reporting requirements, read Q&A: Small Business and the SEC.

In January 1999, the SEC approved an NASD rule allowing the NASD to require that all OTCBB companies file updated financial reports with the SEC or with their banking or insurance regulators. Beginning in June 2000, the rule applied to all companies on the OTCBB. Since then, any companies who have refused to file timely reports with the SEC or their banking or insurance regulators have been removed from the OTCBB.

**Tip:** When an OTCBB company fails to file its reports on time, the NASD will add a fifth letter "E" to its four-letter stock symbol. The company then has 30 days to file with the SEC or 60 days to file with its banking or insurance regulator. If it's still delinquent after the grace period, the company will be removed from the OTCBB. You'll find a list of securities that have been removed from the OTCBB at www.otcbb.com.

With few exceptions, companies that file reports with the SEC must do so electronically using the SEC's EDGAR system. EDGAR stands for electronic data gathering and retrieval. The EDGAR database is available on the SEC's website at www.sec.gov. You'll find many corporate filings in the EDGAR database, including annual and quarterly reports and registration statements. Any investor can access and download this information for free from the SEC's website. Click here if you want to view detailed instructions on how to use EDGAR.

**Caution:** By law, the reports that companies file with the SEC must be truthful and complete, presenting the facts investors find important in making decisions to buy, hold, or sell a security. But the SEC cannot guarantee the accuracy of the reports companies file. Some dishonest companies break the law and file false reports. Every year, the SEC brings enforcement actions against companies who've "cooked their books" or failed to provide important information to investors. Read SEC filings — and all other information — with a questioning and critical mind.

### Which Companies Don't Have to File Reports With the SEC?

Smaller companies — those with less than $10 million in assets — generally do not have to file reports with the SEC. But some smaller companies, including microcap companies, may choose voluntarily to register their securities with the SEC. As described above, companies that register with the SEC must also file quarterly, annual, and other reports.

### A Word About Offering Requirements

Any company that wants to offer or sell securities to the public must either register with the SEC or meet an exemption. Here are two of the most common exemptions that many microcap companies use:

- **"Reg A" Offerings**   Companies raising less than $5 million in a 12-month period may be exempt from registering their securities under a rule known as Regulation A. Instead of filing a registration statement through EDGAR, these companies need only file a printed copy of an "offering circular" with the SEC containing financial statements and other information.

- **"Reg D" Offerings**   Some smaller companies offer and sell securities without registering the transaction under an exemption known as Regulation D. Reg D exempts from registration companies that seek to raise less than $1 million dollars in a twelve-month period. It also exempts companies seeking to raise up to $5 million, as long as the companies sell only to 35 or fewer individuals or any number of "accredited investors" who must meet high net worth or income standards. In addition, Reg D exempts some larger private offerings of securities. While companies claiming an exemption under Reg D don't have to register or file reports with the SEC, they must still file what's known as a "Form D" within a few days after they first sell their securities. Form D is a brief notice that includes the names and addresses of owners and stock promoters, but little other information about the company. You may be able to find out more about Reg D companies by contacting your state securities regulator. You will find the contact information for your state securities regulator at www.nasaa.org.

Unless they otherwise file reports with the SEC, companies that are exempt from registration under Reg A, Reg D, or another offering exemption do not have to file reports with the SEC. For more information about the registration requirements and offering exemptions, read Q&A: Small Business and the SEC.

### What's So Important About Public Information?

Many of the microcap companies that don't file reports with the SEC are legitimate businesses with real products or services. But the lack of reliable, readily available information about some microcap companies can open the door to fraud. It's easier for fraudsters to manipulate a stock when there's little or no information available about the company.

Microcap fraud depends on spreading false information. Here's how some

Microcap Stock: A Guide for Investors                    Page 5 of 9
Case 9:03-cv-80612-KAM    Document 14    Entered on FLSD Docket 07/09/2003    Page 506 of
510

fraudsters carry out their scams:

- **E-mail Spam**   Fraudsters distribute junk e-mail or "spam" over the Internet to spread false information quickly and cheaply about a microcap company to thousands of potential investors. Spam allows the unscrupulous to target many more potential investors than cold calling or mass mailing.

- **Internet Fraud**   Fraudsters often use aliases on Internet bulletin boards and chat rooms to hide their identities and post messages urging investors to buy stock in microcap companies based on supposedly "inside" information about impending developments at the companies. For more information about Internet fraud and on-line investing, read Internet Fraud and What You Need to Know About Trading in Fast Moving Markets.

- **Paid Promoters**   Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows. Paid promoters are generally behind the unsolicited "junk" faxes you may receive, touting a microcap company. The federal securities laws require the newsletters to disclose who paid them, the amount, and the type of payment. But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.

- **"Boiler Rooms" and Cold Calling**   Dishonest brokers set up "boiler rooms" where a small army of high-pressure salespeople use banks of telephones to make cold calls to as many potential investors as possible. These strangers hound investors to buy "house stocks" — stocks that the firm buys or sells as a market maker or has in its inventory. To learn more about cold calling, read Cold Calling Alert.

- **Questionable Press Releases**   Fraudsters often issue press releases that contain exaggerations or lies about the microcap company's sales, acquisitions, revenue projections, or new products or services. These fraudulent press releases are then disseminated through legitimate financial news portals on the Internet.

Microcap fraud schemes can take a variety of forms. Here's a description of the two most common schemes:

**The Classic "Pump and Dump" Scheme**   It's common to see messages posted on the Internet that urge readers to buy a stock quickly or to sell before the price goes down, or a telemarketer will call using the same sort of pitch. Often the promoters will claim to have "inside" information about an impending development or to use an "infallible" combination of economic and stock market data to pick stocks. In reality, they may be company insiders or paid promoters who stand to gain by selling their shares after the stock price is pumped up by the buying frenzy they create. Once these fraudsters sell their shares and stop hyping the stock, the price typically falls, and investors lose their money.

**The Off-Shore Scam**   Under a rule known as "Regulation S," companies do not have to register stock they sell outside the United States to foreign or "off-shore" investors. In the typical off-shore scam, an unscrupulous

Microcap Stocks: A Guide for Investors                                        Page 6 of 9
Case 9:03-cv-80612-KAM   Document 14   Entered on FLSD Docket 07/09/2003   Page 507 of
510

microcap company sells unregistered Reg S stock at a deep discount to
fraudsters posing as foreign investors. These fraudsters then sell the stock
to U.S. investors at inflated prices, pocketing huge profits that they share
with the microcap company insiders. The flood of unregistered stock into
the U.S. eventually causes the price to plummet, leaving unsuspecting U.S.
investors with enormous losses.

## How Do I Get Information About Microcap Companies?

If you're working with a broker or an investment adviser, you can ask your
investment professional if the company files reports with the SEC and to get
you written information about the company and its business, finances, and
management. Be sure to carefully read the prospectus and the company's
latest financial reports. Remember that unsolicited e-mails, message board
postings and company news releases should never be used as the sole basis
for your investment decisions. You can also get information on your own
from these sources:

- **From the company**  Ask the company if it is registered with the SEC
  and files reports with us. If the company is small and unknown to
  most people, you should also call your state securities regulator to get
  information about the company, its management, and the brokers or
  promoters who've encouraged you to invest in the company.

- **From the SEC**  A great many companies must file their reports with
  the SEC. Using the EDGAR database, you can find out whether a
  company files with us and get any reports in which you're interested.
  For companies that do not file on EDGAR, check with the SEC's Public
  Reference Room to see whether the company has filed an offering
  circular under Reg A.

- **From your state securities regulator**  We strongly urge you to
  contact your state securities regulator to find out whether they have
  information about a company and the people behind it. Look in the
  government section of your phone book or visit the website of the
  North American Securities Administrators Association to get the name
  and phone number. Even though the company does not have to
  register its securities with the SEC, it may have to register them with
  your state. Your regulator will tell you whether the company has been
  legally cleared to sell securities in your state. Too many investors
  could easily have avoided heavy and painful financial losses if they
  only called their state securities regulator *before* they bought stock.

- **From other government regulators**  Many companies, such as
  banks, do not have to file reports with the SEC. But banks must file
  updated financial information with their banking regulators. Visit the
  Federal Reserve System's National Information Center of Banking
  Information site at www.ffiec.gov/NIC, the Office of the Comptroller of
  the Currency at www.occ.treas.gov, or the Federal Deposit Insurance
  Corporation at www.fdic.gov.

- **From reference books and commercial databases**  Visit your
  local public library or the nearest law or business school library. You'll
  find many reference materials containing information about
  companies. You can also access commercial databases for more
  information about the company's history, management, products or

services, revenues, and credit ratings. The SEC cannot recommend or
endorse any particular research firm, its personnel, or its products.
But there are a number of commercial resources you may consult,
including: Bloomberg, Dun & Bradstreet, Hoover's Profiles, Lexis-
Nexis, and Standard & Poor's Corporate Profiles. Ask your librarian
about additional resources.

- **The Secretary of State Where the Company Is Incorporated**
  Contact the secretary of state where the company is incorporated to
  find out whether the company is a corporation in good standing. You
  may also be able to obtain copies of the company's incorporation
  papers and any annual reports it files with the state. Please visit the
  National Association of Secretaries of State website at www.nass.org
  for contact information regarding a particular Secretary of State.

**Caution**   If you've been asked to invest in a company but you can't find
any record that the company has registered its securities with the SEC or
your state, or that it's exempt from registration, call or write your state's
securities regulator or the SEC immediately with all the details. You may
have come face to face with a scam.

### What if I Want to Invest in Microcap Stocks?

To invest wisely and avoid investment scams, research each investment
opportunity thoroughly and ask questions. These simple steps can make the
difference between profits and losses:

1. Find out whether the company has registered its securities with the
   SEC or your state's securities regulators.

2. Make sure you understand the company's business and its products or
   services.

3. Read carefully the most recent reports the company has filed with its
   regulators and pay attention to the company's financial statements,
   particularly if they are not audited or not certified by an accountant.
   If the company does not file reports with the SEC, be sure to ask your
   broker for what's called the "Rule 15c2-11 file" on the company. That
   file will contain important information about the company.

4. Check out the people running the company with your state securities
   regulator, and find out if they've ever made money for investors
   before. Also ask whether the people running the company have had
   run-ins with the regulators or other investors.

5. Make sure the broker and his or her firm are registered with the SEC
   and licensed to do business in your state. And ask your state
   securities regulator whether the broker and the firm have ever been
   disciplined or have complaints against them.

We've spelled out the questions you'll need to ask in the following
publications: Internet Fraud and Ask Questions. When you ask these
questions, write down the answers you received and what you decided to
do. If something goes wrong, your notes can help to establish what was

said. Let your broker or investment adviser know you're taking notes. They'll know you're a serious investor and may tell you more — or give up trying to scam you. We've developed a Form for Taking Notes to help you. You'll find these and other useful publications on the <u>Investor Information</u> section of the SEC's website or from our toll-free publications line at (800) SEC-0330.

Also, watch out for these "red flags":

- **SEC Trading Suspensions**   The SEC has the power to suspend trading in any stock for up to 10 days when it believes that information about the company is inaccurate or unreliable. Think twice before investing in a company that's been the subject of an SEC trading suspension. You'll find information about trading suspensions on the SEC's website.

- **High Pressure Sales Tactics**   Beware of brokers who pressure you to buy before you have a chance to think about and investigate the "opportunity." Dishonest brokers may try to tell you about a "once-in-a-lifetime" opportunity or one that's based on "inside" or "confidential" information. Don't fall for brokers who promise spectacular profits or "guaranteed" returns. These are the hallmarks of fraud. If the deal sounds too good to be true, then it probably is.

- **Assets Are Large But Revenues Are Small**   Microcap companies sometimes assign high values on their financial statements to assets that have nothing to do with their business. Find out whether there's a valid explanation for low revenues, especially when the company claims to have large assets.

- **Odd Items in the Footnotes to the Financial Statements**   Many microcap fraud schemes involve unusual transactions among individuals connected to the company. These can be unusual loans or the exchange of questionable assets for company stock that may be discussed in the footnotes.

- **Unusual Auditing Issues**   Be wary when a company's auditors have refused to certify the company's financial statements or if they've stated that the company may not have enough money to continue operating. Also question any change of accountants.

- **Insiders Own Large Amounts of the Stock**   In many microcap fraud cases — especially "pump and dump" schemes — the company's officers and promoters own significant amounts of the stock. When one person or group controls most of the stock, they can more easily manipulate the stock's price at your expense. You can ask your broker or the company whether one person or group controls most of the company's stock, but if the company is the subject of a scam, you may not get an honest answer.

**Additional Red Flags**   Don't deal with brokers who refuse to provide you with written information about the investments they're promoting. Never tell a cold caller your social security number or numbers for your banking and securities accounts. And be extra wary if someone you don't know and trust recommends foreign investments. For more tips on avoiding danger, be sure to read Cold Calling and The Fleecing of Foreign Investors.

## What If I Run Into Trouble?

Act promptly! By law, you only have a limited time to take legal action. Follow these steps to solve your problem:

1. Talk to your broker and explain the problem. What happened? Who said what, and when? Were communications clear? What did the broker tell you? Did you take notes about what your broker said at the time? If so, what do your notes say?

   Note: If you believe your broker engaged in unauthorized transactions or other serious frauds, be sure to put your complaint in writing right away and send it to the firm. Your written complaint may be the only way to prove that you complained to the firm about unauthorized transactions. For more information about unauthorized transactions, please read our "Fast Answer" on that topic.

2. If your broker can't resolve your problem, then talk to the broker's branch manager.

3. If the problem is still not resolved, put your complaint in writing and send it to the compliance department at the firm's main office. Explain your problem clearly, and tell the firm how you want it resolved. Ask the compliance office to respond to you in writing within 30 days.

4. If you're still not satisfied, then send a letter to your state securities regulator and attach copies of any letters you've sent already to the firm. Or send your complaint to the SEC using our online complaint form.

We will forward your complaint to the firm's compliance department and ask that they look into the problem and respond to you in writing.

Please note that sometimes a complaint can be successfully resolved. But in many cases, the firm denies wrongdoing, and it comes down to one person's word against another's. In that case, we cannot do anything more to help resolve the complaint. We cannot act as a judge or an arbitrator to establish wrongdoing and force the firm to satisfy your claim. And we cannot act as your lawyer.

*http://www.sec.gov/investor/pubs/microcapstock.htm*

Home | Previous Page                                   Modified: 02/05/2003