UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**03 - 80612**

Case No.



CIV-ZLOCH

MAGISTRATE JUDGE
SNOW

)
SECURITIES AND EXCHANGE COMMISSION, )
)
Plaintiff, )
)
v. )
)
MICHAEL LAUER, )
LANCER MANAGEMENT GROUP, LLC, and )
LANCER MANAGEMENT GROUP II, LLC, )
)
Defendants, )
and )
)
LANCER OFFSHORE, INC., )
LANCER PARTNERS, LP, )
OMNIFUND, LTD., )
LSPV, INC., and )
LSPV, LLC, )
)
Relief Defendants. )
)

**EXHIBITS IN SUPPORT OF THE MOTION AND MEMORANDUM OF LAW
FOR EX PARTE TEMPORARY RESTRAINING ORDER
AND OTHER RELIEF AND THEREAFTER PRELIMINARY INJUNCTION**

**VOLUME IV**

<u>EX. #</u>          <u>DESCRIPTION</u>

28.          Morgan Stanley Composite Correspondence
29.          Partners Newsletter dated 7/10/00
30.          Partners Portfolio as of 6/2000 and 7/2000
31.          Funds Newsletter dated 9/2001
32.          Funds Portfolio as of 8/2001 and 9/2001
33.          Partners Newsletter dated 5/5/2002
34.          Offshore Newsletter dated 5/5/2002
35.          Partners Portfolio as of 4/2002 and 5/2002



36.     Offshore Portfolio as of 4/2002 and 5/2002
37.     Funds Newsletter dated 9/11/2002
38.     Offshore Portfolio as of 8/2002
39.     Lancer Personnel List
40.     Final Judgment of Permanent Injunction and Other Relief as to Bruce Cowen
41.     SEC Lit Release No. 16200
42.     Funds Newsletter dated 1/13/2003
43.     Certification of NASD Business Records for John W. Bendall Jr.
44.     Stock Purchase Agreements and Requests
45.     Declaration of Fernando Torres
46.     Aug Corp. Form 10-QSB for the period ended September 30, 2002
47.     Total Film Group, Inc. Form 10-QSB for the period ended March 31, 2001
48.     Lancer Offshore Wire Transfer Requests

# EXHIBIT 28

# Morgan Stanley

*ALTERNATIVE INVESTMENT PARTNERS*

October 2, 2002
Michael Lauer
Lancer Management Group
375 Park Avenue
New York, New York
Fax#: 212-521-8401

**Inspection of Fund Books and Records**

Dear Michael:

Further to our recent discussions, pursuant to Sections 5.04 and 3.07 of the Limited Partnership Agreement of Lancer Partners, Limited Partnership (the "Onshore Fund") and Section 67 of the International Business Companies Act of the British Virgin Islands governing Lancer Offshore, Inc. (together with the Onshore Fund, the "Funds"), Morgan Stanley Alternative Investment Partners is requesting access to the books and records of the Funds, including any and all information to which you have access regarding all transactions and circumstances affecting the Funds, for a period of time sufficient to complete our review, likely to last at least several weeks. We would expect this access to commence during the week of October 7, 2002. If we receive the December 31, 2001 audited financial statements of Lancer Partners, Limited Partnership together with the auditor's report before October 9, 2002, we may limit the scope of such inspection. Please acknowledge receipt of this request by signing below and returning a copy to my attention to our fax number 877-260-1197.

In addition, kindly forward to us as soon as possible the current Schedule A to the Limited Partnership Agreement of Lancer Partners, Limited Partnership as required on page 1 and Section 2.01 of the Limited Partnership Agreement.

Best regards,

R. Putnam Coes III
Chief Operating Officer
Morgan Stanley Alternative Investment Partners


Acknowledged and agreed as of the above written date.

By: _____
Name:
Title:

cc:  Jennifer Anne Spiegel, Debevoise & Plimpton
     Barry Fink, Morgan Stanley Investment Management
     William Hunnicutt, Hunnicutt & Co, Inc.  fax#: 212-752-3022

100 FRONT STREET SUITE 1100 • ONE TOWER BRIDGE • WEST CONSHOHOCKEN, PA 19428-2881 • (610) 940-5000

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

# SERIAL BROADCAST REPORT (1)
## (WED) OCT 02 2002 15:23

| DOCUMENT # | TIME STORED | TIME SENT | DURATION | DST | PAGES | DEPARTMENT |
|---|---|---|---|---|---|---|
| 3561849-894 | 10.02 15.20 | 10.02 15:21 | 58" | 2DST | · | |

| TRANSMISSIONS COMPLETED | 2DST. |
|---|---|

| :2:2521840: | | :12127523022 |
|---|---|---|

(WED) 10. 02. 02. 15:27/ST. 15:24/NO. 3561849898 P 2.2

FROM

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001808

OCT 10 2002 12:45 FR MORGAN STANLEY     212 762 1125

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

October 10, 2002

**BY FAX AND FEDEX**

Robert G. Leonard, Esq.
Bryan Cave Robinson Silverman
245 Park Avenue
New York, NY  10167

Re:     Lancer

Dear Mr. Leonard:

I write on behalf of Morgan Stanley and Morgan Stanley Alternative Investment Partners ("AIP"). I understand that you represent Lancer Partners, Limited Partnership (the "Lancer Fund") and Lancer Management Group II, LLC ("Lancer"). I attach a copy of a letter that Putnam Coes of Morgan Stanley AIP sent to Michael Lauer of Lancer on October 2, 2002. As you can see, we have requested prompt access to the books and records of the Lancer Fund, and we have also requested the schedule of limited partners of the Lancer Fund. Mr. Lauer has preliminarily indicated that he is not inclined to honor these requests. Certain Morgan Stanley AIP funds are limited partners of the Lancer Fund, and as such, we are entitled to both items under the Limited Partnership Agreement, Sections 3.07 and 5.04, and as Schedule A to the Agreement.

I am sure you can appreciate our need for as much information as possible in light of the fact that we have not received audited financials for December 31, 2001 from your client. We continue to hope that those financials will be forthcoming shortly, but as you must also be aware, we have certain obligations that we need to meet as investment advisers. In order to meet these obligations, we will consider all our options to enforce our rights. It is our view that the Limited Partnership Agreement is clear about our rights with respect to the requests that we have made. We ask that you discuss our requests with Mr. Lauer, and respond to us in writing by the close of business tomorrow.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

Robert G. Leonard, Esq.
October 10, 2002
Page 2

# Morgan Stanley

I appreciate your attention to this matter. I have tried to reach you by telephone, and remain willing to discuss this matter with you further. Please feel free to call me at (212) 762-8205.

Sincerely,

Soo-Mi Lee
Executive Director and Counsel

Enclosures

cc:   R. Putnam Coes III, Morgan Stanley Alternative Investment Partners
      Barry Fink, Morgan Stanley Investment Management
      Natasha Kassian, Morgan Stanley Investment Management
      Jennifer Anne Spiegel, Debevoise & Plimpton

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

Morgan Stanley

*Direct Dial: (212) 762-8205*
*Facsimile No: (212 ) 762-7129*
*Email: Soo-Mi.Lee@morganstanley.com*

December 17, 2002

**BY FAX AND HAND**

Robert G. Leonard, Esq.
Bryan Cave Robinson Silverman
245 Park Avenue
New York, NY 10167

       Re:    <u>Lancer</u>

Dear Mr. Leonard:

    I write again on behalf of Morgan Stanley and Morgan Stanley Alternative Investment Partners ("AIP") in connection with Lancer Partners, Limited Partnership (the "Lancer Fund") and Lancer Management Group II, LLC ("Lancer"). As you are well aware, we have requested several times from Lancer access to its books and records and the list of its limited partners. We have also made this request formally in writing. I refer you to the October 2, 2002 letter from Putnam Coes to Michael Lauer and my October 9, 2002 letter to you. To date, we have not been given access to the books and records or the list of limited partners, much less the courtesy of a formal response.

    We have tried working with Lancer, and although we receive some verbal assurances, we have not seen any real progress being made in the time that has passed. We still do not have sufficient comfort that Lancer will make progress. As we continue to try to fulfill our obligations, it is getting more and more difficult to do so without audited financials or without any firm prospect of getting audited financials. The Limited Partnership Agreement is clear about our rights with respect to the requests that we have made, and we have determined that it is time for us to take action. I attach a copy of a draft complaint that we plan to file by Monday, December 23, if you do not give us access to the books and records by that time.

    This is a course of action that we take very seriously. We feel that you and your client have left us no choice but to seek legal recourse. I hope that you will not make it necessary for us to file the action.

    Please feel free to call me at (212) 762-8205.

                Sincerely,

                Soo-Mi Lee
                Executive Director and Counsel

Enclosures

cc:    Michael Lauer, Lancer Partners, LP

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001904

 Morgan

Robert G. Leonard, Esq.
Page 2

R. Putnam Coes III, Morgan Stanley Alternative Investment Partners
Barry Fink, Morgan Stanley Investment Management
Jennifer Anne Spiegel, Debevoise & Plimpton
Joseph Moodhe, Debevoise & Plimpton

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

**ATTORNEY WORK PRODUCT**                    **DRAFT**
**PRIVILEGED & CONFIDENTIAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    )
MORGAN STANLEY ALTERNATIVE INVESTMENT    )    SUPERIOR COURT
PARTNERS LP,                                         )
                                                    )    JUDICIAL DISTRICT
                    Plaintiff,                       )
                                                    )    OF FAIRFIELD
        - against -                                  )
                                                    )    November __, 2002
LANCER PARTNERS, LP, and                             )
LANCER MANAGEMENT GROUP II, LLC,                     )
                                                    )
                    Defendants.                      )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff Morgan Stanley Alternative Investment Partners LP ("AIP"), on behalf

of and a s general partner of Morgan Stanley Private Markets Fund I LP and Morgan

Stanley Institutional Fund of Hedge Funds LP, by and through its undersigned attorneys,

__, for its complaint herein, alleges as follows:

### Nature of the Action

1.      This is an action for damages and declaratory and injunctive relief arising

out of breaches by Defendant Lancer Management Group II, LLC ("Lancer") and

Defendant Lancer Partners, Limited Partnership (the "Lancer Fund") of their contractual

obligations under a Limited Partnership Agreement ("Partnership Agreement," attached

as Exhibit A), which Morgan Stanley Private Markets Fund I LP and Morgan Stanley

Institutional Fund of Hedge Funds LP joined as limited partners on January 1, 2001 and

July 1, 2002.

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

2.      Under the Partnership Agreement, Lancer agreed to distribute annual audited financial statements to the limited partners, and to provide access to the books and records of the Lancer Fund upon written notice.

3.      Defendants have failed to distribute an audited financial statement for the year ending December 31, 2001 and have refused Plaintiff's repeated requests to inspect the books and records of the Lancer Fund.

### The Parties

4.      Plaintiff AIP is a limited partnership organized under the laws of the state of Delaware with its principal place of business in West Conshohocken, PA.

5.      On information and belief, Defendant Lancer Partners, Limited Partnership is a limited partnership organized under the laws of the state of Connecticut with its principal place of business in New York, New York.

6.      On information and belief, Defendant Lancer Management Group II, LLC is a limited liability company organized under the laws of the state of Connecticut with its principal place of business in New York, New York.

### Jurisdiction and Venue

7.      Jurisdiction is conferred by Conn. Gen. Stat. § 52. Defendants are domiciled in Connecticut. AIP's claims arise out of acts and transactions that took place in Connecticut. Moreover, Defendants, in Section 14.06 of the Partnership Agreement, agreed that "any action or proceeding [t]hereunder must be commenced and prosecuted in the Superior Court of the State of Connecticut, Fairfield County."

2

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001907

8.      Venue is proper pursuant to Conn. Gen. Stat. § 51-345, because Defendants, in Section 14.06 of the Partnership Agreement, agreed that "any action or proceeding [t]hereunder must be commenced and prosecuted in the Superior Court of the State of Connecticut, Fairfield County."

9.      Section 14.05 of the Partnership Agreement provides that the Partnership Agreement "shall be construed in accordance with and governed by the laws of the State of Connecticut."

### The Partnership Agreement

10.     The Partnership Agreement, dated November 24, 1997, established the Lancer Fund as a limited partnership, consisting of Lancer as general partner and certain limited partners, pursuant to the Connecticut Uniform Limited Partnership Act. Partnership Agreement § 1.01.

11.     AIP entered into the Partnership Agreement on behalf of and as general partner of Morgan Stanley Liquid Markets Fund I LP on January 1, 2001 as a limited partner, as provided by Section 8.01 of the Partnership Agreement.

12.     AIP entered into the Partnership Agreement on behalf of and as general partner of Morgan Stanley Institutional Fund of Hedge Funds LP on July 1, 2002, as a limited partner, as provided by Section 8.01 of the Partnership Agreement.

13.     The purpose of the Lancer Fund was to "serve as a fund through which the assets of its Partners may be utilized in investing and trading in securities." Partnership Agreement § 1.03.

3

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001908

14.     The parties to the Partnership Agreement agreed that Lancer, as general partner, would have the exclusive authority to make investments on behalf of the Lancer Fund.  Partnership Agreement § 3.01.

15.     Lancer agreed to keep books, financial and tax records relating to the Lancer Fund, together with a certified copy of the Certificate of Limited Partnership and any amendments thereto, at its offices and make them available to any limited partner upon written request.

16.     In particular, Section 3.07 of the Partnership Agreement provides that such records "shall at all times be maintained at the principal office of the Partnership, and open to reasonable inspection and examination by the Partners, during business hours upon prior written notice." Section 5.04 of the Partnership Agreement further provides, in pertinent part:

> Each Limited Partner shall have the same right as the General Partner . . . to inspect and copy the Partnership's books and records upon prior written notice at any reasonable time and at such Limited Partner's sole cost and expense, and to receive on demand true and full information regarding all actions and circumstances affecting the Partnership, and a formal account of the Partnership's affairs whenever circumstances render it just and reasonable.

17.     Lancer also agreed to distribute an annual audited financial statement to each limited partner.

18.     Section 3.07 of the Partnership Agreement provides, in relevant part, (emphasis added):

4

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001909

> The General Partner shall cause to be prepared and distributed *as soon as practicable following the end of each Partnership Fiscal Year* an audited annual financial statement prepared in accordance with generally accepted accounting principles, consistently applied.

19.     Section 1.05 of the Partnership Agreement provides that "the fiscal year of the Partnership shall end on December 31 of each year," unless changed by the General Partner.

## Defendants Have Breached Their Obligations Under the Partnership Agreement

20.     To date, Defendants have failed to distribute an audited financial statement for the year ending December 31, 2001.

21.     On October 2, 2002, R. Putnam Coes III, AIP's Chief Operating Officer, wrote to Lancer, requesting access to the Lancer Fund's books and records and noting that AIP had yet to receive a 2001 audited financial statement for the Lancer Fund. Mr. Coes also requested a copy of the current Schedule A to the Partnership Agreement, which identifies each limited partner to the Partnership Agreement. (The October 2, 2002 letter is attached as Exhibit B.)

22.     Defendants, by Michael Lauer, Lancer's Manager, stated that they were unwilling to honor the request.

23.     On October 10, 2002, counsel for Morgan Stanley Dean Witter & Co., AIP's parent company, wrote to Defendants' counsel, again reminding Defendants of their obligation to provide an annual audited financial statement for the Lancer Fund and a copy of the schedule listing the limited partners, and requesting access to the Lancer Fund's books and records. (The October 10, 2002 letter is attached as Exhibit C.)

5

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

24.     Additional requests have been made through telephone calls beginning October 2, 2002, all of which to this date have been ignored or rebuffed.

25.     Defendants have failed and refused, and continue to fail and refuse, to perform their contractual obligations to provide financial statements and access to the books and records of the Lancer Fund, causing great concern to Plaintiff at a time of declining net asset value being reported by the Lancer Fund.

### First Cause of Action

### (For Declaratory Judgment)

26.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 25 inclusive, as though each were fully set forth herein.

27.     By failing to provide an annual audited financial statement for the year ending December 31, 2001 and by refusing to honor Plaintiff's request for a copy of the schedule listing the limited partners and for access the books and records of the Lancer Fund, Defendants have breached the Partnership Agreement.

28.     By virtue of the foregoing, Plaintiff is entitled to a declaratory judgment that Defendants have breached their obligations under the Partnership Agreement.

### Second Cause of Action

### (For Injunction Requiring Defendants to Provide 2001 Financial Statement)

29.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 25 inclusive, as though each were fully set forth herein.

6

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001911

30.     Pursuant to Section 3.07 of the Partnership Agreement, Defendants are required to provide Plaintiff with an annual audited financial statement for the Lancer Fund.

31.     Defendants have refused and failed to provide an audited financial statement for the year ending December 31, 2001.

32.     Plaintiff is therefore entitled to a preliminary and permanent injunction requiring Defendants to provide it with an audited financial statement for the year ending December 31, 2001.

### Third Cause of Action

#### (For Injunction Requiring Defendants to Allow Access)

33.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 25 inclusive, as though each were fully set forth herein.

34.     Pursuant to Section 5.04 of the Partnership Agreement, Plaintiff is entitled to inspect and examine the books and records kept by Lancer relating to the Lancer Fund, as well as the certificate and schedule listing the limited partners.

35.     Defendants have refused Plaintiff's written requests for access to these books and records relating to the Lancer Fund.

36.     Plaintiff is therefore entitled to a preliminary and permanent injunction requiring Defendants to provide it with access to the Lancer Fund's books and records, and to the certificate and schedule listing the limited partners.

### Fourth Cause of Action

7

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001912

**(Breach of the Partnership Agreement)**

37.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 25 inclusive, as though each were fully set forth herein.

38.     The Partnership Agreement, which is a valid and binding contract between the parties, requires Lancer to distribute an annual audited financial statement to each limited partner and to allow limited partners access to the books and records of the Lancer Fund.

39.     By failing to provide an annual audited financial statement for the year ending December 31, 2001 and by refusing to honor Plaintiff's request to access the books and records of the Lancer Fund, including the certificate and schedule listing the limited partners, Defendants have breached the Partnership Agreement.

40.     As a result of the Defendants' breach of the Partnership Agreement, plaintiff has been forced to incur costs in protecting its rights and interests under the Agreement, and suffered other monetary damages as a result of being unable to verify information relating to the Partnership.

41.     Plaintiff is therefore entitled to recover damages in an amount to be determined at trial to compensate it for losses arising out of Plaintiff's efforts to gain access to the books and records of the Lancer Fund.

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001913

### Prayer for Relief

WHEREFORE, Morgan Stanley Alternative Investment Partners LP respectfully requests that the Court grant an order and judgment in favor of Plaintiff:

A.      Declaring that Defendants have breached the Partnership Agreement;

B.      Ordering Defendants to provide Plaintiff within 30 days with an audited financial statement for the Lancer Fund relating to the year ending December 31, 2001;

C.      Ordering Defendants to provide Plaintiff immediate and complete access to the Lancer Fund's books and records, as well as the certificate and schedule listing the limited partners, in accordance with the provisions of the Partnership Agreement;

D.      Awarding to Plaintiff damages in an amount to be determined at trial;

E.      Awarding such other and further relief as the Court deems just and proper, together with the cost and expenses of this action, including attorneys' fees and disbursements.


Dated: New York, New York
       November __, 2002



                                        By: _____
                                        [Connecticut Counsel]


                                        *Attorneys for Plaintiff*


9

21429098v7

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

0001914



### BRYAN CAVE ROBINSON SILVERMAN

# Facsimile Cover

Bryan Cave LLP
1290 Avenue of the Americas
New York, NY 10104-2300
Tel (212) 541-2000
Fax (212) 541-4830
www.bryancave.com

This facsimile contains information which (a) may be LEGALLY PRIVILEGED, PROPRIETARY
IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE and (b) is intended
for the use of the Addressee(s) named below. If you are not the Addressee, or the person responsible
for delivering this to the Addressee(s), you are hereby notified that reading, copying or distributing this
facsimile is prohibited. If you have received this facsimile in error, please telephone us immediately
and mail the facsimile back to us at the address to the right. Thank you.

| | | | |
|---|---|---|---|
| Date: | December 18, 2002 | | |
| From: | Robert G. Leonard | Matter: | 166163 |
| Tel: | 212-541-2266 | | |
| To: | Soo-Mi Lee | Fax Number: | 212-762-7129 |
| Company: | Morgan Stanley | Phone Number: | 212-762-8205 |

Message:

To Sender:
Do you wish to be contacted when fax is sent?          ☐ Yes   ☒ No
Do you wish to be contacted at your home/office if fax   ☐ Yes   ☒ No
cannot be sent within one hour?          Tel:

Sender's Fax Number:   212-541-1412          Number of Pages Including Cover: 3

If all pages are not received, please call 212-541-2136 or 2137.

DEC 18 2002 15:43

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001120



BRYAN CAVE ROBINSON SILVERMAN

Robert G. Leonard
Voice: 212-541-2266
Fax: 212-541-1412
rgleonard@bryancave.com

December 19, 2002

VIA FACSIMILE

Soo-Mi Lee
Executive Director and Counsel
Morgan Stanley
1221 Avenue of the Americas
New York, NY 10020

Dear Ms. Lee:

We are in receipt of your December 17, 2002 letter. First, allow me to apologize for any confusion created by your not receiving a formal written response to your earlier records request. You were not being intentionally ignored. We had understood that Morgan Stanley Private Markets Fund I L.P. and Morgan Stanley Institutional Fund of Hedge Funds L.P. (collectively the "MS Funds") were discussing this records request, as well as the MS Funds' redemption requests, with Lancer Management Group II, LLC (the "General Partner") and Lancer Partners, Limited Partnership (the "Partnership").

As you know, the General Partner has fiduciary obligations and responsibility to the Partnership and its limited partners. The General Partner must act in a manner that the General Partner believes to be in the best interest of the Partnership and the limited partners. In addition, the Limited Partnership Agreement provides that any request to inspect the Partnership's books of account or Certificate of Limited Partnership must be made in good faith without any intent to damage the Partnership or any of its Partners in any manner. Accordingly, the General Partner needs sufficient information and assurance of appropriate safeguards to insure that this strict standard is met before releasing information that might damage the Partnership or any of its partners.

The Partnership invests a significant portion of its assets in the securities of small and microcap companies. At times, concentrated positions are taken in such companies. As a result, a change in value of a security in the Partnership's portfolio can have a material positive or negative effect on the portfolio's value. The General Partner believes that there are parties on "the street" that seek to take advantage of the concentration of Partnership's positions to the detriment of the Partnership and the underlying companies. The General Partner, in fact, has witnessed negative movements in the portfolio's securities on the rare occasion when "the street" has become aware of the Partnership's position. It is for the protection of the Partnership and its limited partners that the General Partner closely guards information regarding the underlying portfolio. The General Partner cannot ignore that any disclosure of this information increases the possibility that information could be leaked, which could result in substantial material adverse effect in one or more securities in the portfolio.

Bryan Cave LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Tel (212) 541-2000
Fax (212) 541-4630
www.bryancave.com

Hong Kong
Irvine
Jefferson City
Kansas City
Los Angeles
New York
Overland Park
Phoenix
Shanghai
St. Louis
Washington, DC
and offices in
the Middle East

In association with
Bryan Cave (Illinois)
Chicago

and Bryan Cave,
A Multinational
Partnership
London

DEC 18 2022 15:49

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001121

Soo-Mi Lee
December 19, 2002
Page 2

Indeed, the limited partners, likely in recognition of these issues, have never requested disclosure of the books and records of the Partnership or a list of its limited partners. It also is worth nothing that, since the inception of the Partnership and its predecessor, no limited partner has or group of limited partners has ever submitted a redemption request as large as those submitted by the MS Funds. These facts cannot be ignored in the General Partner's evaluation of your request.

The General Partner also believes that should the names of the limited partners be disclosed to any particular limited partner, certain of those limited partners likely would almost certainly consider the disclosure a betrayal of confidence and would seek immediate withdrawal from the Partnership (the General Partner has advised that it has contacted a number of the non-withdrawing limited partners in the Partnership to inquire whether such limited partners would like their respective names disclosed to a large investment bank firm that was seeking to withdraw from the Partnership and the General Partner was told by each of the non-withdrawing limited partners that they did not want their respective names disclosed). Such withdrawals would erode the Partnership's ability to maximize value for its limited partners.

Furthermore, the General Partner believes that selectively disclosing information to certain investors and not to others is not in the best interest of either the Partnership or the limited partners. The General Partner is very concerned that Morgan Stanley wants to be treated preferentially to all other limited partners.

Finally, the General Partner wants to express its strong view that a lawsuit against the General Partner and the Partnership would not be in the best of the Partnership, its limited partners or the MS Funds. Adverse publicity, devoting time to defend the lawsuit and possible acrimony between the parties could negatively impact the Partnership's portfolio or force a distribution-in-kind. You should think very carefully about the ramifications of commencing a lawsuit and otherwise interfering with the General Partner's operation of the Partnership.

Before the General Partner can evaluate your records request, additional information and safeguards would need to be provided to insure the protection of the portfolio, the Partnership and the confidence enjoyed between the General Partner and the rest of the limited partners. Please contact me at your convenience to arrange a meeting to discuss the records and withdrawal request at your earliest convenience. The General Partner would like to work with you in this regard and we stand ready to sit down and discuss how best to achieve this end.

Sincerely,

Robert G. Leonard

cc: Lancer Management Group II, LLC

C61556-166163/1032791v2

Confidential Treatment Requested By Morgan Stanley & Co. Incorporated

0001122

# EXHIBIT 29

A 0 0 3 5 4

# Lancer Partners, L.P.

## Year-To-Date Review

Dear Partner:                                                                                    July 10, 2000

Although some semblance of stability crept back into the equity markets in June, the nervousness quotient remains high, with (we think) good justification.  The Dow Industrial's June decline (less than 1%) represented the fifth negative monthly performance this year, for an aggregate net loss of 10%.  Indeed, even on a twelve-month trailing basis this key index registers a deficit of 5%.  The S&P 500 and the Russell 2000 are faring somewhat less badly; however both remain close to break-even year-to-date, and have posted single digit gains for the past twelve months. **The Partnership remained essentially unchanged for the month of June, putting the year-to-date performance at approximately 11%.**

As mentioned in our June correspondence, we believe the rotational nature of the continuing market correction is bullish for the longer term, as the valuation excesses in certain sectors are translating to a reallocation of liquidity to formerly less favored sectors. Bottoms-up stock picking will remain the ticket to successful investing over the next twelve to eighteen months, and is one of the reasons why we remain optimistic about the performance outlook for Lancer. First, in our opinion, the present composition of the portfolio is vastly richer in the opportunity for gain than in the risk of loss over the next twelve months.  Second, new opportunities that are likely to meet our investment criteria and are currently undergoing our scrutiny are more numerous than we have seen in quite some time.

**Some observations:**
- The index rebalancing phenomenon (see the attached *WSJ* article) nipped the performance of the Partnership in June, literally in the final seconds of the month's last trading day, as a couple of our significant positions posted meaningful, yet unexplained declines, before rebounding the following Monday.   Consider as an example US Industries, one of our significant positions. The stock was trading at $15 (up 11% for the month of June) minutes before the close on June 30th.  But several huge blocks that traded at just about 4 pm dropped the price to $12 on the final trade, turning the 11% monthly gain into an 11% monthly loss.    As the article implies, the regulatory agencies are looking into the activity and we certainly hope we can chalk it up to a one-time event. As of this writing, US Industries is up 20% in July.

- The Federal Reserve's interest rate strangulation policy is finally appearing to bear fruit, with the economy's leading indicators weakening, most recently to negative growth. The Manufacturers' Index fell again in June, for its fourth consecutive decline. This however is an ominous omen for the earnings prospects of industrial America, and by implication the many "high expectations" stocks we tend to favor as our short-selling

1

candidates.    The list of those companies who were victims of recent negative pre-announcements or changing analyst opinions is too lengthy to mention, but the roster is remarkable for both its blue-chip membership and the severity of punishments conferred on the culprit companies' market capitalization. We think the carnage will get worse before things stabilize, and at prevailing valuations, the "favorite" stocks are priced for perfection that is not forthcoming, particularly in a weaker economic climate.   We believe that the Lancer strategy that largely focuses on "low expectation" companies with upward revaluation catalysts will, to a significant degree, isolate the portfolio from the veritable minefield of valuation implosions.

- Although there are indications that consumers are beginning to delay big-ticket item purchases, the economy is still quite healthy, and does not appear at risk of a recession. Rather, it may slow its growth pace to a less inflation-threatening and thus a more Fed-acceptable pace, suggesting less interest pressures in the future.   A friendlier Fed will certainly help in the long run.  The market appears to be building a base, and with less margin debt speculation, and with individual investors still committed to their mutual funds (although fund managers have raised cash balances recently), the worst of the correction may be over.  The risk-reward has turned modestly positive, certainly when one is selective enough to focus on specific groups, which are already doing quite well even in the recent volatile times.

As a reminder, our mid-year conference call will be held in early August, so as to allow us to encompass one more month of performance review.

Sincerely,                                                         Michael Lauer, General Partner

2

# EXHIBIT 30

Banc Of America Securities LLC

Client Position Summary by Asset Class

118-11892 Lancer Partners LP
PosSum-CTA

Page: 1
As Of: 06/30/00
Printed: 07/06/00

**CASH BALANCES**

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 3,210,670 USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | 3,210,669.79 | 3,210,669.79 | 0.00 | 1.65 |
| 494,351 USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 494,351.18 | 494,351.18 | 0.00 | 0.25 |
| | **TOTAL CASH BALANCES** | | | 0.00 | 3,705,020.97 | 3,705,020.97 | 0.00 | 1.90 |

**LONG POSITIONS**

**Fixed Income**

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 500,000 | 8855705 | TELEDATA WORLD SERVICES 12% NT | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.26 |
| 500,000 | OSGELOAN | OSAGE SYSTEMS GROUP (OSE) | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.26 |
| 1,000,000 | SKYLOAN | SKYNET BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,000,000.00 | 1,000,000.00 | 0.00 | 0.51 |
| 850,000 | SKYLOAN2 | SKYNET BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 850,000.00 | 850,000.00 | 0.00 | 0.44 |
| | | **Total Long Fixed Income** | | | 0.00 | 2,850,000.00 | 2,850,000.00 | 0.00 | 1.46 |

**Equities**

| SHR/FACE | Symbol | Name | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 529,500 | AVWK | AT VENTUREWORKS INC | 0.6472 | 1.4000 | 116.33 | 342,674.80 | 741,300.00 | 398,625.20 | 0.38 |
| 5,500 | CNFT | CNF TECHNOLOGIES INC | 4.4827 | 5.0000 | 11.54 | 24,655.00 | 27,500.00 | 2,845.00 | 0.01 |
| 54,700 | CACI | CACI INTL INC | 26.6760 | 19.5000 | (26.90) | 1,459,175.42 | 1,066,650.00 | (392,525.42) | 0.55 |
| 250,000 | C007585 | CHINA BROADBAND CORP | 7.5000 | 7.5000 | 0.00 | 1,875,000.00 | 1,875,000.00 | 0.00 | 0.96 |
| 2,453,548 | PLCR | CREDIT STORE INC | 1.0098 | 4.6875 | 364.19 | 2,477,658.16 | 11,501,006.25 | 9,023,348.09 | 5.90 |
| 150,000 | CYDX | CYTOMEDIX INC | 2.8000 | 8.8750 | 216.96 | 420,000.00 | 1,331,250.00 | 911,250.00 | 0.68 |
| 555,350 | DRS | DIAGNOSTIC RETRIEVAL SYS INC | 10.9010 | 11.6250 | 6.62 | 6,054,963.80 | 6,455,943.75 | 400,979.95 | 3.31 |
| 631,150 | DECOC | DECORA INDS INC | 5.8012 | 0.4687 | (91.92) | 3,661,451.56 | 295,820.00 | (3,365,631.56) | 0.15 |
| 165,000 | DRCT | DIRECT INTL MARKETING INC | 2.8951 | 14.2500 | 392.21 | 477,695.50 | 2,351,250.00 | 1,873,554.50 | 1.21 |
| 10,000 | DTR | DONALDSON LUFKIN & JENRETTE NW | 8.9380 | 7.1250 | (20.28) | 89,380.00 | 71,250.00 | (18,130.00) | 0.04 |
| 9,600 | EPTG | EPL TECHNOLOGIES INC NEW | 1.3050 | 1.3125 | 0.58 | 12,527.64 | 12,600.00 | 72.36 | 0.01 |
| 220,000 | ECSL | ECARE SOLUTIONS INC | 1.0273 | 1.5000 | 46.02 | 226,000.00 | 330,000.00 | 104,000.00 | 0.17 |
| 434,900 | FTGX | FIBERNET TELECOM GROUP INC | 3.5105 | 17.0000 | 384.27 | 1,526,703.68 | 7,393,300.00 | 5,866,596.32 | 3.79 |
| 192,623 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 14.1830 | 27.0000 | 90.37 | 2,731,969.65 | 5,200,821.00 | 2,468,851.35 | 2.67 |
| 1,521,500 | GETT | GLOBAL E TUTOR INC | 0.2747 | 1.7500 | 536.97 | 418,015.00 | 2,662,625.00 | 2,244,610.00 | 1.37 |
| 80,000 | GFF | GRIFFON CORP | 7.9832 | 5.5625 | (30.32) | 638,653.00 | 445,000.00 | (193,653.00) | 0.23 |
| 33,600 | INTV | INTERVOICE INC | 12.9365 | 6.5625 | (49.27) | 434,666.00 | 220,500.00 | (214,166.00) | 0.11 |
| 125,000 | MNGX | MANOSOFT INC | 4.0000 | 12.6250 | 215.63 | 500,000.00 | 1,578,125.00 | 1,078,125.00 | 0.81 |
| 12,001,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.0547 | 2.2500 | 4011.20 | 656,791.58 | 27,002,250.00 | 26,345,458.42 | 13.85 |
| 166,860 | MHTXM | MANHATTAN SCIENTIFICS | 0.0000 | | | 0.00 | 26,133,324.00 | 26,133,324.00 | 13.41 |
| 166,800 | MLRE | MILLIONAIRE.COM INC | 0.1600 | 1.1000 | 587.50 | 26,688.00 | 183,480.00 | 156,792.00 | 0.09 |
| 3,453,380 | NURC | NEUROCORP LTD | 0.4221 | 2.7500 | 551.50 | 1,457,670.75 | 9,496,795.00 | 8,039,124.25 | 4.87 |
| 1,676,666 | OSE | OSAGE SYSTEMS GROUP INC | 0.3130 | 2.5000 | 698.81 | 524,741.80 | 4,191,665.00 | 3,666,923.20 | 2.15 |
| 10,000 | PMBC | PACIFIC MERCANTILE BANCORP | 8.0015 | 8.0000 | (0.02) | 80,015.00 | 80,000.00 | (15.00) | 0.04 |
| 500,000 | RXTX | RX TECHNOLOGY HLDGS INC' | 0.0410 | 1.8125 | 4320.73 | 20,500.00 | 906,250.00 | 885,750.00 | 0.47 |
| 25,000 | SMKX | SMK CORP | 1.3756 | 2.3750 | 72.65 | 34,390.00 | 59,375.00 | 24,985.00 | 0.03 |
| 350,000 | 8856815 | SINEX/NK TECHNOLOGIES INC | 1.9000 | 1.3750 | (27.63) | 665,000.00 | 481,250.00 | (183,750.00) | 0.25 |
| 592,500 | SMXT | SIMEX CORP | 0.9846 | 1.3750 | 39.65 | 583,396.25 | 814,687.50 | 231,291.25 | 0.42 |
| 216,500 | SYM | SKYNET HOLDINGS INC PRVT RSTK | 2.4724 | 0.3438 | (86.10) | 535,274.25 | 74,421.88 | (460,852.38) | 0.04 |
| 440,000 | 8856830 | SKYNET HOLDINGS INC PRVT RSTK | 2.2500 | 0.5313 | (76.39) | 990,000.00 | 233,750.00 | (756,250.00) | 0.12 |
| 1,058,700 | SYPM | SYMPOSIUM TELECOM CORP | 1.0553 | 2.1250 | 101.37 | 1,117,231.44 | 2,249,737.50 | 1,132,506.06 | 1.15 |
| 5,000 | TMOS | TELEDATA WORLD SERVICES INC | 0.1530 | 0.1500 | (1.96) | 765.00 | 750.00 | (15.00) | 0.00 |

A00869

Banc Of America Securities LLC
Client Position Summary by Asset Class

118-11892 Lancer Partners LP

PosSum-CTA

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 259,650 | BBS437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 26.9500 | | 0.00 | 6,997,567.50 | 6,997,567.50 | 3.59 |
| 316,900 | TTN | TITAN CORP | 6.4989 | 44.7500 | 588.58 | 2,059,495.02 | 14,181,275.00 | 12,121,779.98 | 7.28 |
| 1,968,397 | TFGP | TOTAL FILM GROUP INC | 1.2480 | 4.1875 | 235.54 | 2,456,541.65 | 8,242,662.44 | 5,786,120.79 | 4.23 |
| 267,350 | USPL | U S PLASTIC LBR CORP | 8.8644 | 4.4063 | (50.29) | 2,369,885.42 | 1,178,010.94 | (1,191,874.48) | 0.60 |
| 219,100 | USI | U S INDUSTRIES INC NEW | 11.2049 | 12.1250 | (8.21) | 2,894,297.66 | 2,656,587.50 | (237,710.16) | 1.36 |
| 2,076,667 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.6000 | 0.7500 | 25.00 | 1,246,000.00 | 1,557,500.25 | 311,500.25 | 0.80 |
| 668,500 | UHTS | UNIVERSAL HEIGHTS INC | 0.6974 | 0.7500 | 7.55 | 466,180.70 | 501,375.00 | 35,194.30 | 0.26 |
| 100,000 | 9386761 | WARRANTS FIBERNET TELXTOM | 0.0000 | 17.0000 | | 0.00 | 1,700,000.00 | 1,700,000.00 | 0.87 |
| 125,000 | 9380042 | NETVALUE HOLDINGS INC | 12.0000 | 12.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.77 |
| 56,250 | 9389989 | ZI CORP WARRANTS CONV @ 22.75 | 0.0000 | 0.0100 | | 0.00 | 562.50 | 562.50 | 0.00 |
| 2,317,024 | XWC | WORLD WIRELESS COMMUNICATIONS | 1.3849 | 3.6250 | 161.75 | 3,208,863.36 | 8,399,212.00 | 5,190,348.64 | 4.31 |
| 1,835,610 | ZICA | **21 CORPORATION | 3.2832 | 9.2000 | 181.74 | 6,026,680.58 | 16,979,392.50 | 10,952,711.92 | 8.71 |
| 2,500,000 | OSEWTS | OSAGE SYSTEMS WARRANTS CONVERT @ | 0.0000 | 3.5000 | | 0.00 | 8,750,000.00 | 8,750,000.00 | 4.49 |
| 450,000 | 8350395 | AUTOMOTIVE PERFORMANCE GROUP | 0.0000 | 0.5000 | | 0.00 | 225,000.00 | 225,000.00 | 0.12 |
| Total Long Equities | | | | | 260.17 | 52,291,575.17 | 188,336,854.06 | 136,045,278.89 | 96.64 |
| TOTAL LONG POSITIONS | | | | | 246.72 | 55,141,575.17 | 191,186,854.06 | 136,045,278.89 | 98.10 |
| TOTAL EXPOSURE VALUE | | | | | | 55,141,575.17 | 191,186,854.06 | 136,045,278.89 | 98.10 |
| NET EXPOSURE VALUE | | | | | | 55,141,575.17 | 191,186,854.06 | 136,045,278.89 | 98.10 |
| TOTAL LONG POSITIONS | | | | | | 55,141,575.17 | 191,186,854.06 | 136,045,278.89 | 98.10 |
| TOTAL SHORT POSITIONS | | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH | | | | | | 3,705,020.97 | 3,705,020.97 | | 1.90 |
| TOTAL | | | | | | 58,846,596.14 | 194,891,875.03 | 136,045,278.89 | 100.00 |

A00877

118-11892 Lancer Partners LP
PosSum CTA

**Banc Of America Securities LLC**
**Client Position Summary by Asset Class**

Page: 1
As Of: 07/31/00
Printed : 10/12/00

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH BALANCES** | | | | | | | | | |
| 766,152 USD | TYPE 2 | | 1.0000 | 1.0000 | 0.00 | 766,151.85 | 766,151.85 | 0.00 | 0.40 |
| 494,351 USD | TYPE 3 | | 1.0000 | 1.0000 | 0.00 | 494,351.18 | 494,351.18 | 0.00 | 0.26 |
| 400,000 USD | TYPE 6 | | 1.0000 | 1.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.21 |
| | TOTAL CASH BALANCES | | | | 0.00 | 1,660,503.03 | 1,660,503.03 | 0.00 | 0.87 |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 500,000 | 8855705 | TELEDATA WORLD SERVICES 12% NT | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.26 |
| 500,000 | OSGELOAN | OSAGE SYSTEMS GROUP (OSE) | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.26 |
| 1,000,000 | SKYLOAN | SKYNET BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,000,000.00 | 1,000,000.00 | 0.00 | 0.52 |
| 850,000 | SKYLOAN2 | SKYNET BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 850,000.00 | 850,000.00 | 0.00 | 0.44 |
| | Total Long Fixed Income | | | | 0.00 | 2,850,000.00 | 2,850,000.00 | 0.00 | 1.49 |
| **Equities** | | | | | | | | | |
| 529,500 | AVWK | AT VENTUREWORKS INC | 0.6457 | 1.1750 | 81.96 | 341,923.75 | 622,162.50 | 280,238.75 | 0.32 |
| 5,500 | CNFT | CNF TECHNOLOGIES INC | 4.4827 | 4.4375 | (1.01) | 24,655.00 | 24,406.25 | (248.75) | 0.01 |
| 64,200 | CACI | CACI INTL INC | 25.4719 | 17.0000 | (31.26) | 1,635,296.67 | 1,091,400.00 | (543,896.67) | 0.57 |
| 250,000 | CBBH | CHINA BROADBAND CORP | 7.5000 | 7.5000 | 0.00 | 1,875,000.00 | 1,875,000.00 | 0.00 | 0.98 |
| 2,473,548 | CDS | CREDIT STORE INC | 1.0367 | 4.3438 | 319.01 | 2,564,273.16 | 10,744,474.13 | 8,180,200.97 | 5.61 |
| 150,000 | CYDX | CYTOMEDIX INC | 2.8000 | 8.0000 | 185.71 | 420,000.00 | 1,200,000.00 | 780,000.00 | 0.63 |
| 555,350 | DRS | DIAGNOSTIC RETRIEVAL SYS INC | 10.9030 | 10.7400 | (1.49) | 6,054,943.80 | 5,964,459.00 | (90,484.80) | 3.11 |
| 631,150 | DECO | DECORA INDS INC | 5.8012 | 0.5000 | (91.38) | 3,661,423.06 | 315,575.00 | (3,345,848.06) | 0.16 |
| 165,000 | DRCT | DIRECT III MARKETING INC | 2.8951 | 14.5000 | 400.84 | 477,695.50 | 2,392,500.00 | 1,914,804.50 | 1.25 |
| 10,000 | DIR | DONALDSON LUFKIN & JENRETTE NW | 8.9380 | 6.7500 | (24.48) | 89,380.00 | 67,500.00 | (21,880.00) | 0.04 |
| 9,600 | EPTG | EPL TECHNOLOGIES INC NEW | 1.3050 | 0.9688 | (25.76) | 12,527.64 | 9,300.00 | (3,227.64) | 0.00 |
| 220,000 | ECSL | ECARE SOLUTIONS INC | 1.0273 | 1.9375 | 88.61 | 226,000.00 | 426,250.00 | 200,250.00 | 0.22 |
| 439,900 | FTGX | FIBERNET TELECOM GROUP INC | 3.6474 | 16.1250 | 342.10 | 1,604,473.68 | 7,093,387.50 | 5,488,913.82 | 3.70 |
| 202,623 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 14.4874 | 22.1250 | 52.72 | 2,935,484.65 | 4,483,033.88 | 1,547,549.23 | 2.34 |
| 1,521,500 | GETT | GLOBAL E TUTOR INC | 0.2747 | 0.8125 | 195.74 | 418,015.05 | 1,236,218.75 | 818,203.75 | 0.65 |
| 90,000 | GFT | GRIFFON CORP | 7.7616 | 6.2500 | (19.48) | 698,544.00 | 562,500.00 | (136,044.00) | 0.29 |
| 90,000 | INTV | INTERVOICE INC | 4.8296 | 2.3800 | (50.72) | 434,666.00 | 214,200.00 | (220,466.00) | 0.11 |
| 125,000 | MNGX | MANGOSOFT INC | 4.0000 | 12.7500 | 218.75 | 500,000.00 | 1,593,750.00 | 1,093,750.00 | 0.83 |
| 12,036,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.0630 | 2.8750 | 4462.17 | 758,487.58 | 34,601,500.00 | 33,845,012.42 | 18.07 |
| 7,466,664 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 3.5000 | 0.00 | 0.00 | 26,133,324.00 | 26,133,324.00 | 13.65 |
| 166,800 | MLRE | MILLIONAIRE.COM | 0.1600 | 0.7350 | 359.38 | 26,688.00 | 122,598.00 | 95,910.00 | 0.06 |
| 3,453,380 | NURC | NEUROCORP LTD | 0.4221 | 2.6875 | 536.70 | 1,457,670.75 | 9,280,958.75 | 7,823,288.00 | 4.85 |
| 1,696,666 | OSE | OSAGE SYSTEMS GROUP INC | 0.3318 | 2.0000 | 502.77 | 562,954.80 | 3,393,332.00 | 2,830,377.20 | 1.77 |
| 500,000 | PCFC | PIONEER COMMERCIAL FUNDING | 5.0530 | 5.0625 | 0.19 | 2,526,500.00 | 2,531,250.00 | 4,750.00 | 0.01 |
| 500,000 | RKTX | RX TECHNOLOGY HLDGS INC | 0.0410 | 2.1250 | 5082.93 | 20,500.00 | 1,062,500.00 | 1,042,000.00 | 0.55 |
| 230,500 | SMX | SMX CORP | 1.8220 | 2.2031 | 20.91 | 429,092.50 | 518,830.05 | 89,737.55 | 0.27 |
| 350,000 | SMXX | SIMEX/NK TECHNOLOGIES INC | 1.9000 | 1.7500 | (7.89) | 665,000.00 | 612,500.00 | (52,500.00) | 0.32 |
| 592,500 | SMXT | SIMEX CORP | 0.9846 | 1.7500 | 77.73 | 583,396.25 | 1,036,875.00 | 453,478.75 | 0.54 |
| 216,500 | SKYN | SKYNET | 2.4724 | 0.3438 | (86.10) | 535,274.25 | 74,421.88 | (460,852.38) | 0.04 |
| 440,000 | 8856830 | SKYNET HOLDINGS INC PRVT RSTK | 2.2500 | 0.5313 | (76.39) | 990,000.00 | 233,750.00 | (756,250.00) | 0.12 |
| 1,058,700 | SSM | SYMPOSIUM CORPORATION | 1.0553 | 3.0000 | 184.28 | 1,117,231.44 | 3,176,100.00 | 2,058,868.56 | 1.66 |

A00878

~11892 Lancer Partners LP
Sum=CTA

Banc of America Securities LLC

Client Position Summary by Asset Class

Page: 2
As Of : 07/31/00
Printed : 10/12/00

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 5,000 | TWOS | TELEDATA WORLD SERVICES INC | 0.1530 | 0.0800 | (47.71) | 765.00 | 400.00 | (365.00) | 0.00 |
| 259,650 | 8855437 | WTS FILM FUNDING CORPORATION | 0.0000 | 26.9500 | | 0.00 | 6,997,567.50 | 6,997,567.50 | 3.65 |
| 316,900 | TTN | TITAN CORP | 6.4989 | 29.6875 | 356.81 | 2,059,495.02 | 9,407,968.75 | 7,348,473.73 | 4.91 |
| 1,908,397 | TFGI | TOTAL FILM GROUP INC | 1.2400 | 4.8125 | 289.62 | 2,406,541.65 | 9,472,910.56 | 7,016,368.91 | 4.95 |
| 267,350 | USPL | U S PLASTIC LMBR CORP | 8.0644 | 3.8750 | (56.29) | 2,164,845.42 | 1,035,981.25 | (1,313,904.17) | 0.54 |
| 227,100 | USI | U S INDUSTRIES INC NEW | 13.1972 | 13.1250 | (0.55) | 2,997,094.46 | 2,980,687.50 | (16,406.96) | 1.56 |
| 2,016,667 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.6000 | 0.7700 | 25.00 | 1,246,000.00 | 1,557,500.25 | 311,500.25 | 0.81 |
| 668,500 | UHTS | UNIVERSAL HEIGHTS INC | 0.6974 | 0.7500 | 7.55 | 466,180.70 | 501,375.00 | 35,194.30 | 0.26 |
| 100,000 | 9386761 | WARRANTS FIBERNET TELECOM | 0.0000 | 17.0000 | | 0.00 | 1,700,000.00 | 1,700,000.00 | 0.89 |
| 125,000 | 9389042 | NETVALUE HOLDINGS INC | 12.0000 | 12.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.78 |
| 56,250 | 9389909 | Z1 CORP WARRANTS CONV @ 22.75 | 0.0000 | 0.0100 | | 0.00 | 562.50 | 562.50 | 0.00 |
| 2,327,024 | XWC | WORLD WIRELESS COMMUNICATIONS | 1.3948 | 3.8750 | 177.82 | 3,245,760.36 | 9,011,218.00 | 5,771,457.64 | 4.71 |
| 1,845,610 | Z1CA | ***Z1 CORPORATION | 3.3047 | 7.3750 | 123.17 | 6,099,111.58 | 13,611,373.75 | 7,512,262.17 | 7.11 |
| 2,500,000 | OSEWTS | OSAGE SYSTEMS WARRANTS CONVERT @ | 0.0000 | 3.5000 | | 0.00 | 8,750,000.00 | 8,750,000.00 | 4.57 |
| 450,000 | 8350395 | AUTOMOTIVE PERFORMANCE GROUP | 0.0000 | 0.5000 | | 0.00 | 225,000.00 | 225,000.00 | 0.12 |
| | | Total Long Equities | | | 248.88 | 53,586,715.67 | 186,954,217.74 | 133,367,502.07 | 97.64 |
| | | TOTAL LONG POSITIONS | | | 236.31 | 56,436,715.67 | 189,804,217.74 | 133,367,502.07 | 99.13 |
| | | TOTAL EXPOSURE VALUE | | | | 56,436,715.67 | 189,804,217.74 | 133,367,502.07 | 99.13 |
| | | NET EXPOSURE VALUE | | | | 56,436,715.67 | 189,804,217.74 | 133,367,502.07 | 99.13 |
| | | TOTAL LONG POSITIONS | | | | 56,436,715.67 | 189,804,217.74 | 133,367,502.07 | 99.13 |
| | | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH | | | | 1,660,503.03 | 1,660,503.03 | | 0.87 |
| | | TOTAL | | | | 58,097,218.70 | 191,464,720.77 | 133,367,502.07 | 100.00 |

# EXHIBIT 31

A 0 0 2 6 3

# Lancer Offshore, Inc.

## Monthly Performance Update

Dear Shareholder:                                                    September 3, 2001

Apologies for starting our monthly commentary with yet another litany of dejecting statistics, but the scope of the damage being inflicted on some of the previously valuation extended indexes is worth emphasizing. The NASDAQ Composite, the index darling of so many growth and momentum investors, returned to its double-digit volatility in August, dropping 11% for the month. Coupled with July's 6% decline, the Composite is down 17% two-thirds through the third quarter, and 27% year-to-date (YTD). This follows the 40% plunge last year. On a twelve-month trailing basis, the NASDAQ Composite is down nearly 60%. Other, previously less extended market indexes are behaving less horrifically, but continue to add to their YTD losses. The S&P 500 and the Russell 2000 declined 6% and 3%, respectively for the month of August, extending their twelve-month trailing losses to 25% and 13%, respectively.

A broader market of stocks, particularly the ones that did not enjoy much favor in the feverish 1995-1999 timeframe are actually doing okay. Consider that the S&P 600 Small Cap Index is in fact sporting a modest gain, as is the Value Line Arithmetic Index of nearly 1700 equally weighted stocks.

**As the market seeks to find its footing, we think it prudent to emphasize capital preservation as our paramount near-term objective. Lancer Offshore's YTD, as well as its twelve-trailing month performance continues to show a mid-single digit advance (the final NAV will be available later this week). On a longer-term basis, the Fund is up 110% over the past 36 months, and nearly 800% since its inception in October 1995.** The S&P 500 and the Russell 2000 total return over the past 3 years is 18% and 9%, respectively and 94% and 51%, respectively since October 1995.

**Some observations:**
Three points worth making regarding the NASDAQ's collapse:
1) A close correlation between the size of the capitalization of the underlying companies and the extent of the market bruising continues. The larger the company, the more the damage, presumably owing to the 1995 through 1999 institutional investors' infatuation with the "big-cap growth" theme that drove valuations of these companies to absurd levels. Consider that the NASDAQ 100 (Composite's 100 largest companies) is showing a YTD loss of nearly 40%! That after a 40% plus bruising last year.

2) The NASDAQ's damage is actually worse than the already abysmal statistics indicate. By far the largest component of this capitalization weighted index is Microsoft, which is actually up 32% YTD (we continue to believe its stock is overvalued and vulnerable to a significant pullback), favorably distorting the realities among its mega-technology peers (such as Cisco, EMC, Oracle, Sun Micro, etc.), whose average decline for the year appears to be around 60%.

3) <u>Massive damage does not necessarily constitute a bargain</u>. A legacy of the 1995 through 1999 excesses that drove the NASDAQ from approximately 750 to north of 5000 by early 2000, is the nearly 70% retracement which brings the valuations closer to reasonable, but not necessarily a bargain territory. For example, now that we know that Cisco is just another hyper-cyclical entity (living off ultra-volatile markets) that will struggle to generate $20 billion in revenue, while reporting a deficit, is this company still really worth $120 billion? We already know that its $600 billion market cap in March 2000 was quite silly, even when the company was touted by Wall Street's research as a perpetual 50%+ plus grower. The fact is that there is still a myriad of mega-caps whose top to bottom declines may be in excess of 80%, yet their valuations are still detached from the economic realities. Is, for example, Oracle still worth $80 billion or Dell $60B, Sun Micro $40B or EMC or Nortel $35B and $20B respectively, to say nothing about Microsoft's $350B (fully diluted)?   Clearly, there is a lot of potential downside in these names.

- In our opinion, Wall Street is underestimating the significance of the Financial Accounting Standard Board's new ruling on accounting for goodwill in acquisitions. We think it will offer a big boost in reported earnings for many acquisition minded companies, and given our historical emphasis on a "consolidation" theme, that is a major positive. Moreover, the number of transactions is likely to proliferate and the premiums paid could be justifiably higher, as the earnings accretion to acquiring companies is easier to derive. The rule takes effect for most companies in January 2002, but because of a fiscal year anomaly, DRS Technologies (a defense electronics company in our portfolio) already has adopted this standard. Consider that for the June quarter, the Company reported $0.30 per share, significantly above the $0.23 (vs. $0.18 of prior year) it would have reported prior to the adoption. Instead of $1.20, the Company is now likely to report EPS in excess of $1.50 for the year (vs. $1.00 last year). As DRS's growth history was strongly influenced by acquisitions, the senior management confirms that the new FASB accounting standard will make it is easier to justify immediate accretion to EPS in the future, thus increasing the universe of potential acquisition candidates.

- Seasonally, the month of September is the year's worst month for the Dow Industrials, but the nastiest month for NASDAQ is not until October (August is historically the second worst). The best six-month period will not commence until November 1st. However, given the extent of the damage the markets have incurred over the past 18 months, the historical patterns may not hold. For more of our views on the market, please see our monthly letters dated July 11th and August 1st of 2001.

We conclude with a recent Financial Times interview with Roy Neuberger (see attached), whose market perspective, which dates back to the great depression, is illuminating and perhaps timely. We still have some copies of Roy's autobiography, *"So Far, So Good-The First 94 Years,"* that were autographed for Lancer's investors. Please contact us if you would like a copy of this inspirational and enlightening book.

Sincerely,                                                    Michael Lauer, Investment Manager

2

A 0 0 2 6 9

# 𝕷𝖆𝖓𝖈𝖊𝖗 𝕻𝖆𝖗𝖙𝖓𝖊𝖗𝖘, 𝕷.𝕻.

## Monthly Performance Update

Dear Partner:                                                    September 6, 2001

Apologies for starting our monthly commentary with yet another litany of dejecting statistics, but the scope of the damage being inflicted on some of the previously valuation extended indexes is worth emphasizing. The NASDAQ Composite, the index darling of so many growth and momentum investors, returned to its double-digit volatility in August, dropping 11% for the month. Coupled with July's 6% decline, the Composite is down 17% two-thirds through the third quarter, and 27% year-to-date (YTD). This follows the 40% plunge last year. On a twelve-month trailing basis, the NASDAQ Composite is down nearly 60%. Other, previously less extended market indexes are behaving less horrifically, but continue to add to their YTD losses. The S&P 500 and the Russell 2000 declined 6% and 3%, respectively for the month of August, extending their twelve-month trailing losses to 25% and 13%, respectively.

A broader market of stocks, particularly the ones that did not enjoy much favor in the feverish 1995-1999 timeframe are actually doing okay. Consider that the S&P 600 Small Cap Index is in fact sporting a modest gain, as is the Value Line Arithmetic Index of nearly 1700 equally weighted stocks.

**As the market seeks to find its footing, we think it prudent to emphasize capital preservation as our paramount near-term objective. Lancer Partners' YTD, as well as its twelve-trailing month performance continues to show a slightly positive advance.**

**Some observations:**
Three points worth making regarding the NASDAQ's collapse:
1) A close correlation between the size of the capitalization of the underlying companies and the extent of the market bruising continues. The larger the company, the more the damage, presumably owing to the 1995 through 1999 institutional investors' infatuation with the "big-cap growth" theme that drove valuations of these companies to absurd levels. Consider that the NASDAQ 100 (Composite's 100 largest companies) is showing a YTD loss of nearly 40%! That after a 40% plus bruising last year.

2) The NASDAQ's damage is actually worse than the already abysmal statistics indicate. By far the largest component of this capitalization weighted index is Microsoft, which is actually up 32% YTD (we continue to believe its stock is overvalued and vulnerable to a significant pullback), favorably distorting the realities among its mega-technology peers (such as Cisco, EMC, Oracle, Sun Micro, etc.), whose average decline for the year appears to be around 60%.

A00270

3) <u>Massive damage does not necessarily constitute a bargain</u>. A legacy of the 1995 through 1999 excesses that drove the NASDAQ from approximately 750 to north of 5000 by early 2000, is the nearly 70% retracement which brings the valuations closer to reasonable, but not necessarily a bargain territory. For example, now that we know that Cisco is just another hyper-cyclical entity (living off ultra-volatile markets) that will struggle to generate $20 billion in revenue, while reporting a deficit, is this company still really worth $120 billion? We already know that its $600 billion market cap in March 2000 was quite silly, even when the company was touted by Wall Street's research as a perpetual 50%+ plus grower. The fact is that there is still a myriad of mega-caps whose top to bottom declines may be in excess of 80%, yet their valuations are still detached from the economic realities. Is, for example, Oracle still worth $80 billion or Dell $60B, Sun Micro $40B or EMC or Nortel $35B and $20B respectively, to say nothing about Microsoft's $350B (fully diluted)?   Clearly, there is a lot of potential downside in these names.

- In our opinion, Wall Street is underestimating the significance of the Financial Accounting Standard Board's new ruling on accounting for goodwill in acquisitions. We think it will offer a big boost in reported earnings for many acquisition minded companies, and given our historical emphasis on a "consolidation" theme, that is a major positive. Moreover, the number of transactions is likely to proliferate and the premiums paid could be justifiably higher, as the earnings accretion to acquiring companies is easier to derive. The rule takes effect for most companies in January 2002, but because of a fiscal year anomaly, DRS Technologies (a defense electronics company in our portfolio) already has adopted this standard. Consider that for the June quarter, the Company reported $0.30 per share, significantly above the $0.23 (vs. $0.18 of prior year) it would have reported prior to the adoption. Instead of $1.20, the Company is now likely to report EPS in excess of $1.50 for the year (vs. $1.00 last year). As DRS's growth history was strongly influenced by acquisitions, the senior management confirms that the new FASB accounting standard will make it is easier to justify immediate accretion to EPS in the future, thus increasing the universe of potential acquisition candidates.

- Seasonally, the month of September is the year's worst month for the Dow Industrials, but the nastiest month for NASDAQ is not until October (August is historically the second worst). The best six-month period will not commence until November 1st. However, given the extent of the damage the markets have incurred over the past 18 months, the historical patterns may not hold.  For more of our views on the market, please see our previous commentaries.

We conclude with a recent Financial Times interview with Roy Neuberger (see attached), whose market perspective, which dates back to the great depression, is illuminating and perhaps timely. We still have some copies of Roy's autobiography, *"So Far, So Good-The First 94 Years,"* that were autographed for Lancer's investors. Please contact us if you would like a copy of this inspirational and enlightening book.

Sincerely,

Michael Lauer, General Partner

2

# EXHIBIT 32

A 0 1 0 4 0

118-11892 Lancer Partners LP

PosSum-TCBA

Banc Of America Securities LLC

Client Position Summary by Asset Class

| SUR/FACE | Symbol | Description | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (13,330,775) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (13,330,775.21) | (13,330,775.21) | 0.00 | (6.68) |
| 479,997 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 479,997.11 | 479,997.11 | 0.00 | 0.24 |
| | | TOTAL CASH AND EQUIVALENTS | | | | (12,850,778.10) | (12,850,778.10) | 0.00 | (6.44) |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 250,000 | 9386655 | LIGHTHOUSE LANDINGS INC | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.13 |
| 1,050,000 | EQUILLOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,050,000.00 | 1,050,000.00 | 0.00 | 0.53 |
| 300,000 | LLFILOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.15 |
| 500,000 | OSGELOAN | OSAGE SYSTEMS GROUP (OSE) | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.25 |
| 500,000 | TFGPLOAN4 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.25 |
| 350,000 | XWCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.18 |
| | | Total Long Fixed Income | | | | 2,950,000.00 | 2,950,000.00 | 0.00 | 1.48 |
| **Equities** | | | | | | | | | |
| 141,000 | APAC | APAC TELESERVICES INC | 2.9601 | 2.9000 | (2.03) | 417,380.00 | 408,900.00 | (8,480.00) | 0.20 |
| 3,289,367 | AURA | AURA SYSTEMS INC | 0.3648 | 0.5900 | 61.73 | 1,200,000.30 | 1,940,726.53 | 740,726.23 | 0.97 |
| 35,000 | BTGI | BTG INC | 9.1600 | 9.3600 | 2.18 | 320,600.00 | 327,600.00 | 7,000.00 | 0.16 |
| 250,000 | CBBD | CHINA BROADBAND CORP | 7.5000 | 0.6000 | (92.00) | 1,875,000.00 | 150,000.00 | (1,725,000.00) | 0.08 |
| 20,000 | CPWR | COMPUWARE CORP | 14.0240 | 12.2100 | (12.93) | 280,480.00 | 244,200.00 | (36,280.00) | 0.12 |
| 2,774,048 | CDS | CREDIT STORE INC | 1.1434 | 1.6000 | 39.93 | 3,171,950.65 | 4,438,476.80 | 1,266,526.15 | 2.22 |
| 1,751,700 | XMM | CROSS MEDIA MARKETING CORP | 1.4147 | 1.3000 | (8.11) | 2,478,135.73 | 2,277,210.00 | (200,925.73) | 1.14 |
| 150,000 | CYDXE | CYTOMEDIX INC | 2.8000 | 0.1200 | (95.71) | 420,000.00 | 18,000.00 | (402,000.00) | 0.01 |
| 160,000 | DRCT | DIRECT 111 MARKETING INC | 3.4209 | 2.6500 | (22.54) | 547,344.17 | 424,000.00 | (123,344.17) | 0.21 |
| 60,500 | EPTG | EPL TECHNOLOGIES INC NEW | 0.6807 | 0.1335 | (80.38) | 41,182.75 | 8,080.00 | (33,102.75) | 0.00 |
| 70,500 | FGXL | EDELBROCK CORP | 10.1630 | 9.6063 | (5.48) | 716,495.03 | 677,248.00 | (39,247.03) | 0.34 |
| 607,188 | FTGX | FIBERNET TELECOM GROUP INC | 3.3203 | 0.5400 | (83.74) | 2,016,028.07 | 327,881.52 | (1,688,146.55) | 0.16 |
| 1,578,559 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 2.2161 | 4.5000 | 103.06 | 3,498,305.97 | 7,103,515.50 | 3,605,209.53 | 3.56 |
| 19,500 | GNBT | GENEREX BIOTECHNOLOGY CP DEL | 8.0389 | 7.8000 | (2.97) | 156,758.35 | 152,100.00 | (4,658.35) | 0.08 |
| 12,390,000 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.0259 | 0.0538 | 107.76 | 320,932.90 | 666,765.00 | 345,832.10 | 0.33 |
| 10,000,000 | MHTX | MANHATTAN SCIENTIFIES INC | 0.1506 | 0.7062 | 368.82 | 1,506,407.25 | 7,062,300.00 | 5,555,892.75 | 3.54 |
| 5,196,535 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 0.0048 | | 0.00 | 25,000.00 | 25,000.00 | 0.01 |
| 25,000 | NURC | NEUROCORP LTD | 72.6397 | 64.4370 | (11.29) | 1,815,993.25 | 1,610,925.85 | (205,067.40) | 0.81 |
| 19,223,450 | NUDZ | NU-O-ZIME INC. INC | 0.0262 | 1.4650 | 5498.92 | 502,996.00 | 28,162,354.25 | 27,659,358.25 | 14.11 |
| 200,000 | NXMM | NXGEN NETWORKS INC | 0.0000 | 0.1000 | | 0.00 | 20,000.00 | 20,000.00 | 0.01 |
| 405,234 | PO01682 | WTS PIONEER COMMERCIAL FUNDING | 2.3018 | 1.7778 | (21.80) | 921,250.44 | 720,421.20 | (200,829.24) | 0.36 |
| 511,500 | PCFC | PIONEER COMMERCIAL FUNDING | 0.1016 | 0.1150 | 13.18 | 51,974.40 | 58,822.50 | 6,848.10 | 0.03 |
| 990,251 | RXTX | RX TECHNOLOGY HLDGS INC | 1.5670 | 15.0000 | 857.22 | 1,551,754.86 | 14,853,765.00 | 13,302,010.14 | 7.44 |
| 975,000 | SMKP | SMK CORP | 1.2994 | 0.1500 | (88.46) | 1,266,949.25 | 146,250.00 | (1,120,699.25) | 0.07 |
| 135,200 | SMXT | SIMEX CORP | 7.7534 | 8.1900 | 5.63 | 1,048,260.00 | 1,107,288.00 | 59,028.00 | 0.55 |
| 655,500 | TTEC | TELETECH HOLDINGS INC | 12.4972 | 18.5500 | 48.43 | 8,191,911.11 | 12,159,525.00 | 3,967,613.89 | 6.09 |
| 509,650 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 21.7500 | | 0.00 | 11,084,887.50 | 11,084,887.50 | 5.55 |
| 3,107,597 | TFGP | TOTAL FILM GROUP INC | 0.9678 | 0.2500 | (74.17) | 3,007,604.20 | 776,899.25 | (2,230,704.95) | 0.39 |
| 111,650 | USPL | U S PLASTIC LMBR CORP | 1.0250 | 0.8600 | (16.10) | 114,441.25 | 96,019.00 | (18,422.25) | 0.05 |

Banc Of America Securities LLC

Client Position Summary by Asset Class

118-11892 Lancer Partners LP

PosSum-TCBA

Page: 2
As Of: 08/31/01
Printed: 10/10/01

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 2,076,667 | U331992 UNIVERSAL HEIGHTS INC OLD | 0.6000 | 0.2600 | (56.67) | 1,246,000.00 | 539,933.42 | (706,066.58) | 0.27 |
| 666,500 | UVIH UNIVERSAL INS HLDGS INC | 0.6914 | 0.2600 | (62.72) | 466,180.70 | 173,810.00 | (292,370.70) | 0.09 |
| 15,000 | VIGN VIGNETTE CORP | 8.5243 | 6.8400 | (19.80) | 127,864.00 | 102,450.00 | (25,414.00) | 0.05 |
| 131,419 | 9388042 NETVALUE HOLDINGS INC | 11.4139 | 11.4139 | (0.00) | 1,500,000.00 | 1,499,999.38 | (0.62) | 0.75 |
| 2,000,000 | 9388464 WTS SYMPOSIUM CORP | 0.0000 | 5.0000 | | 0.00 | 10,000,000.00 | 10,000,000.00 | 5.01 |
| 2,000,000 | 9388465 WTS SYMPOSIUM CORP | 0.0000 | 5.0000 | | 0.00 | 10,000,000.00 | 10,000,000.00 | 5.01 |
| 2,476,124 | XWC WORLD WIRELESS COMMUNICATIONS | 1.3851 | 0.1800 | (87.00) | 3,429,789.43 | 445,702.32 | (2,984,087.11) | 0.22 |
| 2,916,410 | ZICA ***ZI CORPORATION | 4.4159 | 6.1000 | 38.14 | 12,878,508.87 | 17,790,101.00 | 4,911,592.13 | 8.91 |
| 10,000,000 | AUGMT AUGMENT SYSTEMS WARRANTS | 0.0000 | 0.0000 | | 0.00 | 0.00 | 0.00 | 0.00 |
| 10,000,000 | SMXWT SMX CORP WTS | 0.0000 | 4.6000 | | 0.00 | 46,000,000.00 | 46,000,000.00 | 23.04 |
| 300,000 | USPLPFD US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,050,000.00 | 1,050,000.00 | 0.00 | 0.53 |
| | Total Long Equities | | | 260.20 | 58,198,478.93 | 209,632,407.02 | 151,433,928.09 | 105.01 |
| | **Options** | | | | | | | |
| 500 | QBUCID CALL BEA SYSTEMS INC SEP 20.00 | 2.7612 | 0.1500 | (94.57) | 138,060.00 | 7,500.00 | (130,560.00) | 0.00 |
| 250 | QQMSIF CALL MICROSEMI CORP SEP 30 | 0.8350 | 1.5500 | 85.63 | 20,875.00 | 38,750.00 | 17,875.00 | 0.02 |
| 500 | QSOVAV CALL SOVEREIGN BANCOR JAN 12.50 | 1.0328 | 0.5000 | (51.59) | 51,640.00 | 25,000.00 | (26,640.00) | 0.01 |
| | Total Long Options | | | (66.16) | 210,575.00 | 71,250.00 | (139,325.00) | 0.04 |
| | TOTAL LONG POSITIONS | | | 246.57 | 61,359,053.93 | 212,653,657.02 | 151,294,603.09 | 106.53 |

SHORT POSITIONS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Equities** | | | | | | | |
| (5,000) | ABS ALBERTSONS INC | 34.6588 | 34.9900 | (0.96) | (173,294.21) | (174,950.00) | (1,655.79) | (0.09) |
| | TOTAL EXPOSURE VALUE | | | | 61,532,348.14 | 212,828,607.02 | 151,296,258.88 | 106.61 |
| | NET EXPOSURE VALUE | | | | 61,185,759.72 | 212,478,707.02 | 151,292,947.30 | 106.44 |
| | TOTAL LONG POSITIONS | | | | 61,359,053.93 | 212,653,657.02 | 151,294,603.09 | 106.53 |
| | TOTAL SHORT POSITIONS | | | | (173,294.21) | (174,950.00) | (1,655.79) | (0.09) |
| | TOTAL CASH EQ | | | | (12,950,778.10) | (12,950,778.10) | | (6.44) |
| | TOTAL | | | | 48,334,981.62 | 199,627,928.92 | 151,292,947.30 | 100.00 |

A01042

**Banc Of America Securities LLC**

**Client Position Summary by Asset Class**

313-11895 Lancer Offshore Inc

PosSum-TCBA

Page: 1
As Of: 08/31/01
Printed: 10/10/01

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (43,286,381) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (43,286,381.35) | (43,286,381.35) | 0.00 | (5.98) |
| 4,335,409 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 4,335,408.96 | 4,335,408.96 | 0.00 | 0.60 |
| 268,125 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 268,125.00 | 268,125.00 | 0.00 | 0.04 |
| | | **TOTAL CASH AND EQUIVALENTS** | | | 0.00 | (38,682,847.39) | (38,682,847.39) | 0.00 | (5.35) |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 1,400,000 | TELEDATA WORLD SERVICES 12% NT | 8855705 | 100.0000 | 100.0000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.19 |
| 3,500,000 | EPL TECHNOLOGIES LOAN | 9386567 | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.48 |
| 500,000 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 9386637 | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.07 |
| 250,000 | LIGHTHOUS LANDINGS INC | 9386655 | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.03 |
| 650,000 | GENETIC VECTORS 12% NOTE | 9387415 | 100.0000 | 100.0000 | 0.00 | 650,000.00 | 650,000.00 | 0.00 | 0.09 |
| 4,050,000 | EQUITEL BRIDGE LOAN | EQUILOAN | 100.0000 | 100.0000 | 0.00 | 4,050,000.00 | 4,050,000.00 | 0.00 | 0.56 |
| 355,000 | GENETIC VECTORS BRIDGELOAN | GVECLOAN | 100.0000 | 100.0000 | 0.00 | 355,000.00 | 355,000.00 | 0.00 | 0.05 |
| 1,450,000 | LIGHTHOUSE LANDINGS F.F. INC | LLFILOAN | 100.0000 | 100.0000 | 0.00 | 1,450,000.00 | 1,450,000.00 | 0.00 | 0.20 |
| 7,000,000 | SKYNET BRIDGE LOAN | SKYLOAN | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 0.97 |
| 1,500,000 | SKYNET BRIDGE LOAN | SKYLOAN2 | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.21 |
| 1,900,000 | TELEDATA WIRELESS COMMUNICATION | TELWIRLES | 100.0000 | 100.0000 | 0.00 | 1,900,000.00 | 1,900,000.00 | 0.00 | 0.26 |
| 400,000 | TOTAL FILM GROUP BRIDGE LOAN | TFGPLOAN5 | 100.0000 | 100.0000 | 0.01 | 400,000.00 | 400,000.00 | 0.00 | 0.06 |
| 150,000 | TOTAL FILM GROUP BRIDGE LOAN | TFGPLOAN6 | 100.0000 | 100.0000 | 0.00 | 150,000.00 | 150,000.00 | 0.00 | 0.02 |
| 50,000 | TOTAL FILM GROUP BRIDGE LOAN | TFGPLOAN7 | 100.0000 | 100.0000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.01 |
| 1,100,000 | TOTAL FILM GROUP BRIDGE LOAN | TFGPLOAN8 | 100.0000 | 100.0000 | 0.00 | 1,100,000.00 | 1,100,000.00 | 0.00 | 0.15 |
| 1,125,000 | XMC LOAN | XMCLOAN2 | 100.0000 | 100.0000 | 0.00 | 1,125,000.00 | 1,125,000.00 | 0.00 | 0.16 |
| | | **Total long Fixed Income** | | | 0.00 | 25,380,000.00 | 25,380,000.00 | 0.00 | 3.51 |
| **Equities** | | | | | | | | | |
| 125,000 | ASPT EUROPE INC | ASPQ | 0.7500 | 1.4000 | 86.67 | 93,750.00 | 175,000.00 | 81,250.00 | 0.02 |
| 9,090,536 | AURA SYSTEMS INC | AURA | 0.3196 | 0.5900 | 84.62 | 2,905,150.00 | 5,363,416.24 | 2,458,266.24 | 0.74 |
| 570,667 | BTG INC | BTG1 | 9.1702 | 9.9160 | 2.07 | 5,357,638.00 | 5,365,040.00 | 7,402.00 | 0.05 |
| 576,667 | CHINA BROADBAND CORP | CBBD | 7.5000 | 0.6000 | (92.00) | 4,325,002.50 | 346,000.20 | (3,979,002.30) | 0.05 |
| 10,000 | CONIFWARE CORP | CPWR | 13.6892 | 12.2100 | (10.81) | 136,892.00 | 122,100.00 | (14,792.00) | 0.02 |
| 57,900 | CONTROL CHIEF HOLDINGS INC | DIGM | 4.6628 | 2.6250 | (43.70) | 269,974.69 | 151,987.50 | (117,987.19) | 0.02 |
| 6,885,635 | CREDIT STORE INC | CDS | 2.7366 | 1.6000 | (41.53) | 18,842,933.86 | 11,017,016.00 | (7,825,917.86) | 1.52 |
| 15,043,720 | CROSS MEDIA MARKETING CORP | XMM | 0.4927 | 1.3000 | 163.83 | 7,412,752.09 | 19,556,836.00 | 12,144,083.91 | 2.70 |
| 275,000 | CYTOMEDIX INC | CYDXE | 2.8906 | 0.1200 | (95.85) | 794,905.50 | 33,000.00 | (761,905.50) | 0.00 |
| 3,199,035 | DECORA INDS INC | DECO | 3.2113 | 0.0550 | (98.29) | 10,272,966.15 | 175,946.92 | (10,097,019.23) | 0.02 |
| 1,904,800 | DIRECT III MARKETING INC | DRCT | 1.8760 | 2.6500 | 41.26 | 3,573,336.05 | 5,047,720.00 | 1,474,383.95 | 0.70 |
| 11,878,317 | EPL TECHNOLOGIES INC NEW | EPTG | 1.1150 | 0.1600 | (85.65) | 13,243,974.74 | 1,900,530.72 | (11,343,444.02) | 0.26 |
| | ECARE SOLUTIONS INC | EDSL | 0.2300 | | | | | (148,182.50) | |
| 120,000 | EDELBROCK CORP | EDEL | 12.6032 | 9.6200 | (23.67) | 1,526,242.31 | 1,164,982.00 | (361,260.31) | 0.16 |
| 803,600 | ENVISION DEV CORP | EDVC | 11.4912 | 0.0500 | (99.56) | 9,234,332.88 | 40,180.00 | (9,194,152.88) | 0.01 |
| 2,215,474 | FIBERNET TELECOM GROUP INC | FTGX | 2.3971 | 0.5400 | (77.47) | 5,310,626.15 | 1,196,355.96 | (4,114,270.19) | 0.17 |
| 25,027,382 | FIDELITY FIRST FINANCIAL CORP | FFIRD | 0.3808 | 4.5000 | 1081.64 | 9,531,094.90 | 112,623,219.00 | 103,092,124.10 | 15.57 |
| 9,000 | GENEREX BIOTECHNOLOGY CP DEL | GNBT | 8.9946 | 7.8000 | (13.28) | 80,951.10 | 70,200.00 | (10,751.10) | 0.01 |
| 1,002,016 | GENETIC VECTORS INC | GVEC | 4.2841 | 3.5000 | (18.30) | 4,292,739.22 | 3,507,056.00 | (785,683.22) | 0.40 |

113-11895 Lancer Offshore Inc

PosSum-TCBA

Bank of America Securities LLC

Client Position Summary by Asset Class

Page: 2
As Of: 08/31/01
Printed: 10/10/01

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 7,910,933 | GETT | GLOBAL E. TUTOR INC | 0.7510 | 0.0150 | (98.00) | 5,940,888.80 | 118,664.00 | (5,822,224.80) | 0.02 |
| 30,000 | LSATA | LIBERTY SATELLITE & TECHNOLOGY | 2.4400 | 2.1200 | (11.11) | 73,200.00 | 63,600.00 | (9,600.00) | 0.01 |
| 3,137,548 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.2897 | 1.6500 | 469.60 | 908,870.67 | 5,176,954.20 | 4,268,083.53 | 0.72 |
| 31,608,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.2609 | 0.5700 | 118.49 | 8,246,119.49 | 18,016,560.00 | 9,770,440.51 | 2.49 |
| 16,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS | 0.0000 | 2.5000 | | 0.00 | 40,000,000.00 | 40,000,000.00 | 5.53 |
| 10,012,500 | MTDP | METHOD PRODS CORP NEW | 0.0508 | 0.9500 | 1769.20 | 508,875.00 | 9,511,875.00 | 9,003,000.00 | 1.31 |
| 10,688,255 | NUDC | NU-D-ZINE INC | 1.5019 | 1.1500 | (23.43) | 16,053,676.05 | 12,291,493.62 | (3,762,182.43) | 0.45 |
| 27,137,783 | NUDZ | NU-D-ZINE INC | 0.0411 | 1.4150 | 3007.56 | 1,279,334.95 | 39,756,115.20 | 38,476,780.25 | 5.50 |
| 898,292 | NYER | NYER MEDICAL GROUP INC | 4.9242 | 1.3500 | (72.58) | 4,423,355.53 | 1,212,694.20 | (3,210,661.33) | 0.17 |
| 10,030,000 | OSYM | OSAGE SYSTEMS GROUP INC | 0.2034 | 0.0180 | (91.15) | 2,040,300.09 | 180,540.00 | (1,859,760.09) | 0.02 |
| 11,000 | PMBC | PACIFIC MERCANTILE BANCORP | 7.5568 | 8.1400 | 7.58 | 83,125.00 | 89,430.00 | 6,305.00 | 0.01 |
| 276,737 | PCFC | PIONEER COMMERCIAL FUNDING | 1.0345 | 1.8000 | 74.00 | 286,277.08 | 498,126.60 | 211,849.52 | 0.07 |
| 515,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.1150 | (93.43) | 901,250.00 | 59,225.00 | (842,025.00) | 0.01 |
| 10,841,775 | SMXP | SMX CORP | 0.3317 | 15.0000 | 4421.53 | 3,596,713.25 | 162,626,625.00 | 159,029,911.75 | 22.48 |
| 2,270,857 | SMXT | SIMEX CORP | 1.6398 | 150.0000 | (90.85) | 3,723,424.54 | 340,628.55 | (3,383,285.99) | 0.05 |
| 8,000 | FDON | SPRINT CORP | 23.5916 | 23.3400 | (1.06) | 275,120.60 | 271,200.40 | (3,920.20) | 0.04 |
| 395,784 | STG | STONE PATH GROUP INC | 0.7911 | 1.8000 | 127.54 | 313,093.87 | 712,411.20 | 399,317.33 | 0.10 |
| 96,100 | TTEC | TELETECH HOLDINGS INC | 8.9591 | 8.1900 | (8.59) | 860,974.24 | 787,059.00 | (73,915.24) | 0.11 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 1,178,950 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 21.7500 | | 0.00 | 25,642,162.50 | 25,642,162.50 | 3.54 |
| 1,626,600 | TTN | TITAN CORP | 15.4550 | 18.5500 | 20.03 | 25,139,035.37 | 30,173,430.00 | 5,034,394.63 | 4.17 |
| 5,607,559 | TFGP | TOTAL FILM GROUP INC | 1.7705 | 0.2500 | (85.88) | 9,928,212.07 | 1,401,889.75 | (8,526,322.32) | 0.19 |
| 1,074,250 | USPL | U S PLASTIC LMBR CORP | 7.4648 | 0.8600 | (88.48) | 8,020,108.81 | 923,855.00 | (7,096,313.81) | 0.13 |
| 1,687,400 | UGSI | UNDERGROUND SOLUTIONS INC | 0.8987 | 0.3000 | (61.05) | 1,516,462.16 | 590,590.00 | (925,872.16) | 0.08 |
| 435,000 | U331992 | UNIVERSAL HEIGHTS INC OLD | 1.0000 | 0.2600 | (74.00) | 435,000.00 | 113,100.00 | (321,900.00) | 0.02 |
| 3,004,137 | VTIH | UNIVERSAL IMS HLDGS INC | 0.7292 | 0.2600 | 64.44 | 2,197,493.90 | 781,075.62 | (1,416,418.28) | 0.11 |
| 10,000 | VGTR | VIGNETTE CORP | 8.6198 | 6.8400 | (22.50) | 86,198.75 | 68,400.00 | (119,889.75) | 0.01 |
| 750,000 | 9387800 | LIGHTHOUSE LANDINGS INC | 0.0000 | 2.0000 | | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.21 |
| 212,373 | 9388042 | NETVALUE HOLDINGS INC | 11.4139 | 0.0000 | (0.00) | 2,424,000.00 | 2.19 | (2.19) | 0.34 |
| 10,300,000 | 9390720 | WTS LIGHTHOUSE LANDINGS INC | 0.0000 | 2.0000 | | 0.00 | 20,600,000.00 | 20,600,000.00 | 2.85 |
| 6,147,928 | XWC | WORLD WIRELESS COMMUNICATIONS | 2.2873 | 0.1800 | (92.13) | 14,062,055.99 | 1,106,627.04 | (12,955,428.95) | 0.15 |
| 7,827,875 | ZICA | ***ZI CORPORATION | 4.4254 | 6.1000 | 37.84 | 34,641,560.32 | 47,750,037.50 | 13,108,477.18 | 6.60 |
| 500,000 | AUGNPFD | AUGMENT SYSTEMS PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 100,000.00 | 10,000,000.00 | | 0.01 |
| 10,000,000 | MTDPW1 | METHOD PRODUCTS CORP WARRANTS | 0.0000 | 1.0000 | | 0.00 | 10,000,000.00 | 10,000,000.00 | 1.38 |
| 10,000,000 | MTDPW2 | METHOD PRODUCTS CORP WARRANTS | 0.0000 | 0.9500 | | 0.00 | 9,500,000.00 | 9,500,000.00 | 1.31 |
| 36,150,000 | NUDZW | NU-D-ZINE WARRANT | 0.0000 | 1.4150 | | 0.00 | 51,153,950.00 | 51,153,950.00 | 7.10 |
| 30,000,000 | MTDPW2 | METHOD PRODUCTS CORP WARRANTS | 0.0000 | 1.4400 | | 0.00 | 43,200,000.00 | 43,200,000.00 | 5.97 |
| 1,000,000 | SHXW1 | SMX CORP WARRANTS | 14.0000 | 14.0000 | | 0.00 | 14,000,000.00 | 14,000,000.00 | 1.94 |
| 1,000,000 | SHXW2 | SMX CORP WARRANTS | 15.0000 | 15.0000 | | 0.00 | 15,000,000.00 | 15,000,000.00 | 2.07 |
| 1,000,000 | SHXW3 | SMX CORP WARRANTS | 17.5000 | 14.8750 | | 0.00 | 14,875,000.00 | 14,875,000.00 | 2.06 |
| 556,250 | XWCWTS | XWC WARRANTS | 0.0000 | 0.0000 | | 0.00 | 0.00 | 0.00 | 0.00 |
| 250,000 | ENEWF | ***E-NEW MEDIA HKD0.50 | 0.0500 | 0.0400 | | 10,000.00 | (2,500.00) | | 0.00 |

| | | | | | (20.00) | | | | |
| Total Long Equities | | | 1.8652 | | 206.29 | 240,528,192.79 | 736,713,738.76 | 496,185,545.97 | 101.85 |

**Options**

| 500 | QOEIKO | CALL OCEAN ENERGY INC NOV 20.00 | 1.3000 | 1.3000 | (30.30) | 93,257.50 | 65,000.00 | (28,257.50) | 0.01 |
| 500 | QOEIWW | PUT OCEAN ENERGY INC NOV 17.50 | 1.4727 | 1.1500 | (21.91) | 73,632.50 | 57,500.00 | (16,132.50) | 0.01 |

| Total Long Options | | | 1.4727 | | (26.60) | 166,890.00 | 122,500.00 | (44,390.00) | 0.02 |

A01044

Banc Of America Securities LLC

Client Position Summary by Asset Class

113-11895 Lancer Offshore Inc

PosSum-TCBA

| SHR/FACE | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL LONG POSITIONS | | | 186.47 | 266,075,082.79 | 762,216,238.76 | 496,141,155.97 | 105.37 |
| **SHORT POSITIONS** | | | | | | | |
| **Equities** | | | | | | | |
| ALBERTSONS INC | | | | | | | |
| (5,000) ABS | 34.6500 | 34.9900 | (0.96) | (173,294.21) | (174,950.00) | (1,655.79) | (0.02) |
| TOTAL EXPOSURE VALUE | | | | 266,248,377.00 | 762,391,188.76 | 496,142,811.76 | 105.40 |
| NET EXPOSURE VALUE | | | | 265,901,788.58 | 762,041,288.76 | 496,139,500.18 | 105.35 |
| TOTAL LONG POSITIONS | | | | 266,075,082.79 | 762,216,238.76 | 496,141,155.97 | 105.37 |
| TOTAL SHORT POSITIONS | | | | (173,294.21) | (174,950.00) | (1,655.79) | (0.02) |
| TOTAL CASH EQ | | | | (38,682,847.39) | (38,682,847.39) | | (5.35) |
| TOTAL | | | | 227,218,941.19 | 723,358,441.37 | 496,139,500.18 | 100.00 |

A01045

313-12796 The Orbiter Fund ltd

PosSum-TCBA

```
                                                    Page:    1
                                              As Of: 08/31/01
                                              Printed: 10/10/01
```

Banc of America Securities LLC

Client Position Summary by Asset Class

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (3,391,288) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (3,391,287.99) | (3,391,287.99) | 0.00 | (8.05) |
| 3,057,764 USD | | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,057,763.65 | 3,057,763.65 | 0.00 | 7.26 |
| TOTAL CASH AND EQUIVALENTS | | | 100.0000 | 100.0000 | 0.00 | (333,524.34) | (333,524.34) | 0.00 | (0.79) |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 1,600,000 | SKYLON3 | SKYNET BRIDGELOAN | 100.0000 | 100.0000 | 0.00 | 1,600,000.00 | 1,600,000.00 | 0.00 | 3.80 |
| **Equities** | | | | | | | | | |
| 531,250 | AURA | AURA SYSTEMS INC | 0.3200 | 0.5900 | 84.38 | 170,000.00 | 313,437.50 | 143,437.50 | 0.74 |
| 100,000 | CYDXE | CYTOMEDIX INC | 2.8000 | 0.1200 | (95.71) | 280,000.00 | 12,000.00 | (268,000.00) | 0.03 |
| 152,500 | EDVC | ENVISION DEV CORP | 11.0836 | 0.0500 | (99.55) | 1,690,241.50 | 7,625.00 | (1,682,616.50) | 0.02 |
| 1,179,968 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 0.8275 | 4.5000 | 443.84 | 976,370.61 | 5,309,856.00 | 4,333,485.39 | 12.60 |
| 500,000 | HHTX | MANHATTAN SCIENTIFIES INC | 1.4759 | 0.5700 | (61.38) | 737,960.25 | 285,000.00 | (452,960.25) | 0.68 |
| 755,000 | NUDZ | NU-D-ZINE INC. | 0.2397 | 1.4650 | 511.09 | 181,000.00 | 1,106,075.00 | 925,075.00 | 2.62 |
| 100,000 | NXNW | NGEN NETWORKS INC. | 0.0000 | 0.1000 | 0.00 | 0.00 | 10,000.00 | 10,000.00 | 0.02 |
| 275,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.1140 | (93.43) | 481,250.00 | 31,625.00 | (449,625.00) | 0.08 |
| 836,770 | SMXP | SMX CORP | 0.1908 | 15.0000 | 7762.70 | 159,634.00 | 12,551,550.00 | 12,391,916.00 | 29.78 |
| 18,500 | SMXT | SIMEX CORP | 5.7237 | 0.1500 | (97.38) | 105,887.70 | 2,775.00 | (103,112.70) | 0.01 |
| 111,400 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 21.7500 | 0.00 | 0.00 | 2,422,950.00 | 2,422,950.00 | 5.75 |
| 250,000 | 9389149 | WTS TOTAL FILM GROUP | 0.0000 | 0.0000 | 0.00 | 0.00 | 250,000.00 | 250,000.00 | 0.59 |
| 478,545 | ZICA | ***ZI CORPORATION | 11.3895 | 6.1000 | (46.44) | 5,450,400.48 | 2,919,124.50 | (2,531,275.98) | 6.93 |
| 40,000,000 | AUGMT | AUGMENT SYSTEMS WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 380,000 | GVECWTS | GENETIC VECTOR WARRANTS | 0.0000 | 5.0000 | 0.00 | 0.00 | 1,900,000.00 | 1,900,000.00 | 4.51 |
| 3,150,000 | NUDZW | NU-D-ZINE WARRANT | 0.0000 | 1.4200 | 0.00 | 0.00 | 4,473,000.00 | 4,473,000.00 | 10.61 |
| 250,000 | SMXW1 | SMX CORP WARRANTS | 0.0000 | 14.0000 | 0.00 | 0.00 | 3,500,000.00 | 3,500,000.00 | 8.30 |
| 175,000 | SMXW2 | SMX CORP WARRANTS | 0.0000 | 15.0000 | 0.00 | 0.00 | 2,625,000.00 | 2,625,000.00 | 6.23 |
| 400,000 | 9002684 | ZI CORP WTS | 0.0000 | 7.9000 | 0.00 | 0.00 | 3,160,000.00 | 3,160,000.00 | 7.50 |
| | | Total Long Equities | | | 299.50 | 10,232,744.54 | 40,880,018.00 | 30,647,273.46 | 97.00 |
| | | TOTAL LONG POSITIONS | | | 259.00 | 11,832,744.54 | 42,480,018.00 | 30,647,273.46 | 100.79 |
| | | TOTAL LONG POSITIONS | | | | 11,832,744.54 | 42,480,018.00 | 30,647,273.46 | 100.79 |
| | | NET EXPOSURE VALUE | | | | 11,832,744.54 | 42,480,018.00 | 30,647,273.46 | 100.79 |
| | | TOTAL LONG POSITIONS | | | | 11,832,744.54 | 42,480,018.00 | 30,647,273.46 | 100.79 |
| | | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH EQ | | | | (333,524.34) | (333,524.34) | | (0.79) |
| | | TOTAL | | | | 11,499,220.20 | 42,146,493.66 | 30,647,273.46 | 100.00 |

A01046

311-13377 Viator Fund Ltd
PosSum-TCBA

Bank of America Securities LLC
Client Position Summary by Asset Class

Page: 1
As of: 08/31/01
Printed: 10/10/01

| SHR/FACE | SYMBOL | DESCRIPTION | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (2,307,711) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (2,307,710.68) | (2,307,710.68) | 0.00 | (8.81) |
| 346,095 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 346,094.89 | 346,094.89 | 0.00 | 1.32 |
| | | **TOTAL CASH AND EQUIVALENTS** | | | 0.00 | (1,961,615.79) | (1,961,615.79) | 0.00 | (7.49) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 900,000 | SKYLOAN3 | SKYNET BRIDGELOAN | 100.0000 | 100.0000 | 0.00 | 900,000.00 | 900,000.00 | 0.00 | 3.44 |
| 250,000 | TFGPLOAN4 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.95 |
| 125,000 | TFGPLOAN5 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 125,000.00 | 125,000.00 | 0.00 | 0.48 |
| 150,000 | TFGPLOAN6 | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 150,000.00 | 150,000.00 | 0.00 | 0.57 |
| | | **Total Long Fixed Income** | | | | 1,425,000.00 | 1,425,000.00 | 0.00 | 5.44 |
| **Equities** | | | | | | | | | |
| 400,000 | AURA | AURA SYSTEMS INC | 0.3200 | 0.5900 | 84.38 | 128,000.00 | 236,000.00 | 108,000.00 | 0.90 |
| 40,000 | CBBD | CHINA BROADBAND CORP | 7.5000 | 0.6000 | (92.00) | 300,000.00 | 24,000.00 | (276,000.00) | 0.09 |
| 51,100 | LLB | COMPUTRAC INC | 0.3750 | 0.5400 | 44.00 | 19,162.50 | 27,594.00 | 8,431.50 | 0.11 |
| 102,500 | CDS | CREDIT STORE INC | 2.8850 | 1.6000 | (44.54) | 295,710.20 | 164,000.00 | (131,710.20) | 0.63 |
| 146,400 | XMM | CROSS MEDIA MARKETING CORP | 2.5367 | 1.3000 | (48.75) | 371,367.36 | 190,320.00 | (181,047.36) | 0.73 |
| 100,000 | CYDXE | CYTOMEDIX INC | 2.8000 | 0.1200 | (95.71) | 280,000.00 | 12,000.00 | (268,000.00) | 0.05 |
| 100,000 | DRCT | DIRECT 111 MARKETING INC | 0.9249 | 2.6500 | 186.50 | 92,494.86 | 265,000.00 | 172,505.14 | 1.01 |
| 1,310,968 | EPTG | EPL TECHNOLOGIES INC NEW | 0.0116 | 0.1600 | 1277.37 | 15,228.62 | 209,754.88 | 194,526.26 | 0.80 |
| 52,500 | EDVC | ENVISION DEV CORP | 10.9840 | 0.0500 | (99.54) | 576,704.00 | 2,625.00 | (574,079.00) | 0.01 |
| 115,000 | FTGX | FIBERNET TELECOM GROUP INC | 4.6407 | 0.5400 | (88.36) | 533,678.10 | 62,100.00 | (471,578.10) | 0.24 |
| 916,437 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 0.1407 | 4.5000 | 3099.37 | 128,902.00 | 4,124,056.50 | 3,995,154.50 | 15.75 |
| 500,000 | GETT | GLOBAL E TUTOR INC | 0.2578 | 0.0150 | (94.18) | 128,902.50 | 7,500.00 | (121,402.50) | 0.03 |
| 107,761 | HAUP | HAUPPAGUE DIGITAL INC | 1.7984 | 1.6000 | (11.03) | 193,797.35 | 172,417.60 | (21,379.75) | 0.66 |
| 35,000 | HEB | HEMISPHERX BIOPHARMA INC | 1.7500 | 4.8000 | 174.29 | 61,250.00 | 168,000.00 | 106,750.00 | 0.64 |
| 916,850 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.6370 | 1.6500 | 159.02 | 584,048.30 | 1,512,802.50 | 928,754.20 | 5.78 |
| 905,000 | HHTX | MANHATTAN SCIENTIFIES INC | 1.7225 | 0.5700 | (66.91) | 1,558,822.20 | 515,850.00 | (1,042,972.20) | 1.97 |
| 91,333 | NORC | NEUROCORP LTD | 1.6272 | 0.3100 | (80.95) | 148,621.17 | 28,313.23 | (120,307.94) | 0.11 |
| 705,000 | NUDZ | NU-D-ZINE INC | 0.2567 | 1.5650 | 511.09 | 181,000.00 | 1,106,075.00 | 925,075.00 | 4.22 |
| 200,000 | NXGN | NXGEN NETWORKS INC | 1.7500 | 0.1150 | (93.43) | 350,000.00 | 23,000.00 | (327,000.00) | 0.09 |
| 200,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.8039 | 0.1000 | (94.46) | 360,787.50 | 20,000.00 | (340,787.50) | 0.08 |
| 423,800 | SMKP | SHK CORP | 0.8513 | 15.0000 | 1661.98 | 360,787.50 | 6,357,000.00 | 5,996,212.50 | 24.27 |
| 50,400 | SNKT | SIMEX CORP | 2.1203 | 0.1500 | (92.93) | 106,861.20 | 7,560.00 | (99,301.20) | 0.03 |
| 50,000 | B955437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 21.7500 | 0.00 | 0.00 | 1,087,500.00 | 1,087,500.00 | 4.15 |
| 73,600 | TTN | TITAN CORP | 26.9018 | 18.4000 | (31.61) | 1,979,972.10 | 1,354,150.00 | (625,822.10) | 5.17 |
| 237,155 | TFGP | TOTAL FILM GROUP INC | 3.0038 | 0.2500 | (91.68) | 712,356.68 | 59,288.75 | (653,067.93) | 0.23 |
| 233,700 | UVIH | UNIVERSAL INS HLDGS INC | 0.4091 | 0.2600 | (36.45) | 95,617.39 | 60,762.00 | (34,855.39) | 0.23 |
| 250,000 | 9387252 | ICONNECT.COM | 1.0000 | 5.0000 | 400.00 | 250,000.00 | 1,250,000.00 | 1,000,000.00 | 4.77 |
| 300,000 | 9307020 | MTS LIGHTHOUSE LANDINGS INC | 0.0000 | 2.0000 | 0.00 | 0.00 | 600,000.00 | 600,000.00 | 2.29 |
| 200,000 | XMC | WORLD WIRELESS COMMUNICATIONS | 2.7632 | 0.1800 | (93.49) | 552,649.94 | 36,000.00 | (516,649.94) | 0.14 |
| 380,700 | ZICA | ***21 CORPORATION | 17.0800 | 6.1000 | (64.29) | 6,502,372.74 | 2,322,270.00 | (4,180,102.74) | 8.87 |
| 35,000,000 | AUGMNT | AUGMENT SYSTEMS WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 700,000 | NUDZM | NU-D-ZINE WARRANT | 0.0000 | 1.4200 | 0.00 | 0.00 | 994,000.00 | 994,000.00 | 3.80 |

A01047

Banc Of America Securities LLC

Client Position Summary by Asset Class

313-13377 Viator Fund Ltd

PosSum-TCBA

Page:    2
As Of: 08/31/01
Printed: 10/10/01

| SHR/FACE | | UNIT COST | CURRENT UNIT | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 225,000 | SMXW2   SMX CORP WARRANTS | 0.0000 | 15.0000 | | 0.00 | 3,375,000.00 | 3,375,000.00 | 12.89 |
| 100,000 | USPLPFD  US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 1.34 |
| | Total Long Equities | | | 58.53 | 16,858,306.71 | 26,724,939.46 | 9,866,632.75 | 102.05 |
| | TOTAL LONG POSITIONS | | | 53.97 | 18,283,306.71 | 28,149,939.46 | 9,866,632.75 | 107.49 |
| | TOTAL EXPOSURE VALUE | | | | 18,283,306.71 | 28,149,939.46 | 9,866,632.75 | 107.49 |
| | NET EXPOSURE VALUE | | | | 18,283,306.71 | 28,149,939.46 | 9,866,632.75 | 107.49 |
| | TOTAL LONG POSITIONS | | | | 18,283,306.71 | 28,149,939.46 | 9,866,632.75 | 107.49 |
| | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | TOTAL CASH EQ | | | | (1,961,615.79) | (1,961,615.79) | | (7.49) |
| | TOTAL | | | | 16,321,690.92 | 26,188,323.67 | 9,866,632.75 | 100.00 |

A01048

118-11892 Lancer Partners LP

Banc of America Securities LLC

Client Position Summary by Asset Class

PosSum-TCBA

| SHR/FACE | | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | | |
| (16,993,920) | USD | | | 1.0000 | 1.0000 | 0.00 | (16,993,919.55) | (16,993,919.55) | 0.00 | (7.78) |
| 287,213 | USD | | | 1.0000 | 1.0000 | 0.00 | 287,213.44 | 287,213.44 | 0.00 | 0.13 |
| | | TYPE 2 | | | | | | | | |
| | | TYPE 3 | | | | | | | | |
| | | | TOTAL CASH AND EQUIVALENTS | | | 0.00 | (16,706,706.11) | (16,706,706.11) | 0.00 | (7.65) |
| | | | | | | | | | | |
| **LONG POSITIONS** | | | | | | | | | | |
| | | **Fixed Income** | | | | | | | | |
| 250,000 | 9386655 | LIGHTHOUS LANDINGS INC | | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.11 |
| 300,000 | LLF1LOAN | LIGHTHOUSE LANDINGS F.F. INC | | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.14 |
| 500,000 | OSGELOAN | OSAGE SYSTEMS GROUP (OSE) | | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.23 |
| 350,000 | XWCLOAN | WORLD WIRELESS COMM LOAN | | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.16 |
| | | | Total Long Fixed Income | | | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.64 |
| | | | | | | | | | | |
| | | **Equities** | | | | | | | | |
| 85,800 | APAC | APAC TELESERVICES INC | | 2.9474 | 1.7500 | (40.62) | 252,884.00 | 150,150.00 | (102,734.00) | 0.07 |
| 3,389,367 | AURA | AURA SYSTEMS INC | | 0.3679 | 0.4700 | 27.76 | 1,246,900.30 | 1,593,002.49 | 346,102.19 | 0.73 |
| 55,000 | CRNK | CENTRACK INTERNATIONAL INC | | 0.0160 | 0.0010 | (93.75) | 880.00 | 55.00 | (825.00) | 0.00 |
| 250,000 | CBBD | CHINA BROADBAND CORP | | 7.5000 | 0.8200 | (89.07) | 1,875,000.00 | 205,000.00 | (1,670,000.00) | 0.09 |
| 2,779,048 | CDS | CREDIT STORE INC | | 1.1437 | 1.3000 | 13.66 | 3,178,407.65 | 3,612,762.40 | 434,354.75 | 1.65 |
| 1,853,200 | XMM | CROSS MEDIA MARKETING CORP | | 1.4291 | 1.6900 | 18.26 | 2,648,340.73 | 3,131,908.00 | 483,567.27 | 1.43 |
| 150,000 | CYDXE | CYTOMEDIX INC | | 2.8000 | 0.2500 | (91.07) | 420,000.00 | 37,500.00 | (382,500.00) | 0.02 |
| 160,000 | DRCT | DIRECT III MARKETING INC | | 3.6328 | 1.7000 | (50.00) | 581,244.17 | 272,000.00 | (275,344.17) | 0.12 |
| 88,500 | EFTG | EPL TECHNOLOGIES INC NEW | | 0.6328 | 0.4400 | (30.47) | 56,002.75 | 38,940.00 | (17,062.75) | 0.02 |
| 607,188 | FTGX | FIBERNET TELECOM GROUP INC | | 3.3203 | 0.2400 | (92.77) | 2,016,028.07 | 145,725.12 | (1,870,302.95) | 0.07 |
| 4,587,859 | FFIRD | FIDELITY FIRST FINANCIAL CORP | | 0.7727 | 5.0000 | 547.07 | 3,545,080.97 | 22,939,295.00 | 19,394,214.03 | 10.51 |
| 5,000 | GVEC | GENETIC VECTORS INC | | 3.0200 | 3.2500 | 7.62 | 15,100.00 | 16,250.00 | 1,150.00 | 0.01 |
| 418,100 | LHFF | LIGHTHOUSE FAST FERRY INC | | 0.8222 | 1.6400 | 99.46 | 343,772.90 | 685,684.00 | 341,911.10 | 0.31 |
| 12,615,000 | MHTX | MANHATTAN SCIENTIFIES INC | | 0.1290 | 0.4800 | 272.03 | 1,627,607.25 | 6,055,200.00 | 4,427,592.75 | 2.77 |
| 10,000,000 | MHTXN | WTS MANHATTAN SCIENTIFICS | | 0.0000 | 0.4300 | | 0.00 | 4,300,000.00 | 4,300,000.00 | 1.97 |
| 77,000 | MTDP | METHOD PRODS CORP NEW | | 0.8797 | 1.0500 | 19.35 | 67,740.00 | 80,850.00 | 13,110.00 | 0.04 |
| 5,196,535 | NURC | NEUROCORP LTD | | 0.3495 | 0.3100 | (11.29) | 1,815,993.25 | 1,610,925.85 | (205,067.40) | 0.74 |
| 24,235,950 | NDIZ | NU-D-ZINE INC. | | 0.0209 | 1.6000 | 7546.31 | 506,931.00 | 38,761,520.00 | 38,254,589.00 | 17.75 |
| 200,000 | NXNW | NXGEN NETWORKS INC | | 0.0000 | 0.1000 | | 0.00 | 20,000.00 | 20,000.00 | 0.01 |
| 400,234 | P001682 | WTS PIONEER COMMERCIAL FUNDING | | 0.0000 | 0.0250 | | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 511,500 | PCFC | PIONEER COMMERCIAL FUNDING | | 2.3018 | 1.4000 | (39.18) | 921,250.44 | 560,327.60 | (360,922.84) | 0.26 |
| 1,019,426 | RXTX | RX TECHNOLOGY HLDGS INC | | 0.1016 | 0.0500 | (50.79) | 51,974.40 | 25,575.00 | (26,399.40) | 0.01 |
| 975,000 | SMKP | SMX CORP | | 1.9368 | 15.0000 | 674.48 | 1,974,404.86 | 15,291,390.00 | 13,316,985.14 | 7.00 |
| 1,509,650 | SMXT | SIMEX CORP | | 1.2994 | 0.1550 | (88.07) | 1,266,949.25 | 151,125.00 | (1,115,824.25) | 0.07 |
| 663,500 | TTN | WTS FFIR FUNDING CORPORATION | | 0.0000 | 4.9500 | | 0.00 | 7,472,767.50 | 7,472,767.50 | 3.42 |
| 3,107,597 | TFGP | TITAN CORP | | 12.5703 | 19.6000 | 55.92 | 8,340,367.61 | 13,004,600.00 | 4,664,232.39 | 5.96 |
| 131,650 | USPL | TOTAL FILM GROUP INC | | 0.9678 | 0.2500 | (74.17) | 716,899.25 | 52,475.50 | (716,899.25) | 0.00 |
| 2,076,667 | U731992 | U S PLASTIC LMBR CORP | | 1.0250 | 0.4700 | (54.15) | 114,441.25 | 52,475.50 | (2,230,584.75) | 0.02 |
| 668,667 | UVIH | UNIVERSAL HEIGHTS INC OLD | | 0.6000 | 0.5000 | (16.67) | 1,246,000.00 | 1,038,333.50 | (207,666.50) | 0.48 |
| 131,419 | 9388042 | UNIVERSAL INS HLDGS INC | | 0.6974 | 0.0000 | (28.30) | 466,180.70 | 334,250.00 | (131,930.70) | 0.15 |
| 2,000,000 | 9388464 | NETVALUE HOLDINGS INC | | 11.4139 | 11.4139 | (0.00) | 1,499,999.38 | 1,499,999.38 | (0.62) | 0.69 |
| | | WTS SYMPOSIUM CORP | | 0.0000 | 1.6000 | | 1,500,000.00 | 3,200,000.00 | 3,200,000.00 | 1.47 |

A01049

Banc Of America Securities LLC
Client Position Summary by Asset Class

118-11892 Lancer Partners LP

Page: 2
As Of: 09/30/01
Printed: 10/15/01

PosSum-TCBA

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 2,000,000 | 9388465 | WFS SYMPOSIUM CORP | 0.0000 | 1.6000 | 0.00 | 0.00 | 3,200,000.00 | 3,200,000.00 | 1.47 |
| 3,440,375 | WFPK | WOLFPACK CORP | 0.7056 | 1.8500 | 162.19 | 2,427,550.00 | 6,364,693.75 | 3,937,143.75 | 2.92 |
| 2,416,124 | XWC | WORLD WIRELESS COMMUNICATIONS | 1.3851 | 0.9000 | (78.34) | 3,429,789.43 | 742,837.20 | (2,686,952.23) | 0.34 |
| 3,075,610 | ZICA | ***ZI CORPORATION | 4.4175 | 5.1000 | 16.47 | 13,636,654.19 | 15,931,659.80 | 2,253,005.61 | 7.30 |
| 10,250,000 | AUGNPFD1 | AUGMENT SYSTEMS PREFERRED STOCK | 0.0146 | 0.9000 | 6050.00 | 150,000.00 | 9,225,000.00 | 9,075,000.00 | 4.23 |
| 22,500,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.0178 | 1.0000 | 5525.00 | 400,000.00 | 22,500,000.00 | 22,100,000.00 | 10.31 |
| 2,000,000 | SNKW1 | SNK CORP WARRANTS | 0.0000 | 12.5000 | 0.00 | 0.00 | 25,000,000.00 | 25,000,000.00 | 11.45 |
| 6,000,000 | TFGPFD | TOTAL FILM GROUP PREFERRED STK | 0.5000 | 2.5000 | 400.00 | 3,000,000.00 | 15,000,000.00 | 12,000,000.00 | 6.87 |
| 300,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,050,000.00 | 1,050,000.00 | 0.00 | 0.48 |
| 5,000,000 | WFPKWT | WOLFPACK CORP WARRANTS | 0.0000 | 1.5000 | 0.00 | 0.00 | 7,500,000.00 | 7,500,000.00 | 3.44 |
| | | Total Long Equities | | | 269.66 | 63,189,179.37 | 233,584,951.34 | 170,395,771.97 | 106.99 |
| | **Options** | | | | | | | | |
| 250 | QBHCKV | PUT BHC SOFTWARE NOV 12.50 | 1.4240 | 1.4000 | (1.69) | 35,600.00 | 35,000.00 | (600.00) | 0.02 |
| 500 | QSOVAV | CALL SOVEREIGN BANCOR JAN 12.50 | 1.0328 | 0.2750 | (73.37) | 51,640.00 | 13,750.00 | (37,890.00) | 0.01 |
| | | Total Long Options | | | (44.12) | 87,240.00 | 48,750.00 | (38,490.00) | 0.02 |
| | | TOTAL LONG POSITIONS | | | 261.40 | 64,676,419.37 | 235,033,701.34 | 170,357,281.97 | 107.65 |
| | | TOTAL EXPOSURE VALUE | | | | 64,676,419.37 | 235,033,701.34 | 170,357,281.97 | 107.65 |
| | | NET EXPOSURE VALUE | | | | 64,676,419.37 | 235,033,701.34 | 170,357,281.97 | 107.65 |
| | | TOTAL LONG POSITIONS | | | | 64,676,419.37 | 235,033,701.34 | 170,357,281.97 | 107.65 |
| | | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH EQ | | | | (16,706,706.11) | (16,706,706.11) | | (7.65) |
| | | TOTAL | | | | 47,969,713.26 | 218,326,995.23 | 170,357,281.97 | 100.00 |

A 0 1 0 5 0

Banc Of America Securities LLC

Client Position Summary by Asset Class

313-11895 Lancer Offshore Inc
PosSum-TCBA

Page: 1
As of: 09/30/01
Printed: 10/15/01

| SHR/FACE | | Description | UNIT COST | CURRENT PRICE | P/T G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (32,085,676) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (32,085,676.29) | (32,085,676.29) | 0.00 | (4.63) |
| 4,157,876 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 4,157,876.46 | 4,157,876.46 | 0.00 | 0.60 |
| 316,250 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 316,250.00 | 316,250.00 | 0.00 | 0.05 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | (27,611,549.83) | (27,611,549.83) | 0.00 | (3.99) |
| **LONG POSITIONS** | | | | | | | | | |
| *Fixed Income* | | | | | | | | | |
| 3,500,000 | 9386567 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.51 |
| 500,000 | 9386637 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.07 |
| 250,000 | 9386655 | LIGHTHOUSE LANDINGS INC | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.04 |
| 650,000 | 9387415 | GENETIC VECTORS 12% NOTE | 100.0000 | 100.0000 | 0.00 | 650,000.00 | 650,000.00 | 0.00 | 0.09 |
| 355,000 | GVECLOAN | GENETIC VECTORS BRIDGELOAN | 100.0000 | 100.0000 | 0.00 | 355,000.00 | 355,000.00 | 0.00 | 0.05 |
| 1,450,000 | LLFILOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 1,450,000.00 | 1,450,000.00 | 0.00 | 0.21 |
| 7,000,000 | SKYLOAN | SKYNET BRIDGE LOAN | 100.0000 | 50.0000 | (50.00) | 7,000,000.00 | 3,500,000.00 | (3,500,000.00) | 0.51 |
| 1,500,000 | SKYLOAN2 | SKYNET BRIDGE LOAN | 100.0000 | 50.0000 | (50.00) | 1,500,000.00 | 750,000.00 | (750,000.00) | 0.11 |
| 1,125,000 | XWCLOAN2 | XWC LOAN | 100.0000 | 100.0000 | 0.00 | 1,125,000.00 | 1,125,000.00 | 0.00 | 0.16 |
| **Total Long Fixed Income** | | | | | (26.03) | 16,330,000.00 | 12,080,000.00 | (4,250,000.00) | 1.74 |
| *Equities* | | | | | | | | | |
| 125,000 | ASFQ | ASFI EUROPE INC | 0.7500 | 1.1700 | 56.00 | 93,750.00 | 146,250.00 | 52,500.00 | 0.02 |
| 9,090,536 | AURA | AURA SYSTEMS INC | 0.3196 | 0.4700 | 47.07 | 2,905,150.00 | 4,272,551.92 | 1,367,401.92 | 0.62 |
| 400,000,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0010 | 0.0010 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.06 |
| 576,667 | CBBD | CHINA BROADBAND CORP | 7.5000 | 0.8200 | (89.07) | 4,325,002.50 | 472,866.94 | (3,852,135.56) | 0.07 |
| 57,900 | DIGM | CONTROL CHIEF HOLDINGS INC | 4.6628 | 2.6800 | (42.52) | 269,974.69 | 155,172.00 | (114,802.69) | 0.02 |
| 6,885,635 | CDS | CREDIT STORE INC | 2.7366 | 1.3000 | (52.50) | 18,842,933.86 | 8,951,325.50 | (9,891,608.36) | 1.29 |
| 15,015,270 | XMM | CROSS MEDIA MARKETING CORP | 0.4918 | 1.6900 | 243.65 | 7,384,302.09 | 25,375,806.30 | 17,991,504.21 | 3.66 |
| 275,000 | CYDXE | CYTOMEDIX INC | 2.8906 | 0.2500 | (91.35) | 794,905.50 | 68,750.00 | (726,155.50) | 0.01 |
| 3,199,035 | DECO | DECORA INDS INC | 3.2113 | 0.0530 | (98.35) | 10,272,966.15 | 169,548.86 | (10,103,417.30) | 0.02 |
| 1,404,800 | DRCT | DIRECT 111 MARKETING INC | 2.5437 | 2.3050 | (9.38) | 3,573,336.05 | 3,238,160.00 | (335,176.05) | 0.47 |
| 17,540,000 | EPTG | EPL TECHNOLOGIES INC | 0.7551 | 0.4366 | (42.18) | 13,243,939.74 | 7,657,459.48 | (5,586,480.26) | 1.11 |
| 400,000 | ECSL | ECARE SOLUTIONS INC | 0.6005 | 0.3150 | (47.54) | 240,182.50 | 126,000.00 | (114,182.50) | 0.02 |
| 803,600 | EDVC | ENVISION DEV CORP | 11.4912 | 0.0500 | (99.56) | 9,234,332.88 | 40,180.00 | (9,194,152.88) | 0.01 |
| 2,215,474 | FTGX | FIBERNET TELECOM GROUP INC | 2.3971 | 0.2400 | (89.99) | 5,310,626.15 | 531,713.76 | (4,778,912.39) | 0.08 |
| 25,027,382 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 0.3808 | 5.0000 | 1212.91 | 9,531,094.90 | 125,196,910.00 | 115,665,815.10 | 18.06 |
| 1,003,016 | GVEC | GENETIC VECTORS INC | 4.2833 | 3.2500 | (24.12) | 4,296,239.22 | 3,259,802.00 | (1,036,437.22) | 0.47 |
| 7,910,933 | GETT | GLOBAL E TUTOR INC | 0.7510 | 0.0150 | (98.00) | 5,940,888.80 | 118,664.00 | (5,822,224.80) | 0.02 |
| 30,000 | LSATA | LIBERTY SATELLITE & TECHNOLOGY | 2.4400 | 1.2400 | (49.18) | 73,200.00 | 37,200.00 | (36,000.00) | 0.01 |
| 3,145,048 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.2929 | 1.6400 | 459.87 | 921,260.67 | 5,157,878.72 | 4,236,618.05 | 0.74 |
| 21,758,000 | MHTX | MANHATTAN SCIENTIFIES INC | 0.3826 | 0.3177 | (16.98) | 8,325,340.49 | 6,911,510.51 | (1,413,829.98) | 2.20 |
| 23,398,955 | MTDP | MEDIXPRODE CORP NEW | 0.0335 | 1.0663 | 3082.99 | 783,875.00 | 24,950,625.00 | 24,166,750.00 | 3.60 |
| 19,398,955 | NIRC | NEUROCORP LTD | 0.8266 | 0.1662 | (79.90) | 16,034,421.67 | 3,223,676.05 | (12,810,745.62) | 0.47 |
| 27,137,780 | NUDZ | NU-D-ZINE INC. | 0.0472 | 1.6000 | 3292.04 | 1,280,069.95 | 43,420,448.00 | 42,140,378.05 | 6.27 |
| 888,992 | NUDZ | NYER MEDICAL GROUP INC | 4.9110 | 2.1500 | (56.22) | 4,365,829.21 | 1,911,332.80 | (2,454,496.41) | 0.28 |
| 12,000 | PMBC | PACIFIC MERCANTILE BANCORP | 7.5938 | 6.3100 | (16.91) | 91,125.00 | 75,720.00 | (15,405.01) | 0.01 |
| 276,737 | PCFC | PIONEER COMMERCIAL FUNDING | 1.0345 | 1.4000 | 35.33 | 286,277.08 | 387,431.80 | 101,154.72 | 0.06 |

A01051

313-11895 Lancer Offshore Inc

PosSum-TCBA

Bank of America Securities LLC

Client Position Summary by Asset Class

Page: 2
As Of: 09/30/01
Printed: 10/15/01

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 515,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.0500 | (97.14) | 901,250.00 | 25,750.00 | (875,500.00) | 0.00 |
| 10,846,910 | SMXP | SMX CORP | 0.3387 | 15.0000 | 4328.83 | 3,673,738.25 | 162,703,650.00 | 159,029,911.75 | 23.48 |
| 2,270,857 | SMXT | SIMEX CORP | 1.6398 | 0.1550 | (90.55) | 3,723,654.54 | 351,982.84 | (3,371,671.71) | 0.05 |
| 343,784 | STG | STONE PATH GROUP INC | 0.5500 | 1.5000 | 81.82 | 189,081.20 | 343,784.00 | 154,702.80 | 0.05 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 1,178,950 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 4.9500 | 0.00 | 0.00 | 5,835,802.50 | 5,835,802.50 | 0.84 |
| 1,214,100 | TTN | TITAN CORP | 18.8099 | 19.6000 | 4.20 | 22,837,086.89 | 23,796,360.00 | 959,273.11 | 3.43 |
| 39,607,559 | TFGP | TOTAL FILM GROUP INC | 0.2936 | 0.2500 | (14.85) | 11,628,212.07 | 9,901,889.75 | (1,726,322.32) | 1.43 |
| 1,074,250 | USPL | U S PLASTIC LMBR CORP | 7.4654 | 0.4700 | (93.70) | 8,020,168.81 | 504,897.50 | (7,515,271.31) | 0.07 |
| 1,687,400 | UGSI | UNDERGROUND SOLUTIONS INC | 0.8987 | 0.2750 | (69.40) | 1,516,462.16 | 464,035.00 | (1,052,427.16) | 0.07 |
| 435,000 | U331992 | UNIVERSAL HEIGHTS INC OLD | 1.0000 | 0.5000 | (50.00) | 435,000.00 | 217,500.00 | (217,500.00) | 0.03 |
| 3,004,137 | UVIH | UNIVERSAL INS HLDGS INC | 0.7315 | 0.5000 | (31.65) | 2,197,483.90 | 1,502,068.50 | (695,415.40) | 0.22 |
| 750,000 | 93BT000 | LIGHTHOUSE LANDINGS INC* | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 212,373 | 9386042 | NETVALUE HOLDINGS INC | 11.4139 | 11.4139 | (0.00) | 2,424,000.00 | 2,423,997.81 | (2.19) | 0.35 |
| 10,300,000 | 9390720 | WTS LIGHTHOUSE LANDINGS INC | 0.0000 | 0.0010 | 0.00 | 0.00 | 10,300.00 | 10,300.00 | 0.00 |
| 13,592,213 | WFPK | WOLFPACK CORP | 0.5408 | 1.8500 | 242.12 | 7,350,000.00 | 25,145,594.05 | 17,795,594.05 | 3.63 |
| 6,197,928 | XWC | WORLD WIRELESS COMMUNICATIONS | 2.2704 | 0.3000 | (86.79) | 14,071,555.99 | 1,859,378.40 | (12,212,177.59) | 0.27 |
| 1,827,875 | ZICA | ***ZI CORPORATION | 4.4254 | 5.1000 | 17.05 | 34,641,560.32 | 40,548,392.50 | 5,906,832.18 | 5.85 |
| 750,000 | AUGNPFD | AUGMENT SYSTEMS PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 150,000.00 | 150,000.00 | 0.00 | 0.02 |
| 16,000,000 | MHTXWT | MANHATTAN SCIENTIFICS PREFERRED STOCK | 0.0000 | 0.4300 | 0.00 | 0.00 | 6,880,000.00 | 6,880,000.00 | 0.99 |
| 10,000,000 | MTDPW1 | METHOD PRODUCTS CORP WARRANTS | 0.0000 | 1.0400 | 0.00 | 0.00 | 10,400,000.00 | 10,400,000.00 | 1.50 |
| 10,000,000 | MTDPW2 | METHOD PRODUCTS CORP WARRANTS | 0.0000 | 1.0400 | 0.00 | 0.00 | 10,400,000.00 | 10,400,000.00 | 1.50 |
| 36,150,000 | NU2EW | NU-I-ZINE WARRANT | 0.0000 | 1.5800 | 0.00 | 0.00 | 57,117,000.00 | 57,117,000.00 | 8.24 |
| 30,000,000 | NU2EW2 | NU-I-ZINE WARRANTS | 0.0000 | 1.5500 | 0.00 | 0.00 | 46,500,000.00 | 46,500,000.00 | 6.71 |
| 1,000,000 | SMXW1 | SMX CORP WARRANTS | 0.0000 | 12.5000 | 0.00 | 0.00 | 12,500,000.00 | 12,500,000.00 | 1.80 |
| 1,000,000 | SMXW2 | SMX CORP WARRANTS | 0.0000 | 10.0000 | 0.00 | 0.00 | 10,000,000.00 | 10,000,000.00 | 1.44 |
| 850,000 | SMXW3 | SMX CORP WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.61 |
| 556,250 | XWCWTS | XWC WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 250,000 | ENEWF | ***E-NEW MEDIA HK00.50 | 0.0500 | 0.0400 | (20.00) | 12,500.00 | 10,000.00 | (2,500.00) | 0.00 |
| | | **Total Long Equities** | | | 191.97 | 242,622,233.23 | 708,394,261.97 | 465,772,028.74 | 102.24 |
| | | **TOTAL LONG POSITIONS** | | | 178.23 | 258,952,233.23 | 720,474,261.97 | 461,522,028.74 | 103.99 |
| | | TOTAL EXPOSURE VALUE | | | | 258,952,233.23 | 720,474,261.97 | 461,522,028.74 | 103.99 |
| | | NET EXPOSURE VALUE | | | | 258,952,233.23 | 720,474,261.97 | 461,522,028.74 | 103.99 |
| | | TOTAL LONG POSITIONS | | | | 258,952,233.23 | 720,474,261.97 | 461,522,028.74 | 103.99 |
| | | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | | TOTAL CASH EQ | | | | (27,611,549.83) | (27,611,549.83) | 0.00 | (3.99) |
| | | **TOTAL:** | | | | 231,340,683.40 | 692,862,712.14 | 461,522,028.74 | 100.00 |

A01052

313-12796 The Orbiter Fund Ltd

PosSum-TCBA

Bank Of America Securities LLC
Client Position Summary by Asset Class

Page: 1
As of: 09/30/01
Printed: 10/15/01

| SHR/FACE | | | INIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (3,076,228) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (3,076,227.73) | (3,076,227.73) | 0.00 | (7.88) |
| 3,057,764 USD | | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,057,763.65 | 3,057,763.65 | 0.00 | 7.83 |
| TOTAL CASH AND EQUIVALENTS | | | | | 0.00 | (18,464.08) | (18,464.08) | 0.00 | (0.05) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 1,600,000 | SKYLOAN3 | SKYNET BRIDGELOAN | 100.0000 | 50.0000 | (50.00) | 1,600,000.00 | 800,000.00 | (800,000.00) | 2.05 |
| | | **Equities** | | | | | | | |
| 531,250 | AURA | AURA SYSTEMS INC | 0.3200 | 0.4700 | 46.88 | 170,000.00 | 249,687.50 | 79,687.50 | 0.64 |
| 100,000 | CYDXE | CYTOMEDIX INC | 2.8000 | 0.2500 | (91.07) | 280,000.00 | 25,000.00 | (255,000.00) | 0.06 |
| 152,500 | EDVC | ENVISION DEV CORP | 11.0836 | 0.0500 | (99.55) | 1,690,241.50 | 7,625.00 | (1,682,616.50) | 0.02 |
| 1,354,968 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 0.7206 | 5.0000 | 593.88 | 976,370.61 | 6,774,840.00 | 5,798,469.39 | 17.36 |
| 500,000 | MHTX | MANHATTAN SCIENTIFIES INC | 1.4759 | 0.4800 | (67.48) | 737,960.25 | 240,000.00 | (497,960.25) | 0.61 |
| 755,000 | NUDZ | NU-D-ZINE INC. | 0.2397 | 1.6000 | 567.40 | 181,000.00 | 1,208,000.00 | 1,027,000.00 | 3.10 |
| 100,000 | NXNW | NXKGN NETWORKS INC | 0.0000 | 0.1000 | | | 10,000.00 | 10,000.00 | 0.03 |
| 275,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.0500 | (97.14) | 481,250.00 | 13,750.00 | (467,500.00) | 0.04 |
| 836,770 | SMXP | SMX CORP | 0.1908 | 15.0000 | 7762.70 | 159,634.00 | 12,551,550.00 | 12,391,916.00 | 32.16 |
| 18,500 | SMXT | SIMEX CORP | 5.7237 | 0.1550 | (97.29) | 105,887.70 | 2,867.50 | (103,020.20) | 0.01 |
| 211,400 | 8855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 4.9500 | | 0.00 | 1,046,430.00 | 1,046,430.00 | 2.68 |
| 4,290,000 | TFGP | TOTAL FILM GROUP INC | 0.0117 | 0.2500 | 2045.00 | 50,000.00 | 1,072,500.00 | 1,022,500.00 | 2.75 |
| 2,500,000 | ULSPE | ULTIMATE SPORTS ENTERTAINMENT | 0.0000 | 0.1250 | | 0.00 | 312,500.00 | 312,500.00 | 0.80 |
| 1,000,000 | 9389149 | WTS TOTAL FILM GROUP | 0.0000 | 0.2400 | | 0.00 | 240,000.00 | 240,000.00 | 0.61 |
| 400,000 | 21CA | **21 CORPORATION | 13.3805 | 5.1800 | (61.29) | 5,352,219.23 | 2,072,000.00 | (3,280,219.23) | 5.31 |
| 380,000 | GVECMTS | GENETIC VECTOR WARRANTS | 0.0000 | 3.1500 | | | 1,197,000.00 | 1,197,000.00 | 3.07 |
| 3,980,000 | NUDZM | NU-D-ZINE WARRANT | 0.0000 | 1.2500 | | | 4,975,000.00 | 4,975,000.00 | 12.75 |
| 250,000 | SMXW1 | SMX CORP WARRANTS | 0.0000 | 12.5000 | | | 3,125,000.00 | 3,125,000.00 | 8.01 |
| 175,000 | SMXW2 | SMX CORP WARRANTS | 0.0000 | 10.0000 | | | 1,750,000.00 | 1,750,000.00 | 4.48 |
| 400,000 | 9082684 | 21 CORP WTS | 0.0000 | 3.4300 | | | 1,332,000.00 | 1,332,000.00 | 3.52 |
| Total Long Equities | | | | | 271.35 | 10,104,164.29 | 38,247,750.00 | 28,064,186.71 | 90.00 |
| TOTAL LONG POSITIONS | | | | | 231.35 | 11,784,563.29 | 39,047,750.00 | 27,263,186.71 | 100.05 |
| TOTAL EXPOSURE VALUE | | | | | | 11,784,563.29 | 39,047,750.00 | 27,263,186.71 | 100.05 |
| NET EXPOSURE VALUE | | | | | | 11,784,563.29 | 39,047,750.00 | 27,263,186.71 | 100.05 |
| TOTAL LONG POSITIONS | | | | | | 11,784,563.29 | 39,047,750.00 | 27,263,186.71 | 100.05 |
| TOTAL SHORT POSITIONS | | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | | | (18,464.08) | (18,464.08) | | (0.05) |
| TOTAL | | | | | | 11,766,099.21 | 39,029,285.92 | 27,263,186.71 | 100.00 |

A01053

313-13377 Viator Fund Ltd

PosSum-TCBA

Banc Of America Securities LLC
Client Position Summary by Asset Class

Page: 1
As Of: 09/30/01
Printed: 10/15/01

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (828,357) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (828,356.95) | (828,356.95) | 0.00 | (3.10) |
| 346,095 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 346,094.89 | 346,094.89 | 0.00 | 1.30 |
| 13,125 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 13,125.00 | 13,125.00 | 0.00 | 0.05 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | (469,137.06) | (469,137.06) | 0.00 | (1.76) |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 900,000 | SKYNETLN | SKYNET LOAN | 100.0000 | 10.0000 | (90.00) | 900,000.00 | 90,000.00 | (810,000.00) | 0.34 |
| **Equities** | | | | | | | | | |
| 400,000 | AURA | AURA SYSTEMS INC | 0.3200 | 0.4700 | 46.88 | 128,000.00 | 188,000.00 | 60,000.00 | 0.70 |
| 40,000 | CBBD | CHINA BROADBAND CORP | 7.5000 | 0.8200 | (89.07) | 300,000.00 | 32,800.00 | (267,200.00) | 0.12 |
| 51,100 | LLB | COMPUTRAC INC | 0.3750 | 0.3700 | (1.33) | 19,162.50 | 18,907.00 | (255.50) | 0.07 |
| 102,500 | CDS | CREDIT STORE INC | 2.8850 | 1.3000 | (54.94) | 295,710.20 | 133,250.00 | (162,460.20) | 0.50 |
| 100,000 | CYDXE | CYTOMEDIX INC | 2.8000 | 0.2500 | (91.07) | 280,000.00 | 25,000.00 | (255,000.00) | 0.09 |
| 100,000 | DRCT | DIRECT 111 MARKETING INC | 0.9249 | 1.7000 | 83.79 | 92,494.86 | 170,000.00 | 77,505.14 | 0.64 |
| 2,285,968 | EPTG | EPL TECHNOLOGIES INC NEW | 0.0067 | 0.4400 | 6504.94 | 15,228.62 | 1,005,825.92 | 990,597.30 | 3.76 |
| 52,500 | EDVC | ENVISION DEV CORP | 10.9848 | 0.0500 | (99.54) | 576,704.00 | 2,625.00 | (574,079.00) | 0.01 |
| 115,000 | FTGX | FIBERNET TELECOM GROUP INC | 4.6407 | 0.2400 | (94.83) | 533,678.10 | 27,600.00 | (506,018.10) | 0.10 |
| 916,457 | FFTRD | FIDELITY FIRST FINANCIAL CORP | 0.1407 | 5.0000 | 3454.86 | 128,902.00 | 4,582,285.00 | 4,453,383.00 | 17.15 |
| 101,761 | HAUP | HAUPPAGE DIGITAL INC | 1.7984 | 1.0500 | (41.61) | 193,791.35 | 113,149.05 | (80,648.30) | 0.42 |
| 5,000 | HEB | HEMISPHERX BIOPHARMA INC | 1.7500 | 4.0300 | 130.29 | 8,750.00 | 20,150.00 | 11,400.00 | 0.08 |
| 916,850 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.6410 | 1.4400 | 157.41 | 584,040.30 | 1,501,634.00 | 919,585.70 | 5.61 |
| 905,000 | MHTX | MANHATTAN SCIENTIFICS INC | 1.7225 | 0.4400 | (72.13) | 1,558,822.20 | 414,400.00 | (1,144,422.20) | 1.63 |
| 91,333 | NURC | NEUROCORP LTD | 1.6272 | 0.3100 | (80.95) | 148,621.17 | 28,313.23 | (120,307.94) | 0.11 |
| 755,000 | NUDZ | NU-D-ZINE INC. | 0.2397 | 1.6000 | 567.40 | 181,000.00 | 1,208,000.00 | 1,027,000.00 | 4.52 |
| 200,000 | NXNW | NXGEN NETWORKS INC | 0.0000 | 0.1000 | | 0.00 | 20,000.00 | 20,000.00 | 0.07 |
| 200,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.7500 | 0.0500 | (97.14) | 350,000.00 | 10,000.00 | (340,000.00) | 0.04 |
| 423,800 | SMKP | SMK CORP | 0.8513 | 15.0000 | 1661.98 | 360,787.50 | 6,357,000.00 | 5,996,212.50 | 23.79 |
| 50,400 | SMXT | SIMEX CORP | 2.1203 | 0.1550 | (92.69) | 106,861.20 | 7,812.00 | (99,049.20) | 0.03 |
| 19,441,100 | TFGP | TOTAL FILM GROUP INC | 0.0681 | 0.2500 | 263.54 | 1,335,356.68 | 4,861,788.75 | 3,524,432.07 | 18.19 |
| 233,700 | UVIH | UNIVERSAL INS HLDGS INC | 0.4091 | 0.5000 | 22.21 | 95,617.39 | 116,850.00 | 21,232.61 | 0.44 |
| 250,000 | 9387720 | ICONNECT.COM | 1.0000 | 1.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.94 |
| 300,000 | 9390720 | MTS LIGHTHOUSE LANDINGS INC | 0.0010 | 0.0010 | | 300.00 | 300.00 | 0.00 | 0.00 |
| 200,000 | XMC | WORLD WIRELESS COMMUNICATIONS | 2.7632 | 0.3000 | (89.14) | 552,649.94 | 60,000.00 | (492,649.94) | 0.22 |
| 380,700 | ZICA | ***ZI CORPORATION | 17.0800 | 5.1800 | (69.67) | 6,502,372.74 | 1,972,026.00 | (4,530,346.74) | 7.38 |
| 50,000 | FFIRDWT | FIDELITY FIRST FIN'L CORP WTS | 0.0000 | 4.9500 | 0.00 | 0.00 | 247,500.00 | 247,500.00 | 0.93 |
| 700,000 | NUD2W | NU-D-ZINE WARRANT | 0.0000 | 1.5800 | | 0.00 | 1,106,000.00 | 1,106,000.00 | 4.14 |
| 225,000 | SMKW2 | SMK CORP WARRANTS | 0.0000 | 10.0000 | | 0.00 | 2,250,000.00 | 2,250,000.00 | 8.42 |
| 100,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 1.31 |
| **Total Long Equities** | | | | | 81.29 | 14,950,564.75 | 27,103,215.95 | 12,152,651.20 | 101.42 |
| **TOTAL LONG POSITIONS** | | | | | 71.56 | 15,850,564.75 | 27,193,215.95 | 11,342,651.20 | 101.76 |

A01054

Banc Of America Securities LLC

713-13377 Viator Fund Ltd

Client Position Summary by Asset Class

Page: 2
As Of: 09/30/01
Printed: 10/15/01

PosSum-TCBA

| SHR/FACE | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| TOTAL EXPOSURE VALUE | | | | 15,850,564.75 | 27,193,215.95 | 11,342,651.20 | 101.76 |
| NET EXPOSURE VALUE | | | | 15,850,564.75 | 27,193,215.95 | 11,342,651.20 | 101.76 |
| | | | | | | | |
| TOTAL LONG POSITIONS | | | | 15,850,564.75 | 27,193,215.95 | 11,342,651.20 | 101.76 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | (469,137.06) | (469,137.06) | | (1.76) |
| | | | | | | | |
| TOTAL | | | | 15,381,427.69 | 26,724,078.89 | 11,342,651.20 | 100.00 |

# EXHIBIT 33

A00129

# Lancer Partners, LP

## Year-to-date Performance Update

Dear Partner: May 5, 2002

The month of April bore the brunt of what cumulatively still ails the senior market indexes. The sector-specific earnings depression (March quarter results were horrific for some of the once high-flying industries), the corporate accounting qualms (Enron-itis etc.), the Wall Street credibility issues (even more so than usual), geopolitical tensions (Middle East mostly) and the still lofty valuations (among the top tier, index driving stocks), all conspired to drop the S&P 500 to its worst monthly performance since September of 2001. The 6% drawdown, added to the slight loss through the first three months of the year, puts the year-to-date decline at nearly 7% (20% + annualized). Considering this follows double-digit losses in each of the two previous years, the portfolio pain for the indexers (both overt and covert) has been quite severe. To be specific, the S&P 500 is approximately 30% below the high it reached in August of 2000 (does anyone still believe that indexing is a low risk investment strategy, suited for everyone?).

The realities were even more mournful in NASDAQ land. The Composite's 9% drop in April put the YTD drawdown at 14% (dropped another 4% in the first three days of May). This follows 21% and 39% losses in 2001 and 2000, respectively. The NASDAQ now stands at nearly 70% below the high it registered in the first quarter of 2000. The top-tier of the Composite is still under more pressure, as the NASDAQ 100 is down 25% YTD and 76% from its high. Large institutional investors continue to purge their holdings in the big cap growth sector (remember those one-decision stocks?), as the desired strategy *de jure* for beating the "benchmark" appears to reside in distancing portfolios from the S&P 500's largest components (an inverse of the Nineties).

**Lancer Partners registered a mid-single digit YTD pre-fee advance (annualized gain at 15% to 20%), suggesting a low-teen increase over the past 12 months. Thus, over the past 36 months the advance stands at over 90%, while the S&P 500 losses for the trailing 12 and 36 months were 14% and 20% respectively (the NASDAQ losses were 20% and 34% during the comparable periods).**

1

## Our take on things:

### On the equity markets:

In our opinion, the broader market of stocks (as opposed to the distortion prone, cap weighted market indexes) are behaving quite rationally and are significantly more buoyant than the damage in the senior indexes would suggest. Not having enjoyed the liquidity deluge of the large cap growth universe in the second half of the Nineties, the lesser tiers of stocks (in terms of market capitalization) were not subject to the same valuation excesses bestowed on the top echelon. Thus the ongoing excess expunging exercise is more of a top tier phenomenon. The big caps thus continue to undergo liquidation and cash redistribution into the broader markets. The new cash (inflows into equity funds remain strong) is also favoring the relative petiteness. The Russell 2000 is actually up 5% and 17% over the past 12 and 36 months respectively, with the S&P 600 Small Cap index flirting with its all time high! (up 15% and 48% over the past 12 and 36 months respectively). Indeed, even within the S&P 500 index itself, more stocks are up than down YTD, with the lower quartiles of stocks (the smaller the better in terms of caps) easily outperforming their larger brethren.

The dis-indexation phenomenon is the consequence of benchmark chasing (discussed by us in 1999, please call Jeannine for copies), which resulted in waves of price-insensitive buying of the top tier stocks. In a nutshell, the investment objective's dis-intermediation between the individual investor and the professional money manager (delegated by the former) was the key culprit in the market bifurcation and the resultant valuation bubble. Although the institutionalization of the market place (read as increasingly relative performance driven) is a decade old phenomenon, it certainly gained momentum in the late Nineties.

Once the individual investor parted with his/her cash in favor of "professional" management, he/she changed (often without comprehending the implication) the performance objective for their assets, from one of an absolute to a relative return. Clearly the latter necessitates a manifestly different strategy that is often valuation insensitive, and thus prone to extreme excesses such as those experienced in market bubbles. For the relative performer ("professional manager"), it is actually more desirable to lose money, but less than the chosen benchmark, than deliver profitability, but below the levels of the targeted index. That is why for example, Fidelity Magellan is paying itself generous bonuses, even though it is losing money for its clients for the third straight year. Thus from a portfolio selection

perspective, the Nineties called for overexposure to the mega-caps as the ticket to relative performance successes, but as of the early 2000, the reverse was true. On the way up, buying the index driven stocks propelled them ever higher, necessitating further portfolio adjustments, which resulted in more buying of the same stocks. <u>This "virtues cycle" has alas, turned into a "vicious cycle", as the selling of the mega caps (key index components), begets more adjustment (selling) on the downside, causing the cascading price patterns bemoaned by the media.</u> When will it bottom is anyone's guess, but there is still no valuation support in sight for these former high-flyers.

Cash is not fleeing the market however (in fact the inflows into equity funds remain quite favorable) and the rotation into much of the rest of the market has clearly benefited the broader markets (note the Value Line). <u>Although valuations of the top tier stocks remain rich, among the secondary universe, bargains abound. For a bottom up, stock picking absolute return objective driven fund, the latter consideration is much more important.</u>

As we move forward, the seasonal influences on the market for the second quarter (and the third) are historically negative, but in our opinion, the past patterns will be unhelpful in the current cycle, given the rather unprecedented nature of the declines over the past two years. We continue to believe that the S&P 500 is less than 50% likely to experience its third consecutive deficit year (would be the first time since the Great Depression if it did), and thus will more than make up its present 7% YTD deficit (and than some) by year-end. The markets surge when investors least expect them, and the sidelined, opportunity-less liquidity resources remain robust.

**On Lancer's performance:**
Nothing particularly eventful to point to so far this year, other than validation that the bottom up, value focused and catalyst driven stock picking is the best strategy for all seasons. Nearly all of the YTD gains were generated from the long side, with recent profits taken in holdings, which never quite acquired the status of "core" positions, by virtues of advancing above our buying range too early (Hyperion Solutions, Perkin Elmer, Plantronics, TRW, Teledyne Tech., Terex, Tyco International, and US Industries to name a few). Our core positions, we believe, are well poised for a catalyst driven advances over the next twelve months, but net-net, it has been a wash YTD. The multi-industry, hidden value, "restructuring" themes continue to predominate the portfolio, although increasingly, bottom fishing in selective niche technology and industrial companies is also underway. We continue to avoid the pure-play defense plays (for reasons

3

discussed in prior letters), but a considerable exposure to that market remains in our multi-industry holdings.

The plunge in the formerly "high expectation" stocks notwithstanding, short selling remains quite tricky. The unnerving month to month volatility and our belief that the probability of a sharp upside move in the indexes is quite significant, precludes a more determined positioning on the short side. This strategy is only slightly better than break-even YTD. Substantial liquidity resources remain available to the market, though presently sidelined, and coupled with the likely sequentially improving macro-economic climate (including corporate earnings performance), argue for caution. As always, we will remain opportunistic.

**On the economy:**
The GDP leaped nearly 6% in the March quarter, after posting a stronger than expected 1.7% advance in the final three months of 2001. Although we recognize that the recent quarter had quite a few distortions in the numbers (more than half of the advance came from businesses depleting inventories), on balance the recovery is on track. The Government's spending also helped the economy (accounted for 1.4% of GDP's 5.8% growth), with defense spending up 20% on an annualized rate (fastest growth since the mid-60's). This good old Keynesian stimulus is not expected to abandon us anytime soon. The total final sales (which did not include inventory adjustments) rose 2.6%, which is approximately what we think the underlying GDP growth will be for the year.

The bottom line is that we should not expect much of a recovery, given that we did not have much of a recession. Durable goods orders and new home sales have softened, but the consumer held up nicely overall in the quarter, even after the low interest rate incentives binge in the December quarter. The consumer is not likely to capitulate anytime soon given that the Household Prosperity Index is hovering at near record levels at the end of the first quarter. The real wages and salary income per worker were up strongly, housing prices continue to advance nationally, unemployment stabilized (more or less, adjusting for statistical aborations) and even the broader equity markets were up in the quarter. We do not believe the US economy is heading for a double dip, and we assume at least a 3% GDP growth for the June quarter. Unspectacular, but also not enough of a momentum to panic Chairman Greenspan into hurried tightening of the liquidity spigot (particularly since the inflation also remains under control), which would be even more damaging to the market.

4

**On corporate earnings:**
The recent corporate profit performance was one of the worst since the Great Depression, paradoxically, while the economic recession (if any) was one of the shallowest on record.   Again the picture here was highly bifurcated as some industry segments continued to wallow in a depressionary environment (burdened by low demand and massive overcapacity), while other sectors prosper.

The nadir in the earnings cycle has passed, and momentum will become less negative as the year progresses. Operating earnings which fell 10% to 12% in the first quarter (from already depressed levels), will likely be flat to up mid-single digits in the June quarter, with highly positive comparisons (vs. the ultra weak numbers last year) expected in the second half of the year. Corporate pricing power remains negligible, but productivity growth should continue strong.

Earnings typically lag economic recovery, so we think we are generally on track. Suffice it to say; once the evidence of robust corporate earnings is upon us, it will be too late to go bargain shopping for equities.

We have recently participated in dozens of quarterly conference calls, in addition to individual management visits and phone conversations.   Overwhelmingly, the general tone of the feedback is one of "the worst is behind us" sentiment. Historically, it is at times like this that a savvy, value focused and contrarian investor averages into his holdings.   Anticipatory timing is essential to long-term superior investment results, particularly since the risk reward over the next twelve months appears very favorable.

**Other issues:**
- We will address the recent hysteria surrounding the investment communities' conflicts of interest at another time, as this letter is already too lengthy, but the only point worth noting is one of apparent surprise that conflicts may exist (will the next thing they tell us be that professional wrestlers are faking it?).  As Warren Buffet recently noted: "Wall Street is configured to make money off investors rather than for them."   A yet unilluminated conflict is the one that we addressed in prior pages, mainly that the individual investor has yet to fully comprehending that the "professional" manager is chasing a totally different set of objectives than those of his own, often to the latter's financial detriment.

- The greater scrutiny of corporate balance sheets and general accounting practices will in the longer-term boost, not hurt credibility.   At present

5

however, the anxiety of who will come clean next, is certainly not helping the markets. We are confidant that time will heal this wound.

- As the mega-caps collapse, so do the one-decision "faith" stocks and the celebrity executives that led them.  The cover of the latest issue of *The Economist* "The Fallen Idol; The Overthrow of Celebrity CEO" is a worthwhile read on this subject. The point is that it should be analytical rigor that eventually leads to investment decisions, and not a mesmerizingly charismatic (often highly promotional) CEO.

In the following pages, Bruce Cowen encapsulates Harvard University's Sixth Congress on the Psychology of Investing, which took place in late April.

Sincerely,                                              Michael Lauer, General Partner

## Summary From Harvard's Psychology of Investment Conference

On April 27th, I had the privilege of speaking at Harvard's Sixth Congress on the Psychology of Investing which brought together a faculty of seminal educators and leaders in the fields of investment and psychology in order to explore the interface between human emotions and financial decision-making.  The conference was co-hosted by Dr. Richard Geist, editor, author and faculty member at the Department of Psychology at Harvard Medical School  (also Director of Lancer Offshore, Inc.) whose piece "What is Risk?" was attached to March 8, 2002 performance update.

The speakers included David Dreman, author of several books on investing and a columnist for *Forbes Magazine;* Mark Hulbert, editor of *The Hulbert Financial Digest*, author and columnist; Charles Jaffe, personal finance and mutual funds columnist at *The Boston Globe*; Stephen Lord, publisher of *The Advisors Digest* and syndicated columnist for *Knight Ridder Tribune*; Paul Merriman, co-portfolio manager of the Merriman Family of Mutual Funds; Robert Prechter, president of Elliot Wave International and editor;  and Ray Kurtzweil, inventor, innovator and futurist that received the 1999 National Medal of Technology, the nation's highest honor in technology  as well as receiving ten honorary doctorates and honors from three U.S. Presidents.

My dissertation was on the Psychology of the CEO.  I emphasized the pressures and temptations which drive some executives to distort their company's

performance in order to maintain or buoy stock price and uphold their reputations and personal wealth. This is driven by the strenuous demands by the market and the company's shareholders.

I discussed several case studies to illustrate how such negative actions by the CEO often leads to a company's deterioration and potential downfall as we have all seen recently with observation of Enron and others.

My presentation next centered on the fact that we can't change psychology, but can minimize the impact of psychology through more thorough due diligence, interaction with Boards of Directors, selective support of proposed institutional reforms which include tightening of accounting standards. Animated discussion followed.

Presented below is a brief summary of noteworthy comments by other speakers.

David Dreman discussed his research on 500,000 individual analyst estimates reported between 1973 and 1996, and subsequently updated to 2000. The average error for the sample was an astounding 44% annually. In the last 8 years of the study, the average error was 50% and in two of those years, 57% and 65%, respectively. Only one in four estimates were in the +/-5% range. Bottom line was obviously that we shouldn't rely on or expect that analyst estimates will be accurate. (Nothing new to our thinking.)

Robert Prechter discussed the Wave Theory of Social Behavior and the Markets. His specific theory suggests that in a bull market there are 5 up cycles and 3 down cycles. In a bear market there are 5 down cycles and 3 up cycles. Prechter argued that we were now in a down cycle that will last for 15 more years. (Of course Prechter has been wrong for the past 8 years and will probably be wrong for the next 15).

Charles Jaffe analyzed whether the media was giving investors what they need or what they want. His conclusion was that for most of the popular media, giving investors what they want rather than what they need is what sells magazines and newspapers. Thus the press generally does a disservice to most investors who follow their advice (as does the brokerage community).

Mark Hulbert, the one person who keeps track of newsletter writers' market predictions, analyzed the relationship between market letter writers' forecasts and the actual performance of the index. He found that newsletter forecasts were often

A00136

contrary indicators and that newsletter writers' actions were often diametrically opposed to their written predictions. So it is more important to follow what they do than what they say.

Richard Geist discussed the fact that investing is more of a subjective process than most economists and investors are willing to admit. Although we all have access to similar data, the judgments we use to interpret that data are typically based on unconscious emotional convictions that can unwittingly distort our understanding of a company's numbers, management, and products or services. Several case examples illustrated how two people with similar information can make very different investment decisions depending on the lenses through which they view the data. Emphasis was placed on getting to know one's idiosyncratic lenses as a key to preventing irrational decisions in the market.

Stephen Lord discussed the impact of economic developments on investor psychology. He emphasized how investors today are distorting all the negative economic data to make it appear positive in order to maintain their cheery consensus in the face of the worst environment for stocks since the 1973-1974 period. He emphasized that the unrealistic expectations of the investing public have yet to be fully addressed, and they must be reminded that a few good statistics do not a trend make. Mr. Lord concluded that eventually economic reality and investor perception would clash and that economic reality will win out with a further drop in the stock market.

Paul Merriman discussed the value of buy and hold vs. market timing. He emphasized how many buy and hold investors were closet market timers. He expressed a strong belief that for most investors buy and hold strategies do not work. Therefore, Merriman believes that a combination of buy and hold and market timing, matched to the emotional and financial needs of the investor, is the best long term strategy for financial planners to execute with their clients.

Richard Horwitz discussed risk management decisions in the hedge fund industry. After explaining how hedge funds operate, Horwitz discussed personality characteristics of managers that help and hurt returns—from rock star mentalities to being too disconnected to the market, to having a lack of focus, and not enough passion. Because investment time horizons have shortened, many pension funds and endowments have turned to hedge funds to increase returns.

Keynote speaker Ray Kurzweil gave an inspiring speech on the state of technology and the advancements to be expected over the next ten to twenty years that will

8

impact our lives.   It was interesting to note that life expectancy is currently increasing by 120+ days per year and Ray Kurzweil predicted by the year 2010 that life expectancy will increase by one year for each subsequent year.   In otherwords, if we live to 2010, we will have the choice of never dying.  Do we really want to live forever?

The conference was well attended with an outstanding list of speakers that included several other well-known and respected industry leaders.  Dr. Geist and Harvard plan on sponsoring the event again next year and we will keep you informed on the schedule once determined.

Should you have any questions, please call.

Sincerely,                                              Bruce Cowen, Managing Director

# EXHIBIT 34

A 0 0 1 3 8

# Lancer Offshore, Inc.

## Year-to-date Performance Update

Dear Shareholder:                                                    May 5, 2002

The month of April bore the brunt of what cumulatively still ails the senior market indexes.   The sector-specific earnings depression (March quarter results were horrific for some of the once high-flying industries), the corporate accounting qualms (Enron-itis etc.), the Wall Street credibility issues (even more so than usual), geopolitical tensions (Middle East mostly) and the still lofty valuations (among the top tier, index driving stocks), all conspired to drop the S&P 500 to its worst monthly performance since September of 2001. The 6% drawdown, added to the slight loss through the first three months of the year, puts the year-to-date decline at nearly 7% (20% + annualized). Considering this follows double-digit losses in each of the two previous years, the portfolio pain for the indexers (both overt and covert) has been quite severe.   To be specific, the S&P 500 is approximately 30% below the high it reached in August of 2000 (does anyone still believe that indexing is a low risk investment strategy, suited for everyone?).

The realities were even more mournful in NASDAQ land. The Composite's 9% drop in April put the YTD drawdown at 14% (dropped another 4% in the first three days of May). This follows 21% and 39% losses in 2001 and 2000, respectively. The NASDAQ now stands at nearly 70% below the high it registered in the first quarter of 2000.  The top-tier of the Composite is still under more pressure, as the NASDAQ 100 is down 25% YTD and 76% from its high.   Large institutional investors continue to purge their holdings in the big cap growth sector (remember those one-decision stocks?), as the desired strategy *de jure* for beating the "benchmark" appears to reside in distancing portfolios from the S&P 500's largest components (an inverse of the Nineties).

**The Lancer Offshore Fund's final NAV for the month of April was 961.63, up slightly for the month, and adding to the first quarter's mid single digit YTD gain (annualized gain at 15% to 20%).   Thus, over the past 12 and 36 months, the NAV advance stands at 12% and 92% respectively, while the S&P 500 losses for the same periods were 14% and 20% respectively (the NASDAQ comparisons were declines of 20% and 34%).   Since inception in October of**

1995, The Lancer Offshore NAV rose 862%, vs. the S&P 500's 84% (the NASDAQ and the Russell 2000 were up 61% and 64% respectively).

## Our take on things:

### On the equity markets:

In our opinion, the broader market of stocks (as opposed to the distortion prone, cap weighted market indexes) are behaving quite rationally and are significantly more buoyant than the damage in the senior indexes would suggest. Not having enjoyed the liquidity deluge of the large cap growth universe in the second half of the Nineties, the lesser tiers of stocks (in terms of market capitalization) were not subject to the same valuation excesses bestowed on the top echelon.  Thus the ongoing excess expunging exercise is more of a top tier phenomenon.  The big caps thus continue to undergo liquidation and cash redistribution into the broader markets. The new cash (inflows into equity funds remain strong) is also favoring the relative petiteness.  The Russell 2000 is actually up 5% and 17% over the past 12 and 36 months respectively, with the S&P 600 Small Cap index flirting with its all time high! (up 15% and 48% over the past 12 and 36 months respectively). Indeed, even within the S&P 500 index itself, more stocks are up than down YTD, with the lower quartiles of stocks (the smaller the better in terms of caps) easily outperforming their larger brethren.

The dis-indexation phenomenon is the consequence of benchmark chasing (discussed by us in 1999, please call Jeannine for copies), which resulted in waves of price-insensitive buying of the top tier stocks.  In a nutshell, the investment objective's dis-intermediation between the individual investor and the professional money manager (delegated by the former) was the key culprit in the market bifurcation and the resultant valuation bubble. Although the institutionalization of the market place (read as increasingly relative performance driven) is a decade old phenomenon, it certainly gained momentum in the late Nineties.

Once the individual investor parted with his/her cash in favor of "professional" management, he/she changed (often without comprehending the implication) the performance objective for their assets, from one of an absolute to a relative return. Clearly the latter necessitates a manifestly different strategy that is often valuation insensitive, and thus prone to extreme excesses such as those experienced in market bubbles. For the relative performer ("professional manager"), it is actually more desirable to lose money, but less than the chosen benchmark, than deliver profitability, but below the levels of the targeted index. That is why for example,

2

Fidelity Magellan is paying itself generous bonuses, even though it is losing money for its clients for the third straight year.   Thus from a portfolio selection perspective, the Nineties called for overexposure to the mega-caps as the ticket to relative performance successes, but as of the early 2000, the reverse was true. On the way up, buying the index driven stocks propelled them ever higher, necessitating further portfolio adjustments, which resulted in more buying of the same stocks. This "virtues cycle" has alas, turned into a "vicious cycle", as the selling of the mega caps (key index components), begets more adjustment (selling) on the downside, causing the cascading price patterns bemoaned by the media. When will it bottom is anyone's guess, but there is still no valuation support in sight for these former high-flyers.

Cash is not fleeing the market however (in fact the inflows into equity funds remain quite favorable) and the rotation into much of the rest of the market has clearly benefited the broader markets (note the Value Line).   Although valuations of the top tier stocks remain rich, among the secondary universe, bargains abound. For a bottom up, stock picking absolute return objective driven fund, the latter consideration is much more important.

As we move forward, the seasonal influences on the market for the second quarter (and the third) are historically negative, but in our opinion, the past patterns will be unhelpful in the current cycle, given the rather unprecedented nature of the declines over the past two years.  We continue to believe that the S&P 500 is less than 50% likely to experience its third consecutive deficit year (would be the first time since the Great Depression if it did), and thus will more than make up its present 7% YTD deficit (and than some) by year-end.  The markets surge when investors least expect them, and the sidelined, opportunity-less liquidity resources remain robust.

**On Lancer's performance:**
Nothing particularly eventful to point to so far this year, other than validation that the bottom up, value focused and catalyst driven stock picking is the best strategy for all seasons.  Nearly all of the YTD gains were generated from the long side, with recent profits taken in holdings, which never quite acquired the status of "core" positions, by virtues of advancing above our buying range too early (Hyperion Solutions, Perkin Elmer, Plantronics, TRW, Teledyne Tech., Terex, Tyco International, and US Industries to name a few).  Our core positions, we believe, are well poised for a catalyst driven advances over the next twelve months, but net-net, it has been a wash YTD.   The multi-industry, hidden value, "restructuring" themes continue to predominate the portfolio, although

3

increasingly, bottom fishing in selective niche technology and industrial companies is also underway.   We continue to avoid the pure-play defense plays (for reasons discussed in prior letters), but a considerable exposure to that market remains in our multi-industry holdings.

The plunge in the formerly "high expectation" stocks notwithstanding, short selling remains quite tricky. The unnerving month to month volatility and our belief that the probability of a sharp upside move in the indexes is quite significant, precludes a more determined positioning on the short side.  This strategy is only slightly better than break-even YTD.  Substantial liquidity resources remain available to the market, though presently sidelined, and coupled with the likely sequentially improving macro-economic climate (including corporate earnings performance), argue for caution. As always, we will remain opportunistic.

**On the economy:**
The GDP leaped nearly 6% in the March quarter, after posting a stronger than expected 1.7% advance in the final three months of 2001. Although we recognize that the recent quarter had quite a few distortions in the numbers (more than half of the advance came from businesses depleting inventories), on balance the recovery is on track.  The Government's spending also helped the economy (accounted for 1.4% of GDP's 5.8% growth), with defense spending up 20% on an annualized rate (fastest growth since the mid-60's). This good old Keynesian stimulus is not expected to abandon us anytime soon. The total final sales (which did not include inventory adjustments) rose 2.6%, which is approximately what we think the underlying GDP growth will be for the year.

The bottom line is that we should not expect much of a recovery, given that we did not have much of a recession. Durable goods orders and new home sales have softened, but the consumer held up nicely overall in the quarter, even after the low interest rate incentives binge in the December quarter. The consumer is not likely to capitulate anytime soon given that the Household Prosperity Index is hovering at near record levels at the end of the first quarter. The real wages and salary income per worker were up strongly, housing prices continue to advance nationally, unemployment stabilized (more or less, adjusting for statistical aborations) and even the broader equity markets were up in the quarter. We do not believe the US economy is heading for a double dip, and we assume at least a 3% GDP growth for the June quarter. Unspectacular, but also not enough of a momentum to panic Chairman Greenspan into hurried tightening of the liquidity spigot (particularly since the inflation also remains under control), which would be even more damaging to the market.

4

A 0 0 1 4 2

**On corporate earnings:**
The recent corporate profit performance was one of the worst since the Great Depression, paradoxically, while the economic recession (if any) was one of the shallowest on record.  Again the picture here was highly bifurcated as some industry segments continued to wallow in a depressionary environment (burdened by low demand and massive overcapacity), while other sectors prosper.

The nadir in the earnings cycle has passed, and momentum will become less negative as the year progresses. Operating earnings which fell 10% to 12% in the first quarter (from already depressed levels), will likely be flat to up mid-single digits in the June quarter, with highly positive comparisons (vs. the ultra weak numbers last year) expected in the second half of the year. Corporate pricing power remains negligible, but productivity growth should continue strong.

Earnings typically lag economic recovery, so we think we are generally on track. Suffice it to say: once the evidence of robust corporate earnings is upon us, it will be too late to go bargain shopping for equities.

We have recently participated in dozens of quarterly conference calls, in addition to individual management visits and phone conversations.  Overwhelmingly, the general tone of the feedback is one of "the worst is behind us" sentiment. Historically, it is at times like this that a savvy, value focused and contrarian investor averages into his holdings.  Anticipatory timing is essential to long-term superior investment results, particularly since the risk reward over the next twelve months appears very favorable.

**Other issues:**
- We will address the recent hysteria surrounding the investment communities' conflicts of interest at another time, as this letter is already too lengthy, but the only point worth noting is one of apparent surprise that conflicts may exist (will the next thing they tell us be that professional wrestlers are faking it?).  As Warren Buffet recently noted: "Wall Street is configured to make money _off_ investors rather than for them."  A yet unilluminated conflict is the one that we addressed in prior pages, mainly that the individual investor has yet to fully comprehending that the "professional" manager is chasing a totally different set of objectives than those of his own, often to the latter's financial detriment.

5

- The greater scrutiny of corporate balance sheets and general accounting practices will in the longer-term boost, not hurt credibility. At present however, the anxiety of who will come clean next, is certainly not helping the markets. We are confidant that time will heal this wound.

- As the mega-caps collapse, so do the one-decision "faith" stocks and the celebrity executives that led them. The cover of the latest issue of *The Economist* "The Fallen Idol; The Overthrow of Celebrity CEO" is a worthwhile read on this subject. The point is that it should be analytical rigor that eventually leads to investment decisions, and not a mesmerizingly charismatic (often highly promotional) CEO.

In the following pages, Bruce Cowen encapsulates Harvard University's Sixth Congress on the Psychology of Investing, which took place in late April.

Sincerely,                                               Michael Lauer, Investment Manager


## Summary From Harvard's Psychology of Investment Conference

On April 27th, I had the privilege of speaking at Harvard's Sixth Congress on the Psychology of Investing which brought together a faculty of seminal educators and leaders in the fields of investment and psychology in order to explore the interface between human emotions and financial decision-making. The conference was co-hosted by Dr. Richard Geist, editor, author and faculty member at the Department of Psychology at Harvard Medical School (also Director of Lancer Offshore, Inc.) whose piece "What is Risk?" was attached to March 8, 2002 performance update.

The speakers included David Dreman, author of several books on investing and a columnist for *Forbes Magazine;* Mark Hulbert, editor of *The Hulbert Financial Digest*, author and columnist; Charles Jaffe, personal finance and mutual funds columnist at *The Boston Globe*; Stephen Lord, publisher of *The Advisors Digest* and syndicated columnist for *Knight Ridder Tribune*; Paul Merriman, co-portfolio manager of the Merriman Family of Mutual Funds; Robert Prechter, president of Elliot Wave International and editor;  and Ray Kurtzweil, inventor, innovator and futurist that received the 1999 National Medal of Technology, the nation's highest honor in technology  as well as receiving ten honorary doctorates and honors from three U.S. Presidents.

A00144

My dissertation was on the Psychology of the CEO. I emphasized the pressures and temptations which drive some executives to distort their company's performance in order to maintain or buoy stock price and uphold their reputations and personal wealth. This is driven by the strenuous demands by the market and the company's shareholders.

I discussed several case studies to illustrate how such negative actions by the CEO often leads to a company's deterioration and potential downfall as we have all seen recently with observation of Enron and others.

My presentation next centered on the fact that we can't change psychology, but can minimize the impact of psychology through more thorough due diligence, interaction with Boards of Directors, selective support of proposed institutional reforms which include tightening of accounting standards. Animated discussion followed.

Presented below is a brief summary of noteworthy comments by other speakers.

David Dreman discussed his research on 500,000 individual analyst estimates reported between 1973 and 1996, and subsequently updated to 2000. The average error for the sample was an astounding 44% annually. In the last 8 years of the study, the average error was 50% and in two of those years, 57% and 65%, respectively. Only one in four estimates were in the +/-5% range. Bottom line was obviously that we shouldn't rely on or expect that analyst estimates will be accurate. (Nothing new to our thinking.)

Robert Prechter discussed the Wave Theory of Social Behavior and the Markets. His specific theory suggests that in a bull market there are 5 up cycles and 3 down cycles. In a bear market there are 5 down cycles and 3 up cycles. Prechter argued that we were now in a down cycle that will last for 15 more years. (Of course Prechter has been wrong for the past 8 years and will probably be wrong for the next 15).

Charles Jaffe analyzed whether the media was giving investors what they need or what they want. His conclusion was that for most of the popular media, giving investors what they want rather than what they need is what sells magazines and newspapers. Thus the press generally does a disservice to most investors who follow their advice (as does the brokerage community).

A 0 0 1 4 5

Mark Hulbert, the one person who keeps track of newsletter writers' market predictions, analyzed the relationship between market letter writers' forecasts and the actual performance of the index. He found that newsletter forecasts were often contrary indicators and that newsletter writers' actions were often diametrically opposed to their written predictions. So it is more important to follow what they do than what they say.

Richard Geist discussed the fact that investing is more of a subjective process than most economists and investors are willing to admit. Although we all have access to similar data, the judgments we use to interpret that data are typically based on unconscious emotional convictions that can unwittingly distort our understanding of a company's numbers, management, and products or services. Several case examples illustrated how two people with similar information can make very different investment decisions depending on the lenses through which they view the data. Emphasis was placed on getting to know one's idiosyncratic lenses as a key to preventing irrational decisions in the market.

Stephen Lord discussed the impact of economic developments on investor psychology. He emphasized how investors today are distorting all the negative economic data to make it appear positive in order to maintain their cheery consensus in the face of the worst environment for stocks since the 1973-1974 period. He emphasized that the unrealistic expectations of the investing public have yet to be fully addressed, and they must be reminded that a few good statistics do not a trend make. Mr. Lord concluded that eventually economic reality and investor perception would clash and that economic reality will win out with a further drop in the stock market.

Paul Merriman discussed the value of buy and hold vs. market timing. He emphasized how many buy and hold investors were closet market timers. He expressed a strong belief that for most investors buy and hold strategies do not work. Therefore, Merriman believes that a combination of buy and hold and market timing, matched to the emotional and financial needs of the investor, is the best long term strategy for financial planners to execute with their clients.

Richard Horwitz discussed risk management decisions in the hedge fund industry. After explaining how hedge funds operate, Horwitz discussed personality characteristics of managers that help and hurt returns—from rock star mentalities to being too disconnected to the market, to having a lack of focus, and not enough passion. Because investment time horizons have shortened, many pension funds and endowments have turned to hedge funds to increase returns.

A00146

Keynote speaker Ray Kurzweil gave an inspiring speech on the state of technology and the advancements to be expected over the next ten to twenty years that will impact our lives.   It was interesting to note that life expectancy is currently increasing by 120+ days per year and Ray Kurzweil predicted by the year 2010 that life expectancy will increase by one year for each subsequent year.   In otherwords, if we live to 2010, we will have the choice of never dying.   Do we really want to live forever?

The conference was well attended with an outstanding list of speakers that included several other well-known and respected industry leaders.   Dr. Geist and Harvard plan on sponsoring the event again next year and we will keep you informed on the schedule once determined.

Should you have any questions, please call.

Sincerely,                                         Bruce Cowen, Managing Director

9

# EXHIBIT 35

A01147

Banc Of America Securities LLC

Client Position Summary by Asset Class

PosSum-TCRA

118-11892 Lancer Partners LP

Page: 1
As Of: 04/30/02
Printed: 11/08/02

| SHR/FACE | Symbol | Name | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (30,443,229) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (30,443,228.61) | (30,443,228.61) | 0.00 | (10.67) |
| 268,592 USD | | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 268,591.58 | 268,591.58 | 0.00 | 0.09 |
| 312,500 USD | | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 312,500.00 | 312,500.00 | 0.00 | 0.11 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | (29,862,137.03) | (29,862,137.03) | 0.00 | (10.47) |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 75,000 | FFIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 75,000.00 | 75,000.00 | 0.00 | 0.03 |
| 350,000 | LLFILOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.12 |
| **Total Long Fixed Income** | | | | | 0.00 | 425,000.00 | 425,000.00 | 0.00 | 0.15 |
| **Equities** | | | | | | | | | |
| 25,000 | AOL | AOL TIME WARNER | 21.9910 | 19.0200 | (13.51) | 549,775.00 | 475,500.00 | (74,275.00) | 0.17 |
| 20,000 | AVII | AVI BIOPHARMA INC | 7.8357 | 7.2000 | (8.11) | 156,714.00 | 144,000.00 | (12,714.00) | 0.05 |
| 12,507,800 | AUGC | AUG CORP | 0.0430 | 5.0000 | 11529.87 | 537,742.40 | 62,539,000.00 | 62,001,257.60 | 21.93 |
| 5,789,367 | AURA | AURA SYSTEMS INC | 0.3330 | 0.2400 | (27.94) | 1,928,067.66 | 1,389,448.08 | (538,619.58) | 0.49 |
| 15,000 | BRLI | BIO REFERENCE LABORATORIES INC | 9.4375 | 7.4700 | (20.85) | 141,563.00 | 112,050.00 | (29,513.00) | 0.04 |
| 60,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0158 | 0.0110 | (30.53) | 950.00 | 660.00 | (290.00) | 0.00 |
| 500 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 3.5000 | 4.0000 | 14.29 | 1,750.00 | 2,000.00 | 250.00 | 0.00 |
| 2,844,048 | CDSEQ | CREDIT STORE INC | 1.1391 | 0.5600 | (50.84) | 3,239,540.65 | 1,592,666.98 | (1,646,873.77) | 0.56 |
| 1,020,674 | XMM | CROSS MEDIA MARKETING CORP | 6.9034 | 13.0000 | 87.52 | 7,046,051.44 | 13,266,762.00 | 6,192,710.56 | 4.65 |
| 50,000 | CROS | CROSSROADS SYS INC | 3.7022 | 3.1090 | (16.02) | 185,107.92 | 155,450.00 | (29,657.92) | 0.05 |
| 160,000 | EDUG | EDUCATION LENDING GROUP INC | 3.8292 | 3.8700 | 1.07 | 612,672.00 | 619,200.00 | 6,528.00 | 0.22 |
| 4,525,784 | EQUA | EQUITEL INC | 0.7147 | 0.9500 | 32.96 | 3,234,589.26 | 4,299,644.80 | 1,065,055.54 | 1.51 |
| 10,490,281 | FFIN | FIDELITY FIRST FINANCIAL CORP | 0.3334 | 4.6000 | 1279.62 | 3,497,721.22 | 48,255,292.60 | 44,757,571.38 | 16.92 |
| 2,046,900 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.3642 | 1.3100 | 259.65 | 745,562.70 | 2,681,439.00 | 1,935,876.30 | 0.94 |
| 10,000 | MGGN | MGI PHARMA INC | 8.1898 | 7.2600 | (11.11) | 81,898.00 | 72,600.00 | (9,298.00) | 0.03 |
| 12,000,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.1333 | 0.2450 | 83.85 | 1,599,115.59 | 2,940,000.00 | 1,340,884.41 | 1.01 |
| 10,000,000 | MHTXW | WTS MANHATTAN SCIENTIFICS INC | 0.0000 | 0.1950 | 0.00 | 0.00 | 1,950,000.00 | 1,950,000.00 | 0.68 |
| 16,350 | MHTD | METHOD PRODUCTS CORP | 7.6079 | 6.0500 | (20.48) | 124,388.50 | 98,917.50 | (25,471.00) | 0.03 |
| 95,000 | QQQ | NASDAQ 100 SHARES | 35.0187 | 31.7300 | (9.39) | 3,326,775.00 | 3,014,350.00 | (312,425.00) | 1.06 |
| 19,226,450 | NUDZ | NU-D-ZINE INC. | 0.0265 | 3.4000 | 12750.87 | 508,681.00 | 65,369,930.00 | 64,861,249.00 | 22.92 |
| 25,000 | P001682 | WTS PIONEER COMMERCIAL FUNDING | 0.0000 | 0.2500 | 0.00 | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 400,234 | PCFC | PIONEER COMMERCIAL FUNDING | 2.3018 | 2.5000 | 8.61 | 921,259.44 | 1,000,585.00 | 79,325.56 | 0.35 |
| 1,035,232 | SMKP | SMKP CORP | 2.0753 | 6.5000 | 212.87 | 2,150,517.86 | 6,728,319.00 | 4,577,801.14 | 2.36 |
| 259,650 | BBS5437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 4.9000 | 0.00 | 0.00 | 1,272,285.00 | 1,272,285.00 | 0.45 |
| 1,405,000 | TTN | TITAN CORP | 17.7325 | 22.8600 | 28.92 | 24,914,219.46 | 32,118,300.00 | 7,204,080.54 | 11.26 |
| 41,914,897 | TFGP | TOTAL FILM GROUP INC | 0.1536 | 0.5000 | 225.61 | 6,436,239.20 | 20,957,448.50 | 14,521,169.30 | 7.35 |
| 50,000 | TYC | TYCO INTERNATIONAL LTD NEW | 18.5841 | 18.4500 | (0.72) | 929,205.00 | 922,500.00 | (6,705.00) | 0.32 |
| 2,076,662 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.6000 | 0.0850 | (85.83) | 1,246,000.00 | 176,516.70 | (1,069,483.30) | 0.06 |
| 688,500 | UVIH | UNIVERSAL INS HLDGS INC | 0.6843 | 0.0850 | (87.58) | 471,130.70 | 58,522.50 | (412,608.20) | 0.02 |
| 26,382,524 | XMC | WORLD WIRELESS COMMUNICATIONS | 0.1842 | 0.2800 | 52.00 | 4,859,939.59 | 7,387,106.72 | 2,527,167.13 | 2.59 |
| 3,549,010 | Z1CA | Z1 CORPORATION | 4.5675 | 5.0662 | 10.90 | 16,210,169.90 | 17,976,549.01 | 1,766,379.11 | 6.30 |
| 250,000 | CENPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.02 |
| 1,050,000 | FIRSTWT | FIRST FIDELITY WARRANTS | 0.0000 | 4.9000 | 0.00 | 0.00 | 5,145,000.00 | 5,145,000.00 | 1.80 |

A01148

Bank Of America Securities LLC

Client Position Summary by Asset Class

11H-11892 Lancer Partners LP

PosSum-TCBA

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 1,250,000 | SMXW1 SMX CORP WARRANTS | 0.0000 | 1.2500 | | 0.00 | 9,062,500.00 | 9,062,500.00 | 3.18 |
| 1,250,000 | SMXW2 SMX CORP WARRANTS | 0.0000 | 2.2500 | | 0.00 | 2,812,500.00 | 2,812,500.00 | 0.99 |
| 50,000 | XWCWT WORLD WIRELESS COMM WARRANTS | 0.0000 | 0.1000 | | 0.00 | 5,000.00 | 5,000.00 | 0.00 |
| | Total Long Equities | | | 267.29 | 85,669,941.65 | 314,657,493.28 | 228,987,509.63 | 110.32 |
| | TOTAL LONG POSITIONS | | | 265.97 | 86,094,983.65 | 315,082,493.28 | 228,987,509.63 | 110.47 |
| | TOTAL EXPOSURE VALUE | | | | 86,094,983.65 | 315,082,493.28 | 228,987,509.61 | 110.47 |
| | NET EXPOSURE VALUE | | | | 86,094,983.65 | 315,082,493.28 | 228,987,509.63 | 110.47 |
| | TOTAL LONG POSITIONS | | | | 86,094,983.65 | 315,082,493.28 | 228,987,509.63 | 110.47 |
| | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | TOTAL CASH EQ | | | | (29,862,137.03) | (29,862,117.03) | | (10.47) |
| | TOTAL | | | | 56,232,846.62 | 285,220,356.25 | 228,987,509.63 | 100.00 |

A01155

Banc of America Securities LLC
Client Position Summary by Asset Class

1H-11892 Lancer Partners LP
PosSum-TCBA

Page: 1
As Of: 05/31/02
Printed: 11/08/02

| SHR/FACE | SYMBOL | DESCRIPTION | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (31,523,568) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (31,523,567.82) | (31,523,567.82) | 0.00 | (10.81) |
| 268,592 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 268,591.58 | 268,591.58 | 0.00 | 0.09 |
| 12,500 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 12,500.00 | 12,500.00 | 0.00 | 0.00 |
| TOTAL CASH AND EQUIVALENTS: | | | | | 0.00 | (31,242,476.24) | (31,242,476.24) | 0.00 | (10.71) |
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 75,000 | FFIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 75,000.00 | 75,000.00 | 0.00 | 0.03 |
| 350,000 | LLFILOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.12 |
| Total Long Fixed Income | | | | | 0.00 | 425,000.00 | 425,000.00 | 0.00 | 0.15 |
| **Equities** | | | | | | | | | |
| 12,500 | AOL | AOL TIME WARNER | 21.3680 | 18.7000 | (12.49) | 267,100.00 | 233,750.00 | (33,350.00) | 0.08 |
| 38,000 | AVII | AVI BIOPHARMA INC | 7.3225 | 4.8500 | (33.77) | 278,254.40 | 184,300.00 | (93,954.40) | 0.06 |
| 12,507,800 | AUGC | AUG CORP | 0.0430 | 5.0000 | 11538.58 | 537,342.40 | 62,539,000.00 | 62,001,657.60 | 21.45 |
| 5,789,367 | AURA | AURA SYSTEMS INC | 0.3330 | 0.1950 | (41.45) | 1,928,067.66 | 1,128,926.56 | (799,141.09) | 0.39 |
| 60,000 | CBNK | CENTRAX INTERNATIONAL INC | 0.0158 | 0.0100 | (36.84) | 948.00 | 600.00 | (348.00) | 0.00 |
| 5,500 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 4.4727 | 4.8000 | 7.32 | 24,600.00 | 26,400.00 | 1,800.00 | 0.01 |
| 2,861,548 | CDSEQ | CREDIT STORE INC | 1.1358 | 0.6200 | (45.41) | 3,250,175.90 | 1,774,159.76 | (1,476,016.14) | 0.61 |
| 1,008,974 | XMM | CROSS MEDIA MARKETING CORP | 6.9949 | 11.9900 | 71.41 | 7,057,691.49 | 12,097,598.26 | 5,039,906.77 | 4.15 |
| 100,000 | CRUS | CROSSROADS SYS INC | 2.6611 | 1.5500 | (41.75) | 266,107.92 | 155,000.00 | (111,107.92) | 0.05 |
| 160,000 | EDLG | EDUCATION LENDING GROUP INC | 3.4292 | 3.4500 | 0.61 | 548,679.17 | 552,000.00 | 3,320.83 | 0.19 |
| 4,573,284 | EQUA | EQUITEL INC | 0.7174 | 1.0800 | 50.53 | 3,281,079.26 | 4,939,146.72 | 1,658,067.46 | 1.69 |
| 10,489,781 | FFIRU | FIDELITY FIRST FINANCIAL CORP | 0.3313 | 4.2500 | 1182.75 | 3,475,471.22 | 44,581,569.25 | 41,106,098.03 | 15.29 |
| 10,000 | L | LIBERTY MEDIA CORP | 12.5120 | 12.0500 | (3.69) | 125,120.00 | 120,500.00 | (4,620.00) | 0.04 |
| 2,567,859 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.4951 | 1.1700 | 136.32 | 1,271,318.09 | 3,004,395.03 | 1,733,076.94 | 1.03 |
| 159,200 | MGCH | MGI PHARMA INC | 7.5659 | 9.3600 | 23.70 | 1,204,491.28 | 1,490,112.00 | 285,620.72 | 0.51 |
| 12,000,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.1333 | 0.2700 | 102.61 | 1,599,115.59 | 3,240,000.00 | 1,640,884.41 | 1.11 |
| 10,000,000 | MHTXW | WTS MANHATTAN SCIENTIFIC | 0.0000 | 0.2200 | | 0.00 | 2,200,000.00 | 2,200,000.00 | 0.75 |
| 20,350 | MHTD | METHOD PRODUCTS CORP | 7.4098 | 7.0000 | (5.53) | 150,788.50 | 142,450.00 | (8,338.50) | 0.05 |
| 85,000 | QQQ | NASDAQ 100 SHARES | 32.7247 | 30.0400 | (8.20) | 2,781,596.00 | 2,553,400.00 | (228,196.00) | 0.88 |
| 19,239,050 | NUDZ | NU-D-ZINE INC. | 0.0277 | 3.2500 | 11618.98 | 533,552.65 | 62,526,912.50 | 61,993,359.85 | 21.44 |
| 180,000 | OPWV | OPENWAVE SYS INC | 5.4601 | 6.0100 | 10.07 | 982,813.25 | 1,081,800.00 | 98,986.75 | 0.37 |
| 25,000 | P001682 | WTS PIONEER COMMERCIAL FUNDING | 0.0000 | 0.2500 | | 0.00 | 6,250.00 | 6,250.00 | 0.00 |
| 400,234 | PCFC | WTS PIONEER COMMERCIAL FUNDING | 2.3018 | 1.8750 | (18.54) | 921,250.44 | 750,438.75 | (170,811.69) | 0.26 |
| 1,064,631 | SMKP | SMK CORP | 2.2108 | 6.5000 | 194.01 | 2,353,640.96 | 6,920,101.50 | 4,566,460.54 | 2.37 |
| 20,000 | B855437 | SUN MICROSYSTEMS INC | 6.9300 | 6.9000 | (0.43) | 138,600.00 | 138,000.00 | (600.00) | 0.05 |
| 259,650 | B855437 | WTS FFIR FUNDING CORPORATION | 0.0000 | 4.9000 | | 0.00 | 1,272,285.00 | 1,272,285.00 | 0.44 |
| 1,415,000 | TTN | TITAN CORP | 17.7686 | 21.5000 | 21.00 | 25,142,546.46 | 30,422,500.00 | 5,279,953.54 | 10.43 |
| 41,919,897 | TFGP | TOTAL FILM GROUP INC | 0.1536 | 0.8000 | 420.70 | 6,440,529.20 | 33,535,917.60 | 27,095,388.40 | 11.50 |
| 2,076,667 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.6000 | 0.1300 | (78.33) | 1,246,000.00 | 269,966.71 | (976,033.29) | 0.09 |
| 698,500 | UVIH | UNIVERSAL INS HLDGS INC | 0.6843 | 0.1300 | (81.00) | 471,130.70 | 89,505.00 | (381,625.70) | 0.03 |
| 26,520,524 | XMC | WORLD WIRELESS COMMUNICATIONS | 0.1849 | 0.3500 | 89.28 | 4,903,815.59 | 9,282,183.40 | 4,378,367.81 | 3.18 |
| 100,000 | WCOEQ | WORLDCOM INC-GA NEW | 1.2849 | 1.6600 | 29.19 | 128,490.00 | 166,000.00 | 37,510.00 | 0.06 |
| 3,630,010 | ZICA | ZI CORPORATION | 4.5794 | 5.3000 | 15.74 | 16,623,298.32 | 19,239,053.00 | 2,615,754.68 | 6.60 |

A01156

Banc Of America Securities LLC

Client Position Summary by Asset Class

Page: 2
As Of: 05/31/02
Printed: 11/08/02

118-11892 Lancer Partners LP

PosSum-TCBA

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 250,000 | CENKPFD CENTRAK INTL. PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.02 |
| 1,050,000 | FIRSTWT FIRST FIDELITY WARRANTS | 0.0000 | 4.9000 | | 0.00 | 5,145,000.00 | 5,145,000.00 | 1.76 |
| 1,250,000 | SMXW1 SMX CORP WARRANTS | 0.0000 | 7.2500 | | 0.00 | 9,062,500.00 | 9,062,500.00 | 3.11 |
| 1,250,000 | SMXW2 SMX CORP WARRANTS | 0.0000 | 2.2500 | | 0.00 | 2,812,500.00 | 2,812,500.00 | 0.96 |
| 50,000 | XWCWT WORLD WIRELESS COMM WARRANTS | 0.0000 | 0.1000 | | 0.00 | 5,000.00 | 5,000.00 | 0.00 |
| | Total Long Equities | | | 270.87 | 86,932,291.97 | 322,408,109.04 | 235,475,811.08 | 110.57 |
| | TOTAL LONG POSITIONS | | | 269.55 | 87,357,297.97 | 322,833,109.04 | 235,475,811.08 | 110.71 |
| | TOTAL EXPOSURE VALUE | | | | 87,357,297.97 | 322,833,109.04 | 235,475,811.08 | 110.71 |
| | NET EXPOSURE VALUE | | | | 87,357,297.97 | 322,833,109.04 | 235,475,811.08 | 110.71 |
| | TOTAL LONG POSITIONS | | | | 87,357,297.97 | 322,833,109.04 | 235,475,811.08 | 110.71 |
| | TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| | TOTAL CASH EQ | | | | (31,242,476.24) | (31,242,476.24) | | (10.71) |
| | TOTAL | | | | 56,114,821.73 | 291,590,632.81 | 235,475,811.08 | 100.00 |

# EXHIBIT 36

A01149

Banc Of America Securities LLC

313-11895 Lancer Offshore Inc

PosSum-TCBA

Client Position Summary by Asset Class

Page: 1
As Of: 04/30/02
Printed: 11/08/02

| SHR/FACE | | | UNIT COST | CURRENT PRICE | P/T G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| CASH AND EQUIVALENTS | | | | | | | | | |
| (59,222,417) | USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (59,222,417.32) | (59,222,417.32) | 0.00 | (6.26) |
| 3,968,054 | USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,968,054.05 | 3,968,054.05 | 0.00 | 0.42 |
| 5,688,526 | USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 5,688,525.97 | 5,688,525.97 | 0.00 | 0.60 |
| | | TOTAL CASH AND EQUIVALENTS | | | 0.00 | (49,565,837.30) | (49,565,837.30) | 0.00 | (5.24) |
| **LONG POSITIONS** | | | | | | | | | |
| | | **Fixed Income** | | | | | | | |
| 3,500,000 | 9386567 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.37 |
| 500,000 | 9386637 | LIGHTHOUSE LANDINGS BRIDGE NOTE. | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 500,000 | 9386655 | LIGHTHOUSE LANDINGS, INC. | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 300,000 | AUGCLOAN | AUG CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.03 |
| 1,350,000 | EQUILOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,350,000.00 | 1,350,000.00 | 0.00 | 0.14 |
| 7,000,000 | EXPGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 0.74 |
| 500,000 | INHEALTH | 1STINHEALTH INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 3,250,000 | KNGTLOAN | KNIGHTSCOVE ENTERTAINMENT BRIDGE | 100.0000 | 100.0000 | 0.00 | 3,250,000.00 | 3,250,000.00 | 0.00 | 0.34 |
| 600,000 | LFFLOAN1 | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.06 |
| 1,750,000 | LFLLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 1,750,000.00 | 1,750,000.00 | 0.00 | 0.19 |
| 3,725,000 | TFGPLOAN | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 3,725,000.00 | 3,725,000.00 | 0.00 | 0.39 |
| 600,000 | USPLELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.06 |
| 350,000 | XWCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.04 |
| | | Total Long Fixed Income | | | 0.00 | 23,925,000.00 | 23,925,000.00 | 0.00 | 2.53 |
| | | **Equities** | | | | | | | |
| 25,000 | AOL | AOL TIME WARNER | 24.4870 | 19.0700 | (22.33) | 612,175.00 | 475,500.00 | (136,675.00) | 0.05 |
| 125,000 | ASPQ | ASPI EUROPE INC | 0.7500 | 1.5900 | 112.00 | 93,750.00 | 198,750.00 | 105,000.00 | 0.02 |
| 40,000 | AVII | AVI BIOPHARMA INC | 7.5716 | 7.2000 | (4.91) | 302,863.00 | 288,000.00 | (14,863.00) | 0.03 |
| 28,400,655 | AVGI | AVG CORP 2 | 0.0679 | 5.0000 | 7263.58 | 1,928,860.50 | 142,033,275.00 | 140,104,414.50 | 15.02 |
| 38,125,078 | AVSC | AVG SYSTEMS INC | 0.3020 | 0.2400 | (20.54) | 11,515,215.24 | 9,150,258.72 | (2,364,956.52) | 0.97 |
| 5,000 | BRLI | BIO REFERENCE LABORATORIES INC | 8.4610 | 7.4700 | (11.71) | 42,305.00 | 37,350.00 | (4,955.00) | 0.00 |
| 24,700 | CAI | CACI INTL INC | 29.5836 | 30.1740 | 2.00 | 730,716.05 | 745,297.80 | 14,581.75 | 0.08 |
| 2,500,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0200 | 0.0110 | (45.00) | 50,000.00 | 27,500.00 | (22,500.00) | 0.00 |
| 1,366,667 | CBBG | CHINA BROADBAND CORP | 3.3959 | 0.1700 | (94.99) | 4,641,002.50 | 232,333.39 | (4,408,669.11) | 0.02 |
| 95,000 | CTXS | CITRIX SYS INC | 13.8331 | 11.6000 | (16.14) | 1,314,140.40 | 1,102,000.00 | (212,140.40) | 0.12 |
| 2,600,000 | CMDX | COMDISCO INC | 0.3685 | 0.1000 | (72.87) | 958,208.65 | 260,000.00 | (698,208.65) | 0.03 |
| 11,709,000 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 0.0900 | 4.0000 | 4346.05 | 1,053,430.00 | 46,836,000.00 | 45,782,570.00 | 4.95 |
| 56,800 | DIGMD | CONTROL CHIEF HOLDINGS INC | 4.6824 | 3.2150 | (31.34) | 265,958.37 | 192,612.00 | (83,346.37) | 0.02 |
| 7,634,335 | COSEQ | CREDIT STORE INC | 2.5257 | 0.5500 | (78.23) | 19,285,227.60 | 4,475,327.60 | (15,006,816.96) | 0.45 |
| 3,256,645 | XMM | CROSS MEDIA MARKETING CORP | 3.4027 | 3.1000 | (8.89) | 11,085,608.38 | 10,096,585.00 | (19,185,401) | 4.48 |
| 720,000 | CRDS | CROSSROADS SYS INC | 1.1597 | 0.2750 | (76.29) | 834,955.50 | 198,000.00 | (636,955.50) | 0.02 |
| 15,000 | CYME | CYTOMEDIX INC | 8.9609 | 7.5000 | (16.30) | 134,412.75 | 112,500.00 | (21,912.75) | 0.01 |
| 18,155,217 | DOVP | DOV PHARMACEUTICAL INC | 0.7388 | 0.1400 | (81.05) | 13,412,729.74 | 2,541,730.38 | (10,870,999.36) | 0.27 |
| 1,934,800 | EPTG | EPL TECHNOLOGIES INC NEW | 1.9105 | 3.8700 | 102.57 | 3,696,366.05 | 7,487,676.00 | 3,791,309.95 | 0.79 |
| 16,547,439 | EQUA | EQUITEL INC | 0.5519 | 0.9500 | 72.14 | 9,132,323.82 | 15,720,067.05 | 6,587,743.23 | 1.66 |
| 1,406,327 | ETGX | FIBERNET TELECOM GROUP INC | 2.2010 | 0.1200 | (94.55) | 3,095,270.72 | 168,759.24 | (2,926,511.48) | 0.02 |

Banc Of America Securities LLC

313-11895 Lancer Offshore Inc

PosSum-TCBA

Client Position Summary by Asset Class

Page: 2
As Of: 04/30/02
Printed: 11/08/02

| SHR/FACE | | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 6,551,071 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 1.4166 | 4.6000 | 224.73 | 9,280,109.33 | 30,134,926.60 | 20,854,817.27 | 3.19 |
| 40,000 | IVX | IVAX CORP | 14.5575 | 11.8000 | (18.94) | 582,300.00 | 472,000.00 | (110,300.00) | 0.05 |
| 4,410,248 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.5113 | 1.1100 | 156.19 | 2,255,155.17 | 5,777,424.88 | 3,522,269.71 | 0.61 |
| 15,000 | MOGN | MGI PHARMA INC | 8.1702 | 7.2800 | (10.90) | 122,551.00 | 109,200.00 | (13,353.00) | 0.01 |
| 32,659,000 | MHTX | MANHATTAN SCIENTIFICS INC | 0.2729 | 0.2450 | (10.23) | 8,913,006.06 | 8,001,455.00 | (911,551.06) | 0.85 |
| 2,451,059 | MHTD | METHOD PRODUCTS CORP | 0.4684 | 6.0500 | 1191.62 | 1,148,089.87 | 14,828,906.95 | 13,680,817.08 | 1.57 |
| 230,000 | QQQ | NASDAQ 100 SHARES | 35.0822 | 31.7300 | (9.56) | 8,068,905.00 | 7,297,900.00 | (771,005.00) | 0.77 |
| 26,787,680 | NU2D | NU-D-ZINE INC. | 0.0468 | 3.4000 | 7168.91 | 1,252,981.18 | 91,078,112.00 | 89,825,130.82 | 9.63 |
| 767,492 | NYER | NYER MEDICAL GROUP INC | 4.6231 | 2.0100 | (56.52) | 3,548,170.69 | 1,542,658.92 | (2,005,511.77) | 0.16 |
| 217,400 | OPWV | OPENWAVE SYS INC | 7.2694 | 5.7200 | (21.32) | 1,580,573.88 | 1,243,528.00 | (337,045.88) | 0.13 |
| 276,737 | PCFC | PIONEER COMMERCIAL FUNDING | 1.0345 | 2.5000 | 141.67 | 286,277.08 | 691,842.50 | 405,565.42 | 0.07 |
| 900,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.0472 | 0.1050 | (89.97) | 942,500.00 | 94,500.00 | (848,000.00) | 0.01 |
| 500,000 | RELM | RELM WIRELESS CORP | 0.9000 | 1.0000 | 11.11 | 450,000.00 | 500,000.00 | 50,000.00 | 0.05 |
| 500,000 | RELMW | RELM WIRELESS CORP WARRANTS | 0.0000 | 0.2900 | | 0.00 | 145,000.00 | 145,000.00 | 0.02 |
| 9,971,329 | SMXP | SMX CORP | 0.4594 | 6.5000 | 1314.81 | 4,581,079.54 | 64,813,638.50 | 60,232,558.96 | 6.86 |
| 3,245,857 | SMXT | SIMEX CORP | 1.2013 | 0.1600 | (86.68) | 3,899,154.54 | 519,337.12 | (3,379,817.42) | 0.05 |
| 5,000 | STG | STONE PATH GROUP INC | 0.5500 | 2.3800 | 332.73 | 2,750.00 | 11,900.00 | 9,150.00 | 0.00 |
| 362,718 | S012759 | STONEPATH GROUP INC SER C PFD | 11.4138 | 11.4139 | 0.00 | 4,140,000.00 | 4,140,026.98 | 26.98 | 0.44 |
| 4,794 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 5.0000 | 4.5700 | (8.60) | 22,491.00 | 22,097.58 | (393.42) | 0.00 |
| 3,601,400 | TTN | TITAN CORP | 20.7456 | 22.8600 | 10.19 | 74,713,128.71 | 82,328,004.00 | 7,614,875.29 | 8.71 |
| 139,306,495 | TFGP | TOTAL FILM GROUP INC | 0.0983 | 0.5000 | 408.87 | 13,687,892.29 | 69,653,247.50 | 55,965,355.21 | 7.37 |
| 295,000 | TYC | TYCO INTERNATIONAL LTD NEW | 19.2226 | 18.4500 | (4.02) | 5,670,681.00 | 5,442,750.00 | (227,931.00) | 0.58 |
| 155,000 | USPL | U S PLASTIC LMBR CORP | 3.9666 | 0.4100 | (89.66) | 614,829.23 | 63,550.00 | (551,279.23) | 0.01 |
| 1,687,400 | UGSI | UNDERGROUND SOLUTIONS INC | 0.8987 | 0.2600 | (71.07) | 1,516,462.16 | 438,724.00 | (1,077,738.16) | 0.05 |
| 435,000 | U331992 | UNIVERSAL HEIGHTS INC OLD | 1.0000 | 0.0850 | (91.50) | 435,000.00 | 36,975.00 | (398,025.00) | 0.00 |
| 3,069,137 | UVIH | UNIVERSAL INS HLDGS INC | 0.7220 | 0.0840 | (88.23) | 2,215,933.40 | 260,876.65 | (1,955,056.75) | 0.03 |
| 331,250 | 9307252 | ICONNECT.COM | 1.0000 | 0.5000 | (50.00) | 331,250.00 | 165,625.00 | (165,625.00) | 0.02 |
| 300,000 | 9390720 | WTS LIGHTHOUSE LANDINGS INC | 0.0000 | 0.1500 | | 0.00 | 45,000.00 | 45,000.00 | 0.00 |
| 86,700,328 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.2106 | 0.2800 | 32.98 | 18,255,412.29 | 24,276,091.84 | 6,020,619.55 | 2.57 |
| 10,684,475 | ZICA | ZI CORPORATION | 4.7851 | 5.1462 | 7.43 | 51,078,715.56 | 54,829,446.62 | 3,789,731.06 | 5.80 |
| 595,238 | AURAWT | AURA SYSTEMS INC WARRANTS | 0.0000 | 0.0000 | | 0.00 | 0.01 | 0.01 | 0.00 |
| 1,666,667 | AURAWT2 | AURA SYSTEMS INC WARRANTS | 0.0000 | 0.0000 | | 0.00 | 0.02 | 0.02 | 0.00 |
| 2,000,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.04 |
| 47,041,635 | FFIR | FIRST FIDELITY STOCK | 0.0059 | 2.1000 | 38751.18 | 278,487.74 | 108,195,760.50 | 107,917,272.76 | 11.44 |
| 10,000,000 | MHTDW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 5.8000 | | 0.00 | 58,000,000.00 | 58,000,000.00 | 6.14 |
| 16,000,000 | MHTXWT | MANHATTAN SCIENTIFICS WARRANTS | 0.0000 | 0.2000 | | 0.00 | 3,200,000.00 | 3,200,000.00 | 0.34 |
| 16,700,000 | NU2W | NU-D-ZINE WARRANT | 0.0000 | 3.3700 | | 0.00 | 56,279,000.00 | 56,279,000.00 | 5.95 |
| 400,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.15 |
| 225,000 | XWCWT | WORLD WIRELESS COMM WARRANTS | 0.0000 | 0.1000 | | 0.00 | 22,500.00 | 22,500.00 | 0.00 |
| 250,000 | ENEWF | E-NEW MEDIA COMPANY LTD | 0.0500 | 0.0397 | (20.50) | 12,500.00 | 9,925.00 | (2,562.89) | 0.00 |
| | | **Total Long Equities** | | | 218.12 | 305,240,617.37 | 971,036,008.87 | 665,795,391.50 | 102.71 |
| | | **TOTAL LONG POSITIONS** | | | 202.27 | 329,165,617.37 | 934,961,008.87 | 665,795,391.50 | 105.24 |

A01151

Banc Of America Securities LLC

313-11895 Lancer Offshore Inc

PosSum-TCBA

Client Position Summary by Asset Class

As Of: 04/30/02
Printed: 11/08/02
Page: 3

| SHR/FACE | UNIT COST | CURRENT PRICE | PCT G/A | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL EXPOSURE VALUE | | | | 329,165,617.37 | 994,961,008.87 | 665,795,391.50 | 105.24 |
| NET EXPOSURE VALUE | | | | 329,165,617.37 | 994,961,008.87 | 665,795,391.50 | 105.24 |
| TOTAL LONG POSITIONS | | | | 329,165,617.37 | 994,961,008.87 | 665,795,391.50 | 105.24 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | (49,565,837.30) | (49,565,837.30) | | (5.24) |
| TOTAL | | | | 279,599,780.07 | 945,395,171.57 | 665,795,391.50 | 100.00 |

A01157

313-11895 Lancer Offshore Inc
ConSum-TCHA

**Banc Of America Securities LLC**
**Client Position Summary by Asset Class**

Page: 1
As Of: 05/31/02
Printed: 11/08/02

| SHR/FACE | | Security | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | | |
| (45,230,058) USD | | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (45,230,058.02) | (45,230,058.02) | 0.00 | (4.61) |
| 3,905,393 USD | | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,905,393.01 | 3,905,393.01 | 0.00 | 0.40 |
| 816,584 USD | | TYPE 6 | 1.0000 | 1.0000 | 0.00 | 816,583.99 | 816,583.99 | 0.00 | 0.08 |
| **TOTAL CASH AND EQUIVALENTS** | | | | | 0.00 | (40,508,081.02) | (40,508,081.02) | 0.00 | (4.13) |

**LONG POSITIONS**

| SHR/FACE | Symbol | Security | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **Fixed Income:** | | | | | | | | | |
| 3,500,000 | 9386567 | EPL TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.37 |
| 500,000 | 9386637 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 500,000 | 9386655 | LIGHTHOUSE LANDINGS, INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 300,000 | AUGCLOAN | AUG CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.03 |
| 1,550,000 | EQUILOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,550,000.00 | 1,550,000.00 | 0.00 | 0.16 |
| 7,000,000 | EXGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 0.71 |
| 35,000 | FFIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 35,000.00 | 35,000.00 | 0.00 | 0.00 |
| 1,000,000 | INHEALTH | 1STINHEALTH INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,000,000.00 | 1,000,000.00 | 0.00 | 0.10 |
| 3,250,000 | KNGTLOAN | KNIGHTSCOVE ENTERTAINMENT BRIDGE | 100.0000 | 100.0000 | 0.00 | 3,250,000.00 | 3,250,000.00 | 0.00 | 0.33 |
| 600,000 | LFFALOAN | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.06 |
| 1,750,000 | LLFLLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 1,750,000.00 | 1,750,000.00 | 0.00 | 0.18 |
| 400,000 | LNSHLOAN | LIONSHARE GROUP INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.04 |
| 3,825,000 | TFGPLOAN | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 3,825,000.00 | 3,825,000.00 | 0.00 | 0.39 |
| 600,000 | USPLELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.06 |
| 1,500,000 | XMHLOAN | CROSS MEDIA MARKETING LOAN | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.15 |
| 350,000 | XMCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.04 |
| **Total Long Fixed Income** | | | | | 0.00 | 26,660,000.00 | 26,660,000.00 | 0.00 | 2.72 |
| **Equities** | | | | | | | | | |
| 2,500 | AOL | AOL TIME WARNER | 21.7500 | 18.7000 | (14.02) | 54,375.00 | 46,750.00 | (7,625.00) | 0.00 |
| 125,000 | ASPQ | ASPT EUROPE INC | 0.7500 | 1.1300 | 50.67 | 93,750.00 | 141,250.00 | 47,500.00 | 0.01 |
| 92,500 | AVII | AVI BIOPHARMA INC | 6.9432 | 4.8500 | (30.15) | 642,245.65 | 448,625.00 | (193,620.65) | 0.05 |
| 28,413,787 | AUGC | AIG CORP | 0.0691 | 5.0000 | 7134.20 | 1,963,852.10 | 142,068,935.00 | 140,105,082.90 | 14.47 |
| 39,619,378 | AURA | AURA SYSTEMS INC | 0.2990 | 0.1950 | (34.79) | 11,847,788.74 | 7,725,778.71 | (4,122,010.03) | 0.79 |
| 2,500,000 | CBNK | CENTRACK INTERNATIONAL INC | 0.0200 | 0.0100 | (50.00) | 50,000.00 | 25,000.00 | (25,000.00) | 0.00 |
| 1,366,667 | CBKF | CHINA BROADBAND CORP | 3.3959 | 0.1000 | (97.06) | 4,640,782.50 | 136,666.70 | (4,504,115.80) | 0.01 |
| 111,057 | CTXS | CITRIX SYS INC | 11.8331 | 9.1270 | (22.87) | 1,314,140.40 | 1,013,650.00 | (300,490.40) | 0.10 |
| 200,000 | COHO | CODESTREAM HOLDINGS INC | 0.6000 | 0.6000 | 0.00 | 120,000.00 | 120,000.00 | 0.00 | 0.01 |
| 2,050,000 | C539830 | COMDISCO INC | 0.2816 | 0.0430 | (84.73) | 577,150.64 | 88,150.00 | (489,200.64) | 0.01 |
| 11,719,500 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 0.0935 | 4.8000 | 5032.96 | 1,095,930.00 | 56,253,600.00 | 55,157,670.00 | 5.73 |
| 54,800 | DIGMD | CONTROL CHIEF HOLDINGS INC | 4.7074 | 3.0850 | (34.46) | 257,963.65 | 169,058.00 | (88,905.65) | 0.02 |
| 7,786,135 | CDSEQ | CREDIT STORE INC | 2.4865 | 0.6200 | (75.07) | 19,360,119.62 | 4,827,403.70 | (14,532,715.92) | 0.49 |
| 3,347,045 | XMM | CROSS MEDIA MARKETING CORP | 3.5320 | 11.9900 | 239.47 | 11,821,726.06 | 40,131,069.55 | 28,309,343.49 | 4.09 |
| 720,000 | CYME | CYTOMEDIX INC | 1.1597 | 0.2350 | (79.74) | 834,955.50 | 169,200.00 | (665,755.50) | 0.02 |
| 30,000 | DOVP | DOV PHARMACEUTICAL INC | 8.4821 | 5.7500 | (32.21) | 254,462.55 | 172,500.00 | (81,962.55) | 0.02 |
| 18,155,217 | EPTG | EPL TECHNOLOGIES INC NEW | 0.7388 | 0.1500 | (79.70) | 13,412,729.74 | 2,723,282.55 | (10,689,447.19) | 0.28 |
| 2,034,000 | EDUG | EDUCATION LENDING GROUP INC | 1.9861 | 3.4500 | 73.71 | 4,041,366.05 | 7,020,060.00 | 2,978,693.95 | 0.72 |
| 16,801,939 | EQUA | EQUITEL INC | 0.5603 | 1.0800 | 92.75 | 9,414,321.92 | 18,146,094.12 | 8,731,772.30 | 1.85 |

413-11895 Lancer Offshore Inc

Bank of America Securities LLC
Client Position Summary by Asset Class

PossSum-TCHA

Page: 2
As Of: 05/31/02
Printed: 11/08/02

| SHR/FACE | SYMBOL | NAME | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 1,406,327 | FTGX | FIBERNET TELECOM GROUP INC | 2.2010 | 0.1200 | (94.55) | 3,095,210.72 | 168,759.24 | (2,926,511.48) | 0.02 |
| 6,755,580 | FFIRD | FIDELITY FIRST FINANCIAL CORP | 1.3767 | 4.2500 | 208.70 | 9,300,670.78 | 28,711,257.50 | 19,410,586.72 | 2.92 |
| 50,000 | IVX | IVAX CORP INC | 14.0360 | 13.0400 | (6.82) | 701,900.00 | 654,000.00 | (47,900.00) | 0.07 |
| 20,000,000 | JKC | JKC GROUP INC. | 0.0238 | 0.5500 | 2215.19 | 475,000.00 | 11,000,000.00 | 10,525,000.00 | 1.12 |
| 10,000 | L | LIBERTY MEDIA CORP | 12.5120 | 12.0500 | (3.69) | 125,120.00 | 120,500.00 | (4,620.00) | 0.01 |
| 27,510 | LSTTA | LIBERTY SATELLITE & TECHNOLOGY | 3.4011 | 3.2700 | (3.85) | 93,563.85 | 89,957.70 | (3,606.15) | 0.01 |
| 4,945,148 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.5656 | 1.1700 | 106.87 | 2,796,775.17 | 5,785,823.16 | 2,989,047.99 | 0.59 |
| 30,000 | MGGN | MGI PHARMA INC | 7.6414 | 7.9600 | 4.17 | 229,243.00 | 238,800.00 | 9,557.00 | 0.02 |
| 32,951,300 | MHTX | MANHATTAN SCIENTIFIES INC | 0.2727 | 0.2700 | (1.00) | 8,986,482.06 | 8,896,851.00 | (89,631.06) | 0.91 |
| 2,536,809 | MHTD | METHOD PRODUCTS CORP | 6.6523 | 7.0000 | 11.07 | 16,877,746.47 | 17,757,663.00 | 16,102,916.53 | 1.81 |
| 26,787,680 | NUDZ | NU-D-ZINE INC. | 0.0469 | 3.2500 | 6829.15 | 1,256,394.48 | 87,059,960.00 | 85,803,565.52 | 8.87 |
| 767,492 | NYER | NYER MEDICAL GROUP INC | 4.6231 | 1.9600 | (57.60) | 3,548,173.69 | 1,504,284.32 | (2,043,889.37) | 0.15 |
| 953,800 | OPWV | OPENWAVE SYS INC | 5.8707 | 6.0100 | 2.37 | 5,599,492.93 | 5,732,338.00 | 132,845.07 | 0.58 |
| 276,737 | PCFC | PIONEER COMMERCIAL FUNDING | 1.0345 | 1.8750 | 81.25 | 286,277.08 | 518,881.88 | 232,604.79 | 0.05 |
| 900,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.0472 | 0.0300 | (97.14) | 942,500.00 | 27,000.00 | (915,500.00) | 0.00 |
| 500,000 | RELM | RELM WIRELESS CORP | 0.9000 | 0.8600 | (4.44) | 450,000.00 | 430,000.00 | (20,000.00) | 0.04 |
| 500,000 | RELM | RELM WIRELESS CORP WARRANTS | 0.0000 | 0.2100 | 0.00 | 0.00 | 105,000.00 | 105,000.00 | 0.01 |
| 10,172,329 | SMKP | SMK CORP | 0.5496 | 6.5000 | 1082.66 | 5,590,944.54 | 66,120,138.50 | 60,529,344.96 | 6.73 |
| 299,900 | SBYN | SKERRYONNI TECHNOLOGIES CORP | 3.1711 | 3.1500 | (0.67) | 951,074.69 | 944,685.00 | (6,389.69) | 0.10 |
| 3,286,157 | SMKT | SIMKX CORP | 1.1910 | 0.3500 | (70.61) | 3,913,885.54 | 1,150,154.95 | (2,763,730.59) | 0.12 |
| 300 | SCPA | STONE PATH GROUP INC | 7.5000 | 2.5500 | (66.00) | 2,250.00 | 765.00 | (1,485.00) | 0.00 |
| 362,710 | SOI2759 | STONEPATH GROUP INC SER C PFD | 11.4138 | 11.4139 | 0.00 | 4,140,000.00 | 4,140,026.98 | 26.98 | 0.42 |
| 80,000 | SUNW | SUN MICROSYSTEMS INC | 6.9900 | 6.8900 | (1.43) | 559,200.00 | 551,200.00 | (8,000.00) | 0.06 |
| 67,000 | SURE | SUREBEAM CORP | 6.3812 | 6.1500 | (3.62) | 427,539.52 | 412,050.00 | (15,489.52) | 0.04 |
| 110,000 | TTEC | TELETECH HOLDINGS INC | 12.2461 | 11.8700 | (3.08) | 1,347,136.11 | 1,305,700.00 | (41,436.11) | 0.13 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 3,964,600 | TTN | TITAN CORP | 20.8877 | 21.5000 | 2.93 | 82,811,435.37 | 85,239,900.00 | 2,427,464.63 | 8.68 |
| 139,345,472 | TFGP | TOTAL FILM GROUP INC | 0.0984 | 0.8000 | 713.13 | 13,709,536.72 | 111,476,377.60 | 97,766,840.88 | 11.35 |
| 75,000 | TCHSF | TOUCHSTONE RESOURCES LTD | 0.0000 | 1.5400 | 0.00 | 0.00 | 115,500.00 | 115,500.00 | 0.01 |
| 90,000 | USPL | U S PLASTIC LMBR CORP | 3.5868 | 0.3200 | (91.08) | 322,810.16 | 28,800.00 | (294,010.16) | 0.00 |
| 1,697,400 | UGSI | UNDERGROUND SOLUTIONS INC | 1.4987 | 0.4900 | (25.48) | 1,516,462.14 | 826,026.00 | (688,436.16) | 0.08 |
| 435,000 | U331992 | UNIVERSAL HEIGHTS INC OLD | 1.0000 | 0.1300 | (87.00) | 435,000.00 | 56,550.00 | (378,450.00) | 0.01 |
| 3,069,137 | UVIH | UNIVERSAL INS HLDGS INC | 0.7220 | 0.1300 | (81.99) | 2,215,933.40 | 398,987.81 | (1,816,945.59) | 0.04 |
| 331,250 | 9387252 | ICONNECT.COM | 1.0000 | 0.5000 | (50.00) | 331,250.00 | 165,625.00 | (165,625.00) | 0.02 |
| 300,000 | 9390720 | WTS LIGHTHOUSE LANDINGS INC | 0.0000 | 0.1500 | 0.00 | 0.00 | 45,000.00 | 45,000.00 | 0.00 |
| 86,754,328 | XWC | WORLD WIRELESS COMMUNICATIONS | 0.2106 | 0.4600 | 66.22 | 18,267,899.19 | 40,364,014.80 | 12,096,115.61 | 3.09 |
| 1,500,000 | WCHKQ | WORLDCOM INC-CA NEW | 1.3413 | 1.6600 | 23.57 | 2,015,017.40 | 2,490,000.00 | 474,982.70 | 0.25 |
| 11,729,475 | ZICA | ZI CORPORATION | 4.7719 | 5.8000 | 21.21 | 55,948,941.86 | 68,761,915.64 | 6,761,973.44 | 6.11 |
| 595,238 | AURAWT | AURA SYSTEMS INC WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.01 | 0.01 | 0.00 |
| 1,666,667 | AURAWT2 | AURA SYSTEMS INC WARRANTS | 0.0000 | 0.0000 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 |
| 42,000,000 | CENKFD | CENTRACAN PREFERRED STOCK | 0.0059 | 1.5000 | 25237.72 | 278,487.74 | 70,562,452.50 | 70,283,964.76 | 7.19 |
| 10,000,000 | FITR | FIDELITY FIRST STK | 0.0000 | 6.7500 | 0.00 | 0.00 | 67,500,000.00 | 67,500,000.00 | 6.88 |
| 16,000,000 | MHTXW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 0.2200 | 0.00 | 0.00 | 3,520,000.00 | 3,520,000.00 | 0.36 |
| 10,500,000 | MHTXWT | MANHATTAN SCIENTIFICS WARRANTS | 0.0000 | 3.2200 | 0.00 | 0.00 | 33,810,000.00 | 33,810,000.00 | 3.44 |
| 400,000 | NUD2W | NU-D-ZINE WARRANT | 0.0000 | 3.5000 | 0.00 | 0.00 | 1,400,000.00 | 0.00 | 0.14 |
| 400,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.00 |
| 225,000 | XWCWT | WORLD WIRELESS COMM WARRANTS | 0.0000 | 0.1000 | 0.00 | 0.00 | 22,500.00 | 22,500.00 | 0.00 |
| 250,000 | ENEWF | E-NEW MEDIA COMPANY LTD | 0.0500 | 0.0378 | (24.36) | 12,500.00 | 9,455.37 | (3,044.63) | 0.00 |

A01159

Bank of America Securities LLC

Client Position Summary by Asset Class

313-11895 Lancer Offshore Inc

PosSum-TCBA

Page: 3
As Of: 05/31/02
Printed: 11/08/02

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| 10,000 FLEX | ***FLEXTRONICS INT LTD | 14.7177 | 14.7400 | (10.11) | 147,177.00 | 142,400.00 | (14,877.00) | 0.01 |
| | Total Long Equities | | | 213.52 | 317,557,012.55 | 995,608,102.16 | 678,051,089.61 | 101.41 |
| TOTAL LONG POSITIONS | | | | 196.98 | 344,217,012.55 | 1,022,268,102.16 | 678,051,089.61 | 104.13 |
| TOTAL EXPOSURE VALUE | | | | | 344,217,012.55 | 1,022,268,102.16 | 678,051,089.61 | 104.13 |
| NET EXPOSURE VALUE | | | | | 344,217,012.55 | 1,022,268,102.16 | 678,051,089.61 | 104.13 |
| TOTAL LONG POSITIONS | | | | | 344,217,012.55 | 1,022,268,102.16 | 678,051,089.61 | 104.13 |
| TOTAL SHORT POSITIONS | | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | | (40,508,081.02) | (40,508,081.02) | | (4.13) |
| TOTAL | | | | | 303,708,931.53 | 981,760,021.14 | 678,051,089.61 | 100.00 |

# EXHIBIT 37

# The Lancer Group

Dear Investor:

September 11, 2002

As I draft this note on the morning of September 11, I have a distinct feeling of *de javu*, as for the second time in the past five years a "reporter" for a local distribution tabloid, in what is essentially yet another diatribe against the hedge fund community ("unregistered, unsupervised, uncontrolled mutual funds on steroids" etc.), used Lancer Offshore fund as a prototypical potential nest for alleged misdeeds. The vulgar tone of the reportage and the ridiculousness of the comments raises a reasonable question of whether one should even dignify the item with a response. However, as we did after the first assault, we think that at the very least, it would be helpful to respond with a point-by-point rebuttal.

As a background, in 1998, at the peak of the anti-hedge fund hysteria (after the collapse of Long Term Capital), we found ourselves on this same reporter's radar screen by virtue of managing one of the best performing funds in the country. As appears to be his *modus operandi*, the reporter, in order to meet his purpose of creating a sensational story (i.e. must have a negative slant), used his imagination to distort reality and through innuendo maligned the fund. To our astonishment, he was then invited by CNBC to discuss hedge funds generally (offering a very negatively biased view), and again on the air, disparaged several hedge funds, with Lancer among them. The gist of the assault vis-à-vis the fund related to a couple of our holdings, as they appeared to be nascent or troubled companies, and then he contradicted himself, by suggesting that we might have actually engaged in aggressive short selling that damaged the underlying holdings.  As I pen this note, I recall only one of the stocks questioned (DRS Technologies), which eventually evolved into a leading defense electronics presence (and a solid profit contributor to the fund). The reporter further fantasized that we had offices on several continents. It did not make sense to us at that time either, but we responded then as we are doing now with a letter to our investors addressing all of the points in a factual manner.

This latest assault appears to have been sparked simply by our connection to one of Lancer's consultants, Bruce Cowen. In a nutshell, the Justice Department has charged him with a conspiracy to collect a "kickback" fee in a sting operation that took place over a year ago.  We are constrained by our legal advisors from commenting on the merits of the charges against Bruce. However, his personal achievements speak for themselves.  In addition to many successful years in financial consulting, Bruce also served as a Director for the US Chamber of Commerce, as well as the Chairman of the Connecticut Gaming Commission (appointed by the Governor and confirmed by the State Senate).  He was also a President of a New York Stock Exchange company and a senior audit manager for PriceWaterHouse. It is our understanding, that he continues to be an upstanding member of the Southern California civic community, where he resides.

Notwithstanding, based upon the advice of counsel, we believe that the most prudent course for all parties is for us to suspend our consulting activities with Bruce until such time as his legal issues are resolved. What is most important to note, however, is that the fund is not and has never been implicated in any wrongdoing (see the enclosed note).

Nevertheless, the reporter, in what was less than a three-minute conversation, inquired as to how we were doing since the bear market began and how much we managed. My answer was "double-digit" returns and about $1 billion in assets. In his article he makes an issue of the fact that some hedge fund tracking service had us at closer to $185 million, an apparent inconsistency. As the investor knows, there is a plethora of tracking agencies with seemingly one common denominator, that of perpetual inaccuracies. We tend not to report to tracking agencies, other than ALTVEST, which does have accurate numbers.

Then in his article he proceeds to question the existence of audits for the Lancer Offshore, Inc., although he never asked me about them. The reality is that as an Irish Stock Exchange listed fund we not only have to have timely audits, but we also have had to meet higher standards of disclosure, and guidelines on capital allocations (such as limits on position sizes). Lancer Offshore, Inc. is audited by PriceWaterhouseCoopers, has always been in compliance with regulations, and has never had a qualified audit.

The reporter then gleaned from our public filings that we are invested in Lighthouse Fast Ferry, suggesting that the company is likely to be insolvent and that the fund controls over 60% of equity.

Our perspective is that the water ferry service around the metropolitan area is a rapidly growing business, and Lighthouse is quickly emerging as one of the leaders. We expect the company will further accelerate its growth through acquisitions, or in turn be consolidated into a larger service provider. We believe that the company's existing contracts, and the likely awards over the next several months make for a compelling investment risk-reward play. We have a bridge loan outstanding to the company (in our specialty fund), on which we expect to be repaid from the future financings, and our equity share count in the fund is less than 4.9 million shares. As a percentage of the company, Lancer's holdings are still north of 24%, but will continue to decline as other financing comes in. The value of the common in the Lancer Offshore's portfolio is less than a quarter of one percent of the total. To our knowledge, the reporter made no effort to contact the company.

We have no association with one Joseph Giamanco cited in the article as also being a shareholder, although I know his name from when he ran one of the larger specialist firms on the American Stock Exchange.

The Method Products Corp is another small position and a play on the Technology Services market. If it is successful, the pay off could be substantial. If not, it will turn into a minor write-off. Bruce had helped us with research on this idea, as it is too small to divert our energies. Although we entered the transaction through a private placement, our cost basis is certainly higher than cited in the article, and we have never sold a share of the stock (see the enclosed note from the CEO). To our knowledge, the reporter never bothered to contact the company.

As was the case in 1998, this negative press will pass and we will continue to go about our business and thrive. However, to ensure that we get through this period together, I have been on the phone with many of you since yesterday, and I will continue to reach out for the foreseeable future. Should you have any further questions, please do not hesitate to call.

Sincerely,

Michael Lauer, Investment Manager

# EXHIBIT 38

A01180

313-11895 Lancer Offshore Inc
PosSum-TCBA

Bank Of America Securities LLC

Client Position Summary by Asset Class

| SHR/FACE | | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|
| **CASH AND EQUIVALENTS** | | | | | | | | |
| (3,112,493) USD | TYPE 2 | 1.0000 | 1.0000 | 0.00 | (3,112,492.72) | (3,112,492.72) | 0.00 | (0.31) |
| 3,829,807 USD | TYPE 3 | 1.0000 | 1.0000 | 0.00 | 3,829,806.60 | 3,829,806.60 | 0.00 | 0.38 |
| (60,741,714) USD | TYPE 6 | 1.0000 | 1.0000 | 0.00 | (60,741,714.35) | (60,741,714.35) | 0.00 | (6.05) |
| **TOTAL CASH AND EQUIVALENTS** | | | | 0.00 | (60,024,400.47) | (60,024,400.47) | 0.00 | (5.98) |

| SHR/FACE | SYM | Name | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| **LONG POSITIONS** | | | | | | | | | |
| **Fixed Income** | | | | | | | | | |
| 3,500,000 | 9386567 | EFI TECHNOLOGIES LOAN | 100.0000 | 100.0000 | 0.00 | 3,500,000.00 | 3,500,000.00 | 0.00 | 0.35 |
| 500,000 | 9386631 | LIGHTHOUSE LANDINGS BRIDGE NOTE | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 500,000 | 9386655 | LIGHTHOUSE LANDINGS, INC | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 300,000 | AUGCLOAN | AUG CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 300,000.00 | 300,000.00 | 0.00 | 0.03 |
| 500,000 | AURALOAN | AURA SYSTEMS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 500,000.00 | 500,000.00 | 0.00 | 0.05 |
| 250,000 | BLACK | BLACK SKY ENTERTAINMENT LOAN | 100.0000 | 100.0000 | 0.00 | 250,000.00 | 250,000.00 | 0.00 | 0.02 |
| 505,000 | CPHGLOAN | CORPUS HOLDINGS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 505,000.00 | 505,000.00 | 0.00 | 0.05 |
| 2,500,000 | CSORLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 2,500,000.00 | 2,500,000.00 | 0.00 | 0.25 |
| 50,000 | CTKLOAN | CENTRAK CORP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 50,000.00 | 50,000.00 | 0.00 | 0.00 |
| 2,050,000 | EQUILOAN | EQUITEL BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 2,050,000.00 | 2,050,000.00 | 0.00 | 0.20 |
| 7,000,000 | EXPGLOAN | CONTINENTAL SOUTHERN RESOURCES | 100.0000 | 100.0000 | 0.00 | 7,000,000.00 | 7,000,000.00 | 0.00 | 0.70 |
| 180,000 | FYIRLOAN | FIDELITY FIRST FINANCIAL SVCS | 100.0000 | 100.0000 | 0.00 | 180,000.00 | 180,000.00 | 0.00 | 0.02 |
| 1,250,000 | INHEALTH | ISTINHEALTH INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,250,000.00 | 1,250,000.00 | 0.00 | 0.12 |
| 3,805,000 | KNGTLOAN | KNIGHTSCOVE ENTERTAINMENT BRIDGE | 100.0000 | 100.0000 | 0.00 | 3,805,000.00 | 3,805,000.00 | 0.00 | 0.38 |
| 600,000 | LFFLOAN1 | LIGHTHOUSE FAST FERRY BRIDGE | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.06 |
| 2,250,000 | LFLLOAN | LIGHTHOUSE LANDINGS F.F. INC | 100.0000 | 100.0000 | 0.00 | 2,250,000.00 | 2,250,000.00 | 0.00 | 0.22 |
| 400,000 | LNSHLOAN | LIONSHARE GROUP INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.04 |
| 1,500,000 | NEPHLOAN | NEPHROS INC BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 1,500,000.00 | 1,500,000.00 | 0.00 | 0.15 |
| 3,850,500 | TFGPLOAN | TOTAL FILM GROUP BRIDGE LOAN | 100.0000 | 100.0000 | 0.00 | 3,850,500.00 | 3,850,500.00 | 0.00 | 0.38 |
| 600,000 | USPLELOAN | ULTIMATE SPORTS ENTERTAINMENT | 100.0000 | 100.0000 | 0.00 | 600,000.00 | 600,000.00 | 0.00 | 0.06 |
| 3,000,000 | XMMLOAN | CROSS MEDIA MARKETING LOAN | 100.0000 | 100.0000 | 0.00 | 3,000,000.00 | 3,000,000.00 | 0.00 | 0.30 |
| 350,000 | XMCLOAN | WORLD WIRELESS COMM LOAN | 100.0000 | 100.0000 | 0.00 | 350,000.00 | 350,000.00 | 0.00 | 0.03 |
| **Total Long Fixed Income** | | | | | 0.00 | 35,440,500.00 | 35,440,500.00 | 0.00 | 3.53 |
| **Equities** | | | | | | | | | |
| 29,197,001 | AUGC | AUG CORP | 0.1176 | 6.0000 | 5002.31 | 3,432,213.10 | 175,122,006.00 | 171,689,792.90 | 17.45 |
| 41,960,378 | AURA | AURA SYSTEMS INC | 0.2896 | 0.0800 | (72.38) | 12,151,484.36 | 3,356,830.24 | (8,794,654.12) | 0.33 |
| 2,500,000 | CENK | CENTRACK INTERNATIONAL INC | 0.0200 | 0.0070 | (65.00) | 50,000.00 | 17,500.00 | (32,500.00) | 0.00 |
| 100,000 | CTXS | CITRIX SYS INC | 5.9895 | 6.3000 | 5.18 | 598,951.85 | 630,000.00 | 31,048.15 | 0.06 |
| 14,243,000 | CSOR | CONTINENTAL SOUTHERN RESOURCES | 0.0955 | 6.4000 | 6601.74 | 1,359,841.60 | 91,139,896.40 | 89,779,896.40 | 9.08 |
| 48,400 | DIGMD | CONTROL CHIEF HOLDINGS INC | 4.7000 | 2.9700 | (37.91) | 227,480.00 | 143,843.41 | (83,636.59) | 0.01 |
| 10,000,000 | CPHG | CORPAS HOLDINGS INC | 0.0100 | 0.0100 | 0.00 | 100,000.00 | 100,000.00 | 0.00 | 0.01 |
| 7,786,135 | CDSEQ | CREDIT STORE INC | 2.4827 | 0.0500 | (97.99) | 19,330,407.76 | 389,306.75 | (18,941,101.01) | 0.04 |
| 5,174,719 | XMM | CROSS MEDIA MARKETING CORP | 3.6004 | 1.4200 | (60.56) | 18,631,097.22 | 7,348,100.98 | (11,282,996.24) | 0.73 |
| 143,998 | CYMX | CYTOMEDIX INC | 5.7984 | 1.6750 | (71.11) | 834,955.50 | 241,196.65 | (593,758.85) | 0.02 |
| 21,155,217 | EPTG | EPL TECHNOLOGIES INC NEW | 0.6340 | 0.0480 | (92.43) | 13,412,729.74 | 1,015,450.42 | (12,397,279.32) | 0.10 |
| 2,194,800 | EDLG | EDUCATION LENDING GROUP INC | 2.0856 | 4.0000 | 91.80 | 4,577,366.05 | 8,779,200.00 | 4,201,833.95 | 0.87 |
| 20,010,859 | EQUA | EQUITEL INC | 0.4777 | 0.1400 | (72.79) | 9,599,333.37 | 2,601,411.67 | (6,998,321.70) | 0.26 |

A01181

313-11895 Lancer Offshore Inc

Banc Of America Securities LLC

Client Position Summary by Asset Class

PosSum-TCBA

Lancer Offshore Inc

| SHR/FACE | Symbol | Security | UNIT COST | CURRENT PRICE | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|---|---|
| 2,311,031 | FTGX | ETHERNET TELECOM GROUP INC | 1.3833 | 0.1050 | (92.79) | 3,196,784.08 | 242,638.26 | (2,936,125.83) | 0.02 |
| 8,866,390 | FFRD | FIDELITY FIRST FINANCIAL CORP | 1.1540 | 5.3750 | 365.18 | 10,231,662.04 | 47,656,846.25 | 37,425,184.21 | 4.75 |
| 10,000,000 | IIN | INTELLI-CHECK INC | 1.3000 | 1.3000 | 0.00 | 13,000,000.00 | 13,000,000.00 | 0.00 | 0.00 |
| 30,000,000 | JKC | JKC GROUP INC | 0.0158 | 0.6000 | 3689.47 | 475,000.00 | 18,000,000.00 | 17,525,000.00 | 1.79 |
| 17,510 | LSTTA | LIBERTY SATELLITE & TECHNOLOGY | 3.3854 | 2.5500 | (24.68) | 59,278.85 | 44,650.50 | (14,628.35) | 0.00 |
| 5,384,493 | LHFF | LIGHTHOUSE FAST FERRY INC | 0.5744 | 0.9204 | 60.32 | 3,092,984.51 | 4,958,579.60 | 1,865,595.09 | 0.49 |
| 995 | LNSG | LIONSHARE GROUP INC | 1.3000 | 1.6250 | 25.00 | 1,293.50 | 1,616.88 | 323.38 | 0.00 |
| 32,951,300 | MHTX | MANHATTAN SCIENTIFICS INC | 0.2727 | 0.0770 | (71.77) | 8,986,482.06 | 2,537,250.10 | (6,449,231.96) | 0.25 |
| 2,841,009 | MHTD | METHOD PRODUCTS CORP | 1.0143 | 2.8000 | 176.04 | 2,881,747.77 | 7,954,825.20 | 5,073,077.43 | 0.79 |
| 26,806,180 | NUDZ | NU-D-ZINE INC. | 0.0490 | 3.2500 | 6535.39 | 1,312,960.48 | 87,120,085.00 | 85,807,124.52 | 8.68 |
| 726,992 | NYER | NYER MEDICAL GROUP INC | 4.5081 | 1.7600 | (60.96) | 3,277,162.02 | 1,279,505.92 | (1,997,656.10) | 0.13 |
| 2,100,000 | OPWV | OPENWAVE SYS INC | 3.7690 | 1.3400 | (64.48) | 7,914,992.27 | 2,814,000.00 | (5,100,992.27) | 0.21 |
| 65,300 | PER | PEROT SYSTEMS CORP | 11.4028 | 11.4500 | 0.43 | 744,600.22 | 747,805.00 | 3,204.78 | 0.08 |
| 276,737 | PCFC | PIONEER COMMERCIAL FUNDING | 1.0345 | 1.7500 | 69.17 | 286,277.08 | 484,289.75 | 198,012.67 | 0.05 |
| 900,000 | RXTX | RX TECHNOLOGY HLDGS INC | 1.0472 | 0.0600 | (94.27) | 942,500.00 | 54,000.00 | (888,500.00) | 0.00 |
| 500,000 | RELM | RELM WIRELESS CORP | 0.9000 | 0.5400 | (40.00) | 450,000.00 | 270,000.00 | (180,000.00) | 0.03 |
| 500,000 | RELMW | RELM WIRELESS CORP WARRANTS | 0.0000 | 0.1400 | | 0.00 | 70,000.00 | 70,000.00 | 0.01 |
| 10,439,962 | SMKP | SMK CORP | 0.6926 | 5.5000 | 694.15 | 7,230,344.09 | 57,419,791.00 | 50,189,446.91 | 5.72 |
| 1,036,500 | SBYN | SEEBEYOND TECHNOLOGIES CORP | 2.7174 | 1.6900 | (37.81) | 2,816,558.15 | 1,751,685.00 | (1,064,873.15) | 0.17 |
| 130,000 | SEBL | SIEBEL SYSTEMS INC | 9.4029 | 8.4700 | (9.92) | 1,222,372.00 | 1,101,100.00 | (121,272.00) | 0.11 |
| 3,360,057 | SMXT | SIMEX CORP | 1.1700 | 0.2350 | (79.92) | 3,932,191.54 | 789,613.39 | (3,142,578.15) | 0.08 |
| 5 | SCPR | SIMEX CORP SER C PFD | 500.0000 | 500.0000 | 0.00 | 2,500.00 | 2,500.00 | 0.00 | 0.00 |
| 362,718 | S012759 | STONEPATH GROUP INC SER C PFD | 11.4139 | 11.4138 | 0.00 | 4,140,600.00 | 4,140,626.98 | 26.98 | 0.00 |
| 5,099,135 | SURE | SUREBEAM CORP | 4.5437 | 2.5000 | (44.98) | 23,169,097.79 | 12,747,836.85 | (10,421,260.94) | 1.27 |
| 93,100 | TTEC | TELETECH HOLDINGS INC | 6.3601 | 6.3000 | (0.94) | 592,121.08 | 586,530.00 | (5,591.08) | 0.06 |
| 14,994 | 8847007 | FIDELITY FIRST FINANCIAL CORP | 1.5000 | 1.5000 | 0.00 | 22,491.00 | 22,491.00 | 0.00 | 0.00 |
| 5,574,800 | TTN | TITAN CORP | 15.1532 | 11.2500 | (25.76) | 84,476,171.10 | 62,716,500.00 | (21,759,671.10) | 6.25 |
| 133,474,819 | TFGP | TOTAL FILM GROUP INC | 0.1451 | 1.0100 | 595.95 | 19,370,518.17 | 134,809,567.19 | 115,439,049.02 | 13.43 |
| 75,000 | TCHSF | TOUCHSTONE RESOURCES LTD | 0.0000 | 0.7058 | | 0.00 | 52,935.52 | 52,935.52 | 0.04 |
| 1,687,400 | UGSI | UNDERGROUND SOLUTIONS INC | 0.8987 | 0.2250 | (74.96) | 1,516,462.16 | 379,665.00 | (1,136,797.16) | 0.04 |
| 2,526,667 | U331992 | UNIVERSAL HEIGHTS INC OLD | 0.2385 | 0.0500 | (79.04) | 602,633.36 | 126,333.35 | (476,300.01) | 0.01 |
| 391,337 | UVH | UNIVERSAL INS HLDGS INC | 5.8510 | 0.5100 | (91.59) | 2,289,709.40 | 199,566.85 | (2,090,142.55) | 0.02 |
| 300,000 | 939752 | ICONNECT.COM | 1.1042 | 0.5521 | (50.00) | 331,250.00 | 165,625.00 | (165,625.00) | 0.02 |
| 300,000 | 9390720 | WTS LIGHTHOUSE LANDINGS INC | 0.0000 | 0.0100 | | 0.00 | 3,000.00 | 3,000.00 | 0.00 |
| 99,830,228 | XMC | WORLD WIRELESS COMMUNICATIONS | 0.1921 | 0.2100 | 9.30 | 19,180,709.54 | 20,964,347.88 | 1,783,639.34 | 2.09 |
| 14,679,175 | ZICA | ZI CORPORATION | 4.7016 | 5.0892 | 8.22 | 69,016,227.64 | 74,690,957.81 | 5,674,730.17 | 7.44 |
| 595,238 | AURAWT | AURA SYSTEMS INC WARRANTS | 0.0000 | 0.0000 | | 0.00 | 0.01 | 0.01 | 0.00 |
| 1,666,667 | AURAWT2 | AURA SYSTEMS INC WARRANTS | 0.0000 | 0.0000 | | 0.00 | 0.02 | 0.02 | 0.00 |
| 2,000,000 | CENKPFD | CENTRAK INTL PREFERRED STOCK | 0.2000 | 0.2000 | 0.00 | 400,000.00 | 400,000.00 | 0.00 | 0.04 |
| 47,041,635 | FFIR | FIRST FIDELITY STOCK | 0.0059 | 2.7500 | 46352.49 | 278,487.74 | 129,364,496.25 | 129,086,008.51 | 12.89 |
| 10,000,000 | MHTDW | METHOD PRODUCTS GROUP WARRANTS | 0.0000 | 2.5500 | | 0.00 | 25,500,000.00 | 25,500,000.00 | 2.54 |
| 16,000,000 | MHTXW | MANHATTAN SCIENTIFICS WARRANTS | 0.0000 | 0.0270 | | 0.00 | 432,000.00 | 432,000.00 | 0.04 |
| 16,000,000 | MHTXW | MANHATTAN SCIENTIFICS WARRANT | 0.0000 | 2.1131 | | 0.00 | 33,810,000.00 | 33,810,000.00 | 3.37 |
| 400,000 | USPLPFD | US PLASTIC LUMBER CORP SERIES D | 3.5000 | 3.5000 | 0.00 | 1,400,000.00 | 1,400,000.00 | 0.00 | 0.14 |
| 400,000 | XMMMT1 | CROSS MEDIA MARKETING WARRANT | 0.0000 | 0.0000 | | 0.00 | 0.00 | 0.00 | 0.00 |
| 225,000 | XHCWT | WORLD WIRELESS COMM WARRANTS | 0.0000 | 0.0100 | | 0.00 | 2,250.00 | 2,250.00 | 0.00 |
| **Total Long Equities** | | | | | 177.78 | 370,088,982.30 | 1,028,017,822.26 | 657,928,839.96 | 102.45 |

A01182

Banc Of America Securities LLC

114-11895 Lancer Offshore Inc

PosSim TCHA

Client Position Summary by Asset Class

As Of: 08/31/02
Printed: 11/08/02
Page: 3

| SHR/FACE | UNIT COST | CURRENT UNIT | PCT G/L | TOTAL COST | MARKET VALUE | TOTAL GAIN/LOSS | PCT OF ASSETS |
|---|---|---|---|---|---|---|---|
| TOTAL LONG POSITIONS | | | 162.24 | 405,529,482.30 | 1,063,458,322.26 | 657,928,839.96 | 105.98 |
| | | | | | | | |
| TOTAL EXPOSURE VALUE | | | | 405,529,482.30 | 1,063,458,322.26 | 657,928,839.96 | 105.98 |
| NET EXPOSURE VALUE | | | | 405,529,482.30 | 1,063,458,322.26 | 657,928,839.96 | 105.98 |
| | | | | | | | |
| TOTAL LONG POSITIONS | | | | 405,529,482.30 | 1,063,458,322.26 | 657,928,839.96 | 105.98 |
| TOTAL SHORT POSITIONS | | | | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL CASH EQ | | | | (60,024,400.47) | (60,024,400.47) | | (5.98) |
| | | | | | | | |
| TOTAL | | | | 345,505,081.83 | 1,003,433,921.79 | 657,928,839.96 | 100.00 |

# EXHIBIT 39

## LANCER PERSONNEL

Lancer Management Group, LLC, is the Investment Manager for the Fund. Michael Lauer is the managing member and Lancer's largest investor.

**Michael Lauer** has approximately 20 years of experience in the securities industry. He began his career in 1980 as a junior analyst at Oppenheimer & Co., in New York City. From 1982 to 1994, Mr. Lauer served as a senior analyst for several brokerage firms in New York, most notably serving as a Senior Vice President from 1988 to 1994 at Kidder Peabody & Co. Throughout his career, Mr. Lauer has focused primarily on industrial and technology stocks. Mr. Lauer was named to *Institutional Investor Magazine*'s All American Research Team for seven consecutive years (1987-1993). For 1992 and 1993, Greenwich Associates annual survey of defense/aerospace analysts ranked Mr. Lauer #1 for stock recommendations. In addition, *The Wall Street Journal* for 1993 named Mr. Lauer as one of the top three analysts in his field in its annual review. Mr. Lauer holds a BA in International Relations from Columbia University and an MBA in Finance and International Trade from Manhattan College.

**Bruce Cowen** has over twenty years of involvement with managing public companies as either a board member, consultant or senior management. From 1974 – 1979, Mr. Cowen was a manager with Price Waterhouse and from 1979 –1997, he was CFO and then President of TRC Companies, a NYSE listed company. From 1997 – 2000, he has served as chairman of Sterling Technology Partners. Mr. Cowen served on the Board of the US Chamber of Commerce from 1993 – 1999. He also served on the Board of the Center for International Private Enterprise from 1996 - 1999, a Congressionally funded organization to promote capitalism in developing countries. He graduated from American International College in 1974 and holds a BS in Business Administration.

**Martin Garvey** held various legislative and administrative positions with U.S. Senator Bill Bradley (D-NJ). Mr. Garveyt began his investment career with Paine Webber Inc. in 1991 and subsequently joined Lancer in 1995. He holds a BA degree in History and Political Science from Williams College and a Master's degree in Public Administration from George Washington University.

**Eric C. Hauser** was an equities trader at Morgan Stanley, UBS Securities, Oppenheimer & Co., and Montgomery Securities from 1980 through 1996. He holds a BS degree in Marketing from Rider College.

**Kenneth R. Marcus** has nearly eight years of investment experience and serves as senior analyst. Prior to joining the firm, Ken served as Vice President and portfolio manager at U.S. Trust Co., where he managed over $300 million in assets, including dedicated small cap funds and separate portfolios. Previously, he spent four years at J.P. Morgan Securities in New York, where he traded investment grade corporate bonds. He graduated *Magna Cum Laude*, as a Benjamin Franklin Scholar from the Wharton School of the University of Pennsylvania in 1991, receiving a B.S.E. in Finance. He completed his Masters of Business Administration degree there the following year.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

**David Newman** started his career in 1993 as a margin analyst for Bear Stearns and Spear Leeds and Kellogg. In 1996 he joined ING Barings Furman Selz as a Vice President in the Prime Brokerage division where he managed a team of account representatives for the firm's hedge fund clients. In 1999 he joined Banc of America's Prime Brokerage unit as a Vice President. He holds a BA degree in Economics from Rutgers University.

**Jimmy Tsakni** joined The Lancer Group in June of 1998 as a Research Analyst. Prior to his joining Lancer, he was a Junior Analyst at Paribus Capital Markets in the Risk Arbitrage Group since October 1996, where he assisted analysts and traders in managing a proprietary portfolio for Banque Paribas. He holds a Bachelors of Science in Finance and International Business from the Leonard N. Stern School of Business at New York University.

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

# EXHIBIT 40

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | Civil Action No. |
| | : | |
| Plaintiff, | : | 99 1762 |
| | : | |
| v. | : | **FILED** |
| | : | |
| BRUCE D. COWEN, | : | JUN 3 0 1999 |
| | : | |
| Defendant. | : | NANCY MAYER-WHITTINGTON, CLERK |
| | : | U.S. DISTRICT COURT |

## FINAL JUDGMENT OF PERMANENT INJUNCTION
## AND OTHER RELIEF AS TO BRUCE D. COWEN

Plaintiff Securities and Exchange Commission ("Commission") having filed a

Complaint For Permanent Injunction And Other Relief ("Complaint"); Bruce D. Cowen

("Cowen"), in his attached Consent and Undertakings, having entered a general appearance,

waived service of the Summons and Complaint, admitted the jurisdiction of the Court over him

and the subject matter of this action, waived the entry of findings of fact and conclusions of law

pursuant to Rule 52 of the Federal Rules of Civil Procedure, and, solely for the purpose of this

action, without admitting or denying the allegations of the Complaint, consented to the entry of

this Final Judgment of Permanent Injunction And Other Relief As To Bruce D. Cowen ("Final

United States District Court
For the District of Columbia
A TRUE COPY
NANCY MAYER WHITTINGTON, Clerk
By _Michael Darby_ 6-3-03
Deputy Clerk

( N/

2

Judgment"), and it appearing that this Court has jurisdiction over the defendant and the subject matter hereof:

I.

IT IS ORDERED, ADJUDGED AND DECREED that Cowen, his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of this order by personal service or otherwise, are permanently enjoined from violating Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, to

a.   employ any device, scheme, or artifice to defraud;

b.   make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c.   engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

II.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Cowen be, and hereby is barred for a period of five years, beginning with the date of entry of the Final Judgment, from acting as a director or officer of any issuer that has a class of securities

2

registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. Section

78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C.

Section 78o(d)].

III.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Cowen shall pay a

civil penalty of $400,000, pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. §

78u(d)(3). The $400,000 shall be paid within ninety (90) days of entry of this Final Judgment,

by U.S. Postal money order, certified check, bank cashier's check, or bank money order, made

payable to the U.S. Treasury; and shall be transmitted to the Comptroller, U.S. Securities and

Exchange Commission, Mail Stop 0-3, 450 Fifth Street, N.W. Washington, D.C. 20549, under

cover of a letter than identifies defendant, the name and case number of this action, the name of

this Court and the Commission's case number (HO-3409). A copy of the cover letter and the

check or money order shall be transmitted simultaneously to Alex Lipman, Senior Counsel, U.S.

Securities and Exchange Commission, Division of Enforcement, 450 Fifth Street, N.W.,

Washington, DC 20549-0803.

IV.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Bruce D.

Cowen shall comply with the annexed Consent and Undertakings of Bruce D. Cowen, which are

incorporated herein with the same force as if fully set forth in this Final Judgment.

3

## V.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court shall retain jurisdiction of this matter for all purposes, including enforcement and implementation of this Final Judgment.

## VI.

There being no just reason for delay, the Clerk of the Court is hereby directed, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, to enter this Final Judgment forthwith.

SO ORDERED, this 30 day of June 1999

UNITED STATES DISTRICT JUDGE

4

# EXHIBIT 41

Search Result                    Rank 1 of 2                      Database
                                                                 FSEC-ALL

Litigation Release No. 16200, 70 S.E.C. Docket 162
**(Cite as: 1999 WL 430864 (S.E.C. Release No.))**

              Securities and Exchange Commission (S.E.C.)
   *1 SECURITIES AND EXCHANGE COMMISSION V. BRUCE D. COWEN, NO. 1:99CV01762
                               (RMU)
                          June 29, 1999

   SEC Sues Former President Of TRC Companies, Inc. For Misallocating to Himself
                         Company Securities


   The Securities and Exchange Commission (the "Commission") filed a complaint
today in the United States District Court for the District of Columbia against
Bruce D. Cowen, former President and Director of TRC Companies, Inc. ("TRC") The
complaint alleges, that while serving as the president of TRC, Cowen enriched
himself by misallocating to himself stock options and warrants in excess of
amounts authorized by the board of directors to be issued to him.
   Specifically, the complaint alleges that during the period 1986 to 1996, TRC's
board of directors periodically authorized the grant of employee stock options
under the company's incentive compensation program and directed the company's
now-deceased former chief executive officer ("CEO") to distribute those options
to others. At various times, the board: 1) specified certain employees who were
to receive options; 2) directed that a certain number of options be granted to
employees of particular departments or subsidiaries or new potential employees
if they were hired; or 3) gave the CEO discretion to assign a specified number
of options to others as he saw fit. However, the board did not give the CEO
discretion to grant options to himself or Cowen. Rather, all option grants to
the CEO and Cowen were specified in the board of directors' resolutions.
According to the complaint, on at least ten separate occasions between
approximately 1986 and approximately 1996, Cowen and the CEO intentionally
diverted to themselves options that the board had authorized for other officers,
employees and potential new hires. They facilitated and concealed this conduct
through, among other means, the creation of false option contracts and
fraudulent transfer agent instructions. In 1994, Cowen and the CEO also diverted
50,000 TRC warrants that the board had designated for other employees. The
Commission further alleges that, as a result of these actions, Cowen realized
approximately $702,100 in gross profits. The Commission alleges that these
actions violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange
Act") and Rule 10b-5.
   In settlement of this matter, Cowen has consented, without admitting or
denying the allegations in the complaint, to the entry of an order permanently
enjoining him from violating Section 10(b) of the Exchange Act and Rule 10b-5
thereunder, and barring him from serving as an officer or director of a
publicly-held company for a period of five years. He has also agreed to pay a
civil penalty of $400,000. Cowen previously paid the company $1.1 million,
including interest, in a separate settlement.
Litigation Release No. 16200, 70 S.E.C. Docket 162, 1999 WL 430864 (S.E.C.
Release No.)

              Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

**(Cite as: 1999 WL 430864, \*1 (S.E.C. Release No.))**

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# EXHIBIT 42

# The Lancer Group

Dear Investor:                                                   January 13, 2003

In yet another diatribe against the offshore hedge fund community a local tabloid "reporter" again maligned Lancer (second time in four months and third time in four years), as well as a number of other individuals and entities.

As communicated in our September 11, 2002 correspondence, the reporter's *modus operandi* is to either distort the facts so as to develop a most negative slant possible, or to fabricate them altogether. With an objective of creating a sensationalized story, presumably anything goes. As was the case in August of 1998 and September of 2002, the article is essentially a work of fiction with clearly a malicious intent. We will discuss legal remedies available to us with our attorneys later this morning, but as we did on prior occasions, for investor's peace of mind, we forthwith address specific issues raised in the article.

- We do in fact have a $1.5 million investment in Nephros Inc., which is a late stage private company (new approach in filters for kidney dialysis), that was scheduled to go public late last year. When it became apparent that the liquidity event (IPO) would slip, we reduced our commitment (given the new level of uncertainty). The company and its bankers are optimistic that the IPO will take place in the first quarter of 2003 which should result in a profit and a liquidity opportunity for the fund. We have done many such deals in the past and fully expect to do more of them in the future. It appears that it was Ron Perelman's (same reporter's frequent target) involvement in the transaction that sparked the reporter's interest in highlighting this investment. Although we certainly know of Mr. Perelman (Revlon etc.), we have no other association and we have never met with Mr. Perelman's representatives, as suggested by the reporter.

- The reporter's favorite tactic is to plunk myriad of apparently notorious characters, and by innuendo, suggest that they may have something to do with the funds. Even Bill Gates was not spared by the reporter's innuendo. As we have absolutely no association with the individuals cited in the article, it is difficult to comment further on this issue.

- On specific companies mentioned, again for the investors' peace of mind, we will have the International Fund Services (administrator), PriceWaterhouseCoopers (auditor), and the Bank Of America (prime broker) confirm independently that no such stocks reside in our portfolios. The funds did own Credit Store (AMEX listed, sub-prime credit card issuer) a number of years ago, and we made money on some of the early investment, as the company prospered. However, as the

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

industry's fortunes soured (a number of years ago) we conservatively wrote off the remaining holdings to nil, and the stock had no influence on valuations for a number of years. Such holdings changeovers are routine for any fund of our size.

- Upon some of our investors' advice, we did upgrade the fund's Board of Directors in early 2002 to industry professionals, rather then just the fund's administrators. Mr. Bendall runs a successful New York based institutional investment banking/brokerage boutique and with over 30 years in the business, possesses a very extensive knowledge base that we have benefited from on many occasions. Dr. Richard Geist of Harvard University is one of the nations' foremost experts in behavioral finance, a discipline that disputes the prevailing orthodoxy of the Efficient Market Hypothesis. He also authors an action-specific investment letter, rich in moneymaking wisdom. With collective investment related experience of nearly 50 years, we are indeed privileged to have a board of directors of this caliber. To the tabloid's reporter however, everyone in the investment business appears to be a penny stock tout.

- In the last paragraph of his article the reporter raises a number of questions, answers to which, in a nutshell are: I am the largest single investor in the funds, followed by some of the most sophisticated domestic and global institutions (mostly pension funds and endowments), as well as wealthy individuals. The Offshore Fund for years has been audited by the afore mentioned PriceWaterhouseCoopers and the financials are readily available to investors. As an Irish Stock Exchange listed fund we have to conform to higher standard of transparency.

Suffice it to say, there are enough challenges in this business without distractions from a rogue reporter, even from a $0.25 tabloid. I intend to delegate this issue to attorneys to explore our options vis-à-vis both the reporter and the publication.

Please call with any questions,..                                      Michael Lauer

**Confidential Treatment Requested By Morgan Stanley & Co. Incorporated**

# EXHIBIT 43

## CERTIFICATION OF NASD BUSINESS RECORDS

Barbara Z. Sweeney hereby declares and states as follows:

1.  I am the Senior Vice President and Corporate Secretary of the National Association of Securities Dealers, Inc. ("NASD") and am familiar with and am a custodian of NASD business records including interpretations, policies and rules adopted by the NASD Board of Governors.

2.  Attached are true, accurate and complete copies of NASD documents listed below that were prepared, kept and maintained in the ordinary course of NASD's business at or near the time of the act, condition or event:

> a)  Central Registration Depository (CRD) record for John Wilson Bendall, Jr. (CRD No. 17841).
>
> b)  CRD record for Hermitage Capital Corp. (BD No. 20509).

3.  These records are business records of the NASD as defined in Rule 803 of the Federal Rules of Evidence.

4.  I declare, under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true of my own knowledge.

Washington, DC
May 13, 2003

_____
Barbara Z. Sweeney
Senior Vice President and Corporate Secretary

```
17841 - BENDALL JR, JOHN WILSON                          3
        Reportable Events                               13
        Regulator Archive and Z Records                 16
        Legacy Disclosure                               23
```

Notice

CRD® or IARD(SM) Information: This report contains information from the
CRD (Central Registration Depository) system, or the IARD system
(Investment Advisers Registration Depository), which are operated by the
NASD, a national securities association registered under the Securities
Exchange Act of 1934.  The CRD system primarily contains information
submitted on uniform broker-dealer and agent registration forms and
certain other information related to registration and licensing.  The IARD
system primarily contains information submitted on uniform investment
adviser and agent registration forms and certain other information related
to registration and licensing. The information on Uniform Forms filed with
the CRD or IARD is deemed to have been filed with each regulator with
which the applicant seeks to be registered or licensed and shall be the
joint property of the applicant and such regulators.  The compilation
constituting the CRD database as a whole is the property of NASD.  Neither
the NASD nor a participating regulator warrants or guarantees the accuracy
or the completeness of the CRD or IARD information. CRD information
consists of reportable and non-reportable information.

NASD operates the CRD system in its capacity as a registered national
securities association and pursuant to an agreement with the North
American Securities Administrators Association, Inc. (NASAA).

NASD operates the IARD system as a vendor pursuant to a contract with the
Securities and Exchange Commission and undertakings with NASAA and
participating state regulators.

Reportable Information: Information that is required to be reported on the
current version of the uniform registration forms.

Non-Reportable Information: Information that is not currently reportable
on a uniform registration form.  Information typically is not reportable
because it is out-of-date;  it was reported in error; or some change
occurred either in the disposition of the underlying event after it was
reported or in the question on the form that elicited the information.
Although not currently reportable, this information was once reported on a
uniform form and, consequently, may have become a state record.  Users of
this information should recognize that filers have no obligation to update
non-reportable data; accordingly, it may not reflect changes that have
occurred since it was reported.

Details for Request# 507139

Report: Snapshot - NASD Individual Database
Extract

| Parameter Name | Value |
|---|---|
| Individual CRD # | 17841 |
| Include Personal Information? | Yes |
| Include All Registrations with Employments: | Both Current and Previous Employments |
| Include All Registrations for Current and/or Previous Employments with: | All Regulators |
| Include Legacy Registration History? | Yes |
| Include Professional Designations? | Yes |
| Include Employment History? | Yes |
| Include Legacy Employment History? | Yes |
| Include Other Business | Yes |
| Include Exam Information? | Yes |
| Include Continuing Education Information? | Yes |
| Include Filing History? | Yes |
| Include Legacy Filing History? | Yes |
| Include Current Reportable Disclosure Information? | Yes |
| Include Regulator Archive and Z Record Information? | Yes |
| Include Legacy Disclosure? | Yes |
| User Initials | BAW |

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 3
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

**Composite Information:**

| | |
|---|---|
| Full Legal Name: | BENDALL JR, JOHN WILSON |
| Date of Birth: | 06/16/1943 |
| State of Residence: | NY |
| Current Employing Firm: | HERMITAGE CAPITAL CORPORATION |
| Office of Employment Address: | 405 PARK AVENUE |
| | SUITE 1102 |
| | NY |
| | NY |
| | 10022 |
| Firm Main Address: | 405 PARK AVE. |
| | SUITE 801 |
| | NEW YORK |
| | NY , UNITED STATES |
| | 10022 |
| Firm Mailing Address: | 405 PARK AVENUE |
| | SUITE 801 |
| | NEW YORK |
| | NY |
| | 00000-0000 |
| Business Telephone #: | (212) 832-2100 |
| Reportable Disclosures? | Yes |
| Statutorily Disqualification? | SDNO |
| Registered With Multiple Firms? | No |
| Material Difference in Disclosure? | No |

**Personal Information:**

Individual CRD#:             17841        SSN: 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

Other Names Known By:        <<No Other Names found for this Individual.>>

Date of Birth: 06/16/1943    State/Country of Birth: Virginia
Sex:           M             Height: 6 ft  0 in    Weight: 220 lbs
Hair Color:    BROWN                              Eye Color:  BROWN

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 4
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

**Registrations with Current Employer(s):**

From 08/01/1987 To Present:      HERMITAGE CAPITAL CORPORATION(20509)

| Regulator | Registration Category | Status Date | Registration Status | Approval Date | Registration Status Note |
|-----------|----------------------|-------------|---------------------|---------------|--------------------------|
| NASD | GP | 12/12/2001 | APPROVED | 12/08/1994 | No |
| NASD | GP | 12/12/2001 | APPROVED | 12/08/1994 | No |
| NASD | GS | 12/12/2001 | APPROVED | 10/28/1987 | No |
| NASD | GS | 12/12/2001 | APPROVED | 10/28/1987 | No |
| NASD | ET | 10/01/2000 | T_NOREG | | No |
| NASD | FN | 04/12/1999 | PURGED | | No |
| AZ | AG | 03/08/1999 | APPROVED | 03/08/1999 | No |
| NE | AG | 01/14/1998 | TERMED | 03/26/1997 | No |
| MI | AG | 04/03/1997 | APPROVED | 04/03/1997 | No |
| NJ | AG | 03/26/1997 | APPROVED | 03/26/1997 | No |
| PA | AG | 03/24/1997 | APPROVED | 03/24/1997 | No |
| IL | AG | 03/21/1997 | APPROVED | 03/21/1997 | No |
| OH | AG | 03/21/1997 | APPROVED | 03/21/1997 | No |
| CT | AG | 03/20/1997 | APPROVED | 03/20/1997 | No |
| MA | AG | 07/29/1996 | APPROVED | 07/29/1996 | No |
| NY | AG | 09/14/1995 | APPROVED | 09/14/1995 | No |
| FL | AG | 03/16/1995 | APPROVED | 03/16/1995 | No |
| TX | AG | 02/15/1995 | APPROVED | 02/15/1995 | No |
| VA | AG | 02/15/1995 | APPROVED | 02/15/1995 | No |

**Legacy Registrations:**

Firm Name:     HERMITAGE CAPITAL CORPORATION(20509)

| Regulator | Registration Category | Filing Date | Status Date | Legacy Registration Status | Deficiencies |
|-----------|----------------------|-------------|-------------|----------------------------|--------------|
| AZ | AG | 11/30/1998 | 03/08/1999 | APPROVED | |
| CT | AG | 03/18/1997 | 03/20/1997 | APPROVED | |
| FL | AG | 03/10/1995 | 03/16/1995 | APPROVED | |
| IL | AG | 03/18/1997 | 03/21/1997 | APPROVED | |
| MA | AG | 01/03/1996 | 07/29/1996 | APPROVED | |
| MI | AG | 03/18/1997 | 04/03/1997 | APPROVED | |
| NASD | ET | 06/12/1998 | 06/12/1998 | DEFICIENT | EXAM(S55) |
| NASD | FN | 08/18/1998 | 04/12/1999 | PURGED | |
| NASD | GP | 09/08/1993 | 12/08/1994 | APPROVED | |

**CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.**

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                           Page 5
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

| | | | | | |
|---|---|---|---|---|---|
| NASD | GS | 08/27/1987 | 10/28/1987 | APPROVED | |
| NE | AG | 03/26/1997 | 01/14/1998 | TERMED | |
| NJ | AG | 03/18/1997 | 03/26/1997 | APPROVED | |
| NY | AG | 02/11/1995 | 09/14/1995 | APPROVED | |
| NY | AG | 11/25/1987 | 12/31/1994 | TERMED | |
| OH | AG | 03/18/1997 | 03/21/1997 | APPROVED | |
| PA | AG | 03/18/1997 | 03/24/1997 | APPROVED | |
| TX | AG | 02/11/1995 | 02/15/1995 | APPROVED | |
| VA | AG | 02/11/1995 | 02/15/1995 | APPROVED | |

**Firm Name:**    BLACKSTOCK & LANDSTREET, INC.(14227)

| Regulator | Registration Category | Filing Date | Status Date | Legacy Registration Status | Deficiencies |
|---|---|---|---|---|---|
| FL | AG | 03/30/1987 | 07/27/1987 | TERM w/o REG | |
| NASD | GS | 03/30/1987 | 07/27/1987 | TERM w/o REG | |
| NY | AG | 04/15/1987 | 07/27/1987 | TERM w/o REG | |

**Firm Name:**    BLACKSTOCK & CO., INC.(8469)

| Regulator | Registration Category | Filing Date | Status Date | Legacy Registration Status | Deficiencies |
|---|---|---|---|---|---|
| NASD | GS | 12/11/1986 | 04/03/1987 | TERM w/o REG | |
| NY | AG | 12/11/1986 | 04/03/1987 | TERM w/o REG | |

**Firm Name:**    BATEMAN EICHLER, HILL RICHARDS, INCORPORATED(76)

| Regulator | Registration Category | Filing Date | Status Date | Legacy Registration Status | Deficiencies |
|---|---|---|---|---|---|
| IL | AG | 07/10/1980 | 05/26/1982 | TERMED | |
| MA | AG | 08/06/1980 | 05/26/1982 | TERMED | |
| NASD | GS | 03/26/1980 | 05/26/1982 | TERMED | |
| NY | AG | 09/07/1981 | 05/26/1982 | TERMED | |

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 6
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

Legacy Registrations: (cont):


Firm Name:    ROSS, STEBBINS INC.(6381)

| Regulator | Registration Category | Filing Date | Status Date | Legacy Registration Status | Deficiencies |
|---|---|---|---|---|---|
| NASD | GS | 05/04/1978 | 12/23/1979 | TERMED | |

Firm Name:    ROONEY, PACE INC.(6218)

| Regulator | Registration Category | Filing Date | Status Date | Legacy Registration Status | Deficiencies |
|---|---|---|---|---|---|
| NASD | GS | 08/03/1977 | 07/21/1979 | TERMED | |


**Professional Designations:**
  << None found for this Individual: BENDALL JR, JOHN WILSON >>


**Employment History:**

From 08/1987 To Present:    **Name:**      HERMITAGE CAPITAL CORPORATION
                           **Location:**  NY, NY
                           **Position:**  UNKNCONV
                           **Investment Related:**    Yes

**Office of Employment History:**

From 08/1987 To Present:    **Name:**      HERMITAGE CAPITAL CORPORATION
                           **Location:**  405 PARK AVENUE
                                          SUITE 1102
                                          NY, NY   10022

**Legacy Employment History:**

From 08/1987 To :          **Name:**      HERMITAGE CAPITAL
                                          CORPORATION(20509)
                           **Location:**  NY NY
                           **Position:**


CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 7
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

Legacy Employment History: (cont):


From 01/1987 To 07/1987:      **Name:**      BLACKSTOCK & LANDSTREET,
                                             INC.(14227)
                              **Location:**  NEW YORK NY
                              **Position:**


From 09/1986 To 03/1987:      **Name:**      BLACKSTOCK & CO., INC.(8469)
                              **Location:**  NEW YORK NY
                              **Position:**


From 05/1982 To 09/1986:      **Name:**      ROONEY, PACE INC.(6218)
                              **Location:**  NEW YORK NY
                              **Position:**  SALES


From 12/1979 To 05/1982:      **Name:**      BATEMAN EICHLER, HILL RICHARDS,
                                             INCORPORATED(76)
                              **Location:**  LOS ANGELES CA
                              **Position:**  Representative


From 02/1978 To 12/1979:      **Name:**      ROSS, STEBBINS INC.(6381)
                              **Location:**  NEW YORK NY
                              **Position:**  Representative


From 08/1977 To 07/1979:      **Name:**      ROONEY, PACE INC.(6218)
                              **Location:**  NEW YORK NY
                              **Position:**  Representative


From 04/1977 To 02/1978:      **Name:**      EXCELSIOR SECURITIES
                              **Location:**  NEW YORK NY
                              **Position:**  REG REP


From 03/1975 To 04/1977:      **Name:**      INDEPENDENT ACQUISITION CONSULTANT
                              **Location:**  NEW YORK NY
                              **Position:**  SELF EMPLOYED


From 06/1974 To 03/1975:      **Name:**      WILLIAM HILL & CO
                              **Location:**  NEW YORK NY
                              **Position:**  CONSULTANT


**CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.**

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 8
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

Legacy Employment History: (cont):

```
From 06/1968 To 06/1974:      Name:      INDEPENDENT ACQUISITION CONSULTANT
                              Location:  NEW YORK NY
                              Position:  CONSULTANT
```

**Other Business:**
  <<No Other Business found for this Individual.>>

**Examination Information:**

| Exam | Status | Status Date | Exam Date | Grade | Score | Window Dates |
|------|--------|-------------|-----------|-------|-------|--------------|
| S1 | OFFICIAL_RESULT | 07/15/1966 | 07/15/1966 | PASSED | 100 | - |
| S24 | OFFICIAL_RESULT | 05/04/1994 | 05/04/1994 | PASSED | 76 | - |
| S24 | OFFICIAL_RESULT | 12/02/1993 | 12/02/1993 | FAILED | 67 | - |
| S27 | EXPIRED | 03/17/1999 | | | 0 | - |
| S27 | EXPIRED | 11/18/1998 | | | 0 | - |
| S55 | EXPIRED | 10/01/2000 | | | | 06/12/1998-10/01/2000 |
| S63 | WITHDRAW | 09/23/1987 | | | | - |
| S63 | WITHDRAW | 09/14/1987 | | | | - |
| S63 | OFFICIAL_RESULT | 06/13/1980 | 06/13/1980 | PASSED | 82 | - |
| S7 | OFFICIAL_RESULT | 06/17/1977 | 06/17/1977 | PASSED | 200 | - |

**CE Regulatory Element Status:**

**Current CE Status:**    SATISFIED

**CE Base Date:**         05/04/1978

**Current CE**
  <<No Current CE Session Found >>

**Next CE**

| Requirement Window | Requirement Type | Session |
|--------------------|------------------|---------|

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                Page 9
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

Next CE (Cont)

| Requirement Window | Requirement Type | Session |
|---|---|---|
| 05/04/2004-08/31/2004 | Anniversary | 201 |

CE Directed Sequence History
   <<No CE Directed Sequence History Found for this Individual.>>

Inactive CE History Dates
From 09/01/2001 To 12/12/2001

Previous CE Requirement Status

| Requirement Type | Status | Previous Window | Session | Status Date | Result |
|---|---|---|---|---|---|
| Anniversary | SATISFIED | 05/04/1998-08/31/1998 | 101 | 05/04/1978 | 05/04/1978- |
| Anniversary | CEINACTIVE | 05/04/2001-08/31/2001 | 201 | 09/01/2001 | 09/01/2001- |
| Anniversary | SATISFIED | 05/04/2001-08/31/2001 | 201 | 12/12/2001 | 12/12/2001-CMPLT |
| Anniversary | REQUIRED | 05/04/2001-08/31/2001 | 201 | 05/04/2001 | 05/04/2001- |

Filing History:

| Filing Date | Form Type | Filing Type | Source |
|---|---|---|---|
| 05/05/2003 | U4 | AMENDMENT | Org CRD# 20509 HERMITAGE CAPITAL CORPORATION |
| 04/15/2003 | U4 | AMENDMENT | Org CRD# 20509 HERMITAGE CAPITAL CORPORATION |
| 11/30/2001 | U6 | REGINDVL | United States Securities and Exchange Commission |
| 07/07/1999 | U6 | CONVERSION | New York Stock Exchange |
| 07/07/1999 | U6 | CONVERSION | United States Securities and Exchange Commission |
| 07/07/1999 | U6 | CONVERSION | National Association of Securities Dealers, Inc. |
| 07/06/1999 | U4 | CONVERSION | Org CRD# 20509 HERMITAGE CAPITAL CORPORATION |

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                        Page 10
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

**Filing History (cont):**

| Filing Date | Form Type | Filing Type | Source |
|---|---|---|---|
| 07/05/1999 | U4 | CONVERSION | Org CRD# 20509 |
| | | | HERMITAGE CAPITAL CORPORATION |
| 07/05/1999 | U5 | CONVERSION | Org CRD# 20509 |
| | | | HERMITAGE CAPITAL CORPORATION |

**Legacy Filing History:**

| Received Date | Filing Date | Form Type | Filing Type | Electronic Filing | Firm Name | Questions |
|---|---|---|---|---|---|---|
| 01/11/1999 | 01/14/1999 | U4 | PAGE 3 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 12/11/1998 | 12/17/1998 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 11/24/1998 | 11/30/1998 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 08/14/1998 | 08/18/1998 | U4 | FULL | N | HERMITAGE CAPITAL CORPORATION | 22D2, 22D4, 22F2, 22F4 |
| 06/10/1998 | 06/12/1998 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| | 01/20/1998 | U5 | DRP | N | HERMITAGE CAPITAL CORPORATION | |
| 03/13/1997 | 03/17/1997 | U4 | PAGE 1 PAGE 3 | N | HERMITAGE CAPITAL CORPORATION | 22D2, 22D4 |
| 01/02/1996 | 01/03/1996 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 03/07/1995 | 03/10/1995 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 02/06/1995 | 02/11/1995 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| | 12/26/1994 | U5 | DRP | N | HERMITAGE CAPITAL CORPORATION | |
| 03/08/1994 | 03/16/1994 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 11
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

Legacy Filing History(cont.):

| Received Date | Filing Date | Form Type | Filing Type | Electronic Filing | Firm Name | Questions |
|---|---|---|---|---|---|---|
| 09/02/1993 | 09/08/1993 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 09/04/1987 | 09/09/1987 | U4 | PAGE 1 ONLY | N | HERMITAGE CAPITAL CORPORATION | |
| 08/24/1987 | 08/27/1987 | U4 | PARTIAL | N | HERMITAGE CAPITAL CORPORATION | 22D2, 22D4 |
| 07/27/1987 | 07/27/1987 | U5 | FULL | N | BLACKSTOCK & LANDSTREET, INC. | |
| 04/13/1987 | 04/15/1987 | U4 | PAGE 1 ONLY | N | BLACKSTOCK, MCMAHON & LANDSTREET, INC. | |
| 04/03/1987 | 04/03/1987 | U5 | FULL | N | BLACKSTOCK & CO., INC. | |
| 03/23/1987 | 03/30/1987 | U4 | PARTIAL | N | ST JOHNS CAPITAL INVESTORS | 22D2, 22D4 |
| 12/08/1986 | 12/11/1986 | U4 | FULL | N | BLACKSTOCK & CO., INC. | 22D2, 22D4 |
| 09/29/1986 | 09/29/1986 | U5 | FULL | N | ROONEY, PACE INC. | |
| | 06/20/1986 | U5 | DRP | N | ROONEY, PACE INC. | |
| 02/03/1986 | 02/05/1986 | U4 | PAGE 1 ONLY | N | ROONEY, PACE INC. | |
| | 04/27/1985 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |
| | 03/24/1984 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |
| | 08/25/1983 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |
| | 08/24/1983 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |
| | 08/23/1983 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |
| 05/18/1983 | 05/19/1983 | U4 | AMEND | N | ROONEY, PACE INC. | |
| | 03/06/1983 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |

---

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 12
Individual: 17841 - BENDALL JR, JOHN WILSON
Administrative Information:
```

**Legacy Filing History(cont.):**

| Received Date | Filing Date | Form Type | Filing Type | Electronic Filing | Firm Name | Questions |
|---|---|---|---|---|---|---|
| | 03/05/1983 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |
| | 08/27/1982 | U4 | PAGE 1 | N | ROONEY, PACE INC. | |
| | 06/15/1982 | U4 | FULL | N | ROONEY, PACE INC. | |
| | 05/24/1982 | U5 | FULL | N | BATEMAN EICHLER, HILL RICHARDS, INCORPORATED | |
| | 09/07/1981 | U4 | CONVERSION U4 | N | BATEMAN EICHLER, HILL RICHARDS, INCORPORATED | |
| | 03/26/1980 | U4 | CONVERSION U4 | N | BATEMAN EICHLER, HILL RICHARDS, INCORPORATED | |
| | 05/04/1978 | U4 | CONVERSION U4 | N | ROSS, STEBBINS INC. | |
| | 08/03/1977 | U4 | CONVERSION U4 | N | ROONEY, PACE INC. | |

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 13
Individual: 17841 - BENDALL JR, JOHN WILSON
Reportable Events:
```

**Number of Reportable Events:**

| | |
|---|---|
| **Bankruptcy:** | 0 |
| **Bond:** | 0 |
| **Civil Judicial:** | 0 |
| **Criminal:** | 0 |
| **Customer Complaint:** | 0 |
| **Internal Review:** | 0 |
| **Investigation:** | 0 |
| **Judgment/Lien:** | 0 |
| **Regulatory Action:** | 1 |
| **Termination:** | 0 |

```
Occurrence:          100388    Disclosure Type:    Regulatory Action
NASD Public Disclosable:   Y    Reportable:         Y
Material Difference in Disclosure:    N

    Rev. Form U-4 (03/2002)
    Form:            U-4      Received:          05/05/2003
    Source: Organization CRD# 20509
    Questions:       14C(2),14C(4),14C(5)
```

---

**CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.**

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
```
Request Submitted: 05/13/2003                                     Page 14
```
Individual: 17841 - BENDALL JR, JOHN WILSON
Reportable Events:
```

    Regulatory Action DRP Content

    1.  Regulatory Action Initiated By:        SEC
    2.  Principal Sanction:
        Other Sanctions:
    3.  Date initiated:                         11/18/1968
    4.  Docket/Case Number:
    5.  Employing Firm:                         PICKARD & COMPANY, INC.
    6.  Principal Product Type:                 Other
        Other Product Types:
    7.  Allegations:
        VIOLATIONS OF SECTIONS 7(A)AND 15(A)(1) OF THE SECURITIES
        EXCHANGE ACT; AND RULE 15C1-7 THEREUNDER.
    8.  Current Status:                         Final
    9.  Appealed to:
    10. Resolution:                             Other
    11. Resolution Date/Explanation:            11/18/1968
        WAS RESOLVED IN STAGES, SEE 12C
    12. (A) Resolution Detail:
            Bar Sanction
        (B) Other Sanctions Ordered:
        (C) Sanction Detail:
            SEE 13 BELOW
    Summary:
        INITIALLY BARRED FROM ASSOCIATION WITH ANY BROKER DEALER, IN 1977
        PERMITTED TO BE GENERAL SECURITIES REPRESENTATIVE, IN 1994
        APPROVED TO BE GENERAL SECURITIES PRINCIPAL, AND IN 1997
        S.E.C. VACATED BAR ORDER

    Rev. Form U-6 (08/1999)
    Form:            U-6         Received:           11/30/2001
    Source: United States Securities and Exchange Commission
    Questions:

---

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 15
Individual: 17841 - BENDALL JR, JOHN WILSON
Reportable Events:


    Regulatory Action DRP Content

    1.  Regulatory Action Initiated By:        SECURITIES AND EXCHANGE
                                                COMMISSION
    2.  Principal Sanction:
        Other Sanctions:
    3.  Date initiated:                         11/18/1968
    4.  Docket/Case Number:
    5.  Employing Firm:                         PICKARD & COMPANY, INC.
    6.  Principal Product Type:                 Other
        Other Product Types:
    7.  Allegations:
        NA
    8.  Current Status:                         Final
    9.  Appealed to:
    10. Resolution:                             Vacated
    11. Resolution Date/Explanation:            02/24/1997
    12. (A) Resolution Detail:
        (B) Other Sanctions Ordered:
        (C) Sanction Detail:
    Summary:
        11-18-68 ND 68-225 REL-34-8448: BARRED, BY CONSENT, AFTER
        ADMITTING TO CERTAIN ALLEGATIONS AGAINST HIM UNDER THE EXCHANGE
        ACT AND ADVISORS ACT; 8-3-77 S.E.C: AUTHORIZED REGISTRATION PER
        LETTER OF 8-3-77 AS A GENERAL SECURITIES REPRESENTATIVE SUBJECT
        TO THE SPECIFICATIONS IN THE LETTER.    04-28-97, 63 SEC DOCKET
        2790, DATED MARCH 25, 1997, DISCLOSES:SEC BAR WAS DATED NOVEMBER
        14, 1968. THE ORDER TO VACATE IS DATED FEBRUARY 24, 1997.
        (34-38326)

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 16
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:
```

```
Occurrence:              280911    Disclosure Type:    Regulatory Action
NASD Public Disclosable:    N      Reportable:         N
Material Difference in Disclosure:    N

    Rev. Form U-4 (03/2002)
    Form:              U-4         Received:           04/15/2003
    Source: Organization CRD# 20509
    Questions:         14E(3)


    Regulatory Action DRP Content

    1.  Regulatory Action Initiated By:       NASD REGULATOR
    2.  Principal Sanction:
        Other Sanctions:
    3.  Date initiated:               09/21/1993
    4.  Docket/Case Number:           C059300N1
    5.  Employing Firm:               HERMITAGE CAPITAL CORPORATION
    6.  Principal Product Type:       Other
        Other Product Types:
    7.  Allegations:
        ALLEGATIONS WERE AGAINST THE FIRM ONLY.
    8.  Current Status:               Final
    9.  Appealed to:
    10. Resolution:                   Settled
    11. Resolution Date/Explanation:  09/21/1993
    12. (A) Resolution Detail:
            Monetary Sanction (Amount: $100000), Censure Sanction
        (B) Other Sanctions Ordered:
        (C) Sanction Detail:
            SANCTION AGAINST THE FIRM ONLY.
    Summary:
        NOT PROVIDED

Occurrence:              329403    Disclosure Type:    Regulatory Action
NASD Public Disclosable:    N      Reportable:         N
Material Difference in Disclosure:    N

    Rev. Form U-6 (08/1999)
    Form:              U-6         Received:           02/24/1997
    Source: National Association of Securities Dealers, Inc.
    Questions:
```

```
CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.
```

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                  Page 17
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:
```

Regulatory Action DRP Content

1.  **Regulatory Action Initiated By:**        NATIONAL ASSOCIATION OF
                                               SECURITIES DEALERS, INC.
2.  **Principal Sanction:**
    **Other Sanctions:**
3.  **Date initiated:**                10/28/1987
4.  **Docket/Case Number:**            MCHS
5.  **Employing Firm:**                HERMITAGE CAPITAL CORPORATION
6.  **Principal Product Type:**
    **Other Product Types:**
7.  **Allegations:**
8.  **Current Status:**                Final
9.  **Appealed to:**
10. **Resolution:**                    Decision
11. **Resolution Date/Explanation:**   10/28/1987
12. **(A) Resolution Detail:**
    **(B) Other Sanctions Ordered:**
    **(C) Sanction Detail:**
**Summary:**
    10/28/87, RECEIVED NOTIFICATION FROM THE OFFICE OF GENERAL
    COUNSEL THAT THE APPLICATION FOR REGISTRATION OF JOHN WILSON
    BENDALL, JR. AS A GENERAL SECURITIES REPRESENTATIVE WITH
    HERMITAGE CAPITAL CORPORATION HAS BEEN APPROVED PURSUANT TO  RULE
    19h-1 SHORT FORM NOTIFICATION TO THE COMMISSION. BENDALL  WILL BE
    EMPLOYED IN THE FIRM'S BRANCH OFFICE LOCATED AT 405  PARK AVENUE,
    NEW YORK, NEW YORK. BENDALL WILL BE SUPERVISED BY  B.W.
    LANDSTREET, III, WILLIAM NELSON, II AND ROLLO INGRAM, ALL
    REGISTERED PRINCIPALS.
    ********************************************************
     6/7/94** RECEIVED AMENDED MC-400 (JDS #8008 15294) FROM
    HERMITAGE CAPITAL CORPORATION INDICATING A CHANGE IN
    SUPERVISION, VIA AMENDED ITEM 10.a, REFLECTING THAT DIRECT
    SUPERVISION WILL NOW BE PROVIDED BY WILL A. CANNON, III,
    PRESIDENT OF THE FIRM. THIS AMENDMENT HAS BEEN REVIEWED AND
    APPROVED BY THE NASD OFFICE OF GENERAL COUNSEL.

**Occurrence:**        364085     **Disclosure Type:**    Regulatory Action
**NASD Public Disclosable:**    N     **Reportable:**        N
**Material Difference in Disclosure:**        N

    Rev. Form U-6 (08/1999)
    **Form:**              U-6     **Received:**          02/24/1997
    **Source:** National Association of Securities Dealers, Inc.
    **Questions:**

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                Page 18
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:
```

**Regulatory Action DRP Content**

1.  **Regulatory Action Initiated By:**   NATIONAL ASSOCIATION OF
                                          SECURITIES DEALERS, INC.
2.  **Principal Sanction:**
    **Other Sanctions:**
3.  **Date initiated:**                   12/08/1994
4.  **Docket/Case Number:**               MCC
5.  **Employing Firm:**                   HERMITAGE CAPITAL CORPORATION
6.  **Principal Product Type:**
    **Other Product Types:**
7.  **Allegations:**
8.  **Current Status:**                   Final
9.  **Appealed to:**
10. **Resolution:**                       Decision
11. **Resolution Date/Explanation:**      12/08/1994
12. **(A) Resolution Detail:**
    **(B) Other Sanctions Ordered:**
    **(C) Sanction Detail:**
**Summary:**

******** 12/8/94** RECEIVED NOTIFICATION FROM NASD OFFICE OF
GENERAL COUNSEL THAT THE APPLICATION FOR REGISTRATION OF JOHN  W.
BENDALL, JR. WAS APPROVED AS A GENERAL SECURITIES PRINCIPAL  AND
CONTROL PERSON WITH HERMITAGE CAPITAL CORP. PURSUANT TO  RULE
19H-1 NOTIFICATION TO THE COMMISSION EFFECTIVE TODAY. MR.
BENDALL IS SUBJECT TO A STATUTORY DISQUALIFICATION AS A RESULT
OF SEC ADMINISTRATIVE PROCEEDINGS, DATED NOVEMBER 14, 1968, IN
WHICH HE WAS BARRED FROM ASSOCIATION WITH ANY BROKER OR DEALER.
THE FIRM PROPOSES TO EMPLOY MR. BENDALL AS A GENERAL SECURITIES
PRINCIPAL AND CONTROL PERSON TO WORK FROM THE FIRM'S HOME  OFFICE
WHICH IS LOCATED AT 405 PARK AVENUE, SUITE 1102, NEW  YORK, NY
10022. MR. BENDALL WILL BE SUPERVISED BY WILLIAM  CANNON,
PRESIDENT AND GENERAL SECURITIES PRINCIPAL. IT IS  PROPOSED THAT
MR. BENDALL WOULD BECOME THE PRESIDENT OF THE  FIRM AND OWN 66%
OF THE STOCK. HE WOULD ALSO ACT AS A GENERAL  SECURITIES
PRINCIPAL, AND WOULD HAVE SUPERVISORY RESPONSIBILITY  FOR THE
FIRM. IN THE WRITTEN SUBMISSIONS, THE FIRM OUTLINED THE
FOLLOWING SUPERVISORY PLAN: 1) MR. CANNON AND MR. BENDALL SIT  IN
CLOSE PROXIMITY. 2) MR. CANNON WILL CONTINUE TI REVIEW ALL
TICKETS, NEW ACCOUNT FORMS AND CORRESPONDENCE. 3) THE FIRM  WOULD
OBTAIN THE SERVICES OF A PART-TIME COMPLIANCE PERSON TO  REVIEW
REPORTS ON A MONTHLY AND YEARLY BASIS. AFTER A CAREFUL  REVIEW OF
THE ENTIRE RECORD IN THIS MATTER, THE BOARD CONCLUDED  THAT THE

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 19
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:

        APPLICATION OF JOHN W. BENDALL, JR. TO REMAIN  ASSOCIATED WITH
        HERMITAGE CAPITAL CORPORATION AS A GENERAL  SECURITIES PRINCIPAL
        AND CONTROL PERSON BE APPROVED WITH  LIMITATIONS. THE BOARD IS
        PERMITTING MR. BENDALL TO ACQUIRE 49%  OF THE FIRM'S STOCK AT
        THIS TIME, AND TO ACT AS A SUPERVISING  PRINCIPAL. HOWEVER, HIS
        ACTIVITIES IN TURN SHALL BE SUPERVISED  BY MR. CANNON AND AN
        INDEPENDENT COMPLIANCE CONSULTANT. AFTER  TWO YEARS, MR. BENDALL
        MAY APPLY TO BECOME PRESIDENT AND  MAJORITY OWNER OF THE FIRM.
        *****

Occurrence:            364150      Disclosure Type:       Regulatory Action
NASD Public Disclosable:     N     Reportable:            N
Material Difference in Disclosure:      N

    Rev. Form U-6 (08/1999)
    Form:            U-6         Received:         02/24/1997
    Source: National Association of Securities Dealers, Inc.
    Questions:


    Regulatory Action DRP Content

    1.  Regulatory Action Initiated By:        NATIONAL ASSOCIATION OF
                                               SECURITIES DEALERS, INC.
    2.  Principal Sanction:
         Other Sanctions:
    3.  Date initiated:                        04/06/1983
    4.  Docket/Case Number:                    MCC
    5.  Employing Firm:                        ROONEY PACE INC.
    6.  Principal Product Type:
         Other Product Types:
    7.  Allegations:
    8.  Current Status:                        Final
    9.  Appealed to:
    10. Resolution:                            Decision
    11. Resolution Date/Explanation:           04/06/1983
    12. (A) Resolution Detail:
        (B) Other Sanctions Ordered:
        (C) Sanction Detail:
    Summary:
        4/6/83, BENDALL APPROVED WITH ROONEY PACE INC. AS A GENERAL
        SECURITIES REPRESENTATIVE IN CONFORMANCE WITH THE ASSOCIATION'S
        NOTIFICATION DATED 3/29/83 FROM NYSE ******** A CONDITIONAL
        APPROVAL ONLY. **********

Occurrence:            364197      Disclosure Type:       Regulatory Action

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 20
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:


NASD Public Disclosable:     N        Reportable:          N
Material Difference in Disclosure:       N


    Rev. Form U-6 (08/1999)
    Form:              U-6       Received:         02/24/1997
    Source: United States Securities and Exchange Commission
    Questions:


    Regulatory Action DRP Content

    1.  Regulatory Action Initiated By:        SECURITIES AND EXCHANGE
                                               COMMISSION
    2.  Principal Sanction:
        Other Sanctions:
    3.  Date initiated:                    02/24/1997
    4.  Docket/Case Number:                MCC
    5.  Employing Firm:                    BATEMAN EICHLER, HILL RICHARDS
    6.  Principal Product Type:
        Other Product Types:
    7.  Allegations:
    8.  Current Status:                    Final
    9.  Appealed to:
    10. Resolution:                        Decision
    11. Resolution Date/Explanation:       12/19/1979
    12. (A) Resolution Detail:
        (B) Other Sanctions Ordered:
        (C) Sanction Detail:
    Summary:
        DIST. 12 000076 APPROVED BY THE COMMISSION AS A CONTROLLED
        PERSON WITH BATEMAN EICHLER, HILL RICHARDS UNDER CONDITIONS
        OUTLINED IN SEC'S LETTER OF DECEMBER 19, 1979.

Occurrence:            364205     Disclosure Type:    Regulatory Action
NASD Public Disclosable:    N     Reportable:          N
Material Difference in Disclosure:       N


    Rev. Form U-6 (08/1999)
    Form:              U-6       Received:         02/24/1997
    Source: New York Stock Exchange
    Questions:


CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 21
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:
```

Regulatory Action DRP Content

```
1.  Regulatory Action Initiated By:      NEW YORK STOCK EXCHANGE
2.  Principal Sanction:
    Other Sanctions:
3.  Date initiated:                      02/24/1997
4.  Docket/Case Number:                  MCC
5.  Employing Firm:                      HERMITAGE CAPITAL CORPORATION
6.  Principal Product Type:
    Other Product Types:
7.  Allegations:
8.  Current Status:                      Final
9.  Appealed to:
10. Resolution:                          Decision
11. Resolution Date/Explanation:         02/24/1997
12. (A) Resolution Detail:
    (B) Other Sanctions Ordered:
    (C) Sanction Detail:
    Summary:
       DIST. 12 006381 APPROVED UNDER CONDITIONS OUTLINED IN SEC'S
       LETTER OF MARCH 23, 1978.
```

```
Occurrence:                364226    Disclosure Type:      Regulatory Action
NASD Public Disclosable:   N         Reportable:           N
Material Difference in Disclosure:    N
```

```
   Rev. Form U-6 (08/1999)
   Form:                U-6         Received:             02/24/1997
   Source: National Association of Securities Dealers, Inc.
   Questions:
```

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 22
Individual: 17841 - BENDALL JR, JOHN WILSON
Regulator Archive and Z Records:


    Regulatory Action DRP Content

    1.  Regulatory Action Initiated By:      NATIONAL ASSOCIATION OF
                                             SECURITIES DEALERS, INC.

    2.  Principal Sanction:
        Other Sanctions:
    3.  Date initiated:                      02/24/1997
    4.  Docket/Case Number:                  MCC
    5.  Employing Firm:                      HERMITAGE CAPITAL CORPORATION
    6.  Principal Product Type:
        Other Product Types:
    7.  Allegations:
    8.  Current Status:                      Final
    9.  Appealed to:
    10. Resolution:                          Decision
    11. Resolution Date/Explanation:         02/24/1997
    12. (A) Resolution Detail:
        (B) Other Sanctions Ordered:
        (C) Sanction Detail:
    Summary:
        DIST. 12 006218 19H-1 FILING MADE BY THE ASSOCIATION FOR
        CONTINUED REGISTRATION WITH EXCELSIOR SECURITIES CORP. AS A
        GENERAL SECURITIES REPRESENTATIVE. SEC DID NOT INTERRUPT
        REGISTRATION.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 23
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:
```

Occurrence:   2

    Incident Type:       Y4
    Question Numbers:    22F2, 22F4

    Filing:        U4 - 08/20/1998
    Updated By:     JUBB
    Details:
       JDS   977-22698; Form U4; Full; B/D 20509
       1. Questions: 22F2 22F4
       2. Update: Not Provided
       3. Initiated by: NASD REGULATOR
       4. Type of Event/Proceeding: ADMINISTRATIVE
       5. Date Initiated: 9/21/93
       6. Docket/Case#: C059300N1
       7. Allegations: FAILED AND NEGLECTED TO PREPARE AND MAINTAIN BROKER
    RECORDS, FAILED TO ENSURE THAT THE ESCROW AGENT WAS PROPERLY INVESTING
    THE ESCROWED FUNDS, FAILED  TO PREPARE DISTRIBUTE AND MAINTAIN
    CUSTOMER CONFIRMATION FOR ACT PURCHASES THAT CONTAINED REQUIRED
    DISCLOSURE; FAILED TO MAKE BONA FIDEPUBLIC DISTRIBUTION AT THE PUBLIC
    OFFERING PRICE.
       8a. Current Status: SETTLED
       8b. Status Date: 9/21/93
       8c. Results: FINED $100,000; A CENSURE AND SIX MONTH SUSPENSION OF HC
    CORP FROM PARTICIPATION IN ANY UNDERWRITING ACTIVITY WITH THE
    EXCEPTION OF SELLING GROUP PARTICIPATION THAT DOES NOT INVOLVE PRIMARY
    RECORD KEEPING. OBTAINED NEW MANAGEMENT.
       9. Summary: Not Provided
       10. Attachments: Not Applicable

    Filing:        U4 - 08/20/1998
    Updated By:     MANDELBA
    Details:
       1. Questions: 22F2 22F4
       2. Update: Not Provided
       3. Initiated by: NASD REGULATOR
       4. Type of Event/Proceeding: ADMINISTRATIVE
       5. Date Initiated: 9/21/93
       6. Docket/Case#: C059300N1
       7. Allegations: FAILED AND NEGLECTED TO PREPARE AND MAINTAIN BROKER
    RECORDS, FAILED TO ENSURE THAT THE ESCROW AGENT WAS PROPERLY INVESTING
    THE ESCROWED FUNDS, FAILED  TO PREPARE DISTRIBUTE AND MAINTAIN
    CUSTOMER CONFIRMATION FOR ACT PURCHASES THAT CONTAINED REQUIRED

---

**CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.**

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003 _____ Page 24 __
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:

    DISCLOSURE; FAILED TO MAKE BONA FIDEPUBLIC DISTRIBUTION AT THE PUBLIC
OFFERING PRICE.
    8a. Current Status: SETTLED
    8b. Status Date: 9/21/93
    8c. Results: FINED $100,000; A CENSURE AND SIX MONTH SUSPENSION OF HC
CORP FROM PARTICIPATION IN ANY UNDERWRITING ACTIVITY WITH THE
EXCEPTION OF SELLING GROUP PARTICIPATION THAT DOES NOT INVOLVE PRIMARY
RECORD KEEPING. OBTAINED NEW MANAGEMENT.
    9. Summary: Not Provided
    10. Attachments: Not Applicable


Occurrence:   1


  **Incident Type:**        X
  **Question Numbers:**


  **Filing:**        SE - 11/14/1968
  **Updated By:**     GRAHAMM
  **Details:**
    11-18-68 ND 68-225 REL-34-8448: BARRED, BY CONSENT, AFTER ADMITTING TO
CERTAIN ALLEGATIONS AGAINST HIM UNDER THE EXCHANGE ACT AND ADVISORS
ACT; 8-3-77 S.E.C: AUTHORIZED REGISTRATION PER LETTER OF 8-3-77 AS A
GENERAL SECURITIES REPRESENTATIVE SUBJECT TO THE SPECIFICATIONS IN THE
LETTER.  SRR NOTE: SEE X4 RECORD AS BAR WAS VACATED 2/24/9
    7.  04-28-97, 63 SEC DOCKET 2790, DATED MARCH 25, 1997, DISCLOSES: SEC
BAR WAS DATED NOVEMBER 14, 196
    8. THE ORDER TO VACATE IS DATED FEBRUARY 24, 1997. (34-38326)


  **Incident Type:**        Y4
  **Question Numbers:**     22D2, 22D4


  **Filing:**        U4 - 12/12/1986
  **Updated By:**     JUBB
  **Details:**
    JDS   977-22698; Form U4; Full; B/D 20509
    1. Questions: 22D2 22D4
    2. Update: No
    3. Initiated by: SEC
    4. Type of Event/Proceeding: CIVIL
    5. Date Initiated: 11/18/1968
    6. Docket/Case#: 3-1660
    7. Allegations: AIDED AND ABETTED VIOLATIONS OF SECTIONS 7(a) AND
15(a)(1) OF THE SEC ACT; AND RULE 15C1-7 THERE UNDER. HE EXTENDED
CREDIT TO CUSTOMERS IN CONTRAVENTION OF REG T; AND EFFECTED
TRANSACTIONS WHICH WERE EXCESSIVE IN SIZE AND FREQUENCY. HE WAS BARRED

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 25
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:

    FROM ASSOCIATION WITH ANYBROKER/DEALER FIRM. ON 9/20/1994 HE WAS
    APPROVED AS GP AND LIMITED CONTROL PERSON BY THE NASD.
    8a. Current Status: VACATED
    8b. Status Date: 2/14/1997
    8c. Results: AS OF 2/24/1997, ORDER GRANTED MOTION TO VACATE
    COMMISSION ORDER
    9. Summary: Not Provided
    10. Attachments: Not Applicable

**Filing:**        U4 - 12/12/1986
**Updated By:**    P2WINTER
**Details:**
    JDS  5274-07297; Form U4; Amend 1,3; B/D 20509
    1. Questions: 22D2 22D4
    2. Update: Yes
    3. Initiated by: SEC
    4. Type of Event/Proceeding: ADMINISTRATIVE
    5. Date Initiated: 11/18/68
    6. Docket/Case#: 3-1660
    7. Allegations: SOLD UNREGISTERED SECURITIES; OBTAINED MONEY AND
    PROPERTY BY MEANS OF UNTRUE STATEMENTS OR EMISSIONS OF UNTRUE FACTS;
    ENGAGED IN TRANSACTIONS WHICH OPERATED A FRAUD AND DECEIT UPON
    PURCHASE OF SECURITIES; AND VARIOUS VIOLATIONS
    8a. Current Status: VACATED
    8b. Status Date: 2/24/97
    8c. Results: AS OF 2/24/97 ORDER GRANTED MOTION TO VACATE COMMISSION
    ORDER. SEE ATTATCHED COPY OF ORDER.
    9. Summary: Not Provided
    10. Attachments: Not Applicable

**Filing:**        U4 - 12/12/1986
**Updated By:**    BLAKEJ
**Details:**
    OTHER RELATED ITEM 22D4: U4 DISCLOSES THAT, FROM JANUARY 1966 TO
    SEPTEMBER 1966 AND FROM MARCH 1967 TO FEBRUARY 1968, BENDALL WAS A
    REGISTERED REPRESENTATIVE EMPLOYED AS A SALESMAN BY PICKARD & COMPANY,
    INCORPORATED. IN 1968, THE SECURITIES AND EXCHANGE COMMISSION
    INSTITUTED ADMINISTRATIVE PROCEEDINGS AGAINST PICKARD & COMPANY,
    INCORPORATED, ITS PRINCIPALS, OFFICERS, MANAGERS AND SALESMEN. THE
    PROCEEDINGS INVOLVED A NUMBER OF CHARGES AGAINST PICKARD AND THE
    VARIOUS PERSONS ASSOCIATED WITH IT. THE CHARGES AGAINST BENDALL WERE
    THAT HE MISHANDLED ACCOUNTS BY CAUSING EXCESSIVE TRADING AND
    IMPROPERLY EXTENDING CREDIT. TO THE BEST OF HIS KNOWLEDGE, THE CHARGES
    ALL RELATE TO THE MANNER IN WHICH HE CONDUCTED HIMSELF WITH RESPECT TO
    A SINGLE CUSTOMER'SACCOUNT. IN THE OVERALL PROCEEDINGS THE COMMISSION

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 26
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:

    STAFF CHARGED THAT FROM 1965 TO 1968, PICKARD & COMPANY AND CERTAIN OF
ITS PRINCIPALS, OFFICERS, MANAGERS AND SALESMEN 1) SOLD UNREGISTERED
SECURITIES; 2) OBTAINED MONEY AND PROPERTY BY MEANS OF UNTRUE
STATEMENTS OR OMISSIONS OF MATERIAL FACTS; 3) ENGAGED IN TRANSACTIONS
WHICH OPERATED AS A FRAUD AND DECEIT UPON PURCHASES OF SECURITIES; 4)
FAILED TO ACCURATELY MAKE AND KEEP CURRENT ACCOUNTS, CORRESPONDENCE,
BOOKS AND OTHER RECORDS RELATING TO PICKARD'S BUSINESS; 5) FAILED TO
TIMELY FILE A REPORT OF FINANCIAL CONDITION AND OTHER DISCLOSURE
DOCUMENTS; 6) COMMINGLED THE SECURITIES CARRIED FOR THE ACCOUNTS OF
CUSTOMERS WITH SECURITIES CARRIED FOR THE ACCOUNTS OF OTHER CUSTOMERS,
ANDHYPOTHECATED AND SUBJECTED CUSTOMERS' SECURITIES TO LIENS FOR A SUM
IN EXCESS OF THE CUSTOMERS' INDEBTEDNESS; AND 7) EFFECTED TRANSACTIONS
IN THE STOCK OF A COMPANY CREATING ACTUAL AND APPARENT ACTIVE TRADING
IN SUCH SECURITIES FOR THE PURPOSE OF INDUCING OTHERS TO BUY AND SELL
SUCH SECURITIES. THE CHARGES AGAINST BENDALL WERE THAT HE: 1) EXTENDED
CREDIT TO CUSTOMERS IN CONTRAVENTION OF REGULATION T; 2) EFFECTED
TRANSACTIONS FOR DISCRETIONARY ACCOUNTS WHICH WERE EXCESSIVE IN SIZE
AND FREQUENCY; 3) ACCEPTED ORDERS FOR THE PURCHASE AND SALE OF
SECURITIES WHEN PICKARD & COMPANY LACKED THE FACILITIES TO PROMPTLY
CONSUMMATE THE TRANSACTIONS; AND 4) MADE FALSE AND MISLEADING
STATEMENTS OF MATERIAL FACTS CONCERNING PICKARD &COMPANY'S ABILITY TO
SELECT PROFITABLE SECURITIES AND THE FINANCIAL CONDITION OF PICKARD &
CO. ON NOVEMBER 14, 1968, BENDALL CONSENTED TO THE ENTRY OF AN ORDER
FINDING THAT FROM JANUARY 1, 1966, TO MARCH 1, 1968, HE AIDED AND
ABETTED VIOLATIONS OF SECTION 7(c) and 15(c)(1) OF THE EXCHANGE ACT
AND RULE 15C1-7 BY: (a) CAUSING PICKARD TO EXTEND AND MAINTAIN CREDIT
FOR CERTAIN CUSTOMERS IN CONTRAVENTION OF REGULATION T; AND (b) WITH
RESPECT TO CERTAIN DISCRETIONARY ACCOUNTS, EFFECTING TRANSACTIONS

Filing:          U4 - 12/12/1986
Updated By:      MANDELBA
Details:
   1. Questions: 22D2 22D4
   2. Update: No
   3. Initiated by: SEC
   4. Type of Event/Proceeding: CIVIL
   5. Date Initiated: 11/18/1968
   6. Docket/Case#: 3-1660
   7. Allegations: AIDED AND ABETTED VIOLATIONS OF SECTIONS 7(a) AND
15(a)(1) OF THE SEC ACT; AND RULE 15C1-7 THERE UNDER. HE EXTENDED
CREDIT TO CUSTOMERS IN CONTRAVENTION OF REG T; AND EFFECTED
TRANSACTIONS WHICH WERE EXCESSIVE IN SIZE AND FREQUENCY. HE WAS BARRED
FROM ASSOCIATION WITH ANYBROKER/DEALER FIRM. ON 9/20/1994 HE WAS
APPROVED AS GP AND LIMITED CONTROL PERSON BY THE NASD.
   8a. Current Status: VACATED

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

```
CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                              Page 27
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:
```

```
        8b. Status Date: 2/14/1997
        8c. Results: AS OF 2/24/1997, ORDER GRANTED MOTION TO VACATE
        COMMISSION ORDER
        9. Summary: Not Provided
        10. Attachments: Not Applicable

    Incident Type:          X4
    Question Numbers:

    Filing:         BD - 03/18/1997
    Updated By:     P2SAULSB
    Details:
        3/18/97< REQ'D (5980-07797) CORRESPONDENCE REC'D FROM HERMITAGE
        CAPITAL CORPORATION DISCLOSES A COPY OF THE ORDER GRANTING MOTION TO
        VACATE COMMISSION ORDER FROM THE UNITED STATES OF AMERICA BEFORE THE
        SECURITIES AND EXCHANGE COMMISSION FILE NO. 3-1660 DATED 2/24/97; IT
        IS ORDERED THAT THE APPLICATION OF JOHN W. BENDALL, JR. TO VACATE THE
        ORDER ENTERED AGAINST HIM ON NOVEMBER 14, 1968, BE, AND IT HEREBY IS,
        GRANTED; AND THAT THE ORDER BE AND IT HEREBY IS, VACATED BY THE
        COMMISSION.

Incident:          8                    Incident Sequence:   1
Last Filing Source:        NA           Action Date:       02/24/1997
Details:
    ******** 12/8/94** RECEIVED NOTIFICATION FROM NASD OFFICE OF GENERAL
    COUNSEL THAT THE APPLICATION FOR REGISTRATION OF JOHN W. BENDALL, JR.
    WAS APPROVED AS A GENERAL SECURITIES PRINCIPAL AND CONTROL PERSON WITH
    HERMITAGE CAPITAL CORP. PURSUANT TO RULE 19H-1 NOTIFICATION TO THE
    COMMISSION EFFECTIVE TODAY. MR. BENDALL IS SUBJECT TO A STATUTORY
    DISQUALIFICATION AS A RESULT OF SEC ADMINISTRATIVE PROCEEDINGS, DATED
    NOVEMBER 14, 1968, IN WHICH HE WAS BARRED FROM ASSOCIATION WITH ANY
    BROKER OR DEALER. THE FIRM PROPOSES TO EMPLOY MR. BENDALL AS A GENERAL
    SECURITIES PRINCIPAL AND CONTROL PERSON TO WORK FROM THE FIRM'S HOME
    OFFICE WHICH IS LOCATED AT 405 PARK AVENUE, SUITE 1102, NEW YORK, NY
    10022. MR. BENDALL WILL BE SUPERVISED BY WILLIAM

Incident:          8                    Incident Sequence:   2
Last Filing Source:        NA           Action Date:       02/24/1997
Details:
    CANNON, PRESIDENT AND GENERAL SECURITIES PRINCIPAL. IT IS PROPOSED
    THAT MR. BENDALL WOULD BECOME THE PRESIDENT OF THE FIRM AND OWN 66% OF
    THE STOCK. HE WOULD ALSO ACT AS A GENERAL SECURITIES PRINCIPAL, AND
    WOULD HAVE SUPERVISORY RESPONSIBILITY FOR THE FIRM. IN THE WRITTEN
    SUBMISSIONS, THE FIRM OUTLINED THE FOLLOWING SUPERVISORY PLAN: 1) MR.
```

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 28
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:

    CANNON AND MR. BENDALL SIT IN CLOSE PROXIMITY. 2) MR. CANNON WILL
CONTINUE TI REVIEW ALL TICKETS, NEW ACCOUNT FORMS AND CORRESPONDENCE.
3) THE FIRM WOULD OBTAIN THE SERVICES OF A PART-TIME COMPLIANCE PERSON
TO REVIEW REPORTS ON A MONTHLY AND YEARLY BASIS. AFTER A CAREFUL
REVIEW OF THE ENTIRE RECORD IN THIS MATTER, THE BOARD CONCLUDED THAT
THE APPLICATION OF JOHN W. BENDALL, JR. TO REMAIN

Incident:        8                    Incident Sequence:     3
Last Filing Source:      NA           Action Date:      02/24/1997
Details:
    ASSOCIATED WITH HERMITAGE CAPITAL CORPORATION AS A GENERAL SECURITIES
PRINCIPAL AND CONTROL PERSON BE APPROVED WITH LIMITATIONS. THE BOARD
IS PERMITTING MR. BENDALL TO ACQUIRE 49% OF THE FIRM'S STOCK AT THIS
TIME, AND TO ACT AS A SUPERVISING PRINCIPAL. HOWEVER, HIS ACTIVITIES
IN TURN SHALL BE SUPERVISED BY MR. CANNON AND AN INDEPENDENT
COMPLIANCE CONSULTANT. AFTER TWO YEARS, MR. BENDALL MAY APPLY TO
BECOME PRESIDENT AND MAJORITY OWNER OF THE FIRM. *****

Incident:        7                    Incident Sequence:     1
Last Filing Source:      NA           Action Date:      02/24/1997
Details:
    10/28/87, RECEIVED NOTIFICATION FROM THE OFFICE OF GENERAL COUNSEL
THAT THE APPLICATION FOR REGISTRATION OF JOHN WILSON BENDALL, JR. AS A
GENERAL SECURITIES REPRESENTATIVE WITH HERMITAGE CAPITAL CORPORATION
HAS BEEN APPROVED PURSUANT TO RULE 19h-1 SHORT FORM NOTIFICATION TO
THE COMMISSION. BENDALL WILL BE EMPLOYED IN THE FIRM'S BRANCH OFFICE
LOCATED AT 405 PARK AVENUE, NEW YORK, NEW YORK. BENDALL WILL BE
SUPERVISED BY B.W. LANDSTREET, III, WILLIAM NELSON, II AND ROLLO
INGRAM, ALL REGISTERED PRINCIPALS.
*********************************************************
6/7/94** RECEIVED AMENDED MC-400 (JDS #8008 15294) FROM HERMITAGE
CAPITAL CORPORATION INDICATING A CHANGE IN

Incident:        7                    Incident Sequence:     2
Last Filing Source:      NA           Action Date:      02/24/1997
Details:
    SUPERVISION, VIA AMENDED ITEM 10.a, REFLECTING THAT DIRECT SUPERVISION
WILL NOW BE PROVIDED BY WILL A. CANNON, III, PRESIDENT OF THE FIRM.
THIS AMENDMENT HAS BEEN REVIEWED AND APPROVED BY THE NASD OFFICE OF
GENERAL COUNSEL.

Incident:        5                    Incident Sequence:     1
Last Filing Source:      NA           Action Date:      02/24/1997
Details:
    4/6/83, BENDALL APPROVED WITH ROONEY PACE INC. AS A GENERAL SECURITIES

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System - Current As Of 05/12/2003 11:49 PM
Snapshot - NASD Individual Database Extract
CRD® or IARD(SM) System Report provided to: NASD
Request Submitted: 05/13/2003                                    Page 29
Individual: 17841 - BENDALL JR, JOHN WILSON
Legacy Disclosure:

    REPRESENTATIVE IN CONFORMANCE WITH THE ASSOCIATION'S NOTIFICATION
    DATED 3/29/83 FROM NYSE ******** A CONDITIONAL APPROVAL ONLY.
    **********

Incident:          4                    Incident Sequence:      1
Last Filing Source:       SE            Action Date:        02/24/1997
Details:
    DIST. 12 000076 APPROVED BY THE COMMISSION AS A CONTROLLED PERSON WITH
    BATEMAN EICHLER, HILL RICHARDS UNDER CONDITIONS OUTLINED IN SEC'S
    LETTER OF DECEMBER 19, 1979.

Incident:          3                    Incident Sequence:      1
Last Filing Source:       NX            Action Date:        02/24/1997
Details:
    DIST. 12 006381 APPROVED UNDER CONDITIONS OUTLINED IN SEC'S LETTER OF
    MARCH 23, 1978.

Incident:          2                    Incident Sequence:      1
Last Filing Source:       NA            Action Date:        02/24/1997
Details:
    DIST. 12 006218 19H-1 FILING MADE BY THE ASSOCIATION FOR CONTINUED
    REGISTRATION WITH EXCELSIOR SECURITIES CORP. AS A GENERAL SECURITIES
    REPRESENTATIVE. SEC DID NOT INTERRUPT REGISTRATION.

# EXHIBIT 44

# AUG CORP.

# TERM SHEET

## AUG CORP. ("AUGC")
## A DELAWARE CORPORATION

## FOR INVESTMENT INTO BIOMETRIC MARKETING, INC.

## JULY 16, 2002

| Purchase Price: | $ 300,000 |
| --- | --- |
| AUG Shares to Lancer: | 200,000 |
| Price Per Share: | $ 1.50 |

ACCEPTED:                                    ACCEPTED:

LANCER OFFSHORE, INC.                         AUG CORP.

By:_____                   By:_____
   Michael Lauer, Investment Manager            Laurence S. Isaacson, as President

TERM SHEET 7-16-02.wpd

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0008



# THORNHILL
## GROUP, INC.

Member NASD•SIPC•NIBA

# FAX TRANSMISSION

| | | | |
|---|---|---|---|
| **To:** | Mike Lauer | **From:** | Laurence S. Isaacson |
| **Fax:** | (212) 521-8401 | **Date:** | January 30, 2003 |
| **Re:** | Biometrics Marketing | **# of Pages:** | 15 |

Original WILL [ ]    WILL NOT  [ X ] follow by mail.

**Comments:**

Michael:

Hope all is well with you. I am enclosing the following:

1.  Request for Biometrics Marketing's February 2003 requirements. **Would like to transfer funds ($100,000) that are available from XtraCard, since the Eskill transaction looks like it is not moving forward. In addition, we could also use $100,000 for Bob Steinberg's future needs.**

2.  A memo from Shashi on Titan for your review and ideas on how Titan and Biometrics Marketing can mutually work and prosper together.

3.  Biometrics Marketing's current Project Status Report.

4.  Wiring Instructions.

Please call me, otherwise, I will call you this afternoon.

Larry

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

*The information contained in this facsimile is confidential and may also contain privileged attorney/client information or work product. The information is intended only for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received the facsimile in error, please notify us by telephone (collect) and return the original message to us at the above address via the U.S. Postal Service. Thank you.*

1900 NW Corporate Blvd., Suite 305W • Boca Raton, Florida  33431
Phone (561) 241-9921  Fax (561) 241-7011
www.thornhillgroup.com

AUG-0093

# THORNHILL GROUP, INC.

MEMBER NASD * SIPC * NIBA
1900 Corporate Blvd., Suite 305 West
Boca Raton, Florida 33431
(561) 241-9921; FAX#: (561) 241-7011

## FAX TRANSMISSION

| | | | | |
|---|---|---|---|---|
| **To:** | Mike Lauer | **From:** | Laurence S. Isaacson |
| **Fax:** | (212) 521-8401 | **Date:** | December 31, 2002 |
| **Re:** | Biometrics Marketing | **# of Pages:** | 1 |

Original  WILL [ ]    WILL NOT  [ X ] follow by mail.

**Comments:**

*Mike:*

*Yesterday I sent you the cash flows for Biometrics Marketing.  How do you want to handle the January funding of $100,000?*
*The Oct-Dec fundings were handled without diverting funds from Lancer, but January needs your assistance.  The funding is required on January 2nd to maintain the operations.  Costs have been seriously slashed with layoffs, deferral of payments, and reduction in salaries for officers.*

*Larry*

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

The information contained in this facsimile is confidential and may also contain privileged attorney/client information or work product.  The information is intended only for the use of the individual or entity to whom it is addressed.  If you are not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any use, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received the facsimile in error, please notify us by telephone (collect) and return the original message to us at the above address via the U.S. Postal Service.  Thank you.

AUG-0078

# AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into by and among AUG CORP., a Delaware corporation ("AUG") and LANCER OFFSHORE, INC., a Netherlands Antilles company ("Lancer") and is effective as of April 14, 2002.

WHEREAS, Lancer wishes to purchase 2,200,000 shares of AUG Common Stock, par value $.001 per share (the "Shares") for $1,100,000, pursuant to the terms and conditions of this Agreement, and AUG desires to sell the Shares to Lancer for $1,100,000, pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants herein contained, as of the date above, it is agreed that Lancer shall purchase the Shares for $1,100,000, subject to the terms and conditions set forth herein:

1.   **Purchase of Shares.** AUG hereby agrees to transfer to Lancer the Shares, and AUG agrees to deliver to Lancer a certificate representing the Shares in consideration of $1,100,000, payable on the date of this Agreement.

2.   **Representations of AUG.** AUG hereby represents and warrants that:

(a)   AUG is validly organized, existing and in good standing under the laws of the State of Delaware.

(b)   The Shares to be sold are validly issued, fully paid and non-assessable.

3.   **Representations of Lancer.** Lancer hereby makes the following representations and warranties to AUG:

(a)   Lancer is a company duly organized and existing under and by virtue of the laws of the Netherlands Antilles, and is in good standing under the laws thereof.

(b)   The execution and delivery of this Agreement by Lancer and the performance by Lancer of its covenants and undertakings hereunder have been duly authorized by all requisite corporate action, and Lancer has the corporate power and authority to enter into this Agreement and to perform the covenants and undertakings to be performed by it hereunder.

4.   **Investment Purpose.** The Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), and may not be resold unless the Shares are registered under the Act or an exemption from such registration is available. Lancer represents and warrants that it is acquiring the Shares for its own account, for

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0027

investment, and not with a view to the sale or distribution of the Shares. Each certificate representing the Shares will have a legend thereon incorporating language as follows:

"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws. The shares have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the shares under the Act unless in the opinion of counsel satisfactory to the Company, registration is not required under the Act or any applicable state securities laws."

5.  **Notices.**  Any notice or communication necessary or desirable hereunder shall be considered sufficient and delivery thereof shall be deemed complete if delivered in person or mailed by registered mail on the part of

AUG to:

> AUG Corp.
> 1900 Corporate Blvd.
> Boca Raton, Florida 33431

Lancer to:

> Lancer Offshore, Inc.
> Kaya Flambayon 9
> Curacao, Netherlands Antilles

6.  **Entire Agreement.**  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection herewith.

7.  **Severability.**  Lancer and AUG hereby agree and affirm that none of the above provisions is dependent on the validity of any other provision and invalidity as to any provision or any part thereof shall not affect any other provision.

8.  **Governing Law.**  This Agreement shall be governed by the laws of the State of Florida.  Venue shall be Palm Beach County, Florida.

9.  **Counterpart.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute but one agreement.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0028

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

AUG CORP.

By: _____
     Laurence S. Isaacson, President

LANCER OFFSHORE, INC.

By: _____
Name: _____
Its: _____

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0029

# AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into by and among AUG CORP., a Delaware corporation ("AUG") and LANCER OFFSHORE, INC., a Netherlands Antilles company ("Lancer") and is effective as of April 14, 2002.

WHEREAS, Lancer wishes to purchase 4,400,000 shares of AUG Common Stock, par value $.001 per share (the "Shares") for $1,100,000, pursuant to the terms and conditions of this Agreement and AUG desires to sell the Shares to Lancer for $1,100,000, pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants herein contained, as of the date above, it is agreed that Lancer shall purchase the Shares for $1,100,000, subject to the terms and conditions set forth herein:

1.      **Purchase of Shares**. AUG hereby agrees to transfer to Lancer the Shares, and AUG agrees to deliver to Lancer a certificate representing the Shares in consideration of $1,100,000, payable on the date of this Agreement.

2.      **Representations of AUG.** AUG hereby represents and warrants that:

(a)      AUG is validly organized, existing and in good standing under the laws of the State of Delaware.

(b)      The Shares to be sold are validly issued, fully paid and non-assessable.

3.      **Representations of Lancer.**   Lancer hereby makes the following representations and warranties to AUG:

(a)      Lancer is a company duly organized and existing under and by virtue of the laws of the Netherlands Antilles, and is in good standing under the laws thereof.

(b)      The execution and delivery of this Agreement by Lancer and the performance by Lancer of its covenants and undertakings hereunder have been duly authorized by all requisite corporate action, and Lancer has the corporate power and authority to enter into this Agreement and to perform the covenants and undertakings to be performed by it hereunder.

4.      **Investment Purpose.**   The Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), and may not be resold unless the Shares are registered under the Act or an exemption from such

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0024

registration is available. Lancer represents and warrants that it is acquiring the Shares for its own account, for investment, and not with a view to the sale or distribution of the Shares. Each certificate representing the Shares will have a legend thereon incorporating language as follows:

"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws. The shares have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the shares under the Act unless in the opinion of counsel satisfactory to the Company, registration is not required under the Act or any applicable state securities laws."

5.       **Notices.** Any notice or communication necessary or desirable hereunder shall be considered sufficient and delivery thereof shall be deemed complete if delivered in person or mailed by registered mail on the part of

AUG to:

     AUG Corp.
     1900 Corporate Blvd.
     Boca Raton, Florida  33431

Lancer to:

     Lancer Offshore, Inc.
     Kaya Flambayon 9
     Curacao, Netherlands Antilles

6.       **Entire Agreement.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection herewith.

7.       **Severability.** Lancer and AUG hereby agree and affirm that none of the above provisions is dependent on the validity of any other provision and invalidity as to any provision or any part thereof shall not affect any other provision.

8.       **Governing Law.** This Agreement shall be governed by the laws of the State of Florida. Venue shall be Palm Beach County, Florida.

9.       **Counterpart.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute but one agreement.

2

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

AUG CORP.

By: _____
Laurence S. Isaacson, President

LANCER OFFSHORE, INC.

By: _____
Name: _MICHAEL LAUER_
Its: _INVESTMENT MANAGER_

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0026

# AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into by and among AUG CORP., a Delaware corporation ("AUG") and LANCER OFFSHORE, INC., a Netherlands Antilles company ("Lancer") and is effective as of June 12, 2002.

WHEREAS, Lancer wishes to purchase 500,000 shares of AUG Common Stock, par value $.001 per share (the "Shares") for $750,000, pursuant to the terms and conditions of this Agreement, and AUG desires to sell the Shares to Lancer for $750,000, pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants herein contained, as of the date above, it is agreed that Lancer shall purchase the Shares for $750,000, subject to the terms and conditions set forth herein:

1.      **Purchase of Shares**. AUG hereby agrees to transfer to Lancer the Shares, and AUG agrees to deliver to Lancer a certificate representing the Shares in consideration of $750,000, payable on the date of this Agreement.

2.      **Representations of AUG.**  AUG hereby represents and warrants that:

(a)     AUG is validly organized, existing and in good standing under the laws of the State of Delaware.

(b)     The Shares to be sold are validly issued, fully paid and non-assessable.

3.      **Representations of Lancer.** Lancer hereby makes the following representations and warranties to AUG:

(a)     Lancer is a company duly organized and existing under and by virtue of the laws of the Netherlands Antilles, and is in good standing under the laws thereof.

(b)     The execution and delivery of this Agreement by Lancer and the performance by Lancer of its covenants and undertakings hereunder have been duly authorized by all requisite corporate action, and Lancer has the corporate power and authority to enter into this Agreement and to perform the covenants and undertakings to be performed by it hereunder.

4.      **Investment Purpose.** The Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), and may not be resold unless the Shares are registered under the Act or an exemption from such registration is available. Lancer

AUG/AGREEMENT-Lancer 6-12-02.wpd

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

AUG-0016

represents and warrants that it is acquiring the Shares for its own account, for investment, and not with a view to the sale or distribution of the Shares. Each certificate representing the Shares will have a legend thereon incorporating language as follows:

"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws. The shares have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the shares under the Act unless in the opinion of counsel satisfactory to the Company, registration is not required under the Act or any applicable state securities laws."

5.   **Notices.**  Any notice or communication necessary or desirable hereunder shall be considered sufficient and delivery thereof shall be deemed complete if delivered in person or mailed by registered mail on the part of

AUG to:

> AUG Corp.
> 1900 Corporate Blvd.
> Boca Raton, Florida  33431

Lancer to:

> Lancer Offshore, Inc.
> Kaya Flambayon 9
> Curacao, Netherlands Antilles

6.   **Entire Agreement.**  This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection herewith.

7.   **Severability.**  Lancer and AUG hereby agree and affirm that none of the above provisions is dependent on the validity of any other provision and invalidity as to any provision or any part thereof shall not affect any other provision.

8.   **Governing Law.**  This Agreement shall be governed by the laws of the State of Florida.  Venue shall be Palm Beach County, Florida.

9.   **Counterpart.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute but one agreement.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT          AUG-0017

IN WITNESS WHEREOF. the parties have executed this Agreement the day and year first above written.

AUG CORP.

By: _____
     Laurence S. Isaacson, President

LANCER OFFSHORE, INC.

By: _____
Name: _____
Its: _____

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0018

## AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into by and among AUG CORP., a Delaware corporation ("AUG") and LANCER OFFSHORE, INC., a Netherlands Antilles company ("Lancer") and is effective as of February 14, 2002.

WHEREAS, Lancer wishes to purchase 6,000,000 shares of AUG Common Stock, par value $.001 per share (the "Shares") for $300,000, pursuant to the terms and conditions of this Agreement and AUG desires to sell the Shares to Lancer for $300,000, pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the premises and of the mutual agreements and covenants herein contained, as of the date above, it is agreed that Lancer shall purchase the Shares for $300,000, subject to the terms and conditions set forth herein:

1.      **Purchase of Shares.** AUG hereby agrees to transfer to Lancer the Shares, and AUG agrees to deliver to Lancer a certificate representing the Shares in consideration of $300,000, payable on the date of this Agreement.

2.      **Representations of AUG.** AUG hereby represents and warrants that:

(a)     AUG is validly organized, existing and in good standing under the laws of the State of Delaware.

(b)     The Shares to be sold are validly issued, fully paid and non-assessable.

3.      **Representations of Lancer.** Lancer hereby makes the following representations and warranties to AUG:

(a)     Lancer is a company duly organized and existing under and by virtue of the laws of the Netherlands Antilles, and is in good standing under the laws thereof.

(b)     The execution and delivery of this Agreement by Lancer and the performance by Lancer of its covenants and undertakings hereunder have been duly authorized by all requisite corporate action, and Lancer has the corporate power and authority to enter into this Agreement and to perform the covenants and undertakings to be performed by it hereunder.

4.      **Investment Purpose.** The Shares have not been registered under the Securities Act of 1933, as amended (the "Act"), and may not be resold unless the Shares are registered under the Act or an exemption from such

7628-00100 350043.1

**CONFIDENTIAL  TREATMENT**
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

registration is available. Lancer represents and warrants that it is acquiring the Shares for its own account, for investment, and not with a view to the sale or distribution of the Shares. Each certificate representing the Shares will have a legend thereon incorporating language as follows:

"The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws. The shares have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the shares under the Act unless in the opinion of counsel satisfactory to the Company, registration is not required under the Act or any applicable state securities laws."

5.    **Notices.** Any notice or communication necessary or desirable hereunder shall be considered sufficient and delivery thereof shall be deemed complete if delivered in person or mailed by registered mail on the part of

AUG to:

> AUG Corporation
> 1900 Corporate Blvd.
> Boca Raton, Florida  33431

Lancer to:

> Lancer Offshore, Inc.
> Kaya Flambayon 9
> Curacao, Netherlands Antilles

6.    **Entire Agreement.** This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection herewith.

7.    **Severability.** Lancer and AUG hereby agree and affirm that none of the above provisions is dependent on the validity of any other provision and invalidity as to any provision or any part thereof shall not affect any other provision.

8.    **Governing Law.** This Agreement shall be governed by the laws of the State of Florida. Venue shall be Palm Beach County, Florida.

9.    **Counterpart.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall constitute but one agreement.

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

AUG-0005

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

AUG CORP.

By: _____
    Laurence S. Isaacson, President

LANCER OFFSHORE, INC.

By: _____
Name: _____
Its: _____

7828-00100 350043.1                    3

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT                            AUG-0006

`

# SMX CORP.

SMX:

TGH

Term Sheet – Lancer
1/27/03 $30,000

SMX-0003

# TERM SHEET

## Promissory Note
## Between
## LANCER OFFSHORE, INC. - Lender
## and
## SMX CORP. - Borrower

| Amount: | $30,000 |
|---|---|
| Term: | 6 months.   If note is not repaid in full, conversion price (below) is reduced by $0.05 for every 30 days the loan is not repaid or converted. |
| Rate: | 10% |
| Prepayment Penalty | None |
| Conversion Price | $0.25 per share |
| Equity Kicker | SMX Corp shall issue to Lancer Offshore, Inc. 100,000 shares |

ACCEPTED:                                    ACCEPTED:

LANCER OFFSHORE, INC.            SMX CORP.


By:_____     By:_____
    Michael Lauer                              Laurence S. Isaacson
    Investment Manager                     President
    January ___, 2003                        January 27, 2003

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

SMX-0004

# TERM SHEET

### Promissory Note
### Between
### LANCER OFFSHORE, INC. - Lender
### and
### SMX CORP. - Borrower

| | |
|---|---|
| Amount: | $30,000 |
| Term: | 6 months. If note is not repaid in full, conversion price (below) is reduced by $0.05 for every 30 days the loan is not repaid or converted. |
| Rate: | 10% |
| Prepayment Penalty | None |
| Conversion Price | $0.25 per share |
| Equity Kicker | SMX Corp shall issue to Lancer Offshore, Inc. 100,000 shares |

ACCEPTED:                                ACCEPTED:

LANCER OFFSHORE, INC.              SMX CORP.


By:_____       By:_____
    Michael Lauer                              Laurence S. Isaacson
    Investment Manager                   President
    January ___, 2003                       January 27, 2003

**CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT**

SMX-0005

<u>SMX</u>

Current Cash                                    $2,945.47

Expenses:
     Transfer Agent        $250/mo
     Audit                 $20,000±
     Legal                 $5.000
     Director Fee          $2,000/mo

Request                                         $30,000.00

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

G \Beth\My Documents\THORNHILL\2003 Docs\SMX-Lancer Term Sheet 1-03 .wpd

SMX-0006

**THORNHILL GROUP, INC. TRUST ACCOUNT**
1900 NW CORPORATE BLVD., SUITE 305W
BOCA RATON, FL 33431

**FLEET BANK, FSB**
00800 BOCA RATON
BOCA RATON, FL 33431
63-9053/2670

1068

01/27/2003

PAY TO THE
ORDER OF   SMX Corp.                                                $ **30,000.00

Thirty Thousand and 00/100*********************************************************************** **DOLLARS**

SMX Corp.
1900 Corporate Blvd.
Suite 305 West
Boca Raton, Fl 33431

FOR

⑈"001068"⑈ ⑆267090536⑈: 94184 68461"⑈

THIS DOCUMENT CONTAINS A COLORED BACKGROUND ON WHITE PAPER. MICROPRINT IS LOCATED BELOW THIS WARNING BAND

---

**THORNHILL GROUP, INC. TRUST ACCOUNT**
   SMX Corp.                                          01/27/2003      1068
                                                                30,000.00

   Fleet - SMX                                                     30,000.00

**THORNHILL GROUP, INC. TRUST ACCOUNT**
   SMX Corp.                                          01/27/2003      1068
                                                                30,000.00

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0007

   Fleet - SMX                                                     30,000.00

DEPOSIT TICKET

☑ CASH

**SMX CORPORATION**
1900 CORPORATE BLVD., SUITE 305W
BOCA RATON, FL 33431

63-9053/2670
9418467872

DATE _____1/28/03_____
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL

TGI-TRUST ACCT.    30 000.00

**Fleet**
Small Business Services
smallbiz.fleet.com   Boca Raton, FL

TOTAL FROM OTHER SIDE ▸

$    30 000.00

⑊5230⑊1347⑊ 94184 67872⑊

---

**THORNHILL GROUP, INC. TRUST ACCOUNT**
1900 NW CORPORATE BLVD., SUITE 305W
BOCA RATON, FL 33431

FLEET BANK, FSB
00800 BOCA RATON
BOCA RATON, FL 33431
63-9053/2670

1068

01/27/2003

PAY TO THE
ORDER OF   SMX Corp.      $ **30,000.00

Thirty Thousand and 00/100********************************************************************   **DOLLARS**

SMX Corp.
1900 Corporate Blvd.
Suite 305 West
Boca Raton, Fl 33431

FOR

⑊001068⑊ ⑊267090536⑊ 94184 68461⑊

THIS DOCUMENT CONTAINS A COLORED BACKGROUND ON WHITE PAPER. MICROPRINT IS LOCATED BELOW THIS WARNING BAND

CONFIDENTIAL TREATMENT
REQUEST FREEDOM
OF INFORMATION

SMX-0008

AGREEMENT AND PLAN OF MERGER

BY AND AMONG

SMX CORP., a Florida corporation,

SMX ACQUISITION CORP., a Florida corporation,

RACEWAY NET, INC., a Delaware corporation

and

LANCER OFFSHORE, INC., a Curacao Netherlands Antilles corporation

DECEMBER 7, 2000

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

6042-00300 299242.4

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER ("Agreement"), dated as of December 7, 2000, by and among SMX CORP., a Florida corporation ("SMX"), SMX ACQUISITION CORP., a Florida corporation and wholly owned subsidiary of SMX ("Acquisition Sub"), and RACEWAY NET., INC., a Delaware corporation ("Raceway"), and Lancer Offshore, Inc., a corporation organized under the laws of the Curacao Netherlands Antilles ("Lancer"). SMX, Acquisition Sub, and Raceway, are sometimes hereinafter referred to collectively as the "Companies," or individually as a "Company,"

WHEREAS, the respective Boards of Directors of the Companies deem it advisable and in the best interests of their respective stockholders that Raceway be acquired by and become a wholly owned subsidiary of SMX and, in furtherance thereof, the Boards of Directors of the Companies have approved, as applicable, the merger of Acquisition Sub with and into Raceway, upon the terms and subject to the conditions set forth herein; and

WHEREAS, for federal income tax purposes, it is intended that the merger shall qualify as a reorganization within the meaning of Section 368 of the Internal Revenue Code of 1986, as amended (the "Code");

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, the parties hereto agree as follows:

## I.

## THE MERGER

A.   **The Merger**.  Subject to the terms and conditions of this Agreement, at the Effective Time (as defined in Section 1.2 hereof), Acquisition Sub shall be merged (the "Merger") with and into Raceway, with Raceway being the surviving corporation in the Merger (the "Surviving Corporation") and the separate existence of Acquisition Sub shall thereupon cease.  The Merger shall have the effects set forth in the Florida Business Corporation Act (the "FBCA") and the Delaware General Corporation Law (the "DGCL").

B.   **Effective Time of the Merger**. The Merger shall become effective (the "Effective Time") upon the completion of the later of the filing of properly executed Articles of Merger with the Secretary of State of the State of Florida and the filing of properly executed Certificate of Merger with the Secretary of State of the State of Delaware, which filings shall be made on the Closing Date after satisfaction of the conditions set forth in Section VIII.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

## II.

## SMX, CORP. AND THE SURVIVING CORPORATION

A.    **Articles of Incorporation of the Surviving Corporation**. The Articles of Incorporation of Raceway shall be the Articles of Incorporation of the Surviving Corporation, except that such Articles of Incorporation shall be amended and restated at the Effective Time to read in their entirety substantially the same as the Articles of Incorporation of Acquisition Sub (with the name of Raceway being substituted for that of Acquisition Sub).

B.    **Bylaws of the Surviving Corporation**. The Bylaws of Acquisition Sub as in effect at the Effective Time shall be the Bylaws of the Surviving Corporation until thereafter amended in accordance with applicable law.

C.    **Directors and Officers of the Surviving Corporation**.

1.    The directors of Raceway at the Effective Time shall be the initial directors of the Surviving Corporation of the Merger and shall hold office from the Effective Time until their respective successors are duly elected or appointed and qualified in the manner provided in the Articles of Incorporation and Bylaws of the Surviving Corporation, or as otherwise provided by law.

2.    The following individuals shall be the initial officers of the Surviving Corporation of the Merger and shall hold office from the Effective Time until removed or until their respective successors are duly elected or appointed and qualified in the manner provided in the Articles of Incorporation and Bylaws of the Surviving Corporation, or as otherwise provided by law: George Burmeister shall be President, William Hoffman shall be Vice President and Treasurer, and Shawn Preston shall be Secretary.

## III.

## CONVERSION OF SHARES

A.    **Exchange Ratio**. At the Effective Time and subject to Section 7.14, by virtue of the Merger and without any action on the part of the holder thereof:

1.    Each share of common stock of Raceway ("Share") issued and outstanding immediately prior to the Effective Time (other than the Excluded Shares as defined in Section 3.7 below and Shares held by SMX or any subsidiary of SMX, if any), shall be converted at the Effective Time into the right to receive 9.58733318 share of restricted common stock, par value $.0001 per share, of SMX ("SMX Shares") (or a total of 74,527,470 shares prior to SMX's one for ten reverse stock split).

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

6042-00300 299242.4

SMX-0058

2.     At the Effective Time, all Shares of Raceway (other than the Excluded Shares) shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each certificate previously representing any such Shares or shall thereafter represent the SMX Shares, into which such Shares of Raceway have been converted.   Certificates representing Shares of Raceway shall be exchanged for certificates representing whole SMX Shares.

3.     If, prior to the Effective Time, except as contemplated by Section 3.1(a), SMX should split or combine the Shares, SMX Shares, or SMX Preferred, or pay a stock dividend or other stock distribution in, SMX Shares, or SMX Preferred, then the Raceway Exchange Ratio shall be appropriately adjusted to reflect such split, combination, dividend, or other distribution.

4.     Each Share of Raceway held in treasury (or a subsidiary, as such term is defined in Article IV hereof) and each such Share held by SMX or any subsidiary of SMX immediately prior to the Effective Time shall be canceled and retired and cease to exist, and no SMX Shares shall be issued in exchange therefor.

5.     Each share of common stock of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the holder thereof, be converted into and exchangeable for one share of common stock of the Surviving Corporation of the Merger.

B.     **Exchange of Shares**.

1.     As of the Effective Time, each holder of Shares (other than Excluded Shares) shall, upon surrender of one or more certificates representing such Shares for cancellation to SMX's transfer agent, Florida Atlantic Stock Transfer, Inc., at 7130 Nob Hill Road, Tamarac, Florida 33321, be entitled to receive certificates representing the number of SMX Shares into which such Shares are converted in the Merger.  The SMX Shares into which the Shares shall be converted in the Merger shall be deemed to have been issued at the Effective Time.

2.     As soon as reasonably practicable after the Effective Time, the Exchange Agent shall mail to each holder of record of a certificate or certificates which immediately prior to the Effective Time represented outstanding Shares (the "Certificates") whose Shares were converted into SMX Shares pursuant to Section 3.1, (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon delivery of the Certificates to the Exchange Agent and shall be in such form and have such other provisions as SMX and the other Companies may reasonably specify) and (ii) instructions for use in effecting the surrender of the Certificates in exchange for certificates representing SMX Shares.  Upon surrender of a Certificate for cancellation to the Exchange Agent together with such letter of transmittal, duly executed, the holder of such Certificate shall be entitled to receive in exchange therefor a certificate representing that number of whole SMX Shares which such

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0059

holder has the right to receive in respect of the Certificates surrendered pursuant to the provisions of this Article III.

   **3.**  In the event that any stock certificate representing Shares shall have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming such certificate to be lost, stolen, or destroyed, SMX shall issue or cause to be issued in exchange for such lost, stolen, or destroyed certificate the number of SMX Shares into which such shares are converted in the Merger in accordance with this Article III. When authorizing such issuance in exchange therefor, the Board of Directors of SMX may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate to give SMX a bond in such sum as it may direct as indemnity, or such other form of indemnity as it shall direct, against any claim that may be made against SMX with respect to the certificate alleged to have been lost, stolen, or destroyed.

   **C.**  **Stock Options, Warrants, Debentures and other Agreements**. As of the Effective Time, any stock options, warrants, convertible securities, or other contractual commitments or agreements of any kind to purchase or issue Shares that are outstanding both as of the date hereof and at the Effective Time (whether or not contingent or otherwise requiring further shareholder approval) shall terminate as of the Effective Time, and prior to the Effective Time, Raceway shall take or cause to be taken all necessary actions to ensure that following the Effective Time no participant in any such plan, program or arrangement shall have any right thereunder to acquire any equity securities of Raceway, the Surviving Corporation, any subsidiary thereof or SMX.

   **D.**  **Dividends; Transfer Taxes**. No dividends that are declared on SMX Shares shall be paid to persons entitled to receive certificates representing SMX Shares until such persons surrender their certificates representing Shares or Raceway Series A Preferred. Upon such surrender, there shall be paid to the person in whose name the certificates representing such SMX Shares shall be issued any dividends which shall have become payable with respect to such SMX Shares between the Effective Time and the time of such surrender. In no event shall the person entitled to receive such dividends be entitled to receive interest on such dividends. If any certificates for any SMX Shares are to be issued in a name other than that in which the certificate representing Shares surrendered in exchange therefor is registered, it shall be a condition of such exchange that the person requesting such exchange shall pay to the Exchange Agent any transfer or other taxes required by reason of the issuance of certificates for such SMX Shares in a name other than that of the registered holder of the certificate surrendered, or shall establish to the satisfaction of the Exchange Agent that such tax has been paid or is not applicable. Notwithstanding the foregoing, neither the Exchange Agent nor any party hereto shall be liable to a holder of Shares for any SMX Shares or dividends thereon or, in accordance with Section 3.4 hereof, the cash payment for fractional interests, delivered to a public official pursuant to applicable escheat laws.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

E.    **No Fractional Securities**.  No certificates or scrip representing fractional SMX Shares shall be issued upon the surrender for exchange of certificates representing Shares pursuant to this Article III and no dividend, stock split-up, or other change in the capital structure of SMX shall relate to any fractional security, and such fractional interests shall not entitle the owner thereof to vote or to any rights of a security holder.  In lieu of any such fractional securities, each holder of Shares who would otherwise have been entitled to a fraction of an SMX Share upon surrender of stock certificates for exchange pursuant to this Article III shall be adjusted to the next highest share.

F.    **Closing of Transfer Books**.  At the Effective Time, the stock transfer books of Raceway shall be closed and no transfer of Shares shall thereafter be made.  If, after the Effective Time, certificates representing Shares are presented to the Surviving Corporation, they shall be canceled and exchanged for certificates representing SMX Shares in accordance with the terms hereof.  At and after the Effective Time, the holders of Shares to be exchanged for SMX Shares pursuant to this Agreement shall cease to have any rights as stockholders of Raceway except for the right to surrender such stock certificates in exchange for SMX Shares as provided hereunder.

G.    **Dissenting Shares**.  If holders of Shares are entitled to dissent from the Merger and demand appraisal of any such Shares in accordance with the provisions of the FBCA or the DGCL concerning the right of such holders to dissent from the Merger and demand appraisal of their shares ("Dissenting Holders"), any Shares held by a Dissenting Holder as to which appraisal has been so demanded ("Excluded Shares") shall not be converted as described in Section 3.1, but shall from and after the Effective Time represent only the right to receive such consideration as may be determined to be due to such Dissenting Holder pursuant to the FBCA or DGCL, as the case may be; provided, however, that each Share held by a Dissenting Holder who shall, after the Effective Time, withdraw his demand for appraisal or lose his right of appraisal with respect to such Shares, in either case pursuant to the FBCA or DGCL, shall not be deemed Excluded Shares but shall be deemed to be converted, as of the Effective Time, into the right to receive SMX Shares in accordance with the Raceway Exchange Ratio, as applicable.

H.    **Closing**.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Atlas Pearlman, P.A., Suite 1700, 350 East Las Olas Boulevard, Fort Lauderdale, Florida 33301, no later than Thursday, December 7, 2000, at 10:00 a.m., local time.

I.    **Supplementary Action**.  If at any time after the Effective Time, any further assignments or assurances in law or any other things are necessary or desirable to vest or to perfect or confirm of record in the Surviving Corporation the title to any property or rights of either SMX or Raceway, or otherwise to carry out the provisions of this Agreement, the officers and directors of the Surviving Corporation are hereby authorized and empowered on behalf of each, in the name of and on behalf of them as appropriate, to execute and deliver any and all things necessary or proper to vest or to perfect or

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

6042-00300 299242.4

confirm title to such property or rights in the Surviving Corporation, and otherwise to carry out the purposes and provisions of this Agreement.

## IV.

## REPRESENTATIONS AND WARRANTIES OF RACEWAY

As used in this Agreement, (i) the term "Material Adverse Effect" means, with respect to SMX, Acquistion Sub, or Raceway, as the case may be, a Material Adverse Effect on the business, assets, results of operations, or financial condition of such party and its subsidiaries taken as a whole, or in the ability of such party to perform its obligations hereunder, including, but not limited to, any event resulting in, or that could reasonably result in, a change of greater than 10% in any number in any of the parties' financial statements, and (ii) the word "subsidiary" when used with respect to any party means any corporation or other organization, whether incorporated or unincorporated, of which such party or any other subsidiary of such party is a general partner (excluding partnerships the general partnership interests of which held by such party or any subsidiary of such party do not have a majority of the voting interests in such partnership) or of which at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the Board of Directors or others performing similar functions with respect to such corporations or other organizations is directly or indirectly owned or controlled by such party and/or by any one or more of the subsidiaries.

Raceway represents and warrants, with respect to itself and its subsidiaries, except as disclosed to SMX in the Raceway Schedule of Exceptions (the "Raceway Schedule"), attached hereto and incorporated herein by this reference, as follows:

A.    **Organization**.  Each of Raceway and its subsidiaries is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the corporate power to carry on its business as it is now being conducted or presently proposed to be conducted.  Each of Raceway and its subsidiaries is duly qualified as a foreign corporation to do business, and is in good standing (to the extent the concept of good standing exists), in each jurisdiction where the character of its properties owned or held under lease or the nature of its activities makes such qualification necessary, except where the failure to be so qualified shall not have a Material Adverse Effect.

B.    **Capitalization**.  As of the date hereof, the authorized capital stock of Raceway and each of its subsidiaries is as set forth in Section 4.2 of the Raceway Schedule. As of the date hereof, the number of capital stock of Raceway which are issued and outstanding is as set forth in Section 4.2 of the Raceway Schedule. All of the issued and outstanding shares of capital stock of Raceway are validly issued, fully paid, and non-assessable and free of preemptive rights or similar rights created by statute, the Articles of Incorporation or Bylaws of Raceway or any agreement by which Raceway or any

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

of its subsidiaries is a party or by which it is bound.  Except (a) as set forth above or, (b) as disclosed in Section 4.2 of the Raceway Schedule, there are not as of the date of this Agreement any shares of capital stock of Raceway issued or outstanding or any options, warrants, subscriptions, calls, rights, convertible securities, or other agreements or commitments obligating Raceway to issue, transfer, or sell any shares of its capital stock. As of the date hereof, no bonds, debentures, notes, or other indebtedness having the right to vote (or convertible into or exercisable for securities having the right to vote) on any matters on which stockholders of Raceway may vote ("Voting Debt") were issued and outstanding.

C.   **Authority Relative to this Agreement**.  Raceway has the corporate power to enter into this Agreement and to carry out its obligations hereunder.  The execution and delivery of this Agreement by Raceway and the consummation by Raceway of the transactions contemplated hereby have been duly authorized by its Board of Directors, and, except for approval by the requisite votes cast by Raceway's stockholders and the holders of outstanding Raceway Series A Preferred at the meeting provided for in Section 7.4, no other corporate proceedings on the part of Raceway are necessary to approve this Agreement or the transactions contemplated hereby.

D.   **Consents and Approvals; No Violations**.  Except for filing and recordation of a Certificate of Merger under the DGCL, no filing with, and no permit, authorization, consent, or approval of, any public body or authority is necessary for the consummation by Raceway of the transactions contemplated by this Agreement.  Neither the execution and delivery of this Agreement by Raceway, nor the consummation by it of the transactions contemplated hereby, nor compliance by Raceway with any of the provisions hereof, shall (a) result in any breach of the Articles of Incorporation or Bylaws of Raceway, (b) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, or acceleration) under, any of the terms, conditions, or provisions of any note, bond, mortgage, indenture, license, contract, agreement, or other instrument or obligation to which Raceway or any of its subsidiaries is a party or by which any of them or any of their properties or assets may be bound or (c) violate any order, writ, injunction, decree, statute, rule, or regulation applicable to Raceway, any of its subsidiaries or any of their properties or assets, except in the case of clauses (b) and (c) for violations, breaches, or defaults that would not have a Material Adverse Effect.

E.   **Financial Statements**.  The unaudited balance sheet dated June 30, 2000 for the six months ended (the "Interim Balance Sheet") fairly present in all material respects the consolidated financial position of Raceway and its subsidiaries as of the respective dates thereof, and the other related statements included therein fairly represent in all material respects the results of operations and cash flows of Raceway and its subsidiaries for the six months ended June 30, 2000.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

F.    **Absence of Certain Changes or Events**.  Since June 30, 2000, neither Raceway nor any of its subsidiaries has: (a) taken any of the actions set forth in Sections 6.1(b), 6.1(c), or 6.1(e) hereof; (b) incurred any liability material to Raceway and its subsidiaries on a consolidated basis, except in the ordinary course of its business, consistent with past practices; (c) suffered a change, or any event involving a prospective change, in the business, assets, financial condition, or results of operations of Raceway or any of its subsidiaries which has had, or is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, (other than as a result of changes or proposed changes in federal or state regulations of general applicability or interpretations thereof, changes in generally accepted accounting principles, and changes that could, under the circumstances, reasonably have been anticipated in light of disclosures made in writing by Raceway to SMX pursuant hereto); or (d) subsequent to the date hereof, except as permitted by Section 6.1 hereof, conducted its business and operations other than in the ordinary course of business and consistent with past practices.

G.    **Litigation**.  As of the date of this Agreement, and except to the extent that individually and in the aggregate they would not reasonably be expected to have a Material Adverse Effect: (i) there is no action, suit, judicial, or administrative proceeding, arbitration or investigation pending or, to the best knowledge of Raceway, threatened against or involving Raceway or any of its subsidiaries, or any of their properties or rights, before any court, arbitrator, or administrative or governmental body; (ii) there is no judgment, decree, injunction, rule, or order of any court, governmental department, commission, agency, instrumentality, or arbitrator outstanding against Raceway or any of its subsidiaries; and (iii) Raceway and its subsidiaries are not in violation of any term of any judgments, decrees, injunctions, or orders outstanding against them.  Raceway has furnished to SMX in writing, a description of all litigation, actions, suits, proceedings, arbitration's, investigations known to it, judgments, decrees, injunctions or orders pending; or to its best knowledge, threatened against or involving Raceway or any of its subsidiaries, or any of their properties or rights as of the date hereof.

H.    **Contracts**.

1.    Each of the material contracts, instruments, mortgages, notes, security agreements, leases, agreements, or understandings, whether written or oral, to which Raceway or any of its subsidiaries is a party that relates to or affects the assets or operations of Raceway or any of its subsidiaries or to which Raceway or any of its subsidiaries or their respective assets or operations may be bound or subject is a valid and binding obligation of Raceway and in full force and effect (with respect to Raceway or such subsidiary), except for where the failure to be in full force and effect would not, individually or in the aggregate, have a Material Adverse Effect.  Except to the extent that the consummation of the transactions contemplated by this Agreement may require the consent of third parties, as disclosed in the Raceway Schedule, there are no existing defaults by Raceway or any of its subsidiaries thereunder or, to the knowledge of Raceway, by any other party thereto, which defaults, individually or in the aggregate, would have a Material Adverse Effect; and no event of default has occurred, and no event, condition, or

CONFIDENTIAL8 TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

occurrence exists, that (whether with or without notice, lapse of time, or the happening or occurrence of any other event) would constitute a default by Raceway or any of its subsidiaries thereunder which default would, individually or in the aggregate, have a Material Adverse Effect.

2.    Except for this Agreement, as of the date of this Agreement neither Raceway nor any of its subsidiaries is a party to any oral or written (i) consulting agreement not terminable on 60 days' or less notice involving the payment of more than $25,000 per annum, in the case of any such agreement with an individual; (ii) joint venture agreement; (iii) non-competition or similar agreements that restricts Raceway or its subsidiaries from engaging in a line of business; (iv) agreement with any executive officer or other employee of Raceway or any subsidiary the benefits of which are contingent, or the terms of which are materially altered, upon the occurrence of a transaction involving Raceway or the nature contemplated by this Agreement and which provides for the payment of in excess of $10,000; (v) agreement with respect to any executive officer of Raceway or any subsidiary providing any term of employment beyond one year or compensation guaranty in excess of $50,000 per annum; or (vi) agreement or plan, including any stock option plan, stock appreciation rights plan, restricted stock plan, or stock purchase plan, any of the benefits of which shall be increased, or the vesting of the benefits of which shall be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the value of any of the benefits of which shall be calculated on the basis of any of the transactions contemplated by this Agreement.

I.    **Employee Benefit Plans**.

1.    Disclosed in Schedule 4.9 of the Raceway Disclosure Schedule is a true and complete list of each written or formal employee benefit plan (including, without limitation, any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) policy or agreement that is maintained (all of the foregoing, the "Benefit Plans"), or is or was contributed to by Raceway or pursuant to which Raceway or any trade or business, whether or not incorporated (an "ERISA Affiliate"), which together with Raceway would be deemed a "single employer" within the meaning of Section 4001 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), is still potentially liable for payments, benefits, or claims. A copy of each Benefit Plan as currently in effect and, if applicable, the most recent Annual Report, Actuarial Report or Valuation, Summary Plan Description, Trust Agreement, and a Determination Letter issued by the IRS for each Benefit Plan have heretofore been delivered to SMX. No Benefit Plan was or is subject to Title IV of ERISA or Section 412 of the Code (including any "multi-employer plan," as defined in Section 3(37) of ERISA).

2.    Each of the Benefit Plans that are subject to ERISA is in substantial compliance with ERISA; each of the Benefit Plans intended to be "qualified" within the meaning of Section 401 (a) of the Internal Revenue Code of 1986, as amended (the "Code") is so qualified; and no event has occurred, and to Raceway's knowledge, there

CONFIDENTIAL gTREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

exists no condition or set of circumstances, in connection with which Raceway or any ERISA Affiliate is or could be subject to liability (except liability for benefit claims and funding obligations payable in the ordinary course) under ERISA, the Code, or any other applicable law with respect to any Benefit Plan.

3.     All contributions or other amounts payable by Raceway or its subsidiaries through September 30, 2000 with respect to each Benefit Plan in respect of current or prior plan years have been either paid or accrued on the most recent financial statements of Raceway made available to SMX.  Any contributions or other amounts payable by Raceway or its subsidiaries for periods between September 30, 2000 and the Effective Time with respect to each Benefit Plan in respect of current or prior plan years have been or shall be either paid or accrued in the normal course of business on the books and records of Raceway at or prior to the Effective Time.  There are no pending, or, to the best knowledge of Raceway, threatened or anticipated claims (other than routine claims for benefits) by or on behalf of or against any of the Benefit Plans or any trusts or other funding vehicles related thereto.

4.     No Benefit Plan provides benefits, including without limitation death or medical benefits (whether or not insured), with respect to current or former employees for periods extending beyond their retirement or other termination of service (other than (i) coverage mandated by Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or any comparable state law, (ii) death benefits or retirement benefits under any "employee pension plan," as that term is defined in Section 3(2) of ERISA, (iii) deferred compensation benefits accrued as liabilities on the books of Raceway or the ERISA Affiliates, or (iv) benefits the full cost of which is borne by the current or former employee or his or her beneficiary).

J.     **Taxes.**  For the purposes of this section, the term "tax" shall include all taxes, charges, withholdings, fees, levies, penalties, additions, interest, or other assessments imposed by any United States federal, state, or local authority or any other taxing authority on Raceway or any of its Tax Affiliates (as hereinafter defined) as to their respective income, profit, franchise, gross receipts, payroll, sales, employment, worker's compensation, use, property, withholding, excise, occupancy, environmental, and other taxes, duties, or assessments of any nature, whatsoever.  Raceway has filed or caused to be filed all material federal, state, local, and foreign tax returns required to be filed by each of its and any member of its consolidated, combined, unitary, or similar group (each such member a "Tax Affiliate").  Such returns, reports, and other information are accurate and complete in all material respects.  Raceway has paid or caused to be paid or has made adequate provision or set up an adequate accrual or reserve for the payment of, all taxes shown to be due in respect of the periods for which returns are due, and has established (or shall establish at least quarterly) an adequate accrual or reserve for the payment of all taxes payable in respect of the period subsequent to the last of said periods required to be so accrued or reserved.  Neither Raceway nor any of its Tax Affiliates has any material liability for taxes in excess of the amount so paid or accruals or reserves so established. Neither Raceway nor any of its Tax Affiliates is delinquent in the payment of any tax in

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

excess of the amount reserved or provided therefor, and no deficiencies for any tax, assessment, or governmental charge in excess of the amount reserved or provided therefor have been threatened, claimed, proposed, or assessed. No waiver or extension of time to assess any taxes has been given or requested. The Internal Revenue Service or comparable state agencies have never audited Raceway's federal and state income tax returns.

K.    **Compliance With Applicable Law.** Raceway and each of its subsidiaries holds all licenses, franchises, permits, variances, exemptions, orders, approvals, and authorizations necessary for the lawful conduct of its business under and pursuant to, and the business of each of Raceway and its subsidiaries is not being conducted in violation of, any provision of any federal, state, local, or foreign statute, law, ordinance, rule, regulation, judgment, decree, order, concession, grant, franchise, permit or license, or other governmental authorization or approval applicable to Raceway or any of its subsidiaries, except to the extent that the failure to hold any such licenses, franchises, permits, or authorizations, or any such violation, would not, individually or in the aggregate, have a Material Adverse Effect.

L.    **Subsidiaries.** The Raceway Schedule lists all the subsidiaries of Raceway as of the date of this Agreement and indicates for each such corporate subsidiary as of such date the jurisdiction of incorporation or organization. All of the outstanding shares of capital stock or other equity interests of each of the subsidiaries are (i) held by Raceway or one of such wholly-owned subsidiaries; (ii) fully paid and non-assessable; and (iii) owned by Raceway or one of such wholly owned subsidiaries free and clear of any claim, lien, or encumbrance.

M.    **Labor and Employment Matters.** (a) Raceway and its subsidiaries are and have been in compliance in all material respects with all applicable laws respecting employment and employment practices, terms, and conditions of employment and wages and hours, and such laws respecting employment discrimination, equal opportunity, affirmative action, worker's compensation, occupational safety, and health requirements and unemployment insurance and related matters, and are not engaged in and have not engaged in any unfair labor practice; (b) to the knowledge of Raceway, no investigation or review by or before any governmental entity concerning any violations of any such applicable laws is pending nor, to the knowledge of Raceway is any such investigation threatened or has any such investigation occurred during the last three years, and no governmental entity has provided any notice to Raceway or any of its subsidiaries or otherwise asserted an intention to conduct any such investigation; (c) there is no labor strike, dispute, slowdown, or stoppage actually pending or threatened against Raceway or any of its subsidiaries; (d) no union representation question or union organizational activity exists respecting the employees of Raceway or any of its subsidiaries; (c) no collective bargaining agreement exists which is binding on Raceway or any of its subsidiaries; (f) neither Raceway nor any of its subsidiaries has experienced any material work stoppage or other material labor difficulty; and (g) in the event of termination of the employment of any of the current officers, directors, employees, or agents of Raceway or any of its

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

subsidiaries, neither Raceway nor any of its subsidiaries shall pursuant to any agreement or by reason of anything done prior to the Effective Time by Raceway or any of its subsidiaries be liable to any of said officers, directors, employees, or agents for so-called "severance pay" or any other similar payments or benefits, including, without limitation, post-employment healthcare (other than pursuant to COBRA) or insurance benefits.

N.   **Intellectual Property**.

1.     Except to the extent that the inaccuracy of any of the following (or the circumstances giving rise to such inaccuracy) does not have or could not reasonably be expected to have a Material Adverse Effect:

a.     Raceway and each of its subsidiaries owns, or is licensed or otherwise has the legally enforceable right to use (in each case, clear of any liens or encumbrances of any kind), all Intellectual Property (as hereinafter defined) used in or necessary for the conduct of its business as currently conducted;

b.     no claims are pending or, to the best knowledge of Raceway, threatened that Raceway or any of its subsidiaries is infringing on or otherwise violating the rights of any person with regard to any Intellectual Property used by, owned by, and/or licensed to Raceway or any of its subsidiaries and, to the best knowledge of Raceway, there are no valid grounds for any such claims;

c.     to the best knowledge of Raceway, no person is infringing on or otherwise violating any right of Raceway or any of its subsidiaries with respect to any Intellectual Property owned by and/or licensed to Raceway or any of its subsidiaries;

d.     to the best knowledge of Raceway, there are no valid grounds for any claim challenging the ownership or validity of any Intellectual Property owned by Raceway or any of its subsidiaries or challenging Raceway's or any of its subsidiaries' license or legally enforceable right to use any Intellectual Property licensed by it; and

e.     to the best knowledge of Raceway, all patents, registered trademarks, service marks, and copyrights held by Raceway and each of its subsidiaries are valid and subsisting.

2.     For purposes of this Agreement, "Intellectual Property" means trademarks (registered or unregistered), service marks, brand names, certification marks, trade dress, assumed names, trade names, and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries and ideas, whether patented, patentable, or not in any jurisdiction; trade secrets and confidential information and rights in any jurisdiction to limit the use or disclosure thereof by any person; writings and other works of authorship, whether copyrighted, copyrightable, or not in any jurisdiction;

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0068

registration or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof; any similar intellectual property or proprietary rights and computer programs and software (including source code, object code, and data); licenses, immunities, covenants not to sue, and the like relating to the foregoing; and any claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

O.   **Insurance**.  As of the date hereof, Raceway and each of its subsidiaries is not insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are customary in the businesses in which they are engaged. Raceway and each of its subsidiaries shall, within a reasonable period of time, obtain material policies of insurance and fidelity or surety bonds insuring Raceway or any of its subsidiaries or their respective businesses, assets, employees, officers, and directors.

P.   **Ownership of Shares**.  All Raceway stockholders are either (i) "accredited investors," as such term is defined in the Securities Act of 1933, as amended or (ii) which have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of and investment in SMX.  There are 44 accredited investors and 14 sophisticated investors.

The Company acknowledges that each Certificate representing a SMX Share shall contain a restrictive legend representing that the Shares have not been registered under the Securities Act.  The Shares may not be sold or offered for sale or otherwise distributed without an effective registration statement for the Shares under the Securities Act or an opinion of counsel satisfactory to SMX that such registration is not required as the sale offer or distribution thereof.

Q.   **Shareholder Approval**.  Attached hereto as Exhibit 4.17, is the consent of certain Raceway shareholders to this Agreement and the transactions reflected hereby.

R.   **Provisions of FBCA Not Applicable**.  Neither the provisions of Sections 607.0901 and 607.0902 of the FBCA, nor the equivalent provisions of the DGCL, will apply to this Agreement, the Merger, or the transactions contemplated hereby or thereby.

**V.**

**REPRESENTATIONS AND WARRANTIES OF SMX**

SMX and Acquisition Sub jointly and severally represent and warrant, with respect to themselves and their subsidiaries, except as disclosed to Raceway in the SMX/Acquisition Sub Schedule of Exceptions (the "SMX/Acquisition Sub Schedule"), attached hereto and incorporated herein by this reference, as follows:

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

A. **Organization**.  Each of SMX and its subsidiaries is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the corporate power to carry on its business as it is now being conducted or presently proposed to be conducted.  Each of SMX and its subsidiaries is duly qualified as a foreign corporation to do business, and is in good standing (to the extent the concept of good standing exists), in each jurisdiction where the character of its properties owned or held under lease or the nature of its activities makes such qualification necessary, except where the failure to be so qualified shall not have a Material Adverse Effect.

B. **Capitalization**.  As of the date hereof, the authorized capital stock of SMX and its subsidiaries is as set forth in Schedule 4.2 of the SMX/Acquisition Sub Schedule. As of the date hereof, the number of SMX Shares which are issued and outstanding is as set forth in Section 5.2 of the SMX/Acquisition Sub Schedule.  All of the issued and outstanding SMX Shares are validly issued, fully paid, and non-assessable and free of preemptive rights or similar rights created by statute, the Articles of Incorporation or Bylaws of SMX or any agreement by which SMX or any of its subsidiaries is a party or by which it is bound.  Except (a) as set forth above or, (b) as disclosed in Schedule 4.2 of the SMX/Acquisition Sub Schedule, there are not as of the date of this Agreement any shares of capital stock of SMX issued or outstanding or any options, warrants, subscriptions, calls, rights, convertible securities, or other agreements or commitments obligating SMX to issue, transfer, or sell any shares of its capital stock.  As of the date hereof, Voting Debt of SMX were issued and outstanding.

C. **Authority Relative to this Agreement**.  SMX and Acquisition Sub have the corporate power to enter into this Agreement and to carry out their obligations hereunder. The execution and delivery of this Agreement by SMX and Acquisition Sub and the consummation by SMX and Acquisition Sub of the transactions contemplated hereby have been duly authorized by their respective Boards of Directors, and, except for approval by the requisite votes cast by SMX's shareholders at the meeting provided for in Section 7.4, no other corporate proceedings on the part of SMX or Acquisition Sub are necessary to approve this Agreement or the transactions contemplated hereby.

D. **Consents and Approvals; No Violations**.  Except if applicable, state securities or blue sky laws, and, as applicable, filing and recordation of Articles of Merger under the FBCA, no filing with, and no permit, authorization, consent, or approval of, any public body or authority is necessary for the consummation by SMX and Acquisition Sub of the transactions contemplated by this Agreement.  Neither the execution and delivery of this Agreement by SMX and Acquisition Sub, nor the consummation by them of the transactions contemplated hereby, nor compliance by SMX and Acquisition Sub with any of the provisions hereof, shall (a) result in any breach of the Articles of Incorporation or Bylaws of SMX or Acquisition Sub, (b) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation, or acceleration) under, any of the terms, conditions, or provisions

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0070

of any note, bond, mortgage, indenture, license, contract, agreement, or other instrument or obligation to which SMX or any of its subsidiaries is a party or by which any of them or any of their properties or assets may be bound or (c) violate any order, writ, injunction, decree, statute, rule, or regulation applicable to SMX, any of its subsidiaries or any of their properties or assets, except in the case of clauses (b) and (c) for violations, breaches, or defaults that would not have a Material Adverse Effect.

E.    **Financial Statements**.  The audited balance sheet dated December 31, 1999, for the year ended, and the unaudited financial statements dated October 31, 2000, for the 10 months ended (the "Interim Balance Sheet") fairly present in all material respects the consolidated financial position of SMX and its subsidiaries as of the date thereof, and the other related statements included therein fairly represent in all material respects the results of operations and cash flows of SMX and its subsidiaries for the respective period.

F.    **Absence of Certain Changes or Events**.  Since October 31, 2000, neither SMX nor any of its subsidiaries has: (a) incurred any liability material to SMX and its subsidiaries on a consolidated basis, except in the ordinary course of its business, consistent with past practices; (b) suffered a change, or any event involving a prospective change, in the business, assets, financial condition, or results of operations of SMX or any of its subsidiaries which has had, or is reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, (other than as a result of changes or proposed changes in federal or state regulations of general applicability or interpretations thereof, changes in generally accepted accounting principles, and changes that could, under the circumstances, reasonably have been anticipated in light of disclosures made in writing by SMX or Acquisition Sub to Raceway pursuant hereto).

G.    **Litigation**.  As of the date of this Agreement, and except to the extent that individually and in the aggregate they would not reasonably be expected to have a Material Adverse Effect: (i) there is no action, suit, judicial, or administrative proceeding, arbitration or investigation pending or, to the best knowledge of SMX or Acquisition Sub, threatened against or involving SMX or any of its subsidiaries, or any of their properties or rights, before any court, arbitrator, or administrative or governmental body; (ii) there is no judgment, decree, injunction, rule, or order of any court, governmental department, commission, agency, instrumentality, or arbitrator outstanding against SMX or any of its subsidiaries; and (iii) SMX and its subsidiaries are not in violation of any term of any judgments, decrees, injunctions, or orders outstanding against them. SMX and Acquisition Sub have furnished to Raceway in writing, a description of all litigation, actions, suits, proceedings, arbitration's, investigations known to it, judgments, decrees, injunctions or orders pending; or to its best knowledge, threatened against or involving SMX or any of its subsidiaries, or any of their properties or rights as of the date hereof.

H.    **Contracts**. Each of the material contracts, instruments, mortgages, notes, security agreements, leases, agreements, or understandings, whether written or oral, to which SMX or any of its subsidiaries is a party that relates to or affects the assets or

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

15

operations of SMX or any of its subsidiaries or to which SMX or any of its subsidiaries or their respective assets or operations may be bound or subject is a valid and binding obligation of SMX and in full force and effect (with respect to SMX or such subsidiary), except for where the failure to be in full force and effect would not, individually or in the aggregate, have a Material Adverse Effect. Except to the extent that the consummation of the transactions contemplated by this Agreement may require the consent of third parties, as disclosed in the SMX/Acquisition Sub Schedule, there are no existing defaults by SMX or any of its subsidiaries thereunder or, to the knowledge of SMX, by any other party thereto, which defaults, individually or in the aggregate, would have a Material Adverse Effect; and no event of default has occurred, and no event, condition, or occurrence exists, that (whether with or without notice, lapse of time, or the happening or occurrence of any other event) would constitute a default by SMX or any of its subsidiaries thereunder which default would, individually or in the aggregate, have a Material Adverse Effect.

I.     **Compliance With Applicable Law**. SMX and each of its subsidiaries holds all licenses, franchises, permits, variances, exemptions, orders, approvals, and authorizations necessary for the lawful conduct of its business under and pursuant to, and the business of each of SMX and its subsidiaries is not being conducted in violation of, any provision of any federal, state, local, or foreign statute, law, ordinance, rule, regulation, judgment, decree, order, concession, grant, franchise, permit or license, or other governmental authorization or approval applicable to SMX or any of its subsidiaries, except to the extent that the failure to hold any such licenses, franchises, permits, or authorizations, or any such violation, would not, individually or in the aggregate, have a Material Adverse Effect.

J.     **Subsidiaries**. The SMX/Acquisition Sub Schedule lists all the subsidiaries of SMX as of the date of this Agreement and indicates for each such corporate subsidiary as of such date the jurisdiction of incorporation or organization. All of the outstanding shares of capital stock or other equity interests of each of the subsidiaries are (i) held by SMX or one of such wholly-owned subsidiaries; (ii) fully paid and non-assessable; and (iii) owned by SMX or one of such wholly owned subsidiaries free and clear of any claim, lien, or encumbrance.

K.     **Labor and Employment Matters**. (a) SMX and its subsidiaries are and have been in compliance in all material respects with all applicable laws respecting employment and employment practices, terms, and conditions of employment and wages and hours, and such laws respecting employment discrimination, equal opportunity, affirmative action, worker's compensation, occupational safety, and health requirements and unemployment insurance and related matters, and are not engaged in and have not engaged in any unfair labor practice; (b) to the knowledge of SMX and Acquisition Sub, no investigation or review by or before any governmental entity concerning any violations of any such applicable laws is pending nor, to the knowledge of SMX and Acquisition Sub is any such investigation threatened or has any such investigation occurred during the last three years, and no governmental entity has provided any notice to SMX or any of its subsidiaries or otherwise

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

asserted an intention to conduct any such investigation; (c) there is no labor strike, dispute, slowdown, or stoppage actually pending or threatened against SMX or any of its subsidiaries; (d) no union representation question or union organizational activity exists respecting the employees of SMX or any of its subsidiaries; (c) no collective bargaining agreement exists which is binding on SMX or any of its subsidiaries; (f) neither SMX nor any of its subsidiaries has experienced any material work stoppage or other material labor difficulty; and (g) in the event of termination of the employment of any of the current officers, directors, employees, or agents of SMX or any of its subsidiaries, neither SMX nor any of its subsidiaries shall pursuant to any agreement or by reason of anything done prior to the Effective Time by SMX or any of its subsidiaries be liable to any of said officers, directors, employees, or agents for so-called "severance pay" or any other similar payments or benefits, including, without limitation, post-employment healthcare (other than pursuant to COBRA) or insurance benefits.

L.    **Intellectual Property**.

1.    Except to the extent that the inaccuracy of any of the following (or the circumstances giving rise to such inaccuracy) does not have or could not reasonably be expected to have a Material Adverse Effect:

a.    SMX and each of its subsidiaries owns, or is licensed or otherwise has the legally enforceable right to use (in each case, clear of any liens or encumbrances of any kind), all Intellectual Property (as hereinafter defined) used in or necessary for the conduct of its business as currently conducted;

b.    no claims are pending or, to the best knowledge of SMX or Acquisition Sub, threatened that SMX or any of its subsidiaries is infringing on or otherwise violating the rights of any person with regard to any Intellectual Property used by, owned by, and/or licensed to SMX or any of its subsidiaries and, to the best knowledge of SMX and Acquisition Sub, there are no valid grounds for any such claims;

c.    to the best knowledge of SMX and Acquisition Sub, no person is infringing on or otherwise violating any right of SMX or any of its subsidiaries with respect to any Intellectual Property owned by and/or licensed to SMX or any of its subsidiaries;

d.    to the best knowledge of SMX and Acquisition Sub, there are no valid grounds for any claim challenging the ownership or validity of any Intellectual Property owned by SMX or any of its subsidiaries or challenging SMX's or any of its subsidiaries' license or legally enforceable right to use any Intellectual Property licensed by it; and

e.    to the best knowledge of SMX and Acquisition Sub, all patents, registered trademarks, service marks, and copyrights held by SMX and each of its subsidiaries are valid and subsisting.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

6042-00300 299242.4

SMX-0073

2.    For purposes of this Agreement, "Intellectual Property" means trademarks (registered or unregistered), service marks, brand names, certification marks, trade dress, assumed names, trade names, and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries and ideas, whether patented, patentable, or not in any jurisdiction; trade secrets and confidential information and rights in any jurisdiction to limit the use or disclosure thereof by any person; writings and other works of authorship, whether copyrighted, copyrightable, or not in any jurisdiction; registration or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof; any similar intellectual property or proprietary rights and computer programs and software (including source code, object code, and data); licenses, immunities, covenants not to sue, and the like relating to the foregoing; and any claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

M.    **Insurance**. As of the date hereof, SMX and each of its subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are customary in the businesses in which they are engaged. All material policies of insurance and fidelity or surety bonds insuring SMX or any of its subsidiaries or their respective businesses, assets, employees, officers, and directors are in full force and effect. As of the date hereof, there are no material claims by SMX or any of its subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause.

N.    **Taxes**. SMX has filed or caused to be filed all material federal, state, local, and foreign tax returns required to be filed by each of its and any member of its consolidated, combined, unitary, or similar group (each such member a "Tax Affiliate"). Such returns, reports, and other information are accurate and complete in all material respects. SMX has paid or caused to be paid or has made adequate provision or set up an adequate accrual or reserve for the payment of, all taxes shown to be due in respect of the periods for which returns are due, and has established (or shall establish at least quarterly) an adequate accrual or reserve for the payment of all taxes payable in respect of the period subsequent to the last of said periods required to be so accrued or reserved. Neither SMX nor any of its Tax Affiliates has any material liability for taxes in excess of the amount so paid or accruals or reserves so established. Neither SMX nor any of its Tax Affiliates is delinquent in the payment of any tax in excess of the amount reserved or provided therefor, and no deficiencies for any tax, assessment, or governmental charge in excess of the amount reserved or provided therefor have been threatened, claimed, proposed, or assessed. No waiver or extension of time to assess any taxes has been given or requested. The Internal Revenue Service or comparable state agencies have never audited SMX's federal and state income tax returns.

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

# VI.

## CONDUCT OF BUSINESS PENDING THE MERGER

A.    **Conduct of Business Pending the Merger**. Raceway agrees on its own behalf and on behalf of its subsidiaries that, during the period from the date of this Agreement and continuing until the Effective Time:

1.    the respective businesses of Raceway and its subsidiaries shall be conducted only in the ordinary and usual course of business and consistent with past practices;

2.    Raceway and its subsidiaries shall not (i) sell or pledge or agree to sell or pledge any stock owned by it in any of its subsidiaries; (ii) amend its Articles of Incorporation or Bylaws; or (iii) split, combine, or reclassify any shares of its outstanding capital stock or declare, set aside, or pay any dividend or other distribution payable in cash, stock, or property in respect of its capital stock, or directly or indirectly redeem, purchase, or otherwise acquire any shares of its capital stock or other securities or shares of the capital stock or other securities of any of its subsidiaries;

3.    Raceway and its subsidiaries shall not (i) authorize for issuance, issue, sell, pledge, dispose of, encumber, deliver, or agree or commit to issue, sell, pledge, or deliver any additional shares of, or rights of any kind to acquire any shares of, its capital stock of any class or exchangeable into shares of stock of any class or any Voting Debt (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase, or otherwise), except that Raceway may issue Shares required to be issued upon exercise of existing stock options, warrants, or similar plans, or under other contractual commitments previously made, which options, warrants, plans, or commitments have been disclosed in writing to SMX in the Raceway Schedule; (ii) acquire, dispose of, transfer, lease, license, mortgage, pledge, or encumber any fixed or other substantial assets other than in the ordinary course of business and consistent with past practices; (iii) incur, assume, or prepay any material indebtedness, liability, or obligation or any other material liabilities or issue any debt securities other than in the ordinary course of business and consistent with past practices; (iv) assume, guarantee, endorse, or otherwise become liable or responsible (whether directly, contingently, or otherwise) for the obligations any other person (other than a subsidiary) in a material amount other than in the ordinary course of business and consistent with past practices; (v) make any material loans, advances, or capital contributions to, or investments in, any other person, other than to subsidiaries, other than in the ordinary course of business and consistent with past practices; (vi) fail to maintain adequate insurance consistent with past practices for their businesses and properties; or (vii) enter into any contract, agreement, commitment, or arrangement with respect to any of the foregoing;

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT
6042-00300 299242.4

19

SMX-0075

4.      Raceway shall preserve intact the business organization of Raceway and its subsidiaries, to keep available the services of its and their present officers and key employees, and to preserve the goodwill of those having business relationships with it and their respective subsidiaries; provided, however, that no breach of this covenant shall be deemed to have occurred if a failure to comply with this Section 6.1(d) occurs as a result of any matter arising out of the transactions contemplated by this Agreement or any acquisition proposals made to Raceway or the public announcement thereof;

5.      Raceway and its subsidiaries shall not knowingly take or allow to be taken or fail to take any action which act or omission would jeopardize qualification of the Merger as a "reorganization" within the meaning of Section 368(a) of the Code; and

6.      Raceway and its subsidiaries shall use all reasonable efforts to prevent any representation or warranty of Raceway herein from becoming untrue or incorrect in any material respect.

B.      **Compensation Plans**.  During the period from the date of this Agreement and continuing until the Effective Time, Raceway agrees as to itself and its subsidiaries that, it shall not, without the prior written consent of SMX (except as required by applicable law or pursuant to existing contractual arrangements or other plans or commitments as otherwise disclosed to SMX in writing pursuant hereto) (a) enter into, adopt, or amend any bonus, profit sharing, compensation, stock option, pension, retirement, deferred compensation, employment, severance, or other employee benefit plan, agreement, trust, plan, fund or other arrangement between Raceway and one or more of its officers, directors, or employees, in each case so as to materially increase the benefits thereunder (collectively, "Compensation Plans"), (b) grant or become obligated to grant any increase in the compensation or fringe benefits of directors, officers, or employees (including any such increase pursuant to any Compensation Plan) or any increase in the compensation payable or to become payable to any officer, except, with respect to employees other than officers, for increases in compensation in the ordinary course of business consistent with past practice, or enter into any contract, commitment, or arrangement to do any of the foregoing, except for normal increases and non-stock benefit changes in the ordinary course of business consistent with past practice, (c) institute any new employee benefit, welfare program, or Compensation Plan, (d) make any change in any Compensation Plan or other employee welfare or benefit arrangement or enter into any employment or similar agreement or arrangement with any employee, or (e) enter into or renew any contract, agreement, commitment, or arrangement providing for the payment to any director, officer, or employee of Raceway of compensation or benefits contingent, or the terms of which are materially altered in favor of such individual, upon the occurrence of any of the transactions contemplated by this Agreement.

C.      **Current Information**.  From the date of this Agreement to the Effective Time, Raceway shall cause one or more of its designated representatives to confer on a regular and frequent basis with representatives of SMX and to report the general status of its

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

20

ongoing operations.  Raceway shall promptly notify the others of any material change in the normal course of business or in its or its subsidiaries' properties.

D.   **Legal Conditions to Merger**.  Each of SMX and Raceway shall, and shall cause their subsidiaries to, use all reasonable efforts (a) to take, or cause to be taken, all actions necessary to comply promptly with all legal requirements which may be imposed on such party or its subsidiaries with respect to the Merger and to consummate the transactions contemplated by this Agreement, subject to the appropriate vote or consent of shareholders, and (b) to obtain (and to cooperate with the other party to obtain) any consent, authorization, order or approval of, or any exemption by, any governmental entity and/or any other public or private third party which is required to be obtained or made by such party or any of its subsidiaries in connection with the Merger and the transactions contemplated by this Agreement; provided, however, that a party shall not be obligated to take any action pursuant to the foregoing if the taking of such action or such compliance or the obtaining of such consent, authorization, order, approval, or exemption would, in such party's reasonable opinion, (i) be materially burdensome to such party and its subsidiaries taken as a whole or impact in such a materially adverse manner the economic or business benefit of the transactions contemplated by this Agreement as to render inadvisable the consummation of the Merger, or (ii) result in the imposition of a condition or restriction on such party or on the Surviving Corporation of the type referred to in Section 8.1(c).  Each of SMX and Raceway shall promptly cooperate with and furnish information to the other in connection with any such burden suffered by, or requirement imposed upon, any of them or any of their subsidiaries in connection with the foregoing.

E.   **Advice of Changes; Government Filings**.  Each party shall confer on a regular and frequent basis with the other, report on operational matters and promptly advise the other orally and in writing of any change or event having, or which, insofar as can reasonably be foreseen, could have, a Material Adverse Effect on such party or which would cause or constitute a material breach of any of the representations, warranties, or covenants of such party contained herein.  Each Company shall file all reports required by regulation to be filed by it with the SEC between the date of this Agreement and the Effective Time and shall deliver to the other party copies of all such reports promptly after the same are filed.  Except where prohibited by applicable statutes and regulations, each party shall promptly provide the other (or its counsel) with copies of all other filings made by such party with any state or federal government entity in connection with this Agreement or the transactions contemplated hereby.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

6042-00300 299242.4

SMX-0077

## VII.

## ADDITIONAL AGREEMENTS

A.   **Access and Information**.

   1.   Raceway shall afford to SMX and its financial advisors, legal counsel, accountants, consultants, and other representatives access during normal business hours throughout the period from the date hereof to the closing to all of its books, records, properties, facilities, personnel commitments, and records (including but not limited to Tax Returns) and, during such period, each shall furnish promptly all information concerning its business, properties, and personnel as SMX may reasonably request in order for SMX to fully investigate the business and affairs of Raceway prior to the Effective Time (the "Inspection").

   2.   All information furnished by any company to another pursuant hereto shall be treated as the sole property of the party furnishing the information until consummation of the Merger contemplated hereby.   The parties shall hold any such information that is nonpublic in confidence.

   B.   **Acquisition Proposals**.  Raceway and its subsidiaries shall not, and shall use its best efforts to cause their respective directors, officers, employees, financial advisors, legal counsel, accountants, and other agents and representatives (for purposes of this Section 7.2 only, being referred to as "affiliates") not to, initiate, solicit, or encourage, directly or indirectly, or take any other action to facilitate any inquiries or the making of any proposal with respect to, engage or participate in negotiations concerning, provide any nonpublic information or data to, or have any discussions with any person other than SMX relating to, any acquisition, merger, consolidation, acquisition of beneficial ownership of or the right to vote securities representing 10% or more of the total voting power of such entity or any of its subsidiaries, dissolution, business combination, purchase of all or any significant portion of the assets or any division of, or any equity interest in, such entity or any subsidiary, or similar transaction other than the Merger (such proposals, announcements, or transactions being referred to as "Acquisition Proposals").  Raceway shall promptly notify the others orally and in writing if any such Acquisition Proposal (including the terms thereof and identity of the persons making such proposals) is received and furnish to the other parties hereto a copy of any written proposal.

   C.   _   **Shareholder Approvals**.  Attached hereto as Exhibit 4.17, is the consent of certain Raceway shareholders to this Agreement and the transactions reflected hereby.

   D.   **Public Announcements**.  So long as this Agreement is in effect, each Company agrees that it shall obtain the approval of the other party prior to issuing any press release and shall use its best efforts to consult with the others before otherwise making any public statement or responding to any press inquiry with respect to this

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0078

Agreement or the transactions contemplated hereby, except as may be required by law or any governmental agency.

E.     **Expenses**.  Whether or not the Merger is consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby and thereby shall be paid by the party incurring such expenses.

F.     **Additional Agreements**.

1.     Subject to the terms and conditions herein provided, including without limitation those set forth in the proviso to Section 6.5 hereof, each of the parties hereto agrees to use all reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement, including using all reasonable efforts to obtain all necessary waivers, consents, and approvals, and to effect all necessary registrations and filings.  In case at any time after the Effective Time any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and/or directors of the Companies shall take all such necessary action.

2.     Subject to the terms and conditions herein provided, including without limitation those set forth in the proviso to Section 6.4 hereof, each Company shall cooperate with the others and use all reasonable efforts to prepare all necessary documentation to effect promptly all necessary filings and to obtain all necessary permits, consents, approvals, orders, and authorizations of or any exemptions by, all third parties and governmental bodies necessary to consummate the transactions contemplated by this Agreement.

G.     **Survival of Representations and Warranties**.  The respective representations and warranties of Raceway contained in this Agreement shall survive the Closing Date for a period of two years (the "Survival Period"), at the end of which Survival Period no claim may be made with respect to any such representation or warranty unless such claim shall have been asserted in writing to the Indemnifying Party during such period, except for the representations and warranties contained in Sections 4.1, 4.2, 4.3, 4.8, 4.9 and 4.10, which, in each case, shall survive indefinitely.

The respective representations and warranties of SMX and Acquisition Sub contained in this Agreement shall survive the Closing Date for a period of two years (the "Survival Period"), at the end of which Survival Period no claim may be made with respect to any such representation or warranty unless such claim shall have been asserted in writing to the Indemnifying Party during such period, except for the representations and warranties contained in Sections 5.1, 5.2, 5.3, and 5.8, which, in each case, shall survive indefinitely.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

23

SMX-0079

H.     **Indemnification**.

1.     Raceway hereby agrees to indemnify and hold SMX, the Surviving Corporation and their officers, directors, affiliates, representatives, trustees, grantors, beneficiaries and agents, and any successors thereto (the "SMX Indemnitees"), harmless from any and all damages, losses, costs or reasonable expenses (including, without limitation, reasonable fees and expenses of investigation and reasonable attorneys' and consultants' fees and expenses in connection with any action suit, or proceeding) (collectively, "Damages") incurred or suffered as a result of or arising out of: (i) the breach of any representation or warranty made by or on behalf of Raceway pursuant to Article IV of this Agreement or any other certificate or document delivered by Raceway pursuant to this Agreement, and (ii) the breach of any covenant or agreement made or to be performed by Raceway pursuant to this Agreement.

2.     SMX hereby agrees to indemnify and hold Raceway and its officers, directors, affiliates, representatives, trustees, grantors, beneficiaries and agents, and any successors thereto (the "Raceway Indemnitees") harmless from Damages incurred or suffered as a result of or arising out of (i) the breach of any representation or warranty made by SMX pursuant to Article V of this Agreement or any other certificate or document delivered by SMX pursuant to this Agreement; or (ii) the breach of any covenant or agreement made or to be performed by SMX pursuant to this Agreement.

3.     Any party seeking indemnification (the "Indemnified Party") from any other party (the "Indemnifying Party") with respect to any claim, demand, action, proceeding or other matter (the "Claim") pursuant to this Section 7.9 shall promptly notify the Indemnifying Party in writing of the existence of the Claim, setting forth in reasonable detail the facts and circumstances pertaining thereto and the basis for the Indemnified Party's right to indemnification.

4.     In the event that any third party notifies any Indemnified Party with respect to any matter which may give rise to a Claim for indemnification against the Indemnifying Party under this Agreement, then the Indemnified Party shall promptly notify the Indemnifying Party of such Claim; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any liability or obligation hereunder unless (and then solely to the extent) the Indemnifying Party is prejudiced by such failure to give notice. The Indemnifying Party, upon waiver of its right to contest the liability for which indemnification is being sought and demonstration by the Indemnifying Party of its financial ability to satisfy any resulting judgment to the reasonable satisfaction of the Indemnified Party, shall have the right to assume defense of the Claim if notice is given to the Indemnified Party within ten (10) days after receipt of notice of such Claim. If the Indemnifying Party assumes defense of the Claim as provided in the preceding sentence, then:

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

24

SMX-0080

a.  The Indemnifying Party will diligently defend the Indemnified Party against the matter with counsel of its choice reasonably satisfactory to the Indemnified Party;

b.  The Indemnified Party may retain separate co-counsel at its sole cost and expense (except that the Indemnifying Party will be responsible for the fees and expenses of the separate co-counsel (a) to the extent the Indemnified Party concludes reasonably based upon advice of counsel that a conflict of interest exists between the Indemnified Party and Indemnifying Party or (b) the named parties to any such action (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to the Indemnified Party which are not available to the Indemnifying Party, or available to the Indemnifying Party, but the assertion of which would be adverse to the interest of the Indemnified Party;

c.  The Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the matter without the written consent of the Indemnifying Party (not to be withheld or delayed unreasonably; it being understood and agreed that failure to consent to a judgment or settlement that provides for relief other than monetary damages or does not provide an unconditional release of the Indemnifying Party from liability shall not be deemed unreasonable); and

d.  The Indemnifying Party will not consent to the entry of any judgment or enter into any settlement, without the written consent of the Indemnified Party (not to be withheld or delayed unreasonably; it being understood and agreed that failure to consent to a judgment or settlement that provides for relief other than monetary damages or does not provide an unconditional release of the Indemnified Party from liability shall not be deemed unreasonable).

5.  If no Indemnifying Party notifies the Indemnified Party within ten (10) days after the Indemnified Party has given notice of the matter that the Indemnifying Party is assuming the defense thereof, then the Indemnified Party may defend against, or enter into any settlement with respect to, the matter in any manner it reasonably may deem appropriate, without prejudice to any of its rights hereunder.

6.  The Indemnified Party shall be entitled to reimbursement of reasonable expenses included in Damages with respect to any Claim (including, without limitation, the cost of defense, preparation and investigation relating to such Claim) as such expenses are incurred by the Indemnified Party; provided, however, that the Indemnified Party shall undertake to repay any amounts arising solely from the fault of such Indemnified Party.

7.  The rights and remedies of the SMX Indemnitees under Section 5.12 shall not be limited or otherwise affected by or as a result of any information furnished to,

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

25

SMX-0081

or any investigation made by or knowledge of, any of the SMX Indemnitees or any of their respective representatives or agents.

        8.    Notwithstanding any provision of this Section 7.8 to the contrary, the indemnification obligations of Raceway shall be limited to the return of up to $2,500,000 worth of the SMX Shares received by the Raceway shareholders upon the conversion of their Shares, on a dollar for dollar basis.

        I.    **SMX Board of Directors and Officers.**  SMX agrees to take any and all action necessary to effectuate the appointment of each of three Raceway designees to serve on the Board of Directors of SMX for two years. The SMX board of directors at the Effective Date shall consist of a total of five directors. SMX agrees to take any and all action necessary to effectuate the appointment the following as officers of SMX: George Burmeister as President, William Hoffman as Vice President and Treasurer, and Shawn Preston as Secretary.

**VIII.**

**CONDITIONS TO CONSUMMATION OF THE MERGER**

        A.    **Conditions to the Companies' Obligation to Effect the Merger**. The respective obligations of all Companies to effect the transactions contemplated herein shall be subject to the satisfaction at or prior to the Effective Time of the following conditions, any one of which may .be waived by a writing signed by SMX, Acquisition Sub, and Raceway:

        1.    This Agreement and the transactions contemplated hereby shall have been approved and adopted by the requisite vote of the shareholders of Raceway in accordance with applicable law.

        2.    No preliminary or permanent injunction or other order by any federal, state, or foreign court of competent jurisdiction which prohibits the consummation of any Merger shall have been issued and remain in effect. No statute, rule, regulation, executive order, stay, decree, or judgment shall have been enacted, entered, issued, promulgated, or enforced by any court or governmental authority which prohibits or restricts the consummation of the Merger. Other than the filing of Articles of Merger with the Secretary of State for the State of Florida and a Certificate of Merger with the Secretary of State for the State of Delaware, all authorizations, consents, orders or approvals of, or declarations or filings with, and all expirations of waiting periods imposed by, any governmental entity (all of the foregoing, "Consents") which are necessary for the consummation of the Merger, other than Consents the failure to obtain which would have no material adverse effect on the consummation of the Merger or on the Surviving Corporation and its subsidiaries, taken as a whole, shall have been filed, occurred, or been obtained (all such permits, approvals, filings, and consents and the lapse of all such waiting periods being referred to as the

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0082

"Requisite Regulatory Approvals") and all such Requisite Regulatory Approvals shall be in full force and effect. All state securities or blue sky permits and other authorizations necessary to issue the SMX Shares in exchange for the Shares of Raceway and to consummate the Merger shall have been received.

3.      There shall not be any action taken, or any statute, rule, regulation, or order enacted, entered, enforced, or deemed applicable to any Merger, by any federal or state governmental entity which, in connection with the grant of a Requisite Regulatory Approval, imposes any condition or restriction upon any Surviving Corporation or its subsidiaries (or, in the ease of any disposition of assets required in connection with such Requisite Regulatory Approval, upon any Company or its subsidiaries), including, without limitation, requirements relating to the disposition of assets, which in any such case would so materially adversely impact the economic or business benefits of the transactions contemplated by this Agreement as to render inadvisable the consummation of the Merger.

4.      The other Company shall have performed in all material respects its obligations under this Agreement required to be performed by it at or prior to the Effective Time and the representations and warranties of the other Company contained in this Agreement shall be true and correct in all material respects at and as of the Effective Time as if made at and as of such time, except as contemplated by this Agreement, and each Company shall have received a certificate of the Chairman of the Board, the President, or an Executive Vice President of the other Company as to the satisfaction of this condition.

5.      Each Company shall have obtained the consent or approval of each person whose consent or approval shall be required in connection with the transactions contemplated hereby, under any loan or credit agreement, note, mortgage, indenture, lease, license, or other agreement or instrument, except those for which failure to obtain such consents and approvals would not, individually or in the aggregate, have a material adverse effect on the Surviving Corporation and its subsidiaries taken as a whole or upon the consummation of the transactions contemplated hereby.

6.      SMX shall have received an equity contribution from Lancer in the aggregate principal amount of at least $2.5 million, according to the term sheet attached as Exhibit 8.1(f) hereto.

7.      SMX shall have completed a one for ten reverse split of its common stock.

8.      SMX, Raceway, and Jeffrey G. Klein ("Escrow Agent") shall have executed an escrow agreement providing for the deposit with Escrow Agent of 74,527,470 of the SMX Shares, in the form of the attached Exhibit 8.1(h).

B.      **Conditions to Obligations of SMX.** The obligations of SMX to carry out the transactions contemplated by this Agreement are subject, at the option of SMX, to the satisfaction, or waiver by SMX, of the following conditions:

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

27

SMX-0083

1.     No proceeding which Raceway shall be a debtor, defendant, or party seeking an order for its own relief or reorganization shall have been brought or be pending by or against such person under any United States or state bankruptcy or insolvency law.

2.     SMX's Board of Directors shall have received an opinion from a financial advisor satisfactory to it, to the effect that the Merger is fair, from a financial point of view, to the stockholders of SMX.

3.     Each Raceway stockholder shall, as a condition to receiving the SMX Shares, enter into lockup agreements with SMX restricting the resale of the SMX Shares held by them the form of which is attached as Exhibit 8.2(c) hereto.

4.     SMX shall have received an Officer's Affidavit from a duly authorized officer of Raceway attesting that Raceway's representations and warranties contained in the Agreement are true and correct as of the date of the Officer's Affidavit and that Raceway has performed in all material respects all of its obligations and agreements and complied in all material respects with all of its covenants contained in the Agreement.

5.     There shall have not been a Material Adverse Effect on the business, prospects, financial or other condition of Raceway.

6.     Raceway shall have converted all of its loans and notes from shareholders to equity.

C.     **Conditions to Obligations of Raceway**.  The obligations of Raceway to carry out the transactions contemplated by this Agreement are subject, at the option of Raceway, to the satisfaction, or waiver by Raceway, of the following conditions:

1.     No proceeding which SMX shall be a debtor, defendant, or party seeking an order for its own relief or reorganization shall have been brought or be pending by or against such person under any United States or state bankruptcy or insolvency law.

2.     Lancer agrees to vote its shares and to take any and all action necessary to effectuate the appointment of George Burmeister, Wiliam Hoffman, and Larry Ferk to serve on the Board of Directors of SMX for two years.

## IX.

## TERMINATION, AMENDMENT AND WAIVER

A.     **Termination**. This Agreement may be terminated and the Merger contemplated hereby abandoned at any time prior to the Effective Time, whether before or after approval by the shareholders of Raceway:

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

28

SMX-0084

1.    By mutual written consent of all of the Companies.

2.    By either SMX or Raceway if the Merger shall not have been consummated on or before December 31, 2000.

3.    By SMX or Raceway if there shall have been any material breach of a material obligation of the other hereunder and, if such breach is curable, such default shall have not been remedied within 10 days after receipt by the other Company, as the case may be, of notice in writing from such Company specifying such breach and requesting that it be remedied; provided, that such 10-day period shall be extended for so long as the other Company shall be making diligent attempts to cure such default.

4.    By either SMX or Raceway if any court of competent jurisdiction in the United States or other United States governmental body shall have issued an order, decree, or ruling or taken any other action restraining, enjoining, or otherwise prohibiting the Merger and such order, decree, ruling, or any other action shall have become final and non-appealable.

5.    By either SMX or Raceway upon written notice to the other if any approval of the shareholders of Raceway required for the consummation of the Merger submitted for their approval shall not have been obtained by reason of the failure to obtain the required vote at a duly held meeting of shareholders or at any adjournment thereof.

B.    **Effect of Termination.**  In the event of termination of this Agreement as provided above, this Agreement shall forthwith become of no further effect and, except for a termination resulting from a breach by a party of this Agreement, there shall be no liability or obligation on the part of any Company or their respective officers or directors except for Sections 7.7, 10.1 and 10.5 hereof which shall survive the termination). Nothing contained in this Section 9.2 shall relieve any party from liability for willful breach of this Agreement that results in termination of this Agreement.  Upon request therefor, each party shall redeliver all documents, work papers, and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing same.

C.    **Amendment.**  This Agreement may be amended by action taken at any time before or after approval hereof by the shareholders of SMX, but, after any such approval, no amendment shall be made which alters the Exchange Ratio or which in any way materially adversely affects the rights of such shareholders, without the further approval of such shareholders.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.

D.    **Waiver.**  At any time prior to the Effective Time, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

29

herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party. Such extensions or waivers shall be in writing, executed by each of SMX and Raceway. Such waiver shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

## X.

## GENERAL PROVISIONS

A.    **Brokers**. Each Company represents and warrants to the others that no broker, finder, or financial advisor is entitled to any brokerage, finder's, or other fee or commission in connection with the Merger or the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any party hereto, except as reflected in the Raceway Schedule or the SMX/Acquisition Sub Schedule.

B.    **Notices**. All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by telex or telecopy or mailed by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified by like notice):

| | | |
|---|---|---|
| 1. | If to SMX, to: | 1900 Corporate Boulevard<br>Suite 305 West<br>Boca Raton, Florida 33431<br>Attention: President |
| | with a copy to: | Atlas Pearlman, P.A.<br>350 East Las Olas Boulevard<br>Suite 1700<br>Fort Lauderdale, Florida 33301<br>Attention: James M. Schneider |
| 2. | If to Raceway, to: | 7280 West Palmetto Road<br>Suite 303N<br>Boca Raton, Florida 33433<br>Attention: President |
| | with a copy to: | Jeffrey G. Klein, P.A.<br>23123 State Road #7<br>Suite 350B<br>Boca Raton, Florida 33428<br>Attention: Jeffrey G. Klein |

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

30

C.     **Descriptive Headings**. The headings contained in this Agreement are for reference Purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

D.     **Entire Agreement; Assignment**. This Agreement (including the Exhibits, Schedules, and other documents and instruments referred to herein) and the Confidentiality Agreement (a) constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, among the parties or any of them, with respect to the subject matter hereof; and (b) shall not be assigned by operation of law or otherwise.

E.     **Governing Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to the provisions thereof relating to conflicts of law.

F.     **Parties in Interest**. Nothing in this Agreement, express or implied, is intended to or shall confer upon any other person any rights, benefit, or remedies of any nature whatsoever or by reason of this Agreement.

G.     **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.

H.     **Validity**. The invalidity or unenforceability of any provision of this Agreement shall not effect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect.

I.     **Jurisdiction and Venue**. Each Party hereto hereby agrees that any proceeding relating to this Agreement and the Merger shall be brought in a state court of Florida. Each party hereto hereby consents to personal jurisdiction in any such action brought in any such Florida court, consents to service of process by registered mail made upon such party and such party's agent and waives any objection to venue in any such Florida court or to any claim that such Florida court is an inconvenient form.

J.     **Investigation**. The respective representations and warranties of each Company contained herein or in the certificates or other documents delivered prior to the Closing shall not be deemed waived or otherwise affected by any investigation made by any party hereto.

K.     **Consents**. For purposes of any provision of this Agreement requiring, permitting, or providing for the consent of any or Company, the written consent of the Chief Executive Officer of a Company shall be sufficient to constitute such consent.

**[additional signatures are on the following page]**

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

31

SMX-0087

IN WITNESS WHEREOF, each Company has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the date first above written.

SMX CORP., a Florida corporation

By: _Kathryn Braithwaite_
Name _Kathryn Braithwaite_
Title: _Chairperson_

RACEWAY NET, INC., a Delaware corporation

By: _George Burmister_
Name _George Burmister_
Title: _Pres_

SMX ACQUISITION, CORP., a Florida corporation

By: _Kathryn Braithwaite_
Name _Kathryn Braithwaite_

Titles: _Chairperson_

LANCER OFFSHORE, INC., a Curaçao Netherlands Antilles corporation
With respect to the provisions of Section 8.3(b):

By: _____
Name _____

Titles: _____

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

SMX-0088

IN WITNESS WHEREOF, each Company has caused this Agreement to be executed on its behalf by its officers thereunto duly authorized, all as of the date first above written.

**SMX CORP.,** a Florida corporation

By: _Kathryn Braithwaite_
Name _Kathryn Braithwaite_
Title: _Chairperson_

**SMX ACQUISITION, CORP.,** a Florida corporation

By: _Kathryn Braithwaite_
Name _Kathryn Braithwaite_
Titles: _Chairperson_

**RACEWAY NET, INC.,** a Delaware corporation

By: _____
Name _____
Title: _____

**LANCER OFFSHORE, INC.,** a Curaçao Netherlands Antilles corporation
With respect to the provisions of Section 8.3(b):

By: _____
Name _MICHAEL LAUER_
Titles: _INVESTMENT MANAGER_

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0366

WRITTEN CONSENT IN LIEU OF MEETING OF THE SHAREHOLDER
OF
SMX CORP.

The undersigned, representing the holders of a majority of the issued and outstanding shares of common stock of SMX Corp., do hereby take and ratify the following action as if duly called to vote upon at a meeting of the shareholders.

RESOLVED, the undersigned shareholders hereby approve and consent to SMX Corp., entering into a Plan of Merger and Reorganization with Raceway Net, Inc., SMX Acquisition Corp., and Lancer Offshore, Inc., pursuant to the terms set forth in the Merger Agreement presented to the shareholders, a copy of which is attached hereto;

BE IT FURTHER RESOLVED, SMX Corp., and its officers are hereby authorized to take such steps as necessary to affirm and ratify the merger, and the effectuate all of SMX Corp.'s obligations and agreements as contained in the Merger Agreement.

BE IT FURTHER RESOLVED, the undersigned shareholders, pursuant to Section 607.10025 of the Florida Business Corporation Act, hereby approve and consent to the amendment of the articles of incorporation of SMX Corp. by the Board of Directors, and the taking of any other action deemed necessary by the Board of Directors, to effect a 10 to 1 reverse stock split, provided that the number of SMX Corp.'s authorized shares of capital stock after the reverse stock split shall be the same as the number SMX Corp.'s authorized shares of capital stock prior to the reverse stock split.

Dated: December _3_, 2000                SHAREHOLDERS:

Lancer Offshore, Inc.
A Curaçao Netherlands Antillas corporation

By:
Name _____
Its: _INVESTMENT MANAGER_

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

6042-00300 301291.1

SMX-0365

## WRITTEN CONSENT IN LIEU OF MEETING OF THE SHAREHOLDER
## OF
## SMX CORP.

The undersigned, representing the holders of a majority of the issued and outstanding shares of common stock of SMX Corp., do hereby take and ratify the following action as if duly called to vote upon at a meeting of the shareholders.

RESOLVED, the undersigned shareholders hereby approve and consent to SMX Corp., entering into a Plan of Merger and Reorganization with Raceway Net, Inc., SMX Acquisition Corp., and Lancer Offshore, Inc., pursuant to the terms set forth in the Merger Agreement presented to the shareholders, a copy of which is attached hereto;

BE IT FURTHER RESOLVED, SMX Corp., and its officers are hereby authorized to take such steps as necessary to affirm and ratify the merger, and the effectuate all of SMX Corp.'s obligations and agreements as contained in the Merger Agreement.

BE IT FURTHER RESOLVED, the undersigned shareholders, pursuant to Section 607.10025 of the Florida Business Corporation Act, hereby approve and consent to the amendment of the articles of incorporation of SMX Corp. by the Board of Directors, and the taking of any other action deemed necessary by the Board of Directors, to effect a 10 to 1 reverse stock split, provided that the number of SMX Corp.'s authorized shares of capital stock after the reverse stock split shall be the same as the number SMX Corp.'s authorized shares of capital stock prior to the reverse stock split.

Dated: December _3_, 2000          SHAREHOLDERS:

Lancer Offshore, Inc.
A Curaçao Netherlands Antillas corporation

By: _____
Name _____
Its: _INVESTMENT MANAGER_____

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

6042-00500 301291.1                                        SMX-0163

FROM : COWEN                          PHONE NO. : 9496616260              Dec. 06 2000 04:50AM P1

FROM : COWEN                          PHONE NO. : 9496616260              Dec. 06 2000 04:31AM P1
                                                                                PAGE  02/03

## WRITTEN CONSENT IN LIEU OF MEETING OF THE SHAREHOLDER
## OF
## SMX CORP.

The undersigned, the holder of a majority of the issued and outstanding shares of common stock of SMX Corp., does hereby take and ratify the following action as if duly called to vote upon at a meeting of the shareholders.

RESOLVED, the undersigned shareholder, pursuant to Section 607.1003 of the Florida Business Corporation Act, hereby approves and consents to the amendment of the articles of incorporation of SMX Corp. by the Board of Directors, and the taking of any other act as deemed necessary by the Board of Directors, to increase the authorized capital stock of the corporation from One Hundred Million (100,000,000) to Two Hundred Million (200,000,000).

Dated: December 5, 2000

| SHAREHOLDER | # of Shares | % of Shares |
|---|---|---|
| Lancer Offshore, Inc. A Curacao Netherlands Antilles corporation | 18,300,000 | 95% |

By: _____
Name: MICHAEL LAUER
Its: INVESTMENT MANAGER

OHU-COWK 101013.1

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0190

**SMX CORP.**
**TERM SHEET**

November 27, 2000

This signed and executed Term Sheet supercedes the October 27, 2000 signed and executed Term Sheet (attached).

| Investment | $2.5 million. |
|---|---|
| Consideration | SMX Corp. ("SMXX" or the "Company") shall issue of 50 million newly authorized Common Shares at $0.05/share.<br><br>Issuance of 5-year Warrants for 12.5 million shares exercisable at $0.50/share to Lancer Group and/or its assigns, plus an additional 5-year Warrant for 12.5 million shares exercisable at $1.00/share to Lancer Group and/or its assigns, plus an additional 2 year warrant for 6.25 million shares exercisable at $0.25/share to Lancer Group and/or its assigns. |
| Use of Proceeds | Working capital following acquisition of Raceway Net, Inc. ("Raceway") with transaction to close no later than December 15, 2000, with a target closing of November 30, 2000. Assuming all of Raceway's notes and loans are converted at or prior to Closing, then the acquisition shall be 50%-50% on shares outstanding. |
| Conditions | Following investment, Company will affect a 1 for 10 reverse stock split effective prior to December 31, 2000.<br><br>Shareholders of EAI Partners, Inc. holding 744,818 shares of the Company will extend the lock-up from April 29, 2001 to October 29, 2002. Additional lock-ups for former officers of SMXX to be negotiated.<br><br>For services performed, the Company will issue Laurence S. Isaacson and Katherine Braithwaite 250,000 Common Shares each.<br><br>For the acquisition of Raceway, current shareholders, option holders and warrant holders of Raceway will enter into a two year lock-up agreement for shares issued upon closing of acquisition. |

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

| | |
|---|---|
| **Reporting Requirements** | The following conditions will be incorporated into the Stock Purchase Agreement:<br><br>1. Current majority shareholders of SMXX will have an option to select 50% of Board members.<br><br>2. Visitation rights for Bruce Cowen at all Board of Directors and committee meetings.<br><br>3. Raceway's monthly financial statements will be distributed within 30 days of previous month's end. |
| **Documentation** | Company will provide fully executed Stock Purchase Agreements, Common Shares, Warrants, and registration rights agreements by November 30, 2000. |
| **Fee** | The Company shall issue a 7½% fee in Common Shares (3.75 million shares) payable to Capital Research, Ltd. at Closing. |

_____ Date _11/27/00_
on behalf of SMX Corp.

_____ Date _11/27/00_
on behalf of Investor

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

SMX-0123

# NU-D-ZINE/XTRACARD

press or other public disclosure with respect to either the fact that discussions or negotiations have taken place concerning the transactions contemplated by this Agreement, the existence or contents of this Agreement or any prior correspondence relating to this transactions contemplated by this Agreement, except for such public disclosure as may be necessary, in the written opinion of outside counsel (reasonably satisfactory to the other parties) for the party proposing to make the disclosure not to be in violation of or default under any applicable law, regulation or governmental order. If either party proposes to make any disclosure based upon such an opinion, that party will deliver a copy of such opinion to the other party, together with the text of the proposed disclosure, as far in advance of its disclosure as is practicable, and will in good faith consult with and consider the suggestions of the other party concerning the nature and scope of the information it proposes to disclose.

7.4   Confidential Information. In connection with the negotiation of this Agreement and the consummation of the transactions contemplated hereby, each party hereto will have access to data and confidential information relating to the other party. Each party hereto shall treat such data and information as confidential, preserve the confidentiality thereof and not duplicate or use such data or information, except in connection with the transactions contemplated hereby, and in the event of the termination of this Agreement for any reason whatsoever, each party hereto shall return to the other all documents, work papers and other material (including all copies thereof) obtained in connection with the transactions contemplated hereby and will use reasonable efforts, including instructing its employees who have had access to such information, to keep confidential and not to use any such data or information; provided, however, that such obligations shall not apply to any data and information (a) which at the time of disclosure, is available publicly, (b) which, after disclosure, becomes available publicly through no fault of the receiving party, (c) which the receiving party knew or to which the receiving party had access prior to disclosure by the disclosing party, (d) which is required by law, regulation or exchange rule, or in connection with legal process, to be disclosed, (e) which is disclosed by a receiving party to its attorneys or accountants, who shall respect the above restrictions, or (f) which is obtained in connection with any Tax matters and is disclosed in connection with the filing of Tax returns or claims for refund or in conducting an audit or other proceeding.

7.5   Additional Information.

(a)   Nu-D-Zine has advised XtraCard, and XtraCard shall, prior to any vote by XtraCard stockholders in connection with the transactions contemplated by this Agreement, advise each of its stockholders, that in connection with its obtaining stockholder approval for the Merger and the other transactions contemplated by this Agreement, XtraCard shall deliver to each of its stockholders a copy of this Agreement, as well as the Nu-D-Zine Annual Report.

(b)   From the date hereof and continuing until the Closing, Nu-D-Zine agrees to afford XtraCard and each of its stockholders with the opportunity to ask questions of, and receive answers from, the officers and/or directors of Nu-D-Zine, concerning the terms and conditions of this transaction, and to obtain any additional information, to the extent that Nu-D-Zine possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of information furnished by Nu-D-Zine.

7.6   Board Seats.   For a period of ten years following the Closing Date, Robert Steinberg shall have the right to designate one person who will be included on management's slate of nominees to serve as members of Nu-D-Zine's Board of Directors. At the Effective time, Nu-D-Zine's Board of Directors shall consist of two members. Lancer shall vote it's shares of common stock of Nu-D-Zine to effectuate the provisions of this Section 7.6.

14

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT.

NU-0182

# AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger dated as of November ___, 2002, is entered into by and among NU-D-ZINE, INC., a Florida corporation ("Nu-D-Zine"), XTRACARD SERVICES, INC., a Florida corporation to be formed as wholly-owned subsidiary of Nu-D-Zine ("SUB"), XTRACARD SERVICES, INC., a Delaware corporation ("XtraCard"), and LANCER OFFSHORE, INC. ("Lancer").

WHEREAS, the issued and outstanding shares of capital stock of XtraCard are owned by the persons and in the amounts set forth on Schedule A hereto, as may be amended from time-to-time prior to the Closing (as hereinafter defined); and

WHEREAS, the Boards of Directors of Nu-D-Zine, SUB and XtraCard deem it advisable and in the best interests of each corporation and their respective stockholders that XtraCard be acquired by Nu-D-Zine in a merger consummated as hereinafter set forth and in accordance with the applicable laws of the State of Florida; and

WHEREAS, it is intended that the acquisition of XtraCard by Nu-D-Zine be effected by the merger of XtraCard with and into SUB, with SUB surviving such Merger, and which is intended to be treated for Federal income tax purposes as a reorganization described in Section 368(a) of the Internal Revenue Code of 1986, as amended (the "Code").

NOW THEREFORE, in consideration of the mutual promises and covenants herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## MERGER

1.1   Terms of the Merger.  Subject to the terms and conditions of this Agreement, at the Effective Time (as hereinafter defined), XtraCard shall be merged with and into SUB and the separate corporate existence of XtraCard shall thereupon cease (the "Merger").  SUB (sometimes hereinafter referred to as the "Surviving Corporation") shall be the surviving corporation to the Merger.  The Merger shall have the effects set forth in the applicable provisions of the Florida Corporation Law (the "FCL") and the Delaware General Corporation Law (the "DGCL").  The Shareholders of XtraCard shall receive 40,649,634 shares of the common stock of Nu-D-Zine (subject to adjustment for rounding) in the Merger.

1.2   Effective Time of the Merger.  Subject to the terms and conditions of this Agreement, on the Closing Date (as hereinafter defined), the parties hereto shall cause a Certificate of Merger (the "Certificate of Merger") that meets the applicable requirements of the FCL and DGCL to be properly executed and filed with the Secretary of the State of Florida and the Secretary of State of the State of Delaware.  The Merger shall be effective at the later of time of filing of the Certificate of Merger with the Secretary of the State of Florida and the Secretary of State of the State of Delaware, or at such later time which the parties hereto shall have lawfully agreed upon and designated in such Certificate of Merger as the effective time of the Merger (the "Effective Time").

1.3   The Surviving Corporation.  At the Effective Time:

(a)   Articles of Incorporation.  The Articles of Incorporation of SUB in effect immediately prior to the Effective Time shall be the Articles of Incorporation of the Surviving Corporation until otherwise modified in accordance with applicable law.

(b)   By-Laws.  The Bylaws of SUB as in effect immediately prior to the Effective

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM

NU-0169

Time shall be the Bylaws of the Surviving Corporation until otherwise modified in accordance with applicable law.

(c) Directors and Officers. As of the Effective Time (i) the directors and officers of XtraCard shall resign, (ii) Laurence Isaacson shall resign all offices held with SUB other than that of Director, and (iii) Robert Steinberg shall be appointed as the second Director, the Chief Executive Officer, and the President of the Surviving Corporation, and such parties shall hold such offices from the Effective Time until their respective successors are duly elected or appointed and qualify in the manner provided in the Articles of Incorporation and Bylaws of the Surviving Corporation, or as otherwise provided by law.

1.4 Directors and Officers of Nu-D-Zine. As of the Effective Time (i) Laurence Isaacson shall resign all offices held with Nu-D-Zine other than that of Director, and (ii) Robert Steinberg shall be appointed as the second Director, the Chief Executive Officer, and the President of Nu-D-Zine, and such parties shall hold such offices from the Effective Time until their respective successor(s) are duly elected or appointed and qualify in the manner provided in the Articles of Incorporation and Bylaws of Nu-D-Zine, or as otherwise provided by law.

1.5 Name Change. At the Effective Time, or as soon thereafter as is practicable, Nu-D-Zine shall change its name to "XtraCard, Corp."

1.6 Conversion of XtraCard Shares.

(a) XtraCard Securities. At the Effective Time, by virtue of the Merger and without any action on the part of the Nu-D-Zine, SUB or XtraCard, or the holder of capital stock of any of them, each of the 42,831,085 shares of XtraCard common stock, par value $.001 per share (the "XtraCard Common Stock") issued and outstanding immediately prior to the Effective Time, shall be converted into the right to receive 0.9490685 shares (the "Nu-D-Zine Shares") of Nu-D-Zine common stock, par value $.001 per share ("Nu-D-Zine Common Stock"). The Nu-D-Zine Shares shall be issued to the persons and in the amounts set forth on Schedule A.

(b) Effect of Merger. At the Effective Time all outstanding shares of XtraCard Common Stock shall be cancelled and retired and each certificate or other instrument theretofore evidencing the right to receive XtraCard Common Stock shall thereafter represent only the right to receive the Nu-D-Zine Shares issuable in exchange therefore upon surrender of such certificate or instrument to the Surviving Corporation.

(c) Status of Registration. The Nu-D-Zine Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "Act") or the securities laws of any state, and will be issued pursuant to exemptions afforded under the Act and the rules and regulations promulgated thereunder and under applicable state securities laws. Each certificate evidencing any of the Nu-D-Zine Shares will bear a legend disclosing that the Nu-D-Zine Shares may not be sold, assigned, pledged, hypothecated, transferred or otherwise disposed of absent registration under the Act and other applicable state securities laws, or the availability of applicable exemptions therefrom.

(d) SUB Common Stock. Each share of capital stock of SUB issued and outstanding immediately prior to the Effective Time, shall remain issued and outstanding and unchanged.

1.7 Stock Certificates. At or following the Effective Time, each holder of an outstanding certificate or certificates representing XtraCard Common Stock shall surrender the same to SUB and SUB shall, in exchange therefor, cause to be issued to the holder of such certificate(s) a new certificate representing shares of Nu-D-Zine Common Stock, and the surrendered certificate(s) shall

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM

2

NU-0170

be cancelled. Until so surrendered and exchanged, each such certificate shall represent solely the right to receive the consideration described in Section 1.6, without interest.

1.8    Fractional Shares. No fractional shares of Nu-D-Zine Common Stock shall be issued in the Merger. In the event that a holder of XtraCard Common Stock would otherwise be entitled to receive any fractional shares of Nu-D-Zine Common Stock as a result of the Merger, such holder shall be entitled to receive one full share in lieu thereof.

1.9    Transfers. From and after the Effective Time, there shall be no further transfers on the stock transfer books of XtraCard or the Surviving Corporation. If, subsequent to the Effective Time, certificates evidencing shares of XtraCard are presented to the Surviving Corporation, they shall be cancelled and exchanged as provided in this Article I.

1.10    Nu-D-Zine Guarantee. Nu-D-Zine hereby unconditionally guarantees the performance of the obligations of SUB pursuant to the terms and conditions hereof.

1.11    Successor Acquiror. Notwithstanding anything contained herein to the contrary, the parties acknowledge that in the event Nu-D-Zine is unable to consummate the transactions contemplated by this Agreement, for any reason, including without limitation its inability to become current in its filings with the Securities and Exchange Commission ("SEC"), then Nu-D-Zine may assign its rights and obligations under this Agreement to another entity (the "Assignee") (a) that is reasonably satisfactory to XtraCard, (b) that has no active business operations and no material liabilities, (c) that is capable of making substantially the same representations and warranties as are made by Nu-D-Zine hereunder, (d) that is capable of satisfying the obligations of Nu-D-Zine hereunder, and (e) that can otherwise consummate the transactions contemplated hereby on substantially the same relative terms and conditions as are applicable to Nu-D-Zine. In the event of an assignment contemplated by this Section, Nu-D-Zine shall thereupon be released from its obligations under this Agreement, the Assignee shall assume all of Nu-D-Zine's obligations and duties under this Agreement, and the parties shall enter into an amendment to this Agreement substituting the Assignee for Nu-D-Zine and otherwise modifying this Agreement to the extent necessary to effect the intent of this Section.

## ARTICLE II
## THE CLOSING

2.1    The closing of the transactions contemplated hereby (the "Closing") shall take place at the offices of Adorno & Yoss, P.A., 350 East Las Olas Blvd., Suite 1700, Fort Lauderdale, Florida 33301 on November 8, 2002 (the "Closing Date") or at such other place as Nu-D-Zine and XtraCard may agree.

2.2    Deliveries. At the Closing:

(a)    XtraCard shall deliver certificates evidencing all of the XtraCard Common Stock, duly endorsed for transfer to SUB;

(b)    the parties shall execute and deliver the Certificate of Merger;

(c)    the parties shall deliver the certificates and other documents required by Article VI; and

(d)    the parties shall execute such other and further instruments and documents as may be necessary to consummate the Merger and the other transactions described in this Agreement.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM

NU-0171

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF Nu-D-Zine

Nu-D-Zine represents and warrants to XtraCard and the XtraCard Shareholders that, as of the Closing Date, except as otherwise disclosed in this Agreement, shall be deemed adequate to disclose an exception to a representation or warranty made herein, unless Nu-D-Zine identifies the exception with reasonable particularity, including each numbered section and paragraph of this Agreement to which the exception relates, and describes the relevant facts in reasonable detail:

3.1     Due Organization and Qualification; Due Authorization.

(a)     Nu-D-Zine is a corporation duly incorporated, validly existing and in good standing under the laws of its jurisdiction of formation, with full corporate power and authority to own, lease and operate its respective business and properties and to carry on its respective business in the places and in the manner as presently conducted or proposed to be conducted. Nu-D-Zine is in good standing as a foreign corporation in each jurisdiction in which it is required to so qualify, except where the failure to qualify would not result in a material adverse effect on the business, operations or financial condition of Nu-D-Zine ("Nu-D-Zine Material Adverse Effect").

(b)     Nu-D-Zine does not own, directly or indirectly, any capital stock, equity or interest in any corporation, firm, partnership, joint venture or other entity, other than that of SUB.

(c)     Nu-D-Zine has all requisite corporate power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby and thereby. Nu-D-Zine has taken all corporate action necessary for the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and this Agreement constitutes the valid and binding obligation of Nu-D-Zine, enforceable against Nu-D-Zine in accordance with its respective terms, except as may be affected by bankruptcy, insolvency, moratoria or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

3.2     No Conflicts or Defaults. The execution and delivery of this Agreement by Nu-D-Zine and the consummation of the transactions contemplated hereby do not and shall not (a) contravene the Certificate of Incorporation or Bylaws of Nu-D-Zine or (b) with or without the giving of notice or the passage of time (i) violate, conflict with, or result in a breach of, or a default or loss of rights under, any material covenant, agreement, mortgage, indenture, lease, instrument, permit or license to which Nu-D-Zine is a party or by which Nu-D-Zine is bound, or any judgment, order or decree, or any law, rule or regulation to which Nu-D-Zine is subject, (ii) result in the creation of, or give any party the right to create, any lien, charge, encumbrance or any other right or adverse interest ("Liens") upon any of the assets of Nu-D-Zine, (iii) terminate or give any party the right to terminate, amend, abandon or refuse to perform, any material agreement, arrangement or commitment to which Nu-D-Zine is a party or by which Nu-D-Zine's assets are bound, or (iv) accelerate or modify, or give any party the right to accelerate or modify, the time within which, or the terms under which, Nu-D-Zine is to perform any duties or obligations or receive any rights or benefits under any material agreement, arrangement or commitment to which it is a party.

3.3     Capitalization. The authorized capital stock of Nu-D-Zine immediately prior to giving effect to the transactions contemplated hereby consists of 350,000,000 shares of Common

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM

NU-0172

Stock par value $0.001 per share, of which 51,735,898 shares are issued and outstanding as of December 31, 2001. All of the outstanding shares of capital stock of Nu-D-Zine are, and the Nu-D-Zine Shares when issued in accordance with the terms hereof will be, duly authorized, validly issued, fully paid and non-assessable, and have not been or, with respect to Nu-D-Zine Shares, will not be, issued in violation of any preemptive right or similar right of any person. The Nu-D-Zine Shares are not subject to any preemptive or subscription right, any voting trust agreement or other contract, agreement, arrangement, option, warrant, call, commitment or other right of any character obligating or entitling Nu-D-Zine to issue, sell, redeem or repurchase any of its securities.

3.4    Financial Statements. Nu-D-Zine's Audited Financial Statements include the consolidated balance sheet of Nu-D-Zine at December 31, 2001 and the related statements of operations, stockholders' equity and cash flows for the fiscal year then ended, including the notes thereto, as audited by Weinberg & Company, P.A., certified public accountants, (collectively, the "Nu-D-Zine Financial Statements"). The Nu-D-Zine Financial Statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") applied on a basis consistent throughout all periods presented, subject to, in the case of the interim statements, full notes and audit adjustments, which are not expected to be material. Such statements present fairly the financial position of Nu-D-Zine as of the dates and for the periods indicated.

3.5    Further Financial Matters. Nu-D-Zine does not have any liabilities or obligations, whether secured or unsecured, accrued, determined, absolute or contingent, asserted or unasserted or otherwise, which are required to be reflected or reserved in a balance sheet or the notes thereto under generally accepted accounting principles, but which are not reflected in the Nu-D-Zine Financial Statements.

3.6    Taxes. Nu-D-Zine and each subsidiary of Nu-D-Zine has filed all United States federal, state, county, local and foreign national, provincial and local returns and reports which were required to be filed on or prior to the date hereof in respect of all income, withholding, franchise, payroll, excise, property, sales, use, value added or other taxes or levies, imposts, duties, license and registration fees, charges, assessments or withholdings of any nature whatsoever (together, "Taxes"), and has paid all Taxes (and any related penalties, fines and interest) which have become due pursuant to such returns or reports or pursuant to any assessment which has become payable, or, to the extent its liability for any Taxes (and any related penalties, fines and interest) has not been fully discharged, the same have been properly reflected as a liability on the books and records of Nu-D-Zine or such subsidiary and adequate reserves therefore have been established. All such returns and reports filed on or prior to the date hereof have been properly prepared and are true, correct (and to the extent such returns reflect judgments made by Nu-D-Zine, as the case may be, such judgments were reasonable under the circumstances) and complete in all material respects. No tax return or tax return liability of Nu-D-Zine or such subsidiary has been audited or, presently under audit. Nu-D-Zine has not given or been requested to give waivers of any statute of limitations relating to the payment of any Taxes (or any related penalties, fines and interest). There are no claims pending or, to the knowledge of Nu-D-Zine, threatened, against Nu-D-Zine or such subsidiary for past due Taxes. All payments for withholding taxes, unemployment insurance and other amounts required to be paid for periods prior to the date hereof to any governmental authority in respect of employment obligations of Nu-D-Zine or such subsidiary, including, without limitation, amounts payable pursuant to the Federal Insurance Contributions Act, have been paid or shall be paid prior to the Closing and have been duly provided for on the books and records of Nu-D-Zine and in Nu-D-Zine Financial Statements.

3.7    No Adverse Changes. Since the date of the Nu-D-Zine financial statements there has not been (a) any material adverse change in the business, prospects, the financial or other condition, or the respective assets or liabilities of Nu-D-Zine or any subsidiary of Nu-D-Zine as reflected in the Nu-D-Zine Financial Statements, (b) any material loss sustained by Nu-D-Zine or any subsidiary of

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT.

NU-0173

Nu-D-Zine, including, but not limited to any loss on account of theft, fire, flood, explosion, accident or other calamity, whether or not insured, which has resulted in a Nu-D-Zine Material Adverse Effect, or (c) any event, condition or state of facts, including, without limitation, the enactment, adoption or promulgation of any law, rule or regulation, the occurrence of which would result in a Nu-D-Zine Material Adverse Effect.

3.8    Litigation. (a) There is no claim, dispute, action, suit, proceeding or investigation pending or, to the knowledge of Nu-D-Zine, threatened, against or affecting the business of Nu-D-Zine or challenging the validity or propriety of the transactions contemplated by this Agreement, at law or in equity or admiralty or before any federal, state, local, foreign or other governmental authority, board, agency, commission or instrumentality, nor to the knowledge of Nu-D-Zine, has any such claim, dispute, action, suit, proceeding or investigation been pending or threatened, during the 12-month period preceding the date hereof; (b) there is no outstanding judgment, order, writ, ruling, injunction, stipulation or decree of any court, arbitrator or federal, state, local, foreign or other governmental authority, board, agency, commission or instrumentality, against or materially affecting the business of Nu-D-Zine and (c) Nu-D-Zine has not received any written or verbal inquiry from any federal, state, local, foreign or other governmental authority, board, agency, commission or instrumentality concerning the possible violation of any law, rule or regulation or any matter disclosed in respect of its business.

3.9    Brokers.    All negotiations relative to this Agreement and the transactions contemplated hereby have been carried without the intervention of any person in such a manner as to give rise to any valid claim for a finder's fee, brokerage commission or similar payment.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF XtraCard**

XtraCard represents and warrants to Nu-D-Zine that, as of the Closing Date, except as otherwise disclosed in a disclosure schedule arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Agreement, delivered to Nu-D-Zine by XtraCard not later than the Closing Date (the "XtraCard Disclosure Schedule"); provided that nothing in the XtraCard Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein, unless the XtraCard Disclosure Schedule identifies the exception with reasonable particularity, including each numbered section and paragraph of this Agreement to which the exception relates, and describes the relevant facts in reasonable detail:

4.1    Due Organization and Qualification; Subsidiaries; Due Authorization.

(a)    XtraCard is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of formation, with full power and authority to own, lease and operate its business and properties and to carry on its business in the places and in the manner as presently conducted or proposed to be conducted. XtraCard is in good standing as a foreign corporation in each jurisdiction in which it is required to so qualify, except where the failure to qualify would not result in a material adverse effect on the business, operations or financial condition of XtraCard ("XtraCard Material Adverse Effect").

(b)    XtraCard has no subsidiaries and does not own, directly or indirectly, any capital stock, equity or interest in any corporation, firm, partnership, joint venture or other entity.

(c)    XtraCard has requisite power and authority to execute and deliver this Agreement, and to consummate the transactions contemplated hereby and thereby. XtraCard has taken all action necessary for the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and this Agreement constitutes the valid and binding

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM

NU-0174

obligation of XtraCard, enforceable against XtraCard in accordance with its terms, except as may be affected by bankruptcy, insolvency, moratoria or other similar laws affecting the enforcement of creditors' rights generally and subject to the qualification that the availability of equitable remedies is subject to the discretion of the court before which any proceeding therefore may be brought.

4.2    No Conflicts or Defaults. The execution and delivery of this Agreement by XtraCard and the consummation of the transactions contemplated hereby do not and shall not (a) contravene the organizational documents of XtraCard or (b) with or without the giving of notice or the passage of time, (i) violate, conflict with, or result in a breach of, or a default or loss of rights under, any material covenant, agreement, mortgage, indenture, lease, instrument, permit or license to which XtraCard is a party or by which XtraCard or any of its assets are bound, or any judgment, order or decree, or any law, rule or regulation to which XtraCard or any of its assets are subject, (ii) result in the creation of, or give any party the right to create, any Lien upon any of the assets of XtraCard, or (iii) terminate or give any party the right to terminate, amend, abandon or refuse to perform, any material agreement, arrangement or commitment to which XtraCard is a party or by which any of its assets are bound, or (iv) accelerate or modify, or give any party the right to accelerate or modify, the time within which, or the terms under which XtraCard is to perform any duties or obligations or receive any rights or benefits under any material agreement, arrangement or commitment to which it is a party.

4.3    Capitalization. The authorized capital stock of XtraCard consists of 75,000,000 shares of Common Stock par value $0.001 per share, of which 42,831,085 shares are issued and outstanding, and 25,000,000 shares of preferred stock par value $0.001 per share, none of which are issued and outstanding, which shares constitute the XtraCard Shares. There are no other authorized classes of XtraCard capital stock. All of the XtraCard Shares were duly authorized and are validly issued, fully paid and non-assessable, and were not issued in violation of the preemptive or similar right of any person. There are no preemptive or subscription rights available to holders of the XtraCard Shares. There is no voting trust agreement or other contract, agreement, arrangement, option, warrant, call, commitment or other right of any character obligating or entitling any person to acquire any shares of XtraCard capital stock. XtraCard is not a party to any agreement to issue, sell, redeem or repurchase any of its securities.

4.4    Financial Statements. XtraCard has delivered to Nu-D-Zine copies of the consolidated pro forma balance sheet of XtraCard at December 31, 2001, and September 30, 2002, and the related statements of operations and stockholders' equity for the two years then ended, including the notes thereto, prepared by Nu-D-Zine's management (collectively, the "XtraCard Financial Statements"). The XtraCard Financial Statements have been prepared in accordance with reasonable principles adopted and applied on a consistent basis by XtraCard management on a basis consistent throughout all periods presented, subject to full GAAP footnotes and audit adjustments, which are not expected to be material. Such statements present fairly the financial position of XtraCard as of the dates and for the periods indicated.

4.5    Further Financial Matters. XtraCard has no material liabilities or obligations, whether secured or unsecured, accrued, determined, absolute or contingent, asserted or unasserted or otherwise, which are required to be reflected or reserved in a balance sheet or the notes thereto under generally accepted accounting principles, but which are not reflected in the XtraCard Financial Statements.

4.6    Books and Records. The books, records and documents of XtraCard accurately reflect in all material respects all material information relating to the business of XtraCard, the location and collection of its assets, and the nature of all transactions giving rise to the assets and liabilities of XtraCard. XtraCard (a) maintains books and records that, in reasonable detail, accurately and fairly reflect transactions and dispositions of its assets, (b) has devised and maintains

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

7

NU-0175

a system of accounting controls sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorization, (ii) transactions are recorded so as to permit financial statements to be prepared in accordance with GAAP and maintain accountability for assets (including cash), (c) access to assets is permitted only in accordance with management's general or specific authorization and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

4.7    Taxes.    XtraCard has complied with all relevant legal requirements relating to registration or notification for taxation purposes. All tax returns and reports filed on or prior to the date hereof have been properly prepared and are true, correct (and to the extent such returns reflect judgments made by the subsidiaries, such judgments were reasonable under the circumstances) and complete in all material respects. No extension for the filing of any such return or report is currently in effect. No tax return or tax return liability of XtraCard has been audited or, presently under audit. All taxes which have been asserted to be payable as a result of any audits have been paid or have been provided for in the XtraCard Financial Statements. XtraCard has not given or been requested to give waivers of any statute of limitations relating to the payment of any Taxes (or any related penalties, fines and interest). All payments for withholding taxes, unemployment insurance and other amounts required to be paid for periods prior to the date hereof to any governmental authority in respect of employment obligations of the subsidiaries have been paid or shall be paid prior to the Closing and have been duly provided for on the books and records of XtraCard and in the XtraCard Financial Statements.

4.8    Indebtedness; Contracts; No Defaults.

(a)    The Disclosure Schedule includes a summary description of all material instruments, agreements, leases, indentures, mortgages, guarantees, notes, commitments, accommodations, letters of credit or other arrangements or understandings, whether written or oral, to which XtraCard is a party (collectively, the "XtraCard Operating Agreements"). An agreement shall not be considered material for the purposes of this Section 4.9(a) if it provides for expenditures or receipts of less than US $25,000 and has been entered into by any subsidiary in the ordinary course of business. The XtraCard Operating Agreements constitute the material XtraCard contracts, agreements, understandings and arrangements required for the operation of the business of XtraCard or which have a material effect thereon. True, complete and accurate copies of all such material written XtraCard Operating Agreements have been made available to Nu-D-Zine.

(b)    Neither XtraCard nor, to XtraCard's knowledge, any other person or entity, is in breach in any material respect of, or in default in any material respect under, any material contract, agreement, arrangement, commitment or plan to which XtraCard is a party; and no event or action has occurred, is pending or is threatened, which, after the giving of notice, passage of time or otherwise, would constitute or result in such a material breach or material default by XtraCard or any other person or entity. XtraCard has received no notice of default under any contract, agreement, arrangement, commitment or plan to which it is a party, which default has not been cured to the satisfaction of, or duly waived by, the party claiming such default on or before the date hereof.

4.9    Personal Property.    XtraCard has legally sufficient right, title and interest to all of its tangible personal property and assets to permit it to operate its business as presently conducted, including, without limitation, all of the assets reflected in the XtraCard Financial Statements that have not been disposed of in the ordinary course of business since December 31, 2001, free and clear of all Liens or mortgages, except for any Lien for current taxes not yet due and payable and such restrictions, if any, on the disposition of securities as may be imposed by federal or applicable state securities laws.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM

NU-0176

4.10    Real Property. Except for leasehold improvements, XtraCard owns no real property. The XtraCard Disclosure Schedule sets forth a true and complete list of all real property leased or subleased by or to, XtraCard.

4.11    Compliance with Law. XtraCard is conducting its business or affairs in material compliance with applicable law, ordinance, rule, regulation, court or administrative order, decree or process, or any requirement of insurance carriers. XtraCard has received no notice of violation or claimed violation of any such law, ordinance, rule, regulation, order, decree, process or requirement.

4.12    No Adverse Changes. Since September 30, 2002, there has not been (a) any material adverse change in the business, prospects, the financial or other condition, or the assets or liabilities of XtraCard as reflected in the XtraCard Financial Statements, (b) any material loss sustained by XtraCard, including, but not limited to any loss on account of theft, fire, flood, explosion, accident or other calamity, whether or not insured, which has resulted in a XtraCard Material Adverse Effect, or (c) to the best knowledge of XtraCard, any event, condition or state of facts, including, without limitation, the enactment, adoption or promulgation of any law, rule or regulation, the occurrence of which would result in a XtraCard Material Adverse Effect. Notwithstanding the foregoing, Nu-D-Zine acknowledges and understands that XtraCard's business is in an early-stage and is subject to all of the risks and challenges to which such entities are normally subject, including those identified in the XtraCard Disclosure Schedule.

4.13    Litigation. Except in the ordinary course of business, an adverse determination to which would result in a XtraCard Material Adverse Effect, (a) there is no claim, dispute, action, suit, proceeding or investigation pending or, to the knowledge of XtraCard threatened, against or affecting the business of XtraCard, or challenging the validity or propriety of the transactions contemplated by this Agreement, at law or in equity or admiralty or before any authority, board, agency, commission or instrumentality, nor to the knowledge of XtraCard, has any such claim, dispute, action, suit, proceeding or investigation been pending or threatened, during the 12-month period preceding the date hereof; (b) there is no outstanding judgment, order, writ, ruling, injunction, stipulation or decree of any court, arbitrator or federal, state, local, foreign or other governmental authority, board, agency, commission or instrumentality, against or materially affecting the business of XtraCard; and (c) XtraCard has not received nor has any subsidiary received any written or verbal inquiry from any federal, state, local, foreign or other governmental authority, board, agency, commission or instrumentality concerning the possible violation of any law, rule or regulation or any matter disclosed in respect of its business.

4.14    Insurance. XtraCard maintains or causes the maintenance of insurance against all risks customarily insured against by companies in its industry. All such policies are in full force and effect, and XtraCard has received no notice from any insurance company suspending, revoking, modifying or canceling (or threatening such action) any insurance policy issued to XtraCard or subsidiary.

4.15    Certificate of Incorporation; Minute Books. True, complete and correct copies of the Certificate of Incorporation of XtraCard, and all amendments thereto have been delivered to Nu-D-Zine. The minute books of XtraCard contain true and complete records of all meetings and consents in lieu of meetings of their Board of Directors (and any committees thereof), or similar governing bodies, since the time of their respective organization. The stock records of XtraCard are true, correct and complete.

4.16    Employee Benefit Plans. XtraCard does not have in existence any share incentive, share option scheme or profit sharing bonus or other such incentive scheme for any of its directors or employees. There are no arrangements, schemes, customs or practices (whether legally enforceable or not) in operation for the payment of or contributions towards any provident fund,

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

NU-0177

pensions, allowances, lump sums or other like benefits on retirement or on death or during periods of sickness or disablement for the benefit of any director or former director or employee or former employee or for the benefit of the dependents of any such persons nor has any proposal been announced to establish any such agreement or agreements.

4.17   Patents; Trademarks and Intellectual Property Rights. XtraCard owns or possesses sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, internet web site(s) proprietary rights and processes necessary for its business as now conducted without any conflict with or infringement of the rights of others.  There are no outstanding options, licenses or agreements of any kind relating to the foregoing, and no subsidiary is bound by, or a party to, any options, licenses or agreements of any kind with respect to the patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, proprietary rights and processes of any other person or entity.

4.18   Brokers.   All negotiations relative to this Agreement and the transactions contemplated hereby have been carried without the intervention of any person in such a manner as to give rise to any valid claim for a finder's fee, brokerage commission or similar payment.

4.19   Nature of Stockholders.  XtraCard has no more than 35 stockholders who are not "accredited", within the meaning of Rule 501(a) of Regulation D promulgated under the Act.  Any stockholder of XtraCard that is not accredited (a) has such knowledge in financial and business matters that he, she or it is capable of understanding the risks and merits of an investment in Nu-D-Zine; or, (b) XtraCard will provide any such stockholder a "purchaser representative", meeting the requirements of Rule 501(h) of Regulation D.  Each XtraCard stockholder will acquire the Nu-D-Zine Shares for his, her or its own account, for investment purposes, and not with a view to the distribution of the Nu-D-Zine Shares, except in compliance with applicable law.

4.20   Acknowledgement of Lack of Nu-D-Zine Operations.  XtraCard acknowledges its understanding, and XtraCard will advise each of its stockholders, that Nu-D-Zine is an inactive corporation and does not currently conduct business operations.  The success of Nu-D-Zine, including the ability of XtraCard stockholders to resell their Nu-D-Zine Shares in the future, will depend upon the ability of Nu-D-Zine and SUB, through their management, to develop their business and operate at a profit.

4.21   Disclosure.  No representation or warranty of XtraCard set forth herein or in any document or statement furnished and to be furnished by XtraCard hereunder, contains an untrue statement or a material fact, omits a material fact or omits any fact necessary to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading.

**ARTICLE V**
**INDEMNIFICATION**

5.1   Indemnification by Nu-D-Zine.  Nu-D-Zine hereby indemnifies and holds XtraCard harmless from and against any and all damages, losses, liabilities, obligations, costs or expenses incurred by XtraCard and arising out of the breach of any representation or warranty of Nu-D-Zine hereunder, or Nu-D-Zine's failure to perform any covenant or obligation required to be performed by it hereunder.

5.2   Indemnification by XtraCard.  XtraCard hereby indemnifies and holds Nu-D-Zine harmless from and against any and all damages, losses, liabilities, obligations, costs or expenses incurred by Nu-D-Zine and arising out of the breach of any representation or warranty of XtraCard hereunder, or XtraCard's failure to perform any covenant or obligation required to be performed by it hereunder.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION

NU-0178

5.3    Procedure for Indemnification.  Any party entitled to indemnification under this Article V (an "Indemnified Party") will give written notice to the indemnifying party of any matters giving rise to a claim for indemnification; provided, that the failure of any party entitled to indemnification hereunder to give notice as provided herein shall not relieve the indemnifying party of its obligations under this Article V except to the extent that the indemnifying party is actually prejudiced by such failure to give notice. In case any action, proceeding or claim is brought against an Indemnified Party in respect of which indemnification is sought hereunder, the indemnifying party shall be entitled to participate in and, unless in the reasonable judgment of counsel to the Indemnified Party a conflict of interest between it and the indemnifying party may exist with respect of such action, proceeding or claim, to assume the defense thereof with counsel reasonably satisfactory to the Indemnified Party.  In the event that the indemnifying party advises an Indemnified Party that it will contest such a claim for indemnification hereunder, or fails, within 30 days of receipt of any indemnification notice to notify, in writing, such person of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the Indemnified Party may, at its option, defend, settle or otherwise compromise or pay such action or claim. In any event, unless and until the indemnifying party elects in writing to assume and does so assume the defense of any such claim, proceeding or action, the Indemnified Party's costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding shall be losses subject to indemnification hereunder.  The Indemnified Party shall cooperate fully with the indemnifying party in connection with any settlement negotiations or defense of any such action or claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party, which relates to such action or claim.  The indemnifying party shall keep the Indemnified Party fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto.  If the indemnifying party elects to defend any such action or claim, then the Indemnified Party shall be entitled to participate in such defense with counsel of its choice at its sole cost and expense.  The indemnifying party shall not be liable for any settlement of any action, claim or proceeding effected without its prior written consent.  Notwithstanding anything in this Article V to the contrary, the indemnifying party shall not, without the Indemnified Party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof which imposes any future obligation on the Indemnified Party or which does not include, as an unconditional term thereof, the giving by the claimant or the plaintiff to the Indemnified Party of a release from all liability in respect of such claim.  The indemnity agreements contained herein shall be in addition to (a) any cause of action or similar rights of the Indemnified Party against the indemnifying party or others, and (b) any liabilities the indemnifying party may be subject to.

5.4    Time for Assertion.  No party to this Agreement shall have any liability (for indemnification or otherwise) with respect to any representation, warranty or covenant or obligation to be performed and complied hereunder, unless notice of any such liability is provided on or before one year from the date hereof.

5.5    Basket. Notwithstanding any conflicting or inconsistent provisions hereof, XtraCard shall not be liable in damages, indemnity or otherwise to Nu-D-Zine or SUB in respect of the inaccuracy or breach of any representations, warranties, covenants or agreements herein, except to the extent that the damages to Nu-D-Zine and SUB, singularly or in the aggregate, exceed the sum of $25,000. Notwithstanding any conflicting or inconsistent provisions hereof, Nu-D-Zine and SUB shall not be liable in damages, indemnity or otherwise to XtraCard in respect to the inaccuracy or breach of any representations, warranties, covenants or agreements herein except to the extent that damages to XtraCard exceed, individually or in the aggregate, the sum of $25,000.

**ARTICLE VI**
**CONDITIONS PRECEDENT**

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT

NU-0179

6.1     <u>Conditions Precedent to the Obligations of Nu-D-Zine</u>. The obligations of Nu-D-Zine to consummate the transactions contemplated by this Agreement are subject to satisfaction of the following conditions at or prior to the Closing:

(a)     the representations and warranties of XtraCard contained in this Agreement, shall be true and correct in all material respects at and as of the Closing Date;

(b)     XtraCard shall have performed and complied with each of its covenants hereunder in all material respects as of and through the Closing;

(c)     there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)     no event shall have occurred that results in or causes, or could reasonably result in or cause, a XtraCard Material Adverse Effect;

(e)     XtraCard shall have delivered to Nu-D-Zine "lock-up" agreements in the form of Exhibit 6.1(e), whereby each XtraCard stockholder agrees not to transfer or dispose of his, her or its Nu-D-Zine Shares for a period of at least three years following the Closing;

(f)     XtraCard shall have delivered to Nu-D-Zine investment letters from each XtraCard stockholder in the form of Exhibit 6.1(f);

(g)     INTENTIONALLY LEFT BLANK;

(h)     This Agreement shall have been approved by the stockholders of XtraCard, to the extent and in the manner required by the DGCL and the FCL;

(i)     XtraCard shall have delivered to Nu-D-Zine, the XtraCard Disclosure Schedule;

(j)     XtraCard shall have delivered to Nu-D-Zine a Certificate duly executed by its President and Chief Executive Officer, certifying that each of the conditions specified above in subsections (a) through (d) of this Section 6.1 has been satisfied in all material respects;

(k)     XtraCard shall have paid in full its debt obligations to Lancer Offshore, Inc. in the amount of approximately $1,250,000 (subject to offset as set forth in Section 6.2(f);

(l)     all actions to be taken by XtraCard in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to Nu-D-Zine.

6.2     <u>Conditions Precedent to the Obligations of XtraCard</u>. The obligations of XtraCard to consummate the transactions contemplated by this Agreement are subject to satisfaction of the following conditions at or prior to the Closing:

(a)     the representations and warranties of Nu-D-Zine set forth in this Agreement, shall be true and correct in all material respects at and as of the Closing Date;

(b)     Nu-D-Zine shall have performed and complied with each of its covenants hereunder in all material respects as of and through the Closing;

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM F INFORMATION ACT

NU-0180

12

(c)     there shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(d)     no event shall have occurred that results in or causes, or could reasonably result in or cause, a Nu-D-Zine Material Adverse Effect;

(e)     Nu-D-Zine shall have increased the number of shares of common stock it is authorized to issue to 350,000,000 shares;

(f)     Nu-D-Zine shall have assigned to XtraCard all right, title and interest of Nu-D-Zine in and to that certain $300,000 promissory note issued by AUG Corp. to Nu-D-Zine on or about October 1, 2002;

(g)     Nu-D-Zine shall have delivered to XtraCard, the Nu-D-Zine Disclosure Schedule, to the extent that Nu-D-Zine has any information requiring disclosure;

(h)     Nu-D-Zine shall have delivered to XtraCard a Certificate duly executed by its President and Chief Executive Officer, certifying that each of the conditions specified above in subsections (a) through (d) of this Section 6.2 has been satisfied in all material respects; and

(i)     all actions to be taken by Nu-D-Zine in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be reasonably satisfactory in form and substance to XtraCard.

## ARTICLE VII
## ADDITIONAL AGREEMENTS

7.1     <u>Consents; Filings</u>.  Upon the terms and subject to the conditions hereof, each of the parties hereto shall (a) use all commercially reasonable efforts to take, or cause to be taken, all appropriate action and do, or cause to be done, all things necessary, proper or advisable under applicable law or otherwise to consummate and make effective the Merger and this Agreement, (b) use all reasonable efforts to obtain from third parties any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained or made by XtraCard or Nu-D-Zine in connection with the authorization, execution and delivery of this Agreement and the consummation of the Merger and the other transactions contemplated by this Agreement and (c) make all necessary filings, and thereafter make any other required submissions, with respect to this Agreement, the asset sale and the other transactions contemplated by this Agreement that are required under any applicable law.

7.2     <u>Access to Books and Records</u>.  During the course of this transaction, from the date hereof through Closing, each party agrees to make available for inspection all corporate books, records and assets, and otherwise afford to each other and their respective representatives, reasonable access to all documentation and other information concerning the business, financial and legal conditions of each other for the purpose of conducting a due diligence investigation thereof. Such due diligence investigation shall be for the purpose of satisfying each party as to the business, financial and legal condition of each other for the purpose of determining the desirability of consummating the proposed transaction. The parties further agree to keep confidential and not use for their own benefit, except in accordance with this Agreement any information or documentation obtained in connection with any such investigation.

7.3     <u>No Public Disclosure</u>.  Without the prior written consent of the other, no party to this Agreement will, and will each cause their respective representatives not to, make any release to the

NU-0181

## ARTICLE VIII
## TERMINATION

8.1    Termination by Mutual Consent.  This Agreement may be terminated by mutual consent of all parties, in writing, signed by each of the parties hereto.

8.2    Effect of Termination.  Except as otherwise set forth in a mutual termination pursuant to Section 8.1, termination of this Agreement shall not preclude the parties from pursuing all remedies available to them under applicable law for any breach of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

9.1    Survival of Representations, Warranties and Agreements.  All representations and warranties and statements made by a party to in this Agreement or in any document or certificate delivered pursuant hereto shall survive the Closing Date for a period of one year. Each of the parties hereto is executing and carrying out the provisions of this agreement in reliance upon the representations, warranties and covenants and agreements contained in this agreement or at the closing of the transactions herein provided for and not upon any investigation which it might have made or any representations, warranty, agreement, promise or information, written or oral, made by the other party or any other person other than as specifically set forth herein.

9.2    Further Assurances.  If, at any time after the Closing, the parties shall consider or be advised that any further deeds, assignments or assurances in law or that any other things are necessary, desirable or proper to complete the merger in accordance with the terms of this agreement or to vest, perfect or confirm, of record or otherwise, the title to any property or rights of the parties hereto, the Parties agree that their proper officers and directors shall execute and deliver all such proper deeds, assignments and assurances in law and do all things necessary, desirable or proper to vest, perfect or confirm title to such property or rights and otherwise to carry out the purpose of this Agreement, and that the proper officers and directors the parties are fully authorized to take any and all such action.

9.3    Notice.   All communications, notices, requests, consents or demands given or required under this Agreement shall be in writing and shall be deemed to have been duly given when delivered to, or received by prepaid registered or certified mail or recognized overnight courier addressed to, or upon receipt of a facsimile sent to, the party for whom intended, as follows, or to such other address or facsimile number as may be furnished by such party by notice in the manner provided herein:

If to Nu-D-Zine:        Nu-D-Zine, Inc.
                        1900 Corporate Blvd., Suite 305W
                        Boca Raton, Florida 33431
                        Attention: President
                        Tel: 561-241-9921
                        Fax: 561-241-7011

With a copy to:         Adorno & Yoss, P.A.
                        350 East Las Olas Boulevard, Suite 1700
                        Fort Lauderdale, Florida 33301
                        Attention: James Schneider, Esq.
                        Tel: 954-763-1200
                        Fax: 954-766-7800

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

15

NU-0183

If to XtraCard:          XtraCard Services, Inc.
                         777 Terrace Avenue
                         Hasbrouck, NJ 07604
                         Attention: Robert Steinberg
                         Tel: 201-696-4444
                         Fax: 201-696-4001

Or such other as XtraCard may notify to the other parties to the Agreement by not less than five (5) Business Day's notice.

     9.4    Entire Agreement.  This Agreement, the Schedules and any instruments and agreements to be executed pursuant to this Agreement, sets forth the entire understanding of the parties hereto with respect to its subject matter, merges and supersedes all prior and contemporaneous understandings with respect to its subject matter and may not be waived or modified, in whole or in part, except by a writing signed by each of the parties hereto. No waiver of any provision of this Agreement in any instance shall be deemed to be a waiver of the same or any other provision in any other instance. Failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of its rights under such provision.

     9.5    Successors and Assigns.  This Agreement shall be binding upon, enforceable against and inure to the benefit of, the parties hereto and their respective heirs, administrators, executors, personal representatives, successors and assigns, and nothing herein is intended to confer any right, remedy or benefit upon any other person. This Agreement may not be assigned by any party hereto except with the prior written consent of the other parties, which consent shall not be unreasonably withheld.

     9.6    Governing Law; Venue.  This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Florida are applicable to agreements made and fully to be performed in such state, without giving effect to conflicts of law principles. The parties further: (a) agree that any legal suit, action or proceeding arising out of or relating to this Agreement shall be instituted exclusively in any Federal or State court of competent jurisdiction within the County of Palm Beach, State of Florida, (b) waive any objection that they may have now or hereafter to the venue of any such suit, action or proceeding, and (c) irrevocably consent to the in personam jurisdiction of any Federal or State court of competent jurisdiction within the County of Palm Beach, State of Florida in any such suit, action or proceeding. The parties each further agree to accept and acknowledge service of any and all process which may be served in any such suit, action or proceeding in a Federal or State court of competent jurisdiction within the County of Palm Beach, State of Florida, and that service of process upon the parties mailed by certified mail to their respective addresses shall be deemed in every respect effective service of process upon the parties, in any action or proceeding.

     9.7    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     9.8    Construction.  Headings contained in this Agreement are for convenience only and shall not be used in the interpretation of this Agreement. References herein to Articles, Sections and Exhibits are to the articles, sections and exhibits, respectively, of this Agreement. The XtraCard Disclosure Schedule is hereby incorporated herein by reference and made a part of this Agreement. As used herein, the singular includes the plural, and the masculine, feminine and neuter gender each includes the others where the context so indicates.

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT.   NU-0184

9.9     <u>Severability</u>. If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, this Agreement shall be interpreted and enforceable as if such provision were severed or limited, but only to the extent necessary to render such provision and this Agreement enforceable.

9.10    <u>Costs and Expenses</u>. Each party shall be responsible for its costs and expenses in connection with this Agreement.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0185

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date first set forth above.

NU-D-ZINC, INC.

By: _____
Laurence S. Isaacson
Its C.E.O. and President


XTRACARD SERVICES, INC.
(A Florida corporation)

By: _____
Laurence S. Isaacson
Its C.E.O. and President


EXTRACARD SERVICES, INC.
(a Florida corporation)

By: _____
Robert Steinberg
Its C.E.O. and President


With respect to Section 7.6 only:

LANCER OFFSHORE, INC.

By: _____
Name: _____
Its: _____


CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0186

## SCHEDULE A

| Name and Address of Stockholder | Number of XtraCard Shares | Number of Nu-D-Zine Shares |
| --- | --- | --- |

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT.

NU-0187

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the date first set forth above.

NU-D-ZINE, INC.

By: _____
Laurence S. Isaacson
Its C.E.O. and President


XTRACARD SERVICES, INC.
(A Florida corporation)

By: _____
Laurence S. Isaacson
Its C.E.O. and President


XTRACARD SERVICES, INC.
(a Florida corporation)

By: _____
Robert Steinberg
Its C.E.O. and President


With respect to Section 7.6 only:

LANCER OFFSHORE, INC.


By: _____
Name: _____
Its: _____


CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

18

NU-0188

# TERM SHEET

## Promissory Note
### Between
### LANCER OFFSHORE, INC. - Lender
### and
### XTRACARD CORP. - Borrower

| | |
|---|---|
| Amount: | $100,000 |
| Term: | 6 months. If note is not repaid in full, conversion price (below) is reduced by $0.25 for every 30 days the loan is not repaid or converted. |
| Rate: | 10% |
| Prepayment Penalty | None |
| Conversion Price | $2.00 per share |
| Fee | XtraCard Corp shall issue to Lancer Offshore, Inc. 1,000,000 shares |

ACCEPTED:                              ACCEPTED:

LANCER OFFSHORE, INC.                  XTRACARD CORP.


By: _____           By: _____
    Michael Lauer                         Robert M. Steinberg
    Investment Manager                     Chief Financial Officer
    January ___, 2003                      January ___, 2003


M:\D2\Term Sheet-Promissory Note-XtraCard 1-6-03.wpd

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0006

| Subj: | **Fwd:** |
|---|---|
| Date: | 12/23/2002 11:12:06 AM Eastern Standard Time |
| From: | LSIsaacson |
| To: | bcowen@earthlink.net |

FYI

Best regards,

Laurence S. Isaacson
President & CEO
Thornhill Group, Inc.
1900 Corporate Blvd., Suite 305 W
Boca Raton, FL 33431
561-241-9921 x 11
561-241-7011 FAX

The information in this e-mail is confidential and may be privileged or subject to copyright. It is intended for the exclusive use of the addressee(s). If you are not an addressee, please do not read, copy, distribute or otherwise act upon this email. If you have received the email in error, please contact the sender immediately and delete the email. The unauthorized use of this email may result in liability for breach of confidentiality, privilege or copyright. Email transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message which arise as a results of email transmission. If verification is required please request a hard copy version. This message is provided for informational purposes.

Forwarded Message:

| Subj: | |
|---|---|
| Date: | 12/23/2002 9:53:02 AM Eastern Standard Time |
| From: | rms@xtracards.com |
| To: | LSIsaacson@aol.com |
| Sent from the Internet (Details) | |

Larry,I emailed Bruce last Thursday and have still not heard from him.I need your help.We have laid out a huge amount of cash in December.In addition to the fulfillment expense I had to add a few people to help mange the additional activity,so my expenses increased from $75,000 to $90,000.We paid our annual fee to Map Quest.Map Quest takes our database of providers and adds mapping capability to the search engine.We also paid our provider networks for the last week of Dec.to cover the recent mailings of cardholders.I will negotiate a better deal for January but didn't want any problems over the holidays.The long and short of this is that we are out of money.I thought that Lancer would welcome an additional investor and would agree to the WIC deal.We need $300,000 to bring this deal home and take advantage of the great money making opportunity that I laid out for you with EFG.
Bob

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0472

<u>VIA FACSIMILE #212-521-8401</u>

January 3, 2003

Mr. Michael Lauer
The Lancer Group
375 Park Avenue
New York, New York 10152

Dear Michael,

It was great seeing you this morning. Attached are the 2003/2004 projections you requested. We have gone back and reworked the 2003 numbers to more accurately reflect what we believe will take place during the year. The net revenues for 2003 came down slightly because of some bank fees that were left out and the expenses are higher because some outside commissions were also left out of the projections we ran last night.

As I said to you this morning, the EFG deal alone takes us to cash flow positive. The only thing I can't project is exactly when that will happen. If more people opt out than I estimated, and it takes a little longer, our breakeven obviously will be pushed back.

Although I believe $300,000 should take us home, it does not give us very much margin for error. $400,000 will give us the cushion we need if any of our revenue assumptions should be delayed. With regard to our conversation about WIC, I don't disagree with you that their proposal is tough, but it still provides an alternative for Lancer having to put up an additional $400,000. As they have stated, they are ready, willing and able to put up $200,000. However, I do want to clarify one point about their proposal with regard to the lock-up agreement; they cannot sell unless Lancer sells.

Again, thank you for your continued support. Please let me know what you want to do as far as WIC is concerned.

I have attached the wiring instructions for the $100,000 on Monday.

Have a great weekend and speak to you soon!

Sincerely yours,

Robert M. Steinberg
Chairman and Chief Executive Officer

RMS/ang
Enclosure

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0475

| Subj: | FW: |
|---|---|
| Date: | 01/23/2003 11:36:59 AM Eastern Standard Time |
| From: | rms@xtracards.com |
| To: | LSIsaacson@aol.com |
| Sent from the Internet (Details) | |

I just sent this to Bruce.You should have everything.Call me if you have ANY
QUESTIONS.
Bob

> ——Original Message——
> From:   Steinberg, Robert
> Sent:   Thursday, January 23, 2003 11:16 AM
> To:   Bruce D. Cowen (E-mail)
> Subject:
>
> Bruce,
> I have not gotten any response from Michael from my last communication.I
> also emailed him the other day,a copy of which is attached.I fully
> understand that Michael is not a detail guy and probably focuses on only
> those things that matter at the moment.I need your help to get through the
> administrative process.
> Regards
> Bob
>
> When are you going to be in NY.I'm in Waco most of next week,but other
> than that I'm around and would love to see you.
>
>
> Michael,
> I hope all is well. Things are going very well here. Is there anything you
> want me to do with regard to WIC.We will definitely need the second
> $100,000 before month's end as we continue to spend money on fulfillment
> which should result in being cash flow positive by sometime in March. We
> will be in Waco next week visiting EFG trying to create even more
> opportunities between the two organizations. I'm here all this week. I
> would very much like to have the funds here before I leave for Texas.
> Regards,
> Bob
>

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0476

Thursday, January 23, 2003 America Online: LSIsaacson

VIA FACSIMILE #212-521-8401

March 14, 2003

Mr. Michael Lauer
The Lancer Group
375 Park Avenue
New York, New York  10152

Dear Michael,

Jay and I feel absolutely terrible about what you are going through.  We are convinced that you
will get past this very quickly. So that we are not a burden to you at this time, yesterday
afternoon we had a discussion with Ben Fernandez of Warminster Investor Corp. (WIC) to see if
they would be interested in financing XtraCard. I've attached his preliminary proposal. There are
several things you should keep in mind regarding these terms.

1. Ben needs to discuss this matter with his partners. They operate as a team and won't do
anything unless they all agree.
2. They are very sophisticated and hard negotiators. Since we have urgency for funding, they
will smell blood, and their terms may become more demanding.

The good news is that they believe strongly in this business and in Jay and me.

As you have heard from me many times we are extremely optimistic about the future of this
enterprise. Without funding, I am convinced that we would lose so much of the momentum that
we have going at this time that recovering would be very difficult.  In order to keep our
momentum going, we have financial commitments that we need to meet.  As Chief Executive
Officer of XtraCard I will have no choice but to accept a W.I.C. offer, even if the terms are
onerous, as we are so close to achieving success.

We need to complete the W.I.C. transaction without delay. Unless I hear differently from you by
the end of the day Monday March 17th I will assume that Lancer is on board with our completing
a deal with WIC and will assist in any way needed.

Michael, you are a great partner and individual. You have always been there for us. You do not
deserve to have this happen to you. We hope you get through this difficult period very quickly. If
there is anything we can do to help, please do not hesitate to ask.

Very truly yours,


Robert M. Steinberg
Chairman of the Board
Chief Executive Officer

RMS/ang
Enclosure

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT.

NU-0464

<u>Via Federal Express</u>

February 19, 2003

Mr. Michael Lauer
The Lancer Group
375 Park Avenue
New York, New York 10152

Dear Michael,

First of all, I read your lawsuit and feel that you have a very strong case.  What the <u>Post</u> did is outrageous and irresponsible, and I hope they pay dearly.

Let me bring you up to date as to what's going on at XtraCard Corp.  As I said to you on the phone, the news is generally good.  So far this month, we have revenue of almost $70,000, which is the most we ever had in a given month.  Our fixed expenses run about $100,000 but our variable expenses are running about $60,000.  Our variable expenses are essentially two items: new fulfillment orders for which we collect no fees for thirty days, and network fees associated with these fulfillments. With the business in-house and signed deals about to commence, I am now estimating that we will turn cash flow positive sometime in April and once it turns, I am convinced we will become extremely profitable.

I anticipate our shortfall between now and cash flow positive to be approximately $150,000.  We will need $100,000 by the end of next week, and another $50,000 towards the end of March.

I am very excited that we can finally see the light at the end of the tunnel.  It has taken longer and it has cost us all more than we figured, but I am convinced at the end it will all be worth it.

Again, thank you for your support. If for any reason you want us to contact WIC, we need to act now, as it will take some time to get that deal done, if at all, as the terms have changed from what was discussed with them originally.

Sincerely yours,

Robert M. Steinberg
Chairman of the Board
Chief Executive Officer

RMS/ang

CONFIDENTIAL TREATMENT REQUESTED UNDER THE FREEDOM OF INFORMATION ACT.

# METHOD PRODUCTS

06/21/2001  16:20  5512417011  MPC  PAGE  01

06/21/2001  16:20  5782508  MPC  PAGE  01

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 21 day of June, 2001, by and between Lancer Offshore, Inc., a Curasao, Netherland Antilles corporation (the "Buyer"), and Method Products Corporation, a Florida corporation ("he "Company"), relating to the acquisition by and issuance to the Buyer of 10,000,000 shares of the Company's Common Stock, par value $. 0001 per share (the "Common Stock"), along with 10,000,000 Warrants at $.08 and 10,000,000 Warrants at $.12 exercisable until June 21, 2004, all Warrant Agreements to be executed under separate agreement ("the Warrants").

### WITNESSETH:

WHEREAS, the Company has sufficient shares of Common Stock authorized; and

WHEREAS, the Buyer desires to purchase and the Company desires to sell to the Buyer an aggregate of 10,000,000 of its Common Stock and the Warrants, such purchase to be upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the parties hereto agree as follows:

I.

## SALE AND PURCHASE OF SHARES AND OTHER AGREEMENTS

1.1    Sale and Purchase of Shares.  The Company hereby agrees to sell and transfer to the Buyer 10,000,000 shares of Common Stock of the Company and the Warrants in the form attached hereto as Exhibit A. The Buyer agrees to purchase the Common Stock from the Company at a purchase price of $.05 per share ("Share Price") or an aggregate purchase price of $500,000, payable via wire transfer upon execution hereof.

1.2    Investment Intent and Legends.  The Common Stock and underlying securities have not been registered under the Securities Act of 1933, as amended, and may not be resold unless the Common Stock and underlying securities are registered under such Act or an exemption from such registration is available. The Buyer represents and warrants that it is acquiring the Common Stock and underlying securities for its own account for investment and not with a view to the sale or distribution thereof. Each certificate representing such securities will have a legend thereon incorporating language as follows:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"). The securities have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the securities under the Act unless, in the opinion of counsel satisfactory to the Company, registration is not required by the Act."

1.3    Right of First Refusal. For a period of three (3) years from the date hereof the Company agrees to provide the Buyer with the opportunity, on 30 days' prior written notice, to participate on the same terms and conditions as any other purchaser in connection with any private financing undertaken by the Company.

1.4    Nomination of Directors. At the request of the Buyer, the Company agrees to recommend to its stockholders and use its best efforts to have two (2) individuals designated by the Buyer to be elected as directors of the Company. In addition, Mr. Bruce Cowen shall have visitation rights to all Board of Director and Committee meetings.

1.5    The Company shall distribute its internally prepared monthly financial statements within 30 days of the previous month's end to the Buyer.

1.6    Cash disbursements over $5,000, except for vendor purchases, shall be approved in advance by a Buyer's

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0127

representative to be designated prior to closing.

1.7     Mark Antonucci, Mark Weltsman and Michael Beaubien (Exhibit B-1, B-2, B-3) shall execute a Lock-Up Agreement to June 12, 2003.

1.8     In the event that the Company shall sell or issue any Common Shares or Convertible Securities (including, without limitation, warrants, options, etc.) at a per share price below the Share Price, the Share Price shall be immediately and automatically reduced to such lower price and the number of Common Stock purchased in the Agreement shall be proportionally increased, as to the same economic benefit originally granted to the Buyer. (Example: 10,000,000 Shares at $.05 per share would result in $500,000 to the Company. Should the Share Price be reduced to say $.03 per share, then the number of shares to be issued would then be increased to 16,666,667 "Price Protection".)

1.9     Mark Antonucci's (the Company's CEO) Employment Contract shall be extended for an additional two (2) years.

1.10    The Company shall obtain D&O Insurance within sixty (60) days of closing by the Buyer.

II.

## REPRESENTATIONS AND WARRANTIES OF COMPANY

The Company makes to the Buyer the following representations and warranties:

2.1     Organization and Standing of the Company.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and is entitled to own or lease its properties and to carry on its business as and in the places where such properties are now owned, leased or operated.  The Company has full corporate power and other authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Company and is the valid and binding obligation of the Company enforceable in accordance with its terms.  Neither the execution nor the consummation of this Agreement will conflict with or result in a breach or default under, or result in the creation of any lien, security interest, charge or encumbrance upon the Common Stock and the underlying securities, or any of the properties or assets of the Company as a result of the terms, conditions or provisions of any contract, note, mortgage or any other agreement, instrument or obligation to which the Company is a party or by which the Company or any of its properties or assets may be bound.

2.2     Capitalization.  The authorized capital stock of the Company consists of 80,000,000 shares of Common Stock, $.0001 par value per share, of which 10,577,773 shares are presently issued and outstanding.  The Company has not granted, issued or agreed to grant, issue or make any warrants, options, subscription rights or any other commitments of any character relating to the issued or unissued shares of capital stock of the Company except as previously discussed in the Company's reports filed under the Securities Exchange Act of 1934 or otherwise disclosed to the Buyer.

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

2.3   Properties. The Company has good and unencumbered title to and the right to the use of all of its properties and assets,

2.4   Disclosure and Liabilities. Except with respect to the liabilities and obligations disclosed in such periodic reports, the Company has no material liabilities, obligations or commitments of any nature, whether liquidated or unliquidated, absolute or contingent.

2.5   Delivery of Periodic Reports; Compliance with 1934 Act. The Company has provided the Buyer with access to all of its periodic reports filed with the Securities and Exchange Commission. The Company has filed all required periodic reports and is in compliance with its reporting obligations under the Securities Exchange Act of 1934 as a result of having been registered under Section 12(g) of that Act. All reports filed pursuant to such Act are complete and correct in all material respects.

2.6   Full Disclosure. No representation or warranty by the Company in this Agreement or in any exhibit or document to be delivered pursuant hereto contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make any statement herein or therein not material misleading or necessary to a complete and correct presentation of all material aspects of the business of the Company which would materially adversely effect the business of the Company and the transactions contemplated hereby.

## III.

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

3.1   Survival of Representations and Warranties. Notwithstanding any right of the Buyer fully to investigate the affairs of the Company the Company shall have the right to rely fully upon the representations, warranties, covenants and agreements of the Company contained in this Agreement or in any document delivered to the Buyer by the Company or any of its representatives, in connection with the transactions contemplated by this Agreement. All such representations, warranties, covenants and agreements shall survive the execution and delivery hereof for twelve (12) months following the date hereof.

3.2   Obligation of the Company to Indemnify. Subject to the limitations on the survival of representations and warranties contained herein, the Company hereby agrees to indemnify, defend and hold harmless the Buyer from and against any losses, liabilities, damages, deficiencies, costs or expenses (including interest, penalties and reasonable attorneys, fees and disbursements) based upon, arising out of or otherwise due to any inaccuracy in or any breach of any representation, warranty, covenant or agreement of the Company contained in this Agreement or in any document or other writing delivered pursuant to this Agreement.

## IV.

## MISCELLANEOUS

4.1   Entire Agreement. This Agreement (including the Recitals and any Exhibits hereto) contains the entire agreement among the parties with respect to the purchase of the Common Stock and related transactions and supersedes all prior agreements, written or oral, with respect thereto.

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0129

06/21/2001 15:28 9782500 MPC PAGE 04

4.2.   Waivers and Amendments.  This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which any party may otherwise have at law or in equity.  The rights and remedies of any party based upon, arising out of or otherwise in respect of any inaccuracy in or breach of any  representation, warranty, covenant or agreement contained in this Agreement shall in no way be limited by the fact that the act, omission, occurrence or other state of facts upon which the claim of any inaccuracy or breach is based may also be the subject matter of any other representation, warranty, covenant or agreement contained in this Agreement (or in any other agreement between the parties) as to which there is no inaccuracy or breach.

4.3    Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

4.4    No Assignment. This Agreement is not assignable except by operation of law.

4.5    Headings.  The headings in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

4.6    Severability of Provisions.  The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or other provision of this Agreement shall in no way affect the validity or enforcement of any other provision or any part thereof.

4.7    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall constitute an original copy hereof, but all of which together shall be considered but one and the same documents.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first above written.

Lander Offshore, Inc.
the Buyer

By: _____


Method Products Corp.
(the Company)

By: _____


CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0130

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this ___ day of September, 2001, by and between Lancer Offshore, Inc. and/or assigns, a Curasao, Netherland Antilles corporation (the "Buyer"), and Method Products Corporation, a Florida corporation (the "Company"), relating to the acquisition by and issuance to the Buyer of 13,750,000 shares of the Company's Common Stock, par value $. 0001 per share (the "Common Stock"), along with 20,000,000 Warrants at $.001 exercisable until June 21, 2004, executed under separate agreement ("the Warrants").

## WITNESSETH:

WHEREAS, the Company has sufficient shares of Common Stock authorized; and

WHEREAS, the Buyer desires to purchase and the Company desires to sell to the Buyer an aggregate of 13,750,000 of its Common Stock and the re-pricing of Warrants, such purchase to be upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the parties hereto agree as follows:

I.

## SALE AND PURCHASE OF SHARES AND OTHER AGREEMENTS

1.1    Sale and Purchase of Shares. The Company hereby agrees to sell and transfer to the Buyer 13,750,000 shares of Common Stock of the Company. The Buyer agrees to purchase Common Stock from the Company at a purchase price of $.02 per share ("Share Price") or an aggregate purchase price of 275,000, payable via wire transfer upon execution hereof.

1.2    Investment Intent and Legends. The Common Stock and underlying securities have not been registered under the Securities Act of 1933, as amended, and may not be resold unless the Common Stock and underlying securities are registered under such Act or an exemption from such registration is available. The Buyer represents and warrants that it is acquiring the Common Stock and underlying securities for its own account for investment and not with a view to the sale or distribution thereof. Each certificate representing such securities will have a legend thereon incorporating language as follows:

"The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"). The securities have been acquired for investment and may not be sold or transferred in the absence of an effective Registration Statement for the securities under the Act unless, in the opinion of counsel satisfactory to the Company, registration is not required by the Act."

1.3    Right of First Refusal. For a period of three (3) years from the date hereof the Company agrees to provide the Buyer with the opportunity, on 30 days' prior written notice, to participate on the same terms and conditions as any other purchaser in connection with any private financing undertaken by the Company.

1.4    Nomination of Directors, At the request of the Buyer, the Company agrees to recommend to its stockholders and use its best efforts to have two (2) additional individuals designated by the Buyer for a total of three (3) to be elected as directors of the Company. In addition, Mr. Bruce Cowen shall have visitation rights to all Board of Director and Committee meetings.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0082

1.5     The Company shall distribute its internally prepared monthly financial statements within 30 days of the previous month's end to the Buyer.

1.6     Cash disbursements over $5,000, except for vendor purchases, shall be approved in advance by a Buyer's representative to be designated prior to closing.

1.7     Mark Antonucci, Mark Weitsman and Michael Beaubien, each, executed a Lock-Up Agreement to June 12, 2003, which shall remain in effect.

II.

## REPRESENTATIONS AND WARRANTIES OF COMPANY

The Company makes to the Buyer the following representations and warranties:

2.1     Organization and Standing of the Company.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and is entitled to own or lease its properties and to carry on its business as and in the places where such properties are now owned, leased or operated.  The Company has full corporate power and other authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of the Company and is the valid and binding obligation of the Company enforceable in accordance with its terms.  Neither the execution nor the consummation of this Agreement will conflict with or result in a breach or default under, or result in the creation of any lien, security interest, charge or encumbrance upon the Common Stock and the underlying securities, or any of the properties or assets of the Company as a result of the terms, conditions or provisions of any contract, note, mortgage or any other agreement, instrument or obligation to which the Company is a party or by which the Company or any of its properties or assets may be bound.

2.2     Capitalization.  The authorized capital stock of the Company consists of 80,000,000 shares of Common Stock, $.0001 par value per share, of which 24,704,714 shares are presently issued and outstanding.  The Company has not granted, issued or agreed to grant, issue or make any warrants, options, subscription rights or any other commitments of any character relating to the issued or unissued shares of capital stock of the Company except as previously discussed in the Company's reports filed under the Securities Exchange Act of 1934 or otherwise disclosed to the Buyer.

2.3     Properties.  The Company has good and unencumbered title to and the right to the use of all of its properties and assets.

2.4     Disclosure and Liabilities.  Except with respect to the liabilities and obligations disclosed in such periodic reports, the Company has no material liabilities, obligations or commitments of any nature, whether liquidated or unliquidated, absolute or contingent.

2.5     Delivery of Periodic Reports; Compliance with 1934 Act.  The Company has provided the Buyer with access to all of its periodic reports filed with the Securities and Exchange Commission.  The Company has filed all required periodic reports and is in compliance with its reporting obligations under the Securities Exchange Act of 1934 as a result of having been registered under Section 12(g) of that Act.  All reports filed pursuant to such Act are complete and correct in all material respects.

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

2.6     Full Disclosure. No representation or warranty by the Company in this Agreement or in any exhibit or document to be delivered pursuant hereto contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make any statement herein or therein not material misleading or necessary to a complete and correct presentation of all material aspects of the business of the Company which would materially adversely affect the business of the Company and the transactions contemplated hereby.

III.

SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

3.1     Survival of Representations and Warranties. Notwithstanding any right of the Buyer fully to investigate the affairs of the Company, the Company shall have the right to rely fully upon the representations, warranties, covenants and agreements of the Company contained in this Agreement or in any document delivered to the Buyer by the Company or any of its representatives, in connection with the transactions contemplated by this Agreement. All such representations, warranties, covenants and agreements shall survive the execution and delivery hereof for twelve (12) months following the date hereof.

3.2     Obligation of the Company to Indemnify. Subject to the limitations on the survival of representations and warranties contained herein, the Company hereby agrees to indemnify, defend and hold harmless the Buyer from and against any losses, liabilities, damages, deficiencies, costs or expenses (including interest, penalties and reasonable attorneys, fees and disbursements) based upon, arising out of or otherwise due to any inaccuracy in or any breach of any representation, warranty, covenant or agreement of the Company contained in this Agreement or in any document or other writing delivered pursuant to this Agreement.

IV.

MISCELLANEOUS

4.1     Entire Agreement. This Agreement (including the Recitals and any Exhibits hereto) contains the entire agreement among the parties with respect to the purchase of the Common Stock and related transactions and supersedes all prior agreements, written or oral, with respect thereto.

4.2.    Waivers and Amendments.  This Agreement may be amended, modified, superseded, canceled, renewed or extended, and the terms and conditions hereof may be waived, only by a written instrument signed by the parties or, in the case of a waiver, by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which any party may otherwise have at law or in equity.  The rights and remedies of any party based upon, arising out of or otherwise in respect of any inaccuracy in or breach of any  representation, warranty, covenant or agreement contained in this Agreement shall in no way be limited by the fact that the act, omission, occurrence or other state of facts upon which the claim of any inaccuracy or breach is based may also be the subject matter of any other representation, warranty, covenant or agreement contained in this Agreement (or in any other agreement between the parties) as to which there is no inaccuracy or breach.

4.3     Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Florida.

4.4     No Assignment. This Agreement is not assignable except by operation of law.

4.5     Headings. The headings in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

MET-0084

4.6     Severability of Provisions.  The invalidity or unenforceability of any term, phrase, clause, paragraph, restriction, covenant, agreement or other provision of this Agreement shall in no way affect the validity or enforcement of any other provision or any part thereof.

4.7     Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall constitute an original copy hereof, but all of which together shall be considered but one and the same documents.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date first above written.

Lancer Offshore, Inc.
the Buyer)

By: _____


Method Products Corporation
(the Company)

By: _____  CFO

CONFIDENTIAL   TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0085

09/24/2001  14:49   561.2417011                                       PAGE  02/02

# METHOD PRODUCTS CORPORATION
## TERM SHEET

### September 24, 2001

| Investment | $275,000 |
|---|---|
| Consideration | Method Products Corporation ("MTDP" or the "Company") shall issue 13,750,000 newly authorized Common Shares at $0.02/share, plus the Company shall re-price the 3-year Warrants for 10 million shares exercisable at $0.08/share to $0.01/share to Lancer Group and/or its assigns, plus an additional 3-year Warrant for 10 million shares exercisable at $0.12/share to $0.01/share to Lancer Group and/or its assigns, plus additional 2-year Warrant for 1,500,000 shares exercisable at $0.01/share with a cashless exercise provision to Stenton Leigh Business Resources, Inc. and/or its assigns. |
| Use of Proceeds | Working capital for the Ameritrend acquisition. |
| Conditions | The 10,000,000 shares issued to Lancer Group @ $.05 will not be re-priced.  Shareholders of greater than 5% of the Company will execute a Lock-Up Agreement to June 12, 2003, including all former officers of MTDP as well shall remain in place. |
| Documentation | Company will provide fully-executed Stock Purchase Agreements and Warrant Agreements by September 26, 2001, with a closing no later September 28, 2001. |

_____ Date: 9/24/01         _____ Date: _____

Mark Antonucci, as CEO of                      On Behalf of Investor
Method Products Corporation

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0086

# METHOD PRODUCTS CORPORATION
## TERM SHEET

### September 24, 2001

| | |
|---|---|
| Investment | $275,000 |
| Consideration | Method Products Corporation ("MTDP" or the "Company") shall issue 13,750,000 newly authorized Common Shares at $0.02/share, plus the Company shall re-price the 3-year Warrants for 10 million shares exercisable at $0.08/share to $0.01/share to Lancer Group and/or its assigns, plus an additional 3-year Warrant for 10 million shares exercisable at $0.12/share to $0.01/share to Lancer Group and/or its assigns, plus additional 2-year Warrant for 1,500,000 shares exercisable at $0.01/share with a cashless exercise provision to Stenton Leigh Business Resources, Inc. and/or its assigns. |
| Use of Proceeds | Working capital for the Ameritrend acquisition. |
| Conditions | The 10,000,000 shares issued to Lancer Group @ $.05 will not be re-priced.  Shareholders of greater than 5% of the Company will execute a Lock-Up Agreement to June 12, 2003, including all former officers of MTDP as well shall remain in place. |
| Documentation | Company will provide fully-executed Stock Purchase Agreements and Warrant Agreements by September 26, 2001, with a closing no later September 28, 2001. |

_____ Date: 9/24/01      _____ Date: _____
Mark Antonucci, as CEO of                    On Behalf of Investor
Method Products Corporation

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0086

# MEMORANDUM

**TO:**     Board of Directors Method Products Corp.,Mark Antonucci, Michael
           Beaubien and Kathryn Bathright

**FROM:**   Richard Fieni

**DATE:**   Febuary 1, 2002

**RE:**     Emergency Board of Directors Meeting

**CC:**     Milton Barbarosh, Jay Valinsky and Elliot Weinberg

As President and Director of Method Products Corp, I want to inform the board that I am
in total disbelief that the Emergency Board meeting that I had called for on January 29,
2002 has not been re-scheduled.

Jay Valinski assured me that he would set a time that would accommodate both Mark
Antonucci and Michael Beaubien. I had requested that this take place by January 30, 2002
at the very latest, due to the horrid financial condition of the company along with other
very important issues that I stated in my memo to the board dated Januay 17, 2002,
Kathryn Bathright also requested to be informed of the time and place for this re-
scheduled meeting. As of the end of the day, Friday, Febuary 1, 2002, I have not heard a
word about the board meeting.

Present at the meeting which had to be adjourned due to the fact that we did not have a
majority, were Richard Fieni and Kathryn Bathright (via conference call). As the
transcripts will show, I expressed my total disappointment with the non action of the
Board at this critical time.

I do thank Kathryn Bathright for her concern and duty to the shareholders and the board
of directors.

Gentelmen, all we are doing here is trying to fulfill our fiduciary duties. And with the
information I received today from Mr. Antonucci, it is even more important for the board
to make some serious decisions and these are matters for the board.

I do understand that one investor owns apporxmatly 70% of the company, however the
board has duties it must fufill in accordance to the law.

Richard Fieni
President

CONFIDENTIAL  TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

| Subj: | **Fwd: FW: MPC Integrated Technologies & Ameritrend Corp.** |
|---|---|
| Date: | 02/03/2002 7:48:38 AM Eastern Standard Time |
| From: | LSIsaacson |
| To: | FLACANDLES |

please print
LSI

---

Forwarded Message:

| Subj: | **FW: MPC Integrated Technologies & Ameritrend Corp.** |
|---|---|
| Date: | 02/02/2002 11:31:53 AM Eastern Standard Time |
| From: | mantonucci@ameritrend.com |
| To: | lsisaacson@aol.com, Jvalinsky@ktlv.com |
| *Sent from the Internet (Details)* | |

-----Original Message-----
**From:** Mark Antonucci [mailto:mantonucci@ameritrend.com]
**Sent:** Saturday, February 02, 2002 11:21 AM
**To:** Fieni, Richard; 'mbeaubien@ameritrend.com'
**Cc:** lsisaacson@aol.com; Jvalinsky@ktlv.com
**Subject:** MPC Integrated Technologies & Ameritrend Corp.

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

Gentlemen,

We all understand the plight of our Company and we all understand that we have to make some very hard decisions in the near future.  At this time the meeting which was being scheduled for February 5 or the 6 for us to meet I do not feel it is necessary to have at this time.  We are all aware that our majority shareholder Lancer Offshore has denied us the funding we needed because we did not take there advise.

So at this time we have no other alternative than to make some major cuts into the Company's payroll. The goal here will be to wind the company down and payoff as much debt as possible as to hopefully avoid bankruptcy and have a little company that can be sold so Lancer can regain some of its invested capital.

Rich at this time I would like to refer back to you 2 layoff lists you gave me a couple of weeks ago.  We acted on the smaller one understanding that if we did not get the funding we would have to enact the larger list and perhaps more so with this in mind could you to speak to Gasper and have him layoff the Telephony Sales department as a whole and than I would request your resignation as President of the Company and all its subsidiaries as well as resign from the boards of directors as this was referenced within your recommendation.

Mike at this time I would like to have a meeting with you at 8am on Monday morning because I would like to keep 3 to 4 tech so we can get the outstanding jobs completed and I would like you to resign from the board of directors as well.

I will meet with all other department heads on Monday to layoff the rest of the necessary cuts and try to keep some of the necessary personal to keep the company going long enough to pay off some of the larger debts if not all the debt.

I would like to thank everybody for all there hard work and effort and hope everyone life long

MET-0338

success.

Sincerely yours,
Mark Antonucci
Chief Executive Officer /
Chairman of the board of directors
Method Products Corp. and its Subsidiaries

CONFIDENTIAL TREATMENT
REQUESTED UNDER THE FREEDOM
OF INFORMATION ACT

MET-0339

# EXHIBIT 45

## DECLARATION OF FERNANDO TORRES

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is Fernando Torres.  I am over twenty-one years of age and have personal knowledge of the matters set forth herein.

2.      I am a certified public accountant in the State of Florida and am employed as a senior accountant with the Southeast Regional Office of the U.S. Securities and Exchange Commission ("Commission").

### Documents Reviewed

3.      This declaration is based upon my personal review of investor newsletters produced by the Lancer Group to the Commission, including:

      a.      Lancer Partners, L.P. ("Lancer Partners") newsletters, as follows:

            i.      Year-to-Date Review newsletter dated July 10, 2000;

            ii.     Monthly Performance Update newsletter dated September 6, 2001; and

            iii.    Year-to-Date Performance Update newsletter dated May 5, 2002.

      b.      Lancer Offshore, Inc. ("Lancer Offshore") newsletters, as follows:

            i.      Monthly Performance Update newsletter dated September 3, 2001; and

            ii.     Year-to-Date Performance Update newsletter dated May 5, 2002.

      c.      Lancer Group newsletters dated September 11, 2002 and January 13, 2003.

4.      This declaration is further based on my review of brokerage statements for the following accounts, which were produced to the Commission by Banc of America Securities, LLC ("Banc of America"):

      a.      Lancer Partners, account number 118-11892-1-6 for June 2000 to July 2000; August 2001 to September 2001; and, January 2002 to May 2002; and

      b.      Lancer Offshore, account number 313-11895-1-0 for August 2001 to September 2001; January 2002 to May 2002; and, August 2002 to September 2002.

5.      This declaration is further based on my review of spreadsheets titled "Banc of America Securities LLC Client Position Summary by Asset Class" ("Position Summary") for the month-ended from June 2000 to October 2002 for Lancer Partners, and August 2000 to October 2002 for Lancer Offshore, which were produced to the Commission by the Lancer Group.

<u>US Industries</u>

6.      The Lancer Partners Year-To-Date Review newsletter dated July 10, 2000 states that "US Industries" is "one of our significant positions."

7.      In reality, a review of the Lancer Partners June 2000 and July 2000 Banc of America statements reveals that as of June 30, 2000, Lancer Partners held 219,100 shares of US Industries.  Subsequently, on July 7,  2000, Lancer Partners acquired 8,000 additional shares of US Industries.  Therefore, as of the date of the newsletter (July 10, 2000), Lancer Partners held 227,100 shares of US Industries.

8.      Further, a review of the Lancer Partners June 2000 and July 2000 Position Summary further reveals that Lancer Partners held 219,100 shares of US Industries, representing 1.36 percent of its assets as of June 30, 2000, and 227,100 shares of US Industries, representing 1.56 percent of its assets as of July 31, 2000.

DRS Technologies

9.      Lancer Partners and Lancer Offshore Monthly Performance Update newsletters dated September 6, 2001 and September 3, 2001, respectively, state that "DRS Technologies" is a "company in our portfolio."

10.     In reality, a review of the Lancer Partners and Lancer Offshore August 2001 and September 2001 Banc of America statements reveals that Lancer Partners and Lancer Offshore did not hold any positions in DRS Technologies as of August 31, 2001 or September 28, 2001, or at any time during September 2001.

11.     Further, a review of the Lancer Partners and Lancer Offshore August 2001 and September 2001 Position Summary does not reveal any holdings in DRS Technologies as of August 31, 2001 or September 30, 2001.

Plantronics, TRW, Teledyne Tech. and Terex

12.     Lancer Partners and Lancer Offshore Year-to-Date Performance Update newsletters dated May 5, 2002 state that "[n]early all of the YTD gains were generated from the long side, with recent profits taken in holdings, which never quite acquired the status of 'core' positions, by virtues of advancing above our buying range too early (Hyperion Solutions, Perkin Elmer, Plantronics, TRW, Teledyne Tech., Terex, Tyco International, and US Industries to name a few)."

3

13.     In reality, a review of the Lancer Partners and Lancer Offshore January 2002 to May 2002 Banc of America statements reveals that Lancer Partners and Lancer Offshore did not hold any positions from January 1, 2002 to May 31, 2002 in four (Plantronics, TRW, Teledyne Tech. and Terex) and two (TRW and Terex) of the mentioned equities in the newsletters, respectively.

14.     Further, a review of the Lancer Partners and Lancer Offshore January 2002 to May 2002 Position Summary also reveals that Lancer Partners and Lancer Offshore did not hold any positions, as of month-ended January 31, 2002 to May 31, 2002, in the four and two described equities above.

Method Products Corp.

15.     The Lancer Group newsletter dated September 11, 2002 states that "The Method Products Corp is another small position."

16.     In reality, a review of the Lancer Offshore August 2002 and September 2002 Banc of America statements reveals that Lancer Offshore held 2,844,509 shares of Method Products Corp. as of the date of the newsletter (September 11, 2002).

17.     Further, a review of the Lancer Offshore August 2002 Position Summary reveals that Lancer Offshore held 2,841,009 shares and 10,000,000 warrants of Method Products Corp. as of August 31, 2002, or approximately 3.33 percent (or $33.45 million) of its total assets.

Credit Store, Inc.

18.     The Lancer Group newsletter dated January 13, 2003 states that the "funds did own Credit Store … a number of years ago … the stock had no influence on valuations for a number of years."

19.     In reality, a review of the Lancer Partners and Lancer Offshore August 2000 to June 2002 Position Summary reveals that from August 31, 2000 to August 31, 2001 Lancer Partners' holdings in Credit Store, Inc. represented from 2.03 percent to 5.97 percent of its total asset value and Lancer Offshore's holdings represented from 1.49 percent to 4.63 percent of its total asset value. I further noticed that as of May 31, 2002, Lancer Partners and Lancer Offshore, combined, held over 10 million shares of Credit Store, Inc. Also, both Lancer Partners and Lancer Offshore held shares in Credit Store, Inc. until at least October 31, 2002, and in June 30, 2002 holdings in Credit Store, Inc. represented 0.42 percent (or $1.12 million) of Lancer Partners' total asset value and 0.31 percent (or $3.04 million) of Lancer Offshore's total asset value.

I declare under penalty of perjury that the foregoing is true, correct and made in good faith. Executed on this _24th_ day of June 2003.


Fernando Torres

5

# EXHIBIT 46

Documents > Filing

**AUG CORP - 10-Q**

**Return to Filings**



- Document
  - Base
    - Cover Page
    - Table of Contents
    - Financial Statement Item
      - Financial Statements
        - Balance Sheet
        - Income Statement
        - Cashflow Statement
        - Financial Footnotes
    - Management Discussion
    - Legal Proceedings
    - Changes in Securities
    - Defaults Upon Securities
    - Submission to a Vote
    - Other Information
    - Exhibits and Reports
      - List of Exhibits
    - Signatures
  - Exhibits
    - Additional Exhibits 99.1
    - Additional Exhibits 99.2

U.S. SECURITIES AND EXCHANGE COMMISSION

Return to Navigational Table of Contents

Washington, D.C. 20549

# FORM 10-QSB

(Mark One)

{ X }    QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
         ACT OF 1934

         For the quarterly period ended **September 30, 2002**
                                        ------------------

{   }    TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE EXCHANGE ACT

         For the transition period from _____ to _____

                     Commission File Number: 0-22341

                              **AUG CORP.**
                              ---------
         (Exact name of Small Business Issuer as specified in its Charter)

             Delaware                              04-3089539
------------------------------        ------------------------------------
(State or other jurisdiction of       (I.R.S. Employer Identification No.)
incorporation or organization)

         1900 Corporate Blvd., Suite 305W, Boca Raton, Florida 33431
         --------------------------------------------------------------
                    (Address of principal executive offices)

                            (561) 241-9921
                            --------------
                        (Issuer's telephone number)

              --------------------------------------------------------------
              (Former Name, former address and former fiscal year, if changed

since last Report.)

    Check mark whether the Issuer (1) has filed all reports required to be
filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the
past 12 months (or for such shorter period that the registrant was required to
file such reports), and (2) has been subject to such filing requirements for the
past 90 days. Yes {X}    No  { }

                    APPLICABLE ONLY TO CORPORATE ISSUERS

    State the number of shares outstanding of each of the issuer's classes
of common equity, as of the latest practicable date: 104,780,223 shares of
Common Stock as of November 15, 2002.


**INDEX**

Return to Navigational Table of Contents

PART I.  **FINANCIAL INFORMATION**                                                3
         ----------------------

Item 1.  Condensed Financial Statements (unaudited)                              3

         Balance Sheets                                                          3

         Statements of Operations                                               4

         Statements of Cash Flows                                               5

         Notes to Financial Statements                                          6

Item 2.  Management's Discussion and Analysis and Plan of Operations            13

Item 3.  Controls and Procedures                                               15

PART II. **OTHER INFORMATION**                                                 16
         ------------------

Item 1.  Legal Proceedings                                                     16

Item 2.  Changes in Securities and Use of Proceeds                             16

Item 3.  Defaults Upon Senior Securities                                       17

Item 4.  Submissions of Matters to a Vote of Security Holders                  17

Item 5.  Other Information                                                      17

Item 6.  Exhibits and Reports on Form 8-K                                       17

2

PART I.  FINANCIAL INFORMATION
         ----------------------


Item 1.  Condensed Financial Statements
Return to Navigational Table of Contents


Return to Navigational Table of Contents

AUG CORP. AND SUBSIDIARY
CONDENSED BALANCE SHEETS
--------------------------

### ASSETS

| | September 30, 2002 (Consolidated) (Unaudited) | December 31, 2001 (Restated) |
|---|---|---|
| **CURRENT ASSETS** | | |
| Cash and cash equivalents | $   178,185 | $    36,079 |
| Cash advance for pending merger | -- | 600,000 |
| Prepaid expenses and other assets | 49,906 | -- |
| Total Current Assets | 228,091 | 636,079 |
| Furniture, fixtures and equipment, net | 181,963 | -- |
| Goodwill | 19,977,468 | -- |
| **TOTAL ASSETS** | $ 20,387,522 | $   636,079 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts payable | $    85,148 | $      -- |
| Accrued expenses | 72,533 | 7,258 |
| Loans payable to related party | 975,000 | -- |
| Total Current Liabilities | 1,132,681 | 7,258 |
| **STOCKHOLDERS' EQUITY** | | |
| Preferred stock, Series A, $0.01 par value, 2,000,000 shares authorized, none issued and outstanding | -- | -- |
| Common stock, $0.0001 par value, 148,000,000 shares authorized, 104,780,223 and 82,189,964 shares issued and outstanding, respectively | 10,479 | 8,220 |
| Additional paid-in capital | 44,911,255 | 22,887,815 |
| Accumulated deficit | (25,666,893) | (22,267,214) |
| Total Stockholders' Equity | 19,254,841 | 628,821 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 20,387,522 | $   636,079 |

See accompanying notes to condensed consolidated financial statements.

3

Return to Navigational Table of Contents

AUG CORP. AND SUBSIDIARY
CONDENSED STATEMENTS OF OPERATIONS
----------------------------------
(UNAUDITED)

| | For the Three Months Ended September 30, 2002 (Consolidated) | For the Three Months Ended September 30, 2001 | For the Nine Months Ended September 30, 2002 (Consolidated) | For the Nine Months Ended September 30, 2001 |
|---|---|---|---|---|
| **NET REVENUES** | $    33,946 | $      -- | $    68,936 | $      -- |
| **OPERATING EXPENSES** | | | | |
| General and administrative | 328,832 | 7,321 | 1,410,717 | 7,605 |
| Salaries, wages and consulting | 572,666 | -- | 1,539,732 | -- |
| Professional fees | 160,583 | 127,866 | 518,166 | 148,125 |
| Total Operating Expenses | 1,062,081 | 135,187 | 3,468,615 | 155,730 |
| **LOSS FROM OPERATIONS** | (1,028,135) | (135,187) | (3,399,679) | (155,730) |
| **OTHER INCOME** | | | | |
| Gain on settlement of accounts payable | -- | 108,134 | -- | 108,134 |

| | | | |
|---|---|---|---|
| | ------------- | ------------- | ------------- | ------------- |
| LOSS BEFORE EXTRAORDINARY GAIN | (1,028,135) | (27,053) | (3,399,679) | (47,596) |
| EXTRAORDINARY GAIN | | | | |
| Gain on extinguishment of debt | -- | -- | -- | 1,665,043 |
| | ------------- | ------------- | ------------- | ------------- |
| NET (LOSS) INCOME | $ (1,028,135) | (27,053) | (3,399,679) | $ 1,617,447 |
| | | | | |
| Net (loss) income per share of common stock - basic and diluted | $ (0.01) | $ (0.02) | $ (0.04) | $ 1.74 |
| | | | | |
| Weighted average number of shares outstanding during the period - basic and diluted | 102,560,948 | 1,314,964 | 92,551,672 | 932,154 |

See accompanying notes to condensed consolidated financial statements.

4

Return to Navigational Table of Contents

### AUG CORP. AND SUBSIDIARY
### CONDENSED STATEMENTS OF CASH FLOWS
------------------------------------
#### (UNAUDITED)

| | For the Nine Months Ended September 30, 2002 (Consolidated) | For the Nine Months Ended September 30, 2001 |
|---|---|---|
| | ------------------- | ------------- |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net (Loss) Income | $(3,399,679) | $ 1,617,447 |
| Adjustments to reconcile net (loss) income to net cash used in operating activities: | | |
| Issuance of common stock for services | 51,250 | -- |
| Extraordinary gain on extinguishment of debt | -- | (1,665,043) |
| Depreciation | 82,828 | -- |
| Changes in assets and liabilities: | | |
| Prepaid expenses and other current assets | 34,584 | -- |
| Accounts payable | (13,931) | (54,942) |
| Accrued expenses | 54,723 | (57,684) |
| | ----------- | ----------- |
| Net Cash Used In Operating Activities | (3,190,225) | (160,222) |
| | ----------- | ----------- |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of furniture, fixtures and equipment | (222,604) | -- |
| Cash acquired in merger acquisition | 187,435 | -- |
| Capital expenditures to purchase Company stock | -- | (207,500) |
| | ----------- | ----------- |
| Net Cash Used In Investing Activities | (35,169) | (207,500) |
| | ----------- | ----------- |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from the issuances of common stock, net | 2,392,500 | 400,000 |
| Proceeds from loans | 975,000 | -- |
| Note payable | -- | (6,432) |
| Capital lease obligation | -- | (46,760) |
| | ----------- | ----------- |
| Net Cash Provided By Financing Activities | 3,367,500 | 346,808 |
| | ----------- | ----------- |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 142,106 | (20,914) |
| CASH AND CASH EQUIVALENTS - BEGINNING OF PERIOD | 36,079 | 29,172 |
| | ----------- | ----------- |
| CASH AND CASH EQUIVALENTS - END OF PERIOD | $ 178,185 | $ 8,258 |

SUPPLEMENTAL CASH FLOW INFORMATION:
-----------------------------------

Non Cash Investing and Financing Activities:

During the nine months ended September 30, 2002, 350,000 shares were issued (275,000 valued at $0.05 per share and 75,000 shares valued at $.50 per share) for the payment of services valued at $51,250.

During the nine months ended September 30, 2001, 65,743 shares valued at $658 were issued for the extinguishment of debt consisting of notes and interest valued at $1,665,701. A gain on extinguishment of debt was recognized for

$1,665,043.

**See accompanying notes to condensed consolidated financial statements.**

5

Return to Navigational Table of Contents

AUG CORP. AND SUBSIDIARY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
AS OF SEPTEMBER 30, 2002
-------------------------
(UNAUDITED)

NOTE 1 ORGANIZATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
------ -----------------------------------------------------------

(A) Organization
----------------

AUG Corp. (the "Company") was incorporated in 1990 to develop and
distribute fiber optic printed circuit boards in the publishing and
printing markets. The fiber optic products had limited success and in
fiscal 1994 the Company began phasing out the fiber optic operations and
began the transition into a systems integration and engineering
consulting business. In 1995, the Company made a strategic shift in its
business operation into the server market.

In November 1998, the Company was informed by the investment bank that
had provided financing that they would be unable to secure the additional
funding required to repay an outstanding bridge loan and provide the
Company with the necessary working capital to support its plan and
ongoing operations. The Company began to seek alternative financing, but
was unable to secure the necessary funds for extinguishment of the bridge
loan.

In January 1999, the Board of Directors decided to seek buyers, strategic
partners and merger opportunities to make the Company economically
viable.

On March 11, 2000, Right2Web.Com, Inc. acquired 1,416,700 shares of the
Company's preferred stock convertible into 92% of the outstanding shares
of the Company's common stock. In return for the shares of preferred
stock, Right2Web.Com, Inc. undertook to satisfy the Company's current
debt and obligations and fund its operations. The transaction was valued
at $40,480 and was accounted for as a reverse merger in 2000. The
preferred stock was converted into common stock in 2001.

In September 2001, the Board of Directors and a majority of the
stockholders of the Company voted to change the name of the Company to
AUG Corp. The name change became effective on October 29, 2001.

Effective August 31, 2001, the Company entered into a Stock Purchase
Agreement ("Agreement") with the purchaser, a Curacao, Netherlands
Antilles corporation. Under this Agreement, the purchaser purchased
2,000,000 shares of the Company's Series A Preferred Stock, par value
$.01 and 670,854 shares of the Company's common stock (post 100:1 reverse
stock split) for the sum of $400,000. The preferred shares were converted
into an aggregate of 40,000,000 common shares, par value $.0001, upon the
completion of a 100:1 reverse stock split of the Company's common stock.

In addition, under the Agreement, the Company issued warrants to a
company related to and controlled by the purchaser to purchase 10,000,000
shares of the Company's common stock exercisable at $.01 per share until
November 30, 2001; warrants to purchase 20,000,000 shares of the

6

AUG CORP. AND SUBSIDIARY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
AS OF SEPTEMBER 30, 2002
-------------------------
(UNAUDITED)

Company's common stock exercisable at $.05 per share until August 31,
2004; and warrants to purchase 20,000,000 shares of the Company's common
stock exercisable at $.10 per share until August 31, 2006. In November
2001, the Company issued 10,000,000 shares of common stock in exchange
for the 10,000,000 warrants that were exercisable at $.01 per share. In

accordance with the Agreement, the Company also issued to another company
controlled by the purchaser a cash-less exercisable option to purchase
2,000,000 shares of the Company's common stock along with warrants to
purchase 1,000,000 shares of the Company's common stock exercisable at
$.05 per share until August 31, 2004 and was also issued warrants to
purchase 1,000,000 shares of the Company's common stock at $.10 per share
until August 31, 2006. In November 2001, the Company issued the 2,000,000
shares of common stock upon the cash-less exercise of the related
options.

In January 2002, the Company acquired 100% of the common stock of
Synthesys Secure Technologies, Inc. ("Synthesys"). The purchase price of
the investment amounted to $20,181,948, and was comprised of a cash
payment of $600,000 made in December 2001, and the issuance of 5,350,259
shares of restricted common stock valued at $19,581,948. The shares were
valued at the average quoted trading price during the acquisition period
(See Note 4). The fair value of the investment at the acquisition date
was determined to be $204,480. The excess of the purchase price over the
fair value of the investment in the amount of $19,977,469 was accounted
for as goodwill.

Synthesys was formed on May 18, 2001 in the state of Florida. Synthesys
is a global security solutions company specializing in security access to
computer networks, buildings, offices, and other secure areas. Synthesys
develops and markets a variety of innovative security-based products that
are used to secure databases, to authenticate people over the phone, over
the computer, and via cameras.

In July 2002, the Company incorporated Biometrics Marketing Inc. ("BMI"),
which is a 100% wholly owned subsidiary of AUG. BMI will perform
marketing, sales and administrative functions.

(B) Principles of Consolidation
-------------------------------

The accompanying condensed consolidated financial statements for 2002
include the accounts of Aug Corp and its wholly owned subsidiaries
Synthesys and BMI. All intercompany transactions and balances have been
eliminated in consolidation. The pre-acquisition financial statements for
2001 only included the accounts of the parent company, Aug Corp.

                                  7


                      AUG CORP. AND SUBSIDIARY
          NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                      AS OF SEPTEMBER 30, 2002
                      ------------------------
                            (UNAUDITED)


(C) Use of Estimates
--------------------

In preparing condensed consolidated financial statements in conformity
with accounting principles generally accepted in the United States of
America, management is required to make estimates and assumptions that
affect the reported amounts of assets and liabilities and the disclosure
of contingent assets and liabilities at the date of the condensed
consolidated financial statements and revenues and expenses during the
reported period. Actual results could differ from those estimates.

(D) Income (Loss) Per Common Share
-----------------------------------

Basic earnings (loss) per common share are based on net income (loss)
divided by the weighted average number of common shares outstanding.
Diluted earnings per common share are adjusted to reflect the incremental
number of shares issuable for the assumed conversion of common stock
purchase warrants if such adjustments are dilutive. Warrants to purchase
42,000,000 shares of common stock were not included in the calculation of
diluted EPS for "loss before extraordinary item" as the effect would be
anti-dilutive. Additionally, there were no common stock equivalents
outstanding for the three and nine months ended September 30, 2001. The
weighted average shares outstanding for the three and nine months ended
September 30, 2001 have been restated for the reverse stock splits that
occurred in 2001.

(E) Interim Condensed Consolidated Financial Statements
-------------------------------------------------------

The condensed consolidated financials statements as of September 30, 2002 and for the three and nine months ended September 30, 2002 and the condensed financial statements of the parent company for the three and nine month ended September 30, 2001 are unaudited. In the opinion of management, such financial statements include all adjustments (consisting only of normal recurring accruals) necessary for the fair presentation of the financial position and the results of operations. The results of operations for the three and nine months ended September 30, 2002 (consolidated) and for the three and nine months ended September 30, 2001 are not necessarily indicative of the results to be expected for the full year. The condensed balance sheet information as of December 31, 2001 was derived from the audited financial statements included in the Company's Annual Report Form 10-KSB. The interim condensed financial statements should be read in conjunction with that report.

(F) Furniture, Fixtures and Equipment
---------------------------------------

Furniture, fixtures and equipment are stated at cost less accumulated depreciation. Depreciation is computed using accelerated methods over the estimated economic useful lives of 5 to 7 years. Expenditures for repairs and maintenance are charged to expense as incurred and major improvements are capitalized.

8

AUG CORP. AND SUBSIDIARY
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
AS OF SEPTEMBER 30, 2002
------------------------
(UNAUDITED)

(G) Impairment of Long-Lived Assets
------------------------------------

The Company has evaluated its long-lived assets for financial impairment, and will continue to evaluate them as events or changes in circumstances indicated that the carrying amount of such assets may not be fully recoverable.

The Company evaluates the recoverability of long-lived assets not held for sale by measuring the carrying amount of the assets against the estimated undiscounted future cash flows associated with them. At the time such cash flows of certain long-lived assets are not sufficient to recover the carrying value of such assets, the assets are adjusted to their fair values.

(H) Revenue Recognition
------------------------

Revenue is recognized when all significant contractual obligations have been satisfied and collection of the resulting accounts receivable is reasonably assured. Revenue from software and engineering services are recognized at the time of delivery according to contractual terms and are recorded net of discounts and allowances.

(I) Restatement of Financial Statements Resulting from the Correction of
------------------------------------------------------------------------
an Error
--------

The accompanying balance sheet as of December 31, 2001 has been restated to correct an error for the overstatement of expenses and additional paid-in capital during 2001. The restatement results from the Company recording certain direct costs of raising capital as expense rather than as an offset to additional paid-in capital. The effect of the restatement was to decrease net accumulated deficit and decrease additional paid-in capital by $104,000 at December 31, 2001.

(J) Going Concern
------------------

The Company's condensed consolidated financial statements have been presented on the basis that it is a going concern, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. For the nine months ended September 30, 2002, the Company has a net loss of $3,399,679 and a negative cash flow from operations of $3,190,225, and has a working capital deficiency of

$904,590 and an accumulated deficit of $25,666,893 at September 30, 2002.
These circumstances raise substantial doubt as to the Company's ability
to continue as a going concern.

The Company's ability to continue as a going concern is dependent on the
Company's ability to raise additional capital, and implement its business
plan. Management believes that actions presently taken to obtain
additional funding provide the opportunity for the Company to continue as
a going concern. The condensed consolidated financial statements do not
include any adjustments that might result from the outcome of this
uncertainty.

                                  9

                    AUG CORP. AND SUBSIDIARY
            NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                      AS OF SEPTEMBER 30, 2002
                      ------------------------
                           (UNAUDITED)


    (K) Reclassifications
    ---------------------

    Certain prior period amounts have been reclassified to conform to the
    current period's presentation.

NOTE 2 FURNITURE, FIXTURES AND EQUIPMENT
------ ----------------------------------

    The furniture, fixtures and equipment were acquired with the acquisition
    of the assets of SyntheSys on January 7, 2002. During the nine months
    ended September 30, 2002 the Company has acquired additional computer
    hardware and software of approximately $222,000 to increase the
    infrastructure of its information technology support and development
    capabilities.

    Furniture, fixtures and equipment at September 30, 2002 consists of the
    following:

| | | |
|---|---|---:|
| Furniture and fixtures | $ | 11,027 |
| Computer hardware | | 90,204 |
| Computer software | | 153,841 |
| Equipment | | 20,073 |
| | | --------- |
| | | 275,145 |
| Less: accumulated depreciation | | (93,182) |
| | | --------- |
| | $ | 181,963 |

NOTE 3 AFFILIATED PARTY TRANSACTIONS
------ ------------------------------

    The Company pays a licensed broker dealer corporation owned by the
    president, fees for all funds raised for the Company from parties
    introduced by the broker dealer. Fees associated with transactions
    resulting in the issuances of common stock are recorded as a reduction of
    additional paid-in capital (See Note 4(B)).

    During the nine months ended September 30, 2002, the Company received
    loans from an affiliated party amounting to $1,100,000. In April 2002,
    the Company repaid $125,000 of the loans. At September 30, 2002 the
    unpaid balances on the loans amounted to $975,000. The loans bear
    interest at 10% and are due 180 days from the date the loans were
    originated. The due dates of the loans range from November 2002 through
    March 2003. In connection with the loans, the Company issued 75,000
    shares of common stock to affiliated parties valued at $3,750, and paid
    cash of approximately $230,000 to an affiliated party in payment of
    consulting fees relating to the loans. Such amounts are included in
    professional fees in the accompanying condensed consolidated statement
    of operations for the nine months ended September 30, 2002.

                                  10

                    AUG CORP. AND SUBSIDIARY
            NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                      AS OF SEPTEMBER 30, 2002
                      ------------------------
                           (UNAUDITED)

NOTE 4 STOCKHOLDERS' EQUITY
------   -------------------

    2002
    ----

    (A) Common Stock Issued for Acquisition
    ---------------------------------------

    In January 2002, the Company acquired 100% of the common stock of
    Synthesys. In connection with the purchase, the Company was to issue
    5,350,259 shares of restricted common stock valued at $19,581,948. The
    shares were valued at the average quoted trading price during the
    acquisition period. These shares were issued in August 2002.

    (B) Issuance of Common Stock for Cash and Services
    --------------------------------------------------

    For the nine months ended September 30, 2002, the Company issued
    14,920,000 shares of common stock for $2,392,500, net of direct costs of
    $357,500 to an affiliated party, according to various term sheets. The
    Company also issued 275,000 shares of common stock valued at $47,500 for
    consulting services related to the issuances.

    (C) Exercise of Common Stock Warrants
    -------------------------------------

    In May 2002 the Company issued 1,970,000 shares of common stock for two
    1,000,000 warrants in a cash-less exercise option of those warrants with
    exercise prices of $.035 and $.05 per share.

    2001
    ----

    In February 2001, 15,778,406 common shares were retired and replaced by
    3,944,602 common shares according to the 4:1 reverse stock split approved
    by the Board of Directors.

    In September 2001, the Board of Directors and a majority of the
    shareholders of the Company voted to effectuate a 100:1 reverse stock
    split of the Company's currently issued and outstanding shares of common
    stock. The reverse stock split became effective on October 29, 2001.

    All shares and per share amounts have been restated to reflect these
    transactions.

    (A) Issuance of Common Stock for Debt
    -------------------------------------

    In June 2001, 65,743 shares of common stock were issued for the
    settlement of debt. The shares were valued at $2,200 using the fair value
    as determined by an independent appraiser. This resulted in an
    extraordinary gain of $1,665,043.

                                   11

                       AUG CORP. AND SUBSIDIARY
             NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
                        AS OF SEPTEMBER 30, 2002
                        ------------------------
                             (UNAUDITED)


    (B) Conversion of Outstanding Preferred Stock
    ---------------------------------------------

    In June 2001, the Company converted the 1,416,700 shares of preferred
    stock outstanding to 1,209,678 shares of common stock.

NOTE 5 LITIGATION
------   ----------

    An action was brought against the Company's subsidiary, Synthesys, prior
    to the acquisition by AUG Corp., by an investment broker, alleging breach
    of an investment-banking contract. This lawsuit was settled in May 2002
    by a confidential agreement between the parties that resulted in no
    change to the Company's condensed consolidated financial position,
    results of operations or cash flows.

NOTE 6  SUBSEQUENT EVENTS
------  -----------------

·       In October 2002 the Company borrowed $300,000 from an affiliated company
        and issued a promissory note with 12% interest and a repayment term of
        120 days. In addition to the promissory note, 100,000 warrants to
        purchase the common stock of the Company were issued with an exercise
        price of $4.00 per share.

12

Return to Navigational Table of Contents
Item 2.  Management Discussion and Analysis

General

        Management's discussion and analysis contains various forward-looking
statements within the meaning of the Securities and Exchange Act of 1934. These
statements consist of any statement other than a recitation of historical fact
and can be identified by the use of forward looking terminology such as "may,"
"expect," "anticipate," "estimates" or "continue" or use of negative or other
variations of comparable terminology. Management cautions that these statements
are further qualified by important factors that could cause actual results to
differ materially from those contained in forward looking statements, that these
forward looking statements are necessarily speculative, and there are certain
risks and uncertainties that could cause actual events or results to differ
materially from those referred to in forward looking statements.

Overview

        On January 7, 2002, the Company and its wholly-owned subsidiary, AUG
Acquisition Corp. ("AAC"), entered into an Agreement and Plan of Merger, dated
December 28, 2001 with SyntheSys Secure Technologies, Inc. ("Synthesys"). The
Merger Agreement provided that upon the terms and subject to conditions therein,
for the merger of AAC into Synthesys. Synthesys, the surviving corporation,
became a wholly owned subsidiary of the Company. Synthesys and AAC made the
appropriate filings to complete the Merger Agreement with the State of Florida
on January 7, 2002. The Company paid $600,000 cash and the shareholders of
Synthesys received an aggregate of 5,350,259 shares of the Company's Common
Stock in exchange for their interest in Synthesys.

        Synthesys, a Florida corporation, with its executive offices located in
Deerfield Beach, Florida, is a global secure solutions company that intends to
develop and market a variety of innovative security-based products that function
on multiple operating systems including Open VMS(TM), UNIX(TM), Linux(TM),
Windows NT(TM), Windows 2000(TM) and AS400(TM).

        Synthesys was incorporated in May 2001 under the name SyntheSys
Technologies, Inc. Its name was subsequently changed to SyntheSys Secure
Technologies, Inc.

13

SyntheSys's operations are reflected in the results of operations for the three month and nine month period ended September 30, 2002. As Synthesys was not incorporated until May 2001, results of operations for the quarter and nine months ended June 2001 only reflect the Company's activity since inception for the second quarter of 2001. Since SyntheSys was not incorporated until May 2001, the pro forma effect for the three and nine months ended September 30, 2001 is insignificant.

Results of Operations for the Three Months ending September 30, 2002 and 2001

The Company recognized revenues of $33,946 for the quarter ended September 30, 2002. For the corresponding period of 2001 the Company did not recognize any revenues. The Company's sales efforts are focused on continuing to market its' biometric software and technical service products.

The Company incurred $1,062,081 of operating expenses for the quarter ended September 30, 2002, of these expenses, $572,666, were incurred from salaries, wages and consulting fees associated with the continued development and enhancement of the Company's biometric software products and marketing and sales of these products. The operating expense also included general and administrative expenses of $328,832. The Company also incurred $160,583 of professional fees during the quarter ended September 30, 2002. Operating expenses for the quarter ended September 30, 2001 was $135,187. These expenses were primarily professional fees related to start up costs and expenses.

The Company incurred a net loss for the quarter ended September 30, 2002 of $1,028,135. For the quarter ended September 30, 2001 the Company had a net loss of $27,053.

Results of Operations for the Nine Months ending September 30, 2002 and 2001

The Company had revenues of $68,936 for the nine months ended September 30, 2002. For the corresponding period of 2001 the Company did not recognize any revenues.

The Company incurred $3,468,615 of operating expenses for the nine months ended September 30, 2002. Expenses increased during the nine months ended September 30, 2002, as the Company increased personnel in both biometric software development and finance. On a very selective basis the Company will continue to evaluate the addition of key personnel. Operating expenses for the nine months ended September 30, 2001 was $155,730. These expenses were primarily professional fees incurred in the start-up of the Company.

14

During the nine months ended September 30, 2001, 65,743 shares valued at $658 were issued for the extinguishments of debt consisting of notes and interest valued at $1,665,701. A gain on extinguishments of debt was recognized for $1,665,043.

Liquidity and Capital Resources

The Company's condensed consolidated financial statements have been presented on the basis that it is a going concern, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. For the nine months ended September 30, 2002, the Company has a net loss of $3,399,679, a negative cash flow from operations of $3,190,225 and a working capital deficiency of $904,590. The Company had an accumulated deficit of $25,666,893 at September 30, 2002. These circumstances raise substantial doubt as to the Company's ability to continue as a going concern. The Company's ability to continue as a going concern is dependent on the Company's ability to raise additional capital, and implement its business plan. The Company has obtained short term financing and equity funding through the issuance of restricted common stock and related party loans.

For the nine months ended September 30, 2002, the Company issued 14,920,000 shares of common stock for $2,392,500, net of direct costs of $357,500 to an affiliated party, according to various term sheets. The Company also issued 275,000 shares of common stock valued at $47,500 for consulting services related to the issuances.

In May 2002, the Company issued 1,970,000 shares of common stock for two 1,000,000 warrants in a cashless exercise option of those warrants with exercise prices of $.035 and $.05 per share.

During October and November 2002, the Company borrowed an aggregate of $500,000 from an affiliated company and issued a promissory note with 12% interest and a repayment term of 120 days. In addition to the promissory note, 100,000 warrants to purchase the common stock of the Company were issued with an exercise price of $4.00 per share.

        The Company believes that the short term financing and equity funding
through the issuance of restricted common stock and related party loans is
sufficient to maintain operations over the next 12 months.

Item 3.  Controls and Procedures

Evaluation of disclosure controls and procedures
-------------------------------------------------

        Within the 90 days prior to the filing date of this report, the Company
carried out an evaluation of the effectiveness of the design and operation of
its disclosure controls and procedures pursuant to Exchange Act Rule 13a-14.
This evaluation was done under the supervision and with the participation of the
Company's Principal Executive Officer and Principal Accounting Officer. Based
upon that evaluation, they concluded that the Company's disclosure controls and
procedures are effective in gathering, analyzing and disclosing information
needed to satisfy the Company's disclosure obligations under the Exchange Act.

Changes in internal controls
-----------------------------

        There were no significant changes in the Company's internal controls or
in other factors that could significantly affect those controls since the most
recent evaluation of such controls.

                                       15


PART II. OTHER INFORMATION


Return to Navigational Table of Contents
Item 1.  Legal Proceedings

        During the first quarter 2002 HD Brous & Co., Inc. filed an action in
the United States District Court for the Eastern District of New York against
the C. (HD Brous & Co., Inc. vs. Synthesys Secure Technologies, Inc. a/k/a
Synthesys Technologies, Inc., case # CV 02 910). By its Complaint, Brous alleged
that it Company's subsidiary, SyntheSys Secure Technologies, Inc performed
investment banking services for Synthesys and is entitled to be compensated.
This lawsuit was settled in May 2002 by an agreement between the parties that
resulted in no change to the Company's condensed consolidated financial
position.

        On May 10 2002, Information Transport Associates, Inc, Inc. filed an
action in the United States District Court in the Fifteenth Judicial Circuit of
Florida against the Company's subsidiary, Synthesys, Case No. 02-05130AH. By its
complaint, ITA alleges that it performed business, technical services for
Synthesys and is entitled to be compensated. This lawsuit was settled in
September 2002 by an agreement to pay $25,000.


Return to Navigational Table of Contents
Item 2.  Changes in Securities and Use of Proceeds

        In January 2002, the Company acquired 100% of the common stock of
Synthesys. In connection with the purchase, the Company was to issue 5,350,259
shares of restricted common stock valued at $19,581,948. The shares were valued
at the average quoted trading price during the acquisition period. These shares
were issued in August 2002.

        For the nine months ended September 30, 2002, the Company issued
14,920,000 shares of common stock for $2,392,500, net of direct costs of
$357,500 to an affiliated party, according to various term sheets. The Company
also issued 275,000 shares of common stock valued at $47,500 for consulting
services related to the issuances.

        In May 2002 the Company issued 1,970,000 shares of common stock
pursuant to the exercise of two warrants with cash-less exercise provisions. The
options had exercise prices of $.035 and $.05 per share.

16

    Between October and November 2002, the Company borrowed $500,000 from an
affiliated company and issued a promissory note with 12% interest and a
repayment term of 120 days. In addition to the promissory note, 100,000 warrants
to purchase the common stock of the Company were issued with an exercise price
of $4.00 per share.

    The securities issued in connection with the transactions above were
issued under the exemption from registration provided by Section 4(2) of the
Securities Act. The shareholders received information concerning the Company and
had the opportunity to ask questions about the Company. The securities issued
are marked with the appropriate restrictive legends.


Return to Navigational Table of Contents
Item 3.  Defaults Upon Senior Securities

        None.


Return to Navigational Table of Contents
Item 4.  Submission of Matters to a Vote of Security Holders

        None.


Return to Navigational Table of Contents
Item 5.  Other Information

        None.


Return to Navigational Table of Contents
Item 6.  Exhibits and Reports on Form 8-K


        (a) Exhibits required by Item 601 of Regulation S-B
Return to Navigational Table of Contents

        The following exhibits are filed as part of this report:

        Exhibits:

2.1     Agreement and Plan of Merger, dated December 28, 2001 with SyntheSys
        Secure Technologies, Inc. (previously filed on Form 8-K filed February
        12, 2002).

        99.1    Certification of Principal Executive Officer

        99.2    Certification of Principal Accounting Officer

        (b) Reports on Form 8-K

        None.




                                      17


Return to Navigational Table of Contents
                                  SIGNATURE


        Pursuant to the requirements of the Securities Exchange Act of 1934,
the Registrant has duly caused this report to be signed on its behalf by the
undersigned as duly authorized officers of the Registrant.

                                  AUG CORP

DATED: November 18, 2002          By: /s/ Laurence S. Isaacson
                                  -----------------------------------
                                      Laurence S. Isaacson, President


DATED: November 18, 2002          By: /s/ Jeff Barocus

```
---------------------------------
```
Jeff Barocus, Principal
Accounting Officer

18

Return to Navigational Table of Contents

EXHIBIT 99.1

Return to Navigational Table of Contents

CERTIFICATION BY PRINCIPAL EXECUTIVE OFFICER

I, Laurence S. Isaacson, the principal executive officer of AUG CORP., a Florida corporation (the "Registrant"), certify that:

1. I have reviewed this quarterly report on Form 10-QSB for the period ended September 30, 2002, of the Registrant (the "Report").

2. Based on my knowledge, the Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Report.

3. Based on my knowledge, the financial statements, and other financial information included in the Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in the Report.

4. The Registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which the Report is being prepared.

b) evaluated the effectiveness of the Registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of the Report (the "Evaluation Date"); and

c) presented in the Report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The Registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the Registrant's auditors and the Audit Committee of the Registrant's Board of Directors:

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the Registrant's ability to record, process, summarize and report financial data and have identified for the Registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control.

6. The Registrant's other certifying officers and I have indicated in the Report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

/s/Laurence S. Isaacson
-----------------------
Name: Laurence S. Isaacson
Title: Principal Executive Officer
Dated: November 18, 2002

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the accompanying Quarterly Report of AUG CORP. (the "Company") on Form 10-QSB for the period ending September 30, 2002, as filed with the Securities and Exchange commission on the date hereof (the "Report"), I, Laurence S. Isaacson, principal executive officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fully presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/Laurence S. Isaacson
    -----------------------
    Laurence S. Isaacson

    November 18, 2002

2

Exhibit 99.2

Return to Navigational Table of Contents

CERTIFICATION BY PRINCIPAL ACCOUNTING OFFICER

I, Jeff Barocus, the principal accounting officer of AUG CORP., a Florida corporation (the "Registrant"), certify that:

1. I have reviewed this quarterly report on Form 10-QSB for the period ended September 30, 2002, of the Registrant (the "Report").

2. Based on my knowledge, the Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the Report.

3. Based on my knowledge, the financial statements, and other financial information included in the Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as

of, and for, the periods presented in the Report.

    4. The Registrant's other certifying officers and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined in
Exchange Act Rules 13a-14 and 15d-14) for the Registrant and we have:

    a) designed such disclosure controls and procedures to ensure
that material information relating to the Registrant, including its consolidated
subsidiaries, is made known to us by others within those entities, particularly
during the period in which the Report is being prepared.

    b) evaluated the effectiveness of the Registrant's disclosure
controls and procedures as of a date within 90 days prior to the filing date of
the Report (the "Evaluation Date"); and

    c) presented in the Report our conclusions about the
effectiveness of the disclosure controls and procedures based on our evaluation
as of the Evaluation Date;

    5. The Registrant's other certifying officers and I have disclosed,
based on our most recent evaluation, to the Registrant's auditors and the Audit
Committee of the Registrant's Board of Directors:

    a) all significant deficiencies in the design or operation of
internal controls which could adversely affect the Registrant's ability to
record, process, summarize and report financial data and have identified for the
Registrant's auditors any material weaknesses in internal controls; and

    b) any fraud, whether or not material, that involves
management or other employees who have a significant role in the Registrant's
internal control.

    6. The Registrant's other certifying officers and I have indicated in
the Report whether or not there were significant changes in internal controls or
in other factors that could significantly affect internal controls subsequent to
the date of our most recent evaluation, including any corrective actions with
regard to significant deficiencies and material weaknesses.

                  /s/Jeff Barocus
                  ---------------
                  Name: Jeff Barocus
                  Title: Principal Accounting Officer
                  Dated November 18, 2002

                  CERTIFICATION PURSUANT TO
                  18 U.S.C. SECTION 1350
                  AS ADOPTED PURSUANT TO
    SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

    In connection with the accompanying Quarterly Report of AUG CORP. (the
"Company") on Form 10-QSB for the period ending September 30, 2002, as filed
with the Securities and Exchange commission on the date hereof (the "Report"),
I, Jeff Barocus, principal accounting officer of the Company, certify, pursuant
to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the
Sarbanes-Oxley Act of 2002, to the best of my knowledge, that:

    (1) The Report fully complies with the requirements of Section 13(a) or
15(d) of the Securities Exchange Act of 1934; and

    (2) The information contained in the Report fully presents, in all
material respects, the financial condition and results of operations of the
Company.

By: /s/Jeff Barocus
    ---------------
    Jeff Barocus

    November 18, 2002

2

(Return to Navigational Table of Contents)

**Return to Filings**

© 2002 Thomson Financial. All rights reserved.

Client Services 1-877-256-3986 | Terms of Use

# EXHIBIT 47

Documents > Filing

**TOTAL FILM GROUP INC - 10-Q**

[Return to Filings]



▶ Document
    ▶ Base
        ▶ Cover Page
        ▶ Financial Statement Item
            ▶ Financial Statements
                ▶ Balance Sheet
                ▶ Income Statement
                ▶ Cashflow Statement
                ▶ Financial Footnotes
        ▶ Management Discussion
        ▶ Changes in Securities
        ▶ Defaults Upon Securities
        ▶ Other Information
        ▶ Exhibits and Reports
            ▶ List of Exhibits
        ▶ Signatures
    ▶ Exhibits
        ▶ Opinion: Discount on Cap Shares 6.52
        ▶ Opinion: Discount on Cap Shares 6.53
        ▶ Opinion: Discount on Cap Shares 6.54

```
                        UNITED STATES
            SECURITIES AND EXCHANGE COMMISSION
                  Washington, D.C.  20549

                        FORM 10-QSB

(Mark One)

   {X}   QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
         EXCHANGE ACT OF 1934

         For the quarter ended March 31, 2001

   { }   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
         EXCHANGE ACT OF 1934

         For the transition period from _____ to _____

                  Commission File Number: 0-30227

                     TOTAL FILM GROUP, INC.
            (Exact name of Registrant as specified in charter)

       DELAWARE                              13-3851302
 State or other jurisdiction of        I.R.S. Employer I.D. No.
 incorporation or organization

9107 WILSHIRE BOULEVARD, SUITE 475, BEVERLY HILLS, CA        90210
(Address of principal executive offices)              (Zip Code)

Issuer's telephone number, including area code:  (310) 275-8404

Check whether the Issuer (1) has filed all reports required to be filed by
section 13 or 15(d) of the Exchange Act during the past 12 months (or for
such shorter period that the registrant was required to file such reports),
and (2) has been subject to such fling requirements for the past 90 days.
(1) Yes {X} No { }  (2) Yes {X} No { }

State the number of shares outstanding of each of the Issuer's classes of
```

common equity as of the latest practicable date: At May 11, 2001, there were 14,953,899 shares of the Registrant's Common Stock outstanding.

PART I
FINANCIAL INFORMATION

ITEM 1.  FINANCIAL STATEMENTS

TOTAL FILM GROUP, INC. AND SUBSIDIARIES
Return to Navigational Table of Contents
CONSOLIDATED BALANCE SHEETS

ASSETS

| | March 31, 2001 | June 30, 2000 |
|---|---|---|
| | (Unaudited) | |
| **CURRENT ASSETS** | | |
| Cash and Cash Equivalents | $ 302,805 | $ 448,102 |
| Time Certificate of Deposit | 20,692 | 20,692 |
| Accounts Receivable | 377,681 | 1,181,579 |
| Related Party Receivable | 271,828 | 218,954 |
| Deferred Production Costs | 25,372 | 103,221 |
| Prepaid Expenses | 85,375 | 281,347 |
| Unamortized Placement Fee | 794,874 | - |
| TOTAL CURRENT ASSETS | 1,878,627 | 2,253,895 |
| **OTHER ASSETS** | | |
| Film Costs, Net of Amortization | 9,076,056 | 9,495,808 |
| Property and Equipment, Net of Amortization | 265,162 | 200,714 |
| Investment in Meet World Trade | 3,868,956 | 3,745,090 |
| Recoverable Production Costs | 1,000,000 | 1,000,000 |
| Deposits | 345,944 | 538,483 |
| Goodwill, Net of Amortization | 266,509 | 282,186 |
| Capitalized Financing Fee | - | 196,053 |
| Other Assets | 25,000 | |
| | 14,847,627 | 15,458,334 |
| TOTAL ASSETS | $ 16,726,254 | $ 17,712,229 |

LIABILITIES

| | | |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Debt Maturing with One Year | $ 7,507,925 | $ 4,776,918 |
| Current Portion of Capital Lease | 41,018 | 45,464 |
| Accounts Payable and Accrued Expenses | 1,250,006 | 1,815,534 |
| Deferred Revenue | 2,217,226 | 227,163 |
| Producer's Fee Payable, Related Party | 572,500 | 600,000 |
| TOTAL CURRENT LIABILITIES | 11,588,675 | 7,465,079 |
| **LONG-TERM LIABILITIES** | | |
| Long-Term Debt, Net of Current Portion | 18,131 | 1,040,931 |
| Capital Lease, Net of Current Portion | 29,719 | 57,905 |
| TOTAL LONG-TERM LIABILITIES | 47,850 | 1,098,836 |
| TOTAL LIABILITIES | 11,636,525 | 8,563,915 |
| MINORITY INTEREST IN EQUITY OF CONSOLIDATED SUBSIDIARY | 808,907 | 829,550 |

SEE NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

1

TOTAL FILM GROUP, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

|  | March 31, 2001 | June 30, 2000 |
|---|---|---|
|  | (Unaudited) |  |
| **STOCKHOLDERS' EQUITY** |  |  |
| Preferred Stock - Par Value $3 per Share; Authorized 1,080,000 Shares |  |  |
| Issued and Outstanding 738,600 | 2,215,800 | 2,215,800 |
| Common Stock, $0.001 Par Value; Authorized 50,000,000 Shares |  |  |
| Issued and Outstanding 15,612,289 and 12,335,299 Shares Respectively | 15,612 | 12,336 |
| Additional Paid-in Capital | 18,334,472 | 13,422,193 |
| Accumulated Deficit | (16,285,062) | (7,331,565) |
| TOTAL STOCKHOLDERS' EQUITY | 4,280,822 | 8,318,764 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 16,726,254 | $ 17,712,229 |

See Notes to Consolidated Financial Statements

2

TOTAL FILM GROUP, INC. AND SUBSIDIARIES

Return to Navigational Table of Contents

CONSOLIDATED STATEMENTS OF OPERATIONS
(UNAUDITED)

|  | Three Months Ended March 31, | | Nine Months Ended March 31, | |
|---|---|---|---|---|
|  | 2001 | 2000 | 2001 | 2000 |
| **REVENUE** |  |  |  |  |
| Film Production Income | $ 25,000 | $ - | $ 447,467 | $ 85,331 |
| Advertising and Marketing Fees | 945,896 | 1,064,731 | 1,361,720 | 2,236,398 |
|  | 970,896 | 1,064,731 | 1,809,187 | 2,321,729 |
| **COSTS AND OPERATING EXPENSES** |  |  |  |  |
| Production and Design Costs | 682,603 | 639,783 | 1,032,951 | 1,679,429 |
| Selling, General & Administrative Expenses | 1,865,184 | 953,271 | 4,727,817 | 2,092,392 |
| Depreciation and Amortization | 752,645 | 30,842 | 808,203 | 165,151 |
| TOTAL COSTS AND OPERATING EXPENSES | 3,300,432 | 1,623,896 | 6,568,971 | 3,936,972 |
| LOSS BEFORE OTHER INCOME (EXPENSES) | (2,329,536) | (559,165) | (4,759,784) | (1,615,243) |
| **OTHER INCOME (EXPENSE)** |  |  |  |  |
| Interest Income | 3,804 | 4,244 | 21,286 | 4,758 |
| Interest Expense | (120,109) | (159,138) | (646,679) | (519,923) |
| Amortization of Placement Fee | (1,690,071) | 168,073 | (3,591,517) | (506,446) |
| Minority Interest | 11,172 | - | 20,643 | - |
| Miscellaneous Income | 1,437 | 37,951 | 2,554 | 73,312 |
| TOTAL OTHER INCOME (EXPENSE) | (1,793,767) | 51,130 | (4,193,713) | (948,299) |
| LOSS BEFORE CUMULATIVE EFFECT OF ACCOUNTING CHANGE | $(4,123,303) | $ (508,035) | $ (8,953,497) | $ (2,563,542) |
| Cumulative Effect of Accounting Change | - | - | - | (126,784) |
| NET LOSS | $(4,123,303) | $ (508,035) | $ (8,953,497) | $ (2,690,326) |
| BASIC LOSS PER SHARE | $ (0.28) | $ (0.05) | $ (0.65) | $ (0.30) |
| WEIGHTED AVERAGE NUMBER OF BASIC COMMON SHARES OUTSTANDING | 14,930,029 | 9,513,789 | 13,701,632 | 8,872,191 |

See Notes to Consolidated Financial Statements

3

TOTAL FILM GROUP, INC. AND SUBSIDIARIES
Return to Navigational Table of Contents
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

|  | Nine Months Ended March 31, | |
|  | 2001 | 2000 |
| --- | --- | --- |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net Loss | $ (8,953,497) | $ (2,690,326) |
| Cumlative Effect of Accounting Change | - | 126,784 |
| Loss from Continuing Operations | (8,953,497) | (2,563,542) |
| Adjustments to Reconcile Net Loss to Net Cash Provided By (Used in) Operating Activities | | |
| Proceeds from Production Funding Arrangements | 2,442,504 | 2,881,004 |
| Cash Used in Motion Picture Development | (2,426,333) | (5,020,638) |
| Fair Value of Equity Granted/Other NonCash Transactions | 803,153 | 479,784 |
| Depreciation and Amortization | 808,203 | 165,151 |
| Amortization of Placement Fees | 3,591,517 | 506,446 |
| Minority Interest in Investments | (20,643) | - |
| Decrease (Increase) in Assets: | | |
| Accounts Receivable | 803,898 | (407,273) |
| Related Party Receivable | (52,874) | (118,064) |
| Deferred Production Costs | 77,849 | - |
| Prepaid Expenses | 195,972 | 12,807 |
| Deposits | 192,539 | (85,330) |
| Other Assets | (25,000) | 6,883 |
| Increase (Decrease) in Liabilities: | | |
| Accounts Payable and Accrued Expenses | (565,528) | (132,231) |
| Deferred Revenue | 1,990,063 | 131,000 |
| Producers Fee | (27,500) | - |
| TOTAL ADJUSTMENTS | 7,787,820 | (1,580,461) |
| NET CASH USED BY OPERATING ACTIVITIES | (1,165,677) | (4,144,003) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Cash Proceeds from the Redemption of Certificate of Deposit | - | 7,128 |
| Cash Used to Purchase Investment in Meet World Trade | (253,910) | (2,200,000) |
| Purchase of Subsidiaries | - | (5,000) |
| Purchase of Property and Equipment | (129,355) | (15,536) |
| NET CASH USED BY INVESTING ACTIVITIES | (383,265) | (2,213,408) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from Loans | 2,193,688 | 4,000,000 |
| Proceeds from the Issuance of Stock | 42,107 | 2,200,000 |
| Principal Payments Made on Loans Payable | (799,518) | (118,285) |
| Principal Payments on Capital Lease Obligations | (32,632) | (28,031) |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 1,403,645 | 6,053,684 |

See Notes to Consolidated Financial Statements

4

TOTAL FILM GROUP, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

|  | Nine Months Ended March 31, | |
|  | 2001 | 2000 |
| --- | --- | --- |
| NET DECREASE IN CASH AND | | |

| | | |
|---|---|---|
| CASH EQUIVALENTS | (145,297) | (303,727) |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF THE PERIOD | 448,102 | 1,130,179 |
| CASH AND CASH EQUIVALENTS AT END OF THE PERIOD | $ 302,805 | $ 826,452 |

See Notes to Consolidated Financial Statements

5

TOTAL FILM GROUP, INC. AND SUBSIDIARIES

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

1.  Interim Financial Statements
    The accompanying consolidated financial statements of Total Film Group,
    Inc. and Subsidiaries (the "Company") have been prepared in accordance with
    generally accepted accounting principles for interim financial information
    without audit. Accordingly, they do not include all of the information and
    footnotes required by generally accepted accounting principles for complete
    financial statements. In the opinion of management, all adjustments
    (consisting only of normal recurring adjustments) considered necessary for
    a fair presentation have been reflected in these consolidated financial
    statements. Operating results for the nine months ended March 31, 2001 are
    not necessarily indicative of the results that may be expected for the year
    ending June 30, 2001. Certain reclassifications have been made in the June
    30, 2000 consolidated financial statements to conform to the March 31, 2001
    presentation. For further information, refer to the consolidated financial
    statements and footnotes thereto included in the Company's Annual Report on
    Form 10-KSB for the year ended June 30, 2000.

2.  Going Concern
    The Company has an immediate need for additional capital in order to
    provide working capital for its current business plans. Management is
    unsure if it will be able to secure sufficient financing to carry out its
    business plan.

    The Company's continued expansion of its business will depend substantially
    upon the availability of cash flow from operations or its ability to raise
    additional funds. As a result, Total Film Group may be required to seek
    additional financing sooner than anticipated. There is no assurance that
    the Company will be able to obtain additional financing when needed, or on
    terms acceptable to it. In the event the Company cannot obtain additional
    funds when needed on acceptable terms, it may be forced to limit its future
    operations, which could have a materially adverse impact on its business.

3.  Notes Payable
    The Company extended a debt obligation for $2,500,000 dated April 20, 2000
    originally due August 15, 2000. Preceding its maturity, the Company
    negotiated with its principal shareholder to extend this obligation. During
    the Company's second fiscal quarter the note was extended until March 31,
    2001. Under the terms of the arrangement, the Company granted 750,000
    shares of common stock to its principal shareholder and 30,000 shares of
    common stock to a related party consultant. The Company valued the equity
    instruments at $2.06 per share. During the Company's third fiscal quarter
    the note was once again extended, on this occasion until May 30, 2001. The
    Company procured this extension, by issuing 600,000 shares of common stock
    plus an additional 30,000 shares as a fee to a related party consultant for
    brokering the extension. The Company valued the equity instruments between
    $.80 and $1.05 per share.

    The Company obtained a $300,000 loan from its principal shareholder. The
    loan was evidenced by a convertible promissory note. The note, convertible
    into Company common stock at $2 per share has a stated rate of interest of
    12%, is dated February 7, 2001 and is redeemable six months from issuance.
    Under the terms of the note, the Company issued 100,000 shares of Company
    common stock valued at $1.54 to the lender. The financial consultant who
    arranged the financing received a fee of 7% of the convertible promissory
    note and 30,000 five year stock warrants exercisable at $2.60 per share.

    The Company obtained a $50,000 loan from its principal shareholder. The
    loan was evidenced by a convertible promissory note. The note, convertible
    into Company common stock at $1 per share has a stated rate of interest of
    12%, is dated March 21, 2001 and is redeemable three months from issuance.
    Under the terms of the note, The Company issued 25,000 shares of Company
    common stock valued at $.94 to the lender. The financial consultant who
    arranged the financing received a fee of 7% of the convertible promissory

note and 5,000 f *:s year stock warrants exercisable at $1.00 per share.

As of March 31, 2001, there were 1,963,390 shares of common stock
pertaining to the Company's debt issuances, which had not been issued.
For purposes of the presented financial statements all shares were
deemed as issued.

6

TOTAL FILM GROUP, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

4.   Film Cost
     Motion picture development costs are valued at the lower of unamortized
     cost or estimated net realizable value. Management, on a quarterly basis
     reviews the revenue and cost forecasts on its films. For the quarter ended
     March 31, 2001, management determined that the unamortized costs from the
     film New Swiss Family Robinson exceeded its projected future revenue by
     $700,000. As such, the excess cost was recognized in the current period as
     amortization.

5.   Commitments and Contingencies
     The Company breached the lease agreement, dated April 5, 2000 with
     California Federal Bank for property located at 2099 Market Street, San
     Francisco, CA. The lease, which expires December 31, 2002, has a monthly
     payment of $22,833. As of March 31, 2001, the Company was in arrears for
     $68,350, on rents for the months of February and March, real estate taxes
     and assessed late fees. Until the property has been subleased or the
     Company released from the agreement by the landlord, the monthly payments
     and annual real estate taxes will continue to accrue. Pursuant to the
     lease, California Federal Bank drew down on an irrevocable letter of credit
     issued by Mercantile National Bank in the amount of $137,000, which secured
     the lease payments. The Company has reached a tentative arrangement with
     Mercantile National Bank whereby the irrevocable letter of credit is to be
     repaid through an immediate payment of $37,000 for principal, a bank fee of
     $2,000 and accrued interest thereon. Subsequently, the Company will make a
     monthly payment of $10,000 plus interest (prime + 3.5%) until the amount of
     the irrevocable letter of credit has been replaced.

     The Company owns approximately 6.6% of Meet World Trade (MWT), an
     internet portal dedicated to facilitating cross border merchandise trade
     among Asia, Latin America and Eastern Europe. The Company received
     notification that MWT's business model was being revised. MWT began a
     considerable restructuring effort aimed at refocusing its business and
     revenue efforts, while preserving its liquid assets. Once further
     information is made available, the management, if needed will adjust
     its investment in MWT for any necessary impairment.

7

ITEM 2.  MANAGEMENT'S DISCUSSION AND ANALYSIS

Management's Discussion and Analysis of Financial Condition and Results of
Operations

This Quarterly Report on Form 10-QSB contains "forward-looking statements"
including those within the meaning of the Private Securities Litigation
Reform Act of 1995. Such statements can be identified by the use of
forward-looking terminology such as "may", "expect", "anticipate",
"estimate", "intend" or "continue" or the negative thereof or other
variations thereon or comparable terminology. The reader is cautioned that
all forward-looking statements are necessarily speculative and there are
certain risks and uncertainties that could cause actual events or results to
differ materially from those referred to in such forward-looking statements.
These risks and uncertainties include, among other things, the highly
speculative and inherently risky and competitive nature of the motion picture
industry. There can be no assurance of the economic success of any motion
picture since the revenues derived from the production and distribution of a
motion picture (which do not necessarily bear a direct correlation of the
production or distribution costs incurred) depend primarily upon its
acceptance by the public, which cannot be predicted. The commercial success
of a motion picture also depends upon the quality and acceptance of other
competing films released into the marketplace at or near the same time, the
availability of alternative forms of entertainment and leisure time

activities, general economic conditions and other tangible and intangible factors, all of which can change and cannot be predicted with certainty. Therefore, there is a substantial risk that some or all of the motion pictures released, financed or produced by the Company will not be commercially successful, resulting in costs not being recouped or anticipated profits not being realized.

GENERAL

     Total Film Group, Inc (the "Company") was established February 5, 1997. The Company is divided into three segments. (i) the film production business; (ii) the advertising and marketing business: and (iii) as a holding company of the stock of an internet related business. The Company produces independent feature films for distribution in the domestic and foreign markets. The advertising and marketing business offers internet web design, advertising and consulting services. The holding company maintains ownership in the stock of Meet World Trade formerly known as MeetChina.com, an internet portal. There has been no activity for the holding company during the current fiscal year

SEASONALITY

The Company's businesses are subject to the effects of seasonality. Consequently, the operating results for the quarter ended March 31, 2001 for each business segment, and for the Company as a whole, are not necessarily indicative of results to be expected for the full year.

Movie release revenues fluctuate based upon the timing of theatrical motion picture and home video releases and seasonal consumer purchasing behavior. Release dates for theatrical and home video products are determined by several factors, including timing of vacation and holiday periods and competition in the market.

Design fees are influenced by vendor demand and the seasonal nature of the marketing and advertising services provided by the Company and generally peak in the spring and summer.

8

RESULTS OF OPERATIONS

THREE MONTHS ENDED MARCH 31, 2001 COMPARED TO THE THREE MONTHS ENDED MARCH 31, 2000

Net loss and basic loss per share for the quarter increased by 712% and 460% from $508,035 to $4,123,303 and from $.05 to $.28, respectively.

Revenue decreased by 9% or $93,835 from $1,064,731 to $970,896 for the three months ended March 31, 2001. The decrease in revenues was due exclusively to the Company's marketing and advertising segments reduction in consulting revenues from its internet operations.

Costs and operating expenses increased by 103% or $1,676,896 from $1,623,536 to $3,300,432 for the three months ended March 31, 2001. Selling, General & Administrative expenses increased by $911,913 due in large part to the Company writing off several projects from the film segment, additional outlays for marketing costs of the Company's film library and increased professional fees. The Company also recognized an impairment of $700,000 on the motion picture New Swiss Family Robinson, which is reflected by the increase of depreciation and amortization.

Net other expense increased by $1,844,897 from income of $51,130 to an expense of $1,793,767 for the three months ended March 31, 2001. The increase in net other expense was primarily due to the amortization costs associated with Company borrowings rising in the current quarter. For each debt issuance or note extension, the Company issued shares of common stock or stock warrants. The number and value of the equity instruments granted rose with each extension or new issuance of debt.

BUSINESS SEGMENT RESULTS

Film Production

     Revenues increased by $25,000 to $25,000 due to the Company's video licensing arrangement with Lion's Gate Films Inc. for New Swiss Family Robinson. The license grants Lion's Gate Films Inc. the exclusive right to distribute the film within the United States and Canada for a ten-year period.

     Costs and operating expenses increased by $1,183,711 or 136% to

$2,053,702, in large part attributable to an increase of $731,571 for amortization and impairment recorded for New Swiss Family Robinson. Management determined that the film's carrying value overstated its future revenue potential, as such the film's carrying value was adjusted to the present value of the revised revenue projections. Additionally, the company discontinued production on several film projects, which had previously been capitalized and recorded a charge of $423,800 on those projects.

Other expenses increased by $1,844,897 to $1,793,767, reflecting an increase of $1,858,144 for the amortization of placement fees. The Company's lenders have required a supplemental fee of common stock as a condition to obtain or refinance our debt obligations. The common stock is recorded as unamortized placement fee at its fair value on the date of grant. The placement fee is then amortized over the duration of the obligation.

9

Advertising and Marketing

Revenues decreased by $118,835 or 11% to $945,896 reflecting a decrease in revenue generated from internet consulting. In the current quarter, TFG recognized $441,750 of previously deferred revenue due to the delivery of a website for the Tourism Authority of Thailand. Excluding this customer the revenues for this segment totaled $496,646 of this balance $236,081 related to a new business unit, which commenced operations in the Company's second fiscal quarter. The decrease in revenues reflects a transition by one of the business units within the segment from a graphic arts house to a web design firm. The conversion has taken longer than initially forecast by the management in part due to an adverse market condition within the segment's targeted clientele.

Costs and operating expenses increased by $492,825 or 65% to $1,246,730, reflecting an increase in the cost of $356,029 associated with freelance labor. Also, incorporated within the costs and operating expenses were expenditures associated with the new business unit, the costs associated with this venture totaled $292,617 for the quarter. San Francisco operations, although discontinued, are obligated under a lease for office space. This lease, which commenced April 2000, has resulted in an additional $50,791 of rent in the current period. The lease on the unoccupied space expires December 31, 2002.

Other income decreased by $19,572 or 95% to $1,084, reflecting a decrease of $33,164 in miscellaneous income recognized from the sale of non-capitalized equipment in the current period and an increase of interest expense of $13,427.

RESULTS OF OPERATIONS

NINE MONTHS ENDED MARCH 31, 2001 COMPARED TO THE NINE MONHTS ENDED MARCH 31, 2000

Net loss and basic loss per share for the nine month period increased by 233% and 117% from $2,690,326 to $8,953,497 and from $.30 to $.65, respectively.

Revenue decreased by 22% or $512,542 from $2,321,729 to $1,809,187 for the nine months ended March 31, 2001. The decrease in revenues was primarily due to the marketing and advertising segment refocusing its operations for the internet. The Company's transition has taken longer than initially forecast and was negatively effected by the slowdown of internet related businesses.

Costs and operating expenses increased by 67% or $2,631,999 from $3,936,972 to $6,568,971 for the nine months ended March 31, 2001. Increased expenses pertaining to the exploitation costs of the films and non-cash consideration granted via equity instruments attributed the majority of the additional selling, general and administrative expenses. The increase in depreciation and amortization was due to the Company recognizing an impairment on New Swiss Family Robinson in the quarter ended March 31, 2001. Those increased expenses offset the decrease in production and design costs attributable to the marketing and advertising segment's reduction of revenue.

Net other expense increased by 342% or $3,245,414 from $948,299 to $4,193,713 for the nine months ended March 31, 2001. The increase in net other expense was due to the amortization of placement fees (costs associated with Company borrowings) rising in the current year. The Company's lenders have

10

required a supplemental fee of common stock as a condition to obtain or

Edgar Online Filing                                                                              Page 9 of 16

refinance debt. The fees charged by the lenders have risen in conjunction with the Company's increased short-term debt obligations.

The cumulative effect of accounting change decreased by 100% from $126,784 to $0 for the nine months ended March 31, 2001. In accordance with accounting standards established pursuant to Statement of Position 98-5 "Reporting on the Costs of Start-Up Activities" the Company's previously capitalized start-up costs were expensed as of the period ended March 31, 2000. Prior to this pronouncement the start-up costs were being amortized over a five-year period.

BUSINESS SEGMENT RESULTS

Film Production

    Revenues increased by 424% or $362,136 to $447,467 driven by video revenues from Diamonds, which increased by $421,403 over the previous year. The Company completed negotiations with Buena Vista Television for a licensing agreement of $1,000,000 whereby the exclusive rights to broadcast, in perpetuity, through all forms of terrestrial, cable and satellite television the motion picture New Swiss Family Robinson throughout the United States and Canada. The revenue will be recognized during the quarter ending June 30, 2001 when the holdback period for the film ends.

    Costs and operating expenses increased by $2,491,313 or 161% to $4,037,815, reflecting an increase in the current period of $641,736 for the exploitation costs associated with the Company's film library. The Company recorded an additional $673,399 of amortization on its motion pictures in large part due to an impairment that was recognized on New Swiss Family Robinson. Further, management decided against pursuing other projects previously capitalized; as such an additional $433,947 was expensed in the current period. Also, the Company's increased spending on compensation of $299,471, travel of $142,196 and professional fees of $165,218, were attributable to the Company's aggressive pursuit of new film opportunities and the amplified costs of being a fully reporting entity.

    Other expenses increased by $3,194,673 or 320% to $4,194,226, reflecting an increase of $3,085,071 for the amortization of placement fees. The Company's lenders have required a supplemental fee of common stock as a condition to obtain or refinance our debt obligations. The supplemental fees are amortized over the duration of the refinanced or new debt. Interest expense increased by $136,015 due to the Company maintaining a higher average debt balance on its interest sensitive debt during the Company's fiscal first quarter of the current year.

Advertising and Marketing

    Revenues decreased by $874,678 or 39% to $1,361,720, reflecting the closure of the advertising and marketing's San Francisco operations effective July 6, 2000. For the nine-month period ended March 31, 2000, San Francisco generated $805,513 of revenue. This reduction in revenue was in part offset by the $244,316 of proceeds produced by a business unit formed in December 2000. Ongoing operations are in the process of repositioning itself as an internet website designer from a traditional graphic arts studios. Unfortunately, the revenue streams from the new market sector have taken longer than initially forecast by management to materialize.

    Costs and operating expenses increased by $140,686 or 6% to $2,531,156, reflecting $348,259 of costs associated with the new business unit. The rent associated with the segment increased by $161,546

11

for office space in San Francisco, the lease was entered into late in the previous fiscal year on the unoccupied space. The Company is actively contesting the validity of the lease. Expenses increased for commissions of $47,250 and bad debt of $34,003.

    Other income decreased by $50,741 or 99% to $513, reflecting a decrease of $67,408 in miscellaneous income and a decrease of $9,259 of interest.

FINANCIAL CONDITION

The Company has traditionally operated via the sale of equity and the issuance of debt instruments. At this time there is no guarantee that such funding will be available in the future or on acceptable terms. The Company will need additional financing in order to provide working capital for its current business plan or it may be forced to limit its future operations,

which would have a materially adverse impact on the business. Presently, management is unsure if it will be able to secure sufficient funding to carry out its operations due to ongoing losses and its current debt obligations.

Management is assessing the feasibility of restructuring the Company, in order to bring corporate expenses in line with reported revenues. However, management believes that losses for the Company will continue through its fiscal fourth quarter, which ends June 30, 2001.

A strike by the Screen Actors Guild (SAG) could have a material adverse effect on the operations of the Company. This strike, which may commence in July 2001, could delay production of the Company's planned film projects until a resolution is reached with the Guild.

The Company breached the lease agreement, dated April 5, 2000 with California Federal Bank for property located at 2099 Market Street, San Francisco, CA. The lease, which expires December 31, 2002, has a monthly payment of $22,833. As of March 31, 2001, the Company was in arrears for $68,350, on rents for the months of February and March, real estate taxes and assessed late fees. Until the property has been subleased or the Company released from the agreement by the landlord, the monthly payments and annual real estate taxes will continue to accrue. Pursuant to the lease, California Federal Bank drew down on an irrevocable letter of credit issued by Mercantile National Bank in the amount of $137,000, which secured the lease. The Company has reached a tentative arrangement with Mercantile National Bank whereby the irrevocable letter of credit, which is secured by the Company's liquid assets, is to be repaid through an immediate issuance of $37,000 for principal, pay a bank fee of $2,000 and accrued interest. Subsequently, the Company will make a monthly payment of $10,000 plus interest (prime + 3.5%) until the obligation has been satisfied. The Company is currently vigorously contesting the validity of the lease agreement with California Federal Bank.

The Company owns approximately 6.6% of Meet World Trade (MWT), an internet portal dedicated to facilitating cross border merchandise trade among Asia, Latin America and Eastern Europe. The Company received notification that MWT's business model was being revised. MWT began a considerable restructuring effort aimed at refocusing its business and revenue efforts, while preserving its liquid assets. Once further information is made available, the management, if needed will adjust its investment in MWT for any necessary impairment.

12

The Company expects its film production segment to continue to enter into production funding arrangements for developing and releasing feature length motion pictures.

The Company has secured the domestic distribution with Paramount Classics for the motion pictures, "Bride of the Wind" and "My First Mister". The first film has a tentative release date in June 2001 with the latter scheduled for a November 2001 theatrical debut.

The Company entered into a licensing agreement with Buena Vista Television. Under the terms of the contract, Buena Vista Television acquired the exclusive rights to broadcast, in perpetuity, through all forms of terrestrial, cable and satellite television the motion picture New Swiss Family Robinson throughout the United States and Canada. For those rights the Company received a licensing fee of $1,000,000, with $600,000 paid upon execution and payments of $200,000 due at the one-year and two-year anniversaries of the agreement. Subsequent to this agreement, the Company discounted the balance owed from Buena Vista Television for $321,000. The contract specifies a holdback period for Buena Vista Television, which allows exploitation of the film to begin on April 30, 2001. In compliance with Statement of Position 00-2, the Company will not record the licensing fee as income until the holdback period has expired. As such the contract is recorded currently as deferred revenue.

The Company's advertising and marketing segment commenced operations of a new enterprise, Match Creative LLP on December 1, 2000, which offers recruiting services for all types of creative professionals. The Company owns 80% of this entity, which is located in Los Angeles. There are significant start-up and ongoing costs associated with this enterprise that must be funded by the Company in order for Match Creative to meet management's expectations. If capital is not available for Match Creative there may be a material adverse effect on its operations in future quarters.

During the current fiscal year the Company had the following capital transaction. In early July 2000, the Company completed its joint private offering in Total China II to raise funds for the purchase of shares in MWT.

The offering, which began May 2000, raised $3,693,000 of which Total China II realized gross proceeds of $2,215,000 and the Company realized gross proceeds of $1,478,000. Of the total proceeds raised the Company received $42,107 in the current fiscal year, the difference, $3,650,893 had been received by June 30, 2000. The Company's proceeds of the offering were used for general working capital and the proceeds to Total China II were used to purchase shares in MWT. During the first quarter Total China II used previously received funds from the private placement to purchase $253,910 of equity securities in MWT. In connection with this private offering, a cash fee of $369,000 was paid in the previous year as a commission to the administrator of the placement. In addition to the cash fee the administrator was issued 50,000 shares of the Company's common stock in June 2000 as compensation for their services. The Company believes that future offerings of subsidiary stock may occur if the opportunity arises to increase its equity position in MWT or other equity securities.

The Company expects to expense the majority of the unamortized placement fee of $794,874 during its fiscal fourth quarter ending June 30, 2001.

For the nine months ended March 31, 2001, cash used by operations was $1,165,677, a decrease of $2,978,326 or 72% as the result of increased collection of receivables, a decrease in motion picture costs, prepaid expenses and deposits, and increased deferred revenue, which was offset by decreased accounts payable. Cash flows used by investing activities at March 31, 2001 was $383,265, a decrease of $1,830,143 or 83% due to the majority of the cost associated with the Company's investment in MWT being incurred in the prior year. Cash flows provided by financing activities was $1,403,645, a decrease

13

of $4,650,039 or 77% due to a decrease in the proceeds received from the issuance of equity and the issuance of debt.

At March 31, 2001, the Company had cash and cash equivalents of $302,805 compared to cash and cash equivalents of $448,102 as of June 30, 2000. As of the end of either period the Company had no restricted cash.

The Securities and Exchange Commission completed its review on February 27, 2001 of the Company's Form 10-SB filing, reaching a position of "no further comment", and thereby clearing the way for the Company's re-listing on the NASD Over the Counter Bulletin Board.

PART II
OTHER INFORMATION

ITEM 2.  CHANGES IN SECURITIES AND USE OF PROCEEDS

        The following unregistered sales of securities were made by the Company during the quarter ended March 31, 2001:

        In February 2001 the Company entered into an investor relations consulting agreement with Rubenstein Investor Relations, Inc. Pursuant to the terms of the consulting agreement, on February 16, 2001, the Company issued five-year warrants to Rubenstein to purchase 35,000 shares of common stock at $4 per share. Rubenstein Investor Relations, Inc. is believed to be an accredited investor. Such securities were issued without registration under the Act by reason of the exemption from registration afforded by the provisions of Section 4(2) thereof as transactions by an issuer not involving any public offering. No general solicitations were made in connection with the transaction.

        In February 2001 the Company borrowed $150,000 each from Lancer Offshore, Inc. and The Viator Fund, accredited investors controlled by Michael Lauer, our principal shareholder, and issued senior convertible promissory notes to such investors representing such loans. The notes totaling $300,000 are due within six months of issuance and bear simple interest of 12% payable quarterly. They are convertible into common stock at $2.00 per share if redeemed within six months of issuance, at $1.50 per share if redeemed within the thirty-day period following default, and reduced by $0.25 per month thereafter. Plus, we have agreed to issue 50,000 warrants exercisable at $1.00 per share on the first day of each month that default remains in place. In addition, the Company issued 100,000 shares of common stock pro rata to the entities for lending the funds. These shares contain anti-dilution provisions. Further, the Company paid $21,000 and issued 30,000 five-year warrants exercisable at $2.60 per share to Capital Research, Ltd. for consulting services in connection with the loans. Such securities were

issued without registration under the Securities Act by reason of the exemption from registration afforded by the provisions of Section 4(2) thereof, as transactions by an issuer not involving any public offering. No general solicitations were used in connection with the transaction. No underwriting discounts or commissions were paid in connection with such issuance, except for the fees paid to Capital Research, Ltd.

14

In March 2001 the Company borrowed $50,000 from Lancer Offshore, Inc., an accredited investor controlled by Michael Lauer, our principal shareholder, and issued a senior convertible promissory note to such investor representing such loan. The note is due within three months of issuance and bears simple interest of 12% payable quarterly. The note is convertible into common stock at $1.00 per share if redeemed within three months of issuance, at $0.75 per share if redeemed within the thirty-day period following default, and reduced by $0.25 per month thereafter. Plus, we have agreed to issue 5,000 warrants exercisable at $1.00 per share on the first day of each month that default remains in place. In addition, the Company issued 25,000 shares of common stock to the lender for lending the funds. These shares contain anti-dilution provisions. Further, the Company paid $3,500 and issued 5,000 five-year warrants exercisable at $1.00 per share to Capital Research, Ltd. for consulting services in connection with the loan. Such securities were issued without registration under the Securities Act by reason of the exemption from registration afforded by the provisions of Section 4(2) thereof, as transactions by an issuer not involving any public offering. No general solicitations were used in connection with the transaction. No underwriting discounts or commissions were paid in connection with such issuance, except for the fees paid to Capital Research, Ltd.

In April 2000 the Company borrowed $2,500,000 from four accredited investors and issued a promissory note to such investors representing such loan. In August 2000 the loan was extended until November 13, 2000. In October 2000 the company issued 500,000 shares to such lenders for the granting of the extension. In addition, the Company issued 25,000 shares to Capital Research Ltd. for consulting services in connection with the extension of the loan. The notes were further extended until December 31, 2000. For such extension, the Company issued 350,000 shares to the lenders. The Company also paid a fee to Capital Research Ltd. of 25,000 shares. The notes were further extended until March 31, 2001. For such extension, the Company agreed to issue 750,000 shares to the lenders. The Company also agreed to pay a fee to Capital Research Ltd. of 30,000 shares. The notes were further extended until May 30, 2001. For such extension, the Company agreed to issue 600,000 shares to the lenders. The Company also agreed to pay a fee to Capital Research Ltd. of 30,000 shares. Such securities were issued without registration under the Securities Act by reason of the exemption from registration afforded by the provisions of Section 4(2) thereof, as transactions by an issuer not involving any public offering. No general solicitations were used in connection with the transaction. No underwriting discounts or commissions were paid in connection with such issuance, except for the fee paid to Capital Research Ltd. as set forth above

In September 1999 the Company entered into a consulting agreement with Capital Research Ltd. Pursuant to the terms of the consulting agreement, on March 1, 2001, the Company issued warrants to Capital to purchase 25,000 shares of common stock. Capital Research Ltd. is believed to be an accredited investor. Such securities were issued without registration under the Act by reason of the exemption from registration afforded by the provisions of Section 4(2) thereof as transactions by an issuer not involving any public offering. No general solicitations were made in connection with the transaction.

ITEM 3.  DEFAULTS UPON SENIOR SECURITIES

The Company breached the lease agreement, dated April 5, 2000 with California Federal Bank for property located at 2099 Market Street, San Francisco, CA. The lease, which expires December 31, 2002, has a monthly payment of $22,833. As of March 31, 2001, the Company was in arrears for $68,350, on rents for the months of February and March, real estate taxes and assessed late fees. Until the property has been subleased or the Company released from the agreement by the landlord, the monthly payments and annual real estate taxes will continue to accrue. Pursuant to the lease, California Federal Bank drew

15

down on an irrevocable letter of credit issued by Mercantile National Bank in

the amount of $137,0^^, which secured the lease. The Company has reached a
tentative arrangement with Mercantile National Bank whereby the irrevocable
letter of credit, which is secured by the Company's liquid assets, is to be
repaid through an immediate issuance of $37,000 for principal, pay a bank fee
of $2,000 and accrued interest. Subsequently, the Company will make a monthly
payment of $10,000 plus interest (prime + 3.5%) until the obligation has been
satisfied.

ITEM 5.  OTHER INFORMATION

        On April 24, 2001, the Board of Directors appointed Jeffrey D.
Hoffman as the president and chief executive officer of the Company.  Mr.
Green will remain as Chairman of the Board.  Madeleine Ali was appointed as
the secretary of the Company.  Also, the Board of Directors was increased to
four persons and Mr. Hoffman was appointed as a director.  Further, the
employment agreement with Mr. Hoffman was approved and ratified.

ITEM 6.  EXHIBITS AND REPORTS ON FORM 8-K

        (a)       The following exhibits are attached hereto:

| EXHIBIT NO. | DESCRIPTION | LOCATION |
| --- | --- | --- |
| 6.52 | Term Sheet for $300,000 senior convertible promissory notes | Attached |
| 6.53 | Term Sheet for $50,000 senior convertible promissory notes | Attached |
| 6.54 | Extension of Payment Date of Promissory Note re Memorandum of Agreement dated April 20, 2000, with Lauer, Garvey, Hauser, and Cowen for $2,500,000 loan | Attached |

        (b)       Reports on Form 8-K: No reports on Form 8-K were filed
during the quarter ended March 31, 2001.

                                SIGNATURES

        Pursuant to the requirements of the Securities Exchange Act of 1934,
as amended, the registrant has duly caused this report to be signed on its
behalf by the undersigned hereunto duly authorized.

                        Total Film Group, Inc.

Date: May 15, 2001            By /s/ Jeffrey D. Hoffman
                              ---------------------------------------
                              Jeffrey D. Hoffman, President


Date: May 15, 2001            By /s/ Peter Dattilo
                              ---------------------------------------
                              Peter Dattilo, Chief Financial Officer
                              and Principal Accounting Officer
                                                            •


EXHIBIT 6.52

                        Total Film Group, Inc.
                            Term Sheet


| Instrument and Amount | $300,000 senior convertible promissory notes |
| --- | --- |
| Use of Proceeds | Working capital |
| Interest Rate | 12% simple interest payable quarterly |

| Redeemable | Within six months of issuance<br>May be repaid anytime without penalty<br>Mandatory repayment out of proceeds of financing greater than $3 million |
| --- | --- |
| Convertible | Initially into common shares at $2.00 per share.<br>Anti-dilution clause will exist |
| Equity Kicker | 100,000 unregistered common shares in Total Film Group, Inc. |
| Registration Rights | On demand registration and unlimited piggyback rights |
| Default | If not redeemed in full within six months following issuance:<br>1. convertible into common at $1.50 per share for first thirty day default period and than exercise price reduced by $.25 per month thereafter<br>2. issuance of 50,000 warrants at $1.00 on first day of each month that default remains in place |
| Reporting Requirements | The following conditions will be incorporated in the stock purchase agreement:<br>1. copies of all SEC filings as filed<br>2. Visitation rights for Bruce Cowen at all Board of Directors and its committee meetings<br>3. Monthly financial statements within thirty days of month end |
| Documentation | Company will provide fully executed loan agreements, common shares and registration rights agreement by March 1, 2001 |
| Fee | 7% cash fee to be paid at closing on gross amount of proceeds received payable to Capital Research Ltd., plus 30,000 five year warrants priced at $2.60 per share |

On behalf of Total Film Group, Inc.

/s/ Gerald Green          on this date    2/7/01

On behalf of Lenders:

/s/ Michael Lauer              Amount of participation $ 150,000
The Viator Fund, Ltd.          on this date 2/7/01

/s/ Michael Lauer              Amount of participation $ 150,000
Lancer Offshore, Inc           on this date 2/15/01

EXHIBIT 6.53

Total Film Group, Inc.
Term Sheet

| Instrument and Amount | $50,000 senior convertible promissory notes |
| --- | --- |
| Use of Proceeds | Working capital |
| Interest Rate | 12% simple interest payable quarterly |
| Redeemable | Within three months of issuance<br>May be repaid anytime without penalty<br>Mandatory repayment out of proceeds of financing greater than $3 million |
| Convertible | Initially into common shares at $1.00 per share.<br>Anti-dilution clause will exist |
| Equity Kicker | 25,000 unregistered common shares in Total Film Group, Inc. |
| Registration Rights | One demand registration and unlimited piggyback rights |
| Default | If not redeemed in full within three months following issuance:<br>1. convertible into common at $.75 per share for first thirty day default period and than exercise price further reduced by $.25 per month thereafter<br>2. issuance of 5,000 warrants at $1.00 on first day of |

each month that default remains in place

| | |
|---|---|
| Reporting Requirements | The following conditions will be incorporated in the stock purchase agreement:<br>1. copies of all SEC filings as filed<br>2. Visitation rights for Bruce Cowen at all Board of Directors and its committee meetings<br>3. Monthly financial statements within thirty days of month end |
| Documentation | Company will provide fully executed loan agreements, common shares and registration rights agreement by April 15, 2001 |
| Fee | 7% cash fee to be paid at closing on gross amount of proceeds received payable to Capital Research Ltd., plus 5,000 five year warrants priced at $1.00 per share |

On behalf of Total Film Group, Inc.

    /s/ Peter Dattilo
    Total Film Group        on this date    3/21/01

On behalf of Lenders:

                Amount of participation $50,000

    /s/ Bruce Cowen
    Lancer Offshore, Inc.    on this date    3/21/01

EXHIBIT 6.54

Total Film Group, Inc.
Extension of Payment Date of Promissory Note

Total Film Group, Inc. ("Total") has entered into certain promissory notes dated as of April 20, 2000 and amended in August 2000 and November 2000 with the lenders listed below:

| | |
|---|---|
| Michael Lauer | $1,900,000 |
| Martin Garvey | 250,000 |
| Eric Hauser | 250,000 |
| Bruce Cowen | 100,000 |
| | ---------- |
| Total | $2,500,000 |

The maturity date for the above notes is August 15, 2000 whereby the principal of $2,500,000 and the premium of $750,000 (Article 2 of the Memorandum of Agreement) is hereby due for a total payment of $3,250,000 to the lenders. This payment does not reflect the lenders six percent interest in the adjusted gross proceeds of the "Untitled N Sync Project" (Article 4 of the Memorandum of Agreement). The maturity date was extended per the August, November and December 2000 Amendments to March 31, 2001 in consideration of the issuance of unregistered common shares of the Company.

It is the desire of Total to extend the payment date of the principal and premium of the above promissory notes.

As such, the lenders hereby extend the payment date of principal and interest for a period up to two months to May 30, 2001 in consideration of the following:

    The Company will issue the lenders a total of 600,000 shares of the Company's common stock on the first day of the extension period that the principal and premium are not repaid in full which is March 31, 2001.

If the principal and premium are not repaid by May 30, 2001, the Company and the lenders will use their best efforts to enter into an amendment to further extend the notes.

The Company also agrees to pay a fee to Capital Research, Ltd. equal to

$24,000, such fee to be payable, at the Company's option in cash, or in shares of common stock having a deemed value of $.80 per share. Accordingly, if the entire fee was paid in shares of common stock, the Company would be required to issue 30,000 shares of common stock to pay such fee in full.

Except as expressly provided herein, the Promissory Notes and the Memorandum of Understanding will remain in full force and effect as originally executed and delivered by the parties hereto. This Letter supercedes any prior understanding or agreement, written or oral, among the parties hereto relating to the subject matter hereof.


On behalf of Total Film Group, Inc.

/s/ Jeffrey Hoffman
Total Film Group                    dated this 4/12/01


On behalf or the Lenders:

/s/ Michael Lauer                   dated this 4/4/01
Michael Lauer

/s/ Martin Garvey                   dated this 4/4/01
Martin Garvey

/s/ Eric Hauser                     dated this 4/4/01
Eric Hauser

/s/ Bruce Cowen                     dated this 4/4/01
Bruce Cowen

Distribution of Shares:

| | |
|---|---|
| Michael Lauer | 456,000 |
| Martin Garvey | 60,000 |
| Eric Hauser | 60,000 |
| Bruce Cowen | 24,000 |
| | ------- |
| Total shares | 600,000 |

[Return to Filings]

© 2002 Thomson Financial. All rights reserved.

Client Services 1-877-256-3986 | Terms of Use

# EXHIBIT 48

All 313-11895

# Lancer Offshore, Inc.

# Fax

| To: | Andrew Pennecke/Banc of America | From: | Michael Lauer |
|---|---|---|---|
| Fax: | 212-583-8707 | Pages: | 1 including this page |
| Phone: | 212-583-8653 | Date: | 3/31/03 |
| Re: | | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● **Comments:**

Please wire the following dollar amount $ *1,300,000⁰⁰* from the Lancer Offshore, Inc. account, account number 313-11895. You may use the following instructions:

Bank: *Bank of NY*

Bank Route: *021-000-018*

Account Name: *Bank of Ireland*

Account #: *8033174765*

FFC: *Lancer Offshore Inc.*

Account #: *47652020*

Thank you.

Sincerely,

Michael Lauer

Reference: *ME → 2002 Man fees*

**Lancer Offshore, Inc.**

# Fax

A/c 313-11895

| | | | |
|---|---|---|---|
| To: | Andrew Pennecke/Banc of America | From: | Michael Lauer |
| Fax: | 212-583-8707 | Pages: | 1 including this page |
| Phone: | 212-583-8653 | Date: | 12/12/02 |
| Re: | | CC: | |

☐ **Urgent**　☐ **For Review**　☐ **Please Comment**　☐ **Please Reply**　☐ **Please Recycle**

● **Comments:**

Please wire the following dollar amount $ *150 000* from the Lancer Offshore, Inc. account, account number 313-11895. You may use the following instructions:

Bank: *Bank of NY*

Bank Route: *021 - 000 - 018*

Account Name: *Bank of Ireland*

Account #: *8033174765*

FFC: *Lancer Offshore Inc.*

Account #: *4765 2020*

Thank you.

Sincerely,

*Michael Lauer*

Reference _____

*12/13/2002*

P.01

Apr-07-03 10:18A

**Lancer Offshore, Inc.**

# Fax

A/C 313-11895
2pss

| To: | Andrew Pennecke/Banc of America | From: | Michael Lauer |
|---|---|---|---|
| Fax: | 212-583-8707 | Pages: | 1 including this page |
| Phone: | 212-583-8653 | Date: | 4/7/03 |
| Re: | | CC: | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

● Comments:

Please wire the following dollar amount $ _100,000 00_ from the Lancer Offshore, Inc
account, account number 313-11895. You may use the following instructions:

Bank: Bank of NY

Bank Route: 021-000-018

Account Name: Bank of Ireland

Account #: 8033174765

FFC: Lancer Offshore Inc

Account #: 47652020

Thank you.

Sincerely,

Michael Lauer

Reference: ME - Consulting fee Q1 & Q2 2002 Bingham

4/7/2003