UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 03-80612-CIV-MARRA/JOHNSON

SECURITIES AND EXCHANGE COMMISSION

      Plaintiff

vs.

MICHAEL LAUER,
LANCER MANAGEMENT GROUP, L.L.C. and
LANCER MANAGEMENT GROUP II, L.L.C.

      Defendants

and

LANCER OFFSHORE, INC.,
LANCER PARTNERS, LP, OMNIFUND, LTD.,
LSPV, INC. and LSPC, L.L.C.

      Relief Defendants.
_____/

## ORDER AND OPINION ON MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Plaintiff Securities and Exchange Commission

Motion For Summary Judgment Against Defendant Michael Lauer [DE 1737].  Plaintiff

Securities and Exchange Commission ("SEC" or the "Commission")  moves the Court to

enter summary judgment against defendant Michael Lauer ("Lauer) and find as a matter

of law that Lauer violated Sections 17(a)(1), (2) and (3) of the Securities Act of 1933

("Securities Act"), Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

("Exchange Act"), both individually and as a control person pursuant to Section 20(a) of

the Exchange Act, and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940

("Advisers Act") in connection with an alleged massive fraud he conducted as manager

of the Lancer funds.  The SEC asks that the Court: (1) grant summary judgment against

Lauer on Counts I-V of its Complaint; (2) enter a permanent injunction enjoining Lauer

from future violations of Sections 17(a)(1)-(3) of the Securities Act, Section 10(b) and

Rule 10b-5 of the Exchange Act, and Sections 206(1) and (2) of the Advisers Act; (3) order

Lauer to pay disgorgement and prejudgment interest thereon; and (4) reserve

jurisdiction to impose civil money penalties against him.  The motion is fully briefed and

ripe for review.  The Court will grant the motion as to liability but reserve on the motion

as to disgorgement and civil penalties.

## STANDARD OF REVIEW

A court, in reviewing a motion for summary judgment, is guided by the standard

set forth in Federal Rule of Civil Procedure 56(c), which states, in relevant part, as

follows:

> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories and
> admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that
> the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).   The moving party bears the burden of meeting this exacting

standard.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  That is, "[t]he moving

party bears 'the initial responsibility of informing the ... court of the basis for its motion,

and identifying those portions of the 'pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact.' " *U.S. v. Four Parcels of*

*Real Property,* 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting *Celotex*, 477 U.S. at 323).

In assessing whether the moving party has satisfied this burden, the Court is required to

view the evidence and all factual inferences arising therefrom in the light most favorable

to the non-moving party. *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994).

The party opposing the motion for summary judgment may not simply rest upon

mere allegations or denials of the pleadings; the non-moving party must establish the

essential elements of its case on which it will bear the burden of proof at trial. *Celotex*,

477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574

(1986). The nonmovant must present more than a scintilla of evidence in support of the

nonmovant's position. A jury must be able reasonably to find for the nonmovant.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-252 (1986); *Walker v. Darby*, 911 F.2d

1573, 1577 (11th Cir. 1990). Moreover, the Eleventh Circuit "has consistently held that

conclusory allegations without specific supporting facts have no probative value." *Evers*

*v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). "The failure of proof

concerning an essential element of the non-moving party's case necessarily renders all

other facts immaterial and requires the court to grant the motion for summary

judgment." *Henderson v. Carnival Corp.*, 125 F. Supp. 2d 1375, 1376 (S.D. Fla. 2000).

Lauer presents lengthy challenges to the SEC's Statement of Material Facts as to

Which There is no Genuine Issue to be Tried (DE 1744) but these challenges consist

mainly of unsupported hyperbole demonstrating nothing of probative value and are

therefore properly disregarded.

## UNDISPUTED FACTS

The following facts, taken mainly from Plaintiff SEC's Statement of Material Facts as to Which There is no Genuine Issue to be Tried (DE 1744) ("PSF"), are meticulously supported by evidence in the record, which evidence Lauer has not controverted by any evidence of his own.  S.D. Fla. L.R. 7.5D.  Where Lauer has presented undisputed material facts supported by the evidence, these facts have been added below.

### DEFENDANTS

1.    Defendant Lancer Management Group, LLC ("Lancer") was established in December 1997 and was the investment manager for Lancer Offshore, Inc. ('Offshore"), Omnifund, Ltd. ("Omnifund"), Viator Fund, Ltd, ("Viator") and Orbiter Fund, Ltd. ("Orbiter") hedge funds.  Michael Lauer was one of three founders, sole manager and principal owner of Lancer and controlled its operations and activities.  Lancer initiated orders for the purchase and sale of securities on behalf of Offshore and Orbiter.[1]

2.    Defendant Lancer Management Group II, LLC ("Lancer II") was established in November 1997 and was the sole general partner for Lancer Partners, LP ("Partners").  Lauer was one of three founders, sole manager and principal owner and was solely responsible for its operations and activities.[2]  As general partner, Lancer II owed the limited partners (investors) a fiduciary responsibility and was required to exercise the

---

[1]  TRO Exs. 1; 3 (at A475, A480, A486 & A491; & 5 at A543, A547, A553 & A557) (DE 14) and Depo. Exs. 21, 44, 104 & 119.  Defendants produced to the SEC documents bate stamped A00001-A01245. Depo. Ex. 2;

[2]  TRO Exs. 2; 4 (at A475 & A480); & 5 (at A543) (DE 14) and Depo. Exs. 19-20 & 103.

utmost good faith and integrity in handling Partners' affairs.  Lancer II was required to give all Partners' investors timely and full information and these investors had the right to inspect Partners' books and records.[3]

3.      Defendant Lauer was the control person of Lancer and Lancer II (collectively "Lancer Management") and Offshore, Omnifund, Partners, LSPV, Inc. ("Offshore LSPV"), and LSPV, LLC ("Partners LSPV") (collectively "Funds").[4]  Lauer directed the Funds' day-to-day activities and determined the Funds' acquisitions of some securities.  Lauer met and communicated with investors, he prepared and disseminated newsletters to investors and he was a contact person with the Funds' auditors.  Lauer also was the portfolio manager and had sole and exclusive authority to manage the Funds' assets and take write-downs.  Lauer determined whether to fund the corporate shells that compised a vast majority of the Funds' holdings.[5]  Lauer also had signatory authority and could authorize the Funds' primary prime broker, Banc of America Securities ("BOA"), to wire funds.[6]  Furthermore, investors and others viewed Lauer as

---

[3]  TRO Ex. 4 at A413.

[4]  TRO Exs. 14 (at 1237); & 16; & SJ Ex. 7, Lauer's Response to Request For Admissions - Nos. 1-5.  On occasion, the Funds and Lancer Management are referred to in newsletters and marketing materials as "The Lancer Group."

[5]  Depo. Ex. A, Marty Lax Depo. pp. 14, 31-32 & 43; Depo. Ex. B, Jimmy Tsakni Depo. pp. 10, 18-19 & 59; Depo. Ex. C, Bruce Cowen Depo. pp. 20-21, 114-15, 152, 155, 186, 470-71 & 481; Depo. Ex. D, Andre Mayrand Depo, pp. 20-25 & 105-06; Depo. Ex. E, Noel Langlois Depo. pp. 28-29 & 126; Depo. Ex. F, Robert Steinberg Depo. pp. 69-70, 80, 84 & 90; Depo. Ex. H, Joseph Huard Depo. pp. 129-35; & Depo. Ex. G, John Wolak Depo. pp. 14-15; Depo. Exs. 21 (at MORG 342); 162; 169-70; 183; 203; 220; & 564; &  SJ Ex. 15, Richard Geist Declaration ¶ 4-9.

[6]  Depo. Ex. I-1, Andrew Pennecke Depo., pp. 6-8, 48-50 & 85-89; Depo. Ex. 358-61.

the person "in charge" or the principal decision maker.[7]  Lauer had full voting and dispositive power with respect to all of the securities Offshore and Partners owned. [8] Lauer devoted substantial time soliciting new investors and meeting with existing investors.  Lauer also controlled Alpha Omega Group, Inc., an entity he used to deplete the assets of the Funds.  Alpha Omega had an ownership interest in Capital Research Ltd.[9]

**RELIEF DEFENDANTS**

4.       Relief Defendant Offshore is a British Virgin Islands ("BVI") international business corporation incorporated in September 1995.[10]  Offshore received investments from, among other things, trusts subject to the Employee Retirement Income Security Act ("ERISA") and individual retirement accounts ("IRAs") whose beneficiaries were United States citizens.  It used banks located in the United States to receive investors' funds.[11] As of December 31, 1999; Dec. 31, 2000; Dec. 31, 2001; Dec. 31, 2002; and April 30, 2003, respectively, Offshore reportedly owned investment securities worth more than

---

[7]   Depo. Ex. J, James Raker Depo. pp. 23-24; Depo. Ex. K, Robert Maum Depo. p. 74; Depo Ex. L, Brian Erickson Depo. pp. 16 & 28; & Lax Depo. p. 14.

[8]   SJ Ex. 8, Declaration of Terence Tennant, 1/11/07 at Ex. A, Form 3 for DRS on behalf of Lancer, filed July 7, 1999 & Attestation dated September 11, 2006; Form 3, Initial Statement of Beneficial Ownership of Securities under Partners on behalf of MHTX, which Lauer executed electronically on April 13, 2000.

[9]  Cowen Depo. pp. 18-19, 114-15 & 153; & Depo. Exs. 97-99 & 114-15.

[10]  TRO Exs. 3 (at A475) & 6.

[11]  Depo. Ex. M, Donald Borneman Depo. pp. 27-31, 44-45 & 60-62; Depo. Exs. 54, 242, 246 & 249.

$600 million ("M"), $709M; $811M; $827M; and $657M.[12]

5.      Offshore's articles of incorporation stated that its net asset value ("NAV") "shall be determined on an accrual basis with generally accepted accounting principles ("GAAP") in the United States."[13]  Lauer represented that Offshore's NAV "at any date shall be determined on an accrual basis of accounting in accordance with" GAAP in the United States and certain other provisions.[14]  Offshore's financial statements were not prepared in accordance with GAAP.[15]  Offshore was audited through calendar year-end 2001 "in accordance with International Standards on auditing," not GAAP.[16]

6.      Relief Defendant Partners commenced operations in November 1997 and operated as a partnership.  Partners did not have a board of directors; instead, Lancer II acted as its general partner.  As of Dec. 31, 2000; Dec. 31, 2001; and Dec. 31, 2002, respectively, Partners reportedly owned investment securities worth more than $227M, $285M; and $246M.[17]  Partners' financial statements were supposed to be prepared in accordance with GAAP but were not.[18]

---

[12]  TRO Exs. 19 (at A925); 20 (at A1073); 21 (at A1209); 8 (at A1241), & 7 (at A757) and Depo. Exh. 536.

[13]  TRO Ex. 6 at 12.

[14]  TRO Ex. 3 (at A509); Depo. Exs. 21 (at MORG 355), 119 (at INVT 1480) & 528; & Erickson Depo. pp. 19-20.

[15]  SJ Ex. 9, Soneet Kapila Affidavit, ¶¶ 10 (10.10) & 30; (From December 31, 1999-2002, Offshore's financial statements were not prepared in accordance with GAAP in the U.S.).

[16]  TRO Ex. 7 at A00755.

[17]  TRO Exs. 9; 10 (at 281); 19 (at A923); 20 (at A1071) & 21 (at A1207); & SJ Ex. 10, List of Partners' Investors.

[18]  TRO Ex. 4 (at A398 & 410); Erickson Depo. pp. 19-20; Depo. Ex. 528; and Kapila Aff. ¶¶ 10 (10.9), 26, & 29 (From December 31, 2000-2002, Partners' financial statements were not prepared in accordance with GAAP).

7.      Relief Defendant Omnifund is a BVI corporation originally incorporated in January 1999 as Orbiter.  Omnifund is the successor fund to the March 2002 merger of Orbiter and Viator (a BVI corporation incorporated in September 1999).[19]  Reportedly, as of Dec. 31, 2000, the Orbiter and Viator funds collectively owned investment securities worth more than $74M.  Reportedly, as of Dec. 31, 2001, these funds collectively owned investment securities worth more than $70M.  Reportedly, as of Dec. 31, 2002 and April 30, 2003, Omnifund owned investment securities worth more than $56M and $44M, respectively. [20]

8.      Relief Defendant Offshore LSPV is a BVI corporation incorporated in December 2002.  Purportedly, Offshore LSPV was created as a special-purpose company by Lauer to handle the redemption requests of Offshore's investors.  Lauer claimed in a newsletter to investors that as of January 2, 2003, Offshore contributed to Offshore LSPV a pro rata portion of Offshore's securities attributable to investors who requested redemptions.  In reality, no such funding took place.[21]

---

[19]  TRO Exs. 5 (at A543) & 11 & SJ Ex. 11, List of Omnifund's investors that includes U.S. investors.

[20]  TRO Exs. 12; 19 (at A92-30); 20 (at A1074-76); & 21 (at A1210).

[21]  TRO Exs. 13 & 14; Kapila Aff. ¶¶ 10 (10.7) & 27; Langlois Depo. 75-80; Pennecke Depo. (I-2) pp. 10-11 & Mayrand Depo. pp. 78-80; and Depo. Exs. 211 & 518.

9.      Relief Defendant Partners LSPV is a Delaware LLC established in December 2002.  Lauer created Partners LSPV to handle the redemption requests of Partners' investors.[22]

10.      From 1999 through 2002, the Funds raised more than $734M and had net subscriptions of more than $310M.  Lauer raised the bulk of this money while representing that the Funds were beating the major stock indexes during the 2000-02 bear market.  For example, from 2000 through 2002, Lauer raised more than $590M and had net subscriptions of more than $295M.  When the Receiver was appointed in July 2003, the Funds' portfolios were collectively worth less than $60M, and less than $4M in cash remained. [3][2]

## BACKGROUND

11.      Lauer founded three hedge funds, Offshore, Partners and OmniFund, to pool investments in securities on behalf of qualified investors.[24]  Lancer Management managed the Funds in exchange for fees.  The fees were calculated on the basis of the Funds' asset values.  Lancer Management received a 1% annualized advisory fee, paid quarterly, on the reported assets.  It also received an annual incentive fee calculated

---

[22] TRO Exs. 15 & 16.

[23] Kapila Aff. ¶¶ 13-14; Initial Report of the Receiver, p. 18 (DE 43); Receiver's Eighth Status Report, pp. 13-15 (DE 1535); & Depo. Ex. 60, 1/20/03 Offshore Newsletter, where Lauer called the last three years the "bear-years" and noted that during this time the SP 500 was down 40%, the NASDAQ was down 70%, and the Russell 2000 was down 24%, while claiming that the Offshore was up 5% during the "bear-years."  As of Dec. 31, 2002, Lauer claimed the Funds were worth more than $1.1 billion.  See TRO Ex. 21.

[24] TRO Exs  3 (at A475); 4 (at A391); & Ex. 5 (at A543).

as of the last business day of the year equal to 20% of the net profits of Offshore or increase in Partners' net worth, which included realized and unrealized gains.[25]  Lancer was entitled to a 1% expense fee on Offshore's reported assets for referral fees paid. [26]

12.     Lancer could defer all or part of its incentive fee.  Any incentive fee not deferred was to be paid in cash.  During the deferral period, the deferred incentive fee was invested into the offshore funds.  By way of example, if $1M was deferred and the fund's value increased 10% during the deferral period, the fund would owe Lancer $1.1M in cash at the end of the deferral period.[27]

13.     From 1999 through 2002, Lancer Management received more than $85M in cash from the Funds.  During that same time period, Lauer received $48M in cash from Lancer Management, Offshore and Partners, and received an additional $5.3M from the Funds as proceeds of the sale of his personal portfolio.  Lauer, therefore, collectively received more than $53M.[28]  Lauer hid his compensation from the IRS by failing to

---

[25] TRO Exs. 3 (at A483 & 491-92); 4 (at A393-94 & 409-411); & TRO Ex. 5 (at A557-58); Lauer's Response to Admissions, Nos. 6-8; & Cowen Depo. pp. 125-26 & 545-55.  The arrangement for Omnifund was different as Lancer received a 2% annualized advisory fee, paid quarterly, on the purported assets, and an annual incentive fee calculated as of the last business day of the Funds' fiscal year equal to 25% of the alleged net profits.

[26] TRO Ex. 3 at A483.

[27] TRO Exs. 3 & 5 at A550 & A557.

[28] Kapila Aff. ¶¶ 15-19; TRO Exs. 7 (at A769, A757 & A759) & 10 (at 282-83); Lax Depo. pp. 40-42; & Cowen Depo. pp. 148-49.

declare more than $21 million he received during 2000 and lying about the existence of his offshore bank account into which he funneled millions. [9][2]

14.    Lauer used investor funds for personal gain.  For example, Lauer loaned $1.9M to Total Film Group, Inc. ("TFGP") to provide funding for the development of a remake of the movie Grease involving 'N Sync.  This film was never made.  The loan was in default and TFGP could not repay the loan to Lauer.  Instead of Lauer taking a loss, he had Partners buy him out for $1.9M.  Lauer also had Partners purchase shares of SMX Corp. for $7 a share and Nu-D-Zine, Inc./Xtracard Services, Inc. ("NUDZ") for $1.90 a share from him, when these shares were worth less than 10 cents each.[30]  Lauer also diverted investor funds to purchase a Cessna aircraft and an extremely rare C-11 race car.  The Court has found that Lauer used investor funds to purchase a Cessna for his company, Alpha Omega, and the C-11 with funds from Offshore.[31]  Lauer also used investors' funds to obtain securities for no consideration. For instance, when Offshore paid $400,000 to take control of Augment Systems, Inc./Biometrics Security Technology, Inc. ("AUG"), Lauer simultaneously personally acquired 50 million warrants for no consideration.[32]

---

[29] Depo. Ex. Z, Stuart Jasphy Depo. pp. 92-125 & Depo. Exs. 86-96, 304-07, 309 & 311-16.

[30] Cowen Depo. 148-50; Depo. Ex. BB, Jeffery Hoffman Depo. pp. 164-68 & 172-76; Kapila Aff. ¶ 18; SJ Ex. 14, Declaration of Shannon Pratt dated 9/28/06 at ¶ 7(f); TRO Ex. 23 ¶ 8(i); & Depo. Exs. 289, 291-293, 556 & 610.  In exchange for cold hard cash to Lauer, Partners' investors obtained 50M shares of essentially worthless TFGP stock.

[31] Pennecke Depo. (I-1) 86-89 & Cowen Depo. 153; & Depo. Ex. 114-15, 317-22 & 359-61; Cessna Pleadings & Orders (DE 188, 222 (Order), 442, 487, 487-88 (Order), 501, 507, 516, 519 (Order), 525, 540, 549, & 582 (Order)); & C/11 Pleadings & Orders (DE 760, 773, 786, 864, & 1072 (Order)).

[32] Depo. Exs. 70-71; SJ Ex. 18, Warrant Agreement & Agreement and Plan of Reorganization.  Lauer kept 40M warrants, which based on the valuations Lauer used to value the Funds and calculate his incentive fees, would have been worth $133M as of 12/31/01 and $217M as of 12/31/02!  TRO Exs. 20-21 & Kapila Aff. (Ex.

15.      Investors were told in the private placement memoranda ("PPMs") that the net worth for the Funds was to be determined in accordance with GAAP.  Lauer, however, presented Offshore's financial statements through December 31, 2001, "in conformity with international accounting standards."  Moreover,  Pricewaterhouse-Coopers (NetherlandsAntilles) ("PWC") audited Offshore in accordance with international standards on auditing.[33]   The PPMs represented that securities listed on national securities exchanges or over-the-counter securities listed on the NASDAQ National Market System were to be valued at their last sales price, or, if no sales occurred, at the mean between the "bid" and "ask" prices.  Those shares that were not so listed were valued at their last closing "bid" prices if held "long", and at their last closing "ask" prices if sold short.  Securities held by Partners with no public market would be valued as Lancer II reasonably determined.  In addition, the board of directors of Offshore and Omnifund reportedly had the discretion to value securities as they reasonably determined when they believed that the security did not represent its market value.[34]   Lauer, as the investment manager, valued Offshore and Omnifund, not their boards of directors.[35]

16.      The Funds' PPMs contained various potential conflicts of interests and risk factors.  Quite obviously, however, there was no disclosure that investors risked losing

---

C).

[33] TRO Ex. 7 at A00755.

[34] Lauer's Response to Admissions, Nos. 10 & 13; TRO Exs. 3 (at A509); 4 (at A410); & 5 (at A575-76).

[35] Geist Dec. ¶¶ 4-10; Depo. Ex. Y, John Bendall Depo. p. 265; & Depo. Exs. 77-79.

their investment from fraud, misappropriation of assets, or stock manipulation.[36]   The

PPMs also did not exempt portfolio positions from being part of the books and records,

or exempt Lauer from presenting a condensed schedule of investments as required by

GAAP.[37]

## THE ROLE OF OTHERS IN LAUER'S SCHEME

17.   Eric Hauser was a trader for the Funds, and Martin Garvey was a Managing

Director of the Lancer Group.  Both of them have a 10% interest in Lancer Management.

During their depositions in this matter, Hauser and Garvey asserted their Fifth

Amendment privileges against self-incrimination and refused to answer all questions

regarding, among other things, Lauer, the Funds, John Bendall, trading, and any other

Lancer related matter. [8][3]

18.   David Newman ("Newman") handled administrative matters for the Funds.

During his deposition in this matter, Newman asserted his Fifth Amendment privilege

against self-incrimination and refused to answer all questions regarding, among other

things, Lauer, the Funds, and any other Lancer related matter. [9][3]

---

[36]  TRO Exs. 3 (at A493-98); 4 (at A404-07 & 412); & 5 (at A559-64).

[37]  TRO Exs. 3-5.  A brochure for  the Lancer Group explains that disclosing a portfolio's active holdings costs the Fund money by wasting time in rationalizing the Funds' positions and by outsiders who "coat-tail" on Lauer's ideas.  Ex. 2 to Lauer's Statement of Facts (DE 1823).

[38]  Depo. Ex. N, Eric Hauser & Depo. Ex. O, Martin Garvey Depos.; Depo. Exs. 528 & 611; & SJ Ex. 12, Operating Agreement (at L-094-1832).  Documents bate stamped L-, LHD-CD-, & L-FBI- are business records of the Lancer Group.  Custodian of Records, Affidavits of Marty Steinberg, Esq. (SJ Exs. 1 & 2) & Beth Moon (SJ Ex. 3).

[39]  Depo. Ex. P, David Newman Depo. & Depo Exs. 528 & 611.

19.     Bruce Cowen ("Cowen") assumed the title of Managing Director of the Lancer Group even though he was a consultant.  At meetings with an investor where Lauer was present, and in an investor newsletter, Cowen was referred to as "Managing Director of the Lancer Group."[40]  Cowen testified on numerous occasions that Lauer manipulated shares of stock held by the Funds and used shells to inflate the valuations provided to investors.[41]

20.     Between 1999 through 2002, Joseph Huard ("Huard") was a registered representative who placed trades for Defendants at Shamrock Partners, Ltd. and Phillip Louis Trading, Inc.  Huard swore that starting in 1999 and continuing through December 2002, Lauer and Lancer Management instructed him to artificially inflate stocks held in the Lancer Funds' portfolios.[42]

21.     Stenton Leigh Capital was requested to perform valuations.  Milton Barbarosh and George Levie were associated with Stenton.  At least one of these purported valuations was provided to an auditor.  During their depositions in this matter, Barbarosh and Levie asserted their Fifth Amendment privileges against self-incrimination and refused to answer all questions regarding, among other things, Lauer, valuations or

---

[40] Depo. Ex. S, *USA v. Kelly*, Cowen TT, 10/3/03, pp. 135-36; Erickson Depo. pp. 16-18; & Depo. Exs. 257 (at DOMINION 411) & 528.

[41] Cowen TT, 10/3/03, pp. 121-37 & Cowen Depo. pp. 386-88, 496.

[42] Depo. Ex. Q, *USA v. Kelly*, Huard TT, 10/2/03, pp. 20 & 114; & SJ Ex. 13, Huard Declaration, ¶ 2. Huard confirmed the truthfulness of his declaration in a state court deposition. *Hempstead v. Lauer, et al.*, Huard Depo. pp. 15-18.

appraisals, or any other Lancer related matter.[43]

22.      Laurence Isaacson was the president and member of the boards of directors of at least three of the Funds' portfolio companies, AUG, NUDZ and SMX.  During his deposition in this matter, other than admitting that he was affiliated with Thornhill Group, Inc., Isaacson asserted his Fifth Amendment privilege against self-incrimination and refused to answer all questions regarding Lauer, the Funds, AUG, SMX, appraisals or valuations, or any other matter.[44]

23.      Marty Lax was the engagement partner for Goldstein Golub & Kessler LLP ("GGK"), which was Partners' auditor for many years.  GGK stated that the "financial statements are the responsibility of the General Partner [Lancer II]."  It further stated that in all respects the financial statements were not presented in accordance with GAAP, because Lancer II declined to present a condensed schedule of investments as required by GAAP.   Lax testified that: GGK would not issue an audit opinion if management lacked integrity, an auditor may not be able to detect fraud by management, and management, not the auditor, is the one who takes write-downs. [45]

24.      PricewaterhouseCoopers (Netherlands Antilles) was Offshore's auditor who issued its last audit opinion for the period ending December 31, 2001.  PWC stated that

---

[43] Depo. Ex. U, Milton Barbarosh Depo.; Depo. Ex. V, George Levie Depo.; Lax Depo. pp. 100-02; & Cowen Depo. pp. 120-22, 130, 141 & 226-27; Depo. Exs. 187, 547 & 549; & TRO Ex. 23 (at App. B, p.1; App. E, p.1, & App. G, p.1).

[44] Depo. Exs. 8 (at NU-188-89); 25-26; 70 (at MHB-5480); 208 & 211; & Depo Ex. W, Laurence Isaacson Depo.

[45] TRO Ex. 10 (at 280); Lax Depo. pp. 8-39, 44-54, 111-14, 132-37 & 145-47; Depo. Exs. 178-85, 188 & 197.

it had conducted its audit in accordance with international auditing standards and Offshore's financial statements presented fairly, in all material respects, in conformity with international accounting standards.  PWC did not, therefore, attest that Offshore's financial statements were presented fairly in accordance with GAAP.  PWC's audit opinions also make clear that the "financial statements are the responsibility of the Fund's management [Lancer]."[46]  Lauer misrepresented to PWC the businesses in which NUDZ and SMX were engaged.[47]

      25.    Harry Lander and Jimmy Tskani were employees of the Lancer Group. Lander left his job as a trader for Lancer because, among other reasons, he felt it was a Ponzi scheme.[48]  Tsakni was hired as an analyst for Lancer and he did not have access, nor did he request access, to the Funds' portfolios.[49]  Lauer gave Tsakni instructions to increase trading orders during the last week of the month and claimed that the shells were only small positions. [50]

      26.    John Doyle ("Doyle") was a registered representative at Shamrock and testified that he marked the close in various stocks after receiving price targets from

---

[46]  TRO Exhibit 7 (at A755); Kapilla Aff. ¶ 30; & Depo. Ex. 23.

[47]  Depo. Ex. 537; & Cowen Depo. pp. 488-89.

[48]  Depo. Ex. X, Harry Lander Depo. pp. 31-33 & 84.

[49]  Tskani Depo. pp. 85-86.

[50]  Tsakni Depo. pp. 21-22, 60-71, 77 & 121-31.

Lancer. [1][5]

27.     Citco Fund Services (Curacao) N.V. ("Citco") was retained by Offshore and Omnifund to perform administrative services.[52]  Citco did not perform any administrative services for Partners.  In 2002, Citco resigned because it was "uneasy with Mr. Lauer's portfolio" and was concerned about valuation, illiquidity, an implosion, and "serious indications that Lancer is manipulating the market price" of its holdings.[53]   Lauer, however, refused to take any write-downs.  Lauer also misled investors by creating a "script" when dealing with third-party inquiries regarding Citco's termination, falsely stating it was "mutually and amicably agreed" upon.[54]

28.     From 1999 through February 2002, two of Citco's representatives served as the only two members of the Offshore Funds' board of directors.[55]  From February 2002 on, John Bendall ("Bendall") and Richard Geist ("Geist") served as the only directors of the board of directors of Offshore and Omnifund.  They were supposed to be elected by the shareholders, and Offshore's board was supposed to meet at least once a year. Bendall and Geist were not elected, and no formal board meeting was held.  They also

---

[51]  Depo. Ex. AA, John Doyle Depo. pp. 11-23, 32-33, 35, & 84-87; Depo. Exs. 4, 12-15, 605, & 620.

[52]  TRO Exs. 3 (at A519) & 5 (at A585).

[53]  Cowen Depo. pp. 100-113, 444-59 & 494-95; Depo Exs. 74, 544 & 600-04; SJ Ex. 16, May 13, 2002 Citco Memo. Valuation of Offshore, (at CR 05894, emphasis in the original); & SJ Ex. 17, Declaration of Patrick G. Fenlon.

[54]  Cowen Depo. pp. 291, 449 & 455-59 & Depo Exs. 604 (at L-96-729).

[55]  Def. Ex. 10 & Depo. Ex 21 (at MORG 325).

did not have access to the offshore funds' portfolios and did not value the offshore funds.  Bendall does not even remember being on Omnifund's board.[56]

29.    Bendall also controls Hermitage Capital Corp. where the Funds were a client.  Bendall suffers from memory loss due to depression and brain hemorrhaging from receiving a blow to the head, and was on Valium and an anti-depressant during his deposition.  Bendall cannot remember the trading done by the Funds except that it was all done at Lancer's request.  Bendall knows nothing about the activities of Shamrock, Phillip Louis, Huard, Doyle and Lauer's individual account.  Bendall also knows nothing about the shell companies and "couldn't describe" what he saw in the portfolio "in a million years."[57]  Bendall admits it is wrong to manipulate stocks, but claims he could not manipulate stocks because he is not a market maker and clears through Pershing.[58] Bendall testified that if Lauer lied to him he would have resigned from the board.[59]

30.    Banc of America Securities acted as the prime broker for the Funds.  BOA did not value the Funds or confirm ownership of positions they held.  David Newman was BOA's account representative for the Funds until he left to work for Lancer and was replaced by BOA's Andrew Pennecke. [60]

---

[56] TRO Exs. 3 (at A519) & 5 (at A585); Geist Dec. ¶¶ 3-7; & Bendall Depo. pp. 113-14, 120-22, 265 & 427-29.

[57]  Bendall Depo. pp. 6-42, 69, 104-06, 122-24, 140-41, 193-203, 224-26, 232-35, 244-45, 259-60, 309-11, 313-14 & 327-39.

[58]  Bendall Depo. pp. 152 & 371.

[59]  Bendall Depo. pp. 56, 120-21 & 146-51; & Depo. Exs. 621 (at TRADE 1089-1091) & 622;

[60] Pennecke Depo. (I-1) pp. 12-14, 19-20, 24-34, 47-52 & 56-70 & Depo. Exs. 349 & 351-54.  Documents bate stamped BASSSEC, BAS, & BASSRVR, documents from the primebroker.com maintained by BOA, and emails

31.   James Raker served as CFO and Robert Maum served as CEO of Fidelity First Financial Corp. ("FFIRD").  FFIRD was one of the Funds' biggest holdings.  Raker and Maum were consultants to Lancer Management. [1][6]

## FRAUDULENT SCHEME

A.   **Misrepresentations in the Private Placement Memoranda** [2][6]

32.   Lauer misrepresented to Offshore investors that "[n]o more than 20% of the gross asset value of the Fund may be lent to or invested in the securities of any one issuer or may be exposed to the creditworthiness or solvency of any one counterparty." This claim was first made during 1998 and later made conditional on Offshore being listed on the Irish Stock Exchange, which it was from at least October 26, 1999 through mid-March 2003.[63]  Lauer violated this provision by having, as of December 31, 1999, more than 25% of Offshore's gross assets in Manhattan Scientific, Inc. ("MHTX") and more than 21% in Zi Corp ("ZI").[64]  Lauer also violated this provision by having, as of December

---

produced by BOA are the business records of BOA.  See Custodian of Records Declaration of Richard Rauzi (SJ Ex.4), John Bruno (SJ Ex. 5), and John Ritter (SJ Ex. 6).

[61]  By no later than January 2003, Raker and Maum ran FFIRD while simultaneously serving as consultants to Lancer Management.  Raker Depo. pp. 13-16 & 22; Maum Depo. pp. 27-28 & 69-72 & 113-14; & Depo. Exs. 589 & 592.

[62]  The PPM for Offshore stated that it did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statement" not misleading.  TRO Ex. 3 (at 477).

[63]  TRO Exs. 3 (at A475, A479, A489-90 & A495-96) & 42 (at 1282); Depo. Exs. 21 (at MORG 321), 119 (at INVT 1461 & 1466-67), 325, 335-36 & 341-42; SJ Ex. 19, 5/18/03 Newsletter (at L-43-483-86); & Cowen Depo. p. 493.

[64] Depo. Ex. 536.

31, 2000, more than 27% of Offshore's gross assets in SMX.[65]

33.     Lauer misrepresented in Offshore's PPM, under a section titled "Investment Restrictions," that the fund may "not take or seek to take legal or management control of the issuer of any of its underlying investments."[66]  In direct contravention of this restriction, Offshore repeatedly acquired a controlling interest in several issuers, such as taking control of TFGP, having Isaacson manage at least three of the shells, and having Raker and Maum simultaneously work as consultants (Lauer even announced Raker as the CFO for the Lancer Group) and run FFIRD.[67]  For example, Offshore owned more than 72% of SMX as of December 31, 2001, more than 87% of FFIRD as of December 31, 2002, more than 96% of AUG as of December 31, 2001, and more than 94% of NUDZ as of December 26, 2000.[68]

34.     Lauer misrepresented to investors that BOA "is entrusted with the safe custody of all the assets of the [Offshore] Fund. . ."[69]  BOA's official account statements

---

[65] Depo. Ex. 1 at A925 & Kapila Aff. ¶¶ 20 & 24.  If First Financial Corp. (FFIRD) and First Fidelity Stock (FFIR) are considered the same issuer, Lauer violated this provision as of Dec. 31, 2002 by having more than 21% of Offshore's gross assets in FFIRD (more than 5%) and FFIR (more than 16%).  Depo. Ex. 51 at A1208-09.

[66] TRO Ex. 3 (at A489-90); & Depo. Exs. 21 (at MORG 335-36) & 119 (at INVT 1462).

[67] Raker Depo. pp. 36-37; Depo. Exs. 8, 70-71, 25-26, 226, 287 & 589; & Hoffman Depo. 158-59.

[68] TRO Ex. 23 at App. D, pp. 6-7 (based on all of the Funds' holdings they owned approximately 80% of SMX); *Id.*, at App. G, p. 41 (at least 92% of FFIRD based the Funds' holdings); *Id.*, at App. B, p. 54 & App. C, p. 8, Depo. Exs. 69 (at GRL 30) & 70 (at MHB 5482) (AUG); TRO Ex. 23 at App. F, Tab 4, p. 6 & Depo. Exs 4-5 (NUDZ).

[69] TRO Ex. 3 (at A521); & Depo. Exs. 21 (at MORG 365) & 119 (at INVT 1490) (During 1998, Offshore used a subsidiary of BOA).

and PWC's audit opinions,[70] however, show a tremendous disparity between the assets in the safe custody of BOA and those purportedly owned by the Funds.  For example, as of December 31, 2002, BOA had in its custody just $76 million worth of securities, while Offshore reportedly owned assets worth more than $822M.[71]  Lauer's failure to have BOA keep safe custody of all the assets enabled him to report bogus assets, which were then used to value the Funds.  For example, as of December 31, 2002, the NAV of Offshore was overstated by at least 26% or $217M.[72]

35.     Offshore's PPM dated February 15, 2002 falsely stated that most investments would trade on "listed exchanges."[73]  In reality, a majority of these funds' investments traded or were quoted on the OTCBB and pink sheets.[74]

36.     Partners' PPM also falsely assured investors that they would receive annual financial reports and access to books and records upon request.  Partners' investors did

---

[70]  TRO Ex. 7 at A00770.

[71]  Pennecke Depo. (I-1) pp. 8-10 & 18-38 & Depo. Exs. 6 (at A1073), 51 & 216-17.

[72]  Kapila Aff. ¶¶ 20-23 & 28 (As of December 31, 2002, Partners was overstated by at least $59M); Affidavit of Marty Steinberg, SJ Ex. 1) Pennecke Depo. (I-2) pp. 48-53; & Depo. Ex. 380.  One reason the Funds were overstated was because Lauer claimed they owned more shares than the portfolio company was authorized to issue.  For example, of December 31, 2002, Lauer claimed the Funds owned nearly 20M shares of FFIRD but FFIRD was only authorized to issue around 4.8M shares.  If FFIR is considered as the same issuer as FFIRD this problem is magnified, because Lauer would be claiming that the Funds own nearly 65M shares of FFIRD (more than 13 times the number of authorized shares).  Lowry Dec. ¶¶ 14 & 18; Kapila Aff. (Ex. C.4(a); Depo. Ex. 550; Raker Depo. 45-48; & Maum Depo. p. 132.

[73]  TRO Exs. 3 (at A494) & 4 (at A404).  A listed exchange is one that is organized and registered such as the New York Stock Exchange or American Stock Exchange.  Unlisted exchanges include the Over-the-Counter-Bulletin Board ("OTCBB") and pink sheets.  See John Downes & Elliot Goodman, DICTIONARY OF FINANCE AND INVESTMENT TERMS 330 [5th ed. 1998] [defining listed securities versus unlisted securities].

[74]  TRO Ex. 22 ¶¶ 5-6.

not, however, obtain audited financials after year-end 2000 and they were denied access to Partners' books and records.[75]  A draft annual financial report was prepared for year-end 2001, but never completed as Lauer repeatedly refused requests for audited financials for year-end 2001.[76]

**B.    Lauer's Fake Portfolios**

37.    To perpetuate his fraudulent scheme, Lauer lied about and hid the Funds' actual portfolios from investors and even from employees.[77]  The only individuals at Lancer who had access to the Funds' portfolios were Lauer, Garvey, Hauser, Cowen and Newman.[78]

38.    One of Offshore's largest investors, University of Montreal Pension Fund, invested $67 million and was informed that as of January 31, 2002, its investment was worth $112 million.  Ultimately, however, the University of Montreal Pension Fund did not receive any of the money it invested.[79]

39.    During June 2001, this pension fund, already an investor in Offshore, appointed a new director to monitor its investments.  The new director, however, found

---

[75] TRO Exs . 4 (at A395) & 28; Depo. Exs. 17 & 66; & Erickson Depo. p.63.

[76] *Id.*; Lauer's Statement of Facts (DE 1823) at Ex. 3.

[77] Tsakni Depo. p. 21; Mayrand Depo. pp. 23-35 (document mailed by Lauer (Depo. Ex. 203) compared to actual portfolio (Depo. Ex. 204) show vastly different portfolio holdings) & 60-66; Wolak Depo. pp. 16-31; Erickson Depo. pp. 27-28;  Langlois Depo. pp. 94-116; Cowen Depo. pp. 97-100; & Depo Exs. 203-04, 208-09, 521, & 530.

[78] Cowen Depo. p. 97; Tskani Depo. p. 21; & Pennecke Depo. (I-1), pp. 45-47.

[79] Mayrand Depo. pp. 8, 14-17 & 47-54; & Depo. Exs. 201 & 205-07.

it difficult to monitor Offshore because its holdings were not transparent.  Consequently, during the spring of 2002, she called Lauer and requested the most up-to-date position statement of stocks held by Offshore that Lauer could provide.  In response, Lauer sent her a year old "model" portfolio[80] with the handwritten notation "Per your request, ML."  This document purported to be a BOA statement as March 31, 2001 for Offshore ("Fake March 2001 Portfolio").  The director relied on this fake portfolio to monitor the pension fund's investment and she believed that Offshore actually owned the securities represented.[81]

40.     In reality, the Fake March 2001 Portfolio was fraudulent.  It did not come from BOA, had portfolio holdings that Offshore did not actually own, and omitted disclosing the shell companies that comprised a vast majority of Offshore's alleged value.[82]  For example, the Fake March 2001 Portfolio indicated that Offshore held more than 900,000 shares of Harris Corporation worth more than $22M when it did not own any.  In the aggregate, Lauer represented that Offshore owned more than $219M worth of securities that it did not own.[83]  This sham portfolio also did not reveal that Offshore had invested in shell corporations or that the shell corporations comprised the vast majority of its holdings.  For instance, Lauer did not disclose that he valued Offshore's

---

[80]  Pennecke Depo. (I-2) pp. 18-22 & 29-31.

[81]  Mayrand Depo. pp. 7-9, 19-20, 23-26 & 31-32; & Depo. Ex. 203.  Cowen also testified that Lauer directed Garvey to prepare a "model" portfolio to the pension fund.  Cowen Depo. pp. 97-98

[82]  Pennecke Depo. (I-2) pp. 18-22 & 29-31; Mayrand Depo. pp. 26-44; & Depo. Exs. 203-04.

[83]  Mayrand Depo. pp. 26-31 & Depo. Exs. 203-04.

position in NUDZ at more than $100M when it had no operations, and SMX at more than

$264M when it was a pink sheet shell with no business operations.[84]

41.     The director of the pension fund considered the differences between the

actual and fake positions material.  She felt Lauer had lied and had perpetrated a fraud.

Had she known the truth, she would have redeemed the entire investment. [85]

42.     Moreover, the pension fund received fake portfolios going as far back as

1998.  The director of the pension fund found in its files a portfolio that came from

Lauer that purported to be a BOA statement for Partners as of September 30, 1998, but

in reality also contained false positions and did not come from BOA. [86]

43.     During September 2002, the pension fund received another false portfolio

for Offshore as of March 31, 2002 ("Fake March 2002 Portfolio").  This fake portfolio also

did not come from BOA and had more than $600M worth of securities that Offshore did

not actually own.[87]  In addition, Lauer failed to disclose shell companies valued at more

than $350M.[88]

44.     On January 30, 2003, Lauer appeared before the pension fund investment

committee and provided another fake portfolio.  At this meeting Lauer handed out what

[84] Mayrand Depo. pp. 33-46 & Depo. Exs. 4-5, 25 & 27.

[85] Mayrand Depo. pp. 31-33, 36-37, 46-49 & 68 & Depo. Ex. 205.  Notably, after receiving the Fake March 2001 Portfolio the pension fund tried to redeem over $25M of its investment (it did not receive a cent).

[86] Mayrand Depo. pp. 21-22; Pennecke Depo. (I-2) pp. 22-25 & Depo. Exs. 202 & 367.

[87] Mayrand Depo. pp. 54-68; Pennecke Depo. pp. (I-2) 31-34 & Depo. Exs. 208-09 & 372.

[88] Mayrand Depo. pp. 69- 75 & Depo. Exs. 70 & 208-09

he claimed was Offshore's portfolio as of September 2002.  Lauer did not let the pension fund keep a copy, so the pension fund took copious notes recording the positions reflected on Lauer's fake portfolio.  The portfolio reflected more than $440M worth of securities that were not owned by Offshore. [89]

45.   Lauer also gave a fake portfolio to Morgan Stanley, an institutional investor with more than $50M invested.  After months of being denied an audit opinion or access to Partners' books and records, Lauer agreed to give Morgan Stanley a chance to review the Partners' portfolio and contact BOA to verify positions.  At the meeting, Lauer was the only representative for Lancer, and he handed out a spreadsheet containing what he claimed was the Partners' portfolio as of November 30, 2002 ("Fake November 2002 Portfolio").  Lauer, however, would not let them keep a copy of his spreadsheet; instead, copious notes were taken. [90]

46.   The Fake November 2002 Portfolio omitted positions, contained positions not owned, or positions owned in much smaller amounts than represented.  For example, Lauer represented that as of November 30, 2002, Partners owned 910,200 shares of Siebl Systems, Inc., 2,104,000 shares of Open Wave Systems, 910,000 shares of the NASDAQ 100 Index and 425,000 shares of Yahoo, when Partners did not own any shares of these

---

[89] Mayrand Depo. pp. 81-91; Depo. Exs. 212-213.

[90] Wolak Depo. pp. 14-19 & 50-54; Langlois Depo. pp. 28, 79-85, 87-97, 112, 188-192; & Erickson Depo. pp. 20-34 & 45-57; & Depo. Exs. 66, 505, 509-10, 514 & 519-22.  Langlois testified that he wrote down every company, every name of investment, and information, such as valuation and shares.  He feels he was very accurate in the information he wrote down and that he had enough time.  Langlois Depo. p. 92. Langlois further testified that he wrote down the right fund, name, shares held and market value.  Langlois Depo. pp. 191-192.

companies.   In all, Lauer's Fake November 2002 Portfolio represented 19 positions (valued at tens of millions of dollars) that were different than the actual portfolio. Morgan Stanley considered these differences material.[91]   After this meeting, Morgan Stanley contacted BOA and discovered there were material differences between the Fake November 2002 Portfolio and BOA's holdings.  Morgan Stanley has not received any of its investment back and wrote off its investment.[92]

47.     Lauer also misrepresented Offshore's holdings to another investor.   An assistant treasurer largely responsible for retirement and pension fund investing for Dominion Resources, a United States based corporation, met with Lauer approximately twice a year about Offshore's larger positions.   At these meetings, Lauer disclosed portfolio positions that Offshore did not actually hold or were small positions, and failed to disclose nearly all of the shells, including SMX, AUG and NUDZ.[93]   If Dominion Resources had known of Offshore's actual holdings, the huge false gains Lauer prescribed to the shells, and that Lauer had deceived it about the true holdings, it would have redeemed all of the money invested and not made subsequent investments.[94]

---

[91]  Langlois Depo. pp. 95-117 & Erickson Depo. pp. 40-41 & 54; & Depo. Exs. 118, 348 & 521-22.  Lauer also represented that Partners owned 13.7M shares of Zi, 6.5M of AUG, and 6.2M of NUDZ when it actually owned just 3.7M share of Zi, over 12.5M shares of AUG and over 19.2M of NUDZ.  Langlois Depo. pp. 100 & 104.

[92]  Langlois Depo. pp. 117-125; Erickson Depo pp. 32-33, 35-45 & 48-54; Wolak Depo. pp. 16-38 & Pennecke Depo. (I-2) 57-65; & Depo. Exs. 523-26 & 530.

[93]  Borneman Depo. pp. 7-12, 25-43, 45-467 & 52-54; & Depo. Ex. 6.

[94]  Borneman Depo. pp. 47-57 & Depo. Exs. 244-46.

48.     Lauer also lied in public filings about the Funds' positions or failed to file required disclosures with the Commission.  For example: (1) after being appointed, the Receiver had to make more than a dozen filings with the Commission; (2) despite owning more than 96% of AUG's outstanding shares and nearly 50% of ZI's outstanding shares, Lauer failed to make required filings with the Commission; and (3) on April 13, 2000, Lauer filed a Form 3 (Initial Statement of Beneficial Ownership) for Partners, Offshore, Orbiter and himself that falsely claimed that on February 7, 2000, they collectively acquired more than 45M shares of MHTX.  In reality, Lauer and these entities owned all of the shares by no later than year-end 1999, which comprised a material portion of the respective funds' valuation.[95]

49.     Lauer held himself out as a value-oriented investor who invested in companies with strong balance sheets that the market misconceived.[96]  Investors and GGK did not know that in reality Lauer was artificially increasing the price of securities held by the Funds or using shells.[97]  Investors were surprised and upset to learn that the Funds invested in shells.  Had they known that Lauer was investing in such stocks, they would have withdrawn their money and not made any subsequent investments.[98]

---

[95]  SJ Ex. 8, Tennant Dec., SJ Ex. 8; Form 13 & 16 Filings Made by the Receiver, SJ Ex. 20; Depo. Exs. 70 (at MRB 5482) & 536; BOA Custodian Affidavits; Cowen Depo. pp. 486-87; & SJ Ex. 21, CPSS for Partners, Lauer, Orbiter and Viator as 12/31/99.

[96]  Cowen Depo. pp. 416-18 & 477-79; Depo. Exs. 16, 49-50 & 612; Mayrand Depo. pp. 39-40, 43-44 & 70; Borneman Depo. pp 47 & 51; & TRO Exs. 5 (at A554) & 17 (at 4 & 18).

[97]  Lax Depo. pp. 75-76; Mayrand Depo. pp. 38-40; & Borneman Depo. p. 65.

[98]  Mayrand Depo. pp. 34 & 39-40 & Borneman Depo. pp. 40-43, 46-47 & 50-54.

C.      **Non-Valuation Misrepresentations**

50.      Lauer reviewed, approved and authored newsletters or investor letters issued by Lancer Management and the Funds.[99]

51.      Lauer claimed in Partners' July 2000 newsletter that United States Industries was one of its "significant" holdings.[100] In reality, United States Industries was a minuscule 1.36% of Partners' portfolio value as of June 30, 2000.[101] Lauer also claimed in the Partners' April 2000 newsletter that one of its "recent holdings," Cordant Technologies, was purchased in a cash tender of "100% premium to its then market price."   In reality, no shares of Cordant were held in Partners' portfolio going back at least five months.[102]   The Funds' September 2001 newsletters stated that they held shares in a company traded on the New York Stock Exchange called DRS Technologies.[103] None of the Funds, however, owned any shares in that company.[104]

52.      Lauer claimed in his May 2002 newsletters that Offshore and Partners' year-to-date growth stemmed from taking profits in 2002 in companies such as Plantronics,

---

[99]  Lauer's Response to Admissions, Nos. 26-27.

[100]  TRO Exs. 29 & 45 ¶¶ 3-6.

[101]  TRO Exs. 30 & 45 ¶¶ 3-5 & 7-8.

[102]  Partners' April 3, 2000 Newsletter and SJ Ex. 28, Partners' Portfolios from 11-30-99 to 3-31-00.

[103]  TRO Exs. 31 (at A264 & 266) & 45 ¶¶ 3-5, & 9.

[104]  TRO Exs. 32 & 45 ¶¶ 3-5 & 10-11.

TRW, Teledyne, and Terex.[105] In truth, Partners did not own any shares of Plantronics,

TRW, Terex, and Teledyne, and Offshore did not own any shares of Terex and TRW.[106]

53.    Lauer misled investors in Offshore's September 2002 newsletter by stating

that "Methods Products" was a "small position. . . If it is successful, the pay off could

be substantial.  If not, it will turn into a minor write-off."[107]  In reality, Offshore's

holdings in Methods Products was not a "small position" which would only result in a

"minor write-off" if unsuccessful.[108]

54.    Lauer misled investors about the background of Bruce Cowen in his

September 11, 2002 newsletter.   The newsletter praised Cowen's professional

background stating, "his personal achievements speak for themselves."  Lauer did not,

however, disclose that in 1999 Cowen was enjoined, fined and barred from serving as an

officer or director of a public company for five years.  This injunction stemmed from

Cowen's fraudulent conduct involving, among other things, misallocating securities while

serving as CFO and later president of TRC Companies, Inc.[109]  Lauer failed to disclose

Cowen's restrictions, even though he and Cowen discussed it in April/June 2002.[110]

---

[105]  TRO Exs. 33 (at A131); 34 (at A140); & 45 ¶¶ 3-5 & 12.

[106]  TRO Exs. 35-36 & 45 ¶¶ 3-5 & 13-14.

[107]  TRO Exs. 37 & 45 ¶¶ 3-5 & 15.

[108]  As of August 31, 2002, eleven days before the dissemination of the newsletter, Methods Products comprised 3.33% or $33.45 million of Offshore's portfolio.  TRO Exs. 38 & Ex. 45 at ¶¶ 3-5 & 16-17.

[109]  TRO Exs. 37 and 39-41.

[110]  Cowen Depo. pp. 475-76. Furthermore, it concerned an investor that Lauer represented that Cowen worked for Lancer and then, after the indictment, claimed that Cowen never worked for Lancer.  Borneman Depo. p. 75.

55.     The Funds' January 2003 newsletter falsely stated that the Funds owned shares in the Credit Store, Inc. "a number of years ago" and that this holding had "no influence on valuations for a number of years."[111]  In fact, less than one year prior (May 2002) the Funds held more than 10 million shares of the Credit Store, which ranged from 2.03% to 5.97% of Partners' portfolio and 1.49% to 4.63% of Offshore's portfolio between August 2000 and August 2001.  These holdings affected the valuations of the funds until past June 2002.[112]

56.     In a December 18, 2002 newsletter, Lauer represented that Raker had recently joined the Lancer Group as CFO, touted Raker's "strong financial background," and proclaimed that "with the recent arrival of Bob Maum, Lancer's overall professional capabilities were never stronger."   In fact, Raker never joined Lancer Fund as its CFO and the newsletter failed to mention that Raker worked for FFIRD at the time.[113]

57.     Lauer lied on an investor call about the status of GGK's 2001 audit.  In February 2003, during an investor call, Lauer was asked by an investor about the status of the 2001 audit (that GGK never issued).  Lauer stated he did not know why GGK had not issued the report and that the delay did not involve valuations of the fund or any other issues of which he was aware.  Lauer's statement was untrue.[114]  In reality, GGK

---

[111] TRO Exs. 42 & 45 ¶¶ 3-5 & 18.

[112] TRO Exs. 27 (at Ex. D) & 45 ¶¶ 3-5 & 19.

[113] Raker Depo. pp. 36-37 & Depo. Ex. 226.

[114] Lax Depo. pp. 60-64.

could not sign off on the audit because Lauer did not provide GGK with necessary documents and GGK had serious concerns about Lauer's integrity, the concentration of thinly traded shell companies, illiquidity, and the valuations in light of the shells' lack of operations.  Lauer did not disclose to investors that GGK had valuation concerns.[115] In fact, Lauer even distributed a draft of Partners' December 31, 2001 audited financial statements to investors, even though GGK never executed it.[116]

58.    Lauer also stated during this investor call that the 2002 audit was underway when, in fact, GGK had not even sent an engagement letter to Lauer.  These events gave GGK significant concerns about Lauer's integrity.  Consequently, GGK resigned.[117]  After this investor call, on April 16, 2003, Lilling & Company LLP sent Partners a bill for $10,000 for non-specified professional services,[118] but there is no evidence that Lilling & Company was engaged to perform a 2002 audit of Partners.

D.    **Valuation Misrepresentations through Manipulation of the Funds' Holdings**

59.    Investors expected Lauer to represent NAVs that were truthful and accurate.  At least one institutional investor, Morgan Stanley, incorporated the NAVs received from Lauer into the valuations that it reported to its own investors.  Lauer reported the Funds' performance to investors in various ways including his monthly and

---

[115] Lax Depo. pp. 23-25, 53-57, & 67-110; & Depo. Exs. 4, 32-33, 179, 186-88 & 190-91.

[116] Langlois Depo. pp. 49-51 & 64-66; Lax Depo. pp. 121-32; Depo. Exs. 50, 186, 188 & 195.

[117] Lax Depo. pp. 64-66.

[118] Lauer's Statement of Facts, Ex. 4 (DE 1823).

quarterly newsletters and conference calls.[119]

60.    Nearly every newsletter that Lauer sent investors compared the respective Fund's performance to the major stock indexes.[120]  For example, during September 2001, when over the last year the NASDAQ was down by nearly 60%, the S&P 500 was down 25%, and the Russell 2000 was down by 13%, Lancer claimed mid-single digit returns achieved through his strategy of "capital preservation."[121]  Based on these newsletters, investors believed that the Funds were outperforming the indexes.  This was a very strong point for investors.[122]

61.    F om November 1999 through July 2003, Lauer relied heavily on thinly-traded shells with either no operations or struggling operations, little or no revenues, and no earnings.  Lauer did this to obtain compensation based on artificially inflated valuations he reported to investors.  Lauer used these shell corporations to "soften" the losses of the Funds' other stocks.  Generally, Lauer purchased huge controlling stakes in these shells for pennies a share and valued all of the shells' shares based on the closing prices that he

---

[119]  Cowen TT, 10/3/03, pp. 132-33; Langlois Depo. pp. 34-38; Mayrand Depo. pp. 105-113; & Depo. Exs. 219-221 & 506-508.

[120]  SJ Ex. 22, Composite of Offshore Newsletters comparing performance to major stock indexes (*see* January 2, 2002 newsletter (2001 Year-end Performance Update) "Although, as a group, we tend not to get exited about "teen" returns given the realities of the equity markets over the past two years, in which the values of the SP 500 and NASDAQ Composite have plunged 22% and 52% respectively (since January 1, 2000) perhaps a 26% <u>gain</u> is tolerable." (emphasis in the original); SJ Ex 23, Composite of Partners Newsletters comparing performance to major stock indexes; & Depo. Ex. 65. Cowen TT, 10/3/03, pp. 133-34.

[121]  Composite of Offshore Newsletters (*see* September 3, 2001 newsletter (at L-050-001011).

[122]  Depo. Exs. 219-221 & Mayrand Depo. pp. 105-113.  Mayrand testified that the comparisons of Offshore's returns to other indexes were something she saw in correspondence from Lauer.  *Id.*, p. 112.

created by buying shares at the end of the month.  Had the shells not been included in the portfolio, the valuations would have plunged.[123]

62.     The Funds' valuation became a function of how Lauer wanted his Funds to perform in comparison to those indexes.  To achieve the valuation Lauer wanted, Defendants purchased blocks of certain thinly-traded stocks, often at increasing prices, at or near the close of the last trading days of the month.  Typically, on the last day of the month, Defendants would give orders to brokers to purchase shares in order to increase the prices of certain securities.[124]  Lauer gave Garvey instructions that he wanted the Funds to have a certain performance for the month, and the Funds achieved this performance by moving the closing price of stocks or by increasing the number of shares held in the portfolios in order to obtain an artificially inflated valuation that Lauer then provided to investors.[125]

63.     Defendants made these purchases through brokerage accounts they controlled.[126]  Lauer used his own personal account at BOA to manipulate stocks.  For example, Lauer used his personal account at least 70 times as part of the scheme to manipulate the Funds' holdings.[127]

---

[123]  Cowen Depo. pp. 22-28, 37-40, 128 & 496; Cowen TT, 10/3/03, pp. 132-33; SJ Ex. 24, Declaration of Robert Lowry; Kapila Aff. ¶¶ 20-25 (Ex. C); TRO Exs. 19-21 & 23; Pratt Dec.; & Depo. Ex. 536.

[124]  Cowen TT, 10/3/03, pp. 120-23 & Depo. Ex. T, *USA v. Kelly*, Cowen 2nd Trial Testimony, 10/15/04, pp. 84-86.

[125]  Cowen TT, 10/3/03, pp. 128-29; Cowen 2nd TT, 10/12/04, pp. 34-35 & 37-42, Cowen Depo. pp. 125, 138-39 & 400-01; Huard TT, 10/2/03, pp. 182-83; & Huard Depo. p. 57.

[126]  TRO Ex. 27 at ¶¶ 6-11 & 13-56 (Ex. D).

[127]  TRO Ex. 27 ¶¶ 6-7 (Ex. A – Shows over 70 trades through Lauer's account); Lowry Dec. ¶¶ 19-21; 26-27; & 36-44; Pennecke Depo. (I-1) pp. 81-84; & Depo. Exs. 101 & 303.

64.     F om at least November 1999 through at least April 2003, the free economic forces of supply and demand did not determine the prices of at least seven securities that constituted a material portion of the Funds' portfolios.   Instead, Lauer and Lancer Management made artificial purchases that directly caused the prices of securities held by the Funds to increase.[128]

65.     Specifically, purchases by Lauer and Lancer Management artificially set the price for SMX from November 1999 to at least April 2003,[129] NUDZ from December 2000 through at least April 2003,[130] FFIRD from no later than November 1999 to at least April 2003,[131] AUG from no later than December 2001 to at least April 2003,[132] TFGP from January 2000 through at least April 2003,[133] and Lighthouse Fast Ferry ("LHFF") from no later than January 2001 to at least December 2002.[134]  But for Lauer and Lancer Management engaging

---

[128] Lowry Dec. ¶¶ 6 & 35-38 & Kapila Aff. ¶¶ 20-25 (Ex. C).

[129] Lowry Dec. ¶¶ 6-8, 19-24, 34-37, 45-46, 50-52 & 54-57; & TRO Ex. 27 ¶¶ 53-56.

[130] Lowry Dec. ¶¶ 6-8, 25-28, 34-37, 44, 50,  & 54-56; TRO Ex. 27 ¶¶ 53-56; Huard Depo. 60-61; & Depo. Ex. 4.

[131] Lowry Dec. ¶¶ 6-18, 34-37, 48-51 & 54-57; TRO Exs. 25 & 27 ¶¶ 38-44 & 48; & Depo. Ex. 605 p. 4.

[132] Lowry Dec. ¶¶ 6-8, 29-30, 34-37, 47, 50  & 54-57 & TRO Ex. 27 ¶¶ 46-50 & 48.

[133] Lowry Dec. ¶¶ 6-8, 31-32, 34-37, 50 & 54-57 & TRO Ex. 27 ¶¶ 55-56; Huard Dec. ¶ 2; & Huard Depo. 15-18, 23-24, 28-29, 34, 58-61, 69-70, 106-08 & 124-25.

[134] Lowry Dec. ¶¶ 6-8, 50-52 & 54-56; TRO Ex. 27 ¶¶ 13-35; Huard TT, pp. 181-82; Cowen TT, 10/3/03, pp. 122-35; Cowen Depo. pp. 466-68.; Huard Depo. pp. 60-61; Depo. Ex. R, *USA v. Kelly*, Huard 2nd Testimony Transcript, 11/10/04, pp. 80-86; & Cowen 2nd TT, 10/15/04, pp. 77-78 & 83-94.  Notably, there was no market for FFIR even though by April 30, 2003, Lauer valued the Funds' holdings in FFIR at more than $218M.  Lowry Dec. ¶¶ 18 & 37.

in this manipulative activity, the market price for these securities would have been substantially and materially lower.

66.    Lauer and Lancer Management engaged the following manipulative trading practices: (1) they dominated and controlled the markets for these securities by preventing the natural operation of supply and demand; (2) they prevented a competitive market from developing for these securities; (3) they marked the close; (4) they engaged in economically irrational trading; (5) they engaged in matched trades; and (6) they failed to disclose their control.[135]

67.    Lauer and Lancer Management engaged in this manipulative activity through several broker-dealers, including Shamrock and Phillip Louis.  Joseph Huard, John Doyle and Bruce Cowen have all testified on numerous occasions that this manipulative activity occurred at Shamrock.[136]  After Shamrock discontinued its business, Huard testified that Lauer continued this manipulative activity.[137]  Cowen testified that he heard Lauer place manipulative trades through Hermitage.[138]

---

[135] *Id.*, ¶¶ 4, -36, 38-53 & 57-58; Steinberg Depo. p. 66-67 & TRO Ex. 27.  Once the Court restrained Lauer from engaging in these manipulative activities, the prices for these shares dropped substantially.  Lowry Dec. ¶ 36 & 47.

[136] Huard Depo. p. 65, Cowen Depo. pp. 136-39 & 426-27; Huard TT, 10/2/03, pp. 17-18; Doyle Depo. pp. 11-23, 32-33, 35, & 84-87; Depo. Exs. 4, 12-15, 541, 605, 608 & 620.

[137] Huard TT, 10/2/03, pp. 20 & 114 & Huard Second TT, 11/10/04, pp. 89.

[138] Cowen Depo. pp. 387-89.

**1.      Lauer is Collaterally Estopped from Claiming He Did Not Manipulate TFGP**

68.      Another court has already found that Lauer committed fraud by illegally manipulating the market for TFGP's stock.  Lauer had notice of this case, filed a demurrer to the second amended complaint, fought unsuccessfully to quash his deposition, and had a default judgment entered against him that awarded the plaintiff compensatory and punitive damages.[139] By virtue of the Default Judgment, all well-pleaded allegations of fact of the second amended complaint were deemed admitted, i.e., that the published price for TFGP "during the period 1999 through June, 2001 and thereafter was the result of illegal manipulation of the market for [TFGP] by Defendant Lauer;" Lauer controlled and dominated TFGP; Lauer placed calls to Huard to make sham purchases of TFGP; the actual market value (absent the manipulation) of TFGP's stock was zero or close to zero; and Lauer manipulated the price of TFGP as part of a scheme to defraud securities investors.[140] *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987) ("[t]he general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." (internal quotation marks omitted)); *Johnson v. Stanhiser*, 85 Cal. Rptr. 2d 82, 84 (Cal. Dist. Ct. App. 1999) (same).

---

[139] SJ Ex. 25, *Hannah Hempstead v. Lauer, et al.*, No. SC 07112 (Los Angeles Super. Ct. Cal.), Judgment in Favor of Plaintiff Hannah Hempstead Against Total Film Group, Inc. And Michael Lauer, May 3, 2005.

[140] SJ Ex. 25, filings from *Hannah Hempstead v. Lauer, et al.*, No. SC 07112 (Los Angeles Super. Ct. Cal.), *id.*; Second Amended Complaint  filed June 20, 2003 at ¶¶ 12-15, *see also* Demurrer filed July 17, 2003; Judgment in Favor of Plaintiff Hannah Hempstead Against Total Film Group, Inc. And Michael Lauer, May 3, 2005.

**2.**   **Lauer Materially Overstated Offshore's NAV as Of December 31, 1999**

69.    Lauer reported to investors that for the period ending December 31, 1999, Offshore's NAV was $732.43 per share, which reportedly represented a net gain of more than 60% for the year.  By virtue of this report, Lauer was able to obtain millions in fees.[141]  In reality, Lauer created these returns by manipulating the market price for three of the portfolio companies (SMX, FFIRD, and TFGP) and having a concentration in two companies (ZI and MHTX) that exceeded the 20% maximum threshold represented to investors in Offshore's PPM.  Hence, as of  December 31, 1999, Lauer reported a NAV for Offshore that was overstated by at least 15%.[142]

70.    As of December 31, 1999, Lauer had no legitimate basis for the $20M valuation he placed on SMX (a 5,600% gain in just three months).  During October 1999, Lauer had Offshore $300,000 to acquire 14M shares of SMX, a pink sheet shell with no operations and *de minimis* assets.  During December 1999, Offshore acquired an additional 2.5M shares for $50,000.[143] Despite still having no operations, Lauer valued all 16.5M shares of SMX at $1.25

---

[141]  Kapila Aff. ¶¶ 15-17, 20-21 (Exs. C.1-(a)); Depo. Ex. 536; & SJ Ex. 29, Offshore F/S 1999 (at L-45-460 & 469).

[142]  Kapila Aff. ¶ 20-21 (Exs. C.1(a) & Depo. Ex. 536 – Offshore Holdings.  As of 12/31/99, Offshore's NAV would be reduced by 1% for each 5.1M reduction of Offshore's assets.  Kapila Aff. ¶ 21 (Ex. C.1).  For Offshore as of 12/31/99, SMX was valued at 20.6M, TFGP was valued at $11.2M and FFIRD was valued at $10.3M, and MHTX and ZI exceeded the 20% threshold by more than $25M and $5M respectively.  *Id.* Consequently, as of 12-31-99, Offshore's NAV was overstated by over 15%.  [Step 1 -- $20.6M + $11.2M + $10.3M + $32.1M + $6 = $80.2.  Step 2 -- $72.1M/$5.1M = 15%].  As of 12/31/99, Partner's net worth was overstated by at least 4% due to its holdings in TFGP ($6.3M) and FFIRD ($2.8M).  Kapila Aff. ¶ 22-23 (Exs. D.1-(a)).

[143]  Pratt Dec., 9/28/06 ¶¶ 4, 10 & 12 (Ex. E); SJ Ex. 26, SMX's Audit for 1999 and 1998; SJ Ex. 27, Re: 2.5M SMX for $50,000; SJ Ex. 31, Offshore Newsletters for November & December 1999; & Cowen Depo. pp. 22-33.

a share in Offshore's portfolio for the period ending December 31, 1999.  Lauer had no basis to price the SMX shares at $1.25, because it was a shell with no operations and no plans to even acquire a business, and this inflated valuation was based on a manipulated closing price he created using his and Offshore's brokerage accounts.[144]  In addition, as of December 31, 1999, Lauer had no legitimate basis for the valuations he placed on Offshore's holdings in TFGP and FFIRD, which were based on closing prices he manipulated.[145]

### 3.  Partners and Offshore were Materially Overstated as of December 31, 2000

71.    Despite the major indexes being down and the Funds two biggest holdings (ZI and MHTX) dropping by at least 50%, Lauer reported to investors that in 2000, Offshore's NAVs had increased by 14.7% to $840.22 per share, and Partners' net worth had increased by at least 12%.  Once again, this report allowed Lauer to obtain millions in fees.[146]  Lauer, however, created these returns by manipulating the market price of four of the Funds' holdings (NUDZ, SMX, FFIRD, and TFGP) that were valued at more than $280M in Offshore and at more than $62M in Partners.  Hence, as of December 31, 2000, Lauer reported a NAV for

---

[144] Lowry Dec. ¶¶ 19-21; Kapila Aff. ¶ 20-21 (Ex. C.1(a)); & Pratt Dec., 9/28/06, ¶ 10.  On 12/31/99, SMX closed at the manipulated price of a $1.00 share.  Nonetheless, he priced it at $1.25 a share in Offshore's portfolio.

[145] Lowry Dec. ¶¶ 9-13; Huard Aff. ¶ 2; Collateral Estoppel findings from CA state case for TFGP; Raker Depo. pp. 17-20 & 121-22; Maum Depo. p. 41; & Depo. Ex. 588.

[146] Kapila Aff. ¶ 15-17, 20-23 & 25 (Exs. C.2-(a) & D.2-(a)); Depo. Exs. 1, 266 & 536; SJ Ex. 30, Offshore F/S for 2000 (at CR031717-18); & TRO Ex. 10 (at 283).

Offshore that was overstated by at least 44%, and a net worth for Partners that was overstated by at least 30%.[147]

72.    Lauer had no legitimate basis for claiming a $70M valuation for NUDZ, especially since it was a shell with no operations.  On December 26, 2000, Lancer purchased 10.9M shares of NUDZ's outstanding stock for $400,000 and three days later acquired 30M more shares and 40M warrants for $350,000.  At the time NUDZ was a shell with no operations and no plans to be acquired.  After marking the close to over $1.00 a share, Lauer valued the $750,000 investment at more than $70M in the Funds' portfolios as of December 31, 2000.[148]

73.    Lauer also had no legitimate basis for the valuations he placed on the Funds' holdings of SMX, FFIRD and TFGP as of December 31, 2000, since the shares' true value was a few pennies.  SMX was a pink sheet shell with no operations that tried to merge with a company (Raceway).  SMX, however, was defrauded in the transaction so it declared the merger null and void.  FFIRD had ceased all operations and was a shell, and TFGP was struggling to stay afloat.[149]

---

[147] Kapila Aff. ¶ 20-21 (Exs. C.2(a) & D.2(a)) & Depo. Ex. 1 – Portfolio Holdings.  As of 12/31/00, Offshore's NAV would be reduced by 1% for each 6.2M reduction of its assets and Partners' net worth would be reduced by 1% for each $2M reduction of its assets.  Kapila Aff. ¶ 21 (Exs. C.2 & D.2).

[148] Pratt Dec. ¶¶ 4a & 6 (Exs. C & H); Lowry Dec. ¶¶ 18 & 25-28; Kapila Aff. Ex. C.2(a) & D.2(a); Steinberg Depo. pp. 14-15, 18-23; 39-42, 44-51, 53-54 & 101-03; Cowen Depo. pp. 56-74; & Depo Exs.  4-5, 8-10, 151-60.

[149] Cowen Depo. pp. 33-57, 64, 74, 116-19, 128-29, 134-35 & 143-45; Lowry Dec. ¶¶ 14-15, 18, 22 & 31-38; Raker Depo. pp. 15-17, 19-25 & 39-43; Maum Depo. p. 87; Hoffman Depo. pp. 33-55, 58-59, 70-72, 110-11, 146-47 & 151-62; TRO Ex. 47 & Depo. Exs. 26-34, 276-78, 287 & 561.

### 4.   <u>Partners and Offshore Were Materially Overstated as of December 31, 2001</u>

74.      Despite the major indexes being down again, Lauer reported to investors in 2001 that Offshore's NAVs had increased by 10% to $915.43 per share, and Partners' net worth had increased by at least 12%.  This report allowed Lauer to obtain millions in fees.[150]  Lauer, however, created these returns by manipulating the shares of six of the portfolio companies (AUG, LHFF, NUDZ, SMX, FFIRD, and TFGP) and making up a market price for FFIR's stock.  Lauer valued these holdings at more than $496M in Offshore, and at over $188M in Partners.   Hence, Lauer reported a NAV for Offshore that was overstated by at least 64%, and a net worth for Partners that was overstated by at least 74%.[151]

75.      Lauer had no legitimate basis for the valuations he placed on the Funds' holdings of AUG, FFIRD, FFIR,  NUDZ, SMX, LHFF and TFGP as of December 31, 2001, since the shares were practically worthless.[152]

---

[150] Kapila Aff. ¶ 15-17, 20-23 & 25 (Exs. C.3-(a) & D.3-(a)); Depo. Exs. 1, 267 & 536; SJ Ex. 30, Offshore F/S for 2000 at CR031717-18; & TRO Ex. 10 (at 283).

[151] Kapila Aff. ¶ 20-21 (Exs. C.3(a) & D.3(a)); Depo. Exs. 6, 13-15, 35-43A, 72 & 636; Lowry Dec. ¶ 14-18, 24, 26, 29-38 & 50-56; & TRO Exs. 27 ¶¶ 13-37, 45 & 53.  As of 12/31/01, Offshore's NAV would be reduced by 1% for each $7.7M reduction of its assets and Partner's net worth would be reduced by 1% for each $2.5M reduction of its assets.  Kapila Aff. ¶ 21 (Exs. C.3 & D.3).

[152] TRO Ex. 23 ¶¶ 5-6, 8 & 11; Pratt Dec., 9/28/06 ¶¶ 7, 9 & 12 (Exs. C, D, F & G); TRO Exs. 46 (at 3) & 47 (at 3); Depo. Exs. 5, 7, 27, 31A, 31B, 69-71, 276-80, 537-39, 548, 553-55, 567-69 & 605-06; & Cowen Depo. 69, 78-87, 116-19, 127-31, 142-47, 462-63 & 469; Maum Depo. 61-62; & Raker Depo. 42-43.

### 5.  **Partners and Offshore Were Materially Overstated as of December 31, 2002**

76.     Lauer reported to investors that as of December 31, 2002, Offshore's NAV was still more than $767 a share, and that Partners' net worth had gone down by just 10% (based on its investment securities still being worth more than $246M).  Lauer, however, created these values by manipulating the shares of six of the Funds' holdings companies (AUG, LHFF, NUDZ, SMX, FFIRD, and TFGP) and making up a market price for FFIR's stock. Lauer valued these holdings at more than $573M in Offshore, and at more than $209M in Partners.  Hence, Lauer overstated Offshore's NAV by at least 75%, and Partners' net worth by at least 86%.[153]  Lauer also had no legitimate basis for the valuations he placed on the Funds' holdings of AUG, FFIRD, FFIR, NUDZ, SMX, LHFF and TFGP, since the shares were worthless or worth pennies a share.[154]

### 6.    **The Funds' 2003 Holdings**

77.     By July 2003, AUG, FFIRD, FFIR, NUDZ, SMX, LHFF and TFGP were not even operating or needed additional financing to survive.  Lauer refused to provide the needed financing.  Notwithstanding these deficiencies, Lauer did not take write-downs

---

[153] Kapila Aff. ¶ 20-21 (Exs. C.4(a) & D.4(a)); Depo. Exs. 51 & 261-64; Lowry Dec. ¶ 14-16, 18, 30, 34-38 & 50-58; TRO Ex. 27 ¶¶ 38-39, 46-50 & 52; SJ Ex. 32, Offshore and Partners Newsletters, 1/20/03.  As of 12/31/02, Offshore's NAV would be reduced by 1% for each $7.6M reduction of its assets and Partners' net worth would be reduced by 1% for each $2.4M reduction of Offshore's assets.  Kapila Aff. ¶ 21 (Exs. C.4 & D.4).

[154] TRO Ex. 23 ¶¶ 7-11; Depo. Exs. 8-9, 27, 31A, 31B, 77-79, 281-85, 550-51, 545-47, 555, 562-64, 570-77, 590, 607 & 614; Cowen Depo. pp. 90-93, 132-34, 146-47 & 488-90; Raker Depo. pp. 46-49 & 79; Maum Depo. 89-90 & 103; Hoffman Depo. 61-67, 70-73, 76-83, 85 & 101-06; & Steinberg Depo. p. 103.

and continued to purchase their stock.  Once Lauer's purchasing of these shares ceased, their market values decreased dramatically.[155]

### 7.    The Valuations Lauer Had Created or Executed Are Flawed

78.    During 2002, in response to pressure from the service providers, Lauer executed memos to Offshore's board regarding valuations of many of the portfolio companies that were baseless.  The values were predicated on (or discounted from) the manipulated share price, based on non-existent mergers, or mergers that could not take place.[156]

79.    Subsequently, Lauer hired Stenton to create valuations that mirrored or closely approximated the values assigned to Offshore's holdings based on the manipulated closing prices at the month's end.[157]  Lauer instructed Stenton to obtain valuations to approximate the current market price.  Lauer felt the valuations were "very creative."[158]

80.    These valuation reports, however, were flawed and did not reflect the true values of the Funds' holdings under generally accepted Uniform Standards of Professional

---

[155] Lowry Dec. ¶¶ 35-37 & 47; Depo. Exs. 43B, 71, 81, 169-70,175-76, 365, 564, 591-95, 609, 629, 633, & 635; Steinberg Depo. pp. 80-85; Hoffman Depo. 149-50 & Raker Depo. pp. 49-51.

[156] Cowen Depo.  pp. 103-125 & 490-91; Depo. Exs. 74, 544, 546-47 & 614; & SJ Ex. 33, Filings Regarding a June 12, 2002 agreement entered into by American Home Mortgage and Columbia National for American to purchase Columbia National.  Even though Columbia had already agreed to be purchased, on June 20, 2002, Lauer claimed to Offshore's board that FFIRD "entered into discussions, which continue, to purchase Columbia.  *Id.*; Depo. Ex. 546 & Raker Depo. pp. 85-88.

[157] TRO Exs. 7; Ex. 19; Ex. 20.

[158] Cowen Depo. p. 122-123 & 292.

Appraisal Practice.  The valuations were based upon (i) unreliable market prices of thinly traded securities; (ii) baseless and unrealistic projections; (iii) improper hypothetical appraisals; or (iv) incorrectly averaged various factors.   Under accepted appraisal standards, many of the Funds' holdings were essentially worthless or at most worth pennies a share.[159]

**DISCUSSION**

The Commission's Complaint alleges that Lauer violated Sections 17(a)(1)-(3) of the Securities Act (Counts I and III), Section 10(b) and Rule 10b-5 of the Exchange Act (Count II), Sections 206(1) and (2) of the Advisers Act (Count V), and, as control person of Defendants Lancer and Lancer II, pursuant to Section 20(a) of the Exchange Act, is jointly and severally liable for their violations of Section 10(b) and Rule 10b-5 of the Exchange Act (Count IV).

A.   **Sections 17(a)(1)-(3) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act**

Sections 17(a)(1)-(3) of the Securities Act, which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) and Rule 10b-5 of the Exchange Act, which proscribe fraudulent conduct in connection with the purchase or sale of securities, both prohibit essentially the same type of practices. *United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979).   To establish violations of the anti-fraud provisions, the SEC must show Lauer: (1) made a false statement or omission; (2) that

---

[159] TRO Ex. 23 ¶¶ 5, 6[f], 7[h], 8[i], 9, 10[j] & 11 Pratt Dec., 9/28/06, ¶ 3; SJ Ex. 15, Geist Declaration ¶ 10.

was material; (3) that he acted with scienter;[160] and (4) that these acts were taken in the offer or sale, or in connection with the purchase or sale of securities. *German v. SEC*, 334 F.3d 1183, 1992 (10th Cir. 2003); *SEC v. Corporate Relations Group*, 2003 U.S. Dist. Lexis 24925 at *24 (M.D. Fla. Mar. 28, 2003). The SEC also must show the involvement of interstate commerce, the mails, or a national securities exchange. *Id.*, at *24.

>    1.    **False Statements and Omissions**

A defendant makes a false statement when he "acting alone or with others, creates a misrepresentation." *In re Enron Corp. Sec. Litig.*, 235 F. Supp. 2d 549, 588 (S.D. Tex. 2002). This can encompass participating in a course of business that operates as a fraud on the buyers or sellers of stock. *SEC v. Zandford*, 535 U.S. 813, 819-22 (2002); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53 (1972).

Lauer made false statements and omissions within the meaning of the federal securities laws in the offer or sale and in connection with the purchase or sale of investments in the Funds via: (a) private placement memoranda; (b) investor newsletters; (c) fictitious portfolios; (d) telephone conferences and other meetings with investors; and (e) materially false and misleading net asset values ("NAV's") for the Offshore Funds and the net worth for Partners. Some of these misrepresentations and omissions involved the portfolio positions, the status of Partners' audits, the concerns and ultimate resignations of the Funds' domestic auditor and offshore administrator, the

---

[160] The SEC need not show scienter to prove violations of Sections 17(a)(2) and (a)(3) of the Securities Act - only negligence. *Aaron v. SEC*, 446 U.S. 680 (1980). Scienter is only applicable to Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act. *Id.*

background and employment of key personnel, excessive concentration of the illiquid and essentially worthless positions in Offshore, and the whereabouts of the Funds' assets.[161]  For example:

> Citco Fund Services (Curacao) N.V. ("Citco") - - the administrator for Offshore and Omnifund which resigned in 2002 - - was "uneasy with Mr. Lauer's portfolio" in light of concerns about valuation, illiquidity, and an implosion, and believed there were "serious indications that Lancer is manipulating the market price" of its holdings.  Instead, of disclosing these issues, Lauer created a "script" when dealing with any third-party inquiries that Citco's termination was a "mutually and amicably agreed" upon.  [PSF ¶¶ 27].

> Like Citco, Partners' auditor, Goldstein Golub Kessler, LP's ("GGK"), had concerns about Lauer's integrity, the concentration of thinly traded shell companies, illiquidity, and the valuations in light of the shells' lack of operations. GGK heard Lauer misrepresent to investors that GGK's delay in issuing its 2001 audit opinion had nothing to do with valuation issues.  In response, GGK resigned, and the 2001 audit for Partners was never issued. [PSF ¶¶ 36 & 58-59].

> Lauer claimed in investor newsletters that the Funds' performance resulted from their owning a number of portfolio positions that the funds did not truly own or owned in amounts materially different than Lauer had represented.  [PSF ¶¶ 50-53 & 55].

> Lauer falsely stated in investor newsletters that James Raker had been hired as a new CFO "with a strong financial background."  Lauer also misled investors about the background of Bruce Cowen, whom Lauer referred to his newsletters to as "Managing Director of the Lancer Group."[162]  [PSF ¶¶  54 & 56-57].

---

[161]  PSF ¶¶ 5-6, 13-16, 19-20, 23-24, 27, 32-68 & 70-81.

[162] During 1999, Cowen was enjoined and barred from acting as an officer or director.  Since Cowen's bar was less than five years old when Lauer omitted it from his 2002 newsletter, it clearly should have been disclosed.  *See SEC v. Freeman*, Fed. Sec. L. Rep. (CCH) ¶¶ 96, 361 (N.D. Ill. 1978) (regulatory bar should have been disclosed when touting background and business acumen).

Lauer misrepresented in Offshore's PPMs to investors that "[n]o more than 20% of the gross asset value of the Fund may be lent to or invested in the securities of any one issuer." Lauer violated this provision on numerous occasions by having more than 20% of Offshore's gross assets in one issuer. [PSF ¶ 32].[163]

Lauer misrepresented in Offshore's PPMs under a section titled "Investment Restrictions" that the fund may "not take or seek to take legal or management control of the issuer of any of its underlying investments." In direct contravention of this restriction, Offshore repeatedly acquired a controlling interest over several issuers, such as Augment Systems, Inc./Biometrics Security Technology, Inc. ("AUG"), Nu-D-Zine, Inc./Xtracard Services, Inc. ("NUDZ"), and Fidelity First Financial Corp. ("FFIRD"). [PSF ¶ 33].

Lauer misrepresented in Offshore's PPMs that Banc of America ("BOA") "is entrusted with the safe custody of all the assets of the [Offshore] Fund" In reality, BOA did not hold a material amount of the Funds' assets, enabling Lauer to claim as assets positions that the Funds did not actually own. This allowed Lauer to overstate the NAV of Offshore by at least 27% or $217M for the period ending December 31, 2002, because Lauer claimed millions of shares that cannot be located. [PSF ¶¶ 30 & 34].

Lauer represented in Partners' and Offshore's PPMs that these entities' financial statements would be prepared in accordance with generally accepted accounting principles in the United States ("GAAP"). In reality, they were not prepared in accordance with GAAP. [PSF ¶¶ 5-6 & 23-24].

Lauer also made misrepresentations and omissions by providing investors with fake "model" portfolios that were materially false and misleading. These falsified portfolios contained portfolio positions that the Funds did not actually own and omitted shells that comprised a material amount of the Funds' purported values. Lauer personally provided these fake portfolios in written form (it appeared that these written portfolios were

---

[163] Lauer violated this provision, because as of Dec. 31, 1999, more than 25% and 21% of Offshore's gross assets consisted of Manhattan Scientific, Inc. ("MHTX") and Zi Corp ("ZI"), respectively. Also, as of Dec. 31, 2000, more than 27% of Offshore's gross assets consisted of SMX, Corp. ("SMX").

generated by BOA, but in reality they were not) or orally to some of the Funds' largest investors. Investors uniformly testified that these contrived portfolios were materially different than the Funds' actual portfolios.[164] For example, Lauer provided the University of Montreal Pension Fund with a fake portfolio for Offshore with the notation "Per your request, ML." The fake portfolio listed more than $219M worth of securities that Offshore did not actually own and did not disclose that Lauer valued Offshore's position in NUDZ at more than $100M. Lauer did this even though NUDZ had no operations. Lauer valued SMX at more than $264M, even though it was a pink sheet shell with no business operations[165] In addition, Lauer lied in public filings about the Funds' positions or failed to file the required disclosures with the Commission.[166]

Moreover, Lauer made misrepresentations and omissions regarding the value and performance of the Funds. Nearly every newsletter that Lauer sent investors compared the respective Funds' performance to the major stock indexes. The newsletters noted

---

[164] PSF ¶¶ 37-48.

[165] PSF ¶¶ 38-41.

[166] PSF ¶ 48. Lauer failed to file required disclosures mandated by Sections 13 and 16 of the Exchange Act (which require filings if beneficial owner of more than 5% of the outstanding shares (Section 13) or more than 10% of the outstanding shares (Section 16) by failing to disclose the Funds' huge interests in AUG (upwards of 90%) and ZI (nearly 50%) and on the rare occasions when Lauer did make such filings on at least one occasion involving the Funds; huge position in MHTX, such filing was false. [PSF ¶ *Id*.]. Lauer's material misrepresentation of the Funds' holdings and failure to make the required filings is another basis for why he violated Section 10b and Rule 10b-5 of the Exchange Act. *See U.S. v. Bilzerian*, 926 F.2d 1285, 1298 (2nd Cir. 1991) (A duty to file under 13D "creates the duty to file truthfully and completely" and "false and misleading statement made on a Schedule 13D may be actionable under the antifraud provision of [Section] 10b.") [Citations omitted].

that those indexes declined significantly in 2000-01 while the Funds purportedly increased in value.[167]

In reality, the Funds performance was inflated by shell corporations. Generally, Lauer purchased huge controlling stakes in these shells for pennies a share and valued tens of millions of these shells' shares in the Funds' portfolios based on the closing prices that he artificially created by buying their shares at the end of the month. Had the shells not been included in the portfolio, the valuations would have plunged.[168] Lauer's manipulation of the Funds' holdings enabled him to obtain illegally tens of million of dollars in fees by materially overstating the Funds' valuations. As demonstrated below, this material overstatement permeated the Funds' portfolios:

> As of December 31, 1999 -- Lauer falsely claimed that Offshore increased in value by 60%. In reality, Lauer concocted these returns by manipulating the market price for three of the portfolio companies (SMX, FFIRD, and TFGP) and having a concentration in two companies (ZI and MHTX) that exceeded the 20% maximum threshold. Hence, as of December 31, 1999, Lauer reported an NAV for Offshore that was overstated by at least 15%. [PSF ¶¶ 70-71].

> As of December 31, 2000 -- Despite the major indexes being down and the Funds' two biggest holdings (ZI and MHTX) dropping by at least 50%, Lauer falsely claimed Offshore's NAV had increased by 14.7%, and Partners' net worth had increased by at least 12%. Lauer created these returns by manipulating the market price of the Funds' holdings (NUDZ, SMX, FFIRD, TFGP) that he fraudulently valued at more than $280M in Offshore, and at more than $62M in Partners. Hence, as of December 31, 2000, Lauer reported a NAV for Offshore that was overstated by at least 44% and a net worth for Partners that was overstated by at least 30%. [PSF ¶¶ 72-74].

---

[167] PSF ¶¶ 10, 61, 63, 72 & 75.

[168] PSF ¶¶ 11-13 & 62.

As of December 31, 2001 -- Despite the major indexes being down again, Lauer falsely claimed Offshore's NAV had increased by 10%, and Partners' net worth had increased by at least 12%. Lauer fashioned these returns by manipulating the shares of six of the portfolio companies (AUG, Lighthouse Fast Ferry ("LHFF"), NUDZ, SMX, FFIRD, and TFGP) and by making up a market price for First Fidelity ("FFIR") stock. Lauer fraudulently valued these holdings at more than $496M in Offshore, and at over $188M in Partners. Hence, Lauer reported an NAV for Offshore that was overstated by at least 64% and a net worth for Partners that was overstated by at least 74%. [PSF ¶¶ 75-76].

As of December 31, 2002 -- Lauer reported that Offshore's total assets were still worth more than $800M and Partners' total net worth was more than $246M. Lauer manufactured these values by manipulating the shares of six of the portfolio companies (AUG, LHFF, NUDZ, SMX, FFIRD, and TFGP) and making up a market price for FFIR's stock. Lauer fraudulently valued these holdings at more than $573M in Offshore and at more than $209M in Partners. Hence, Lauer reported an NAV for Offshore that was overstated by at least 75% and a net worth for Partners that was overstated by at least 86%. [PSF ¶ 77].

The Receiver who was appointed over the Funds in July 2003, recovered less than $4M and a portfolio worth less than $60M.[169] The undisputed facts clearly show that there is no genuine issue of material fact regarding Lauer's violation of the anti-fraud provisions of the federal securities laws.

## 2.   Lauer's False Statements and Omissions Were Material

Information is deemed material if there is a substantial likelihood that the misrepresented or omitted facts would have assumed actual significance in the deliberations of a reasonable investor. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also*

---

[169] PSF ¶10. Less than seven months earlier, Lauer was claiming that the Funds were worth more than a billion dollars. Hence, either more than $900M evaporated in little more than six months or Lauer's valuations were materially misleading. Plainly, the facts demonstrate the latter.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976); *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir. 1982).

An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 231-32; *Carriba Air.*, 681 F.2d at 1323 (a statement is material if "a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action").

Lauer made material misrepresentations and omissions to investors regarding, among other things: (1) the Funds' portfolio valuation, concentration, and true contents; (2) Lauer's trading strategy; (3) the safety and liquidity of the investments; (4) Lauer's self-dealing; (5) the resingnations of Citco and GGK; and (6) the manipulation of assets in the Funds' portfolio.  Moreover, Lauer issued fraudulent newsletters to investors indicating exorbitant returns - - which investors attributed to Lauer's professed market strategy - - when, in fact, Lauer and his cohorts created these bogus returns by artificially inflating the Funds' portfolios, making material omissions about key Lancer personnel, and misrepresenting the value and true ownership of various companies.[170] These falsehoods and omissions were clearly material.

---

[170]  PSF ¶¶ 20, 27, 40-47, 49, 51-68 & 70-81.

Notably, any and all doubt about whether Lauer's false statements and omissions were material is eliminated when one considers that Lauer overstated the value of Offshore by at least 75% and Partners by at least 86%.[171]

Lauer's strategy to provide investors with sham portfolios is obviously material as well.  Numerous investors have testified that they were surprised and upset to discover that the Funds invested in shell companies.  Had they known that Lauer was investing in such stocks, they would have withdrawn their money and not made any subsequent investments.[172]

The representations by Lauer of large returns from an investment in the Funds and the glowing comparisons between the Funds' returns and the performance of other indexes constituted material misrepresentations.  As previously detailed, the portfolios' performances had no reasonable basis in fact.[173]  *See SEC v. Haffenden-Rimar Int.*, 362 F. Supp. 323, 327 (E.D. Vir. 1973) (court held that defendants knowingly and materially violated antifraud provisions when falsely promised returns).

---

[171]  PSF ¶ 77.

[172]  PSF at ¶37-49.

[173]  PSF ¶¶ 60-78.  The SEC has provided evidence from one of the foremost experts regarding valuations, Shannon Pratt, that the shells were worth no were not worth a fraction of the amount Lauer valued them.  In stark contrast, the valuators hired by Lauer, Milton Barbarosh and George Levie, refused to stand behind their work and asserted their Fifth Amendment privileges to all the SEC's deposition questions.  PSF ¶¶ 21 & 79-81.

### 3.    Lauer Acted With Scienter

Lauer's actions demonstrate a callous disregard for others, including investors in Partners to whom he owed a fiduciary duty.[174]  The SEC must show that Lauer acted with scienter,[175] which the courts have defined as either knowing misconduct or severe recklessness – extreme departure from the standards of ordinary care.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *Carriba Air*, 681 F.2d at 1322.[176]

Evidence of Lauer's scienter is plentiful.  For instance, Lauer knew the "model" portfolios he provided to investors were false.  Lauer was the one who masterminded their creation and took pains to keep these portfolios secret, misleading even his own analyst, Jimmy Tskani, about the Funds' actual holdings in shells.[177]  Also, Lauer knew the inflated NAVs listed in investor newsletters were the intended product of his marking-the-close manipulation scheme.  Indeed, it was Lauer who decided what the

---

[174]  PSF ¶ 2.

[175]  While scienter is required to establish violations of Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, it is not required to establish a violation of Sections 17(a)(2) or 17(a)(3) of the Securities Act; a finding of mere negligence is sufficient.  *Aaron v. SEC*, 446 U.S. 680, 696-702 (1980); *SEC v. Liberty Capital Group, Inc.*, 75 F. Supp. 2d 1160, 1163 (W.D. Wash. 1999).

[176]  The Eleventh Circuit has defined severe recklessness as involving "highly unreasonable omissions or misrepresentations . . . that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989) (citation omitted).

[177]  PSF ¶¶ 25 & 37-49.  When Tskani, who did not have access to the Funds, asked Lauer why he was having him place so many trades for AUG, NUDZ, SMX and TFGP, Lauer told him that he was "adding" to small positions.  PSF ¶ 25 (Tskani Depo. p. 63 & 77).  In truth, these securities where huge positions and comprised an overwhelming majority of the Funds' purported value.  PSF ¶¶ 77.

Funds' NAVs should be each month.[178]  As aptly stated by Joseph Huard, who executed

trades for Lancer:

> Basically, Lancer was ripping off their customers.  What they were doing was
> moving the price up in stock in Lighthouse that it owned to get a high value for
> it when the day before it wasn't.  They were doing that to get it up so they
> could get, they would get their management and incentive fee on the
> increase.[179]

Underscoring Lauer's scienter is his conduct with work associates; in orchestrating

the fraud, he skillfully used others to achieve his goals.  For example, Cowen recalled

that when the market was down in 2000 and 2001, Lauer targeted Lancer's performance

at 7 to 10% so the Funds' performance would not encourage redemptions:

> I observed – I heard him [Lauer] tell Mr. Garvey what he wanted the fund to
> approximate.  And what I mean by that is it would be – have looked at the
> different indexes, like Dow Jones, NASDAQ, Russell 2000, S&P and say, you know,
> they're down or flat, and I want the fund up two percent.  And then it would be
> up to Mr. Garvey to figure out how to get to that level.[180]

Lauer's scienter is further highlighted by his active role in acquiring non-operating

shell corporations with few or no assets in order to control their closing price at month's

end and enhance the artificial valuations in the Funds' portfolios.  The following excerpt

from Cowen's deposition in this matter regarding a December 2000 memorandum he

faxed to Lauer pertaining to the purchase of Nu-D-Zine illustrates Lauer's knowledge of

the fraud:

---

[178]  PSF ¶ 63.

[179]  PSF at ¶ 66 (Huard Depo., 2/7/05, pp. 60-61, emphasis added).

[180]  PSF ¶ 63, Cowen Depo. pp. 122-125.

Q   And what -- so on December 26th of 2000, what percentage of -- of the outstanding stock of Nu-D-Zine was Lancer going to acquire?

A   94.5 percent.

* * *

Q   And did Nu-D-Zine have a business in it when it was purchased?

A   At that point in time, it was -- businesses were removed, so it was a clean shell, no, no business.

Q   Do you have an understanding of -- of -- there's a -- you wrote "Inside Market .155 cents bid, .625 ask." Why were you conveying that to Mr. Lauer?

A   This stock was not a -- it was a very thinly traded share -- stock.  So it had a very large spread between the bid and the offer or the bid and the ask.  What I was trying to do in this memo was to give him all the information regarding the shell.  This is information that would be useful to him, and one of the things that you could look at is if the stock closed at the bid or the offer, it could have a wide difference on what the valuation is.  I mean, the difference between 15 ½ cents and 62 cents is four times.  I mean, usually the difference in spread between the bid and the offer is a penny or two or a very small percentage.

Q   And why would Mr. Lauer -- what was your understanding of why Mr. Lauer would care about what the bid and the ask were?

A   Well, the reason is that -- I state later is after 62 ½, the stock -- the next offer -- or the next ask goes to a dollar five.  It just shows how thinly traded the shares are and that the stock could be moved up what looked like easily.

* * *

Q   And there's a statement under the strategy that you wrote to Mr. Lauer.  It says, "Move the offer or close year at .625." What did you mean by that?

A   I just basically told him that if the stock closed at 62 ½ cents, his $700,000 investment, which was the purchase of the shell for $400,000 plus putting $300,000 into the shell, would have a potential market value of $49 million.

* * *

Page 54 of  67

Q   So from December 26th through the end of the year, five days later, did any business go into the Nu-D-Zine shell?

A   Absolutely not.

Q   Were there any plans to put anything else into the Nu-D-Zine shell as of December 31st, 2000?

A   Not to my knowledge, and I would be someone that would know.

Q   So are you -- do you have any -- was it – do you believe it was reasonable for Lancer to ascribe over $70 million of value to its holdings in Nu-D-Zine that it had acquired on December 26th for 700,000?

A   Absolutely not.

Q   Why not?

A   This was a company that just had $300,000 in cash, nothing else.  It probably was worth $300,000, plus a value of, you know, having to put a business in it. But the number, you said, was $70 million.  He wouldn't go out and pay $70 million in the open market for it.  Nobody would.

Q   And was Mr. Lauer aware of the financial condition of Nu-D-Zine, do you believe, as of December 31st, 2000 that was just a shell?

A   He approved the purchase of the shell.  So he needed to know -- he wanted the details.  It was his approval before a shell was purchased.  So the answer is yes.[181]

Moreover, Lauer knew that he was indulging in repeated self-dealing, using the Funds' assets for his own personal benefit.  For example, Lauer loaned $1.9 million to TFGP to help fund the remake of a movie.  The film was never made, the loan was in default, and TFGP could not repay the loan to Lauer.  Instead of taking a loss on this

---

[181]  PSF ¶¶ 26, 63 & 71, (Cowen Depo. pp. 59-65, citing to Depo. Ex. 4, emphasis added)].

worthless debt, Lauer used investors' money to have Partners buy him out for $1.9 million.  Therefore, instead of Lauer personally losing $1.9M on a bad loan, the investors lost $1.9M.

Lauer also used investors' funds to obtain securities for no consideration.  For instance, when Offshore paid $400,000 to take control of BMTS, Lauer simultaneously personally acquired a self dealt bonus of 50 million warrants at no cost.[182]

Punctuating Lauer's scienter is his effort to deceive investors regarding why Lancer's auditor, GGK, had failed to issue its 2002 audit.  Specifically, Lauer represented to investors that the audit was underway, even though GGK had not even sent out an engagement letter and he had not provided GGK with documents it deemed necessary for its audit.  Lauer - - while representing that the delay in GGK's audit had nothing to do with valuation issues - - knew or was severely reckless in not knowing that GGK had concerns about the valuation and concentration of shell corporations in the Funds' portfolios.[183]  This pattern of deception is enough to establish Lauer's scienter.

---

[182]  PSF ¶ 14.

[183]  PSF ¶¶ 58-59.  Similarly to GGK, Citco resigned in 2002, because it was "uneasy with Mr. Lauer's portfolio" in light of concerns about valuation, illiquidity, and an implosion.  Lauer's scienter is further demonstrated by the "script" he created when dealing with third party inquiries stating that Citco's termination was "mutually and amicably agreed" upon.  PSF ¶ 27.

### 4.     Lauer's Conduct Meets The "In Connection With" Test

The Commission must show that Lauer's conduct occurred in the offer or sale of securities (17(a)) or in connection with the purchase or sale of securities (10(b) and Rule 10b-5).  The Supreme Court has held that the federal courts should broadly interpret this "in connection with" requirement of the securities laws to effectuate their remedial purpose.  *Zandford,* 535 U.S. at 819.  Statements or omissions made with regard to trading in general, not just particular transactions, meet the "in connection with" requirement.  *In re Carter-Wallace Sec. Litig.*, 150 F.3d 153, 156 (2$^d$ Cir. 1998) (company statements in technical medical journals were in connection with trading of securities); *SEC v. Rana Research,* 8 F.3d 1358, 1362 (9th Cir. 1993) (press releases were in connection with stock trading).

Lauer's misrepresentations and omissions, individually and as a control person, were made in connection with the purchase and sale of investments in the Funds. Investors purchased and sold hundreds of millions of dollars of the Funds' securities while Lauer was conducting his fraudulent scheme and Lauer used his own brokerage account more than 70 times in connection with the marking the close scheme.[184]

---

[184]  PSF ¶¶ 10, 13-14, 60 & 64.

### 5. Interstate Commerce

Lauer used the telephone, facsimile, and e-mail lines to contact investors all over the world.  Furthermore, Lauer and the defendant entities mailed correspondence and, in at least one instance, sent a fake portfolio, to an investor.[185]  Thus, the Commission has shown Lauer used interstate commerce.

Based on the above, the SEC has proven all of the necessary elements to show Lauer violated the Sections 17(a)(1)-(3) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act.

### 6. Lauer's Liability as a Control Person

Section 20(a) of the Exchange Act imposes liability on a control person for violations by an entity, unless the person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.  The test for control person liability requires a showing that the defendant had the power to control the general affairs of the entity primarily liable and had the requisite power to directly or indirectly control or influence the specific corporate policy that resulted in the primary liability.  *Brown v. Enstar Group*, 84 F.2d 393, 396-97 (11th Cir. 1996).  For liability to attach, the defendant need not have actually exercised control over nor participated in the specific transaction or activity constituting the violation.  *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981).   As to Lancer

---

[185]  PSF ¶¶ 37, 39 & 60.

Management, an adverse inference could be drawn that two of its principals, Martin Garvey and Eric Hauser, both 10% owners, asserted their Fifth Amendment privilege against self-incrimination to all questions asked by the SEC.  A number of courts have drawn adverse inferences against Defendants in similar situations.[186]  *See F.D.I.C. v. Fidelity & Deposit Co. of Maryland*, 45 F.3d 969, 977-78 (5th Cir. 1995) (where the Fifth Circuit held that evidence of a non-party's invocation of the Fifth Amendment privilege is admissible so long as it is relevant and its probative value is not outweighed by the danger that it may unfairly prejudice the party to that suit).

Lauer used his control over Lancer Management and the Funds to create a labyrinth of fraud and was directly responsible for the misrepresentations and lack of disclosure.  This is hardly surprising, because Lauer owned 80% of Lancer Management, was the Funds' founder, director, and portfolio manager, and was the single biggest beneficiary from his scheme.[187]  Lauer directed the Funds' day-to-day activities, met with investors, prepared and disseminated periodic newsletters, and handled redemption requests.[188]  Lauer also valued the Funds, determined the securities in which the Funds would invest, and decided what their "target price" should be at month's end.[189]  In

---

[186]  PSF ¶ 17.  Both David Newman, who handled back office duties for the Funds, and Laurence Isaacson, who ran a number of the shells, also asserted their Fifth Amendment privileges against self-incrimination to the SEC's questions. PSF ¶¶ 18 & 22.

[187]  PSF ¶¶ 1-3, 10-14, 20, 28, 44-47, 70 & 72.

[188]  PSF ¶¶ 3, 8-9 & 39.

[189]  PSF ¶¶ 26 & 63.

addition, he approved negotiations for equity purchases or loans made on behalf of Lancer, wrote or approved investor newsletters, made funding decisions for the shell corporations, prepared investor correspondence, and conducted conference calls with investors.[190]

As demonstrated above, Lancer Management violated Sections 10(b) and Rule 10b-5 of the Exchange Act.  Since Lauer controlled Lancer Management when these violations occurred, Lauer also violated Sections 10(b) and Rule 10b-5 of the Exchange Act, pursuant to Section 20(a) of the Exchange Act.

### B.    Sections 206(1) and (2) of the Advisers Act

Sections 206(1) and 206(2) of the Advisers Act prohibit an investment adviser from employing any device, scheme, or artifice to defraud clients or engage in any transaction, practice, or course of business that defrauds clients.  Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be "in the offer or sale of any" security or "in connection with the purchase or sale of any security."  Advisers Act Release No. 1092, 6 Fed. Sec. L. Rep. (CCH) ¶ 56,156E, at 44,057-7 to 44,058 (Oct. 8, 1987).  To establish a violation of Section 206(1) of the Advisers Act, the Commission must prove scienter. *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981).[191]  In addition, a misstatement or omission must be material.  As demonstrated

---

[190] PSF ¶¶ 3-4, 14, 60-64 & 78.

[191] On the other hand, scienter is not required to establish a violation of Section 206(2) of the Advisers Act.  *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963); Steadman, 603 F.2d at 1133.

above, Lauer and Lancer Management violated Sections 206(1) and (2) of the Advisers

Act, because the SEC has shown all of the elements for liability under Section 17(a) of

the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act, which are more

stringent than the requirements to violate Sections 206(1) and (2) of the Advisers Act.

### THE REQUESTED RELIEF

### A.    Permanently Enjoining Lauer

The SEC is entitled to a permanent injunction if it establishes a prima facie case

of previous violations of the securities laws and a reasonable likelihood the defendant

will repeat the wrongs.  *S.E.C. v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004).  It is

important to remember the SEC appears in this matter "not as an ordinary litigant, but

as a statutory guardian charged with safeguarding the public interest in enforcing the

securities laws."  *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2[d] Cir. 1975).

It therefore does not have to show irreparable injury or a balance of the equities in its

favor.  *See, e.g., SEC v. Unifund SAL,* 910 F.2d 1028, 1036 (2[d] Cir. 1990).

The SEC has established Lauer's past violations of several securities laws.   In

determining whether there is a reasonable likelihood that Lauer will repeat his violations

if not enjoined, the Court should consider: (1) the egregiousness of the defendant's

actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter

involved; (4) the defendant's recognition of the wrongful nature of his conduct; (5) the

sincerity of the defendant's assurances against future violations; and (6) the likelihood

the defendant's occupation will present opportunities for future violations.  *Calvo,* 378 F.3d at 1216.

The application of these factors to this case leads inexorably to the conclusion that a permanent injunction is warranted.  The SEC has shown Lauer violated the antifraud provisions of the federal securities laws by conducting an elaborate scheme to defraud investors, including artificially inflating the Funds' NAVs, writing and issuing false and misleading PPMs and investor newsletters, and providing sham portfolios to investors.  Lauer's conduct was egregious, pervasive, premeditated and resulted in the loss of hundreds of millions of dollars in investors' funds.  Over the course of years, Lauer provided investors with investment materials, including portfolios and newsletters that were blatantly false and misleading.  Lauer's scienter is highlighted by the pains he took to hide the contents of the portfolios and the intricate nature of the fraud.  Furthermore, Lauer has made no assurances against future violations.  To the contrary, he maintains a position of innocence in the face of overwhelming evidence to the contrary and refuses to recognize the wrongful nature of his conduct or accept responsibility for his actions.  Based on these factors, a permanent injunction prohibiting Lauer from committing future violations of the securities laws is warranted.

### B.    Disgorge His Ill-Gotten Gains

Disgorgement is designed both to deprive a wrongdoer of unjust enrichment and deter others from violating the securities laws.  *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989); *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1103-04 (2[d]

Cir. 1972) ("the effective enforcement of the federal securities laws requires that the SEC be able to make violations unprofitable").  Where, as here, the fraud is pervasive, the Court should order the wrongdoer to disgorge all profits stemming from the scheme. *CFTC v. British Am. Commodity Options Corp.*, 788 F.2d 92, 93-94 (2$^d$ Cir.), *cert. denied*, 479 U.S. 853 (1986).  "The District Court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged."  *SEC v. First Jersey Sec. Inc.*, 101 F.3d 1450, 1475 (2$^d$ Cir. 1996), *cert. denied*, 522 U.S. 812 (1997).

The burden on the SEC for "showing the amount of assets subject to disgorgement (and therefore available for freeze) is light."  *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005).  All that is required is "a reasonable approximation of a defendant's ill-gotten gains . . .  Exactitude is not a requirement."  *Id.*; *First City*, 890 F.2d at 1231. It is well recognized that it is often impossible to calculate disgorgement with precision and exactitude.  *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 171 (2d Cir. 1980).  Any risk of uncertainty about exact amount received falls on the wrongdoer whose illegal conduct created the uncertainty.  *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341 (S.D.N.Y.  2002) (stating that the risk of uncertainty falls on defendants since fraudsters rarely keep accurate records of the proceeds of their crimes).  Once the SEC makes a demonstration, the burden shifts to the defendant to demonstrate that he received less than the full amount sought to be disgorged.  *SEC v. Robinson*, 2002 WL 1552049 at *5-6 (S.D.N.Y. 2002).

Many factors influence the award of damages, and these factors are ordinarily heavily fact-intensive.  In this case, the amount to be disgorged is limited to the amount, with interest, by which Lauer profited from the wrongdoing.  *Securities and Exchange Commission v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978).   This determination is necessarily very fact-intensive and the Court declines to determine the amount of damages on the instant motion for summary judgment.  The Court will reserve on the question of the amount that should be disgorged until it has had an opportunity to conduct an evidentiary hearing on the issue.

### C.    Civil Penalties

The SEC seeks civil penalties against Lauer pursuant to Section 20(d) of the Securities Act, Section 21(d) of the Exchange Act, and Section 209(e) of the Advisers Act. The purpose of a civil penalty is to punish the individual violator as well as deter future violations.  *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998).  The SEC requests that the Court reserve jurisdiction to impose a specific civil penalty until its five-member Commission in Washington, D.C. has had the opportunity to meet and recommend a specific penalty amount.

### CONCLUSION

The uncontroverted facts show, among other things, that Lauer:

(1) controlled Defendants Lancer Management Group and Lancer Management Group II, LLC (collectively the "Corporate Defendants"), which controlled the Funds (PSF ¶¶ 1-9 & 11);

(2) materially overstated the Funds' valuations for calendar year-ends 1999-2002 (PSF ¶¶ 69-78);

(3) manipulated the prices of seven securities that where a material portion of the Funds' portfolios from November 1999 through at least April 2003 (PSF ¶¶ 61-67);

(4) failed to provide any basis to substantiate or explain the exorbitant valuations of the shell corporations that saturated the Funds' portfolios (PSF ¶¶ 69-80);

(5) violated the express terms of the Offshore Fund's PPM's by having Offshore concentrate over 20% of its holdings in one company; by not having Bank of America hold its assets for safekeeping; and by taking legal and management control of the companies Offshore invested in (PSF ¶¶ 30-34);

(6) violated the express terms of the respective Funds' articles of incorporation and PPM's by failing to present the Funds' financial statements in accordance with GAAP (PSF ¶¶ 5, 15, 23-24, & 57-58);

(7) hid or lied to investors about the Funds' actual holdings by providing them with fake portfolios; by falsely representing the Funds' holdings in newsletters; and by lying in, or failing to file, required disclosures (PSF ¶¶ 37-53 & 55);

(8) provided material misrepresentations and omissions about the Funds' personnel, why the Offshore administrator resigned; and the status of the Partners' Fund audit (PSF ¶¶ 27 & 54-58);

(9) is collaterally estopped from claiming he did not manipulate Total Film Group's stock (PSF ¶ 68); and

(10) provides no evidence disputing the amount of money received by the Funds, the Corporate Defendants, and himself, and the specific transactions that he used to further loot the Funds, such as using investors' funds to buy him out of a $1.9M defaulted loan, to purchase a Cessna aircraft and Mercedes C-11 racecar, and obtaining tens of millions of securities for no consideration (PSF ¶¶ 10 & 13-14).

Accordingly, since these uncontroverted facts overwhelmingly demonstrate Lauer violated the federal securities laws, summary judgment is appropriate in this case.  It is hereby

**ORDERED AND ADJUDGED** that Plaintiff Securities and Exchange Commission Motion For Summary Judgment Against Defendant Michael Lauer **[DE 1737] is GRANTED IN PART AND RESERVED IN PART**.  Summary judgment is granted against Michael Lauer on Counts I-V of the Complaint.  Michael Lauer is permanently enjoined from future violations of Sections 17(a)(1)-(3) of the Securities Act, Section 10(b) and Rule 10b-5 of the Exchange Act, and Sections 206(1) and (2) of the Advisers Act.  The amount Lauer is to pay in disgorgement and prejudgment interest thereon is reserved until an evidentiary hearing can be held on the amount of damages.  The Court reserves jurisdiction to impose civil money penalties against Lauer.  The SEC may file an appropriate motion for civil penalties within 60 days of the entry of summary judgment in favor of the Commission.  It is further

ORDERED AND ADJUDGED that Defendant Michael Lauer's Motion For Order to Stay the Securities and Exchange Commission's Litigation Against the Defendant During the Pendency of the Criminal Case **[DE 2095] is DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 23rd day of September, 2008.

 

 

_____
KENNETH A. MARRA
United States District Judge

copies to:

Michael Lauer
All counsel of record
Magistrate Judge Linnea R. Johnson