UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 03-80612-Civ-MARRA/JOHNSON

SECURITIES AND EXCHANGE COMMISSION

        Plaintiff

vs.

MICHAEL LAUER,
LANCER MANAGEMENT GROUP, LLC, and
LANCER MANAGEMENT GROUP II, LLC

        Defendants

and

LANCER OFFSHORE, INC.,
LANCER PARTNERS, LP,
OMNIFUND, LTD.,
LSPV, INC., and LSPV, LLC

        Relief Defendants.
_____/

## ORDER AND OPINION DENYING MOTION TO MODIFY FREEZE ORDER

THIS CAUSE is before the Court upon Defendant Lauer's Motion to Modify

Freeze Order to Allow Use of His Own Assets to Retain Counsel [DE 2063].  The Court

has carefully considered the motion, supplemental filings, responses filed by both the

Receiver and the Securities and Exchange Commission ("SEC"), the reply, the

evidence presented at the evidentiary hearing held November 6, 2008, and argument

of counsel.

All of Michael Lauer's ("Lauer") assets are currently restrained pursuant to an

order entered on July 18, 2003 [DE 22] ("Freeze Order").  Lauer has on previous

occasions sought modification of the Freeze Order to allow for payment of living

expenses and for the retention of counsel.  Those motions were denied because the

purpose of the asset freeze was to preserve sufficient funds for the payment of a

potential disgorgement award.  *SEC v. ETS Payphones*, 408 F.3d 727, 734 (11th Cir.

2005).  The Court has since granted summary judgment in favor of the SEC and

against Lauer finding that Lauer committed a massive securities fraud.  An

evidentiary hearing to determine the proper amount of disgorgement and

prejudgment interest that Lauer should pay was held on December 12, 2008.  The SEC

has been given an extension of time to file a motion seeking a civil monetary penalty

as well.

On January 29, 2008, a federal grand jury returned an indictment against

Lauer, among others, based largely on the same conduct as alleged by the SEC in this

case.  The instant motion seeks modification of the Freeze Order so that Lauer may

retain counsel of his choice to represent him in the criminal proceeding.  Lauer bases

his present request on his assertion that there is a difference between the standard

for asset freezes for disgorgement purposes in SEC enforcement actions and his Sixth

Amendment right to use non-forfeitable assets to retain counsel of his choice.

In order to assure him adequate funds for defense in his criminal case, Lauer

requests that the Court release $2.5 million of his frozen assets to his defense

attorney's trust account.  Lauer points to two potential sources for such funds:  1)

the cash account in his Banc of America ("BOA") brokerage account, worth over $2.6

million; and 2) the proceeds from the sale of his New York condominium, now held by the Receiver, which amounts to approximately $750,000.  Lauer argues that the sources of these funds are not tainted with any of his allegedly fraudulent conduct, but rather are derived from assets acquired by him prior to the time his fraud allegedly began ("Fraudulent Time Period").

A defendant's right to use his own assets to retain counsel of choice is limited to use of assets which are legitimately obtained.  *United States v. Bissell*, 866 F.2d 1343, 1351 (11th Cir. 1989).  Thus, Lauer may not use assets to retain counsel which are subject to criminal forfeiture in the indictment.  *Id.*; *United States v. Register*, 182 F.3d 820, 834-36 (11th Cir. 1999).  Conversely, under circumstances where frozen assets are otherwise unencumbered, a defendant should not be deprived of the use of such assets for retention of counsel which are not "traceable" to the commission of the offense.  Lauer acknowledges that he has no right to access funds which are tainted by securities fraud and subject to forfeiture.

The indictment's forfeiture count describes the assets subject to forfeiture as property and proceeds "obtained, directly or indirectly, as the result of [the violations alleged in the indictment]."  Indictment, pg. 2, ¶ 2.  Those violations are alleged to have taken place "from in or around October 1999 through in or around July 2003."  *See, e.g.,* Count 1, pg. 6, ¶ 2.  Accordingly, Lauer's asserts that assets obtained prior to that date, or derived from assets obtained prior to that date, are

not subject to pre-trial restraint and therefore should be available to him for defense fees and costs.

Currently, all of Lauer's assets are frozen by the Freeze Order without regard to whether they are forfeitable.  Previously, Lauer sought modification of the freeze order to retain counsel for the defense of this civil enforcement action and to pay his living expenses.  The Court held that the asset freeze in this case could reach all of Lauer's assets without regard to their origin in order to ensure their availability to satisfy any disgorgement remedy that might be awarded.

Now Lauer requests a distribution of untainted funds in order to pay legal fees arising from his criminal defense.  His current claim, not previously asserted, is based on his Sixth Amendment constitutional right to have the use of his own funds to retain counsel.  It is well-settled that in the face of a Sixth Amendment claim of entitlement to the use of unencumbered assets for legal fees in a criminal case, the defendant may only be denied access to forfeitable assets, *i.e.*, those which are traceable proceeds of criminal activity.  *Bissell*, 866 F.2d at 1351; *Register*, 182 F.3d at 834-36.  Therefore, in ruling on this motion, the Court is required to determine whether the particular assets which Lauer wishes to use for legal expenses should be

made available because there is not probable cause[1] to believe they are forfeitable

proceeds.

Proceeds of the Sale of the New York Condominium

      Lauer seeks to have the proceeds from the sale of the New York City

condominium made available to him based on the fact that the condominium was

purchased in 1997, prior to the period of the alleged fraud.

      The condominium was purchased in January 1997, for $1.33 million by TRSOR,

Inc., a company Lauer controlled as its sole shareholder.  DE 2176 at 52-53 and 79 &

Ex. 11.  Lauer financed 100% of the purchase of the condominium through an interest

only loan.  Lauer, therefore, had no equity in the condominium when he purchased it.

DE 2176 at 52 & Ex. 11.  Evidence shows that during the Fraudulent Time Period,

Lauer carried the condominium by using tainted funds.  DE 2176 at 54-56 & Ex. 12.

After the Court entered the Freeze Order, the condominium was sold for $2.4 million

and net proceeds from the sale were approximately $750,000.  DE 2176 at 53 & Ex.

11.  These proceeds are now held by the Receiver.

      Lauer asserts, and the SEC's expert does not disagree, that the value of the

condominium, which increased by approximately $750,000, is attributable purely to

market appreciation.  Since the market appreciation value was not derived from

---

    [1]  To secure a pre-trial order restraining a defendant from using potentially
forfeitable assets to pay counsel of his choice, the government need only show
probable cause to believe that the assets at issue are tainted by the defendant's
alleged fraud.  *See United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir. 1991).

payments made by Lauer, Lauer asserts that any arguably tainted money he used to keep the condominium does not render the property forfeitable under applicable forfeiture statutes.  "Under Sections 981(a)(1)(C), and Section 982(a)(2)(A), only property which constitutes or is derived from proceeds 'traceable' to a violation is forfeitable."  DE 2109 at 8-9.

The Court concludes, for purposes of this case, that when tainted funds are used to pay costs associated with maintaining ownership of the property, the property itself and its proceeds are tainted by the fraud.  *See United States v. One Single Family Residence Located at 15603 85th Ave. North, Lake Park, Palm Beach County, Fla.*, 933 F.2d 976, 982 (11th Cir. 1991) (as to a wrongdoer, the full value of real property is forfeitable because some of the funds invested are traceable to the alleged conduct).  Since Lauer's use of tainted funds allowed him to maintain ownership, use and benefit of the property, this case does not present a "mere commingling of tainted and untainted" funds.  *See United States v. Puche*, 350 F.3d 1137, 1153-54 (11th Cir. 2003).  Lauer directly profited from using tainted funds to pay for the property.  That profit includes any appreciation in its value.

Even assuming, *arguendo*, that the $750,000 being held by the Receiver from the sale of condominium is not tainted by securities fraud, there is another claimant with a prior and superior right to these funds, namely, the Internal Revenue Service ("IRS").  Even after the forced sale of Lauer's Greenwich Connecticut home, he remains indebted to the United States in excess of $2 million for unpaid income

taxes, interest and penalties for the 2001 tax year.  DE 2160, DE 2176 at 85 & Ex. 16,

17.  Indeed, the United States Department of Justice, Tax Division, "object[s] to any

distribution of funds currently held by the Receiver or Bank of America Brokerage

account to Lauer.  Rather because all of the untainted funds in the possession of the

Receiver and in possession of Bank of America are subject to the government's tax

lien, we request that any untainted funds be transmitted to this office to satisfy - in

whole or in part - Mr. Lauer's unpaid  tax debt." *See* Ex. 19 to Evidentiary Hearing

(Letter to SEC from Michael Kearns, Chief, Civil Trial Section, Southern Region, U.S.

Department of Justice, Tax Division.)

      The Internal Revenue Code provides that a lien upon all of a debtor's property

arises in favor of the United States as to any tax unpaid after demand. 26 U.S.C. §

6321.  The federal tax lien arises upon assessment.  26 U.S.C. § 6322.  The IRS made

its first assessment against Lauer, giving rise to a lien of approximately $3 million, on

December 30, 2002.  Ex. 19 to Evidentiary Hearing.  A tax liability in excess of $2

million remains.  The assessment created a lien on all of the property owned by Lauer

at that time.  That property includes the BOA account and the New York

condominium.  Accordingly, the IRS lien arose before Lauer was indicted on January

29, 2008, and has priority over Lauer's instant effort to free funds for counsel of his

choice.  Lauer cannot use an indictment handed down after a tax lien has attached to

his property, and the need for counsel incident to that indictment, as a basis for

avoiding the legal effects of the prior lien.

The Banc of America Cash Account

Lauer also argues that the cash in his BOA Account constitutes untainted funds which should be made available to him to retain counsel of his choice.  As of February 28, 2008, the cash balance in the account was approximately $2.6 million.  As of October 31, 2008, Lauer's BOA Account was worth approximately $4.69 million.  DE 2176 at 39-41 & Ex. 8.  Lauer maintains that this cash was derived  primarily from the proceeds of the sale of stock in Titan Corporation ("Titan") which was acquired before the beginning of the Fraudulent Time Period.  He therefore asserts these funds are untainted and should be available for him to hire defense counsel.

In the first instance, as was the case with the proceeds from the sale of his New York condominium, Lauer's claim to the use of these funds is subordinate to the tax lien of the I.R.S.  Moreover, at the beginning of the Fraudulent Time Period, Lauer had 90,000 shares of Titan in his BOA Account.  During the Fraudulent Time Period, Lauer sold all but 7,500 Titan shares. DE 2176 at 47 & Ex. 9.  Subsequently, and within the Fraudulent Time Period, Lauer purchased more than 900,000 Titan shares and then sold hundreds of thousands of shares.  DE 2176 at 47-48 & Ex. 9.  At the end of the Fraudulent Time Period, Lauer once again owned 90,000 Titan shares.  Based on Lauer's own records, the cost basis of the 90,000 Titan shares he originally owned was different than the cost basis for the 90,000 Titan shares he owned at the end of the Fraudulent Time Period.  *See* DE 2064 at 3.  Consequently, contrary to Lauer's initial claim, it is undisputed that the 90,000 Titan shares he owned at the

end of the Fraudulent Time Period were not the same 90,000 Titan shares that he owned at the beginning of the Fraudulent Time Period.  Thus, the allegedly untainted funds Lauer possessed at the outset of the Fraudulent Period no longer exist.  All the funds currently held in the BOA Account related to the Titan shares were acquired during the Fraudulent Time Period.  This, in and of itself, demonstrates that the funds in the BOA Account are not free from the taint of the alleged fraud.

Furthermore, Lauer's counsel acknowledged that money is fungible and as such, it is impossible to differentiate between "tainted" and "untainted" dollars in a bank account.  Lauer also acknowledged that approximately $7 million of the deposits made into his BOA Account are "arguably traceable by the Government as criminal proceeds."  DE 2109 at 10.  Nonetheless, Lauer asserts that "it is fair" to give him credit for the amount derived from the sale of the Titan stock which was purchased before the Fraudulent Time Period.  DE 2109 at 10; DE 2176 at 91.

The Court rejects this argument.  As previously stated, the "untainted funds" Lauer had at the outset of the Fraudulent Period no longer exist.  They lost their "untainted" status when the original 90,000 Titan Shares were sold and different shares were acquired during the Fraudulent Time Period when $7 million of funds traceable to fraudulent conduct was infused into the account.  Thus, this is not a case of mere commingling of tainted and untainted funds in an account.  *See United States v. Puche*, 350 F.3d  at 1153.  Moreover, under the facts presented here, the Court concludes that "[i]t is unnecessary to attempt to segregate in some manner the

tainted funds from the commingled account. ... The presence of some tainted funds ... is sufficient to taint [all]." *United States v. Garcia*, 37 F.3d 1359, 1365 (9th Cir. 1994); *accord United States v. Tencer,* 107 F.3d 1120, 1131 (5th Cir. 1997); *U.S. v. Cancelliere,* 69 F.3d 1116, 1120 (11th Cir. 1995), as amended on clarification, (Feb. 2, 1996); *United States  v. Jackson,* 935 F.2d 832, 840 (7th Cir. 1991); *cf. United States  v. Voigt*, 89 F.3d 1050, 1081 (3d Cir. 1996).

The Eleventh Circuit has cited *United States v. Garcia*, stating "[b]ecause money is fungible, the government must prove only that the tainted proceeds were commingled with other funds." *United States v. Ward,* 197 F.3d 1076, 1083 (11th Cir. 1999).  In *United States v. Ward,* a bankruptcy fraud and money laundering case, the court held, "[o]nce tainted, proceeds cannot become untainted." *Ward,* 197 F.3d at 1083. The *Ward* Court also cited *United States v. Moore,* 27 F.3d 969, 976-77 (4th Cir. 1994) stating, "[w]hen money is commingled, 'the illicitly-acquired funds and the legitimately-acquired funds . . . cannot be distinguished from each other. . .'" *Id.*

Conclusion

"There is a strong governmental interest in obtaining full recovery of all forfeitable assets, an interest that overrides any Sixth Amendment interest in permitting criminals to use assets adjudged forfeitable to pay for their defense." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 631-632 (1989).  Under the facts of this case, there is no way to distinguish, nor is it necessary to attempt to distinguish, tainted funds from untainted funds.  Moreover, the IRS has a lien for

approximately $2 million against all of Lauer's property.  Thus, none of Lauer's assets may be release from the freeze order to pay for counsel of his choice.  Hence, it is hereby

**ORDERED AND ADJUDGED** that Defendant Lauer's Motion to Modify Freeze Order to Allow Use of His Own Assets to Retain Counsel **[DE 2063] is DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 25th day of March, 2008.

KENNETH A. MARRA
United States District Judge

copies to:

All counsel of record