FILED by _____

FEB 20 2013

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

SECURITIES AND EXCHANGE COMMISSION, )

    Plaintiff, )

      v. )

MICHAEL LAUER, )

    Defendant. )


## DEFENDANT MICHAEL LAUER'S MOTION TO VACATE THE JUDGMENT AND DISMISS THE COMPLAINT HEREIN

Defendant Michael Lauer files this motion under Rules 60(b)(4) and 60(d)(3) of the Federal Rules of Civil Procedure and the inherent power of this court to vacate the judgment and dismiss the complaint in this case. With minor exceptions Lauer has represented himself *pro se* against the combined resources of the SEC and the Receiver, who, between them, have utilized dozens of lawyers against him to deny him the use of his own money with which to retain a lawyer in this exhausting and complex case that was filed on July 8, 2003, and not concluded in the district court until September 22, 2009, more than six years later. This was despite the fact that his net worth exceeded $100 million at the start of the case. He repeatedly filed motions for access to his funds (he had been found guilty of nothing), but the SEC and the court-appointed Receiver opposed every single one of his applications for funds to defend himself. For six months he was denied all access to his funds. Then, the court allowed him $10,000 a month for his four minor children, his aging mother, and his legal fees, with which to live in Manhattan, but then only funds obtained from the sale of his two homes, not his business or untainted investments or even his readily available case that he should have been allowed to

use to retain an attorney. DE 108. The allotted sum was inadequate for Lauer to support his family, so he had to forgo legal assistance. Denials of relief were frequently on the basis of transparent technicalities that have no business in the United States' legal system.[1]

Points A and B demonstrate that the judgment is void, because the proceeding deprived Lauer of due process.[2] *Burke v. Smith*, 252 F.3d 1260, 1263, 1265-66 (11th Cir. 2001) ("Generally, a judgment is void under Rule 60(b)(4) 'if the court that rendered it lacked jurisdiction of the subject matter, or of the parties, or if it acted in a matter inconsistent with due process of law.'"); *accord, Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1215 n.13 (11th Cir. 2009) (quoting *Burke v. Smith*); *Bass v. Hoagland*, 172 F.2d 205, 209 (5th Cir. 1949). In *United Student Aid Funds, Inc. v. Espinosa*, 130 S.Ct. 1367 (2010), the Supreme Court affirmed that standard, and clarified that the moving party satisfies Rule 60(b)(4) if he did not have actual knowledge of the violation of his rights at the time they were violated and was not "afforded a full and fair opportunity to litigate" his contention. A party knowingly deprived of his rights cannot sit back and later proceed under Rule 60(b)(4); with actual knowledge he was not deprived of due process. *Id.* at 1380. *See United States v. James Daniel Good Real Property*, 510 U.S. 43, 48, 55, 56 (1993) ("Our precedents establish the general rule that individuals must receive notification and an opportunity to be heard before the Government deprives them of property."); *Fuentes v. Shevin*, 407 U.S. 57, 81-82, 88 (1972) ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time

---

[1] For example, Lauer made a combined motion to dismiss and for summary judgment. The former was based on absence of subject matter jurisdiction. DE 746. The SEC moved to strike the entire combined motion on the ground that it exceeded the maximum page limit for motions. DE 778. Even though courts are required to raise subject matter jurisdiction *sua sponte*, Arbough v. Y & H Corp., 546 U.S. 500, 514 (2006), the district court struck Lauer's combined motion and proceeded with the case to judgment, whether it had subject matter jurisdiction or not. DE 1075.

[2] The Fifth Amendment commands: "nor [shall a person] be deprived of life, liberty, or property, without due process of law."

when the deprivation can still be prevented."); *Goldberg v. Kelly*, 397 U.S. 254, 264, 267-68 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard. . . . The hearing must be at a meaningful time and in a meaningful manner.")

The claims in this case differ significantly from those in the Rule 60(b)(3) cases cited above. In none of the cited cases did misconduct on the part of the nonmoving party deprive the moving party of due process. In this case, the SEC, an agency of the federal government, was clearly at fault, indeed, seriously at fault. *See United States v. Consolidated Laundries Corp.*, 291 F.2d 563 (2d Cir. 1961); *Curran v. Delaware*, 259 F.2d 707, 713 (3d Cir. 1958); *Woollomes v. Heinze*, 198 F.2d 577, 579 (9th Cir. 1952).

When a judgment is void under Rule 60(b)(4), the district court has no discretion; it must vacate the judgment, because a judgment is either void or it is not. *Oldfield v. Pueblo de Bahia Lora, S.A.*, *supra*, at 1217-18; *Burke v. Smith*, *supra*, at 1267. Significantly, there is no time limit on motions to dismiss void judgments under Rule 60(b)(4). They are void. *New York Life Ins. Co. v. Brown*, 84 F.3d 137, 142-43 (5th Cir. 1996), citing Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 2862 (2d ed. 1995); *Briley v. Hidalgo*, 981 F.2d 246, 249 (5th Cir. 1993), citing Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 2862 (1973); *Matter of West Texas Marketing Corp.*, 12 F.3d 497, 503 n.3 (5th Cir. 1994). "[B]efore a federal constitutional error can be deemed harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). In *SEC v. Lauer*, the SEC's Miami office's first hedge-fund case,[3] the SEC's procedures violated Lauer's constitutional rights and were fatally flawed from the start.

---

[3] *Miami Herald Tribune*, July 11, 2003.

## A. The SEC's Commencement of This Action Without Proper Commission Authorization Violated Lauer's Right to Due Process

The Securities Exchange Act, 15 U.S.C. § 78u(d)(1); SEC Rule 7(a), 17 C.F.R. § 203.7(a); and § 2.3.4.2 of the SEC Enforcement Manual require a vote of the Commission to file a complaint. Construing the statute and regulations, the Manual states: "The filing or institution of any enforcement action must be authorized by the Commission," and details the procedures to be followed in seeking authorization to commence a lawsuit (Ex. B). Testifying in 2010, John Mattimore, the associate regional director of the SEC's Miami office who was intimately involved in the case before it was filed, was asked, "You mention that you have to get approval from the Commission to bring the action"; he answered unequivocally, "Correct." *U.S. v. Isaacson*, 08-20071-CR-AJ, 7/1/10, Tr. 91 (Ex. J).

The SEC cannot avail itself of 15 U.S.C. § 78d-1, which delegates the Commission's powers to a single Duty Commissioner subject to a defendant's unqualified right to appeal (assuming the SEC can prove that they even got a single Commissioner to agree). The statute assures a defendant the right to be heard by the full Commission, and it cannot be seriously argued that Congress allowed the SEC staff to thwart that right at will by inflicting immediate and irreparable harm before a defendant could appeal. Congress's clear purpose and intent was to provide a meaningful appeal. *E.g.*, *Kaston v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325 (2011); *see United States v. American Trucking Assoc.*, 310 U.S. 534, 543 (1940).[4] In this case a later appeal to the Commission was worthless. Moreover, Duty Commissioners can authorize only action which is "urgent," which cannot include the immediate and unnecessary destruction of an ongoing business and certainly not a destruction accomplished by lies and misleading information that an adversarial appeal to the full Commission would have

---

[4] No Wells letter was sent or a formal investigation sought or authorized, two other important protections that the SEC's Miami office circumvented in its rush to neutralize Lancer Management and Lauer. *Cf.* James B. Stewart, "Another Fumble by the SEC on Fraud," *New York Times*, Nov. 16, 2012.

uncovered. *See* SEC Manual 2.5.2.3. Authorization by less than the whole Commission in this case was without effect.

Within 24 hours of the filing of the complaint, the Receiver, an officer of the court, working closely with the SEC, raided Lancer Management offices in New York City and Connecticut, removed all computers and documents, cancelled leases for the offices, cancelled contracts with high-tech service providers such as Bloomberg, fired all employees without notice and without severance pay while terminating their health insurance, shut down the entire business, which was more than ten years old and manned with highly qualified employees, and substituted a vacuum lasting months for the expert, innocent and uncharged employees. *Lauer Aff.* ¶¶ 63-65 (Ex. A). The arrival of the Receiver on the morning of July 11 was the first notice that Lauer and his attorney had of the filing of the complaint, the TRO, and the appointment of a receiver. Lancer's attorney, Gerald Labush, testified at a hearing in this case: "I learned about the filing of the SEC case when I was present in the Lancer offices on I think it was July 12[th] . . . . I was in the conference room when another raiding party arrived. This one on behalf of the receiver. . . . And they, by the end of the day, they took us out and had taken physical possession of the office, changed the lock." DE 1198, at 49.[5] Lauer's business was irrevocably destroyed in one day. Defendant knows of no precedent that upholds the destruction of a citizen's livelihood on the basis of an *ex parte* hearing. Unless it is the Queen of Hearts: "Sentence first – verdict afterwards."[6] The procedure violated due process. *United States v. James Daniel Good Real Property, supra; Fuentes v. Shevlin, supra; Goldberg v. Kelly, supra.*

Denying a defendant a hearing on a fundamental legal requisite designed to provide him with substantial protections makes the complaint void under Rule 60(b)(4), Fed.R.Civ.Proc. In *Burke v. Smith, supra,* the Eleventh Circuit set aside as void an earlier judgment because the

---

[5] July 12 was a Saturday; the Receiver's posse arrived in the morning of July 11.
[6] Lewis Carroll, *Alice in Wonderland*, Ch. XII.

district court failed to conduct a fairness hearing on the settlement of a minor's claim, holding

that the hearing requirement was binding. It did not matter that the minor's representative who

settled the case had no conflict of interest with her child. That binding precedent is also the

teaching of *Carter v. Fenner*, 136 F.3d 1000 (5th Cir. 1998), cited with approval in *Burke*, 252

F.3d at 1263, where the Fifth Circuit affirmed the district court's decision to declare a judgment

void in similar circumstances, namely, a consent judgment, the proceeds of which were to

benefit the five-year-old son of the deceased. The consent judgment was successfully

challenged on the ground that the child's representative failed to secure court approval *before*

the settlement, which the court held was essential to protect the interests of minors. The Fifth

Circuit continued:

> The Achilles' heel of the appellant's situation lies in her failure to obtain
> state court approval of the settlement *prior* to confecting the federal consent
> judgment with the City. . . . A belated request for state court permission to
> disburse funds of the minor will not cure an earlier failure to obtain
> permission to compromise the minor's claim itself. Without such prior
> approval, the statutory directive requiring judicial oversight of minor
> settlements would be rendered meaningless. . . . Because the consent
> judgment in this case is void, we affirm the district court's decision to set it
> aside.

*Id.* at 1008-09. (Emphasis in original.) The case before the court presents the identical legal

situation and the identical policies, and requires the identical result of vacating the judgment.

The SEC may claim that the full Commission duly and timely authorized the filing of a

complaint in this action. If that is the case, all the SEC has to do is produce that authorization.

If it does not, that would be conclusive proof that no proper authorization exists. Lauer is taking

the precaution of filing an accompanying motion for discovery, including for any evidence of

Commission authorization of the formal investigation and complaint. Among the documents

sought are communications from the SEC's Miami office to the Commission that would show

whether the Miami office procured any authorization to file the complaint by fraud or

misrepresentations, including a false representation that the status quo would be maintained

pending an adversary hearing – as it falsely represented to Judge Zloch on July 10, 2003.

## B. The SEC's Interference with Lauer's Attorney-Client Relationship Violated His Right to Due Process

The SEC violated Lauer's Due Process rights by interfering with his attorney-client

relationship. The law is stated *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008):

> "[G]overnment interference with a defendant's relationship with his attorney
> may render counsel's assistance so ineffective as to violate . . . his Fifth
> Amendment right to due process of law." . . . . "[A] claim of outrageous
> government conduct premised upon deliberate intrusion into the attorney-
> client relationship will be cognizable where the defendant can point to actual
> and substantial prejudice." . . . . A claim of government interference with the
> attorney-client relationship has three elements: (1) the government was
> objectively aware of an ongoing, personal attorney-client relationship; (2) the
> government deliberately intruded into that relationship; and (3), as a result, the
> defendant suffered actual and substantial prejudice. . . . Most cases finding
> deliberate intrusion into the attorney-client relationship involve government
> informants who somehow penetrated the attorney-client relationship to obtain
> confidential or privileged information and then feed that information to the
> government.

*Accord*, *United States v. Voigt*, 89 F.3d 1050, 1066-67 (3d Cir. 1996); *see United States v.*

*Scrushy*, 366 F. Supp. 1134 (N.D. Ala. 2005).

That is precisely what happened in this case and it is documented in sworn testimony in

federal-court proceedings in 2010 and 2011. Barton Sacher, the lawyer for Milton Barbarosh

and Laurence Isaacson and former head of enforcement for the SEC's southeast region, testified

at the pretrial hearing in Lauer's criminal case in support of the defendants' motion to dismiss

the indictment because of SEC and prosecutorial misconduct. *U.S. v. Lauer*, 08-20071-CR-AJ

(Ex. F). Lauer and Garvey had also moved to sever their case from Barbarosh and Isaacson.

After an evidentiary hearing on the motion in April 2010, Judge Jordan denied the motion to

dismiss on the ground that Barbarosh and Isaacson had not established as a matter of law that

they were confidential informants, but granted Lauer's and Garvey's motion to sever because of the issue of their codefendants' relationship with the SEC would be part of the case involving Barbarosh and Isaacson.[7] Subsequently, Sacher, Barbarosh, and Isaacson testified at the trial of Isaacson, and Barbarosh also testified at the trial of Lauer. The facts follow.

In 2002 Barbarosh prepared valuations of Lancer's Funds' holdings for its internal use. *U.S. v. Lauer*, 3/31/11, Tr. 32-71 (Barbarosh) (Ex. K). In the spring of 2003 Lancer and Lauer were involved in litigation in the British Virgin Islands (BVI) (where two of the hedge funds were domiciled), as well as the nearly identical in scope SEC investigation. Lancer's and Lauer's lawyer in the BVI, Simon Pasco, asked Barbarosh if he would perform an analysis of a highly confidential report and act as an expert witness. The confidential report, which had been placed under seal by the BVI courts, was an analysis of the valuation of certain Lancer holdings prepared by the accounting firm of Deloitte Touche, and was known as the Deloitte Touche Report. The Report concluded that the actual value of each of the companies discussed in the report was far less than Lancer and the Funds claimed. Since Lancer was paid on the basis of the value and profitability of the three hedge funds, the Report would provide the SEC with invaluable material against Lauer.

Lauer's affidavit confirms that the communications between Lancer's BVI lawyer Simon Pasco and Barbarosh was for use in providing legal advice to Lancer. *Lauer Aff.* ¶¶ 42-43 (Ex. A). No disclosure would be made to third parties of the content of the Deloitte Touche Report or Barbarosh's analysis. Indeed, Barbarosh signed a confidentiality agreement and converted the names of the companies analyzed into a code, which was given to the SEC at its request. *U.S. v. Lauer*, 4/7/10, Tr. 123-25 (Sacher) (Ex. F); *U.S. v. Isaacson*, 3/31/11, Tr. 98-100 (Barbarosh) (Ex. K).

---

[7] The severance was Judge Jordon's only in his dozen years as a district judge.

Barbarosh and Isaacson, who shared office space, contacted their lawyers, Sacher and Nancy Van Sant (who were in the same firm), about Lancer's and Lauer's request that Barbarosh undertake a new assignment. Barbarosh's position was that he would not work on the Report unless the SEC specifically requested him to do so. Sacher, who himself had spent many years at the SEC, told the two that he would call the SEC to talk to them about securing protected status for them in connection with any work they would do for Pasco with reference to Lancer and Lauer. *U.S. v. Lauer*, 3/30/11, Tr. 78 (Sacher) (Ex. F).

Sacher spoke to John Mattimore, the highest ranking SEC enforcement official in the region, who told him that the SEC wanted the Deloitte Touche Report "desperately," as "the last piece of information that they [the SEC] needed to be able to file suit against Lancer," and, "the proof we need to go file the lawsuit." *U.S. v. Isaacson*, 6/29/10, Tr. 160-61, 165-208 (Sacher) (Ex. G). Sacher also testified that he secured Mattimore's agreement that Barbarosh and Isaacson would be given the status of confidential informants (if not directed agents)[8] to protect them from liability while Barbarosh obtained the sealed report from Pasco for the SEC by agreeing to do the work that Lancer's and Lauer's attorney asked him to do. The SEC knew that the highly confidential Report was being supplied by Pasco, that Pasco was acting as attorney for Lauer and Lancer, and that Barbarosh was deceiving Pasco to obtain the Report for the SEC. Without question the SEC wanted the report specifically for its use in developing a case against Lancer and Lauer.

Concealing from Pasco, Lauer, and Lancer that he was acting in concert with the SEC, *U.S. v. Lauer*, 4/7/10, Tr. 135 (Sacher) (Ex. F), Barbarosh agreed to perform the services requested by Pasco, who then sent him the Report, which he gave to his attorney Sacher. Then,

---

[8] Sacher explained that from his experience a directed agent engages in acts at the request of the government that he might not have done otherwise, such as, in the case of Barbarosh, agreeing to work with Lancer's and Lauer's BVI attorney and thereby obtain a copy of the Deloitte Touche Report for the SEC.

at a meeting in Sacher's conference room on June 10, 2003, attended by, *inter alia*, Sacher, Isaacson, Mattimore, and another SEC lawyer, Sacher turned over the Report to the SEC at its request so it could examine it.

Barbarosh testified at Lauer's criminal trial that he would not have gotten involved in reviewing the report but for the SEC's request and that he "knew the whole purpose of this charade was to get the SEC a copy of this report." Ex. K, at 99. Isaacson testified at his criminal trial: "After we confirmed again – one more time that I had confidential – and Mr. Barbarosh had confidential informant status, Mr. Barbarosh – Mr. Sacher had the Deloitte Touche report on his desk in a binder, and he would not let them see it until they confirmed that . . . ." *U.S. v. Isaacson*, 6/29/10, Tr. 44-45 (Ex. H).

Sacher anticipated serious legal problems for the SEC from his and his clients' disclosure to it of the Report, and so informed the SEC at the June 10, 2003, meeting. He specifically told Mattimore and the other SEC lawyer that came to his office for the Report that Barbarosh's and Isaacson's actions could create a problem down the line. When the SEC asked to have a copy of the Report, Sacher refused, stating that he was very concerned about tainting the investigation by giving the SEC a highly confidential financial document that might undermine its entire investigation. "[I]f we turn it over to you [SEC], stop and think about it. Is Lauer, or Lancer, or someone else gonna assert that you compromised what was otherwise an attorney-client communication between Mr. Pasco and Mr. Barbarosh attorney work product or any of these secrecy things?" *U.S. v. Lauer*, 4/8/10, at 115-18 (Sacher) (Ex. F). The SEC nevertheless decided that it wanted the Report, was shown a copy, examined it in detail for hours, and made extensive notes. *Id.* at 124-25. The SEC violated Lauer's rights knowingly and willfully.

While disputing that Barbarosh and Isaacson were technically confidential informants and entitled to special treatment as such, the SEC has conceded that, unbeknownst to Lauer, that Barbarosh was providing the SEC with full access to the critical privileged and confidential document sent to them by Lauer's attorney in the British Virgin Islands. That violation of Lauer's rights is sufficient to grant his motion. A case binding on this court so commands. *SEC v. ESM Government Securities, Inc.*, 645 F.2d 310, 315-16 & n.7 (5th Cir. 1981) ("We believe that a private person has the right to expect that the government, when acting in its own name, will behave honorably. . . . [T]he government agents were given access to records not available to the general public, just because they were government agents.").[9]

The protected nature of the communication between Lancer and Lauer's BVI lawyer Simon Pasco and Barbarosh is established by the important decision of Judge Henry J. Friendly in *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961). Kovel was an accountant retained by a law firm to assist it in defending an income-tax case. When questioned about communications with the firm's client, Kovel pleaded the attorney-client privilege. The trial judge rejected the claim of privilege (and held Kovel in contempt and had him taken into custody). The Second

---

[9] While federal agencies' running parallel civil and criminal investigations is not illegal per se, they cannot run a *joint* investigation to allow criminal investigators to obtain the benefits of civil discovery, including material voluntarily produced by parties solely for civil purposes, and civil investigators to obtain the benefits of grand jury evidence, as in this case. *See* United States v. Kordel, 397 U.S. 1, 11 (1970). The SEC admitted that it and the DOJ "shared information." U.S. v. Isaacson, 7/1/10, Tr. 130-31 (Mattimore) (Ex. J); *id.*, 6/29/10, Tr. 198-20 (Sacher) (Ex. G). The DOJ instigated the SEC investigation. U.S. v. Lauer (hearing), 4/8/10, Tr. 327-28 (Mattimore) (Ex. I) ("they did come to us"). Based on the shared information, including the Deloitte Touche report illegally accessed by the SEC on June 10, 2003, the DOJ obtained and executed a search warrant on June 11, the following day. Then, the SEC obtained Lauer's alleged overseas account (TRO Exhibit 48) and other information because the FBI seized it pursuant to its search warrant and gave it to the SEC. *See Lauer Aff.* ¶¶ 48-51 (Ex. A). The SEC had no subpoena power until the complaint was filed on July 8, 2003, so could not have itself subpoenaed documents from Lauer or the DOJ. Moreover, Harry Schimkat, who was the lead prosecutor in U.S. v. Lauer, was working for both the SEC and the DOJ during at least the crucial months of March to August 2003, aggravating the improper collusion (Ex. G, Tr. 201-06; Ex. L). There is more. The SEC and the DOJ jointly withheld exculpatory material from Lauer during the entirety of both the civil and criminal case, including an exculpatory affidavit by Lancer Funds director Richard Geist as well as a *second* Deloitte Touche Report, dated July 13, 2003.[9] (Ex. M.) (These and related issues of SEC and DOJ misconduct are involved in Laurence Isaacson's pending appeal from his conviction. U.S. v. Isaacson, No. 12-14703, 11th Cir.).)

Circuit reversed. Judge Friendly wrote: "What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*." *Id.* at 922.[10] That is the law. *United States v. Davis*, 636 F.2d 1028, 1044 (5th Cir. 1981) (citing *Kovel*); *United States v. Pipkins*, 528 F.2d 559, 562-63 (5th Cir. 1976) (citing *Kovel*); *In re Witness-Attorney Before Grand Jury No. 83-1*, 613 F. Supp. 394, 397-98 (S.D. Fla. 1984) (citing *Kovel*).

The SEC violated Lauer's due process rights. *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1117-18 (5th Cir. 1980), stated:

> Although there do not appear to be any civil cases on this point, the Supreme Court has indicated in its criminal case that the right to retain counsel in civil litigation is implicit in the concept of fifth amendment due process. . . . [A] civil litigant has a constitutional right to retain hired counsel.

*Accord, In re Bellsouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003) ("due process guarantee of right to [retained] counsel extends to civil as well as criminal proceedings"); *Anderson v. Sheppard*, 856 F.2d 741, 747 (6th Cir. 1988) ("the right of a civil litigant to be represented by retained counsel, if desired, is now clearly recognized"); *Gray v. New England Tel. & Tel. Co.*, 792 F.2d 251, 257 (1st Cir. 1986) ("a civil litigant does have a constitutional right, derived from due process, to retain hired counsel in a civil case," citing *Potashnick*)

Lauer was severely prejudiced by the SEC's surreptitious and flagrant invasion of his attorney-client relationship, as Mattimore admitted to Sacher. Information the SEC improperly obtained from Barbarosh and Isaacson in violation of the rights of Lauer and Lancer led the DOJ to apply for a search warrant the next day, June 11, 2003, which was immediately executed against Lancer (Ex. N). The SEC filed its complaint against Lancer and Lauer four weeks later. The essence of the charge against Lauer in the complaint was that he grossly inflated the net asset values of the assets held by the Funds, which in turn provided him with millions of dollars

---

[10] *See* David M. Dorsen, *Henry Friendly, Greatest Judge of His Era* 336 (Harvard Univ. Press 2012).

in higher fees. The Deloitte Touche Report, which analyzed the valuations of the various assets of the Funds, was invaluable, as the SEC's Mattimore admitted to Sacher and others and never denied in his multiple court appearances as a witness.[11]

## C. The SEC's Knowingly False Representations in Its Opposition to Lauer's Motion to Transfer Venue Constituted a Fraud on the Court

The SEC engaged in fraud on the court under Rule 60(d)(3) in its opposition to Lauer's motion to transfer venue to the northeastern United States when it lied to the court. The questionable propriety of venue in the Southern District of Florida surfaced as early as the July 10, 2003, TRO hearing. Judge Zloch's *sua sponte* questioning of SEC lawyer Zinn demonstrated the tenuous nature of the case's contacts with the Southern District of Florida:

> THE COURT: Well, wouldn't venue be more appropriate in the northeastern districts of the country?
>
> MS. ZINN: I don't know that it would be more appropriate,[12] I think you could say it would also be appropriate. But there's certainly enough factors for there to be venue here in the Southern District of Florida.
>
> THE COURT: Is any individual defendant a citizen of the Southern District?
>
> MS. ZINN: No.
>
> THE COURT: What about any of the corporate defendants, are they incorporated in or have their principal place of doing business in the Southern District?
>
> MS. ZINN: No, Your Honor. However, some of them are in the British Virgin Islands, which is not here, but it's a little closer to here than if we were to - -
>
> THE COURT: What about the relief defendant[s]?
>
> MS. ZINN: No, Your Honor. [DE 20, at 17-18 (Ex. C).]

---

[11] The importance of the Deloitte Touche Report is confirmed by the SEC's admission that the evidence they had before the filing of the complaint was thin: "The SEC's evidence of these matters was primarily developed during these depositions [after the complaint was filed]." DE 1852, at 10.

[12] The SEC's statement on July 10, 2003 that the northeast was not more appropriate than south Florida was undeniably and indefensibly false and misleading.

Lauer filed his motion "to move venue to a more convenient location" on March 8, 2004. DE 207.[13] He argued he did not live in Florida and never traveled there on business, the overwhelming majority of events occurred outside Florida, and his personal life, which included caring for his four minor children and ailing elderly mother, who submitted her own affidavit, were all in the northeast. The employees of Lancer, the directors of the hedge funds, traders, suppliers, and virtually all of the other witnesses who were not located abroad principally in the British Virgin Islands, lived and worked in the northeast. *Id.* at 4-5; DE 28.

The Receiver and the SEC docketed similar oppositions to Lauer's motion on April 30, 2004, and May 6, 2004, DE 309 and DE 321, respectively. Some of their arguments were anemic, such as inconvenience to a national law firm (Hunton & Williams, which became involved only after the suit was filed) and to lawyers and investigators employed by a federal agency. "The factor of 'location of counsel' is irrelevant and improper for consideration in determining the question of transfer of venue." *In re Horseshoe Ent., Inc.*, 337 F.3d 429, 434 (5th Cir. 2003). To try to answer Lauer's strongest argument, that his witnesses would be greatly inconvenienced and that he could not require their presence at trial, the SEC countered by falsely claiming that it had comparable "key" witnesses from south Florida, so the court should not give weight to Lauer's contention:

> Similarly, the SEC has several key witnesses located in South Florida whom it intends to call as witnesses at trial, including Barbarosh and Levie, who performed bogus valuations of the South Florida Shells controlled by Lauer; Lawrence [sic] Isaacson, who headed the South Florida Shells that Lauer manipulated; and the [sic] Marty Steinberg the Receiver in this matter. [DE 321, at 5]

The court concluded, "there is little to connect this case to South Florida," DE 491, at 4, but denied Lauer's motion. The false representation that Milton Barbarosh, Lawrence Isaacson, and George Levie would testify as SEC witnesses constituted a fraud on the court designed for

---

[13] Lauer's motion to dismiss the case for lack of personal jurisdiction is not part of this motion.

the purpose, which succeeded, of deceiving the court into believing that the SEC had important south Florida witnesses ready to testify. The SEC's deceit prevented the case from being transferred to the Southern District of New York (or the District of Connecticut), where it belonged – and where Lauer and his witnesses were located and where he could defend himself, especially *pro se*.

The status of Barbarosh and Isaacson was the subject of extensive testimony in 2010 and 2011 in the criminal prosecution of Lauer, Barbarosh, Isaacson, and Martin Garvey. The testimony demonstrated that the SEC affirmatively misled the court in March and April 2004 by representing that the three individuals would be SEC trial witnesses and concealed from the court the fact that Barbarosh, Isaacson, and Levie had toxic relationships with the SEC that made its representation knowingly false. They had accused the SEC of bad faith in dealing with them and were adverse to the SEC and the Department of Justice and refused to testify when deposed by the SEC. They were protecting themselves from forthcoming federal charges, and pleaded the Fifth Amendment. Barbarosh and Isaacson were subsequently indicted with Lauer and Garvey.

Rule 60(d)(3) requires the court to grant Lauer's motion based on the SEC's fraud committed on the court, which prevented Lauer from obtaining the crucial transfer of the case to near his home. Moreover, the fraud was intertwined with another fraud, discussed in Point B. There was no fraud or negligence on Lauer's part and Lauer has no adequate remedy at law. Litigating the case in South Florida rather than in the northeast imposed a devastating burden on Lauer, causing, among other things, his inability to obtain free legal assistance from friends and his inability to adhere to the tremendous discovery burden the SEC placed on him by, *inter alia*, making Lancer's records and files in the possession of the SEC and the Receiver inaccessible. *Lauer Aff.* ¶¶ 70-73 (Ex. A).

The SEC's flagrant misconduct requires the judgment to be vacated. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944) ("This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed to have been guilty of perjury. Here, . . . we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals."); *United States v. Beggerly*, 524 U.S. 38 (1998) (Rule 60(d)(3) is applied to cases of "'injustices which, in certain instances are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata"); *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1139 (5th Cir. 1978) ("The conduct complained of must be such as prevented the losing party from fully and fairly presenting his case or defense. . . . This Subsection of the Rule is aimed at judgments which were unfairly obtained, not those which are factually incorrect."); *Matter of West Texas Marketing. Corp.*, 12 F.3d 497, 503 n.3 (5th Cir. 1994); *R.C. v. Nochman*, 969 F. Supp. 682, 691-92 (M.D. Ala. 1997) (denying motion on ground that "[d]efendant has failed to demonstrate that any party actively misled or deceived the Court"), *aff'd mem.*, 145 F.3d 363 (11th Cir. 1998); *see SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 127 (3d Cir. 1981) (the "ultimate question [is] whether the SEC is . . . abusing the court's process").

## D. Lauer Had Neither Actual Knowledge of the Violation of His Rights Nor a Full and Fair Opportunity to Litigate His Contentions

The court deprived Lauer of his constitutional right to retain counsel with his own funds, which requires vacating the judgment and dismissing the complaint. Moreover, the denial to Lauer of counsel means that he did not have a full and fair opportunity to litigate the other denial of his rights. The facts stated above make it clear that Lauer did not have actual knowledge of the violation of the violation of his rights or a full and fair opportunity to litigate his claims described in Points A and B. In fact, the SEC affirmatively concealed the facts. In

the event that the SEC disputes this position, the illegal, indeed, unconstitutional, denial to Lauer of the right to use his own funds to retain a lawyer requires the court to consider his arguments. As discussed in Point B, parties in civil litigation have a constitutional right to use their own funds to retain counsel. *E.g., Potashnick v. Port City Constr. Co., supra.* The court improperly and unlawfully denied Lauer use of his own funds to retain a lawyer. There was no finding that Lauer had violated any law. Moreover, the SEC made a preposterous claim that Lauer's ill-gotten gains or unjust enrichment was over $600 million, apparently accepted by the court. The SEC argued: "[A]pproximately $613 million remained in the Lancer funds when this action was filed. At this time, it is impossible to determine with absolute certainty [in September 2003] whether the entire $613 million, or a portion of thereof, was raised during the fraudulent scheme." DE 52, at 4. (Emphasis added.) The SEC admittedly had nowhere near the proof needed to sequester all of Lauer's assets. Its solution was to grasp at the total amount *raised and earned* by the funds operating over the course of a decade as the amount of Lauer's ill-gotten gains for purposes of evaluating his right to use his funds to retain counsel! Denial to Lauer of his right to retain counsel severely restricted his ability to raise and argue these critical issues.

Lauer's motions repeatedly argued that because of the total asset freeze, he was unable to afford an attorney, court and deposition transcripts, or expert witnesses. Indeed, he could not afford to attend many court hearings. DE 31, at 10-12; DE 49, at 16-18. He and his family were surviving only because of loans from his relatives and his friends. Lauer *Aff.* ¶¶ 72-73. In a 245-page response, the SEC opposed *any* relaxation of the absolute asset freeze and argued that Lauer should have no money for attorneys' fees. DE 44, DE 93, at 10. The court, however, found (DE 108, at 3):

> The Court . . . does recognize the benefit to the Court and to the allegedly
> defrauded investors of a full and fair adjudication of the issues presented in

this cause. To that end, it is beneficial that Lauer have access to and be represented by experienced and knowledgeable counsel in defending this action.

The December 3, 2003, order, issued nearly six months after the entry of the absolute freeze order, however, provided far less than it promised: "Beginning with the month funds are deposited in the escrow account, Receiver shall pay Lauer ten thousand dollars ($10,000) per month to be used by Lauer for living expenses and attorney's fees." It specified that Lauer would receive the funds *only* if he sold his house and condominium apartment and satisfied "all encumbrances upon those properties," *id.* at 4-5, without even exploring whether Lauer had any equity in the properties. The Eleventh Circuit regarded $9,000 minimal for housing and sustenance,[14] leaving enough for two hours *a month* for legal fees.[15] (Lauer's budget presented under oath was substantially higher.) Given the extraordinary complexity of the case and that experienced and knowledgeable counsel charged upwards of $500 an hour in 2003, the order constituted an unconstitutional denial of counsel to meet the combined resources of the SEC and the Receiver. The order continued to deny Lauer any access to liquid and untainted funds he had earned prior to the start of the alleged fraud. Moreover, without citing any authority for its extreme action, the court's order required him to sell his home where he, his children, and his mother lived, maintaining the total freeze on Lauer's untainted liquid assets, to access funds to hire a lawyer. Aside from everything else, requiring any funds paid to Lauer to come from the proceeds of the sale of his house would be uncertain and at the very least delay for many more months any access by Lauer to his assets with which to defend himself. Lauer complained:

LAUER: I leave here without the ability to defend myself.

---

[14] Recording of oral argument in SEC v. Lauer, No. 09-15138, 11th Cir., Feb. 1, 2012.

[15] The hourly rate for the lawyers for the Receiver started at close to $500 and has risen to $750, according to their filings in this case. To date the Receiver and his law firms have billed to the Lancer hedge funds and received upwards of $60 million dollars, as evidenced by the Receiver's periodic reports to the court. Since the court imposed a $43 million dollar disgorgement on Lauer, the Receiver's total bill is in the neighborhood of 150 per cent of the SEC's and the court's determination of the total unjust enrichment of Lauer.

THE COURT: Well, do you want to sell your home?

LAUER: No, sir.

THE COURT: All right.  [DE 215, at 72]

If more be needed, the court violated Lauer's rights by denying him the use of the appreciated value on his condominium, which had been purchased with untainted funds before any allegations of fraud, to defend himself.  DE 2240.  The court wrongfully chose to rely on inapplicable authority, *United States v. One Single Family Residence*, 933 F.2d 976, 982 (11th Cir. 1991), which involved forfeiture under a harsh narcotics statute rather than a freeze for possible disgorgement.  In fact, even under that statute, the court required proof that tainted funds had been deposited and intermingled in the account in question.  *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978), which *is* applicable, states:

> Disgorgement is remedial and not punitive.  The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.  Any further sum would constitute a penalty assessment.  In *SEC v. Manor Nursing Centers, Inc.*, . . . the court held that the trial court erred in ordering restitution of income earned on ill-gotten profits.

*Accord*, SEC v. *Manor Nursing Center, Inc.*, 458 F.2d 1082, 1104-05 (2d Cir. 1972).

## CONCLUSION

For the foregoing reasons, the judgment herein should be vacated and, if supported by the applicable law, the complaint should be dismissed.

Respectfully submitted,

Michael Lauer, Pro Se[16]
101 West End Avenue
New York, NY 10023
Tel: 347-503-9913

---

[16] This motion and the related motions for discovery and for a hearing were drafted primarily by David M. Dorsen, attorney for defendant Lauer in this case in the United States Court of Appeals for the Eleventh Circuit and in the United States Supreme Court. Mr. Dorsen will be filing shortly a motion to appear pro hac vice with respect to post-judgment motions.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this __19__ day of February, 2013, a true and correct copy of the foregoing has been sent via United States Mail to:

Christopher Martin, Esq.
Securities & Exchange Commission
801 Brickell Avenue
Suite 1800
Miami, FL 33131

David Bane, Esq.
Hunton & Williams
1111 Brickell Avenue
Suite 2500
Miami, FL 33131

Michael Lauer, Pro Se

**EXHIBITS TO DEFENDANT MICHAEL LAUER'S MOTION TO VACATE THE JUDGMENT HEREIN IN SECURITIES AND EXCHANGE COMMISSION v. MICHAEL LAUER, No. 03-80612-Civ-MARRA, S.D. FLA.**

A.  Michael Lauer Affidavit

B.  Excerpts from SEC Manual

C.  TRO Hearing, DE 20

D.  SEC Opp. to Motion to Transfer, DE 207

E.  Barton Sacher letter to SEC, August 11, 2003

F.  Sacher testimony, U.S. v. Lauer (pretrial hearing)

G.  Sacher testimony, U.S. v. Isaacson

H.  Laurence Isaacson testimony (excerpt), U.S. v. Isaacson

I.  John Mattimore testimony (excerpt), U.S. v. Lauer (pretrial hearing)

J.  Mattimore testimony (excerpt), U.S. v. Isaacson

K.  Milton Barbarosh testimony (excerpt), U.S. v. Lauer

L.  Material relating to Harold Schimkat

M.  Material relating to withheld evidence

N.  Affidavit of Anne Marie Eddy, dated June 11, 2003, in support of search warrant of the offices of the Lancer Group, 375 Park Avenue, Suite 2006, New York, New York